UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

# 05 11627 RCL

The Archdiocese of Milwaukee Supporting
Fund, On Behalf of Plaintiff and All Others
Similarly Situated,

Civil Action No.

Plaintiff,

vs.

INVESTORS FINANCIAL SERVICES
CORP., KEVIN J. SHEEHAN, MICHAEL F.
ROGERS, ROBERT D. MANCUSO,
EDMUND J. MARONEY, AND JOHN N.
SPINNEY, JR.,

JURY TRIAL DEMANDED

Defendants.

RECEIPT #
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE

## CLASS ACTION COMPLAINT FOR VIOLATIONS
## OF FEDERAL SECURITIES LAWS

Plaintiff, individually and on behalf of all other persons similarly situated, by

plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the

following based upon personal knowledge as to plaintiff and plaintiff's own acts, and

upon information and belief as to all other matters, based on, inter alia, the investigation

conducted by and through plaintiff's attorneys, which included, among other things, a

review of the defendants' press releases, Securities and Exchange Commission ("SEC")

filings by Investors Financial Services Corp. ("Investors Financial" or the "Company")

and media reports about the Company. Plaintiff believes that substantial evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for

discovery.

## NATURE OF THE CASE

1.     This is a securities class action on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired Investors Financial securities ("the "Class") during the period October 15, 2003 and through July 15, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Investors Financial operates as a bank holding company for Investors Bank & Trust Company that provides asset administration services for the financial services industry in the United States. The Company's services consist of securities lending, foreign exchange, cash management, performance measurement, institutional transfer agency, investment advisory services, lines of credit and brokerage, and transition management services.

3.     During the Class Period, defendants caused Investors Financial's shares to trade at artificially inflated levels, through the issuance of false and misleading financial statements and guidance. Defendants' statements served to convince investors that (i) the Company's financial statements were accurate, including results for revenues, growth and interest income and (ii) the Company had prudently built into their models and assumptions the impact of continued interest rate compression and flattening of the US interest rate yield curve.

4.     Defendants shocked the market in October of 2004, when they finally revealed the need to restate financial results over a three year period. On October 21, 2004, the price of Investors Financial stock plummeted, from its previous close of $43.70, for a loss of $7.20, losing 16.4% percent of its value, closing at $36.50, on volume of over 11 million shares. Later, the Company would reveal that during the period from 2001 to 2004, defendants had overstated net interest income by as much as $6.2 million.

5. Although the market reacted severely to the news of the restatement, the news served as a "red herring," to (i) distract the investment community from inconsistencies between uncorrected and actual net interest income results and (ii) aid in defendants' continued concealment of the impact of a flattening yield curve and rate spread compression on net interest income and on its 2005 guidance.

6. On July 15, 2005, defendants again shocked the market, announcing an unprecedented "reset" of their quarterly and 2005 guidance, to bring their guidance in line with the "new" realities of market-driven rates and rate spreads. However, despite defendants' assertions that an interest rate event peculiar to the second quarter served as the purported "trigger" for the Company's changed circumstances, investors now understood that the change in the Company's fortunes was a direct result of the dramatic flattening of the yield curve and contraction of rate spreads, evident from the very beginning of the Class Period.

7. On July 15, 2005, following the Company's shocking announcement, the price of the Company's stock plummeted, from its previous close of $41.52, for a loss of $7.47, losing 17.9% percent of its value, closing at $34.05, on unprecedented volume of over 22 million shares.

8. During the Class Period, defendants knew and concealed that:

(a) the impact of interest rate yield compression and the flattening of the interest rate curve was so dire that it could cut the Company's growth rate in half;

(b) the Company's financial controls were flawed and a series of accounting errors existed in the Company's financial statements;

(c) accounting errors in the Company's 2001-2004 financial statements required restatement, making it difficult for analysts and investors to accurately track the impact of the flattening yield curve and tightened yield spreads on net interest income, for affected and future quarters;

3

(d) the Company's 2005 guidance was unachievable, based on the flattened interest rate yield curve and yield spread compression, *events that had already transpired and were evident well before the end of the first quarter of 2005; and*

(e) defendants' "hedging activities" against negative impacts to the balance sheet using interest rate swaps were proving difficult to manage and were becoming ineffective.

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

10.    Venue is proper in this District pursuant to §27 of the 1934 Act. The corporate headquarters of Investors Financial are located in the District.

11.    In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

12.    Plaintiff The Archdiocese of Milwaukee Supporting Fund, as set forth in the accompanying certification, incorporated by reference herein, purchased shares of Investors Financial stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

13.    Defendant Investors Financial operates as a bank holding company for Investors Bank & Trust Company that provides asset administration services for the financial services industry in the United States. The company offers core and value-added services to financial asset managers, such as mutual fund complexes, investment advisors, family offices, banks and insurance companies. Its core services include middle office outsourcing, global custody, multicurrency accounting, and fund administration.

4

The value-added services consist of securities lending, foreign exchange, cash management, performance measurement, institutional transfer agency, investment advisory services, lines of credit and brokerage, and transition management services. The company provides its services from offices in Boston, New York, Sacramento, Toronto, Dublin, and the Cayman Islands. Investors Financial Services Corp. was organized as a Delaware corporation in 1995 and its principal administrative offices, where its day to day affairs are managed are located at 200 Clarendon Street, Boston, Massachusetts.

14.     Defendant Kevin J. Sheehan ("Sheehan") was Chairman and CEO for the Company. During the Class Period, defendant Sheehan sold 262,690 shares of his Investors Financial stock, for proceeds of $12.1 million.

15.     Defendant Michael F. Rogers ("Rogers") was President of the Company during the Class Period. During the Class Period, defendant Rogers sold 49,171 shares of his Investors Financial stock, for proceeds of $1.8 million.

16.     Defendant John N. Spinney Jr. ("Spinney") was Senior Vice President and CFO of the Company during the Class Period. During the Class Period, defendant Spinney sold 4,869 shares of his Investors Financial stock, for proceeds of $189,543.

17.     Defendant Robert D. Mancuso ("Mancuso") was Senior Vice President of the Company during the Class Period. During the Class Period, defendant Mancuso sold 421,040 shares of his Investors Financial stock, for proceeds of $17.6 million.

18.     Defendant Edmund J. Maroney ("Maroney") was Senior Vice President of the Company during the Class Period. During the Class Period, defendant Maroney sold 191,215 shares of his Investors Financial stock, for proceeds of $7.4 million.

19.     The individuals named as defendants in ¶¶14-18 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company and its business segments, possessed the power and authority to control the contents of Investors Financial quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the

5

market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER

20. In addition to the above-described involvement, each Individual Defendant had knowledge of Investors Financial's problems. Each defendant was motivated to conceal such problems. Defendant Spinney, as CFO, provided for financial reporting and communications with the market. Communications with the market, including conference calls, as well as internal reports, showing Investors Financial's forecasted and actual growth were prepared under their direction. Defendants Sheehan and Rogers, having served as CEO and President, respectively, also provided for communications with the market, including conference calls, as well as reports on Company operations, financing and press releases issued by the Company. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. Each Individual Defendant also owed a duty to the Company and its shareholders not to trade on inside information.

6

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

21.     Each defendant is liable for (a) making false statements, *or* (b) failing to disclose adverse facts known to him about Investors Financial. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Investors Financial publicly traded securities was a success, as it (a) deceived the investing public regarding Investors Financial's prospects and business; (b) artificially inflated the prices of Investors Financial's publicly traded securities; (c) allowed defendants to shift and "front-load" bonus accruals ahead of "bad news"; (d) allowed defendants to sell 928,985 shares of Investors Financial stock at inflated prices for proceeds of $39.3 million; and (e) caused plaintiff and other members of the Class to purchase Investors Financial's publicly traded securities at inflated prices.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS
## MADE DURING THE CLASS PERIOD

22.     On October 15, 2003, defendants conducted their 3Q 2003 conference call and earnings report. Defendants stated in part:

> Kevin Sheehan  - Investors Financial Services Corp. - Chairman and CEO
>
> Thanks. I will begin by reviewing some of the key points from our third quarter, and then John Spinney will discuss our financial results in more detail. Investors Financial Services recorded extremely impressive results for the third quarter of 2003. Diluted operating EPS for the quarter came in at 40 cents, up 25 percent on a linked-quarter basis; up 14 cents or 54 percent from quarter three of last year.
>
> ***
>
> To summarize, again, we delivered excellent results for our investors during the third quarter of 2003. These results were driven by our ability to sell new and existing clients, our continued focus on prudent expense management, and solid equity market performance. I will now turn the call over to John Spinney, who will review the quarter's financial results in more detail.

John Spinney - Investors Financial Services Corp. - CFO and SVP

Good morning. As Kevin mentioned, third-quarter diluted operating EPS came in at 40 cents a share, up 8 cents or 25 percent on a linked-quarter basis. Our diluted EPS of 40 cents represents a 54 percent increase over our third-quarter 2002 diluted EPS of 26 cents.

On year-over-year basis our net operating revenue increased 9 percent, compared to a 5 percent decrease in operating expenses, exhibiting the earnings growth potential and inherent leverage in our model. On a linked-quarter basis, revenue decreased 2 percent, versus a 10 percent decrease in our cost structure.

Each of our revenue sources represents a component of our compensation for providing asset processing services to our clients. Net interest income is one of these components and results from investing the residual cash of our asset processing clients, who use our balance sheet as a convenient way to invest their excess cash.

We generate asset servicing fees based on assets under administration, the number of transactions generated by our clients, and managed risk (ph) income. These three revenue components create a natural hedge for our business model, which has been one of the factors enabling us to succeed in a variety of market environments.

***The breakdown of our revenue stream for the third quarter of 2003 was 55 percent asset based, 15 percent transaction based, and 30 percent net interest income based, continuing the shift that we have witnessed recently to more of a contribution from asset-based fees as opposed to net interest income.***

I will now discuss the significant income and expense components in more detail. Core asset servicing fees increased 13 percent year-over-year and 5 percent linked quarter, due to favorable market conditions, the addition of new clients such as BGI Canada, and the ability of our clients to continue to develop and sell new products.

Transaction-driven income, in which we include our ancillary services such as securities lending, foreign exchange fees, and cash management fees, increased 12 percent year-over-year, driven by strong increases in FX and cash management fees. On a linked-quarter basis, transaction income decreased 10 percent, primarily as a result of linked-quarter decrease in our FX and securities lending businesses.

Regarding FX, despite beating our expectations for the quarter and being up 19 percent on a year-over-year basis, lower volatility and volumes in the currencies traded by our clients during the third quarter compared to the second quarter caused a linked-quarter decline in FX revenue.

Securities lending decreased 12 percent year-over-year, due to a smaller lending book, and declined linked quarter primarily due to the end of the international dividend season. ***Net interest income was flat on a year-over-year basis and decreased 8 percent linked quarter, primarily due to increased prepayments in our mortgage-backed securities portfolio***

8

*through most of the summer. We expect lower prepayment activity in the fourth quarter.*

*Also we recorded an additional interest expense in the third quarter of approximately 1 million related to the ineffectiveness of our swap portfolio in accordance with FAS 133. The 1 million will flow back into net interest income over the remaining life of the swaps. Absent a further cut in the Fed funds rate, we expect little to no impact going forward.*

*We continue to maintain strong net interest margin spread as a result of continued healthy levels of client funding. The linked-quarter net interest margin decreased by 27 basis points to 1.81 percent, while the linked-quarter interest rate spread contracted by 26 basis points to 1.71 percent. Compared to the same quarter of last year, net interest income was flat, primarily as a result of a larger balance sheet offsetting a lower interest rate environment.*

\*\*\*

We continue to be cautiously optimistic about the capital markets and interest rate environment. As such we are increasing our GAAP EPS guidance to a range of $1.30 to $1.32 a share for the year ended December 31, 2003; and we're revising our diluted operating earnings-per-share target to a range of $1.41 to $1.43. *We remain comfortable with our long-term growth rate of 25 percent in EPS.* I would now like to open up the call to your questions.

\*\*\*

Jon Arfstrom  - RBC Capital Markets - Analyst

And then in terms of your guidance, any change in the typical assumptions that you give for a flattish market?

John Spinney  - Investors Financial Services Corp. - CFO and SVP

In terms of rate environment?

Jon Arfstrom  - RBC Capital Markets - Analyst

Rate environment and equity market levels.

John Spinney  - Investors Financial Services Corp. - CFO and SVP

We have no equity market upside built into our estimates. We never do that. In terms of interest rate environment, in terms of the rest of the year, obviously we don't think debt funds is going anywhere from where it is today. And the ten-year will probably trade somewhere, we hope, within the 4 percent range.

Jon Arfstrom  - RBC Capital Markets - Analyst

*Okay. And you're still comfortable with the 25 percent growth rate on that $1.40 to $1.43?*

John Spinney - Investors Financial Services Corp. - CFO and SVP

*Currently we are. Yes, Jon.*

\*\*\*

Casey Ambrich - Millennium Partners - Analyst

One concern that some investors have had is regarding the potential NBS mark that the company might incur with the ten-year moving up here; the yields anyway. *I was wondering if you could talk a little bit about your swaps on the liability side of the balance sheet? And how that works to hedge that?*

John Spinney - Investors Financial Services Corp. - CFO and SVP

Certainly from the ten-year perspective on the asset side of the balance sheet, the mark on that is positive still. It has never run into a negative mark to market. And we're very comfortable with that, and it doesn't have an impact on our regulatory capital if it did.

Secondly on the swap portfolio, we use swaps basically against some of our deposit liability products to extend the maturities and fix those against fixed-rate assets. That really helps us to keep the duration up on the liabilities and matched with the asset duration.

\*\*\*

Meryl Witmer - Eagle Capital Partners - Analyst

*This is actually Meryl Witmer. Excuse me for being a little dense, but I am just looking at the comp and benefit line, which I believe went from almost 51 million in the second quarter to 42.5 million this quarter.* Is that like a lower bonus accrual? If you didn't let anybody go, is that a lower bonus accrual? Did people leave? Did you have some consultants you are now paying? What caused that?

John Spinney - Investors Financial Services Corp. - CFO and SVP

Some of that is bonus accrual; and some of that is taking the efficiencies in terms of headcount reductions in the business.

Meryl Witmer - Eagle Capital Partners - Analyst

So there were headcount reductions?

John Spinney - Investors Financial Services Corp. - CFO and SVP

As a result of not replacing positions for people that left the firm, where we had efficiencies in the technology that allowed us not to replace positions.

Meryl Witmer  - Eagle Capital Partners - Analyst

I see; so you let some people run off and the technology took its place.

John Spinney  - Investors Financial Services Corp. - CFO and SVP

Exactly. It just goes hand-in-hand with depreciation expense being up because we put the technology in place.

Meryl Witmer  - Eagle Capital Partners - Analyst

I see. That ties in nicely. Now the lower bonus accruals, is that a foreshadowing of things not great to come?

John Spinney  - Investors Financial Services Corp. - CFO and SVP

I think part of that, and we talked about it on the second-quarter call, was just a tremendous second quarter for us. *Having the ability to accrue bonuses against hiring earnings in the second quarter; that allowed us to take lower bonus accruals going forward.* And I think giving the REIT charge we took, we're not going to reach the potential of maximizing bonuses. So our accruals are going to be lower just as a result of that.

Meryl Witmer  - Eagle Capital Partners - Analyst

*So did you front-end load the bonuses into the second quarter?*

John Spinney  - Investors Financial Services Corp. - CFO and SVP

*We accrue bonuses when we have the room (ph) in the EPS that marries up to it. So if the performance is there, we will accrue bonuses up against the performance.*

Meryl Witmer  - Eagle Capital Partners - Analyst

*Although this quarter is very good also.*

John Spinney  - Investors Financial Services Corp. - CFO and SVP

It is. But as we went into the third quarter, we looked at last year and said, last year's third quarter was not the best quarter in terms of transactional revenue; and the markets really took a sharp downturn; *so we were not about to get behind the eight-ball on bonus accruals, and have to make up for it in the summertime.*

\*\*\*

Casey Ambrich  - Millennium Partners - Analyst

One last quick question. Can you give some color on how the margin changed by month? I will start with that.

John Spinney - Investors Financial Services Corp. - CFO and SVP

*The net interest margin? By month I don't think it's really that important to go through in detail. But if you look at the decline sequentially, the biggest contributor to that was obviously the prepayments on the mortgage-backed portfolio, that caused earnings to go down on the net interest income line.*

I actually added back the effect of that prepayment; and it probably gets us back to somewhere like 195, 196 from a margin perspective. So I clearly isolated the prepayments on the mortgage-backed portfolio. But we have those slow down now, and we are anticipating to have a fourth quarter of very slow prepayments relative to the third quarter.

\*\*\*

23.     Defendants' conference call of October 15, 2003, was false and misleading for the following reasons. First, defendants' quarterly results, as well as previous financial statements for the years 2001 through 2004 had cumulatively overstated $6.2 million in net interest income. Until defendants had examined the extent of their accounting errors causing the cumulative overstatement, they were in no position to provide analysts with proper guidance for future quarterly revenues and growth rates.

24.     Moreover, defendants knew that net interest income was flat on a year over year basis and had declined 8% during the quarter. Any restatement impacting this measure would deepen the reported decline and would again place defendants "behind the eight ball," as a multi-year restatement would undermine defendants' justification for "front-loaded" bonus accruals during the second quarter. Defendants thus demonstrated creativity to assure their bonus opportunities, without alarming investors with restatement of its erroneous, over-reported year over year net interest income.

25.     Finally, defendants wanted to reassure investors that they had isolated the reasons for decline in net interest income, as directly related to mortgage prepayments. A multi-year restatement of defendants' erroneous over-reported net interest income would have overshadowed its attempts to reassure the investment community and the

12

confidence they sought in their relationship with investors, that mortgage prepayments were to slow going into the fourth quarter. Defendant Spinney also sought confidence in the Company's ability to maintain its long-term growth rate of 25%, something he could not easily obtain, while faced with questions about a broad-based restatement impacting an already negative income measure, while attempting to justify front-loaded bonus accruals. Worse, investor concerns about worsened performance on the net interest income line of defendants' financials could have increased investor doubt concerning the ability of the Company to maintain positive performance on that component of its overall business, including the ability of the Company to maintain a 25% long-term growth rate, going into a tightening interest rate environment.

26.    On July 14, 2004, defendants conducted their 2Q 2004 conference call and earnings report. Defendants stated in part:

Kevin Sheehan - Investors Financial Services Corp. - Chairman & CEO

Thanks, Joe. I will begin by reviewing some of the key points from the second quarter and then John Spinney will discuss our financial results in more detail.

Investors Financial Services recorded extremely impressive results for the second quarter of 2004. Diluted EPS for the quarter came in at 52 cents, up 63 percent from the second quarter of 2003 diluted operating EPS. Our total asset servicing revenue grew by a strong 30 percent year-over-year, driven by a 27 percent increase in core service revenue and a 39 percent increase in ancillary services fees.

As of June 30, we processed approximately 1.2 trillion of assets for our clients, up 72 billion, or 6 percent, from March 31, 2004, and up 306 billion, or 34 percent, from June 30, 2003. We converted over 2.4 billion from new clients such as Matlin Patterson in the U.S. and Marathon Asset Management in our Dublin office.

In addition, we grew our institutional custody business by signing several new advisory clients and family offices in the second quarter, including a new $2 billion outsourcing relationship with Manning & Napier, which we expect to convert during the third quarter. We also won approximately 8.5 billion in assets from numerous existing clients during the quarter, including BGI, Eaton Vance, Goldman Sachs, MassMutual and Vega.

Client fund flows, and to a lesser extent, market appreciation, accounted for approximately 61 billion of the 72 billion increase during the quarter.

Directly related to the growth of our processing business is the growth of our balance sheet, which on an average basis grew 2 billion, or 25 percent, from last year's second quarter to this year's second quarter, as a result of strong client funding.

The current status of our new business pipeline remains medium. We continue to maintain a positive outlook on our sales pipeline as we are seeing strong levels of RFP activity and increased interest by our clients in our service offerings.

To summarize, we again delivered outstanding results for our investors during the second quarter of 2004. These results were driven by our ability to sell to new and existing clients, strong client fund flows and a favorable interest rate environment.

\*\*\*

Carla Cooper - Robert W. Baird - Analyst

I had a question, I guess also about your guidance. Just if I think about your new guidance, even the top end of the range implies that the quarters coming up in the back half of the year are going to be a little weaker than certainly what we saw this quarter. And I'm just wondering sort of philosophically, what sort of lens -- is there anything sort of conservatism baked in there, or what kind of -- I don't think you've ever had a year where the quarters have sort of been flat.

John Spinney

*I think on the guidance front, Carla, we brought it up to a point where we felt comfortable achieving those numbers. And giving ourselves some flexibility, as we've historically always done, we start with a 25 percent growth rate at the beginning of the year and try to outperform it quarter after quarter and try to guide you up, and try not to get ahead of ourselves.*

\*\*\*

Jamie Lester - SAB Capital Management - Analyst

I'm with you; I'm just trying to see -- you guys, obviously, had net income of what, 35 million? But equity was down 10 million in the quarter. So, I guess, what happened there?

John Spinney

We had net income and then we had the marked to market on the portfolio, and the offset for the marked to market in the swaps runs through other OCI.

Jamie Lester - SAB Capital Management - Analyst

So there's another 20 million of swap?

John Spinney

Roughly about 20 million; yes.

Jamie Lester - SAB Capital Management - Analyst

And then, where do you see, or how do you stand on the leverage side now? It looks like ending assets (indiscernible) interest-bearing assets of (indiscernible) I guess you look at total assets. I guess just walk us through where you are on the leverage side; it seems like you're kind of getting -- creeping towards the top-end.

John Spinney

We're at like the 5 58 (ph), I think, at the end of the quarter. And I think we will trend a little bit higher towards the end of the year; so that's still under 6 percent.

Jamie Lester - SAB Capital Management - Analyst

It looks like, if you look at a spread, non-interest income to non-interest expense, it seems to be kind of trending up. Should we look at that growth rate -- whatever it is, 5 million a quarter, plus or minus -- as continuing through the year? How do you think about that, or is that even a useful metric to look at?

John Spinney

I don't necessarily use that metric per se, but I think you could probably intuitively say that would go up.

Jamie Lester - SAB Capital Management - Analyst

What was the -- you mentioned the adjusted spread. If you take out the prepay penalties on the liability side for the quarter, what were the --?

John Spinney

The margin would have been 203 and the spread would have been 196.

Jamie Lester - SAB Capital Management - Analyst

What would the spread have been for the first quarter on that same basis?

John Spinney

I don't have that handy; it's probably about 10 basis points higher (multiple speakers) 13 and 206, probably.

Jamie Lester - SAB Capital Management - Analyst

*So you did see some compression in the quarter?*

John Spinney

*Slightly.*

\*\*\*

27.     Defendants' conference call of July 14, 2004 was false and misleading for the following reasons. First, defendants' quarterly results, as well as previous financial statements for the years 2001 through 2004 had cumulatively overstated $6.2 million in net interest income. Until defendants had examined the extent of their accounting errors causing the cumulative overstatement, they were in no position to provide analysts with proper guidance for future quarterly revenues and growth rates.

28.     Moreover, the interest rate yield curve for July 2004, shown in the following graphical illustration[1] had changed, in that it had flattened versus previous months, indicating the potential for yield spread compression. This fact pointed to the need for careful and prudent financial management on the part of defendants and on a quarter to quarter basis, to accurately predict the Company's continued financial progress:

---

[1] This and other graphical illustrations of monthly interest rate yield curves included in this Complaint are reproduced from a plot of yields for various maturities of U.S. Treasury bills and bonds using the SmartMoney.com "Living Yield Curve" appelet, found at http://www.smartmoney.com/onebond/index.cfm?story=yieldcurve, last accessed on July 17, 2005.



29.     However, defendant Spinney's reply to analyst questions, stating that defendants "would always try to 'guide up'" and "try not to get ahead of ourselves" in issuing guidance was false and misleading. Defendant Spinney again pointed to a 25% growth rate, as he did in October of 2003, as if it were an axiom investors could rely upon. In fact, Spinney knew that the Company had entered an uncertain interest rate environment, one that was proving difficult to manage given evidence that equity on the balance sheet was down 10 million, with defendants' hedging activities involving interest rate swaps taking a hit during the quarter.

30.     On October 21, 2004, the Company issued press release entitled, "INVESTORS FINANCIAL SERVICES CORP. EXPECTS TO REPORT FULLY DILUTED EPS OF $0.51 TO $0.53 FOR Q3 2004; EVALUATING FAS 91 CHANGE BUT EXPECTS NO SIGNIFICANT IMPACT FOR 2004, 2003 OR 2002 REPORTED RESULTS - THE COMPANY REAFFIRMS EXPECTED FULLY DILUTED EPS OF $2.00 TO $2.05 FOR 2004". The press release stated in part:

17

*BOSTON, MA, October 21, 2004 - Investors Financial Services Corp. (Nasdaq: IFIN) announced today that it expects to report fully diluted earnings per share of $0.51 to $0.53 for the quarter ended September 30, 2004. The Company also expects to report fully diluted earnings per share of $1.55 to $1.57 for the nine months ended September 30, 2004. The Company is releasing a preliminary earnings estimate today as it finalizes the impact of an expected change in application of Financial Accounting Standard No. 91 ("FAS 91"). This change is not expected to have a material impact on earnings for 2004.*

In the third quarter of 2004 the Company's revenue from core services such as global custody, multicurrency accounting and mutual fund administration rose to $76.6 million, up 17% from $65.3 million in the same period in the prior year. Revenue from ancillary services including foreign exchange, securities lending, cash management, and investment advisory services increased to $23.5 million for the quarter, up 21% from $19.5 million in the third quarter of 2003.

Assets processed for clients totaled approximately $1,243 billion at September 30, 2004 compared to $1,203 billion at June 30, 2004 and $956 billion at September 30, 2003.

Kevin J. Sheehan, Chairman and Chief Executive Officer, stated, "Our business trends remain strong, as both core services and ancillary services continued to show impressive growth in the third quarter. We are pleased with the continued validation of our unwavering commitment to superior client service. We continue to expect to achieve fully diluted earnings per share of $2.00 to $2.05 for 2004."

*Commenting on the change in the application of FAS 91, the Company noted that it has historically applied a prospective method under FAS 91 to determine the amortization of premiums and accretion of discounts on applicable investment securities.*

*The Company has determined that it is appropriate to change to applying a retrospective method on applicable investment securities. The Company does not believe that the impact of this change will be significant in the years 2004, 2003 and 2002.*

*The impact on 2001 reported earnings per share could be higher due to changes in interest rates that occurred in that year. The Company is working closely with its audit committee in evaluating the effects of this change in application of FAS 91, and expects to complete this evaluation by November 15, 2004.*

Today the Company also announced that its Board of Directors declared a cash dividend of $0.0175 per share on its common stock. The dividend is payable November 15, 2004 to stockholders of record as of October 29, 2004.

31.     Then, on October 21, 2004, after the close of the markets, defendants conducted a conference call providing details regarding their guidance announcement, stating in part:

Jon Arfstrom  - RBC Capital Markets - Analyst

*Interesting release. Question on the accounting change, of course. Is it something that the auditors decided needed to be changed? When did it arise and can you just talk about what needs to be done before you can officially put out the number with the full release?*

Kevin Sheehan  - Investors Financial Services Corp. - Chairman, CEO

*Sure. I think clearly everybody is looking at income recognition in this particular area. And we really have re-evaluated our approach. It is an extremely complex and technical area and we wanted to really essentially take a real hard look at what we were doing and make sure that we were using the right methodology. We have gone through an analysis of our portfolio and looked at it under both methodologies. It is a very time consuming and detailed exercise. We have involved both the audit committee and the external auditors in reviewing the results. And I think it will take us probably until the November 15th time frame to complete that exercise and process all the changes to the financials if they are necessary.*

Jon Arfstrom  - RBC Capital Markets - Analyst

*Is it as simple as -- is it conservatism? And if one results in a lower number that's what you will choose or how do you differentiate between which method is the best to use?*

Kevin Sheehan  - Investors Financial Services Corp. - Chairman, CEO

I think they are just really 2 fundamentally different methodologies and I think we have come to the conclusion in conjunction with our advisors that the retrospective method is the more correct method and more consistent with the requirements of GAAP. And we just have to change to it.

Jon Arfstrom  - RBC Capital Markets - Analyst

*Okay. Another question, and I'm assuming that it is a net interest income in fact which is why the number isn't disclosed in the release?*

Kevin Sheehan  - Investors Financial Services Corp. - Chairman, CEO

*Yes.*

***

Kyle Simonairro  - T Rowe Price - Analyst

*Do you have an estimate of a range of your net interest margin during the quarter?*

John Spinney Jr.  - Investors Financial Services Corp. - CFO

*No.*

32.     On October 22, 2004, on the next trading day following the shocking after-hours news and conference call, the price of Investors Financial stock plummeted, from its previous close of $43.70, for a loss of $7.20, losing 16.4% percent of its value, closing at $36.50, on volume of over 11 million shares.

33.     On November 15, 2004, defendants conducted their 3Q 2004 conference call and earnings report. Defendants stated in part:

Kevin Sheehan  - Investors Financial Services Corp. - Chairman, CEO

I will begin by reviewing some of the key points from our restatement process which we successfully completed and then turn to our third-quarter results. John Spinney will finish with the detailed discussion of our financial results.

*Senior management, the audit committee of the board, our internal auditors and our independent registered public accountants have completed a comprehensive review of the amortization of premiums and accretion of discounts on all of our investment securities. We have examined the accounting for and evaluation of each and every investment security in our portfolio from December 31, 2000 to September 30, 2004. We are now amortizing premiums and accreting discounts in the affected securities in accordance with generally accepted accounting principals, including FAS 91. Again, we're making this statement in relation to all the securities and security types in our portfolio.*

Today, we filed an amended annual report on form 10-KA for the year ended December 31, 2003. Amended quarterly reports on form 10-K -- 10-QA for the first two quarters of 2004 and our quarterly report on form 10-Q for the quarter ended September 30, 2004. We initially reported on October 21 that the impact of this change was not significant for the years 2002 through 2004, but *it resulted in a larger reduction in 2001 reported earnings per share due to the rapidly changing interest rate environment during that period. The company's cumulative restatement since inception, resulting from the accounting review was a reduction of 6.2 million in net interest income. The opening adjustment to retained earnings as of January 1, 2001, was an increase of .9 million.*

20

*2001's total net interest income adjustment was a reduction of 8.5 million, resulting in a decrease in diluted earning per share of 8 cents. The net interest income adjustment for 2002 was a reduction of 2.3 million or 2 cents per share. For 2003, the adjustment was an increase of $1 million or 1 cent per share. For 2004, the adjustment was an increase of 2.7 million or 2 cents per share. There was no significant change to our capital or leverage ratios for any restated quarter.* A detailed presentation of the changes arising from the restatement can be found in the reports we filed today with the SEC. In addition, this restatement did not impact the accounting for our SBA portfolio.

We did, however, correct a clerical error in the contractual maturity table in the MD&A session of our 2003 10-K. We previously reported federal agency securities having a yield of 3.16% in the over-10-year catagory and 2.76% in the 5- to 10-year category. These yields should have been 2.71% and 2.28% respectively, consistent with the income we recognize in our financial statements.

To summarize, we undertook a comprehensive effort to audit, recalculate and correct our financial statements and our SEC filings. We accomplished these tasks in a short period of time thanks to the tireless effort of our dedicated employees.

We will now turn to a review of our financial results. For the quarter ended September 30, 2004, we reported fully diluted earnings per share of 53 cents, up 29% from the third quarter of 2003's diluted EPS of 41 cents. For the 9 months ended September 30, 2004, net operating revenue rose 27% to 456 million while diluted operating earnings per share rose 52% and net operating income rose 56%. Our five-year compound annual growth rate and diluted earnings per share through September 30 remains an impressive 43%.

As we disclosed in our previous call in October, core business trends remain positive. Our total asset servicing fees for the third quarter grew impressively year-over-year due to three factors: Wins from new clients and existing clients, the ability of our clients to develop and sell product which generates fund flows that have a direct positive impact on our business, and higher asset values compared to a year-ago period. Also, as previously disclosed, our assets process continued to grow impressively. As of September 30, we processed approximately 1.2 trillion of assets for our clients, up 40 billion or 3% from June 30, 2004 and up 287 billion or 30% from September 30, 2003.

\*\*\*

Jon Arfstrom  - RBC Capital Markets - Analyst

*Okay. And then I guess the last question is just on your interest rate positioning. Has anything that the Fed has done so far and the changes in the slope of the curve surprised you or has it all been consistent with your expectations for a flattening curve?*

21