UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, On Behalf of Plaintiff and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>INVESTORS FINANCIAL SERVICES CORP., et al.,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 05-11627-RCL **(Consolidated)** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED COMPLAINT IN ITS ENTIRETY**

BINGHAM McCUTCHEN LLP

Jordan D. Hershman, Esq. (BBO #553709)
Jason D. Frank, Esq. (BBO #634985)
James P. Lucking, Esq. (BBO #650588)
William R. Harb, Esq. (BBO #657270)
150 Federal Street
Boston, MA 02110
Tel: (617) 951-8000

Attorneys for Defendants Investors
Financial Services Corp., Kevin J. Sheehan,
Michael F. Rogers, John N. Spinney, Jr.,
Karen C. Keenan, Robert D. Mancuso,
Edmund J. Maroney and John E. Henry

## TABLE OF CONTENTS

Introduction ..................................................................................................... 1

Preliminary Statement ...................................................................................... 1

Argument .......................................................................................................... 8

I.      PLAINTIFFS FAIL TO PLEAD FRAUD WITH PARTICULARITY ........................... 8

II.     PLAINTIFFS FAIL TO STATE ANY FEDERAL
securities fraud claims based on the
forward-looking statements they challenge ................................................. 11

      A.      PLAINTIFFS' FORWARD-LOOKING STATEMENT
CLAIMS BASED ON THE COMPANY'S 2005 EARNINGS
GUIDANCE MUST BE DISMISSED UNDER RULE 12(B)(6) ...................... 12

            1.      The Challenged Forward-Looking
Statement Is Immune From Liability
Under The PSLRA's Safe-Harbor Provision ........................................... 13

                  a.      Forward-Looking Statements
Accompanied By Meaningful Cautionary Language
Cannot Give Rise To Liability Under Section 10(b) .................. 13

                  b.      The Forward-Looking Statement
Challenged Was Accompanied By
Meaningful Cautionary Language Concerning
The Risks Associated With Fluctuating Interest Rates ............... 14

            2.      Section 10(b) Claims Cannot Be Based On An
Alleged Failure Accurately To Predict Interest Rates ........................... 16

      B.      Plaintiffs' Forward-Looking Statement Claims
Based On The Company's 2005 Earnings Guidance
Must Be Dismissed Under The PSLRA And Rule 9(b)
Because Plaintiffs Have Failed Adequately To Plead Scienter .......................... 17

            1.      Plaintiffs Must Plead Specific Facts Giving
Rise To A Strong Inference Of Actual Knowledge ................................. 17

            2.      Plaintiffs Have Failed To Plead Specific Facts
Giving Rise To A Strong Inference Of Actual Knowledge ..................... 18

                  a.      Plaintiffs Fail To Plead Any Specific Facts
Supporting A Strong Inference That Any Forward-Looking
Statement Challenged Was Knowingly False When Made ......... 19

                  b.      Plaintiffs' Motive Allegations
With Respect to Their 2005 Guidance
Claims Do Not Support A Strong Inference Of Scienter ............. 22

           (1)    Plaintiffs' Allegations Concerning
Defendants' Trading Do Not Give
Rise To A Strong Inference Of Scienter ......................... 23

           (2)    Plaintiffs' Allegations Concerning
Defendants' Bonus Plans Do Not Give
Rise To A Strong Inference Of Scienter ......................... 31

    C.    Plaintiffs' Claims Based On All Other Forward-Looking Statements
Must Be  Dismissed Under Rule 12(b)(6), The PSLRA, And Rule 9(b) ............ 32

III.    Plaintiffs fail to state any Federal
securities fraud claims based on the
historical financial results that they challenge ................................................................ 35

    A.    Plaintiffs' Financial Disclosure Claims Must
Be Dismissed Under The PSLRA And Rule 9(b) ................................................ 36

        1.    Plaintiffs Fail To Plead Any Specific
Facts Supporting A Strong Inference That Any
Financial Disclosure Was Knowingly False When Made ...................... 36

           a.    IFIN's Restatement Does Not
Support Any Inference Of Scienter .............................................. 37

           b.    Plaintiffs' "Status" And "Access"
Allegations Cannot Support Any Inference Of Scienter ............. 40

           c.    Plaintiffs' Motive Allegations Do
Not Support Any Inference Of Scienter ...................................... 45

        2.    Plaintiffs Fail To Allege Specific Facts
Regarding The Company's SBA Securities
That Render Any Financial Disclosure False Or Misleading ................. 47

           a.    Plaintiffs Fail To Plead Specific Facts
Showing That Any Disclosure Concerning
The Company's SBA Portfolio Was False ................................. 48

           b.    Plaintiffs Fail To Plead Specific Facts Showing
That A Simple Clerical Error Was Evidence Of Any Fraud ....... 53

           c.    Plaintiffs Fail To Plead Specific Facts Showing That The
Company's SBA Securities Were Permanently Impaired .......... 54

        3.    Plaintiffs Fail To Plead Scienter
Respecting Their SBA Security-Related Allegations ........................ 59

        4.    Plaintiff' Fail To Plead Loss Causation
Respecting Their SBA Security-Related Allegations ........................ ...59

    B.    Plaintiffs' Financial Disclosure Claims
Must Be Dismissed Under Rule 12(b)(6) ......................................................... 60

1.  The Vast Majority Of The Company's
    Historical Financial Results Challenged Are
    Not Actionable Because They Were Not Materially Inaccurate ............. 60

2.  The Company Disclosed The Allegedly Omitted
    Information Respecting The Risk Of Prepayments ................................. 62

IV.  PLAINTIFFS' SECTION 20(A)
     "CONTROL PERSON" CLAIMS MUST BE
     DISMISSED BECAUSE PLAINTIFFS HAVE FAILED
     TO ALLEGE A PRIMARY VIOLATION OF THE SECURITIES LAWS................... 63

CONCLUSION......................................................................................................... 64

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

In re 1993 Corning Sec. Litig., No. 93 Civ. 7015, 1996 U.S. Dist. LEXIS 6601
    (S.D.N.Y. May 15, 1996)..........................................................................45

ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336 (5th Cir. 2002) ......................9

Abrams v. Baker Hughes, Inc., 292 F.3d 424 (5th Cir. 2002)...........................................36

Acito v. Imcera Group, Inc., 47 F.3d 47 (2d Cir. 1995) ....................................................32

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999)..............................18, 26, 30

Aldridge v. A.T. Cross Corp., 284 F.3d 72 (1st Cir. 2002) ...........................................3, 33

In re Allscripts, Inc. Sec. Litig., No. 00 C 6796, 2001 WL 743411
    (N.D. Ill. June 29, 2001) ..........................................................................61

Arazie v. Mullane, 2 F.3d 1456 (7th Cir. 1993) ................................................................44

Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F. Supp. 505, 514
    (S.D.N.Y 1990)..........................................................................................46

Baron v. Smith, 380 F.3d 49 (1st Cir. 2004) .....................................................................13

In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43 (D. Mass. 1998)..................... passim

In re CDNOW, Inc. Sec. Litig., 138 F. Supp. 2d 624 (E.D. Pa. 2001).............................45

In re Cabletron Sys., Inc., 311 F.3d 11 (1st Cir. 2002)...............................................37, 42

In re Capstead Mortgage Corp. Sec. Litig., 258 F. Supp. 2d 533 (N.D. Tex. 2003) . passim

Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235 (D. Mass. 2001).... passim

iii

In re Century Bus. Serv. Secs. Litig., No. 1:99CV02200, 2002 WL 32254513
  (N.D. Ohio June 27, 2002).................................................................................29

Chan v. Orthologic Corp., No. 96-1514, 1998 WL 1018624
  (D. Ariz. Feb. 5, 1998)..................................................................................10

Chill v. Gen. Elec., Co., 101 F.3d 263 (2d Cir. 1996) ........................................38

Coates v. Heartland Wireless Commc'ns, Inc., 26 F. Supp. 2d 910
  (N.D. Tex. 1998)............................................................................................28

Coates v. Heartland Wireless Commc'ns, Inc., 55 F. Supp. 2d 628
  (N.D. Tex. 1999)............................................................................................55

Colby v. Hologic, Inc., 817 F. Supp. 204 (D. Mass 1999) ................................64

In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662 (E.D. Mich. 1999)...........26

In re Cytyc Corp. Sec. Litig., No. 02-12399, 2005 WL 3801468
  (D. Mass. Mar. 2, 2005)................................................................................13

D.E.&J Ltd. P'ship v. Conway, 284 F. Supp. 2d 719 (E.D. Mich. 2003)............................3

Davis v. SPSS, Inc., 385 F. Supp. 2d 697 (N.D. Ill. 2005)..........................................38, 61

Denny v. Barber, 576 F.2d 465 (2d Cir. 1978) .................................................16

Dileo v. Ernst & Young, 901 F.2d 624 (7th Cir. 1990) .....................................55

Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005).....................................59, 60

In re E.Spire Commc'ns, Inc. Sec. Litig., 127 F. Supp. 2d 734 (D. Md. 2001) ....27, 29, 40

In re First Union Corp. Sec. Litig., No. Civ. 3:99CV237-H, 2006 WL 163616
  (W.D.N.C. Jan. 20, 2006) .........................................................................25, 27, 60

In re FVC.com Sec. Litig., 136 F. Supp. 2d 1031 (N.D. Cal. 2000) ................................30

Fitzer v. Sec. Dynamics Techs., 119 F. Supp. 2d 12 (D. Mass. 2000) .......................23, 42

In re Galileo Corp., S'holders Litig., 127 F. Supp. 2d 251 (D. Mass 2001).............. passim

In re Geopharma, Inc. Sec. Litig., 411 F. Supp. 2d 434 (S.D.N.Y. 2006)........................45

Glassman v. Computervision Corp., 90 F.3d 617 (1st Cir. 1996) ....................................61

Goldberg v. Household Bank, F.S.B., 890 F.2d 965 (7th Cir. 1989) ................................60

Greebel v. FTP Software, Inc., 182 F.R.D. 370 (D. Mass. 1998)....................................23

Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999)................................... passim

Greenstone v. Cambex Corp., 975 F.2d 22 (1st Cir. 1992) ...............................38

iv

Gross v. Summa Four, 93 F.3d 987 (1st Cir. 1996).........................................................18

Guerra v. Teradyne, Inc., No. 01-11789, 2004 WL 1467065
  (D. Mass. Jan. 16, 2004) ..............................................................................................43

In re Guess?, Inc. Sec. Litig., 174 F. Supp. 2d 1067 (C.D. Cal. 2001).............................45

In re Hypercom Corp. Sec. Litig., No. CV-05-0455-PHX-NVW,
  2006 WL 726791 (D. Ariz. Mar. 9, 2006) ...................................................................39

In re Integrated Elec. Serv. Inc. Sec. Litig., No. 04-CV-3342,
  2006 WL 54021 (S.D. Tex. Jan. 10, 2006) ..................................................................39

In re John Alden Fin. Corp. Sec. Litig., 249 F. Supp. 2d 1273 (S.D. Fla. 2003)...............27

Kalnit v. Eichler, 246 F.3d 131 (2d Cir. 2001) ..................................................................47

In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881 (8th Cir. 2002)................................. passim

In re Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724 (W.D. Ky. 2004) ...........17

Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991)...................................................4

Limantour v. Cray, Inc., No. CO5-943Z, 2006 WL 1169791
  (W.D. Wash. Apr. 28, 2006) ........................................................................................25

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005)............................................61

Lirette v. Shiva Corp., 27 F. Supp. 2d 268 (D. Mass. 1998) ..................................... passim

Maldonado v.  Dominguez, 137 F.3d 1 (1st Cir. 1998)............................................. passim

Meyer v. Biopure Corp., 221 F. Supp. 2d 195 (D. Mass. 2002).......................................14

In re NAHC, Inc. Sec. Litig., 306 F.3d 1314 (3d Cir. 2002) ...............................................3

Nathenson v. Zonagen, Inc., 267 F.3d 400 (5th Cir. 2001) ...............................................27

In re Netflix, Inc., Sec. Litig., No. C04-2978-FMS, 2005 WL 1562858
  (N.D. Cal. June 28, 2005) ............................................................................................28

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) .................................................................33

In re Noven Pharms., Inc. Litig., 238 F. Supp. 2d 1315 (S.D. Fla. 2002) ........................19

Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996) ................................15

In re Party City Sec. Litig., 147 F. Supp. 2d 282 (D. N.J. 2001)......................................31

In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379 (4th Cir. 2005)..................................49

In re PETsMART, Inc. Sec. Litig., 61 F. Supp. 2d 982 (D. Ariz. 1999) .............................9

PR Diamonds, Inc. v. Chandler, 364 F.3d 671 (6th Cir. 2004) .........................................40

v

In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211 (D. Mass. 1999). passim

Plevy v. Haggerty, 38 F. Supp. 2d 816 (C.D. Cal. 1998) ........................................2, 55, 56

In re Polaroid Corp. Sec. Litig., 134 F. Supp. 2d 176 (D. Mass. 2001)............................60

Reisman v. KPMG Peat Marwick LLP, 965 F. Supp. 165 (D. Mass. 1997) ....................40

Robbins v. Koger Props., Inc., 116 F.3d 1441 (11th Cir. 1997).......................................61

Romani v. Shearson Lehman Hutton, 929 F.2d 875 (1st Cir. 1991) ..................................3

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004).............................................................30

In re SCB Computer Tech., Inc. Sec. Litig., 149 F. Supp. 2d 334
    (W.D. Tenn. 2001)........................................................................................................41

San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos.,
    75 F.3d 801 (2d Cir. 1996)...........................................................................................31

Schuster v. Symmetricon, Inc., No. C9420024RMW, 2000 WL 33115909 (N.D.
    Cal. Aug. 1, 2000).......................................................................................................30

In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161 (D. Mass. 2000)........... passim

Shapiro v. UJB Fin. Corp., 964 F.2d 272 (3d Cir. 1992)...................................................40

Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996) .............................................24

Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171 (S.D.N.Y. 1996)...................8

In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970 (9th Cir. 1999).............................30

In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059
    (N.D. Cal. 2001)............................................................................................................9

Stavros v. Exelon Corp., 266 F. Supp. 2d 833 (N.D. Ill. 2003)................................ passim

In re Stratus Computer, Inc. Sec. Litig., No. 89-2075-Z, 1992 WL 73555
    (D. Mass. Mar. 27, 1991)..............................................................................................11

In re Sun Healthcare Group Inc. Sec. Litig., 181 F. Supp. 2d 1283 (D. N.M. 2002) ........19

Suna v. Bailey Corp., 107 F.3d 64 (1st Cir. 1997) ............................................................64

In re Syncor Int'l Corp. Sec. Litig., 327 F. Supp. 2d 1149 (C.D. Cal. 2004) ...................30

Thor Power Tool Co. v. Comm'r of Internal Revenue, 439 U.S. 522 (1977) ...................52

Thornton v. Micrografx, Inc., 878 F. Supp. 931 (N.D. Tex. 1995) ...................................46

Tracinda Corp. v. Daimler Chrysler AG, 197 F. Supp. 2d 42 (D. Del. 2002)...................46

vi

<u>Van Ormer v. Aspen Tech., Inc.</u>, 145 F. Supp. 2d 101 (D. Mass. 2000)...........................44

<u>In re the Vantive Corp. Sec. Litig.</u>, 110 F. Supp. 2d 1209 (N.D. Cal. 2000)....................30

<u>In re the Vantive Corp. Sec. Litig.</u>, 283 F.3d 1079 (9th Cir. 2002)..................................28

<u>In re Veritex Pharm., Inc.</u>, 357 F. Supp. 2d 343 (D. Mass. 2005) ....................................20

<u>Vtech Holdings Ltd. v. PriceWaterhouseCoopers, LLP</u>, No. 03 Civ. 1413 (LAK),
    2003 WL 21756623 (S.D.N.Y. July 30, 2003) ...............................................................9

<u>Wietschner v. Monterey Pasta Co.</u>, 294 F. Supp. 2d 1102 (N.D. Cal. 2003) ..................28

<u>In re Westinghouse Sec. Litig.</u>, 90 F.3d 696 (3d Cir. 1996).............................................37

<u>Williams v. WMX Techs., Inc.</u>, 112 F.3d 175 (5th Cir. 1997)...........................................9

## **Statutes & Rules**

SEC Rule 10b5-1(c)(1) .........................................................................................................8

15 U.S.C. §78u-4(b)(1) .......................................................................................................10

15 U.S.C. §78u-4(b)(2) .......................................................................................................10

15 U.S.C. §78u-5(c)(1) ........................................................................................................14

15 U.S.C. §78u-5(c)(2) ........................................................................................................34

15 U.S.C. §78u-5(c)(3) ........................................................................................................34

15 U.S.C. §78u-5(i)(1)..........................................................................................................15

Fed. R. Civ. P. 9(b) ...................................................................................................... passim

Fed. R. Civ. P.12(b)(6)................................................................................................. passim

## **Legislative History**

H.R. Conf. Rep. No. 104-369 (1995), <u>reprinted in</u> 1995 U.S.C.C.A.N. 730......................1

LITDOCS/637159.5

## INTRODUCTION

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Defendants Investors Financial Services Corp. ("IFIN" or the "Company"), Kevin J. Sheehan, Michael F. Rogers, John N. Spinney, Jr., Karen C. Keenan, Robert D. Mancuso, Edmund J. Maroney, and John E. Henry (collectively, the "Individual Defendants") submit this Memorandum of Law in Support of their Motion to Dismiss the Consolidated Complaint (the "Amended Complaint" or "AC") in its entirety, with prejudice.

## PRELIMINARY STATEMENT

Congress enacted the Private Securities Litigation Reform Act of 1995 (the "PSLRA") in order to deter "baseless and extortionate securities lawsuits." H.R. Conf. Rep. No. 104-369, at 32 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731. The legislation was:

> prompted by significant evidence of abuse in private securities lawsuits . . . [which] include . . . the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in the issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action . . . .

Id. at 31, reprinted in 1995 U.S.C.C.A.N. at 730 (emphasis added). The PSLRA "marked a bipartisan effort to curb abuse in private securities lawsuits, particularly the filing of strike suits." Greebel v. FTP Software, Inc., 194 F.3d 185, 191 (1st Cir. 1999). This litigation is exactly the type of securities "strike suit" that the PSLRA was designed to prevent.

Based in Boston, Massachusetts, IFIN offers a broad range of services to financial asset managers, and it also manages a portfolio of financial assets that it holds for its own account, rendering its financial results dependent, in part, on the movements of short-term and long-term interest rates.[1]  For each of the fiscal years 2001 through 2004, IFIN regularly forecast 25%

---

[1] AC ¶¶ 2, 17, 19; Defendants' App. 11.  The Appendices filed herewith contain complete copies of documents referenced in this moving brief, cited to herein as "App. ___."  This Court properly may consider, without turning this motion into one for summary judgment, documents attached to the Amended Complaint, matters of which the Court may take judicial notice, and documents the authenticity of which are not contested and which are referenced in the Amended Complaint or upon which the complaint necessarily relies.  Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 n.3 (1st Cir. 1991) (internal citations omitted).  See also In re NAHC, Ins. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002)

(Footnote Continued on Next Page.)

annual growth in its diluted earnings per share ("EPS").  See AC ¶ 3.[2]  In each of those years, IFIN met or exceeded its 25% earnings growth guidance.  See AC ¶ 3.[3]

On July 14, 2005, after IFIN closed its second quarter ("Q2 05"), the Company announced a revision to its prior guidance for fiscal 2005 (the "July 14, 2005 Announcement").  It stated that it expected an annual increase in diluted EPS of only approximately 10% -- not 25% -- principally due to unanticipated and historically anomalous interest rate activity.  AC ¶¶ 223-24; App. 22.  The Company explained that the "key factors" giving rise to the Company's change in expected diluted EPS included, among others, "a flatter than expected yield curve" and "narrower than expected reinvestment spreads."  Id.[4]  IFIN's stock price dropped approximately 18% that day following its announcement.  AC ¶ 12.

Beginning on August 4, 2005 and thereafter, the plaintiffs' class action bar filed a flurry of knee-jerk complaints in this Court, essentially alleging that the Defendants allegedly committed fraud by failing accurately to predict the historically anomalous movement of interest rates in 2005.  It is common knowledge, however, that the largest financial institutions in the

_____

(Footnote Continued from Previous Page.)

(court may take judicial notice of "documents relied upon in the complaint . . . documents filed with the SEC, but not relied upon in the Complaint [and] stock price data"); In re PETsMART, Inc. Sec. Litig., 61 F. Supp. 2d 982, 987 n.1 (D. Ariz. 1999) (court may take judicial notice of analyst reports to establish "whether and when certain information was provided to the market"); Plevy v. Haggerty, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998) (holding press releases, analysts' reports and news articles that were "cited from, quoted from, and/or referenced" in the complaint could be considered by the court, and taking judicial notice of SEC filings).

[2] See also App. 12; App. 15; App. 17.

[3] See App. 4 at 24.

[4] The "yield curve" describes the relationship between the interest rate and the maturity of fixed-income securities (e.g., U.S. treasury notes).  A typical yield curve reflects those circumstances where shorter-term securities (e.g., three-month treasury notes) have a lower yield (i.e., interest rate) compared to longer maturity securities (e.g., ten-year treasury notes).  The yield curve is considered "positive" when it ascends (i.e., short term interest rates are lower than long-term rates), "flat" when short-term and long-term rates are the same, and "negative" or "inverted" when short-term rates are higher than long-term rates.  See App. 28 (Barron's Finance & Investment Handbook at 706-07 (5th ed. 1998)).

world were blindsided by the same interest rate movements that caused IFIN to revise its 2005 guidance. For example, on July 19, 2005, just five days after IFIN's announcement, Citigroup's CFO publicly stated in explaining Citigroup's Q2 05 results: "**Our guys in the trading side were not expecting the yield curve to flatten the way it has**." App. 24 (FDCH Business Transcripts, Citigroup - CFO Interview, By Maria Bartiromo, July 19, 2005) (emphasis added). Similarly, that same day, Marc Oken, the CFO of Bank of America, stated that Bank of America's earnings were adversely affected by the yield curve, which he observed had "**flattened beyond expectations**." App. 25 (American Banker (USA), B of A to Slow Its Corporate Expansion, By Paul Davis, July 19, 2005) (emphasis added).[5]

No less an authority than Alan Greenspan, then-Chairman of the Federal Reserve Board, observed in early 2005 that, in contrast with "most experience," long-term interest rates had been trending lower, even as short-term interest rates had increased. App. 23 (Testimony of Alan Greenspan, Federal Reserve Board's semiannual Monetary Policy Report to the Congress, Before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, February 16, 2005).[6] Former Chairman Greenspan characterized the worldwide flattening of the yield curve, i.e., the rise in short-term rates coupled with the decline in long-term rates, as a "**short-term aberration**" and a "**conundrum**." Id. (emphasis added). Lacking a crystal ball, however, Mr. Greenspan, and all of Wall Street, failed accurately to predict that the flattening yield curve would compress even further in 2005. In short, IFIN was hardly alone in predicting, incorrectly, the vexing movement of interest rates in 2005. See supra 3.

---

[5] Defendants refer to the public statements of other issuers solely for background purposes, not to support the legal arguments on which this motion is based. The Court may consider background material, without placing any evidentiary reliance on its contents, and not run "afoul of the rule that a district court must confine itself to the four corners of the complaint when deciding a motion to dismiss under Rule 12(b)(6)." Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

[6] This Court may take judicial notice of market phenomena, such as broad market sector ascents and declines. See, e.g., D.E.&J Ltd. P'ship v. Conway, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003) ("The Court may take judicial notice of well-publicized stock prices and market trends without converting a motion to dismiss into a motion for summary judgment in a securities fraud case.") (citation omitted).

On February 3, 2006, six months after filing their first complaint, Plaintiffs filed their hopelessly prolix 142-page, 263-paragraph Amended Complaint.  Apart from its length, what is most notable about Plaintiffs' Amended Complaint is that it tells a whole new story.  In an obvious effort to capture within the purported class period stock trades made by IFIN personnel going as far back as 2001, Plaintiffs more than doubled the length of the purported class period, extending the original 1 year and 9 months proposed class period to 4 years and 3 months.  To do so, however, Plaintiffs were forced to concoct an illogical theory of fraud that required them to reverse field on certain allegations contained in their original complaint.  More specifically, Plaintiffs entirely changed their allegations about a restatement of financial results that IFIN first announced <u>nine</u> <u>months</u> before the stock price decline that triggered this suit.

In the original complaint, Plaintiffs characterized IFIN's restatement in November 2004 as a "red herring" designed to "distract" the investment community from the impact of the flattening yield curve.  <u>See</u> Docket No. 1 at p. 3.  They did not allege that the restatement itself was the result of any earlier fraud.  <u>Id.</u>  In the Amended Complaint, Plaintiffs now claim that the restatement itself was the product of a fraudulent scheme, which was supposedly formed almost five years earlier.  Reversing their "red herring" allegations, Plaintiffs now allege that it was the Company's July 14, 2005 Announcement that was "simply a red-herring," supposedly designed to distract the investment community from accounting issues associated with the Company's November 2004 restatement.  AC ¶ 13.  On this basis, Plaintiffs now challenge as alleged misrepresentations the financial results that IFIN reported in every quarterly and annual filing that it issued between April 10, 2001 and July 14, 2005.

Given the 180-degree turn that Plaintiffs have taken on their restatement allegations, it is hardly surprising that their newly minted fraud claims simply make no sense.  Ordinarily, class action plaintiffs point to financial restatements as supposed evidence of a fraud scheme because the restated financial results are substantially **lower** than the financial results that the defendant company had previously reported.  Plaintiffs thus typically allege that the defendant company allegedly "cooked its books" in order artificially to **inflate** its financial results.  Here, IFIN's

4

restated financial results are actually **higher** for some of the restated financial quarters; not materially different for most of the restated financial quarters; and only materially lower in the year 2001, four years before IFIN restated its results.

The upshot of Plaintiffs' restatement allegations is the following bedrock claim. Plaintiffs contend that IFIN was only able to meet or exceed, year after year, its **25%** annual earnings growth targets by employing improper accounting.   AC ¶ 5.   As the Amended Complaint states at the outset:

> [IFIN management] consistently told the market, in conference calls and through conversations with analysts, that the Company would produce growth of **25%** in diluted earnings per share virtually every year from 2001 through 2005. . . .   **The essence of this case involves defendants' scheme to achieve these results** by deceiving investors and the market about Investors Financial's true financial condition by issuing false and misleading statements and omissions regarding the Company's net interest income as a result of prepayment of the Company's debt instruments.

AC ¶ 3 (emphasis added).  That contention is belied by the simple fact that IFIN did not need to engage in the fictitious fraud scheme alleged in order to achieve those results.  Even as restated, IFIN's diluted EPS grew by **25% or more** in each year that it restated:  **25.9%** in 2001, **50.0%** in 2002, **36.3%** in 2003, and **50.4%** in 2004.[7]

Moreover, while Plaintiffs allege that for fiscal years 2001, 2002, 2003 and 2004 the Company made cumulative net interest income adjustments of $6.2 million (AC ¶ 242), Plaintiffs do not mention that, during those adjusted periods, IFIN had reported total net operating revenue of approximately **$1.6 billion**.  App. 10, 11.  Thus, the cumulative adjustment of $6.2 million was **less than 0.4%** of IFIN's total net operating revenue during those periods. A simple bar chart contrasting IFIN's pre- and post-restatement diluted EPS illustrates not only how well the Company was performing during the putative class period, but also how immaterial the restatement was to the Company's earnings for 2001 through 2004.

_____

[7] See App. 11 at 21



See App. 11.

Unable to allege credibly that either the Company's 2005 revision to its guidance or its 2004 restatement constituted violations of the federal securities laws, Plaintiffs have endeavored to knit the two events together in an effort to transform a simple guidance case into some sort of accounting fraud scandal. Plaintiffs, however, are unable to support their fabricated claims with any specific facts. For this reason, and others discussed below, neither Plaintiffs' guidance allegations nor their restatement allegations can survive this motion to dismiss.

Indeed, Plaintiffs' guidance claims fail for numerous reasons under Rule 12(b)(6), the PSLRA and Rule 9(b). First, Plaintiffs' guidance allegations fail because all of the Company's statements respecting its expected future financial results are immune from liability under the PSLRA's safe harbor for forward-looking statements. See infra 13-16. Second, IFIN expressly cautioned investors, on numerous occasions throughout the class period, regarding the exact risks that led to the stock drop at issue, warning that changes in the relationship between short-term and long-term interest rates, i.e., the yield curve, could adversely affect the Company's results. See infra 14-16. Third, no claim can be based upon a failure accurately to predict the future

6

movement of interest rates.  See infra 16-17 (citing Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 178 (S.D.N.Y. 1996) ("Failure to predict a rise in interest rates does not constitute fraud and cannot be the basis for alleging misrepresentations or omissions of material facts.")).  That is particularly so here, where former Federal Reserve Board Chairman Alan Greenspan characterized interest rate activity in 2005 as "a conundrum," which confounded all of Wall Street.  See supra 3.  Fifth, Plaintiffs have failed to plead any specific facts supporting a strong inference that any forward-looking statement was knowingly false when made.  See infra 19-22.  Nor do Plaintiffs' motive allegations support a strong inference of scienter, as numerous trades made by Defendants were made pursuant to Rule 10b5-1 trading plans and others were not unusual in timing or amount.  See infra 22-31.

Plaintiffs' claims based on IFIN's restatement fare no better.  First, Plaintiffs fail to plead any specific facts supporting a strong inference that any financial disclosure challenged was knowingly false when made.  See infra 36-52.  Furthermore, Plaintiffs' financial disclosure claims are illogical, given that the effect of the restatement was to increase -- and not decrease -- the Company's reported results for some of the financial quarters at issue.  In other words, the facts relating to this restatement are the polar opposite of the sort of facts consistent with a scheme to commit fraud.  No officer or director intent on committing fraud would intentionally **understate** financial results, artificially **deflating** the Company's stock, for the purpose of selling his or her shares at **depressed** prices or receiving a **lower** bonus payment.  An accounting change that has a disparate impact on the financial periods restated, causing some financial results to be higher, some to be lower, and most to have no material change, does not support any inference of fraud.

Second, the vast majority of the Company's historical financial results are not actionable because they were not materially inaccurate.  See infra 60-61.  Indeed, as Plaintiffs themselves acknowledge, for some periods, the restated results were higher than those originally disclosed, and for most periods, the difference between the original and the restated results is immaterial.

AC ¶ 6.  Third, IFIN plainly disclosed the allegedly omitted information respecting the risk of increased prepayments.  See infra 62-63.

Last, Plaintiffs attempt to tie the restatement to the Company's revised guidance in 2005 by making unsupported allegations about the Company's portfolio of Small Business Association ("SBA") securities.  See infra 47-60.  Plaintiffs contend that the Company committed fraud because it should have applied the "retrospective method" under Statement of Financial Accounting Standards No. 91 ("FAS 91") to its SBA portfolio, and should have recognized a loss because this portfolio allegedly was impaired.  Plaintiffs, however, allege no specific facts to support these conclusory allegations.  Their SBA allegations also fail because Plaintiffs do not, and cannot, adequately plead scienter or loss causation as to those claims.

For all of these reasons, the Amended Complaint should be dismissed in its entirety, with prejudice.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO PLEAD FRAUD WITH PARTICULARITY.

Plaintiffs' Complaint extends for 142 pages, and 263 paragraphs.  However, the PSLRA's "heightened pleading rules are designed to elicit clarity . . . not volume."  In re PETsMART, Inc. Sec. Litig., 61 F. Supp. 2d 982, 991 (D. Ariz. 1999) (dismissing "cumbersome and unhelpful" securities fraud complaint).  As the Fifth Circuit noted in rejecting similarly ill-pled claims under Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"):

> A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail. The amended complaint here, although long, states little with particularity.

Williams v. WMX Techs., Inc., 112 F.3d 175, 178 (5th Cir. 1997); see also Vtech Holdings Ltd. v. PriceWaterhouseCoopers, LLP, No. 03 Civ. 1413 (LAK), 2003 WL 21756623, at *1 (S.D.N.Y. July 30, 2003) (dismissing 113-page pleading and noting that "[d]espite its enormous length and an overabundance of detail, it is often quite conclusory"); In re Splash Tech.

Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1073-1075 (N.D. Cal. 2001) (dismissing with prejudice securities fraud claims contained in 124-page "puzzle style pleading").

As this Court has observed, the PSLRA's pleading requirements are "strict and rigorous," requiring Plaintiffs, inter alia, to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." Carney v. Cambridge Tech. Partners, 135 F. Supp. 2d 235, 240-41 (citing 15 U.S.C. §78u-4(b)(1)) (emphasis added).[8] Further, the PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. (citing 15 U.S.C. §78u-4(b)(2)) (emphasis added).

In this case, the Amended Complaint does not comply with these mandates. Instead of adhering to the exacting pleading standards of the PSLRA and Rule 9(b), the Amended Complaint's structure seems designed to confuse and obscure. Plaintiffs cite to dozens of press releases, conference call transcripts, and SEC filings over a four-year period, and identify the supposed "fraudulent" aspects of these many statements simply by cutting and pasting nearly identical, boilerplate allegations thereafter. The Court and Defendants are left to guess as to which aspects of the press releases, conference calls and SEC filings were supposedly false or misleading, and which of the boilerplate allegations apply to which statements. Paragraphs 171 through 177 serve as one among many examples of this impermissible pleading practice. See AC ¶¶ 171-77. The Amended Complaint offers no guidance as to which particular statements in Paragraphs 171 through 176 -- which span over 5 pages -- were rendered false and misleading by the alleged omissions set forth in Paragraph 177. See id.

--------

[8] Allegations that "are not based upon [a plaintiff's] personal knowledge . . . are . . . necessarily pleaded on 'information and belief,' although not labeled as such." ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 351 (5th Cir. 2002).

9

Repeatedly applying this pleading practice, Plaintiffs fill nearly seventy pages of the Amended Complaint with lengthy quoted statements and almost identical, boilerplate allegations. Not surprisingly, courts are highly critical of this cut-and-paste style of pleading. For example, in Chan v. Orthologic Corp., No. 96-1514 PHX RCV, 1998 WL 1018624 (D. Ariz. Feb. 5, 1998), the court dismissed similarly repetitive claims, observing:

> The Plaintiffs' decision to merely cut and paste identical allegations as to each charge of fraud or misrepresentation contributes to the deficiency of the complaint. Such repeated lists of "specific" reasons make a mockery of Rule 9(b) and the Reform Act. Apparently, the Plaintiffs determined that placing identical assertions of falsehood under each of the complaint's allegations would suffice where lumping the allegations together, and following with the same assertions, would not. On this point, the Plaintiffs clearly confuse quantity and position with substance. Plaintiffs' attempt to meet the specificity requirements of Rule 9(b), through this repetitive method, is simply insufficient.

Id. at *14 n.11 (citation omitted) (emphasis added). Plaintiffs' effort here is no better, and their Amended Complaint should be dismissed outright for this reason alone.

Moreover, although there are seven named Individual Defendants in the Amended Complaint, Plaintiffs have failed to particularize the role of any of the Individual Defendants in the alleged fraud. Courts dismiss securities fraud claims against individuals where the individuals' particular roles in the alleged fraud are not specified. See, e.g., In re Stratus Computer, Inc. Sec. Litig., No. 89-2075-Z, 1992 WL 73555 (D. Mass. Mar. 27, 1991). In Stratus, the Court explained the policy behind this pleading requirement:

> [The complaint] only discusses the defendants in collective terminology, making no reference to any particular act of any particular defendant . . . . It is, thus, by no means clear whom plaintiff . . . alleges to have done what. Not only does [the complaint] fail to provide the defendants with the notice requisite to the preparation of meaningful responses, but the danger of holding the individual defendants in terrorem and subjecting them to a frivolous suit that might likely injure their reputations is high.

Id. at *7-8 (dismissing complaint) (citations omitted) (emphasis added).

For this reason alone, all of Plaintiffs' claims, particularly against the Individual Defendants, must be dismissed under Rule 9(b). In addition, set forth below, first, are the additional reasons that Plaintiffs' claims respecting IFIN's 2005 guidance must be dismissed

10

and, second, the additional reasons that Plaintiffs' claims respecting IFIN's historical financial disclosures from April 10, 2001 to July 14, 2005 must be dismissed.

## II. PLAINTIFFS FAIL TO STATE ANY FEDERAL SECURITIES FRAUD CLAIMS BASED ON THE FORWARD-LOOKING STATEMENTS THEY CHALLENGE.

As explained above, this case arose out of the stock price drop that followed the Company's mid-2005 public disclosure revising its prior earnings guidance for that year. Plaintiffs allege that, when Defendants previously had issued earnings guidance for 2005 on December 16, 2004, that guidance was false and misleading. Specifically, in Paragraph 211 of the Amended Complaint, Plaintiffs challenge as an alleged misrepresentation the Company's December 16, 2004 press release, which stated that, "[b]ased on our favorable operating environment and outlook for future sales, we remain comfortable with our long term guidance of 25% growth in fully diluted earnings per share." AC ¶ 211. As Plaintiffs do not dispute, the Company's December 16, 2004 press release included a disclosure, specifically referencing the PSLRA's safe harbor, warning investors of important risks that might cause the Company's actual results to differ materially from its projected results, including the risk that short- and long-term interest rates might change. App. 21. On July 14, 2005, IFIN ultimately revised its 2005 earnings guidance from 25% to 10% growth, citing a number of factors, including a flatter-than-expected yield curve. App. 22. Despite their conclusory allegations that the revision was the ultimate result of some fraud (AC ¶ 223), Plaintiffs have failed to allege any specific facts demonstrating that the revision was the result of anything other than the factors cited by the Company. See infra 48-52.

Plaintiffs also challenge numerous other forward-looking statements made by the Company in 2001, 2002 and 2003, when IFIN also forecast annual earnings of 25%. See e.g. AC ¶¶ 139, 151, 157, 163. Those forward-looking statements also were accompanied by specific cautionary language, identifying those disclosures as forward-looking and cautioning investors respecting numerous risks that might cause actual results to differ materially from those the

11

Company had forecast. Moreover, those forward-looking statements were accurate predictions of the future, as the Company in fact attained earnings growth of greater than 25% in 2002, 2003 and 2004, even based on the Company's restated results. See Carney, 135 F. Supp. 2d at 245 (question of whether a growth projection was sufficiently accompanied by meaningful cautionary language is "moot" if the defendant's projection "was not off the mark").

As discussed below, Plaintiffs' claims based on the Company's 2005 earnings guidance must be dismissed for failure to state a claim under Rule 12(b)(6) because: (1) the 2005 earnings guidance was a forward-looking statement accompanied by meaningful cautionary language warning investors of the risks posed by fluctuating interest rates; and (2) Section 10(b) claims cannot be based on an alleged failure accurately to predict interest rates. Moreover, these claims must be dismissed under the PSLRA and Rule 9(b) because Plaintiffs have failed to plead any specific facts that give rise to a strong inference that the Company issued its guidance with actual knowledge of its falsity. Plaintiffs' claims based on other various forward-looking statements are defective for these same reasons. They also fail for the additional reason that these forward-looking statements accurately predicted future events.

**A.    Plaintiffs' Forward-Looking Statement
Claims Based On The Company's 2005 Earnings
Guidance Must Be Dismissed Under Rule 12(b)(6).**

Plaintiffs' claims concerning the Company's 2005 earnings guidance must be dismissed because the statement at issue was a forward-looking statement accompanied by meaningful cautionary language, and is therefore immune from liability under the PSLRA's safe harbor provision. Moreover, as explained more fully below, Section 10(b) claims cannot be based on a mere failure accurately to predict interest rates.

1.    **The Challenged Forward-Looking
Statement Is Immune From Liability
Under The PSLRA's Safe-Harbor Provision.**

a.    **Forward-Looking Statements
Accompanied By Meaningful Cautionary
Language Cannot Give Rise To Liability Under Section 10(b).**

Under the PSLRA's safe harbor provision, forward-looking statements are not actionable under Section 10(b) if they are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1); see also Baron v. Smith, 380 F.3d 49, 53-54 (1st Cir. 2004) (affirming dismissal of securities claims where forward-looking statements were accompanied by meaningful cautionary language).

In the First Circuit, courts routinely apply the PSLRA's safe harbor, holding that cautionary language in press releases shield a defendant company from liability for its routine financial projections. See, e.g., Baron, 380 F.3d at 53-54 (affirming safe harbor protection for forward-looking statement in press release accompanied by cautionary language); Meyer v. Biopure Corp., 221 F. Supp. 2d 195, 203-204 (D. Mass. 2002) (Harrington, J.) (dismissing claims where forward-looking statements in press release were accompanied by cautionary language); Carney, 135 F. Supp. 2d at 245-246, 251 (Lindsay, J.) (holding that paragraph in press release that "specifically warns potential investors that the company's projections are 'subject to risks and uncertainties' . . . places the forward-looking statements . . . within the PSLRA's safe harbor").  To obtain the protections of the PSLRA's safe harbor, companies do not have to be clairvoyant; they do not have to predict the future accurately, but rather they must disclose those risks important to the projection.  See In re Cytyc Corp. Sec. Litig., No. 02-12399, 2005 WL 3801468, at *21 (D. Mass. Mar. 2, 2005) ("[T]he cautionary statement does not necessarily have 'to include the particular factor that ultimately causes the forward-looking statement not to come true.'") (citing H.R. Conf. Rep. No. 104-369 at 44 (1995)) (Bowler, J.). Of course, where a company not only accompanies its projections with those risks that are important to the projection, but also warns investors of a risk that ultimately materializes, courts

13

dismiss claims predicated on the company's projection.  See In re Capstead Mortgage Corp. Sec. Litig., 258 F. Supp. 2d 533, 555 (N.D. Tex. 2003) (court held that company's public filings "adequately warned investors of exactly the [interest rate] risks Plaintiffs contend were not disclosed"); Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) ("The prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed.").

**b.      The Forward-Looking Statement Challenged Was Accompanied By Meaningful Cautionary Language Concerning The Risks Associated With Fluctuating Interest Rates.**

Here, Defendants cannot be held liable for the Company's 2005 earnings guidance, as that guidance is immune from liability under the PSLRA's safe harbor.  There can be no dispute that the Company's guidance in 2004 respecting its expected diluted EPS for 2005 was a forward-looking statement, and identified as such.  See 15 U.S.C. §78u-5(i)(1)(A) ("The term 'forward-looking statement' means -- a statement containing a projection of . . . earnings . . . per share . . . .") (emphasis added); App. 21 ("This news release contains forward-looking statements . . . such as the Company's statements regarding its current and long term earnings guidance . . . .").

In addition, the Company's 2005 earnings guidance was accompanied by "meaningful cautionary language" in the form of a list of potential risks and uncertainties that could cause IFIN's future results to differ materially from the predictions contained in the challenged forward-looking statement.  Indeed in this case, the press release warned investors that the Company's earnings guidance could be affected, inter alia, by a change in the yield curve, i.e., the relationship between long-term and short-term interest rates, which is exactly the risk that ultimately materialized and negatively impacted the Company's financial results.  App. 21. Specifically, the Company stated:

> This news release contains **forward-looking statements** (statements that are not historical facts).  **These statements, such as the Company's statements regarding its current and long term earnings guidance**, are based upon assumptions and estimates that might not be realized and are **subject to risks and uncertainties that could cause actual results to differ materially from those in**

14

**the forward-looking statements**.  Such risks and uncertainties include the performance of global financial markets, **changes in interest rates, changes in the relationship between long-term and short-term interest rates**, regulatory actions affecting the Company's clients, the Company's ability to manage the conversion of new business, and the Company's ability to continue to manage its costs.  Additional factors that could also affect actual results are set forth under the heading "Certain Factors That May Affect Future Results" in the Company's Form 10-Q for the quarter ended September 30, 2004 and in the Company's Annual Report Form 10-K, as amended, for the year ended December 31, 2003.

App. 21.

Moreover, the SEC filings that the Company incorporated by reference in this December 16, 2004 press release also disclosed the risks of interest rate fluctuations.  Indeed, they specifically warned that the yield curve may change, which could "adversely affect . . . the earnings produced by [IFIN's] investment and loan portfolios, and thus could adversely affect [IFIN's] operating results."  App. 4, 10.  As the Company stated in its Form 10-Q for the quarter ended September 30, 2004 ("Q3 04"):

> ***Our operating results are subject to fluctuations in interest rates and the securities markets.***
>
> A significant portion of our fees are based on the market value of the assets we process.  Accordingly, **our operating results are subject to fluctuations in interest rates** and securities markets as these fluctuations affect the market value of assets processed.  While reductions in asset servicing fees may be offset by increases in other sources of revenue, a sustained downward movement of the broad equity markets will likely have an adverse impact on our earnings.  Fluctuations in interest rates or the securities markets can also lead to investors seeking alternatives to the investment offerings of our clients, which could result in a lesser amount of assets processed and correspondingly lower fees. Also, our net interest income is earned by investing depositors' funds and making loans. While we expect interest rates to continue to rise over the next fifteen months, rapid, **sustained changes in interest rates and/or the relationship between short-term and long-term interest rates could adversely affect** the market value of, or **the earnings produced by, our investment and loan portfolios, and thus could adversely affect our operating results**.

App. 10 (italics in original; emphasis added).

Similarly, the Company warned its shareholders in its Form 10-K for the year ended December 31, 2003:

*Our operating results are subject to fluctuations in interest rates and the securities markets.*

A significant portion of our fees is based on the market value of the assets we process. Accordingly, **our operating results are subject to fluctuations in interest rates** and securities markets as these fluctuations affect the market value of assets processed. Current market conditions, including the recent volatility in the equity markets, can have a material effect on our asset-based fees. While reductions in asset servicing fees may be offset by increases in other sources of revenue, a sustained downward movement of the broad equity markets will likely have an adverse impact on our earnings. Fluctuations in interest rates or the securities markets can also lead to investors seeking alternatives to the investment offerings of our clients, which could result in a lesser amount of assets processed and correspondingly lower fees. Also, our net interest income is earned by investing depositors' funds in our investment portfolio and secondarily making loans. **Rapid changes in interest rates and/or the relationship between short-term and long-term interest rates could adversely affect** the market value of, or **the earnings produced by, our investment and loan portfolios, and thus could adversely affect our operating results**.

App. 4.

Given these indisputable facts, Plaintiffs' claims based on the Company's 2005 earnings guidance given on December 16, 2004, must be dismissed. That guidance constituted a forward-looking statement, was identified as such, and was accompanied by meaningful cautionary language. Indeed, the Company warned investors of the exact risk that ultimately materialized. Accordingly, the PSLRA's safe harbor provision <u>does not</u> permit the statement to form the basis of a Section 10(b) claim. Plaintiffs' claims based on the Company's 2005 earnings guidance must be dismissed for this reason alone.

**2.      Section 10(b) Claims Cannot Be Based On An
Alleged Failure Accurately To Predict Interest Rates.**

Plaintiffs' guidance claims also must be dismissed because, as a matter of law, a Section 10(b) claim cannot be based on a mere failure to predict future events. <u>See</u> <u>Denny v. Barber</u>, 576 F.2d 465, 470 (2d Cir. 1978) ("While greater clairvoyance . . . [might have led to certain realizations], failure to make such perceptions does not constitute fraud."); <u>In re Kindred Healthcare, Inc. Sec. Litig.</u>, 299 F. Supp. 2d 724, 731 n.7 (W.D. Ky. 2004) ("Defendants cannot be expected to predict future activity.").

More specifically, as a matter of law, Section 10(b) claims cannot be based on a mere failure accurately to predict the future movement of interest rates. <u>Sheppard v. TCW/DW Term</u>

Trust 2000, 938 F. Supp. 171, 178 (S.D.N.Y. 1996) ("Failure to predict a rise in interest rates does not constitute fraud and cannot be the basis for alleging misrepresentations or omissions of material facts."). As explained above, this case was filed shortly after the Company revised its earnings guidance in the middle of 2005, when numerous market participants, like IFIN, were surprised that the yield curve flattened even more than had been predicted. See supra 3. IFIN had to reduce its 2005 earnings growth estimate from 25% to 10% because interest rates in 2005 moved in historically anomalous ways, which confounded IFIN and all of Wall Street. Thus, at its core, this case is about IFIN's failure in December 2004 accurately to predict the extent to which the yield curve would flatten in 2005. Although IFIN's guidance presumed a flattening of the yield curve in 2005 (AC ¶ 226), it ultimately flattened to a far greater degree than IFIN, or the market at large, expected. IFIN cannot be held liable for failing accurately to predict future interest rate movements. See supra 16.

**B. Plaintiffs' Forward-Looking Statement Claims Based On The Company's 2005 Earnings Guidance Must Be Dismissed Under The PSLRA And Rule 9(b) Because Plaintiffs Have Failed Adequately To Plead Scienter.**

**1. Plaintiffs Must Plead Specific Facts Giving Rise To A Strong Inference Of Actual Knowledge.**

Plaintiffs' 2005 guidance claims also must be dismissed because the Amended Complaint fails to plead any specific facts giving rise to a strong inference that the Company issued its 25% guidance with actual knowledge that the guidance was false or misleading. In the First Circuit, "general averments of defendants' knowledge of material falsity [do] not suffice." Gross v. Summa Four, 93 F.3d 987, 991 (1st Cir. 1996). Pursuant to both the PSLRA and Rule 9(b), the Amended Complaint "must, 'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" In re Galileo Corp., S'holders Litig., 127 F. Supp. 2d 251, 260 (D. Mass 2001) (alteration in original) (emphasis added). A reasonable inference of scienter is not sufficient: "[I]nferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong . . . .'" Greebel, 194 F.3d at 195-96 (emphasis in original).

Moreover, under the PSLRA, a defendant is not liable with respect to a forward-looking statement if the plaintiff fails to prove that the forward-looking statement "was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. §78u-5(c)(1)(B)(ii); see Greebel, 194 F.3d at 201 (safe harbor provision "focuses on the state of mind of the defendant and precludes liability for a forward-looking statement unless the maker of the statement had actual knowledge it was false or misleading"). Although usually plaintiffs may prove a Section 10(b) violation by proving intent to defraud or a high degree of recklessness, under the PSLRA's safe harbor provisions, recklessness is not sufficient to establish liability for forward-looking statements. Greebel, 194 F.3d at 201-202. For this reason, courts dismiss securities fraud claims based on forward-looking statements where the plaintiff fails to plead with particularity facts giving rise to a strong inference that the defendant made the statements with actual knowledge that they were false or misleading. In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535-36 (3d Cir. 1999); Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 847 (N.D. Ill. 2003); In re Noven Pharms., Inc. Litig., 238 F. Supp. 2d 1315, 1322-1324 (S.D. Fla. 2002); see also In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d 1283, 1289 (D. N.M. 2002) (plaintiff must plead and prove actual knowledge to establish securities violation based on forward-looking statement).

### 2. Plaintiffs Have Failed To Plead Specific Facts Giving Rise To A Strong Inference Of Actual Knowledge.

Plaintiffs' Section 10(b) claims must be dismissed with respect to IFIN's 2005 earnings guidance because the Amended Complaint fails to satisfy the scienter standard. First, Plaintiffs have failed to plead any specific facts giving rise to **any** inference, let alone a strong inference, that any Individual Defendant had "actual knowledge" that the 25% guidance was false or misleading. Second, Plaintiffs' motive allegations concerning the Individual Defendants' sales of stock and the Company's bonus plan do not support any inference of scienter, as a matter of law.

18

a.    **Plaintiffs Fail To Plead Any**
**Specific Facts Supporting A Strong**
**Inference That Any Forward-Looking**
**Statement Challenged Was Knowingly False When Made.**

Predictive statements such as earnings guidance "are not 'facts' which are 'false' when made merely because the prediction turned out to be wrong." Capstead, 258 F. Supp. 2d at 563. To plead that a defendant had "actual knowledge" that a predictive, forward-looking statement was false or misleading, a plaintiff must allege specific facts demonstrating that: (1) the speaker did not genuinely believe the statement was accurate; (2) the speaker did not have a reasonable basis for his or her stated belief; or (3) the speaker was aware of an undisclosed fact that would have tended seriously to undermine the accuracy of the statement. See Capstead, 258 F. Supp. 2d at 563 (citation omitted). Plaintiffs plead no such specific facts here.

Plaintiffs attempting to establish scienter "typically identify internal reports, memoranda or the like and allege both the contents of those documents and defendant's possession of them at the relevant time." In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 57 (D. Mass. 1998) (granting motion to dismiss securities fraud complaint). Securities fraud complaints that fail to identify such documents or other contemporaneous facts tending to show that the defendants knew the statements in question were false when made are subject to dismissal. Id.; see also Carney, 135 F. Supp. 2d at 251-252 (granting motion to dismiss where plaintiffs failed to plead specific facts indicating discrepancy between what defendant company was hearing internally and what it was saying publicly). Here, as in Boston Technology and Carney, Plaintiffs have not pled a single specific contemporaneous fact indicating that Defendants had actual knowledge that any alleged misstatement was false when made.

Here, Plaintiffs fail to plead any specific facts supporting any inference -- let alone a strong inference -- of scienter. The Amended Complaint literally does not particularize one fact tending to support any inference that, as of December 16, 2004, when the Company issued its 2005 guidance, any Defendant knowingly misrepresented the Company's expected financial results for 2005. For example, the Amended Complaint is devoid of a single specific fact to support the assertion that, as of December 16, 2004, any Defendant knew: (1) the precise extent

19

to which the yield curve would flatten in 2005; or (2) that the Company's estimates of earnings growth for 2005 would not meet or exceed 25%, which it had for many years.  See supra 5.

The best Plaintiffs can do is essentially allege that the Company "must have known" how interest rates would behave in 2005 because, in 2004, Company officers claimed to have "baked" an expected flattening of the yield curve into the Company's earnings projections.  AC ¶ 226. As noted above, however, lacking clairvoyance, IFIN could only "bake" into its guidance its own best estimate of the degree to which the yield curve would flatten in 2005.   That estimate, like similar estimates made by major financial institutions, proved incorrect.

As discussed above, the entire marketplace was surprised at the extent to which the yield curve flattened in 2005, as it flattened to a far greater extent than market participants expected. Five days after IFIN revised its guidance for 2005, CNBC interviewed Citigroup's CFO regarding Citigroup's Q2 2005 financial results and the impact of the flattening yield curve:

> Maria Bartiromo, CNBC Anchor:  Let me ask you about the impact of interest rates, it seems that Greenspan has made his moves pretty clear, most people expect the Fed to continue raising interest rates.  **The company's investment portfolio was hurt by rising short-term rates and by a flatter yield curve.**  We know what's happening in terms of short-term rates, **why hasn't Citigroup taken more steps to immunize itself against those higher short-term rates[?]**
>
> Sallie Krawcheck, CFO, Citigroup:  Well, I think -- look, **it's very easy to -- hindsight being 20-20, to talk about how everyone knew XYZ**, and certainly the markets have expected that short-term rates would have come up.  **Our guys in the trading side were not expecting the yield curve to flatten the way it was.**  So it wasn't the surprise of higher short-term rates, **it's the flatness of the yield curve**.  Those hurt -- **that hurts all banks**.  And what we're seeing, Maria, is not just a flat yield curve in the United States, but a flat yield curve around the world.  And **I think that surprises some people to see it**.

App. 24 (FDCH Business Transcripts, Citigroup - CFO interview, By Maria Bartiromo, July 19, 2005) (emphasis added).

As noted above, Citigroup was not the only major financial institution surprised by the extent to which the yield curve had flattened.  On the very same day that the CFO of Citigroup stated that Citigroup was not expecting the yield curve to flatten as it had, the CFO of Bank of

America stated that the bank's earnings also were affected by the yield curve, which he observed had "**flattened beyond expectations**." App. 25 (American Banker (USA), <u>B of A to Slow Its Corporate Expansion</u>, By Paul Davis, July 19, 2005) (emphasis added).

Similarly, analysts following IFIN in the days and weeks preceding July 14, 2005, observed that the yield curve had "flattened materially" in the second quarter of 2005.  For example, on July 13, 2005, the day before the Company revised its earnings guidance, RBC Capital Markets ("RBC") issued an analyst report on IFIN in which RBC commented:

> **Net Interest Income** - Analyzing the expected trends of the rest of the business is far less complex than attempting to project net interest income for the company, but <u>we do believe that the net interest margin pressure from the flattening of the yield curve is larger than management anticipated when first quarter earnings were announced</u>.  At that point, management believed that fee income strength would offset margin pressure, but **the curve has flattened materially since that point in time**.  As we have mentioned in several previous notes, <u>a flattening yield curve and weak equity markets are the worst combination for the company and we did have that occur during the second quarter</u>.  That said, the yield curve slope has stabilized recently and the equity markets have rebounded somewhat and the new business pipeline may be enough to produce reasonable growth, but <u>we are not overly confident in the ability to outpace all of the margin pressure potential</u>.

App. 26 (RBC Capital Markets, <u>Research Comment</u>, John G. Arfstrom, Analyst, July 13, 2005) (emphasis added).  As these market disclosures demonstrate, the most sophisticated financial institutions in the world, along with financial market analysts, were stating in mid-2005 that they did not anticipate the extent to which the yield curve would flatten in 2005.  These disclosures are directly at odds with Plaintiffs' conclusory allegations that Defendants somehow had actual knowledge in December 2004 regarding the extent to which the yield curve would continue to flatten in 2005.[9]  The Amended Complaint lacks a single specific fact to support that conclusory, and absurd, allegation.

---

[9] Indeed, on December 28, 2005, the yield curve actually inverted, <u>i.e.</u>, a short-term interest rate was higher than a longer-term interest rate, a relatively rare occurrence that usually precedes an economic recession.  <u>See</u> App. 27 (The Wall Street Journal, <u>Ahead of the Tape</u>, By Justin Lahart, Dec. 30, 2005).

Moreover, Plaintiffs' allegations ignore the context in which the Company issued its 2005 guidance. On December 16, 2004, the Company was nearing the close of one of the most successful periods of growth in its history. As stated above, its earnings in 2004 were over **50%** higher than its earnings in 2003, which had grown **36%** over the prior year. See infra 47. In this context, it is hardly surprising that IFIN was comfortable projecting year-over-year growth of 25%

In sum, Plaintiffs have failed to offer any specific facts giving rise to a strong inference that any Defendant had actual knowledge that the Company's 2005 earnings guidance was false or misleading. Rather, Plaintiffs rely solely on the legally inadequate allegation that Defendants must have known the extent to which the yield curve would flatten in 2005. See, e.g., Carney, 135 F. Supp. 2d at 252 ("There is no liability where a plaintiff's claim rests on the assumption that defendants must have known of the severity of their problems earlier because conditions became so bad later on.") (citations omitted); Galileo, 127 F. Supp. 2d at 261 ("Nor is scienter pleaded sufficiently by an allegation that a defendant 'must have knowledge of the facts,' . . . or by an allegation that the defendants must have known the facts solely by virtue of their positions with the issuer of the securities.") (citations omitted). For this reason alone, Plaintiffs' claims based on the Company's 2005 earnings guidance must be dismissed.

> **b.** **Plaintiffs' Motive Allegations With Respect To Their 2005 Guidance Claims Do Not Support A Strong Inference Of Scienter.**

Where, as here, Plaintiffs fail to plead specific facts supporting a strong inference of scienter, they cannot plead scienter based on "motive and opportunity" allegations alone. Greebel, 194 F.3d at 197 ("[M]erely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of scienter, is not enough" to meet the pleading standards under the PSLRA and Rule 9(b).)

In any event, Plaintiffs' "motive and opportunity" allegations do not support any inference of scienter respecting the Company's 2005 earnings guidance because: (1) Plaintiffs have failed to show that the Individual Defendants' stock trading after December 16, 2004 (or at

22

any time during the four-plus year proposed class period) was unusual in timing or amount; and (2) Plaintiffs' allegations that the Individual Defendants stood to benefit from bonus incentives make no sense with respect to Plaintiffs' guidance allegations, as the alleged bonuses were dependant upon actual financial results, not the Company's projections.

### (1)    Plaintiffs' Allegations Concerning Defendants' Trading Do Not Give Rise To A Strong Inference Of Scienter.

Trading by insiders, by itself, is not probative of scienter. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1224 (1st Cir. 1996) ("[T]he mere fact that insider stock sales occurred does not suffice to establish scienter.")  To support an inference of scienter based on insider trading, a plaintiff must plead facts showing that there was a suspiciously abnormal amount and pattern of trading.  See, e.g., Greebel, 194 F.3d at 198, 207 (stating that defendants' trading must be "unusual" and "well-beyond [their] normal patterns of trading" and finding that individual defendants' sale of over $23 million of corporate stock over a six month period did not give rise to a strong inference of scienter); Carney, 135 F. Supp. 2d at 256 ("[P]laintiffs must show that defendants' trading was 'unusual, well beyond normal patterns of trading by those defendants.'") (citation omitted); Fitzer, 119 F. Supp. 2d at 25 (considering prior trading practices as well as timing and amount).[10]

Measured against these criteria, none of the Individual Defendants' stock sales highlighted in the Amended Complaint support an inference of scienter with respect to Plaintiffs' guidance allegations.  Ordinarily, when plaintiffs accuse a company of issuing misleading earnings guidance, the plaintiffs attempt to show that officers within the company sold large

---

[10] See also Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (dismissing complaint because plaintiffs failed to "set forth the amount of trading [the insider] conducted before or after the class period, or, for that matter, any other fact that might support a finding of unusualness"); Greebel v. FTP Software, Inc., 182 F.R.D. 370, 375 (D. Mass. 1998), aff'd, 194 F.3d 185 (1st Cir. 1999) (a plaintiff's failure to plead the amount of trading normally conducted by individual defendants "prevents the court from determining whether the class period sales were extraordinary, and thus indicative of motive").

23

quantities of stock after the allegedly misleading guidance but before any subsequent downward revision, and that such sales were suspicious or unusual.  See, e.g., Limantour v. Cray, Inc., No. CO5-943Z, 2006 WL 1169791, at *15-18 (W.D. Wash. Apr. 28, 2006) (rejecting plaintiffs' attempt to establish scienter based on insider sales after allegedly misleading 2004 guidance).  In this case, however, Plaintiffs do not even attempt to show that any of the Individual Defendants' stock sales after the Company's 2005 guidance were suspicious or unusual.  Instead, Plaintiffs merely list all of the Individual Defendants' stock sales during the entire four-plus year proposed class period and allege that the Defendants "took advantage of the inflation of the stock price." AC ¶236.  Such a cursory allegation falls far short of establishing that any of the Individual Defendants' stock sales after the 2005 guidance support an inference of scienter.

As an initial matter, it bears mention that Plaintiffs' allegations setting forth the amounts of the Individual Defendants' retained holdings of stock and exercisable options as of the end of the purported class period are grossly inaccurate with respect to three of the Individual Defendants.  See AC ¶ 236.  As publicly available SEC filings evidence, and contrary to Plaintiffs' inaccurate allegations, during the four-plus year class period, Mr. Maroney sold no more than **28.1%** of his total holdings as of the end of the class period, **not** 56.88%, Mr. Mancuso sold only **32.2%** of his total holdings, **not** 51.83%, and Mr. Henry sold no more than **22.9%** of his total holdings, **not** 44.05%.  Compare App. 36 with AC ¶ 236.[11]  Of course, the actual facts significantly weaken any inference Plaintiffs wish this Court to draw from the Individual Defendants' trading.  Nonetheless, even when taking as true Plaintiffs' inaccurate calculations, their allegations regarding stock trading by the Individual Defendants' do not support any inference of scienter.

---

[11] Submitted herewith at App. 35 are the SEC filings evidencing Messrs. Maroney, Mancuso, and Henry's holdings of shares and exercisable stock as of the end of the purported class period, publicly available documents of which this Court may take judicial notice.  See supra at 1-2.

As far as the relevant law, this Court's decision in <u>Carney v. Cambridge Tech. Partners, Inc.</u> is instructive. In <u>Carney</u>, the defendant company issued 30% earnings guidance in November 1998, only to announce four months later that it would miss its guidance projections. 135 F. Supp. 2d 235. The plaintiffs in that case attempted to establish scienter by alleging that two of the defendant company's officers, the CEO and the CFO, had engaged in insider trading in the months between the initial earnings guidance and the subsequent announcement that the company would miss its projections. <u>Id.</u> at 256. Specifically, the plaintiffs alleged that the company's CEO had sold 125,000 shares for approximately $3.85 million and that the CFO had sold over 85,000 shares for approximately $2.6 million during the months at issue. <u>Id.</u> In granting with prejudice the defendants' motion to dismiss, this Court held that the plaintiffs' insider trading allegations did not support any inference of scienter, stating:

> [T]o show scienter on the basis of stock trading, the plaintiffs must show that the defendants' trading was "unusual, well beyond the normal patterns of trading by those defendants." Here, . . . . [n]othing . . . is said about whether these sales were inconsistent with any pattern established by these defendants in either amount or . . . timing. Without more, these allegations do not raise a strong inference of scienter.

<u>Id.</u> (citations omitted).

In this case, the insider trading allegations are far weaker than those held wanting in <u>Carney</u>. First, Plaintiffs in this case have failed to allege that there was anything unusual about any of the Individual Defendants' stock sales after the earnings guidance at issue. For this reason alone, Plaintiffs' scienter arguments fail with respect to their guidance allegations. <u>See</u> <u>Carney</u>, 135 F. Supp. 2d at 256 ("[P]laintiffs must show that defendants' trading was 'unusual . . . .'"). Second, unlike in <u>Carney</u>, IFIN's CFO did not sell <u>any</u> Company stock after IFIN issued its allegedly misleading earnings guidance. AC ¶ 236. This lack of trading by the Company's CFO undermines severely Plaintiffs' scienter allegations. <u>See</u> <u>In re First Union Corp. Sec. Litig.</u>, 128 F. Supp. 2d 871, 899 (W.D. N.C. 2001) (the fact that "many key First Union executives . . . -- including the Company's Chief Financial Officer</u> -- did not sell a single share . . . is fatal to

25

Plaintiffs' effort to establish scienter through stock sales") (emphasis added).  As another District Court, dismissing a securities fraud claim, explained:

> [T]he Complaint does not allege any stock sales whatsoever by Roberts, CAC's Chief Financial Officer.  It seems as though the CFO would have been an essential participant in any fraudulent scheme to defraud the company.  The fact that he did not sell any shares during the class period undermines the suggestion that the Defendants engaged in securities fraud in order to profit from their own stock sales.

In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 622, 677 (E.D. Mich. 1999) (emphasis added).

Third, four of the seven Individual Defendants sold no IFIN stock between the issuance of the 2005 earnings guidance and the subsequent July 2005 guidance revision.  AC ¶ 236. Moreover, six of the seven Individual Defendants sold no Company stock in the entire second quarter of 2005, immediately preceding the Company's guidance revision.  Id.  Courts across the country have held that where, as here, only some of the individual defendants in a complaint actually traded company stock during the period at issue, there is no inference of scienter.  See, e.g., Nathenson v. Zonagen, Inc., 267 F.3d 400, 420-21 (5th Cir. 2001) (no strong inference of scienter where only one out of three insider defendants sold corporate stock); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d Cir. 1999) (no strong inference of scienter where "three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported"); In re John Alden Fin. Corp. Sec. Litig., 249 F. Supp. 2d 1273, 1282 (S.D. Fla. 2003) (insider trading allegations inadequate where only one of four individual defendants sold stock during the class period).

The only Individual Defendants who sold any Company stock after the 2005 earnings guidance were Mr. Sheehan, Mr. Mancuso, and Mr. Maroney.  AC ¶ 236.  However, Plaintiffs have failed to plead facts showing that any of their sales were suspicious or unusual.  Indeed, Mr. Sheehan's post-guidance stock sales, the last of which occurred on March 14, 2005, represented only **5%** of his total holdings during the purported class period.  AC ¶ 236.  The sale of such a

low percentage of a defendant's holdings generally is not considered suspicious.  See, e.g., In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 898 (W.D.N.C. 2001) (sale of less than 5% of corporate officers' total holdings "affirmatively demonstrates the absence of scienter"); In re E.spire Commc'ns, Inc. Sec. Litig., 127 F. Supp. 2d 734, 743 (D. Md. 2001) ("[T]he fact that an individual defendant sold so little stock [6.2% of holdings] can be construed as negating the inference that there was fraud."); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1094 (9th Cir. 2002) (finding a defendant's sale of 13% of stock and options was not suspicious and "belies any intent to rid himself of a substantial portion of his holdings").  Further, as evidenced in the Amended Complaint, Mr. Sheehan's 2005 sales were consistent with his sales in earlier years. From 2001 to 2004, Mr. Sheehan sold an average of 200,000 shares of IFIN stock per year. AC ¶ 236.  There was nothing unusual about his sale of 155,000 shares of IFIN stock after the Company's 2005 earnings guidance.

Likewise, there was nothing suspicious or unusual about Mr. Mancuso's or Mr. Maroney's post-guidance stock sales, which represented, according to Plaintiffs, only 12% and 3.7% of their class period holdings, and which were consistent with their stock sales in earlier years.  AC ¶ 236.  Indeed, in 2003 and 2004, Mr. Mancuso sold an average of over 87,000 shares of Company stock each year, so his sale of 60,000 shares in 2005 was not unusual in amount. Mr. Maroney had sold over 215,000 shares of IFIN stock since 2001, so his sale of 15,000 shares of IFIN stock on December 27, 2004 also was not unusual in amount.

Moreover, there was nothing suspicious about the timing of Mr. Mancuso's or Mr. Maroney's post-guidance stock sales, all of which were made pursuant to pre-existing written trading plans, and which, therefore, as a matter of law, cannot give rise to any inference of scienter.  See App. 35.  Pursuant to SEC Rule 10b5-1, a person's trading is not "on the basis of" material non-public information if the person adopted a written trading plan consistent with the terms of Rule 10b5-1, and that person purchased or sold securities pursuant to that written trading plan.  See SEC Rule 10b5-1(c)(1).  Courts have interpreted this rule to provide that, on a motion to dismiss, a plaintiff may not rely on such transactions to support an inference of

27

scienter.  See In re Netflix, Inc., Sec. Litig., No. C04-2978-FMS, 2005 WL 1562858, at *8 (N.D. Cal. June 28, 2005) (finding no strong inference of scienter when defendants' sales were pursuant to a Rule 10b5-1 plan); Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (same).

Simply put, Mr. Sheehan, Mr. Mancuso, and Mr. Maroney were the only Individual Defendants who sold any Company stock after the 2005 earnings guidance at issue, and Plaintiffs have not even attempted to plead that there was anything suspicious or unusual about any of those sales.  Therefore, none of the post-guidance stock sales Plaintiffs list in the Amended Complaint support a strong inference of scienter with respect to Plaintiffs' guidance allegations.

Furthermore, the fact that the Individual Defendants retained most of their stock and options after the Company issued its earnings guidance simply cannot be harmonized with the unsupported allegations in the Amended Complaint.  See Maldonado v. Dominguez, 137 F.3d 1, 12 n.9 (1st Cir. 1998) (noting that any inference of scienter was undermined by the defendants' loss of $1.5 million of their own money); Coates v. Heartland Wireless Commc'ns Inc., 26 F. Supp. 2d 910, 920 (N.D. Tex. 1998) (dismissing securities fraud claim in part because "the notion that [the defendant] would engage in fraud and then wait for the stock price to plummet before selling his securities without benefiting from the fraud is a 'nonsensical premise'"); PETsMART, 61 F. Supp. 2d at 1000 (stating that "where an individual retains significantly more shares than he or she sold, the resulting aggregate loss may defeat an inference of fraud").

In addition, none of the Individual Defendants' pre-guidance stock sales from 2001 through December 2004, listed in Paragraph 236 of the Amended Complaint, support any inference of scienter with respect to Plaintiffs' 2005 guidance allegations.  Just as with the post-guidance stock sales discussed above, Plaintiffs have not established that there was anything unusual about the amount of the Individual Defendants' earlier stock sales.  First, it should be noted that, in a transparent attempt to increase the amount of relevant insider sales, Plaintiffs have extended their purported class period back to 2001, creating a class period of almost four

28

and a half years.  Courts across the country have found that an unusually long class period is a mitigating factor when determining, with respect to scienter, the weight to be attributed to insider sales.  See In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir. 2002) ("[P]laintiffs have selected an unusually long class period of sixty-three weeks . . . allow[ing] the plaintiffs to sweep as many sales into their total as possible, thereby making the stock sales appear more suspicious."); In re Syncor Int'l Corp. Sec. Litig., 327 F. Supp. 2d 1149, 1163 (C.D. Cal. 2004) ("[T]he Court views the allegations of insider trading with heightened scrutiny considering the length of the class period -- approximately four years and eight months."); In re Splash Tech. Holdings, Inc., 160 F. Supp. 2d 1059, 1083 (N.D. Cal. 2001) ("[T]he length of the Class Period in this case (approximately 90 weeks) is a major mitigating factor in this finding.") (internal quotations omitted).

However, even with this extended class period, the volume of the trading alleged in the Amended Complaint was not unusual.  Over the entire class period, two of the seven Individual Defendants sold less than 5% of their stock and option holdings.[12]  Mr. Spinney, the Company's CFO, did not sell **any** of his Company stock during the entire class period,[13] but rather **bought** 10,150 shares.  See App. 37.  See Rombach v. Chang, 355 F.3d 164, 176-77 (2d Cir. 2004) (no scienter where, inter alia, individual defendants' purchased shares); In re Century Bus. Serv. Secs. Litig., 2002 WL 3224513, at *8 (N.D. Ohio June 27, 2002) (finding it improbable that defendant would seek to increase his wealth by purchasing stock at inflated prices); Schuster v.

---

[12] When considering allegations of insider trading, courts should take into account both the stock and stock options held by an insider.  See In re Silicon Graphics Inc., 183 F.3d 970, 986-87 (9th Cir. 1999) ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than stock shares alone."); In re E.Spire Commc'ns, Inc. Sec. Litig., 127 F. Supp. 2d 734, 743 (D. Md. 2001) ("[S]hares of stock held plus exercisable options represent the owner's trading potential more accurately than the stock shares alone.").

[13] Although Plaintiffs allege that Mr. Spinney sold 200 shares of IFIN stock in 2002 (AC ¶ 236), in fact, as indicated in contemporaneously filed SEC filings, Mr. Spinney sold no shares of IFIN stock during the class period.  App. 35.

29

Symmetricon, Inc., 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000) (purchase of stock undermined inference of scienter).  Mr. Rogers, who allegedly was one of two insiders who "controlled Investors Financial" in a "dictatorship of two partners" (AC ¶ 257), sold only **4.86%** of his stock and options during the class period. AC ¶ 236.  The fact that two key officers sold **0%** and **5%** of their holdings during a purported class period of over four years -- and the Company's CFO actually **bought** shares -- undermines any inference of scienter in this case.

Moreover, when viewed in the aggregate, the Individual Defendants retained over **73%** of their holdings in IFIN stock and options during the class period, according to Plaintiffs.  AC ¶ 236.  Thus, whether viewed individually or in the aggregate, the Individual Defendants' insider sales, on their face, rebut any inference of scienter based on insider trading.  See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999) ("Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, [retained holdings] suggest they had every incentive to keep Advanta profitable."); San Leandro Emergency Med. Group Profit Sharing Plan, 75 F.3d 801, 814 (2d Cir. 1996) (scienter not established where insider retained large holding in the company); In re Party City Sec. Litig., 147 F. Supp. 2d 282, 313 (D. N.J. 2001) ("[l]ow aggregate sales and large retained aggregate holdings rebut an inference of motive."); In re the Vantive Corp. Sec. Litig., 110 F. Supp. 2d 1209, 1219 (N.D. Cal. 2000) (sale of 38%, and retention of 62%, is a "minimal sale of stock [that] tends to negate an inference of scienter"), aff'd, 283 F.3d 1079 (9th Cir. 2002); In re FVC.com Sec. Litig., 136 F. Supp. 2d 1031, 1038 (N.D. Cal. 2000) (defendants' retention of over 86% of their exercisable shares suggests there was no fraud); In re Peritus Software Servs., Inc., 52 F. Supp. 2d 211, 225 (D. Mass. 1999) (sale of up to 38% of holdings not suspicious).

Having failed to establish anything unusual about the amount of the Individual Defendants' trading during the extended class period, Plaintiffs also have failed to establish that there was anything unusual about the timing or pattern of the Individual Defendants' sales.  As discussed above, the majority of the Individual Defendants had no sales after the Company issued its 2005 earnings guidance but prior to the July 2005 guidance revision. AC ¶ 236.  In

fact, three of the Individual Defendants did not sell any Company stock after 2002, two years before the allegedly misleading earnings guidance.[14]  Id.  Moreover, as with Mr. Mancuso's and Mr. Maroney's post-guidance sales discussed above, numerous of the other Individual Defendants' stock sales in earlier years were made pursuant to Rule 10b5-1 plans, and, therefore, cannot support an inference of scienter.  See supra 27-28.  Indeed, with respect to four of the seven Individual Defendants, all or most of their sales during the class period were pursuant to Rule 10b5-1 trading plans.  App. 35.  These many transactions yielded proceeds of over $52 million, or 76% of the total trading relied on by Plaintiffs over the proposed four-plus year class period.  These trades cannot support any inference that any Defendant acted with scienter.  See Netflix, Inc., 2005 WL 1562858, at *8; Wietschner, 294 F. Supp. 2d at 1116-1117.  For this reason, as well, Plaintiffs' allegations concerning stock sales from 2001 through 2004 do not support any inference of scienter with respect to Plaintiffs' 2005 guidance claims.

### (2)    Plaintiffs' Allegations Concerning Defendants' Bonus Plans Do Not Give Rise To A Strong Inference Of Scienter.

With respect to Plaintiffs' 2005 guidance claims, it is not clear in the Amended Complaint whether Plaintiffs are attempting to raise an inference of scienter by pointing to the incentive-based bonuses received by some of the Individual Defendants.  To the extent that they are, that attempt fails.  Instead of providing factual detail tying the Company's allegedly misleading earnings guidance to specific bonuses, Plaintiffs simply list the bonuses received by some of the Individual Defendants during the class period, and then allege that "executive defendants' bonus compensation was heavily tied to the Company's financial performance."  AC

---

[14] Individual Defendant Karen Keenan's last stock sale was on March 8, 2002, two months after her retirement from the Company in January 2002.  AC ¶¶ 119, 236.  The fact that Ms. Keenan sold 60,000 shares of IFIN stock within three months of her retirement is not unusual or suspicious so as to support a strong inference of scienter.  See Greebel, 194 F. 3d at 206 ("It is not unusual for individuals leaving a company . . . to sell shares."); In re K-Tel Intern., Inc., Sec. Litig., 300 F.3d 881, 896 (8th Cir. 2002) (individual defendant's sale of $11.7 million of company stock "should not materially impact the scienter analysis because he resigned as company president [three weeks later]").

¶ 232.  The First Circuit, along with courts around the country, have held that the mere assertion that a defendant's compensation is tied to financial performance is insufficient to raise a strong inference of scienter.  See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002) ("Their [executives'] compensation depended on the company's earnings; as Cross correctly notes, that fact alone is not and cannot be enough to establish scienter."); Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000) ("Plaintiffs could not proceed based on motives possessed by virtually all corporate insiders, including . . . the desire to maintain a high stock price in order to increase executive compensation."); Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit.  If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud.").

Moreover, Plaintiffs fail to explain how incentive based bonuses could possibly serve as a motive for artificially inflating the Company's earnings projections.  While Plaintiffs have alleged that bonus compensation was tied to financial performance, nowhere do Plaintiffs allege that the Individual Defendants' compensation was in any way tied to its earnings projections. Having failed to identify any specific fact supporting a strong inference that any Defendant actually knew that the 2005 earnings guidance was false or any supporting motive, Plaintiffs have failed adequately to plead scienter.  Accordingly, their 2005 guidance claims must be dismissed on this ground as well.

### C.    Plaintiffs' Claims Based On All Other Forward-Looking Statements Must Be Dismissed Under Rule 12(b)(6), The PSLRA, And Rule 9(b).

Although the essence of Plaintiffs' guidance claim focuses on the Company's 2005 earnings guidance, Plaintiffs also allege that the Company's earnings guidance for the years 2002, 2003, and 2004 was false and misleading.  Specifically, Plaintiffs allege that, when the Company issued projections that its year-over-year earnings would grow at a rate of 25% for the years 2002, 2003, and 2004, those projections were purposefully false and misleading because

IFIN had failed to disclose that it accounted for its interest income by using "the prospective method." AC ¶¶ 144, 151, 157, 163, 190, 198. No claims based on these statements can survive this motion.

As an initial matter, for all the reasons Plaintiffs' 2005 guidance claims fail, as set forth above, Plaintiffs' claims with respect to the Company's earnings guidance for earlier years also fail. First, Plaintiffs' guidance claims fail because each statement at issue was a forward-looking statement accompanied by meaningful cautionary language, and is therefore protected by the PSLRA's safe harbor for forward-looking statements. See supra 13-14. For example, at the outset of the July 11, 2002 conference call Plaintiffs cite (AC ¶ 139), the Company cautioned investors that:

> We'll be making a number of forward-looking statements which are based on management's assumptions as of today. The company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the [MD&A] section of the most recent 10-Q and 10-K. I recommend that anyone listening to this call review those reports carefully.

See App. 12.[15] Similarly, at the outset of the October 10, 2002 conference call Plaintiffs cite (AC ¶ 147), the Company cautioned investors that:

> We'll be making a number of forward-looking statements which are based on management's assumptions and predictions as of today. The company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the [MD&A] section of the most recent 10-K and 10-Q. I recommend that anyone listening to this call review those reports carefully. Because this call will be archived on our web site, I want to emphasize again for anyone listening at a later date that the statements made today are based on

---

[15] Orally communicated forward-looking statements may obtain safe-harbor protection by referencing SEC filings containing meaningful cautionary language. See 15 U.S.C. §78u-5(c)(2)(B)(i) (oral forward-looking statements obtain safe harbor protection if "the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof"); 15 U.S.C. §78u-5(c)(3) ("[a]ny document filed with the Commission or generally disseminated shall be deemed to be readily available for purposes of paragraph (2)").

> assumptions as of today, October 10th, 2002.  These assumptions may change, but the recording of this call will not be updated.

See App. 13.

The Company also included meaningful cautionary language in all of the press releases Plaintiffs cite in the Amended Complaint.  For example, in the January 23, 2003 press release (AC ¶ 152), the Company cautioned that:

> This news release contains forward-looking statements (statements which are not historical facts).  These statements, such as Mr. Sheehan's statements regarding the Company's 2003 earnings estimate, are based upon certain assumptions and estimates that might not be realized.  Important factors that could cause actual results to differ materially from those indicated by such forward-looking statements include the performance of global financial markets, changes in interest rates, and the Company's ability to continue to manage its costs. Additional factors that could also affect actual results are set forth under the heading "Certain Factors That May Affect Future Results" in the Company's Annual Report of Form 10-K for the year ended December 31, 2001 and Quarterly Report on Form 10-Q for the quarter ended September 30, 2002.

See App. 14.

All of the additional earnings guidance Plaintiffs cite for the years 2002, 2003, and 2004 contain similar cautionary language.[16]   As with the Company's 2005 earnings guidance discussed above, the Company's guidance in these earlier years meet the requirements for safe harbor protection, and therefore cannot give rise to liability under the federal securities laws.

Second, Plaintiffs' 2002, 2003, and 2004 guidance claims fail because Plaintiffs have not pled that any Defendant had actual knowledge that the guidance was false when issued.  Under the second-prong of the PSLRA's safe harbor for forward looking statements, a defendant is not liable with respect to a forward-looking statement if the plaintiff fails to prove that the forward-looking statement was made "with actual knowledge . . . that the statement was false or misleading."  See supra 18 (quoting 15 U.S.C. §78u-5(c)(1)(B)(ii)).  Plaintiffs do not -- because

---

[16] See January 23, 2003 conference call transcript (AC ¶ 154) at App. 15; April 10, 2003 press release (AC ¶ 159) at App. 16; June 7, 2004 Reg. FD Disclosure (AC ¶ 188) at App. 7; July 14, 2004 press release (AC ¶ 191) at App. 18; September 28, 2004 Reg. FD Disclosure (AC ¶ 196) at App. 9.

they cannot -- allege that any Defendant had actual knowledge that any earnings guidance for 2002, 2003, or 2004 was false or misleading.

This is so for one simple reason, which constitutes a separate and independent ground mandating dismissal of Plaintiffs' various claims based on the Company's earnings guidance for 2002, 2003, and 2004. In this case, as explained more fully below in Section III.A.1, the Company exceeded its 25% earnings growth projections in 2002, 2003, and 2004 <u>irrespective</u> of whether it was using the prospective or the retrospective method of accounting. Indeed, even after the Company's restatement, IFIN **exceeded** its **25%** earnings growth targets in 2002, 2003 and 2004. It achieved year-over-year earnings growth of **50%** in 2002, **36%** in 2003, and **50%** in 2004. <u>See infra</u> 47. As a matter of law, a company's earnings guidance that is later proven to be accurate cannot be "false and misleading." <u>See</u> <u>Carney</u>, 135 F. Supp. 2d at 245 (question of whether a growth projection was sufficiently accompanied by meaningful cautionary language is "moot" if the defendant's projection "was not off the mark"). For all of these reasons, Plaintiffs' claims based on the Company's earnings guidance for 2002, 2003, 2004, and 2005 must be dismissed.

III. **PLAINTIFFS FAIL TO STATE ANY FEDERAL SECURITIES FRAUD CLAIMS BASED ON THE <u>HISTORICAL FINANCIAL RESULTS THAT THEY CHALLENGE.</u>**

As discussed above, unlike the original Complaint in this case, the Amended Complaint bases claims on the restatement of financial results that IFIN announced in October 2004 -- nine months before the July 14, 2005 Announcement regarding 2005 guidance that triggered the filing of this case. Plaintiffs attack as a misrepresentation virtually every financial disclosure that IFIN made between 2001 and 2005, and certain related statements (the "Financial Disclosure Claims"). For the reasons discussed below, Plaintiffs' Financial Disclosure Claims must be dismissed pursuant to the PSLRA and Rule 9(b), and Rule 12(b)(6).

**A.    Plaintiffs' Financial Disclosure Claims Must
Be Dismissed Under The PSLRA And Rule 9(b).**

Plaintiffs' Financial Disclosure Claims must be dismissed under the PSLRA and Rule 9(b) because:  (1) Plaintiffs fail to plead any specific facts supporting a strong inference that any financial disclosure was knowingly false when made; (2) Plaintiffs' allegations regarding the Company's SBA securities are not pled with specificity; (3) Plaintiffs fail to plead scienter respecting their SBA security-related claims; and (4) Plaintiffs fail to plead loss causation respecting their SBA security-related claims.

**1.    Plaintiffs Fail To Plead Any Specific Facts
Supporting A Strong Inference That Any
Financial Disclosure Was Knowingly False When Made.**

As discussed above, in order to support a strong inference that a challenged statement was knowingly false when made, a complaint is required to identify internal reports, memoranda or the like and allege both the contents of those documents and defendant's possession of them at the relevant time.  See supra 19.  Here, despite the length of the Amended Complaint, Plaintiffs have failed to allege a single specific fact -- not a single specific document, or meeting, or conversation -- that supports any inference, let alone a strong inference, that any one of the myriad challenged statements was knowingly false when made.  That failure is fatal to all of their financial disclosure claims.[17]

---

[17] In addition, Plaintiffs conclusorily allege that Defendants knew that IFIN's internal accounting controls were inadequate in violation of Section 13(b)(2).  AC ¶ 90-95.  Plaintiffs' allegations fail as a matter of law as Plaintiffs allege no specific facts suggesting that Defendants knew of any alleged control problems or of any dangers associated with IFIN's internal controls.  Courts routinely dismiss internal control allegations for precisely this reason.  See Abrams v. Baker Hughes, Inc., 292 F.3d 424, 433 (5th Cir. 2002); In re Westinghouse Sec. Litig., 90 F.3d 696, 711-12 (3d Cir. 1996).  Accordingly, Plaintiffs' internal control allegations must be dismissed.

Lacking any specific facts to support any of their financial disclosure claims, the best that Plaintiffs can do is seek to plead scienter based upon allegations concerning: (1) the restatement itself; and (2) the status and background of the Individual Defendants. None of those allegations, either individually or in the aggregate, support any inference of scienter, as a matter of law.

### a. IFIN's Restatement Does Not Support Any Inference Of Scienter.

This Court's decision in <u>Galileo</u> exemplifies the First Circuit's stringent standards for pleading scienter and further emphasizes Plaintiffs' pleading deficiencies in this case. In <u>Galileo</u>, plaintiffs brought Section 10(b) claims against defendants in connection with the defendant company's announcement of accounting errors and charges that triggered a <u>64% stock drop</u> in its stock price. <u>In re Galileo Corp. S'holders Litig.</u>, 127 F. Supp. 2d 251, 258 (D. Mass. 2001). In addition, defendants allegedly <u>violated</u> the defendant company's own <u>revenue recognition policy</u>, forcing the company to restate its financial results for Q2 1998. <u>Id.</u> at 259. The defendant company's <u>CEO and CFO were fired</u> when the GAAP violations were discovered. <u>Id.</u> In granting the defendants' motion to dismiss for failure adequately to allege scienter, this Court stressed: "What is **missing** from these allegations, in sum, is the kind of **essential** <u>detail</u> necessary to give rise to a <u>strong</u> inference that, to the extent [the CFO] participated in the preparation of the forms 10-Q . . . he acted with intent to deceive or that he acted recklessly in recognizing revenues from sales to Imagyn." <u>Id.</u> at 263 (emphasis added).

The facts pled in <u>Galileo</u> are far more egregious than those pled here, but this Court held them wanting. <u>Ipso</u> <u>facto</u>, Plaintiffs' scienter allegations here are legally deficient. Unlike <u>Galileo</u>, this case does not involve the sort of "fictitious sales" or "systematic fraud" at issue in, for example, <u>In re Cabletron Sys., Inc.</u>, 311 F. 3d 11, 25, 35 (1st Cir. 2002). To the contrary, Plaintiffs here merely allege that IFIN improperly used one accounting method recognized by FAS 91 -- the prospective method -- over another -- the retrospective method. <u>See</u> AC, Ex. A (Sunil Gangwani, Allen S. Thomas & James Mountain, <u>Accounting for Investments in MBS and ABS</u>, <u>in</u> Speaking of Securitization: Accounting, Tax, Regulatory and Other Developments

37

Affecting Transfers and Servicing of Financial Assets, Vol. 5, Issue 1, at 8-11 (2000) ("SFAS No. 91 allows two basic methods of accounting for interest income for mortgage loans and debt securities that are prepayable.")).   At bottom, Plaintiffs attempt to conjure fraud out of what amounted to a subjective bookkeeping judgment between two recognized and complex accounting methods.  Well-established legal principles preclude Plaintiffs' efforts.

First, the mere fact that a company has restated its financial results does not, without more, "support a 'strong inference' of fraud, or for that matter, a weak one."  In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 169 (D. Mass. 2000); see also In re Peritus Software Servs., Inc., 52 F. Supp. 2d 211, 224 (D. Mass. 1999); Chill v. Gen. Elec., Co., 101 F.3d 263, 270-71 (2d Cir. 1996).  "Instead, the Court must ask whether the GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants knowingly or recklessly misled investors."  Peritus Software Servs., Inc., 52 F. Supp. 2d at 224.  That is, a plaintiff must do more than simply allege that a defendant's preparation and oversight of restated financial statements give reason to infer scienter, as such allegations amount to nothing more than fraud by hindsight.  Greenstone v. Cambex Corp., 975 F.3d 22, 25 (1st Cir. 1992); In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 53 (D. Mass. 1998); see also Davis v. SPSS, Inc., 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005).

Second, where, as here, the issuer's financial adjustments are small in size "[r]estatements are less probative of deliberate wrongdoing or recklessness."  In re Hypercom Corp. Sec. Litig., No. CV-05-0455-PHX-NVW, 2006 WL 726791, at *4 (D. Ariz. Mar. 9, 2006) (dismissing fraud claim and holding that company's restatement was "not of the magnitude typically found to support a strong inference of scienter"); see also Greebel, 194 F.3d at 206 (concluding that improper recognition of 4.2% of defendant's revenues did not support a strong inference of scienter); In re Integrated Elec. Serv. Inc. Sec. Litig., No. 04-CV-3342, 2006 WL 54021, at *3 (S.D. Tex. Jan. 10, 2006) (restatement reducing net income by $5.7 million over

thirty month period "surely cannot, by itself, support an inference of scienter").[18]

For example, in In re Segue Software, Inc. Sec. Litig., plaintiffs alleged that the company had intentionally "underestimated" product returns in violation of GAAP, which caused the company to restate its financials and reduce the company's 1998 revenues by 2.6%. In dismissing the case for failing adequately to allege scienter, the Court stressed:

> Accounting judgments, even imperfect ones that violate GAAP, do not, absent "other circumstances," support an inference of scienter. See Greebel, 194 F.3d at 205; Reisman, 965 F. Supp. at 172. Cf. Shapiro v. UJB Financial Corp., 964 F.2d 272, 283 (3d Cir. 1992) ("[I]t is not a violation of the securities laws to simply fail to provide adequate loan loss reserves; properly collateralize or secure a loan portfolio; or provide sufficient internal controls or management practices"). The "other circumstances" that plaintiffs point to have a certain circularity in their logic, that is, they consist for the most part of the very practices that plaintiffs allege cumulatively violated GAAP.

Segue Software, Inc., 106 F. Supp. 2d at 170 (emphasis added). Further, concluding that the company's 2.6% overstatement of its revenues was "insignificant," the court cautioned: "To reflexively punish a company for correcting its earning statements when subsequent events disclose errors in the originals would create a perverse incentive for management to conceal mistakes, thereby defeating a core purpose of the securities laws." Id. at 169-70.

In this case, as in Segue, Plaintiffs ask this Court to infer from the fact that IFIN restated its financial results that Defendants acted with the requisite mental state. See AC ¶¶ 79, 82, 87, 88, 89, 103, 104 & 231. As discussed above, merely alleging that IFIN restated its financial results does not support even a "weak" inference of scienter. See supra 38.

Moreover, the size of IFIN's adjustment to its financial results for fiscal years 2001, 2002, 2003, and 2004 militates against any inference, let alone a strong inference, of scienter. Indeed, the cumulative adjustment of $6.2 million was **less** **than** **0.4%** of the **$1.6 billion** total net operating revenue that IFIN reported during those periods. In addition, IFIN actually

---

[18] See also PR Diamonds, 364 F.3d at 685-86 (reasoning that relatively smaller variations in financial statements fail to give rise to inference of scienter).

**understated** its earnings for fiscal year 2003 and the first two quarters of 2004, causing IFIN to **revise upward** its net interest income for those time periods.  AC ¶ 6.  For most of the other restated quarters, the difference between the original and restated numbers is immaterial.[19]  All told, IFIN's restatement of less than 0.4% of its net operating revenues constituted a far smaller restatement, on a percentage basis, than the restatement the Segue court found to be "insignificant."  Segue Software, Inc., 106 F. Supp. 2d at 169 (dismissing securities fraud claim where 2.6% overstatement of its revenues did not support a strong inference of scienter).

Indeed, numerous courts, including the First Circuit, have dismissed securities fraud claims based upon overstatements of financial results that were significantly larger and more egregious than those alleged here.  See, e.g., Greebel, 194 F.3d at 206 (no strong inference of scienter where revenue artificially inflated by 4%); Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 851 (N.D. Ill. 2003) (3% restatement failed to raise inference of scienter); In re E.Spire Commc'ns Inc. Sec. Litig., 127 F. Supp. 2d 734, 747 (D. Md. 2001) (3.7% revenue overstatement for fiscal quarter did not give rise to inference of scienter); In re SCB Computer Tech., Inc. Sec. Litig., 149 F. Supp. 2d 334, 351 (W.D. Tenn. 2001) (2.9% and 1.65% revenue overstatement did not give rise to strong inference of scienter).  In light of these many authorities, Plaintiffs' allegations regarding IFIN's restatement of its financial results, absent additional specific facts which Plaintiffs' Amended Complaint lacks, cannot give rise to the requisite strong inference of scienter.

**b.    Plaintiffs' "Status" And "Access"
Allegations Cannot Support Any Inference Of Scienter.**

Lacking the particularized facts required under the PSLRA and Rule 9(b), Plaintiffs resort to allegations regarding the status of one of the Individual Defendants and the alleged access that four of the Individual Defendants had to documents at internal meetings.  AC ¶¶ 28,

---

[19] See supra 6.

69-76, 79, 82, 89. These allegations are incapable of giving rise to a strong inference that any Defendant acted with the necessary level of scienter.

In the Amended Complaint, Plaintiffs suggest that all Defendants knew that IFIN's restated financial results were not filed in accordance with GAAP and that its accounting was "improper" by virtue of Defendant Spinney's accounting background. AC ¶ 89. For example, Paragraph 89 of the Amended Complaint, states, in its entirety:

> The improper accounting was not a result of inexperienced accounting managers who did not understand accounting rules, nor can it be blamed solely on implementation of a new accounting system or poor accounting controls. To the contrary, Investors Financial's CFO is an experienced Certified Public Accountant and seasoned financial professional with significant auditing and SEC reporting experience. Spinney has 14 years' experience at KPMG working with financial service clients and as an audit partner in KPMG's Boston, Massachusetts office. As a result of his "Big Four" accounting and auditing background, he was well versed in evaluating, establishing, and auditing securities and internal accounting controls.

AC ¶ 89.

In other words, Plaintiffs allege that, because Mr. Spinney is a CPA, he "must have known" that financial disclosures were inaccurate when made. However, rote allegations such as these, suggesting what Defendants must have known solely by virtue of their status, position or background are not sufficient to meet the strict pleading requirements of the PSLRA and Rule 9(b). See, e.g., Peritus Software Servs., Inc., 52 F. Supp. 2d at 228 (granting motion to dismiss and rejecting status allegations).[20] Allegations that a defendant "must have known" information cannot support a strong inference of scienter as a matter of law. See, e.g., Lirette v. Shiva, 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (allegations "consist[ing] solely of general inferences that the defendants, by virtue of their position within the Company, must have known about the company's problems when they undertook allegedly fraudulent actions," are "'precisely the types of inferences which this court, on numerous occasions, has determined to be inadequate' to

---

[20] See also Greebel v. FTP Software, Inc., 182 F.R.D. 370, 374 (D. Mass. 1998), aff'd, 1999 WL 902898 (1st Cir. 1999) ("generalized allegations" that "Defendants, solely by virtue of their positions at FTP," participated in the alleged fraud "do not satisfy Rule 9(b) or the PSLRA").

withstand the special pleading requirements in securities fraud cases") (citing <u>Maldonado</u>, 137 F.3d at 9).

Plaintiffs' "access" allegations are similarly flawed.  Specifically, Plaintiffs allege that four of the Individual Defendants participated on IFIN's Asset and Liability Committee ("ALCO") and received unspecified reports and information as a result.  AC ¶¶ 28, 69-76, 89.[21] However, it is axiomatic that, "[g]eneral allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss."  <u>Lirette</u>, 27 F. Supp. 2d at 283.  Rather, plaintiffs must <u>specifically</u> identify <u>particular</u> internal corporate documents, the date of such documents, the exact information in the documents, and who received them.  <u>Capstead</u>, 258 F. Supp. 2d at 564-65 (allegations that defendants knew from internal documents that prepayment levels were "adversely affecting" income insufficient to give rise to strong inference of scienter).  Courts in this district dismiss complaints where a plaintiff "has not directed the Court to any particular documents drafted by, or available to, the defendants that would indicate the defendants' knowledge of [the company's] problems."  <u>Lirette</u>, 27 F. Supp. 2d at 283; <u>see also</u> <u>Guerra v. Teradyne, Inc.</u>, No. 01-11789, 2004 WL 1467065, at *25 (D. Mass. Jan. 16, 2004) (dismissing complaint for, <u>inter alia</u>, failing to satisfy scienter standard where plaintiffs did not

---

[21] Plaintiffs attribute a number of their very general ALCO meeting allegations to "CW1."  AC ¶¶ 73-75.  Courts in the First Circuit carefully scrutinize statements attributed to confidential witnesses, evaluating, among other things, "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  <u>In re Cabletron Sys., Inc.</u>, 311 F.3d at 29-30 (confidential witness testimony should include "personal knowledge" and "specific descriptions of the precise means through which [the fraud] occurred").  Where the confidential witness relied upon is not alleged to have been in a position to know the information for which that witness is cited, statements of that witness cannot support any inference of scienter.  <u>Fitzer v. Sec. Dynamics Techs.</u>, 119 F. Supp. 2d 12, 22 (D. Mass. 2000) (confidential witnesses must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); <u>see also</u> <u>In re Veritex Pharm., Inc.</u>, 357 F. Supp. 2d 343, 353 (D. Mass. 2005) (disregarding confidential witness allegations because "none of the CWs claims to have personal knowledge of the most important facts they allege").  Here, CW1 is not cited as the source of any allegation of specific fact bearing on what any Individual Defendant knew at any particular time.

plead with particularity the contents of any single report allegedly received by defendants); <u>Van Ormer v. Aspen Tech., Inc.</u>, 145 F. Supp. 2d 101, 104 (D. Mass. 2000) (allegations that the defendants received "sales pipeline reports" containing information that sales were stagnating insufficient to support an inference of scienter); <u>Boston Tech., Inc.</u>, 8 F. Supp. 2d at 358 (complaint failed adequately to allege scienter where "[n]ot a single report, memorandum, meeting minute, or like item is referred to or specified in the Complaint").

For example, in <u>Capstead</u>, the plaintiffs alleged, <u>inter alia</u>, that defendants erroneously represented to the market that the defendant company "had protected itself from interest-rate changes by investing heavily in mortgage-backed securities." 258 F. Supp. 2d at 545. Plaintiffs, however, alleged that the defendants were aware, through the receipt of internal documents containing "adverse information," that "the combination of high rates of prepayments and falling interest rates were having a negative impact on the Company's earnings and dividends." <u>Id.</u> at 565. Plaintiffs' complaint provided the following description of those "internal documents":

> Plaintiffs allege that Defendants routinely received the "Capstead Corporate Monthly Report" and other materials transmitted over the "Capnet" intranet, and monthly "Management Reports," which included operating plans, budgets and forecasts and reports of actual operations compared thereto. Plaintiffs also allege that the monthly corporate update included a specific "Financial Highlights" section, which monitored the trends and actual status of interest rates, and analyzed how the trends would affect Capstead's business.

<u>Id.</u> at 564 n.12. Employing reasoning that applies with equal force here, the court determined that plaintiffs' allegations failed to give rise to a strong inference of scienter:

> With respect to the documentary evidence, Plaintiffs do not specifically identify <u>any one particular internal document</u> containing the alleged "adverse information"; the contents of such adverse or negative information; when the internal document . . . was prepared; by whom it was prepared; or to whom was it directed.

<u>Id.</u> at 565 (emphasis added). Consequently, the court concluded that plaintiffs' allegations were "insufficient to give rise to a strong inference of scienter." <u>Id.</u>

<u>Capstead</u> is squarely on point. As in <u>Capstead</u>, the Amended Complaint here does not specify the date that any one ALCO "reporting package" was prepared; the sender of any one specific "reporting package;" the recipient of any one specific "reporting package;" or the

content of any one specific "reporting package."  See Capstead, 258 F. Supp. 2d at 565; see also Van Ormer, 145 F. Supp. 2d at 104 ("[P]laintiffs never specify which reports contained this information, the date of such reports, the exact information in the reports, or who received them.")  Further, Plaintiffs have not specifically described a single particular "reporting package" that allegedly addressed FAS 91, the retrospective method, the prospective method, MBS securities, or SBA securities.  Indeed, Plaintiffs' Amended Complaint does not describe any one specific document.  See AC ¶¶ 70-75.[22]  Instead, the Amended Complaint contains only conclusory allegations regarding the general composition of ALCO and a "reporting package" allegedly distributed to the committee.[23]  Thus, none of Plaintiffs' ALCO allegations can support any inference that any Defendant possessed any specific information, at any point in time, indicating that any challenged statement was false when made.  For all of the reasons discussed above, the Amended Complaint fails to allege facts sufficient to give rise to a strong inference of scienter respecting Plaintiffs' Financial Disclosure Claims.  Accordingly, their claims must be dismissed.

---

[22]  Numerous cases reject allegations -- like those Plaintiffs make here -- regarding alleged "types" of documents or reports that the Defendants supposedly received, even where the complaint described generally the supposed contents of those types of reports.  For example, in In re Silicon Graphics, Inc. Sec. Litig. 183 F.3d 970 984-85 & n.14 (9th Cir. 1999) the plaintiffs referred to three named reports that were generated regularly by defendants, and described their alleged general contents.  Nevertheless, the Ninth Circuit held these allegations insufficient because they lacked a specific description of the content of particular reports stating:  "[A] proper Complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability."  173 F.3d at 985.  See also Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993) (holding insufficient to support allegations of fraud "scanty descriptions" of internal documents not augmented by facts showing "who sent the memo, when it was received, or whether it reflected a final determination"); In re Guess?, Inc. Sec. Litig., 174 F. Supp. 2d 1067, 1075-76 (C.D. Cal. 2001) (rejecting allegations of access to "weekly inventory reports" that failed to detail who drafted them, "what date the key reports or statements were made, what specifically the reports contained, or any other corroborating facts.").

[23]  See, e.g., Peritus Software Servs., Inc., 52 F. Supp. 2d at 228 (rejecting allegations regarding unspecified internal documents as insufficient under the PSLRA); see also San Leandro, 75 F.3d at 812 (affirming dismissal of plaintiffs' securities claim based on supposedly "confidential" company reports because the reports were not specifically identified in complaint).

### c. Plaintiffs' Motive Allegations Do Not Support Any Inference Of Scienter.

For all of the reasons discussed above, Plaintiffs' motive allegations relating to the Individual Defendants' stock trading and bonus compensation do not support any inference of scienter.  See supra 22-32.  Furthermore, as discussed below, those motive allegations do not support any inference of scienter as applied to Plaintiffs' Financial Disclosure Claims.  Nor does Plaintiffs' allegation that Defendants were motivated to achieve 25% growth in EPS "year after year" "by deceiving investors and the market about [IFIN's] true financial condition" support any inference of scienter.   AC ¶ 3, 232-234, 235-236.

As noted above, motive and opportunity allegations alone cannot support a strong inference of scienter.  See supra 22.  Furthermore, in addition to the numerous reasons discussed above, Plaintiffs' allegations about Defendants' stock trading and bonus compensation do not support any inference of scienter as applied to Plaintiffs' Financial Disclosure Claims for an additional reason:  They make no sense.  Irrational motive allegations cannot support a fraud claim under Rule 9(b), as a matter of law.  See In re CDNOW Sec. Litig., 138 F. Supp. 2d 624, 642 (E.D. Pa. 2001) (granting motion to dismiss where "motive alleged" was "illogical") (citation omitted); Coates v. Heartland Wireless Commc'ns, Inc., 55 F. Supp. 2d 628, 643 (N.D. Tex. 1999) (granting motion to dismiss where plaintiffs' "alleged motive to commit fraud is not plausible as pleaded" and further stating that "[t]he first motive for fraud on which plaintiffs rely defies common sense, is facially implausible, and does not give rise to a strong inference of fraud.").[24]

_____

[24] See also In re Geopharma, Inc. Sec. Litig., 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006) (dismissing securities fraud claims with prejudice noting that "the tenuous plausibility of the alleged scheme substantially weakens the overall strength of plaintiffs' scienter allegations"); Tracinda Corp. v. Daimler Chrysler AG, 197 F. Supp. 2d 42, 84 (D. Del. 2002) (dismissing claims when "the Court agrees with Defendants that this alleged motive is tenuous and somewhat illogical"); In re 1993 Corning Sec. Litig., No. 93 Civ. 7015, 1996 U.S. Dist. LEXIS 6601, at *21 (S.D.N.Y. May 15, 1996) (granting motion to dismiss because, inter alia, "Plaintiffs' 'theory of motive makes no sense'"); Thornton v. Micrografx, Inc., 878 F. Supp. 931, 938 (N.D. Tex. 1995) ("Plaintiffs draw inferences of wrongdoing based upon a nonsensical premise. . . .  The Court refuses to leave its common sense at the courthouse steps, and

(Footnote Continued on Next Page.)

Here, Plaintiffs' insider trading and bonus allegations make no sense as applied to Plaintiffs' Financial Disclosure Claims because IFIN **actually** **revised** **upward** its net interest income and net operating revenues for 2003 and the first three quarters of 2004.   See infra 61. Indeed, IFIN's adjustments resulted in an **increase** of $2.7 million in net interest income for the first three quarters of 2004.   See App. 19.   No officer or director intent on selling stock or obtaining a **higher** incentive-based bonus would intentionally **understate** financial results, artificially **deflating** the Company's stock, for the purpose of selling his or her shares at **depressed** prices or receiving a **lower** bonus payment.   Plaintiffs' motive allegations defy economic reason.   Therefore, they cannot support any inference of scienter when applied to Plaintiffs' Financial Disclosure Claims.   See Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001) (affirming lower court's dismissal of the complaint where plaintiffs' view of the facts defies economic reason); Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (dismissing fraud claims where plaintiff's view of the facts defies economic reason, and therefore does not yield a reasonable inference of intent).

Further, Plaintiffs' allegation that Defendants were motivated to inflate artificially financial results to achieve 25% growth in EPS year over year is equally fallacious.   As an initial matter, merely alleging that Defendants desired to sustain the appearance of "corporate profitability," or positive growth, cannot support a strong inference of scienter, as those motives are "possessed by virtually all corporate insiders."   Novak, 216 F.3d at 307.   Additionally, as the below chart demonstrates, Plaintiffs' motive allegations are fatally flawed because IFIN achieved at least 25% growth in EPS irrespective of whether it used the prospective or retrospective method to account for its MBS securities:

---

(Footnote Continued from Previous Page.)

concludes that the Plaintiffs have failed to make the requisite showing of scienter to support their securities fraud claims.").

| Year | Reported EPS | EPS Growth Rate | Restated EPS | EPS Growth Rate |
|------|------|------|------|------|
| 2000 | $0.54 | N/A | N/A | N/A |
| 2001 | $0.76 | 41% | $0.68 | 26% |
| 2002 | $1.04 | 37% | $1.02 | 50% |
| 2003 | $1.38 | 33% | $1.39 | 36% |
| 2004 | $2.09 | 51% | $2.09 | 50% |

See App. 5, 6, 8.    Therefore, Plaintiffs' allegation that Defendants were motivated to commit fraud in order to continue to achieve 25% growth in EPS is, much like their trading and bonus compensation allegations, entirely nonsensical.  In sum, Plaintiffs' irrational motive allegations are defective, as a matter of law.[25]

> **2.    Plaintiffs Fail To Allege Specific Facts
> Regarding The Company's SBA Securities
> That Render Any Financial Disclosure False Or Misleading.**

Plaintiffs litter throughout their Amended Complaint the allegation that IFIN's financial disclosures respecting its SBA securities were fraudulently inaccurate.  Like Plaintiffs' other financial disclosure claims, those claims fail because Plaintiffs fail to plead a single specific fact supporting any inference that any Individual Defendant knew that any SBA security disclosure was false.  See supra 17-22.  As discussed below, Plaintiffs' SBA securities claims also fail to state a claim because:  (1) Plaintiffs fail to plead specific facts showing that any financial disclosure concerning the Company's SBA portfolio was false; (2) Plaintiffs fail to plead specific facts showing that the Company's correction to the contractual maturity table in its 2003 10-K was done for any other reason than to correct a simple clerical oversight; and (3) Plaintiffs fail to plead specific facts showing that the Company's SBA securities were permanently impaired.

---

[25]  Plaintiffs alternatively argue that Defendants acted "recklessly."  AC ¶ 213.  "[C]loser to being a lesser form of intent" than a "greater degree" of negligence, Greebel, 194 F.3d at 199 (citation omitted), recklessness requires callous disregard of "dangers" about which a defendant has "**full knowledge**" that make it probable that statements being made to the investing public are inaccurate.  Maldonado v. Dominquez, 137 F.3d 1, 9 n.5 (1st Cir. 1998).  Having failed to allege any specific facts regarding any Defendants' knowledge, Plaintiffs have failed to satisfy this standard as well.

**a.    Plaintiffs Fail To Plead Specific Facts
Showing That Any Disclosure Concerning
The Company's SBA Portfolio Was False.**

Plaintiffs conclusorily allege, without any supporting facts, that IFIN's restatement of its financial results in the Fall of 2004 affected its SBA securities despite IFIN's statement to the contrary. More specifically, Plaintiffs allege that: (1) IFIN "was experiencing prepayments on its SBA securities during 2002 and 2003;" (2) that IFIN could "reasonably anticipate prepayments;" and (3) IFIN knew that it should apply, or was reckless in not applying, the retrospective method under Paragraph 19 of FAS 91 to its SBA portfolio. AC ¶ 53. Plaintiffs' conclusory allegations are unsupported by any specific facts. In addition, they are premised upon a blatant misrepresentation of FAS 91 and its requirements.

As an initial matter, conclusory allegations of GAAP violations do not suffice. Greebel, 194 F.3d at 203-204. Rather, a court must analyze whether the specific facts alleged demonstrate a violation of the GAAP provision on which a plaintiff relies. Id. Indeed, courts routinely dismiss securities fraud complaints that fail to plead specific facts showing that the GAAP provision in question has been triggered and violated. See, e.g., Greebel, 194 F.3d at 203-204 (affirming dismissal of claim that defendant improperly inflated earnings under GAAP where plaintiffs failed to plead specific facts indicating violation of FAS 48); In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 389-390 (4th Cir. 2005) (affirming dismissal of claim that defendant violated FAS 5 by not taking a charge against income, because plaintiffs failed to plead specific facts indicating that nonpayment was "probable" and the resulting loss could be "reasonably estimated") (emphasis added); In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 891-892 (8th Cir. 2002) (affirming dismissal of claim that defendants violated FAS 121 and FAS 5 because plaintiffs failed to plead specific facts indicating that either provision was violated); Capstead, 258 F. Supp. 2d at 552-554 (dismissing, inter alia, claim that defendants failed properly to account for interest income under FAS 125, where plaintiffs did not plead specific facts necessary to trigger application of FAS 125).

Here, Plaintiffs allege that IFIN was required to apply the retrospective method under Paragraph 19 of FAS 91 to its SBA securities. AC ¶¶ 53, 130, 210. However, under Paragraph 19 of FAS 91, a company is only allowed to estimate prepayments if its loans meet specific requirements. See FAS No. 91, ¶ 19; FASB Implementation Guide on FAS 91, ¶ 52; App 29-30. See App. 29, 30. Paragraph 19 of FAS 91 provides, in pertinent part:

> [I]f the enterprise holds a large number of <u>similar loans</u> for which <u>prepayments are probable</u> **and** the <u>timing and amount of prepayments can be reasonably estimated</u>, the enterprise <u>may</u> consider estimates of future principal payments in the calculation of the constant effective yield necessary to apply the interest method.

FAS No. 91, ¶ 19 (emphasis added). The FASB has established a non-exclusive list of factors that should be considered when evaluating whether a company "holds a large number of similar loans" for purposes of estimating prepayments under Paragraph 19 of FAS 91. FASB Implementation Guide on FAS 91, ¶ 51. Those factors include, but are not limited to, loan type, loan size, nature and location of collateral, coupon interest rate, maturity, period of origination, prepayment history of the loans (if seasoned), level of net fees and costs, prepayment penalties, interest rate type, and expected prepayment performance in varying interest rate scenarios. Id. Further, assuming that a company has determined: (a) that it holds a large number of similar loans for which prepayments are probable; <u>and</u> (b) that the timing and amount of prepayments can be reasonably estimated; <u>then</u> (c) only after a difference arises between a company's prepayment estimates and actual prepayments received is it required to recalculate effective yields:

> <u>If the enterprise anticipates prepayments</u> in applying the interest method <u>and a difference arises between the prepayments anticipated and actual prepayments received</u>, the enterprise <u>shall recalculate the effective yield to reflect actual payments to date and anticipated future payments.</u>

FAS No. 91, ¶ 19 (emphasis added).

Here, Plaintiffs' Amended Complaint contains the very types of unsubstantiated allegations that are routinely dismissed in securities fraud cases. That is, Plaintiffs fail to plead any specific facts to support their conclusory allegation that IFIN's SBA portfolio met the criteria set forth in Paragraph 19 of FAS 91. As explained above, IFIN could only estimate

prepayments on its SBA securities if: (1) the SBA securities were "similar loans for which prepayments were probable;" <u>and</u> (2) "the timing and amount of prepayments can be reasonably estimated." <u>See</u> FAS No. 91, ¶ 19. Further, FAS 91 would require IFIN to recalculate yields only in the event that, after estimating prepayments, a difference arose between that estimate and actual prepayments received. <u>Id.</u> Plaintiffs have not alleged any specifics facts to support the conclusion that any of these criteria were met.

First, Plaintiffs' Amended Complaint is devoid of any specific facts indicating that IFIN's SBA securities were "similar loans for which prepayments [were] probable." <u>Id.</u> Rather, Plaintiffs allege that IFIN was required to use the retrospective method to account for its SBA securities because it "was experiencing prepayments on its SBA securities during 2002 and 2003." AC ¶ 53. Thus, according to Plaintiffs, under FAS 91, "the occurrence of 'actual prepayments' show that the Company could reasonably anticipate prepayments." <u>Id.</u> That generalized allegation does not contain a single specific fact addressing any of the factors that the FASB has provided for determining whether a company "holds a large number of similar loans" under FAS 91. <u>See</u> FASB Implementation Guide on FAS 91, ¶ 51; <u>see also</u> No. FAS 91, ¶ 58 ("Paragraph 19 [of FAS 91] sets forth conditions that **must exist** for an enterprise to anticipate prepayments . . . . Absent a reasonably large number of loans with similar characteristics, the Board believes the reliability of reasonably projecting cash flows is diminished to an unacceptable level."). For example, Plaintiffs offer no allegation of specific fact -- because they cannot -- indicating that IFIN's SBA securities portfolio is similar in nature from security to security, that loans within IFIN's SBA portfolio do not vary in size, have different industry, geographic, and underlying credit parameters, or are homogeneous. Thus, Plaintiffs have not pled specific facts indicating that IFIN's SBA securities were susceptible to "reasonabl[e] estimat[ion]" under Paragraph 19 of FAS 91.[26] <u>See id.</u>; <u>see also</u> <u>K-Tel Int'l, Inc.,</u>

---

[26] Plaintiffs conclusorily assert in their Complaint that IFIN had a "well-defined borrowers' payment profile" and that IFIN's SBA securities "could be prepaid without penalty." AC ¶¶ 49 & 54.

(Footnote Continued on Next Page.)

300 F.3d at 891-892 ("While the allegations contained in the complaint may withstand standard notice pleading, such allegations were not pled with particularity as required by the Reform Act in terms of alleging a basis for implicating FAS 121 and further specifying the assets, the carrying amount and the impairment of such assets.") (citing Greebel, 194 F.3d at 204).

Second, even if Plaintiffs had alleged specific facts demonstrating that IFIN's SBA securities constituted "similar loans for which prepayments were probable" -- and they have not -- their claim would still fail because they have not alleged specific facts demonstrating that IFIN could have "reasonably estimated" "the timing and amount of prepayments" on its SBA securities. See FAS No. 91, ¶ 19. After all, GAAP provisions "tolerate a range of 'reasonable' treatments leaving the choice among alternatives to management." Greebel, 194 F.3d at 205 (quoting Thor Power Tool Co. v. Comm'r of Internal Revenue, 439 U.S. 522, 544 (1979)). Furthermore, GAAP provisions, such as FAS 91, "require the substantial application of judgment to the totality of the circumstances." Capstead, 258 F. Supp. 2d at 552; see also Galileo, 127 F. Supp. 2d at 265 (dismissing accounting fraud claims and noting that accounting decisions often involve "fundamentally a subjective determination" and are "a matter of judgment and estimate").

In this case, Plaintiffs allege that "under FAS 91, the occurrence of 'actual prepayments' show that the Company could reasonably anticipate prepayments." AC ¶ 53. As support for their conclusion that IFIN was receiving "actual prepayments," Plaintiffs cite to a confidential

---

(Footnote Continued from Previous Page.)

Again, Plaintiffs fail to provide the Court with any specific facts to support their allegations, such as the connection, if any, between IFIN's allegedly "well-defined borrowers' payment profile" and its ability to estimate prepayments on its SBA securities, whether any of the borrowers in IFIN's "well-defined" portfolio actually received SBA loans, or the basis for their conclusion that IFIN's SBA securities lacked prepayment penalties. Lacking any such specific facts, those allegations are infirm and subject to dismissal under the PSLRA and Rule 9(b). See Greebel, 194 F.3d at 205 ("Plaintiffs merely make an allegation that [defendant] failed to adequately reserve . . . revenues [under FAS 48]. Without any information on [defendant's] experience with past return rates, the size of its reserve for returns, or how the reserve changed over time, it is difficult to infer that [defendant's] . . . decisions were unreasonable enough to violate GAAP.").

source for the general assertion that banks were prepaying SBA loans held by secondary lenders, such as IFIN, during the 2002-2003 timeframe.  AC ¶ 53.  Further, Plaintiffs conclusorily allege that IFIN experienced prepayments on its SBA securities during 2002 and 2003.  Id.  Absent from those allegations are any specific facts about any specific prepayment of any specific loan(s) during any specific financial quarter or year.  The Amended Complaint also lacks any specific facts to support the allegation that IFIN could reasonably estimate (not merely "anticipate") prepayments under FAS 91.  For example, Plaintiffs' allegations lack such specific facts as the rate of prepayment on IFIN's SBA securities, the amount of such prepayments, prepayment history, loan type, loan size, or any explanation of how their allegation that IFIN was receiving "actual prepayments" on its SBA securities in 2002 and 2003 allowed IFIN to reasonably estimate "the timing and amount" of prepayments under FAS 91.  Consequently, here, as in K-Tel Int'l, Inc., "[t]he complaint does not explain what specific information was available and how [SBA prepayments] could be reasonably estimated . . . .  Accordingly, the Class allegations related to FAS [91] . . . fail for lack of particularity."  300 F.3d at 893.

Third, even if Plaintiffs had alleged specific facts demonstrating that IFIN's SBA loans were "similar loans for which prepayments were probable" and that IFIN could have "reasonably estimated" "the timing and amount of prepayments" on its SBA securities, they still have failed to allege any facts indicating that IFIN experienced or would have experienced any difference between estimated prepayments and actual prepayments received.  For all of these reasons, Plaintiffs' have failed sufficiently to allege that IFIN accounted improperly for its SBA securities, as a matter of law.

**b.    Plaintiffs Fail To Plead
Specific Facts Showing That A Simple
Clerical Error Was Evidence Of Any Fraud.**

In their Amended Complaint, Plaintiffs assert, again without proffering a single specific fact, that the correction of a clerical error in IFIN's 2003 10-K was, in actuality, an attempt to conceal the effect that prepayments were having on the effective yield for IFIN's SBA securities. AC ¶ 210.  Plaintiffs assert that IFIN's correction of the clerical error in its Form 10-K is, in and of itself, evidence that IFIN's restatement of its financial results affected its SBA securities.  AC ¶ 210.  Specifically, Plaintiffs allege that the following excerpt from IFIN's November 15, 2004 conference call during which the Company announced the filing of its Form 10-K/A for the year ending 2003 was materially false and misleading:

> In addition, this restatement did not impact the accounting for our SBA portfolio. We did, however, correct a clerical error in the contractual maturity table in the MD&A [section] of our 2003 10-K.  We previously reported federal agency securities having a yield of 3.16% in the over-10-year category and 2.76% in the 5-to-10-year category.  These yields should have been 2.71% and 2.28% respectively, consistent with the income we recognize in our financial statements.

AC ¶ 205; App. 20.  Plaintiffs conclusorily allege that that statement was false and misleading because "the Company denied that the restatement did not impact the accounting for its SBA portfolio, when in fact the Company made material adjustments to the Company's effective yield calling it just a 'clerical error.'"  AC ¶ 210.  The lone "fact" that Plaintiffs purport to cite to support that bald allegation is, itself, a conclusion: "[a] switch from the prospective method to the retrospective method would reduce the SBA securities effective yield, due to 'actual prepayments' factored into the securities new effective yield."  Id.; see Capstead, 258 F. Supp. 2d at 550 (dismissing accounting allegations and holding "[i]t is not sufficient to simply allege certain facts that support a final conclusion, when those 'facts' themselves are conclusory; the PSLRA is satisfied only by facts, not conclusory allegations").  Of course, such conclusory allegations, unsupported by specific facts, do not come close to satisfying the First Circuit's stringent standard for pleading fraud with particularity.  See supra 17.

Indeed, the actual facts in this case only work to discredit Plaintiffs' ipse dixit.  After all, as IFIN's CEO noted during the conference call, the corrected yields were "consistent with the

53

income [IFIN] recognize[d] in [IFIN's] financial statements."  AC ¶ 205; App. 20.  That is, because the change to the yields was a mere clerical error in the SEC filing -- the wrong numbers were inserted in a chart in the Form 10-K -- it had <u>no</u> <u>effect</u> upon the actual amount of income that IFIN reported in its financial results.  If the correction of the clerical error in IFIN's 2003 10-K had the import that Plaintiffs allege, the Company also would have had to correct its reported financial results.  Plaintiffs have made no such allegation, as that never happened.  Thus, Plaintiffs do not, because they cannot, allege any specific fact supporting any allegation that IFIN's correction of the contractual maturity table in its 2003 10-K was done for any other reason than to correct a simple clerical oversight.

### c.    Plaintiffs Fail To Plead Specific Facts Showing That The Company's SBA Securities Were Permanently Impaired.

Plaintiffs allege that, between March 31, 2004 and the end of the class period, IFIN's SEC filings, financial guidance, and press releases containing financial results were false and misleading and not reported in accordance with GAAP because the Company failed to write down $12.8 million in SBA securities under FAS 115.  <u>See</u> AC ¶¶ 53-67, 210, 213, 219, 222.  In a vain attempt to support their allegation, Plaintiffs cite to facts that have no bearing on whether IFIN should have made the subjective decision under GAAP to write down the value of its SBA securities.  <u>See</u> <u>infra</u> 56.  Accordingly, Plaintiffs' allegations cannot state a claim for securities fraud.

Courts are loathe to substitute their own judgment for an issuer's on highly subjective accounting decisions like the determination of when the value of an asset should be written down.  For example, this Court in <u>Galileo</u> dismissed a securities fraud claim predicated on the allegation that defendants should have written off certain accounts receivable due to the inherent subjectivity of such a determination:

> Whether the collection of the Imagyn receivables was 'reasonably assured,' as Galileo argues, **is fundamentally a subjective determination** . . . . Thus, application of the concept of 'reasonable assurance of collection' in a given situation is <u>a matter of judgment and estimate</u>.  In this case, 'reasonable assurance of collection' was <u>a fluid and subjective concept</u>, dependant on the knowledge the

defendants had at the time they made decisions about whether to record the Imagyn receivables. . . . Subject thus to judgments, as to which reasonable persons might disagree, the proposition that collectibility of the Imagyn revenues was not reasonably assured . . . cannot support the strong inference of scienter required by the PSLRA and Rule 9(b).

Galileo Corp., 127 F. Supp. 2d at 265-266 (emphasis added).  Accord Dileo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) ("No matter when a bank [writes down a loan], someone may say that it should have acted sooner.  If all that is involved is a dispute about the timing of the write-off, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence."); Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 851-852 (N.D. Ill. 2003) (dismissing claim that company failed timely to record an asset impairment).

Due to the subjective nature of the decision to write down an asset, a plaintiff must point to specific facts, such as inconsistent contemporaneous statements or internal reports, that show that the company knew it was required to take a write-down and failed to do so.  Capstead, 258 F. Supp. 2d at 550 ("To remove the accounting practices about which they complain from the realm of acceptable choices, Plaintiffs must specifically and properly plead fraud."); Plevy v. Haggerty, 38 F. Supp. 2d 816, 826 (C.D. Cal. 1998) (plaintiffs failed to plead specific facts indicating that defendants were required to take a write-down under GAAP).  Indeed, Plaintiffs specifically recognize that, under applicable accounting standards, whether a loss is "other than temporary," and thereby requiring a company to recognize an impairment loss in earnings, is an inherently subjective decision:

> *Impairment Losses*.  Regardless of the valuation method used, generally accepted accounting principles might require recognizing in earnings an impairment loss for a decline in fair value that is other than temporary.  Determinations of whether losses are other than temporary often involve estimating the outcome of future events.  Accordingly, **judgment is required in determining whether factors exist that indicate that an impairment loss has been incurred at the end of the reporting period.  These judgments are based on subjective** as well as objective factors, including knowledge and experience about past and current events and assumptions about future events.

AC ¶ 63 (quoting American Institute of Certified Public Accountants Auditing Standards No. 92, ¶ 47) (emphasis added).

55

Here, as in <u>Galileo</u> and <u>Capstead</u>, Plaintiffs fail to provide the Court with specific facts to support their allegation that IFIN violated GAAP by failing to make the subjective determination to write down its SBA securities. Specifically, Plaintiffs allege that, under FAS 115, if a decline in a security's fair value is judged to be "other than temporary," the "cost basis of that security shall be written down to fair value . . . and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss)." AC ¶ 60 (citing FAS No. 115, ¶ 16). According to Plaintiffs, a decline in a security's fair value becomes "other than temporary" and, thus, a security is impaired, when the security's effective yield drops below the risk free interest rate. AC ¶¶ 57, 59. Plaintiffs cite no support for this bald assertion. Plaintiffs allege that by March 31, 2004, IFIN's SBA securities had become other than temporarily impaired because, according to Plaintiffs, the effective yield on IFIN's SBA securities had fallen below the risk-free market interest rate -- as evidenced by 7-year and 10-year treasury notes -- requiring an impairment charge under GAAP. AC ¶ 57-58.

As in <u>Galileo</u>, and as Plaintiffs recognize in their Amended Complaint, the determination of whether IFIN's SBA securities were other than temporarily impaired was "a matter of judgment and estimate" that required IFIN to make a "subjective determination." <u>Galileo</u>, 127 F. Supp. 2d at 265-266. Accordingly, under <u>Plevy</u> and <u>Capstead</u>, the subjective nature of that determination required Plaintiffs to cite "specific facts, such as inconsistent contemporaneous statements or internal reports, that show that the company knew" its SBA securities were other than temporarily impaired and "was required to take a write-down and failed to do so." <u>See</u> <u>Plevy</u>, 38 F. Supp. 2d at 826; <u>see</u> <u>also</u> <u>Capstead</u>, 258 F. Supp. 2d at 550. Plaintiffs' Amended Complaint is bereft of any such specific facts.

Plaintiffs ask the Court simply to conclude that IFIN's SBA securities were other than temporarily impaired without proffering any specific facts to support that conclusion. The facts Plaintiffs do cite are at best inapposite and, at worst, misleading. In their sole attempt to support their allegation that IFIN's SBA securities were other than temporarily impaired, Plaintiffs insert a table in their Amended Complaint that purports to compare the effective yield of IFIN's SBA

56

securities to the interest rates for 7- and 10-year treasury notes. AC ¶¶ 57, 58. Plaintiffs argue that IFIN's SBA securities were "becoming impaired" in December 2003, when their effective yield dropped below the interest rates for 7- and 10-year treasury notes, and that IFIN's SBA securities were other than temporarily impaired by the end of 2004. AC ¶ 58. However, Plaintiffs themselves recognize in their Amended Complaint that IFIN's SBA securities are "variable rate" securities, specifically noting that "[a]ll SBA pool data is available on *Bloomberg*." AC ¶ 51 & n.5; see also App. 3. Indeed, information regarding SBA pools from Bloomberg shows that the effective yield for SBA securities, as variable rate securities, is reset monthly (i.e., 12 times per year, or, as referenced by Bloomberg, "12/y") and quarterly (i.e., four times a year, or as referenced by Bloomberg, "4/y") in accordance with interest rate changes. App. 32.[27] In fact, the Amended Complaint also cites and quotes from a presentation on SBA securities that specifically states that variable rate SBA pools "[a]djust either **monthly or quarterly**." AC ¶ 48 n.4; App. 33 (emphasis added). Regardless, Plaintiffs, in an apparent effort to mislead, compare IFIN's SBA securities' effective yield against the risk free rate for fixed-rate, long-term treasury notes. AC ¶¶ 57 & 58. Comparing the effective yield for IFIN's SBA securities to the risk free market rate for comparable short-term treasury notes, e.g., three-month treasury notes, demonstrates that IFIN's SBA securities were not impaired, temporarily or otherwise:

---

[27] As Plaintiffs have incorporated Bloomberg data in the Complaint, this Court may properly consider that data on this motion to dismiss.

| Period Ending | (under 1 yr) | | (1 to 5 yrs) | | (5 to 10 yrs) | | | (over 10 yrs) | | | Risk Free Rate for 3 Month Treasury |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Amount | Yield | Amount | Yield | Amount | Yield | Risk Free Rate | Amount | Yield | Risk Free Rate | |
| 3/31/2001 | $0 | | $111,011 | 7.16% | $221,148 | 7.26% | 4.86% | $0 | | 4.93% | 4.30% |
| 6/30/2001 | $0 | | $111,937 | 5.88% | $258,118 | 6.10% | 5.28% | $0 | | 5.42% | 3.65% |
| 9/30/2001 | $5,000 | 6.44% | $104,792 | 5.04% | $291,586 | 5.26% | 4.37% | $0 | | 4.60% | 2.40% |
| 12/31/2001 | $5,000 | 6.43% | $141,739 | 4.05% | $309,369 | 4.26% | 4.84% | $0 | | 5.07% | 1.74% |
| 3/31/2002 | $5,000 | 6.40% | $15,182 | 3.80% | $271,953 | 4.06% | 5.29% | $319,899 | 3.83% | 5.42% | 1.79% |
| 6/30/2002 | $5,000 | 6.30% | $14,981 | 3.83% | $418,081 | 3.83% | 4.52% | $396,701 | 3.83% | 4.86% | 1.70% |
| 9/30/2002 | $0 | | $13,692 | 3.88% | $504,525 | 3.88% | 3.25% | $484,828 | 3.88% | 3.63% | 1.57% |
| 12/31/2002 | $0 | | $12,665 | 3.75% | $648,756 | 3.74% | 3.36% | $625,817 | 3.75% | 3.83% | 1.22% |
| 3/31/2003 | NR | | NR | | NR | | 3.35% | NR | | 3.83% | 1.14% |
| 6/30/2003 | NR | | NR | | NR | | 3.03% | NR | | 3.54% | 0.90% |
| 9/30/2003 | NR | | NR | | NR | | 3.41% | NR | | 3.96% | 0.95% |
| 12/31/2003 | $0 | | $0 | | $41,708 | 2.76% | 3.77% | $1,864,804 | 3.16% | 4.27% | 0.95% |
| 12/31/03A | $0 | | $0 | | $41,705 | 2.28% | 3.77% | $1,864,849 | 2.71% | 4.27% | 0.95% |
| 3/31/2004 | NR | | NR | | NR | | 3.33% | NR | | 3.86% | 0.95% |
| 3/31/04A | NR | | NR | | NR | | 3.33% | NR | | 3.86% | 0.95% |
| 6/30/2004 | NR | | NR | | NR | | 4.24% | NR | | 4.62% | 1.33% |
| 6/30/04A | NR | | NR | | NR | | 4.24% | NR | | 4.62% | 1.33% |
| 9/30/2004 | NR | | NR | | NR | | 3.79% | NR | | 4.14% | 1.71% |
| 12/31/2004 | $0 | | $2,407 | 2.32% | $106,572 | 3.04% | 3.94% | $2,165,686 | 3.17% | 4.24% | 2.22% |
| 3/31/2005 | NR | | NR | | NR | | 4.33% | NR | | 4.50% | 2.79% |
| 6/30/2005 | NR | | NR | | NR | | 3.80% | NR | | 3.94% | 3.13% |
| 9/30/2005 | NR | | NR | | NR | | 4.23% | NR | | 4.34% | 3.55% |

See AC ¶ 57.[28]

As the above chart demonstrates, when one compares the SBA securities' effective yield against the interest rates for three-month treasury notes, it is apparent that IFIN's SBA securities' effective yields never fell below the comparable "risk free market rate."  Thus, contrary to

---

[28] The chart is an exact duplicate of the chart Plaintiffs set forth in Paragraph 57 of their Complaint, with the notable exception of the last column entitled:  "Risk Free Rate For 3 Month Treasury," which sets forth the interest rate of 3-month treasury notes.  This Court may properly take judicial notice of publicly available stock and bond information as well as Bloomberg data that Plaintiffs incorporated by reference in the Amended Complaint.  Supra 1-2 n. 1.

Plaintiffs' factually deficient allegations, IFIN's SBA securities were never impaired, temporarily or otherwise. Consequently, IFIN was not required to write down the value of its SBA securities under GAAP. For this reason, and all of the reasons discussed above, Plaintiffs' claims relating to IFIN's SBA securities are not pled with the specificity required by Rule 9(b) and the PSLRA and, therefore, must be dismissed.

### 3. Plaintiffs Fail To Plead Scienter Respecting Their SBA Security-Related Allegations.

Even if Plaintiffs had pled specific facts indicating that IFIN made a material misstatement concerning the Company's SBA portfolio -- which they have not -- their SBA security-related claims nonetheless would still fail because they have not pled any specific facts supporting a strong inference that any Individual Defendant knew that any statement concerning SBA loans was false when made. Contrary to the strict pleading requirements of the PSLRA and Rule 9(b), Plaintiffs fail to cite a single contemporaneous fact -- not a single specific document, or meeting, or conversation -- supporting a strong inference of scienter. See supra 17-22. For this independent reason, Plaintiffs' SBA security-related claims must be dismissed under Rule 9(b) and the PSLRA.

### 4. Plaintiffs Fail To Plead Loss Causation Respecting Their SBA Security-Related Allegations.

Plaintiffs' SBA Security-related claims also fail because they do not and cannot plead loss causation, as to those claims. A securities plaintiff must plead and prove loss causation, i.e., that the alleged misrepresentation or omission concealed a truth from that market that, once revealed, caused plaintiff's stock to decline in value. See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 1630-1632 (2005). "Loss causation is causation in the traditional 'proximate cause' sense -- that the allegedly unlawful conduct caused the economic harm." In re Polaroid Corp. Sec. Litig., 134 F. Supp. 2d 176, 188 (D. Mass. 2001). Thus, loss causation is not adequately pled unless a plaintiff alleges that a stock declined below the purchase price as a result of a corrective disclosure. As the court stated in Polaroid, "there [is] no loss causation where the concealments were 'latent faults that never manifested themselves." Id.   See also

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005) (to plead loss causation plaintiff must allege "that the misstatement or omission concealed something from the market that, **when disclosed**, negatively affected the value of the security") (emphasis added); Robbins v. Koger Props., Inc., 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict on loss causation grounds because $100 million in GAAP violations were not revealed to the market until after stock drop about which plaintiff complained).  Further, as it is an element of their Section 10(b) securities fraud claim, Plaintiffs must allege loss causation with particularity under Rule 9(b).  In re First Union Corp. Sec. Litig., No. Civ. 3:99CV237-H, 2006 WL 163616, at *5-6 (W.D.N.C. Jan. 20, 2006).

Here, Plaintiffs' SBA claims fail to allege loss causation as a matter of law, because the Amended Complaint does not and cannot identify any disclosure that IFIN ever made regarding its accounting for its SBA securities that negatively affected the value of IFIN's stock price. Indeed, the Amended Complaint alleges the opposite.  It notes, correctly, that IFIN announced that the restatement "did not impact the accounting for [IFIN's] SBA portfolio."  AC ¶ 205.  In sum, even if IFIN had inaccurately accounted for its SBA securities -- which it did not -- any artificial inflation in IFIN's stock price that might have resulted from any such misstatements would have remained in IFIN's stock price through to the present date, thus precluding Plaintiffs from pleading loss causation as to their SBA security claims.  See Dura, 125 S. Ct. at 1631-1632 (holding that merely alleging artificial inflation is not sufficient to satisfy loss causation).  For this reason as well, Plaintiffs' SBA security-related claims must be dismissed under Rule 9(b).

**B.**    **Plaintiffs' Financial Disclosure Claims Must Be Dismissed Under Rule 12(b)(6).**

**1.**    **The Vast Majority Of The Company's Historical Financial Results Challenged Are Not Actionable Because They Were Not Materially Inaccurate.**

The Amended Complaint also fails to state a claim based upon alleged misstatements in the Company's historical financial results because the alleged misstatements are immaterial as a matter of law.  "Restatements of earnings are common," Goldberg v. Household Bank, F.S.B.,

890 F.2d 965, 967 (7th Cir. 1989), and "[a] restatement itself does not create an inference of wrongdoing, except in cases of gross financial misstatements."  Davis, 385 F. Supp. 2d at 713. "Minor adjustments in a company's gross revenues are not, as a rule, deemed material by either accountants or the securities law."  Segue Software, Inc., 106 F. Supp. 2d at 170.  When an adjustment to financial results is not "unusually large," plaintiffs seeking to use the adjustment to support a securities fraud claim face an "uphill battle."  Goldberg, 890 F.2d at 967.

IFIN's adjustments to its net interest income were relatively minor and fail to rise to a level of legal significance.  The Company's net operating revenues were adjusted by $8.5 million for 2001, a **2.4%** decrease; by $2.3 million for 2002, a **0.5%** decrease; by $1.0 million for 2003, a **0.2% increase**; and by $2.7 million for the first three quarters of 2004, a **0.75% increase**.  In the aggregate, the adjustments decreased net operating revenues by less than **0.4%** for all adjusted periods.  Courts in this circuit, including the First Circuit Court of Appeals, have found adjustments to reported revenue of a far greater percentage than those at issue in this case to be immaterial for purposes of the federal securities laws.  See, e.g., Glassman v. Computervision Corp., 90 F.3d 617, 633 (1st Cir. 1996) (holding that a 3 to 9 percent misstatement of revenues was not material for purposes of Rule 10b-5 and affirming district court's dismissal and denial of motion for leave to amend); Segue, 106 F. Supp. 2d at 171 (dismissing claims with prejudice and holding that overstatement of revenues by $1.1 million, or 2.6%, was "insignificant").

Other courts similarly have held that minor revenue restatements, which were larger than the restatement at issue in this case, were not material and, hence, could not support securities fraud claims.  See, e.g., Davis, 385 F. Supp. 2d at 715 (holding that alleged misstatement of 1.4% of revenues was "minor"); Stavros, 266 F. Supp. 2d at 850 (dismissing claim based on alleged inflation of net income by less than 3%); In re Allscripts, Inc. Sec. Litig., No. 00 C 6796, 2001 WL 743411, at *10 (N.D. Ill. June 29, 2001) (holding that 4% overstatement of revenues for quarter and overstatement of over 2% of revenues for six-month period "cannot as a matter of law be material").  Accordingly, IFIN's adjustments to its financial results were immaterial, as a matter of law.

61

### 2. The Company Disclosed The Allegedly Omitted Information Respecting The Risk Of Lower Prepayments.

Additionally, Plaintiffs' allegation that the Company's press releases and financial results were misleading because the Company failed to disclose risks associated with the possible prepayment of its debt securities must fail because the Company, in fact, disclosed these risks in its SEC filings throughout the proposed class period. Specifically, Plaintiffs allege that IFIN failed to disclose "the Company's prepayment risk that its debt securities could be redeemed prior to maturity and that the Company would lose its interest income and unamortized premium amount for securities purchased over par value." AC ¶110. Plaintiffs, however, conveniently ignore disclosures in IFIN's SEC filings, which this Court need not disregard. See, e.g., Capstead, 258 F. Supp. 2d at 555.

To be sure, the Company repeatedly disclosed the risks it faced due to the possibility of prepayments. Throughout the class period, in its Forms 10-K the Company warned:

> We invest in mortgage-backed securities, Federal agency bonds and corporate debt to increase the total return of the investment portfolio. Mortgage-backed securities generally have a higher yield than U.S. Treasury securities due to credit and prepayment risk. Credit risk results from the possibility that a loss may occur if a counterparty is unable to meet the terms of the contract. Prepayment risk results from the possibility that changes in interest rates may cause mortgage-backed securities to be paid off prior to their maturity dates.

See, e.g., App. 4, 5.[29] Similarly, several of the Company's 10-Q reports that were filed during the Class Period stated:

---

[29] To avoid burdening the Court with literally hundreds of additional pages of exhibits, Defendants have not included in the Appendix submitted herewith all of IFIN's SEC filings from 2001 to 2005, virtually all of which Plaintiffs have challenged as false and misleading. To the extent the Court wishes to review any of these filings, Defendants will promptly submit them upon request and note that they are publicly available at http://www.sec.gov.

In addition, with mortgage rates at historic lows, refinancing activities increase, resulting in prepayments of higher yielding mortgage-backed securities that we hold, the proceeds of which are reinvested at current market rates. These factors, among others, may decrease our net interest margin to more traditional levels and reduce the unusually high growth rates in net interest income that we have experienced during the last two years.

See, e.g., App. 1, 2.

Against this undisputable factual background, Plaintiffs' allegations that the Company failed to disclose its prepayment risk clearly have no basis in fact and cannot survive this motion to dismiss.

## IV.   PLAINTIFFS' SECTION 20(a) "CONTROL PERSON" CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE A PRIMARY VIOLATION OF THE SECURITIES LAWS.

As set forth above, Plaintiffs have failed adequately to allege a primary violation of Section 10(b) of the 1934 Act and SEC Rule 10b-5 thereunder. Accordingly, the Amended Complaint cannot state a claim for violation of Section 20(a) of the 1934 Act, as a matter of law. See Greebel, 194 F.3d at 207 (affirming district court's dismissal of Section 20(a) claim because appellants failed to allege an underlying violation of the securities laws); Suna v. Bailey Corp., 107 F.3d 64, 71 (1st Cir. 1997) (same).

## CONCLUSION

For all of the foregoing reasons, the Amended Complaint should be dismissed. Furthermore, because here, as in Carney, Plaintiffs have "pled [their] case with determined imagination, but little factual substance," "[c]onsiderations of fairness, judicial economy, and congressional purpose in enacting the Securities Laws all point to a denial of discovery and to dismissal of this complaint with prejudice." Carney, 135 F. Supp. 2d at 257 (quoting Colby v. Hologic, Inc., 817 F. Supp. 204, 217 (D. Mass. 1999)).

Respectfully Submitted,

**INVESTORS FINANCIAL SERVICES CORP., KEVIN J. SHEEHAN, MICHAEL F. ROGERS, JOHN N. SPINNEY, JR., KAREN C. KEENAN, ROBERT D. MANCUSO, EDMUND J. MARONEY AND JOHN E. HENRY**

By their attorneys,

/s/ Jordan D. Hershman
Jordan D. Hershman, BBO #553709
Jason D. Frank, BBO #634985
James P. Lucking, BBO #650588
William R. Harb, BBO #657270
**BINGHAM McCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: May 12, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 12, 2006.

/s/ Jordan D. Hershman

64

LITDOCS/637159.5

LITDOCS/637159.5