UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, On Behalf of Plaintiff and All Others Similarly Situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>INVESTORS FINANCIAL SERVICES CORP., et al., )<br><br>Defendants. ) | CIVIL ACTION<br>NO. 05-11627-RCL<br>**(Consolidated)** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED COMPLAINT IN ITS ENTIRETY**

BINGHAM McCUTCHEN LLP

Jordan D. Hershman, Esq. (BBO #553709)
Jason D. Frank, Esq. (BBO #634985)
James P. Lucking, Esq. (BBO #650588)
William R. Harb, Esq. (BBO #657270)
150 Federal Street
Boston, MA 02110
Tel: (617) 951-8000

Attorneys for Defendants Investors
Financial Services Corp., Kevin J. Sheehan,
Michael F. Rogers, John N. Spinney, Jr.,
Karen C. Keenan, Robert D. Mancuso,
Edmund J. Maroney and John E. Henry

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

PRELIMINARY STATEMENT ......................................................................... 1

ARGUMENT ...................................................................................................... 6

I.      PLAINTIFFS FAIL TO PLEAD FRAUD WITH PARTICULARITY ............... 6

II.      PLAINTIFFS FAIL TO STATE ANY FEDERAL SECURITIES FRAUD CLAIMS BASED ON THE FORWARD-LOOKING STATEMENTS THEY CHALLENGE ....................... 7

     A.    Plaintiffs' Forward-Looking Statement Claims Based On The Company's 2005 Earnings Guidance Must Be Dismissed Under Rule 12(b)(6) ................................. 7

       1.    The Challenged Forward-Looking Statement Is Immune From Liability Under The PSLRA's Safe-Harbor Provision ........ 7

       2.    Section 10(b) Claims Cannot Be Based On An Alleged Failure Accurately To Predict Interest Rates ................... 9

     B.    Plaintiffs' Forward-Looking Statement Claims Based On The Company's 2005 Earnings Guidance Must Be Dismissed Under The PSLRA And Rule 9(b) Because Plaintiffs Have Failed Adequately To Plead Scienter ................. 9

       1.    Plaintiffs Must Plead Specific Facts Giving Rise To A Strong Inference Of Actual Knowledge ........................ 9

       2.    Plaintiffs Have Failed To Plead Specific Facts Giving Rise To A Strong Inference Of Actual Knowledge ......... 10

         a.    Plaintiffs Fail To Plead Any Specific Facts Supporting A Strong Inference That IFIN's 2005 Guidance Was Knowingly False When Made ........ 10

         b.    Plaintiffs' Motive Allegations With Respect To Their 2005 Guidance Claims Do Not Support A Strong Inference Of Scienter ............. 12

           (1)   Plaintiffs' Allegations Concerning Defendants' Trading Do Not Give Rise To A Strong Inference Of Scienter .............. 12

           (2)   Plaintiffs' Allegations Concerning Defendants' Bonus Plans Do Not Give Rise To A Strong Inference Of Scienter .............. 18

     C.    Plaintiffs' Claims Based On All Other Forward-Looking Statements Must Be Dismissed Under Rule 12(b)(6), The PSLRA, And Rule 9(b) ............... 18

III.     PLAINTIFFS FAIL TO STATE ANY FEDERAL SECURITIES FRAUD CLAIMS BASED ON THE HISTORICAL FINANCIAL RESULTS THAT THEY CHALLENGE............. 20

     A.    Plaintiffs' Financial Disclosure Claims Must Be Dismissed Under The PSLRA And Rule 9(b)................................... 20

**Page**

1. Plaintiffs Fail To Plead Specific
Facts Supporting A Strong Inference That Any
Financial Disclosure Was Knowingly False When Made .......... 21

    a. IFIN's Restatement Does Not
Support Any Inference Of Scienter.................................. 21

    b. Plaintiffs' "Status" And
"Access" Allegations Cannot
Support Any Inference Of Scienter.................................. 23

    c. Plaintiffs' Motive Allegations Do
Not Support Any Inference Of Scienter.......................... 25

2. Plaintiffs Fail To Plead Specific Facts
Regarding The Company's SBA Securities
That Render Any Financial Disclosure False Or Misleading ...... 26

    a. Plaintiffs Fail To Plead Specific Facts
Showing That Any Disclosure Concerning
The Company's SBA Portfolio Was False ...................... 26

    b. Plaintiffs Fail To Plead
Specific Facts Showing That A Simple
Clerical Error Was Evidence Of Any Fraud ................... 30

    c. Plaintiffs Fail To Plead Specific
Facts Showing That The Company's
SBA Securities Were Permanently Impaired.................. 30

3. Plaintiffs Fail To Plead Loss Causation
Respecting Their SBA Security-Related Allegations ................. 32

B. Plaintiffs' Financial Disclosure Claims
Must Be Dismissed Under Rule 12(b)(6) ............................... 33

1. The Vast Majority Of The Company's
Historical Financial Results Challenged Are Not
Actionable Because They Were Not Materially Inaccurate ........ 33

2. The Company Disclosed The Allegedly Omitted
Information Respecting The Risk Of Prepayments ................... 33

IV. PLAINTIFFS' SECTION 20(a) "CONTROL PERSON" CLAIMS
MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED
TO ALLEGE A PRIMARY VIOLATION OF THE SECURITIES LAWS....... 34

CONCLUSION.................................................................................. 34

## TABLE OF AUTHORITIES

**Cases**                                                                                                            **Page**

Abrams v. Baker Hughes, Inc., 292 F.3d 424 (5th Cir. 2002)......................................................21

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999)...........................................10, 14, 15

Aldridge v. A.T. Cross Corp., 284 F.3d 72 (1st Cir. 2002) .......................................................18

Baron v. Smith, 380 F.3d 49 (1st Cir. 2004) .....................................................................7, 8

In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43 (D. Mass. 1998)........................................10

In re CDNOW Sec. Litig., 138 F. Supp. 2d 624 (E.D. Pa. 2001) ................................................25

In re Cabletron Sys., Inc., 311 F.3d 11 (1st Cir. 2002)..............................................................23

In re Capstead Mortgage Corp. Sec. Litig., 258 F. Supp. 2d 533 (N.D. Tex. 2003) ............ passim

Carney v. Cambridge Tech. Partners, 135 F. Supp. 2d 235 (D. Mass. 2001)........................ passim

In re Century Bus. Serv. Sec. Litig., No. 1:99CV02200, 2002 WL 32254513
(N.D. Ohio June 27, 2002)...............................................................................................17

Colby v. Hologic, Inc., 817 F. Supp. 204 (D. Mass. 1993) .........................................................34

In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662 (E.D. Mich. 1999)......................14

In re Cytyc Corp. Sec. Litig., No. 02-12399, 2005 WL 3801468
(D. Mass. Mar. 2, 2005).....................................................................................................8

D.E.&J Ltd. P'ship v. Conway, 284 F. Supp. 2d 719 (E.D. Mich. 2003)..................................3, 4

Davis v. SPSS, Inc., 385 F. Supp. 2d 697 (N.D. Ill. 2005).........................................................33

Denny v. Barber, 576 F.2d 465 (2d Cir. 1978)........................................................................9

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627 (2005)........................................32

In re E.spire Commc'ns, Inc. Sec. Litig., 127 F. Supp. 2d 734 (D. Md. 2001) ...........................15

In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871 (W.D.N.C. 2001).................................14

Fitzer v. Sec. Dynamics Techs., 119 F. Supp. 2d 12 (D. Mass. 2000) .......................................23

In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d 251 (D. Mass. 2001)........................ passim

Glassman v. Computervision Corp., 90 F.3d 617 (1st Cir. 1996) ...............................................33

Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999)................................................ passim

Greenstone v. Cambex Corp., 975 F.2d 22 (1st Cir. 1992) ........................................................22

Guerra v. Teradyne, Inc., No. 01-11789, 2004 WL 1467065 (D. Mass. Jan. 16, 2004) ...............24

**Page**

In re Hypercom Corp. Sec. Litig., No. CV-05-0455-PHX-NVW,
2006 WL 726791 (D. Ariz. Mar. 9, 2006) ...................................................................22

In re K-Tel Int'l, Inc., Sec. Litig., 300 F.3d 881 (8th Cir. 2002) .................................17, 27, 28, 29

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ...................................................................25

Kramer v. Time Warner Inc., 937 F.2d 767 (2d Cir. 1991) ...............................................2

Limantour v. Cray, Inc., No. CO5-943Z, 2006 WL 1169791
(W.D. Wash. Apr. 28, 2006) ...................................................................12

Lirette v. Shiva Corp., 27 F. Supp. 2d 268 (D. Mass. 1998) ...............................................23, 24

Maldonado v. Dominguez, 137 F.3d 1 (1st Cir. 1998) ...................................................................15

Nathenson v. Zonagen, Inc., 267 F.3d 400 (5th Cir. 2001) ...............................................14

In re Netflix, Inc., Sec. Litig., No. C04-2978-FMS, 2005 WL 1562858
(N.D. Cal. June 28, 2005) ...................................................................15

In re Peritus Software Servs., Inc., Sec. Litig., 52 F. Supp. 2d 211
(D. Mass. 1999) ...................................................................21, 23

Romani v. Shearson Lehman Hutton, 929 F.2d 875 (1st Cir. 1991) ...............................................1, 2

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004) ...................................................................16

In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161 (D. Mass. 2000) ...................... passim

Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171 (S.D.N.Y. 1996) ...............................9

In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970 (9th Cir. 1999) ...............................................13

In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059
(N.D. Cal. 2001) ...................................................................6

Stavros v. Exelon Corp., 266 F. Supp. 2d 833 (N.D. Ill. 2003) ...............................................10, 33

In re Stratus Computer, Inc. Sec. Litig., No. 89-2075-Z, 1992 WL 73555
(D. Mass. Mar. 27, 1992) ...................................................................6

Suna v. Bailey Corp., 107 F.3d 64 (1st Cir. 1997) ...................................................................34

In re Syncor Int'l Corp. Sec. Litig., 327 F. Supp. 2d 1149 (C.D. Cal. 2004) ...............................16

In re Vantive Corp. Sec. Litig., 283 F.3d 1079 (9th Cir. 2002) ...............................................15, 16

In re Vantive Corp. Sec. Litig., 110 F. Supp. 2d 1209 (N.D. Cal. 2000) ...............................15

In re Westinghouse Sec. Litig., 90 F.3d 696 (3d Cir. 1996) ...............................................21

Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102 (N.D. Cal. 2003) ...............................15

**Page**

**Statutes & Rules**

17 C.F.R. 240.10b5-1..........................................................................................................15

15 U.S.C. §78u-5(c)(1) ...................................................................................................7, 10

Fed. R. Civ. P. 9(b) ...................................................................................................... passim

Fed. R. Civ. P.12(b)(6)................................................................................................. passim

**Legislative History**

H.R. Conf. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730..................................8

LITDOCS/647099.1

## INTRODUCTION

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Defendants Investors Financial Services Corp. ("IFIN" or the "Company"), Kevin J. Sheehan, Michael F. Rogers, John N. Spinney, Jr., Karen C. Keenan, Robert D. Mancuso, Edmund J. Maroney, and John E. Henry (collectively, the "Individual Defendants") submit this Memorandum of Law in Support of their Motion to Dismiss the Consolidated Complaint (the "Amended Complaint" or "AC") in its entirety, with prejudice.

## PRELIMINARY STATEMENT

Congress enacted the Private Securities Litigation Reform Act of 1995 (the "PSLRA") "to curb abuse in private securities lawsuits, particularly the filing of strike suits." Greebel v. FTP Software, Inc., 194 F.3d 185, 191 (1st Cir. 1999). This litigation is exactly the type of securities "strike suit" that the PSLRA was designed to prevent.

Based in Boston, Massachusetts, IFIN offers a broad range of services to financial asset managers, and it also manages a portfolio of financial assets that it holds for its own account, rendering its financial results dependent, in part, on the movements of short-term and long-term interest rates.[1] For each of the fiscal years 2001 through 2004, IFIN regularly forecast 25% annual growth in its diluted earnings per share ("EPS"). See AC ¶ 3.[2] In each of those years, IFIN met or exceeded its 25% earnings growth guidance. See AC ¶ 3.[3]

On July 14, 2005, after IFIN closed its second quarter ("Q2 05"), the Company announced a revision to its prior guidance for fiscal 2005. It stated that it expected an annual

---

[1] AC ¶¶ 2, 17, 19; Defendants' App. 11. The Appendices filed herewith contain complete copies of documents referenced in this moving brief, cited to herein as "App. ___." This Court properly may consider, without turning this motion into one for summary judgment, documents attached to or referenced in the Amended Complaint, matters of which the Court may take judicial notice, and documents the authenticity of which are not contested. Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 n.3 (1st Cir. 1991) (internal citations omitted).

[2] See also App. 12; App. 15; App. 17.

[3] See App. 4 at 24.

increase in diluted EPS of approximately 10% -- not 25% -- principally due to unanticipated and historically anomalous interest rate activity. AC ¶¶ 223-24; App. 22. The Company explained that the "key factors" giving rise to the Company's change in expected diluted EPS included, among others, "a flatter than expected yield curve" and "narrower than expected reinvestment spreads." Id.[4] IFIN's stock price dropped approximately 18% that day following its announcement. AC ¶ 12.

Beginning on August 4, 2005 and thereafter, the plaintiffs' class action bar filed a flurry of knee-jerk complaints in this Court, essentially alleging that the Defendants committed fraud by failing accurately to predict the historically anomalous movement of interest rates in 2005. It is common knowledge, however, that the largest financial institutions in the world were blindsided by the same interest rate movements that caused IFIN to revise its 2005 guidance. For example, on July 19, 2005, just five days after IFIN's announcement, Citigroup's CFO publicly stated in explaining Citigroup's Q2 05 results: "**Our guys in the trading side were not expecting the yield curve to flatten the way it has**." App. 24 (FDCH Business Transcripts, Citigroup - CFO Interview, By Maria Bartiromo, July 19, 2005) (emphasis added). Similarly, that same day, Marc Oken, the CFO of Bank of America, stated that Bank of America's earnings were adversely affected by the yield curve, which he observed had "**flattened beyond expectations**." App. 25 (American Banker (USA), B of A to Slow Its Corporate Expansion, By Paul Davis, July 19, 2005) (emphasis added).[5]

---

[4] The "yield curve" describes the relationship between interest rates and the maturity of fixed-income securities (e.g., U.S. treasury notes). A typical yield curve reflects those circumstances where shorter-term securities (e.g., three-month treasury notes) have a lower yield (i.e., interest rate) compared with longer maturity securities (e.g., ten-year treasury notes). The yield curve is considered "positive" when it ascends (i.e., short term interest rates are lower than long-term rates), "flat" when short-term and long-term rates are the same, and "negative" or "inverted" when short-term rates are higher than long-term rates. See App. 26 (Barron's Finance & Investment Handbook at 706-07 (5th ed. 1998)).

[5] Defendants refer to the public statements of other issuers solely for background purposes. The Court may consider background material, without placing any evidentiary reliance on its contents, and not run "afoul of the rule that a district court must confine itself to the four corners of the complaint when

(Footnote Continued on Next Page.)

No less an authority than Alan Greenspan, then-Chairman of the Federal Reserve Board, observed in early 2005 that, in contrast with "most experience," long-term interest rates had been trending lower, even as short-term interest rates had increased.  App. 23 (Testimony of Alan Greenspan, Federal Reserve Board's semiannual Monetary Policy Report to the Congress, Before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate, February 16, 2005).[6]  Former Chairman Greenspan characterized the worldwide flattening of the yield curve, i.e., the rise in short-term rates coupled with the decline in long-term rates, as a "**short-term aberration**" and a "**conundrum**."  Id. (emphasis added).  Lacking a crystal ball, however, Mr. Greenspan, and all of Wall Street, failed accurately to predict that the flattening yield curve would compress even further in 2005.  In short, IFIN was hardly alone in predicting, incorrectly, the vexing movement of interest rates in 2005.

On February 3, 2006, six months after filing their first complaint, Plaintiffs filed their hopelessly prolix 142-page, 263-paragraph Amended Complaint.  Apart from its length, what is most notable about Plaintiffs' Amended Complaint is that it tells a whole new story.  In an obvious effort to capture within the purported class period stock trades made by IFIN personnel going as far back as 2001, Plaintiffs more than doubled the length of the purported class period, extending the original 1 year and 9 months proposed class period to 4 years and 3 months.  To do so, however, Plaintiffs were forced to concoct an illogical theory of fraud that required them to reverse field on certain allegations contained in their original complaint.  More specifically, Plaintiffs entirely changed their allegations about a restatement of financial results that IFIN first announced nine months before the stock price decline that triggered this suit.

---

(Footnote Continued from Previous Page.)

deciding a motion to dismiss under Rule 12(b)(6)."  Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

[6] This Court may take judicial notice of market phenomena.  See D.E.&J Ltd. P'ship v. Conaway, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003) (citation omitted).

In the original complaint, Plaintiffs characterized IFIN's restatement in November 2004 as a "red herring" designed to "distract" the investment community from the impact of the flattening yield curve. <u>See</u> Docket No. 1 at p. 3. They did not allege that the restatement itself was the result of any earlier fraud. <u>Id.</u> In the Amended Complaint, Plaintiffs now claim that the restatement itself was the product of a fraudulent scheme, which was supposedly formed almost five years earlier. Reversing their "red herring" allegations, Plaintiffs now allege that it was the Company's July 14, 2005 announcement revising its guidance that was "simply a red-herring," supposedly designed to distract the investment community from accounting issues associated with the Company's November 2004 restatement. AC ¶ 13. On this basis, Plaintiffs now challenge as alleged misrepresentations the financial results that IFIN reported in every quarterly and annual filing that it issued between April 10, 2001 and July 14, 2005.

Given the 180-degree turn that Plaintiffs have taken on their restatement allegations, it is hardly surprising that their newly minted fraud claims simply make no sense. Ordinarily, class action plaintiffs point to financial restatements as supposed evidence of a fraud scheme because the restated financial results are substantially **<u>lower</u>** than the financial results that the defendant company had previously reported. Plaintiffs thus typically allege that the defendant company allegedly "cooked its books" in order artificially to **<u>inflate</u>** its financial results. Here, IFIN's restated financial results are actually **<u>higher</u>** for some of the restated financial quarters; not materially different for most of the restated financial quarters; and only materially lower in the year 2001, four years before IFIN restated its results.

The upshot of Plaintiffs' restatement allegations is the following bedrock claim. Plaintiffs contend that IFIN was only able to meet or exceed, year after year, its **<u>25%</u>** annual earnings growth targets by employing improper accounting. AC ¶ 5. As the Amended Complaint states at the outset:

> [IFIN management] consistently told the market, in conference calls and through conversations with analysts, that the Company would produce growth of 25% in diluted earnings per share virtually every year from 2001 through 2005. . . . **<u>The essence of this case involves defendants' scheme to achieve these results</u>** by deceiving investors and the market about Investors Financial's true financial

> condition by issuing false and misleading statements and omissions regarding the Company's net interest income as a result of prepayment of the Company's debt instruments.

AC ¶ 3 (emphasis added). That contention is belied by the simple fact that IFIN did not need to engage in the fictitious fraud scheme alleged in order to achieve those results. Even as restated, IFIN's diluted EPS grew by **25% or more** in each year that it restated: **25.9%** in 2001, **50.0%** in 2002, **36.3%** in 2003, and **50.4%** in 2004. See App. 11 at 21.

Moreover, while Plaintiffs allege that for fiscal years 2001, 2002, 2003 and 2004 the Company made cumulative net interest income adjustments of $6.2 million (AC ¶ 242), Plaintiffs do not mention that, during those adjusted periods, IFIN had reported total net operating revenue of approximately **$1.6 billion**. App. 10, 11. Thus, the cumulative adjustment of $6.2 million was **less than 0.4%** of IFIN's total net operating revenue during those periods. A simple bar chart contrasting IFIN's pre- and post-restatement diluted EPS illustrates not only how well the Company was performing during the putative class period, but also how immaterial the restatement was to the Company's earnings for 2001 through 2004.



See App. 11 at 21.

Unable to allege credibly that either the Company's 2005 revision to its guidance or its 2004 restatement constituted violations of the federal securities laws, Plaintiffs have endeavored to knit the two events together in an effort to transform a simple guidance case into some sort of

accounting fraud scandal. Plaintiffs, however, are unable to support their fabricated claims with <u>any</u> <u>specific</u> <u>facts</u>. For this reason, and others discussed below, neither Plaintiffs' guidance claims nor their restatement claims can survive this motion to dismiss.

<u>ARGUMENT</u>

## I.    <u>PLAINTIFFS FAIL TO PLEAD FRAUD WITH PARTICULARITY.</u>

As this Court has observed, the PSLRA's pleading requirements are "strict and rigorous," requiring Plaintiffs to "<u>specify each statement</u> alleged to have been misleading, <u>the reason or reasons why</u> the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall <u>state with particularity all facts on which the belief is formed</u>." <u>Carney v. Cambridge Tech. Partners</u>, 135 F. Supp. 2d 235, 240-41 (citing 15 U.S.C. §78u-4(b)(1)) (emphasis added). Plaintiffs' 142-page, 263-paragraph Amended Complaint does not comply with these mandates. The Amended Complaint's structure seems designed to confuse and obscure, as it quotes dozens of press releases, conference call transcripts, and SEC filings and identifies the supposed "fraudulent" aspects of these many statements simply by cutting and pasting nearly identical, boilerplate allegations thereafter. <u>See, e.g.</u>, AC ¶¶ 171-77. Nor have Plaintiffs made any effort to particularize the role of the Individual Defendants in any alleged fraud, as they must. <u>See</u> <u>In re Stratus Computer, Inc. Sec. Litig.</u>, No. 89-2075-Z, 1992 WL 73555, *7-8 (D. Mass. Mar. 27, 1992) (dismissing complaint that "only discusses the defendants in collective terminology, making no reference to any particular act of any particular defendant"). Having failed to plead their claims with particularity, all of Plaintiffs' claims must be dismissed under the PSLRA and Rule 9(b). <u>See</u> <u>In re Splash Tech. Holdings, Inc. Sec. Litig.</u>, 160 F. Supp. 2d 1059, 1073-1075 (N.D. Cal. 2001) (dismissing with prejudice securities fraud claims contained in 124-page "puzzle style pleading"). Further, set forth below, first, are the additional reasons that Plaintiffs' claims respecting IFIN's forward-looking statements must be dismissed and, second, the additional reasons that Plaintiffs' claims respecting IFIN's historical financial disclosures must be dismissed.

II.     **PLAINTIFFS FAIL TO STATE ANY FEDERAL
        SECURITIES FRAUD CLAIMS BASED ON THE
        FORWARD-LOOKING STATEMENTS THEY CHALLENGE.**

As discussed above, this case arose out of the stock price drop that followed the Company's mid-2005 public disclosure revising its prior earnings guidance for that year.   As explained below, Plaintiffs' claims based on the Company's 2005 earnings guidance must be dismissed for failure to state a claim under Rule 12(b)(6) because:   (1) the 2005 earnings guidance was a forward-looking statement accompanied by meaningful cautionary language warning investors of the risks posed by fluctuating interest rates; and (2) Section 10(b) claims cannot be based on an alleged failure accurately to predict interest rates.   Moreover, these claims must be dismissed under the PSLRA and Rule 9(b) because Plaintiffs have failed to plead any specific facts that give rise to a strong inference that the Company issued its guidance with actual knowledge of its falsity.   Plaintiffs' claims based on other various forward-looking statements are defective for these same reasons.   They also fail for the additional reason that these forward-looking statements accurately predicted future events.

A.      **Plaintiffs' Forward-Looking Statement
        Claims Based On The Company's 2005 Earnings
        Guidance Must Be Dismissed Under Rule 12(b)(6).**

Plaintiffs' claims concerning the Company's 2005 earnings guidance must be dismissed because the statement at issue was a forward-looking statement accompanied by meaningful cautionary language, and is therefore immune from liability under the PSLRA's safe harbor provision.   Moreover, as explained more fully below, Section 10(b) claims cannot be based on a mere failure accurately to predict interest rates.

1.      **The Challenged Forward-Looking
        Statement Is Immune From Liability
        Under The PSLRA's Safe Harbor Provision.**

Under the PSLRA's safe harbor provision, forward-looking statements, such as earnings estimates, are not actionable under Section 10(b) if they are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from those predicted.   15 U.S.C. § 78u-5(c)(1), 78u-5(i)(1)(A); see also Baron v. Smith, 380 F.3d 49, 53-54 (1st Cir. 2004) (affirming dismissal of securities claims under

PSLRA's safe harbor).  In the First Circuit, courts routinely apply the PSLRA's safe harbor, holding that cautionary language shields a defendant company from liability for its routine financial projections.  See, e.g., Baron, 380 F.3d at 53-54; see also Carney, 135 F. Supp. 2d at 245-56 (granting motion to dismiss Section 10(b) claims under PSLRA's safe harbor).[7]

Here, Defendants cannot be held liable for the Company's 2005 earnings guidance, as that guidance is immune from liability under the PSLRA's safe harbor.  There can be no dispute that the Company's guidance in 2004 respecting its expected diluted EPS for 2005 was a forward-looking statement, and identified as such.  See App. 21.  In addition, the Company's 2005 earnings guidance was accompanied by "meaningful cautionary language" in the form of a list of potential risks and uncertainties that could cause IFIN's future results to differ materially from the Company's 2005 guidance.  Id.  That list disclosed the risk of a change in the yield curve, i.e., the relationship between long-term and short-term interest rates, which is exactly the risk that ultimately negatively impacted the Company's financial results:

> This news release contains **forward-looking statements** (statements that are not historical facts).  These statements, **such as the Company's statements regarding its current and long term earnings guidance**, are based upon assumptions and estimates that might not be realized and are **subject to risks and uncertainties that could cause actual results to differ materially from those in the forward-looking statements**.  Such risks and uncertainties include the performance of global financial markets, **changes in interest rates, changes in the relationship between long-term and short-term interest rates**, . . .

Id. (emphasis added).  Moreover, the SEC filings that IFIN incorporated by reference in its press release also warned investors that its operating results were subject to fluctuations in interest rates, which could "adversely affect . . . the earnings produced by [IFIN's] investment and loan

---

[7] To obtain the protections of the PSLRA's safe harbor, companies do not have to predict the future accurately, but rather they must disclose risks important to their projections.  See In re Cytyc Corp. Sec. Litig., No. 02-12399, 2005 WL 3801468, at *21 (D. Mass. Mar. 2, 2005) (citing H.R. Conf. Rep. No. 104-369 at 44 (1995)).  Of course, where companies accurately warn investors of a risk that materializes, courts dismiss claims predicated on the company's projection.  See, e.g., In re Capstead Mortgage Corp. Sec. Litig., 258 F. Supp. 2d 533, 555 (N.D. Tex. 2003) (dismissing claims, holding that company "adequately warned investors of exactly the [interest rate] risks Plaintiffs contend were not disclosed").

portfolios, and thus could adversely affect [IFIN's] operating results." App. 4, 10. See Yellen v. Hake, No. 4:05-cv-00388, 2006 WL 1881205 (S.D. Iowa July 7, 2006) (dismissing claims where press release incorporated by reference warnings in annual report).

Given these indisputable facts, Plaintiffs' claims based on the Company's 2005 earnings guidance must be dismissed. That guidance constituted a forward-looking statement, was identified as such, and was accompanied by meaningful cautionary language. Accordingly, the PSLRA's safe harbor does not permit the statement to form the basis of a Section 10(b) claim.

### 2. Section 10(b) Claims Cannot Be Based On An Alleged Failure Accurately To Predict Interest Rates.

Plaintiffs' guidance claims also must be dismissed because a Section 10(b) claim cannot be based on a failure to predict future events. See Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) ("[F]ailure to [have greater clairvoyance] does not constitute fraud."). More specifically, Section 10(b) claims cannot be based on a failure accurately to predict interest rates. Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 178 (S.D.N.Y. 1996) ("Failure to predict a rise in interest rates does not constitute fraud and cannot be the basis for alleging misrepresentations . . . ."). As explained above, IFIN reduced its 2005 earnings growth estimate because interest rates in 2005 moved in historically anomalous ways, which confounded IFIN and all of Wall Street. See supra 2-3. Thus, at its core, this case is about IFIN's failure in December 2004 accurately to predict the extent to which the yield curve would flatten in 2005. Although IFIN's guidance presumed a flattening of the yield curve in 2005 (AC ¶ 226), the yield curve ultimately flattened to a far greater degree than IFIN, or the market at large, expected. IFIN cannot be held liable for failing accurately to predict future interest rate movements.

### B. Plaintiffs' Forward-Looking Statement Claims Based On The Company's 2005 Earnings Guidance Must Be Dismissed Under The PSLRA And Rule 9(b) Because Plaintiffs Have Failed Adequately To Plead Scienter.

### 1. Plaintiffs Must Plead Specific Facts Giving Rise To A Strong Inference Of Actual Knowledge.

Plaintiffs' 2005 guidance claims also must be dismissed because Plaintiffs fail to plead any specific facts giving rise to a strong inference that the Company issued its 25% guidance

with actual knowledge that the guidance was false or misleading.  Pursuant to both the PSLRA and Rule 9(b), the Amended Complaint "must, 'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a <u>strong</u> <u>inference</u> that the defendant acted with the required state of mind.'"  <u>In re Galileo Corp. S'holders Litig.</u>, 127 F. Supp. 2d 251, 260 (D. Mass. 2001) (alteration in original) (emphasis added).  In a case predicated on a forward-looking statement, the required state of mind is "actual knowledge."  15 U.S.C. §78u-5(c)(1)(B)(ii); <u>Greebel</u>, 194 F.3d at 201 (safe harbor precludes liability for forward-looking statement unless maker of statement had actual knowledge it was false or misleading).  Section 10(b) claims must be dismissed where, as here, plaintiffs fail to plead with particularity facts giving rise to a strong inference that the defendant made the forward-looking statement with actual knowledge of its falsity.  <u>See</u>, <u>e.g.</u>, <u>In re Advanta Corp. Sec. Litig.</u>, 180 F.3d 525, 535-36 (3d Cir. 1999); <u>Stavros v. Exelon Corp.</u>, 266 F. Supp. 2d 833, 847 (N.D. Ill. 2003).

> **2.      Plaintiffs Have Failed To Plead Specific Facts**
> **<u>Giving Rise To A Strong Inference Of Actual Knowledge.</u>**

Plaintiffs' Section 10(b) claims must be dismissed with respect to IFIN's 2005 earnings guidance because the Amended Complaint fails to satisfy this scienter standard.  First, Plaintiffs have failed to plead specific facts giving rise to **<u>any</u>** inference, let alone a strong inference, that any Defendant had "actual knowledge" that IFIN's 2005 guidance was false or misleading.  Second, Plaintiffs' motive allegations concerning the Individual Defendants' sales of stock and the Company's bonus plan do not support any inference of scienter, as a matter of law.

> **a.      Plaintiffs Fail To Plead Any Specific Facts**
> **Supporting A Strong Inference That IFIN's**
> **<u>2005 Guidance Was Knowingly False When Made.</u>**

Plaintiffs attempting to establish scienter "typically identify internal reports, memoranda or the like and allege both the contents of those documents and defendant's possession of them at the relevant time."  <u>In re Boston Tech., Inc. Sec. Litig.</u>, 8 F. Supp. 2d 43, 57 (D. Mass. 1998) (granting motion to dismiss securities fraud complaint).  Securities fraud complaints that fail to identify such documents or other contemporaneous facts tending to show that the defendants knew the statements in question were false when made are subject to dismissal.  <u>Id.</u>; <u>see also</u>

Carney, 135 F. Supp. 2d at 251-52 (dismissing claims where plaintiffs failed to plead specific facts indicating discrepancy between internal company information and public statements).

Here, as in Boston Technology and Carney, Plaintiffs have not pled a single specific contemporaneous fact supporting any inference -- let alone a strong inference -- that any Defendant knowingly misrepresented the Company's expected financial results for 2005. For example, the Amended Complaint is devoid of a single specific fact to support the assertion that, as of December 16, 2004, any Defendant knew: (1) the precise extent to which the yield curve would flatten in 2005; or (2) that the Company's estimates of earnings growth for 2005 would not meet or exceed 25%, which it had for many years. See supra 4-5.

The best Plaintiffs can do is essentially allege that the Company "must have known" how interest rates would behave in 2005 because, in 2004, Company officers claimed to have "baked" an expected flattening of the yield curve into the Company's earnings projections. AC ¶ 226. As noted above, however, lacking clairvoyance, IFIN could only "bake" into its guidance its own best estimate of the degree to which the yield curve would flatten in 2005. That estimate, like similar estimates made by major financial institutions, proved incorrect.

As discussed above, in 2005 the yield curve flattened to a far greater extent than market participants expected. See supra 2-3. Indeed, the most sophisticated financial institutions in the world were stating in mid-2005 that they did not anticipate the extent to which the yield curve would flatten in 2005. Id. These disclosures are directly at odds with Plaintiffs' conclusory allegations that Defendants somehow had actual knowledge in December 2004 regarding the extent to which the yield curve would continue to flatten in 2005. The Amended Complaint lacks a single specific fact to support that conclusory, and absurd, allegation.[8]

---

[8] Moreover, Plaintiffs' allegations ignore the context in which the Company issued its 2005 guidance. On December 16, 2004, the Company was nearing the close of one of the most successful periods of growth in its history. As stated above, its 2004 earnings were over **50%** higher than its 2003 earnings, which had grown **36%** over the prior year. See infra 25-26. In this context, it is hardly surprising that IFIN was comfortable projecting 25% year-over-year growth.

To be sure, Plaintiffs ask this Court to draw a strong inference of scienter based on alleged statements of two confidential witnesses, one of whom is not identified in any way. AC ¶ 226. Courts in the First Circuit carefully scrutinize statements attributed to confidential witnesses, evaluating, among other things, "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." In re Cabletron Sys., Inc., 311 F.3d 11, 29-30. Where the confidential witness relied upon is not alleged to have been in a position to know the information for which that witness is cited, statements of that witness cannot support any inference of scienter. Fitzer v. Sec. Dynamics Techs., 119 F. Supp. 2d 12, 22 (D. Mass. 2000).

As an initial matter, Plaintiffs have failed to allege that any of its confidential witnesses actually were employed by IFIN in December 2004, when the Company issued its 2005 guidance. AC ¶¶ 33-35. Moreover, none of the alleged statements by confidential witnesses support any inference, let alone a strong inference, that any Defendant actually knew that the 2005 guidance was false or misleading. Utter speculation by CW1 -- whose employment terminated in **2003** -- concerning what "anyone with half a brain knew" in the months preceding the Company's **July 14, 2005** guidance revision, cannot support any inference of scienter.[9] This allegation is a thinly veiled "must have known" allegation. It is well established, however, that assertions that Defendants "must have known" certain facts cannot support a strong inference of scienter. See, e.g., Carney, 135 F. Supp. 2d at 252; Galileo, 127 F. Supp. 2d at 261.

---

[9] To support their allegation that Defendants' July 2005 explanation for their revised guidance was knowingly false, Plaintiffs cite "CW" for the proposition that "Sylvester would never have uttered such nonsense." AC ¶ 226. Plaintiffs fail to plead any facts regarding "CW", let alone facts showing CW was in a position to know the information for which CW is cited. Sheer speculation by an unidentified person about what "Sylvester" allegedly would, or would not, have stated plainly cannot support any inference of scienter against any Defendant.

In sum, Plaintiffs have failed to offer any specific facts giving rise to a strong inference that any Defendant had actual knowledge that the Company's 2005 earnings guidance was false or misleading. Rather, Plaintiffs rely solely on the very sort of "must have known" allegation that this Court previously has held cannot support a securities fraud claim. <u>Id.</u> For this independent reason, Plaintiffs' 2005 guidance claims must be dismissed.

**b.    Plaintiffs' Motive Allegations With
Respect To Their 2005 Guidance Claims
<u>Do Not Support A Strong Inference Of Scienter.</u>**

Where, as here, Plaintiffs fail to plead specific facts supporting a strong inference of scienter, they cannot plead scienter based on "motive and opportunity" allegations alone. <u>Greebel</u>, 194 F.3d at 197. In any event, Plaintiffs' "motive and opportunity" allegations do not support any inference of scienter respecting the Company's 2005 earnings guidance because: (1) Plaintiffs have failed to show that the Individual Defendants' stock trading after December 16, 2004 (or at any time during the four-plus year proposed class period) was unusual in timing or amount; and (2) Plaintiffs' allegations that the Individual Defendants stood to benefit from bonus incentives make no sense with respect to Plaintiffs' guidance allegations, as the alleged bonuses were dependant upon actual financial results, not the Company's projections.

**(1)    Plaintiffs' Allegations Concerning
Defendants' Trading Do Not Give
<u>Rise To A Strong Inference Of Scienter.</u>**

To support an inference of scienter based on insider trading, a plaintiff must plead facts showing that there was a suspiciously abnormal amount and pattern of trading. <u>See</u>, <u>e.g.</u>, <u>Greebel</u>, 194 F.3d at 198, 207 (stating that defendants' trading must be "unusual" and "well-beyond [their] normal patterns of trading"); <u>Carney</u>, 135 F. Supp. 2d at 256 (same). Ordinarily, when plaintiffs accuse a company of issuing misleading earnings guidance, the plaintiffs attempt to show that company officers sold large quantities of stock after the allegedly misleading guidance but before any subsequent downward revision, and that such sales were suspicious or unusual. <u>See</u>, <u>e.g.</u>, <u>Limantour v. Cray, Inc.</u>, No. CO5-943Z, 2006 WL 1169791, at *15-18 (W.D.

13

Wash. Apr. 28, 2006) (rejecting plaintiffs' attempt to establish scienter based on insider sales after allegedly misleading 2004 guidance).

Measured against these criteria, none of the Individual Defendants' stock sales highlighted in the Amended Complaint support an inference of scienter. As an initial matter, it bears mention that Plaintiffs' allegations setting forth the amounts of the Individual Defendants' retained holdings of stock and exercisable options as of the end of the purported class period are grossly inaccurate with respect to three of the Individual Defendants. See AC ¶ 236.[10] As publicly available SEC filings evidence, and contrary to Plaintiffs' inaccurate allegations, during the four-plus year class period, Mr. Maroney sold no more than **28.1%** of his total holdings as of the end of the class period, **not** 56.88%, Mr. Mancuso sold only **32.2%** of his total holdings, **not** 51.83%, and Mr. Henry sold no more than **22.9%** of his total holdings, **not** 44.05%. Compare App. 34 with AC ¶ 236.[11] Of course, the actual facts significantly weaken any inference Plaintiffs wish this Court to draw from the Individual Defendants' trading. Nonetheless, even when taken as true, Plaintiffs' inaccurate allegations do not support any inference of scienter.

Here, Plaintiffs' trading allegations are far weaker than those this Court held wanting in Carney. 135 F. Supp. 2d at 256 (allegations that CEO and CFO sold $3.85 million and $2.6 million in shares in months preceding announcement of earnings miss did not raise strong inference of scienter). Plaintiffs' trading allegations do not give rise to any inference of scienter with respect to: (1) the Company's 2005 guidance; or (2) any other challenged statement.

First, Plaintiffs do not even attempt to show that any of the Individual Defendants' stock sales after the Company's 2005 guidance were suspicious or unusual. Instead, Plaintiffs merely

---

[10] When considering insider trading allegations, courts take into account both stock and stock options held by insiders. See In re Silicon Graphics Inc., 183 F.3d 970, 986-87 (9th Cir. 1999).

[11] Submitted herewith at App. 34 are the SEC filings evidencing Messrs. Maroney, Mancuso, and Henry's holdings of shares and exercisable stock as of the end of the purported class period, publicly available documents of which this Court may take judicial notice. See supra at 1 n.1.

list all of the Individual Defendants' stock sales during the entire four-plus year proposed class period and allege that the Defendants "took advantage of the inflation of the stock price." AC ¶ 236. For this reason alone, Plaintiffs' scienter arguments fail. See Carney, 135 F. Supp. 2d at 256 ("[P]laintiffs must show that defendants' trading was 'unusual . . . .'").

Further, unlike in Carney, IFIN's CFO did not sell any Company stock after IFIN issued its allegedly misleading earnings guidance. AC ¶ 236. This fact undermines severely Plaintiffs' scienter allegations. See In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001) (the fact that "many key First Union executives . . . -- including the Company's Chief Financial Officer -- did not sell a single share . . . is fatal to Plaintiffs' effort to establish scienter through stock sales"); In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) ("The fact that [CFO] did not sell any shares during the class period undermines the suggestion that the Defendants engaged in securities fraud . . . .").

In addition, four of the seven Individual Defendants sold no IFIN stock between the issuance of the 2005 earnings guidance and the subsequent July 2005 guidance revision. AC ¶ 236. Moreover, six of the seven Individual Defendants sold no Company stock in the entire second quarter of 2005, immediately preceding the Company's guidance revision. Id. Courts across the country have held that where, as here, only some of the individual defendants in a complaint actually traded company stock during the period at issue, there is no inference of scienter. See, e.g., Nathenson v. Zonagen Inc., 267 F.3d 400, 420-21 (5th Cir. 2001) (no strong inference of scienter where only one out of three insider defendants sold corporate stock); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d Cir. 1999) (no strong inference of scienter where "three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices").

Mr. Sheehan, Mr. Mancuso, and Mr. Maroney were the only Individual Defendants who sold any Company stock after the 2005 earnings guidance at issue, and Plaintiffs have not even attempted to plead that there was anything suspicious or unusual about any of their sales. AC ¶ 236. Indeed, Mr. Sheehan's post-guidance stock sales, the last of which occurred on March 14,

2005, represented only **5%** of his total holdings during the purported class period.  AC ¶ 236. Mr. Mancuso and Mr. Maroney's post-guidance stock sales represented, according to Plaintiffs, only 12% and 3.7% of their class period holdings.  AC ¶ 236.  The sale of such a low percentage of a defendant's holdings generally is not considered suspicious.  See, e.g., In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1094 (9th Cir. 2002) (finding a defendant's sale of 13% of stock and options was not suspicious and "belies any intent to rid himself of a substantial portion of his holdings"); In re E.spire Commc'ns, Inc. Sec. Litig., 127 F. Supp. 2d 734, 743 (D. Md. 2001) ("[T]hat an individual defendant sold so little stock [6.2% of holdings] can be construed as negating the inference that there was fraud.").[12]

The fact that the Individual Defendants retained most of their stock and options after the Company issued its earnings guidance simply cannot be harmonized with their unsupported accusation of fraud.  See Maldonado v. Dominguez, 137 F.3d 1, 12 n.9 (1st Cir. 1998) (inference of scienter was undermined by the defendants' loss of $1.5 million of their own money); see also In re Vantive Corp. Sec. Litig., 110 F. Supp. 2d 1209, 1219 (N.D. Cal. 2000) (sale of 38% of holdings is a "minimal sale of stock [that] tends to negate an inference of scienter"), aff'd, 283 F.3d 1079 (9th Cir. 2002); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999) ("Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, [retained holdings] suggest they had every incentive to keep Advanta profitable.").

---

[12] Indeed, many of these sales cannot give rise to an inference of scienter because all such post-guidance stock sales by Mr. Mancuso and Mr. Maroney were made pursuant to written trading plans.  See App. 33.  Pursuant to SEC Rule 10b5-1, a person's trading is not "on the basis of" material non-public information if the person adopted, and sold their securities pursuant to, a written trading plan consistent with the terms of Rule 10b5-1.  See 17 C.F.R. 240.10b5-1.  Courts have interpreted this rule to provide that, on a motion to dismiss, a plaintiff may not rely on such transactions to support an inference of scienter.  See In re Netflix, Inc., Sec. Litig., No. C04-2978-FMS, 2005 WL 1562858, at *8 (N.D. Cal. June 28, 2005) (finding no strong inference of scienter where defendants' sales were pursuant to a Rule 10b5-1 plan); Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (same).

Further, as the Amended Complaint demonstrates, Mr. Sheehan, Mr. Mancuso, and Mr. Maroney's sales were consistent with the amounts of their sales in earlier years. There was nothing unusual about Mr. Sheehan's sale of 155,000 shares of IFIN stock after the Company's 2005 earnings guidance, as he had sold an average of 200,000 shares of IFIN stock per year from 2001 to 2004. AC ¶ 236. Likewise, in 2003 and 2004, Mr. Mancuso sold an average of over 87,000 shares of Company stock each year, so his sale of 60,000 shares in 2005 was not unusual in amount. Mr. Maroney had sold over 215,000 shares of IFIN stock since 2001, so his sale of 15,000 shares of IFIN stock on December 27, 2004 also was not unusual in amount.

Second, none of the Individual Defendants' stock sales during the entire class period, listed in Paragraph 236 of the Amended Complaint, support any inference of scienter with respect to any allegedly false statement, let alone IFIN's 2005 guidance. Just as with the post-guidance stock sales discussed above, Plaintiffs have not established that there was anything unusual about the amount of the Individual Defendants' stock sales in the aggregate.[13] In fact, over the entire class period, two of the seven Individual Defendants sold less than 5% of their stock and option holdings. Mr. Spinney, the Company's CFO, did not sell **any** of his Company stock during the entire class period,[14] but rather **bought** 10,150 shares. See App. 35; Rombach v. Chang, 355 F.3d 164, 176-77 (2d Cir. 2004) (no scienter where, inter alia, individual defendants purchased shares); In re Century Bus. Serv. Sec. Litig., 2002 WL 32254513, at *8

---

[13] It should be noted that, in a transparent attempt to increase the amount of relevant insider sales, Plaintiffs have extended their purported class period back to 2001, creating a class period of almost four and a half years. Courts have found that an unusually long class period is a mitigating factor when determining, with respect to scienter, the weight to be attributed to insider sales. See, e.g., In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir. 2002) ("[P]laintiffs have selected an unusually long class period of sixty-three weeks . . . allow[ing] the plaintiffs to sweep as many sales into their total as possible, thereby making the stock sales appear more suspicious."); In re Syncor Int'l Corp. Sec. Litig., 327 F. Supp. 2d 1149, 1163 (C.D. Cal. 2004) (viewing allegations of insider trading "with heightened scrutiny" where class period was four years and eight months).

[14] Although Plaintiffs allege that Mr. Spinney sold 200 shares of IFIN stock in 2002 (AC ¶ 236), in fact, as indicated in contemporaneously filed SEC filings, Mr. Spinney sold no shares of IFIN stock at that time. App. 35.

(N.D. Ohio June 27, 2002) (finding it improbable that defendant would seek to increase his wealth by purchasing stock at inflated prices). Mr. Rogers, who allegedly "controlled Investors Financial" in a "dictatorship of two partners" (AC ¶ 257), sold only **4.86%** of his stock and options during the class period. AC ¶ 236. The fact that two key officers sold **0%** and **4.86%** of their holdings during a purported class period of over four years -- and the Company's CFO actually **bought** shares -- undermines any inference of scienter.

Having failed to establish anything unusual about the amount of the Individual Defendants' trading during the extended class period, Plaintiffs also have failed to establish that there was anything unusual about the timing or pattern of the Individual Defendants' sales during this period. In fact, three of the Individual Defendants did not sell any Company stock after 2002, two years before the allegedly misleading earnings guidance.[15] Id. Moreover, numerous of the other Individual Defendants' stock sales in earlier years were made pursuant to Rule 10b5-1 plans, and, therefore, cannot support an inference of scienter. See supra 16 n12. Indeed, with respect to four of the seven Individual Defendants, all or most of their sales during the class period were pursuant to Rule 10b5-1 trading plans. App. 33. These many transactions yielded proceeds of over $52 million, or **76%** of the total trading relied on by Plaintiffs over the proposed four-plus year class period. Id.; AC ¶ 236. These trades cannot support any inference that any Defendant acted with scienter. See supra 16 n.12. For this reason as well, Plaintiffs' allegations concerning stock sales from 2001 through 2004 do not support any inference of scienter with respect to any challenged statement, let alone IFIN's 2005 guidance.

---

[15] Individual Defendant Karen Keenan's sale of 60,000 shares of stock within three months of her retirement is not unusual or suspicious so as to support a strong inference of scienter. See AC ¶¶ 119, 236; Greebel, 194 F. 3d at 206 ("It is not unusual for individuals leaving a company . . . to sell shares."); In re K-Tel Int'l, Inc., Sec. Litig., 300 F.3d 881, 896 (8th Cir. 2002) (sale of $11.7 million in shares did not "materially impact the scienter analysis" where defendant resigned three weeks after sale).

### (2)    Plaintiffs' Allegations Concerning Defendants' Bonus Plans Do Not Give Rise To A Strong Inference Of Scienter.

Plaintiffs' allegations regarding incentive-based bonuses also fail to give rise to any inference of scienter with respect to any challenged statement, let alone IFIN's 2005 guidance. In the Amended Complaint, Plaintiffs simply list the bonuses received by some of the Individual Defendants during the class period, and then allege that "executive defendants' bonus compensation was heavily tied to the Company's financial performance." AC ¶ 232. The First Circuit has held that the mere assertion that a defendant's compensation is tied to financial performance is insufficient to raise a strong inference of scienter. See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002) (fact that executives' compensation allegedly depended on company earnings "alone is not and cannot be enough to establish scienter"). Moreover, Plaintiffs fail to explain how incentive based bonuses could possibly serve as a motive for artificially inflating the Company's earnings projections. While Plaintiffs have alleged that bonus compensation was tied to financial performance, nowhere do Plaintiffs allege that the Individual Defendants' compensation was in any way tied to its earnings projections.

Having failed to identify any specific fact or motive supporting a strong inference that any Defendant actually knew that the 2005 earnings guidance was false, Plaintiffs have failed adequately to plead scienter. Accordingly, their 2005 guidance claims must be dismissed.

### C.    Plaintiffs' Claims Based On All Other Forward-Looking Statements Must Be Dismissed Under Rule 12(b)(6), The PSLRA, And Rule 9(b).

Although the essence of Plaintiffs' guidance claim focuses on the Company's 2005 earnings guidance, Plaintiffs also allege that the Company's earnings guidance for the years 2002, 2003, and 2004 was false and misleading. Specifically, Plaintiffs allege that, when the Company projected that its earnings would grow at a rate of 25% for the years 2002, 2003, and 2004, those projections were purposefully false and misleading, because IFIN had failed to disclose that it accounted for its interest income by using "the prospective method." AC ¶¶ 144, 151, 157, 163, 190, 198. No claims based on these statements can survive this motion.

As explained more fully in Section III.A.1.c. below, IFIN's earnings guidance for the years 2002, 2003, and 2004 was accurate. The Company exceeded its 25% earnings growth projections in 2002, 2003, and 2004 **irrespective** of whether it was using the prospective or the retrospective method of accounting. Indeed, even after the Company's restatement, IFIN **exceeded** its **25%** earnings growth targets in 2002, 2003 and 2004, achieving year-over-year earnings growth of **50%** in 2002, **36%** in 2003, and **50%** in 2004. See infra 25-26. As a matter of law, a company's earnings guidance that is later proven to be accurate is not actionable. See Carney, 135 F. Supp. 2d at 245 (whether a growth projection was sufficiently accompanied by meaningful cautionary language is "moot" if the defendant's projection "was not off the mark").

Even if the Company's guidance for these years had been inaccurate -- and it was not -- those projections nonetheless are not actionable for all the reasons Plaintiffs' 2005 guidance claims fail. First, Plaintiffs' guidance claims fail because each statement at issue was a forward-looking statement accompanied by meaningful cautionary language, and it is therefore protected by the PSLRA's safe harbor for forward-looking statements. See supra 7-8.[16] Second, Plaintiffs' guidance claims fail because Plaintiffs have not pled that any Defendant had actual knowledge that the guidance was false when issued. See supra 9-10 (quoting 15 U.S.C. §78u-5(c)(1)(B)(ii)). For all of these reasons, Plaintiffs' claims based on the Company's earnings guidance for 2002, 2003, 2004, and 2005 must be dismissed.

## III.     PLAINTIFFS FAIL TO STATE ANY FEDERAL SECURITIES FRAUD CLAIMS BASED ON THE HISTORICAL FINANCIAL RESULTS THAT THEY CHALLENGE.

As discussed above, unlike the original Complaint in this case, the Amended Complaint bases claims on the restatement of financial results that IFIN announced in October 2004 -- nine

---

[16] See July 11, 2002 conference call transcript (AC ¶ 139) at App. 12; October 10, 2002 conference call transcript (AC ¶ 147) at App. 13; January 23, 2003 press release (AC ¶ 152) at App. 14; January 23, 2003 conference call transcript (AC ¶ 154) at App. 15; April 10, 2003 press release (AC ¶ 159) at App. 16; June 7, 2004 Reg. FD Disclosure (AC ¶ 188) at App. 7; July 14, 2004 press release (AC ¶ 191) at App. 18; September 28, 2004 Reg. FD Disclosure (AC ¶ 196) at App. 9.

months before the July 14, 2005 announcement regarding 2005 guidance that triggered the filing of this case.  Plaintiffs attack as a misrepresentation virtually every financial disclosure that IFIN made between 2001 and 2005, and certain related statements (the "Financial Disclosure Claims").  For the reasons discussed below, Plaintiffs' Financial Disclosure Claims must be dismissed pursuant to the PSLRA and Rule 9(b), and Rule 12(b)(6).

>    **A.    Plaintiffs' Financial Disclosure Claims Must**
>    **Be Dismissed Under The PSLRA And Rule 9(b).**

Plaintiffs' Financial Disclosure Claims must be dismissed under the PSLRA and Rule 9(b) because:  (1) Plaintiffs fail to plead any specific facts supporting a strong inference that any financial disclosure was knowingly false when made; (2) Plaintiffs' allegations regarding the Company's SBA securities are not pled with specificity; (3) Plaintiffs fail to plead scienter respecting their SBA security-related claims; and (4) Plaintiffs fail to plead loss causation respecting their SBA security-related claims.

>    **1.    Plaintiffs Fail To Plead Specific Facts**
>    **Supporting A Strong Inference That Any**
>    **Financial Disclosure Was Knowingly False When Made.**

As discussed above, in order to support a strong inference that a challenged statement was knowingly false when made, a complaint is required to identify internal reports, memoranda or the like and allege both the contents of those documents and defendant's possession of them at the relevant time.   See supra 10-11.  Here, despite the length of the Amended Complaint, Plaintiffs have failed to allege a single specific fact -- not a single specific document, or meeting, or conversation -- that supports any inference, let alone a strong inference, that any one of the myriad challenged statements was knowingly false when made.  That failure is fatal to all of their financial disclosure claims.[17]

---

[17] In addition, Plaintiffs conclusorily allege that Defendants knew that IFIN's internal accounting controls were inadequate in violation of Section 13(b)(2).  AC ¶¶ 90-95.  Plaintiffs' allegations fail as a matter of law as Plaintiffs allege no specific facts suggesting that Defendants knew of any alleged control problems or of any dangers associated with IFIN's internal controls.  See Abrams v. Baker Hughes, Inc., 292 F.3d 424, 433 (5th Cir. 2002); In re Westinghouse Sec. Litig., 90 F.3d 696, 711-12 (3d Cir. 1996).  Accordingly, Plaintiffs' internal control allegations must be dismissed.

Lacking any specific facts to support any of their financial disclosure claims, the best that Plaintiffs can do is seek to plead scienter based upon allegations concerning: (1) the restatement itself; and (2) the status and background of the Individual Defendants. None of those allegations, either individually or in the aggregate, support any inference of scienter, as a matter of law.

### a.    IFIN's Restatement Does Not Support Any Inference Of Scienter.

Plaintiffs here allege that IFIN improperly used one accounting method recognized by FAS 91 -- the prospective method -- over another -- the retrospective method. See AC, Ex. A, at 8-11 ("SFAS No. 91 allows two basic methods of accounting for interest income for mortgage loans and debt securities that are prepayable."). At bottom, Plaintiffs attempt to conjure fraud out of what amounted to a subjective bookkeeping judgment between two recognized and complex accounting methods. Well-established legal principles preclude Plaintiffs' efforts.

First, the mere fact that a company has restated its financial results does not, without more, "support a 'strong inference' of fraud, or for that matter, a weak one." In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 169 (D. Mass. 2000); see also Galileo, 127 F. Supp. 2d at 258-63 (dismissing Section 10(b) claims based on restatement, notwithstanding 64% drop in defendant company's stock price, violations of its own revenue recognition policy, and termination of CEO and CFO due to GAAP violations). "Instead, the Court must ask whether the GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants knowingly or recklessly misled investors." In re Peritus Software Servs., Inc., 52 F. Supp. 2d 211, 224 (D. Mass. 1999). Absent other circumstances, allegations that restated financial statements give reason to infer scienter amount to nothing more than fraud by hindsight. Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992).

Second, where, as here, the issuer's financial adjustments are small in size "[r]estatements are less probative of deliberate wrongdoing or recklessness." In re Hypercom Corp. Sec. Litig., No. CV-05-0455-PHX, 2006 WL 726791, at *4 (D. Ariz. Mar. 9, 2006) (dismissing fraud claim and holding that company's restatement was "not of the magnitude

typically found to support a strong inference of scienter"); see also Greebel, 194 F.3d at 206 (concluding that improper recognition of 4.2% of defendant's revenues did not support a strong inference of scienter); In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d at 170 (dismissing claims based on restated financials, noting that "other circumstances" allegedly supporting an inference of scienter "have a certain circularity in their logic, that is, they consist for the most part of the very practices that plaintiffs allege cumulatively violated GAAP").

In this case, Plaintiffs ask this Court to infer from the fact that IFIN restated its financial results that Defendants acted with the requisite mental state.  See AC ¶¶ 79, 82, 87, 88, 89, 103, 104, 231.  As discussed above, merely alleging that IFIN restated its financial results does not support even a "weak" inference of scienter.  Moreover, the size of IFIN's adjustment to its financial results for fiscal years 2001, 2002, 2003, and 2004 militates against any inference, let alone a strong inference, of scienter.  Indeed, the cumulative adjustment of $6.2 million was **less than 0.4%** of the **$1.6 billion** total net operating revenue that IFIN reported during those periods.  In addition, IFIN actually **understated** its earnings for fiscal year 2003 and the first two quarters of 2004, causing IFIN to **revise upward** its net interest income for those time periods. AC ¶ 6.  For most of the other restated quarters, the difference between the original and restated numbers is immaterial.[18]  All told, IFIN's restatement of less than 0.4% of its net operating revenues constituted a far smaller restatement, on a percentage basis, than the restatements that other courts have held do not give rise to any inference of scienter.  See, e.g., Greebel, 194 F.3d at 206 (no strong inference of scienter where revenue artificially inflated by 4%); Segue Software, Inc., 106 F. Supp. 2d at 169 (dismissing securities fraud claim where 2.6% overstatement of its revenues did not support a strong inference of scienter).  In light of these many authorities, Plaintiffs' allegations regarding IFIN's restatement of its financial results,

---

[18] See supra 5.

absent additional specific facts which Plaintiffs' Amended Complaint lacks, cannot give rise to the requisite strong inference of scienter.

### b. Plaintiffs' "Status" And "Access" Allegations Cannot Support Any Inference Of Scienter.

Lacking the particularized facts required under the PSLRA and Rule 9(b), Plaintiffs resort to allegations regarding the status of one of the Individual Defendants and the alleged access that four of the Individual Defendants had to documents at internal meetings. AC ¶¶ 28, 69-76, 79, 82, 89. These allegations are incapable of giving rise to a strong inference that any Defendant acted with the necessary level of scienter.

In the Amended Complaint, Plaintiffs allege that, because Mr. Spinney is a CPA, he "must have known" that financial disclosures were inaccurate when made. AC ¶¶ 28, 69-76, 79, 82, 89. However, rote allegations such as these, suggesting what Defendants must have known solely by virtue of their status, position or background are not sufficient to meet the strict pleading requirements of the PSLRA and Rule 9(b) and cannot support a strong inference of scienter, as a matter of law. See, e.g., Peritus Software Servs., Inc., 52 F. Supp. 2d at 228; Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998).

Plaintiffs' "access" allegations are similarly flawed. Specifically, Plaintiffs allege that four of the Individual Defendants served on IFIN's Asset and Liability Committee ("ALCO") and received unspecified reports and information as a result. AC ¶¶ 28, 69-76, 89.[19] However, it is axiomatic that, "[g]eneral allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss." Lirette, 27 F. Supp. 2d at 283. Rather, plaintiffs must specifically identify particular internal corporate documents, the date of such documents, the exact information in the documents, and who received them. Capstead, 258 F. Supp. 2d at

---

[19] Plaintiffs attribute a number of their very general ALCO meeting allegations to "CW1." AC ¶¶ 73-75. As discussed above, courts in the First Circuit carefully scrutinize statements attributed to confidential witnesses, and alleged confidential witnesses must have been in a position to know the information alleged. See supra 12. Here, CW1 is not cited as the source of any allegation of specific fact bearing on what any Individual Defendant knew at any particular time.

564-65 (allegations that defendants knew from internal documents that prepayment levels were "adversely affecting" income insufficient to give rise to strong inference of scienter); see also Guerra v. Teradyne, Inc., No. 01-11789, 2004 WL 1467065, at *25 (D. Mass. Jan. 16, 2004) (dismissing complaint for, inter alia, failing to satisfy scienter standard where plaintiffs did not plead with particularity the contents of any single report allegedly received by defendants).

As in Capstead, the Amended Complaint here does not specify the date that any one ALCO "reporting package" was prepared; the sender of any one specific "reporting package;" the recipient of any one specific "reporting package;" or the content of any one specific "reporting package." See Capstead, 258 F. Supp. 2d at 565. Further, Plaintiffs have not specifically described a single particular "reporting package" that allegedly addressed FAS 91, the retrospective method, the prospective method, mortgage-backed securities ("MBS securities"), or SBA securities. Instead, the Amended Complaint contains only conclusory allegations regarding the general composition of ALCO and a "reporting package" allegedly distributed to the committee. Thus, none of Plaintiffs' ALCO allegations can support any inference that any Defendant possessed any specific information, at any point in time, indicating that any challenged statement was false when made. For all of the reasons discussed above, the Amended Complaint fails to allege facts sufficient to give rise to a strong inference of scienter respecting Plaintiffs' Financial Disclosure Claims. Accordingly, their claims must be dismissed.

### c.    Plaintiffs' Motive Allegations Do Not Support Any Inference Of Scienter.

For all of the reasons discussed above, Plaintiffs' motive allegations relating to the Individual Defendants' stock trading and bonus compensation do not support any inference of scienter. See supra 13-18. Furthermore, those motive allegations do not support any inference of scienter as applied to Plaintiffs' Financial Disclosure Claims for an additional reason: They make no sense. Irrational motive allegations cannot support a fraud claim, as a matter of law. See Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001) (affirming lower court's dismissal of the complaint where plaintiffs' view of the facts defies economic reason); In re CDNOW Sec.

Litig., 138 F. Supp. 2d 624, 642 (E.D. Pa. 2001) (granting motion to dismiss where "motive alleged" was "illogical") (citation omitted).

Here, Plaintiffs' insider trading and bonus allegations make no sense as applied to Plaintiffs' Financial Disclosure Claims because IFIN **actually revised upward** its net interest income and net operating revenues for 2003 and the first three quarters of 2004.  See App. 19; see also infra 33.  No officer or director intent on selling stock or obtaining a **higher** incentive-based bonus would intentionally **understate** financial results, artificially **deflating** the Company's stock, for the purpose of selling his or her shares at **depressed** prices or receiving a **lower** bonus payment.  Plaintiffs' motive allegations defy economic reason.  Therefore, they cannot support any inference of scienter when applied to Plaintiffs' Financial Disclosure Claims.

Further, Plaintiffs' allegation that Defendants were motivated to inflate artificially financial results to achieve 25% growth in EPS year over year is equally fallacious.  As the below chart demonstrates, IFIN achieved at least 25% growth in EPS **irrespective** of whether it used the prospective or retrospective method to account for its MBS securities:

| Year | Reported EPS | EPS Growth Rate | Restated EPS | EPS Growth Rate |
|------|------|------|------|------|
| 2000 | $0.54 | N/A | N/A | N/A |
| 2001 | $0.76 | 41% | $0.68 | 26% |
| 2002 | $1.04 | 37% | $1.02 | 50% |
| 2003 | $1.38 | 33% | $1.39 | 36% |
| 2004 | $2.09 | 51% | $2.09 | 50% |

See App. 5 at 27, 6 at 22, 8 at 26-27.  Therefore, Plaintiffs' allegation that Defendants were motivated to commit fraud in order to continue to achieve 25% growth in EPS is entirely nonsensical.  In sum, Plaintiffs' irrational motive allegations are defective, as a matter of law.

> **2.    Plaintiffs Fail To Plead Specific Facts Regarding The Company's SBA Securities That Render Any Financial Disclosure False Or Misleading.**

Plaintiffs litter throughout their Amended Complaint the allegation that IFIN's financial disclosures respecting its SBA securities were fraudulently inaccurate.  As discussed above, those claims fail because Plaintiffs fail adequately to plead scienter.  See supra 21-25.  As

discussed below, Plaintiffs' SBA securities claims also fail to state a claim because: (1) Plaintiffs fail to plead specific facts showing that any financial disclosure concerning the Company's SBA portfolio was false; (2) Plaintiffs fail to plead specific facts showing that the Company's correction to the contractual maturity table in its 2003 10-K was done for any other reason than to correct a simple clerical oversight; and (3) Plaintiffs fail to plead specific facts showing that the Company's SBA securities were permanently impaired.

**a.     Plaintiffs Fail To Plead Specific Facts Showing That Any Disclosure Concerning The Company's SBA Portfolio Was False.**

Plaintiffs conclusorily allege that: (1) IFIN "was experiencing prepayments on its SBA securities during 2002 and 2003;" (2) IFIN could "reasonably anticipate prepayments;" and (3) IFIN knew that it should apply the retrospective method under Paragraph 19 of FAS 91 to its SBA portfolio. AC ¶ 53. Plaintiffs' allegations are unsupported by any specific facts and premised upon a blatant misrepresentation of FAS 91 and its requirements.

As an initial matter, conclusory allegations of GAAP violations do not suffice. Greebel, 194 F.3d at 203-04. Rather, a court must analyze whether the specific facts alleged demonstrate a violation of the GAAP provision on which a plaintiff relies. Id. Indeed, courts routinely dismiss securities fraud complaints that fail to plead specific facts showing that the GAAP provision in question has been triggered and violated. See, e.g., Greebel, 194 F.3d at 203-04 (affirming dismissal of claim that defendant improperly inflated earnings under GAAP where plaintiffs failed to plead specific facts indicating violation of FAS 48); In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 891-892 (8th Cir. 2002) (affirming dismissal of claim that defendants violated FAS 121 and FAS 5 because plaintiffs failed to plead specific facts indicating that either provision was violated); Capstead, 258 F. Supp. 2d at 552-54 (dismissing, inter alia, claim that defendants failed properly to account for interest income under FAS 125, where plaintiffs did not plead specific facts necessary to trigger application of FAS 125).

Here, Plaintiffs allege that IFIN was required to apply the retrospective method under Paragraph 19 of FAS 91 to its SBA securities. AC ¶¶ 53, 130, 210. However, under Paragraph

27

19 of FAS 91, a company is only allowed to estimate prepayments if its loans meet specific requirements. See FAS No. 91, ¶ 19; FASB Implementation Guide on FAS 91, ¶ 52; App. 27, 28. Paragraph 19 of FAS 91 provides, in pertinent part:

> [I]f the enterprise holds a large number of <u>similar loans</u> for which <u>prepayments are probable</u> **and** the <u>timing and amount of prepayments can be reasonably estimated</u>, the enterprise <u>may</u> consider estimates of future principal payments in the calculation of the constant effective yield necessary to apply the interest method.

FAS No. 91, ¶ 19 (emphasis added). The FASB has established a non-exclusive list of factors that should be considered when evaluating whether a company "holds a large number of similar loans" for purposes of estimating prepayments under Paragraph 19 of FAS 91. FASB Implementation Guide on FAS 91, ¶ 51. Further, assuming that a company has determined: (a) that it holds a large number of similar loans for which prepayments are probable; <u>and</u> (b) that the timing and amount of prepayments can be reasonably estimated; <u>then</u> (c) only after a difference arises between a company's prepayment estimates and actual prepayments received is it required to recalculate effective yields. FAS No. 91, ¶ 19.

Here, Plaintiffs fail to plead any specific facts to support their conclusory allegation that IFIN's SBA portfolio met the criteria set forth in Paragraph 19 of FAS 91. First, Plaintiffs' Amended Complaint is devoid of any specific facts indicating that IFIN's SBA securities were "similar loans for which prepayments [were] probable." Id. Rather, Plaintiffs allege that IFIN was required to use the retrospective method to account for its SBA securities because it "was experiencing prepayments on its SBA securities during 2002 and 2003" and "the occurrence of 'actual prepayments' show that the Company could reasonably anticipate prepayments." AC ¶ 53. That generalized allegation does not contain a single specific fact addressing any of the factors for determining whether a company "holds a large number of similar loans" under FAS 91. See FASB Implementation Guide on FAS 91, ¶ 51; see also No. FAS 91, ¶ 58. For example, Plaintiffs offer no allegation of specific fact -- because they cannot -- indicating that IFIN's SBA securities portfolio is similar in nature from security to security, that loans within IFIN's SBA portfolio do not vary in size, have different industry, geographic, and underlying credit

parameters, or are homogeneous.  See id.; see also K-Tel Int'l, Inc., 300 F.3d at 891-92 (holding that plaintiffs' "allegations were not pled with particularity as required by the Reform Act in terms of alleging a basis for implicating FAS 121 and further specifying the assets, the carrying amount and the impairment of such assets.") (citing Greebel, 194 F.3d at 204).[20]

Second, Plaintiffs also have failed to allege -- as they must -- specific facts demonstrating that IFIN could have "reasonably estimated" "the timing and amount of prepayments" on its SBA securities.  See FAS No. 91, ¶ 19.[21]  Here, Plaintiffs conclusorily allege that "under FAS 91, the occurrence of 'actual prepayments' show that the Company could reasonably anticipate prepayments."  AC ¶ 53.  As support for their conclusion that IFIN was receiving "actual prepayments," Plaintiffs cite to a confidential source for the general assertion that banks were prepaying SBA loans held by secondary lenders, such as IFIN, during the 2002-2003 timeframe and that  IFIN experienced prepayments on its SBA securities during 2002 and 2003.  Id.  Absent from those allegations are any specific facts about any specific prepayment of any specific loans during any specific financial quarter or year.  The Amended Complaint also lacks any specific facts to support the allegation that IFIN could reasonably estimate (not merely "anticipate") prepayments under FAS 91.  For example, Plaintiffs' allegations lack such specific facts as the rate of prepayment on IFIN's SBA securities, the amount of such prepayments, prepayment history, loan type, loan size, or any explanation of how their allegation that IFIN was receiving

---

[20] Plaintiffs conclusorily assert in their Amended Complaint that IFIN had a "well-defined borrowers' payment profile" and that IFIN's SBA securities "could be prepaid without penalty."  AC ¶¶ 49, 54.  Again, Plaintiffs fail to provide the Court with any specific facts to support their allegation that IFIN violated FAS 91, such as the connection, if any, between IFIN's allegedly "well-defined borrowers' payment profile" and its ability to estimate prepayments on its SBA securities, whether any of the borrowers in IFIN's "well-defined" portfolio actually received SBA loans, or the basis for Plaintiffs' conclusion that IFIN's SBA securities lacked prepayment penalties.

[21] After all, GAAP provisions "tolerate a range of 'reasonable' treatments leaving the choice among alternatives to management."  Greebel, 194 F.3d at 205 (citation omitted).  Furthermore, GAAP provisions, such as FAS 91, "require the substantial application of judgment."  Capstead, 258 F. Supp. 2d at 552; see also Galileo, 127 F. Supp. 2d at 265 (accounting decisions often involve "fundamentally a subjective determination" and are "a matter of judgment and estimate").

"actual prepayments" on its SBA securities in 2002 and 2003 allowed IFIN to reasonably estimate "the timing and amount" of prepayments under FAS 91. Consequently, here, as in <u>K-Tel Int'l, Inc.</u>, "[t]he complaint does not explain what specific information was available and how [SBA prepayments] could be reasonably estimated . . . . Accordingly, the Class allegations related to FAS [91] . . . fail for lack of particularity." 300 F.3d at 893.[22]

For all of these reasons, Plaintiffs' have failed sufficiently to allege that IFIN accounted improperly for its SBA securities, as a matter of law.

**b.    Plaintiffs Fail To Plead Specific Facts Showing That A Simple Clerical Error Was Evidence Of Any Fraud.**

In their Amended Complaint, Plaintiffs assert, again without proffering a single specific fact, that the correction of a clerical error in IFIN's 2003 10-K was, in actuality, an attempt to conceal the effect that prepayments were having on the effective yield for IFIN's SBA securities. AC ¶ 210; <u>see also</u> AC ¶ 205. The actual facts in this case only work to discredit Plaintiffs' <u>ipse dixit</u>. As IFIN's CEO noted during the conference call cited by Plaintiffs, the corrected yields were "<u>consistent with the income</u> [IFIN] recognize[d] in [IFIN's] financial statements." AC ¶ 205; App. 20. That is, this correction had <u>no effect</u> upon the actual amount of income that IFIN reported in its financial results because the correction merely rectified the fact the wrong yield numbers were inserted in a contractual maturity table in IFIN's Form 10-K. If the correction of the clerical error in IFIN's 2003 10-K had the import that Plaintiffs allege, the Company also would have had to correct its reported financial results. Plaintiffs have made no such allegation, as that never happened. Thus, Plaintiffs do not, because they cannot, allege any

---

[22] Further, even if Plaintiffs had alleged specific facts demonstrating that IFIN's SBA loans were "similar loans for which prepayments were probable" and that IFIN could have "reasonably estimated" "the timing and amount of prepayments" on its SBA securities, they still have failed to allege any facts indicating that IFIN experienced or would have experienced any difference between estimated prepayments and actual prepayments received. <u>See</u> FAS 91, ¶ 19.

specific fact supporting any allegation that IFIN's correction of the contractual maturity table in its 2003 10-K was done for any other reason than to correct a simple clerical oversight.

        **c.**      **Plaintiffs Fail To Plead Specific**
                  **Facts Showing That The Company's**
                  <u>**SBA Securities Were Permanently Impaired.**</u>

Plaintiffs allege that, between March 31, 2004 and the end of the class period, IFIN's reported financial results were false because the Company failed to write down $12.8 million in SBA securities under FAS 115. <u>See</u> AC ¶¶ 53-67, 210, 213, 219, 222. In a vain attempt to support their allegation, Plaintiffs cite to facts that have no bearing on whether IFIN should have made the subjective decision under GAAP to write down the value of its SBA securities. Accordingly, Plaintiffs' allegations cannot state a claim for securities fraud.

Courts are loathe to substitute their own judgment for an issuer's on highly subjective accounting decisions like the determination of when the value of an asset should be written down due to the inherent subjectivity of such a determination. <u>Galileo</u>, 127 F. Supp. 2d at 265-66. Due to the subjective nature of the decision to write down an asset, a plaintiff must point to specific facts, such as inconsistent contemporaneous statements or internal reports, that show that the company knew it was required to take a write-down and failed to do so. <u>Capstead</u>, 258 F. Supp. 2d at 550. Indeed, Plaintiffs specifically recognize that, under applicable accounting standards, whether a loss is "other than temporary," and thereby requiring a company to recognize an impairment loss in earnings, is an inherently subjective decision. <u>See</u> AC ¶ 63 (quoting American Institute of Certified Public Accountants Auditing Standards No. 92, ¶ 47).

Here, as in <u>Galileo</u> and <u>Capstead</u>, Plaintiffs fail to provide the Court with specific facts to support their allegation that IFIN violated GAAP by failing to make the subjective determination to write down its SBA securities. Specifically, Plaintiffs allege that, under FAS 115, if a decline in a security's fair value is judged to be "other than temporary," the "cost basis of that security shall be written down to fair value . . . and the amount of the write-down shall be included in earnings (that is, accounted for as a realized loss)." AC ¶ 60 (citing FAS No. 115, ¶ 16) (App. 29). According to Plaintiffs, a decline in a security's fair value becomes "other than temporary"

and, thus, a security is impaired, when the security's effective yield drops below the risk free interest rate.  AC ¶¶ 57, 59.  Plaintiffs cite no support for this bald assertion.  Plaintiffs allege that by March 31, 2004, IFIN's SBA securities had become other than temporarily impaired because, according to Plaintiffs, the effective yield on IFIN's SBA securities had fallen below the market interest rates of 7-year and 10-year treasury notes.  AC ¶¶ 57-58.

Plaintiffs' reliance on the rates of 7-year and 10-year treasury notes is at best inapposite and, at worst, misleading.  In their sole attempt to support their allegation that IFIN's SBA securities were impaired, Plaintiffs insert a table in their Amended Complaint comparing the effective yield of IFIN's SBA securities to the interest rates for 7- and 10-year treasury notes.  AC ¶¶ 57-58.  However, Plaintiffs themselves recognize that IFIN's SBA securities are "variable rate" securities, specifically noting that "[a]ll SBA pool data is available on *Bloomberg*."  AC ¶ 51 & n.5; see also App. 3 at 34.   Indeed, information regarding SBA pools from Bloomberg shows that the effective yield for SBA securities, as variable rate securities, is reset monthly (i.e., 12 times per year, or, as referenced by Bloomberg, "12/y") and quarterly (i.e., four times a year, or as referenced by Bloomberg, "4/y") in accordance with interest rate changes.  App. 30.[23]   Regardless, Plaintiffs, in an apparent effort to mislead, compare IFIN's SBA securities' effective yield against the risk free rate for fixed-rate, long-term treasury notes.  AC ¶¶ 57-58.  Comparing the effective yield for IFIN's SBA securities to the risk free market rate for comparable short-term treasury notes, e.g., three-month treasury notes, demonstrates that IFIN's SBA securities were not impaired, temporarily or otherwise.  See App. 32.[24]   Thus,

---

[23] This Court properly may consider Bloomberg data Plaintiffs have referenced in their Amended Complaint.  Supra 1 n.1.  Notably, Plaintiffs quote from a presentation that specifically states that variable rate SBA pools "[a]djust either **monthly or quarterly**."  AC ¶ 48 n.4; App. 31 (emphasis added).

[24] App. 32 is an exact duplicate of the chart Plaintiffs set forth in Paragraph 57 of their Complaint, with the notable exception of the last column entitled:  "Risk Free Rate For 3 Month Treasury," which sets forth the interest rate of 3-month treasury notes.  This Court may properly take judicial notice of publicly available stock and bond information as well as Bloomberg data that Plaintiffs incorporated by reference in the Amended Complaint.  Supra 1 n.1.

Plaintiffs have pled no facts to suggest that IFIN's SBA securities were impaired. For this reason, and all of the reasons discussed above, Plaintiffs' claims relating to IFIN's SBA securities must be dismissed.

### 3. Plaintiffs Fail To Plead Loss Causation Respecting Their SBA Security-Related Allegations.

Plaintiffs' SBA security-related claims also fail because they do not plead loss causation as to those claims. A securities plaintiff must plead loss causation, i.e., that the alleged misrepresentation concealed a truth from that market that, once revealed, caused plaintiff's stock to decline in value. See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 1630-32 (2005). Here, the Amended Complaint does not identify any disclosure that IFIN ever made regarding its accounting for its SBA securities that negatively affected the value of IFIN's stock price. Indeed, as Plaintiffs allege, IFIN announced that the restatement "did not impact the accounting for [IFIN's] SBA portfolio." AC ¶ 205. Having failed to allege loss causation, Plaintiffs' SBA security-related claims must be dismissed for this independent reason as well.

### B. Plaintiffs' Financial Disclosure Claims Must Be Dismissed Under Rule 12(b)(6).

#### 1. The Vast Majority Of The Company's Historical Financial Results Challenged Are Not Actionable Because They Were Not Materially Inaccurate.

The Amended Complaint also fails to state a claim based upon alleged misstatements in the Company's historical financial results because the alleged misstatements are immaterial as a matter of law. The Company's net operating revenues were adjusted by $8.5 million for 2001, a **2.4%** decrease; by $2.3 million for 2002, a **0.5%** decrease; by $1.0 million for 2003, a **0.2% increase**; and by $2.7 million for the first three quarters of 2004, a **0.75% increase**. See supra 5. In the aggregate, the adjustments decreased net operating revenues by less than **0.4%** for all adjusted periods. Id. The First Circuit and numerous other courts have found adjustments to reported revenue of a far greater percentage than those at issue in this case to be immaterial for purposes of the federal securities laws. See, e.g., Glassman v. Computervision Corp., 90 F.3d 617, 633 (1st Cir. 1996) (holding that a 3 to 9 percent misstatement of revenues was not material for purposes of Rule 10b-5 and affirming district court's dismissal and denial of motion for leave to amend); Segue, 106 F. Supp. 2d at 171 (dismissing claims with prejudice and holding that

overstatement of revenues by $1.1 million, or 2.6%, was "insignificant"); <u>Davis v. SPSS, Inc.</u>, 385 F. Supp. 2d 697, 715 (N.D. Ill. 2005) (holding that alleged misstatement of 1.4% of revenues was "minor"); <u>Stavros</u>, 266 F. Supp. 2d at 850 (dismissing claim based on alleged inflation of net income by less than 3%). Accordingly, IFIN's adjustments to its financial results were immaterial, as a matter of law.

**2.    The Company Disclosed The Allegedly Omitted<br>Information Respecting The Risk Of Prepayments.**

Additionally, Plaintiffs' allegation that the Company's press releases and financial results were misleading because the Company failed to disclose risks associated with the possible prepayment of its debt securities, <u>see</u> AC ¶ 110, must fail because the Company, in fact, publicly disclosed these risks throughout the proposed class period. Specifically, in its Forms 10-K the Company warned investors of the risks it faced due to the possibility of prepayments, stating:

> We invest in mortgage-backed securities, . . . <u>Mortgage-backed securities generally have a higher yield than U.S. Treasury securities due to credit and **prepayment risk**</u>. . . . <u>Prepayment risk results from the possibility that **changes in interest rates may cause mortgage-backed securities to be paid off prior to their maturity dates.**</u>

<u>See</u>, <u>e.g.</u>, App. 4 at 43, 5 at 47 (emphasis added).[25] Similarly, several of the Company's Forms 10-Q filed during the Class Period warned investors of prepayment risk and the effect of prepayment on net interest income. <u>See</u>, <u>e.g.</u>, App. 1 at 34, 2 at 28. Plaintiffs' allegations that the Company failed to disclose its prepayment risk clearly have no basis in fact and cannot survive this motion to dismiss.

---

[25] To avoid burdening the Court with literally hundreds of additional pages of exhibits, Defendants have not included in the Appendix submitted herewith all of IFIN's SEC filings from 2001 to 2005, virtually all of which Plaintiffs have challenged as false and misleading. To the extent the Court wishes to review any of these filings, Defendants will promptly submit them upon request and note that they are publicly available at http://www.sec.gov.

34

IV.    **PLAINTIFFS' SECTION 20(a) "CONTROL PERSON" CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE A PRIMARY VIOLATION OF THE SECURITIES LAWS.**

As set forth above, Plaintiffs have failed adequately to allege a primary violation of Section 10(b) of the 1934 Act and SEC Rule 10b-5 thereunder.  Accordingly, the Amended Complaint cannot state a claim for violation of Section 20(a) of the 1934 Act, as a matter of law. See Greebel, 194 F.3d at 207; Suna v. Bailey Corp., 107 F.3d 64, 71 (1st Cir. 1997) (same).

<u>CONCLUSION</u>

For all of the foregoing reasons, the Amended Complaint should be dismissed. Furthermore, because here, as in Carney, Plaintiffs have "pled [their] case with determined imagination, but little factual substance," "[c]onsiderations of fairness, judicial economy, and congressional purpose in enacting the Securities Laws all point to a denial of discovery and to dismissal of this complaint with prejudice."  Carney, 135 F. Supp. 2d at 257 (quoting Colby v. Hologic, Inc., 817 F. Supp. 204, 217 (D. Mass. 1993)).

Respectfully submitted,

**INVESTORS FINANCIAL SERVICES CORP., KEVIN J. SHEEHAN, MICHAEL F. ROGERS, JOHN N. SPINNEY, JR., KAREN C. KEENAN, ROBERT D. MANCUSO, EDMUND J. MARONEY AND JOHN E. HENRY**

By their attorneys,

/s/ Jordan D. Hershman
Jordan D. Hershman, BBO #553709
Jason D. Frank, BBO #634985
James P. Lucking, BBO #650588
William R. Harb, BBO #657270
**BINGHAM McCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: July 27, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 27, 2006.

/s/ Jordan D. Hershman