UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, On Behalf of Plaintiff and All Others Similarly Situated, | ) ) ) | No. 1:05-cv-11627-RCL **(Consolidated)** |
| | ) | |
| Plaintiff, | ) | <u>CLASS ACTION</u> |
| | ) ) | |
| vs. | ) | |
| | ) | |
| INVESTORS FINANCIAL SERVICES CORP., et al., | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

DECLARATION OF JEFFREY W. LAWRENCE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT AND REQUEST FOR JUDICIAL NOTICE

I, Jeffrey W. Lawrence, declare as follows:

I am a partner in the Lerach Coughlin Stoia Geller Rudman & Robbins LLP law firm, lead counsel for plaintiffs and the class in this action. I am admitted to practice before this Court. I submit this Declaration in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Complaint and Plaintiffs' Request for Judicial Notice.

1.      Attached hereto as Exhibit 1 is a true and correct copy of the U.S. Securities and Exchange Commission's ("SEC") Final Rule on Management's Reports on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports [RELEASE NOS. 33-8238; 34-47986; IC-26068; File Nos. S7-40-02; S7-06-03].

2.      Attached hereto as Exhibit 2 is a true and correct copy of Investors Financial Services, Corp. ("Investors Financial") SEC Schedule 14/A, filed on March 11, 2003.

3.      Attached hereto as Exhibit 3 is a true and correct copy of Investors Financial's SEC Schedule 14/A, filed on March 5, 2004.

4.      Attached hereto as Exhibit 4 is a true and correct copy of Bloomberg-Daily Stock Prices for Investors Financial for April 10, 2001 to July 15, 2005.

5.      Attached hereto as Exhibit 5 is a true and correct copy of Defendant Kevin J. Sheehan's SEC Form 4, filed on October 28, 2004.

6.      Attached hereto as Exhibit 6 is a true and correct copy of Investors Financial's SEC Form 8-K, filed on January 25, 2005, with attached January 25, 2005 press release.

7.      Attached hereto as Exhibit 7 is a true and correct copy of Investors Financial's SEC Form 8-K, filed on April 13, 2005, with attached April 13, 2005 press release.

8.      Attached hereto as Exhibit 8 is a true and correct copy of Investors Financial's June 30, 2005 SEC Form 10-Q, filed on August 9, 2005.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in San Francisco, California, on September 19, 2006.


<div style="text-align:right">

_/s/ Jeffrey W. Lawrence_
JEFFREY W. LAWRENCE

</div>

T:\CasesSF\InvestorsFinancialServices\DEC00034509.doc

CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/ Jeffrey W. Lawrence
JEFFREY W. LAWRENCE (BBO #289140)

LERACH COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  jeffreyl@lerachlaw.com

# Mailing Information for a Case 1:05-cv-11627-RCL

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Pavel Bespalko**
  pavel@bespalko.com

- **Joel Z. Eigerman**
  joel@eigerman.com

- **Jason D. Frank**
  jason.frank@bingham.com

- **William R. Harb**
  william.Harb@bingham.com

- **Jordan D. Hershman**
  jordan.hershman@bingham.com

- **Theodore M. Hess-Mahan**
  ted@shulaw.com

- **Alan L. Kovacs**
  alankovacs@yahoo.com

- **Jeffrey W. Lawrence**
  jeffreyl@lcsr.com

- **James Paul Lucking**
  james.lucking@Bingham.com

- **James W. Oliver**
  jimo@lerachlaw.com e_file_sf@lerachlaw.com;e_file_sd@lerachlaw.com

- **David Pastor**
  dpastor@gilmanpastor.com rdambrosio@gilmanpastor.com

- **Thomas G. Shapiro**
  tshapiro@shulaw.com sgeresy@shulaw.com

- **Christopher N. Souris**
  csouris@krakowsouris.com

- **Marc A. Topaz**
  ecf_filings@sbclasslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Exhibit 1



U.S. Securities and Exchange Commission

**Final Rule:**
**Management's Reports on Internal Control Over**
**Financial Reporting and Certification of Disclosure in**
**Exchange Act Periodic Reports**

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR PARTS 210, 228, 229, 240, 249, 270 and 274**

**[RELEASE NOS. 33-8238; 34-47986; IC-26068; File Nos. S7-40-02;**
**S7-06-03]**

**RIN 3235-AI66 and 3235-AI79**

**MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL**
**REPORTING AND CERTIFICATION OF DISCLOSURE IN EXCHANGE**
**ACT PERIODIC REPORTS**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** As directed by Section 404 of the Sarbanes-Oxley Act of 2002,
we are adopting rules requiring companies subject to the reporting
requirements of the Securities Exchange Act of 1934, other than registered
investment companies, to include in their annual reports a report of
management on the company's internal control over financial reporting. The
internal control report must include: a statement of management's
responsibility for establishing and maintaining adequate internal control
over financial reporting for the company; management's assessment of the
effectiveness of the company's internal control over financial reporting as of
the end of the company's most recent fiscal year; a statement identifying
the framework used by management to evaluate the effectiveness of the
company's internal control over financial reporting; and a statement that
the registered public accounting firm that audited the company's financial
statements included in the annual report has issued an attestation report on
management's assessment of the company's internal control over financial
reporting. Under the new rules, a company is required to file the registered
public accounting firm's attestation report as part of the annual report.
Furthermore, we are adding a requirement that management evaluate any
change in the company's internal control over financial reporting that
occurred during a fiscal quarter that has materially affected, or is
reasonably likely to materially affect, the company's internal control over
financial reporting. Finally, we are adopting amendments to our rules and
forms under the Securities Exchange Act of 1934 and the Investment
Company Act of 1940 to revise the Section 302 certification requirements
and to require issuers to provide the certifications required by Sections 302

and 906 of the Sarbanes-Oxley Act of 2002 as exhibits to certain periodic reports.

**DATES:** Effective Date: August 14, 2003.

Compliance Dates: The following compliance dates apply to companies other than registered investment companies. A company that is an "accelerated filer," as defined in Exchange Act Rule 12b-2, as of the end of its first fiscal year ending on or after June 15, 2004, must begin to comply with the management report on internal control over financial reporting disclosure requirements in its annual report for that fiscal year. A company that is not an accelerated filer as of the end of its first fiscal year ending on or after June 15, 2004, including a foreign private issuer, must begin to comply with the annual internal control report for its first fiscal year ending on or after April 15, 2005. A company must begin to comply with the requirements regarding evaluation of any material change to its internal control over financial reporting in its first periodic report due after the first annual report required to include a management report on internal control over financial reporting. Companies may voluntarily comply with the new disclosure requirements before the compliance dates. A company must comply with the new exhibit requirements for the certifications required by Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 and changes to the Section 302 certification requirements in its quarterly, semi-annual or annual report due on or after August 14, 2003. To account for the differences between the compliance date of the rules relating to internal control over financial reporting and the effective date of changes to the language of the Section 302 certification, a company's certifying officers may temporarily modify the content of their Section 302 certifications to eliminate certain references to internal control over financial reporting until the compliance date, as further explained in Section III.E. below.

Registered investment companies must comply with the rule and form amendments applicable to them on and after August 14, 2003, except as follows. Registered investment companies must comply with the amendments to Exchange Act Rules 13a-15(a) and 15d-15(a) and Investment Company Act Rule 30a-3(a) that require them to maintain internal control over financial reporting with respect to fiscal years ending on or after June 15, 2004. In addition, a registered investment company's certifying officers may temporarily modify the content of their Section 302 certifications to eliminate certain references to internal control over financial reporting, as further explained in Section II.I. below. Registered investment companies may voluntarily comply with the rule and form amendments before the compliance dates.

**FOR FURTHER INFORMATION CONTACT:** N. Sean Harrison, Special Counsel, or Andrew D. Thorpe, Special Counsel, Division of Corporation Finance, at (202) 942-2910, or with respect to registered investment companies, Christian Broadbent, Senior Counsel, Division of Investment Management, at (202) 942-0721, or with respect to attestation and auditing issues, Edmund Bailey, Assistant Chief Accountant, Randolph P. Green, Professional Accounting Fellow, or Paul Munter, Academic Accounting Fellow, Office of the Chief Accountant, at (202) 942-4400, U.S. Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549.

**SUPPLEMENTARY INFORMATION**: We are revising Items 307, 401 and

601 of Regulations S-B[1] and S-K;[2] adding new Item 308 to Regulations S-B and S-K; amending Form 10-K,[3] Form 10-KSB,[4] Form 10-Q,[5] Form 10-QSB,[6] Form 20-F,[7] Form 40-F,[8] Rule 12b-15,[9] Rule 13a-14,[10] Rule 13a-15,[11] Rule 15d-14[12] and Rule 15d-15[13] under the Securities Exchange Act of 1934 (the "Exchange Act");[14] amending Rules 1-02 and 2-02[15] of Regulation S-X;[16] amending Rules 8b-15,[17] 30a-2[18] and 30a-3[19] under the Investment Company Act of 1940 ("Investment Company Act");[20] and amending Forms N-CSR[21] and N-SAR[22] under the Exchange Act and the Investment Company Act.

## TABLE OF CONTENTS

I. BACKGROUND

    A. Management's Report on Internal Control over Financial Reporting

    B. Certifications

II. DISCUSSION OF AMENDMENTS IMPLEMENTING SECTION 404

    A. Definition of Internal Control

        1. Proposed Rule

        2. Comments on the Proposal

        3. Final Rules

    B. Management's Annual Assessment of, and Report on, the Company's Internal Control over Financial Reporting

        1. Proposed Rule

        2. Comments on the Proposal

        3. Final Rules

            a. Evaluation of Internal Control over Financial Reporting

            b. Auditor Independence Issues

            c. Material Weaknesses in Internal Control over Financial Reporting

            d. Method of Evaluating

            e. Location of Management's Report

    C. Quarterly Evaluations of Internal Control over Financial Reporting

1. Proposed Rule

2. Comments on the Proposal

3. Final Rules

D. Differences between Internal Control over Financial Reporting and Disclosure Controls and Procedures

E. Evaluation of Disclosure Controls and Procedures

F. Periodic Disclosure about the Certifying Officers' Evaluation of the Company's Disclosure Controls and Procedures and Disclosure about Changes to its Internal Control over Financial Reporting

1. Existing Disclosure Requirements

2. Proposed Amendments to the Disclosure Requirements

3. Final Disclosure Requirements

4. Conclusions Regarding Effectiveness of Disclosure Controls and Procedures

G. Attestation to Management's Internal Control Report by the Company's Registered Public Accounting Firm

H. Types of Companies Affected

1. Foreign Private Issuers

2. Asset-Backed Issuers

3. Small Business Issuers

4. Bank and Thrift Holding Companies

I. Registered Investment Companies

J. Transition Period

III. DISCUSSION OF AMENDMENTS RELATED TO CERTIFICATIONS

A. Proposed Rules

B. Final Rules

C. Effect on Interim Guidance Regarding Filing Procedures

D. Form of Section 302 Certifications

E.  Transition Period

IV.  PAPERWORK REDUCTION ACT

V.  COST-BENEFIT ANALYSIS

VI.  EFFECT ON EFFICIENCY, COMPETITION AND CAPITAL FORMATION

VII.  FINAL REGULATORY FLEXIBILITY ANALYSIS

VIII.  STATUTORY AUTHORITY AND TEXT OF RULE AMENDMENTS

## I. BACKGROUND

### A. Management's Report on Internal Control over Financial Reporting

In this release, we implement Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"),[23] which requires us to prescribe rules requiring each annual report that a company, other than a registered investment company,[24] files pursuant to Section 13(a) or 15(d) of the Exchange Act to contain an internal control report: (1) stating management's responsibility for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (2) containing an assessment, as of the end of the company's most recent fiscal year, of the effectiveness of the company's internal control structure and procedures for financial reporting. Section 404 also requires every registered public accounting firm that prepares or issues an audit report on a company's annual financial statements to attest to, and report on, the assessment made by management. The attestation must be made in accordance with standards for attestation engagements issued or adopted by the Public Company Accounting Oversight Board ("PCAOB").[25] Section 404 further stipulates that the attestation cannot be the subject of a separate engagement of the registered public accounting firm.

We received over 200 comment letters in response to our release proposing requirements to implement Sections 404, 406 and 407 of the Sarbanes-Oxley Act.[26] Of these, 61 respondents commented on the Section 404 proposals.[27] These comment letters came from corporations, professional associations, accountants, law firms, consultants, academics, investors and others. In general, the commenters supported the objectives of the proposed new requirements. Investors supported the manner in which we proposed to achieve these objectives and, in some cases, urged us to require additional disclosure from companies. Other commenters, however, thought that we were requiring more disclosure than necessary to fulfill the mandates of the Sarbanes-Oxley Act and suggested modifications to the proposals. We have reviewed and considered all of the comments that we received on the proposals. The adopted rules reflect many of these comments -- we discuss our conclusions with respect to each topic and related comments in more detail throughout the release.

### B. Certifications

We also are adopting amendments to require companies to file the certifications mandated by Sections 302 and 906 of the Sarbanes-Oxley Act as exhibits to annual, semi-annual and quarterly reports. Section 302 required the Commission to adopt final rules that were to be effective by August 29, 2002, under which the principal executive and principal financial officers, or persons performing similar functions, of a company filing periodic reports under Section 13(a) or 15(d) of the Exchange Act[28] must provide a certification in each quarterly and annual report filed with the Commission. Section 906 of the Sarbanes-Oxley Act added new Section 1350 to Title 18 of the United States Code,[29] which contains a certification requirement subject to specific federal criminal provisions and that is separate and distinct from the certification requirement mandated by Section 302.[30] On August 28, 2002, we adopted Exchange Act Rules 13a-14 and 15d-14 and Investment Company Act Rule 30a-2 and amended our periodic report forms to implement the statutory directive in Section 302.[31] These rules and amendments became effective on August 29, 2002. On January 27, 2003, we adopted Form N-CSR to be used by registered management investment companies to file certified shareholder reports with the Commission.[32] The provisions added to Title 18 by Section 906 were by their terms effective on enactment of the Sarbanes-Oxley Act.

To enhance the ability of interested parties to effectively access the certifications through our Electronic Data Gathering, Analysis and Retrieval ("EDGAR") system and thereby enhance compliance with the certification requirements, we proposed to amend our rules and forms to require a company to file the certifications as an exhibit to the periodic reports to which they relate.[33] The proposals addressed both Section 302 and 906 certifications. After discussions with the Department of Justice, we concluded that, in light of the inconsistent methods that companies have been employing to fulfill their obligations under Section 906,[34] an exhibit requirement would consistently enable investors and the Commission staff, as well as the Department of Justice, to more effectively monitor compliance with this certification requirement.

## II. DISCUSSION OF AMENDMENTS IMPLEMENTING SECTION 404

### A. Definition of Internal Control

1. Proposed Rule

The proposed rules would have defined the term "internal controls and procedures for financial reporting"[35] to mean controls that pertain to the preparation of financial statements for external purposes that are fairly presented in conformity with generally accepted accounting principles as addressed by the Codification of Statements on Auditing Standards §319 or any superseding definition or other literature that is issued or adopted by the Public Company Accounting Oversight Board.

As noted in the Proposing Release, there has been some confusion over the exact meaning and scope of the term "internal control," because the definition of the term has evolved over time. Historically, the term "internal control" was applied almost exclusively within the accounting profession.[36] As the auditing of financial statements evolved from a process of detailed testing of transactions and account balances towards a process of sampling

and testing, greater consideration of a company's internal controls became necessary in planning an audit.[37] If an internal control component had been adequately designed, then the auditor could limit further consideration of that control to procedures to determine whether the control had been placed in operation. Accordingly, the auditor could rely on the control to serve as a basis to reduce the amount, timing or extent of substantive testing in the execution of an audit. Conversely, if an auditor determined that an internal control component was inadequate in its design or operation, then the auditor could not rely upon that control. In this instance, the auditor would conduct tests of transactions and perform additional analyses in order to accumulate sufficient, competent audit evidence to support its opinion on the financial statements.

From the outset, it was recognized that internal control is a broad concept that extends beyond the accounting functions of a company. Early attempts to define the term focused primarily on clarifying the portion of a company's internal control that an auditor should consider when planning and performing an audit of a company's financial statements.[38] However, this did not improve the level of understanding of the term, nor satisfactorily provide the guidance sought by auditors. Successive definitions and formal studies of the concept of internal control followed.

In 1977, based on recommendations of the Commission, Congress enacted the Foreign Corrupt Practices Act ("FCPA").[39] The FCPA codified the accounting control provisions contained in Statement of Auditing Standards No. 1 (codified as AU §320 in the Codification of Statements on Auditing Standards). Under the FCPA, companies that have a class of securities registered under Section 12 of the Exchange Act, or that are required to file reports under Section 15(d) of the Exchange Act, are required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

- transactions are executed in accordance with management's general or specific authorization;
- transactions are recorded as necessary (1) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (2) to maintain accountability for assets;
- access to assets is permitted only in accordance with management's general or specific authorization; and
- the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.[40]

In 1985, a private-sector initiative known as the National Commission on Fraudulent Financial Reporting, also known as the Treadway Commission, was formed to study the financial reporting system in the United States. In 1987, the Treadway Commission issued a report recommending that its sponsoring organizations work together to integrate the various internal control concepts and definitions and to develop a common reference point.

In response, the Committee of Sponsoring Organizations of the Treadway Commission ("COSO")[41] undertook an extensive study of internal control to establish a common definition that would serve the needs of companies, independent public accountants, legislators and regulatory agencies, and to provide a broad framework of criteria against which companies could evaluate the effectiveness of their internal control systems. In 1992, COSO published its Internal Control -- Integrated Framework.[42] The COSO Framework defined internal control as "a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" in three categories--effectiveness and efficiency of operations; reliability of financial reporting; and compliance with applicable laws and regulations. COSO further stated that internal control consists of: the control environment, risk assessment, control activities, information and communication, and monitoring. The scope of internal control therefore extends to policies, plans, procedures, processes, systems, activities, functions, projects, initiatives, and endeavors of all types at all levels of a company.

In 1995, the AICPA incorporated the definition of internal control set forth in the COSO Report in Statement on Auditing Standards No. 78 (codified as AU §319 in the Codification of Statements on Auditing Standards).[43] Although we recognized that the AU §319 definition was derived from the COSO definition, our proposal referred to AU §319 because we thought that the former constituted a more formal and widely-accessible version of the definition than the latter.

2. Comments on the Proposal

We received comments from 25 commenters on the proposed definition of "internal control and procedures for financial reporting." Eleven commenters stated that the proposed definition of internal control was appropriate or generally agreed with the proposal.[44] Two of these noted that the definition in AU §319 had been adopted by the bank regulatory agencies for use by banking institutions.[45] Fourteen of the 25 commenters opposed the proposed definition. Two of these asserted that the proposed definition was too complex and would not resolve the confusion that existed over the meaning or scope of the term.

Several of the commenters that were opposed to the proposed definition thought that we should refer to COSO for the definition of internal control, rather than AU §319.[46] Some of these commenters noted that the objective of AU §319 is to provide guidance to auditors regarding their consideration of internal control in planning and performing an audit of financial statements. The common concern of these commenters was that AU §319 does not provide any measure or standard by which a company's management can determine that internal control is effective, nor does it define what constitutes effective internal control. One commenter believed that absent such evaluative criteria or definition of effectiveness, the proposed rules could not be implemented effectively.[47] In addition, several of the commenters opposed to the proposed definition suggested that we use the term "internal control over financial reporting" rather than the term "internal controls and procedures for financial reporting,"[48] on the ground that the former is more consistent with the terminology currently used within the auditing literature.

A few of the commenters urged us to adopt a considerably broader definition of internal control that would focus not only on internal control over financial reporting, but also on internal control objectives associated with enterprise risk management and corporate governance. While we agree that these are important objectives, the definition that we are adopting retains a focus on financial reporting, consistent with our position articulated in the Proposing Release. We are not adopting a more expansive definition of internal control for a variety of reasons. Most important, we believe that Section 404 focuses on the element of internal control that relates to financial reporting. In addition, many commenters indicated that even the more limited definition related to financial reporting that we proposed will impose substantial reporting and cost burdens on companies. Finally, independent accountants traditionally have not been responsible for reviewing and testing, or attesting to an assessment by management of, internal controls that are outside the boundary of financial reporting.

3. Final Rules

After consideration of the comments, we have decided to make several modifications to the proposed amendments. We agree that we should use the term "internal control over financial reporting" in our amendments to implement Section 404, as well as our revisions to the Section 302 certification requirements and forms of certification.[49] Rapidly changing terminology has been one obstacle in the development of an accepted understanding of internal control. The term "internal control over financial reporting" is the predominant term used by companies and auditors and best encompasses the objectives of the Sarbanes-Oxley Act. In addition, by using this term, we avoid having to familiarize investors, companies and auditors with new terminology, which should lessen any confusion that may exist about the meaning and scope of internal control.

The final rules define "internal control over financial reporting" as:

A process designed by, or under the supervision of, the registrant's principal executive and principal financial officers, or persons performing similar functions, and effected by the registrant's board of directors,[50] management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the registrant;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the registrant are being made only in accordance with authorizations of management and directors of the

registrant; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the registrant's assets that could have a material effect on the financial statements.[51]

We recognize that our definition of the term "internal control over financial reporting" reflected in the final rules encompasses the subset of internal controls addressed in the COSO Report that pertains to financial reporting objectives. Our definition does not encompass the elements of the COSO Report definition that relate to effectiveness and efficiency of a company's operations and a company's compliance with applicable laws and regulations, with the exception of compliance with the applicable laws and regulations directly related to the preparation of financial statements, such as the Commission's financial reporting requirements.[52] Our definition is consistent with the description of internal accounting controls in Exchange Act Section 13(b)(2)(B).[53]

Following the general language defining internal control over financial reporting, clauses (1) and (2) include the internal control matters described in Section 103 of the Sarbanes-Oxley Act that the company's registered public accounting firm is required to evaluate in its audit or attestation report.[54] This language is included to make clear that the assessment of management in its internal control report as to which the company's registered public accounting firm will be required to attest and report specifically covers the matters referenced in Section 103. A few commenters believed that it would cause confusion if the definition of internal control did not acknowledge the objectives set forth in Section 103 of the Sarbanes-Oxley Act. As discussed in Section II.G below, the PCAOB is responsible for establishing the Section 103 standards.

Our definition also includes, in clause (3), explicit reference to assurances regarding use or disposition of the company's assets. This provision is specifically included to make clear that, for purposes of our definition, the safeguarding of assets is one of the elements of internal control over financial reporting and it addresses the supplementation of the COSO Framework after it was originally promulgated. In the absence of our change to the definition, the determination of whether control regarding the safeguarding of assets falls within a company's internal control over financial reporting currently could be subject to varying interpretation.

Safeguarding of assets had been a primary objective of internal accounting control in SAS No. 1. In 1988, the ASB issued Statement of Auditing Standards No. 55 (codified as AU §319 in the Codification of Statements on Auditing Standards), which replaced AU §320. SAS No. 55 revised the definition of "internal control" and expanded auditors' responsibilities for considering internal control in a financial statement audit. The prior classification of internal control into the two categories of "internal accounting control" and "administrative control" was replaced with the single term "internal control structure," which consisted of three interrelated components--control environment, the accounting system and control procedures. Under this new definition, the safeguarding of assets was no longer a primary objective, but a subset of the control procedures

component.[55] The COSO Report followed this shift in the iteration of safeguarding of assets. The COSO Report states that operations objectives "pertain to effectiveness and efficiency of the entity's operations, including performance and profitability goals and safeguarding resources against loss."[56] However, the report also clarifies that safeguarding of assets can fall within other categories of internal control.[57]

In 1994, COSO published an addendum to the Reporting to External Parties volume of the COSO Report. The addendum was issued in response to a concern expressed by some parties, including the U.S. General Accounting Office, that the management reports contemplated by the COSO Report did not adequately address controls relating to safeguarding of assets and therefore would not fully respond to the requirements of the FCPA.[58] In the addendum, COSO concluded that while it believed its definition of internal control in its 1992 report remained appropriate, it recognized that the FCPA encompasses certain controls related to safeguarding of assets and that there is a reasonable expectation on the part of some readers of management's internal control reports that the reports will cover such controls. The addendum therefore sets forth the following definition of the term "internal control over safeguarding of assets against unauthorized acquisition, use or disposition":

Internal control over safeguarding of assets against unauthorized acquisition, use or disposition is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the entity's assets that could have a material effect on the financial statements.

As indicated above, to achieve the desired result and to provide consistency with COSO's 1994 addendum, we have incorporated this definition into our definition of "internal control over financial reporting." We are persuaded that this is appropriate given the fact that our definition will be used for purposes of public management reporting, and that the companies that will be subject to the Section 404 requirements also are subject to the FCPA requirements. So, under the final rules, safeguarding of assets as provided is specifically included in our definition of "internal control over financial reporting."

## B. Management's Annual Assessment of, and Report on, the Company's Internal Control over Financial Reporting

1. Proposed Rule

We proposed to amend Item 307 of Regulations S-K and S-B, as well as Forms 20-F and 40-F, to require a company's annual report to include an internal control report of management containing:

- A statement of management's responsibility for establishing and maintaining adequate internal controls and procedures for financial reporting;

- The conclusions of management about the effectiveness of the company's internal controls and procedures for financial reporting

based on management's evaluation of those controls and procedures; and

- A statement that the registered public accounting firm that prepared or issued the company's audit report relating to the financial statements included in the company's annual report has attested to, and reported on, management's evaluation of the company's internal controls and procedures for financial reporting.

The proposed amendments did not list any additional disclosure requirements for the management report, but rather would have afforded management the flexibility to tailor the report to fit its company's particular circumstances.

2. Comments on the Proposal

We received comments from 17 commenters on our proposed annual internal control report requirements. All of these commenters believed, in varying degrees, that we should set forth additional disclosure criteria or standards for the management report. Nine commenters stated that we should provide guidance as to the topics to be addressed in the management report, or specify standards or a common set of internal control objectives to be considered by management when assessing the effectiveness of its company's internal control over financial reporting to ensure that control objectives are addressed in a consistent fashion.[59] These commenters believed that consistent standards for management's report on internal control would help investors to understand and compare the quality of various management internal control reports.

Several commenters also thought that we should require management's internal control report to include certain recitations that would parallel recitations that the registered public accounting firm would have to make in its report attesting to management's assessment.[60] Additional commenters believed that the management report on internal control should specifically reference the objectives contained in Section 103 of the Sarbanes-Oxley Act.[61] Furthermore, although Section 404(b) of the Sarbanes-Oxley Act does not explicitly direct us to require companies to file the registered public accounting firms' attestation reports as part of the companies' annual report filings, we proposed a filing requirement that most of those commenting on this aspect of the proposal supported.

3. Final Rules

After evaluating the comments received, we are adopting the proposals with several modifications. The final rules require a company's annual report to include an internal control report of management that contains:

- A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

- A statement identifying the framework used by management to conduct the required evaluation of the effectiveness of the company's internal control over financial reporting;

- Management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether or not the company's internal control over financial reporting is effective.[62] The assessment must include disclosure of any "material weaknesses"[63] in the company's internal control over financial reporting identified by management. Management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting; and

- A statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.[64]

As proposed, our final rules also require a company to file, as part of the company's annual report, the attestation report of the registered public accounting firm that audited the company's financial statements.

a. Evaluation of Internal Control over Financial Reporting

In the Proposing Release, we requested comment on whether we should establish specific evaluative criteria for management's report on internal control. All of the commenters responding to this request supported the establishment of such evaluative criteria in order to improve comparability among the standards used by companies to conduct their annual internal control evaluations.[65] Several commenters believed that we either should adopt the COSO Framework as the means by which management must evaluate its company's internal control over financial reporting or, alternatively, simply acknowledge the COSO Framework as being suitable for purposes of management's evaluation. Other commenters suggested that we require management to evaluate the effectiveness of a company's internal control over financial reporting using suitable control criteria established by a group that follows due process procedures.

After consideration of the comments, we have modified the final requirements to specify that management must base its evaluation of the effectiveness of the company's internal control over financial reporting on a suitable, recognized control framework that is established by a body or group that has followed due-process procedures, including the broad distribution of the framework for public comment.[66]

The COSO Framework satisfies our criteria and may be used as an evaluation framework for purposes of management's annual internal control evaluation and disclosure requirements. However, the final rules do not mandate use of a particular framework, such as the COSO Framework, in recognition of the fact that other evaluation standards exist outside of the United States,[67] and that frameworks other than COSO may be developed within the United States in the future, that satisfy the intent of the statute without diminishing the benefits to investors. The use of standard measures that are publicly available will enhance the quality of the internal control report and will promote comparability of the internal control reports of different companies. The final rules require management's report to identify

the evaluation framework used by management to assess the effectiveness of the company's internal control over financial reporting.[68]

Specifically, a suitable framework must: be free from bias; permit reasonably consistent qualitative and quantitative measurements of a company's internal control; be sufficiently complete so that those relevant factors that would alter a conclusion about the effectiveness of a company's internal controls are not omitted; and be relevant to an evaluation of internal control over financial reporting.[69]

b. Auditor Independence Issues

Because the auditor is required to attest to management's assessment of internal control over financial reporting, management and the company's independent auditors will need to coordinate their processes of documenting and testing the internal controls over financial reporting. However, we remind companies and their auditors that the Commission's rules on auditor independence prohibit an auditor from providing certain nonaudit services to an audit client.[70] As the Commission stated in its auditor independence release, auditors may assist management in documenting internal controls. When the auditor is engaged to assist management in documenting internal controls, management must be actively involved in the process. We understand the need for coordination between management and the auditor, however, we remind companies and auditors that management cannot delegate its responsibility to assess its internal controls over financial reporting to the auditor.[71] The rules adopted today do not amend the Commission's rules on auditor independence.

c. Material Weaknesses in Internal Control over Financial Reporting

In the Proposing Release, we did not propose any specific standard on which management would base its conclusion that the company's internal control over financial reporting is effective. We requested comment on whether we should prescribe specific standards upon which an effectiveness determination would be based, and also what standards we should consider. Several commenters agreed that the final rules should specify standards, and all believed that the existence of a material weakness in internal control over financial reporting should preclude a conclusion by management that a registrant's internal control over financial reporting is effective. We have considered these comments, and agree that the rules should set forth this threshold for concluding that a company's internal control over financial reporting is effective.

The final rules therefore preclude management from determining that a company's internal control over financial reporting is effective if it identifies one or more material weaknesses in the company's internal control over financial reporting.[72] For purposes of the final rules, the term "material weakness" has the same meaning as in the definition under GAAS and attestation standards.[73] The final rules also specify that management's report must include disclosure of any "material weakness" in the company's internal control over financial reporting identified by management in the course of its evaluation.[74]

d. Method of Evaluating

Many commenters addressed the method of evaluating internal control over financial reporting, and some sought additional precision or guidance regarding the extent of evaluation, including the documentation required.[75] The methods of conducting evaluations of internal control over financial reporting will, and should, vary from company to company. Therefore, the final rules do not specify the method or procedures to be performed in an evaluation. However, in conducting such an evaluation and developing its assessment of the effectiveness of internal control over financial reporting, a company must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the company's internal control over financial reporting. Developing and maintaining such evidential matter is an inherent element of effective internal controls.[76] An instruction to new Item 308 of Regulations S-K and S-B and Forms 20-F and 40-F reminds registrants to maintain such evidential matter.[77]

The assessment of a company's internal control over financial reporting must be based on procedures sufficient both to evaluate its design and to test its operating effectiveness. Controls subject to such assessment include, but are not limited to: controls over initiating, recording, processing and reconciling account balances, classes of transactions and disclosure and related assertions included in the financial statements; controls related to the initiation and processing of non-routine and non-systematic transactions; controls related to the selection and application of appropriate accounting policies; and controls related to the prevention, identification, and detection of fraud. The nature of a company's testing activities will largely depend on the circumstances of the company and the significance of the control. However, inquiry alone generally will not provide an adequate basis for management's assessment.[78]

An assessment of the effectiveness of internal control over financial reporting must be supported by evidential matter, including documentation, regarding both the design of internal controls and the testing processes. This evidential matter should provide reasonable support: for the evaluation of whether the control is designed to prevent or detect material misstatements or omissions; for the conclusion that the tests were appropriately planned and performed; and that the results of the tests were appropriately considered. The public accounting firm that is required to attest to, and report on, management's assessment of the effectiveness of the company's internal control over financial reporting also will require that the company develop and maintain such evidential matter to support management's assessment.[79]

e. Location of Management's Report

Although the final rules do not specify where management's internal control report must appear in the company's annual report, we think it is important for management's report to be in close proximity to the corresponding attestation report issued by the company's registered public accounting firm. We expect that many companies will choose to place the internal control report and attestation report near the companies' MD&A disclosure or in a portion of the document immediately preceding the companies' financial statements.

## C. Quarterly Evaluations of Internal Control over Financial Reporting

1. Proposed Rule

We proposed to require a company's certifying officers to evaluate the effectiveness of the company's internal controls and procedures for financial reporting as of the end of the period covered by each annual and quarterly report that the company is required to file under the Exchange Act. The company's certifying officers already are required to evaluate the effectiveness of the company's disclosure controls and procedures on a quarterly basis.[80] We noted that a quarterly evaluation requirement with respect to internal controls would create symmetry between our requirements for periodic evaluations of both the company's disclosure controls and procedures and its internal controls and procedures for financial reporting, and give effect to the language in the Section 302 certification requirements regarding quarterly internal control evaluations.

2. Comments on the Proposal

We received responses from 25 commenters on the proposed amendments. Of the 25 commenters, four supported the proposal to require quarterly evaluations of internal controls and procedures for financial reporting.[81] One commenter specifically concurred with our objective of creating symmetry between the requirements to conduct periodic evaluations of both the company's disclosure controls and procedures and its internal controls and procedures for financial reporting.[82]

Twenty-one commenters opposed quarterly evaluations of internal controls.[83] Many of these believed that quarterly evaluations would impose substantial additional costs on companies without producing any incremental benefit to investors. One individual stated that the proper evaluation of a company's system of internal controls is a weighty and time-consuming process.[84] Twelve of the commenters opposed to quarterly evaluations indicated that quarterly evaluations of all aspects of internal controls and procedures would be extremely burdensome, expensive and difficult to perform under the time constraints of quarterly reporting, particularly as the accelerated filing deadlines for quarterly reports take effect.[85] Several other commenters argued that we should not go beyond the requirements of Section 404 of the Sarbanes-Oxley Act with respect to the frequency of internal control reporting without an adequate basis for doing so.[86] These commenters remarked that such a decision would be better made after we have had sufficient experience with the Section 302 certification requirements adopted in August of 2002.

Several commenters suggested alternatives to quarterly evaluations. Five commenters stated that it would be more appropriate and desirable if companies were required to make quarterly disclosure only of material changes to their internal control that occurred subsequent to management's most recent annual internal control evaluation.[87] Two other commenters similarly recommended that the quarterly evaluation be less rigorous than the annual evaluation.[88] One commenter stated that we should instead adopt an approach that requires less effort and assurance for purposes of quarterly reports, such as permitting companies to test compliance with controls relating to major applications on a rotating basis throughout the

year.[89] This commenter further stated that the objective of the quarterly evaluation should be to identify changes in controls during the quarter and evaluate whether they would change the certifying officers' conclusions about disclosure controls and internal controls as stated in the most recent annual report. The other commenter, although opposed to any quarterly evaluation requirement, believed that if we did require it, the quarterly evaluation should be viewed as an update of the annual evaluation, just as the quarterly report on Form 10-Q is an update of the annual report on Form 10-K.[90] One commenter stated that if we require some form of quarterly certification, it should be limited to negative assurance that nothing has come to the certifying officers' attention since the prior year's evaluation to suggest that the controls are no longer effective.[91]

3. Final Rules

After consideration of the comments received, we have decided not to require quarterly evaluations of internal control over financial reporting that are as extensive as the annual evaluation. We recognize that some controls operate continuously while others operate only at certain times, such as the end of the fiscal year. We believe that each company should be afforded the flexibility to design its system of internal control over financial reporting to fit its particular circumstances. The management of each company should perform evaluations of the design and operation of the company's entire system of internal control over financial reporting over a period of time that is adequate for it to determine whether, as of the end of the company's fiscal year, the design and operation of the company's internal control over financial reporting are effective.

Accordingly, we are adopting amendments that require a company's management, with the participation of the principal executive and financial officers, to evaluate any change in the company's internal control over financial reporting that occurred during a fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting. We also have adopted a modification to the Section 302 certification requirement and our disclosure requirements to adopt this approach, as discussed below.

The management of a foreign private issuer that has Exchange Act reporting obligations must also, like its domestic counterparts, report any material changes to the issuer's internal control over financial reporting. However, because foreign private issuers are not required to file quarterly reports under Section 13(a) or 15(d) of the Exchange Act, the final rules clarify that a foreign private issuer's management need only disclose in the issuer's annual report the material changes to its internal control over financial reporting that have occurred in the period covered by the annual report.[92]

**D. Differences between Internal Control over Financial Reporting and Disclosure Controls and Procedures**

Many of the commenters on the Proposing Release indicated that they were confused as to the differences between a company's disclosure controls and procedures and a company's internal control over financial reporting. Exchange Act Rule 13a-15(d) defines "disclosure controls and procedures"

to mean controls and procedures of a company that are designed to ensure that information required to be disclosed by the company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. The definition further states that disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

While there is substantial overlap between a company's disclosure controls and procedures and its internal control over financial reporting, there are both some elements of disclosure controls and procedures that are not subsumed by internal control over financial reporting and some elements of internal control that are not subsumed by the definition of disclosure controls and procedures.

With respect to the latter point, clearly, the broad COSO description of internal control, which includes the efficiency and effectiveness of a company's operations and the company's compliance with laws and regulations (not restricted to the federal securities laws), would not be wholly subsumed within the definition of disclosure controls and procedures. A number of commenters suggested that the narrower concept of internal control, involving internal control over financial reporting, is a subset of a company's disclosure controls and procedures, given that the maintenance of reliable financial reporting is a prerequisite to a company's ability to submit or file complete disclosure in its Exchange Act reports on a timely basis. This suggestion focuses on the fact that the elements of internal control over financial reporting requiring a company to have a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles can be viewed as a subset of disclosure controls and procedures.

We agree that some components of internal control over financial reporting will be included in disclosure controls and procedures for all companies. In particular, disclosure controls and procedures will include those components of internal control over financial reporting that provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles. However, in designing their disclosure controls and procedures, companies can be expected to make judgments regarding the processes on which they will rely to meet applicable requirements. In doing so, some companies might design their disclosure controls and procedures so that certain components of internal control over financial reporting pertaining to the accurate recording of transactions and disposition of assets or to the safeguarding of assets are not included. For example, a company might have developed internal control over financial reporting that includes as a component of safeguarding of assets dual signature requirements or limitations on signature authority on checks. That company could nonetheless determine that this component is not part of disclosure controls and procedures. We therefore believe that while there is substantial

overlap between internal control over financial reporting and disclosure controls and procedures, many companies will design their disclosure controls and procedures so that they do not include all components of internal control over financial reporting.

## E. Evaluation of Disclosure Controls and Procedures

The rules in place starting in August 2002 requiring quarterly evaluations of disclosure controls and procedures and disclosure of the conclusions regarding effectiveness of disclosure controls and procedures have not been substantively changed since their adoption, including in the rules that we adopt today. These evaluation and disclosure requirements will continue to apply to disclosure controls and procedures, including the elements of internal control over financial reporting that are subsumed within disclosure controls and procedures.

With respect to evaluations of disclosure controls and procedures, companies must, under our rules and consistent with the Sarbanes-Oxley Act, evaluate the effectiveness of those controls and procedures on a quarterly basis. While the evaluation is of effectiveness overall, a company's management has the ability to make judgments (and it is responsible for its judgments) that evaluations, particularly quarterly evaluations, should focus on developments since the most recent evaluation, areas of weakness or continuing concern or other aspects of disclosure controls and procedures that merit attention. Finally, the nature of the quarterly evaluations of those components of internal control over financial reporting that are subsumed within disclosure controls and procedures should be informed by the purposes of disclosure controls and procedures.[93]

The rules adopted in August 2002 required the management of an Exchange Act reporting foreign private issuer to evaluate and disclose conclusions regarding the effectiveness of the issuer's disclosure controls and procedures only in its annual report and not on a quarterly basis. The primary reason for this treatment is because foreign private issuers are not subject to mandated quarterly reporting requirements under the Exchange Act. The rules adopted today continue this treatment.[94]

## F. Periodic Disclosure about the Certifying Officers' Evaluation of the Company's Disclosure Controls and Procedures and Disclosure about Changes to its Internal Control over Financial Reporting

1. Existing Disclosure Requirements

The rules that we adopted in August 2002 to implement the certification requirements of Section 302 of the Sarbanes-Oxley Act included new Item 307 of Regulations S-B and S-K. Paragraph (a) of Item 307 requires companies, in their quarterly and annual reports, to disclose the conclusions of the company's principal executive and financial officers (or persons performing similar functions) about the effectiveness of the company's disclosure controls and procedures as of a date within 90 days of the filing date of the quarterly or annual report. This disclosure enables the certifying officers to satisfy the representation made in their certifications that they have "presented in the quarterly or annual report their conclusions about the effectiveness of the disclosure controls and procedures based on their

evaluation."

Paragraph (b) of Item 307 requires the company to disclose in each quarterly and annual report whether or not there were significant changes in the company's internal controls or in other factors that could significantly affect these controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses. This disclosure enables the certifying officers to satisfy the representation made in their certifications that they have "indicated in the quarterly or annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses."

2. Proposed Amendments to the Disclosure Requirements

In the Proposing Release, we proposed several revisions to the existing disclosure requirements regarding: (1) the certifying officers' evaluation of the company's disclosure controls and procedures; and (2) changes to the company's internal control over financial reporting. We also proposed to require quarterly disclosure regarding the conclusions of the certifying officers about the effectiveness of the company's internal control over financial reporting.

Moreover, we proposed to require evaluations of both types of controls as of the end of the period covered by the quarterly or annual report, rather than "as of a date within 90 days of the filing date" of the quarterly or annual report, as currently required with respect to disclosure controls. With respect to the disclosure about changes to the company's internal control over financial reporting, we proposed to require a company to disclose "any significant changes made during the period covered by the quarterly or annual report" rather than "whether or not there were significant changes in the company's internal control over financial reporting that could significantly affect these controls subsequent to the date of their evaluation."

The commenters were mixed in their reaction to these proposed changes. A couple of the commenters remarking on the point at which a company must undertake an evaluation of its controls "strongly agreed" with the proposed change to require evaluations as of the end of the period. Several other commenters preferred the existing "90 days within the filing date" evaluation point, noting that it provides more flexibility than the fixed point. Some of these commenters expressed concern that it would be hard to conduct evaluations on the last day of the period. One of the commenters suggested that the proposed requirement that a company disclose changes to its internal control over financial reporting that occurred at any time during a fiscal quarter was inconsistent with the proposed requirement that management evaluate such changes "as of the end of each fiscal quarter."[95] An additional commenter asserted that it was critical that we offer companies some guidance as to the types of changes that constitute "significant changes."[96] Finally, a few commenters noted that while we had proposed to delete the words "or other factors" from Exchange Act Rules 13a-14(b)(6) and 15d-14(b)(6) regarding disclosure of "significant changes in internal controls or in other factors that could significantly affect internal

controls...," we had not likewise proposed to delete those words from the actual certification language.

3. Final Disclosure Requirements

After consideration of the comments, we are adopting the proposals with several modifications. We are adopting as proposed the change of the evaluation date for disclosure controls to "as of the end of the period" covered by the quarterly or annual report. We are not specifying the point at which management must evaluate changes to the company's internal control over financial reporting. Given that the final rules do not require a company to state the conclusions of the certifying officers regarding the effectiveness of the company's internal control over financial reporting as of a particular date on a quarterly basis as proposed, as the company must with respect to disclosure controls and procedures, it is unnecessary to specify a date for the quarterly evaluation of changes in internal control over financial reporting. We believe that this change is consistent with the new accelerated reporting deadlines.[97]

We are amending the proposal that would have required companies to disclose any significant changes in its internal controls. Under the final rules, a company must disclose any change in its internal control over financial reporting that occurred during the fiscal quarter covered by the quarterly report, or the last fiscal quarter in the case of an annual report, that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.[98] Furthermore, we have deleted the phrase "or in other factors" from Exchange Act Rules 13a-14 and 15d-15 and the form of certification. Although the final rules do not explicitly require the company to disclose the reasons for any change that occurred during a fiscal quarter, or to otherwise elaborate about the change, a company will have to determine, on a facts and circumstances basis, whether the reasons for the change, or other information about the circumstances surrounding the change, constitute material information necessary to make the disclosure about the change not misleading.[99]

While an evaluation of the effectiveness of disclosure controls and procedures must be undertaken on a quarterly basis, we expect that for purposes of disclosure by domestic companies, the traditional relationship between disclosure in annual reports on Form 10-K and intervening quarterly reports on Form 10-Q will continue. Disclosure in an annual report that continues to be accurate need not be repeated. Rather, disclosure in quarterly reports may make appropriate reference to disclosures in the most recent annual report (and, where appropriate, intervening quarterly reports) and disclose subsequent developments required to be disclosed in the quarterly report.

We note that, as required by the Sarbanes-Oxley Act, the quarterly certification regarding disclosure that the certifying officers must make to the company's auditors and audit committee provides:[100]

The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

We expect that if a certifying officer becomes aware of a significant deficiency, material weakness or fraud requiring disclosure outside of the formal evaluation process or after the management's most recent evaluation of internal control over financial reporting, he or she will disclose it to the company's auditors and audit committee.

4. Conclusions Regarding Effectiveness of Disclosure Controls and Procedures

In disclosures required under current Item 307 of Regulations S-K and S-B, Item 15 of Form 20-F and General Instruction B(6) to Form 40-F, some companies have indicated that disclosure controls and procedures are designed only to provide "reasonable assurance" that the controls and procedures will meet their objectives. In reviewing those disclosures, the Commission staff generally has not objected to that type of disclosure. The staff has, however, requested companies including that type of disclosure to set forth, if true, the conclusions of the principal executive and principal financial officer that the disclosure controls and procedures are, in fact, effective at the "reasonable assurance" level. Other companies have included disclosure that there is "no assurance" that the disclosure controls and procedures will operate effectively under all circumstances. In these instances, the staff has requested companies to clarify that the disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives and to set forth, if true, the conclusions of the principal executive and principal financial officers that the controls and procedures are, in fact, effective at the "reasonable assurance" level.

The concept of reasonable assurance is built into the definition of internal control over financial reporting that we are adopting. This conforms to the standard contained in the internal accounting control provisions of Section 13(b)(2) of the Exchange Act[101] and current auditing literature.[102] If management decides to include a discussion of reasonable assurance in the internal control report, the discussion must be presented in a manner that neither makes the disclosure in the report confusing nor renders management's assessment concerning the effectiveness of the company's internal control over financial reporting unclear.

## G. Attestation to Management's Internal Control Report by the Company's Registered Public Accounting Firm

In the Proposing Release, we proposed to amend Rules 210.1-02 and 210.2-02 of Regulation S-X to make conforming revisions to Regulation S-X to reflect the registered public accounting firm attestation requirements mandated by Section 404(b) of the Sarbanes-Oxley Act. Under the proposals, we set forth a definition for the new term "attestation report on

management's evaluation of internal control over financial reporting" and certain requirements for the accountant's attestation report. We are adopting the proposals substantially as proposed. However, the final rules define the expanded term "attestation report on management's evaluation of internal control over financial reporting." Several commenters suggested that we use this more specific term, noting that auditors currently perform attestation engagements on a broad variety of subjects. Amended Rule 2-02 requires every registered public accounting firm that issues an audit report on the company's financial statements that are included in its annual report required by Section 13(a) or 15(d) of the Exchange Act containing an assessment by management of the effectiveness of the registrant's internal control over financial reporting must attest to, and report on, such assessment.

At the time of the enactment of the Sarbanes-Oxley Act, the applicable standard for attestation by auditors of internal control over financial reporting was set forth in Statements on Standards for Attestation Engagements No. 10 ("SSAE No. 10"). That standard was used by auditors providing attestations on a voluntary basis to companies, as well as by auditors whose financial institution clients are required to obtain attestations under Federal Deposit Insurance Corporation Improvement Act of 1991,[103] as discussed below. Under the Sarbanes-Oxley Act, the PCAOB has become the body that sets auditing and attestation standards generally for registered public accounting firms to use in the preparation and issuance of audit reports on the financial statements of issuers, and under Section 404(b) of the Sarbanes-Oxley Act, the PCAOB is required to set standards for the registered public accounting firms' attestations to, and reports on, management's assessment regarding its internal control over financial reporting.

On April 16, 2003, the PCAOB designated Statements on Standards for Attestation Engagements as existed on April 16 as the standard for attestations of management's assessment of the effectiveness of internal control over financial reporting pending further PCAOB standard-setting in the area (and subject to our approval of the PCAOB's actions), and on April 25, we approved the PCAOB's action. SSAE No. 10 is thus the standard applicable on a transition basis for attestations required under Section 404 of the Act and the rules we are adopting today, again pending further PCAOB standard-setting (and our approval). We expect that the PCAOB will assess the appropriateness of those standards and modify them as needed, and any future standards adopted by the PCAOB will apply to registered public accounting firms in connection with the preparation and issuance of attestation reports on management's assessment of the effectiveness of internal control over financial reporting.

## H. Types of Companies Affected

Section 404 of the Sarbanes-Oxley Act states that the Commission must prescribe rules that require each annual report required by Section 13(a) or 15(d) of the Exchange Act to contain an internal control report. The Act exempts registered investment companies from this requirement.[104]

1. Foreign Private Issuers

Section 404 of the Sarbanes-Oxley Act makes no distinction between

domestic and foreign issuers and, by its terms, clearly applies to foreign private issuers. These amendments, therefore, apply the management report on internal control over financial reporting requirement to foreign private issuers that file reports under Section 13(a) or 15(d) of the Exchange Act. We have, however, adopted a later compliance date for foreign private issuers than for accelerated filers.

2. Asset-Backed Issuers

In the Proposing Release, we proposed to exclude issuers of asset-backed securities from the proposed rules implementing Section 404 of the Act. We noted that because of the unique nature of asset-backed issuers, such issuers are subject to substantially different reporting requirements. Most significantly, asset-backed issuers are generally not required to file the types of financial statements that other companies must file. Also, such entities typically are passive pools of assets, without a board of directors or persons acting in a similar capacity. We did not receive any comments on the proposed exclusion of asset-backed issuers from the internal control reporting requirements, and we are excluding asset-backed issuers from the new disclosure requirements as proposed.

3. Small Business Issuers

Our proposed rules implementing Section 404 of the Act did not distinguish between large and small issuers. Similarly, Section 404 of the Act directs that the management report on internal control over financial reporting apply to any company filing periodic reports under Section 13(a) or 15(d) of the Exchange Act. Accordingly, these amendments apply to all issuers that file Exchange Act periodic reports, except registered investment companies, regardless of their size. However, we are sensitive that many small business issuers may experience difficulty in evaluating their internal control over financial reporting because these issuers may not have as formal or well-structured a system of internal control over financial reporting as larger companies. Accordingly, we are providing an extended compliance period for small business issuers and other companies that are not accelerated filers.[105] In addition, our approach of not mandating specific criteria to be used by management to evaluate a company's internal control over financial reporting should provide small issuers some flexibility in meeting these disclosure requirements.

4. Bank and Thrift Holding Companies

In the Proposing Release, we stated that we were coordinating with the Federal Deposit Insurance Corporation (the "FDIC") and the other federal banking regulators to eliminate, to the extent possible, any unnecessary duplication between our proposed internal control report and the FDIC's internal control report requirements. Under regulations adopted by the FDIC implementing Section 36 of the Federal Deposit Insurance Act,[106] a federally insured depository institution with total assets of $500 million or more ("institution"), is required, among other things, to prepare an annual management report that contains:

- A statement of management's responsibility for preparing the institution's annual financial statements, for establishing and

> maintaining an adequate internal control structure and procedures for financial reporting, and for complying with designated laws and regulations relating to safety and soundness; [107] and

- Management's assessment of the effectiveness of the institution's internal control structure and procedures for financial reporting as of the end of the fiscal year and the institution's compliance with the designated safety and soundness laws and regulations during the fiscal year. [108]

The FDIC's regulations additionally require the institution's independent accountant to examine, and attest to, management's assertions concerning the effectiveness of the institution's internal control structure and procedures for financial reporting. [109] The institution's management report and the accountant's attestation report must be filed with the FDIC, the institution's primary federal regulator (if other than the FDIC), and any appropriate state depository institution supervisor and must be available for public inspection. [110]

Although bank and thrift holding companies are not required under the FDIC's regulations to prepare these internal control reports, many of these holding companies do so under a provision of Part 363 of the FDIC's regulations [111] that permits an insured depository institution that is the subsidiary of a holding company to satisfy its internal control report requirements with an internal control report of the consolidated holding company's management if:

- Services and functions comparable to those required of the subsidiary by Part 363 are provided at the holding company level; [112] and

- The subsidiary has, as of the beginning of its fiscal year, (i) total assets of less than $5 billion or (ii) total assets of $5 billion or more and a composite rating of 1 or 2 under the Uniform Financial Institutions Rating System. [113]

Section 404 of the Sarbanes-Oxley Act does not contain an exemption for insured depository institutions that are both subject to the FDIC's internal control report requirements and required to file Exchange Act reports. In fact, it makes no distinction whatsoever between institutions subject to the FDIC's requirements and other types of Exchange Act filers. Accordingly, regardless of whether an insured depository institution is subject to the FDIC's requirements, insured depository institutions or holding companies that are required to file periodic reports under Section 13(a) or 15(d) of the Exchange Act are subject to the internal control reporting requirements that we are adopting today.

Although our final rules are similar to the FDIC's internal control report requirements, the rules differ in a few significant respects. Most notably, our final rules do not require a statement of compliance with designated laws and regulations relating to safety and soundness. Conversely, the following provisions in our rules are not included in the FDIC's regulations:

- The requirement that the report include a statement identifying the framework used by management to evaluate the effectiveness of the

company's internal control over financial reporting;[114]

- The requirement that management disclose any material weakness that it has identified in the company's internal control over financial reporting (and related stipulation that management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses);

- The requirement that the company state that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's assessment of the company's internal control over financial reporting; and

- The requirement that the company must provide the registered public accounting firm's attestation report on management's assessment of internal control over financial reporting in the company's annual report filed under the Exchange Act.[115]

Several commenters generally supported our goal to eliminate or reduce duplicative reporting requirements. Some of these commenters asserted that we should recognize the substantial protections to depositors and investors provided by the federal laws that govern depository institutions and their holding companies. They suggested that our final rules should state that compliance with the FDIC's internal control report requirements satisfies the internal control report requirements that we are adopting under Section 404. A number of these commenters also thought that if we did not exempt insured depository institutions already filing internal control reports under the FDIC's requirements, we should provide an exemption in our rules mirroring the FDIC's exemption that excludes insured depository institutions or their holding companies with less than $500 million in assets from the internal control report requirements.

After consultation with the staffs of the FDIC, the Federal Reserve Board, the Office of Thrift Supervision and the Office of the Comptroller of Currency, we have determined that insured depository institutions that are subject to Part 363 of the FDIC's regulations (as well as holding companies permitted to file an internal control report on behalf of their insured depository institution subsidiaries in satisfaction of these regulations) and also subject to our new rules implementing Section 404 of the Sarbanes-Oxley Act[116] should be afforded considerable flexibility in determining how best to satisfy both sets of requirements. Therefore, they can choose either of the following two options:

- They can prepare two separate management reports to satisfy the FDIC's and our new requirements; or

- They can prepare a single management report that satisfies both the FDIC's requirements and our new requirements.

If an insured depository institution or its holding company chooses to prepare a single report to satisfy both sets of requirements, the report of management on the institution's or holding company's internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) or 15d-15(f))

will have to contain the following:[117]

- A statement of management's responsibility for preparing the registrant's annual financial statements, for establishing and maintaining adequate internal control over financial reporting for the registrant, and for the institution's compliance with laws and regulations relating to safety and soundness designated by the FDIC and the appropriate federal banking agencies;

- A statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by Exchange Act Rule 13a-15 or 15d-15;

- Management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement as to whether or not management has concluded that the registrant's internal control over financial reporting is effective, and of the institution's compliance with the designated safety and soundness laws and regulations during the fiscal year. This discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management;[118] and

- A statement that the registered public accounting firm that audited the financial statements included in the registrant's annual report has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

Additionally, the institution or holding company will have to provide the registered public accounting firm's attestation report on management's assessment in its annual report filed under the Exchange Act.[119] For purposes of the report of management and the attestation report, financial reporting must encompass both financial statements prepared in accordance with GAAP and those prepared for regulatory reporting purposes.

## I. Registered Investment Companies

Section 404 of the Sarbanes-Oxley Act does not apply to registered investment companies, and we are not extending any of the requirements that would implement section 404 to registered investment companies.[120] Several commenters objected to the proposed requirement that the Section 302 certification include a statement of the officers' responsibility for internal controls.[121] These commenters argued that this requirement would contradict Section 405 of the Sarbanes-Oxley Act and represent a "back-door" application of Section 404, from which registered investment companies are exempt.[122] We disagree. The certification requirements implement Section 302 of the Sarbanes-Oxley Act, from which registered investment companies are not exempt.[123] We are not subjecting registered investment companies to the requirements implementing Section 404 of the Sarbanes-Oxley Act, including the annual and quarterly evaluation requirements with respect to internal control over financial reporting and the requirements for an annual report by management on internal control

over financial reporting and an attestation report on management's assessment.

We are adopting the following technical changes to our rules and forms implementing Section 302 of the Sarbanes-Oxley Act for registered investment companies in order to conform to the changes that we are adopting for operating companies.[124]

- Paragraph (d) of Investment Company Act Rule 30a-3. The amendments use the same term "internal control over financial reporting" that we are using in the rules for operating companies and include the same definition of "internal control over financial reporting" that we are adopting in Exchange Act Rules 13a-15(f) and 15d-15(f).

- Paragraph (a) of Investment Company Act Rule 30a-3. The amendments require every registered management investment company, other than a small business investment company, to maintain internal control over financial reporting. These amendments parallel those that we are adopting for operating companies in Exchange Act Rules 13a-15(a) and 15d-15(a).

- Introductory text and sub-paragraph (b) of paragraph 4 of the certification in Item 10(a)(2) of Form N-CSR. The amendments require the signing officers to state that they are responsible for establishing and maintaining internal control over financial reporting, and that they have designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

- Paragraph (4)(d) of the certification of Item 10(a)(2), and Item 9(b) of Form N-CSR. The amendments require disclosure of any change in the investment company's internal control over financial reporting that occurred during the most recent fiscal half-year that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

- Paragraph (5) of the certification of Item 10(a)(2) of Form N-CSR. The amendments require the signing officers to state that they have disclosed to the investment company's auditors and the audit committee all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the investment company's ability to record, process, summarize, and report financial information.

We are not, however, adopting proposed amendments that would have required the evaluation by an investment company's management of the effectiveness of its disclosure controls and procedures to be as of the end of the period covered by each report on Form N-CSR, rather than within 90 days prior to the filing date of the report, as our certification rules currently

require.[125] Commenters noted that this would require investment company complexes that have funds with staggered fiscal year ends to perform evaluations of their disclosure controls and procedures as many as twelve times per year. They argued that requiring such frequent evaluations would be extremely costly, inefficient, and operationally disruptive, and would not provide any benefits to shareholders.[126] We agree that the costs of requiring investment company complexes to perform evaluations of their disclosure controls and procedures twelve times per year would outweigh the benefits to investors. The certification rules we are adopting will require an investment company complex to perform at most four such evaluations per year.[127]

Transition Period for Registered Investment Companies

Registered investment companies must comply with the rule and form amendments applicable to them on and after August 14, 2003, except as follows. Registered investment companies must comply with the amendments to Exchange Act Rules 13a-15(a) and 15d-15(a) and Investment Company Act Rule 30a-3(a) that require them to maintain internal control over financial reporting with respect to fiscal years ending on or after June 15, 2004. In addition, registered investment companies must comply with the portion of the introductory language in paragraph 4 of the certification in Item 10(a)(2) of Form N-CSR that refers to the certifying officers' responsibility for establishing and maintaining internal control over financial reporting, as well as paragraph 4(b) of the certification, beginning with the first annual report filed on Form N-CSR for a fiscal year ending on or after June 15, 2004.

## J. Transition Period

We received a number of comments urging us to adopt an extended transition period for compliance with the new disclosure requirements.[128] We have decided to delay the compliance date of the requirement to provide a management report assessing the effectiveness of internal control over financial reporting and an auditor's attestation to, and report on, that assessment beyond that in the Proposing Release so that companies and their auditors will have time to prepare and satisfy the new requirements. These compliance dates do not apply to registered investment companies, which are not required to provide the management report assessing the effectiveness of internal control over financial reporting and the related auditor's attestation.[129] A company that is an "accelerated filer," as defined in Exchange Act Rule 12b-2, as of the end of its first fiscal year ending on or after June 15, 2004, must begin to comply with the management report on internal control over financial reporting disclosure requirements promulgated under Section 404 of the Sarbanes-Oxley Act in its annual report for that fiscal year. We recognize that non-accelerated filers, including smaller companies and foreign private issuers, may have greater difficulty in preparing the management report on internal control over financial reporting. Therefore, these types of companies must begin to comply with the disclosure requirements in annual reports for their first fiscal year ending on or after April 15, 2005. A company must begin to comply with the quarterly evaluation of changes to internal control over financial reporting requirements for its first periodic report due after the first annual report that must include management's report on internal control over financial reporting. We believe that the transition period is

appropriate in light of both the substantial time and resources needed to properly implement the rules[130] and the corresponding benefit to investors that will result. In addition, the transition period will provide additional time for the PCAOB to consider relevant factors in determining and implementing any new attestation standard as it finds appropriate, subject to our approval.

Consistent with this extended compliance period for management's internal control report and the related attestation, and for the subsequent evaluation of changes in internal control over financial reporting, the following provisions of the rules adopted today are subject to the extended compliance period:

- The provisions of Items 308(a) and (b) of Regulations S-K and S-B and the comparable provisions of Forms 20-F and 40-F requiring management's internal control report and the related attestation;

- The amendments to Rules 13a-15(a) and 15d-15(a) under the Exchange Act relating to maintenance of internal control over financial reporting; and

- The provisions of Rules 13a-15(c) and (d) and 15d-15(c) and (d) under the Exchange Act requiring evaluations of internal control over financial reporting and changes thereto.

The extended compliance period does not in any way affect the provisions of our other rules and regulations regarding internal controls that are in effect, including, without limitation, Rule 13b-2 under the Exchange Act.

Other rules relating to evaluation and disclosure adopted today are effective on August 14, 2003. These other rules include amendments to Items 308(c) of Regulations S-K and S-B and the comparable provisions of Forms 20-F and 40-F requiring disclosure regarding certain changes in internal control over financial reporting. These amendments modify existing requirements regarding disclosure of changes in internal control over financial reporting, are related to statements made in the Section 302 certifications of principal executive and financial officers, and provide clarifications that are beneficial and whose implementation need not be delayed. These other rules that are effective on August 14, 2003, also include amendments relating to disclosure controls and procedures.

## III. DISCUSSION OF AMENDMENTS RELATED TO CERTIFICATIONS

### A. Proposed Rules

We proposed to amend our rules and forms to require companies to file the certifications required by Section 302 of the Sarbanes-Oxley Act as an exhibit to the periodic reports to which they relate. Specifically, we proposed to amend the exhibit requirements of Forms 20-F and

40-F and Item 601 of Regulations S-B and S-K to add the Section 302 certifications to the list of required exhibits. In addition, we proposed to amend Exchange Act Rules 13a-14 and 15d-14 to require that Section 906 certifications accompany the periodic reports to which they relate, and to

amend Forms 20-F and 40-F and Item 601 of Regulations S-B and S-K to add Section 906 certifications to the list of required exhibits. We also proposed to amend Investment Company Act Rule 30a-2 to require that Section 906 certifications accompany the periodic reports on Form N-CSR to which they relate and Item 10 of Form N-CSR to add the Section 906 certifications as a required exhibit.

We received eight comment letters in response to the proposals.[131] The primary topic addressed by the commenters was whether Section 906 of the Sarbanes-Oxley Act applied to annual reports filed on Form 11-K. Most of the commenters believed that issuers required to file annual reports on Form 11-K should be exempt from the requirement to furnish a Section 906 certification as an exhibit.[132] Two commenters noted that the language of Section 906 that requires certification of the chief executive officer and chief financial officer (or equivalent thereof) is inconsistent with the actual administration of employee benefit plans because such plans do not have individuals acting as chief executive officer and chief executive officer.[133] Those commenters noted that employee benefit plans are typically administered through one or more committees that are appointed as the plan's named fiduciaries to administer the plan and oversee investments.[134] In addition, some commenters believed that we should provide an exemption for Form 11-K because employee benefit plans are already subject to extensive regulation under the Employee Retirement Income Security Act of 1974 ("ERISA"),[135] which includes a requirement for the plan administrator to certify, under penalties of perjury and other criminal and administrative penalties, the accuracy of the plan's disclosures under ERISA.[136]

Commenters also addressed other topics related to Section 906. One commenter requested that the Commission allow Section 906 certifications to remain confidential.[137] That commenter expressed concern that a plaintiff could use a Section 906 certification to create a basis for liability that did not otherwise exist.[138] One commenter objected to the proposal to deem Section 906 certifications as "furnished," rather than as "filed."[139] After considering all of the comments, we are adopting the proposals substantially as proposed.

On April 11, 2003, U.S. Senator Joseph Biden introduced a statement into the Congressional Record that discusses Section 906.[140] The statement asserts that Section 906 "is intended to apply to any financial statement filed by a publicly-traded company, upon which the investing public will rely to gauge the financial health of the company," which includes financial statements included in current reports on Forms 6-K and 8-K and annual reports on Form 11-K.[141] The language added to Title 18 by Section 906 refers to "periodic reports containing financial statements," and our proposals to require companies to furnish Section 906 certifications as exhibits applied to periodic (annual, semi-annual and quarterly) reports but did not address current reports on Forms 6-K and 8-K.[142] One commenter addressed the statement in the Congressional Record, indicating that the suggested requirements would create substantial practical burdens for companies to provide Section 906 certifications in current reports filed on Forms 6-K or 8-K.[143] We are also concerned that extending Section 906 certifications to Forms 6-K or 8-K could potentially chill the disclosure of information by companies. As noted above, four commenters argued that

Section 906 should not apply to Form 11-K.[144] In light of these developments, we are considering, in consultation with the Department of Justice, the application of Section 906 to current reports on Forms 6-K and 8-K and annual reports on Form 11-K and the possibility of taking additional action.

## B. Final Rules

We are amending the exhibit requirements of Forms 20-F and 40-F and Item 601 of Regulations S-B and S-K to add the Section 302 certifications to the list of required exhibits.[145] In the final rules, the specific form and content of the required certifications is set forth in the applicable exhibit filing requirement.[146] To coordinate the rules requiring an evaluation of "disclosure controls and procedures" and "internal control over financial reporting," we are moving the definition of the term "disclosure controls and procedures" from Exchange Act Rules 13a-14(c) and 15d-14(c) and Investment Company Act Rule 30a-2(c) to new Exchange Act Rules 13a-15 (c) and 15d-15(c) and Investment Company Act Rule 30a-3(c), respectively.

We are amending Exchange Act Rules 13a-14 and 15d-14 and Investment Company Act Rule 30a-2 to require the Section 906 certifications to accompany periodic reports containing financial statements as exhibits. We also are amending the exhibit requirements in Forms 20-F, 40-F and Item 601 of Regulations S-B and S-K to add the Section 906 certifications to the list of required exhibits to be included in reports filed with the Commission. In addition, we are amending Item 10 of Form N-CSR to add the Section 906 certifications as a required exhibit. Because the Section 906 certification requirement applies to periodic reports containing financial statements that are filed by an issuer pursuant to Section 13(a) or 15(d) of the Exchange Act, the exhibit requirement will only apply to reports on Form N-CSR filed under these sections and not to reports on Form N-CSR that are filed under the Investment Company Act only.[147] A failure to furnish the Section 906 certifications would cause the periodic report to which they relate to be incomplete, thereby violating Section 13(a) of the Exchange Act.[148] In addition, referencing the Section 906 certifications in Exchange Act Rules 13a-14 and 15d-14 and Investment Company Act Rule 30a-2 subjects these certifications to the signature requirements of Rule 302 of Regulation S-T.[149]

Section 906 requires that the certifications "accompany" the periodic report to which they relate. This is in contrast to Section 302, which requires the certifications to be included "in" the periodic report. In recognition of this difference, we are permitting companies to "furnish," rather than "file," the Section 906 certifications with the Commission.[150] Thus, the certifications would not be subject to liability under Section 18 of the Exchange Act.[151] Moreover, the certifications would not be subject to automatic incorporation by reference into a company's Securities Act registration statements, which are subject to liability under Section 11 of the Securities Act,[152] unless the issuer takes steps to include the certifications in a registration statement.

Although Section 906 does not explicitly require the certifications to be made public, we believe that it is appropriate to require certifications that "accompany" a publicly filed periodic report to be provided publicly in this

manner. We believe that Congress intended for Section 906 certifications to be publicly provided. Civil liability already exists under our signature requirements and the Section 302 certifications. In addition, any Section 906 certification submitted to the Commission as correspondence is subject to the Freedom of Information Act.[153] Finally, the requirement to furnish Section 906 certifications as exhibits serves a number of important functions. First, the exhibit requirement enhances compliance by allowing the Commission, the Department of Justice and the public to monitor the certifications effectively. Second, by subjecting the Section 906 certifications to the signature requirements of Regulation S-T, companies are required to retain a manually signed signature page or other authenticating document for a five-year period. This requirement helps to preserve evidential matter in the event of prosecution.

There are important distinctions to be made between Sections 302 and 906 of the Sarbanes-Oxley Act. Unlike the Section 302 certifications, the Section 906 certifications are required only in periodic reports that contain financial statements. Therefore, amendments to periodic reports that do not contain financial statements would not require a new Section 906 certification, but would require a new Section 302 certification to be filed with the amendment.[154] In addition, unlike the Section 302 certifications, the Section 906 certifications may take the form of a single statement signed by a company's chief executive and financial officers.[155]

## C. Effect on Interim Guidance Regarding Filing Procedures

We provided interim guidance regarding voluntary filing procedures for Section 906 certifications.[156] That guidance encouraged issuers to submit their Section 906 certifications as exhibits to the periodic reports to which they relate.[157] For issuers that are not investment companies, that interim voluntary guidance shall remain in effect until the rules become effective. In the event that the EDGAR system is not updated by the effective date, companies should submit the required certifications as Exhibit 99.[158] For registered investment companies, the interim guidance shall remain in effect until the rules become effective.[159]

## D. Form of Section 302 Certifications

We proposed several amendments to the form of certifications to be provided pursuant to Section 302 of the Sarbanes-Oxley Act. In particular, we proposed the following:

- The addition of a statement that principal executive and financial officers are responsible for designing internal controls and procedures for financial reporting or having such controls and procedures designed under their supervision;

- The clarification that disclosure controls and procedures may be designed under the supervision of principal executive and financial officers; and

- The revision of the statement as to the effectiveness of disclosure controls and procedures and internal controls and procedures for financial reporting would be as of the end of the period.

We have adopted the proposals referred to above substantially as proposed. In addition, we have made the following changes:

- We have incorporated the term "internal control over financial reporting" into the certification;

- We have amended the provision of the certification relating to changes in internal control over financial reporting, consistent with the final rules discussed above regarding evaluation and disclosure, so that it refers to changes that have materially affected or are reasonably likely to materially affect internal control over financial reporting;

- We have clarified that the statement as effectiveness of disclosure controls and procedures be as of the end of the period, but that the date of the evaluation is not specified; and

- We have made minor changes in the organization of the certification.

## E. Transition Period

The final rules regarding filing of certifications under Sections 302 and 906, for companies other than registered investment companies, will be effective on August 14, 2003. The compliance dates applicable to registered investment companies are described in Section II. I., above.

We believe that changes in the form of Section 302 certification described above are beneficial to both registrants and investors because they clarify the provisions of the certification. With one exception, discussed below, the changes are also not related to our new requirements regarding management's internal control report. With that one exception, appropriateness of the modified certification is thus not affected by the extended compliance period we are providing in connection with management's internal control report and the related attestation. Our rules adopted today also therefore provide that the form of Section 302 certification will be modified, with that one exception, in accordance with these rules effective on August 14, 2003.

We are applying the extended compliance period to the portion of the introductory language in paragraph 4 of the Section 302 certification that refers to the certifying officers' responsibility for establishing and maintaining internal control over financial reporting for the company, as well as paragraph 4(b), which must be provided in the first annual report required to contain management's internal control report and thereafter. As noted above, this extended compliance period does not in any way affect the provisions of our other rules and regulations regarding internal controls that are in effect.

## IV. PAPERWORK REDUCTION ACT

### A. Background

Certain provisions of our final amendments contain "collection of information" requirements within the meaning of the Paperwork Reduction

Act of 1995 ("PRA").[160] We published a notice requesting comment on the collection of information requirements in the proposing release for the rule amendments, and we submitted these requirements to the Office of Management and Budget ("OMB") for review in accordance with the PRA.[161] The titles for the collection of information are:

(1) "Form 10-Q" (OMB Control No. 3235-0070);

(2) "Form 10-QSB" (OMB Control No. 3235-0416);

(3) "Form 10-K" (OMB Control No. 3235-0063);

(4) "Form 10-KSB" (OMB Control No. 3235-0420);

(5) "Form 20-F" (OMB Control No. 3235-0288);

(6) "Form 40-F" (OMB Control No. 3235-0381);

(7) "Regulation S-X" (OMB Control No. 3235-0009);

(8) "Regulation S-K" (OMB Control No. 3235-0071);

(9) "Regulation S-B" (OMB Control No. 3235-0417); and

(10) "Form N-CSR" (OMB Control No. 3235-0570).

The forms are periodic reports adopted under the Exchange Act and the Investment Company Act. The regulations set forth the disclosure requirements for periodic reports, registration statements and proxy and information statements filed by companies to ensure that investors are informed. The hours and costs associated with preparing, filing and sending these forms constitute reporting and cost burdens imposed by each collection of information. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Compliance with the requirements is mandatory. Under our rules for the retention of manual signatures,[162] companies must retain, for a period of five years, an original signature page or other document authenticating, acknowledging or otherwise adopting the certifying officers' signatures that appear in their electronically filed periodic reports. Responses to the information collections are not kept confidential.

## B. Summary of the Final Rules

The final rules require the annual report of every company that files periodic reports under Section 13(a) or 15(d) of the Exchange Act, other than reports by registered investment companies, to contain a report of management that includes:

- A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

- A statement identifying the framework used by management to evaluate the effectiveness of the company's internal control over financial reporting;

- Management's assessment of the effectiveness of the company's internal control over financial reporting, as of the end of the most recent fiscal year; and

- A statement that the registered public accounting firm that audited the financial statements included in the annual report has issued an attestation report on management's evaluation of the company's internal control over financial reporting.

We are adding these requirements pursuant to the legislative mandate in Section 404 of the Sarbanes-Oxley Act. Under our final rules, a company also will be required to evaluate and disclose any change in its internal control over financial reporting that occurred during the fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.

We are also adopting amendments to require companies to file the certifications mandated by Sections 302 and 906 of the Sarbanes-Oxley Act as exhibits to their annual, semi-annual and quarterly reports. These amendments will enhance the ability of investors, the Commission staff, the Department of Justice and other interested parties to easily and efficiently access the certifications through our Electronic Data Gathering, Analysis and Retrieval ("EDGAR") system and facilitate better monitoring of a company's compliance with the certification requirements.

## C. Summary of Comment Letters and Revisions to Proposals

We requested comment on the PRA analysis contained in the proposing releases addressing Section 404 and Sections 302 and 906 of the Sarbanes-Oxley Act.[163] We received no comments on our PRA estimates for the certification requirements. With respect to our PRA estimates for the rules implementing Section 404 of the Sarbanes-Oxley Act, eight commenters thought that our PRA estimates significantly understated the actual time and costs that companies would have to expend evaluating and reporting on their internal control over financial reporting.[164] However, few of these commenters provided actual alternative cost estimates, and none provided estimates that could be applied generally to all types and sizes of companies. One commenter believed that, based on its experience, we understated the burden estimate by at least a factor of 100.[165] In response to these commenters, and based on follow-up conversations with several of the commenters who expressed a view on our burden and cost estimates, we have revised our estimates as discussed more fully in Section IV.D below.

We have made a substantive modification to the proposed rules in response to the cost concerns expressed by commenters. Specifically, the final rules require companies to undertake a quarterly evaluation only of any change occurring during the fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting. This change should substantially mitigate some of the

costs and burdens associated with the proposed requirements.

We have made additional substantive changes to the proposed rule as well. First, the final rules require management to evaluate the company's internal control over financial reporting using a suitable framework, such as the COSO Framework. Second, the final rules expand the list of information that must be included in the management report and specify that management cannot conclude that a company's internal control over financial reporting is effective if there are one or more material weaknesses in such control. Under the final rules, management must identify the framework used to evaluate the company's internal control over financial reporting and disclose any material weaknesses in the company's internal control over financial reporting discovered through the evaluation. We do not believe that these changes significantly alter the burdens imposed on companies resulting from the required assessment of internal control over financial reporting.

## D. Revisions to PRA Reporting and Cost Burden Estimates

As discussed above, in consideration of commenters' remarks, we are revising our PRA burden and cost estimates for the rules pertaining to Section 404 that we originally submitted to the OMB in connection with the proposed rules.

We derived our new burden hour estimates for the annual report forms by estimating the total amount of time that it will take a company's management to conduct the annual evaluation of its internal control over financial reporting and to prepare the required management report.[166] Our annual burden estimate is based on several assumptions. First, we assumed that the annual number of responses for each form would be consistent with the number of filings that we received in fiscal year 2002.[167] Second, we assumed that there is a direct correlation between the extent of the burden and the size of the reporting company, with the burden increasing commensurate with the size of the company. We believe that there will be a marked disparity of burdens and costs resulting from the new internal control requirements between the largest and smallest reporting companies. Our estimates reflect an average burden for all sizes of companies. Third, we assumed that the first-year burden would be greater than that for subsequent years, as a portion of the costs will reflect one-time expenditures associated with complying with the rule, such as compiling documentation, implementing new processes, and training staff. We also adjusted the second and third year estimates to account for the fact that management should become more efficient at conducting its internal control assessment and preparing the disclosure after the first year as the process becomes more routine.[168] Under these assumptions, we estimate that the average incremental burden for an annual filing will be 383 hours per company and the portion of that burden that is reflected as the cost associated with outside professionals is approximately $34,300 per company. For large corporations, we expect that this burden will be substantially higher. Indeed, we received estimates in the thousands of hours for some large and complex companies. Conversely, we expect small companies to find their burden to be less than this average. We also believe that many companies will experience costs well in excess of this average in the first year of compliance with the final rules. We believe that costs will decrease in subsequent years. This burden will also vary among companies based on the complexity of their organization and the nature of their

current internal control procedures. We therefore calculated our estimates by averaging the estimated burdens over a three-year period.

We derived our burden estimates for the quarterly report forms by estimating the total amount of time that it will take a company's management to conduct the quarterly evaluation of material changes to the company's internal control over financial reporting and for the company to prepare the required disclosure about such changes. We believe that these quarterly evaluations will impose little additional burden, as much of the structure to conduct these evaluations will be established in connection with the annual evaluations. We estimate that the quarterly reporting will impose an additional burden of five hours per company in connection with each quarterly report. Accordingly, we did not revise our original burden hour estimates for the quarterly report forms.

We estimate the total annual incremental burden (for annual and quarterly reports) associated with the new internal control evaluation and disclosure requirements for all companies to be approximately 3,792,888 hours of company personnel time and a cost of $481,013,550 for the services of outside professionals.[169]

Table 1 below presents these burdens and costs for each form affected by the final rules implementing Section 404 of Sarbanes-Oxley. We calculated the burden by multiplying the estimated number of affected responses by the estimated average number of hours that management will spend conducting its assessment of the company's internal control over financial reporting and preparing the related disclosure. For Exchange Act annual reports, we estimate that 75% of the burden of preparation is carried by the company internally and that 25% of the burden of preparation is carried by outside professionals retained by the company at an average cost of $300 per hour.[170] The portion of the burden carried by outside professionals is reflected as a cost, while the portion of the burden carried by the company internally is reflected in hours. There is no change to the estimated burden of the collections of information entitled "Regulation S-K," "Regulation S-B" and "Regulation S-X" because the burdens that these regulations impose are reflected in our revised estimates for the forms.

Table 1: Incremental Paperwork Burden for the rules implementing Section 404

We do not believe that the amendments with respect to the Section 302 certifications result in a need to alter the burden estimates that we previously submitted to OMB because they merely relocate the certifications from the text of quarterly and annual reports filed or submitted under Section 13(a) or 15(d) of the Exchange Act to the "Exhibits" section of the reports. We are, however, revising the burden estimates for quarterly and annual reports and for Form N-CSR based on the amendment with respect to the Section 906 certification.[171] The PRA estimates for these amendments do not reflect a cost because we believe that the entire burden will be borne by company personnel. With respect to semi-annual reports on Form N-CSR, because the financial statements of registered management investment companies are not as complex as those of operating companies, we estimate that the amendments relating to the Section 906 certifications would result in an increase of one burden hour per

portfolio.[172] We estimate that there are approximately 3,700 registered management investment companies that are required to file reports on Form N-CSR, containing 9,850 portfolios. The following table illustrates the incremental PRA estimates for the new Section 906 certification requirements:

Table 2: Incremental Paperwork Burden for Certification Requirements

| Form | Annual Responses | Hours/Form | Total Hours Added |
|--------|-----------------|-------------|-------------------|
| 20-F | 1,194 | 2 | 2,388 |
| 40-F | 134 | 2 | 268 |
| 10-K | 8,484 | 2 | 16,968 |
| 10-KSB | 3,820 | 2 | 7,640 |
| 10-Q | 23,743 | 2 | 47,486 |
| 10-QSB | 11,299 | 2 | 22,598 |
| N-CSR | 7,400 | $2.66^{173}$ | 19,700 |
| Total | | | 117,048 |

## V. COST-BENEFIT ANALYSIS

The amendments implementing Section 404 of the Sarbanes-Oxley Act are congressionally mandated. We recognize that implementation of the Sarbanes-Oxley Act will likely result in costs and benefits to the economy. We are sensitive to the costs and benefits imposed by our rules, and we have considered costs and benefits of our amendments.

### A. Benefits

One of the main goals of the Sarbanes-Oxley Act is to enhance the quality of reporting and increase investor confidence in the financial markets. Recent market events have evidenced a need to provide investors with a clearer understanding of the processes that surround the preparation and presentation of financial information. These amendments are intended to accomplish the Act's goals by improving public company disclosure to investors about the extent of management's responsibility for the company's financial statements and internal control over financial reporting and the means by which management discharges its responsibility. The establishment and maintenance of internal control over financial reporting has always been an important responsibility of management. An effective system of internal control over financial reporting is necessary to produce reliable financial statements and other financial information used by investors. By requiring a report of management stating management's responsibility for the company's financial statements and internal control over financial reporting and management's assessment regarding the effectiveness of such control, investors will be able to better evaluate management's performance of its stewardship responsibilities and the reliability of a company's financial statements and other unaudited financial information.

The required annual evaluation of internal control over financial reporting will encourage companies to devote adequate resources and attention to the maintenance of such control. Additionally, the required evaluation should help to identify potential weaknesses and deficiencies in advance of a system breakdown, thereby facilitating the continuous, orderly and timely flow of information within the company and, ultimately, to investors and the marketplace. Improved disclosure may help companies detect fraudulent financial reporting earlier and perhaps thereby deter financial fraud or minimize its adverse effects. All of these benefits will increase market efficiency by improving investor confidence in the reliability of a company's financial disclosure and system of internal control over financial reporting. These benefits are not readily quantifiable. Commenters overwhelmingly supported the benefits of the amendments.

The amendments related to Section 302 of the Sarbanes-Oxley Act relocate the certifications required by Exchange Act Rules 13a-14 and 15d-14 from the text of quarterly and annual reports filed or submitted under Section 13 (a) or 15(d) of the Exchange Act to the "Exhibits" section of these reports. The amendments related to Section 906 of the Sarbanes-Oxley Act require that the certifications required by Section 1350 of Title 18 of the United States Code, added by Section 906 of the Act, accompany the periodic reports to which they relate as exhibits. These changes will enhance the ability of investors and the Commission staff to verify that the certifications have, in fact, been submitted with the Exchange Act reports to which they relate and to review the contents of the certifications to ensure compliance with the applicable requirements. In addition, the changes will enable the Department of Justice, which has responsibility for enforcing Section 906, to review effectively the form and content of the certifications required by that section.

## B. Costs

The final rules related to Section 404 of the Sarbanes-Oxley Act require companies, other than registered investment companies, to include in their annual reports a report of management on the company's internal control over financial reporting. The management report on internal control over financial reporting must include: a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting; a statement identifying the framework used to evaluate the effectiveness of the company's internal control over financial reporting; management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year; and a statement that the registered public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's evaluation of the company's internal control over financial reporting. The final rules will increase costs for all reporting companies. These costs are mitigated somewhat because companies have an existing obligation to maintain an adequate system of internal accounting control under the FCPA. Moreover, one commenter noted that some companies already voluntarily include management reports on their internal controls in their annual reports. The preparation of the management report on internal control over financial reporting will likely involve multiple parties, including senior management, internal auditors, in-house counsel, outside counsel and audit committee members.

Many commenters believed that our proposal to require quarterly evaluations of a company's internal control over financial reporting would significantly increase the costs of preparing periodic reports. Several commenters also were concerned that the proposals would result in increased audit fees. We have limited data on which to base cost estimates of the final rules.

Using our PRA burden estimates, we estimate the aggregate annual costs of implementing Section 404(a) of the Sarbanes-Oxley Act to be around $1.24 billion (or $91,000 per company).[174] We recognize the magnitude of the cost burdens and we are making several accommodations to address commenters' concerns and to ease compliance, including:

- Requiring quarterly disclosure only of any change that has materially affected, or is reasonably likely to materially affect, a company's internal control over financial reporting; and

- An extended transition period for the new internal control reporting requirements.

We originally proposed to require a company to include an internal control report in its annual report for fiscal years ending on or after September 15, 2003. Under the final rules, a company that is an "accelerated filer" under the definition in Exchange Act Rule 12b-2 must begin to comply with the internal control report requirement in its annual report for its first fiscal year ending on or after June 15, 2004. All other companies must begin to comply with the requirement in their annual reports for their first fiscal year ending on or after April 15, 2005.

A longer transition period will help to alleviate the immediate impact of any costs and burdens imposed on companies. A longer transition period may even help to reduce costs as companies will have additional time to develop best practices, long-term processes and efficiencies in preparing management reports. Also, a longer transition period will expand the period of availability of outside professionals that some companies may wish to retain as they prepare to comply with the new requirements.

The PRA burden estimate, however, excludes several costs attributable to Section 404. The estimate does not include the costs associated with the auditor's attestation report, which many commenters have suggested might be substantial. It also excludes estimates of likely "indirect" costs of the final rules. For instance, the final rules increase the cost of being a public company; therefore the final rules may discourage some companies from seeking capital from the public markets. Moreover, the final rules may also discourage non-U.S. firms from seeking capital in the United States.

The incremental costs of the amendments related to Section 302 of the Sarbanes-Oxley Act are minimal. Since companies must already include the certifications required by Exchange Act Rules 13a-14 and 15d-14 in their quarterly and annual reports, there should be no incremental cost to relocating the certifications from the text of the reports to the "Exhibits" section of these reports. Requiring the Section 906 certifications to be included as an exhibit to the periodic reports to which they relate will lead to some additional costs for companies that currently are submitting the

certifications to the Commission in some other manner. While these costs are difficult to quantify, we estimate that the annual paperwork burden of the amendments will be approximately \$23.4 million.[175]

One commenter has expressed concern that companies may assume greater legal risk by making their Section 906 certifications publicly available.[176] To the extent that companies may assume greater legal risk by including the Section 906 certifications as part of their periodic reports filed pursuant to the Exchange Act where these reports are incorporated by reference into Securities Act registration statements, we address this risk by requiring companies to "furnish," rather than "file," the certifications with the Commission for purposes of Section 18 of the Exchange Act or incorporation by reference into other filings. Thus, the amendments should mitigate this potential indirect cost of compliance. We believe that it is appropriate to require the certifications that accompany a periodic report to be publicly available. We believe that Congress intended for Section 906 certifications to be publicly available. Civil liability already exists by virtue of the pre-existing signature requirements and Section 302 certifications. In addition, any Section 906 certification submitted to the Commission as correspondence is subject to the Freedom of Information Act.[177]

## VI. EFFECT ON EFFICIENCY, COMPETITION AND CAPITAL FORMATION

Section 23(a)(2) of the Exchange Act[178] requires us to consider the anti-competitive effects of any rules that we adopt under the Exchange Act. In addition, Section 23(a)(2) prohibits us from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act. The amendments related to Section 404 of the Sarbanes-Oxley Act represent the implementation of a congressional mandate. The final rules require management reports that improve investors' understanding of management's responsibility for the preparation of reliable financial information and maintaining adequate internal control over financial reporting. We anticipate that these requirements will enhance the proper functioning of the capital markets by increasing the quality and accountability of financial reporting and restoring investor confidence.

Section 2(b) of the Securities Act,[179] Section 3(f) of the Exchange Act[180] and Section 2(c) of the Investment Company Act[181] require us, when engaging in rulemaking to consider or determine whether an action is necessary or appropriate in the public interest, and consider whether the action will promote efficiency, competition, and capital formation. The amendments related to Section 404 are designed to enhance the quality and accountability of the financial reporting process and may help increase investor confidence, which implies increased efficiency and competitiveness of the U.S. capital markets. Increased market efficiency and investor confidence also may encourage more efficient capital formation. We requested comments on the effect of these amendments on efficiency, competition and capital formation analyses in the proposing release addressing Section 404. We received no comments in response to these requests.

The amendments related to Section 302 of the Sarbanes-Oxley Act would

relocate the certifications required by Exchange Act Rules 13a-14 and 15d-14 from the text of quarterly and annual reports filed or submitted under Section 13(a) or 15(d) of the Exchange Act to the "Exhibits" section of these reports. This relocation will enhance the ability of investors and the Commission staff to verify that the certifications have, in fact, been submitted with the Exchange Act reports to which they relate and to review the contents of the certifications to ensure compliance with the applicable requirements. The amendments related to Section 906 of the Sarbanes-Oxley Act also will streamline compliance with Section 1350 of Title 18 of the United States Code, added by Section 906 of the Act, and will enable investors, the Commission staff and the Department of Justice, which has responsibility for enforcing Section 1350, to verify submission and efficiently review the form and content of the certifications required by that provision.

We do not believe that the amendments related to certifications will impose any burden on competition, nor are we aware of any impact on capital formation that would result from the amendments. Depending on how an issuer's principal executive and principal financial officers presently satisfy the Section 906 certification requirements, issuers may incur some additional costs in submitting these certifications as an exhibit to their periodic reports. While these costs are difficult to quantify, we believe that they would be nominal. We requested comment on whether the amendments would affect competition, efficiency and capital formation. We received no comments in response to this request.

## VII. FINAL REGULATORY FLEXIBILITY ANALYSIS

This Final Regulatory Flexibility Analysis ("FRFA") has been prepared in accordance with the Regulatory Flexibility Act.[182] This FRFA relates to new rules and amendments that require Exchange Act companies, other than registered investment companies, to include in their annual reports a report of management on the company's internal control over financial reporting. The management report on internal control over financial reporting must include: a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting; a statement identifying the framework used to evaluate the effectiveness of the company's internal control over financial reporting; management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year; and a statement that the registered public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's evaluation of the company's internal control over financial reporting. This FRFA also addresses new rules and amendments that require companies to file the certifications mandated by Sections 302 and 906 of the Sarbanes-Oxley Act as exhibits to their periodic reports. An Initial Regulatory Flexibility Analysis ("IRFA") was prepared in accordance with the Regulatory Flexibility Act in conjunction with each of the releases proposing these rules.[183] The proposing releases solicited comments on these analyses.

## A. Need for the Amendments

We are adopting these disclosure requirements to comply with the mandate of, and to fulfill the purposes underlying the provisions of, the Sarbanes-Oxley Act of 2002. The new evaluation and disclosure requirements

regarding a company's internal control over financial reporting are intended to enhance the quality of reporting and increase investor confidence in the fairness and integrity of the securities markets by making it clear that a company's management is responsible for maintaining and annually assessing such controls. The amendments related to Sections 302 and 906 of the Sarbanes-Oxley Act will enhance the ability of investors and the Commission staff to verify that the certifications have, in fact, been submitted with the Exchange Act reports to which they relate and to review the contents of the certifications to ensure compliance with the applicable requirements. The amendments also will streamline compliance with Section 1350 of Title 18 of the United States Code and will enable investors, the Commission staff and the Department of Justice, which has responsibility for enforcing Section 1350, to verify a company's submission of the Section 906 certification and efficiently review the form and content of the certifications.

## B. Significant Issues Raised by Public Comment

In the Proposing Releases, we requested comment on any aspect of the IRFA, including the number of small entities that would be affected by the proposals, and both quantitative and qualitative nature of the impact. Several commenters expressed concern that small business issuers, including small entities, would be particularly disadvantaged by our proposal to require quarterly evaluations of internal control over financial reporting. We received no commentary on the impact on small entities of the new certification requirements.

## C. Small Entities Subject to the Amendments

The new disclosure items affect issuers that are small entities. Exchange Act Rule 0-10(a)[184] defines an issuer, other than an investment company, to be a "small business" or "small organization" if it had total assets of $5 million or less on the last day of its most recent fiscal year. We estimate that there are approximately 2,500 issuers, other than investment companies, that may be considered small entities. For purposes of the Regulatory Flexibility Act, an investment company is a "small entity" if it, together with other investment companies in the same group of related investment companies, has net assets of $50 million or less as of the end of its most recent fiscal year.[185] We estimate that there are approximately 190 registered management investment companies that, together with other investment companies in the same group of related investment companies, have net assets of $50 million or less as of the end of the most recent fiscal year.[186]

The new disclosure items with respect to management's report on internal control over financial reporting and the registered public accounting firm's attestation report apply to any small entity, other than a registered investment company, that is subject to Exchange Act reporting requirements. The new certification requirements apply to any small entity that is subject to Exchange Act reporting requirements.

## D. Reporting, Recordkeeping and other Compliance Requirements

The amendments require a company's management to disclose information regarding the company's internal control over financial reporting, including

management's assessment of the effectiveness of the company's internal control over financial reporting. All small entities that are subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, other than registered investment companies, are subject to these evaluation and disclosure requirements. Because reporting companies already file the forms being amended, no additional professional skills beyond those currently possessed by these filers necessarily are required to prepare the new disclosure, although some companies may choose to engage outside professionals to assist them in complying with the new requirements. We expect that these new disclosure items will increase compliance costs incurred by small entities. We have calculated for purposes of the Paperwork Reduction Act that each company would be subject to an added annual reporting burden of approximately 398 hours and the portion of that burden that is reflected as the cost associated with outside professionals is approximately $35,286.[187] We believe, however, that the annual average burden and costs for small issuers are much lower.[188] For the new certification requirements, we estimate that a company, including a small entity, will be subject to an additional reporting burden of eight hours per year.[189] These burden estimates reflect only the burden and cost of the required collection of information.

## E. Agency Action to Minimize Effect on Small Entities

The Regulatory Flexibility Act directs us to consider alternatives that would accomplish our stated objectives, while minimizing any significant adverse impact on small entities. In connection with the amendments, we considered the following alternatives:

- Establishing different compliance or reporting requirements or timetables that take into account the resources available to small entities;

- Clarifying, consolidating or simplifying compliance and reporting requirements under the rules for small entities;

- Using performance rather than design standards; and

- Exempting small entities from all or part of the requirements.

Several of these alternatives were considered but rejected, while other alternatives were taken into account in the final rules. We believe the final rules fulfill the intent of the Sarbanes-Oxley Act of enhancing the quality of reporting and increasing investor confidence in the fairness and integrity of the securities markets.

Sections 302, 404 and 906 of the Sarbanes-Oxley Act make no distinction based on a company's size. We think that improvements in the financial reporting process for all companies are important for promoting investor confidence in our markets. For example, a 1999 report commissioned by the organizations that sponsored the Treadway Commission found that the incidence of financial fraud was greater in small companies.[190] However, we are sensitive to the costs and burdens that small entities will face. The final rules require only a quarterly evaluation of material changes to a company's internal control over financial reporting, unlike the proposed rules that

would have required management to evaluate the effectiveness of a company's internal control over financial reporting on a quarterly basis. In response to comments, including comments submitted by the Small Business Administration, we have decided not to adopt this proposal.

We believe that a blanket exemption for small entities from coverage of the requirements is not appropriate and would be inconsistent with the policies underlying the Sarbanes-Oxley Act. However, we have provided an extended transition period for companies that do not meet the definition in Exchange Act Rule 12b-2[191] of an "accelerated filer" for the rules implementing Section 404 of the Sarbanes-Oxley Act. Under the adopted rules, non-accelerated filers, including small business issuers, need not prepare the management report on internal control over financial reporting until they file their annual reports for fiscal years ending on or after April 15, 2005. This deferral provides non-accelerated filers more time to develop structured and formal systems of internal control over financial reporting.

We believe that the new disclosure and certification requirements are clear and straightforward. The amendments require only brief disclosure. An effective system of internal control over financial reporting has always been necessary to produce reliable financial statements and other financial information. Our amendments do not specify any particular controls that a company's internal control over financial reporting should include. Each company is afforded the flexibility to design its internal control over financial reporting according to its own set of circumstances. This flexibility should enable companies to keep costs of compliance as low as possible. Therefore, it does not seem necessary to develop separate requirements for small entities.

The final rules impose both design and performance standards regarding disclosure of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company and management's assessment of the effectiveness of such controls. The rules do, however, afford a company the flexibility to design its internal control over financial reporting to fit its particular circumstances. We believe that it would be inconsistent with the purposes of the Sarbanes-Oxley Act to specify different requirements for small entities.

## VIII. STATUTORY AUTHORITY AND TEXT OF RULE AMENDMENTS

The amendments described in this release are being adopted under the authority set forth in Sections 5, 6, 7, 10, 17 and 19 of the Securities Act, as amended, Sections 12, 13, 15, 23 and 36 of the Exchange Act, Sections 8, 30, 31 and 38 of the Investment Company Act, as amended and Sections 3(a), 302, 404, 405 and 906 of the Sarbanes-Oxley Act.

### List of Subjects

17 CFR Part 210

Accountants, Accounting, Reporting and recordkeeping requirements, Securities.

17 CFR Part 228

Reporting and recordkeeping requirements, Securities, Small businesses.

17 CFR Parts 229, 240 and 249

Reporting and recordkeeping requirements, Securities.

17 CFR Parts 270 and 274

Investment companies, Reporting and recordkeeping requirements, Securities.

## TEXT OF AMENDMENTS

For the reasons set out in the preamble, the Commission amends title 17, chapter II, of the Code of Federal Regulations as follows:

## PART 210 - FORM AND CONTENT OF AND REQUIREMENTS FOR FINANCIAL STATEMENTS, SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934, PUBLIC UTILITY HOLDING COMPANY ACT OF 1935, INVESTMENT COMPANY ACT OF 1940, INVESTMENT ADVISERS ACT OF 1940, AND ENERGY POLICY AND CONSERVATION ACT OF 1975

1. The authority citation for Part 210 is revised to read as follows:

Authority: 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 77z-2, 77z-3, 77aa(25), 77aa (26), 78c, 78j-1, 78l, 78m, 78n, 78o(d), 78q, 78u-5, 78w(a), 78ll, 78mm, 79e(b), 79j(a), 79n, 79t(a), 80a-8, 80a-20, 80a-29, 80a-30, 80a-31, 80a-37(a), 80b-3, 80b-11, 7202 and 7262, unless otherwise noted.

2. Section 210.1-02 is amended by:

a. Removing the authority citation following §210.1-02;

b. Redesignating paragraph (a) as paragraph (a)(1); and

c. Adding paragraph (a)(2).

The revisions read as follows:

## §210.1-02 Definition of terms used in Regulation S-X (17 CFR part 210).

\* \* \* \* \*

(a)(1) \* \* \*

(2) Attestation report on management's assessment of internal control over financial reporting. The term attestation report on management's assessment of internal control over financial reporting means a report in which a registered public accounting firm expresses an opinion, or states that an opinion cannot be expressed, concerning management's assessment of the effectiveness of the registrant's internal control over financial

reporting (as defined in §240.13a-15(f) or 240.15d-15(f) of this chapter) in accordance with standards on attestation engagements. When an overall opinion cannot be expressed, the registered public accounting firm must state why it is unable to express such an opinion.

\* \* \* \* \*

3. Amend §210.2-02 by:

a. Revising the section heading;

b. Revising the headings of paragraphs (a), (b), (c) and (d); and

c. Adding paragraph (f).

The addition and revisions read as follows.

### §210.2-02 Accountants' reports and attestation reports on management's assessment of internal control over financial reporting.

(a) Technical requirements for accountants' reports. \* \* \*

(b) Representations as to the audit included in accountants' reports. \* \* \*

(c) Opinions to be expressed in accountants' reports. \* \* \*

(d) Exceptions identified in accountants' reports. \* \* \*

\* \* \* \* \*

(f) Attestation report on management's assessment of internal control over financial reporting. Every registered public accounting firm that issues or prepares an accountant's report for a registrant, other than an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), that is included in an annual report required by section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) containing an assessment by management of the effectiveness of the registrant's internal control over financial reporting must attest to, and report on, such assessment. The attestation report on management's assessment of internal control over financial reporting shall be dated, signed manually, identify the period covered by the report and clearly state the opinion of the accountant as to whether management's assessment of the effectiveness of the registrant's internal control over financial reporting is fairly stated in all material respects, or must include an opinion to the effect that an overall opinion cannot be expressed. If an overall opinion cannot be expressed, explain why. The attestation report on management's assessment of internal control over financial reporting may be separate from the accountant's report.

### PART 228 - INTEGRATED DISCLOSURE SYSTEM FOR SMALL BUSINESS ISSUERS

4. The general authority citation for Part 228 is revised to read as follows:

Authority: 15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa (25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 77jjj, 77nnn, 77sss, 78l, 78m, 78n, 78o, 78u-5, 78w, 78ll, 78mm, 80a-8, 80a-29, 80a-30, 80a-37, 80b-11, 7202, 7241, and 7262; and 18 U.S.C. 1350, unless otherwise noted.

\* \* \* \* \*

5. Revise §228.307 to read as follows:

### §228.307 (Item 307) Disclosure controls and procedures.

Disclose the conclusions of the small business issuer's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the small business issuer's disclosure controls and procedures (as defined in §240.13a-15(e) or 240.15d-15(e) of this chapter) as of the end of the period covered by the report, based on the evaluation of these controls and procedures required by paragraph (b) of §240.13a-15 or 240.15d-15 of this chapter.

6. Add §228.308 to read as follows:

### §228.308 (Item 308) Internal control over financial reporting.

(a) Management's annual report on internal control over financial reporting. Provide a report of management on the small business issuer's internal control over financial reporting (as defined in §240.13a-15(f) or 240.15d-15 (f) of this chapter) that contains:

(1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the small business issuer;

(2) A statement identifying the framework used by management to evaluate the effectiveness of the small business issuer's internal control over financial reporting as required by paragraph (c) of §240.13a-15 or 240.15d-15 of this chapter;

(3) Management's assessment of the effectiveness of the small business issuer's internal control over financial reporting as of the end of the small business issuer's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the small business issuer's internal control over financial reporting identified by management. Management is not permitted to conclude that the small business issuer's internal control over financial reporting is effective if there are one or more material weaknesses in the small business issuer's internal control over financial reporting; and

(4) A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's

assessment of the small business issuer's internal control over financial reporting.

(b) Attestation report of the registered public accounting firm. Provide the registered public accounting firm's attestation report on management's assessment of the small business issuer's internal control over financial reporting in the small business issuer's annual report containing the disclosure required by this Item.

(c) Changes in internal control over financial reporting. Disclose any change in the small business issuer's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of §240.13a-15 or 240.15d-15 of this chapter that occurred during the small business issuer's last fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting.

Instructions to Item 308

1. The small business issuer must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the small business issuer's internal control over financial reporting.

2. A small business issuer that is an Asset-Backed Issuer (as defined in §240.13a-14(g) and §240.15d-14(g) of this chapter) is not required to disclose the information required by this Item.

7. Amend §228.401 by removing the phrase "internal controls and procedures for financial reporting" in paragraph (e)(2)(iv) of Item 401 and adding, in its place, the phrase "internal control over financial reporting".

8. Amend §228.601 by:

a. Removing the last sentence of paragraph (a)(1);

b. Revising the Exhibit Table;

c. Revising paragraph (b)(7) to read "No exhibit required.";

d. Revising the heading in paragraph (b)(11) to read "Statement re: computation of per share earnings"; and

e. Revising paragraphs (b)(27) through (b)(98).

The revisions read as follows.

## §228.601 (Item 601) Exhibits.

\* \* \* \* \*

## EXHIBIT TABLE

(b) Description of exhibits. * * *

(27) through (30) [Reserved]

(31) Rule 13a-14(a)/15d-14(a) Certifications. The certifications required by
Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR
240.15d-14(a)) exactly as set forth below:

## CERTIFICATIONS*

I, [identify the certifying individual], certify that:

1. I have reviewed this [specify report] of [identify small business
   issuer];

2. Based on my knowledge, this report does not contain any untrue
   statement of a material fact or omit to state a material fact necessary
   to make the statements made, in light of the circumstances under
   which such statements were made, not misleading with respect to the
   period covered by this report;

3. Based on my knowledge, the financial statements, and other financial
   information included in this report, fairly present in all material
   respects the financial condition, results of operations and cash flows
   of the small business issuer as of, and for, the periods presented in
   this report;

4. The small business issuer's other certifying officer(s) and I are
   responsible for establishing and maintaining disclosure controls and
   procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15
   (e)) and internal control over financial reporting (as defined in
   Exchange Act Rules 13a-15(f) and 15d-15(f)) for the small business
   issuer and have:

   > (a) Designed such disclosure controls and procedures, or caused
   > such disclosure controls and procedures to be designed under
   > our supervision, to ensure that material information relating to
   > the small business issuer, including its consolidated subsidiaries,
   > is made known to us by others within those entities, particularly
   > during the period in which this report is being prepared;

   > (b) Designed such internal control over financial reporting, or
   > caused such internal control over financial reporting to be
   > designed under our supervision, to provide reasonable
   > assurance regarding the reliability of financial reporting and the
   > preparation of financial statements for external purposes in
   > accordance with generally accepted accounting principles;

   > (c) Evaluated the effectiveness of the small business issuer's
   > disclosure controls and procedures and presented in this report
   > our conclusions about the effectiveness of the disclosure
   > controls and procedures, as of the end of the period covered by
   > this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: ...............

[Signature]
[Title]

* Provide a separate certification for each principal executive officer and principal financial officer of the small business issuer. See Rules 13a-14(a) and 15d-14(a)

(32) Section 1350.

(i) The certifications required by Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350).

(ii) A certification furnished pursuant to this Item will not be deemed "filed" for purposes of section 18 of the Exchange Act (15 U.S.C. 78r), or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the small business issuer specifically incorporates it by reference.

(33) through (98) [Reserved]

\* \* \* \* \*

**PART 229 - STANDARD INSTRUCTIONS FOR FILING FORMS UNDER**

**SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934
AND ENERGY POLICY AND CONSERVATION ACT OF 1975 -
REGULATION S-K**

9. The general authority citation for Part 229 is revised to read as follows:

Authority: 15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa
(25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 77iii, 77jjj, 77nnn, 77sss,
78c, 78i, 78j, 78l, 78m, 78n, 78o, 78u-5, 78w, 78ll, 78mm, 79e, 79j, 79n,
79t, 80a-8, 80a-9, 80a-20, 80a-29, 80a-30, 80a-31(c), 80a-37, 80a-38(a),
80a-39, 80b-11, 7202, 7241, and 7262; and 18 U.S.C. 1350, unless
otherwise noted.

\* \* \* \* \*

10. By revising §229.307 to read as follows:

**§229.307 (Item 307) Disclosure controls and procedures.**

Disclose the conclusions of the registrant's principal executive and principal
financial officers, or persons performing similar functions, regarding the
effectiveness of the registrant's disclosure controls and procedures (as
defined in §240.13a-15(e) or 240.15d-15(e) of this chapter) as of the end
of the period covered by the report, based on the evaluation of these
controls and procedures required by paragraph (b) of §240.13a-15 or
240.15d-15 of this chapter.

11. By adding §229.308 to read as follows:

**§229.308 (Item 308) Internal control over financial reporting.**

(a) Management's annual report on internal control over financial reporting.
Provide a report of management on the registrant's internal control over
financial reporting (as defined in §240.13a-15(f) or 240.15d-15(f) of this
chapter) that contains:

(1) A statement of management's responsibility for establishing and
maintaining adequate internal control over financial reporting for the
registrant;

(2) A statement identifying the framework used by management to evaluate
the effectiveness of the registrant's internal control over financial reporting
as required by paragraph (c) of §240.13a-15 or 240.15d-15 of this chapter;

(3) Management's assessment of the effectiveness of the registrant's
internal control over financial reporting as of the end of the registrant's
most recent fiscal year, including a statement as to whether or not internal
control over financial reporting is effective. This discussion must include
disclosure of any material weakness in the registrant's internal control over
financial reporting identified by management. Management is not permitted
to conclude that the registrant's internal control over financial reporting is
effective if there are one or more material weaknesses in the registrant's
internal control over financial reporting; and

(4) A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

(b) Attestation report of the registered public accounting firm. Provide the registered public accounting firm's attestation report on management's assessment of the registrant's internal control over financial reporting in the registrant's annual report containing the disclosure required by this Item.

(c) Changes in internal control over financial reporting. Disclose any change in the registrant's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of §240.13a-15 or 240.15d-15 of this chapter that occurred during the registrant's last fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

Instructions to Item 308

1. The registrant must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the registrant's internal control over financial reporting.

2. A registrant that is an Asset-Backed Issuer (as defined in §240.13a-14(g) and §240.15d-14(g) of this chapter) is not required to disclose the information required by this Item.

12. By amending §229.401 by removing the phrase "internal controls and procedures for financial reporting" in paragraph (h)(2)(iv) of Item 401 and adding, in its place, the phrase "internal control over financial reporting".

13. By amending §229.601 by:

a. Removing the second and third sentences of paragraph (a)(1);

b. Revising the Exhibit Table which follows the Instructions to the Exhibit Table; and

c. Revising paragraphs (b)(27) through (b)(98).

The revisions read as follows:

## §229.601 (Item 601) Exhibits.

(a) Exhibits and index required. * * *

Instructions to the Exhibit Table

* * * * *

## **EXHIBIT TABLE**

(b) Description of exhibits. * * *

(27) through (30) [Reserved]

(31) Rule 13a-14(a)/15d-14(a) Certifications. The certifications required by Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR 240.15d-14(a)) exactly as set forth below:

## **CERTIFICATIONS\***

I, [identify the certifying individual], certify that:

1. I have reviewed this [specify report] of [identify registrant];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth

> fiscal quarter in the case of an annual report) that has
> materially affected, or is reasonably likely to materially affect,
> the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based
   on our most recent evaluation of internal control over financial
   reporting, to the registrant's auditors and the audit committee of the
   registrant's board of directors (or persons performing the equivalent
   functions):

   > (a) All significant deficiencies and material weaknesses in the
   > design or operation of internal control over financial reporting
   > which are reasonably likely to adversely affect the registrant's
   > ability to record, process, summarize and report financial
   > information; and

   > (b) Any fraud, whether or not material, that involves
   > management or other employees who have a significant role in
   > the registrant's internal control over financial reporting.

Date: ...............

_____

[Signature]
[Title]

* Provide a separate certification for each principal executive officer and
principal financial officer of the registrant. See Rules 13a-14(a) and 15d-14
(a).

(32) Section 1350 Certifications.

(i) The certifications required by Rule 13a-14(b) (17 CFR 240.13a-14(b)) or
Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of
Title 18 of the United States Code (18 U.S.C. 1350).

(ii) A certification furnished pursuant to this item will not be deemed "filed"
for purposes of Section 18 of the Exchange Act (15 U.S.C. 78r), or
otherwise subject to the liability of that section. Such certification will not
be deemed to be incorporated by reference into any filing under the
Securities Act or the Exchange Act, except to the extent that the registrant
specifically incorporates it by reference.

(33) through (98) [Reserved]

* * * * *

## PART 240 - GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

14. The general authority citation for Part 240 is revised to read as follows:

Authority: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78o, 78p, 78q, 78s,

78u-5, 78w, 78x, 78ll, 78mm, 79q, 79t, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4, 80b-11, 7202, 7241, 7262, and 7263; and 18 U.S.C. 1350, unless otherwise noted.

\* \* \* \* \*

15. By revising §240.12b-15 to read as follows:

### §240.12b-15 Amendments.

All amendments must be filed under cover of the form amended, marked with the letter "A" to designate the document as an amendment, e.g., "10-K/A," and in compliance with pertinent requirements applicable to statements and reports. Amendments filed pursuant to this section must set forth the complete text of each item as amended. Amendments must be numbered sequentially and be filed separately for each statement or report amended. Amendments to a statement may be filed either before or after registration becomes effective. Amendments must be signed on behalf of the registrant by a duly authorized representative of the registrant. An amendment to any report required to include the certifications as specified in §240.13a-14(a) or §240.15d-14(a) must include new certifications by each principal executive and principal financial officer of the registrant, and an amendment to any report required to be accompanied by the certifications as specified in §240.13a-14(b) or §240.15d-14(b) must be accompanied by new certifications by each principal executive and principal financial officer of the registrant. The requirements of the form being amended will govern the number of copies to be filed in connection with a paper format amendment. Electronic filers satisfy the provisions dictating the number of copies by filing one copy of the amendment in electronic format. See §232.309 of this chapter (Rule 309 of Regulation S-T).

16. By amending §240.13a-14 by:

a. Revising paragraphs (a) and (b);

b. Removing paragraph (c);

c. Redesignating paragraphs (d), (e) and (f) as paragraphs (c), (d) and (e);

d. Revising newly redesignated paragraph (c), the introductory text of newly redesignated paragraph (d) and newly redesignated paragraph (e); and

e. Adding and reserving new paragraph (f).

The revisions read as follows:

### §240.13a-14 Certification of disclosure in annual and quarterly reports.

(a) Each report, including transition reports, filed on Form 10-Q, Form 10-QSB, Form 10-K, Form 10-KSB, Form 20-F or Form 40-F (§§249.308a, 249.308b, 249.310, 249.310b, 249.220f or 249.240f of this chapter) under section 13(a) of the Act (15 U.S.C. 78m(a)), other than a report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section), must include certifications in the form specified in the applicable exhibit filing requirements of such report and such certifications must be filed as an exhibit to such report. Each principal executive and principal financial officer of the issuer, or persons performing similar functions, at the time of filing of the report must sign a certification.

(b) Each periodic report containing financial statements filed by an issuer pursuant to section 13(a) of the Act (15 U.S.C. 78m(a)) must be accompanied by the certifications required by Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) and such certifications must be furnished as an exhibit to such report as specified in the applicable exhibit requirements for such report. Each principal executive and principal financial officer of the issuer (or equivalent thereof) must sign a certification. This requirement may be satisfied by a single certification signed by an issuer's principal executive and principal financial officers.

(c) A person required to provide a certification specified in paragraph (a) or (b) of this section may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.

(d) Each annual report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section) under section 13(a) of the Act (15 U.S.C. 78m(a)) must include a certification addressing the following items: * * *

(e) With respect to Asset-Backed Issuers, the certification required by paragraph (d) of this section must be signed by the trustee of the trust (if the trustee signs the annual report) or the senior officer in charge of securitization of the depositor (if the depositor signs the annual report). Alternatively, the senior officer in charge of the servicing function of the master servicer (or entity performing the equivalent functions) may sign the certification.

(f) [Reserved]

* * * * *

17. Section 240.13a-15 is revised to read as follows:

### §240.13a-15 Controls and procedures.

(a) Every issuer that has a class of securities registered pursuant to section 12http://www.law.uc.edu/CCL/34Act/sec12.html of the Act (15 U.S.C. 78l), other than an Asset-Backed Issuer (as defined in §240.13a-14(g)), a small business investment company registered on Form N-5 (§§ 239.24 and 274.5 of this chapter), or a unit investment trust as defined by section 4(2) of the Investment Company Act of 1940 (15 U.S.C. 80a-4(2)), must maintain disclosure controls and procedures (as defined in paragraph (e) of this section) and internal control over financial reporting (as defined in paragraph (f) of this section).

(b) Each such issuer's management must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter, except that management must perform this evaluation:

(1) In the case of a foreign private issuer (as defined in §240.3b-4) as of the end of each fiscal year; and

(2) In the case of an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), within the 90-day period prior to the filing date of each report requiring certification under §270.30a-2 of this chapter.

(c) The management of each such issuer, other than an investment company registered under section 8 of the Investment Company Act of 1940, must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness, as of the end of each fiscal year, of the issuer's internal control over financial reporting. The framework on which management's evaluation of the issuer's internal control over financial reporting is based must be a suitable, recognized control framework that is established by a body or group that has followed due-process procedures, including the broad distribution of the framework for public comment.

(d) The management of each such issuer, other than an investment company registered under section 8 of the Investment Company Act of 1940, must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, any change in the issuer's internal control over financial reporting, that occurred during each of the issuer's fiscal quarters, or fiscal year in the case of a foreign private issuer, that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

(e) For purposes of this section, the term disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

(f) The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and

includes those policies and procedures that:

(1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

18. By amending §240.15d-14 by:

a. Revising paragraphs (a) and (b);

b. Removing paragraph (c);

c. Redesignating paragraphs (d), (e) and (f) as paragraphs (c), (d) and (e);

d. Revising newly redesignated paragraph (c), the introductory text of newly redesignated paragraph (d) and newly redesignated paragraph (e); and

e. Adding and reserving new paragraph (f).

The revisions read as follows.

### §240.15d-14 Certification of disclosure in annual and quarterly reports.

(a) Each report, including transition reports, filed on Form 10-Q, Form 10-QSB, Form 10-K, Form 10-KSB, Form 20-F or Form 40-F (§§249.308a, 249.308b, 249.310, 249.310b, 249.220f or 249.240f of this chapter) under section 15(d) of the Act (15 U.S.C. 78o(d)), other than a report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section), must include certifications in the form specified in the applicable exhibit filing requirements of such report and such certifications must be filed as an exhibit to such report. Each principal executive and principal financial officer of the issuer, or persons performing similar functions, at the time of filing of the report must sign a certification.

(b) Each periodic report containing financial statements filed by an issuer pursuant to section 15(d) of the Act (15 U.S.C. 78o(d)) must be accompanied by the certifications required by Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) and such certifications must be furnished as an exhibit to such report as specified in the applicable exhibit requirements for such report. Each principal executive and principal financial officer of the issuer (or equivalent thereof) must sign a certification. This requirement may be satisfied by a single certification

signed by an issuer's principal executive and principal financial officers.

(c) A person required to provide a certification specified in paragraph (a) or (b) of this section may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.

(d) Each annual report filed by an Asset-Backed Issuer (as defined in paragraph (g) of this section) under section 15(d) of the Act (15 U.S.C. 78o (d)), must include a certification addressing the following items: * * *

(e) With respect to Asset-Backed Issuers, the certification required by paragraph (d) of this section must be signed by the trustee of the trust (if the trustee signs the annual report) or the senior officer in charge of securitization of the depositor (if the depositor signs the annual report). Alternatively, the senior officer in charge of the servicing function of the master servicer (or entity performing the equivalent functions) may sign the certification.

(f) [Reserved]

* * * * *

19. Section 240.15d-15 is revised to read as follows:

## §240.15d-15 Controls and procedures.

(a) Every issuer that files reports under section 15(d) of the Act (15 U.S.C. 78o(d)), other than an Asset-Backed Issuer (as defined in §240.15d-14(g) of this chapter), a small business investment company registered on Form N-5 (§§239.24 and 274.5 of this chapter), or a unit investment trust as defined in section 4(2) of the Investment Company Act of 1940 (15 U.S.C. 80a-4(2)), must maintain disclosure controls and procedures (as defined in paragraph (e) of this section) and internal control over financial reporting (as defined in paragraph (f) of this section).

(b) Each such issuer's management must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the issuer's disclosure controls and procedures, as of the end of each fiscal quarter, except that management must perform this evaluation:

(1) In the case of a foreign private issuer (as defined in §240.3b-4) as of the end of each fiscal year; and

(2) In the case of an investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8), within the 90-day period prior to the filing date of each report requiring certification under §270.30a-2 of this chapter.

(c) The management of each such issuer, other than an investment company registered under section 8 of the Investment Company Act of 1940, must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness, as of the end of each fiscal year, of the issuer's

internal control over financial reporting. The framework on which management's evaluation of the issuer's internal control over financial reporting is based must be a suitable, recognized control framework that is established by a body or group that has followed due-process procedures, including the broad distribution of the framework for public comment.

(d) The management of each such issuer, other than an investment company registered under section 8 of the Investment Company Act of 1940, must evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, any change in the issuer's internal control over financial reporting, that occurred during each of the issuer's fiscal quarters, or fiscal year in the case of a foreign private issuer, that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

(e) For purposes of this section, the term disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

(f) The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

## PART 249 - FORMS, SECURITIES EXCHANGE ACT OF 1934

20. The general authority citation for Part 249 and the subauthority citation for "Section 249.331" are revised to read as follows:

Authority: 15 U.S.C. 78a et seq., 7202, 7233, 7241, 7262, 7264, and 7265; and 18 U.S.C. 1350, unless otherwise noted.

\* \* \* \* \*

Section 249.331 is also issued under 15 U.S.C. 78j-1, 7202, 7233, 7241, 7264, 7265; and 18 U.S.C. 1350.

\* \* \* \* \*

21. By amending Form 10-Q (referenced in §249.308a) by:

a. Removing the last sentence of General Instruction G;

b. Revising Item 4 to "Part I - Financial Information;" and

c. Removing the "Certifications" section after the "Signatures" section.

The revision reads as follows.

**Note: The text of Form 10-Q does not, and this amendment will not, appear in the Code of Federal Regulations.**

## FORM 10-Q

\* \* \* \* \*

### Part I - Financial Information

\* \* \* \* \*

### Item 4. Controls and Procedures.

Furnish the information required by Items 307 of Regulation S-K (17 CFR 229.307) and 308(c) of Regulation S-K (17 CFR 229.308(c)).

\* \* \* \* \*

22. By amending Form 10-QSB (referenced in §249.308b) by:

a. Removing the last sentence of paragraph 2 of General Instruction F;

b. Revising Item 3 to "Part I - Financial Information;" and

c. Removing the "Certifications" section after the "Signatures" section.

The revision reads as follows.

**Note: The text of Form 10-QSB does not, and this amendment will**

## not, appear in the Code of Federal Regulations.

### FORM 10-QSB

\* \* \* \* \*

### Part I - Financial Information

\* \* \* \* \*

### Item 3. Controls and Procedures.

Furnish the information required by Items 307 of Regulation S-B (17 CFR 228.307) and 308(c) of Regulation S-B (17 CFR 228.308(c)).

\* \* \* \* \*

23. By amending Form 10-K (referenced in § 249.310) by:

a. Removing the phrase "(who also must provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form)" each time it appears in the first sentence of paragraph (2)(a) of General Instruction D.;

b. Removing the phrase "(Items 1 through 9 or any portion thereof)" and adding, in its place, the phrase "(Items 1 through 9A or any portion thereof)" in the first sentence of paragraph (2) of General Instruction G.;

c. Removing the phrase "(Items 10, 11, 12 and 13)" and adding, in its place, the phrase "(Items 10, 11, 12, 13 and 14)" in the first sentence of paragraph (3) of General Instruction G.;

d. Removing the phrase "(Items 1 through 9)" in the third sentence of paragraph (4) of General Instruction G and adding, in its place, the phrase "(Items 1 through 9A)";

e. Removing the phrase "(Items 10 through 13)" in the third sentence of paragraph (4) of General Instruction G and adding, in its place, the phrase "(Items 10 through 14)";

f. Redesignating Item 14 of Part III as Item 9A of Part II and revising newly redesignated Item 9A;

g. Redesignating Item 15 in Part III as Item 14;

h. "Instruction to Item 15" is corrected to read "Instruction to Item 14";

i. Redesignating Item 16 in Part IV as Item 15;

j. Removing the "Certifications" section after the "Signatures" section and before the reference to "Supplemental Information to be Furnished With Reports Filed Pursuant to Section 15(d) of the Act by Issuers Which Have Not Registered Securities Pursuant to Section 12 of the Act."

The revision reads as follows.

**Note: The text of Form 10-K does not, and this amendment will not, appear in the Code of Federal Regulations.**

<div align="center">

**Form 10-K**

* * * * *

**PART II**

* * * * *

</div>

### Item 9A. Controls and procedures.

Furnish the information required by Items 307 and 308 of Regulation S-K (17 CFR 229.307 and 229.308).

24. By amending Form 10-KSB (referenced in § 249.310b) by:

a. Removing the phrase "(who also must provide the certification required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14) exactly as specified in this form)" each time it appears in the first sentence of paragraph 2 of General Instruction C.;

b. Redesignating Item 14 of Part III as Item 8A of Part II and revising newly redesignated Item 8A;

c. Redesignating Item 15 of Part III as Item 14;

d. "Instruction to Item 15" is corrected to read "Instruction to Item 14";

e. Revising Item 2 of Part III of "INFORMATION REQUIRED IN ANNUAL REPORT OF TRANSITIONAL SMALL BUSINESS ISSER"; and

f. Removing the "Certifications" section after the "Signatures" section and before the reference to "Supplemental Information to be Furnished With Reports Filed Pursuant to Section 15(d) of the Exchange Act By Non-reporting Issuers."

**Note: The text of Form 10-KSB does not, and this amendment will not, appear in the Code of Federal Regulations.**

<div align="center">

**Form 10-KSB**

* * * * *

**PART II**

* * * * *

</div>

### Item 8A. Controls and Procedures

Furnish the information required by Items 307 of Regulation S-B (17 CFR 228.307) and 308 of Regulation S-B (17 CFR 228.308).

\* \* \* \* \*

## INFORMATION REQUIRED IN ANNUAL REPORT OF TRANSITIONAL SMALL BUSINESS ISSER

\* \* \* \* \*

## **PART III**

\* \* \* \* \*

Item 2. Description of Exhibits.

As appropriate, the issuer should file those documents required to be filed as Exhibit Number 2, 3, 5, 6, and 7 in Part III of Form 1-A. The registrant also shall file:

(12) Additional exhibits - Any additional exhibits which the issuer may wish to file, which shall be so marked as to indicate clearly the subject matters to which they refer.

(13) Form F-X - Canadian issuers shall file a written irrevocable consent and power of attorney on Form F-X.

(31) The exhibit described in paragraph (b)(31) of Item 601 of Regulation S-B.

(32) The exhibit described in paragraph (b)(32) of Item 601 of Regulation S-B.

25. By amending Form 20-F (referenced in §249.220f) by:

a. Revising paragraph (e) to General Instruction B;

b. Revising Item 15 of Part II;

c. Removing the phrase "internal controls and procedures for financial reporting" in paragraph (b)(4) of Item 16A of Part II and adding, in its place, the phrase "internal control over financial reporting";

d. Removing the "Certifications" section after the "Signatures" section and before the section referencing "Instructions as to Exhibits"; and

e. In the "Instruction as to Exhibits" section, redesignate paragraph 12 as paragraph 14 and add new paragraph 12 and paragraph 13.

The revisions and addition read as follows.

**Note: The text of Form 20-F does not, and this amendment will not,**

**appear in the Code of Federal Regulations.**

**FORM 20-F**

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

**B. General Rules and Regulations That Apply to this Form.**

\* \* \* \* \*

(e) Where the Form is being used as an annual report filed under Section 13 (a) or 15(d) of the Exchange Act, provide the certifications required by Rule 13a-14 (17 CFR 240.13a-14) or Rule 15d-14 (17 CFR 240.15d-14).

\* \* \* \* \*

**PART II**

\* \* \* \* \*

**Item 15. Controls and Procedures.**

(a) Disclosure Controls and Procedures. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, disclose the conclusions of the issuer's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the issuer's disclosure controls and procedures (as defined in 17 CFR 240.13a-15(e) or 240.15d-15(e)) as of the end of the period covered by the report, based on the evaluation of these controls and procedures required by paragraph (b) of 17 CFR 240.13a-15 or 240.15d-15.

(b) Management's annual report on internal control over financial reporting. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, provide a report of management on the issuer's internal control over financial reporting (as defined in 17 CFR 240.13a-15(f) or 240.15d-15(f)) that contains:

(1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the issuer;

(2) A statement identifying the framework used by management to evaluate the effectiveness of the issuer's internal control over financial reporting as required by paragraph (c) of 17 CFR 240.13a-15 or 240.15d-15;

(3) Management's assessment of the effectiveness of the issuer's internal control over financial reporting as of the end of the issuer's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the issuer's internal control over financial

reporting identified by management. Management is not permitted to conclude that the issuer's internal control over financial reporting is effective if there are one or more material weaknesses in the issuer's internal control over financial reporting; and

(4) A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the issuer's internal control over financial reporting.

(c) Attestation report of the registered public accounting firm. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, provide the registered public accounting firm's attestation report on management's assessment of the issuer's internal control over financial reporting in the issuer's annual report containing the disclosure required by this Item.

(d) Changes in internal control over financial reporting. Disclose any change in the issuer's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of 17 CFR 240.13a-15 or 240.15d-15 that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

Instructions to Item 15.

1. The issuer must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the issuer's internal control over financial reporting.

2. An issuer that is an Asset-Backed Issuer (as defined in 17 CFR 240.13a-14(g) and 17 CFR 240.15d-14(g)) is not required to disclose the information required by this Item.

\* \* \* \* \*

## Instructions as to Exhibits

\* \* \* \* \*

12. The certifications required by Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR 240.15d-14(a)) exactly as set forth below:

## **CERTIFICATIONS\***

I, [identify the certifying individual], certify that:

1. I have reviewed this annual report on Form 20-F of [identify company];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in

the company's internal control over financial reporting.

Date: ...............

_____

[Signature]
[Title]

\* Provide a separate certification for each principal executive officer and principal financial officer of the company. See Rules 13a-14(a) and 15d-14 (a).

13. (a) The certifications required by Rule 13a-14(b) (17 CFR 240.13a-14 (b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350).

(b) A certification furnished pursuant to Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) will not be deemed "filed" for purposes of Section 18 of the Exchange Act [15 U.S.C. 78r], or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the company specifically incorporates it by reference.

26. By amending Form 40-F (referenced in §249.240f) by:

a. Revising paragraph (6) to General Instruction B; and

b. Removing the phrase "internal controls and procedures for financial reporting" and adding, in its place, the phrase "internal control over financial reporting" in paragraph (8)(b)(4) of General Instruction B; and

c. Removing the "Certifications" section after the "Signatures" section.

The revision reads as follows.

**Note: The text of Form 40-F does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 40-F**

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

**B. Information To Be Filed on this Form**

\* \* \* \* \*

(6) Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act:

(a) (1) Provide the certifications required by Rule 13a-14(a) (17 CFR 240.13a-14(a)) or Rule 15d-14(a) (17 CFR 240.15d-14(a)) as an exhibit to this report exactly as set forth below.

## CERTIFICATIONS*

I, [identify the certifying individual], certify that:

1. I have reviewed this annual report on Form 40-F of [identify issuer];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the issuer and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal

control over financial reporting; and

5. The issuer's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

Date: ...............

[Signature]
[Title]

\* Provide a separate certification for each principal executive officer and principal financial officer of the issuer. See Rules 13a-14(a) and 15d-14(a).

(2) (i) Provide the certifications required by Rule 13a-14(b) (17 CFR 240.13a-14(b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) as an exhibit to this report.

(ii) A certification furnished pursuant to Rule 13a-14(b) (17 CFR 240.13a-14 (b)) or Rule 15d-14(b) (17 CFR 240.15d-14(b)) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) will not be deemed "filed" for purposes of Section 18 of the Exchange Act [15 U.S.C. 78r], or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except to the extent that the issuer specifically incorporates it by reference.

(b) Disclosure Controls and Procedures. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, disclose the conclusions of the issuer's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the issuer's disclosure controls and procedures (as defined in 17 CFR 240.13a-15(e) or 240.15d-15(e)) as of the end of the period covered by the report, based on the evaluation of these controls and procedures required by paragraph (b) of 17 CFR 240.13a-15 or 240.15d-15.

(c) Management's annual report on internal control over financial reporting. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, provide a report of management on the issuer's internal control over financial reporting (as defined in 17 CFR

240.13a-15(f) or 240.15d-15(f)) that contains:

(1) A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the issuer;

(2) A statement identifying the framework used by management to evaluate the effectiveness of the issuer's internal control over financial reporting as required by paragraph (c) of 17 CFR 240.13a-15 or 240.15d-15;

(3) Management's assessment of the effectiveness of the issuer's internal control over financial reporting as of the end of the issuer's most recent fiscal year, including a statement as to whether or not internal control over financial reporting is effective. This discussion must include disclosure of any material weakness in the issuer's internal control over financial reporting identified by management. Management is not permitted to conclude that the issuer's internal control over financial reporting is effective if there are one or more material weaknesses in the issuer's internal control over financial reporting; and

(4) A statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the issuer's internal control over financial reporting.

(d) Attestation report of the registered public accounting firm. Where the Form is being used as an annual report filed under Section 13(a) or 15(d) of the Exchange Act, provide the registered public accounting firm's attestation report on management's assessment of internal control over financial reporting in the annual report containing the disclosure required by this Item.

(e) Changes in internal control over financial reporting. Disclose any change in the issuer's internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of 17 CFR 240.13a-15 or 240.15d-15 that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

Instructions to paragraphs (b), (c), (d) and (e) of General Instruction B. 6.

1. The issuer must maintain evidential matter, including documentation, to provide reasonable support for management's assessment of the effectiveness of the issuer's internal control over financial reporting.

2. An issuer that is an Asset-Backed Issuer (as defined in 17 CFR 240.13a-14(g) and 240.15d-14(g)) is not required to disclose the information required by this Item.

\* \* \* \* \*

## PART 270 - RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940

27. The authority citation for Part 270 is amended by revising the

subauthority citation for "Section 270.30a-2" to read as follows:

Authority: 15 U.S.C. 80a-1 et seq., 80a-34(d), 80a-37, and 80a-39, unless otherwise noted.

\* \* \* \* \*

Section 270.30a-2 is also issued under 15 U.S.C. 78m, 78o(d), 80a-8, 80a-29, 7202, and 7241; and 18 U.S.C. 1350, unless otherwise noted.

\* \* \* \* \*

28. By revising the last sentence of §270.8b-15 to read as follows:

### §270.8b-15 Amendments.

\* \* \* An amendment to any report required to include the certifications as specified in §270.30a-2(a) must include new certifications by each principal executive and principal financial officer of the registrant, and an amendment to any report required to be accompanied by the certifications as specified in §240.13a-14(b) or §240.15d-14(b) and §270.30a-2(b) must be accompanied by new certifications by each principal executive and principal financial officer of the registrant.

29. Section 270.30a-2 is revised to read as follows:

### §270.30a-2 Certification of Form N-CSR.

(a) Each report filed on Form N-CSR (§§249.331 and 274.128 of this chapter) by a registered management investment company must include certifications in the form specified in Item 10(a)(2) of Form N-CSR and such certifications must be filed as an exhibit to such report. Each principal executive and principal financial officer of the investment company, or persons performing similar functions, at the time of filing of the report must sign a certification.

(b) Each report on Form N-CSR filed by a registered management investment company under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d)) and that contains financial statements must be accompanied by the certifications required by Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) and such certifications must be furnished as an exhibit to such report as specified in Item 10(b) of Form N-CSR. Each principal executive and principal financial officer of the investment company (or equivalent thereof) must sign a certification. This requirement may be satisfied by a single certification signed by an investment company's principal executive and principal financial officers.

(c) A person required to provide a certification specified in paragraph (a) or (b) of this section may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.

30. By revising §270.30a-3 to read as follows:

## § 270.30a-3 Controls and procedures.

(a) Every registered management investment company, other than a small business investment company registered on Form N-5 (§§239.24 and 274.5 of this chapter), must maintain disclosure controls and procedures (as defined in paragraph (c) of this section) and internal control over financial reporting (as defined in paragraph (d) of this section).

(b) Each such registered management investment company's management must evaluate, with the participation of the company's principal executive and principal financial officers, or persons performing similar functions, the effectiveness of the company's disclosure controls and procedures, within the 90-day period prior to the filing date of each report on Form N-CSR (§§ 249.331 and 274.128 of this chapter).

(c) For purposes of this section, the term disclosure controls and procedures means controls and other procedures of a registered management investment company that are designed to ensure that information required to be disclosed by the investment company on Form N-CSR (§§249.331 and 274.128 of this chapter) is recorded, processed, summarized, and reported within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an investment company in the reports that it files or submits on Form N-CSR is accumulated and communicated to the investment company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

(d) The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the registered management investment company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

(1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the investment company;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the investment company are being made only in accordance with authorizations of management and directors of the investment company; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the investment company's assets that could have a material effect on the financial statements.

## PART 249 - FORMS, SECURITIES EXCHANGE ACT OF 1934

## PART 274 - FORMS PRESCRIBED UNDER THE INVESTMENT COMPANY ACT OF

### 1940

31. The authority citation for Part 274 is amended by revising the authority citation for "Section 274.128" to read as follows:

Authority: 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 78c(b), 78l, 78m, 78n, 78o (d), 80a-8, 80a-24, 80a-26, and 80a-29, unless otherwise noted.

\* \* \* \* \*

Section 274.128 is also issued under 15 U.S.C. 78j-1, 7202, 7233, 7241, 7264, and 7265; and 18 U.S.C. 1350.

32. Form N-SAR (referenced in §§ 249.330 and 274.101) is amended by revising the reference "internal controls and procedures for financial reporting" in paragraph (b)(6)(iv) of the Instruction to Sub-Item 102P3 to read "internal control over financial reporting".

33. Form N-CSR (referenced in §§ 249.331 and 274.128) is amended by:

a. In General Instruction D, revising the reference "Items 4, 5, and 10(a)" to read "Items 4, 5, and 10(a)(1)";

b. Revising paragraph 2.(a) of General Instruction F;

c. In paragraph (c) of Item 2, revising the reference "Item 10(a)" to read "Item 10(a)(1)";

d. In paragraph (f)(1) of Item 2, revising the reference "Item 10(a)" to read "Item 10(a)(1)";

e. In paragraph (b)(4) of Item 3, revising the reference "internal controls and procedures for financial reporting" to read "internal control over financial reporting";

f. Revising Item 9; and

g. In Item 10:

(i) The introductory text and paragraphs (a) and (b) are redesignated as paragraphs (a), (a)(1) and (a)(2), respectively;

(ii) Revising newly redesignated paragraph (a) and newly redesignated paragraph (a)(2); and

(iii) Adding new paragraph (b) and an Instruction to Item 10.

The revisions and additions read as follows.

**Note: The text of Form N-CSR does not, and these amendments will not, appear in the Code of Federal Regulations.**

**FORM N-CSR**

\* \* \* \* \*

**GENERAL INSTRUCTIONS**

\* \* \* \* \*

**F. Signature and Filing of Report.**

\* \* \* \* \*

2. (a) The report must be signed by the registrant, and on behalf of the registrant by its principal executive and principal financial officers.

\* \* \* \* \*

### Item 9. Controls and Procedures.

(a) Disclose the conclusions of the registrant's principal executive and principal financial officers, or persons performing similar functions, regarding the effectiveness of the registrant's disclosure controls and procedures (as defined in Rule 30a-3(c) under the Act (17 CFR 270.30a-3 (c))) as of a date within 90 days of the filing date of the report that includes the disclosure required by this paragraph, based on the evaluation of these controls and procedures required by Rule 30a-3(b) under the Act (17 CFR 270.30a-3(b)) and Rules 13a-15(b) or 15d-15(b) under the Exchange Act (17 CFR 240.13a-15(b) or 240.15d-15(b)).

(b) Disclose any change in the registrant's internal control over financial reporting (as defined in Rule 30a-3(d) under the Act (17 CFR 270.30a-3(d)) that occurred during the registrant's last fiscal half-year (the registrant's second fiscal half-year in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

### Item 10. Exhibits.

(a) File the exhibits listed below as part of this Form.

\* \* \* \* \*

(a)(2) A separate certification for each principal executive and principal financial officer of the registrant as required by Rule 30a-2(a) under the Act (17 CFR 270.30a-2(a)), exactly as set forth below:

### CERTIFICATIONS

I, [identify the certifying individual], certify that:

1. I have reviewed this report on Form N-CSR of [identify registrant];

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, changes in net assets, and cash flows (if the financial statements are required to include a statement of cash flows) of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) and internal control over financial reporting (as defined in Rule 30a-3(d) under the Investment Company Act of 1940) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal half-year (the registrant's second fiscal half-year in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process,

summarize, and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: ...............

[Signature]
[Title]

(b) If the report is filed under Section 13(a) or 15(d) of the Exchange Act, provide the certifications required by Rule 30a-2(b) under the Act (17 CFR 270.30a-2(b)), Rule 13a-14(b) or Rule 15d-14(b) under the Exchange Act (17 CFR 240.13a-14(b) or 240.15d-14(b)), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350) as an exhibit. A certification furnished pursuant to this paragraph will not be deemed "filed" for purposes of

Section 18 of the Exchange Act (15 U.S.C. 78r), or otherwise subject to the liability of that section. Such certification will not be deemed to be incorporated by reference into any filing under the Securities Act of 1933 or the Exchange Act, except to the extent that the registrant specifically incorporates it by reference.

Instruction to Item 10.

Letter or number the exhibits in the sequence that they appear in this item.

\* \* \* \* \*

By the Commission.

J. Lynn Taylor
Assistant Secretary

June 5, 2003

1    17 CFR 228.10 et seq.

2    17 CFR 229.10 et seq.

3    17 CFR 249.310.

4    17 CFR 249.310b.

5    17 CFR 249.308a.

6    17 CFR 249.308b.

7    17 CFR 249.220f.

8   17 CFR 249.240f.

9   17 CFR 240.12b-15.

10   17 CFR 240.13a-14.

11   17 CFR 240.13a-15.

12   17 CFR 140.15d-14.

13   17 CFR 240.15d-15.

14   15 U.S.C. 78a et seq.

15   17 CFR 210.1-02 and 2-02.

16   17 CFR 210.1-01 et seq.

17   17 CFR 270.8b-15.

18   17 CFR 270.30a-2.

19   17 CFR 270.30a-3.

20   15 U.S.C. 80a-1 et seq.

21   17 CFR 249.331; 17 CFR 274.128.

22   17 CFR 249.330; 17 CFR 274.101.

23   Pub. L. 107-204, 116 Stat. 745 (2002).

24   Section 404 of the Sarbanes-Oxley Act does not apply to any registered
     investment company due to an exemption in Section 405 of the Sarbanes-
     Oxley Act. See sec. 405 of Pub. L. 107-204, 116 Stat. 745 (2002).

25   On April 25, 2003, the Commission approved the PCAOB's adoption of the
     auditing and attestation standards in existence as of April 16, 2003 as interim
     auditing and attestation standards. See Release No. 33-8222 (Apr. 25, 2003)
     [68 FR 23335].

26   Release No. 33-8138 (Oct. 22, 2002) [67 FR 66208] ("Proposing Release").
     The public comments we received can be viewed in our Public Reference
     Room at 450 Fifth Street, NW, Washington, DC 20549, in File No. S7-40-02.
     Public comments submitted by electronic mail are available on our website,
     www.sec.gov.

27   The commenters on File No. S7-40-02 are as follows: Academics Paul Walker,
     Ph.D., CPA; Accounting Firms BDO Seidman, LLP; Deloitte & Touche LLP;
     Ernst & Young LLP; KPMG LLP; PricewaterhouseCoopers LLP; Associations
     America's Community Bankers; American Bankers Association; American Bar
     Association; American Corporate Counsel Association; American Institute of
     Certified Public Accountants; Association for Financial Professionals; the
     Association of the Bar of the City of New York; Association for Investment
     Management and Research; the Business Roundtable; Community Bankers
     Association of New York State; Edison Electric Institute; Financial Executives
     International; Independent Community Bankers of America; the Institute of
     Internal Auditors; Maine Bankers Association; Manufacturers Alliance/MAPI
     Inc.; Massachusetts Bankers Association; National Association of Real Estate
     Investment Trusts; New York Bankers Association; New York County Lawyers'
     Association; New York State Bar Association; Software & Information Industry
     Association; Software Finance and Tax Executives Council; Wisconsin Bankers
     Association; Corporations Cardinal Health, Inc.; Compass Bancshares, Inc.;
     Computer Sciences Corporation; Eastman Kodak Company; Eli Lilly and

Company; Emerson Electric Co.; Executive Responsibility Advisors, LLC; Greif Bros.; Intel Corporation; International Paper Company; Protiviti; Government Entities Federal Reserve Bank of Atlanta; Small Business Administration; Law Firms Dykema Gossett PLLC; Karr Tuttle Campbell; Fried, Frank, Harris, Shriver and Jacobson; Sutherland, Asbill & Brennan LLP; Individuals Thomas Damman; D. Scott Huggins; Tim J. Leech; Simon Lorne; Ralph Saul; Lee Squire; Robert J. Stuckey; Foreign Companies Siemens Aktiengesellcraft; International Entities British Bankers Association; British Embassy; Canadian Bankers Association; Confederation of British Industry; European Commission; Institute of Chartered Accountants of England and Wales.

28  15 U.S.C. 78m(a) or 78o(d). Section 13(a) of the Exchange Act requires every issuer of a security registered pursuant to Section 12 of the Exchange Act [15 U.S.C. 78l] to file with the Commission such annual reports and such quarterly reports as the Commission may prescribe. Section 15(d) of the Exchange Act requires each issuer that has filed a registration statement that has become effective pursuant to the Securities Act of 1933 [15 U.S.C. 77a et seq.] (the "Securities Act") to file such supplementary and periodic information, documents and reports as may be required pursuant to Section 13 in respect of a security registered pursuant to Section 12, unless the duty to file under Section 15(d) has been suspended for any fiscal year. See Exchange Act Rule 12h-3 [17 CFR 240.12h-3].

29  18 U.S.C. 1350.

30  See Release No. 34-46300 (Aug. 2, 2002) [67 FR 51508] at n. 11, containing supplemental information on the Commission's original certification proposal in light of the enactment of the Sarbanes-Oxley Act of 2002.

31  See Release No. 33-8124 (Aug. 28, 2002) [67 FR 57276] .

32  See Release No. IC-25914 (Jan. 27, 2003) [68 FR 5348].

33  See Release No. 33-8212 (Mar. 21, 2003) [68 FR 15600].

34  These methods have included: (1) submitting the statement as non-public paper correspondence; (2) submitting the statement as non-public electronic correspondence with the EDGAR filing of the periodic report; (3) submitting the statement under (1) or (2) above supplemented by an Item 9 Form 8-K report so that the statement is publicly available; (4) submitting the statement as an exhibit to the periodic report; and (5) submitting the statement in the text of the periodic report (typically, below the signature block for the report).

35  We proposed to use this term throughout the rules implementing the annual internal control report requirements of Section 404 of the Sarbanes-Oxley Act, as well as the revised Sarbanes-Oxley Section 302 certification requirements, to complement the defined term "disclosure controls and procedures" referred to in the Section 302 requirements. Congress used the term "internal controls" in Section 302 and "internal control structure and procedures for financial reporting" in Section 404.

36  For a history of the development of internal control standards, see Steven J. Root, Beyond COSO-Internal Control to Enhance Corporate Governance (1998).

37  In 1941, the Commission adopted amendments to Rules 2-02 and 3-07 of Regulation S-X that formally codified this practice. See Accounting Series Release No. 21 (Feb. 5, 1941) [11 FR 10921].

38  An early definition for the term appeared in Internal Control--Elements Of a Coordinated System and Its Importance to Management and the Independent Public Accountant, a report published in 1949 by the American Institute of Accountants, the predecessor to the American Institute of Certified Public

Accountants ("AICPA"). The report defined internal control to mean "the plan of organization and all of the coordinate methods and measures adopted within a business to safeguard its assets, check the accuracy and reliability of its accounting data, promote operational efficiency, and encourage adherence to prescribed managerial policies." Subsequent definitions of the term attempted to clarify the distinction by labeling the controls relevant to an audit as "internal accounting controls" and the non-accounting controls as "administrative controls." The AICPA officially dropped these distinctions in 1988. See Root, at p. 76.

39    Title I of Pub. Law No. 95-213 (1977). Beginning in 1973, as a result of the work of the Office of the Watergate Special Prosecutor, the Commission became aware of a pattern of conduct involving the use of corporate funds for illegal domestic political contributions. A subsequent Commission investigation revealed that instances of undisclosed questionable or illegal corporate payments--both domestic and foreign--were widespread. On May 12, 1976, the Commission submitted to the Senate Banking, Housing and Urban Affairs Committee a report entitled Report on Questionable and Illegal Corporate Payments and Practices. The report described and analyzed the Commission's investigation concerning improper corporate payments and outlined legislative and other responses that the Commission recommended to remedy these problems. One of the Commission's recommendations was that Congress enact legislation aimed expressly at enhancing the accuracy of the corporate books and records and the reliability of the audit process.

40    See Exchange Act Section 13(b)(2) [15 U.S.C. 78m(b)(2)].

41    The Treadway Commission was sponsored by the AICPA, the American Accounting Association, the Financial Executives International (formerly Financial Executives Institute), the Institute of Internal Auditors and the Institute of Management Accountants (formerly the National Association of Accountants). The Treadway Commission's report, the Report of the National Commission on Fraudulent Financial Reporting (Oct. 1987), is available at www.coso.org.

42    See COSO, Internal Control-Integrated Framework (1992) ("COSO Report"). In 1994, COSO published an addendum to the Reporting to External Parties volume of the COSO Report. The addendum discusses the issue of, and provides a vehicle for, expanding the scope of a public management report on internal control to address additional controls pertaining to safeguarding of assets. In 1996, COSO issued a supplement to its original framework to address the application of internal control over financial derivative activities.

43    Auditing Standards Board, AICPA, Statement on Auditing Standards No. 78, Consideration of Internal Control in a Financial Statement Audit: An Amendment to Statement on Auditing Standards No. 55 (1995).

44    See letters regarding File No. S7-40-02 of: America's Community Bankers ("ACB"); American Corporate Counsel Association ("ACCA"); American Institute of Certified Public Accountants ("AICPA"); Compass Bancshares, Inc. ("Compass"); Computer Sciences Corporation ("CSC"); the Edison Electric Institute ("EEI"); the Independent Community Bankers of America ("ICBA"); the Institute of Internal Auditors ("IIA"); the Association of the Bar of the City of New York, Committee on Corporate Law ("NYCB-CCL"); Protiviti; and Siemens AG.

45    See letters regarding File No. S7-40-02 of ACB and ICBA.

46    See letters regarding File No. S7-40-02 of: the American Bar Association, Committee on the Federal Regulation of Securities and the Committee on Law and Accounting ("ABA"); the Federal Reserve Bank of Atlanta ("FED"); IIA; Simon Lorne ("Lorne"); and Pricewaterhouse Coopers LLP ("PwC").

47    See ABA letter regarding File No. S7-40-02.

48  See letters regarding File No. S7-40-02 of: AICPA; Compass; Deloitte & Touche LLP ("D&T"); IIA; KPMG LLP ("KPMG"); and PwC.

49  See new Item 308 of Regulations S-K and S-B, amended Items 1-02 and 2-02 of Regulation S-X; amended Items 307and 401 of Regulations S-K and S-B; amended Exchange Act Rules 13a-14, 13a-15, 15d-14 and 15d-15; and amended Forms 20-F and 40-F.

50  The COSO Report states that the composition of a company's board and audit committee, and how the directors fulfill their responsibilities related to the financial reporting process, are key aspects of the company's control environment. An important element of the company's internal control over financial reporting "...is the involvement of the board or audit committee in overseeing the financial reporting process, including assessing the reasonableness of management's accounting judgments and estimates and reviewing key filings with regulatory agencies." See COSO Report at 130. The Commission similarly has stated in the past that both a company's management and board have important roles to play in establishing a supportive control environment. In its 1981 Statement of Policy regarding the FCPA, the Commission stated, "In the last analysis, the key to an adequate `control environment' is an approach on the part of the board and top management which makes clear what is expected and that conformity to these expectations will be rewarded while breaches will be punished." See Release No. 34-17500 (Jan. 29, 1981) [46 FR 11544].

51  See amended Exchange Act Rules 13a-14(d) and 15d-14(d). The scope of the term "preparation of financial statements in accordance with generally accepted accounting principles" in the definition encompasses financial statements prepared for regulatory reporting purposes.

52  Codification of Statements on Auditing Standards Section 317 requires auditors to consider a company's compliance with laws and regulations that have a direct and material effect on the financial statements.

53  15 U.S.C. 78m(b)(2)(B).

54  Section 103 of the Sarbanes-Oxley Act requires the PCAOB to establish by rule standards to be used by registered public accounting firms in the preparation and issuance of audit reports. In carrying out this responsibility, the PCAOB must include in the auditing standards that it adopts, among other things: a requirement that each registered public accounting firm describe in each audit report the scope of its testing of the company's internal control structure and procedures performed in fulfilling its internal control evaluation and reporting required by Section 404(b) of the Sarbanes-Oxley Act; present in the audit report (or attestation report) its findings from such testing; and an evaluation of whether the company's internal control structure and procedures: (1) include maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the company's assets; and (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with the authorization of management and directors of the company. In the audit report (or attestation report), the registered public accounting firm also must describe, at a minimum, material weaknesses in such internal controls and any material noncompliance found on the basis of such testing. See Sections 103(a)(2)(A) (iii)(I), (II) and (III) of the Sarbanes-Oxley Act. See also, Interim Professional Attestation Standards Rule 3300T, adopted in PCAOB Release No. 2003-006 (Apr. 18, 2003), and approved by the Commission on April 25, 2003.

55  Control procedures were described as policies and procedures in addition to the control environment and accounting system that management established to provide reasonable assurance that specific entity objectives will be

achieved. SAS 55 also states that control procedures may generally be categorized as procedures that include, among other things, "adequate safeguards over access to and use of assets and records, such as secured facilities and authorization for access to computer programs and data files." See Statement on Auditing Standards No. 55, paragraph no. 11.

56 See COSO "Addendum to Reporting to External Parties," Internal Control-Integrated Framework, (1994) ("1994 Addendum") at p. 154.

57 The COSO Report states: "Although these [objectives relating to safeguarding of resources] are primarily operations objectives, certain aspects of safeguarding can fall under other categories. . . [T]he goal of ensuring that any such asset losses are properly reflected in the entity's financial statements represents a financial reporting objective." The category in which an objective falls can sometimes depend on the circumstances. Continuing the discussion of safeguarding of assets, controls to prevent theft of assets - such as maintaining a fence around inventory and a gatekeeper verifying proper authorization of requests for movement of goods - fall under the operations category. These controls normally would not be relevant to the reliability of financial statement preparation, because any inventory losses would be detected pursuant to periodic physical inspection and recorded in the financial statements. However, if for financial reporting purposes management relies solely on perpetual inventory records, as may be the case for interim reporting, the physical security controls would then also fall within the financial reporting category. This is because these physical security controls, along with other controls over the perpetual inventory records, would be needed to ensure reliable financial reporting. Id. at 37.

58 As stated in n. 1 to the 1994 Addendum, the FCPA requires companies, among other things, to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary ... to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

59 See letters regarding File No. S7-40-02 of: ABA; CSC; EEI; FED; Eastman Kodak Co. ("Kodak"); KPMG; Protiviti; and PwC.

60 See letters regarding File No. S7-40-02 of: ACCA and Financial Executives Institute ("FEI").

61 See letters regarding File No. S7-40-02 of: AICPA; BDO Seidman, LLP ("BDO"); D&T; Ernst & Young LLP ("E&Y"); KPMG; and PwC.

62 Management must state whether or not the company's internal control over financial reporting is effective. A negative assurance statement indicating that nothing has come to management's attention to suggest that the company's internal control over financial reporting is not effective will not be acceptable.

63 A "material weakness" is defined in Statement on Auditing Standards No. 60 (codified in Codification of Statements on Auditing Standards AU §325) as a reportable condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by errors or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions. See discussion in Section II.B.3.b. below.

64 See new Item 308 of Regulations S-B and S-K, Item 15 of Form 20-F and General Instruction B(6) of Form 40-F.

65 Many commenters cited the absence of evaluative criteria in AU §319 in their arguments against the reference to AU §319 in our proposed definition of "internal controls and procedures for financial reporting."

66 See amended Exchange Act Rule 13a-15(c) or 15d-15(c), amended Item 15 of Form 20-F and amended General Instruction (B) to Form 40-F.

67 The Guidance on Assessing Control published by the Canadian Institute of Chartered Accountants and the Turnbull Report published by the Institute of Chartered Accountants in England & Wales are examples of other suitable frameworks.

68 We are aware that some of the evaluation frameworks used to assess a foreign company's internal controls in its home country do not require a statement regarding whether the company's system of internal control has been effective. Under our final rules, management of a foreign reporting company who relies on such an evaluation framework used in its home country is nevertheless under an obligation to state affirmatively whether its company's internal controls are, or are not, effective.

69 See AT §101, paragraph 24.

70 See Release No. 33-8183 (Jan. 28, 2003) [68 FR 6006].

71 Management's acceptance of responsibility for the documentation and testing performed by the auditor does not satisfy the auditor independence rules.

72 This is consistent with interim attestation standards. See AT §501.

73 The term "significant deficiency" has the same meaning as the term "reportable condition" as used in AU §325 and AT §501. The terms "material weakness" and "significant deficiency" both represent deficiencies in the design or operation of internal control that could adversely affect a company's ability to record, process, summarize and report financial data consistent with the assertions of management in the company's financial statements, with a "material weakness" constituting a greater deficiency than a "significant deficiency." Because of this relationship, it is our judgment that an aggregation of significant deficiencies could constitute a material weakness in a company's internal control over financial reporting.

74 See new Item 308(d) of Regulations S-B and S-K.

75 See, for example, letters re: File No. S7-40-02 of: ABA; AICPA; BDO; Intel; and Eli Lilly and Company.

76 Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. 78m(b)(2)(A)] requires companies to "make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." See also Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. 78m(b)(2)(B)] and In re Microsoft Corp., Administrative Proceeding File No. 3-10789 (June 3, 2002). In the Microsoft order, the Commission stated that such books and records include not only general ledgers and accounting entries, but also memoranda and internal corporate reports. We have previously stated, as a matter of policy, that under Section 13(b)(2) "every public company needs to establish and maintain records of sufficient accuracy to meet adequately four interrelated objectives: appropriate reflection of corporate transactions and the disposition of assets; effective administration of other facets of the issuer's internal control system; preparation of its financial statements in accordance with generally accepted accounting principles; and proper auditing." Statement of Policy Regarding the Foreign Corrupt Practices Act of 1977, Release No. 34-17500 (Jan. 29, 1981) [46 FR 11544].

77 See Instruction 1 to new Item 308 of Regulations S-K and S-B, Instruction 1

to Item 15 of Form 20-F and Instruction 1 to paragraphs (b), (c), (d) and (e) of General Instruction B.6 to Form 40-F.

78  This statement should not be interpreted to mean that management personally must conduct the necessary activities to evaluate the design and test the operating effectiveness of the company's internal control over financial reporting. Activities, including those necessary to provide management with the information on which it bases its assessment, may be conducted by non-management personnel acting under the supervision of management.

79  See Statements on Standards for Attestation Engagements No. 10.

80  See Exchange Act Rules 13a-15(b) and 15d-15(b) [17 CFR 240.13a-15(b) and 240.15d-15(b)].

81  See letters regarding File No. S7-40-02 of: AICPA; Executive Responsibility; FED; and Protiviti.

82  See Protiviti letter regarding File No. S7-40-02.

83  See letters regarding File No. S7-40-02 of: ABA; ACB; ACCA; Association for Financial Professionals ("AFP"); Am. Bankers Assoc.; BDO; Business Roundtable ("BRT"); Computer Sciences Corporation ("CSC"); Compass; Thomas Damman ("Damman"); EEI; Emerson Electric Co. ("Emerson"); FEI; Fried, Frank, Harris, Shriver and Jacobson ("Fried Frank"); International Paper Company ("IPC"); ICBA; NYCB-CCL; New York State Bar Association ("NYSBA"); Siemens AG ("Siemens"); Software & Information Industry Association ("SIIA"); and Software Finance and Tax Executives Council ("SOFTEC").

84  See Damman letter regarding File No. S7-40-02.

85  See letters regarding File No. S7-40-02 of: ABA; ACB; ACCA; BRT; CSC; Emerson; Fried Frank; ICBA; IPC; NYCB-CCL; SIIA; and SOFTEC.

86  See letters regarding File No. S7-40-02 of: Am. Bankers Assoc.; CSC; Fried Frank.

87  See letters regarding File No. S7-40-02 of: Damman; Compass; EEI; Executive Responsibility Advisors, LLC ("Executive Responsibility"); and Siemens.

88  See letters regarding File No. S7-40-02 of: ABA and BDO.

89  See BDO letter regarding File No. S7-40-02.

90  See ABA letter regarding File No. S7-40-02.

91  See Emerson letter regarding File No. S7-40-02.

92  See Exchange Act Rules 13a-15(d) and 15d-15(d) [17 CFR 240.13a-15(d) and 240.15d-15(d)].

93  For example, where a component of internal control over financial reporting is subsumed within disclosure controls and procedures, even where systems testing of that component would clearly be required as part of the annual evaluation of internal control over financial reporting, management could make a different determination of the appropriate nature of the evaluation of that component for purposes of a quarterly evaluation of disclosure controls and procedures.

94  See Exchange Act Rules 13a-15(b) and 15d-15(b).

95  See ABA letter regarding File No. S7-40-02.

96   See Intel letter regarding File No. S7-40-02.

97   See Release No. 33-8128 (Sept. 16, 2002) [67 FR 58480]. The final rule amendments do not require that the evaluation take place on the last day of the period, but that the statement of effectiveness of the issuer's disclosure controls and internal control over financial reporting be as of the end of the period.

98   We have also made conforming changes to Forms 20-F and 40-F to clarify that the management of a foreign private issuer must disclose in the issuer's annual report filed on Form 20-F or 40-F any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report and that materially affected, or is reasonably likely to affect, this internal control. See Item 15(d) of Form 20-F and General Instruction B (6)(e) of Form 40-F.

99   See Exchange Act Rules 10b-5 and 12b-20 [17 CFR 240.10b-5 and 17 CFR 240.12b-20].

100   This is the disclosure required by paragraph 5 of the certification form.

101   15 U.S.C. 78m(b)(2).

102   See Codification of Statement on Auditing Standards AU §319.18.

103   Pub. L. 102-242, 105 Stat. 2242 (1991).

104   See Section 405 of the Sarbanes-Oxley Act.

105   See Section II. J. below.

106   12 U.S.C. 1831m.

107   The designated laws and regulations are federal laws and regulations concerning loans to insiders and federal and state laws and regulations concerning dividend restrictions. See 12 CFR Part 363, Appendix A, Guideline 12.

108   See 12 CFR 363.2, adopted in 58 FR 31332. These requirements only apply to an insured depository institution with total assets of $500 million or more. We recognize that the FDIC's regulations use the term "internal control structure and procedures for financial reporting" rather than the term "internal control over financial reporting" used in our rules. We think the differences in the meaning of the two terms are insignificant because both Section 36(b)(2) of the Federal Deposit Insurance Act and Section 404(a) of the Sarbanes-Oxley Act refer to "internal control structure and procedures for financial reporting." Nevertheless, the FDIC has defined the term "financial reporting" to include financial statements prepared in accordance with generally accepted accounting principles ("GAAP") and those prepared for regulatory reporting purposes (see FDIC Financial Institution Letter FIL-86-94, dated December 23, 1994).

109   12 CFR 363.3.

110   12 CFR 363.4(a) and (b).

111   12 CFR Part 363.

112   Services and functions are considered "comparable" if the holding company prepares and submits the management assessment of the effectiveness of the internal control structure and procedures for financial reporting and compliance with the designated safety and soundness laws and regulations based on information concerning the relevant activities and operations of those subsidiary institutions subject to Part 363. See 12 CFR Part 363,

Appendix A, Guideline 4.

113 This rating is more commonly known as the CAMELS rating, which addresses Capital adequacy, Asset quality, Management, Earnings, Liquidity and Sensitivity to market risk. See 12 CFR 363.1(b)(2). The appropriate federal banking agency may determine that an insured depository institution with total assets in excess of $9 billion that is a subsidiary of a holding company may not satisfy its FDIC internal control report requirement with an internal control report of the consolidated holding company's management if the agency determines that there could be a significant risk to the affected deposit insurance fund if the institution were allowed to satisfy its requirements in this manner. See 12 CFR 363.1(b)(3).

114 The FDIC's regulations do not specifically require that management identify the control framework used to evaluate the effectiveness of the institution's internal control over financial reporting. However, given the requirements of Sections 101 and 501 of the American Institute of Certified Public Accountants' attestation standards, the FDIC believes that the framework used must be disclosed or otherwise publicly available to all users of reports that institutions file with the FDIC pursuant to Part 363 of the FDIC's regulations.

115 The FDIC's regulations do require an independent public accountant to examine, attest to, and report separately on, the assertion of management concerning the institution's internal control structure and procedures for financial reporting, but these regulations do not require the accountant to be a registered public accounting firm. See 12 CFR 363.3(b).

116 Our rules do not provide an exemption that parallels the FDIC's exemption for insured depository institutions with less than $500 million in assets. It would be incongruous to provide an exemption in our rules for small depository institutions and not other small, non-depository Exchange Act reporting companies.

117 An insured depository institution subject to both the FDIC's requirements and our new requirements choosing to file a single report to satisfy both sets of requirements will file the report with its primary federal regulator under the Exchange Act and the FDIC, its primary federal regulator (if other than the FDIC), and any appropriate state depository institution supervisor under Part 363 of the FDIC's regulations. A holding company choosing to prepare a single report to satisfy both sets of requirements will file the report with the Commission under the Exchange Act and the FDIC, the primary federal regulator of the insured depository institution subsidiary subject to the FDIC's requirements, and any appropriate state depository institution supervisor under Part 363.

118 Management will not be permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting.

119 An insured depository institution subject to both the FDIC's requirements and our new requirements choosing to file a single management report to satisfy both sets of requirements will file the attestation report with its primary federal regulator under the Exchange Act and the FDIC, its primary federal regulator (if other than the FDIC), and any appropriate state depository institution supervisor under Part 363 of the FDIC's regulations. A holding company choosing to prepare a single management report to satisfy both sets of requirements will file the attestation report with the Commission under the Exchange Act and the FDIC, the primary federal regulator of the insured depository institution subsidiary subject to the FDIC's requirements, and any appropriate state depository institution supervisor under Part 363.

120 See Section 405 of the Sarbanes-Oxley Act ("Nothing in section 401, 402, or 404, the amendments made by those sections, or the rules of the Commission

under those sections shall apply to any investment company registered under section 8 of the Investment Company Act of 1940 (15 U.S.C. 80a-8)."). The provisions that would not extend to registered investment companies include amendments to Exchange Act rules 13a-15(c) and 15d-15(c) (requiring annual evaluation of the effectiveness of internal control over financial reporting); Exchange Act rules 13a-15(d) and 15d-15(d) (requiring quarterly evaluation of any change in internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, internal control over financial reporting); and Items 308(a) and (b) of Regulations S-K and S-B (requiring annual report by management on internal control over financial reporting and attestation report on management's evaluation of internal control over financial reporting).

121 Proposed paragraph 4 of the certification section of proposed Form N-CSR. Proposing Release, note 26 above, 67 FR at 66250. We received 7 comment letters on the proposed changes to the certification rules with respect to investment companies in the Proposing Release. See letters regarding File No. S7-40-02 of: the Investment Company Institute ("ICI"); Protiviti; OppenheimerFunds, Inc. ("Oppenheimer"); The Association of the Bar of the City of New York; Leslie Ogg of Board Services Corporation ("Ogg"); Federated Funds; and D&T.

122 See letters regarding File No. S7-40-02 of: Association of the Bar of the City of New York; ICI; and Oppenheimer.

123 See Section 302(a)(4)(A) and (B) of the Sarbanes-Oxley Act (requiring signing officers to certify that they are responsible for establishing and maintaining internal controls and have designed the internal controls to ensure that material information relating to the issuer is made known to the signing officers).

124 For a discussion of changes to the form of the Section 302 certification for operating companies, see Section III. D. below.

125 Proposed Exchange Act Rules 13a-15(c) and 15d-15(c), proposed Investment Company Act Rule 30a-2(b)(4)(iii), and proposed Investment Company Act Rule 30a-3(b).

126 See letters regarding File No. S7-40-02 of: D&T; ICI; Ogg; and Oppenheimer.

127 See Release No. IC-25914 (Jan. 27, 2003) [68 FR 5348, 5352 n. 43] (noting that in the case of a series fund or family of investment companies in which the disclosure controls and procedures for each fund in the series or family are the same, a single evaluation of the effectiveness of the disclosure controls and procedures for the series or family could be used in multiple certifications for the funds in the series or family, as long as the evaluation has been performed within 90 days of the report on Form N-CSR).

128 See, for example, the letters regarding File No. S7-40-02 of: AICPA; D&T; CSC; E&Y; and Association of the Bar of the City of New York, Committee on Securities Regulation ("NYCB-CSR").

129 See Section II. I., above, for compliance dates applicable to registered investment companies.

130 See Section V. below.

131 See letters regarding File No. S7-06-03 of: ABA; Cleary, Gottlieb, Steen & Hamilton ("Cleary"); Prof. Paul A. Griffin ("Griffin"); Intel Corporation ("Intel"); ICI; PwC; John Stalnaker and Patrick Derksen ("Stalnaker"); and Rooks Pitts ("Rooks").

132 See letters regarding File No. S7-06-03 of: ABA; Cleary; Intel; and PwC.

133 See letters File No. S7-06-03 of ABA and Cleary.

134  Id.

135  Pub. L. No. 83-406, 88 Stat. 129 (1974).

136  See letters regarding File No. S7-06-03 of: ABA; Cleary; and PwC.

137  See ABA letter regarding File No. S7-06-03.

138  Id.

139  See Stalnaker letter regarding File No. S7-06-03.

140  See 149 Cong. Rec. S5325 (daily ed. Apr. 11, 2003).

141  Id. at S5331.

142  See Release No. 33-8212 (Mar. 21, 2003) [68 FR 15600] at fn. 37.

143  See ABA letter regarding File No. S7-06-03.

144  See letters regarding File No. S7-06-03 of: ABA; Cleary; Intel; and PwC.

145  We recently adopted Form N-CSR, to be used by registered management investment companies to file certified shareholder reports with the Commission. See Release No. IC-25914 (Jan. 27, 2003) [68 FR 5348]. As adopted, Form N-CSR requires the Section 302 certifications to be filed as an exhibit to a report on Form N-CSR. Item 10(b) of Form N-CSR.

146  Accordingly, we are revising Exchange Act Rules 13a-14 and 15d-14 to delete from those rules the detailed description of the contents of the required certifications and to revise the instructions to Forms 10-Q, 10-QSB, 10-K, and 10-KSB to delete the references to the Section 302 certification requirements. We are also adopting similar changes to Investment Company Act Rule 30a-2 and Form N-CSR.

147  See General Instruction A of Form N-CSR (Form N-CSR is a combined reporting form to be used for reports of registered management investment companies under Section 30(b)(2) of the Investment Company Act and Sections 13(a) or 15(d) of the Exchange Act); n. 28 above (discussing issuers covered by Sections 13(a) and 15(d) of the Exchange Act). Registered management investment companies that are required to file reports on Form N-CSR pursuant to Section 13(a) or 15(d) of the Exchange Act will be required to provide the Section 906 certifications under Exchange Act Rules 13a-14(b) and 15d-14(b) as well as Investment Company Act Rule 30a-2(b). By contrast, registered management investment companies that are required to file reports on Form N-CSR are required to provide the Section 302 certifications solely under Investment Company Act Rule 30a-2(a), which was adopted under Sections 13(a) and 15(d) of the Exchange Act as well as the Investment Company Act. Release No. 33-8124 (Aug. 28, 2002) [67 FR 57276, 57295]; Release No. IC-25914 (Jan. 27, 2003) [68 FR 5348, 5365].

148  See also Section 3(b)(1) of the Sarbanes-Oxley Act, which provides that "[a] violation by any person of this Act . . . shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act of 1934 . . . and any such person shall be subject to the same penalties, and to the same extent, as for a violation of that Act. . . ."

149  See Rule 302(b) of Regulation S-T [17 CFR 232.302(b)]. Among other things, this rule requires that an issuer maintain manually signed certifications or other authenticating documents.

150  See, for example, Item 601(b)(32)(ii) of Regulation S-K.

151  15 U.S.C. 78r.

152 15 U.S.C. 77k.

153 5 U.S.C. 552 et seq.

154 See Exchange Act Rule 12b-15 [17 CFR 240.12b-15] and Investment Company Act Rule 8b-15 [17 CFR 270.8b-15]. Depending on the contents of the amendment, the form of certification required to be included may be subject to modification.

155 See Exchange Act Rules 13a-14(b) and 15d-14(b) [17 CFR 240.13a-14(b) and 240.15d-14(b)] and Investment Company Act Rule 30a-2(b) [17 CFR 270.30a-2(b)].

156 See Release No. 33-8212 (Mar. 21, 2003) [68 FR 15600] at Section III.

157 We are modifying that interim guidance, however, to more closely parallel the provisions of Section 302 of Regulation S-T that require retention of manual signatures for electronically filed signed statements. Issuers furnishing Section 906 certifications to the Commission as an exhibit to the periodic reports to which they relate during the period covered by the interim guidance should insert the following legend after the text of each certification: "A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to [name of issuer] and will be retained by [name of issuer] and furnished to the Securities and Exchange Commission or its staff upon request."

158 Use of Exhibit 99 for this purpose will remain in effect until we announce that our EDGAR system permits registrants to file or furnish exhibits 31 and 32 for Section 302 and 906 certifications. We will issue a statement and post it on the Commission's website to announce this date as soon as it becomes known.

159 For a registered management investment company filing reports on Form N-CSR, the EDGAR document type should be EX-99.906CERT for the Section 906 certifications.

160 44 U.S.C. 3501 et seq.

161 44 U.S.C. 3507(d) and 5 CFR 1320.11.

162 See Rule 302 of Regulation S-T [17 CFR 232.302].

163 See Release No. 33-8138 (Oct. 22, 2002) [67 FR 66208] and Release No. 33-8212 (Mar. 21, 2003) [68 FR 15600].

164 See letters regarding File No. S7-40-02 of: AICPA; BDO; D&T; Emerson; E&Y; IPC; Intel; and NYCB-CCL.

165 See Intel letter regarding File No. S7-40-02.

166 Our estimates are based on information from with several large and small firms, accounting firms and trade and professional associations.

167 The estimates used in the releases proposing these rules were based on the number of filings that we received in fiscal year 2001.

168 We assumed the estimated burdens in the second and third years would decline by 75% from the first year estimate.

169 Our PRA estimates do not include any additional burdens or costs that a company will incur as a result of having to obtain an auditor's attestation report on management's internal control report because the PCAOB, rather than the Commission, is responsible for establishing the attestation standards

and the Sarbanes-Oxley Act itself requires companies to obtain such an attestation. We have, however, included an estimated 0.5 hour burden in our revised annual burden estimates to account for the filing by the company of the attestation report.

170 The burden allocation for Forms 20-F and 40-F, however, use a 25% internal to 75% outside professional allocation to reflect the fact that foreign private issuers rely more heavily on outside professionals for the preparation of these forms.

171 While Section 906 of the Sarbanes-Oxley Act requires that certifications must accompany a periodic report, we are increasing our PRA burdens in view of the fact that the amendments explicitly require companies to furnish Section 906 certifications as exhibits to these reports. To date, companies have used various methods to fulfill their obligations under Section 906, and have not consistently submitted the certifications as part of the report.

172 Many registered management investment companies have multiple portfolios. However, they prepare separate financial statements for each portfolio. Thus, the burden of the Section 906 certifications is estimated on a portfolio basis rather than a registered management investment company basis.

173 This number represents the burden associated with the average number of portfolios per form. This number will vary for each registered management investment company depending on the number of portfolios. We estimate that the paperwork burden for each portfolio is one hour.

174 This estimate is based on the estimated total burden hours of 5,396,266, an assumed 75%/25% split of the burden hours between internal staff and external professionals, and an hourly rate of $200 for internal staff time and $300 for external professionals. The hourly cost estimate is based on consultations with several registrants and law firms and other persons who regularly assist registrants in preparing and filing periodic reports with the Commission. Our PRA estimate does not reflect any additional cost burdens that a company will incur as a result of having to obtain an auditor's attestation on management's internal control report.

175 This calculation is based on an estimate of burden hours multiplied by a cost of $200.00 per hour. (117,048 hours multiplied by $200.00 per hour). The hourly cost estimate is based on consultations with several registrants and law firms and other persons who regularly assist registrants in preparing and filing periodic reports with the Commission.

176 See ABA letter regarding File No. S7-06-03.

177 5 U.S.C. 552 et seq.

178 15 U.S.C. 78w(a)(2).

179 15 U.S.C §77b(b).

180 15 U.S.C. 78c(f).

181 15 U.S.C. 80a-2(c).

182 5 U.S.C. 601.

183 5 U.S.C. 603.

184 17 CFR 240.0-10(a).

185 17 CFR 270.0-10.

186 This estimate is based on figures compiled by the Commission staff regarding investment companies registered on Forms N-1A, N-2 and N-3, which are

required to file reports on Form N-CSR.

187 This estimate includes the burden for one annual report and three quarterly reports.

188 Under the method we used to estimate the PRA burdens associated with the Section 404 rules, we estimated that companies with less than $100 million in revenues would be subject to an added annual reporting burden of approximately 100 hours.

189 The estimated burden for one annual report and three quarterly reports.

190 See Beasley, Carcello and Hermanson, Fraudulent Financial Reporting: 1987-1997, An Analysis of U.S. Public Companies (Mar. 1999) (study commissioned by the Committee of Sponsoring Organizations of the Treadway Commission).

191 17 CFR 240.12b-2.

*http://www.sec.gov/rules/final/33-8238.htm*

Home | Previous Page                                                    Modified: 06/11/2003

Exhibit 2

```
<DOCUMENT>
<TYPE>DEF 14A
<SEQUENCE>1
<FILENAME>a2105119zdef14a.txt
<DESCRIPTION>DEF 14A
<TEXT>
<Page>
```

                        SCHEDULE 14A INFORMATION

              Proxy Statement Pursuant to Section 14(a) of
           the Securities Exchange Act of 1934 (Amendment No.     )

    Filed by the Registrant /X/
    Filed by a party other than the Registrant / /


    Check the appropriate box:
    / /  Preliminary Proxy Statement
    / /  CONFIDENTIAL, FOR USE OF THE COMMISSION ONLY (AS PERMITTED BY RULE
         14a-6(e)(2))
    /X/  Definitive Proxy Statement
    / /  Definitive Additional Materials
    / /  Soliciting Material Pursuant to Section 240.14a-12


                      Investors Financial Services Corp.
--------------------------------------------------------------------------------
                  (Name of Registrant as Specified In Its Charter)

--------------------------------------------------------------------------------
     (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

/X/  No fee required.

/ /  Fee computed on table below per Exchange Act Rules 14a-6(i)(4)
     and 0-11.

     (1) Title of each class of securities to which transaction applies:

         -----------------------------------------------------------------------
     (2) Aggregate number of securities to which transaction applies:

         -----------------------------------------------------------------------
     (3) Per unit price or other underlying value of transaction computed
         pursuant to Exchange Act Rule 0-11 (set forth the amount on which the
         filing fee is calculated and state how it was determined):

         -----------------------------------------------------------------------
     (4) Proposed maximum aggregate value of transaction:

         -----------------------------------------------------------------------
     (5) Total fee paid:

         -----------------------------------------------------------------------

/ /  Fee paid previously with preliminary materials.

/ /  Check box if any part of the fee is offset as provided by Exchange Act Rule
     0-11(a)(2) and identify the filing for which the offsetting fee was paid
     previously. Identify the previous filing by registration statement number,
     or the Form or Schedule and the date of its filing.

     (1) Amount Previously Paid:

         -----------------------------------------------------------------------
     (2) Form, Schedule or Registration Statement No.:

         -----------------------------------------------------------------------

```
    (3) Filing Party:

        ------------------------------------------------------------------------
    (4) Date Filed:

        ------------------------------------------------------------------------
```

<Page>

<div align="center">

INVESTORS
FINANCIAL SERVICES CORP.

200 CLARENDON STREET
BOSTON, MA 02116

</div>

March 11, 2003

Dear Stockholder:

      We cordially invite you to attend the 2003 Annual Meeting of Stockholders of Investors Financial Services Corp. The meeting will be held in the Board Room on the 17th Floor at 200 Clarendon Street, Boston, Massachusetts, on Tuesday, April 15, 2003, at 11:00 a.m.

      Details regarding admission to the meeting and the business to be conducted are more fully described in the accompanying Notice of 2003 Annual Meeting of Stockholders and Proxy Statement.

      Your vote is very important. Whether or not you plan to attend the meeting, please carefully review the enclosed proxy statement. Then complete, sign, date and mail promptly the accompanying proxy in the enclosed return envelope. To be sure that your vote will be received in time, please return the proxy at your earliest convenience.

      We look forward to seeing you at the Annual Meeting so that we can update you on our progress. Your continuing interest is very much appreciated.

<div align="center">

Sincerely,

/s/ Kevin J. Sheehan
Kevin J. Sheehan
Chairman and Chief Executive Officer

</div>

PLEASE NOTE: STOCKHOLDERS SHOULD BE AWARE OF THE INCREASED SECURITY AT PUBLIC FACILITIES IN BOSTON. IF YOU PLAN TO ATTEND THE MEETING, PLEASE ALLOW ADDITIONAL TIME FOR REGISTRATION AND SECURITY CLEARANCE. YOU WILL BE ASKED TO PRESENT A VALID, PICTURE IDENTIFICATION SUCH AS A DRIVER'S LICENSE. IF YOU OWN YOUR SHARES THROUGH A BROKERAGE ACCOUNT OR OTHER NOMINEE, YOU MUST BRING PROOF OF OWNERSHIP (FOR DETAILS, SEE MEETING ADMISSION IN THE NOTICE OF 2003 ANNUAL MEETING OF STOCKHOLDERS). PUBLIC PARKING IS AVAILABLE NEARBY INCLUDING IN THE JOHN HANCOCK PARKING GARAGE, WHICH IS ONE BLOCK FURTHER UP CLARENDON STREET FROM OUR BUILDING ON YOUR RIGHT.

<Page>

<div align="center">

INVESTORS
FINANCIAL SERVICES CORP.

200 CLARENDON STREET
BOSTON, MA 02116

---------------

NOTICE OF 2003 ANNUAL MEETING OF STOCKHOLDERS

--------------

</div>

```
TIME         11:00 a.m., Eastern Time

DATE         Tuesday, April 15, 2003
```

| | |
|---|---|
| PLACE | 200 Clarendon Street, Seventeenth Floor, Boston, Massachusetts |
| PURPOSE | 1.  To elect two (2) Class II directors; |
| | 2.  To approve the amendment of the Company's Certificate of Incorporation limiting the indemnification of officers and directors; |
| | 3.  To ratify the selection of Deloitte & Touche LLP as independent auditors for the fiscal year ending December 31, 2003. |
| RECORD DATE | The directors have fixed the close of business on February 25, 2003 as the record date for determining stockholders entitled to notice of and to vote at the meeting. |
| MEETING ADMISSION | For security clearance at the meeting you will be asked to present a valid picture identification such as a driver's license or passport. If your Investors Financial Services Corp. stock is held in a brokerage account or by another nominee, you are considered the beneficial owner of shares held in street name, and these proxy materials are being forwarded to you by your broker or nominee. Your name does not appear on the list of stockholders. If your stock is held in street name, you should also bring with you a letter or account statement showing that you were the beneficial owner of the stock on the record date in order to be admitted to the meeting. |
| VOTING BY PROXY | Please submit a proxy as soon as possible so your shares can be voted at the meeting. You may submit your proxy by mail. If your stock is held in the name of a broker, bank or other nominee, you may have the choice of instructing the record holder as to the voting of your shares over the Internet or by telephone. Follow the instructions on the form you receive from your broker or bank. |

By Order of the Board of Directors,

/s/ John E. Henry
John E. Henry
March 11, 2003                    SECRETARY

<Page>

INVESTORS
FINANCIAL SERVICES CORP.

200 CLARENDON STREET
BOSTON, MA 02116

PROXY STATEMENT

GENERAL INFORMATION

WHEN WAS THIS PROXY STATEMENT AND THE ACCOMPANYING PROXY SCHEDULED TO BE SENT TO STOCKHOLDERS?

This proxy statement and accompanying proxy are scheduled to be sent to stockholders beginning on or about March 11, 2003.

WHO IS SOLICITING MY VOTE?

The Board of Directors of Investors Financial Services Corp. ("Investors Financial" or the "Company") is soliciting your vote for the 2003 Annual Meeting of Stockholders.

HOW MANY VOTES CAN BE CAST BY ALL STOCKHOLDERS?

64,892,525 shares of Common Stock of Investors Financial are outstanding and entitled to be voted at the meeting. Each share of Common Stock is entitled to one vote on each matter.

HOW DO I VOTE?

You may vote in person at the Annual Meeting or by proxy without attending the meeting. To vote by proxy please mark, date, sign and return the enclosed proxy in the enclosed envelope. If you vote by the enclosed proxy your shares will be voted at the meeting in accordance with your instructions or as provided in the proxy. If you do not give any instructions, your shares will be voted by the persons named in the proxy in accordance with the recommendations of the Board of Directors given below.

If your stock is held in the name of a broker, bank or other nominee, you may have the choice of voting your shares over the Internet or by telephone. Follow the instructions on the form you receive from your broker or bank.

To vote in person, bring a form of personal identification with you. If your stock is held by a broker, bank or other nominee, bring an account statement or a letter from the record holder indicating that you own the shares as of the record date and first obtain from the record holder a proxy issued in your name.

WHAT ARE THE BOARD'S RECOMMENDATIONS ON HOW TO VOTE MY SHARES?

The Board of Directors recommends a vote:
- FOR election of the two directors (page 6)
- FOR the amendment to Investors Financial's Certificate of Incorporation (page 20)
- FOR the ratification of Deloitte & Touche LLP as Investors Financial's independent auditors (page 21)

1

<Page>

WHO PAYS THE COST FOR SOLICITING PROXIES?

Investors Financial will pay the cost of soliciting proxies. The solicitation of proxies will be made primarily by mail. Investors Financial has retained Innisfree M&A Corporation to aid in the distribution of proxies for a fee of $2,500, plus expenses. Proxies may be solicited personally, by telephone, fax and e-mail by employees of Investors Financial and its principal subsidiary, Investors Bank & Trust Company (the "Bank"), without any additional remuneration. Investors Financial will reimburse brokers, banks, custodians, other nominees and fiduciaries for forwarding these materials to their principals and for obtaining the authorization for the execution of proxies.

CAN I CHANGE MY VOTE?

You may revoke your signed proxy at any time before it is voted by notifying the Secretary in writing, by returning a signed proxy with a later date, or by attending the meeting and voting in person. If your stock is held in street name, you must contact your broker or nominee for instructions as to how to change your vote.

WHAT VOTE IS REQUIRED TO APPROVE EACH ITEM?

The two nominees for election as directors who receive a plurality of the shares voted for election of directors shall be elected directors (Item 1). The affirmative vote of 75% of all shares outstanding and entitled to vote is necessary to approve the amendment to Investors Financial's Certificate of Incorporation (Item 2). The affirmative vote of a majority of all shares present in person or represented by proxy at the meeting and entitled to vote is necessary to ratify the selection of Deloitte & Touche LLP as Investors Financial's independent auditors (Item 3).

HOW IS THE VOTE COUNTED?

Votes cast by proxy or in person at the Annual Meeting will be counted by the persons appointed by Investors Financial to act as tellers for the meeting. A

majority of the shares entitled to vote at the Annual Meeting constitutes a quorum. The tellers will count shares represented by proxies that withhold authority to vote for a nominee for election as a director only as shares that are present and entitled to vote for purposes of determining the presence of a quorum. None of the withheld votes will be counted as votes "for" a director. Shares properly voted to "abstain" on a particular matter are considered as shares that are entitled to vote for the purpose of determining a quorum but are treated as having voted against the matter.

If you hold shares through a broker, bank or other nominee, generally the nominee may vote the shares for you in accordance with your instructions. Stock exchange and NASD rules prohibit a broker from voting shares held in a brokerage account on some proposals (a "broker non-vote") if the broker does not receive voting instructions from you. Under these rules, a broker may not vote in its discretion on Item 2. Shares that are subject to a broker non-vote are counted for determining the quorum but as not entitled to vote on the particular matter, so without voting instructions a broker non-vote could occur on Item 2. This will have the effect of the shares being voted against approval of Item 2.

COULD OTHER MATTERS BE DECIDED AT THE ANNUAL MEETING?

We do not know of any other matters that may be presented for action at the meeting. Should any other business come before the meeting, the persons named on the enclosed proxy will have discretionary authority to vote the shares represented by such proxies in accordance with their best judgment.

2

<Page>

MANAGEMENT AND PRINCIPAL HOLDERS OF VOTING SECURITIES

The following table sets forth certain information regarding beneficial ownership of the Company's Common Stock as of February 25, 2003: (i) by each person who, to the knowledge of the Company, beneficially owned more than 5% of the shares of the Company's Common Stock outstanding at such date; (ii) by each director, nominee and each executive officer identified in the Summary Compensation Table set forth below under "Compensation and Other Information Concerning Directors and Officers"; and (iii) by all executive officers, directors and nominees as a group. Unless otherwise indicated below, each person listed maintains a business address c/o Investors Financial Services Corp., 200 Clarendon Street, Boston, MA 02116 and, to the knowledge of the Company, all persons listed below have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by spouses under applicable law or as otherwise noted.

<Table>
<Caption>

| Name and Address of Beneficial Owner | Amount and Nature of Ownership*** | Perc of C. |
|---|---|---|
| <S> | <C> | · |
| Entities associated with FMR Corp. (1) ...............................................<br>82 Devonshire Street<br>Boston, MA 02109 | 6,452,167 | · |
| Entities associated with Oakmont Corporation (2) ...................................<br>865 South Figueroa Street<br>Los Angeles, CA 90017 | 3,580,764 | : |
| Frank B. Condon, Jr. (3)........................................ | 66,752 | |
| Robert B. Fraser (4)........................................... | 100,533 | |
| Donald G. Friedl (5)........................................... | 34,598 | |
| Thomas P. McDermott (6)........................................ | 30,814 | |
| James M. Oates (7)............................................. | 53,579 | |
| Phyllis S. Swersky (8) ........................................ | 22,488 | |
| Kevin J. Sheehan (9)........................................... | 2,057,445 | : |
| Michael F. Rogers (10)......................................... | 1,753,097 | : |
| Edmund J. Maroney (11)......................................... | 587,642 | |
| Robert D. Mancuso (12)......................................... | 566,273 | |

| John N. Spinney, Jr. (13) .................................... | 17,954 |
| All executive officers and directors | |
| as a group (12 persons) (14) ................................ | 5,453,337 | : |
</Table>

----------
*       Less than 1%

**      Percentage ownership is based upon shares of Common Stock outstanding
        as of February 25, 2003. Shares of Common Stock that may be acquired by
        a listed person within 60 days of February 25, 2003 are deemed
        outstanding for purposes of computing the number of shares of Common
        Stock owned by that person, but are not deemed outstanding for purposes
        of computing the percentage ownership of any other person.

3

<Page>

***     On February 16, 1999, the Board of Directors declared a two-for-one
        stock split in the form of a 100% stock dividend payable March 17, 1999
        to stockholders of record on March 1, 1999. On May 15, 2000, the Board
        of Directors declared a two-for-one stock split in the form of a 100%
        stock dividend payable June 15, 2000 to stockholders of record on May
        31, 2000. On April 23, 2002, the Board of Directors declared a
        two-for-one stock split in the form of a 100% stock dividend payable
        June 14, 2002 to stockholders of record on May 24, 2002. Share numbers
        in this proxy statement have been restated to reflect these stock
        splits, where applicable.

(1)     All shares may be deemed to be beneficially owned by members of the
        Johnson family who may be deemed to control FMR Corp. Information with
        respect to FMR Corp. and its affiliates is derived from the Schedule
        13G/A filed jointly by FMR Corp., Edward C. Johnson 3d, Abigail P.
        Johnson and Fidelity Management & Research Company with the Securities
        and Exchange Commission on or about February 13, 2003.

(2)     All shares may be deemed to be beneficially owned by Robert Day who may
        be deemed to control Oakmont Corporation. Information with respect to
        Oakmont Corporation and Robert Day is derived from the Schedule 13G/A
        filed jointly by Robert Day and Oakmont Corporation with the Securities
        and Exchange Commission on or about February 13, 2003. The reporting
        herein of such shares shall not be construed as an admission by Mr. Day
        that Mr. Day is the beneficial owner thereof for purposes of Section 16
        of the Securities Exchange Act of 1934 or for any other purpose.

(3)     Includes 26,512 shares of Common Stock which may be purchased within 60
        days of February 25, 2003 upon the exercise of stock options granted
        under the Company's 1995 Non-Employee Director Stock Option Plan (the
        "Director Plan").

(4)     Includes 52,380 shares of Common Stock which may be purchased within 60
        days of February 25, 2003 upon the exercise of stock options granted
        under the Director Plan and the Company's Amended and Restated
        1995 Stock Plan (the "1995 Plan").

(5)     Includes 22,954 shares of Common Stock which may be purchased within 60
        days of February 25, 2003 upon the exercise of stock options granted
        under the Director Plan.

(6)     Includes 14,202 shares of Common Stock which may be purchased within 60
        days of February 25, 2003 upon the exercise of stock options granted
        under the Director Plan.

(7)     Includes 6,699 shares of Common Stock which may be purchased within 60
        days of February 25, 2003 upon the exercise of options granted under
        the Director Plan.

(8)     Includes 16,088 shares of Common Stock which may be purchased within 60
        days of February 25, 2003 upon the exercise of stock options granted

under the Director Plan.

(9)     Includes 935,755 shares of Common Stock which may be purchased within
        60 days of February 25, 2003 upon the exercise of stock options granted
        under the 1995 Plan.

(10)    Includes 710,499 shares of Common Stock which may be purchased within
        60 days of February 25, 2003 upon the exercise of stock options granted
        under the 1995 Plan.

(11)    Includes 363,051 shares of Common Stock which may be purchased within
        60 days of February 25, 2003 upon the exercise of stock options granted
        under the 1995 Plan.

(12)    Includes 315,694 shares of Common Stock which may be purchased within
        60 days of February 25, 2003 upon the exercise of stock options granted
        under the 1995 Plan.

4

<Page>

(13)    Includes 14,999 shares of Common Stock which may be purchased within 60
        days of February 25, 2003 upon the exercise of stock options granted
        under the 1995 Plan.

(14)    Includes 2,590,680 shares of Common Stock which may be purchased by
        executive officers and directors within 60 days of February 25, 2003
        upon the exercise of stock options granted under the 1995 Plan and
        shares of Common Stock which may be purchased by directors within 60
        days of February 25, 2003 upon the exercise of stock options granted
        under the Director Plan.

5

<Page>

## PROPOSAL 1

### ELECTION OF DIRECTORS

#### NOMINEES

        The Company's Certificate of Incorporation and By-laws provide for a
Board of Directors divided into three classes. The members of each class of
directors serve for staggered three-year terms. Mr. Condon and Mr. Fraser are
Class II directors whose terms expire at the 2003 Annual Meeting of
Stockholders. The Board of Directors is also composed of (i) two Class I
directors (Mr. Friedl and Ms. Swersky) whose terms expire upon the election and
qualification of directors at the Annual Meeting of Stockholders to be held in
2005 and (ii) three Class III directors (Messrs. Sheehan, Oates and McDermott)
whose terms expire upon the election and qualification of directors at the
Annual Meeting of Stockholders to be held in 2004.

        The Board of Directors has nominated and recommended that Mr. Condon
and Mr. Fraser be elected Class II directors, to hold office until the Annual
Meeting of Stockholders to be held in the year 2006 and until their successors
have been duly elected and qualified or until their earlier resignation or
removal. The Board of Directors knows of no reason why the nominees should be
unable or unwilling to serve, but if any nominee should for any reason be unable
or unwilling to serve, the proxies will be voted or not voted in accordance with
the judgment of the persons named as attorneys-in-fact in the proxies with
respect to the vacancy created by that nominee's inability or unwillingness to
serve. Unless otherwise instructed, the proxy holders will vote the proxies
received by them for the nominees named below.

                THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS
A VOTE "FOR" THE ELECTION OF FRANK B. CONDON, JR. AND ROBERT B. FRASER

        The following table sets forth the nominees to be elected at the Annual
Meeting and each director whose term of office will extend beyond the Annual
Meeting, the year such nominee or director was first elected a director, the
positions currently held by the nominees and each director with the Company, the

year the nominee's or director's term will expire and the class of director of
each nominee and each director:

```
<Table>
<Caption>
NOMINEE'S OR DIRECTOR'S
NAME AND YEAR NOMINEE OR              POSITION(S) WITH        YEAR TERM      CLASS OF
DIRECTOR FIRST BECAME A DIRECTOR       THE COMPANY           WILL EXPIRE    DIRECTOR
--------------------------------      ----------------       -----------    --------
<S>                                  <C>                      <C>            <C>
NOMINEES:

Frank B. Condon, Jr. (1986)              Director              2006           II
Robert B. Fraser (1996)                  Director              2006           II

CONTINUING DIRECTORS:

Donald G. Friedl (1996)                  Director              2005           I
Phyllis S. Swersky (1996)                Director              2005           I
Kevin J. Sheehan (1990)               Chairman and
                                    Chief Executive Officer    2004           III
James M. Oates (1995)                    Director              2004           III
Thomas P. McDermott (1995)               Director              2004           III
</Table>
```

6

<Page>

## DIRECTORS AND EXECUTIVE OFFICERS

The following table sets forth the directors and the executive officers
of the Company as of February 25, 2003, their ages, and the positions currently
held by them with the Company. The Company's executive officers are appointed
by, and serve at the discretion of, the Board of Directors. Each executive
officer is a full time employee of the Company. There is no family relationship
between any executive officer or director of the Company.

```
<Table>
<Caption>
NAME                  AGE   POSITION
----                  ---   --------
<S>                   <C>   <C>
Kevin J. Sheehan      51    Chairman of the Board and Chief Executive Officer
Michael F. Rogers     45    President
John N. Spinney, Jr.  37    Senior Vice President and Chief Financial Officer
Robert D. Mancuso     42    Senior Vice President - Marketing and Client Management
Edmund J. Maroney     46    Senior Vice President - Technology
John E. Henry         38    Senior Vice President, General Counsel and Secretary
James M. Oates        56    Director
Thomas P. McDermott   67    Director
Robert B. Fraser      74    Director
Frank B. Condon, Jr.  67    Director
Donald G. Friedl      70    Director
Phyllis S. Swersky    51    Director
</Table>
```

Mr. Sheehan is Chairman of the Executive Committee of which Messrs. Oates,
Condon and McDermott are also members. Mr. Oates is Chairman of the Compensation
Committee of which Messrs. Condon and McDermott are also members. Mr. McDermott
is Chairman of the Audit Committee of which Mr. Fraser and Ms. Swersky are also
members. Mr. Condon is Chairman of the Nominating and Corporate Governance
Committee of which Mr. McDermott and Mr. Oates are also members. The Company was
organized in June 1995 to serve as the holding company for the Bank and for
periods prior to that date, references to the Company mean the Bank.

MR. SHEEHAN has served as a director since 1990. He has been Chief
Executive Officer and Chairman of the Board of Directors since June 1995. Mr.
Sheehan served as President from June 1992 to August 2001. Prior to joining the
Company in May 1990 with the Company's acquisition of the Financial Products
Services Division of the Bank of New England, Mr. Sheehan was a Senior Vice
President at the Bank of New England.

MR. ROGERS has been President since August 2001, and has had responsibility for all operating areas since 1990. He served as Executive Vice President from September 1993 to August 2001. Prior to joining the Company in May 1990 with the Company's acquisition of the Financial Products Services Division of Bank of New England, Mr. Rogers was a Vice President at the Bank of New England.

MR. SPINNEY has been Senior Vice President since August 2001 and Chief Financial Officer since January 2002. Prior to joining the Company in August 2001, Mr. Spinney was an audit partner in the Financial Services Practice of KPMG LLP, a public accounting firm.

MR. MANCUSO has been Senior Vice President - Marketing and Client Management since September 1993. He joined the Company in September 1992. Prior to joining the Company, Mr. Mancuso was Eastern Region Director of Sales for PRJ Associates, a software development firm.

MR. MARONEY has been Senior Vice President - Technology since July 1991. Mr. Maroney served as a Systems Manager in the custody department prior to becoming Senior Vice President. Prior to joining the Company in May 1990 with the Company's acquisition of the Financial Products Services Division of the Bank of New England, Mr. Maroney was Vice President at the Bank of New England.

7

<Page>

MR. HENRY has been General Counsel of the Company since February 1996, Secretary of the Company since January 1997 and Senior Vice President since April 2000. Prior to joining the Company, Mr. Henry was an associate at the Boston law firm of Testa, Hurwitz & Thibeault, LLP.

MR. OATES has been a director of the Company since June 1995. Mr. Oates has been Chairman of Hudson Castle Group, Inc., since 1995 and has been the managing director of the Wydown Group, a consulting firm specializing in start-ups and turn-arounds, since 1994. Mr. Oates served as President and Chief Executive officer of Neworld Bancorp Incorporated from 1984 to 1994. Mr. Oates is a Director and Chairman of the Investment Committee and Member of the Audit and Personnel Committees of Connecticut River Bancorp, Inc., and Connecticut River Bank. Mr. Oates is also a Director and Member of the Executive and Compensation Committees of Stifel Financial Corporation; Director of the New Hampshire Trust Co., as well as twenty-five Phoenix Mutual Funds. He serves as a Member of the Consulting Committee of the Phoenix-Kayne Mutual Fund Board. Mr. Oates is Chairman of the Board of Directors and a Member of the Executive and Compensation Committees of Emerson Investment Management, Inc. Mr. Oates is also Treasurer, Director and the Chair of the Finance and Investment Committees of the Endowment for Health, a New Hampshire non-profit corporation; a member of the Investment Committee of the New Hampshire Charitable Foundation; and Trustee Emeritus for Middlesex School.

MR. McDERMOTT has been a director of the Company since June 1995. He has been Managing Director of TPM Associates, a consulting firm, since January 1994. He served as Managing Partner, New England Area of Ernst & Young LLP from 1989 to 1993. Mr. McDermott is also a director of ACCION International, the Pioneer Institute of Public Policy Research, Massachusetts Eye & Ear Infirmary and Harvard University - LASPAU.

MR. FRASER has been a director of the Company since June 1996. Mr. Fraser was Chairman of the Boston law firm of Goodwin Procter LLP from 1984 to 1997. He is also Chairman of The Arts & Business Council of Greater Boston and a Director of the Massachusetts Institute for a New Commonwealth (MassINC).

MR. CONDON has been a director of the Company since April 1986. From July 1982 to July 1993, he was Chief Executive Officer and President, and from July 1993 to April 1997 he was Chief Executive Officer and Chairman, of Woodstock Corporation, a Boston-based investment management firm and of its wholly owned subsidiary, Woodstock Service Corporation, a provider of financial services. Mr. Condon also serves as a Director of Big Sandy Management Company and Manager of Coal, Energy Investments & Management, LLC.

MR. FRIEDL has been a director of the Company since February 1996. He was the Chairman, President and Chief Executive Officer of All Seasons Services,

Inc., a commercial food and vending company, from 1986 until January 1997. He served as a Director of Classic Foods, Inc. from June of 1999 to March of 2002. Mr. Friedl currently serves as a director of Marical, Inc., a marine biotechnology company and Custom Foods, Inc.

    MS. SWERSKY has been a director of the Company since February 1996. She has been President of The Meltech Group, a consulting firm specializing in business advisory services for high-growth potential businesses, since 1995. She was the President of The Net Collaborative, Inc., an Internet systems integration company, from 1996 to 1997. She served as President of Work/Family Directions, Inc., a provider of employee benefits programs, from 1992 through 1995. Prior to 1992, she was Executive Vice President and Chief Financial Officer of AICorp, Inc., a computer software company. Ms. Swersky also serves as a Director of Art Technology Corp., a computer software company.

    A director may be removed for cause, which is generally defined under Delaware law as an event of a substantial nature which directly affects the rights and interests of a company's stockholders, such as disclosing trade secrets of the Company or embezzling corporate funds, by a vote of at least a majority of the shares of the Company's capital stock entitled to vote in the election of directors. A director may be

8

<Page>

removed without cause by a vote of at least seventy-five percent of the shares of the Company's capital stock entitled to vote in the election of directors.

THE BOARD OF DIRECTORS AND ITS COMMITTEES

    The Board of Directors met seven times during the fiscal year ended December 31, 2002. The membership of the Audit Committee of the Board of Directors is currently comprised of Messrs. McDermott and Fraser and Ms. Swersky. The functions and responsibilities of the Audit Committee are set forth below in the Report of the Audit Committee. The Audit Committee met ten times during the fiscal year ended December 31, 2002.

    The Compensation Committee, whose members currently are Messrs. Oates, McDermott and Condon, is responsible for administering the Company's stock plans and for reviewing and approving compensation matters concerning the executive officers and key employees of the Company. The Compensation Committee met five times during the fiscal year ended December 31, 2002.

    The Nominating and Corporate Governance Committee, whose members currently are Messrs. Condon, McDermott and Oates, is responsible for oversight of corporate governance at the Company and recommending to the Board of Directors persons to be nominated for election or appointment as directors of the Company. The Nominating and Corporate Governance Committee will consider nominees recommended by stockholders. Any such recommendations should be submitted in writing to the Secretary of the Company at the Company's principal executive offices in accordance with the nominating procedures set forth in the Company's by-laws. The Nominating and Corporate Governance Committee met four times during the fiscal year ended December 31, 2002.

    During 2002, other than Mr. Friedl who missed three meetings of the Board of Directors due, in part, to illness, no director attended fewer than 75% of (i) the total number of meetings of the Board of Directors (held during the period for which he or she has been a director) and (ii) the total number of meetings held by all committees of the Board on which he or she served (during the period that he or she served).

REPORT OF THE AUDIT COMMITTEE

    The functions of the Audit Committee (the "Audit Committee") are focused on the following areas:

                    - the reliability and integrity of the Company's accounting and
                      financial reporting practices;

- the quality and integrity of the Company's financial
  statements and reports;

- the independence and performance of the Company's internal
  auditors and independent auditors;

- the Company's compliance with legal and regulatory
  requirements and internal policies; and

- the soundness of the Company's internal controls.

        The directors who serve on the Audit Committee are all "Independent"
for purposes of Section 4200(a)(14) of the National Association of Securities
Dealers' listing standards. That is, the Board of Directors has determined that
none of the members of the Audit Committee has a relationship to the Company
that may interfere with his or her independence from the Company and its
management.

9

<Page>

        The Audit Committee met ten times during 2002.

        The Board has adopted a written charter setting out the authority and
responsibilities of the Audit Committee. A copy of the current Audit Committee
Charter is attached to this report as APPENDIX A and provides greater detail
regarding the activities of the Audit Committee.

        Management has primary responsibility for the Company's consolidated
financial statements and the overall reporting process, including the Company's
system of internal controls.

        The independent auditors audit the annual consolidated financial
statements prepared by management, express an opinion as to whether those
consolidated financial statements fairly present the financial position, results
of operations and cash flows of the Company in conformity with generally
accepted accounting principles and discuss with the Audit Committee any issues
they believe should be raised with the Audit Committee.

        For 2002, the Audit Committee reviewed the Company's audited
consolidated financial statements and met with both management and Deloitte &
Touche, the Company's independent auditors, to discuss those consolidated
financial statements. Management has represented to the Audit Committee that the
consolidated financial statements were prepared in accordance with generally
accepted accounting principles and fairly represent the financial condition and
results of operations of the Company.

        The Audit Committee has received from and discussed with Deloitte &
Touche the written disclosures and the letter required by Independence Standards
Board Standard No. 1 (Independence Discussions with Audit Committees). These
items relate to Deloitte & Touche's independence from the Company. The Audit
Committee also discussed with Deloitte & Touche the matters required to be
discussed by Statement on Auditing Standards No. 61 (Communication with Audit
Committees).

        Based on these reviews and discussions, the Audit Committee recommended
to the Board that the Company's audited consolidated financial statements be
included in the Company's Annual Report on Form 10-K for the fiscal year ended
December 31, 2002. The Audit Committee also engaged Deloitte & Touche to act as
the Company's independent auditors for the 2003 fiscal year.

                    RESPECTFULLY SUBMITTED BY THE
              AUDIT COMMITTEE OF THE BOARD OF DIRECTORS

                    Thomas McDermott (Chairman)
                          Robert Fraser
                          Phyllis Swersky

10

<Page>

COMPENSATION AND OTHER INFORMATION
CONCERNING DIRECTORS AND EXECUTIVE OFFICERS

EXECUTIVE COMPENSATION

SUMMARY COMPENSATION TABLE

        The following table sets forth summary information concerning the
compensation paid or earned for services rendered to the Company in all
capacities during the years ended December 31, 2002, 2001 and 2000 to (i) the
Company's Chief Executive Officer and (ii) each of the other four most highly
compensated executive officers of the Company who received total annual salary
and bonus in excess of $100,000 in fiscal 2002 (the "Named Executive Officers").

<Table>
<Caption>

|  |  |  | | LONG TERM COMPENSATION AWARDS |
| --- | --- | --- | --- | --- |
|  |  | ANNUAL COMPENSATION(1) | | |
| NAME AND PRINCIPAL POSITION | YEAR | SALARY($) | BONUS OR COMMISSION($) | OPTIONS(#) (: |
| <S> | <C> | <C> | <C> | <C> |
| Kevin J. Sheehan............. | 2002 | 750,000 | 1,687,500 | 33,428 |
| Chief Executive Officer and | 2001 | 650,000 | 1,462,500 | 70,557 |
| Chairman | 2000 | 550,000 | 1,100,000 | 129,704 |
| Michael F. Rogers........... | 2002 | 650,000 | 1,462,500 | 77,767 |
| President | 2001 | 550,000 | 1,237,500 | 103,962 |
|  | 2000 | 450,000 | 900,000 | 137,806 |
| Edmund J. Maroney........... | 2002 | 425,000 | 956,250 | 20,000 |
| Senior Vice President - | 2001 | 365,000 | 821,250 | 46,199 |
| Technology | 2000 | 315,000 | 630,000 | 53,170 |
| Robert D. Mancuso........... | 2002 | 350,000 | 675,654(4) | 24,759 |
| Senior Vice President - ... | 2001 | 325,000 | 579,438(4) | 45,048 |
| Marketing and Client Management | 2000 | 275,000 | 562,312(4) | 61,336 |
| John N. Spinney, Jr.......... | 2002 | 250,000 | 375,000 | 70,000 |
| Senior Vice President and Chief Financial Officer | 2001(5) | 72,115 | 150,000 | 20,000 |

</Table>

----------
(1)     Excludes non-cash compensation that in the aggregate does not exceed
        the lesser of $50,000 or 10% of such named individual's cash
        compensation.
(2)     Adjusted to reflect the two-for-one stock split of the Company's Common
        Stock on June 14, 2002.
(3)     The amount shown for each Named Executive Officer for 2002, 2001 and
        2000 includes the dollar value ($6,000, $5,100 and $5,100) of matching
        contributions made pursuant to the Company's 401(k) plan, a qualified
        employee benefit defined contribution plan, for 2002, 2001 and 2000,
        respectively. Also included are net premiums paid by the Company for
        term life insurance for the benefit of Messrs. Sheehan ($840, $840 and
        $642), Rogers ($840, $840 and $579), Maroney ($714, $613 and $404),
        Mancuso ($588, $546 and $354) and Spinney ($420, $123 and $0) in 2002,
        2001 and 2000, respectively.
(4)     Amounts shown represent commission payments made during 2002, 2001 and
        2000 and relate in part to revenues generated in 2001, 2000 and 1999,
        respectively.
(5)     Mr. Spinney joined the Company in September 2001.

11

<Page>

OPTION GRANTS IN 2002

        The following table sets forth certain information regarding options to
purchase Common Stock granted during 2002 by the Company to the Named Executive
Officers. The Company did not grant any stock appreciation rights in 2002.

&lt;Table&gt;
&lt;Caption&gt;

| | | | INDIVIDUAL GRANTS | | PO' |
| NAME | NUMBER OF SHARES UNDERLYING OPTIONS GRANTED | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE PRICE ($/SHARE) (1) | EXPIRATION DATE | VALI PERCI PI ------- 5' ------ |
| ---- | ---------- | ------------- | -------------- | ---------- | ---- |
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| Kevin J. Sheehan...... | 3,428(a) | 0.51% | 29.0290 | 11/16/08 | |
| | 30,000(b) | 4.45% | 31.0900 | 11/12/12 | 5: |
| | | | | | |
| Michael F. Rogers..... | 3,324(a) | 0.49% | 31.0900 | 11/16/08 | |
| | 66,513(c) | 9.86% | 31.0900 | 11/12/12 | 1,3⋅ |
| | 3,476(a) | 0.52% | 36.2150 | 11/18/07 | |
| | 4,454(a) | 0.66% | 36.2150 | 11/16/08 | |
| | | | | | |
| Edmund J. Maroney..... | 20,000(b) | 2.97% | 31.0900 | 11/12/12 | 3⋅ |
| | | | | | |
| Robert D. Mancuso..... | 20,000(b) | 2.97% | 31.0900 | 11/12/12 | 3⋅ |
| | 2,722(a) | 0.40% | 36.9700 | 11/18/07 | : |
| | 2,037(a) | 0.30% | 36.9700 | 11/16/08 | : |
| | | | | | |
| John N. Spinney, Jr... | 20,000(b) | 2.97% | 31.0900 | 11/12/12 | 3⋅ |
| | 50,000(d) | 7.41% | 36.9700 | 6/18/12 | 1,1⋅ |

&lt;/Table&gt;

----------

(a)     Grants are exercisable immediately.

(b)     Grants become exercisable in 48 equal monthly installments beginning
        November 12, 2002 and include a reload feature. The reload feature
        provides that on an exercise of options in which the optionee makes
        payment through the delivery of previously owned shares of the
        Company's Common Stock, the optionee shall receive an additional
        option to purchase that number of shares of the Company's Common
        Stock as was delivered in payment for such exercise.
(c)     Of the number shown, (i) a portion of the grant (25,000) becomes
        exercisable in 48 equal monthly installments beginning November 12,
        2002 and includes a reload feature, and (ii) the remainder of the
        grant (41,513) is exercisable immediately.
(d)     Grant becomes exercisable in four annual installments beginning June
        18, 2002 and includes a reload feature.


(1)     The exercise price per share of each option was determined by the
        Compensation Committee to be equal to the fair market value per share
        of the Common Stock on the date of grant.
(2)     Amounts shown represent hypothetical gains that could be achieved for
        the respective options exercised at the end of the option term. These
        gains are based on assumed rates of appreciation of 5% and 10%
        compounded annually from the date the respective options were granted
        to their expiration date. The gains shown are net of the option
        exercise price, but do not include deductions for taxes or other
        expenses associated with the exercise of the options or sale of the
        underlying shares. The actual gains, if any, on the stock option
        exercises will depend on the future performance of the Common Stock,
        the optionholder's continued employment through the option period, the

date on which the options are exercised and the date on which the
underlying shares of Common Stock are sold. The potential realizable
value does not represent the Company's prediction of its future stock
price performance.

12

<Page>

AGGREGATED OPTION EXERCISES IN 2002
AND OPTION VALUES AT DECEMBER 31, 2002

The following table sets forth certain information regarding stock
option exercises by the Named Executive Officers in 2002 and the number and
value of the Named Executive Officers' unexercised stock options at December 31,
2002.

<Table>
<Caption>

|  | | | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT DECEMBER 31, 2002(#) | |
| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($)(1) | EXERCISABLE | UNEXERCISABLE |
| ---- | --------------- | --------------- | ----------- | ------------- |
| <S> | <C> | <C> | <C> | <C> |
| Kevin J. Sheehan..... | 16,704 | 387,125 | 903,255 | 193,759 |
| Michael F. Rogers.... | 66,704 | 1,918,004 | 683,418 | 161,465 |
| Edmund J. Maroney.... | 0 | -- | 356,445 | 106,673 |
| Robert D. Mancuso.... | 50,144 | 1,384,854 | 303,042 | 106,673 |
| John N. Spinney, Jr.. | 0 | -- | 13,333 | 76,667 |

</Table>

----------
(1)    Calculated as the difference between the fair market value of the
       underlying Common Stock at the exercise date of the options and the
       aggregate exercise price. Actual gains on stock option exercises depend
       on the value of the underlying Common Stock on the date such Common
       Stock is actually sold.
(2)    Value is based on the difference between the option exercise price and
       the fair market value of the Company's Common Stock on December 31,
       2002 ($27.39 per share, the last reported sales price of the Company's
       Common Stock on the Nasdaq National Market on December 31, 2002)
       multiplied by the number of shares underlying the option. The actual
       gains, if any, on stock option exercises will depend on the future
       performance of the Common Stock, the optionholder's continued
       employment through the option period, the date on which the options are
       exercised and the date on which the underlying shares of Common Stock
       are sold.

STOCK PLANS

The Company currently has three stock plans: the 1995 Plan, the
Director Plan and the 1997 Employee Stock Purchase Plan (the "1997 Plan"). Each
of the 1995 Plan, the Director Plan and the 1997 Plan have been approved by
stockholders. The Company does not have any equity compensation plans that have
not been approved by stockholders.

The following table provides aggregate information, as of December 31,
2002, regarding outstanding options and the number of shares of Common Stock
available for future issuance under the 1995 Plan, the Director Plan and the
1997 Plan.

<Table>
<Caption>

| Number of securities to be issued upon exercise of outstanding options, warrants and | Weighted-average exercise price of outstanding options, warrants and rights | Numbe: remaining ΐ |
| --- | --- | --- |

```
              rights
------------------------------------ ------------------------------------- -----------
        <S>                                       <C>                                 .
        6,621,152                                 $ 22                                .
------------------------------------ ------------------------------------- -----------
```

</Table>

*Includes shares available for issuance under the 1997 Plan.

13

<Page>

BONUSES

        The Company from time to time awards certain key employees bonuses
based on both individual and Company performance. The Company's 2002 Senior
Executive Bonus Plan was put in place in December 2001 and expired on December
31, 2002. The 2002 Senior Executive Bonus Plan established a target level for
2002 operating earnings per share and cash bonus pools for executive officers
based on achieving target levels. Bonuses were allocated to management based on
contributions to operating results. Payments to Named Executive Officers in 2002
were made in the following amounts: Mr. Sheehan $1,687,500; Mr. Rogers
$1,462,500; Mr. Maroney $956,250; Mr. Spinney $375,000; and all executive
officers as a group $4,825,000.

EMPLOYMENT AGREEMENTS

        The Company entered into amended and restated employment agreements
with Kevin J. Sheehan, Michael F. Rogers, Robert D. Mancuso and Edmund J.
Maroney on May 16, 2000, and with John N. Spinney, Jr. on November 12, 2002,
each with a term of three years, subject to annual renewal and earlier
termination. The agreements with Messrs. Sheehan, Rogers, Mancuso, Maroney and
Spinney currently have a term that expires on December 31, 2005.

        Messrs. Sheehan's, Rogers', Maroney's and Mancuso's and Mr. Spinney's
agreements provide that the Company will employ Messrs. Sheehan, Rogers,
Maroney, Mancuso and Spinney as Chief Executive Officer, President, Senior Vice
President - Technology and Senior Vice President - Marketing and Client
Management, and Senior Vice President and Chief Financial Officer, respectively,
and will pay them an annual salary determined by the Company's Board of
Directors, as well as an annual bonus under the Company's then applicable bonus
plans, if any. Under their employment agreements, the Company may terminate
their employment for cause defined as (i) a finding by a majority of the Board
of Directors that the employee has performed his duties inadequately, (ii)
action or inaction by the employee which results in a material breach of the
agreement or in the employee unfairly competing with the Company, (iii) the
commission of a felony which shall adversely affect the employee's ability to
perform his duties, or (iv) the commission of an act of fraud, dishonesty, gross
negligence or deliberate disregard for the rules and policies of the Company.
Termination for cause results in no liability to the Company beyond the payment
of wages to the date of discharge, except in the case of a termination solely
pursuant to a finding by a majority of the Board of Directors that an individual
has performed his or her duties inadequately, in which case the agreements
provide for a lump sum payment equal to nine months of annual salary at the then
current rate, as well as nine months of continuing medical coverage paid for by
the Company. Should their employment be terminated by the Company without cause,
by disability, or by Messrs. Sheehan, Rogers, Mancuso, Maroney or Spinney for
good reason, which good reason includes (i) a material change by the Company of
either of their authority, functions or duties which results in a reduction in
their respective position's scope, importance or responsibilities, (ii) a
failure by the Company to comply with the terms of the employment agreements,
and (iii) with respect to Mr. Sheehan only, a failure by the stockholders to
re-elect him as a director of the Company, the agreements provide for a lump sum
payment equal to the greater of twice their current annual salary and the amount
equal to the highest of their three most recent annual bonuses, or the salary
and bonus due to be paid under the remaining term of the agreement. Mr.
Mancuso's agreement bases the foregoing payment on the highest of his three most
recent annual sales commission payments, rather than bonus. The agreements also
provide for continuation of medical coverage for the longer of two years or the

remaining term of the agreement. The agreements also provide that the Company
shall pay to Messrs. Sheehan, Rogers, Mancuso, Maroney and Spinney an amount
sufficient to fund a life insurance policy payable to the beneficiaries of their
choice in a face amount equal to same amount as that they would receive upon
termination of their employment by the Company without cause.

          The Company also entered into change of control employment agreements
with Kevin J. Sheehan, Michael F. Rogers, Robert D. Mancuso, and Edmund J.
Maroney on May 16, 2000, and with John N. Spinney, Jr. on August 23, 2001. The
agreements with Messrs. Sheehan, Rogers, Mancuso, Maroney and Spinney currently
have a term of three years, subject to automatic annual renewal and earlier
termination.

                                       14
<Page>

          The change of control employment agreements become effective upon a
change in control of the Company, defined to be a consolidation, merger,
reorganization or sale or transfer of all or substantially all of the assets of
the Company, a change in a majority of the Board of Directors, or the
acquisition by any person of 20% or more of the voting securities of the
Company. The agreements provide that if any of Messrs. Sheehan, Rogers, Mancuso,
Maroney or Spinney is terminated during the term of his or her agreement, he or
she shall receive a lump sum severance payment equal to three times the
employee's most recent annual salary plus a payment equal to three times the
highest of the employee's three most recent annual bonuses, or, in the case of
Mr. Mancuso, the highest of his three most recent annual sales commission
payments, as well as an actuarial payment under any existing defined benefit
plan and continuing benefits and medical coverage for three years.

PENSION PLANS

          In 1971, the Company adopted the Investors Bank & Trust Pension Plan
(as amended, the "Pension Plan"), covering all employees who are at least 21
years of age. In 1996, the Company amended the Pension Plan to freeze the
admission of new entrants after December 31, 1996. The Pension Plan was amended
in December 2001 to freeze benefit accruals for certain highly compensated
participants as of December 31, 2002, as well as change the maximum allowable
compensation projected for future years. Such highly compensated participants
will receive their full benefit accrual under the Company's non-qualified
retirement plan, as described below. Benefits under the Pension Plan are based
on an employee's years of service and his or her final average monthly
compensation. A participant's monthly benefit at normal retirement (I.E., at or
after attaining the age of 65 years) payable as a life annuity equals a
percentage of the participant's final average monthly compensation multiplied by
years of service. The percentage varies depending on years of service and the
level of final average monthly compensation. Early retirement benefits are
available to participants who have attained age 55 and have at least 10 years of
service. Benefits are payable at retirement in the form of a monthly annuity or
a single lump sum.

          A participant's final average monthly compensation is the average of
such participant's total eligible compensation (I.E., basic cash remuneration
excluding incentive compensation) during the 60 consecutive months in the last
120 months of employment affording the highest such average subject to certain
limits on eligible compensation set by Federal law. For 2002, this limit was
$200,000. The Pension Plan's benefit formula described above became effective in
1991, but applies to all periods of benefit service.

          In 1994, the Company adopted the Investors Bank & Trust Supplemental
Executive Retirement Plan (as amended, the "SERP") covering certain employees.
The SERP is a non-qualified supplemental retirement plan and pays benefits for
certain participants in addition to benefits paid under the Pension Plan.
Benefits under the SERP are based on an employee's total compensation or the
portion of such employee's total compensation not included in the calculation of
benefits to be paid under the Pension Plan. Payments under the SERP are based on
years of service and the employee's final total compensation, including
incentive compensation (i.e. bonus and commissions) for certain participants.

          The following table shows the estimated annual benefits payable to

employees covered by both the Pension Plan and the SERP or exclusively by the SERP upon retirement in specified total compensation and years of service classifications. Amounts listed in the table are not subject to deduction for social security or other offset amounts.

<Table>
<Caption>

|  | Years of Service at Retirement (Age 65 in 2002) | | | | | |
|---|---|---|---|---|---|---|
| REMUNERATION | 10 | 15 | 20 | 25 | 30 | 35 |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| $    200,000 | $   40,953 | $   61,430 | $   81,907 | $    102,383 | $    109,883 | $   117, |
| $    500,000 | $  105,453 | $  158,180 | $  210,907 | $    263,633 | $    282,383 | $   301, |
| $  1,000,000 | $  212,953 | $  319,430 | $  425,907 | $    532,383 | $    569,883 | $   607, |
| $  1,500,000 | $  320,453 | $  480,680 | $  640,907 | $    801,133 | $    857,383 | $   913, |
| $  2,000,000 | $  427,953 | $  641,930 | $  855,907 | $  1,069,883 | $  1,144,883 | $ 1,219, |
</Table>

15

<Page>

The following Named Executive Officers have the specified credited years of service under the Pension Plan and the SERP as of December 31, 2002: Mr. Sheehan, 26.6 years; Mr. Rogers, 20.3 years; Mr. Maroney, 17.3 years; and Mr. Mancuso, 10.3 years. Mr. Spinney has 1.3 credited years of service under the SERP as of December 31, 2002. The summary compensation table previously presented does not reflect the payment to any of the Named Executive Officers of compensation pursuant to either the Pension Plan or the SERP, as payment obligations pursuant to each of the Pension Plan and the SERP are contingent on retirement.

REPORT OF COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

The Company's executive compensation program is administered by the three member Compensation Committee of the Board of Directors (the "Compensation Committee"). The three members of the Compensation Committee are independent non-employee directors. Pursuant to the authority delegated by the Board of Directors, the Compensation Committee establishes each year the compensation of the Chief Executive Officer, and together with the Chief Executive Officer, establishes the compensation of the other executive officers of the Company. The Compensation Committee then recommends those compensation packages to the full Board for its approval.

The Company's compensation policy for executive officers is designed to achieve the following objectives:
- To enhance profitability of the Company and increase stockholder value.
- To reward executives in accordance with the Company's annual and long-term performance goals.
- To recognize individual initiative and achievement.
- To provide competitive compensation that will attract and retain qualified executives.

The compensation program for executive officers consists of three primary elements: (1) base salary, which is determined on an annual basis and is primarily dependent on external market data; (2) annual incentive compensation in the form of cash bonuses which are based on the achievement of pre-determined financial objectives of the Company; and (3) long-term incentive compensation, in the form of stock options, granted periodically with the objective of aligning the executive officers' long-term interests with those of the stockholders, encouraging superior results over an extended period and retaining key executive officers. Annual incentive compensation for Mr. Mancuso is in the form of sales commission payments based on revenue received by the Company from new sales.

Base salary is intended to be competitive with base salary offered for similar executive positions at other local companies in the same or similar industries. The base salary for the Company's executive officers for 2002

reflected a mid-range level of competitive compensation in order to attract and retain key executive officers. In addition to external market data, the Committee also reviews the Company's financial performance and individual performances when adjusting base salary annually.

In the spring of 2002, the Compensation Committee engaged Hewitt Associates to perform an independent evaluation of executive compensation at the Company. The Hewitt report looked at each compensation component as well as the relative mix of compensation for executive officers of the Company. The report compared executive compensation at the Company to compensation at various other companies, including competitors of the Company. The report also used a number of third party compensation surveys. The report adjusted comparative compensation levels according to size of company and other factors. The Compensation Committee met independently with officials from Hewitt and used the information and analysis contained in the Hewitt report in developing the 2003 Executive Compensation Plan. The Compensation Committee met in executive session regularly while developing the 2003 Compensation Plan.

16

<Page>

In November 2002, the Compensation Committee set the terms for the 2003 Executive Compensation Plan, and recommended those terms to the full Board for approval. The full Board approved the 2003 Executive Compensation Plan at their November 2002 regular meeting. This plan established (i) base salaries for 2003; (ii) proposed option grant levels for 2003; (iii) target levels for operating earnings per share for 2003 and bonus amounts payable to executive officers under the Senior Executive Bonus Plan, based on achieving such targets and (iv) sales commission parameters for Mr. Mancuso. If 2003 operating earnings per share equal the minimum target, certain executive officers will receive bonuses ranging from 100% to 125% of their annual base pay, depending on their positions, with the Chief Executive Officer and the President each receiving 125% of their respective annual base pay. If 2003 operating earnings per share exceed the minimum target level, additional bonus amounts are available to the executive officers under the bonus plan, up to a maximum amount equal to 225% of their respective annual base pay. The actual level of bonus earned is based upon achievement of specific predetermined performance targets established by the Compensation Committee. No bonuses will be payable to executive officers if 2003 operating earnings per share are less than or equal to 2002 operating earnings per share. Mr. Mancuso receives commissions, subject to various eligibility requirements, on revenue received by the Company from sales to new clients and sales of new products to existing clients.

Federal law and regulations provide generally that in order to qualify for a tax deduction (as further explained later in this report), compensation in excess of $1 million paid to a public corporation's top executive officers must qualify as performance-based compensation. In order to qualify as performance-based compensation, bonuses must be earned under a plan, the material terms of which have been approved by stockholders. In general, the performance measures under such a plan must be reapproved by stockholders every five years. The Senior Executive Bonus Plan was last approved by stockholders in April 2001.

Long-term incentive compensation, in the form of stock options, also aligns executive officers' interests with those of stockholders. In addition, the Compensation Committee believes that equity ownership by executive officers helps to balance the short term focus of annual incentive compensation with an emphasis on long-term financial results and may help to retain key executive officers.

When establishing stock option grant levels, the Compensation Committee considers existing levels of stock ownership, previous grants of stock options, vesting schedules and exercise price of outstanding options and the current stock price. Stock options granted under the 1995 Plan have had an exercise price equal to the fair market value of the Company's Common Stock on the date of grant and generally vest over a four-year period.

The 2002 base salary for Mr. Sheehan, the Company's Chief Executive Officer, was established by the Board of Directors in December 2001. Under the terms of the 2002 Senior Executive Bonus Plan, Mr. Sheehan's bonus

eligibility was set forth on a matrix under which Mr. Sheehan would receive
no bonus if 2002 operating earnings per share did not exceed 2001 operating
earnings per share. Mr. Sheehan's bonus eligibility increased incrementally
in relation to the amount by which 2002 operating earnings exceeded 2001
operating earnings. In accordance with the terms of the 2002 Senior Executive
Bonus Plan, at the Company's operating earnings per share level of $1.04 for
2002, Mr. Sheehan was eligible for a bonus equal to 225% of his 2002 salary,
or $1,687,500. Accordingly, approximately 69% of Mr. Sheehan's $2,437,500 in
2002 cash compensation was based on corporate performance, specifically, the
Company's operating earnings per share. Also, the Compensation Committee
granted Mr. Sheehan options to purchase 30,000 shares of Common Stock under
the Company's 2002 Executive Compensation Plan. The Board of Directors
believes that Mr. Sheehan has led the Company toward achieving its goals of
growth in revenue and the client base and expansion in the breadth of
services provided. The Board specifically noted the Company's overall
performance under Mr. Sheehan's leadership, especially through the difficult
economic and market conditions experienced in 2002.


        In general, under Section 162(m) of the Internal Revenue Code of 1986,
as amended (the "Code"), the Company cannot deduct, for federal income tax
purposes, compensation in excess of $1,000,000 paid to certain executive
officers. This deduction limitation does not apply, however, to compensation
that

                                      17

<Page>

constitutes "qualified performance-based compensation" within the meaning of
Section 162(m) of the Code and the regulations promulgated thereunder. The
Compensation Committee has considered the limitations on deductions imposed by
Section 162(m) of the Code, and it is the Compensation Committee's present
intention that, for so long as it is consistent with its overall compensation
objectives, substantially all tax deductions attributable to executive
compensation will not be subject to the deduction limitations of Section 162(m)
of the Code.

        The Compensation Committee is satisfied that the executive officers of
the Company are dedicated to achieving significant improvements in the long-term
financial performance of the Company and that the compensation policies and
programs implemented and administered have contributed and will continue to
contribute towards achieving this goal.

                         RESPECTFULLY SUBMITTED BY
                         THE COMPENSATION COMMITTEE
                         OF THE BOARD OF DIRECTORS

                            James M. Oates
                            Frank B. Condon, Jr.
                            Thomas P. McDermott

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

        The Company's Board of Directors has established a Compensation
Committee currently consisting of Messrs. Oates, Condon and McDermott, who were
the only members of the Compensation Committee during 2002. No executive officer
of the Company served as a member of the Compensation Committee of another
entity (or other committee of the Board of Directors performing equivalent
functions or, in the absence of any such committee, the entire Board of
Directors), one of whose executive officers served as a director of the Company.

COMPENSATION OF DIRECTORS

        Employee directors do not receive cash compensation for their service
as members of the Board of Directors. For 2002, non-employee directors received
a retainer fee of $15,000, paid quarterly, and an additional $2,142.86 for each
meeting of the Board of Directors they attended. During 2003, each non-employee
director will receive a retainer fee of $20,000 and additional meeting fees for
each meeting attended totaling $15,000 if all regular meetings are attended.
During 2003, each member of the Audit Committee will receive additional fees
equal to $4,000. Seven Board of Director Meetings were planned for 2002 and

seven are planned for 2003. Non-employee directors are also eligible for participation in the 1995 Non-Employee Director Stock Option Plan, pursuant to which each non-employee director receives automatic grants of options and is eligible to receive his or her annual fee in the form of stock options. Pursuant to the Director Plan, immediately following the 2002 Annual Meeting of Shareholders, each of Messrs. Condon, Fraser, Friedl, McDermott, Oates and Ms. Swersky received an option to purchase 5,000 shares of Common Stock at an exercise price equal to the fair market value of the Company's Common Stock on the date of grant. In addition, under the Director Plan, directors may elect to receive their retainer fee in the form of stock options. Pursuant to this election, Messrs. Condon, Fraser, Friedl and McDermott were granted options to purchase a total of 2,728 shares of the Company's common stock. In each such case, the exercise price per share of each option was determined to be equal to the fair market value per share of the Common Stock on the date of grant.

STOCK PERFORMANCE

        The following graph compares the change in the cumulative total stockholder return on the Company's Common Stock for the period from January 1, 1998 through December 31, 2002, with the cumulative total return on the Center for Research in Securities Prices Index for the Nasdaq Stock Market

18

<Page>

("Nasdaq Stock Market Index") and the Center for Research in Securities Prices Index for Nasdaq financial stocks ("Nasdaq Financial Stocks Index"). The comparison assumes $100 was invested on December 31, 1997 in the Company's Common Stock at the $5.75 closing price on that day and in each of the foregoing indices and assumes reinvestment of dividends, if any.

[CHART]

                Comparison of Five Year( )Cumulative Total Return Among
            Investors Financial Services Corp., Nasdaq Stock Market Index
                        and Nasdaq Financial Stocks Index

<Table>
<Caption>
|  | 12/31/97 | 12/31/98 | 12/31/99 | 12/29/00 | 12/31/ |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Investors Financial Services Corp. | 100.00 | 129.88 | 200.35 | 748.35 | 576.4 |
| Nasdaq Stock Market Index | 100.00 | 140.99 | 261.48 | 157.42 | 124.8 |
| Nasdaq Financial Stocks Index | 100.00 | 97.99 | 96.50 | 104.23 | 114.5 |
</Table>

                    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

        The Company has adopted a policy whereby all transactions between the Company and its officers, directors and affiliates will be on terms no less favorable to the Company than could be obtained from unrelated third parties and will be approved by a majority of the disinterested members of the Company's Board of Directors.

19

<Page>

                                PROPOSAL 2

            APPROVAL OF AN AMENDMENT OF THE COMPANY'S CERTIFICATE OF
                                INCORPORATION

GENERAL

        The Board of Directors has voted to recommend to stockholders that the Company amend its Certificate of Incorporation (the "Certificate of

Incorporation") to limit the ability of the Company to indemnify its officers
and directors. The full text of the Certificate of Amendment (the "Certificate
of Amendment") to the Certificate of Incorporation that will effect the
aforementioned amendment (the "Charter Amendment") is attached hereto as
EXHIBIT B.

        The Board of Directors approved the Charter Amendment largely in
response to industry guidance given by the Federal Reserve Board to bank holding
companies concerning indemnification agreements and payments. The purpose of the
guidance was to remind bank holding companies of the limitations upon
indemnification imposed by section 18(K) of the Federal Deposit Insurance Act
and the regulations issued thereunder (the "Indemnification Limits"). The
Indemnification Limits apply to preserve the deterrent effects of administrative
enforcement action by ensuring that individuals subject to final enforcement
actions bear the cost of any judgments, fines and associated legal expenses, and
to safeguard the assets of financial institutions. The Indemnification Limits
prohibit a bank holding company from paying or reimbursing an "Institution
Affiliated Party" (an "IAP" i.e., an officer, director, employee, controlling
stockholder or one who participates in the affairs of the bank holding company)
for any liability or legal expense derived from a bank regulatory administrative
proceeding that results in a final order or settlement in which the IAP is
assessed a civil money penalty, is removed or prohibited from banking, or is
required to cease an action or take any affirmative action, including making
restitution. The Indemnification Limits allow reasonable payments to purchase
liability insurance, but the insurance may not pay or reimburse an IAP for any
final judgment or civil money penalty assessed against the IAP.

        The Charter Amendment is intended to clarify that the indemnification
provisions of the Certificate of Incorporation comply with the Indemnification
Limits by explicitly limiting indemnification such that no indemnification or
insurance coverage provided shall exceed that permitted by applicable law.

BOARD OF DIRECTORS' RESERVATION OF RIGHTS

        If the Charter Amendment is approved by the stockholders, the Charter
Amendment will become effective upon the filing of the Certificate of Amendment
with the Delaware Secretary of State. The Board reserves the right,
notwithstanding stockholder approval and without further action by the
stockholders, to elect not to proceed with the Charter Amendment, if at any time
prior to filing the Certificate of Amendment with the Secretary of State of the
State of Delaware the Board, in its sole discretion, determines that the Charter
Amendment is no longer in the best interests of the Company and its
stockholders. In addition, the Board reserves the right to delay filing the
Certificate of Amendment for up to 12 months following stockholder approval of
the Charter Amendment at the Annual Meeting. However, at the present time, the
Board intends to proceed with the Charter Amendment as presented without delay.

        Approval of the Charter Amendment will require an affirmative vote of
seventy-five percent (75%) of the voting power of all of the then outstanding
shares of the capital stock of the Company entitled to vote generally in the
election of directors, voting together as a single class. Abstention from voting
on this proposal will have the same effect as a vote "against" this proposal.

                THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR"
                        THE PROPOSED CHARTER AMENDMENT.

                                      20

<Page>

                                  PROPOSAL 3

                    RATIFICATION OF SELECTION OF AUDITORS

        The Board of Directors, upon the recommendation of the Audit Committee,
has selected the firm of Deloitte & Touche LLP ("Deloitte & Touche"),
independent certified public accountants, to serve as auditors for the fiscal
year ending December 31, 2003. Deloitte & Touche has served as the Company's
accountants since the fiscal year ended October 31, 1989. It is expected that a
member of Deloitte & Touche will be present at the Annual Meeting with the
opportunity to make a statement if so desired and will be available to respond
to appropriate questions. Ratification of the selection of auditors is not

required under the laws of the State of Delaware but will be considered by the Board of Directors in selecting auditors for future years.

The following table details aggregate fees billed for 2002 and 2001 by Deloitte & Touche to the Company.

<Table>
<Caption>

|                    | Aggregate Fees Billed for Fiscal Year Ended | |
|                    | 2002 | 2001 |
| Services           |      |      |
| -------            | ---- | ---- |
| <S>                | <C>  | <C>  |
| Audit Fees         | $ 417,150 | $ 356,500 |
| Audit-Related Fees | $     0 | $     0 |
| Tax Fees           | $     0 | $     0 |
| Other Fees         | $  49,500 | $  99,400 |
</Table>

----------

The Audit Committee of the Board of Directors has considered whether the provision of the services by Deloitte & Touche covered by the caption "Other Fees" in the above-table is compatible with Deloitte & Touche's independence and has concluded that it is.

Ratification of the selection of Deloitte & Touche to serve as auditors for the fiscal year ending December 31, 2003 will require an affirmative vote of a majority of the outstanding shares of Common Stock of the Company represented in person or by proxy at the Annual Meeting and voting on this proposal.

THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE RATIFICATION OF THE SELECTION OF DELOITTE & TOUCHE LLP.

SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), requires the Company's directors, executive officers and holders of more than 10% of the Company's Common Stock (collectively, "Reporting Persons") to file with the Securities and Exchange Commission (the "Commission") initial reports of ownership and reports of changes in ownership of Common Stock of the Company. Such persons are required by regulations of the Commission to furnish the Company with copies of all such filings. Based on its review of the copies of such filings received by it with respect to the year ended December 31, 2002, the Company believes that all Reporting Persons complied with all Section 16(a) filing requirements in the year ended December 31, 2002, except that Phyllis S. Swersky filed late one Form 4 with respect to one sale of shares of the Company.

21

<Page>

STOCKHOLDER PROPOSALS

Proposals of stockholders intended for inclusion in the Company's proxy materials to be furnished to all stockholders entitled to vote at the 2004 Annual Meeting of Stockholders pursuant to Rule 14a-8 promulgated by the Commission under the Exchange Act must be received at the Company's principal executive offices not later than November 15, 2003. Under the Company's By-laws, stockholders who wish to make a proposal at the 2004 Annual Meeting - other than one that will be included in the Company's proxy materials - must notify the Company no earlier than October 16, 2003 and no later than November 15, 2003. If a stockholder who wishes to present a proposal fails to notify the Company by November 15, 2003, the stockholder would not be entitled to present the proposal at the meeting. If, however, notwithstanding the requirements of the Company's By-laws, the proposal is brought before the meeting, then consistent with the Commission's proxy rules the proxies solicited by management with respect to the 2004 Annual Meeting will confer discretionary voting authority with respect to the stockholder's proposal on the persons selected by management to vote the proxies. If a stockholder makes a timely notification, the proxies may still exercise discretionary voting authority under circumstances consistent with the Commission's proxy rules. All stockholder proposals must comply with the

applicable requirements of the Company's By-laws, a copy of which is on file
with the Commission. In order to curtail controversy as to the date on which a
proposal was received by the Company, it is suggested that proponents submit
their proposals by Certified Mail, Return Receipt Requested, to Investors
Financial Services Corp., P.O. Box 9130, Boston, MA 02117-9130, Attention:
Corporate Secretary.

22

<Page>

APPENDIX A

## INVESTORS FINANCIAL SERVICES CORP.

### AUDIT COMMITTEE CHARTER

PURPOSE

        The Audit Committee (Committee) shall provide assistance to the Boards
of Directors of Investors Financial Services Corp. ("IFSC") and its subsidiaries
(collectively, the "Company"), including Investors Bank & Trust Company (the
"Bank"), in fulfilling their oversight responsibilities to shareholders relating
to (i) the reliability and integrity of corporate accounting and financial
reporting practices; (ii) the quality and integrity of financial statements and
reports; (iii) the performance of the Company's internal audit function and
independent auditors; (iv) compliance with laws, regulations and Company
policies; and (v) maintenance of a sound system of internal controls. In doing
so, it is the responsibility of the Audit Committee to maintain free and open
means of communication among the Directors, the independent auditors, and the
Company's internal auditors and management.

### COMMITTEE MEMBERSHIP AND ORGANIZATION

        The Committee shall be composed of a minimum of three members. Each
Committee member shall meet any independence requirements promulgated by the
Securities and Exchange Commission (the "SEC"), the National Association of
Securities Dealers, any exchange upon which securities of the Company are
traded, and any governmental or regulatory body exercising authority over the
Company (each a "Regulatory Body"). Each member of the Committee shall be free
from any relationship that, in the opinion of the Board, would interfere with
the exercise of his or her independent judgment as a member of the Committee. At
least one member of the Committee shall be a "financial expert" as defined by
the rules of the SEC, and all members of the Committee shall have a strong level
of business or financial acumen (as determined in the reasonable discretion of
the Board).

        The members of the Committee shall be appointed by the Board on the
recommendation of the Nominating and Corporate Governance Committee. Committee
members may be replaced by the Board.

        The Committee shall meet as often as the Committee or the Committee
Chair determines, but not less frequently than quarterly. If circumstances
warrant, an unscheduled meeting of the Committee can be called with or without
the presence of the Company's management. The Committee strongly supports
confidential exchanges with internal auditors and independent auditors.
Therefore, no less frequently than annually, the Committee shall meet with the
Director of Internal Audit without the presence of management. In addition, at
all meetings where independent auditors are present, the Committee will ensure
that sufficient opportunity is made available for the independent auditors to
meet with the Committee without management present.

        The Committee shall have the authority to retain independent legal,
accounting or other consultants to advise the Committee. The Committee shall
also have the authority, to the extent it deems necessary or appropriate, to ask
the Company to provide the Committee with the support of one or more Company
employees to assist it in carrying out its duties. The Company shall provide for
appropriate funding, as determined by the Committee, for payment of compensation
to the independent auditors for the purpose of rendering or issuing an audit
report and to any advisors employed by the Committee. The Committee may request
that any officer or employee of the Company or the Company's outside counsel or
independent auditors attend a meeting of the Committee or meet with any members

of, or consultants to, the Committee.

A-1

<Page>

COMMITTEE AUTHORITY AND RESPONSIBILITIES

    The following activities are set forth as a guide with the understanding that the Committee may diverge from this guide as it considers appropriate.

    CHARTER REVIEW

1.  Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

INDEPENDENT AUDITORS

2.  Appoint and compensate the independent auditors in connection with the preparation and issuance of an audit report regarding the Company's financial statements. The Committee shall receive regular reports regarding the work of the independent auditors, and may obtain the assistance of Company management in the negotiation of the terms of the independent auditors' engagement and the oversight of the independent auditors' performance.

3.  Review the experience and qualifications of the senior members of the independent auditors' team.

4.  Monitor the independence, qualifications and performance of the independent auditors by, among other things

   -  Obtaining and reviewing a report from the independent auditors at least annually regarding (a) the auditors' internal quality-control procedures, (b) any material issues raised by the most recent quality control review or peer review of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, (c) any steps taken to deal with any such issues, and (d) all relationships between the independent auditors and the Company.

   -  If so determined by the Committee, taking additional action to satisfy itself of the qualifications, performance and independence of the auditors.

5.  Oversee the rotation, at least once every five years, of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit.

6.  Meet with the independent auditors and management of the Company to review the scope, planning and staffing of the proposed audit activities for the coming year.

7.  Preapprove all auditing services and permitted non-audit services to be performed for the Company by the independent auditors, except as otherwise permitted by applicable law. In no event shall the independent auditors perform any non-audit services for the Company which are prohibited by Section 10A(g) of the Securities Exchange Act of 1934 (the "Exchange Act") or the rules of the SEC or the Public Corporation Accounting Oversight Board.

8.  Ensure that the Company's management cooperates with the independent auditors and provides access to all appropriate Company resources requested by the independent auditors in the course of their audit.

FINANCIAL REPORTING AND INTERNAL CONTROLS

9.  At the conclusion of the annual audit, meet with the independent auditors and management of the Company and review any related report or opinion issued by the independent auditors and any comments or recommendations stemming from the annual audit. Prior to the release of

the Company's audited and interim financial statements, review the financial statements with the independent auditors and financial management of the Company. Determine that the independent auditors are satisfied with the disclosure and content of the financial statements.

10. Review any changes in accounting principles, changes in the accounting treatment of significant transactions, and changes in financial reporting policies. Additionally, review the independent auditor's judgments regarding the quality and appropriateness of the Company's accounting

A-2

<Page>

principles, as applied in the Company's financial reporting, and the clarity of the Company's financial disclosure practices. Inquire as to the auditors' judgments regarding the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates and other significant decisions made by management in preparing the financial disclosure. Review any significant disagreement or difficulty encountered during the course of the audit.

11. Annually discuss with the independent auditors the matters required to be discussed by Statement on Accounting Standards 61.

12. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

13. Discuss with management, either specifically or by discussion of the types of information to be disclosed and the types of presentation to be made, the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information and any earnings guidance, as well as financial information provided to rating agencies.

14. Based on the reviews and discussions of the Committee pursuant to its responsibilities under this charter, determine on an annual basis whether to recommend to the full Board of Directors that the audited financial statements of the Company be included in the Company's Annual Report on Form 10-K.

15. Review with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditors' reviews of the quarterly financial statements.

16. Review and approve Audit Committee disclosures to be contained in the Company's proxy statement for its annual meeting of stockholders, including the Audit Committee Report and disclosure regarding the independence of members of the Committee. The Committee shall ensure that this Charter is attached as an appendix to the Company's proxy statement at least once every three years.

17. Review with the independent auditors, the Company's internal auditor, and the Company's financial management, the effectiveness and integrity of the accounting, financial and other internal controls of the Company, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls are desirable. In this regard, the Committee shall review management's annual statement of responsibilities for preparing financial statements, establishing and maintaining an adequate internal control structure for financial reporting and major financial risk exposures, and complying with designated safety and soundness laws. The Committee shall also review management's assessments of the effectiveness of the Company's internal control structure and procedures for financial reporting as of the fiscal year-end and compliance with designated laws and regulations during the fiscal year. In addition, the Committee shall review the independent auditors' attestations on the aforementioned management assertions.

18. Monitor the Company's progress in promptly addressing and correcting any and all identified weaknesses or deficiencies in financial reporting, internal controls or related matters.

19. Receive periodic reports from the independent auditors and appropriate officers of the Company on significant accounting or reporting developments proposed by the Financial Accounting Standards Board or the SEC that may impact the Company.

20. Review with management and the independent auditors any effects of regulatory and accounting initiatives as well as any off-balance sheet structures on the Company's financial statements.

21. Review material regulatory inquiries and significant findings and recommendations of all regulatory reports of examination and management's responses thereto.

A-3

<Page>

INTERNAL AUDIT FUNCTION

22. Review and approve the appointment of the Director of Internal Audit.

23. Review and approve the Internal Audit Department's annual audit plans and budget and review the sufficiency of internal audit resources. Review the independence and authority of the internal audit function's reporting obligations and the coordination of efforts with the independent auditors.

24. At each meeting, but no less than quarterly, review significant internal audit reports containing management's responses completed since the previous Committee meeting, the status of the annual audit plan, and a progress report on the extent to which internal audit recommendations have been implemented by management. Any deviations from or modifications to the original audit plan will be reviewed with the Committee, as will be any changes in internal audit policies.

COMPLIANCE OVERSIGHT

25. Discuss with management and the internal auditors the Company's processes regarding compliance with applicable laws and regulations and obtain verbal or written reports from management and internal audit regarding compliance by the Company and its affiliated entities with applicable legal requirements.

26. Review annually the program established to monitor compliance with the Company's Code of Conduct.

27. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Conduct.

28. Obtain from the independent auditors any reports required to be furnished to the Committee under Section 10A of the Exchange Act or other applicable laws or regulations.

29. Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submissions by employees of the Company of concerns regarding questionable accounting, auditing or compliance matters.

30. Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports which raise material issues regarding the Company's financial statements or accounting policies or compliance with the Company's Code of Conduct.

31. Review with the Company's general counsel legal matters that may have a material impact on the financial statements, the Company's compliance

policies and any material reports or inquiries received from regulators
or governmental agencies.

SUBSIDIARIES OF IFSC

32. Perform the duties required to be performed by the audit committee of
    the Bank to the extent permitted, and in the manner required, by
    applicable laws and regulations.

GENERAL

33. Under the direction of the Chairperson of the Committee, report on the
    Committee's activities at the next Board of Directors meeting or, if
    deemed necessary by the Committee Chair, earlier.

34. Investigate any matter brought to the Committee's attention within the
    scope of its duties.

35. Meet at least annually with the chief financial officer, the general
    counsel, the senior internal auditing executive and the independent
    auditor in separate executive sessions.

36. Annually review the performance of the Committee.

A-4

<Page>

## General

The Committee's role is one of oversight as set forth in this charter. It
is not the duty of the Committee to plan or conduct audits or to determine that
the Company's financial statements are complete and accurate and are in
accordance with generally accepted accounting principles. The Company's
management is responsible for preparing the Company's financial statements and
for maintaining internal controls, and the independent auditors are responsible
for auditing the financial statements. Nor is it the duty of the Committee to
conduct investigations, to resolve disagreements, if any, between management and
the independent auditors or to assure compliance with laws and regulations and
the Company's Code of Conduct.

Any duty or action of the Committee may be undertaken and fulfilled by the
Board as a whole in place of the Committee.

With respect to joint sessions of the Committee:

-       The Committee may meet simultaneously as a committee of IFSC
        and the Bank, though it should hold separate sessions if necessary
        to consider transactions between the two entities or other matters
        where IFSC and the Bank may have different interests; and

-       The Committee should consult with internal or outside counsel
        if, in the opinion of the Committee, any matter under consideration
        by the Committee has the potential for any conflict between the
        interests of IFSC and those of the Bank or IFSC's other subsidiaries
        in order to ensure that appropriate procedures are established for
        addressing any such potential conflict and for ensuring compliance
        with the Company's policies regarding Sections 23A and 23B of the
        Federal Reserve Act.

IN PERFORMING THEIR RESPONSIBILITIES, COMMITTEE MEMBERS ARE ENTITLED TO
RELY IN GOOD FAITH ON INFORMATION, OPINIONS, REPORTS OR STATEMENTS PREPARED OR
PRESENTED BY:

1. One or more officers or employees of the Company whom the Committee
   members reasonably believe to be reliable and competent in the
   matters presented;

2. Counsel, independent auditors, or other persons as to matters which
   the Committee members reasonably believe to be within the
   professional or expert competence of such person; or

3. Another committee of the Board as to matters within such other
committee's designated authority which other committee the Committee
members reasonably believe to merit confidence.

A-5

<Page>

APPENDIX B

CERTIFICATE OF AMENDMENT
OF
CERTIFICATE OF INCORPORATION
OF
INVESTORS FINANCIAL SERVICES CORP.

Investors Financial Services Corp. (the "Corporation"), a corporation
organized and existing under and by virtue of the General Corporation Law of the
State of Delaware ("GCL"), does hereby certify as follows, pursuant to Section
242 of the GCL:

FIRST: That pursuant to the authority conferred upon the Board of
Directors by the Certificate of Incorporation of the Corporation, the Board of
Directors, at a meeting held on August 13, 2002, in accordance with Section 242
of the GCL, duly adopted a resolution (i) proposing an amendment to the
Certificate of Incorporation of the Corporation, (ii) declaring said amendment
to be advisable and in the best interests of the Corporation's stockholders and
(iii) directing that the matter be submitted to the stockholders of the
Corporation for the approval of said amendment.

SECOND: The amendment to the Certificate of Incorporation of the
Corporation was duly adopted at the Annual Meeting of Stockholders of the
Corporation held on April 15, 2003, in accordance with Section 242 of the GCL.

THIRD: That in accordance with the aforementioned resolution, the
Corporation's Certificate of Incorporation is hereby amended by inserting at the
end of Article NINTH thereof, the following new Article NINTH, paragraph 16:

16. LIMITATION OF INDEMNIFICATION. NOTWITHSTANDING ANYTHING TO
THE CONTRARY CONTAINED IN THIS ARTICLE NINTH, NO INDEMNIFICATION
OR INSURANCE COVERAGE PROVIDED FOR HEREUNDER SHALL EXCEED THAT
PERMITTED BY APPLICABLE LAW.

FOURTH: That said amendment was duly adopted in accordance with the
provisions of Section 242 of the GCL.

IN WITNESS WHEREOF, Investors Financial Services Corp. has caused this
certificate to be signed by Kevin J. Sheehan, its Chief Executive Officer, as of
this 15th day of April, 2003.

INVESTORS FINANCIAL SERVICES CORP.

By:
--------------------------------
Name:  Kevin J. Sheehan
Title: Chief Executive Office

B-1

<Page>

P
R               INVESTORS FINANCIAL SERVICES CORP.
O
X
Y       PROXY SOLICITATION ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned hereby appoints Kevin J. Sheehan and John N. Spinney, Jr. and
each or either of them, proxies with full power of substitution to vote all
shares of stock of Investors Financial Services Corp. (the "Company") which
the undersigned is entitled to vote at the Annual Meeting of Stockholders of

the Company to be held on Tuesday, April 15, 2003, at 11:00 a.m., local time, at the Company's offices at 200 Clarendon Street, Boston, Massachusetts, and at any adjournment thereof, upon matters set forth in the Notice of 2003 Annual Meeting of Stockholders and Proxy Statement dated March 11, 2003, a copy of which has been received by the undersigned. The proxies are further authorized to vote, in their judgement, upon such other business as may properly come before the meeting or any adjournment thereof.

THE SHARES REPRESENTED BY THIS PROXY WILL BE VOTED AS DIRECTED, OR IF NO DIRECTION IS GIVEN, WILL BE VOTED FOR THE ELECTION OF DIRECTORS AS DESCRIBED IN ITEM 1, FOR THE PROPOSALS IN ITEMS 2 AND 3 AND IN THE JUDGMENT OF THE PROXIES NAMED HEREIN WITH RESPECT TO ANY OTHER MATTERS.

THE NOMINEES FOR CLASS II DIRECTOR ARE:
Frank B. Condon, Jr. and Robert B. Fraser

INSTRUCTION: To withhold your vote for any individual nominee, write that nominee's name in the space provided below Proposal 1 on reverse side. To vote for or against all nominees, see Proposal 1 on reverse side.

(TO BE SIGNED ON REVERSE SIDE)
--------------------------------------------------------------------------------
[arrow up] FOLD AND DETACH HERE [arrow up]
<Page>

/X/ Please mark your
    votes as in this
    example.

                                                     WITHHOLD
                                                     AUTHORITY TO
                                                     VOTE FOR ALL
                            FOR ALL NOMINEES         NOMINEES LISTED
                            LISTED ON REVERSE        ON REVERSE

1. To elect two (2)
   Class II Directors.
   See reverse side
   for instruction.         /       /                 /      /


<Table>
<Caption>

| | FOR | | AGAINST | | ABSTAIN | |
|---|---|---|---|---|---|---|
| <S> | <C> | | <C> | | <C> | |
| 2. To approve the amendment of the Company's Certificate of Incorporation limiting the indemnification of officers and directors as described in the Proxy Statement. | / | / | / | / | / | / |
| 3. To ratify the selection of Deloitte & Touche LLP as independent auditors for the fiscal year ending December 31, 2003. | / | / | / | / | / | / |

</Table>

SIGNATURE _____ DATE _____

NOTE: Please sign exactly as name appears herein, joint owners should each sign. When signing as attorney, executor, administrator, trustee or guardian, please give full title as such.

--------------------------------------------------------------------------------
[arrow up] FOLD AND DETACH HERE [arrow up]

</TEXT>

</DOCUMENT>

Exhibit 3

DEF 14A 1 a2129806zdef14a.htm DEF 14A
QuickLinks -- Click here to rapidly navigate through this document

# SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.        )

Filed by the Registrant ☐

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material Pursuant to §240.14a-12

**Investors Financial Services Corp.**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☒   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.
    (1)   Title of each class of securities to which transaction applies:

    (2)   Aggregate number of securities to which transaction applies:

    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)   Proposed maximum aggregate value of transaction:

    (5)   Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

_____

(2) Form, Schedule or Registration Statement No.:

_____

(3) Filing Party:

_____

(4) Date Filed:

_____

# INVESTORS
## FINANCIAL SERVICES CORP.

**200 Clarendon Street**
**Boston, MA 02116**

March 5, 2004

Dear Stockholder:

    We cordially invite you to attend the 2004 Annual Meeting of Stockholders of Investors Financial Services Corp. The meeting will be held in the Board Room on the 17th Floor at 200 Clarendon Street, Boston, Massachusetts, on Tuesday, April 13, 2004, at 11:00 a.m.

    Details regarding admission to the meeting and the business to be conducted are more fully described in the accompanying Notice of 2004 Annual Meeting of Stockholders and Proxy Statement.

    Your vote is very important. Whether or not you plan to attend the meeting, please carefully review the enclosed proxy statement. Then complete, sign, date and mail promptly the accompanying proxy in the enclosed return envelope. To be sure that your vote will be received in time, please return the proxy at your earliest convenience.

    We look forward to seeing you at the Annual Meeting so that we can update you on our progress. Your continuing interest is very much appreciated.

                                    Sincerely,

Kevin J. Sheehan
Chairman and Chief Executive Officer

**PLEASE NOTE: Stockholders should be aware of the increased security at public facilities in Boston. If you plan to attend the meeting, please allow additional time for registration and security clearance. You will be asked to present a valid, picture identification such as a driver's license. If you own your shares through a brokerage account or other nominee, you must bring proof of ownership (for details, see *Meeting Admission in the Notice of 2004 Annual Meeting of Stockholders*). Public parking is available nearby including in the John Hancock parking garage, which is one block further up Clarendon Street from our building on your right.**

# INVESTORS
## FINANCIAL SERVICES CORP.

**200 Clarendon Street**
**Boston, MA 02116**

### NOTICE OF 2004 ANNUAL MEETING OF STOCKHOLDERS

*Time*        11:00 a.m., Eastern Time

*Date*        Tuesday, April 13, 2004

*Place*       200 Clarendon Street, Seventeenth Floor, Boston, Massachusetts

*Purpose*     1.  To elect three (3) Class III directors;

2.  To approve an amendment to the Company's Certificate of Incorporation to increase the number of authorized shares of the Company's Common Stock;

3.  To approve an amendment to the Company's 1997 Employee Stock Purchase Plan to increase the number of shares available for issuance pursuant to the plan;

4.  To ratify the selection of Deloitte & Touche LLP as independent auditors for the fiscal year ending December 31, 2004; and

5.  To transact such other business as may properly come before the meeting or any adjournments thereof.

*Record Date*  The directors have fixed the close of business on February 20, 2004 as the record date for determining stockholders entitled to notice of and to vote at the meeting.

*Meeting*      For security clearance at the meeting you will be asked to present a valid
*Admission*    picture identification such as a driver's license or passport. If your Investors Financial Services Corp. stock is held in a brokerage account or by another nominee, you are considered the beneficial owner of shares held in street name, these proxy materials are being forwarded to you by your broker or nominee, and your name does not appear on the list of stockholders. Therefore if your stock is held in street name, you should also bring with you a letter or account statement showing that you were

the beneficial owner of the stock on the record date in order to be admitted to the meeting.

***Voting by Proxy***    Please submit a proxy as soon as possible so your shares can be voted at the meeting. You may submit your proxy by mail. If your stock is held in the name of a broker, bank or other nominee, you may have the choice of instructing the record holder as to the voting of your shares over the Internet or by telephone. Follow the instructions on the form you receive from your broker or bank.

By Order of the Board of Directors,

*John Elbery*

*Secretary*

March 5, 2004

# INVESTORS
## FINANCIAL SERVICES CORP.

**200 Clarendon Street**
**Boston, MA 02116**

PROXY STATEMENT

### GENERAL INFORMATION

***When was this proxy statement and the accompanying proxy scheduled to be sent to stockholders?***

This proxy statement and accompanying proxy were scheduled to be sent to stockholders beginning on or about March 5, 2004.

***Who is soliciting my vote?***

The Board of Directors of Investors Financial Services Corp. ("Investors Financial" or the "Company") is soliciting your vote for the 2004 Annual Meeting of Stockholders.

***How many votes can be cast by all stockholders?***

65,972,549 shares of Common Stock of Investors Financial are outstanding and entitled to vote at the meeting. Each share of Common Stock is entitled to one vote on each matter.

***How do I vote?***

You may vote in person at the Annual Meeting or by proxy without attending the meeting. To vote by proxy please mark, date, sign and return the enclosed proxy in the enclosed envelope. If you vote by the enclosed proxy your

shares will be voted at the meeting in accordance with your instructions or as provided in the proxy. If you do not give any instructions, your shares will be voted by the persons named in the proxy in accordance with the recommendations of the Board of Directors given below.

If your stock is held in the name of a broker, bank or other nominee, you may have the choice of voting your shares over the Internet or by telephone. Follow the instructions on the form you receive from your broker or bank.

To vote in person, bring a form of personal identification with you. If your stock is held by a broker, bank or other nominee, bring an account statement or a letter from the record holder indicating that you own the shares as of February 20, 2004, the record date, and obtain from the record holder a proxy issued in your name.

### *What are the Board's recommendations on how to vote my shares?*

The Board of Directors recommends a vote:

- FOR election of the three directors (page 6)

- FOR the amendment to Investors Financial's Certificate of Incorporation (page 21)

- FOR the amendment to Investors Financial's 1997 Employee Stock Purchase Plan (the "1997 Plan") (page 23)

- FOR the ratification of Deloitte & Touche LLP as Investors Financial's independent auditors (page 27)

1

### *Who pays the cost for soliciting proxies?*

Investors Financial will pay the cost of soliciting proxies. The solicitation of proxies will be made primarily by mail. Investors Financial has retained Innisfree M&A Corporation to aid in the solicitation of proxies for a fee of approximately $15,000, plus expenses. Proxies may be solicited personally, by telephone, fax and e-mail by employees of Investors Financial and its principal subsidiary, Investors Bank & Trust Company (the "Bank"), without any additional remuneration. Investors Financial will reimburse brokers, banks, custodians, other nominees and fiduciaries for forwarding these materials to their principals and for obtaining the authorization for the execution of proxies.

### *Can I change my vote?*

You may revoke your signed proxy at any time before it is voted by notifying the Secretary in writing, by returning a signed proxy with a later date, or by attending the meeting and voting in person. If your stock is held in street name, you must contact your broker or nominee for instructions as to how to change your vote.

### *What vote is required to approve each item?*

The three nominees for election as directors who receive a plurality of the shares voted for election of directors shall be elected directors (Item 1). The affirmative vote of a majority of all shares outstanding and entitled to vote is necessary to approve the amendment to Investors Financial's Certificate of Incorporation (Item 2). The affirmative vote of a majority of all shares present in person or represented by proxy at the meeting and entitled to vote is necessary to approve the amendment to the 1997 Plan (Item 3). The affirmative vote of a majority of all shares present in person or represented by proxy at the meeting and entitled to vote is necessary to ratify the selection of Deloitte & Touche LLP as Investors Financial's independent auditors (Item 4).

### *How is the vote counted?*

Votes cast by proxy or in person at the Annual Meeting will be counted by the persons appointed by Investors

Financial to act as tellers for the meeting. A majority of the shares entitled to vote at the Annual Meeting constitutes a quorum. The tellers will count shares represented by proxies that withhold authority to vote for a nominee for election as a director only as shares that are present and entitled to vote for purposes of determining the presence of a quorum. None of the withheld votes will be counted as votes "for" a director. Shares properly voted to "abstain" on a particular matter are considered as shares that are entitled to vote for the purpose of determining a quorum but are treated as having voted against the matter.

If you hold shares through a broker, bank or other nominee, generally the nominee may vote the shares for you in accordance with your instructions. Stock exchange and NASD rules prohibit a broker from voting shares held in a brokerage account on some proposals (a "broker non-vote") if the broker does not receive voting instructions from you. Under these rules, a broker may not vote in its discretion on Item 3. Shares that are subject to a broker non-vote are counted for determining the quorum but as not entitled to vote on the particular matter, so without voting instructions a broker non-vote could occur on Item 3. This will have the effect of the shares being voted against approval of Item 3.

### Could other matters be decided at the Annual Meeting?

We do not know of any other matters that may be presented for action at the meeting. Should any other business come before the meeting, the persons named on the enclosed proxy will have discretionary authority to vote the shares represented by such proxies in accordance with their best judgment.

2

## MANAGEMENT AND PRINCIPAL HOLDERS OF VOTING SECURITIES

The following table sets forth certain information regarding beneficial ownership of the Company's Common Stock as of February 20, 2004: (i) by each person who, to the knowledge of the Company, beneficially owned more than 5% of the shares of the Company's Common Stock outstanding at such date; (ii) by each director, nominee and each executive officer identified in the Summary Compensation Table set forth below under "Compensation and Other Information Concerning Directors and Officers"; and (iii) by all executive officers, directors and nominees as a group. Unless otherwise indicated below, each person listed maintains a business address c/o Investors Financial Services Corp., 200 Clarendon Street, Boston, MA 02116 and, to the knowledge of the Company, all persons listed below have sole voting and investment power with respect to their shares of Common Stock, except to the extent authority is shared by spouses under applicable law or as otherwise noted.

| Name and Address of Beneficial Owner | Amount and Nature of Ownership*** | Percent of Class** |
|---|---|---|
| Entities associated with FMR Corp. (1) 82 Devonshire Street Boston, MA 02109 | 4,910,233 | 7.44% |
| Entities associated with Oakmont Corporation (2) 865 South Figueroa Street Los Angeles, CA 90017 | 3,582,462 | 5.43% |
| Entities associated with William Blair & Company, L.L.C. (3) 222 West Adams Street Chicago, IL 60606 | 3,520,771 | 5.34% |
| Frank B. Condon, Jr. (4) | 74,892 | * |

| | | |
|---|---|---|
| Robert B. Fraser (5) | 81,210 | * |
| Donald G. Friedl (6) | 37,012 | * |
| Thomas P. McDermott (7) | 29,934 | * |
| James M. Oates (8) | 45,663 | * |
| Phyllis S. Swersky (9) | 28,946 | * |
| Kevin J. Sheehan (10) | 2,040,698 | 3.09% |
| Michael F. Rogers (11) | 1,849,135 | 2.80% |
| Edmund J. Maroney (12) | 552,480 | * |
| Robert D. Mancuso (13) | 632,480 | * |
| John N. Spinney, Jr. (14) | 40,797 | * |
| All executive officers and directors As a group (12 persons) (15) | 5,530,652 | 8.38% |

\*       Less than 1%

\*\*      Percentage ownership is based upon shares of Common Stock outstanding as of February 20, 2004. Shares of Common Stock that may be acquired by a listed person within 60 days of February 20,

3

2004 are deemed outstanding for purposes of computing the number of shares of Common Stock owned by that person, but are not deemed outstanding for purposes of computing the percentage ownership of any other person.

\*\*\*     On February 16, 1999, the Board of Directors declared a two-for-one stock split in the form of a 100% stock dividend payable March 17, 1999 to stockholders of record on March 1, 1999. On May 15, 2000, the Board of Directors declared a two-for-one stock split in the form of a 100% stock dividend payable June 15, 2000 to stockholders of record on May 31, 2000. On April 23, 2002, the Board of Directors declared a two-for-one stock split in the form of a 100% stock dividend payable June 14, 2002 to stockholders of record on May 24, 2002. Share numbers in this proxy statement have been restated to reflect these stock splits, where applicable.

(1)     All shares may be deemed to be beneficially owned by members of the Johnson family who may be deemed to control FMR Corp. Information with respect to FMR Corp. and its affiliates is derived from the Schedule 13G/A filed jointly by FMR Corp., Edward C. Johnson 3d, Abigail P. Johnson and Fidelity Management & Research Company with the Securities and Exchange Commission on or about February 17, 2004.

(2)     All shares may be deemed to be beneficially owned by Robert Day who may be deemed to control Oakmont Corporation. Information with respect to Oakmont Corporation and Robert Day is derived from the Schedule 13G/A filed jointly by Robert Day and Oakmont Corporation with the Securities and Exchange Commission on or about February 11, 2004. The reporting herein of such shares shall not be construed as an

admission by Mr. Day that Mr. Day is the beneficial owner thereof for purposes of Section 16 of the Securities Exchange Act of 1934 or for any other purpose.

(3)    All shares may be deemed to be beneficially owned by William Blair & Company, L.L.C. Information with respect to William Blair & Company, L.L.C., and its affiliates is derived from the Schedule 13G filed by William Blair & Company, L.L.C. with the Securities and Exchange Commission on or about February 6, 2004.

(4)    Includes 23,751 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the Company's 1995 Non-Employee Director Stock Option Plan (the "Director Plan").

(5)    Includes 57,333 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the Director Plan and the Company's Amended and Restated 1995 Stock Plan (the "1995 Plan").

(6)    Includes 16,716 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the Director Plan.

(7)    Includes 15,012 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the Director Plan.

(8)    Includes 11,069 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of options granted under the Director Plan.

(9)    Includes 22,546 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the Director Plan.

(10)    Includes 1,022,008 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the 1995 Plan.

(11)    Includes 779,285 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the 1995 Plan.

4

---

(12)    Includes 408,054 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the 1995 Plan.

(13)    Includes 235,109 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the 1995 Plan.

(14)    Includes 35,452 shares of Common Stock which may be purchased within 60 days of February 20, 2004 upon the exercise of stock options granted under the 1995 Plan.

(15)    Includes 2,751,282 shares of Common Stock which may be purchased by executive officers and directors within 60 days of February 20, 2004 upon the exercise of stock options granted under the 1995 Plan and shares of Common Stock which may be purchased by directors within 60 days of February 20, 2004 upon the exercise of stock options granted under the Director Plan.

5

---

## PROPOSAL 1

### ELECTION OF DIRECTORS

#### Nominees

The Company's Certificate of Incorporation and By-laws provide for a Board of Directors divided into three classes. The members of each class of directors serve for staggered three-year terms. Mr. Sheehan, Mr. Oates and Mr. McDermott are Class III directors whose terms expire at the 2004 Annual Meeting of Stockholders. The Board of Directors is also composed of (i) two Class I directors (Mr. Friedl and Ms. Swersky) whose terms expire upon the election and qualification of directors at the Annual Meeting of Stockholders to be held in 2005 and (ii) two Class II directors (Messrs. Condon and Fraser) whose terms expire upon the election and qualification of directors at the Annual Meeting of Stockholders to be held in 2006.

The Board of Directors has nominated and recommended that Mr. Sheehan, Mr. Oates and Mr. McDermott be elected Class III directors, to hold office until the Annual Meeting of Stockholders to be held in the year 2007 and until their successors have been duly elected and qualified or until their earlier resignation or removal. The Board of Directors knows of no reason why the nominees should be unable or unwilling to serve, but if any nominee should for any reason be unable or unwilling to serve, the proxies will be voted or not voted in accordance with the judgment of the persons named as attorneys-in-fact in the proxies with respect to the vacancy created by that nominee's inability or unwillingness to serve. Unless otherwise instructed, the proxy holders will vote the proxies received by them for the nominees named below.

### THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS
### A VOTE "FOR" THE ELECTION OF KEVIN J. SHEEHAN, JAMES M. OATES
### AND THOMAS P. MCDERMOTT

The following table sets forth the nominees to be elected at the Annual Meeting and each director whose term of office will extend beyond the Annual Meeting, the year such nominee or director was first elected a director, the positions currently held by the nominees and each director with the Company, the year the nominee's or director's term will expire and the class of director of each nominee and each director:

| Nominee's or Director's Name and Year Nominee or Director First Became a Director | Position(s) with the Company | Year Term Will Expire | Class of Director |
|---|---|---|---|
| **Nominees:** | | | |
| Kevin J. Sheehan (1990) | Chairman and Chief Executive Officer | 2007 | III |
| James M. Oates (1995) | Director | 2007 | III |
| Thomas P. McDermott (1995) | Director | 2007 | III |
| **Continuing Directors:** | | | |
| Donald G. Friedl (1996) | Director | 2005 | I |
| Phyllis S. Swersky (1996) | Director | 2005 | I |
| Frank B. Condon, Jr. (1986) | Director | 2006 | II |
| Robert B. Fraser (1996) | Director | 2006 | II |

6

## DIRECTORS AND EXECUTIVE OFFICERS

The following table sets forth the directors and the executive officers of the Company as of February 20, 2004, their ages, and the positions currently held by them with the Company. The Company's executive officers are appointed by, and serve at the discretion of, the Board of Directors. Each executive officer is a full time employee of the Company. There is no family relationship between any executive officer or director of the Company.

| Name | Age | Position |
| --- | --- | --- |
| Kevin J. Sheehan | 52 | Chairman of the Board and Chief Executive Officer |
| Michael F. Rogers | 46 | President |
| John N. Spinney, Jr. | 38 | Senior Vice President and Chief Financial Officer |
| Robert D. Mancuso | 43 | Senior Vice President—Marketing and Client Management |
| Edmund J. Maroney | 47 | Senior Vice President—Technology |
| John E. Henry | 39 | Senior Vice President, General Counsel and Secretary |
| James M. Oates | 57 | Director |
| Thomas P. McDermott | 68 | Director |
| Robert B. Fraser | 75 | Director |
| Frank B. Condon, Jr. | 68 | Director |
| Donald G. Friedl | 71 | Director |
| Phyllis S. Swersky | 52 | Director |

Mr. Oates is Chairman of the Compensation Committee of which Messrs. Condon and McDermott are also members. Mr. McDermott is Chairman of the Audit Committee of which Mr. Fraser and Ms. Swersky are also members. Mr. Condon is Chairman of the Nominating and Corporate Governance Committee of which Mr. McDermott and Mr. Oates are also members. Ms. Swersky and Mr. Friedl represent the Board of Directors on the Community Reinvestment Act Committee. The Company was organized in June 1995 to serve as the holding company for the Bank and for periods prior to that date, references to the Company mean the Bank.

**Mr. Sheehan** has served as a director since 1990. He has been Chief Executive Officer and Chairman of the Board of Directors since June 1995. Mr. Sheehan served as President from June 1992 to August 2001. Prior to joining the Company in May 1990 with the Company's acquisition of the Financial Products Services Division of the Bank of New England, Mr. Sheehan was a Senior Vice President at the Bank of New England.

**Mr. Rogers** has been President since August 2001, and has had responsibility for all operating areas since 1990. He served as Executive Vice President from September 1993 to August 2001. Prior to joining the Company in May 1990 with the Company's acquisition of the Financial Products Services Division of Bank of New England, Mr. Rogers was a Vice President at the Bank of New England.

**Mr. Spinney** has been Senior Vice President since August 2001 and Chief Financial Officer since January 2002. Prior to joining the Company in August 2001, Mr. Spinney was an audit partner in the Financial Services Practice of KPMG LLP, a public accounting firm.

**Mr. Mancuso** has been Senior Vice President—Marketing and Client Management since September 1993. He joined the Company in September 1992. Prior to joining the Company, Mr. Mancuso was Eastern Region Director of Sales for PRJ Associates, a software development firm.

7

**Mr. Maroney** has been Senior Vice President—Technology since July 1991. Mr. Maroney served as a Systems Manager in the custody department prior to becoming Senior Vice President. Prior to joining the Company in May 1990 with the Company's acquisition of the Financial Products Services Division of the Bank of New England, Mr. Maroney was Vice President at the Bank of New England.

**Mr. Henry** has been General Counsel of the Company since February 1996, Secretary of the Company since January 1997 and Senior Vice President since April 2000. Prior to joining the Company, Mr. Henry was an associate at the Boston law firm of Testa, Hurwitz & Thibeault, LLP. Mr. Henry is a Director of The Arts & Business Council of Greater Boston, a non-profit organization.

**Mr. Oates** has been a director of the Company since June 1995. Mr. Oates has been Chairman of Hudson Castle Group, Inc., since 1995 and has been the Managing Director of the Wydown Group since 1994. Mr. Oates served as President and Chief Executive officer of Neworld Bancorp Incorporated from 1984 to 1994. Mr. Oates is a Director and Chairman of the Investment Committee and Member of the Audit and Personnel Committees of Connecticut River Bancorp, Inc., and Connecticut River Bank. Mr. Oates is also a Director and Member of the Executive, Compensation, Audit and Finance Committees and Chairman of the Nominating and Corporate Governance Committee of Stifel Financial Corporation, a Director of the New Hampshire Trust Co., and a Director of twenty-five Phoenix Mutual Funds. He serves as a Member of the Consulting Committee of the Phoenix-Kayne Mutual Fund Board. Mr. Oates is Chairman of the Board of Directors and a Member of the Executive and Compensation Committees of Emerson Investment Management, Inc. Mr. Oates is also Treasurer, Director and the Chair of the Finance and Investment Committees of the Endowment for Health, a New Hampshire non-profit corporation; a member of the Investment Committee of the New Hampshire Charitable Foundation; a Trustee of Dean College and Trustee Emeritus for Middlesex School.

**Mr. McDermott** has been a director of the Company since June 1995. He has been Managing Director of TPM Associates, a consulting firm, since January 1994. He served as Managing Partner, New England Area of Ernst & Young LLP from 1989 to 1993. Mr. McDermott is also a Director of ACCION International, Massachusetts Eye & Ear Infirmary and Harvard University—LASPAU.

**Mr. Fraser** has been a director of the Company since June 1996. Mr. Fraser was Chairman of the Boston law firm of Goodwin Procter LLP from 1984 to 1997. He is also Chairman of The Arts & Business Council of Greater Boston and a Director of the Massachusetts Institute for a New Commonwealth (MassINC).

**Mr. Condon** has been a director of the Company since April 1986. From July 1982 to July 1993, he was Chief Executive Officer and President, and from July 1993 to April 1997 he was Chief Executive Officer and Chairman, of Woodstock Corporation, a Boston-based investment management firm and of its wholly owned subsidiary, Woodstock Service Corporation, a provider of financial services. Mr. Condon also serves as a Director of Big Sandy Management Company and Manager of Coal, Energy Investments & Management, LLC.

**Mr. Friedl** has been a director of the Company since February 1996. He was the Chairman, President and Chief Executive Officer of All Seasons Services, Inc., a commercial food and vending company, from 1986 until January 1997. He served as a Director of Classic Foods, Inc. from June of 1999 to March of 2002. Mr. Friedl currently serves as a Director of Marical, Inc., a marine biotechnology company, and as a Director of Custom Foods, Inc.

**Ms. Swersky** has been a director of the Company since February 1996. She has been President of The Meltech Group, a consulting firm specializing in business advisory services for high-growth potential businesses, since 1995. She was the President of The Net Collaborative, Inc., an Internet systems integration company, from 1996 to 1997. She served as President of Work/Family Directions, Inc., a provider of employee benefits programs, from 1992 through 1995. Prior to 1992, she

8

was Executive Vice President and Chief Financial Officer of AICorp, Inc., a computer software company.

Ms. Swersky also serves as a Director of Art Technology Corp., a computer software company, and Berkshire Life Insurance Company of America, Inc.

A director may be removed for cause, which is generally defined under Delaware law as an event of a substantial nature which directly affects the rights and interests of a company's stockholders, such as disclosing trade secrets of the Company or embezzling corporate funds, by a vote of at least a majority of the shares of the Company's capital stock entitled to vote in the election of directors. A director may be removed without cause by a vote of at least seventy-five percent of the shares of the Company's capital stock entitled to vote in the election of directors.

## THE BOARD OF DIRECTORS AND ITS COMMITTEES

The Board of Directors met ten times during the fiscal year ended December 31, 2003. The Board of Directors has determined that the following directors are independent under applicable laws, rules and regulations: Mr. Condon, Mr. Fraser, Mr. Friedl, Mr. McDermott, Mr. Oates and Ms. Swersky. The independent members of the Board of Directors met in executive session (without the presence of management) three times in 2003. The presiding director at each executive session rotates among the chairs of the Board's Audit, Compensation, and Nominating and Corporate Governance Committees. In 2003 the chairs of those Committees were Mr. McDermott, Mr. Oates and Mr. Condon, respectively.

The membership of the Audit Committee of the Board of Directors is currently comprised of Messrs. McDermott and Fraser and Ms. Swersky, all of whom have been determined to be independent. The functions and responsibilities of the Audit Committee are set forth below in the Report of the Audit Committee. The Audit Committee met ten times during the fiscal year ended December 31, 2003. The Board of Directors has determined that Thomas P. McDermott is an "audit committee financial expert" as defined in the applicable rules and regulations of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Board has adopted a written charter setting out the authority and responsibilities of the Audit Committee. The current Audit Committee Charter provides greater detail regarding the activities of the Audit Committee. A copy of the Audit Committee Charter is attached to this Proxy Statement as Appendix A and may be found on the Investor Relations section of the Company's website at *www.ibtco.com.*

The Compensation Committee is currently comprised of Messrs. Oates, McDermott and Condon, all of whom have been determined to be independent. The Compensation Committee operates under a written charter, a copy of which may be found on the Investor Relations section of the Company's website at *www.ibtco.com.* The Compensation Committee is responsible for administering the Company's stock plans and for reviewing and approving compensation matters concerning the executive officers and key employees of the Company. The Compensation Committee met four times during the fiscal year ended December 31, 2003.

The Nominating and Corporate Governance Committee is currently comprised of Messrs. Condon, McDermott and Oates, all of whom have been determined to be independent. The Nominating and Corporate Governance Committee operates under a written charter, a copy of which may be found on the Investor Relations section of the Company's website at *www.ibtco.com.* The Nominating and Corporate Governance Committee is responsible for oversight of corporate governance at the Company and recommending to the Board of Directors persons to be nominated for election or appointment as directors of the Company. The Nominating and Corporate Governance Committee met four times during the fiscal year ended December 31, 2003.

The Nominating and Corporate Governance Committee may use any of a number of methods to identify nominee candidates, including personal and industry contacts and recruiting firms. The Nominating and Corporate Governance Committee does not have specifically enumerated minimum qualifications for nominees, but instead seeks candidates with significant industry or management

9

experience who the Committee believes will contribute to the Board and the Company. The Nominating and Corporate Governance Committee did not engage any third party recruiting firms to identify nominees in 2003. Potential nominees are reviewed by the Committee. Candidates that pass the initial screening by the Committee will then be interviewed by the Committee. The Committee may also request input from, or interviews of candidates by, management of the Company.

The Nominating and Corporate Governance Committee will consider nominees recommended by stockholders. Any such recommendations should be submitted in writing to the Secretary of the Company at the Company's principal executive offices in accordance with the nominating procedures set forth in the Company's by-laws. Nominees recommended by stockholders will be evaluated in the manner described above. The Committee did not receive any stockholder nominee recommendations for the 2004 Annual Meeting of Stockholders.

The Community Reinvestment Act Committee, whose members are currently Ms. Swersky and Mr. Friedl, representing the Board of Directors, and Messrs. Sheehan and Henry and Deirdre Holland, representing management, is responsible for oversight of the Company's performance under the requirements of the Federal Community Reinvestment Act of 1977 and similar state law requirements. The Community Reinvestment Act Committee met four times during the fiscal year ended December 31, 2003.

During 2003, no director attended fewer than 75% of (i) the total number of meetings of the Board of Directors (held during the period for which he or she has been a director) or (ii) the total number of meetings of all committees of the Board on which he or she served (held during the period that he or she served).

The Board expects all directors to attend each Annual Meeting of Stockholders. All directors were present at the 2003 Annual Meeting of Stockholders.

Stockholders who wish to contact the Company's independent directors may do so via e-mail at *Board@ibtco.com.*

## REPORT OF THE AUDIT COMMITTEE

The functions of the Audit Committee (the "Audit Committee") are focused on the following areas:

- the reliability and integrity of the Company's accounting and financial reporting practices;

- the quality and integrity of the Company's financial statements and reports;

- the independent auditors' qualifications and independence;

- the performance of the Company's internal audit function and independent auditors;

- the Company's compliance with laws, regulations and internal policies; and

- the soundness of the Company's internal controls.

The directors who serve on the Audit Committee all meet the independence requirements promulgated by the Securities and Exchange Commission, including Rule 10A-3(b)(1) pursuant to the Exchange Act, and the National Association of Securities Dealers. The Board of Directors made an affirmative determination as to the independence of each member of the Audit Committee, including a determination that no member of the Audit Committee has a relationship to the Company that may interfere with his or her independence from the Company and its management. No member of the Audit Committee has participated in the preparation of the Company's financial statements, and each member is able to read and understand fundamental financial statements. In addition, as disclosed

above, the Board of Directors has determined that Thomas P. McDermott is an "audit committee financial expert," as defined in the applicable rules and regulations of the Exchange Act.

The Audit Committee met ten times during 2003.

The Board has adopted a written charter setting out the authority and responsibilities of the Audit Committee. A copy of the current Audit Committee Charter is attached to this Proxy Statement as Appendix A and provides greater detail regarding the activities of the Audit Committee.

Management has primary responsibility for the Company's consolidated financial statements and the overall reporting process, including the Company's system of internal controls.

The independent auditors audit the annual consolidated financial statements prepared by management, express an opinion as to whether those consolidated financial statements fairly present the financial position, results of operations and cash flows of the Company in conformity with generally accepted accounting principles and discuss with the Audit Committee any issues they believe should be raised with the Audit Committee.

For 2003, the Audit Committee engaged Deloitte & Touche, the Company's independent auditors. The Audit Committee reviewed the Company's audited consolidated financial statements and met with both management and Deloitte & Touche to discuss those consolidated financial statements. Management has represented to the Audit Committee that the consolidated financial statements were prepared in accordance with generally accepted accounting principles and fairly represent the financial condition and results of operations of the Company.

The Audit Committee has received from and discussed with Deloitte & Touche the written disclosures and the letter required by Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees). These items relate to Deloitte & Touche's independence from the Company. The Audit Committee also discussed with Deloitte & Touche the matters required to be discussed by Statement on Auditing Standards No. 61 (Communication with Audit Committees), as amended by Statement on Auditing Standards No. 90 (Audit Committees Communications).

Based on these reviews and discussions, the Audit Committee recommended to the Board that the Company's audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2003. The Audit Committee also engaged Deloitte & Touche to act as the Company's independent auditors for the 2004 fiscal year.

No portion of this Audit Committee Report shall be deemed to be incorporated by reference into any filing under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, through any general statement incorporating by reference in its entirety the Proxy Statement in which this report appears, except to the extent that the Company specifically incorporates this report or any portion of it by reference. In addition, this report shall not be deemed to be filed under either the Securities Act or the Exchange Act.

**Respectfully submitted by the**
**Audit Committee of the Board of Directors**

Thomas P. McDermott (Chairman)
Robert B. Fraser
Phyllis S. Swersky

11

**COMPENSATION AND OTHER INFORMATION**
**CONCERNING DIRECTORS AND EXECUTIVE OFFICERS**

## Executive Compensation

### Summary Compensation Table

The following table sets forth summary information concerning the compensation paid or earned for services rendered to the Company in all capacities during the years ended December 31, 2003, 2002 and 2001 to (i) the Company's Chief Executive Officer and (ii) each of the other four most highly compensated executive officers of the Company who received total annual salary and bonus in excess of $100,000 in fiscal 2003 (the "Named Executive Officers").

| Name and Principal Position | Year | Annual Compensation(1) | | Long Term Compensation Awards | All Other Compensation ($)(3) |
| | | Salary($) | Bonus or Commission($) | Options(#)(2) | |
| --- | --- | --- | --- | --- | --- |
| Kevin J. Sheehan | 2003 | 787,500 | 1,771,875 | 30,000 | 27,300 |
| Chief Executive Officer and | 2002 | 750,000 | 1,687,500 | 33,428 | 27,540 |
| Chairman | 2001 | 650,000 | 1,462,500 | 70,557 | 26,640 |
| Michael F. Rogers | 2003 | 682,500 | 1,535,625 | 70,052 | 14,570 |
| President | 2002 | 650,000 | 1,462,500 | 77,767 | 14,810 |
| | 2001 | 550,000 | 1,237,500 | 103,962 | 13,910 |
| Edmund J. Maroney | 2003 | 446,250 | 1,004,063 | 22,438 | 10,453 |
| Senior Vice | 2002 | 425,000 | 956,250 | 20,000 | 10,631 |
| President—Technology | 2001 | 365,000 | 821,250 | 46,199 | 9,630 |
| Robert D. Mancuso | 2003 | 367,500 | 498,678(4) | 130,964 | 9,466 |
| Senior Vice President—Marketing | 2002 | 350,000 | 675,654(4) | 24,759 | 9,643 |
| and Client Management | 2001 | 325,000 | 579,438(4) | 45,048 | 8,701 |
| John N. Spinney, Jr. | 2003 | 300,000 | 675,000 | 22,954 | 7,960 |
| Senior Vice President and Chief | 2002 | 250,000 | 375,000 | 70,000 | 6,420 |
| Financial Officer | 2001(5) | 72,115 | 150,000 | 20,000 | 123 |

(1) Excludes non-cash compensation that in the aggregate does not exceed the lesser of $50,000 or 10% of such named individual's cash compensation.

(2) Adjusted to reflect the two-for-one stock split of the Company's Common Stock on June 14, 2002.

(3) The amount shown for each Named Executive Officer for 2003, 2002 and 2001 includes the dollar value ($6,000, $6,000 and $5,100) of matching contributions made pursuant to the Company's 401(k) plan, a qualified employee benefit defined contribution plan, for 2003, 2002 and 2001, respectively. Also included are amounts paid to cover certain life insurance arrangements and net premiums paid by the Company for term life insurance, for the benefit of Messrs. Sheehan ($21,300, $21,540, $21,540), Rogers ($8,570, $8,810, $8,810), Maroney ($4,543, $4,631, $4,530), Mancuso ($3,055, $3,643, $3,601) and Spinney ($1,960, $420, $123) in 2003, 2002 and 2001, respectively.

(4) Amounts shown represent commission payments made during 2003, 2002 and 2001 and relate in part to revenues generated in 2002, 2001 and 2000, respectively.

(5) Mr. Spinney joined the Company in September 2001.

## Option Grants in 2003

The following table sets forth certain information regarding options to purchase Common Stock granted during 2003 by the Company to the Named Executive Officers. The Company did not grant any stock appreciation rights in 2003.

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Percentage Rates of Stock Price Appreciation For Option Term (2) | |
| | | | | | | |
| Name | Number of Shares Underlying Options Granted | % of Total Options Granted to Employees in Fiscal Year | Exercise Price ($/Share) (1) | Expiration Date | 5% ($) | 10% ($) |
|------|------|------|------|------|------|------|
| Kevin J. Sheehan | 30,000(a) | 3.9544 | 34.79 | 11/17/13 | 656,377 | 1,663,389 |
| Michael F. Rogers | 25,000(a) | 3.2953 | 34.79 | 11/17/13 | 546,981 | 1,386,158 |
| | 36,837(b) | 4.8557 | 34.79 | 11/17/13 | 805,966 | 2,042,475 |
| | 8,215(b) | 1.0829 | 36.00 | 11/16/08 | 81,708 | 180,552 |
| Edmund J. Maroney | 20,000(a) | 2.6363 | 34.79 | 11/17/13 | 437,585 | 1,108,926 |
| | 2,438(b) | 0.3214 | 28.10 | 11/18/07 | 18,927 | 41,825 |
| Robert D. Mancuso | 20,000(a) | 2.6363 | 34.79 | 11/17/13 | 437,585 | 1,108,926 |
| | 71,001(b) | 9.3590 | 34.79 | 11/17/13 | 1,553,448 | 3,936,743 |
| | 17,999(b) | 2.3725 | 22.71 | 11/16/08 | 139,017 | 315,381 |
| | 956(b) | 0.1260 | 26.69 | 11/16/08 | 8,678 | 19,687 |
| | 484(b) | 0.0638 | 28.13 | 11/15/09 | 5,543 | 12,917 |
| | 20,506(b) | 2.7054 | 29.80 | 11/15/09 | 208,008 | 471,898 |
| John N. Spinney, Jr. | 20,000(a) | 2.6363 | 34.79 | 11/17/13 | 437,585 | 1,108,926 |
| | 2,954(b) | 0.3894 | 36.51 | 10/16/11 | 51,494 | 123,337 |

(a)    Grants become exercisable in 48 equal monthly installments beginning November 17, 2003 and include a reload feature. The reload feature provides that on an exercise of options in which the optionee makes payment through the delivery of previously owned shares of the Company's Common Stock, the optionee shall receive an additional option to purchase that number of shares of the Company's Common Stock as was delivered in payment for such exercise.

(b)    Grants are exercisable immediately.

(1)    The exercise price per share of each option was determined by the Compensation Committee to be equal to the fair market value per share of the Common Stock on the date of grant.

(2)    Amounts shown represent hypothetical gains that could be achieved for the respective options exercised at the end of the option term. These gains are based on assumed rates of appreciation of 5% and 10% compounded annually from the date the respective options were granted to their expiration date. The gains shown are net of the option exercise price, but do not include deductions for taxes or other expenses associated with the exercise of the options or sale of the underlying shares. The actual gains, if any, on the stock option exercises will depend on the future performance of the Common Stock, the optionholder's continued employment through the option period, the date on which the options are exercised and the date on which the underlying

shares of Common Stock are sold. The potential realizable value does not represent the Company's prediction of its future stock price performance.

13

## Aggregated Option Exercises in 2003
## and Option Values at December 31, 2003

The following table sets forth certain information regarding stock option exercises by the Named Executive Officers in 2003 and the number and value of the Named Executive Officers' unexercised stock options at December 31, 2003.

| Name | Shares Acquired On Exercise (#) | Value Realized ($)(1) | Number of Securities Underlying Unexercised Options at December 31, 2003(#) | | Value of Unexercised In-The-Money Options at December 31, 2003 ($)(2) | |
| | | | Exercisable | Unexercisable | Exercisable | Unexercisable |
|---|---|---|---|---|---|---|
| Kevin J. Sheehan | 0 | 0.00 | 997,008 | 130,006 | 24,030,323 | 722,132 |
| Michael F. Rogers | 48,144 | 1,400,297.13 | 758,451 | 108,340 | 12,268,160 | 601,785 |
| Edmund J. Maroney | 12,496 | 278,707.04 | 394,724 | 78,336 | 9,188,090 | 450,915 |
| Robert D. Mancuso | 169,624 | 2,956,111.71 | 292,719 | 78,336 | 3,283,967 | 450,915 |
| John N. Spinney, Jr. | 5,000 | 40,389.22 | 32,120 | 75,834 | 424,576 | 274,987 |

(1)     Calculated as the difference between the fair market value of the underlying Common Stock at the exercise date of the options and the aggregate exercise price. Actual gains on stock option exercises depend on the value of the underlying Common Stock on the date such Common Stock is actually sold.

(2)     Value is based on the difference between the option exercise price and the fair market value of the Company's Common Stock on December 31, 2003 ($38.41 per share, the last reported sales price of the Company's Common Stock on the Nasdaq National Market on December 31, 2003) multiplied by the number of shares underlying the option. The actual gains, if any, on stock option exercises will depend on the future performance of the Common Stock, the optionholder's continued employment through the option period, the date on which the options are exercised and the date on which the underlying shares of Common Stock are sold.

### Stock Plans

The Company currently has three stock plans: the 1995 Plan, the Director Plan and the 1997 Plan. Each of the 1995 Plan, the Director Plan and the 1997 Plan have been approved by stockholders. The Company does not have any equity compensation plans that have not been approved by stockholders.

The following table provides aggregate information, as of December 31, 2003, regarding outstanding options and the number of shares of Common Stock available for future issuance under the 1995 Plan, the Director Plan and the 1997 Plan.

| Number of securities to be issued upon exercise of | Weighted-average exercise price of outstanding options, | Number of securities remaining available for |
|---|---|---|

| outstanding options, warrants and rights | warrants and rights | future issuance |
|---|---|---|
| 6,547,086 | $ 24 | 3,980,312* |

*Includes shares available for issuance under the 1997 Plan.

14

## Employment Agreements

The Company entered into amended and restated employment agreements with Kevin J. Sheehan, Michael F. Rogers, Robert D. Mancuso and Edmund J. Maroney on May 16, 2000, and with John N. Spinney, Jr. on November 12, 2002, each with a term of three years, subject to annual renewal and earlier termination. The agreements with Messrs. Sheehan, Rogers, Mancuso, Maroney and Spinney currently have a term that expires on December 31, 2006.

Messrs. Sheehan's, Rogers', Maroney's and Mancuso's and Mr. Spinney's agreements provide that the Company will employ Messrs. Sheehan, Rogers, Maroney, Mancuso and Spinney as Chief Executive Officer, President, Senior Vice President—Technology and Senior Vice President—Marketing and Client Management, and Senior Vice President and Chief Financial Officer, respectively, and will pay them an annual salary determined by the Company's Board of Directors, as well as an annual bonus under the Company's then applicable bonus plans, if any. Under their employment agreements, the Company may terminate their employment for cause defined as (i) a finding by a majority of the Board of Directors that the employee has performed his duties inadequately, (ii) action or inaction by the employee which results in a material breach of the agreement or in the employee unfairly competing with the Company, (iii) the commission of a felony which shall adversely affect the employee's ability to perform his duties, or (iv) the commission of an act of fraud, dishonesty, gross negligence or deliberate disregard for the rules and policies of the Company. Termination for cause results in no liability to the Company beyond the payment of wages to the date of discharge, except in the case of a termination solely pursuant to a finding by a majority of the Board of Directors that an individual has performed his duties inadequately, in which case the agreements provide for a lump sum payment equal to nine months of annual salary at the then current rate, as well as nine months of continuing medical coverage paid for by the Company. Should their employment be terminated by the Company without cause, by disability, or by Messrs. Sheehan, Rogers, Mancuso, Maroney or Spinney for good reason, which good reason includes (i) a material change by the Company of either of their authority, functions or duties which results in a reduction in their respective position's scope, importance or responsibilities, (ii) a failure by the Company to comply with the terms of the employment agreements, and (iii) with respect to Mr. Sheehan only, a failure by the stockholders to re-elect him as a director of the Company, the agreements provide for a lump sum payment equal to the greater of twice their current annual salary and the amount equal to the highest of their three most recent annual bonuses, or the salary and bonus due to be paid under the remaining term of the agreement. Mr. Mancuso's agreement bases the foregoing payment on the highest of his three most recent annual sales commission payments, rather than bonus. The agreements also provide for continuation of medical coverage for the longer of two years or the remaining term of the agreement. The agreements also provide that the Company shall pay to Messrs. Sheehan, Rogers, Mancuso, Maroney and Spinney an amount sufficient to fund a life insurance policy payable to the beneficiaries of their choice in a face amount comparable to the amount they would receive upon termination of their employment by the Company without cause.

The Company also entered into change of control employment agreements with Kevin J. Sheehan, Michael F. Rogers, Robert D. Mancuso, and Edmund J. Maroney on May 16, 2000, and with John N. Spinney, Jr. on August 23, 2001. The agreements with Messrs. Sheehan, Rogers, Mancuso, Maroney and Spinney currently have a term of three years, subject to automatic annual renewal and earlier termination.

The change of control employment agreements become effective upon a change in control of the Company, defined to be a consolidation, merger, reorganization or sale or transfer of all or substantially all of the assets of the

Company, a change in a majority of the Board of Directors, or the acquisition by any person of 20% or more of the voting securities of the Company. The agreements provide that if any of Messrs. Sheehan, Rogers, Mancuso, Maroney or Spinney is terminated during the term of his agreement, he shall receive a lump sum severance payment equal to three times the employee's most recent annual salary plus a payment equal to three times the highest of the employee's

15

three most recent annual bonuses, or, in the case of Mr. Mancuso, the highest of his three most recent annual sales commission payments, as well as an actuarial payment under any existing defined benefit plan and continuing benefits and medical coverage for three years.

## Pension Plans

In 1971, the Company adopted the Investors Bank & Trust Pension Plan (as amended, the "Pension Plan"), covering all employees who are at least 21 years of age. In 1996, the Company amended the Pension Plan to freeze the admission of new entrants after December 31, 1996. The Pension Plan was amended in December 2001 to freeze benefit accruals for certain highly compensated participants as of December 31, 2002, as well as change the maximum allowable compensation projected for future years. Such highly compensated participants will receive their full benefit accrual under the Company's non-qualified retirement plan, as described below. Benefits under the Pension Plan are based on an employee's years of service and his or her final average monthly compensation. A participant's monthly benefit at normal retirement (*i.e.*, at or after attaining the age of 65 years) payable as a life annuity equals a percentage of the participant's final average monthly compensation multiplied by years of service. The percentage varies depending on years of service and the level of final average monthly compensation. Early retirement benefits are available to participants who have attained age 55 and have at least 10 years of service. Benefits are payable at retirement in the form of a monthly annuity or a single lump sum.

A participant's final average monthly compensation is the average of such participant's total eligible compensation (*i.e.*, basic cash remuneration excluding incentive compensation) during the 60 consecutive months in the last 120 months of employment affording the highest such average subject to certain limits on eligible compensation set by Federal law. For 2003, this limit was $200,000. The Pension Plan's benefit formula described above became effective in 1991, but applies to all periods of benefit service.

In 1994, the Company adopted the Investors Bank & Trust Supplemental Executive Retirement Plan (as amended, the "SERP") covering certain employees. The SERP is a non-qualified supplemental retirement plan and pays benefits for certain participants in addition to benefits paid under the Pension Plan. Benefits under the SERP are based on an employee's total compensation or the portion of such employee's total compensation not included in the calculation of benefits to be paid under the Pension Plan. Payments under the SERP are based on years of service and the employee's final total compensation, including incentive compensation (i.e. bonus and commissions) for certain participants.

The following table shows the estimated annual benefits payable to employees covered by both the Pension Plan and the SERP or exclusively by the SERP upon retirement in specified total compensation and years of service classifications. Amounts listed in the table are not subject to deduction for social security or other offset amounts.

| Remuneration | | Years of Service at Retirement (Age 65 in 2003) | | | | | |
|---|---|---|---|---|---|---|---|
| | | 10 | 15 | 20 | 25 | 30 | 35 |
| $ | 200,000 | $ 40,953 | $ 61,430 | $ 81,907 | $ 102,383 | $ 109,883 | $ 117,383 |
| $ | 500,000 | $ 105,453 | $ 158,180 | $ 210,907 | $ 263,633 | $ 282,383 | $ 301,133 |
| $ | 1,000,000 | $ 212,953 | $ 319,430 | $ 425,907 | $ 532,383 | $ 569,883 | $ 607,383 |
| $ | 1,500,000 | $ 320,453 | $ 480,680 | $ 640,907 | $ 801,133 | $ 857,383 | $ 913,633 |
| $ | 2,000,000 | $ 427,953 | $ 641,930 | $ 855,907 | $ 1,069,883 | $ 1,144,883 | $ 1,219,883 |

The following Named Executive Officers have the specified credited years of service under the Pension Plan and the SERP as of December 31, 2003: Mr. Sheehan, 27.6 years; Mr. Rogers, 21.3 years; Mr. Maroney, 18.3 years; and Mr. Mancuso, 11.3 years. Mr. Spinney has 2.3 credited years of service under the SERP as of December 31, 2003. The summary compensation table previously presented does

16

not reflect the payment to any of the Named Executive Officers of compensation pursuant to either the Pension Plan or the SERP, as payment obligations pursuant to each of the Pension Plan and the SERP are contingent on retirement.

## Report of Compensation Committee on Executive Compensation

The Company's executive compensation program is administered by the three member Compensation Committee of the Board of Directors (the "Compensation Committee"). The three members of the Compensation Committee are independent non-employee directors. Pursuant to the authority delegated by the Board of Directors, the Compensation Committee establishes each year the compensation of the Chief Executive Officer, and together with the Chief Executive Officer, establishes the compensation of the other executive officers of the Company. The Compensation Committee then recommends those compensation packages to the full Board for its approval.

The Company's compensation policy for executive officers is designed to achieve the following objectives:

- To enhance profitability of the Company and increase stockholder value.

- To reward executives in accordance with the Company's annual and long-term performance goals.

- To recognize individual initiative and achievement.

- To provide competitive compensation that will attract and retain qualified executives.

The compensation program for executive officers consists of three primary elements: (1) base salary, which is determined on an annual basis and is primarily dependent on external market data; (2) annual incentive compensation in the form of cash bonuses which are based on the achievement of pre-determined financial objectives of the Company; and (3) long-term incentive compensation, in the form of stock options, granted periodically with the objective of aligning the executive officers' long-term interests with those of the stockholders, encouraging superior results over an extended period and retaining key executive officers. Annual incentive compensation for Mr. Mancuso is in the form of sales commission payments based on revenue received by the Company from new sales.

Base salary is intended to be competitive with base salary offered for similar executive positions at other local companies in the same or similar industries. The base salary for the Company's executive officers for 2003 reflected a mid-range level of competitive compensation in order to attract and retain key executive officers. In addition to external market data, the Committee also reviews the Company's financial performance and individual performances when adjusting base salary annually.

In the spring of 2002, the Compensation Committee engaged Hewitt Associates to perform an independent evaluation of executive compensation at the Company. The Hewitt report looked at each compensation component as well as the relative mix of compensation for executive officers of the Company. The report compared executive compensation at the Company to compensation at various other companies, including competitors of the Company. The report also used a number of third party compensation surveys. The report adjusted comparative compensation levels according to size of company and other factors. The Compensation Committee met independently with officials from Hewitt and used the information and analysis contained in the Hewitt report in developing the 2003 Executive Compensation Plan. The Compensation Committee met in executive session regularly while developing

the 2003 Compensation Plan.

In November 2003, the Compensation Committee set the terms for the 2004 Executive Compensation Plan, and recommended those terms to the full Board for approval. The full Board approved the 2004 Executive Compensation Plan at their November 2003 regular meeting. This plan established (i) base salaries for 2004; (ii) proposed option grant levels for 2004; (iii) target levels for

17

operating earnings per share for 2004 and bonus amounts payable to executive officers under the Senior Executive Bonus Plan, based on achieving such targets and (iv) sales commission parameters for Mr. Mancuso. If 2004 GAAP (Generally Accepted Accounting Principles) earnings per share equal the minimum target, certain executive officers will receive bonuses ranging up to 265% of their annual base pay, depending on their positions, with the Chief Executive Officer and the President each receiving 265% of their respective annual base pay. If 2004 GAAP earnings per share exceed the minimum target level, additional bonus amounts are available to the executive officers under the bonus plan, up to a maximum amount equal to 325% of their respective annual base pay. The actual level of bonus earned is based upon achievement of specific predetermined performance targets established by the Compensation Committee. No bonuses will be payable to executive officers if 2004 GAAP earnings per share are less than or equal to 2003 GAAP earnings per share. Mr. Mancuso receives commissions, subject to various eligibility requirements, on revenue received by the Company from sales to new clients and sales of new products to existing clients.

Federal law and regulations provide generally that in order to qualify for a tax deduction (as further explained later in this report), compensation in excess of $1 million paid to a public corporation's top executive officers must qualify as performance-based compensation. In order to qualify as performance-based compensation, bonuses must be earned under a plan, the material terms of which have been approved by stockholders. In general, the performance measures under such a plan must be reapproved by stockholders every five years. The Senior Executive Bonus Plan was last approved by stockholders in April 2001.

Long-term incentive compensation, in the form of stock options, also aligns executive officers' interests with those of stockholders. In addition, the Compensation Committee believes that equity ownership by executive officers helps to balance the short-term focus of annual incentive compensation with an emphasis on long-term financial results and may help to retain key executive officers.

When establishing stock option grant levels, the Compensation Committee considers existing levels of stock ownership, previous grants of stock options, vesting schedules and exercise price of outstanding options and the current stock price. Stock options granted under the 1995 Plan have had an exercise price equal to the fair market value of the Company's Common Stock on the date of grant and generally vest over a four-year period.

The 2003 base salary for Mr. Sheehan, the Company's Chief Executive Officer, was established by the Board of Directors in December 2002. Under the terms of the 2003 Senior Executive Bonus Plan, Mr. Sheehan's bonus eligibility was set forth on a matrix under which Mr. Sheehan would receive no bonus if 2003 GAAP earnings per share did not exceed 2002 GAAP earnings per share. Mr. Sheehan's bonus eligibility increased incrementally in relation to the amount by which 2003 GAAP earnings exceeded 2002 GAAP earnings. In accordance with the terms of the 2003 Senior Executive Bonus Plan, at the Company's GAAP earnings per share level of $1.38 for 2003, Mr. Sheehan was eligible for a bonus equal to 225% of his 2003 salary, or $1,771,875. Accordingly, approximately 69% of Mr. Sheehan's $2,559,375 in 2003 cash compensation was based on corporate performance, specifically, the Company's GAAP earnings per share. Also, the Compensation Committee granted Mr. Sheehan options to purchase 30,000 shares of Common Stock under the Company's 2003 Executive Compensation Plan. The Board of Directors believes that Mr. Sheehan has led the Company toward achieving its goals of growth in revenue and the client base and expansion in the breadth of services provided. The Board specifically noted the Company's overall performance under Mr. Sheehan's leadership, especially through the volatile economic and market conditions experienced in 2003.

In general, under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), the Company cannot deduct, for federal income tax purposes, compensation in excess of $1,000,000 paid to certain executive officers. This deduction limitation does not apply, however, to compensation that constitutes "qualified performance-based compensation" within the meaning of

18

Section 162(m) of the Code and the regulations promulgated thereunder. The Compensation Committee has considered the limitations on deductions imposed by Section 162(m) of the Code, and it is the Compensation Committee's present intention that, for so long as it is consistent with its overall compensation objectives, substantially all tax deductions attributable to executive compensation will not be subject to the deduction limitations of Section 162(m) of the Code.

The Compensation Committee is satisfied that the executive officers of the Company are dedicated to achieving significant improvements in the long-term financial performance of the Company and that the compensation policies and programs implemented and administered have contributed and will continue to contribute towards achieving this goal.

**Respectfully submitted by
the Compensation Committee
of the Board of Directors**

James M. Oates
Frank B. Condon, Jr.
Thomas P. McDermott

### Compensation Committee Interlocks and Insider Participation

The Company's Board of Directors has established a Compensation Committee currently consisting of Messrs. Oates, Condon and McDermott, who were the only members of the Compensation Committee during 2003. No executive officer of the Company served as a member of the Compensation Committee of another entity (or other committee of the Board of Directors performing equivalent functions or, in the absence of any such committee, the entire Board of Directors), one of whose executive officers served as a director of the Company.

### Compensation of Directors

Employee directors do not receive cash compensation for their service as members of the Board of Directors. For 2003, non-employee directors received a retainer fee of $20,000, paid quarterly, and an additional $2,143 for each meeting of the Board of Directors they attended. In addition, during 2003, each member of the Audit Committee received additional fees equal to $4,000.

The following table sets forth information concerning the compensation to be paid to each non-employee director of the Company during 2004 for their service as a member of the Board and each Committee thereof on which they serve.

### 2004 Non-Employee Director Compensation

|  | Retainer | Fee Per Meeting Attended* | |
|---|---|---|---|
| Board of Directors | $20,000 | $ | 2,200 |
| Audit Committee | — | | 1,500 |

| | | |
|---|---|---|
| Compensation Committee | — | 1,000 |
| Nominating and Corporate Governance Committee | — | 1,000 |
| Community Reinvestment Act Committee | — | 1,000 |

\*    Per meeting fees are only paid for scheduled in-person meetings.

19

Ten Board of Director Meetings were planned for 2003 and ten are planned for 2004. Each Committee plans four in-person meetings in 2004. Non-employee directors are also eligible for participation in the 1995 Non-Employee Director Stock Option Plan, pursuant to which each non-employee director receives automatic grants of options and is eligible to receive his or her annual fee in the form of stock options. Immediately following the 2003 Annual Meeting of Shareholders, each of Messrs. Condon, Fraser, Friedl, McDermott, Oates and Ms. Swersky were granted an option under the Director Plan to purchase 5,000 shares of Common Stock at an exercise price equal to the fair market value of the Company's Common Stock on the date of grant. In addition, under the Director Plan, directors may elect to receive their retainer fee in the form of stock options. Pursuant to this election, Messrs. Condon, Fraser, Friedl and McDermott were each granted options to purchase a total of 1,136 shares of the Company's common stock. In each such case, the exercise price per share of each option was determined to be equal to the fair market value per share of the Common Stock on the date of grant.

**Stock Performance**

The following graph compares the change in the cumulative total stockholder return on the Company's Common Stock for the period from January 1, 1999 through December 31, 2003, with the cumulative total return on the Center for Research in Securities Prices Index for the Nasdaq Stock Market ("Nasdaq Stock Market Index") and the Center for Research in Securities Prices Index for Nasdaq financial stocks ("Nasdaq Financial Stocks Index"). The comparison assumes $100 was invested on December 31, 1998 in the Company's Common Stock at the $7.25 closing price on that day and in each of the foregoing indices and assumes reinvestment of dividends, if any.

<div align="center">

**Comparison of Five Year Cumulative Total Return Among
Investors Financial Services Corp., Nasdaq Stock Market Index
and Nasdaq Financial Stocks Index**

</div>

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The Company has adopted a policy whereby all transactions between the Company and its officers, directors and affiliates will be on terms no less favorable to the Company than could be obtained from unrelated third parties and will be approved by a majority of the disinterested members of the Company's Board of Directors.

20

PROPOSAL 2

APPROVAL OF AN AMENDMENT TO THE COMPANY'S CERTIFICATE OF
INCORPORATION TO INCREASE THE NUMBER OF
AUTHORIZED SHARES OF COMMON STOCK

**General**

The Board of Directors has voted to recommend to stockholders that the Company amend its Certificate of Incorporation (the "Certificate of Incorporation") to increase the number of authorized shares of the Company's Common Stock from 100,000,000 to 175,000,000. Shares of the Company's Common Stock, including the additional shares proposed for authorization, do not have preemptive or similar rights. The full text of the Certificate of Amendment (the "Certificate of Amendment") to the Certificate of Incorporation that will effect the aforementioned amendment (the "Charter Amendment") is attached hereto as Appendix B. As of February 20, 2003, the record date for the Annual Meeting, 65,972,549 shares of Common Stock were outstanding, with an additional 4,235,065 shares reserved for issuance under the 1995 Plan, the 1997 Plan and the Director Plan.

The Board of Directors believes that the number of authorized shares of the Company's Common Stock should be increased to provide sufficient shares for such corporate purposes as may be determined by the Board of Directors to be necessary or desirable. These purposes may include, without limitation: facilitating broader ownership of the Company's Common Stock by effecting a stock split or issuing a stock dividend; acquiring other businesses in exchange for shares of the Company's Common Stock; and raising capital through the sale of the Company's Common Stock. The Board of Directors considers the authorization of additional shares of the

Company's Common Stock advisable to ensure availability of shares for issuance should the occasion arise, without the considerable delay and expense incident to the holding of a special meeting of stockholders to amend the Certificate of Incorporation. Authorized but unissued shares may be issued at such time or times, to such person or persons and for such consideration as the Board of Directors determines to be in the best interests of the Company, without further authorization from stockholders except as may be required by the rules of Nasdaq. If the Charter Amendment is approved, the Board will have the authority to issue 104,792,386 shares of Common Stock which are not otherwise reserved for issuance.

The authorization of additional shares of Common Stock will not, by itself, have any effect on the rights of the holders of existing shares. Any new shares of Common Stock, when issued, would have the same rights and privileges as the shares of Common Stock presently outstanding, and would be available for issuance at such times and on such terms as the Board of Directors may consider appropriate. Depending on the circumstances, issuance of additional shares of Common Stock could affect the existing holders of shares by diluting the voting power of the outstanding shares. Stockholders do not have pre-emptive rights to purchase additional shares of Common Stock nor will they as a result of this proposal.

There are no current negotiations, plans, commitments, agreements or understandings relating to the issuance of any additional shares of Common Stock. The timing of the actual issuance of additional shares will depend upon market conditions, the specific purpose for which the stock is to be issued and other similar factors.

**Possible Anti-Takeover Effects of the Charter Amendment**

The authorization of additional shares of Common Stock may be deemed to have an anti-takeover effect since such shares may be used, under certain circumstances, to create voting impediments to frustrate persons seeking to effect a takeover or otherwise gain control of the Company. In addition, the issuance of additional shares of Common Stock may have an anti-takeover effect, as attached to each share of Common Stock is the right, upon satisfaction of the conditions set forth in the

21

Company's Rights Agreement, dated as of September 25, 1995, as amended, to purchase shares of the Company's series A junior participating preferred stock, $.01 par value per share, which have 100 votes per share on all matters submitted to a vote of the stockholders of the Company.

The increase in authorized Common Stock and the possibility of the issuance of the shares of preferred stock may also be viewed as having the effect of discouraging an attempt by another person or entity, through the acquisition of a substantial number of shares of Common Stock, to acquire control of the Company, since the issuance of additional shares may be used to dilute such person's ownership of shares of the Company's voting stock.

The Charter Amendment has not been proposed as an anti-takeover measure nor is the Board aware of any offers to acquire control of the Company. It should be noted that any action taken by the Company to discourage an attempt to acquire control of the Company may result in stockholders not being able to participate in any possible premiums which may be obtained in the absence of anti-takeover provisions. Any transaction which may be so discouraged or avoided could be a transaction that the Company's stockholders might consider to be in their best interests. However, the Board has a fiduciary duty to act in the best interests of the Company's stockholders at all times.

**Board of Directors' Reservation of Rights**

If the Charter Amendment is approved by the stockholders, the Charter Amendment will become effective upon the filing of the Certificate of Amendment with the Delaware Secretary of State. The Board reserves the right, notwithstanding stockholder approval and without further action by the stockholders, to elect not to proceed with the Charter Amendment, if at any time prior to filing the Certificate of Amendment with the Secretary of State of the State of Delaware the Board, in its sole discretion, determines that the Charter Amendment is no longer in the best

interests of the Company and its stockholders. In addition, the Board reserves the right to delay filing the Certificate of Amendment for up to 12 months following stockholder approval of the Charter Amendment at the Annual Meeting. However, at the present time, the Board intends to proceed with the Charter Amendment as presented without delay.

Approval of the Charter Amendment will require an affirmative vote of a majority of the outstanding shares of Common Stock of the Company.

### THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE PROPOSED CHARTER AMENDMENT.

22

## PROPOSAL 3

### APPROVAL OF AN AMENDMENT TO THE COMPANY'S 1997 EMPLOYEE STOCK PURCHASE PLAN TO INCREASE THE NUMBER OF SHARES AVAILABLE FOR ISSUANCE PURSUANT TO THE PLAN

The 1997 Plan provides an incentive to, and encourages stock ownership by, all eligible employees of the Company and participating subsidiaries so that they may share in the growth of the Company by acquiring or increasing their proprietary interest in the Company. The 1997 Plan is designed to encourage eligible employees to remain in the employ of the Company. Under the 1997 Plan, eligible employees may use payroll deductions to fund purchases of the Company's Common Stock at a discount, through the exercise of stock options. It is intended that the 1997 Plan constitute an "employee stock purchase plan" within the meaning of Section 423(b) of the Code.

The Board of Directors has approved and recommends to stockholders that they approve an amendment to the 1997 Plan to increase the number of shares of Common Stock that may be issued under the 1997 Plan from 1,120,000 shares (after automatic adjustments made to take into account the two-for-one stock splits made by the Company with respect to its shares of Common Stock with issue/payable dates of June 14, 2002, June 15, 2000 and March 17, 1999, respectively) to 1,620,000 shares—an addition of 500,000 shares. As of December 31, 2003, 892,496 shares had been issued under the 1997 Plan and 227,504 shares remained available for issuance under the 1997 Plan.

The 1997 Plan was adopted by the Board of Directors on January 14, 1997, and approved by stockholders on April 15, 1997. The complete text of the 1997 Plan, as proposed to be amended, is attached hereto as Appendix C. A total of 227,504 shares of the Company's Common Stock remained available for issuance under the 1997 Plan as of the record date.

An employee electing to participate in the 1997 Plan must authorize an amount to be deducted by the Company from the employee's pay and applied toward the purchase of Common Stock under the 1997 Plan. On the first business day of each Payment Period (as defined in the 1997 Plan), the Company will grant to each 1997 Plan participant an option to purchase shares of Common Stock of the Company. On the last day of the Payment Period, the employee will be deemed to have exercised this option to the extent of such employee's accumulated payroll deductions. Under the terms of the 1997 Plan, the option price is an amount equal to the lesser of (i) 90% of the average market value of the Common Stock on the first business day of the Payment Period, and (ii) 90% of the average market value of the Common Stock on the last business day of the Payment Period.

The dollar value of benefits that will be received by any participant or group of participants in the 1997 Plan are not determinable due to the voluntary nature of the 1997 Plan and the variables involved in the calculation of any such benefits. In 2003, 902 employees, including 4 executive officers, participated in the 1997 Plan and received $424,358.88 in benefits under the 1997 Plan (measured as the difference between the price paid for shares of Investors Financial common stock purchased under the 1997 Plan and the market value of such common stock on the date of such purchase). 807 employees, including 4 executive officers, currently participate in the 1997 Plan. A total of approximately $14 million of additional capital has been raised by the Company by sales of Common Stock

pursuant to the 1997 Plan.

Since April 15, 1997, when the 1997 Plan was adopted and approved, the number of employees at the Company has increased from approximately 900 to approximately 2,450. The Company relies on the 1997 Plan and employees' ability to purchase stock of the Company under the 1997 Plan as an essential part of the benefits package necessary to attract and retain qualified and experienced employees. The Board of Directors believes that the proposed increase in the number of shares available for issuance under the 1997 Plan is essential to permit the Company to continue to provide long-term, equity based

23

incentives to present and future employees and to align employees' interests with those of the Company's stockholders.

Approval of the proposal to amend the 1997 Plan will require an affirmative vote of a majority of the outstanding shares of Common Stock of the Company represented in person or by proxy at the Annual Meeting and entitled to vote.

## THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE PROPOSAL TO APPROVE THE AMENDMENT TO THE 1997 EMPLOYEE STOCK PURCHASE PLAN

*Description of the 1997 Plan*

The 1997 Plan is administered by the Board of Directors of the Company or a committee thereof. The Board of Directors, subject to the provisions of the 1997 Plan, has the power to construe the 1997 Plan, to determine all questions thereunder, and to adopt and amend such rules and regulations for administration of the 1997 Plan as it may deem appropriate. The Board of Directors may from time to time adopt amendments to the 1997 Plan provided that, without the approval of the Company's shareholders, no amendment may increase the number of shares that may be issued under the 1997 Plan or change the class of the employees eligible to receive options under the 1997 Plan or cause Rule 16b-3 under the Exchange Act to be inapplicable to the 1997 Plan.

The 1997 Plan may be terminated at any time by the Company's Board of Directors but such termination will not affect options then outstanding under the 1997 Plan. If at any time shares of Common Stock reserved for the purposes of the 1997 Plan remain available for purchase but not in sufficient number to satisfy all then unfilled purchase requirements, the available shares will be apportioned among participants in proportion to the amount of payroll deductions accumulated on behalf of each participant that would otherwise be used to purchase stock, and the 1997 Plan will terminate. Upon termination of the 1997 Plan, all payroll deductions not used to purchase Common Stock will be refunded to 1997 Plan participants without interest.

The 1997 Plan authorizes the issuance of up to 1,120,000 shares of Common Stock (subject to adjustment for capital changes) pursuant to the exercise of nontransferable options granted to participating employees. As of December 31, 2003, 892,496 shares had been issued under the 1997 Plan and 227,504 shares remained available for issuance under the 1997 Plan. The Common Stock subject to the options under the 1997 Plan includes shares of the Company's authorized but unissued Common Stock and shares of Common Stock reacquired by the Company, including shares purchased in the open market. Option holders are generally protected against dilution in the event of certain capital changes such as a recapitalization, stock split, merger, consolidation, reorganization, combination, liquidation, stock dividend or similar transaction.

An employee electing to participate in the 1997 Plan must authorize an amount (a whole percentage not less than 1% nor more than 15% of the employee's base salary compensation actually paid during the Payment Period, excluding without limitation any benefits, bonuses or commissions) to be deducted by the Company from the employee's pay and applied toward the purchase of Common Stock under the 1997 Plan. Payroll deductions will be accumulated under the 1997 Plan during the six-month periods January 1 through June 30 and July 1 through

December 31 (the "Payment Periods"). On the first business day of each Payment Period, the Company will grant to each 1997 Plan participant an option to purchase shares of Common Stock of the Company. On the last day of the Payment Period, the employee will be deemed to have exercised this option to the extent of such employee's accumulated payroll deductions. In no event, however, may the employee exercise an option granted under the 1997 Plan for more than 8,000 shares during a Payment Period. If the amount of the accumulated payroll deductions exceeds the aggregate option price of 8,000 shares, the excess deductions will be promptly refunded to the employee without interest. Furthermore, no employee may

24

be granted an option which permits the employee's right to purchase shares of Common Stock under the 1997 Plan and all other Section 423 plans of the Company and any subsidiary companies, to accrue at a rate which exceeds $25,000 of fair market value of such stock (determined on the respective date(s) of grant) for each calendar year in which the option is outstanding. Any excess accumulation of payroll deductions will be promptly refunded to the employee without interest. Under the terms of the 1997 Plan, the option price is an amount equal to the lesser of (i) 90% of the average market value of the Common Stock on the first business day of the Payment Period, and (ii) 90% of the average market value of the Common Stock on the last business day of the Payment Period. The Company will accumulate and hold for the employee's account the amounts deducted from his pay. No interest will be paid on these amounts.

For purposes of the 1997 Plan, the term "average market value" on any date means (i) the average (on that date) of the high and low prices of the Common Stock on the principal national securities exchange on which the Common Stock is traded, if the Common Stock is then traded on a national securities exchange; or (ii) the last reported sale price (on that date) of the Common Stock on the Nasdaq Stock Market, if the Common Stock is not then traded on a national securities exchange, or (iii) the average of the closing bid and asked prices last quoted (on that date) by an established quotation service for over-the-counter securities, if the Common Stock is not reported on the Nasdaq Stock Market; or (iv) if the Common Stock is not publicly traded, the fair market value of the Common Stock as determined by the Committee after taking into consideration all the factors which it deems appropriate, including, without limitation, recent sale and offer prices of the Common Stock in private transactions negotiated at arm's length. An employee may enter the 1997 Plan by delivering to the Company, at least 10 days before the beginning date of the next succeeding Payment Period, an authorization stating the initial percentage to be deducted from the employee's pay and authorizing the purchase of shares of Common Stock for the employee in each Payment Period in accordance with the terms of the 1997 Plan.

Employees of the Company (and participating subsidiaries) who have completed six months of employment with the Company or any of its subsidiaries on or before the first day of any Payment Period are eligible to participate in the 1997 Plan. An employee may not be granted an option under the 1997 Plan, if after the granting of the option such employee would be treated as owning 5% or more of the total combined voting power or value of all classes of stock of the Company or its subsidiaries.

An employee may change the amount of his or her payroll deduction at any time, and such change shall be effective at the beginning of the next Payment Period, provided that such change was received by the Company at least ten (10) days prior to the beginning of such Payment Period. An employee may withdraw from the 1997 Plan, in whole but not in part, at anytime prior to the last business day of each Payment Period by delivering a withdrawal notice to the Company, in which event the Company will refund the entire balance of the employee's deductions not previously used to purchase stock under the 1997 Plan without interest.

If an employee is not a participant in the 1997 Plan on the last day of the Payment Period, the employee generally is not entitled to exercise his option. An employee's rights under the 1997 Plan generally terminate upon his voluntary withdrawal from the 1997 Plan at any time, or when he ceases employment because of retirement, resignation, discharge, death or any other reason, except that employment shall be treated as continuing intact while and employee is on military leave, sick leave or other bona fide leave of absence, for up to 90 days, or for so long as the employee's right to reemployment is guaranteed either by statute or by contract, if longer.

An employee's rights under the 1997 Plan are the employee's alone and may not be transferred to, assigned to, or availed of by any other person. Any option granted to an employee may be exercised, during the employee's lifetime, only by the employee.

25

The proceeds received by the Company from the sale of Common Stock pursuant to the 1997 Plan will be used for general corporate purposes. The Company's obligation to deliver shares of Common Stock is subject to the approval of any governmental authority required in connection with the sale or issuance of such shares. The date of commencement of the first Payment Period was July 1, 1997.

The following general rules are currently applicable for United States federal income tax purposes to employees who receive grants of options for Common Stock and purchase shares of Common Stock pursuant to the 1997 Plan:

1.   The amounts deducted from an employee's pay under the 1997 Plan will be included in the employee's compensation subject to federal income tax. Other than this amount, no additional income will be recognized by the employee either at the time options are granted pursuant to the 1997 Plan or at the time the employee purchases shares pursuant to the 1997 Plan.

2.   If the employee disposes of shares of Common Stock more than two years after the first business day of the Payment Period in which the employee acquired the shares, then upon such disposition the employee will recognize ordinary income in an amount equal to the lesser of:

   (a)   the excess, if any, of the fair market value of the shares on the date of disposition over the amount the employee paid for the shares, or

   (b)   the excess of the fair market value of the shares on the first business day of the Payment Period over the option price.

In addition, the employee generally will recognize capital gain or loss in an amount equal to the difference between the amount realized upon the sale of shares and the employee's basis in the shares (i.e., the amount the employee paid for the shares plus the amount, if any, taxed as ordinary compensation income). If the employee's holding period for the shares exceeds one year, such gain or loss will be long-term capital gain or loss.

3.   If the employee disposes of shares of Common Stock within two years after the first business day of the Payment Period in which the employee acquired the shares, then upon disposition the employee will recognize ordinary income in an amount equal to the excess of the fair market value of the shares on the last business day of the applicable Payment Period over the amount the employee paid for the shares.

In addition, the employee generally will recognize capital gain or loss in an amount equal to the difference between the amount realized upon the sale of the shares and the employee's basis in the shares (i.e., the amount the employee paid for the shares plus the amount, if any, taxed to the employee as ordinary compensation income). If the employee's holding period for the shares is more than one year, such gain or loss will be long-term capital gain or loss.

4.   If the two-year holding period is satisfied, the Company will not be entitled to any federal income tax deduction with respect to the options granted to acquire such shares. If this two-year holding period is not satisfied, the Company generally will be entitled to a deduction in an amount equal to the amount which is treated as ordinary income to the employee.

26

## PROPOSAL 4

### RATIFICATION OF SELECTION OF AUDITORS

The Audit Committee of the Board of Directors, has selected the firm of Deloitte & Touche LLP ("Deloitte & Touche"), independent certified public accountants, to serve as auditors for the fiscal year ending December 31, 2004. Deloitte & Touche has served as the Company's accountants since the fiscal year ended October 31, 1989. It is expected that a member of Deloitte & Touche will be present at the Annual Meeting with the opportunity to make a statement if so desired and will be available to respond to appropriate questions. Ratification of the selection of auditors is not required under the laws of the State of Delaware but will be considered by the Audit Committee in selecting auditors for future years.

The following table details aggregate fees billed for 2003 and 2002 by Deloitte & Touche to the Company.

| Services | Aggregate Fees Billed for Fiscal Year Ended | |
|---|---|---|
| | 2003 | 2002 |
| Audit Fees | $ 499,810 | $ 422,936 |
| Audit-Related Fees | $ 115,560 | $ 111,500 |
| Tax Fees | $ — | $ 28,010 |
| Other Fees | $ — | $ 47,169 |

Audit-Related Fees in 2003 represent audit services for the Company's 401(k) and pension plans, services relating to Deloitte & Touche's attestation under the FDIC Improvement Act of 1991 and services relating to a qualified collateral report for the Federal Home Loan Bank of Boston. All fees of Deloitte & Touche for 2003 were pre-approved by the Company's Audit Committee.

Audit-Related Fees in 2002 represent audit services for the Company's pension plan, services relating to Deloitte & Touche's attestation under the FDIC Improvement Act of 1991 and services relating to a qualified collateral report for the Federal Home Loan Bank of Boston. Tax Fees in 2002 represent tax services related to the Company's subsidiaries in Toronto and Dublin. Other Fees in 2002 represent audit services relating to the administration of the Company's benefit plans and services related to the Company's Dublin operations and the start-up of the Company's brokerage subsidiary. All fees for Deloitte & Touche for 2002 were pre-approved by the Company's Audit Committee.

The Audit Committee is required to pre-approve the audit and non-audit services performed by the independent auditor in order to assure that the provision of such services does not impair the auditor's independence. The Audit Committee has approved specific services that may be performed by the Company's independent auditors during 2004 within pre-approved cost levels. Unless a type of service to be provided by the independent auditor has already received pre-approval, it requires specific pre-approval by the Audit Committee. Any pre-approved services exceeding pre-approved cost levels requires specific further approval by the Audit Committee. Requests or applications to provide services that require approval by the Audit Committee will be submitted to the Audit Committee by both the independent auditor and the Chief Financial Officer, and must include a joint statement as to whether, in their view, the request or application is consistent with the SEC's rules on auditor independence.

Ratification of the selection of Deloitte & Touche to serve as auditors for the fiscal year ending December 31, 2004 will require an affirmative vote of a majority of the outstanding shares of Common Stock of the Company represented in person or by proxy at the Annual Meeting and voting on this proposal.

### THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE RATIFICATION OF THE SELECTION OF DELOITTE & TOUCHE LLP.

27

## CODE OF CONDUCT POLICY

The Company has adopted a Code of Conduct Policy that applies to all employees and directors of the Company. The Code of Conduct Policy is available on the Company's website at *www.ibtco.com.*

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), requires the Company's directors, executive officers and holders of more than 10% of the Company's Common Stock (collectively, "Reporting Persons") to file with the Securities and Exchange Commission (the "Commission") initial reports of ownership and reports of changes in ownership of Common Stock of the Company. Such persons are required by regulations of the Commission to furnish the Company with copies of all such filings. Based on its review of the copies of such filings received by it with respect to the year ended December 31, 2003, the Company believes that all Reporting Persons complied with all Section 16(a) filing requirements in the year ended December 31, 2003, except that Phyllis S. Swersky filed late one Form 4 with respect to one sale of shares of the Company.

## STOCKHOLDER PROPOSALS

Proposals of stockholders intended for inclusion in the Company's proxy materials to be furnished to all stockholders entitled to vote at the 2005 Annual Meeting of Stockholders pursuant to Rule 14a-8 promulgated by the Commission under the Exchange Act must be received at the Company's principal executive offices not later than November 5, 2004. Under the Company's By-laws, stockholders who wish to make a proposal at the 2005 Annual Meeting—other than one that will be included in the Company's proxy materials—must notify the Company no earlier than October 6, 2004 and no later than November 5, 2004. If a stockholder who wishes to present a proposal fails to notify the Company by November 5, 2004, the stockholder would not be entitled to present the proposal at the meeting. If, however, notwithstanding the requirements of the Company's By-laws, the proposal is brought before the meeting, then consistent with the Commission's proxy rules the proxies solicited by management with respect to the 2005 Annual Meeting will confer discretionary voting authority with respect to the stockholder's proposal on the persons selected by management to vote the proxies. If a stockholder makes a timely notification, the proxies may still exercise discretionary voting authority under circumstances consistent with the Commission's proxy rules. All stockholder proposals must comply with the applicable requirements of the Company's By-laws, a copy of which is on file with the Commission. In order to curtail controversy as to the date on which a proposal was received by the Company, it is suggested that proponents submit their proposals by Certified Mail, Return Receipt Requested, to Investors Financial Services Corp., P.O. Box 9130, Boston, MA 02117-9130, Attention: Corporate Secretary.

28

**APPENDIX A**

## INVESTORS FINANCIAL SERVICES CORP.

## AUDIT COMMITTEE CHARTER

### Purpose

The Audit Committee (Committee) shall provide assistance to the Boards of Directors of Investors Financial Services Corp. ("IFSC") and its subsidiaries (collectively, the "Company"), including Investors Bank & Trust Company (the "Bank"), in fulfilling their oversight responsibilities to shareholders relating to (i) the reliability and integrity of corporate accounting and financial reporting practices; (ii) the quality and integrity of financial

statements and reports; (iii) the independent auditors' qualifications and independence; (iv) the performance of the Company's internal audit function and independent auditors; (v) compliance with laws, regulations and Company policies; and (vi) maintenance of a sound system of internal controls. In doing so, it is the responsibility of the Audit Committee to maintain free and open means of communication among the Directors, the independent auditors, and the Company's internal auditors and management.

### Committee Membership and Organization

The Committee shall be composed of a minimum of three members. Each Committee member shall meet any independence requirements promulgated by the Securities and Exchange Commission (the "SEC"), including Rule 10A-3(b)(1), the National Association of Securities Dealers, any exchange upon which securities of the Company are traded, and any governmental or regulatory body exercising authority over the Company (each a "Regulatory Body"). Each member of the Committee shall be free from any relationship that, in the opinion of the Board, would interfere with the exercise of his or her independent judgment as a member of the Committee. No member of the Committee shall have participated in the preparation of the financial statements of the Company or any subsidiary at any time during the past three years. At least one member of the Committee shall be a "financial expert" as defined by the rules of the SEC. All members of the Committee shall have a strong level of business or financial acumen (as determined in the reasonable discretion of the Board), including, at a minimum, the ability to read and understand fundamental financial statements..

The members of the Committee shall be appointed by the Board on the recommendation of the Nominating and Corporate Governance Committee. Committee members may be replaced by the Board.

The Committee shall meet as often as the Committee or the Committee Chair determines, but not less frequently than quarterly. If circumstances warrant, an unscheduled meeting of the Committee can be called with or without the presence of the Company's management. The Committee strongly supports confidential exchanges with internal auditors and independent auditors. Therefore, no less frequently than annually, the Committee shall meet with the Director of Internal Audit without the presence of management. In addition, at all meetings where independent auditors are present, the Committee will ensure that sufficient opportunity is made available for the independent auditors to meet with the Committee without management present.

The Committee shall have the authority to retain independent legal, accounting or other consultants to advise the Committee. The Committee shall also have the authority, to the extent it deems necessary or appropriate, to ask the Company to provide the Committee with the support of one or more Company employees to assist it in carrying out its duties. The Committee may request that any officer or employee of the Company or the Company's outside counsel or independent auditors attend a meeting of the Committee or meet with any members of, or consultants to, the Committee.

A-1

The Company shall provide for appropriate funding, as determined by the Committee, for payment (i) of compensation to the independent auditors for the purpose of rendering or issuing an audit report, (ii) to any advisors employed by the Committee, and (iii) for ordinary administrative expenses that are necessary or appropriate in carrying out the Committee's duties.

### Committee Authority and Responsibilities

The following activities are set forth as a guide with the understanding that the Committee may diverge from this guide as it considers appropriate.

*Charter Review*

1.  Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

**Independent Auditors**

2.  Appoint and compensate the independent auditors in connection with the preparation and issuance of an audit report regarding the Company's financial statements. The Committee shall receive regular reports regarding the work of the independent auditors, and may obtain the assistance of Company management in the negotiation of the terms of the independent auditors' engagement and the oversight of the independent auditors' performance.

3.  Review the experience and qualifications of the senior members of the independent auditors' team.

4.  Monitor the independence, qualifications and performance of the independent auditors by, among other things:

•   Obtaining and reviewing a report from the independent auditors at least annually regarding (a) the auditors' internal quality-control procedures, (b) any material issues raised by the most recent quality control review or peer review of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, (c) any steps taken to deal with any such issues, and (d) all relationships between the independent auditors and the Company.

•   If so determined by the Committee, taking additional action to satisfy itself of the qualifications, performance and independence of the auditors.

5.  Oversee the rotation, at least once every five years, of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit.

6.  Meet with the independent auditors and management of the Company to review the scope, planning and staffing of the proposed audit activities for the coming year.

7.  Pre-approve all auditing services and permitted non-audit services to be performed for the Company by the independent auditors, except as otherwise permitted by applicable law. In no event shall the independent auditors perform any non-audit services for the Company which are prohibited by Section 10A(g) of the Securities Exchange Act of 1934 (the "Exchange Act") or the rules of the SEC or the Public Corporation Accounting Oversight Board.

A-2

8.  Ensure that the Company's management cooperates with the independent auditors and provides access to all appropriate Company resources requested by the independent auditors in the course of their audit.

*Financial Reporting and Internal Controls*

9.  At the conclusion of the annual audit, meet with the independent auditors and management of the Company and review any related report or opinion issued by the independent auditors and any comments or recommendations stemming from the annual audit. Prior to the release of the Company's audited and interim financial statements, review the financial statements with the independent auditors and financial management of the Company. Determine that the independent auditors are satisfied with the disclosure and content of the financial statements.

10. Review any changes in accounting principles, changes in the accounting treatment of significant

transactions, and changes in financial reporting policies. Additionally, review the independent auditor's judgments regarding the quality and appropriateness of the Company's accounting principles, as applied in the Company's financial reporting, and the clarity of the Company's financial disclosure practices. Inquire as to the auditors' judgments regarding the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates and other significant decisions made by management in preparing the financial disclosure. Review any significant disagreement or difficulty encountered during the course of the audit.

11.    Annually discuss with the independent auditors the matters required to be discussed by Statement on Accounting Standards 61.

12.    Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

13.    Discuss with management, either specifically or by discussion of the types of information to be disclosed and the types of presentation to be made, the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information and any earnings guidance, as well as financial information provided to rating agencies.

14.    Based on the reviews and discussions of the Committee pursuant to its responsibilities under this charter, determine on an annual basis whether to recommend to the full Board of Directors that the audited financial statements of the Company be included in the Company's Annual Report on Form 10-K.

15.    Review with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditors' reviews of the quarterly financial statements.

16.    Review and approve Audit Committee disclosures to be contained in the Company's proxy statement for its annual meeting of stockholders, including the Audit Committee Report and disclosure regarding the independence of members of the Committee. The Committee shall ensure that this Charter is attached as an appendix to the Company's proxy statement at least once every three years.

17.    Review with the independent auditors, the Company's internal auditor, and the Company's financial management, the effectiveness and integrity of the accounting, financial and other internal controls of the Company, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls are desirable. In this regard, the Committee shall review management's annual statement of

A-3

responsibilities for preparing financial statements, establishing and maintaining an adequate internal control structure for financial reporting and major financial risk exposures, and complying with designated safety and soundness laws. The Committee shall also review management's assessments of the effectiveness of the Company's internal control structure and procedures for financial reporting as of the fiscal year-end and compliance with designated laws and regulations during the fiscal year. In addition, the Committee shall review the independent auditors' attestations on the aforementioned management assertions.

18.    Monitor the Company's progress in promptly addressing and correcting any and all identified weaknesses or deficiencies in financial reporting, internal controls or related matters.

19.   Receive periodic reports from the independent auditors and appropriate officers of the Company on significant accounting or reporting developments proposed by the Financial Accounting Standards Board or the SEC that may impact the Company.

20.   Review with management and the independent auditors any effects of regulatory and accounting initiatives as well as any off-balance sheet structures on the Company's financial statements.

21.   Review material regulatory inquiries and significant findings and recommendations of all regulatory reports of examination and management's responses thereto.

**Internal Audit Function**

22.   Review and approve the appointment of the Director of Internal Audit.

23.   Review and approve the Internal Audit Department's annual audit plans and budget and review the sufficiency of internal audit resources. Review the independence and authority of the internal audit function's reporting obligations and the coordination of efforts with the independent auditors.

24.   At each meeting, but no less than quarterly, review significant internal audit reports containing management's responses completed since the previous Committee meeting, the status of the annual audit plan, and a progress report on the extent to which internal audit recommendations have been implemented by management. Any deviations from or modifications to the original audit plan will be reviewed with the Committee, as will be any changes in internal audit policies.

*Compliance Oversight*

25.   Discuss with management and the internal auditors the Company's processes regarding compliance with applicable laws and regulations and obtain verbal or written reports from management and internal audit regarding compliance by the Company and its affiliated entities with applicable legal requirements.

26.   Review annually the program established to monitor compliance with the Company's Code of Conduct.

27.   Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Conduct.

28.   Obtain from the independent auditors any reports required to be furnished to the Committee under Section 10A of the Exchange Act or other applicable laws or regulations.

29.   Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the

A-4

confidential, anonymous submissions by employees of the Company of concerns regarding questionable accounting, auditing or compliance matters.

30.   Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports which raise material issues regarding the Company's financial statements or accounting policies or compliance with the Company's Code of Conduct.

31.  Review with the Company's general counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

*Subsidiaries of IFSC*

32.  Perform the duties required to be performed by the audit committee of the Bank to the extent permitted, and in the manner required, by applicable laws and regulations.

**General**

33.  Establish clear hiring policies for employees for former employees of the independent auditor.

34.  Under the direction of the Chairperson of the Committee, report on the Committee's activities at the next Board of Directors meeting or, if deemed necessary by the Committee Chair, earlier.

35.  Investigate any matter brought to the Committee's attention within the scope of its duties.

36.  Meet at least annually with the chief financial officer, the general counsel, the senior internal auditing executive and the independent auditor in separate executive sessions.

37.  Annually review the performance of the Committee.

#### General

The Committee's role is one of oversight as set forth in this charter. It is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. The Company's management is responsible for preparing the Company's financial statements and for maintaining internal controls, and the independent auditors are responsible for auditing the financial statements. Nor is it the duty of the Committee to conduct investigations, to resolve disagreements, if any, between management and the independent auditors or to assure compliance with laws and regulations and the Company's Code of Conduct.

Any duty or action of the Committee may be undertaken and fulfilled by the Board as a whole in place of the Committee.

With respect to joint sessions of the Committee:

*   The Committee may meet simultaneously as a committee of IFSC and the Bank, though it should hold separate sessions if necessary to consider transactions between the two entities or other matters where IFSC and the Bank may have different interests; and

*   The Committee should consult with internal or outside counsel if, in the opinion of the Committee, any matter under consideration by the Committee has the potential for any conflict between the interests of IFSC and those of the Bank or IFSC's other subsidiaries in order to ensure that appropriate procedures are established for addressing any such

A-5

potential conflict and for ensuring compliance with the Company's policies regarding Sections 23A and 23B of the Federal Reserve Act.

**In performing their responsibilities, Committee members are entitled to rely in good faith on information, opinions, reports or statements prepared or presented by:**

1. One or more officers or employees of the Company whom the Committee members reasonably believe to be reliable and competent in the matters presented;

2. Counsel, independent auditors, or other persons as to matters which the Committee members reasonably believe to be within the professional or expert competence of such person; or

3. Another committee of the Board as to matters within such other committee's designated authority which other committee the Committee members reasonably believe to merit confidence.

A-6

**APPENDIX B**

## CERTIFICATE OF AMENDMENT
### OF
## CERTIFICATE OF INCORPORATION
### OF
## INVESTORS FINANCIAL SERVICES CORP.

Investors Financial Services Corp. (the "Corporation"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware ("GCL"), does hereby certify as follows, pursuant to Section 242 of the GCL:

**FIRST:** That pursuant to the authority conferred upon the Board of Directors by the Certificate of Incorporation of the Corporation, the Board of Directors, at a meeting held on February 10, 2004, in accordance with Section 242 of the GCL, duly adopted a resolution (i) proposing an amendment to the Certificate of Incorporation of the Corporation, (ii) declaring said amendment to be advisable and in the best interests of the Corporation's stockholders and (iii) directing that the matter be submitted to the stockholders of the Corporation for the approval of said amendment.

**SECOND:** The amendment to the Certificate of Incorporation of the Corporation was duly adopted at the Annual Meeting of Stockholders of the Corporation held on April 13, 2004, in accordance with Section 242 of the GCL.

**THIRD:** That in accordance with the aforementioned resolution, the Corporation's Certificate of Incorporation is hereby amended by amending and restating in its entirety Article FOURTH (A) thereof and substituting in lieu thereof the following new Article FOURTH (A):

(A) The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is 176,650,000 shares, consisting of 175,000,000 shares of Common Stock with a par value of One Cent (\$.01) per share (the "Common Stock"), 650,000 shares of Class A Common Stock with a par value of One Cent (\$.01) per share (the "Class A Stock"), and 1,000,000 shares of Preferred Stock with a par value of One Cent (\$.01) per share, the designations of which are to be determined by the Board of Directors.

A description of the respective classes of stock and a statement of the designations, preferences, voting powers (or no voting powers), relative, participating, optional or other special rights and

privileges and the qualifications, limitations and restrictions of the Common Stock, Class A Stock and Preferred Stock are as follows:

**FOURTH:**    That said amendment was duly adopted in accordance with the provisions of Section 242 of the GCL.

B-1

IN WITNESS WHEREOF, Investors Financial Services Corp. has caused this certificate to be signed by Kevin J. Sheehan, its Chief Executive Officer, as of this    day of    , 2004.

INVESTORS FINANCIAL SERVICES CORP.

By: _____

Name: Kevin J. Sheehan
Title: Chief Executive Officer

B-2

**APPENDIX C**

## INVESTORS FINANCIAL SERVICES CORP.

## 1997 EMPLOYEE STOCK PURCHASE PLAN

1.    *Purpose.*

This 1997 Employee Stock Purchase Plan (the "Plan") is intended to encourage stock ownership by all eligible employees of Investors Financial Services Corp., a Delaware corporation (the "Company"), and its participating subsidiaries (as defined in Article 17) so that they may share in the growth of the Company by acquiring or increasing their proprietary interest in the Company. The Plan is designed to encourage eligible employees to remain in the employ of the Company and its participating subsidiaries. It is intended that options issued pursuant to this Plan will constitute options issued pursuant to an "employee stock purchase plan" within the meaning of Section 423(b) of the Internal Revenue Code of 1986, as amended (the "Code").

2.    *Administration of the Plan.*

The Plan may be administered by a committee appointed by the Board of Directors of the Company (the "Committee"). The Committee shall consist of not less than two members of the Company's Board of Directors. The Board of Directors may from time to time remove members from, or add members to, the Committee. Vacancies on the Committee, however caused, shall be filled by the Board of Directors. The Committee may select one of its members as Chairman, and shall hold meetings at such times and places as it may determine. Acts by a majority of the Committee, or acts reduced to or approved in writing by a majority of the members of the Committee, shall be the valid acts of the Committee.

The interpretation and construction by the Committee of any provisions of the Plan or of any option granted under it shall be final, unless otherwise determined by the Board of Directors. The Committee may from time to time adopt such rules and regulations for carrying out the Plan as it may deem best, provided that any such rules and regulations shall be applied on a uniform basis to all employees under the Plan. No member of the Board of Directors or the Committee shall be liable for any action or determination made in good faith with respect to the Plan or any option granted under it.

In the event the Board of Directors fails to appoint or refrains from appointing a Committee, the Board of Directors shall have all power and authority to administer the Plan. In such event, the word "Committee" wherever

used herein shall be deemed to mean the Board of Directors.

3.  *Eligible Employees.*

All employees who have completed six months of employment with the Company or any of its participating subsidiaries and whose customary employment is more than twenty (20) hours per week and for more than five (5) months in any calendar year shall be eligible to receive options under this Plan to purchase the Company's Common Stock, and all eligible employees shall have the same rights and privileges hereunder. Persons who are eligible employees on the first business day of any Payment Period (as defined in Article 5) shall receive their options as of such day. Persons who become eligible employees after any date on which options are granted under this Plan shall be granted options on the first day of the next succeeding Payment Period on which options are granted to eligible employees. In no event may an employee be granted an option if such employee, immediately after the option is granted, owns stock possessing five percent (5%) or more of the total combined voting power or value of all classes of stock of the Company or of its parent corporation or subsidiary corporations, as the terms "parent corporation" and "subsidiary corporation" are defined in Section 424(e) and (f) of the

C-1

Code. For purposes of determining stock ownership under this paragraph, the rules of Section 424(d) of the Code shall apply, and stock which the employee may purchase under outstanding options shall be treated as stock owned by the employee.

4.  *Stock Subject to the Plan.*

The stock subject to the options under the Plan shall be shares of the Company's authorized but unissued Common Stock, par value \$.01 per share, or shares of such Common Stock reacquired by the Company, including shares purchased in the open market. The aggregate number of shares which may be issued pursuant to the Plan is ~~140,000~~ 1,620,000, subject to adjustment as provided in Article 12. In the event any option granted under the Plan shall expire or terminate for any reason without having been exercised in full or shall cease for any reason to be exercisable in whole or in part, the unpurchased shares subject thereto shall again be available under the Plan.

5.  *Payment Period and Stock Options.*

The six-month periods January 1 through June 30, and July 1 through December 31, are Payment Periods during which payroll deductions will be accumulated under the Plan. The first Payment Period under the Plan will commence on July 1, 1997 and expire on December 31, 1997.

Twice each year, on the first business day of each Payment Period, the Company will grant to each eligible employee who is then a participant in the Plan an option to purchase on the last day of such Payment Period, at the Option Price hereinafter provided for, a maximum of 8,000 shares, on condition that such employee remains eligible to participate in the Plan throughout such Payment Period. The participant shall be entitled to exercise such option so granted only to the extent of the participant's accumulated payroll deductions on the last day of such Payment Period. In the event that the participant's accumulated payroll deductions on the last day of the Payment Period would enable the participant to purchase more than 8,000 shares except for the 8,000-share limitation, the excess of the amount of the accumulated payroll deductions over the aggregate purchase price of the 8,000 shares shall be promptly refunded to the participant by the Company, without interest. The Option Price for each Payment Period shall be the lesser of (i) 90% of the average market price of the Company's Common Stock on the first business day of the Payment Period or (ii) 90% of the average market price of the Company's Common Stock on the last business day of the Payment Period, in either event rounded up to avoid fractions of a dollar other than $^1/4$, $^1/2$ and $^3/4$. The foregoing limitation on the number of shares which may be granted in any Payment Period and the Option Price per share shall be subject to adjustment as provided in Article 12.

For purposes of this Plan, the term "average market price" on any date means (i) the average (on that date) of the high and low prices of the Company's Common Stock on the principal national securities exchange on which the

Common Stock is traded, if the Common Stock is then traded on a national securities exchange; or (ii) the last reported sale price (on that date) of the Common Stock on the Nasdaq National Market List, if the Common Stock is not then traded on a national securities exchange; or (iii) the average of the closing bid and asked prices last quoted (on that date) by an established quotation service for over-the-counter securities, if the Common Stock is not reported on the Nasdaq National Market List. If the Company's Common Stock is not publicly traded at the time an option is granted under this Plan, "average market price" shall mean the fair market value of the Common Stock as determined by the Committee after taking into consideration all factors which it deems appropriate, including, without limitation, recent sale and offer prices of the Common Stock in private transactions negotiated at arm's length.

For purposes of this Plan, the term "business day" means a day on which there is trading on the Nasdaq National Market System or on the aforementioned national securities exchange, whichever is applicable pursuant to the preceding paragraph.

C-2

No employee shall be granted an option which permits the employee's right to purchase Common Stock under this Plan, and under all other Section 423(b) employee stock purchase plans of the Company or any parent or subsidiary corporations, to accrue at a rate which exceeds $25,000 of fair market value of such stock (determined at the time such option is granted) for each calendar year in which such option is outstanding at any time. The purpose of the limitation in the preceding sentence is to comply with Section 423(b)(8) of the Code. If an eligible employee's accumulated payroll deductions on the last day of the Payment Period would otherwise enable such employee to purchase Common Stock in excess of the Section 423(b)(8) limitation described in this paragraph, the excess of the amount of the accumulated payroll deductions over the aggregate purchase price of the shares actually purchased shall be promptly refunded to the employee by the Company, without interest.

### 6.  *Exercise of Option.*

Each eligible employee who continues to be a participant in the Plan on the last day of a Payment Period shall be deemed to have exercised his/her option on such date and shall be deemed to have purchased from the Company such number of full shares of Common Stock reserved for the purpose of the Plan as his/her accumulated payroll deductions on such date will pay for at the Option Price, subject to the 8,000-share limit of the option and the Section 423(b)(8) limitation described in Article 5. If a person is not an eligible employee on the last day of a Payment Period, he/she shall not be entitled to exercise his/her option. Only full shares of Common Stock may be purchased under the Plan. Unused payroll deductions remaining in an employee's account at the end of a Payment Period by reason of the inability to purchase a fractional share will be carried forward to the succeeding Payment Period.

### 7.  *Authorization for Entering the Plan.*

An employee may enter the Plan by filling out, signing and delivering to the Company an authorization:

   A.   Stating the percentage to be deducted regularly from the employee's pay;

   B.   Authorizing the purchase of stock for the employee in each Payment Period in accordance with the terms of the Plan; and

   C.   Specifying the exact name in which stock purchased for the employee is to be issued as provided under Article 11 hereof.

Such authorization must be received by the Company at least ten (10) days before the beginning date of the next succeeding Payment Period.

Unless an employee files a new authorization or withdraws from the Plan, the deductions and purchases under

the authorization the employee has on file under the Plan will continue from one Payment Period to succeeding Payment Periods as long as the Plan remains in effect.

The Company will accumulate and hold for the employee's account the amounts deducted from his/her pay. No interest will be paid on these amounts.

8.   *Maximum Amount of Payroll Deductions.*

An employee may authorize payroll deductions in an amount (expressed as a percentage) not less than one percent (1%) but not more than fifteen percent (15%) of the employee's base salary compensation actually paid to the employee in the Payment Period, excluding without limitation any benefits, bonuses or commissions.

C-3

9.   *Change in Payroll Deductions.*

Deductions may not be increased or decreased during a Payment Period. However, an employee may withdraw in full from the Plan.

10.   *Withdrawal from the Plan.*

An employee may withdraw from the Plan in whole but not in part, at any time prior to the last business day of each Payment Period by delivering a withdrawal notice to the Company, in which event the Company will promptly refund the entire balance of the employee's deductions not previously used to purchase stock under the Plan.

To re-enter the Plan, an employee who has previously withdrawn must file a new authorization at least ten (10) days before the beginning date of the next Payment Period in which he or she wishes to participate. The employee's re-entry into the Plan becomes effective at the beginning of such Payment Period, provided that he or she is an eligible employee on the first business day of the Payment Period.

11.   *Issuance of Stock.*

Certificates for stock issued to participants will be delivered as soon as practicable after each Payment Period by the Company's transfer agent.

Stock purchased under the Plan will be issued only in the name of the employee, or if his/her authorization so specifies, in the name of the employee and another person of legal age as joint tenants with rights of survivorship.

12.   *Adjustments.*

Upon the happening of any of the following described events, an optionee's rights under options granted under the Plan shall be adjusted as hereinafter provided:

A.   In the event shares of Common Stock of the Company shall be subdivided or combined into a greater or smaller number of shares or if, upon a reorganization, split-up, liquidation, recapitalization or the like of the Company, the shares of the Company's Common Stock shall be exchanged for other securities of the Company, each optionee shall be entitled, subject to the conditions herein stated, to purchase such number of shares of Common Stock or amount of other securities of the Company as were exchangeable for the number of shares of Common Stock of the Company which such optionee would have been entitled to purchase except for such action, and appropriate adjustments shall be made in the purchase price per share to reflect such subdivision, combination or exchange; and

B.   In the event the Company shall issue any of its shares as a stock dividend upon or with respect to the shares of stock of the class which shall at the time be subject to option hereunder, each optionee upon

exercising such an option shall be entitled to receive (for the purchase price paid upon such exercise) the shares as to which he/she is exercising his/her option and, in addition thereto (at no additional cost), such number of shares of the class or classes in which such stock dividend or dividends were declared or paid, and such amount of cash in lieu of fractional shares, as is equal to the number of shares thereof and the amount of cash in lieu of fractional shares, respectively, which he/she would have received if he/she had been the holder of the shares as to which he/she is exercising his/her option at all times between the date of the granting of such option and the date of its exercise.

Upon the happening of any of the foregoing events, the class and aggregate number of shares set forth in Article 4 hereof which are subject to options which have been or may be granted under the Plan and the limitations set forth in the second paragraph of Article 5 shall also be appropriately

C-4

adjusted to reflect the events specified in paragraphs A and B above. Notwithstanding the foregoing, any adjustments made pursuant to paragraphs A or B shall be made only to the extent that the Committee, based on advice of counsel for the Company, determines whether such adjustments would constitute a "modification" (as that terms is defined in Section 424 of the Code) or would constitute a change requiring stockholder approval (pursuant to Section 423(b)(2) of the Code). If the Committee determines that such adjustments would constitute a modification or would require stockholder approval, it may refrain from making such adjustments.

If the Company is to be consolidated with or acquired by another entity in a merger, a sale of all or substantially all of the Company's assets or otherwise (an "Acquisition"), the Committee or the board of directors of any entity assuming the obligations of the Company hereunder (the "Successor Board") shall, with respect to options then outstanding under this Plan, either (i) make appropriate provision for the continuation of such options by arranging for the substitution on an equitable basis for the shares then subject to such options either (a) the consideration payable with respect to the outstanding shares of the Company's Common Stock in connection with the Acquisition, (b) shares of stock of the successor corporation, or a parent or subsidiary of such corporation, or (c) such other securities as the Successor Board deems appropriate, the fair market value of which shall not materially exceed the fair market value of the shares of Common Stock subject to such options immediately preceding the Acquisition; or (ii) terminate all outstanding options in exchange for a cash payment equal to the excess of (a) the fair market value on the date of the Acquisition, of the number of shares of Common Stock that the participant's accumulated payroll deductions as of the date of the Acquisition could purchase, at an option price determined with reference only to the first business day of the applicable Payment Period and subject to the 8,000-share, Code Section 423(b)(8) and fractional-share limitations on the amount of stock a participant would be entitled to purchase, over (b) the result of multiplying such number of shares by such option price.

The Committee or Successor Board of Directors shall determine the adjustments to be made under this Article 12, and its determination shall be conclusive.

13. *No Transfer or Assignment of Employee's Rights.*

An employee's rights under the Plan are the employee's alone and may not be transferred or assigned to, or availed of by, any other person other than by will or the laws of descent and distribution. Any option granted under the Plan to an employee may be exercised, during the employee's lifetime, only by the employee.

14. *Termination of Employee's Rights.*

An employee's rights under the Plan will terminate when he/she ceases to be an employee because of retirement, voluntary or involuntary termination, resignation, lay-off, discharge, death, change of status or for any other reason and the Company shall promptly refund, without interest, the entire balance of his or her payroll deduction account under the Plan. Notwithstanding the foregoing, eligible employment shall be treated as continuing intact while a participant is on military leave, sick leave or other bona fide leave of absence, for up to 90 days, or for so long as the employee's right to re-employment is guaranteed either by statute or by contract, if longer than 90 days. A withdrawal notice will be considered as having been received from the employee on the day his/her employment ceases, and all payroll deductions not used to purchase stock will be refunded.

If an employee's payroll deductions are interrupted by any legal process, a withdrawal notice will be considered as having been received from the employee on the day the interruption occurs.

C-5

15. *Termination and Amendments to Plan.*

Unless terminated sooner as provided below, the Plan shall terminate on January 1, 2007. The Plan may be terminated at any time by the Company's Board of Directors but such termination shall not affect options then outstanding under the Plan. It will terminate in any case when all or substantially all of the unissued shares of stock reserved for the purposes of the Plan have been purchased. If at any time shares of stock reserved for the purpose of the Plan remain available for purchase but not in sufficient number to satisfy all then unfilled purchase requirements, the available shares shall be apportioned among participants in proportion to their options and the Plan shall terminate. Upon such termination or any other termination of the Plan, all payroll deductions not used to purchase stock will be refunded, without interest.

The Committee or the Board of Directors may from time to time adopt amendments to the Plan provided that, without the approval of the stockholders of the Company, no amendment may (i) increase the number of shares that may be issued under the Plan; (ii) change the class of employees eligible to receive options under the Plan, if such action would be treated as the adoption of a new plan for purposes of Section 423(b) of the Code; or (iii) cause Rule or (iii) cause Rule 16b-3 under the Securities Exchange Act of 1934 to become inapplicable to the Plan.

16. *Limits on Sale of Stock Purchased Under the Plan.*

The Plan is intended to provide shares of Common Stock for investment and not for resale. The Company does not, however, intend to restrict or influence any employee in the conduct of his/her own affairs. An employee may, therefore, sell stock purchased under the Plan at any time the employee chooses, subject to compliance with any applicable federal or state securities laws and subject to any restrictions imposed under Article 21 to ensure that tax withholding obligations are satisfied. **THE EMPLOYEE ASSUMES THE RISK OF ANY MARKET FLUCTUATIONS IN THE PRICE OF THE STOCK.**

17. *Participating Subsidiaries.*

The term "participating subsidiary" shall mean any subsidiary of the Company, as that term is defined in Section 424(f) of the Code, which is designated from time to time by the Board of Directors to participate in the Plan. The Board of Directors shall have the power to make such designation before or after the Plan is approved by the stockholders.

18. *Optionees Not Stockholders.*

Neither the granting of an option to an employee nor the deductions from his/her pay shall constitute such employee a stockholder of the shares covered by an option until such shares have been actually purchased by the employee.

19. *Application of Funds.*

The proceeds received by the Company from the sale of Common Stock pursuant to options granted under the Plan will be used for general corporate purposes.

20. *Notice to Company of Disqualifying Disposition.*

By electing to participate in the Plan, each employee agrees to notify the Company in writing immediately after the employee transfers Common Stock acquired under the Plan, if such transfer occurs within two years after the first business day of the Payment Period in which such Common Stock was acquired. Each employee further agrees

to provide any information about such a transfer as may be requested by the Company or any subsidiary corporation in order to assist it in complying with the

C-6

tax laws. Such dispositions generally are treated as "disqualifying dispositions" under Sections 421 and 424 of the Code, which have certain tax consequences to participants and to the Company and its participating subsidiaries.

21. *Withholding of Additional Income Taxes.*

By electing to participate in the Plan, each employee acknowledges that the Company and its participating subsidiaries are required to withhold taxes with respect to the amounts deducted from the employee's compensation and accumulated for the benefit of the employee under the Plan, and each employee agrees that the Company and its participating subsidiaries may deduct additional amounts from the employee's compensation, when amounts are added to the employee's account, used to purchase Common Stock or refunded, in order to satisfy such withholding obligations. Each employee further acknowledges that when Common Stock is purchased under the Plan the Company and its participating subsidiaries may be required to withhold taxes with respect to all or a portion of the difference between the fair market value of the Common Stock purchased and its purchase price, and each employee agrees that such taxes may be withheld from compensation otherwise payable to such employee. It is intended that tax withholding will be accomplished in such a manner that the full amount of payroll deductions elected by the participant under Article 7 will be used to purchase Common Stock. However, if amounts sufficient to satisfy applicable tax withholding obligations have not been withheld from compensation otherwise payable to any employee, then, notwithstanding any other provision of the Plan, the Company may withhold such taxes from the employee's accumulated payroll deductions and apply the net amount to the purchase of Common Stock, unless the employee pays to the Company, prior to the exercise date, an amount sufficient to satisfy such withholding obligations. Each employee further acknowledges that the Company and its participating subsidiaries may be required to withhold taxes in connection with the disposition of stock acquired under the Plan and agrees that the Company or any participating subsidiary may take whatever action it considers appropriate to satisfy such withholding requirements, including deducting from compensation otherwise payable to such employee an amount sufficient to satisfy such withholding requirements or conditioning any disposition of Common Stock by the employee upon the payment to the Company or such subsidiary of an amount sufficient to satisfy such withholding requirements.

22. *Governmental Regulations.*

The Company's obligation to sell and deliver shares of the Company's Common Stock under this Plan is subject to the approval of any governmental authority required in connection with the authorization, issuance or sale of such shares, including the Securities and Exchange Commission, the Board of Governors of the Federal Reserve System, and the Internal Revenue Service. Government regulations may impose reporting or other obligations on the Company with respect to the Plan. For example, the Company may be required to identify shares of Common Stock issued under the Plan on its stock ownership records and send tax information statements to employees and former employees who transfer title to such shares.

23. *Governing Law.*

The validity and construction of the Plan shall be governed by the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law thereof

24. *Approval of Board of Directors and Stockholders of the Company.*

The Plan was adopted by the Board of Directors on January 14, 1997.

C-7

\*/ FOLD AND DETACH HERE \*/

**P**

**R**    ### INVESTORS FINANCIAL SERVICES CORP.

**O**    **PROXY SOLICITATION ON BEHALF OF THE BOARD OF DIRECTORS**

**X**    The undersigned hereby appoints Kevin J. Sheehan and John N. Spinney, Jr. and each or either of them,
proxies with full power of substitution to vote all shares of stock of Investors Financial Services Corp. (the
**Y**    "Company") which the undersigned is entitled to vote at the Annual Meeting of Stockholders of the Company
to be held on Tuesday, April 13, 2004, at 11:00 a.m., local time, at the Company's offices at 200 Clarendon
Street, Boston, Massachusetts, and at any adjournment thereof, upon matters set forth in the Notice of 2004
Annual Meeting of Stockholders and Proxy Statement dated March 5, 2004, a copy of which has been
received by the undersigned. The proxies are further authorized to vote, in their judgement, upon such other
business as may properly come before the meeting or any adjournment thereof.

**THE SHARES REPRESENTED BY THIS PROXY WILL BE VOTED AS DIRECTED, OR IF NO
DIRECTION IS GIVEN, WILL BE VOTED FOR THE ELECTION OF DIRECTORS AS DESCRIBED
IN ITEM 1, FOR THE PROPOSALS IN ITEMS 2, 3 AND 4 AND IN THE JUDGMENT OF THE
PROXIES NAMED HEREIN WITH RESPECT TO ANY OTHER MATTERS.**

**THE NOMINEES FOR CLASS III DIRECTOR ARE:**

01) Kevin J. Sheehan      02) James M. Oates      03) Thomas P. McDermott

**INSTRUCTION:**   To withhold your vote for any individual nominee, write that nominee's name in the space
provided below Proposal 1 on reverse side. To vote for or against all nominees, see Proposal 1 on reverse side.

### (TO BE SIGNED ON REVERSE SIDE)

\*/ FOLD AND DETACH HERE \*/

☒  **Please mark
votes as in
this example.**

6461

### INVESTORS FINANCIAL SERVICES CORP.

1.  To elect three (3) Class III Directors.
    See reverse side for instruction.
    **FOR   WITHHELD**

    **FOR ALL**   ☐    ☐    **WITHHOLD AUTHORITY**
    **NOMINEES**                **TO VOTE FOR ALL NOMINEES**
    **LISTED ON**               **LISTED ON REVERSE**
    **REVERSE**
    ☐

    For all nominees except as written above

    **FOR  AGAINST  ABSTAIN**

2.  To approve an amendment to the Company's Certificate of Incorporation to    ☐    ☐    ☐
    increase the number of authorized shares of the Company's Common Stock.

3. To approve an amendment of the Company's 1997 Employee Stock Purchase Plan to increase the number of shares available for grant pursuant to the plan.    ☐    ☐    ☐

4. To ratify the selection of Deloitte & Touche LLP as independent auditors for the fiscal year ending December 31, 2004.    ☐    ☐    ☐

NOTE: Please sign exactly as name appears herein, joint owners should each sign. When signing as attorney, executor, administrator, trustee or guardian, please give full title as such.

Signature:                Date:            Signature:                    Date:

QuickLinks

GENERAL INFORMATION
MANAGEMENT AND PRINCIPAL HOLDERS OF VOTING SECURITIES
PROPOSAL 1
ELECTION OF DIRECTORS
THE BOARD OF DIRECTORS AND ITS COMMITTEES
REPORT OF THE AUDIT COMMITTEE
COMPENSATION AND OTHER INFORMATION CONCERNING DIRECTORS AND EXECUTIVE OFFICERS
PROPOSAL 2
APPROVAL OF AN AMENDMENT TO THE COMPANY'S CERTIFICATE OF INCORPORATION TO INCREASE THE NUMBER OF AUTHORIZED SHARES OF COMMON STOCK
PROPOSAL 3
APPROVAL OF AN AMENDMENT TO THE COMPANY'S 1997 EMPLOYEE STOCK PURCHASE PLAN TO INCREASE THE NUMBER OF SHARES AVAILABLE FOR ISSUANCE PURSUANT TO THE PLAN
PROPOSAL 4 RATIFICATION OF SELECTION OF AUDITORS
CODE OF CONDUCT POLICY
SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE
STOCKHOLDER PROPOSALS

APPENDIX A

APPENDIX B

Exhibit 4

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 4/10/2001 | 634,600 | $30.73 | $29.07 | $30.51 |
| 4/11/2001 | 2,685,400 | $37.68 | $32.00 | $37.59 |
| 4/12/2001 | 2,065,800 | $37.98 | $35.25 | $36.69 |
| 4/16/2001 | 763,600 | $38.41 | $35.50 | $36.68 |
| 4/17/2001 | 814,000 | $38.63 | $36.41 | $37.33 |
| 4/18/2001 | 1,140,400 | $40.06 | $37.72 | $38.90 |
| 4/19/2001 | 668,000 | $39.07 | $36.48 | $37.62 |
| 4/20/2001 | 634,400 | $37.87 | $36.33 | $37.87 |
| 4/23/2001 | 596,600 | $37.12 | $35.40 | $36.43 |
| 4/24/2001 | 520,000 | $36.53 | $35.98 | $36.32 |
| 4/25/2001 | 432,200 | $36.41 | $35.68 | $35.99 |
| 4/26/2001 | 1,046,600 | $37.05 | $36.05 | $36.88 |
| 4/27/2001 | 593,800 | $37.77 | $36.52 | $36.87 |
| 4/30/2001 | 619,200 | $37.44 | $35.77 | $35.77 |
| 5/1/2001 | 470,800 | $37.63 | $35.56 | $37.40 |
| 5/2/2001 | 372,400 | $37.89 | $37.28 | $37.53 |
| 5/3/2001 | 842,400 | $37.07 | $34.74 | $35.58 |
| 5/4/2001 | 467,800 | $36.62 | $34.60 | $36.59 |
| 5/7/2001 | 306,200 | $36.13 | $34.87 | $35.83 |
| 5/8/2001 | 300,800 | $36.56 | $35.15 | $35.38 |
| 5/9/2001 | 380,400 | $35.94 | $34.33 | $34.47 |
| 5/10/2001 | 394,800 | $35.39 | $34.43 | $34.79 |
| 5/11/2001 | 198,000 | $35.00 | $33.44 | $34.08 |
| 5/14/2001 | 574,200 | $34.20 | $33.38 | $34.00 |
| 5/15/2001 | 321,600 | $34.43 | $33.61 | $34.25 |
| 5/16/2001 | 548,400 | $35.61 | $33.53 | $35.20 |
| 5/17/2001 | 633,200 | $36.71 | $34.82 | $35.50 |
| 5/18/2001 | 232,200 | $35.64 | $34.53 | $35.05 |
| 5/21/2001 | 708,800 | $36.63 | $35.03 | $35.95 |
| 5/22/2001 | 863,000 | $36.13 | $35.65 | $35.96 |
| 5/23/2001 | 276,000 | $35.96 | $34.75 | $35.07 |
| 5/24/2001 | 372,600 | $35.73 | $33.73 | $34.56 |
| 5/25/2001 | 343,400 | $34.75 | $33.73 | $33.75 |
| 5/29/2001 | 1,360,200 | $33.98 | $32.00 | $32.50 |
| 5/30/2001 | 1,008,200 | $33.03 | $31.53 | $32.50 |
| 5/31/2001 | 828,200 | $33.80 | $32.15 | $32.57 |
| 6/1/2001 | 995,600 | $32.68 | $31.47 | $31.77 |
| 6/4/2001 | 1,224,800 | $31.97 | $29.67 | $29.90 |
| 6/5/2001 | 3,143,800 | $31.50 | $29.63 | $31.38 |
| 6/6/2001 | 2,321,400 | $34.39 | $31.42 | $34.13 |
| 6/7/2001 | 694,400 | $34.24 | $32.88 | $33.37 |
| 6/8/2001 | 507,000 | $34.11 | $32.50 | $33.49 |
| 6/11/2001 | 523,200 | $33.48 | $32.50 | $32.50 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|---|---|---|---|---|
| 6/12/2001 | 674,600 | $33.13 | $32.23 | $32.63 |
| 6/13/2001 | 310,200 | $33.80 | $32.48 | $32.50 |
| 6/14/2001 | 1,051,000 | $32.85 | $31.34 | $31.98 |
| 6/15/2001 | 1,049,200 | $33.68 | $31.90 | $33.67 |
| 6/18/2001 | 335,600 | $34.13 | $32.50 | $33.11 |
| 6/19/2001 | 374,200 | $33.98 | $33.20 | $33.33 |
| 6/20/2001 | 450,200 | $34.15 | $33.25 | $33.60 |
| 6/21/2001 | 300,400 | $35.20 | $33.61 | $34.66 |
| 6/22/2001 | 265,400 | $34.91 | $33.35 | $33.57 |
| 6/25/2001 | 448,800 | $34.00 | $33.00 | $33.03 |
| 6/26/2001 | 418,400 | $33.08 | $32.48 | $32.88 |
| 6/27/2001 | 394,200 | $34.04 | $32.93 | $33.26 |
| 6/28/2001 | 279,800 | $35.07 | $33.28 | $34.87 |
| 6/29/2001 | 1,649,000 | $35.96 | $33.38 | $33.50 |
| 7/2/2001 | 576,400 | $34.27 | $33.59 | $33.98 |
| 7/3/2001 | 224,200 | $34.24 | $33.85 | $34.02 |
| 7/5/2001 | 228,400 | $34.25 | $33.88 | $34.23 |
| 7/6/2001 | 265,400 | $34.01 | $32.80 | $33.31 |
| 7/9/2001 | 604,400 | $34.25 | $33.08 | $34.20 |
| 7/10/2001 | 428,000 | $34.38 | $33.60 | $34.13 |
| 7/11/2001 | 1,624,600 | $37.20 | $35.75 | $37.17 |
| 7/12/2001 | 918,000 | $40.10 | $37.33 | $39.35 |
| 7/13/2001 | 1,030,400 | $40.38 | $38.60 | $39.97 |
| 7/16/2001 | 487,600 | $40.00 | $38.38 | $38.54 |
| 7/17/2001 | 495,400 | $39.22 | $38.05 | $38.63 |
| 7/18/2001 | 411,200 | $39.12 | $38.28 | $38.96 |
| 7/19/2001 | 529,600 | $40.17 | $38.59 | $38.91 |
| 7/20/2001 | 384,800 | $40.05 | $38.25 | $39.75 |
| 7/23/2001 | 350,000 | $40.20 | $39.41 | $39.88 |
| 7/24/2001 | 622,200 | $39.84 | $38.33 | $38.80 |
| 7/25/2001 | 292,000 | $39.00 | $38.35 | $38.83 |
| 7/26/2001 | 805,200 | $39.03 | $38.47 | $38.53 |
| 7/27/2001 | 251,400 | $39.02 | $38.10 | $38.31 |
| 7/30/2001 | 683,200 | $38.31 | $37.06 | $37.23 |
| 7/31/2001 | 587,800 | $37.50 | $36.93 | $37.09 |
| 8/1/2001 | 389,600 | $37.05 | $36.08 | $36.20 |
| 8/2/2001 | 1,230,200 | $36.36 | $35.70 | $36.02 |
| 8/3/2001 | 334,600 | $37.13 | $35.65 | $36.98 |
| 8/6/2001 | 348,400 | $36.98 | $35.82 | $36.33 |
| 8/7/2001 | 144,800 | $36.48 | $35.94 | $36.38 |
| 8/8/2001 | 136,200 | $36.58 | $35.48 | $36.25 |
| 8/9/2001 | 229,400 | $36.73 | $35.48 | $36.71 |
| 8/10/2001 | 476,200 | $36.56 | $35.71 | $35.75 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 8/13/2001 | 284,400 | $35.75 | $35.48 | $35.71 |
| 8/14/2001 | 202,400 | $35.71 | $34.97 | $35.01 |
| 8/15/2001 | 179,000 | $35.39 | $34.50 | $35.15 |
| 8/16/2001 | 282,200 | $35.81 | $34.90 | $35.75 |
| 8/17/2001 | 185,000 | $35.47 | $34.90 | $35.15 |
| 8/20/2001 | 136,600 | $35.45 | $34.75 | $35.14 |
| 8/21/2001 | 128,200 | $35.82 | $34.99 | $35.13 |
| 8/22/2001 | 294,200 | $35.25 | $34.31 | $34.45 |
| 8/23/2001 | 424,400 | $34.72 | $34.15 | $34.25 |
| 8/24/2001 | 693,600 | $34.47 | $32.65 | $32.85 |
| 8/27/2001 | 1,080,800 | $33.06 | $30.90 | $31.24 |
| 8/28/2001 | 778,800 | $32.63 | $31.26 | $32.23 |
| 8/29/2001 | 526,400 | $32.37 | $31.88 | $32.20 |
| 8/30/2001 | 363,800 | $32.83 | $31.77 | $31.88 |
| 8/31/2001 | 266,800 | $32.16 | $31.59 | $32.03 |
| 9/4/2001 | 399,600 | $32.96 | $31.56 | $32.40 |
| 9/5/2001 | 299,400 | $32.54 | $31.33 | $31.53 |
| 9/6/2001 | 381,600 | $31.48 | $30.19 | $30.35 |
| 9/7/2001 | 918,000 | $30.44 | $30.00 | $30.18 |
| 9/10/2001 | 845,600 | $30.23 | $29.93 | $30.06 |
| 9/17/2001 | 1,626,200 | $29.41 | $28.10 | $29.10 |
| 9/18/2001 | 537,200 | $29.37 | $28.82 | $29.02 |
| 9/19/2001 | 1,728,400 | $29.08 | $26.15 | $26.71 |
| 9/20/2001 | 768,600 | $26.48 | $24.25 | $25.00 |
| 9/21/2001 | 1,020,600 | $25.25 | $23.00 | $25.11 |
| 9/24/2001 | 715,200 | $28.00 | $24.97 | $27.63 |
| 9/25/2001 | 885,600 | $27.76 | $25.04 | $26.06 |
| 9/26/2001 | 350,800 | $26.81 | $25.98 | $26.63 |
| 9/27/2001 | 533,200 | $28.28 | $26.23 | $28.08 |
| 9/28/2001 | 571,600 | $29.50 | $27.83 | $28.82 |
| 10/1/2001 | 588,000 | $29.00 | $26.50 | $27.50 |
| 10/2/2001 | 345,800 | $29.14 | $26.90 | $28.82 |
| 10/3/2001 | 428,400 | $31.00 | $28.08 | $30.07 |
| 10/4/2001 | 335,800 | $30.25 | $29.38 | $29.62 |
| 10/5/2001 | 285,800 | $29.80 | $28.00 | $28.28 |
| 10/8/2001 | 201,400 | $28.44 | $27.57 | $27.89 |
| 10/9/2001 | 152,200 | $28.29 | $27.17 | $27.63 |
| 10/10/2001 | 523,400 | $28.88 | $27.56 | $28.71 |
| 10/11/2001 | 2,956,200 | $28.86 | $27.28 | $27.88 |
| 10/12/2001 | 550,400 | $28.25 | $27.30 | $27.71 |
| 10/15/2001 | 586,200 | $27.80 | $27.00 | $27.72 |
| 10/16/2001 | 290,000 | $28.93 | $27.63 | $28.83 |
| 10/17/2001 | 340,800 | $29.13 | $28.31 | $28.50 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 10/18/2001 | 161,400 | $29.12 | $28.23 | $28.30 |
| 10/19/2001 | 203,400 | $28.58 | $28.13 | $28.40 |
| 10/22/2001 | 166,400 | $29.05 | $28.19 | $28.95 |
| 10/23/2001 | 201,200 | $29.12 | $28.50 | $28.63 |
| 10/24/2001 | 192,000 | $28.73 | $28.28 | $28.53 |
| 10/25/2001 | 480,400 | $28.53 | $27.77 | $28.48 |
| 10/26/2001 | 726,400 | $28.58 | $27.95 | $28.24 |
| 10/29/2001 | 583,200 | $28.50 | $27.51 | $27.74 |
| 10/30/2001 | 750,800 | $27.75 | $26.49 | $26.49 |
| 10/31/2001 | 347,800 | $27.00 | $26.42 | $26.45 |
| 11/1/2001 | 905,400 | $27.08 | $26.16 | $26.75 |
| 11/2/2001 | 465,800 | $27.38 | $26.38 | $27.20 |
| 11/5/2001 | 156,400 | $27.37 | $27.00 | $27.25 |
| 11/6/2001 | 370,000 | $27.63 | $26.50 | $27.63 |
| 11/7/2001 | 460,800 | $27.94 | $27.01 | $27.68 |
| 11/8/2001 | 658,600 | $28.38 | $27.63 | $28.30 |
| 11/9/2001 | 243,400 | $28.89 | $28.00 | $28.74 |
| 11/12/2001 | 639,800 | $29.55 | $28.26 | $29.50 |
| 11/13/2001 | 650,200 | $31.23 | $29.40 | $30.97 |
| 11/14/2001 | 474,600 | $31.79 | $30.65 | $31.67 |
| 11/15/2001 | 544,000 | $31.90 | $30.75 | $31.12 |
| 11/16/2001 | 161,200 | $31.16 | $30.46 | $30.81 |
| 11/19/2001 | 398,200 | $31.18 | $29.87 | $29.98 |
| 11/20/2001 | 260,600 | $30.57 | $29.70 | $30.51 |
| 11/21/2001 | 174,000 | $30.67 | $30.30 | $30.43 |
| 11/23/2001 | 52,400 | $31.02 | $30.34 | $30.91 |
| 11/26/2001 | 451,200 | $31.50 | $30.83 | $31.50 |
| 11/27/2001 | 570,000 | $32.15 | $31.26 | $31.99 |
| 11/28/2001 | 481,800 | $32.76 | $31.81 | $32.60 |
| 11/29/2001 | 542,200 | $33.41 | $32.06 | $33.25 |
| 11/30/2001 | 392,800 | $33.48 | $32.61 | $33.01 |
| 12/3/2001 | 365,800 | $32.84 | $31.79 | $31.94 |
| 12/4/2001 | 471,200 | $33.83 | $31.75 | $33.83 |
| 12/5/2001 | 318,400 | $34.78 | $33.53 | $34.60 |
| 12/6/2001 | 343,200 | $35.46 | $34.51 | $35.05 |
| 12/7/2001 | 258,400 | $35.52 | $34.44 | $35.52 |
| 12/10/2001 | 366,600 | $35.70 | $34.81 | $35.07 |
| 12/11/2001 | 232,200 | $35.25 | $34.75 | $34.90 |
| 12/12/2001 | 413,600 | $35.08 | $34.18 | $34.45 |
| 12/13/2001 | 369,000 | $34.28 | $32.63 | $33.36 |
| 12/14/2001 | 342,200 | $33.24 | $32.61 | $32.98 |
| 12/17/2001 | 405,200 | $33.10 | $32.00 | $32.10 |
| 12/18/2001 | 302,600 | $32.50 | $31.97 | $32.41 |

4

Source: Bloomberg

# Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|---|---|---|---|---|
| 12/19/2001 | 265,000 | $32.43 | $31.75 | $32.18 |
| 12/20/2001 | 562,600 | $32.37 | $30.64 | $32.17 |
| 12/21/2001 | 608,600 | $34.25 | $32.11 | $34.19 |
| 12/24/2001 | 125,800 | $34.03 | $33.40 | $33.86 |
| 12/26/2001 | 337,000 | $34.05 | $33.40 | $33.49 |
| 12/27/2001 | 257,000 | $33.70 | $33.46 | $33.54 |
| 12/28/2001 | 493,600 | $33.65 | $32.79 | $33.28 |
| 12/31/2001 | 907,200 | $33.60 | $32.54 | $33.11 |
| 1/2/2002 | 288,800 | $33.43 | $32.51 | $33.27 |
| 1/3/2002 | 413,800 | $33.97 | $33.19 | $33.97 |
| 1/4/2002 | 261,200 | $35.00 | $33.94 | $34.85 |
| 1/7/2002 | 673,000 | $35.60 | $34.81 | $35.25 |
| 1/8/2002 | 545,400 | $35.82 | $34.90 | $35.53 |
| 1/9/2002 | 916,000 | $36.25 | $35.50 | $36.20 |
| 1/10/2002 | 647,800 | $37.23 | $36.14 | $37.15 |
| 1/11/2002 | 1,917,000 | $37.75 | $36.77 | $37.00 |
| 1/14/2002 | 309,200 | $36.98 | $36.03 | $36.03 |
| 1/15/2002 | 231,600 | $36.50 | $35.81 | $36.22 |
| 1/16/2002 | 305,600 | $36.41 | $35.49 | $35.51 |
| 1/17/2002 | 213,000 | $35.90 | $35.32 | $35.77 |
| 1/18/2002 | 400,600 | $36.10 | $35.18 | $36.10 |
| 1/22/2002 | 452,400 | $37.10 | $36.17 | $37.09 |
| 1/23/2002 | 347,600 | $37.37 | $36.50 | $36.82 |
| 1/24/2002 | 630,800 | $37.41 | $36.08 | $36.30 |
| 1/25/2002 | 374,400 | $37.00 | $36.04 | $36.91 |
| 1/28/2002 | 288,600 | $36.90 | $36.08 | $36.26 |
| 1/29/2002 | 449,000 | $36.37 | $34.25 | $34.30 |
| 1/30/2002 | 655,000 | $34.80 | $33.97 | $34.49 |
| 1/31/2002 | 437,600 | $35.23 | $34.42 | $34.80 |
| 2/1/2002 | 277,800 | $35.10 | $34.18 | $34.18 |
| 2/4/2002 | 272,600 | $34.23 | $33.15 | $33.26 |
| 2/5/2002 | 754,000 | $33.43 | $32.80 | $33.21 |
| 2/6/2002 | 264,200 | $33.26 | $31.82 | $32.42 |
| 2/7/2002 | 345,200 | $33.85 | $32.20 | $33.85 |
| 2/8/2002 | 155,200 | $34.10 | $33.70 | $34.04 |
| 2/11/2002 | 256,400 | $35.08 | $33.82 | $34.72 |
| 2/12/2002 | 517,000 | $34.98 | $34.49 | $34.64 |
| 2/13/2002 | 239,600 | $34.90 | $34.23 | $34.57 |
| 2/14/2002 | 173,600 | $35.05 | $34.50 | $34.75 |
| 2/15/2002 | 187,200 | $34.75 | $33.95 | $34.35 |
| 2/19/2002 | 261,600 | $34.52 | $33.27 | $33.46 |
| 2/20/2002 | 572,600 | $34.00 | $33.36 | $33.45 |
| 2/21/2002 | 475,200 | $33.75 | $33.23 | $33.23 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 2/22/2002 | 910,200 | $33.78 | $32.88 | $33.38 |
| 2/25/2002 | 475,400 | $33.97 | $33.28 | $33.66 |
| 2/26/2002 | 280,400 | $33.68 | $33.24 | $33.42 |
| 2/27/2002 | 385,800 | $34.33 | $33.56 | $34.27 |
| 2/28/2002 | 371,600 | $34.90 | $34.15 | $34.74 |
| 3/1/2002 | 290,400 | $34.95 | $34.64 | $34.92 |
| 3/4/2002 | 266,400 | $36.15 | $34.86 | $35.91 |
| 3/5/2002 | 313,600 | $36.55 | $35.95 | $36.25 |
| 3/6/2002 | 201,000 | $36.68 | $35.84 | $36.49 |
| 3/7/2002 | 383,000 | $37.18 | $36.52 | $36.57 |
| 3/8/2002 | 799,400 | $38.15 | $36.57 | $38.02 |
| 3/11/2002 | 472,400 | $38.68 | $37.92 | $38.28 |
| 3/12/2002 | 159,600 | $38.48 | $38.08 | $38.30 |
| 3/13/2002 | 626,800 | $38.48 | $37.65 | $38.00 |
| 3/14/2002 | 114,400 | $38.21 | $37.70 | $37.89 |
| 3/15/2002 | 311,400 | $38.66 | $37.80 | $38.63 |
| 3/18/2002 | 330,800 | $39.41 | $38.13 | $38.49 |
| 3/19/2002 | 189,600 | $38.53 | $38.30 | $38.42 |
| 3/20/2002 | 332,200 | $38.50 | $37.96 | $38.46 |
| 3/21/2002 | 260,000 | $38.40 | $37.58 | $38.10 |
| 3/22/2002 | 372,200 | $38.51 | $37.85 | $38.38 |
| 3/25/2002 | 305,200 | $38.45 | $37.63 | $37.84 |
| 3/26/2002 | 388,400 | $38.50 | $37.68 | $38.04 |
| 3/27/2002 | 217,400 | $38.10 | $37.81 | $38.08 |
| 3/28/2002 | 141,600 | $38.10 | $37.91 | $38.03 |
| 4/1/2002 | 288,600 | $38.07 | $37.07 | $37.46 |
| 4/2/2002 | 176,200 | $37.52 | $37.17 | $37.37 |
| 4/3/2002 | 219,400 | $37.45 | $36.11 | $36.11 |
| 4/4/2002 | 577,800 | $36.35 | $35.28 | $35.73 |
| 4/5/2002 | 485,400 | $36.83 | $35.74 | $36.64 |
| 4/8/2002 | 128,400 | $36.84 | $36.14 | $36.78 |
| 4/9/2002 | 214,800 | $37.19 | $36.73 | $37.08 |
| 4/10/2002 | 150,200 | $37.35 | $36.93 | $37.32 |
| 4/11/2002 | 149,600 | $37.32 | $36.58 | $36.60 |
| 4/12/2002 | 208,000 | $37.07 | $36.50 | $37.05 |
| 4/15/2002 | 153,800 | $37.12 | $36.44 | $36.60 |
| 4/16/2002 | 584,600 | $37.68 | $36.60 | $37.46 |
| 4/17/2002 | 655,600 | $38.33 | $37.43 | $38.06 |
| 4/18/2002 | 276,000 | $38.40 | $37.86 | $37.98 |
| 4/19/2002 | 243,800 | $38.42 | $37.98 | $38.14 |
| 4/22/2002 | 264,400 | $38.50 | $37.95 | $38.05 |
| 4/23/2002 | 107,200 | $38.18 | $37.85 | $37.88 |
| 4/24/2002 | 550,800 | $38.59 | $37.83 | $38.08 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 4/25/2002 | 253,000 | $38.33 | $37.81 | $38.17 |
| 4/26/2002 | 222,600 | $38.20 | $36.83 | $36.89 |
| 4/29/2002 | 368,400 | $36.94 | $35.45 | $35.86 |
| 4/30/2002 | 590,600 | $36.94 | $35.85 | $36.82 |
| 5/1/2002 | 310,000 | $37.50 | $36.42 | $37.48 |
| 5/2/2002 | 288,800 | $38.05 | $37.50 | $37.78 |
| 5/3/2002 | 212,800 | $38.00 | $37.35 | $37.80 |
| 5/6/2002 | 147,600 | $37.92 | $37.16 | $37.28 |
| 5/7/2002 | 305,000 | $37.84 | $36.83 | $36.83 |
| 5/8/2002 | 204,000 | $37.64 | $37.01 | $37.62 |
| 5/9/2002 | 160,600 | $37.87 | $37.14 | $37.25 |
| 5/10/2002 | 496,600 | $38.59 | $36.68 | $38.22 |
| 5/13/2002 | 1,197,000 | $39.34 | $38.32 | $39.00 |
| 5/14/2002 | 785,600 | $39.35 | $38.25 | $38.51 |
| 5/15/2002 | 487,800 | $38.73 | $38.03 | $38.42 |
| 5/16/2002 | 299,000 | $38.65 | $38.30 | $38.57 |
| 5/17/2002 | 248,800 | $38.83 | $38.40 | $38.43 |
| 5/20/2002 | 308,000 | $38.57 | $37.97 | $37.97 |
| 5/21/2002 | 492,000 | $38.08 | $37.05 | $37.13 |
| 5/22/2002 | 631,000 | $37.45 | $36.75 | $36.96 |
| 5/23/2002 | 301,000 | $38.00 | $37.00 | $37.95 |
| 5/24/2002 | 195,000 | $38.32 | $37.73 | $37.73 |
| 5/28/2002 | 295,000 | $38.06 | $37.18 | $37.71 |
| 5/29/2002 | 438,800 | $38.50 | $37.75 | $38.43 |
| 5/30/2002 | 886,400 | $38.43 | $38.00 | $38.26 |
| 5/31/2002 | 446,400 | $38.96 | $38.06 | $38.63 |
| 6/3/2002 | 392,200 | $38.75 | $37.89 | $37.90 |
| 6/4/2002 | 563,400 | $37.90 | $36.83 | $37.00 |
| 6/5/2002 | 429,000 | $37.58 | $36.51 | $37.03 |
| 6/6/2002 | 314,000 | $37.31 | $36.22 | $36.23 |
| 6/7/2002 | 336,400 | $36.70 | $35.95 | $36.60 |
| 6/10/2002 | 253,000 | $37.79 | $36.61 | $37.47 |
| 6/11/2002 | 295,200 | $37.77 | $36.49 | $36.50 |
| 6/12/2002 | 944,000 | $36.59 | $34.82 | $35.30 |
| 6/13/2002 | 430,600 | $35.33 | $34.40 | $34.44 |
| 6/14/2002 | 531,600 | $34.56 | $33.03 | $34.27 |
| 6/17/2002 | 667,400 | $36.80 | $34.40 | $36.73 |
| 6/18/2002 | 446,500 | $37.45 | $36.50 | $36.97 |
| 6/19/2002 | 510,700 | $37.42 | $36.16 | $37.10 |
| 6/20/2002 | 682,500 | $37.45 | $34.92 | $35.04 |
| 6/21/2002 | 1,139,000 | $35.63 | $33.38 | $34.43 |
| 6/24/2002 | 806,700 | $34.52 | $33.29 | $33.60 |
| 6/25/2002 | 368,200 | $34.33 | $33.25 | $33.61 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 6/26/2002 | 559,300 | $33.04 | $32.06 | $32.49 |
| 6/27/2002 | 431,300 | $33.84 | $32.53 | $33.60 |
| 6/28/2002 | 857,600 | $34.17 | $33.05 | $33.54 |
| 7/1/2002 | 397,600 | $33.56 | $32.82 | $32.90 |
| 7/2/2002 | 637,900 | $32.90 | $31.12 | $31.25 |
| 7/3/2002 | 481,800 | $31.44 | $29.79 | $30.92 |
| 7/5/2002 | 152,400 | $32.50 | $31.06 | $32.21 |
| 7/8/2002 | 715,500 | $32.28 | $31.42 | $31.60 |
| 7/9/2002 | 506,800 | $32.05 | $30.57 | $30.57 |
| 7/10/2002 | 779,200 | $30.55 | $29.27 | $29.29 |
| 7/11/2002 | 667,800 | $30.85 | $28.44 | $30.60 |
| 7/12/2002 | 983,000 | $33.87 | $30.56 | $33.13 |
| 7/15/2002 | 735,900 | $33.37 | $30.31 | $32.05 |
| 7/16/2002 | 510,500 | $32.59 | $31.39 | $31.93 |
| 7/17/2002 | 372,200 | $33.25 | $30.59 | $31.34 |
| 7/18/2002 | 529,700 | $31.34 | $29.74 | $29.74 |
| 7/19/2002 | 907,200 | $29.69 | $28.60 | $28.99 |
| 7/22/2002 | 1,398,536 | $28.96 | $26.12 | $27.19 |
| 7/23/2002 | 821,682 | $28.01 | $25.60 | $25.85 |
| 7/24/2002 | 962,751 | $29.20 | $24.77 | $29.00 |
| 7/25/2002 | 446,845 | $29.37 | $27.33 | $28.01 |
| 7/26/2002 | 408,445 | $28.27 | $27.19 | $27.62 |
| 7/29/2002 | 575,271 | $31.05 | $27.44 | $30.86 |
| 7/30/2002 | 690,604 | $30.89 | $29.62 | $30.50 |
| 7/31/2002 | 223,788 | $31.18 | $30.17 | $30.77 |
| 8/1/2002 | 343,484 | $30.77 | $30.03 | $30.06 |
| 8/2/2002 | 347,643 | $30.41 | $29.20 | $29.33 |
| 8/5/2002 | 261,622 | $29.44 | $27.90 | $28.00 |
| 8/6/2002 | 347,640 | $29.47 | $28.25 | $29.30 |
| 8/7/2002 | 517,952 | $29.64 | $28.72 | $29.29 |
| 8/8/2002 | 596,390 | $29.93 | $29.09 | $29.78 |
| 8/9/2002 | 371,526 | $30.11 | $29.05 | $29.74 |
| 8/12/2002 | 285,070 | $29.77 | $28.71 | $29.16 |
| 8/13/2002 | 279,336 | $29.67 | $28.95 | $29.03 |
| 8/14/2002 | 353,399 | $30.50 | $28.49 | $30.16 |
| 8/15/2002 | 370,800 | $30.64 | $29.50 | $30.00 |
| 8/16/2002 | 185,734 | $30.10 | $29.00 | $30.04 |
| 8/19/2002 | 424,481 | $31.49 | $29.40 | $31.05 |
| 8/20/2002 | 155,400 | $31.00 | $30.01 | $30.41 |
| 8/21/2002 | 295,693 | $32.14 | $30.46 | $31.73 |
| 8/22/2002 | 342,221 | $32.64 | $31.22 | $32.40 |
| 8/23/2002 | 207,254 | $32.06 | $30.81 | $31.10 |
| 8/26/2002 | 188,876 | $31.83 | $30.84 | $31.63 |

Source: Bloomberg

# Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 8/27/2002 | 418,100 | $31.85 | $30.82 | $31.18 |
| 8/28/2002 | 258,000 | $31.24 | $29.69 | $29.77 |
| 8/29/2002 | 330,087 | $31.31 | $29.50 | $30.91 |
| 8/30/2002 | 192,100 | $31.39 | $30.06 | $30.06 |
| 9/3/2002 | 395,676 | $29.95 | $28.38 | $29.11 |
| 9/4/2002 | 159,235 | $30.24 | $28.91 | $30.24 |
| 9/5/2002 | 288,097 | $29.67 | $28.36 | $28.43 |
| 9/6/2002 | 235,240 | $29.44 | $28.67 | $29.38 |
| 9/9/2002 | 170,200 | $30.22 | $28.77 | $30.05 |
| 9/10/2002 | 199,203 | $30.20 | $29.22 | $29.55 |
| 9/11/2002 | 219,707 | $30.34 | $29.43 | $30.06 |
| 9/12/2002 | 341,472 | $30.18 | $28.86 | $28.89 |
| 9/13/2002 | 489,403 | $29.62 | $28.35 | $29.52 |
| 9/16/2002 | 236,300 | $29.70 | $28.55 | $28.69 |
| 9/17/2002 | 393,335 | $29.02 | $27.73 | $27.81 |
| 9/18/2002 | 553,331 | $27.90 | $26.73 | $27.58 |
| 9/19/2002 | 412,252 | $27.60 | $26.90 | $26.95 |
| 9/20/2002 | 574,664 | $27.34 | $26.56 | $27.32 |
| 9/23/2002 | 379,178 | $27.35 | $26.25 | $27.14 |
| 9/24/2002 | 631,549 | $27.12 | $26.00 | $26.44 |
| 9/25/2002 | 831,832 | $26.75 | $25.50 | $26.00 |
| 9/26/2002 | 566,491 | $27.44 | $25.85 | $27.32 |
| 9/27/2002 | 345,838 | $27.39 | $26.23 | $26.36 |
| 9/30/2002 | 929,938 | $27.17 | $25.50 | $27.07 |
| 10/1/2002 | 438,091 | $28.16 | $26.47 | $28.14 |
| 10/2/2002 | 285,742 | $28.17 | $26.49 | $26.57 |
| 10/3/2002 | 1,067,506 | $26.52 | $25.04 | $25.25 |
| 10/4/2002 | 2,426,322 | $25.16 | $20.63 | $22.29 |
| 10/7/2002 | 1,549,191 | $22.39 | $19.66 | $20.06 |
| 10/8/2002 | 1,948,346 | $23.56 | $20.34 | $23.33 |
| 10/9/2002 | 1,588,135 | $23.11 | $22.10 | $22.39 |
| 10/10/2002 | 1,896,648 | $25.78 | $22.40 | $25.51 |
| 10/11/2002 | 1,075,380 | $27.28 | $25.63 | $25.97 |
| 10/14/2002 | 401,509 | $26.54 | $25.24 | $26.50 |
| 10/15/2002 | 885,222 | $29.72 | $26.86 | $29.14 |
| 10/16/2002 | 634,031 | $29.00 | $27.20 | $27.40 |
| 10/17/2002 | 470,694 | $29.51 | $27.92 | $29.18 |
| 10/18/2002 | 341,632 | $29.50 | $28.80 | $29.43 |
| 10/21/2002 | 351,019 | $29.70 | $28.69 | $29.50 |
| 10/22/2002 | 359,989 | $29.75 | $29.01 | $29.12 |
| 10/23/2002 | 400,893 | $29.58 | $28.24 | $29.48 |
| 10/24/2002 | 437,927 | $29.94 | $29.01 | $29.25 |
| 10/25/2002 | 266,246 | $30.32 | $29.06 | $30.25 |

Source: Bloomberg

# Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 10/28/2002 | 441,998 | $30.37 | $29.65 | $30.10 |
| 10/29/2002 | 539,219 | $30.28 | $28.70 | $29.19 |
| 10/30/2002 | 399,432 | $30.70 | $29.25 | $30.39 |
| 10/31/2002 | 428,743 | $31.18 | $30.36 | $30.67 |
| 11/1/2002 | 370,240 | $31.88 | $30.21 | $31.78 |
| 11/4/2002 | 782,453 | $34.18 | $31.82 | $33.41 |
| 11/5/2002 | 659,029 | $33.64 | $32.34 | $32.66 |
| 11/6/2002 | 436,073 | $32.63 | $31.15 | $32.16 |
| 11/7/2002 | 293,024 | $32.54 | $31.01 | $31.34 |
| 11/8/2002 | 364,883 | $31.58 | $30.27 | $30.56 |
| 11/11/2002 | 234,971 | $30.80 | $29.82 | $30.07 |
| 11/12/2002 | 496,341 | $31.50 | $30.12 | $31.09 |
| 11/13/2002 | 308,220 | $31.60 | $30.62 | $31.41 |
| 11/14/2002 | 244,825 | $32.77 | $31.31 | $32.77 |
| 11/15/2002 | 517,626 | $33.38 | $32.60 | $32.99 |
| 11/18/2002 | 314,294 | $33.38 | $32.25 | $32.41 |
| 11/19/2002 | 171,590 | $32.95 | $31.78 | $32.51 |
| 11/20/2002 | 510,175 | $34.00 | $32.27 | $33.38 |
| 11/21/2002 | 603,604 | $35.66 | $33.47 | $35.52 |
| 11/22/2002 | 342,526 | $35.71 | $34.63 | $35.37 |
| 11/25/2002 | 311,846 | $35.37 | $34.65 | $35.05 |
| 11/26/2002 | 457,948 | $34.91 | $33.07 | $33.10 |
| 11/27/2002 | 299,664 | $35.13 | $33.30 | $34.96 |
| 11/29/2002 | 115,064 | $35.12 | $34.66 | $34.98 |
| 12/2/2002 | 278,194 | $35.94 | $35.08 | $35.44 |
| 12/3/2002 | 446,387 | $35.50 | $34.16 | $34.18 |
| 12/4/2002 | 2,086,757 | $33.00 | $30.75 | $32.22 |
| 12/5/2002 | 1,610,805 | $32.76 | $30.50 | $30.55 |
| 12/6/2002 | 829,597 | $30.70 | $29.78 | $29.86 |
| 12/9/2002 | 865,987 | $30.27 | $28.33 | $28.35 |
| 12/10/2002 | 1,004,410 | $28.59 | $27.85 | $28.25 |
| 12/11/2002 | 1,461,694 | $28.45 | $27.05 | $27.40 |
| 12/12/2002 | 823,123 | $28.05 | $27.42 | $27.65 |
| 12/13/2002 | 747,726 | $27.75 | $26.90 | $26.90 |
| 12/16/2002 | 959,126 | $27.85 | $26.80 | $27.49 |
| 12/17/2002 | 544,481 | $28.25 | $27.32 | $27.57 |
| 12/18/2002 | 428,708 | $27.70 | $27.20 | $27.20 |
| 12/19/2002 | 466,352 | $27.71 | $27.02 | $27.19 |
| 12/20/2002 | 1,063,035 | $28.66 | $27.21 | $28.55 |
| 12/23/2002 | 972,583 | $30.08 | $28.45 | $29.26 |
| 12/24/2002 | 273,056 | $29.84 | $28.64 | $28.83 |
| 12/26/2002 | 240,274 | $29.20 | $28.63 | $28.81 |
| 12/27/2002 | 235,517 | $29.00 | $28.10 | $28.29 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|---|---|---|---|---|
| 12/30/2002 | 493,681 | $28.15 | $27.27 | $27.62 |
| 12/31/2002 | 581,227 | $27.84 | $27.24 | $27.39 |
| 1/2/2003 | 571,798 | $28.34 | $27.00 | $28.25 |
| 1/3/2003 | 456,346 | $28.53 | $27.87 | $28.20 |
| 1/6/2003 | 501,884 | $29.06 | $28.00 | $28.94 |
| 1/7/2003 | 341,050 | $29.50 | $28.33 | $28.46 |
| 1/8/2003 | 283,161 | $28.70 | $27.67 | $27.74 |
| 1/9/2003 | 346,024 | $28.27 | $27.74 | $28.27 |
| 1/10/2003 | 513,648 | $28.32 | $27.30 | $27.96 |
| 1/13/2003 | 330,797 | $28.50 | $27.56 | $27.71 |
| 1/14/2003 | 377,874 | $28.12 | $27.70 | $28.10 |
| 1/15/2003 | 377,115 | $28.10 | $27.00 | $27.01 |
| 1/16/2003 | 1,023,935 | $27.11 | $25.97 | $26.10 |
| 1/17/2003 | 431,115 | $26.48 | $25.58 | $26.41 |
| 1/21/2003 | 593,636 | $26.49 | $25.60 | $25.80 |
| 1/22/2003 | 535,108 | $26.29 | $25.08 | $26.14 |
| 1/23/2003 | 1,259,805 | $28.28 | $26.80 | $27.81 |
| 1/24/2003 | 717,984 | $27.75 | $27.15 | $27.37 |
| 1/27/2003 | 694,266 | $27.79 | $27.18 | $27.18 |
| 1/28/2003 | 328,329 | $27.86 | $27.28 | $27.77 |
| 1/29/2003 | 284,146 | $28.30 | $27.50 | $28.13 |
| 1/30/2003 | 370,332 | $28.12 | $27.50 | $27.56 |
| 1/31/2003 | 254,812 | $28.29 | $27.27 | $27.93 |
| 2/3/2003 | 296,253 | $28.00 | $27.39 | $27.71 |
| 2/4/2003 | 326,941 | $27.75 | $26.65 | $26.81 |
| 2/5/2003 | 587,156 | $27.00 | $26.12 | $26.62 |
| 2/6/2003 | 404,249 | $26.93 | $26.34 | $26.38 |
| 2/7/2003 | 291,576 | $26.61 | $25.96 | $25.97 |
| 2/10/2003 | 495,728 | $26.53 | $25.67 | $26.51 |
| 2/11/2003 | 499,296 | $26.81 | $26.10 | $26.55 |
| 2/12/2003 | 892,584 | $27.50 | $26.55 | $26.91 |
| 2/13/2003 | 425,553 | $26.97 | $25.54 | $26.28 |
| 2/14/2003 | 541,048 | $26.63 | $25.83 | $26.56 |
| 2/18/2003 | 385,955 | $26.79 | $26.44 | $26.69 |
| 2/19/2003 | 324,339 | $26.69 | $26.20 | $26.49 |
| 2/20/2003 | 287,726 | $26.61 | $26.32 | $26.43 |
| 2/21/2003 | 311,100 | $26.58 | $25.97 | $26.45 |
| 2/24/2003 | 439,483 | $26.39 | $25.37 | $25.41 |
| 2/25/2003 | 993,570 | $25.78 | $24.54 | $25.70 |
| 2/26/2003 | 395,299 | $25.69 | $25.20 | $25.40 |
| 2/27/2003 | 536,008 | $25.71 | $24.93 | $25.34 |
| 2/28/2003 | 593,669 | $25.49 | $24.87 | $25.00 |
| 3/3/2003 | 634,566 | $25.70 | $24.82 | $24.83 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 3/4/2003 | 424,391 | $25.00 | $24.30 | $24.44 |
| 3/5/2003 | 708,171 | $24.70 | $24.16 | $24.23 |
| 3/6/2003 | 730,561 | $24.27 | $23.13 | $23.32 |
| 3/7/2003 | 636,213 | $23.62 | $22.95 | $23.17 |
| 3/10/2003 | 723,039 | $23.85 | $22.53 | $22.71 |
| 3/11/2003 | 617,595 | $23.00 | $22.26 | $22.33 |
| 3/12/2003 | 710,746 | $22.57 | $21.53 | $22.18 |
| 3/13/2003 | 1,124,958 | $23.76 | $22.27 | $23.67 |
| 3/14/2003 | 987,941 | $24.05 | $23.20 | $23.80 |
| 3/17/2003 | 386,716 | $25.19 | $23.56 | $25.14 |
| 3/18/2003 | 513,393 | $25.90 | $25.06 | $25.69 |
| 3/19/2003 | 370,038 | $25.77 | $24.88 | $25.41 |
| 3/20/2003 | 607,869 | $26.08 | $24.96 | $26.04 |
| 3/21/2003 | 3,526,789 | $24.75 | $22.81 | $24.61 |
| 3/24/2003 | 1,079,261 | $24.33 | $23.30 | $24.00 |
| 3/25/2003 | 468,000 | $24.61 | $23.69 | $24.04 |
| 3/26/2003 | 640,235 | $24.94 | $23.94 | $24.70 |
| 3/27/2003 | 519,048 | $24.76 | $23.95 | $24.65 |
| 3/28/2003 | 427,482 | $24.75 | $24.11 | $24.44 |
| 3/31/2003 | 575,749 | $24.54 | $24.10 | $24.33 |
| 4/1/2003 | 891,007 | $24.57 | $23.75 | $24.20 |
| 4/2/2003 | 707,217 | $25.54 | $24.21 | $25.38 |
| 4/3/2003 | 571,693 | $25.54 | $24.51 | $25.13 |
| 4/4/2003 | 1,289,577 | $25.48 | $24.42 | $25.10 |
| 4/7/2003 | 818,042 | $26.20 | $25.17 | $25.57 |
| 4/8/2003 | 740,228 | $25.67 | $24.74 | $24.92 |
| 4/9/2003 | 921,647 | $24.99 | $24.22 | $24.45 |
| 4/10/2003 | 3,242,724 | $24.20 | $21.48 | $21.99 |
| 4/11/2003 | 2,612,348 | $22.53 | $20.74 | $20.90 |
| 4/14/2003 | 1,941,381 | $21.35 | $20.18 | $21.17 |
| 4/15/2003 | 1,271,815 | $22.50 | $21.00 | $21.98 |
| 4/16/2003 | 578,231 | $22.50 | $21.50 | $21.80 |
| 4/17/2003 | 666,214 | $22.54 | $21.74 | $22.07 |
| 4/21/2003 | 558,722 | $22.12 | $21.29 | $21.50 |
| 4/22/2003 | 1,021,905 | $22.15 | $21.07 | $22.13 |
| 4/23/2003 | 1,393,740 | $23.58 | $22.13 | $23.39 |
| 4/24/2003 | 1,109,121 | $23.49 | $22.45 | $22.55 |
| 4/25/2003 | 392,913 | $22.62 | $21.85 | $21.85 |
| 4/28/2003 | 705,864 | $22.16 | $21.50 | $22.04 |
| 4/29/2003 | 1,407,330 | $22.40 | $21.62 | $21.70 |
| 4/30/2003 | 860,500 | $22.14 | $21.23 | $21.72 |
| 5/1/2003 | 1,186,822 | $21.91 | $21.21 | $21.30 |
| 5/2/2003 | 846,488 | $22.48 | $21.32 | $22.18 |

Source: Bloomberg

# Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 5/5/2003 | 969,507 | $23.59 | $22.17 | $23.23 |
| 5/6/2003 | 597,271 | $23.75 | $23.10 | $23.71 |
| 5/7/2003 | 679,911 | $23.51 | $23.09 | $23.17 |
| 5/8/2003 | 643,848 | $22.90 | $22.45 | $22.50 |
| 5/9/2003 | 627,414 | $22.99 | $22.45 | $22.95 |
| 5/12/2003 | 370,933 | $23.40 | $22.83 | $23.25 |
| 5/13/2003 | 592,721 | $23.39 | $22.76 | $23.29 |
| 5/14/2003 | 601,292 | $23.40 | $22.92 | $23.10 |
| 5/15/2003 | 484,107 | $23.30 | $22.95 | $23.09 |
| 5/16/2003 | 657,333 | $23.10 | $22.42 | $22.48 |
| 5/19/2003 | 662,232 | $22.35 | $21.57 | $21.57 |
| 5/20/2003 | 899,388 | $21.70 | $21.40 | $21.53 |
| 5/21/2003 | 870,454 | $21.60 | $21.25 | $21.34 |
| 5/22/2003 | 587,463 | $21.48 | $21.14 | $21.25 |
| 5/23/2003 | 881,831 | $21.40 | $20.99 | $21.05 |
| 5/27/2003 | 996,413 | $21.23 | $20.86 | $21.10 |
| 5/28/2003 | 1,005,050 | $21.40 | $20.87 | $21.13 |
| 5/29/2003 | 853,616 | $22.11 | $21.10 | $22.01 |
| 5/30/2003 | 1,481,434 | $23.79 | $21.87 | $23.41 |
| 6/2/2003 | 1,785,234 | $24.99 | $23.48 | $24.05 |
| 6/3/2003 | 982,953 | $24.77 | $24.05 | $24.70 |
| 6/4/2003 | 1,481,760 | $26.39 | $24.60 | $26.30 |
| 6/5/2003 | 1,124,718 | $26.87 | $25.60 | $26.85 |
| 6/6/2003 | 1,099,009 | $27.81 | $26.51 | $26.74 |
| 6/9/2003 | 750,165 | $26.39 | $25.11 | $25.16 |
| 6/10/2003 | 994,028 | $25.98 | $24.96 | $25.91 |
| 6/11/2003 | 908,017 | $26.91 | $25.74 | $26.89 |
| 6/12/2003 | 669,574 | $27.47 | $26.13 | $26.33 |
| 6/13/2003 | 627,635 | $27.40 | $26.25 | $26.25 |
| 6/16/2003 | 936,700 | $26.76 | $26.25 | $26.74 |
| 6/17/2003 | 729,656 | $27.93 | $26.69 | $27.63 |
| 6/18/2003 | 862,409 | $28.18 | $27.40 | $28.00 |
| 6/19/2003 | 968,593 | $28.13 | $26.45 | $26.92 |
| 6/20/2003 | 681,742 | $27.31 | $26.45 | $26.56 |
| 6/23/2003 | 423,838 | $26.45 | $25.70 | $26.11 |
| 6/24/2003 | 327,305 | $26.40 | $25.90 | $26.20 |
| 6/25/2003 | 646,581 | $27.20 | $25.98 | $26.95 |
| 6/26/2003 | 1,579,474 | $28.67 | $27.32 | $28.17 |
| 6/27/2003 | 840,185 | $29.20 | $28.11 | $29.10 |
| 6/30/2003 | 596,493 | $29.50 | $28.74 | $28.95 |
| 7/1/2003 | 921,434 | $30.00 | $28.85 | $29.98 |
| 7/2/2003 | 1,901,646 | $31.84 | $29.97 | $31.59 |
| 7/3/2003 | 306,215 | $31.71 | $31.20 | $31.52 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 7/7/2003 | 940,668 | $32.65 | $31.54 | $32.39 |
| 7/8/2003 | 840,166 | $32.71 | $32.23 | $32.65 |
| 7/9/2003 | 728,315 | $32.78 | $31.79 | $32.31 |
| 7/10/2003 | 1,341,922 | $32.35 | $30.89 | $31.22 |
| 7/11/2003 | 629,965 | $31.80 | $30.87 | $30.92 |
| 7/14/2003 | 567,204 | $31.69 | $31.08 | $31.25 |
| 7/15/2003 | 676,713 | $31.65 | $30.72 | $30.89 |
| 7/16/2003 | 612,278 | $31.60 | $30.67 | $31.28 |
| 7/17/2003 | 985,829 | $31.31 | $30.28 | $30.64 |
| 7/18/2003 | 511,599 | $31.41 | $30.35 | $31.39 |
| 7/21/2003 | 380,889 | $31.50 | $30.92 | $31.00 |
| 7/22/2003 | 374,638 | $31.17 | $30.75 | $30.92 |
| 7/23/2003 | 463,652 | $31.05 | $29.70 | $30.70 |
| 7/24/2003 | 598,358 | $31.63 | $30.74 | $31.14 |
| 7/25/2003 | 706,439 | $31.52 | $31.33 | $31.49 |
| 7/28/2003 | 380,528 | $31.60 | $31.17 | $31.45 |
| 7/29/2003 | 633,097 | $31.58 | $30.81 | $31.44 |
| 7/30/2003 | 539,619 | $31.60 | $30.85 | $31.38 |
| 7/31/2003 | 381,360 | $32.16 | $31.40 | $31.80 |
| 8/1/2003 | 1,026,896 | $31.80 | $29.66 | $29.67 |
| 8/4/2003 | 2,798,702 | $28.87 | $27.52 | $28.37 |
| 8/5/2003 | 1,852,929 | $29.70 | $28.40 | $28.84 |
| 8/6/2003 | 994,578 | $29.85 | $28.12 | $29.06 |
| 8/7/2003 | 415,151 | $29.35 | $28.46 | $28.60 |
| 8/8/2003 | 589,969 | $28.94 | $28.40 | $28.66 |
| 8/11/2003 | 352,747 | $29.54 | $28.36 | $28.52 |
| 8/12/2003 | 306,986 | $29.16 | $28.40 | $29.06 |
| 8/13/2003 | 209,867 | $29.18 | $28.45 | $28.59 |
| 8/14/2003 | 315,709 | $28.74 | $28.44 | $28.69 |
| 8/15/2003 | 160,590 | $28.82 | $28.24 | $28.42 |
| 8/18/2003 | 367,183 | $29.01 | $28.45 | $28.87 |
| 8/19/2003 | 680,295 | $30.55 | $28.64 | $30.03 |
| 8/20/2003 | 354,973 | $30.28 | $29.80 | $29.80 |
| 8/21/2003 | 316,784 | $30.22 | $29.65 | $29.66 |
| 8/22/2003 | 753,063 | $30.73 | $28.86 | $28.86 |
| 8/25/2003 | 381,706 | $29.12 | $28.43 | $28.87 |
| 8/26/2003 | 567,181 | $28.98 | $28.50 | $28.87 |
| 8/27/2003 | 589,047 | $29.25 | $28.79 | $29.07 |
| 8/28/2003 | 365,275 | $29.65 | $28.80 | $29.53 |
| 8/29/2003 | 234,734 | $29.98 | $29.50 | $29.84 |
| 9/2/2003 | 350,994 | $30.25 | $29.42 | $30.02 |
| 9/3/2003 | 255,677 | $30.10 | $29.72 | $29.98 |
| 9/4/2003 | 293,683 | $30.61 | $29.90 | $30.50 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 9/5/2003 | 965,556 | $31.66 | $30.32 | $31.12 |
| 9/8/2003 | 305,011 | $31.40 | $30.63 | $31.10 |
| 9/9/2003 | 205,711 | $31.11 | $30.76 | $30.96 |
| 9/10/2003 | 554,880 | $30.81 | $29.24 | $29.43 |
| 9/11/2003 | 325,323 | $30.00 | $29.10 | $30.00 |
| 9/12/2003 | 212,946 | $30.23 | $29.75 | $30.19 |
| 9/15/2003 | 124,230 | $30.33 | $29.79 | $29.95 |
| 9/16/2003 | 458,437 | $30.45 | $29.84 | $30.20 |
| 9/17/2003 | 463,865 | $31.08 | $30.21 | $31.08 |
| 9/18/2003 | 557,268 | $32.63 | $31.02 | $32.35 |
| 9/19/2003 | 1,713,514 | $34.65 | $32.24 | $34.57 |
| 9/22/2003 | 894,430 | $34.00 | $33.14 | $33.55 |
| 9/23/2003 | 452,550 | $33.93 | $32.91 | $33.53 |
| 9/24/2003 | 296,099 | $33.89 | $32.85 | $32.94 |
| 9/25/2003 | 366,523 | $32.93 | $32.06 | $32.29 |
| 9/26/2003 | 380,692 | $32.29 | $31.38 | $31.91 |
| 9/29/2003 | 402,185 | $32.59 | $31.68 | $31.85 |
| 9/30/2003 | 436,678 | $33.60 | $30.90 | $31.54 |
| 10/1/2003 | 433,056 | $33.15 | $31.40 | $32.74 |
| 10/2/2003 | 236,362 | $32.87 | $32.25 | $32.47 |
| 10/3/2003 | 1,002,028 | $33.36 | $32.84 | $33.11 |
| 10/6/2003 | 495,683 | $33.89 | $33.13 | $33.86 |
| 10/7/2003 | 674,016 | $34.00 | $33.62 | $33.88 |
| 10/8/2003 | 649,873 | $34.10 | $33.69 | $33.92 |
| 10/9/2003 | 677,179 | $34.81 | $33.91 | $34.30 |
| 10/10/2003 | 455,586 | $34.34 | $33.79 | $33.90 |
| 10/13/2003 | 605,775 | $35.22 | $33.88 | $35.07 |
| 10/14/2003 | 1,318,100 | $36.00 | $34.70 | $36.00 |
| 10/15/2003 | 2,438,496 | $38.44 | $36.70 | $37.14 |
| 10/16/2003 | 489,141 | $37.57 | $36.22 | $36.45 |
| 10/17/2003 | 703,916 | $36.10 | $35.10 | $35.64 |
| 10/20/2003 | 1,130,488 | $35.60 | $33.83 | $34.20 |
| 10/21/2003 | 793,985 | $34.34 | $33.98 | $34.13 |
| 10/22/2003 | 908,932 | $34.25 | $32.51 | $32.63 |
| 10/23/2003 | 518,504 | $33.45 | $32.29 | $33.38 |
| 10/24/2003 | 669,965 | $33.70 | $32.98 | $33.35 |
| 10/27/2003 | 377,667 | $34.04 | $33.60 | $33.99 |
| 10/28/2003 | 530,467 | $35.00 | $33.93 | $34.99 |
| 10/29/2003 | 360,898 | $35.69 | $34.85 | $35.10 |
| 10/30/2003 | 356,175 | $35.65 | $34.64 | $34.96 |
| 10/31/2003 | 495,359 | $35.50 | $35.10 | $35.24 |
| 11/3/2003 | 378,862 | $35.49 | $34.93 | $35.34 |
| 11/4/2003 | 322,674 | $36.21 | $34.98 | $35.99 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 11/5/2003 | 501,642 | $35.96 | $35.06 | $35.27 |
| 11/6/2003 | 281,326 | $35.97 | $35.05 | $35.92 |
| 11/7/2003 | 506,009 | $36.70 | $35.83 | $36.34 |
| 11/10/2003 | 283,747 | $36.89 | $35.44 | $35.58 |
| 11/11/2003 | 270,212 | $35.58 | $35.13 | $35.20 |
| 11/12/2003 | 433,644 | $35.72 | $35.13 | $35.66 |
| 11/13/2003 | 322,138 | $35.95 | $35.54 | $35.81 |
| 11/14/2003 | 250,202 | $36.00 | $34.42 | $34.43 |
| 11/17/2003 | 825,672 | $34.90 | $33.58 | $34.79 |
| 11/18/2003 | 718,721 | $35.82 | $34.77 | $35.42 |
| 11/19/2003 | 679,199 | $35.70 | $35.18 | $35.18 |
| 11/20/2003 | 270,211 | $35.21 | $34.59 | $34.70 |
| 11/21/2003 | 281,741 | $35.15 | $34.62 | $35.15 |
| 11/24/2003 | 251,592 | $35.99 | $35.12 | $35.93 |
| 11/25/2003 | 381,381 | $36.18 | $35.73 | $36.08 |
| 11/26/2003 | 286,832 | $36.67 | $35.75 | $36.60 |
| 11/28/2003 | 152,889 | $37.06 | $36.62 | $36.88 |
| 12/1/2003 | 591,137 | $38.15 | $36.88 | $38.05 |
| 12/2/2003 | 679,301 | $38.27 | $37.67 | $38.00 |
| 12/3/2003 | 349,604 | $38.36 | $37.89 | $38.00 |
| 12/4/2003 | 633,349 | $38.16 | $37.60 | $38.00 |
| 12/5/2003 | 454,788 | $38.10 | $37.08 | $37.40 |
| 12/8/2003 | 356,948 | $37.79 | $37.10 | $37.70 |
| 12/9/2003 | 469,424 | $38.03 | $36.64 | $36.68 |
| 12/10/2003 | 654,769 | $36.95 | $35.37 | $36.19 |
| 12/11/2003 | 470,391 | $36.90 | $35.99 | $36.90 |
| 12/12/2003 | 456,587 | $36.90 | $35.88 | $36.53 |
| 12/15/2003 | 642,057 | $36.95 | $35.87 | $36.01 |
| 12/16/2003 | 309,364 | $36.46 | $35.96 | $35.96 |
| 12/17/2003 | 516,781 | $35.96 | $35.15 | $35.29 |
| 12/18/2003 | 545,219 | $36.68 | $35.45 | $36.51 |
| 12/19/2003 | 391,865 | $37.19 | $35.98 | $36.40 |
| 12/22/2003 | 433,676 | $37.28 | $36.38 | $37.26 |
| 12/23/2003 | 935,876 | $38.59 | $37.25 | $38.59 |
| 12/24/2003 | 308,333 | $38.59 | $38.01 | $38.09 |
| 12/26/2003 | 113,745 | $38.45 | $38.08 | $38.42 |
| 12/29/2003 | 449,019 | $38.77 | $38.29 | $38.60 |
| 12/30/2003 | 197,884 | $39.09 | $38.51 | $38.78 |
| 12/31/2003 | 352,963 | $38.82 | $38.30 | $38.41 |
| 1/2/2004 | 769,852 | $39.00 | $38.31 | $38.76 |
| 1/5/2004 | 659,809 | $39.06 | $38.69 | $38.85 |
| 1/6/2004 | 289,956 | $39.16 | $38.70 | $39.13 |
| 1/7/2004 | 422,070 | $39.25 | $38.52 | $38.85 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 1/8/2004 | 269,461 | $39.27 | $38.65 | $38.80 |
| 1/9/2004 | 540,548 | $39.04 | $37.87 | $37.91 |
| 1/12/2004 | 497,670 | $39.23 | $37.97 | $39.20 |
| 1/13/2004 | 1,085,023 | $40.18 | $38.91 | $39.52 |
| 1/14/2004 | 1,005,543 | $40.16 | $38.65 | $38.83 |
| 1/15/2004 | 478,123 | $39.25 | $38.43 | $38.79 |
| 1/16/2004 | 648,841 | $39.72 | $38.59 | $39.70 |
| 1/20/2004 | 1,249,095 | $39.48 | $39.02 | $39.20 |
| 1/21/2004 | 2,111,849 | $40.60 | $38.28 | $40.31 |
| 1/22/2004 | 4,874,488 | $46.15 | $43.22 | $45.71 |
| 1/23/2004 | 2,183,748 | $45.95 | $43.26 | $44.00 |
| 1/26/2004 | 1,786,116 | $43.59 | $41.37 | $43.59 |
| 1/27/2004 | 706,882 | $43.27 | $42.25 | $42.83 |
| 1/28/2004 | 745,927 | $43.00 | $40.22 | $40.22 |
| 1/29/2004 | 1,198,562 | $40.98 | $40.12 | $40.78 |
| 1/30/2004 | 599,196 | $41.69 | $40.36 | $41.41 |
| 2/2/2004 | 1,101,245 | $43.00 | $41.14 | $42.17 |
| 2/3/2004 | 387,154 | $42.35 | $41.62 | $41.92 |
| 2/4/2004 | 680,101 | $41.85 | $40.40 | $40.59 |
| 2/5/2004 | 466,043 | $40.94 | $39.99 | $40.31 |
| 2/6/2004 | 743,105 | $41.50 | $40.21 | $41.25 |
| 2/9/2004 | 356,088 | $42.30 | $41.28 | $41.49 |
| 2/10/2004 | 290,615 | $41.83 | $41.03 | $41.48 |
| 2/11/2004 | 678,670 | $43.00 | $41.33 | $42.79 |
| 2/12/2004 | 360,851 | $43.00 | $42.44 | $42.68 |
| 2/13/2004 | 722,953 | $43.18 | $41.70 | $42.72 |
| 2/17/2004 | 318,272 | $43.22 | $42.75 | $43.14 |
| 2/18/2004 | 236,275 | $43.32 | $42.63 | $42.64 |
| 2/19/2004 | 1,130,588 | $44.44 | $42.87 | $43.81 |
| 2/20/2004 | 417,327 | $44.50 | $42.86 | $43.19 |
| 2/23/2004 | 796,818 | $44.25 | $42.91 | $43.00 |
| 2/24/2004 | 980,629 | $43.54 | $42.90 | $43.38 |
| 2/25/2004 | 1,150,604 | $44.89 | $43.27 | $44.78 |
| 2/26/2004 | 760,660 | $44.78 | $43.97 | $44.03 |
| 2/27/2004 | 808,134 | $44.35 | $43.87 | $43.87 |
| 3/1/2004 | 400,999 | $44.84 | $44.13 | $44.76 |
| 3/2/2004 | 457,143 | $44.99 | $43.66 | $44.00 |
| 3/3/2004 | 206,224 | $44.74 | $43.95 | $44.25 |
| 3/4/2004 | 277,555 | $44.73 | $44.00 | $44.60 |
| 3/5/2004 | 771,652 | $45.59 | $44.43 | $45.18 |
| 3/8/2004 | 582,776 | $45.44 | $43.98 | $44.15 |
| 3/9/2004 | 518,497 | $44.21 | $43.75 | $44.04 |
| 3/10/2004 | 917,961 | $44.28 | $43.75 | $43.85 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 3/11/2004 | 779,726 | $43.75 | $42.88 | $43.01 |
| 3/12/2004 | 539,157 | $43.94 | $42.86 | $43.92 |
| 3/15/2004 | 749,010 | $43.97 | $42.00 | $42.11 |
| 3/16/2004 | 463,486 | $43.02 | $42.19 | $42.58 |
| 3/17/2004 | 225,489 | $43.89 | $42.54 | $43.53 |
| 3/18/2004 | 567,011 | $43.63 | $42.39 | $42.71 |
| 3/19/2004 | 362,751 | $42.88 | $42.40 | $42.46 |
| 3/22/2004 | 651,653 | $42.29 | $41.22 | $41.40 |
| 3/23/2004 | 296,135 | $41.68 | $41.09 | $41.40 |
| 3/24/2004 | 650,603 | $41.48 | $40.50 | $41.15 |
| 3/25/2004 | 533,222 | $41.38 | $40.87 | $41.28 |
| 3/26/2004 | 312,604 | $41.85 | $40.93 | $41.29 |
| 3/29/2004 | 568,022 | $41.74 | $40.90 | $41.00 |
| 3/30/2004 | 652,444 | $41.44 | $40.60 | $41.22 |
| 3/31/2004 | 476,854 | $41.63 | $40.75 | $41.29 |
| 4/1/2004 | 756,810 | $42.04 | $40.95 | $41.20 |
| 4/2/2004 | 2,429,683 | $41.51 | $39.46 | $40.18 |
| 4/5/2004 | 2,697,242 | $41.10 | $40.19 | $40.75 |
| 4/6/2004 | 2,162,843 | $42.52 | $40.52 | $42.23 |
| 4/7/2004 | 833,975 | $43.33 | $42.20 | $42.61 |
| 4/8/2004 | 776,600 | $43.82 | $42.65 | $43.11 |
| 4/12/2004 | 1,078,626 | $43.57 | $42.42 | $42.61 |
| 4/13/2004 | 2,186,139 | $44.75 | $41.90 | $42.61 |
| 4/14/2004 | 2,309,729 | $42.29 | $39.91 | $40.49 |
| 4/15/2004 | 1,975,498 | $40.57 | $39.16 | $40.41 |
| 4/16/2004 | 946,906 | $40.80 | $40.00 | $40.25 |
| 4/19/2004 | 843,912 | $40.75 | $39.85 | $40.15 |
| 4/20/2004 | 977,128 | $40.57 | $39.50 | $39.58 |
| 4/21/2004 | 915,592 | $39.84 | $39.13 | $39.75 |
| 4/22/2004 | 454,917 | $40.47 | $39.25 | $40.23 |
| 4/23/2004 | 865,155 | $40.40 | $39.48 | $40.10 |
| 4/26/2004 | 480,156 | $40.40 | $39.50 | $39.70 |
| 4/27/2004 | 684,713 | $40.65 | $39.97 | $40.51 |
| 4/28/2004 | 882,436 | $40.70 | $38.05 | $38.20 |
| 4/29/2004 | 1,897,018 | $39.50 | $37.71 | $38.73 |
| 4/30/2004 | 917,772 | $39.42 | $38.64 | $38.90 |
| 5/3/2004 | 807,736 | $39.01 | $38.59 | $38.90 |
| 5/4/2004 | 469,181 | $39.51 | $38.72 | $39.05 |
| 5/5/2004 | 423,583 | $39.81 | $38.93 | $39.44 |
| 5/6/2004 | 1,002,374 | $39.44 | $38.33 | $38.49 |
| 5/7/2004 | 1,568,694 | $38.14 | $36.39 | $36.43 |
| 5/10/2004 | 1,970,592 | $36.10 | $34.68 | $35.19 |
| 5/11/2004 | 639,897 | $36.34 | $35.32 | $35.80 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 5/12/2004 | 434,199 | $36.04 | $35.02 | $35.87 |
| 5/13/2004 | 633,898 | $37.20 | $35.66 | $36.38 |
| 5/14/2004 | 434,945 | $36.93 | $35.86 | $35.94 |
| 5/17/2004 | 372,016 | $36.08 | $35.12 | $35.42 |
| 5/18/2004 | 353,799 | $36.33 | $35.48 | $36.23 |
| 5/19/2004 | 1,073,156 | $37.97 | $36.00 | $37.00 |
| 5/20/2004 | 714,142 | $37.56 | $36.46 | $37.09 |
| 5/21/2004 | 644,715 | $37.87 | $37.06 | $37.80 |
| 5/24/2004 | 513,907 | $38.38 | $37.68 | $37.99 |
| 5/25/2004 | 469,581 | $39.05 | $37.35 | $38.87 |
| 5/26/2004 | 390,156 | $39.21 | $38.46 | $38.93 |
| 5/27/2004 | 396,556 | $39.20 | $38.69 | $38.85 |
| 5/28/2004 | 202,866 | $39.21 | $38.58 | $39.04 |
| 6/1/2004 | 319,994 | $39.19 | $38.39 | $39.12 |
| 6/2/2004 | 532,801 | $40.10 | $38.85 | $39.91 |
| 6/3/2004 | 1,143,596 | $40.71 | $39.67 | $40.53 |
| 6/4/2004 | 1,370,060 | $41.67 | $40.66 | $41.52 |
| 6/7/2004 | 1,177,325 | $42.79 | $41.46 | $42.68 |
| 6/8/2004 | 1,268,202 | $43.08 | $41.69 | $42.99 |
| 6/9/2004 | 913,704 | $42.95 | $42.31 | $42.50 |
| 6/10/2004 | 600,108 | $42.71 | $42.10 | $42.36 |
| 6/14/2004 | 581,073 | $42.35 | $40.93 | $41.17 |
| 6/15/2004 | 459,517 | $42.22 | $41.19 | $41.45 |
| 6/16/2004 | 355,160 | $41.86 | $41.16 | $41.41 |
| 6/17/2004 | 400,198 | $41.64 | $41.03 | $41.19 |
| 6/18/2004 | 618,805 | $41.71 | $40.75 | $41.14 |
| 6/21/2004 | 255,316 | $41.30 | $40.74 | $40.85 |
| 6/22/2004 | 618,131 | $41.21 | $40.41 | $40.89 |
| 6/23/2004 | 443,675 | $41.80 | $40.53 | $41.58 |
| 6/24/2004 | 1,130,057 | $43.39 | $41.80 | $42.67 |
| 6/25/2004 | 607,862 | $43.80 | $42.49 | $43.00 |
| 6/28/2004 | 368,830 | $43.34 | $42.27 | $42.37 |
| 6/29/2004 | 616,400 | $42.74 | $42.10 | $42.56 |
| 6/30/2004 | 757,585 | $43.69 | $42.58 | $43.58 |
| 7/1/2004 | 808,901 | $43.76 | $42.60 | $42.91 |
| 7/2/2004 | 495,452 | $43.10 | $42.89 | $42.98 |
| 7/6/2004 | 485,583 | $43.05 | $42.36 | $42.36 |
| 7/7/2004 | 544,013 | $42.75 | $42.26 | $42.66 |
| 7/8/2004 | 774,255 | $42.59 | $41.09 | $41.45 |
| 7/9/2004 | 653,763 | $41.79 | $41.25 | $41.34 |
| 7/12/2004 | 813,349 | $41.52 | $40.69 | $41.17 |
| 7/13/2004 | 1,670,861 | $40.95 | $39.93 | $40.24 |
| 7/14/2004 | 1,385,529 | $40.49 | $39.79 | $40.12 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 7/15/2004 | 2,773,544 | $43.44 | $41.50 | $42.15 |
| 7/16/2004 | 1,452,099 | $44.23 | $42.36 | $43.87 |
| 7/19/2004 | 755,073 | $44.90 | $43.72 | $43.98 |
| 7/20/2004 | 1,148,614 | $45.22 | $43.86 | $45.20 |
| 7/21/2004 | 1,734,541 | $45.91 | $45.10 | $45.12 |
| 7/22/2004 | 729,975 | $45.16 | $43.98 | $44.30 |
| 7/23/2004 | 551,587 | $44.59 | $43.82 | $43.85 |
| 7/26/2004 | 385,633 | $44.23 | $43.61 | $43.78 |
| 7/27/2004 | 666,934 | $44.78 | $43.65 | $44.71 |
| 7/28/2004 | 846,152 | $45.00 | $43.95 | $44.32 |
| 7/29/2004 | 763,155 | $45.65 | $44.55 | $45.41 |
| 7/30/2004 | 508,665 | $45.98 | $45.19 | $45.63 |
| 8/2/2004 | 594,908 | $46.40 | $44.62 | $46.36 |
| 8/3/2004 | 465,953 | $46.95 | $45.75 | $45.81 |
| 8/4/2004 | 727,902 | $45.80 | $44.69 | $44.97 |
| 8/5/2004 | 494,834 | $45.00 | $44.26 | $44.26 |
| 8/6/2004 | 640,400 | $44.10 | $43.48 | $43.56 |
| 8/9/2004 | 1,091,892 | $43.61 | $42.47 | $42.73 |
| 8/10/2004 | 754,904 | $43.22 | $42.24 | $43.20 |
| 8/11/2004 | 626,229 | $43.68 | $42.23 | $43.48 |
| 8/12/2004 | 327,214 | $43.23 | $42.66 | $42.84 |
| 8/13/2004 | 790,492 | $43.00 | $42.15 | $42.18 |
| 8/16/2004 | 934,718 | $43.19 | $42.05 | $43.13 |
| 8/17/2004 | 1,029,752 | $44.58 | $43.00 | $44.55 |
| 8/18/2004 | 659,350 | $45.04 | $44.38 | $44.76 |
| 8/19/2004 | 347,597 | $45.25 | $44.48 | $44.88 |
| 8/20/2004 | 357,301 | $45.91 | $44.78 | $45.75 |
| 8/23/2004 | 320,056 | $46.28 | $45.68 | $45.68 |
| 8/24/2004 | 262,902 | $46.26 | $45.03 | $45.33 |
| 8/25/2004 | 314,904 | $45.97 | $45.45 | $45.60 |
| 8/26/2004 | 463,900 | $46.46 | $45.51 | $46.22 |
| 8/27/2004 | 369,585 | $46.50 | $45.64 | $46.40 |
| 8/30/2004 | 317,614 | $46.69 | $45.89 | $46.03 |
| 8/31/2004 | 420,657 | $46.39 | $45.71 | $46.38 |
| 9/1/2004 | 277,310 | $46.45 | $45.46 | $45.72 |
| 9/2/2004 | 514,357 | $46.30 | $45.36 | $46.12 |
| 9/3/2004 | 361,017 | $46.80 | $46.08 | $46.46 |
| 9/7/2004 | 682,219 | $48.37 | $46.88 | $48.32 |
| 9/8/2004 | 410,071 | $48.45 | $47.60 | $47.79 |
| 9/9/2004 | 429,603 | $48.25 | $47.25 | $47.63 |
| 9/10/2004 | 319,828 | $48.24 | $47.36 | $48.24 |
| 9/13/2004 | 290,182 | $48.90 | $48.20 | $48.34 |
| 9/14/2004 | 349,096 | $48.45 | $47.95 | $48.19 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|---|---|---|---|---|
| 9/15/2004 | 222,540 | $48.25 | $47.36 | $47.57 |
| 9/16/2004 | 321,293 | $47.83 | $47.04 | $47.15 |
| 9/17/2004 | 442,231 | $47.28 | $46.66 | $47.05 |
| 9/20/2004 | 464,911 | $47.46 | $45.79 | $45.92 |
| 9/21/2004 | 484,805 | $47.03 | $45.76 | $46.80 |
| 9/22/2004 | 275,836 | $46.97 | $45.94 | $46.15 |
| 9/23/2004 | 599,698 | $46.24 | $44.75 | $44.99 |
| 9/24/2004 | 224,472 | $45.36 | $44.88 | $45.29 |
| 9/27/2004 | 554,632 | $45.06 | $44.15 | $44.28 |
| 9/28/2004 | 350,727 | $45.15 | $44.22 | $44.94 |
| 9/29/2004 | 324,680 | $45.73 | $44.83 | $45.27 |
| 9/30/2004 | 556,309 | $45.50 | $44.84 | $45.13 |
| 10/1/2004 | 1,099,864 | $47.24 | $45.20 | $46.97 |
| 10/4/2004 | 502,958 | $48.09 | $47.37 | $47.68 |
| 10/5/2004 | 624,812 | $47.95 | $46.56 | $46.72 |
| 10/6/2004 | 238,620 | $46.99 | $46.50 | $46.76 |
| 10/7/2004 | 218,975 | $46.95 | $46.09 | $46.30 |
| 10/8/2004 | 311,636 | $46.53 | $45.64 | $45.67 |
| 10/11/2004 | 214,724 | $46.23 | $45.60 | $45.69 |
| 10/12/2004 | 1,964,912 | $45.01 | $44.07 | $44.79 |
| 10/13/2004 | 1,455,351 | $46.00 | $43.14 | $43.41 |
| 10/14/2004 | 806,661 | $43.49 | $42.51 | $42.54 |
| 10/15/2004 | 1,022,697 | $43.85 | $42.53 | $43.68 |
| 10/18/2004 | 561,013 | $44.25 | $43.15 | $44.09 |
| 10/19/2004 | 622,072 | $45.12 | $43.99 | $44.20 |
| 10/20/2004 | 861,326 | $44.44 | $42.77 | $43.67 |
| 10/21/2004 | 839,898 | $44.60 | $43.39 | $43.70 |
| 10/22/2004 | 11,680,623 | $40.00 | $35.80 | $36.50 |
| 10/25/2004 | 3,212,072 | $36.87 | $35.00 | $35.92 |
| 10/26/2004 | 3,039,607 | $35.98 | $35.00 | $35.60 |
| 10/27/2004 | 2,249,336 | $37.90 | $35.34 | $37.55 |
| 10/28/2004 | 1,077,980 | $38.30 | $37.20 | $38.24 |
| 10/29/2004 | 809,044 | $38.58 | $37.79 | $38.49 |
| 11/1/2004 | 1,092,157 | $38.69 | $38.36 | $38.60 |
| 11/2/2004 | 1,402,917 | $38.60 | $37.85 | $38.02 |
| 11/3/2004 | 1,793,522 | $39.24 | $37.79 | $38.05 |
| 11/4/2004 | 730,762 | $38.72 | $37.41 | $38.57 |
| 11/5/2004 | 1,644,606 | $39.21 | $38.33 | $39.04 |
| 11/8/2004 | 460,223 | $39.00 | $38.44 | $38.77 |
| 11/9/2004 | 460,688 | $39.00 | $38.15 | $38.23 |
| 11/10/2004 | 375,205 | $39.25 | $38.15 | $38.84 |
| 11/11/2004 | 496,191 | $39.40 | $38.60 | $39.35 |
| 11/12/2004 | 1,520,476 | $40.96 | $39.36 | $40.70 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|---|---|---|---|---|
| 11/15/2004 | 968,200 | $41.34 | $40.45 | $41.03 |
| 11/16/2004 | 4,183,656 | $45.01 | $43.19 | $44.96 |
| 11/17/2004 | 1,191,759 | $46.19 | $44.85 | $45.55 |
| 11/18/2004 | 776,317 | $45.99 | $43.84 | $45.60 |
| 11/19/2004 | 867,342 | $45.84 | $44.29 | $44.71 |
| 11/22/2004 | 934,695 | $44.79 | $43.67 | $44.30 |
| 11/23/2004 | 720,378 | $44.45 | $43.27 | $43.97 |
| 11/24/2004 | 376,663 | $44.53 | $43.85 | $44.18 |
| 11/26/2004 | 81,079 | $44.47 | $44.13 | $44.33 |
| 11/29/2004 | 556,450 | $44.74 | $43.91 | $44.23 |
| 11/30/2004 | 420,670 | $44.20 | $43.80 | $43.84 |
| 12/1/2004 | 574,955 | $44.41 | $43.40 | $44.15 |
| 12/2/2004 | 424,430 | $44.20 | $43.50 | $43.59 |
| 12/3/2004 | 894,160 | $43.35 | $42.26 | $42.60 |
| 12/6/2004 | 477,939 | $43.26 | $42.31 | $43.18 |
| 12/7/2004 | 347,102 | $43.16 | $42.18 | $42.29 |
| 12/8/2004 | 459,499 | $42.78 | $41.97 | $42.18 |
| 12/9/2004 | 350,581 | $42.35 | $41.64 | $42.35 |
| 12/10/2004 | 340,325 | $43.21 | $42.09 | $42.85 |
| 12/13/2004 | 524,917 | $43.63 | $42.92 | $43.13 |
| 12/14/2004 | 357,515 | $43.72 | $42.61 | $43.42 |
| 12/15/2004 | 427,539 | $43.69 | $43.10 | $43.69 |
| 12/16/2004 | 452,028 | $44.04 | $43.40 | $43.61 |
| 12/17/2004 | 2,074,645 | $46.00 | $44.20 | $45.70 |
| 12/20/2004 | 1,161,732 | $47.39 | $45.60 | $47.34 |
| 12/21/2004 | 646,579 | $47.58 | $47.00 | $47.27 |
| 12/22/2004 | 543,777 | $47.89 | $46.92 | $47.63 |
| 12/23/2004 | 939,537 | $49.66 | $47.89 | $49.16 |
| 12/27/2004 | 727,089 | $50.20 | $48.60 | $49.06 |
| 12/28/2004 | 465,307 | $49.70 | $49.02 | $49.65 |
| 12/29/2004 | 354,935 | $49.97 | $49.27 | $49.54 |
| 12/30/2004 | 426,055 | $50.10 | $49.30 | $49.83 |
| 12/31/2004 | 378,787 | $50.40 | $49.65 | $49.98 |
| 1/3/2005 | 622,497 | $50.28 | $48.79 | $48.87 |
| 1/4/2005 | 501,337 | $49.20 | $47.56 | $47.66 |
| 1/5/2005 | 517,109 | $47.68 | $46.61 | $47.13 |
| 1/6/2005 | 356,252 | $47.59 | $47.01 | $47.15 |
| 1/7/2005 | 264,590 | $47.45 | $46.53 | $46.82 |
| 1/10/2005 | 447,931 | $47.58 | $46.36 | $47.17 |
| 1/11/2005 | 550,567 | $47.74 | $46.78 | $47.37 |
| 1/12/2005 | 438,713 | $47.54 | $46.55 | $47.35 |
| 1/13/2005 | 693,013 | $47.74 | $47.05 | $47.22 |
| 1/14/2005 | 688,855 | $47.50 | $46.69 | $47.25 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 1/18/2005 | 678,183 | $47.95 | $46.67 | $47.78 |
| 1/19/2005 | 510,687 | $47.95 | $46.89 | $47.06 |
| 1/20/2005 | 926,846 | $47.11 | $45.93 | $46.08 |
| 1/21/2005 | 532,727 | $46.44 | $45.46 | $45.50 |
| 1/24/2005 | 372,418 | $45.90 | $45.33 | $45.62 |
| 1/25/2005 | 544,066 | $46.25 | $45.47 | $46.00 |
| 1/26/2005 | 5,062,972 | $51.25 | $48.00 | $49.65 |
| 1/27/2005 | 1,664,464 | $51.16 | $49.61 | $51.09 |
| 1/28/2005 | 838,578 | $50.72 | $49.73 | $49.98 |
| 1/31/2005 | 530,817 | $50.50 | $50.00 | $50.41 |
| 2/1/2005 | 592,043 | $50.54 | $50.04 | $50.44 |
| 2/2/2005 | 708,333 | $50.99 | $50.12 | $50.79 |
| 2/3/2005 | 481,574 | $50.90 | $50.40 | $50.81 |
| 2/4/2005 | 1,818,199 | $53.25 | $50.71 | $53.11 |
| 2/7/2005 | 1,080,681 | $53.44 | $52.68 | $53.21 |
| 2/8/2005 | 583,797 | $53.33 | $52.20 | $52.42 |
| 2/9/2005 | 292,614 | $52.80 | $51.35 | $51.46 |
| 2/10/2005 | 384,963 | $52.01 | $51.15 | $51.77 |
| 2/11/2005 | 680,878 | $51.90 | $50.43 | $51.30 |
| 2/14/2005 | 760,053 | $51.35 | $50.03 | $51.30 |
| 2/15/2005 | 594,896 | $51.61 | $50.42 | $50.70 |
| 2/16/2005 | 645,631 | $50.70 | $49.74 | $50.42 |
| 2/17/2005 | 467,705 | $50.68 | $49.65 | $49.80 |
| 2/18/2005 | 445,317 | $50.06 | $49.19 | $49.35 |
| 2/22/2005 | 1,249,936 | $49.31 | $47.25 | $47.86 |
| 2/23/2005 | 604,795 | $48.98 | $47.86 | $48.70 |
| 2/24/2005 | 358,167 | $49.51 | $48.48 | $49.50 |
| 2/25/2005 | 388,181 | $49.89 | $49.15 | $49.79 |
| 2/28/2005 | 691,928 | $50.54 | $49.60 | $50.12 |
| 3/1/2005 | 375,731 | $50.51 | $49.90 | $49.99 |
| 3/2/2005 | 432,033 | $49.98 | $48.90 | $49.55 |
| 3/3/2005 | 356,375 | $49.85 | $48.84 | $49.37 |
| 3/4/2005 | 409,970 | $50.50 | $49.35 | $49.96 |
| 3/7/2005 | 481,546 | $50.49 | $49.63 | $50.00 |
| 3/8/2005 | 431,051 | $50.67 | $49.62 | $50.14 |
| 3/9/2005 | 385,446 | $50.36 | $48.83 | $49.14 |
| 3/10/2005 | 257,589 | $49.66 | $48.50 | $49.31 |
| 3/11/2005 | 266,924 | $49.93 | $49.22 | $49.66 |
| 3/14/2005 | 919,071 | $51.34 | $49.47 | $50.99 |
| 3/15/2005 | 633,984 | $51.71 | $50.65 | $50.94 |
| 3/16/2005 | 759,277 | $50.83 | $49.46 | $49.67 |
| 3/17/2005 | 309,395 | $50.01 | $49.56 | $49.76 |
| 3/18/2005 | 959,620 | $50.19 | $49.74 | $49.89 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 3/21/2005 | 506,366 | $49.94 | $49.05 | $49.69 |
| 3/22/2005 | 909,273 | $50.14 | $48.85 | $49.02 |
| 3/23/2005 | 1,063,312 | $49.20 | $47.75 | $48.98 |
| 3/24/2005 | 457,085 | $49.47 | $48.20 | $48.20 |
| 3/28/2005 | 674,562 | $48.56 | $47.17 | $47.44 |
| 3/29/2005 | 578,826 | $48.35 | $46.65 | $47.73 |
| 3/30/2005 | 609,796 | $49.28 | $47.74 | $49.28 |
| 3/31/2005 | 544,641 | $49.43 | $48.46 | $48.91 |
| 4/1/2005 | 525,861 | $49.80 | $48.81 | $49.04 |
| 4/4/2005 | 777,108 | $49.13 | $47.82 | $48.73 |
| 4/5/2005 | 282,490 | $49.36 | $48.49 | $48.82 |
| 4/6/2005 | 519,748 | $49.49 | $48.93 | $49.37 |
| 4/7/2005 | 691,571 | $50.00 | $49.28 | $49.94 |
| 4/8/2005 | 603,866 | $50.25 | $49.55 | $49.92 |
| 4/11/2005 | 563,223 | $50.20 | $49.46 | $49.68 |
| 4/12/2005 | 851,853 | $51.05 | $49.29 | $50.61 |
| 4/13/2005 | 1,384,566 | $50.74 | $48.80 | $49.14 |
| 4/14/2005 | 5,887,093 | $47.50 | $43.98 | $45.47 |
| 4/15/2005 | 2,212,333 | $45.47 | $43.70 | $43.78 |
| 4/18/2005 | 810,706 | $44.40 | $43.50 | $43.98 |
| 4/19/2005 | 1,260,418 | $45.16 | $43.63 | $44.34 |
| 4/20/2005 | 1,239,436 | $44.35 | $42.80 | $43.06 |
| 4/21/2005 | 986,404 | $43.96 | $43.08 | $43.80 |
| 4/22/2005 | 584,073 | $44.15 | $43.21 | $43.68 |
| 4/25/2005 | 625,289 | $43.93 | $43.33 | $43.69 |
| 4/26/2005 | 724,684 | $43.87 | $42.59 | $42.59 |
| 4/27/2005 | 816,979 | $43.46 | $42.11 | $43.38 |
| 4/28/2005 | 773,264 | $43.37 | $42.28 | $42.41 |
| 4/29/2005 | 545,370 | $42.87 | $41.47 | $42.00 |
| 5/2/2005 | 867,821 | $42.61 | $41.37 | $41.78 |
| 5/3/2005 | 814,196 | $42.00 | $40.86 | $40.87 |
| 5/4/2005 | 1,361,738 | $42.59 | $40.80 | $42.32 |
| 5/5/2005 | 638,590 | $42.42 | $41.70 | $41.86 |
| 5/6/2005 | 561,136 | $42.15 | $41.15 | $41.50 |
| 5/9/2005 | 329,487 | $41.75 | $41.28 | $41.50 |
| 5/10/2005 | 582,328 | $41.57 | $41.27 | $41.31 |
| 5/11/2005 | 351,169 | $41.56 | $40.95 | $41.42 |
| 5/12/2005 | 383,463 | $41.82 | $40.86 | $41.12 |
| 5/13/2005 | 875,984 | $41.40 | $40.46 | $41.05 |
| 5/16/2005 | 801,361 | $42.45 | $40.90 | $42.15 |
| 5/17/2005 | 1,055,082 | $43.08 | $42.11 | $42.69 |
| 5/18/2005 | 914,249 | $43.32 | $42.51 | $42.74 |
| 5/19/2005 | 347,085 | $42.96 | $42.25 | $42.49 |

Source: Bloomberg

## Investors Financial Historical Stock Prices

| Date | Volume | High | Low | Last |
|------|--------|------|-----|------|
| 5/20/2005 | 369,584 | $42.65 | $42.09 | $42.50 |
| 5/23/2005 | 747,091 | $43.52 | $42.45 | $43.00 |
| 5/24/2005 | 1,216,612 | $43.07 | $41.75 | $41.78 |
| 5/25/2005 | 1,882,568 | $41.99 | $39.79 | $40.53 |
| 5/26/2005 | 1,232,464 | $40.84 | $40.44 | $40.49 |
| 5/27/2005 | 485,999 | $41.24 | $40.43 | $41.14 |
| 5/31/2005 | 1,982,782 | $41.60 | $40.50 | $41.49 |
| 6/1/2005 | 824,342 | $42.39 | $41.08 | $41.47 |
| 6/2/2005 | 1,093,572 | $41.70 | $40.41 | $40.65 |
| 6/3/2005 | 2,177,047 | $40.75 | $39.18 | $39.21 |
| 6/6/2005 | 780,141 | $39.91 | $39.09 | $39.65 |
| 6/7/2005 | 696,361 | $39.94 | $39.25 | $39.30 |
| 6/8/2005 | 478,031 | $39.67 | $38.87 | $39.20 |
| 6/9/2005 | 1,210,240 | $39.30 | $38.63 | $38.80 |
| 6/10/2005 | 3,043,968 | $38.52 | $36.95 | $37.78 |
| 6/13/2005 | 1,258,255 | $38.50 | $37.75 | $38.10 |
| 6/14/2005 | 1,305,899 | $38.35 | $37.62 | $37.77 |
| 6/15/2005 | 1,216,281 | $37.97 | $37.61 | $37.77 |
| 6/16/2005 | 1,595,510 | $39.36 | $37.73 | $39.31 |
| 6/17/2005 | 1,505,293 | $40.17 | $39.45 | $39.93 |
| 6/20/2005 | 722,234 | $39.90 | $39.00 | $39.26 |
| 6/21/2005 | 5,092,937 | $38.27 | $36.05 | $36.97 |
| 6/22/2005 | 1,407,325 | $37.65 | $36.60 | $37.30 |
| 6/23/2005 | 1,017,060 | $37.55 | $36.69 | $37.00 |
| 6/24/2005 | 931,735 | $38.50 | $36.98 | $37.53 |
| 6/27/2005 | 625,466 | $37.66 | $37.11 | $37.27 |
| 6/28/2005 | 1,227,035 | $38.26 | $37.13 | $37.94 |
| 6/29/2005 | 557,912 | $38.10 | $37.64 | $37.99 |
| 6/30/2005 | 643,868 | $38.30 | $37.76 | $37.82 |
| 7/1/2005 | 759,343 | $38.09 | $37.05 | $37.51 |
| 7/5/2005 | 896,651 | $38.25 | $37.01 | $38.21 |
| 7/6/2005 | 652,178 | $38.56 | $37.56 | $37.86 |
| 7/7/2005 | 700,544 | $39.04 | $36.81 | $38.43 |
| 7/8/2005 | 2,191,465 | $40.50 | $38.51 | $39.86 |
| 7/11/2005 | 773,826 | $40.68 | $39.85 | $39.95 |
| 7/12/2005 | 1,260,674 | $40.90 | $40.13 | $40.64 |
| 7/13/2005 | 1,215,407 | $41.71 | $40.64 | $41.70 |
| 7/14/2005 | 3,714,815 | $42.80 | $41.03 | $41.52 |
| 7/15/2005 | 22,045,842 | $35.00 | $33.68 | $34.05 |

Source: Bloomberg

Exhibit 5

SEC Form 4

| FORM 4 | UNITED STATES SECURITIES AND EXCHANGE COMMISSION | OMB APPROVAL | | |

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

OMB APPROVAL

OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response 0.5

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer |
|---|---|---|
| SHEEHAN KEVIN J | INVESTORS FINANCIAL SERVICES CORP [ IFIN ] | (Check all applicable) |
| (Last)     (First)     (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | Director     10% Owner |
| INVESTORS BANK & TRUST COMPANY | 10/26/2004 | X  Officer (give title below)     Other (specify below) |
| 200 CLARENDON STREET | 4. If Amendment, Date of Original Filed (Month/Day/Year) | Chief Executive Officer |
| (Street) | | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| BOSTON     MA     02116 | | X  Form filed by One Reporting Person |
| (City)     (State)     (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/26/2004 | | F | | 5,513 | D | $35.6 | 1,020,555 | D | |
| Common Stock | 10/26/2004 | | A | | 26,448 | A | $7.4219 | 1,047,003 | D | |
| Common Stock | 10/26/2004 | | F | | 8,952 | D | $35.6 | 1,038,051 | D | |
| Common Stock | 10/26/2004 | | A | | 42,496 | A | $7.5 | 1,080,547 | D | |
| Common Stock | 10/26/2004 | | F | | 965 | D | $35.6 | 1,079,582 | D | |
| Common Stock | 10/26/2004 | | A | | 4,584 | A | $7.5 | 1,084,166 | D | |
| Common Stock | 10/26/2004 | | F | | 1,842 | D | $35.6 | 1,082,324 | D | |
| Common Stock | 10/26/2004 | | A | | 6,096 | A | $10.7579 | 1,088,420 | D | |
| Common Stock | 10/26/2004 | | F | | 2,019 | D | $35.6 | 1,086,401 | D | |
| Common Stock | 10/26/2004 | | A | | 6,684 | A | $10.7579 | 1,093,085 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Common Stock (right to buy) | $7.4219 | 10/26/2004 | | M | | | 26,448 | 01/12/1999 (1) | 01/12/2009 | Common Stock | 26,448 | $0 | 1,093,188 | D | |
| Common Stock (right to buy) | $35.6 | 10/26/2004 | | A | | 5,513 | | 10/26/2004 (1) | 01/12/2009 | Common stock | 5,513 | $0 | 1,098,701 | D | |
| Common Stock (right to buy) | $7.5 | 10/26/2004 | | M | | | 42,496 | 02/23/1999 (1) | 02/23/2009 | Common Stock | 42,496 | $0 | 1,056,205 | D | |
| Common Stock (right to buy) | $35.6 | 10/26/2004 | | A | | 8,952 | | 10/26/2004 (1) | 02/23/2009 | Common Stock | 8,952 | $0 | 1,065,157 | D | |
| Common Stock (right to buy) | $7.5 | 10/26/2004 | | M | | | 4,584 | 02/23/1999 (1) | 02/23/2009 | Common Stock | 4,584 | $0 | 1,060,573 | D | |
| Common Stock (right to buy) | $35.6 | 10/26/2004 | | A | | 965 | | 10/26/2004 (1) | 02/23/2009 | Common Stock | 965 | $0 | 1,061,538 | D | |

## Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Common Stock (right to buy) | $10.7579 | 10/26/2004 | | M | | | 6,096 | 01/14/2000 (1) | 01/14/2010 | Common Stock | 6,096 | $0 | 1,055,442 | D | |
| Common Stock (right to buy) | $35.6 | 10/26/2004 | | A | | 1,842 | | 10/26/2004 (1) | 01/14/2010 | Common Stock | 1,842 | $0 | 1,057,284 | D | |
| Common Stock (right to buy) | $10.7579 | 10/26/2004 | | M | | | 6,684 | 01/14/2000 (1) | 01/14/2010 | Common Stock | 6,684 | $0 | 1,050,600 | D | |
| Common Stock (right to buy) | $35.6 | 10/26/2004 | | A | | 2,019 | | 10/26/2004 (1) | 01/14/2010 | Common Stock | 2,019 | $0 | 1,052,619 | D | |

**Explanation of Responses:**

1 Options granted pursuant to the Company's 1995 Stock Option Plan and became exercisable on the date of the grant

**Remarks:**

| | |
|---|---|
| Kevin J. Sheehan | 10/28/2004 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

| | |
|---|---|
| Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b). | |

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

OMB APPROVAL

| | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | January 31, 2008 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| SHEEHAN KEVIN J | INVESTORS FINANCIAL SERVICES CORP [ IFIN ] | |

| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | |
|---|---|---|
| INVESTORS BANK & TRUST COMPANY | 10/26/2004 | |
| 200 CLARENDON STREET | | |

Relationship:

| | |
|---|---|
| | Director |
| X | Officer (give title below) |
| | 10% Owner |
| | Other (specify below) |

Chief Executive Officer

| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
|---|---|---|
| BOSTON MA 02116 | 10/28/2004 | X Form filed by One Reporting Person |
| (City) (State) (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/26/2004 | | F | | 21,273 [1] | D | $35.6 | 1,071,812 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Common Stock (right to buy) | $7.4219 | 10/26/2004 | | M | | | 26,448 | 01/12/1999 [2] | 01/12/2009 | Common Stock | 26,448 | $0 | 1,093,188 | D | |
| Common Stock (right to buy) | $7.5 | 10/26/2004 | | M | | | 42,496 | 02/23/1999 [2] | 02/23/2009 | Common Stock | 42,496 | $0 | 1,050,692 | D | |
| Common Stock (right to buy) | $7.5 | 10/26/2004 | | M | | | 4,584 | 02/23/1999 [2] | 02/23/2009 | Common Stock | 4,584 | $0 | 1,046,108 | D | |
| Common Stock (right to buy) | $10.7579 | 10/26/2004 | | M | | | 6,096 | 01/14/2000 [2] | 01/14/2010 | Common Stock | 6,096 | $0 | 1,040,012 | D | |
| Common Stock (right to buy) | $10.7579 | 10/26/2004 | | M | | | 6,684 | 01/14/2000 [2] | 01/14/2010 | Common Stock | 6,684 | $0 | 1,033,328 [3] | D | |

**Explanation of Responses:**

1. Shares surrendered in payment of tax liability generated from stock option exercise on 10/26/04

2. Options granted pursuant to the Company's 1995 Stock Option Plan and became exercisable on the date of the grant.

3. Certain option grants reported on original filing dated 10/28/04 were not awarded. Table II amended in its entirety.

**Remarks:**

Kevin J. Sheehan        11/03/2004
** Signature of Reporting Person   Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

Exhibit 6

8-K 1 a05-2156_18k.htm 8-K

# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **January 25, 2005**

# INVESTORS FINANCIAL SERVICES CORP.

(Exact name of registrant as specified in its charter)

| **DELAWARE** | **0-26996** | **04-3279817** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission file number) | (I.R.S. Employer Identification No.) |

**200 Clarendon Street, Boston, MA**              **02116**
(Address of principal executive offices)                 (Zip Code)

Registrant's telephone number including area code: **(617) 937-6700**

**No change since last report**
(Former name or address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 2.02.  Results of Operations and Financial Condition.

      Attached as Exhibit 99.1 and incorporated herein by reference is a copy of the press release of Investors Financial Services Corp. (the "Company"), dated January 25, 2005, reporting the Company's financial results for the fiscal quarter ended December 31, 2004.

      The information contained herein, including the exhibit attached and incorporated herein by reference, is being furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section.  The information contained herein and in the accompanying exhibit shall not be incorporated by reference into any filing with the U.S. Securities and Exchange Commission made by the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filings.

### Item 9.01.  Financial Statements and Exhibits.

(c) Exhibits

The following Exhibit is furnished as part of this report:

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press release issued by Investors Financial Services Corp., dated January 25, 2005 |

2

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

### INVESTORS FINANCIAL SERVICES CORP.

By:    /s/Kevin J. Sheehan

Kevin J. Sheehan
Chief Executive Officer and
Chairman of the Board

Dated:  January 25, 2005

3

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 99.1 | Press release issued by Investors Financial Services Corp. dated January 25, 2005 |

4

EX-99.1 2 a05-2156_1ex99d1.htm EX-99.1

**Exhibit 99.1**

## INVESTORS FINANCIAL SERVICES CORP. ANNOUNCES 2004 DILUTED EARNINGS PER SHARE UP 50%

### 2004 NET OPERATING REVENUE INCREASES 25%

**Contact:**     **John N. Spinney, Jr.**
               **(617) 937-3500**
               **john.spinney@ibtco.com**

**BOSTON, MA, January 25, 2005** - Investors Financial Services Corp. (Nasdaq: IFIN) reported diluted earnings per share of $2.09 for the year ended December 31, 2004, an increase of 50% from $1.39 in 2003. Net income for the year ended December 31, 2004 was $142.0 million, up 54% from $92.4 million in 2003. For the fourth quarter of 2004, diluted earnings per share grew 11% to $0.52 from $0.47 for same period in 2003. Net income for the fourth quarter was $35.3 million, up 13% from $31.2 million in the fourth quarter of 2003.

For the year ended December 31, 2004, diluted operating earnings per share increased 39% to $2.09 per share from $1.50 per share in 2003 and net operating income increased 43% to $142.0 million from $99.6 million in 2003. Diluted operating earnings per share and net operating income for 2003 are presented on a non-GAAP basis, which excludes the impact of a retroactive change in Massachusetts tax law enacted during 2003 as described below in this press release.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Investors Financial Services delivered another year of outstanding results during 2004. Sizeable wins from new and existing clients and the leverage inherent in our business model continue to drive our impressive performance. We remain confident in our ability to produce growth of 25% in diluted earnings per share in 2005."

Diluted earnings per share and net income for the year ended December 31, 2003 include a $7.2 million charge, net of federal income tax benefit, that resulted from a retroactive change in Massachusetts tax law enacted in the first quarter of 2003 and the Company's subsequent settlement of the resulting tax assessment with the Massachusetts Department of Revenue.  The change in tax law disallowed a dividends received deduction taken by Investors Bank & Trust Company on dividends it had received since 1999 from a wholly-owned real estate investment trust. In the second quarter of 2003, the Company settled this disputed tax issue, agreeing to pay 50% of the liability, resulting in the $7.2 million charge, net of federal income tax benefit.

This press release includes both an income statement based on GAAP and a non-GAAP operating income statement that excludes the $7.2 million charge described above. Management believes that operating earnings per share and net operating income, which exclude the charge, present a more useful depiction of the Company's actual results of operations because they exclude the effect of a one-time change in tax law that is unrelated to the Company's ongoing operations. Excluding the $7.2 million

- MORE -

charge, the Company recorded net operating income for the year ended December 31, 2003 of $99.6 million and diluted operating earnings per share of $1.50.

Net operating revenue for the year ended December 31, 2004 grew 25% to $613.2 million from $490.1 million in 2003. Revenue from core services such as global custody, multicurrency accounting and mutual fund administration rose to $314.3 million for the year ended December 31, 2004, up 24% from $254.2 million in the prior year. Revenue from ancillary services including foreign exchange, securities lending, cash management, and investment advisory services increased to $108.9 million for the year ended December 31, 2004, up 37% from $79.4 million in 2003. Net interest income grew 22% to $187.7 million for the year ended December 31, 2004 from $153.9 million in 2003. Operating expenses were $398.4 million in 2004, up 16% from $344.9 million in 2003.

Net operating revenue for the fourth quarter grew 19% to $157.3 million from $131.7 million for the same period in 2003. Revenue from core services such as global custody, multicurrency accounting and mutual fund administration rose to $82.8 million for the fourth quarter, up 18% from $70.1 million from the same period in the prior year. Revenue from ancillary services including foreign exchange, securities lending, cash management, and investment advisory services increased to $25.1 million for the quarter, up 21% from $20.8 million in the fourth quarter of 2003. Net interest income grew 22% to $48.9 million for the fourth quarter of 2004 from $40.1 million for the same period in 2003. Operating expenses were $103.1 million for the fourth quarter of 2004, up 19% from $86.3 million for the same period in 2003.

Assets processed for clients totaled approximately $1.43 trillion at December 31, 2004, up 15% from $1.24 trillion at September 30, 2004 and up 35% from $1.06 trillion at December 31, 2003.

Today the Company also announced that its Board of Directors declared an increase in the cash dividend on its common stock from $0.0175 per share to $0.02 per share. The dividend is payable February 15, 2005 to stockholders of record as of January 31, 2005.

Investors Financial will broadcast a conference call, via the Internet, today, January 25, 2005 at 5:00 p.m. ET. The call will be accessible on Investors Financial's home page at http://www.ibtco.com. The conference call will also be available via telephone at (719) 457-2679, confirmation code 294343. Recorded replays of the conference call will be available at www.ibtco.com or by dialing (719) 457-0820, confirmation code 294343.

Investors Financial Services Corp. provides services for a variety of financial asset managers including mutual fund complexes, investment advisors, banks, and insurance companies. Through our wholly-owned subsidiary, Investors Bank & Trust Company, we provide core services including global

custody, multicurrency accounting, and mutual fund administration, as well as ancillary services including securities lending, foreign exchange, and cash management. Offices are located in the United States, Canada, Cayman Islands, and Ireland. Visit Investors Financial on the web at http://www.ibtco.com.

This news release contains forward-looking statements (statements that are not historical facts). These statements, such as the Company's statements regarding its ability to grow diluted earnings per share for the year ending December 31, 2005 are based upon assumptions and estimates that might not be realized and are subject to risks and uncertainties that could cause actual results to differ materially from those in the forward looking statements. Such risks and uncertainties include the performance of global financial markets, changes in interest rates, changes in the relationship between long-term and short-term interest rates, regulatory actions affecting the Company's clients, the Company's ability to manage the conversion of new business, and the Company's ability to continue to manage its costs, including the costs of compliance with increasing regulatory requirements. Additional factors that could also affect actual results are set forth under the heading "Certain Factors That May Affect Future Results" in the Company's Form 10-Q for the quarter ended September 30, 2004 and in the Company's Annual Report on Form 10-K, as amended, for the year ended December 31, 2003.

**Investors Financial Services Corp.**
**Condensed Consolidated Statements of Income (unaudited)**
**(Dollars in thousands, except share data)**

| | For the Year Ended December 31, | | For the Three Months Ended December 31, | |
|---|---|---|---|---|
| | **2004** | **2003** | **2004** | **2003** |
| **Operating Revenue:** | | | | |
| Asset servicing fees: | | | | |
| Core service fees | $ 314,272 | $ 254,225 | $ 82,787 | $ 70,074 |
| Ancillary service fees | 108,928 | 79,361 | 25,079 | 20,844 |
| Total asset servicing fees | 423,200 | 333,586 | 107,866 | 90,918 |
| Other operating income | 2,057 | 2,607 | 542 | 743 |
| Gain on sale of investment | 234 | — | — | — |
| Total operating revenue | 425,491 | 336,193 | 108,408 | 91,661 |
| | | | | |
| Interest income | 313,149 | 247,094 | 89,899 | 64,987 |
| Interest expense | 125,469 | 93,180 | 40,982 | 24,903 |
| Net interest income | 187,680 | 153,914 | 48,917 | 40,084 |
| | | | | |
| Net operating revenue | 613,171 | 490,107 | 157,325 | 131,745 |
| | | | | |
| **Operating Expenses:** | | | | |
| Compensation and benefits | 205,728 | 186,932 | 51,676 | 43,623 |
| Technology and telecommunications | 49,816 | 38,914 | 14,924 | 9,894 |
| Transaction processing services | 42,159 | 33,299 | 11,393 | 9,675 |
| Depreciation and amortization | 32,124 | 27,971 | 7,736 | 7,738 |
| Occupancy | 29,032 | 29,218 | 7,419 | 7,398 |
| Professional fees | 15,346 | 11,189 | 3,485 | 2,299 |
| Travel and sales promotion | 5,470 | 4,822 | 1,530 | 1,507 |
| Insurance | 4,625 | 3,203 | 1,126 | 1,199 |
| Other operating expenses | 14,083 | 9,373 | 3,769 | 2,976 |
| Total operating expenses | 398,383 | 344,921 | 103,058 | 86,309 |
| | | | | |
| **Income Before Income Taxes** | 214,788 | 145,186 | 54,267 | 45,436 |
| | | | | |
| Provision for income taxes | 72,826 | 52,765 | 18,988 | 14,264 |
| | | | | |
| **Net Income** | $ 141,962 | $ 92,421 | $ 35,279 | $ 31,172 |
| | | | | |
| **Basic Earnings Per Share** | $ 2.15 | $ 1.42 | $ 0.54 | $ 0.48 |
| | | | | |
| **Diluted Earnings Per Share** | $ 2.09 | $ 1.39 | $ 0.52 | $ 0.47 |

| | Share Information (unaudited) | | | |
|---|---|---|---|---|
| | For the Year Ended December 31, | | For the Three Months Ended December 31, | |
| | **2004** | **2003** | **2004** | **2003** |
| Common stock outstanding | 66,595,349 | 65,436,788 | 66,595,349 | 65,436,788 |
| Weighted-average basic shares | 66,179,286 | 65,098,960 | 66,461,316 | 65,306,548 |
| Weighted-average diluted shares | 67,916,217 | 66,475,462 | 68,106,442 | 66,909,373 |

**Investors Financial Services Corp.**
**Condensed Consolidated Balance Sheets (unaudited)**
**(Dollars in thousands, except share data)**

| | December 31, 2004 | December 31, 2003 |
|---|---|---|
| **Assets** | | |
| Cash and due from banks | $ 49,059 | $ 39,689 |
| Securities held to maturity (approximate fair value of $5,937,462 and $4,308,578 at December 31 2004 and 2003, respectively) | 5,942,717 | 4,306,216 |
| Securities available for sale | 4,565,505 | 4,296,637 |
| Nonmarketable equity securities | 50,000 | 50,000 |
| Loans, less allowance for loan losses of $100 at December 31, 2004 and 2003 | 134,530 | 199,530 |
| Accrued interest and fees receivable | 89,292 | 72,816 |
| Equipment and leasehold improvements, less accumulated depreciation of $61,017 and $47,683 at December 31, 2004 and 2003, respectively | 67,883 | 76,420 |
| Goodwill, net | 79,969 | 79,969 |
| Other assets | 188,565 | 101,901 |
| **Total Assets** | $ 11,167,520 | $ 9,223,178 |
| **Liabilities and Stockholders' Equity** | | |
| **Liabilities:** | | |
| Deposits: | | |
| Demand | $ 690,308 | $ 334,823 |
| Savings | 4,448,405 | 3,682,295 |
| Time | 257,669 | 190,000 |
| Total deposits | 5,396,382 | 4,207,118 |
| Securities sold under repurchase agreements | 4,255,497 | 3,258,001 |
| Short-term and other borrowings | 594,681 | 1,098,087 |
| Due to brokers for open trades payable | 5,475 | — |
| Junior subordinated deferrable interest debentures | 24,774 | 24,774 |
| Accrued taxes and other expenses | 52,767 | 52,222 |
| Other liabilities | 123,787 | 42,719 |
| Total liabilities | 10,453,363 | 8,682,921 |
| Commitments and contingencies | — | — |
| **Stockholders' Equity:** | | |
| Preferred stock, par value $0.01 (shares authorized: 1,000,000; issued and outstanding: none in, 2004 and 2003) | — | — |
| Common stock, par value $0.01 (shares authorized: 175,000,000 and 100,000,000 in 2004 and 2003, respectively; issued and outstanding: 66,595,349 and 65,436,788 in 2004 and 2003, respectively) | 667 | 655 |
| Surplus | 272,536 | 242,662 |
| Deferred compensation | (572) | (1,076) |
| Retained earnings | 418,034 | 280,701 |
| Accumulated other comprehensive income, net | 25,783 | 17,865 |
| Treasury stock, at cost (73,235 and 26,508 shares in 2004 and 2003, respectively) | (2,291) | (550) |
| Total stockholders' equity | 714,157 | 540,257 |
| **Total Liabilities and Stockholders' Equity** | $ 11,167,520 | $ 9,223,178 |

**Investors Financial Services Corp.**
**Average Balance Sheet (unaudited)**
**(Dollars in thousands)**

| | Three Months Ended December 31, 2004 | | | Three Months Ended December 31, 2003 | | |
|---|---|---|---|---|---|---|
| | Average Balance | Interest | Average Yield/Cost | Average Balance | Interest | Average Yield/Cost |
| **Interest-earning assets:** | | | | | | |
| Federal funds sold and securities purchased under resale agreements | $ 51,326 | $ 247 | 1.92% | $ 27,043 | $ 67 | 0.99% |
| Investment securities (1) | 10,218,542 | 88,364 | 3.46% | 8,176,007 | 63,993 | 3.13% |
| Loans | 158,160 | 1,288 | 3.26% | 146,730 | 927 | 2.53% |
| Total interest-earning assets | 10,428,028 | 89,899 | 3.45% | 8,349,780 | 64,987 | 3.11% |
| Allowance for loan losses | (100) | | | (100) | | |
| Noninterest-earning assets | 563,545 | | | 496,607 | | |
| Total assets | $ 10,991,473 | | | $ 8,846,287 | | |
| **Interest-bearing liabilities:** | | | | | | |
| Deposits: | | | | | | |
| Savings | $ 3,921,057 | $ 14,622 | 1.49% | $ 3,419,895 | $ 11,112 | 1.30% |
| Time | 112,741 | 557 | 1.98% | 4,696 | 9 | 0.77% |
| Securities sold under repurchase agreements | 4,776,215 | 20,990 | 1.76% | 3,269,592 | 6,986 | 0.85% |
| Junior subordinated debentures | 24,774 | 605 | 9.77% | 24,774 | 605 | 9.77% |
| Other borrowings(2) | 796,934 | 4,208 | 2.11% | 965,579 | 6,191 | 2.56% |
| Total interest-bearing liabilities | 9,631,721 | 40,982 | 1.70% | 7,684,536 | 24,903 | 1.30% |
| **Noninterest-bearing liabilities:** | | | | | | |
| Demand deposits | 247,971 | | | 273,129 | | |
| Savings | 93,825 | | | 124,416 | | |
| Noninterest-bearing time deposits | 143,370 | | | 127,065 | | |
| Other liabilities | 184,858 | | | 115,926 | | |
| Total liabilities | 10,301,745 | | | 8,325,072 | | |
| Equity | 689,728 | | | 521,215 | | |
| Total liabilities and equity | $ 10,991,473 | | | $ 8,846,287 | | |
| Net interest income | | $ 48,917 | | | $ 40,084 | |
| Net interest margin (3) | | | 1.88% | | | 1.92% |
| Average interest rate spread (4) | | | 1.75% | | | 1.81% |
| Ratio of interest-earning assets to interest-bearing liabilities | | | 108.27% | | | 108.66% |

(1) Average yield/cost on available for sale securities is based on amortized cost.
(2) Interest expense for the three months ended December 31, 2003 includes a contractual prepayment penalty of $2.0 million for the prepayment of certain FHLBB borrowings.
(3) Net interest income divided by total interest-earning assets.
(4) Yield on interest-earning assets less rate paid on interest-bearing liabilities.

**Investors Financial Services Corp.**

**Asset servicing fees by service lines (unaudited) (dollars in thousands)**

|  | For the Year Ended December 31, | | For the Three Months Ended December 31, | |
|---|---|---|---|---|
|  | 2004 | 2003 | 2004 | 2003 |
| Core service fees: | | | | |
| Custody, accounting and administration | $ 314,272 | $ 254,225 | $ 82,787 | $ 70,074 |
| Ancillary service fees: | | | | |
| Foreign exchange | 54,466 | 36,501 | 12,132 | 10,517 |
| Cash management | 26,396 | 20,884 | 6,809 | 5,097 |
| Investment advisory | 15,020 | 11,777 | 2,674 | 2,886 |
| Securities lending | 10,385 | 8,903 | 2,667 | 1,985 |
| Other service fees | 2,661 | 1,296 | 797 | 359 |
| Total ancillary service fees | 108,928 | 79,361 | 25,079 | 20,844 |
| Total asset servicing fees | $ 423,200 | $ 333,586 | $ 107,866 | $ 90,918 |

**Change in net assets processed (unaudited) (dollars in billions):**

|  | For the Year Ended December 31, 2004 | For the Three Months Ended December 31, 2004 |
|---|---|---|
| Net assets processed, beginning of period | $ 1,057 | $ 1,243 |
| Change in net assets processed: | | |
| Sales to new clients | 54 | 50 |
| Further penetration of existing clients | 37 | 15 |
| Lost clients | (3) | (1) |
| Fund flows and market gain | 285 | 123 |
| Total change in net assets processed | 373 | 187 |
| Net assets processed, end of period | $ 1,430 | $ 1,430 |

**Investors Financial Services Corp.**
**(Dollars in thousands)**

**GAAP Earnings (unaudited)**

| | For the Year Ended December 31, | | | For the Three Months Ended December 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2004 | | 2003 | 2004 | | 2003 |
| Income before taxes | $ | 214,788 | $ 145,186 | $ | 54,267 | $ 45,436 |
| Provision for income taxes | | 72,826 | 52,765 | | 18,988 | 14,264 |
| Net income | $ | 141,962 | $ 92,421 | $ | 35,279 | $ 31,172 |
| Earnings per share: | | | | | | |
| Basic | $ | 2.15 | $ 1.42 | $ | 0.54 | $ 0.48 |
| Diluted | $ | 2.09 | $ 1.39 | $ | 0.52 | $ 0.47 |

**Non-GAAP Operating Earnings (unaudited)**

| | For the Year Ended December 31, | | | For the Three Months Ended December 31, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2004 | | 2003 | 2004 | | 2003 |
| Income before taxes | $ | 214,788 | $ 145,186 | $ | 54,267 | $ 45,436 |
| Provision for income taxes | | 72,826 | 45,565(1) | | 18,988 | 14,264 |
| Net income | $ | 141,962 | $ 99,621 | $ | 35,279 | $ 31,172 |
| Earnings per share: | | | | | | |
| Basic | $ | 2.15 | $ 1.53 | $ | 0.54 | $ 0.48 |
| Diluted | $ | 2.09 | $ 1.50 | $ | 0.52 | $ 0.47 |

(1) Provision for income taxes for the year ended December 31, 2003 excludes a $7.2 million charge, net of federal income tax benefit, related to a retroactive change in Massachusetts tax law enacted in the first quarter of 2003 and the Company's subsequent settlement of the resulting tax assessment with the Massachusetts Department of Revenue. The effect of the exclusion is an increase of $0.11 per basic and diluted share.

Exhibit 7

8-K 1 a05-6633_18k.htm 8-K

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT

### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **April 13, 2005**

# INVESTORS FINANCIAL SERVICES CORP.
(Exact name of registrant as specified in its charter)

| **DELAWARE** | **0-26996** | **04-3279817** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation or organization) | (Commission file number) | (I.R.S. Employer Identification No.) |

| **200 Clarendon Street, Boston, MA** | **02116** |
|:---:|:---:|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number including area code:    **(617) 937-6700**

**No change since last report**
(Former name or address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02.  Results of Operations and Financial Condition.**

       Attached as Exhibit 99.1 and incorporated herein by reference is a copy of the press release of Investors Financial Services Corp. (the "Company"), dated April 13, 2005, reporting the Company's financial results for the fiscal quarter ended March 31, 2005.

       The information contained herein, including the exhibit attached and incorporated herein by reference, is being furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section.  The information contained herein and in the accompanying exhibit shall not be incorporated by reference into any filing with the U.S. Securities and Exchange Commission made by the Company, whether made before or after the date hereof, regardless of any general incorporation language in such filings.

**Item 9.01.  Financial Statements and Exhibits.**

(c) Exhibits

The following Exhibit is furnished as part of this report:

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Press release issued by Investors Financial Services Corp., dated April 13, 2005 |

2

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**INVESTORS FINANCIAL SERVICES CORP.**

By: ___/s/Kevin J. Sheehan___

Kevin J. Sheehan
Chief Executive Officer and
Chairman of the Board

Dated: April 13, 2005

3

## EXHIBIT INDEX

| Exhibit No. | Description |
|-------------|-------------|
| 99.1 | Press release issued by Investors Financial Services Corp. dated April 13, 2005 |

4

EX-99.1 2 a05-6633_1ex99d1.htm EX-99.1

**Exhibit 99.1**

## INVESTORS FINANCIAL SERVICES CORP. ANNOUNCES FIRST QUARTER EARNINGS UP 11%

Contact:     **John N. Spinney, Jr.**
**(617) 937-3500**
**john.spinney@ibtco.com**

**BOSTON, MA, April 13, 2005** - Investors Financial Services Corp. (Nasdaq: IFIN) reported first quarter diluted earnings per share of $0.60, an increase of 11% from diluted earnings per share of $0.54 in the first quarter of 2004. Net income for the first quarter of 2005 was $40.9 million, up 12% from $36.6 million in net income in the first quarter of 2004.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Investors Financial Services again delivered solid results in the first quarter of 2005. Our core services revenue grew impressively on both a year-over-year and linked quarter basis, driven by new business wins and client fund flows. We continue to have a number of exciting opportunities in our pipeline to drive earnings growth in fiscal year 2005."

Net operating revenue for the first quarter grew 8% to $167.8 million from $155.2 million for the same period in 2004. Revenue from core services such as global custody, multicurrency accounting and mutual fund administration grew to $88.5 million for the first quarter, up 16% from $76.1 million for the same period in the prior year. Revenue from ancillary services including securities lending, foreign exchange and cash management sweep services decreased to $26.7 million for the quarter, down 11% from $30.1 million in the first quarter of 2004. Net interest income decreased 2% to $47.6 million for the first quarter of 2005 from $48.4 million for the same period in 2004. Operating expenses for the first quarter of 2005 grew 5% to $104.8 million from $100.1 million for the same period in 2004.

Assets processed for clients totaled approximately $1.47 trillion at March 31, 2005 compared to $1.43 trillion at December 31, 2004 and $1.13 trillion at March 31, 2004.

Today the Company also announced that its Board of Directors declared a cash dividend on its common stock of $0.02 per share. The dividend is payable May 16, 2005 to stockholders of record as of April 29, 2005.

Investors Financial will broadcast a conference call, via the Internet, today, April 13, 2005 at 5:00 p.m. ET. The call will be accessible on Investors Financial's home page at www.ibtco.com. The conference call will also be available via telephone at (719) 457-2727, confirmation code 2889413. Recorded replays of the conference call will be available on the website and by dialing (719) 457-0820, confirmation code 2889413.

~ MORE ~

Investors Financial Services Corp. provides services for a variety of financial asset managers including mutual fund complexes, investment advisors, banks, and insurance companies. Through our wholly-owned subsidiary, Investors Bank & Trust Company, we provide core services including global custody, multicurrency accounting, and mutual fund administration, as well as value-added services including securities lending, foreign exchange, and cash management. Offices are located in the United States, Canada, Cayman Islands, and Ireland. Visit Investors Financial on the web at www.ibtco.com.

This news release contains forward-looking statements (statements that are not historical facts) made under the safe harbor provisions of Section 21E of the Securities Exchange Act of 1934. These statements, such as the Company's statements regarding its pipeline and ability to grow diluted earnings per share for the year ending December 31, 2005 are based upon assumptions and estimates that might not be realized and are subject to risks and uncertainties that could cause actual results to differ materially from those in the forward looking statements. Such risks and uncertainties include the timing of new sales, the performance of global financial markets, changes in interest rates, changes in the relationship between long-term and short-term interest rates, regulatory actions affecting the Company's clients, the Company's ability to manage the conversion of new business, and the Company's ability to continue to manage its costs, including the costs of compliance with increasing regulatory requirements. Additional factors that could also affect actual results are set forth under the heading "Certain Factors That May Affect Future Results" in the Company's Annual Report on Form 10-K for the year ended December 31, 2004.

~ MORE ~

**Investors Financial Services Corp.**
**Condensed Consolidated Statements of Income (unaudited)**
**(Dollars in thousands, except share data)**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2004 |
| **Operating Revenue:** | | |
| Asset servicing fees: | | |
| Core service fees | $ 88,544 | $ 76,094 |
| Ancillary service fees | 26,659 | 30,093 |
| Total asset servicing fees | 115,203 | 106,187 |
| Other operating income | 785 | 349 |
| Gain on sale of investment | 4,188 | 234 |
| Total operating revenue | 120,176 | 106,770 |
| | | |
| Interest income | 98,055 | 73,636 |
| Interest expense | 50,442 | 25,215 |
| Net interest income | 47,613 | 48,421 |
| Net operating revenue | 167,789 | 155,191 |
| **Operating Expenses:** | | |
| Compensation and benefits | 56,919 | 55,323 |
| Technology and telecommunications | 12,836 | 10,266 |
| Transaction processing services | 11,120 | 10,940 |
| Depreciation and amortization | 7,891 | 7,954 |
| Occupancy | 6,613 | 7,391 |
| Professional fees | 2,973 | 3,238 |
| Travel and sales promotion | 1,349 | 1,082 |
| Insurance | 1,129 | 1,196 |
| Other operating expenses | 3,962 | 2,744 |
| Total operating expenses | 104,792 | 100,134 |
| | | |
| **Income Before Income Taxes** | 62,997 | 55,057 |
| | | |
| Provision for income taxes | 22,049 | 18,504 |
| **Net Income** | $ 40,948 | $ 36,553 |
| **Basic Earnings Per Share** | $ 0.61 | $ 0.56 |
| **Diluted Earnings Per Share** | $ 0.60 | $ 0.54 |

**Share Information (unaudited)**

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2005 | 2004 |
| Common stock outstanding | 66,796,243 | 66,027,734 |
| Weighted-average basic shares | 66,718,362 | 65,837,110 |
| Weighted-average diluted shares | 68,617,491 | 67,712,952 |

**Investors Financial Services Corp.**
**Condensed Consolidated Balance Sheets (unaudited)**
**(Dollars in thousands, except share data)**

| | March 31, 2005 | December 31, 2004 |
|---|---|---|
| **Assets** | | |
| Cash and due from banks | $ 35,553 | $ 49,059 |
| Securities held to maturity (approximate fair value of $6,599,288 and $5,937,462 at March 31, 2005 and December 31 2004, respectively) | 6,609,230 | 5,942,717 |
| Securities available for sale | 4,490,398 | 4,565,505 |
| Nonmarketable equity securities | 50,000 | 50,000 |
| Loans, less allowance for loan losses of $100 at March 31, 2005 and December 31, 2004 | 265,758 | 134,530 |
| Accrued interest and fees receivable | 99,608 | 89,292 |
| Equipment and leasehold improvements, less accumulated depreciation of $60,769 and $61,017 at March 31, 2005 and December 31, 2004, respectively | 66,862 | 67,883 |
| Goodwill, net | 79,969 | 79,969 |
| Other assets | 187,699 | 188,870 |
| **Total Assets** | $ 11,885,077 | $ 11,167,825 |
| | | |
| **Liabilities and Stockholders' Equity** | | |
| **Liabilities:** | | |
| Deposits: | | |
|     Demand | $ 541,252 | $ 690,308 |
|     Savings | 3,659,996 | 4,448,405 |
|     Time | 662,669 | 257,669 |
|        Total deposits | 4,863,917 | 5,396,382 |
| | | |
| Securities sold under repurchase agreements | 4,640,959 | 4,255,497 |
| Short-term and other borrowings | 1,319,712 | 594,681 |
| Due to brokers for open trades payable | 112,805 | 5,475 |
| Junior subordinated deferrable interest debentures | 24,774 | 24,774 |
| Accrued taxes and other expenses | 71,143 | 54,967 |
| Other liabilities | 110,639 | 123,787 |
|     Total liabilities | 11,143,949 | 10,455,563 |
| | | |
| Commitments and contingencies | — | — |
| | | |
| **Stockholders' Equity:** | | |
| Preferred stock, par value $0.01 (shares authorized: 1,000,000; issued and outstanding: none at March 31, 2005 and December 31, 2004) | — | — |
| Common stock, par value $0.01 (shares authorized: 175,000,000; issued and outstanding: 66,796,243 and 66,595,349 at March 31, 2005 and December 31, 2004, respectively) | 669 | 667 |
| Surplus | 279,353 | 272,536 |
| Deferred compensation | (465) | (572) |
| Retained earnings | 457,650 | 418,034 |
| Accumulated other comprehensive income, net | 6,212 | 23,888 |
| Treasury stock, at cost (73,235 shares at March 31, 2005 and December 31, 2004) | (2,291) | (2,291) |
|     Total stockholders' equity | 741,128 | 712,262 |
| **Total Liabilities and Stockholders' Equity** | $ 11,885,077 | $ 11,167,825 |

**Investors Financial Services Corp.**
**Average Balance Sheet (unaudited)**
**(Dollars in thousands)**

| | Three Months Ended March 31, 2005 | | | Three Months Ended March 31, 2004 | | |
|---|---|---|---|---|---|---|
| | Average Balance | Interest | Average Yield/Cost | Average Balance | Interest | Average Yield/Cost |
| **Interest-earning assets:** | | | | | | |
| Federal funds sold and securities purchased under resale agreements | $ 60,611 | $ 363 | 2.40% | $ 67,560 | $ 162 | 0.96% |
| Investment securities (1) | 10,658,090 | 96,132 | 3.61% | 8,851,155 | 72,350 | 3.27% |
| Loans | 163,177 | 1,560 | 3.82% | 198,970 | 1,124 | 2.26% |
| Total interest-earning assets | 10,881,878 | 98,055 | 3.60% | 9,117,685 | 73,636 | 3.23% |
| Allowance for loan losses | (100) | | | (100) | | |
| Noninterest-earning assets | 604,181 | | | 487,392 | | |
| Total assets | $ 11,485,959 | | | $ 9,604,977 | | |
| **Interest-bearing liabilities:** | | | | | | |
| Deposits: | | | | | | |
| Savings | $ 3,496,407 | $ 14,581 | 1.67% | $ 3,924,863 | $ 11,369 | 1.16% |
| Time | 107,334 | 664 | 2.47% | 129 | — | — |
| Securities sold under repurchase agreements | 5,055,797 | 26,354 | 2.09% | 3,691,117 | 7,649 | 0.83% |
| Junior subordinated debentures | 24,774 | 605 | 9.77% | 24,774 | 605 | 9.77% |
| Other borrowings(2) | 1,290,073 | 8,238 | 2.55% | 732,527 | 5,592 | 3.05% |
| Total interest-bearing liabilities | 9,974,385 | 50,442 | 2.02% | 8,373,410 | 25,215 | 1.20% |
| **Noninterest-bearing liabilities:** | | | | | | |
| Demand deposits | 334,974 | | | 308,916 | | |
| Savings | 77,766 | | | 80,953 | | |
| Noninterest-bearing time deposits | 165,444 | | | 164,121 | | |
| Other liabilities | 195,776 | | | 105,964 | | |
| Total liabilities | 10,748,345 | | | 9,033,364 | | |
| Equity | 737,614 | | | 571,613 | | |
| Total liabilities and equity | $ 11,485,959 | | | $ 9,604,977 | | |
| Net interest income | | $ 47,613 | | | $ 48,421 | |
| Net interest margin (3) | | | 1.75% | | | 2.12% |
| Average interest rate spread (4) | | | 1.58% | | | 2.03% |
| Ratio of interest-earning assets to interest-bearing liabilities | | | 109.10% | | | 108.89% |

(1) Average yield/cost on available for sale securities is based on amortized cost.

(2) Interest expense for the three months ended March 31, 2004 includes a contractual prepayment penalty of $2.6 million for the prepayment of certain FHLBB borrowings.

(3) Net interest income divided by total interest-earning assets.

(4) Yield on interest-earning assets less rate paid on interest-bearing liabilities.

**Investors Financial Services Corp.**

## Asset servicing fees by service lines (unaudited) (dollars in thousands)

|  | For the Three Months Ended March 31, | |
|---|---|---|
|  | 2005 | 2004 |
| Core service fees: |  |  |
| Custody, accounting and administration | $ 88,544 | $ 76,094 |
| Ancillary service fees: |  |  |
| Foreign exchange | 13,249 | 18,495 |
| Cash management | 7,364 | 5,600 |
| Securities lending | 3,680 | 2,143 |
| Investment advisory | 1,715 | 3,470 |
| Other service fees | 651 | 385 |
| Total ancillary service fees | 26,659 | 30,093 |
| Total asset servicing fees | $ 115,203 | $ 106,187 |

## Change in net assets processed (unaudited) (dollars in billions):

|  | For the Three Months Ended March 31, 2005 |
|---|---|
| Net assets processed, beginning of period | $ 1,430 |
| Change in net assets processed: |  |
| Sales to new clients | 1 |
| Further penetration of existing clients | 7 |
| Lost clients | (9) |
| Fund flows and market gain | 40 |
| Total change in net assets processed | 39 |
| Net assets processed, end of period | $ 1,469 |

Exhibit 8

10-Q 1 a05-12598_110q.htm 10-Q

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Quarterly period ended June 30, 2005**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Transition period from          to**

**0-26996**
**(Commission File Number)**

# INVESTORS FINANCIAL SERVICES CORP.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3279817** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |

| | |
|---|---|
| **200 Clarendon Street,** | |
| **P.O. Box 9130, Boston, MA** | **02117-9130** |
| (Address of principal executive offices) | (Zip Code) |

**(617) 937-6700**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☒ No ☐

As of July 31, 2005 there were 66,256,763 shares of Common Stock outstanding.

# INVESTORS FINANCIAL SERVICES CORP.

## INDEX

**PART I.**    **FINANCIAL INFORMATION**

Item 1.    Unaudited Condensed Consolidated Financial Statements

    Unaudited Condensed Consolidated Balance Sheets June 30, 2005 and December 31, 2004      3

    Unaudited Condensed Consolidated Statements of Income and Comprehensive Income
    Six months ended June 30, 2005 and 2004      4

    Unaudited Condensed Consolidated Statements of Income and Comprehensive Income
    Three months ended June 30, 2005 and 2004      5

    Unaudited Condensed Consolidated Statements of Stockholders' Equity
    Six months ended June 30, 2005 and 2004      6

    Unaudited Condensed Consolidated Statements of Cash Flows
    Six months ended June 30, 2005 and 2004      7

    Notes to Unaudited Condensed Consolidated Financial Statements      8

    Report of Independent Registered Public Accounting Firm      20

Item 2.    Management's Discussion and Analysis of Financial Condition and Results of Operations      21

Item 3.    Quantitative and Qualitative Disclosures about Market Risk      37

Item 4.    Controls and Procedures      37

**PART II.**    **OTHER INFORMATION**

Item 1.    Legal Proceedings      38

Item 4.    Submission of Matters to a Vote of Security Holders      38

Item 6.    Exhibits      38

**SIGNATURES**      39

# PART I. FINANCIAL INFORMATION
## Item 1.  Unaudited Condensed Consolidated Financial Statements

## INVESTORS FINANCIAL SERVICES CORP.
## UNAUDITED CONDENSED CONSOLIDATED BALANCE SHEETS
### June 30, 2005 and December 31, 2004 (Dollars in thousands, except share data)

| | June 30, 2005 | December 31, 2004 |
|---|---|---|
| **Assets** | | |
| Cash and due from banks | $ 30,434 | $ 49,059 |
| Federal Funds sold | 11,000 | — |
| Securities held to maturity (approximate fair value of $6,956,891 and $5,937,462 at June 30, 2005 and December 31, 2004, respectively) | 6,964,528 | 5,942,717 |
| Securities available for sale | 4,511,673 | 4,565,505 |
| Nonmarketable equity securities | 50,000 | 50,000 |
| Loans, less allowance for loan losses of $100 at June 30, 2005 and December 31, 2004 | 209,820 | 134,530 |
| Accrued interest and fees receivable | 103,777 | 89,292 |
| Equipment and leasehold improvements, less accumulated depreciation of $63,263 and $61,017 at June 30, 2005 and December 31, 2004, respectively | 65,417 | 67,883 |
| Goodwill, net | 79,969 | 79,969 |
| Deposits pledged to secure clearings | 166,092 | 27,242 |
| Other assets | 213,065 | 161,628 |
| **Total Assets** | $ 12,405,775 | $ 11,167,825 |
| **Liabilities and Stockholders' Equity** | | |
| **Liabilities:** | | |
| Deposits: | | |
| Demand | $ 579,807 | $ 690,308 |
| Savings | 4,107,204 | 4,448,405 |
| Time | 412,520 | 257,669 |
| Total deposits | 5,099,531 | 5,396,382 |
| Securities sold under repurchase agreements | 4,851,699 | 4,255,497 |
| Short-term and other borrowings | 1,353,440 | 594,681 |
| Due to brokers for open trades payable | 49,371 | 5,475 |
| Junior subordinated deferrable interest debentures | 24,774 | 24,774 |
| Accrued taxes and other expenses | 58,629 | 54,967 |
| Other liabilities | 174,343 | 123,787 |
| Total liabilities | 11,611,787 | 10,455,563 |
| Commitments and contingencies | — | — |
| **Stockholders' Equity:** | | |
| Preferred stock, par value $0.01 (shares authorized: 1,000,000; issued and outstanding: none at June 30, 2005 and December 31, 2004) | — | — |
| Common stock, par value $0.01 (shares authorized: 175,000,000; issued and outstanding: 66,875,627 and 66,595,349 at June 30, 2005 and December 31, 2004, respectively) | 669 | 667 |
| Surplus | 281,868 | 272,536 |
| Deferred compensation | (360) | (572) |

| Retained earnings | 500,440 | 418,034 |
| Accumulated other comprehensive income, net | 13,662 | 23,888 |
| Treasury stock, at cost (73,235 shares at June 30, 2005 and December 31, 2004) | (2,291) | (2,291) |
| Total stockholders' equity | 793,988 | 712,262 |
| **Total Liabilities and Stockholders' Equity** | $ 12,405,775 | $ 11,167,825 |

*See Notes to Unaudited Condensed Consolidated Financial Statements.*

3

**INVESTORS FINANCIAL SERVICES CORP.**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE**
**INCOME**
Six Months Ended June 30, 2005 and 2004 (Dollars in thousands, except per share data)

| | June 30, 2005 | June 30, 2004 |
|---|---|---|
| **Fees and Other Revenue:** | | |
| Asset servicing fees: | | |
| Core service fees | $ 178,703 | $ 154,849 |
| Ancillary service fees | 58,998 | 60,331 |
| Total asset servicing fees | 237,701 | 215,180 |
| Other operating income | 1,411 | 1,097 |
| Gain on sale of investments | 9,740 | 234 |
| Total fees and other revenue | 248,852 | 216,511 |
| | | |
| Interest income | 206,158 | 142,776 |
| Interest expense | 116,499 | 52,280 |
| Net interest income | 89,659 | 90,496 |
| Net operating revenue | 338,511 | 307,007 |
| | | |
| **Operating Expenses:** | | |
| Compensation and benefits | 120,351 | 109,094 |
| Technology and telecommunications | 25,913 | 20,722 |
| Transaction processing services | 22,776 | 21,138 |
| Depreciation and amortization | 15,984 | 16,721 |
| Occupancy | 12,840 | 14,260 |
| Professional fees | 6,379 | 7,256 |
| Travel and sales promotion | 3,174 | 2,579 |
| Insurance | 2,275 | 2,360 |
| Other operating expenses | 8,337 | 6,704 |
| Total operating expenses | 218,029 | 200,834 |
| | | |
| **Income Before Income Taxes** | 120,482 | 106,173 |
| | | |
| Provision for income taxes | 35,407 | 35,624 |
| | | |
| **Net Income** | $ 85,075 | $ 70,549 |
| | | |
| **Basic Earnings Per Share** | $ 1.27 | $ 1.07 |
| | | |
| **Diluted Earnings Per Share** | $ 1.24 | $ 1.04 |
| | | |
| **Comprehensive Income:** | | |
| Net income | $ 85,075 | $ 70,549 |
| Other comprehensive loss: | | |
| Net unrealized investment loss | (12,694) | (37,076) |
| Net unrealized derivative instrument gain | 2,692 | 11,854 |
| Cumulative translation adjustment | (224) | (400) |
| Other comprehensive loss | (10,226) | (25,622) |
| Comprehensive income | $ 74,849 | $ 44,927 |

*See Notes to Unaudited Condensed Consolidated Financial Statements.*

**INVESTORS FINANCIAL SERVICES CORP.**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME**
**Three Months Ended June 30, 2005 and 2004 (Dollars in thousands, except per share data)**

| | June 30, 2005 | June 30, 2004 |
|---|---|---|
| **Fees and Other Revenue:** | | |
| Asset servicing fees: | | |
| Core service fees | $ 90,159 | $ 78,755 |
| Ancillary service fees | 32,339 | 30,238 |
| Total asset servicing fees | 122,498 | 108,993 |
| Other operating income | 626 | 748 |
| Gain on sale of investments | 5,552 | — |
| Total fees and other revenue | 128,676 | 109,741 |
| | | |
| Interest income | 108,103 | 69,140 |
| Interest expense | 66,057 | 27,065 |
| Net interest income | 42,046 | 42,075 |
| Net operating revenue | 170,722 | 151,816 |
| | | |
| **Operating Expenses:** | | |
| Compensation and benefits | 63,432 | 53,771 |
| Technology and telecommunications | 13,077 | 10,456 |
| Transaction processing services | 11,656 | 10,198 |
| Depreciation and amortization | 8,093 | 8,767 |
| Occupancy | 6,227 | 6,869 |
| Professional fees | 3,406 | 4,018 |
| Travel and sales promotion | 1,825 | 1,497 |
| Insurance | 1,146 | 1,164 |
| Other operating expenses | 4,375 | 3,960 |
| Total operating expenses | 113,237 | 100,700 |
| | | |
| **Income Before Income Taxes** | 57,485 | 51,116 |
| | | |
| Provision for income taxes | 13,358 | 17,120 |
| | | |
| **Net Income** | $ 44,127 | $ 33,996 |
| | | |
| **Basic Earnings Per Share** | $ 0.66 | $ 0.51 |
| | | |
| **Diluted Earnings Per Share** | $ 0.64 | $ 0.50 |
| | | |
| **Comprehensive Income:** | | |
| Net income | $ 44,127 | $ 33,996 |
| Other comprehensive income (loss): | | |
| Net unrealized investment gain (loss) | 13,545 | (58,989) |
| Net unrealized derivative instrument (loss) gain | (5,991) | 13,016 |
| Cumulative translation adjustment | (104) | (317) |
| Other comprehensive income (loss) | 7,450 | (46,290) |
| Comprehensive income | $ 51,577 | $ (12,294) |

*See Notes to Unaudited Condensed Consolidated Financial Statements.*

**INVESTORS FINANCIAL SERVICES CORP.**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
Six Months Ended June 30, 2005 and 2004 (Dollars in thousands, except share data)

|  | June 30, 2005 | June 30, 2004 |
|---|---|---|
| **Common shares** | | |
| Balance, beginning of period | 66,595,349 | 65,436,788 |
| Exercise of stock options | 225,416 | 740,529 |
| Common stock issuance | 54,862 | 47,681 |
| Balance, end of period | 66,875,627 | 66,224,998 |
| | | |
| **Treasury shares** | | |
| Balance, beginning of period | 73,235 | 26,508 |
| Balance, end of period | 73,235 | 26,508 |
| | | |
| **Common stock** | | |
| Balance, beginning of period | $ 667 | $ 655 |
| Exercise of stock options | 2 | 7 |
| Balance, end of period | 669 | 662 |
| | | |
| **Surplus** | | |
| Balance, beginning of period | 272,536 | 242,662 |
| Exercise of stock options | 6,208 | 10,005 |
| Tax benefit from exercise of stock options | 1,246 | 6,539 |
| Common stock issuance | 1,878 | 1,668 |
| Stock option forfeiture | — | (188) |
| Balance, end of period | 281,868 | 260,686 |
| | | |
| **Deferred compensation** | | |
| Balance, beginning of period | (572) | (1,076) |
| Stock option forfeiture | — | 188 |
| Amortization of deferred compensation | 212 | 108 |
| Balance, end of period | (360) | (780) |
| | | |
| **Retained earnings** | | |
| Balance, beginning of period | 418,034 | 280,701 |
| Net income | 85,075 | 70,549 |
| Cash dividend, $0.040 and $0.035 per share in the periods ending June 30, 2005 and 2004, respectively | (2,669) | (2,309) |
| Balance, end of period | 500,440 | 348,941 |
| | | |
| **Accumulated other comprehensive income, net** | | |
| Balance, beginning of period | 23,888 | 17,865 |
| Net unrealized investment loss | (12,694) | (37,076) |
| Net unrealized derivative instrument gain | 2,712 | 11,844 |
| Amortization of terminated interest rate swap agreements | (20) | 10 |
| Effect of foreign currency translation | (224) | (400) |
| Balance, end of period | 13,662 | (7,757) |
| | | |
| **Treasury stock** | | |
| Balance, beginning of period | (2,291) | (550) |
| Balance, end of period | (2,291) | (550) |

**Total Stockholders' Equity** $ 793,988 $ 601,202

*See Notes to Unaudited Condensed Consolidated Financial Statements.*

6

**INVESTORS FINANCIAL SERVICES CORP.**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**Six Months Ended June 30, 2005 and 2004 (Dollars in thousands)**

|  | June 30, 2005 | June 30, 2004 |
|---|---|---|
| **Cash Flows From Operating Activities:** | | |
| Net income | $  85,075 | $  70,549 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Equity in undistributed loss of unconsolidated subsidiary | 14 | 14 |
| Depreciation and amortization | 15,984 | 16,721 |
| Amortization of deferred compensation | 212 | 108 |
| Amortization of premiums on securities, net of accretion of discounts | 24,440 | 21,923 |
| Gain on sale of investments | (9,740) | (234) |
| Changes in assets and liabilities: | | |
| Accrued interest and fees receivable | (14,485) | (10,888) |
| Other assets | (51,478) | (13,552) |
| Accrued taxes and other expenses | 3,662 | (2,670) |
| Other liabilities | 61,356 | 24,907 |
| Net cash used/provided by operating activities | 115,040 | 106,878 |
| **Cash Flows From Investing Activities:** | | |
| Proceeds from maturities and paydowns of securities available for sale | 633,126 | 717,922 |
| Proceeds from maturities and paydowns of securities held to maturity | 752,969 | 758,965 |
| Proceeds from sale of securities available for sale | 248,441 | 25,041 |
| Purchases of securities available for sale | (841,836) | (1,115,949) |
| Purchases of securities held to maturity | (1,795,148) | (1,563,748) |
| Net increase in deposits pledged to secure clearings | (138,850) | (158,580) |
| Net increase in due to brokers for open trades payable | 43,896 | 135,866 |
| Net increase in Federal Funds sold and securities purchased under resale agreements | (11,000) | (425,000) |
| Net (increase) decrease in loans | (75,290) | 7,347 |
| Purchases of fixed assets, capitalized software and leasehold improvements | (13,503) | (11,779) |
| Net cash used for investing activities | (1,197,195) | (1,629,915) |
| **Cash Flows From Financing Activities:** | | |
| Net (decrease) increase in demand deposits | (110,501) | 718,025 |
| Net (decrease) increase in time and savings deposits | (186,350) | 78,030 |
| Net increase in securities sold under repurchase agreements | 596,202 | 1,029,674 |
| Net increase (decrease) in short-term and other borrowings | 758,759 | (308,968) |
| Proceeds from exercise of stock options | 6,210 | 10,012 |
| Proceeds from issuance of common stock | 1,878 | 1,668 |
| Dividends paid to stockholders | (2,669) | (2,309) |
| Net cash provided by financing activities | 1,063,529 | 1,526,132 |
| **Effect of exchange rates on cash** | 1 | (5) |
| **Net (Decrease) Increase in Cash and Due From Banks** | (18,625) | 3,090 |
| **Cash and Due From Banks, Beginning of Period** | 49,059 | 39,689 |
| **Cash and Due From Banks, End of Period** | $  30,434 | $  42,779 |

*See Notes to Unaudited Condensed Consolidated Financial Statements.*

http://www.sec.gov/Archives/edgar/data/949589/0001046590503 7...

7

**INVESTORS FINANCIAL SERVICES CORP.**
**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Information is as of and for the six months and the three months ended June 30, 2005 and 2004)**

**1.    Description of Business**

Investors Financial Services Corp. ('IFSC') provides asset administration services for the financial services industry through its wholly-owned subsidiary, Investors Bank & Trust Company ('the Bank'). As used herein, the defined term "the Company" shall mean IFSC together with the Bank and its domestic and foreign subsidiaries. The Company provides core services and value-added services to a variety of financial asset managers, including mutual fund complexes, investment advisors, family offices, banks and insurance companies. Core services include middle office outsourcing, global custody, multicurrency accounting and fund administration. Value-added services include securities lending, foreign exchange, cash management, performance measurement, institutional transfer agency, investment advisory services, lines of credit and brokerage and transition management services. The Company and/or its affiliates are subject to regulation by the Federal Deposit Insurance Corporation, the Federal Reserve Board of Governors, the Office of the Commissioner of Banks of the Commonwealth of Massachusetts, the Securities and Exchange Commission ('SEC'), the National Association of Securities Dealers, Inc. ('NASD'), the Office of the Superintendent of Financial Institutions in Canada, the Irish Financial Services Regulatory Authority, the Cayman Islands Monetary Authority and the State of Vermont Department of Banking, Insurance, Securities & Health Care Administration.

**2.    Interim Financial Statements**

The unaudited condensed consolidated interim financial statements of the Company and its subsidiaries as of June 30, 2005 and December 31, 2004, and for the six-month and the three-month periods ended June 30, 2005 and 2004 have been prepared by the Company pursuant to the rules and regulations of the SEC. Certain information and footnote disclosures normally included in annual financial statements prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP') have been condensed or omitted as permitted by such rules and regulations. All adjustments, consisting of normal recurring adjustments, necessary for their fair presentation in conformity with GAAP are included. The Company's management believes that the disclosures are adequate to present fairly the financial position, results of operations and cash flows at the dates and for the periods presented. It is suggested that these interim financial statements be read in conjunction with the financial statements and the notes thereto included in the Company's latest annual report on Form 10-K. Results for interim periods are not necessarily indicative of those to be expected for the full fiscal year. Certain amounts in prior financial statements have been reclassified to conform to the current presentation.

*Securities* – The specific identification method is used to determine gains and losses on sales of securities. Amortization and accretion of debt securities purchased at a premium or discount are amortized or accreted into income using a method which approximates the constant effective yield. The Company applies Financial Accounting Standard No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases ('FAS 91') for the amortization of premiums and accretion of discounts. Prepayments are anticipated using three-month actual prepayment experience for securities that represent holdings of large numbers of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated. Premiums and discounts on securities not meeting these criteria are amortized or accreted over their contractual term using the constant effective yield. Actual prepayment experience for all investment securities is reviewed monthly and the timing of the amortization and accretion is adjusted accordingly.

*Income Taxes* – Income tax expense is based on estimated taxes payable or refundable on a tax return basis for the current year and the changes in deferred tax assets and liabilities during the year. Deferred tax assets and liabilities are established for temporary differences between the accounting basis and the tax basis of the Company's assets and liabilities at enacted tax rates expected to be in effect when the amounts related to such temporary differences are realized or settled. If it is determined that a deferred tax asset will "more likely than not" be realized, the Company records a valuation allowance in accordance with the provisions of SFAS No. 109, *Accounting for Income Taxes*.

The Company recorded a one-time benefit of approximately $7 million in the second quarter of 2005 related to the recognition of the indefinite reversal provision of Accounting Principles Board Opinion No. 23, *Accounting for Income Taxes – Special Areas* ('APB 23'). The indefinite reversal provision of APB 23 specifies that U.S. income taxes should not be accrued on the undistributed earnings of a foreign subsidiary if those earnings have been or will be invested indefinitely

in that subsidiary's operations. The Company had previously accrued U.S. income taxes on the undistributed earnings of its Irish subsidiaries. In the second quarter of 2005, the Company recognized the indefinite reversal provision of APB 23 due to the projected capital needs of its Irish subsidiaries necessary to support continued growth. As such, the Company will no longer record U.S. income taxes on the undistributed earnings of its Irish subsidiaries.

8

## 2.   Interim Financial Statements (continued)

***Share-Based Compensation*** – The Company measures compensation expense for share-based compensation plans using the intrinsic value method.  The intrinsic value method measures compensation cost as the amount by which the fair market value of the common stock exceeds the option exercise price on the measurement date, which is typically the date of grant. Generally, options granted have an exercise price equivalent to the fair market value at the measurement date. Accordingly, no compensation cost has been recorded.  If share-based compensation were recognized using the fair value method, stock options would be valued at grant date using the Black-Scholes valuation model and resulting compensation costs would have decreased net income as indicated below (Dollars in thousands, except per share data):

| | For the Six Months Ended June 30, | | For the Three Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2005 | 2004 |
| Net income as reported | $     85,075 | $     70,549 | $     44,127 | $     33,996 |
| Deduct: Total share-based employee compensation expense determined under the fair value method for all awards, net of related tax effects | (2,196) | (5,176) | (1,388) | (3,691) |
| Pro forma net income | $     82,879 | $     65,373 | $     42,739 | $     30,305 |
| | | | | |
| Earnings per share: | | | | |
| Basic-as reported | $     1.27 | $     1.07 | $     0.66 | $     0.51 |
| Basic-pro forma | $     1.24 | $     0.99 | $     0.64 | $     0.46 |
| | | | | |
| Diluted-as reported | $     1.24 | $     1.04 | $     0.64 | $     0.50 |
| Diluted-pro forma | $     1.21 | $     0.97 | $     0.63 | $     0.45 |

The fair value of each option grant was estimated on the date of grant using the Black-Scholes valuation model with the following assumptions for the six months ended June 30, 2005 and 2004, respectively: an average assumed risk-free interest rate of 3.93% and 2.89%, an expected life of four years, an average expected volatility of 42.87% and 52.84%, and an average dividend yield of 0.19% and 0.17%.

For the three months ended June 30, 2005 and 2004, respectively, the following assumptions were used in the Black-Scholes valuation model: an assumed risk-free interest rate of 3.73% and 3.40%, an expected life of four years, an average expected volatility of 41.58% and 51.73%, and a dividend yield of 0.21% and 0.16%.

***Earnings Per Share*** – Basic earnings per share ('EPS') were computed by dividing net income by the weighted-average number of common shares outstanding during the quarter. Diluted EPS reflects the potential dilution that could occur if contracts to issue common stock were exercised into common stock that then shared in the earnings of the Company. The reconciliation from Basic to Diluted EPS is as follows (Dollars in thousands, except per share data):

| | For the Six Months Ended June 30, | | For the Three Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2005 | 2004 | 2005 | 2004 |
| Income available to common stockholders | $     85,075 | $     70,549 | $     44,127 | $     33,996 |
| | | | | |
| Basic weighted-average shares outstanding | 66,761,409 | 65,976,331 | 66,803,946 | 66,115,552 |
| Dilutive effect of stock options | 1,682,240 | 1,731,942 | 1,443,415 | 1,583,639 |
| Diluted weighted-average shares outstanding | 68,443,649 | 67,708,273 | 68,247,361 | 67,699,191 |
| | | | | |
| Earnings per share: | | | | |
| Basic | $     1.27 | $     1.07 | $     0.66 | $     0.51 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Diluted | $ | 1.24 | $ | 1.04 | $ | 0.64 | $ | 0.50 |

9

2.   **Interim Financial Statements (continued)**

There were 13,917 and 42,109 options which were not considered dilutive for purposes of EPS calculations for the six-month periods ended June 30, 2005 and 2004, respectively.  For the three-month periods ended June 30, 2005 and 2004 there were 92,274 and 193,514 options, respectively, which were not considered dilutive for purposes of EPS calculations.

*Recently Issued Accounting Pronouncements*

In December 2004, the Financial Accounting Standards Board ('FASB') issued SFAS No. 123 (revised 2004), *Share-Based Payment*. SFAS No. 123R requires that compensation cost relating to share-based payment transactions be recognized in the financial statements with measurement based upon the fair value of the equity or liability instruments issued. The Company currently uses the intrinsic value method to measure compensation cost related to its share-based transactions. SFAS No. 123R replaces SFAS No. 123, *Accounting for Stock-Based Compensation*, and supersedes APB Opinion No. 25, *Accounting for Stock Issued to Employees.*

In March 2005, the SEC issued Staff Accounting Bulletin ('SAB') No. 107, which expresses the views of the SEC regarding the interaction of SFAS No. 123R and certain SEC regulations and provides the SEC's views regarding the valuation of share-based payment arrangements for public companies.

In April 2005, the SEC issued Release 2005-57, which delays the effective date for SFAS No. 123R to reporting periods in the first fiscal year beginning after June 15, 2005.

Accordingly, the Company expects to adopt SFAS No. 123R and follow the guidance of SAB 107 beginning on January 1, 2006.  The Company is in the process of determining the valuation methodology it will use under the fair value method and is assessing the impact the adoption of SFAS No. 123R will have on its results of operations and financial condition.  The Company does not anticipate any material impact to its financial condition or results of operations as a result of the adoption of SFAS No. 123R.

In May 2005, the FASB issued SFAS No. 154, *Accounting Changes and Error Corrections- a replacement of APB Opinion No. 20 and FASB Statement No. 3*.  SFAS No. 154 replaces APB Opinion No. 20, *Accounting Changes,* and FASB Statement No. 3, *Reporting Accounting Changes in Interim Financial Statements,* and changes the accounting and reporting requirements for a change in accounting principle. SFAS No. 154 applies to all voluntary changes in an accounting principle, as well as to changes required by a new accounting pronouncement in the unusual instance that the pronouncement does not include specific transition provisions.  SFAS No. 154 is effective for accounting changes and error corrections made in fiscal years beginning after December 15, 2005 and requires retrospective application to prior periods' financial statements for most voluntary changes in an accounting principle, unless it is impracticable to do so. The Company does not anticipate any material impact to its financial condition or results of operations as a result of the adoption of SFAS No. 154.

10

## 3.  Securities

Amortized cost amounts and fair values of securities are summarized as follows as of June 30, 2005 (Dollars in thousands):

| Held to Maturity | Amortized Cost | | Unrealized Gains | | Unrealized (Losses) | | Fair Value | |
|---|---|---|---|---|---|---|---|---|
| Mortgage-backed securities | $ | 4,495,423 | $ | 15,005 | $ | (9,678) | $ | 4,500,750 |
| Federal agency securities | | 2,349,721 | | 1,575 | | (20,723) | | 2,330,573 |
| State and political subdivisions | | 119,384 | | 6,246 | | (62) | | 125,568 |
| Total | $ | 6,964,528 | $ | 22,826 | $ | (30,463) | $ | 6,956,891 |

| Available for Sale | Amortized Cost | | Unrealized Gains | | Unrealized (Losses) | | Fair Value | |
|---|---|---|---|---|---|---|---|---|
| Mortgage-backed securities | $ | 3,954,308 | $ | 15,580 | $ | (18,916) | $ | 3,950,972 |
| State and political subdivisions | | 358,979 | | 15,316 | | (48) | | 374,247 |
| Corporate debt | | 177,038 | | 1,048 | | (1,896) | | 176,190 |
| Foreign government securities | | 10,072 | | 192 | | — | | 10,264 |
| Total | $ | 4,500,397 | $ | 32,136 | $ | (20,860) | $ | 4,511,673 |

Amortized cost amounts and fair values of securities are summarized as follows as of December 31, 2004 (Dollars in thousands):

| Held to Maturity | Amortized Cost | | Unrealized Gains | | Unrealized (Losses) | | Fair Value | |
|---|---|---|---|---|---|---|---|---|
| Mortgage-backed securities | $ | 3,543,961 | $ | 13,269 | $ | (7,802) | $ | 3,549,428 |
| Federal agency securities | | 2,274,665 | | 1,658 | | (18,443) | | 2,257,880 |
| State and political subdivisions | | 124,091 | | 6,090 | | (27) | | 130,154 |
| Total | $ | 5,942,717 | $ | 21,017 | $ | (26,272) | $ | 5,937,462 |

| Available for Sale | Amortized Cost | | Unrealized Gains | | Unrealized (Losses) | | Fair Value | |
|---|---|---|---|---|---|---|---|---|
| Mortgage-backed securities | $ | 3,848,255 | $ | 21,596 | $ | (14,951) | $ | 3,854,900 |
| State and political subdivisions | | 384,859 | | 20,110 | | (60) | | 404,909 |
| Corporate debt | | 177,201 | | 911 | | (1,566) | | 176,546 |
| U.S. Treasury securities | | 113,843 | | 4,845 | | — | | 118,688 |
| Foreign government securities | | 10,302 | | 160 | | — | | 10,462 |
| Total | $ | 4,534,460 | $ | 47,622 | $ | (16,577) | $ | 4,565,505 |

The carrying value of securities pledged amounted to approximately $6.9 billion and $6.3 billion at June 30, 2005 and December 31, 2004, respectively. Securities are pledged primarily to secure clearings with other depository institutions, to secure repurchase agreements and to secure outstanding Federal Home Loan Bank of Boston ('FHLBB') borrowings.

On a quarterly basis the Company reviews its investment portfolio on a security-by-security basis for any investment that may be other-than-temporarily impaired. In its evaluation, the Company considers the length of time the security has been impaired, the severity of the impairment, the financial condition and future prospects of the issuer, and the Company's ability and intent to hold the security to maturity or until it recovers in value. At June 30, 2005, no securities were considered to be other-than-temporarily impaired.

### 4. Loans

Loans consist of demand loans to custody clients of the Company, including individuals, not-for-profit institutions and mutual fund clients. The loans to mutual funds and other pooled product clients include lines of credit and advances pursuant to the terms of the custody agreements between the Company and those clients to facilitate securities transactions and redemptions. Generally, the loans are, or may be, in the event of default, collateralized with marketable securities held by the Company as custodian. There were no impaired or nonperforming loans at June 30, 2005 and December 31, 2004. In addition, there were no loan charge-offs or recoveries during the six months ended June 30, 2005 nor the year ended December 31, 2004. Loans are summarized as follows (Dollars in thousands):

|  | June 30, 2005 | December 31, 2004 |
|---|---|---|
| Loans to mutual funds | $ 55,886 | $ 22,520 |
| Loans to individuals | 110,477 | 69,402 |
| Loans to others | 43,557 | 42,708 |
| Gross loans | 209,920 | 134,630 |
| Less allowance for loan losses | (100) | (100) |
| Total | $ 209,820 | $ 134,530 |

### 5. Deposits

The following is a summary of deposit balances by type (Dollars in thousands):

|  | June 30, 2005 | December 31, 2004 |
|---|---|---|
| Interest-bearing deposits: |  |  |
| Savings | $4,084,503 | $4,362,895 |
| Time | 112,520 | 97,669 |
| Total interest-bearing deposits | 4,197,023 | 4,460,564 |
| Noninterest-bearing deposits: |  |  |
| Demand | 579,807 | 690,308 |
| Savings | 22,701 | 85,510 |
| Time | 300,000 | 160,000 |
| Total noninterest-bearing deposits | 902,508 | 935,818 |
| Total | $5,099,531 | $5,396,382 |

Time deposits with balances greater than $100,000 totaled $412.5 million and $257.6 million at June 30, 2005 and December 31, 2004, respectively. All time deposits had a maturity of less than three months at June 30, 2005 and December 31, 2004.

### 6. Securities Sold Under Repurchase Agreements

The components of securities sold under repurchase agreements are as follows (Dollars in thousands):

|  | June 30, 2005 | December 31, 2004 |
|---|---|---|
| Repurchase agreements - short term | $4,251,699 | $3,655,497 |
| Repurchase agreements - long term | 600,000 | 600,000 |
| Total | $4,851,699 | $4,255,497 |

Approximately $5.0 billion and $4.3 billion of securities were pledged to collateralize repurchase agreements as of June 30, 2005 and December 31, 2004, respectively.

12

## 7.   Short-term and Other Borrowings

The components of short-term and other borrowings are as follows (Dollars in thousands):

|  | June 30, 2005 | | December 31, 2004 |
| --- | --- | --- | --- |
| Federal Funds purchased | $1,303,326 | $ | 344,491 |
| Federal Home Loan Bank of Boston short-term advances | — | | 200,000 |
| Federal Home Loan Bank of Boston long-term advances | 50,000 | | 50,000 |
| Treasury, Tax and Loan account | 114 | | 190 |
| Total | $1,353,440 | $ | 594,681 |

The Company has borrowing arrangements with the FHLBB and the Federal Reserve Discount Window, which have been utilized on an overnight, short-term and long-term basis to satisfy funding requirements.  Approximately $1.8 billion and $1.6 billion of securities were pledged to collateralize these advances as of June 30, 2005 and December 31, 2004, respectively.

## 8.   Stockholders' Equity

As of June 30, 2005, the Company's authorized capital stock consisted of 1,000,000 shares of Preferred Stock and 175,000,000 shares of Common Stock, all with a par value of $0.01 per share.

The Company has four equity incentive plans: the Amended and Restated 1995 Stock Plan ('Stock Plan'), the Amended and Restated 1995 Non-Employee Director Stock Option Plan ('Director Plan'), the 1997 Employee Stock Purchase Plan ('ESPP') and the 2005 Equity Incentive Plan, which was approved by the stockholders on April 14, 2005 (the '2005 Plan').  The 2005 Plan supersedes both the Stock Plan and the Director Plan, both of which expire in November 2005. There were no amendments to any plans during the six months ended June 30, 2005.

During the six months ended June 30, 2005, the following activity occurred under the Director Plan, the Stock Plan and the 2005 Plan:

|  | June 30, 2005 | | |
| --- | --- | --- | --- |
|  | Shares | | Weighted-Average Exercise Price |
| Outstanding at December 31, 2004 | 5,929,352 | $ | 28 |
| Granted | 52,366 | | 47 |
| Exercised | (250,624) | | 30 |
| Canceled | (38,265) | | 33 |
| Outstanding at June 30, 2005 | 5,692,829 | $ | 28 |
| Outstanding and Exercisable at June 30, 2005 | 4,884,575 | | |

13

## 8.    Stockholders' Equity (continued)

A summary of activity under the ESPP is as follows:

|  | For the Six Months Ended June 30, 2005 | For the Year Ended December 31, 2004 |
|---|---|---|
| Total shares available under the ESPP, beginning of period | 636,267 | 227,504 |
| Approved increase in shares available | — | 500,000 |
| Issued at June 30 | (54,862) | (47,681) |
| Issued at December 31 | — | (43,556) |
| Total shares available under the ESPP, end of period | 581,405 | 636,267 |

Purchases under the ESPP are made two times a year on the last business day of each payment period.  The purchase price is equal to the lesser of (i) 90% of the market value of the Common Stock on the first business day of the payment period, or (ii) 90% of the market value of the Common Stock on the last business day of the payment period.  The payment periods consist of two six-month periods, January 1 through June 30 and July 1 through December 31.

For the six-month period ended June 30, 2005, the purchase price of the stock was $34.25, or 90% of the market value of the Common Stock on the last business day of the payment period ending June 30, 2005.

During the year ended December 31, 2004, the purchase prices of the stock were $35.00 and $38.75, or 90% of the market value of the Common Stock on the first business day of the payment periods ending June 30, 2004 and December 31, 2004, respectively.

In July 2005, the Company announced that its Board of Directors authorized a repurchase plan of up to $150 million of the Company's common stock over the next twelve months.

## 9.    Employee Benefit Plans

*Pension Plan -* The Company has a trusteed, noncontributory, qualified defined benefit pension plan covering substantially all of its employees who were hired before January 1, 1997.  The benefits are based on years of service and the employee's compensation during employment.  Generally, the Company's funding policy is to contribute annually the maximum amount that can be deducted for federal income tax purposes.  Contributions are intended to provide not only for benefits attributed to service to date, but also for benefits expected to be earned in the future.  The plan document was amended in December 2004 to freeze benefit accruals for certain highly compensated participants as of December 31, 2004.  The Company uses a December 31 measurement date for this plan.

|  | For the Six Months Ended | | For the Three Months Ended | |
|---|---|---|---|---|
|  | June 30, 2005 | June 30, 2004 | June 30, 2005 | June 30, 2004 |
| Service cost-benefits earned / benefit obligations | $ 372 | $ 463 | $ 186 | $ 177 |
| Interest cost on projected benefit obligations | 572 | 555 | 286 | 204 |
| Expected return on plan assets | (718) | (725) | (359) | (358) |
| Net amortization and deferral | 156 | 120 | 78 | 58 |
| Net periodic pension cost | $ 382 | $ 413 | $ 191 | $ 81 |

*Supplemental Retirement Plan -* The Company also has a nonqualified, unfunded, supplemental retirement plan ('SERP') which was established in 1994 and covers certain employees and pays benefits that supplement any benefits paid under the qualified plan.  Benefits under the SERP are generally based on compensation not includable in the calculation of benefits to be paid under the qualified plan.  The Company uses a December 31 measurement date for this plan.

### 9.    Employee Benefit Plans (continued)

Net periodic pension cost for the Company's SERP included the following components (Dollars in thousands):

|  | For the Six Months Ended | | For the Three Months Ended | |
| --- | --- | --- | --- | --- |
|  | June 30, 2005 | June 30, 2004 | June 30, 2005 | June 30, 2004 |
| Service cost-benefits earned / benefit obligations | $    888 | $    476 | $    444 | $    238 |
| Interest cost on projected benefit obligations | 736 | 484 | 368 | 242 |
| Net amortization and deferral | 544 | 296 | 272 | 148 |
| Net periodic pension cost | $  2,168 | $  1,256 | $  1,084 | $    628 |

During 2005, the Company expects to contribute up to $4 million, but no more than the maximum deductible contribution the Company can make for the fiscal year to its pension plan. During the six-month period ended June 30, 2005, the Company did not make any contributions to the plan.

At June 30, 2005, the SERP remained an unfunded plan. Consistent with the Company's expectations at December 31, 2004, no contributions to the SERP are anticipated during 2005.

### 10.    Off-Balance Sheet Financial Instruments

*Lines of Credit* - At June 30, 2005, the Company had commitments to mutual funds under collateralized open lines of credit totaling $850.0 million, against which $21.2 million in loans were drawn. The credit risk involved in issuing lines of credit is essentially the same as that involved in extending demand loans. The Company does not anticipate any loss as a result of these lines of credit.

*Securities Lending* - On behalf of its clients, the Company lends securities to creditworthy broker-dealers. In certain circumstances, the Company may indemnify its clients for the fair market value of those securities against a failure of the borrower to return such securities. The Company requires the borrowers to provide collateral in an amount equal to, or in excess of, 102% of the fair market value of U.S. dollar-denominated securities borrowed and 105% of the fair market value of non-U.S. dollar-denominated securities borrowed. The borrowed securities are revalued daily to determine whether additional collateral is necessary. As guarantor, the Company is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee. The Company measures the fair value of its indemnification obligation by marking its securities lending portfolio to market on a daily basis and comparing the value of the portfolio to the collateral holdings position. The fair value of the indemnification obligation to be recorded would be the deficiency of collateral as compared to the value of the securities out on loan.

With respect to the indemnified securities lending portfolio, the cash and U.S. government securities held by the Company as collateral at June 30, 2005 totaled $6.0 billion while the fair value of the portfolio totaled approximately $5.8 billion. Given that the collateral held was in excess of the value of the securities that the Company would be required to replace if the borrower defaulted and failed to return such securities, the Company's indemnification obligation was zero and no liability was recorded.

All securities loans are categorized as overnight loans. The maximum potential amount of future payments that the Company could be required to make would be equal to the market value of the securities borrowed. Since the securities loans are overcollateralized by 2% (for U.S. dollar-denominated securities) to 5% (for non-U.S. dollar-denominated securities) of the fair market value of the loan made, the collateral held by the Company would be used to satisfy the obligation. In addition, each borrowing agreement includes "set-off" language that allows the Company to use any excess collateral on other loans to that borrower to cover any collateral shortfall of that borrower. However, there is a potential risk that the collateral would not be sufficient to cover such an obligation if the security on loan increased in value between the time the borrower defaulted and the time the security is "bought-in." In those instances, the Company would "buy-in" the security using all available collateral and a loss would result from the difference between the value of the security "bought-in" and the value of the collateral held. The Company has never experienced a broker default.

## 11.  Derivative Financial Instruments

*Interest Rate Contracts* - Interest rate contracts involve an agreement with a counterparty to exchange cash flows based on an underlying interest rate index.  A swap agreement involves the exchange of a series of interest payments, either at a fixed or variable rate, based upon the notional amount without the exchange of the underlying principal amount.  The Company's exposure from these interest rate contracts results from the possibility that one party may default on its contractual obligation when the contracts are in a gain position.  The Company has experienced no terminations or defaults by counterparties of interest rate swaps.  Credit risk is limited to the positive fair value of the derivative financial instrument, which is significantly less than the notional value.  As of June 30, 2005, the credit risk related to the Company's interest rate contracts was approximately $10.8 million.

The Company enters into pay-fixed/receive-floating interest rate swap agreements.  These instruments have been designated as cash flow hedges of variable-rate liabilities.  The contractual or notional amounts of the interest rate swap agreements held by the Company were approximately $1.8 billion and $1.6 billion at June 30, 2005 and December 31, 2004, respectively.  These contracts had net fair values of approximately $10.5 million and $1.5 million at June 30, 2005 and December 31, 2004, respectively. These fair values are included in the respective other assets and other liabilities categories on the Company's consolidated balance sheet.

For the six months and the three months ended June 30, 2005, the Company recognized net pre-tax gains of $3.0 million and $0.6 million, respectively, which represented the total ineffectiveness for all cash flow hedges. For both the six months and the three months ended June 30, 2004, total ineffectiveness related to cash flow hedges was $0.9 million.

As of June 30, 2005, the Company expects that approximately $5.2 million of deferred net after-tax gains on derivative contracts included in other comprehensive income will be reclassified to net interest income within the next twelve months. This expectation is based on the net discounted cash flows from derivative instruments hedging short-term variable-rate liabilities, as well as the amortization of gains from the termination of cash flow hedging derivatives.

*Foreign Exchange Contracts* - Foreign exchange contracts involve an agreement to exchange the currency of one country for the currency of another country at an agreed-upon rate and settlement date.  Foreign exchange contracts consist of spot, forward and swap contracts.  Spot contracts call for the exchange of one currency for another and usually settle in two business days.  Forward contracts call for the exchange of one currency for another at a date beyond spot.  In a currency swap, the holder of a currency transacts simultaneously both a spot and a forward transaction in that currency for an equivalent amount of another currency to get temporary liquidity in the currency owned.  The Company's risk from foreign exchange contracts results from the possibility that one party may default on its contractual obligation or from movements in exchange rates.  Credit risk is limited to the positive market value of the derivative financial instrument, which is significantly less than the notional value. The notional value of the Company's foreign exchange contracts as of June 30, 2005 and December 31, 2004 was $8.2 billion and $6.9 billion, respectively.  Unrealized gains or losses resulting from purchases and sales of foreign exchange contracts are included within the respective other assets and other liabilities categories on the Company's consolidated balance sheet.  Unrealized gains in other assets were $125.9 million and $99.6 million as of June 30, 2005 and December 31, 2004, respectively.  Unrealized losses in other liabilities were $125.2 million and $98.5 million as of June 30, 2005 and December 31, 2004, respectively.  Foreign exchange contracts with the same counterparty are netted in the Company's consolidated balance sheet when a master netting agreement exists.  These contracts have not been designated as hedging instruments; therefore, all changes in fair value are included in asset servicing fees.

*Other* - The Company also enters into fixed price purchase contracts that are designed to hedge the variability of the consideration to be paid for the purchase of investment securities.  By entering into these contracts, the Company is fixing the price to be paid at a future date for certain investment securities.  At June 30, 2005 and December 31, 2004, the Company had $114.9 million and $672.2 million, respectively, of fixed price purchase contracts outstanding to purchase investment securities.  The net fair value of the contracts at June 30, 2005 and December 31, 2004 was not significant. Changes in fair value of these cash flow hedges are included as a component of other comprehensive income.

## 12.  Commitments and Contingencies

*Restrictions on Cash Balances* - The Company is required to maintain certain average cash reserve balances.  The average required reserve balance with the Federal Reserve Bank ('FRB') for the two-week period including June 30, 2005 was

approximately $16.3 million. In addition, the Company's balance sheet includes deposits totaling $166.0 million, which were pledged to secure clearings with depository institutions as of June 30, 2005.

16

## 12.  Commitments and Contingencies (continued)

*Contingencies* - Assets held by the Company in a fiduciary capacity are not included in the consolidated balance sheets since these items are not assets of the Company.  Management conducts regular reviews of its fiduciary responsibilities and considers the results in preparing its consolidated financial statements.  In the opinion of management, there were no contingent liabilities at June 30, 2005 that were material to the consolidated financial position or results of operations of the Company.

## 13.  Regulatory Matters

The Company and the Bank are subject to various regulatory capital requirements administered by the federal banking agencies.  Failure to meet minimum capital requirements can initiate certain mandatory and possibly additional discretionary actions by regulators that, if undertaken, could have a direct material effect on the Company's and the Bank's financial statements.  Under capital adequacy guidelines and the regulatory framework for prompt corrective action, the Bank must meet specific capital guidelines that involve quantitative measures of the Bank's assets, liabilities, and certain off-balance sheet items as calculated under regulatory accounting practices.  The Company's and the Bank's capital amounts and classification are also subject to qualitative judgments by the regulators about components, risk weightings, and other factors.

Quantitative measures established by regulation to ensure capital adequacy require the Company and the Bank to maintain minimum amounts and ratios (set forth in the table below) of Total and Tier 1 capital (as defined in the regulations) to risk-weighted assets (as defined), and of Tier 1 capital (as defined) to average assets (as defined).  Management believes, as of June 30, 2005, that the Company and the Bank meet all capital adequacy requirements to which they are subject.

As of June 30, 2005, the most recent notification from the Federal Deposit Insurance Corporation categorized the Company and the Bank as well-capitalized under the regulatory framework for prompt corrective action.  To be categorized as well-capitalized, the Company and the Bank must maintain minimum Total risk-based, Tier 1 risk-based, and Tier 1 leverage ratios as set forth in the table.  There are no conditions or events since that notification that management believes have changed the Company's or the Bank's category.  The following table presents the capital ratios for the Company and the Bank (Dollars in thousands):

|  | Actual | | For Capital Adequacy Purposes | | To Be Well Capitalized Under Prompt Corrective Action Provisions | |
|---|---|---|---|---|---|---|
|  | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| **As of June 30, 2005:** |  |  |  |  |  |  |
| Total Capital |  |  |  |  |  |  |
| (to Risk-Weighted Assets-the |  |  |  |  |  |  |
| Company) | $727,948 | 19.63% | $296,655 | 8.00% | N/A | N/A |
| Total Capital |  |  |  |  |  |  |
| (to Risk-Weighted Assets-the Bank) | $705,812 | 19.05% | $296,455 | 8.00% | $370,569 | 10.00% |
| Tier 1 Capital |  |  |  |  |  |  |
| (to Risk-Weighted Assets-the |  |  |  |  |  |  |
| Company) | $727,848 | 19.63% | $148,327 | 4.00% | N/A | N/A |
| Tier 1 Capital |  |  |  |  |  |  |
| (to Risk-Weighted Assets-the Bank) | $705,711 | 19.04% | $148,228 | 4.00% | $222,342 | 6.00% |
| Tier 1 Capital |  |  |  |  |  |  |
| (to Average Assets-the Company) | $727,848 | 6.05% | $481,336 | 4.00% | N/A | N/A |
| Tier 1 Capital |  |  |  |  |  |  |
| (to Average Assets-the Bank) | $705,711 | 5.87% | $481,256 | 4.00% | $601,570 | 5.00% |
| **As of December 31, 2004:** |  |  |  |  |  |  |
| Total Capital |  |  |  |  |  |  |
| (to Risk-Weighted Assets-the |  |  |  |  |  |  |
| Company) | $636,219 | 20.54% | $247,782 | 8.00% | N/A | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total Capital | | | | | | |
| (to Risk-Weighted Assets-the Bank) | $618,166 | 19.98% | $247,572 | 8.00% | $309,465 | 10.00% |
| Tier 1 Capital | | | | | | |
| (to Risk-Weighted Assets-the Company) | $636,119 | 20.54% | $123,891 | 4.00% | N/A | N/A |
| Tier 1 Capital | | | | | | |
| (to Risk-Weighted Assets-the Bank) | $618,066 | 19.97% | $123,786 | 4.00% | $185,679 | 6.00% |
| Tier 1 Capital | | | | | | |
| (to Average Assets-the Company) | $636,119 | 5.85% | $435,080 | 4.00% | N/A | N/A |
| Tier 1 Capital | | | | | | |
| (to Average Assets-the Bank) | $618,066 | 5.68% | $435,017 | 4.00% | $543,772 | 5.00% |

17

**13.  Regulatory Matters (continued)**

Under Massachusetts law, trust companies such as the Bank, like national banks, may pay dividends no more often than quarterly, and only out of net profits and to the extent that such payments will not impair the Bank's capital stock and surplus account.  Moreover, prior Commissioner approval is required if the total dividends for a calendar year would exceed net profits for that year combined with retained net profits for the previous two years.  These restrictions on the ability of the Bank to pay dividends to the Company may restrict the ability of the Company to pay dividends to its stockholders.

The operations of the Company's securities broker affiliate, Investors Securities Services, LLC, are subject to federal and state securities laws, as well as the rules of both the SEC and the NASD.  Management believes, as of June 30, 2005, that Investors Securities Services, LLC is in material compliance with all of the foregoing requirements to which it is subject.

The operations of the Company's insurance captive affiliate, Investors Vermont Insurance Company (IVIC), are subject to the laws of the State of Vermont Department of Banking, Insurance, Securities and Health Care Administration. Management believes, as of June 30, 2005, that IVIC is in material compliance with all of the requirements to which it is subject.

**14.  Geographic Reporting and Service Lines**

The Company does not utilize segment information for internal reporting as management views the Company as one segment. The following represents net operating revenue and long-lived assets (including goodwill) by geographic area (Dollars in thousands):

| | Net Operating Revenue | | | | Long-Lived Assets | |
| | For the Six Months Ended June 30, | | For the Three Months Ended June 30, | | June 30, | December 31, |
| Geographic Information: | 2005 | 2004 | 2005 | 2004 | 2005 | 2004 |
|---|---|---|---|---|---|---|
| United States | $ 317,369 | $ 291,240 | $ 159,631 | $ 143,197 | $ 139,613 | $ 141,801 |
| Ireland | 18,423 | 13,440 | 9,782 | 7,343 | 5,618 | 5,930 |
| Canada | 2,634 | 2,237 | 1,267 | 1,231 | 155 | 121 |
| Cayman Islands | 85 | 90 | 42 | 45 | — | — |
| Total | $ 338,511 | $ 307,007 | $ 170,722 | $ 151,816 | $ 145,386 | $ 147,852 |

Barclays Global Investors, N.A. ('BGI') accounted for approximately 18% of the Company's consolidated net operating revenues for both the six-month and the three-month periods ended June 30, 2005, and 17% of the Company's consolidated net operating revenues for both the six-month and the three-month periods ended June 30, 2004.  No client other than BGI accounted for more than 10% of the Company's consolidated net operating revenues for the six-month and the three-month periods ended June 30, 2005 and 2004.

The following represents the Company's asset servicing fees by service lines (Dollars in thousands):

| | For the Six Months Ended June 30, | | For the Three Months Ended June 30, | |
| | 2005 | 2004 | 2005 | 2004 |
|---|---|---|---|---|
| Core service fees: | | | | |
| Custody, accounting and administration | $ 178,703 | $ 154,849 | $ 90,159 | $ 78,755 |
| Ancillary service fees: | | | | |
| Foreign exchange | 25,504 | 33,008 | 12,255 | 14,513 |
| Cash management | 16,537 | 12,338 | 9,173 | 6,738 |
| Securities lending | 11,850 | 5,724 | 8,170 | 3,581 |
| Investment advisory | 3,704 | 8,033 | 1,989 | 4,563 |
| Other service fees | 1,403 | 1,228 | 752 | 843 |

| Total ancillary service fees | 58,998 | 60,331 | 32,339 | 30,238 |
|---|---|---|---|---|
| Total asset servicing fees | $ 237,701 | $ 215,180 | $ 122,498 | $ 108,993 |

18

## 15.  Net Interest Income

The components of interest income and interest expense are as follows (Dollars in thousands):

| | For the Six Months Ended June 30, | | For the Three Months Ended June 30, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Interest income: | | | | |
| Federal funds sold and securities sold under repurchase agreements | $ 753 | $ 314 | $ 390 | $ 152 |
| Investment securities held to maturity and available for sale | 201,594 | 140,310 | 105,461 | 67,961 |
| Loans | 3,811 | 2,152 | 2,252 | 1,027 |
| Total interest income | 206,158 | 142,776 | 108,103 | 69,140 |
| Interest expense: | | | | |
| Deposits | 31,363 | 22,274 | 16,118 | 10,904 |
| Securities sold under repurchase agreements | 60,551 | 19,086 | 34,197 | 11,439 |
| Short-term and other borrowings | 24,585 | 10,920 | 15,742 | 4,722 |
| Total interest expense | 116,499 | 52,280 | 66,057 | 27,065 |
| Net interest income | $ 89,659 | $ 90,496 | $ 42,046 | $ 42,075 |

19

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders
of Investors Financial Services Corp.

We have reviewed the accompanying condensed consolidated balance sheet of Investors Financial Services Corp. and subsidiaries (the "Company") as of June 30, 2005, and the related condensed consolidated statements of income and comprehensive income for the three-month and six-month periods ended June 30, 2005 and 2004, and the condensed consolidated statements of stockholders' equity and cash flows for the six-month periods ended June 30, 2005 and 2004. These interim financial statements are the responsibility of the Company's management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Investors Financial Services Corp. and subsidiaries as of December 31, 2004, and the related consolidated statements of income and other comprehensive income, stockholders' equity, and cash flows for the year then ended (not presented herein); and in our report dated February 28, 2005, we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2004 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

*DELOITTE & TOUCHE LLP*

Boston, Massachusetts
August 9, 2005

20

### Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations

*You should read the following discussion together with our Unaudited Condensed Consolidated Financial Statements and related Notes to Unaudited Condensed Consolidated Financial Statements, which are included elsewhere in this Report. The following discussion contains forward-looking statements that reflect plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. See "Certain Factors That May Affect Future Results."*

### Overview

We provide asset administration services for the financial services industry through our wholly-owned subsidiary, Investors Bank & Trust Company. We provide core services and value-added services to a variety of financial asset managers, including mutual fund complexes, investment advisors, family offices, banks and insurance companies. Core services include middle office outsourcing, global custody, multicurrency accounting and fund administration. Value-added services include securities lending, foreign exchange, cash management, performance measurement, institutional transfer agency, investment advisory services, lines of credit and brokerage and transition management services. We have offices located in the United States, Ireland, Canada, and the Cayman Islands with a vast global subcustodian network established to accommodate the international needs of our clients. At June 30, 2005, we provided services for approximately $1.5 trillion in net assets, including approximately $250 billion in foreign net assets.

We grow our business by selling our services to new clients and by further penetrating our existing clients. We believe that we service less than 10% of the assets managed by our existing clients, and we have traditionally achieved significant success in growing client relationships. Our ability to service new clients and expand our relationships with existing clients depends on our provision of superior client service. Our growth is also affected by overall market conditions, the regulatory environment for us and our clients and the success of our clients in marketing their products.

We derive our asset servicing revenue from providing core and value-added services. We derive our net interest income by investing the cash balances our clients leave on deposit with us. Since we price our service offerings on a bundled basis, our share of earnings from these investments is viewed as part of the total compensation that our clients pay us for servicing their assets. In establishing a fee structure for a specific client, we analyze all expected revenue and expenses. We believe net operating revenue (net interest income plus noninterest income) and net income are the most meaningful measures of our financial results.

As an asset administration services company, the amount of net operating revenue that we generate is impacted by overall market conditions, client activity and the prevailing interest rate environment. A significant portion of our core services revenue is based upon the amount of assets under administration. As market values of underlying assets fluctuate, so will our revenue. We have managed this volatility by offering a tiered pricing structure for our asset-based fees. As asset values increase, the basis point fee is reduced for the incremental assets. When asset values decrease, revenue is only impacted at the then marginal rate. Many of our value-added services are transactional based, and we receive a fee for each transaction processed. We have continued to experience net interest margin compression during the first half of 2005 versus 2004 due to a flatter yield curve and lower reinvestment spreads and the liability sensitive nature of our balance sheet. Because we are a liability sensitive institution, as overnight interest rates rise, most of our liabilities reprice but our assets take longer to reprice due to the nature of their reset provisions (i.e., monthly, quarterly and annually). The lower interest rate spreads were also due to the narrowing of market spreads on reinvestment and purchase opportunities of fixed and floating-rate investment assets.

We remain focused on our sales efforts, prudent expense management and increasing our operating efficiency. These goals are complicated by the need to build infrastructure to support our rapid growth, the need to maintain state-of-the-art systems and the need to retain and motivate our workforce.

21

**Certain Factors That May Affect Future Results**

From time to time, information provided by us, statements made by our employees, or information included in our filings with the Securities and Exchange Commission (including this Form 10-Q) may contain statements which are not historical facts, so-called "forward-looking statements," which are made under Section 21E of the Securities Exchange Act of 1934 and which involve risks and uncertainties. These statements relate to future events or our future financial performance and are identified by words such as "may," "will," "could," "should," "expect," "plan," "intend," "seek," "anticipate," "believe," "estimate," "potential," or "continue" or other comparable terms or the negative of those terms. Forward-looking statements in this Form 10-Q include certain statements regarding liquidity, growth rate, annual dividend payments, interest rate conditions, interest rate sensitivity, compliance with capital adequacy guidelines, loss exposure on lines of credit, the timing and effect on earnings of derivative gains and losses and the reclassification of net after-tax gains on derivative contracts, securities lending revenue, net interest income, operating expenses, including occupancy needs, professional fee expense, travel and sales expense, investments in technology and compensation expense, pension plan and supplemental pension expense, depreciation expense, effective tax rate, investments in FHLBB capital stock, the effect on earnings of changes in equity values or fixed income, our ability to execute our stock repurchase plan, and the effect of certain legal claims against us. Our actual future results may differ significantly from those stated in any forward-looking statements. Factors that may cause such differences include, but are not limited to, the factors discussed below. Each of these factors, and others, are discussed from time to time in our filings with the SEC.

*Our operating results are subject to fluctuations in interest rates and the securities markets.*

A significant portion of our fees is based on the market value of the assets we process. Accordingly, our operating results are subject to fluctuations in interest rates and securities markets as these fluctuations affect the market value of assets processed. Current market conditions, including the recent volatility in the equity markets, can have a material effect on our asset-based fees. While reductions in asset servicing fees may be offset by increases in other sources of revenue, a sustained downward movement of the broad equity markets will likely have an adverse impact on our earnings.

Our growth depends in part on the ability of our clients to generate fund flows by selling their investment products to new and existing investors. Fluctuations in interest rates or the securities markets can lead to investors seeking alternatives to the investment offerings of our clients, which could result in a lesser amount of assets processed and correspondingly lower fees. For example, if the value of equity assets held by our clients were to increase or decrease by 10%, we estimate currently that this, by itself, would cause a corresponding change of approximately 3% in our earnings per share. If the value of fixed-income assets held by our clients were to increase or decrease by 10%, we estimate currently that this, by itself, would cause a corresponding change of approximately 2% in our earnings per share.

Our net interest income is earned by investing depositors' funds in our investment portfolio and, in small part, by making loans. A rising interest rate environment, such as we are now experiencing, generally causes downward pressure on net interest income. Changes in the relationship between short-term and long-term interest rates, referred to as the yield curve, could also adversely affect the market value of, or the earnings produced by, our investment and loan portfolios, and thus could adversely affect our operating results. The current flattening yield curve, where short-term rates have increased while long-term rates have failed to increase, has resulted in a decrease in our net interest margin that may continue to have a material impact on our net interest income.

In addition, we are experiencing narrower investment portfolio reinvestment spreads. If reinvestments spreads on the security types we purchase remain narrow, or become narrower, our net interest income could be impacted negatively.

*A material portion of our revenue is derived from our relationship with Barclays Global Investors, N.A. ('BGI') and related entities.*

As a result of our selection to service assets for Barclays Global Investors Canada, Ltd., our assumption of the operations of the U.S. asset administration unit of BGI in 2001 and our ongoing relationship with BGI's iShares and Master Investment Portfolios, BGI accounted for approximately 18% of our net operating revenue during both the six months and the three months ended June 30, 2005. We expect that BGI will continue to account for a significant portion of our net operating revenue. While we provide services to BGI under long-term contracts (that expire in 2006), those contracts may be terminated for certain regulatory and fiduciary reasons. The loss of BGI's business would cause our net

operating revenue to decline significantly and would likely have an adverse effect on our quarterly and annual results.

22

*We may incur losses due to operational errors.*

The services that we provide require complex processes and interaction with numerous third parties. While we maintain sophisticated computer systems and a comprehensive system of internal controls, and our operational history has been excellent, from time to time we may make operational errors for which we are responsible to our clients. In addition, even though we maintain appropriate errors and omissions and other insurance policies, an operational error could result in a significant liability to us and may have a material adverse effect on our results of operations.

*We face significant competition from other financial services companies, which could negatively affect our operating results.*

We are part of an extremely competitive asset servicing industry. Many of our current and potential competitors have longer operating histories, greater name recognition and substantially greater financial, marketing and other resources than we do. These greater resources could, for example, allow our competitors to develop technology superior to our own. In addition, we face the risk that large mutual fund complexes may build in-house asset servicing capabilities and no longer outsource these services to us. As a result, we may not be able to compete effectively with current or future competitors, which could result in a loss of existing clients or difficulty in gaining new clients.

*We may incur significant costs defending legal claims.*

We have been named in a lawsuit in U.S. District Court in Massachusetts alleging, among other things, violations of securities laws. In addition, we have been named in a lawsuit in Massachusetts state court alleging, among other things, violations of a covenant of good faith and fair dealing in a contract. While we believe these claims are without merit, we cannot be sure that we will prevail in the defense of these claims. We are also party to other litigation and we may become subject to other legal claims in the future. Litigation is costly and could divert the attention of management.

*Our future results depend, in part, on successful integration of prior and possible future acquisitions and outsourcing transactions.*

Integration of acquisitions and outsourcing transactions is complicated and frequently presents unforeseen difficulties and expenses which can affect whether and when a particular acquisition or outsourcing transaction will be accretive to our earnings per share. Any future acquisitions or outsourcing transactions will present similar challenges. These acquisitions or outsourcing transactions can also consume a significant amount of management's time.

*The failure to properly manage our growth could adversely affect the quality of our services and result in the loss of clients.*

We have experienced a period of rapid growth that has required the dedication of significant management and other resources. Continued rapid growth could place a strain on our management and other resources. To manage future growth effectively, we must continue to invest in our operational, financial and other internal systems, and our human resources, which could affect our profitability.

*We must hire and retain skilled personnel in order to succeed.*

Qualified personnel, in particular managers and other senior personnel, are in great demand throughout the financial services industry. As a result, we could find it increasingly difficult to continue to attract and retain sufficient numbers of these highly skilled employees, which could affect our ability to attract and retain clients.

*We may not be able to protect our proprietary technology.*

Our proprietary technology is important to our business. We rely on trade secret, copyright and trademark laws and confidentiality agreements with employees and third parties to protect our proprietary technology, all of which offer only limited protection. These intellectual property rights may be invalidated or our competitors may develop similar technology independently. Legal proceedings to enforce our intellectual property rights may be unsuccessful, and could also be expensive and divert management's attention.

http://www.sec.gov/Archives/edgar/data/940589/000110465905037...

*Our quarterly and annual operating results may fluctuate.*

Our quarterly and annual operating results are difficult to predict and may fluctuate from quarter to quarter and annually for several reasons, including:

- The timing of commencement or termination of client engagements;

- Changes in interest rates, the relationship between different interest rates or equity values;

- The rate of net inflows and outflows of investor funds in the investment vehicles offered by our clients; and

- The timing and magnitude of share repurchases under our share repurchase plan.

Most of our expenses, such as employee compensation and rent, are relatively fixed. As a result, any shortfall in revenue relative to our expectations could significantly affect our operating results.

*We are subject to extensive federal and state regulations that impose complex restraints on our business.*

Federal and state laws and regulations applicable to financial institutions and their parent companies apply to us. Our primary regulators are the Federal Reserve Board ('FRB'), the Federal Deposit Insurance Corporation ('FDIC'), the Massachusetts Commissioner of Banks, the National Association of Securities Dealers, Inc. ('NASD'), and the State of Vermont Department of Banking, Insurance, Securities and Health Care Administration ('BISHCA'). Virtually all aspects of our operations are subject to specific requirements or restrictions and general regulatory oversight including the following:

- The FRB and the FDIC maintain capital requirements that we must meet. Failure to meet those requirements could lead to severe regulatory action or even receivership. We are currently considered to be "well capitalized";

- Under Massachusetts law, the Bank may be restricted in its ability to pay dividends to Investors Financial Services Corp., which may in turn restrict our ability to pay dividends to our stockholders;

- The FRB and the FDIC are empowered to assess monetary penalties against, and to order termination of activities by, companies or individuals who violate the law;

- The NASD maintains certain regulatory requirements that our securities broker affiliate, Investors Securities Services, LLC, must meet. Failure to meet those requirements could lead to severe regulatory action;

- BISHCA maintains certain regulatory requirements that our insurance captive affiliate, Investors Vermont Insurance Company, must meet. Failure to meet those requirements could lead to regulatory action; and

- Our international operations are subject to regulatory oversight by regulators in the jurisdictions in which we operate, including the Office of the Superintendent of Financial Institutions in Canada, the Irish Financial Services Regulatory Authority and the Cayman Islands Monetary Authority. Failure to comply with applicable international regulatory requirements could result in regulatory action and impact our ability to provide services in those jurisdictions.

Banking law restricts our ability to own the stock of certain companies and also makes it more difficult for us to be acquired. Also, we have not elected financial holding company status under the federal Gramm-Leach-Bliley Act of 1999. This may place us at a competitive disadvantage with respect to other organizations.

## Statements of Income

### *Comparison of Operating Results for the Six and Three Months Ended June 30, 2005 and 2004*

Net income for the six-month and three-month periods ended June 30, 2005 increased 21% to $85.1 million, and increased 30% to $44.1 million, respectively, from the same periods in 2004. The overall increase in net income for both the six-month and three-month period comparisons resulted from higher asset servicing fees, reflecting strong client fund flows combined with our continued ability to sell to new and existing clients. The increases in net income for both periods were also due to gains from sales of investment securities in the first half of 2005, as well as a one-time tax benefit related to our recognition of the indefinite reversal provisions of Accounting Principles Board Opinion No. 23, *Accounting for Income Taxes – Special Area*s ('APB 23'), in the second quarter of 2005. See Note 2 in 'Notes to Unaudited Condensed Consolidated Financial Statements' for further discussion of the one-time tax benefit. The increases in net income for the six-month and three-month periods ended June 30, 2005 were partially offset by increases in operating expenses, reflecting continued growth in headcount and technology to support new and existing clients.

Fees and Other Revenue

The components of fees and other revenue are as follows (Dollars in thousands):

|  | For the Six Months Ended June 30, | | | For the Three Months Ended June 30, | | |
|  | 2005 | 2004 | Change | 2005 | 2004 | Change |
|---|---|---|---|---|---|---|
| Total asset servicing fees | $ 237,701 | $ 215,180 | 10% | $ 122,498 | $ 108,993 | 12% |
| Other operating income | 1,411 | 1,097 | 29% | 626 | 748 | (16)% |
| Gain on sale of investment | 9,740 | 234 | 4,062% | 5,552 | — | 100% |
| Total fees and other revenue | $ 248,852 | $ 216,511 | 15% | $ 128,676 | $ 109,741 | 17% |

The largest components of asset servicing fees are custody, accounting and administration, which increased 15% to $178.7 million, and increased 14% to $90.2 million, for the six month and three month periods ended June 30, 2005, respectively, from the same periods in 2004. The increase in custody, accounting and administration fees in both the six month and three month periods is primarily due to growth in assets processed resulting from fund flows and market value gains and further penetration of existing clients. Assets processed is the total dollar value of financial assets on the reported date for which we provide one or more of the following services: middle office outsourcing, global custody, multicurrency accounting, fund administration, securities lending, foreign exchange, cash management, performance measurement, institutional transfer agency, investment advisory services, lines of credit and brokerage and transition management services. The change in net assets processed includes the following components (Dollars in billions):

|  | For the Six Months Ended June 30, 2005 | For the Three Months Ended June 30, 2005 |
|---|---|---|
| Net assets processed, beginning of period | $ 1,430 | $ 1,469 |
| Change in net assets processed: | | |
| Sales to new clients | 2 | 1 |
| Further penetration of existing clients | 21 | 14 |
| Lost clients | (11) | (2) |
| Fund flows and market gain | 54 | 14 |
| Total change in net assets processed | 66 | 27 |
| Net assets processed, end of period | $ 1,496 | $ 1,496 |

The majority of the increase in assets processed for the six months ended June 30, 2005 was due to the ability of our clients to develop and sell product, which generates fund flows that have a direct, positive impact on our business. The increase in assets processed for the three months ended June 30, 2005 was due to client fund flows and sales to new and existing clients. As indicated in the 'Overview' section, our core services fees are generated by charging a fee based upon the value of assets processed. As market values or clients' asset levels fluctuate, so will our revenue. Our tiered pricing structure, coupled with minimum and flat fees, allow us to manage this volatility to a certain extent. As asset values

http://www.sec.gov/Archives/edgar/data/949588/0001 10465905037...

increase, the basis point fee typically lowers. When asset values decrease, revenue is only impacted by the asset decline at the then marginal rate.

      If the value of equity assets held by our clients were to increase or decrease by 10%, we estimate currently that this, by itself, would cause a corresponding change of approximately 3% in our earnings per share. If the value of fixed-income assets held by our

25

clients were to increase or decrease by 10%, we estimate currently that this, by itself, would cause a corresponding change of approximately 2% in our earnings per share. In practice, earnings per share do not track precisely to the value of the equity and fixed-income markets because conditions present in a market increase or decrease may generate offsetting increases or decreases in other revenue items. For example, market volatility often results in increased transaction fee revenue. Also, market declines may result in increased interest income and sweep fee income as clients move larger amounts of assets into the cash management vehicles that we offer. However, there can be no assurance that these offsetting revenue increases will occur during any future downturn in the equity or fixed-income markets.

Transaction-driven income, a component of asset servicing fees, includes our ancillary services, such as foreign exchange, cash management, securities lending and investment advisory services.

• Foreign exchange fees were $25.5 million for the six-month period ended June 30, 2005, down 23% from the same period in 2004, and were $12.3 million for the three-month period ended June 30, 2005, down 16% from the same period in 2004. The decrease in foreign exchange fees is primarily attributable to lower volatility in currency markets. Future foreign exchange income is dependent on the volume of client activity and the overall volatility in the currencies traded.

• Cash management fees, which consist of sweep fees, were $16.5 million for the six months ended June 30, 2005, up 34% from the same period in 2004, and were $9.2 million for the three months ended June 30, 2005, up 36% from the same period in 2004. The increase is primarily due to higher balances placed by our clients in the cash management products we offer. Cash management revenue will continue to depend on the level of client balances maintained in the cash management products we offer. If our clients' investment products continue to maintain increasing cash balances, we expect our cash management revenue to be positively impacted.

• Securities lending fees were $11.9 million for the six months ended June 30, 2005, up 107% from the same period in 2004, and were $8.2 million for the three-month period ended June 30, 2005, up 128% from the same period in 2004. The increase in securities lending fees in both periods was due to higher volumes and improved market conditions. Securities lending transaction volume is positively affected by the market value of the securities on loan, merger and acquisition activity, increased IPO activity and a steeper short end of the yield curve. If the capital markets experience any of the aforementioned activity, it is likely that our securities lending revenue will be positively impacted. If we experience a reduction in our securities lending portfolio, lower market values and compression of the spreads earned on securities lending activity, our securities lending revenue will likely be negatively impacted. In addition, second quarter securities lending fees are typically seasonally higher due to the dividend arbitrage opportunity on foreign securities.

• Investment advisory fees were $3.7 million for the six months ended June 30, 2005, down 54% from the same period in 2004, and were $2.0 million for the three-month period ended June 30, 2005, down 56% from the same period in 2004. The decrease in investment advisory fees is attributable to lower asset levels in our proprietary Merrimac money market funds combined with advisory fee waivers on certain of the funds. Future investment advisory fee income is dependent upon asset levels within the Merrimac money market funds, which are driven by overall market conditions, client activity and transaction volumes. The Company discontinued advisory fee waivers in the second quarter of 2005.

• Other service fees for the six months ended June 30, 2005 were $1.4 million, up 14% from the same period last year, and were $0.8 million for the three months ended June 30, 2005, down 11% from the same period in 2004. Other service fees primarily include income earned on brokerage and transition management services, which were provided in greater volume in the first half of 2005 compared to the same period in 2004. The decrease in other service fees from the three-month period ended June 30, 2004 to the same period in 2005 was due to a one-time transition for a large client in the second quarter of 2004.

Other operating income for the six months ended June 30, 2005 was $1.4 million, up 29% from the same period in 2004, and was $0.6 million for the three months ended June 30, 2005, down 16% from the same period in 2004. The increase in the six-month period was primarily due to an increase in stock dividend income from Federal Home Loan Bank of Boston ('FHLBB') from 2004. The decrease in the three-month period was due to a one-time client system enhancement project that was completed in the second quarter of 2004.

During the first half of 2005, we sold municipal securities and U.S. Treasury securities held in our available for sale portfolio, resulting in the recognition of $9.7 million and $5.6 million in gains for the six-month and three-month periods ended June 30, 2005, respectively. These security sales were the result of our strategy to improve the after-tax yield of our municipal securities portfolio by replacing certain municipal securities sold with those that offer a more attractive after-tax yield, as well as to capitalize on strong market conditions.

26

*Net Interest Income*

The following table presents the components of net interest income (Dollars in thousands):

| | For the Six Months Ended June 30, | | | For the Three Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2005 | 2004 | Change | 2005 | 2004 | Change |
| Interest income | $ 206,158 | $ 142,776 | 44% | $ 108,103 | $ 69,140 | 56% |
| Interest expense | 116,499 | 52,280 | 123% | 66,057 | 27,065 | 144% |
| Total net interest income | $ 89,659 | $ 90,496 | (1)% | $ 42,046 | $ 42,075 | — |

Net interest income is affected by the volume and mix of assets and liabilities and the movement and level of interest rates. The slight decrease in our net interest income for both the six-month and three-month periods ended June 30, 2005, was primarily driven by lower interest rate spreads, which was partially offset by growth in our investment portfolio. Lower interest rate spreads were due to increasing short-term interest rates without a concurrent increase in longer-term rates, which resulted in a flattening yield curve. Consequently, our interest-bearing liabilities, of which the majority is priced based on overnight floating rates, have repriced faster than our interest-earning assets, resulting in a lower net interest margin. In addition, reinvestment and purchase spreads on fixed and floating-rate assets were lower than expected due to higher market demand, especially for shorter-term and floating-rate fixed income investments. Average investment security balances were higher in 2005 by approximately $1.8 billion in both the six-month and three-month periods ended June 30, 2005 compared to the same periods in 2004.

The table below presents the changes in net interest income resulting from changes in the volume of interest-earning assets or interest-bearing liabilities and changes in interest rates for the six months and the three months ended June 30, 2005 compared to the same periods in 2004. Changes attributed to both volume and rate have been allocated based on the proportion of change in each category (Dollars in thousands):

| | For the Six Months Ended June 30, 2005 | | | For the Three Months Ended June 30, 2005 | | |
|---|---|---|---|---|---|---|
| | Change Due to Volume | Change Due to Rate | Net | Change Due to Volume | Change Due to Rate | Net |
| Interest-earning assets: | | | | | | |
| Federal Funds sold and securities purchased under resale agreements | $ (45) | $ 484 | $ 439 | $ (26) | $ 264 | $ 238 |
| Investment securities | 31,083 | 30,201 | 61,284 | 15,099 | 22,401 | 37,500 |
| Loans | 152 | 1,507 | 1,659 | 460 | 765 | 1,225 |
| Total interest-earning assets | $ 31,190 | $ 32,192 | $ 63,382 | $ 15,533 | $ 23,430 | $ 38,963 |
| Interest-bearing liabilities: | | | | | | |
| Deposits | $ (4,272) | $ 13,361 | $ 9,089 | $ (3,270) | $ 8,484 | $ 5,214 |
| Borrowings | 22,983 | 32,147 | 55,130 | 14,155 | 19,623 | 33,778 |
| Total interest-bearing liabilities | $ 18,711 | $ 45,508 | $ 64,219 | $ 10,885 | $ 28,107 | $ 38,992 |
| Change in net interest income | $ 12,479 | $ (13,316) | $ (837) | $ 4,648 | $ (4,677) | $ (29) |

In addition to investing in both variable and fixed-rate securities, we use derivative instruments to manage our exposure to interest rate risk. See the 'Market Risk' section for more detailed information.

27

The following tables present average balances, interest income and expense, and yields earned or paid on the major categories of assets and liabilities for the periods indicated (Dollars in thousands):

| | Six Months Ended June 30, 2005 | | | Six Months Ended June 30, 2004 | | |
|---|---|---|---|---|---|---|
| | Average Balance | Interest | Average Yield/Cost | Average Balance | Interest | Average Yield/Cost |
| **Interest-earning assets:** | | | | | | |
| Federal Funds sold and securities purchased under resale agreements | $ 55,967 | $ 753 | 2.69% | $ 64,110 | $ 314 | 0.98% |
| Investment securities(1) | | | | | | |
| Mortgage-backed securities | 7,867,841 | 145,277 | 3.69% | 6,311,071 | 100,426 | 3.18% |
| Federal agency securities | 2,318,705 | 40,860 | 3.52% | 2,003,017 | 24,253 | 2.42% |
| State and political subdivisions | 470,210 | 10,885 | 4.63% | 472,435 | 10,701 | 4.53% |
| Other securities | 259,273 | 4,572 | 3.53% | 298,676 | 4,930 | 3.30% |
| Total investment securities | 10,916,029 | 201,594 | 3.69% | 9,085,199 | 140,310 | 3.09% |
| Loans | 192,997 | 3,811 | 3.95% | 180,998 | 2,152 | 2.38% |
| Total interest-earning assets | 11,164,993 | 206,158 | 3.69% | 9,330,307 | 142,776 | 3.06% |
| Allowance for loan losses | (100) | | | (100) | | |
| Noninterest-earning assets | 637,264 | | | 527,817 | | |
| Total assets | $11,802,157 | | | $ 9,858,024 | | |
| | | | | | | |
| **Interest-bearing liabilities:** | | | | | | |
| Deposits: | | | | | | |
| Savings | $ 3,252,860 | $ 29,753 | 1.83% | $4,050,597 | $ 22,198 | 1.10% |
| Time | 118,270 | 1,610 | 2.72% | 15,151 | 76 | 1.00% |
| Securities sold under repurchase agreements(2) | 5,210,157 | 60,551 | 2.32% | 3,726,235 | 19,086 | 1.02% |
| Junior subordinated debentures | 24,774 | 1,210 | 9.77% | 24,774 | 1,210 | 9.77% |
| Other borrowings (3) | 1,647,953 | 23,375 | 2.84% | 783,422 | 9,710 | 2.48% |
| Total interest-bearing liabilities | 10,254,014 | 116,499 | 2.27% | 8,600,179 | 52,280 | 1.22% |
| Noninterest-bearing liabilities: | | | | | | |
| Demand deposits | 304,401 | | | 289,415 | | |
| Savings | 57,415 | | | 77,897 | | |
| Noninterest-bearing time deposits | 203,425 | | | 165,852 | | |
| Other liabilities | 231,710 | | | 136,181 | | |
| Total liabilities | 11,050,965 | | | 9,269,524 | | |
| Equity | 751,192 | | | 588,500 | | |
| Total liabilities and equity | $11,802,157 | | | $ 9,858,024 | | |
| Net interest income | | $ 89,659 | | | $ 90,496 | |
| Net interest margin (4) | | | 1.61% | | | 1.94% |
| Average interest rate spread (5) | | | 1.42% | | | 1.84% |
| Ratio of interest-earning assets to interest-bearing liabilities | | | 108.88% | | | 108.49% |

(1)    Average yield/cost on available for sale securities is based on amortized cost.

(2)    Interest expense includes penalties of $2.9 million for the six months ended June 30, 2004 for prepayment of two term repurchase agreements.

(3)    Interest expense includes contractual prepayment penalties of $3.9 million for the six months ended June 30, 2004 for the prepayment of certain FHLBB borrowings.

(4)    Annualized net interest income divided by total interest-earning assets.

(5)    Yield on interest-earning assets less rate paid on interest-bearing liabilities.

28

*Operating Expenses*

Total operating expenses were $218.0 million for the six months ended June 30, 2005, up 9% from the same period in 2004. Total operating expenses were $113.2 million for the three months ended June 30, 2005, up 12% from the same period in 2004. The increases in operating expenses were primarily due to increased compensation and benefits, technology and telecommunications, travel and sales and other operating expenses, as detailed below. It is expected that incremental expense for the remainder of 2005 will primarily be driven by continued investments in headcount and technology to support new and existing clients. The components of operating expenses were as follows (Dollars in thousands):

|  | For the Six Months Ended June 30, | | | For the Three Months Ended June 30, | | |
|  | 2005 | 2004 | Change | 2005 | 2004 | Change |
|---|---|---|---|---|---|---|
| Compensation and benefits | $ 120,351 | $ 109,094 | 10% | $ 63,432 | $ 53,771 | 18% |
| Technology and telecommunications | 25,913 | 20,722 | 25% | 13,077 | 10,456 | 25% |
| Transaction processing services | 22,776 | 21,138 | 8% | 11,656 | 10,198 | 14% |
| Depreciation and amortization | 15,984 | 16,721 | (4)% | 8,093 | 8,767 | (8)% |
| Occupancy | 12,840 | 14,260 | (10)% | 6,227 | 6,869 | (9)% |
| Professional fees | 6,379 | 7,256 | (12)% | 3,406 | 4,018 | (15)% |
| Travel and sales promotion | 3,174 | 2,579 | 23% | 1,825 | 1,497 | 22% |
| Insurance | 2,275 | 2,360 | (4)% | 1,146 | 1,164 | (2)% |
| Other operating expenses | 8,337 | 6,704 | 24% | 4,375 | 3,960 | 10% |
| Total operating expenses | $ 218,029 | $ 200,834 | 9% | $ 113,237 | $ 100,700 | 12% |

Compensation and benefits expense was $120.4 million for the six months ended June 30, 2005 and was $63.4 million for the three months ended June 30, 2005, up 10% and 18%, respectively, from the same periods last year due to higher headcount and annual salary increases partially offset by lower bonus accruals consistent with our current EPS projections for 2005. Further increases in compensation expense in 2005 will be primarily dependent upon sales to new and existing clients.

Technology and telecommunications expense was $25.9 million for the six months ended June 30, 2005 and was $13.1 million for the three months ended June 30, 2005, both up 25% from the same periods last year. These increases were due to our outsourcing agreement with IBM, which we entered into in July of 2004. The costs of this agreement were partially offset by decreases in other technology and telecommunications expenses, as the services were previously performed by the Bank or other service providers. Future technology and telecommunications expense will be dependent on client integrations associated with new business and ongoing improvement to our infrastructure. Generally, we expect technology reinvestment to equal approximately 18-20% of net operating revenue each year, including the related compensation costs.

Occupancy expense was $12.8 million for the six months ended June 30, 2005 and was $6.2 million for the three months ended June 30, 2005, down 10% and 9%, respectively, from the same periods last year. These decreases were due to favorable new ten-year lease agreements for our 505,000 square feet of office space in Boston. Occupancy expense should remain relatively stable until the fourth quarter of 2005 when we expect to add additional space to support our growth.

Professional fees expense was $6.4 million for the six months ended June 30, 2005 and was $3.4 million for the three months ended June 30, 2005, down 12% and 15%, respectively, from the same periods last year. These decreases are attributed primarily to lower subadvisory expense associated with our Merrimac Master Portfolios, resulting from lower average fund balances and advisory fee waivers. These fee waivers were discontinued during the second quarter of 2005. We expect professional fees expense to remain consistent for the remainder of the year.

Travel and sales promotion expense was $3.2 million for the six months ended June 30, 2005 and was $1.8 million for the three months ended June 30, 2005, up 23% and 22%, respectively, compared to the same periods last year. Travel and sales promotion expense consists of expenses incurred by the sales force, client management staff and other employees in connection with sales calls on potential clients and traveling to existing client sites and our foreign offices.

The increases in 2005 resulted from a higher level of travel to client sites, a higher level of sales calls to potential clients and industry conferences. We expect travel and sales expense to remain consistent for the remainder of 2005.

Other operating expense was $8.3 million for the six months ended June 30, 2005 and was $4.4 million for the three months ended June 30, 2005, up 24% and 10%, respectively, compared to the same periods last year primarily as a result of higher recruiting expense and higher miscellaneous expenses. We expect that incremental expense for the remainder of 2005 will be primarily associated with new business.

29

2005. The decrease was mainly due to sales of U.S. Treasuries and municipal securities during 2005 and investment security maturities and prepayments, partially offset by purchases of investment securities. Our investment security purchases included mortgage-backed securities, as well as municipal securities that offer a more attractive after-tax yield than those that we sold.

30

We believe that purchasing these securities allows us to take advantage of attractive yields and limited extension risk which aligns with our asset and liability strategy. Refer to the gap analysis under the 'Market Risk' section for additional details regarding the matching of our interest-earning assets and interest-bearing liabilities.

The average balance of our investment securities for the six-month period ended June 30, 2005 was $10.9 billion, with an average yield of 3.69%, compared to an average balance of $9.1 billion with an average yield of 3.09% during the same period in 2004. The increase in yield is primarily due to our variable rate securities repricing at higher interest rates. If long-term interest rates rise during 2005, we would expect slower prepayments and our overall yield to increase as our variable rate securities reprice. Conversely, if long-term interest rates decline during 2005, we would expect that prepayments would accelerate, with the cash flows from these prepayments being reinvested in lower-yielding assets of equal quality and similar risk.

We invest in mortgage-backed securities and Federal agency securities to increase the total return of the investment portfolio. Mortgage-backed securities and Federal agency bonds generally have a higher yield than U.S. Treasury securities due to credit and prepayment risk. Credit risk results from the possibility that a loss may occur if a counterparty, such as the Federal agency issuing the securities, is unable to meet the terms of the contract. Credit risk related to mortgage-backed securities and Federal agency bonds is substantially reduced by payment guarantees and credit enhancements. Prepayment risk results from the possibility that changes in interest rates and other economic factors will result in investment securities being paid off earlier than the scheduled maturity date. Refer to the 'Market Risk' section for additional details regarding our net interest income simulation model, which includes the impact of changes in interest rates, and therefore prepayment risk, on our net interest income.

We invest in AAA rated, insured municipal securities to generate stable, tax advantaged income. Municipal securities generally have lower stated yields than Federal agency and U.S. Treasury securities, but their after-tax yields are comparable. Municipal securities are subject to call risk. Call risk is similar to prepayment risk and results from the possibility that fluctuating interest rates and other factors may result in the exercise of the call option by the issuing municipality prior to the maturity date of the bond.

*Loan Portfolio*

Our loan portfolio increased $75.3 million, or 56%, from December 31, 2004 to June 30, 2005 primarily due to an increase in overdrafts and demand loans.

We make loans to individually managed account customers and to mutual funds and other pooled product clients. We offer overdraft protection and lines of credit to our clients for the purpose of funding redemptions, covering overnight cash shortfalls, leveraging portfolios and meeting other client borrowing needs. Virtually all loans to individually managed account customers are written on a demand basis, bear variable interest rates tied to the Prime rate or the Federal Funds rate and are fully secured by liquid collateral, primarily freely tradable securities held in custody by us for the borrower. We monitor the value of collateral daily to ensure the amount of collateral held by us exceeds the loan balance by a certain threshold. Loans to mutual funds and other pooled product clients include unsecured lines of credit that may, in the event of default, be collateralized at our option by securities held in custody by us for those clients. Loans to individually managed account customers, mutual funds and other pooled product clients also include advances that we make to certain clients pursuant to the terms of our custody agreements with those clients to facilitate securities transactions and redemptions.

At June 30, 2005, our only lending concentrations that exceeded 10% of total loan balances were the lines of credit to mutual fund clients discussed above. These loans were made in the ordinary course of business on the same terms and conditions prevailing at the time for comparable transactions.

Our credit loss experience has been excellent. There have been no loan charge-offs in the history of our Company. It is our policy to place a loan on nonaccrual status when either principal or interest becomes 60 days past due and the loan's collateral is

31

not sufficient to cover both principal and accrued interest. As of June 30, 2005, there were no loans on nonaccrual status, no loans greater than 90 days past due, and no troubled debt restructurings. Although virtually all of our loans are fully collateralized with freely tradable securities, management recognizes some credit risk inherent in the loan portfolio, and has an allowance for loan losses of $0.1 million at June 30, 2005, a level which has remained consistent for the past five years. This amount is not allocated to any particular loan, but is intended to absorb any risk of loss inherent in the loan portfolio. Management actively monitors the loan portfolio and the underlying collateral and regularly assesses the adequacy of the allowance for loan losses.

*Repurchase Agreements and Short-Term and Other Borrowings*

Asset growth was funded in part by increased securities sold under repurchase agreements. Repurchase agreements increased $0.6 billion, or 14%, from December 31, 2004 to June 30, 2005. The majority of our repurchase agreements are with clients who prefer a more collateralized form of deposit. Repurchase agreements provide for the sale of securities for cash coupled with the obligation to repurchase those securities on a set date or on demand. We use repurchase agreements, including client repurchase agreements, because they provide a lower cost source of funding than other short-term borrowings and allow our clients the extra benefit of collateralization of their deposits. The average balance of securities sold under repurchase agreements for the six months ended June 30, 2005 was $5.2 billion with an average cost of approximately 2.32%, compared to an average balance of $3.7 billion and an average cost of approximately 1.02% for the same period last year. The increase in the average cost of repurchase agreements from 2004 is due to higher short-term interest rates in the first half of 2005 versus the first half of 2004. The average cost of securities sold under repurchase agreements for the six months ended June 30, 2004 included prepayment fees of $2.9 million. These fees were incurred to employ an asset and liability strategy in which we replaced high rate borrowings with lower cost term funding.

Short-term and other borrowings increased $0.8 billion, or 128%, from December 31, 2004 to June 30, 2005. We use short-term and other borrowings to offset the variability of deposit flow. The average balance of short-term and other borrowings for the six months ended June 30, 2005 was $1.6 billion with an average cost of approximately 2.84%, compared to an average balance of $0.8 billion and an average cost of approximately 2.48% for the same period last year. The increase in the average cost of short-term and other borrowings was due to an increase in short-term rates during the first half of 2005 compared to the same period in 2004. The average cost of borrowings for the six months ended June 30, 2004 included prepayment fees of $3.9 million. Again, these fees were incurred to employ an asset and liability strategy in which we replaced high rate borrowings with lower cost term funding.

**Market Risk**

Our clients, in the course of their financial asset management, maintain cash balances, which they can deposit with us on a short-term basis in interest-bearing accounts or client repurchase agreements. We either directly invest these cash balances to earn interest income, or place these deposits in third-party vehicles and remit a portion of the earnings on these investments to our clients after deducting a fee as our compensation for investing clients' funds in these investment vehicles. In the conduct of these activities, we are subject to market risk.

Market risk is the risk of an adverse financial impact from changes in market prices and interest rates. The level of risk we assume is a function of our overall strategic objectives and liquidity needs, client requirements and market volatility. The active management of market risk is integral to our operations. The objective of interest rate sensitivity management is to provide sustainable net interest income under various economic conditions.

Our balance sheet is primarily subject to interest rate risk, which is the risk of loss due to movements in interest rates. Prepayment risk, which is the risk that changes in interest rates and other economic factors will result in investment securities being paid off earlier than the scheduled maturity date, is inherent in our investment securities, mainly our mortgage-backed securities and Federal agency bond portfolios. Prepayment levels for mortgage-backed securities are primarily driven by changes in interest rates. Prepayment levels for Federal agency securities are driven by a number of factors, including expiration of prepayment penalty provisions, economic condition of the borrower, borrower refinancing alternatives, and, to a lesser extent, interest rates.

Prepayment speeds for mortgage-backed securities increased during the second quarter of 2005 due to increased refinancing activity driven by declining mortgage rates. We expect recent prepayment experience to continue subject to

future interest rate movements. Prepayment experience for Federal agency securities (primarily SBA guaranteed loan pools) also increased over this period as the weighted average life of the securities shortened. We expect the combination of heightened prepayment experience and, more significantly, reduced reinvestment opportunities to continue to pressure our net interest income for the remainder of 2005.

32

Our Board of Directors has set asset and liability management policies that define the overall framework for managing interest rate sensitivity, including accountabilities and controls over investment activities. These policies delineate investment limits and strategies that are appropriate, given our liquidity and regulatory requirements. For example, we have established a policy limit stating that projected net interest income over the next twelve months will not change by more than 10% given a change in interest rates of up to 200 basis points (+ or -) over twelve months. Each quarter, our Board of Directors reviews our asset and liability positions, including simulations of the effect of various interest rate scenarios on our capital.

The day-to-day responsibility for oversight of the Asset and Liability Management function has been delegated by our Board of Directors to our Asset and Liability Committee ('ALCO'). ALCO is a senior management committee consisting of the Chief Executive Officer, the President, the Chief Financial Officer, the Chief Risk Officer and members of the Treasury function. ALCO meets twice monthly. Our primary tool in managing interest rate sensitivity is an income simulation model. Key assumptions in the simulation model include the timing of cash flows, which include forecasted prepayment speeds that are based on market and industry data, maturities and repricing of financial instruments, changes in market conditions, capital planning and deposit sensitivity. The model assumes that the composition of our interest-sensitive assets and liabilities existing at the beginning of a period will change periodically over the period being measured. The model also assumes that a particular change in interest rates is reflected uniformly across the yield curve regardless of the duration to maturity or repricing of specific assets and liabilities. These assumptions are inherently uncertain, and as a result, the model cannot precisely predict the effect of changes in interest rates on our net interest income. Actual results may differ from simulated results due to the timing, magnitude and frequency of interest rate changes and changes in market conditions and management strategies.

The results of the income simulation model as of June 30, 2005 and 2004 indicated that an upward shift of interest rates by 200 basis points over a twelve-month period would result in a reduction in projected net interest income of 6.5% and 7.1%, respectively, which is within our 10% policy limit. We also simulate a 200 basis point rate reduction over a twelve-month period, however, in the simulation we do not reduce rates below 0% because of the low likelihood that rates will move into a negative position. This modified simulation would result in an increase in projected net interest income of 0.2% and a reduction of 13.8% as of June 30, 2005 and 2004, respectively. In 2004, our Board of Directors approved a temporary exception to the 10% limit for decreases in interest rates, as a 200 basis point reduction would have moved interest rates into a negative position.

We also use gap analysis as a secondary tool to manage our interest rate sensitivity. Gap analysis involves measurement of the difference in asset and liability repricing on a cumulative basis within a specified time frame. A positive gap indicates that more interest-earning assets than interest-bearing liabilities mature in a time frame, and a negative gap indicates the opposite. By seeking to minimize the net amount of assets and liabilities that could reprice in the same time frame, we attempt to reduce the risk of significant adverse effects on net interest income caused by interest rate changes. As shown in the cumulative gap position in the table presented below, at June 30, 2005, interest-bearing liabilities repriced faster than interest-earning assets in the short term, as has been typical for us. Generally speaking, during a period of falling interest rates, net interest income would be higher than it would have been until interest rates stabilize. During a period of rising interest rates, net interest income would be lower than it would have been until interest rates stabilize. Other important determinants of net interest income are general rate levels, balance sheet growth and mix, and interest rate spreads. We continue to run a closely matched balance sheet by investing the majority of our assets in short duration, variable-rate securities and adding interest rate swaps against client liabilities, including client repurchase agreements.

We manage the structure of interest-earning assets and interest-bearing liabilities by adjusting their mix, yield, maturity and/or repricing characteristics based on market conditions. Client deposits and repurchase agreements, which are predominantly short term, are our primary sources of funds. We also use term borrowings and interest rate swap agreements to augment our management of interest rate exposure. The effect of the swap agreements is to lengthen short-term variable-rate liabilities into longer-term fixed-rate liabilities. The weighted-average fixed-payment rates were 3.25% and 3.00% at June 30, 2005 and 2004, respectively. Variable-interest payments received are currently indexed to the overnight Federal Funds rate. At June 30, 2005 and 2004, the weighted-average rates of variable market-indexed interest payment obligations to the Company were 3.19% and 1.02%, respectively. The remaining terms of swaps at June 30, 2005 range from 0 to 36 months. These contracts had net fair values of approximately $10.5 million and $3.6 million at June 30, 2005 and 2004, respectively.

33

The following table presents the repricing schedule of our interest-earning assets and interest-bearing liabilities at June 30, 2005 (Dollars in thousands):

| | Within Three Months | Three to Six Months | Six to Twelve Months | One Year to Five Years | Over Five Years | Total |
|---|---|---|---|---|---|---|
| Interest-earning assets: (1) | | | | | | |
| Investment securities (2), (3) | $6,648,006 | $ 731,929 | $1,065,444 | $2,524,400 | $ 445,776 | $11,415,555 |
| Federal funds sold and securities purchased under repurchase agreements | 11,000 | — | — | — | — | 11,000 |
| Loans - variable rate | 209,908 | — | — | — | — | 209,908 |
| Loans - fixed rate | — | — | 12 | — | — | 12 |
| Total interest-earning assets | $6,868,914 | $ 731,929 | $1,065,456 | $2,524,400 | $ 445,776 | $11,636,475 |
| Interest-bearing liabilities: | | | | | | |
| Savings accounts | $4,051,685 | $  — | $  — | $  32,818 | $  — | $ 4,084,503 |
| Time deposits | 112,520 | — | — | — | — | 112,520 |
| Interest rate contracts | (1,680,000) | 120,000 | 240,000 | 1,320,000 | — | — |
| Securities sold under repurchase agreements | 4,051,699 | 50,000 | 150,000 | 600,000 | — | 4,851,699 |
| Short-term and other borrowings | 1,303,440 | — | — | 50,000 | — | 1,353,440 |
| Junior subordinated debentures | — | — | — | 24,774 | — | 24,774 |
| Total interest-bearing liabilities | $7,839,344 | $ 170,000 | $ 390,000 | $2,027,592 | $  — | $10,426,936 |
| Net interest-sensitivity gap during the period | $ (970,430) | $ 561,929 | $ 675,456 | $ 496,808 | $ 445,776 | $ 1,209,539 |
| Cumulative gap | $ (970,430) | $(408,501) | $ 266,955 | $ 763,763 | $1,209,539 | |
| Interest-sensitive assets as a percent of interest-sensitive liabilities (cumulative) | 87.62% | 94.90% | 103.18% | 107.32% | 111.60% | |
| Interest-sensitive assets as a percent of total assets (cumulative) | 55.37% | 61.27% | 69.86% | 90.21% | 93.80% | |
| Net interest-sensitivity gap as a percent of total assets | (7.82)% | 4.53% | 5.44% | 4.00% | 3.59% | |
| Cumulative gap as a percent of total assets | (7.82)% | (3.29)% | 2.15% | 6.16% | 9.75% | |

(1) Adjustable rate assets are included in the period in which interest rates are next scheduled to adjust rather than in the period in which they are due. Fixed-rate loans are included in the period in which they are scheduled to be repaid.

(2) Mortgage-backed securities are included in the pricing category that corresponds with the earlier of their first repricing date or principal paydown schedule generated from industry sourced prepayment projections.

(3) Excludes $49.4 million of unsettled securities purchases and $11.3 million of net unrealized losses as of June 30, 2005.

34

## Liquidity

Liquidity represents the ability of an institution to meet present and future financial obligations through either the sale or maturity of existing assets or the acquisition of additional funds through liability management. For a financial institution such as ours, these obligations arise from the withdrawals of deposits and the payment of operating expenses.

Our primary sources of liquidity include cash and cash equivalents, Federal Funds sold, Federal Reserve Discount Window, new deposits, short-term borrowings, interest and principal payments on securities held to maturity and available for sale, and fees collected from asset administration clients. As a result of our management of liquid assets and our ability to generate liquidity through liability funds, management believes that we maintain overall liquidity sufficient to meet our depositors' needs, to satisfy our operating requirements and to fund the payment of an anticipated annual cash dividend of $0.08 per share for 2005 (approximately $5.4 million based upon 66,875,627 shares outstanding as of June 30, 2005).

Our ability to pay dividends on Common Stock may depend on the receipt of dividends from the Bank. Any dividend payments by the Bank are subject to certain restrictions imposed by the Massachusetts Commissioner of Banks. During all periods presented in this report, the Company did not require dividends from the Bank in order to fund the Company's own dividends. In addition, we may not pay dividends on our Common Stock if we are in default under certain agreements entered into in connection with the sale of our Capital Securities. Our Capital Securities were issued by Investors Capital Trust I, ('ICTI'), a Delaware statutory business trust sponsored by us, and qualify as Tier 1 capital under the capital guidelines of the Federal Reserve.

In July 2005, we announced that our Board of Directors authorized us to repurchase up to $150 million of our Common Stock in the open market over the next twelve months. We expect the purchase of our Common Stock to be funded primarily by a dividend from the Bank to the Company. We do not expect the stock purchase program to have a material impact on our liquidity position, our risk-based capital ratios, including our leverage capital ratio, or our ability to pay dividends on our Common Stock.

We have informal borrowing arrangements with various counterparties. Each counterparty has agreed to make funds available to us at the Federal Funds overnight rate. The aggregate amount of these borrowing arrangements as of June 30, 2005 was $4.6 billion. Each bank may terminate its arrangement at any time and is under no contractual obligation to provide us with requested funding. Our borrowings under these arrangements are typically on an overnight basis. We cannot be certain, however, that such funding will be available. Lack of availability of liquid funds could have a material adverse impact on our operations.

We also have Master Repurchase Agreements in place with various counterparties. Each counterparty has agreed to make funds available to us at various rates in exchange for collateral consisting of marketable securities. The aggregate amount of these borrowing arrangements at June 30, 2005 was $6.3 billion.

On April 19, 2004, the Federal Home Loan Bank of Boston ('FHLBB') implemented a new capital structure mandated for all Federal Home Loan Banks by the Gramm-Leach-Bliley Act of 1999 and regulations that were subsequently promulgated in 2001 by the FHLBB's regulator, the Federal Housing Finance Board. The Bank's capital stock investment in the FHLBB totaled $50 million as of June 30, 2005. The $50 million capital stock investment includes both a $25 million membership component and a $25 million activity-based component. The Bank's $50 million capital stock investment in the FHLBB provides a borrowing capacity of approximately $555 million. Under the new capital plan, FHLBB capital stock investments require a five-year advance notice of withdrawal. The amount outstanding under this arrangement at June 30, 2005 was $50 million. Additional borrowing is available to the Bank based on prescribed collateral levels and increased investment in FHLBB capital stock. The Bank currently has no plans to increase its investment in FHLBB capital stock.

35

**Capital Resources**

      Historically, we have financed our operations principally through internally generated cash flows. We incur capital expenditures for furniture, fixtures, capitalized software and miscellaneous equipment needs. We lease office space and computing equipment through operating leases. Capital expenditures have been incurred and leases entered into on an as-required basis, primarily to meet our growing operating needs. As a result, our capital expenditures were $13.5 million and $11.8 million for the six months ended June 30, 2005 and 2004, respectively. For the six months ended June 30, 2005, capital expenditures were comprised of approximately $10.8 million in capitalized software and projects in process, $2.6 million in fixed assets, and $0.1 million in leasehold improvements. For the six months ended June 30, 2004, capital expenditures were comprised of approximately $3.8 million in capitalized software and projects in process, $7.9 million in fixed assets and $0.1 million in leasehold improvements.

      Stockholders' equity at June 30, 2005 was $794 million, up 11% from December 31, 2004, primarily due to net income earned in the first half of 2005. The ratio of average stockholders' equity to average assets remained constant at approximately 6% for June 30, 2005 and December 31, 2004.

      In July 2005, we announced that our Board of Directors has authorized us to repurchase up to $150 million of our Common Stock in the open market over the next twelve months. We do not expect our stock purchase program to have a material impact on our capital resources, such as maintaining risk-based capital ratios in excess of capital adequacy guidelines and our ability to pay dividends on our Common Stock.

      The FRB has adopted capital adequacy guidelines applicable to United States banking organizations. The FRB's capital adequacy guidelines generally require BHCs to maintain total capital equal to 8% of total risk-adjusted assets and off-balance sheet items (the 'Total Risk-Based Capital Ratio'), with at least 50% of that amount consisting of Tier 1, or core capital and the remaining amount consisting of Tier 2, or supplementary capital. Tier 1 capital for BHCs generally consists of the sum of common stockholders' equity and perpetual preferred stock (subject to certain limitations), less goodwill and other nonqualifying intangible assets. Tier 2 capital generally consists of hybrid capital instruments, perpetual debt and mandatory convertible debt securities; perpetual preferred stock, not included as Tier 1 capital; term subordinated debt and intermediate-term preferred stock; and, subject to limitations, general allowances for loan and lease losses. Assets are adjusted under the risk-based guidelines to take into account different risk characteristics.

      In addition to the risk-based capital requirements, the FRB requires BHCs to maintain a minimum leverage capital ratio of Tier 1 capital to its average total consolidated assets (the 'Leverage Ratio') of 3.0%. Total average consolidated assets for this purpose does not include goodwill and any other intangible assets and investments that the FRB determines should be deducted from Tier 1 capital. The FRB has announced that the 3.0% Leverage Ratio requirement is the minimum for the top-rated BHCs. All other BHCs are required to maintain a minimum Leverage Ratio of 4.0%. BHCs with supervisory, financial, operational or managerial weaknesses, as well as BHCs that are anticipating or experiencing significant growth, are expected to maintain capital ratios well above the minimum levels. Because we anticipate significant future growth, we will be required to maintain a Leverage Ratio of 4.0% or higher.

      We are currently in compliance with both the Total Risk-Based Capital Ratio and the Leverage Ratio requirements, and management expects these ratios to remain in compliance with the FRB's capital adequacy guidelines. At June 30, 2005, our Total Risk-Based Capital Ratio and Leverage Ratio were 19.63% and 6.05%, respectively.

36

**Item 3.      Quantitative and Qualitative Disclosures about Market Risk**

The information required by this item is contained in the 'Market Risk' section in the 'Management's Discussion and Analysis of Financial Condition and Results of Operations,' as part of this Report.

**Item 4.      Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15 under the Securities Exchange Act of 1934, as of June 30, 2005, the end of the quarter covered by this report, the Company carried out an evaluation under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures. In designing and evaluating the Company's disclosure controls and procedures, the Company and its management recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and the Company's management necessarily was required to apply its judgment in evaluating and implementing possible controls and procedures. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective at the reasonable assurance level to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure, and is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. There was no change in the Company's internal control over financial reporting that occurred during the quarter ended June 30, 2005 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting. The Company reviews, on an ongoing basis, its disclosure controls and procedures, which may include its internal controls over financial reporting on an ongoing basis, and may from time to time make changes aimed at enhancing their effectiveness and to ensure that the Company's systems evolve with its business.

37

## PART II. OTHER INFORMATION

### Item 1. Legal Proceedings

Investors Financial Services Corp. and five of its officers are named as defendants in a purported class action complaint that was filed on or about August 4, 2005 in the United States District Court for the District of Massachusetts, Boston, Massachusetts. Among other things, the complaint asserts that the defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 during the period October 15, 2003 until July 15, 2005. The allegations in the Complaint predominantly relate to: (1) the Company's October 2004 restatement of its financial results, and (2) the Company's July 2005 revision of public guidance regarding its future financial performance. The complaint seeks unspecified damages, interest and costs. We strongly believe that the lawsuit lacks merit and we intend to defend against the claims vigorously. However, we cannot predict the outcome of the lawsuit at this time, and we can give no assurance that it will not materially adversely affect our financial condition or results of operations.

### Item 4. Submission of Matters to a Vote of Security Holders

Our annual meeting of stockholders was held on Thursday, April 14, 2005. A vote was proposed to:

- Elect two (2) Class I directors;
- Approve the Company's 2005 Equity Incentive Plan;
- Ratify the selection of Deloitte & Touche LLP as independent registered public accounting firm for the fiscal year ending December 31, 2005.

All proposals were approved. The voting results were as follows:

|     |                                                              | Votes For  | Votes Against | Votes Withheld | Abstained |
| --- | ------------------------------------------------------------ | ---------- | ------------- | -------------- | --------- |
| (1) | Election of Phyllis S. Swersky as a Class I Director         | 59,630,521 | N/A           | 1,286,180      | N/A       |
|     | Election of Edward F. Hines, Jr. as a Class I Director       | 57,327,290 | N/A           | 3,589,411      | N/A       |
| (2) | Approve the Company's 2005 Equity Incentive Plan             | 43,600,713 | 9,507,814     | N/A            | 201,941   |
| (3) | Ratify the selection of Deloitte & Touche LLP                | 60,213,685 | 640,670       | N/A            | 62,346    |

### Item 6.    Exhibits

(a) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 15 | Letter of awareness from Deloitte & Touche LLP. |
| 31.1 | Certification of Kevin J. Sheehan, Chief Executive Officer. |
| 31.2 | Certification of John N. Spinney, Jr., Chief Financial Officer. |
| 32.1 | Certification of Kevin J. Sheehan, Chief Executive Officer, and John N. Spinney, Jr., Chief Financial Officer, pursuant to 18 U.S.C. Section 1350, as adopted, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

38

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

### INVESTORS FINANCIAL SERVICES CORP.

Date: August 9, 2005

By: /s/ Kevin J. Sheehan

Kevin J. Sheehan
Chairman and Chief Executive Officer

By: /s/ John N. Spinney, Jr.

John N. Spinney, Jr.
Senior Vice President and Chief Financial Officer
(Principal Financial and Accounting Officer)

39

EX-15 2 a05-12598_1ex15.htm EX-15

**Exhibit 15**

## LETTER OF AWARENESS FROM DELOITTE & TOUCHE LLP

To the Board of Directors and
Shareholders of Investors Financial Services Corp:

We have made a review, in accordance with standards of the Public Company Accounting Oversight Board (United States), of the unaudited interim financial information of Investors Financial Services and subsidiaries for the periods ended June 30, 2005 and 2004, as indicated in our report dated August 9, 2005; because we did not perform an audit, we expressed no opinion on that information.

We are aware that our report referred to above, which is included in your Quarterly Report on Form 10-Q for the quarter ended June 30, 2005, is incorporated by reference in the following Registration Statements:

Filed on Form S-8:
 Registration Statement No. 333-72786
 Registration Statement No. 333-79639
 Registration Statement No. 333-43353

We also are aware that the aforementioned report, pursuant to Rule 436(c) under the Securities Act of 1933, is not considered a part of the Registration Statements prepared or certified by an accountant or a report prepared or certified by an accountant within the meaning of Sections 7 and 11 of that Act.

 /s/DELOITTE & TOUCHE
LLP
Boston, Massachusetts
August 9, 2005

EX-31.1 3 a05-12598_1ex31d1.htm EX-31.1

**Exhibit 31.1**

I, Kevin J. Sheehan, Chairman and Chief Executive Officer, certify that:

1.     I have reviewed this Report on Form 10-Q filed on August 9, 2005 of Investors Financial Services Corp.;

2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

   (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   (a)  All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  August 9, 2005

                                        /s/ Kevin J.
                                        Sheehan
                                        _____
                                        Kevin J. Sheehan
                                        Chairman and Chief Executive Officer

EX-31.2 4 a05-12598_1ex31d2.htm EX-31.2

**Exhibit 31.2**

I, John N. Spinney, Jr., Senior Vice President and Chief Financial Officer, certify that:

1.   I have reviewed this Report on Form 10-Q filed on August 9, 2005 of Investors Financial Services Corp.;

2.   Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

     (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

     (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

     (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

     (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

     (a)  All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2005

                              /s/ John N.
                              Spinney, Jr.
                              John N. Spinney Jr.
                              Senior Vice President and Chief Financial Officer

EX-32.1 5 a05-12598_1ex32d1.htm EX-32.1

**Exhibit 32.1**

### CERTIFICATION PURSUANT TO
### 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Report on Form 10-Q of Investors Financial Services Corp. (the "Company") for the period ending June 30, 2005 as filed on August 9, 2005 (the "Report"), I, Kevin J. Sheehan, Chairman and Chief Executive Officer, hereby certify, pursuant to 18. U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.   The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.   The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.


  /s/Kevin J. Sheehan
Kevin J. Sheehan
Chairman and
Chief Executive Officer

August 9, 2005

A signed original of this written statement required by Section 906 has been provided to Investors Financial Services Corp. and will be retained by Investors Financial Services Corp. and furnished to the Securities and Exchange Commission or its staff upon request.


In connection with the Report on Form 10-Q of Investors Financial Services Corp. (the "Company") for the period ending June 30, 2005 as filed on August 9, 2005 (the "Report"), I, John N. Spinney, Jr., Senior Vice President and Chief Financial Officer, hereby certify, pursuant to 18. U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.   The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.   The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.


  /s/John N. Spinney, Jr.
John N. Spinney, Jr.
Senior Vice President and
Chief Financial Officer

August 9, 2005

A signed original of this written statement required by Section 906 has been provided to Investors Financial Services Corp. and will be retained by Investors Financial Services Corp. and furnished to the Securities and Exchange Commission or its staff upon request.