UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, On Behalf of Plaintiff and All Others Similarly Situated,<br><br>       Plaintiff,<br><br>  vs.<br><br>INVESTORS FINANCIAL SERVICES CORP., et al.,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:05-cv-11627-RCL<br>**(Consolidated)**<br><br><u>CLASS ACTION</u> |

LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE
CONSOLIDATED CLASS ACTION COMPLAINT

**EXCESS PAGES AUTHORIZED BY THE COURT BY ORDER,
DATED JUNE 21, 2006**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   SUMMARY OF FRAUD SCHEME ALLEGED.............................................2

III.  STANDARD OF REVIEW ................................................................................11

IV.   ARGUMENT ......................................................................................................12

A.   Plaintiffs' Complaint Adequately Pleads Falsity and Scienter Section 10b Claim...............................................................................................................12

  1.  Defendants Concede the Complaint Alleges Falsity of Investors Financial's First Quarter of 2001 Through Second Quarter of 2004 Financial Statements ...............................................................................13

  2.  Plaintiffs Plead with Particularity that Defendants Made Recklessly False and Misleading Statements that SBA Securities Have Prepayments Risk, Even Though Actual Prepayments Had Occurred.......................................................................................................14

  3.  Plaintiffs Plead with Particularity that Investors Financial Failed to Disclose the SBA Securities' Prepayment Risk in Its SEC Filings from March 31, 2003 to the End of the Class Period................................15

B.   Plaintiffs Have Pled a Strong Inference of Scienter Against All Defendants........15

  1.  Defendants Had Actual Knowledge of Prepayments on the Company's Debt Securities and Need to Write-Off or Amortize the Appropriate Amount of Premium ..........................................................16

    a.  Because the Company's Mortgage-Backed and SBA Securities Were Classified as Held-to-Maturity, Defendants Knew or Were Reckless in Not Knowing that the "Prospective Method" to Account for Its Debt Securities Violated GAAP Because They Were Not High Risk Securities.......................................................................................19

  2.  Plaintiffs Plead with Particularity that Defendants Knew or Were Reckless in Not Disclosing the Company's Prepayment Policy Until After the Class Period....................................................................19

  3.  Defendants' Actions in Running the Company, as Well as the Nature of the Fraudulent Scheme, Further Supports Scienter ...................21

**Page**

4.      Defendants' Suspicious, Unusual and Substantial Stock Sales of More than $68.1 Million Support a Strong Inference of Scienter ............22

5.      Defendants' Dramatic Increase in Their Eligible Bonuses for 2004, Further Supports a Strong Inference of Scienter......................................27

C.     The Allegations of Financial Fraud Are Clearly Material and Cannot Be Dismissed as "Immaterial As a Matter of Law" ....................................................29

D.     The Complaint Adequately Pleads Loss Causation ...............................................30

E.     Where the Combined Allegations Sufficiently Plead Defendants Had Actual Knowledge of SBA Prepayments, Investors Financial's Cautionary Warnings that Actual Results "Could" Differ from Projections Were Not Meaningful.......................................................................................................................31

F.     Defendants Are Liable Under Section 20(a) of the Securities Exchange Act of 1934 .......................................................................................................................34

V.     LEAVE TO AMEND .......................................................................................................34

VI.    CONCLUSION.................................................................................................................35

**Page**

## TABLE OF AUTHORITIES

*Acito v. IMCERA Group*,
    47 F.3d 47 (2d Cir. 1995) ........................................................................................22

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002).............................................................................. *passim*.

*Asher v. Baxter Int'l Inc.*,
    377 F.3d 727 (7th Cir. 2004), *cert. denied*, 544 U.S. 920 (2005).....................33

*Carney v. Cambridge Tech. Partners, Inc.*,
    135 F. Supp. 2d 235 (D. Mass. 2001) .............................................................32

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
    387 F.3d 468 (6th Cir. 2004) ...........................................................................28

*Conley v. Gibson*,
    355 U.S. 41 (1957)............................................................................................12

*Davis v. SPSS, Inc.*,
    385 F. Supp. 2d 697 (N.D. Ill. 2005) ...............................................................30

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).....................................................................................12, 30

*EP Medsystems, Inc. v. Echocath, Inc.*,
    235 F.3d 865 (3d Cir. 2000)..............................................................................33

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)..........................................................................................13

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ............................................................................28

*Foman v. Davis*,
    371 U.S. 178 (1962)..........................................................................................34

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000).............................................................................29

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir. 1996)...............................................................................30

- iii -

**Page**

*Gompper v. VISX, Inc.*,
　298 F.3d 893 (9th Cir. 2002) ........................................................26

*Greebel v. FTP Software, Inc.*,
　194 F.3d 185 (1st Cir. 1999)........................................................21

*Guerra v. Teradyne Inc.*,
　Civil Action No. 01-11779-NG, 2004 U.S. Dist. LEXIS 28548
　(D. Mass. Jan. 16, 2006) ..............................................................34

*Howard v. Everex Sys.*,
　228 F.3d 1057 (9th Cir. 2000) ...............................................17, 31

*Huddleston v. Herman & MacLean*,
　640 F.2d 534 (5th Cir. 1981) ........................................................14

*In re Apple Computer Sec. Litig.*,
　886 F.2d 1109 (9th Cir. 1989) ......................................................14

*In re Cabletron Sys.*,
　311 F.3d 11 (1st Cir. 2002)..............................................11, 12, 22

*In re Convergent Techs. Sec. Litig.*,
　948 F.2d 507 (9th Cir. 1991) ........................................................31

*In re Cylink Sec. Litig.*,
　178 F. Supp. 2d 1077 (N.D. Cal. 2001) ........................................13

*In re Daou Sys.*,
　411 F.3d 1006 (9th Cir. 2005), *cert. denied*,
　*Daou Sys. v. Sparling*, 126 S. Ct. 1335 (2006) .............................30

*In re FirstEnergy Corp. Sec. Litig.*,
　316 F. Supp. 2d 581 (N.D. Ohio 2004)..........................................13

*In re Goodyear Tire & Rubber Co. Sec. Litig.*,
　436 F. Supp. 2d 873 (N.D. Ohio 2006)..........................................13

*In re Ibis Tech. Sec. Litig.*,
　422 F. Supp. 2d 294 (D. Mass. 2005) ......................................31, 34

**Page**

*In re Netflix, Inc. Sec. Litig.*,
  2005 U.S. Dist. LEXIS 18765 (N.D. Cal. June 28, 2005) ..........................................26, 29

*In re No. Nine Visual Tech. Corp. Sec. Litig.*,
  51 F. Supp. 2d 1 (D. Mass. 1999) .................................................................................12

*In re NorthPoint Commc'ns Group, Inc., Sec. Litig. & Consol. Cases*,
  221 F. Supp. 2d 1090 (N.D. Cal. 2002) .........................................................................22

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................................................25

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 472 (S.D.N.Y. 2005) ............................................................................30

*In re PeopleSoft, Inc., Sec. Litig.*,
  99-00472 WHA 2000 U.S. Dist. LEXIS 10953 (N.D. Cal. May 26, 2000) .....................22

*In re PerkinElmer, Inc. Sec. Litig.*,
  286 F. Supp. 2d 46 (D. Mass. 2003) ..............................................................................29

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
  266 F. Supp. 2d 1150 (C.D. Cal. 2003) ..........................................................................31

*In re Segue Software, Inc. Sec. Litig.*,
  106 F. Supp. 2d 161 (D. Mass. 2000) .............................................................................30

*In re Sepracor, Inc., Sec. Litig.*,
  308 F. Supp. 2d 20 (D. Mass. 2004) ..............................................................................32

*In re Stone & Webster, Inc., Sec. Litig.*,
  253 F. Supp. 2d 102 (D. Mass. 2003) ............................................................................28

*In re Stone & Webster, Inc., Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005) .........................................................................................12

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ................................................................................25, 26

*In re Viropharma Sec. Litig.*,
  No. 02-1627, 2003 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 7, 2003) ................................33

**Page**

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................25

*In re Wells Fargo Sec. Litig.*,
    12 F.3d 922 (9th Cir. 1993) ...........................................................................24

*In re Xerox Corp. Sec. Litig.*,
    165 F. Supp. 2d 208 (D. Conn. 2001)............................................................23

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) .........................................................................33

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996) ..............................................................25

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)....................................................................17, 18

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .......................................................................21

*Plotkin v. IP Axess Inc., Etc.*,
    407 F.3d 690 (5th Cir. 2005) .........................................................................18

*Provenz v. Miller*,
    102 F.3d 478 (9th Cir. 1996) .........................................................................24

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .......................................................................17

*Pyramid Co. v. Homeplace Stores Two*,
    175 F.R.D. 415 (D. Mass. 1997)....................................................................34

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ...........................................................................14

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)..........................................................................33

*Stavros v. Exelon Corp.*,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) .............................................................30

**Page**

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999)..................................................................................23

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) ...........................................................26

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)............................................................................................................12
    78u-4(b)(1)......................................................................................................12
    §78u-5(c)........................................................................................................31

17 C.F.R.
    §210.1-02(a)(2) ..............................................................................................13
    §240.10b-5 .....................................................................................................12
    §240.10b5-1(c)...............................................................................................26

Federal Rules of Civil Procedure

    Rule 8 ........................................................................................................26, 30
    Rule 12(b)(6)..............................................................................................2, 12
    Rule 15(a).......................................................................................................34

## I.    INTRODUCTION

Lead plaintiffs' initial Complaint[1][2] demonstrates in extensive and particularized detail both how and why defendants misled the market concerning Investors Financial Services Corporation's ("Investors Financial" or the "Company") reported net interest income and, even after they were forced to reveal their misrepresentations by restating their 2001 through second quarter of 2004 financial results, continued to lie to the market about the Company's business and prospects. It was not until July 14, 2005 that defendants finally admitted that the promises of 25% growth in net income would not (and could not) be achieved because, the Company had been experiencing extensive prepayments in their bond portfolio.

Defendants were well motivated to conceal the true financial picture of the Company throughout the Class Period. During the Class Period (April 10, 2001 through July 14, 2005), they also sold a combined total of over 1,100,000 shares of stock at artificially inflated prices for proceeds of over $65.8 million. The executive officers also reaped bonuses of $8.7 million which were tied to the Company's financial performance. ¶¶52, 236-237[3] (breakdown of the individual defendants' sales). Indeed, even as they were forced to reveal portions of the true state of Investors

---

[1]    "Complaint" refers to Lead Plaintiffs' [Corrected] Consolidated Complaint for Violation of the Federal Securities Laws, filed February 3, 2006.

[2]    Throughout their brief, defendants repeatedly attempt to attribute the allegations made in prior complaints, filed by other plaintiffs, to the lead plaintiffs' complaint. This is both improper and wrong. Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a potential lead plaintiff need not file a complaint but must move for appointment as lead plaintiff within 60 days of receiving notice that a complaint, that potentially implicates its interest, has been filed. In this case, lead plaintiffs, the City of Deerfield Beach Non-Uniform Employees Retirement Plan and the Ironworkers St. Louis District Council Pension Fund, filed the motion on October 2, 2005 and were appointed lead plaintiffs on November 2, 2005. The Complaint is the first complaint they have filed in this action.

[3]    All paragraph ("¶") references refer to the Complaint.

Financial's condition – through a restatement in November 2004 – defendants managed to reap additional benefits by granting themselves options just after the stock declined and again right before it was likely to increase.  Defendants were thus able to reap the benefit of their fraudulent conduct.

Rather than addressing these compelling facts squarely, defendants seek to mischaracterize the Complaint, visit the statements made by others in earlier complaints filed by other plaintiffs, and most aggressively, ask this Court to draw inferences in their favor.  Plaintiffs claim that defendants affirmatively misled the public about Investors Financial's reported financial results and its projections of its income going forward are pled with particularity and raise a strong inference of scienter that is more than sufficient to meet even the stringent standards of the PSLRA.  At most, defendants' efforts raise questions of fact not suitable for disposition under Fed. R. Civ. P. 12(b)(6).  Lead plaintiffs' current Complaint meets its burden at the pleading stage, and defendants' motion to dismiss should be denied.

## II.    SUMMARY OF FRAUD SCHEME ALLEGED

Investors Financial is a bank holding company that through its subsidiaries, primarily Investors Bank & Trust ("IBT"), provides a broad range of services to financial asset managers, such as mutual fund complexes, investment advisors, banks and insurance companies.  The Company manages a portfolio of financial assets that it holds for its own account.  ¶2.  A key measure of the Company's financial health is its net interest income,[4] which the market watched and the Company reported in every quarterly earnings release.  *See, e.g.*, ¶105 (first quarter 2001 net interest income of $21.5 million – an increase of 65% over the first quarter of 2000); *see also* ¶¶112, 120.  Investors

---

[4]    The Company's net interest income is the difference between income generated from interest-earning assets and expense on its interest-bearing liabilities – generally mortgage backed securities ("MBS") and federal agency debt securities (principally Small Business Administration ("SBA") backed loans).  ¶4.

looked at the Company's net interest income because, among other things, it reflected the income stream and profitability generated by the Company's bond portfolio.

Plaintiffs allege that during the Class Period, Investors Financial and the individual defendants, made false and misleading statements to the market concerning its net interest income – making it appear that the Company was recovering the premiums it paid on its asset-backed securities when, in fact, as defendants knew, those premiums were lost as a result of the prepayments of hundreds of millions of dollars of the loans.

Defendants carried out their scheme to defraud though several means and methods each of which was designed to (and did) deceive and conceal the Company's true net interest income. Because Investors Financial's net income was sensitive to and dependent on changes in interest rates, the means by which defendants defrauded the market were modified accordingly.  For example, at the beginning of the Class Period, interest rates had been in substantial decline. From January 3, 2001 to May 15, 2001, the Federal Reserve had cut the Federal Funds Rate 200 basis points reducing the rate from 6% to 4% in a span of 4 and a half months.  Not surprisingly, there was a substantial number of prepayments which eliminated the income stream on those loans and resulted in the loss of the premiums the Company had paid for the loans when it had invested in them. Defendants continued to report the Company's net interest income, without accounting for the prepayments, thereby maintaining the illusion that Investors Financial's results were unaffected by the prepayments.  In fact, by the end of 2003, the Company had experienced approximately $619 million in SBA loan prepayments.  Nevertheless, defendants continued to maintain (falsely) that they could continue to deliver ever-increasing earnings. As late as July 14, 2004, defendant Kevin J. Sheehan stated in a Company press release that "we are confident in our ability to grow our diluted earnings per share in excess of 30% in 2004."  ¶191.

While they were misleading the market in 2001-2002, defendants also sold a combined total of over 1,100,000 shares of stock at artificially inflated prices for proceeds of over $65.8 million. The executive officers also received bonuses of $8.7 million which were tied to the Company's financial performance. ¶¶52, 236-237( breakdown of the individual defendants' sales). Defendants were thus able to reap the benefit of their fraudulent conduct.

Defendants, however, could not maintain the fraud forever. On October 21, 2004, Investors Financial announced in a press release that it was "Evaluating [a] FAS 91 Change" because it had "determined that it [was] appropriate to change to applying a retrospective method[5] on applicable investment securities." ¶199. The market was stunned – particularly in light of the significant impact the accounting for loans would have on the Company's financial results and the fact that defendant John N. Spinney, Jr. the Chief Financial Officer ("CFO"), had been a CPA and a partner at a Big 5 accounting firm.

In the Company's conference call, analysts grilled defendant Spinney asking him to "tell us what happened this quarter that made this accounting issue come up," "you're a CPA . . . a partner in a Big 5 firm. What happened this quarter that you suddenly woke up and said we need to take a look at this?" ¶200 (the "re-examination" took place in 4Q04 – just before the 2004 audit). Further,

---

[5]     FASB Statement of Financial Accounting Standards ("FAS") 91 is the provision of generally accepted accounting principles ("GAAP") that determines how to account for interest income on financial investments. The two accounting methods are set out in detail in Complaint, Ex. A at 8-11, and ¶¶39-40 in the Complaint. The most significant difference between the two is that the "prospective method" is used for high risk securities, such as interest only and residual securities, where there is a potential for loss of substantially all of the original investment." It allows companies to adjust the yield using future estimates that the company determines. Investors' portfolio consisted of mortgage-backed securities and SBA loans – which were not high risk. This method was thus never appropriate for the securities and defendants, particularly Spinney as a certified public accountant ("CPA"), clearly knew it. By using it, however, defendants were able to report estimates and avoided reporting the actual declines in net interest income and required recalculation of the "constant effective yield" that resulted from the prepayment in 2001-2003.

despite the long prepayment history, the fact that the Company's top executives reviewed the prepayments periodically and at least one of the Company senior executives (confidential witness ("CW") 1) had explicitly informed Spinney of the impact of the prepayments, Spinney attempted to pass it off as simply a review of the Company's internal controls. *Id*. Spinney also revealed, for the first time that in calculating the interest method, the Company had been using the "prospective method" to account for the income from the securities. He then stated that the Company and its auditors now believed that the "retrospective method probably was more appropriate." ¶200.

In fact, as Spinney knew, the accounting rules did not allow for the use of the prospective method – which was designed for high risk securities – in the first place. Indeed, Investors Financial's auditor, Deloitte & Touche LLP, had definitively stated some four years earlier that under FAS 91, "[a]ll fixed rate MBSs (mortgage back securities) and adjustable rate MBSs are required to follow the retrospective method." ¶7. Defendant Sheehan was far more candid about the accounting requirements, acknowledging earlier in the same conference call that: " the retrospective method *is the more correct method and more consistent with the requirements of GAAP*."[6] ¶200.

With the revelation of part of the true state of the Company's financial picture, the market reacted swiftly and severely. The following day, Friday, October 22, 2004, Investors Financial's share price dropped 16.5% from $43.70 to $36.50 on trading volume of 11.6 million shares (over 17 times the average Class Period trading volume). ¶201. Two trading days later, on October 26, 2004,

---

[6]    All emphasis is added unless otherwise stated.

Investors Financial stock closed at a Class Period low of $35.46. *See Bloomberg* Stock Prices for Investors Financial, Lawrence Decl.,[7] Ex. 4.

On November 15, 2004, Investors Financial announced its restated financials for 2001, 2002, 2003 and the first two quarters of 2004, stating in part that:

> [T]he Company's cumulative restatement since inception resulting from the accounting review was a reduction of $6.2 million in net interest income. . . . The respective net interest income adjustments for the years ended December 31, 2002, 2003 and 2004 were a reduction of $2.3 million, an increase of $1.0 million and an increase of $2.7 million.

¶204.

Even this revealed only part of the story. Defendants restated fiscal years 2001, 2002, 2003 and the first two quarters of 2004, but included the third quarter of 2004 net interest income to arrive at the $2.7 million increase to net interest income. *Id.* The restated quarters actually reflect rather that first quarter of 2004 net interest income was overstated by $1.578 million and second quarter 2004 net interest income was understated by $1.502 million.[8] ¶206; Defs' App., Ex. 5.

In the Company's conference call, Sheehan stated that "[w]e are now amortizing premiums and accreting discounts in the affected securities in accordance with generally accepted accounting principals, including FAS 91" and that "***this restatement did not impact the accounting for our SBA portfolio***." ¶205. However, he stated that the Company

---

[7]    "Lawrence Decl." refers to Declaration of Jeffrey W. Lawrence in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Complaint and Request for Judicial Notice.

[8]    Defendants' total restatement of $6.2 million in net interest income is derived from net interest income overstated by $5.514 million in 2001, $1.509 million in 2002 and understated by $661,000 in 2003, understated by $1.578 million in the first quarter of 2004, and overstated by $1.502 million in the second quarter of 2004. ¶206; Appendix of Documents Submitted in Support of Defendants' Motion to Dismiss the Consolidated Complaint ("Defs' App."), Ex. 5.

correct[ed] a clerical error in the contractual maturity table in the MD&A session of our 2003 10-K. We previously reported federal agency securities having a yield of 3.16% in the over-10-year category [sic] and 2.76% in the 5- to 10-year category. These yields should have been 2.71% and 2.28% respectively, *consistent with the income we recognize in our financial statements*.

*Id*.

The above statement that the yields dropped due to a "clerical error" was simply not true. While the yield adjustments were "consistent with the income . . . recognize[d] in . . . [its] financial statements," defendants failed to disclose that when the $619 million in SBA securities prepaid as of December 2003, defendants did not write off or amortize the appropriate amount of premium when applying the interest method to keep a "constant effective yield," which was required by FAS 91 and thus, materially overstated Investors Financial's net interest income. Investors Financial had lost a substantial amount of the premium it had paid. CW1, in describing SBA securities, used as an example that IBT purchased around $900 million of SBA securities and that the premium was about $90 million. ¶48. Thus, in CW1's example, if the entire amount of SBA securities was prepaid immediately after defendants purchased the SBA securities, the amount of premium lost would be $90 million, because the Company did not have the opportunity to amortize the premium it had paid (cost) over the life of the security. In fact, the Company's financial reports show that between 2001-2002, defendants added $393.3 million of the "5 to 10" year maturities, which brought the total balance of these securities to $648.7 million by 2002. Because these were repaid during 2003, very little premium could have been recovered before these securities were prepaid in 2002-2003. ¶57.

Thus, later in the conference call, Spinney couched their guidance by stating:

> *Included in our guidance is and has always been a forecast of SBAs running at industry prepayment speeds*. We remain comfortable with our long-term growth rate of 25% on EPS.

- 7 -

¶205.[9]  But defendants knew that significant SBA prepayments had already occurred and that those prepayments had negatively affected the Company's net interest income.

In the December 31, 2003 Amended Form 10-K, defendants provided restatement results for net interest income for fiscal years 2001, 2002 and 2003, and acknowledged that the Company "was required" to change internal controls over financial reporting as it pertained to FAS 91.  They also reported the same number of SBA loans, even though the yields change dramatically, with the greatest change by over 17.3%.  ¶¶57-58.  Such a drastic change was not merely correction of a "clerical error" but rather represented **defendants' attempt to correct the misstatements** they had earlier made by not taking into account the SBA prepayments.  Indeed, as CW1, the former managing director of risk management at Investors Financial during 2001 through 2003, noted the restatement should have included SBA bonds because the Company was experiencing prepayments on its SBA securities during 2002 and 2003.  ¶53.  CW1 not only knew of the prepayments but had also continually examined the loan portfolio as part of the monthly meetings.  ¶¶68-76.  They thus, knew that the net interest income, and the Company's earning would be adversely impacted and Investors Financial could not maintain the results it had conditioned the market to expect.

Nonetheless, defendants continued to provide guidance that they knew was false and misleading.  On December 15, 2004, in a press release, Sheehan falsely stated that "we remain comfortable with our long term guidance of 25% growth in fully diluted earnings per share."  ¶211.

---

[9]     Also, near the end of the conference call, an analyst asked "on your interest rate positioning[,] [h]as anything that the Fed has done so far and the changes in the slop of the curve surprised you or has it all been consistent with **your expectations for a flattening curve**?"  ¶205.  Spinney replied, "It's **pretty consistent with what we expected** in terms of what the Fed moves have been.  And it was built into that 300-basis point guidance we gave way back in June and continues to be in our guidance with the 200 basis points up from here today."  *Id*.

On January 25, 2005, in press release, Sheehan stated "[w]e remain confident in our ability to produce growth of 25% in diluted earnings per share in 2005." ¶214.

By mid-year, however, defendants could no longer maintain the facade. On July 14, 2005, Investors Financial slashed its fiscal year 2005 and 2006 diluted earnings per share ("EPS") guidance by 15% announcing that "[t]he Company expects to achieve growth of approximately 10% in diluted earnings per share in 2005." ¶223.  Defendants sought to explain the change by providing implausible explanations such as that the revision of its historical target for annual EPS growth was due to "*a flatter than expected yield curve*," among other things.  *Id*.  Such a statement is directly contrary to defendants Sheehan's and Spinney's statements in a January 25, 2005 conference call where they stated that "*we are also modeling a further flattening of the yield curve in 2005*" and that "a flattening of the yield curve [is] baked into our guidance [for next year (2005)]." ¶¶13, 226.  CW1, who served on the Asset and Liability Committee ("ALCO") with Sheehan, Michael F. Rogers, Spinney and H. C. ("Spike") Sylvester (IBT's Treasurer) said that Sylvester would never have uttered such nonsense and that such a statement of surprise is "naive garbage" because "anyone with half a brain knew that for months all the extra cash from the Far East was going into 10-year US Treasury bonds."  ¶226.

Indeed, on the conference call, held the same day, Spinney had trouble keeping his story straight and stated that "[c]oming out of the first quarter, *we had a pretty – pretty relatively steep yield curve*." ¶224.  However, the April 13, 2005 first quarter conference call transcript reflects that defendant Spinney stated that the yield curve "*was probably a little flatter curve than we anticipated*."   ¶221.   Similarly, Sheehan had remarked that "the yield curve flatten[ed] significantly." *Id*.  Earlier, on the January 25, 2005 conference call, Sheehan specifically stated in response to an analyst question, that "with respect to the yield curve, *we do have a flattening of the*

*yield curve baked into our guidance* . . . and expect [fed] funds to achieve 4 percent by the end of

December. ***That's baked into our guidance. Does that answer your question?***" ¶215.  Even after

the July 2005 drastic guidance revision, allegedly caused by their not noticing the flat or flattening

yield curve, defendants nonetheless continued to provide guidance stating that "[w]e assume in our

net interest income forecast for 2005 and 2006 . . . *that the yield curve will remain flat*." ¶224.

The next day, on July 15, 2004, the market reaction was again severe.  Investors Financial's

share price immediately dropped 18% from $41.52 to $34.05.  ¶225. On August 9, 2005, within

three weeks of the end of the Class Period, defendants disclosed *for the very first time*  what they

had known since the beginning: that SBA securities experienced prepayments by stating that:

> ***Prepayment experience for Federal agency securities (primarily SBA
> guaranteed loan pools) also increased*** over this period as the weighted average life
> of the securities shortened.  We expect the combination of ***heightened prepayment
> experience and, more significantly, reduced reinvestment opportunities to continue
> to pressure our net interest income for the remainder of 2005***.

¶228.  Investors Financial's September 30, 2005 Form 10-Q contained an identical statement that

SBA securities experienced prepayments affecting net interest income for 2005.  ¶230.

Defendants' motive in defrauding the market was simple: money.  By maintaining Investors

Financial's stock price at artificially inflated levels, they were able to, among other things, sell $68.1

million in Investors Financial stock (an amount higher than the Company's 2001 or 2002 reported

earnings of $44.6 million and $67.4 million, respectively) and to take home $8.6 million in salary

and $21.8 million in incentive bonuses – which was tied to the Company's financial performance.

¶¶231-236.  Indeed, one need only to look at their conduct in granting themselves options to

maximize the use of non-public information.[10] On October 26, 2004, within three trading days of the

---

[10]    This practice, known as "spring loading," is designed to take advantage of stock movements
for corporate evidence as the Securities and Exchange Commission ("SEC") describes it is where "a

October 21, 2005 announced restatement, Sheehan received a grant of 19, 291 shares of *immediately exercisable options*. *See* Lawrence Decl., Ex. 5. This was the lowest point that Investors Financial stock had reached for the prior two years (and it turned out the lowest level for the entire Class Period). On November 3, 2004 and November 15, 2004, just prior to the Company's disclosure of its restated financial results, Rogers, Robert D. Mancuso, Spinney, John E. Henry, Edmund Maroney and Sheehan again received grants of 421,550 *immediately exercisable options* – the only time such a grant has been made. ¶204; Defs' App., Ex. 34 (Investors Financial's March 7, 2005 proxy reported on Schedule 14/A at 14 and all Form 4 filings included, except Sheehan's). When the market opened on November 16, 2004, investors reacted to the information provided to the market by defendants and the shares rose $3.93 giving defendants an immediate gain of $1.9 million on the 440,841 shares they had been granted. ¶243.

The Complaint lays out defendants' scheme to defraud the market with particularized detail that far exceeds the pleading requirements of the PSLRA. Accordingly, defendants' motion to dismiss should be denied.

## III.    STANDARD OF REVIEW

The court "must take the allegations in the complaint as true" and "in the light most favorable to the plaintiff." *In re Cabletron Sys.*, 311 F.3d 11, 22, 39 (1st Cir. 2002). The First Circuit has recognized that PSLRA was not intended by Congress to prevent the litigation of meritorious claims merely because a plaintiff had not learned, pled or negated every conceivable fact that might exist. *Id*. at 32 (courts allow "complaints to advance past the pleadings stage when some questions

---

company purposefully schedules an option grant ahead of good news, or purposefully postpones an option grant until after bad news." *See* Speech by SEC Commissioner: "Remarks before the International Corporate Governance Network 11th Annual Conference" by Commissioner Paul S. Atkins, *available at* http://www.sec.gov/news/speech/2006/spch070606psa.htm.

remained unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA"); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 79-82 (1st Cir. 2002). Indeed, a complaint's failure to document precise amounts of overstatements of revenue is not fatal. *In re No. Nine Visual Tech. Corp. Sec. Litig.*, 51 F. Supp. 2d 1, 26-27 (D. Mass. 1999) (complaint survives PSLRA scrutiny despite failure of complaint to document precise amount of overstatement of inventory or to tie knowledge of inventory problems to specific defendants). Thus, under Rule 12(b)(6), the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Cabletron*, 311 F.3d at 22.

## IV.    ARGUMENT

### A.    Plaintiffs' Complaint Adequately Pleads Falsity and Scienter Section 10b Claim

To state a claim under §10b of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, plaintiffs must allege: (1) "a material misrepresentation (or omission)"; (2) "scienter, *i.e.*, a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) "loss causation." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 193 (1st Cir. 2005) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). Under the PSLRA, a complaint alleging §10(b) securities fraud must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which the belief is formed. 15 U.S.C. §78u-4(b)(1).

Under §10(b) and Rule 10b-5, scienter is "a mental state embracing intent to deceive, manipulate, or defraud" and is successfully plead if the allegation in the complaint show either that

the defendants consciously intended to defraud, or that they acted with a high degree of recklessness.

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Aldridge*, 284 F.3d at 82.

    **1.    Defendants Concede the Complaint Alleges Falsity of Investors Financial's First Quarter of 2001 Through Second Quarter of 2004 Financial Statements**

Defendants concede that the Complaint sufficiently pleads the falsity of Investor Financial's

financial statements filed between first quarter of 2001 and second quarter of 2004. MTD at 21.[11]

Indeed, defendants cannot challenge the falsity of Investors Financial's financial statements because

Investors Financial has already restated the first quarter of 2001 through second quarter of 2004

financial results, admitting that they were false when originally filed.  ¶¶77-89.  Restatements are

admissions that facts existed and were available at the time of the filing of the original financial

statements which contradicted those financial statements.  *See In re Goodyear Tire & Rubber Co.

Sec. Litig*., 436 F. Supp. 2d 873 (N.D. Ohio 2006) (citing *In re FirstEnergy Corp. Sec. Litig.*, 316 F.

Supp. 2d 581, 595 (N.D. Ohio 2004) ("'By definition . . . a restatement says that the prior financial

statement was false.'")); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("the

mere fact that the [financial] statements were restated at all supports . . . an inference" of falsity);

SEC Regulation S-X, 17 C.F.R. §§210.1-02(a)(2), 249.308a, 210.4-01(a)(1) ("[f]inancial statements

filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be

misleading or inaccurate").

---

[11]    "MTD" refers to Defendants' Motion to Dismiss the Consolidated Complaint in Its Entirety.

2.    **Plaintiffs Plead with Particularity that Defendants Made Recklessly False and Misleading Statements that SBA Securities Have Prepayments Risk, Even Though Actual Prepayments Had Occurred**

In the Company's June 30, 2003, September 30, 2003, and December 31, 2003 Forms 10-Q and 10-K, defendants made false and misleading statements regarding the Company's SBA prepayment risk stating that "SBA securities provide an attractive yield ***with limited*** credit risk and ***prepayment risk*** in a rapidly changing interest rate environment." ¶¶169, 176, 181. However, CW1, an IBT former managing director of risk management,[12] who served on ALCO with Sheehan, Rogers, Spinney and IBT's Treasurer Sylvester, reported that SBA securities had already experienced prepayments starting in 2002 that continued through 2003. ¶¶33, 53, 73. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981).

Here, defendants' disclosure suggests ***not an existing fact but rather a hypothetical future risk***. Defendants cannot immunize themselves from securities fraud allegations by warning of a future risk, when the event is already occurring. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) ("There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems . . . ."); *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("'to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit'"). Indeed, the only time

---

[12]    CW1 was employed at IBT from early 2001 to late 2003 and reported to, and communicated with, Sheehan and members of the Management, Asset/Liability, and Credit Committees concerning independent risk management including tracking key–risk indicators of common stock, debt, and credit default swap prices that included mortgage backed securities, collateralized debt obligations, municipal, and agency bond portfolios. ¶33.

defendants admit that SBA prepayments occurred is after the end of the Class Period when defendants filed their June 30, 2005 and September 30, 2005 Forms 10-Q.  Plaintiffs sufficiently allege falsity concerning the SBA securities' prepayment risk.

> **3.     Plaintiffs Plead with Particularity that Investors Financial Failed to Disclose the SBA Securities' Prepayment Risk in Its SEC Filings from March 31, 2003 to the End of the Class Period**

Plaintiffs allege that Investors Financial did not disclose the Company's SBA securities' prepayment risk and that the Company would lose its interest income and unamortized premium amount for securities purchased over par value.  ¶¶118, 123, 129, 136, 144, 151, 157, 163, 190, 198, 210, 213, 219, 222.  Defendants contend that they publicly disclosed this prepayment risk.[13]  Not so. Defendants' disclosure warns of risk of prepayment of the Company's MBS, not a specific risk disclosure regarding SBA securities.  As noted above, defendants know how to warn, albeit falsely, of the SBA securities prepayment risk.  ¶¶169, 176, 181.  Plaintiffs have sufficiently pled the falsity of defendants' omissions regarding the SBA securities prepayment risk.

> **B.     Plaintiffs Have Pled a Strong Inference of Scienter Against All Defendants**

In the First Circuit, scienter is determined by "analyz[ing] the particular facts alleged in each individual case."  *Aldridge*, 284 F.3d at 82.  A "plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter.  As part of the mix of facts, the plaintiff may allege that the defendants had the motive (concrete benefits that could be

---

[13]     Defendants cite the Company's 2003 Form 10-K which states: "We invest in mortgage-backed securities. . . . Mortgage-backed securities generally have a higher yield than U.S. Treasury securities due to credit and prepayment risk. . . . ***Prepayment risk*** results from the possibility that changes in interest rates may cause ***mortgage-backed securities*** to be paid off prior to their maturity dates."  MTD at 34.

realized by . . . the false statements and wrongful nondisclosures) and opportunity (the means and likely prospect of achieving concrete benefits by the means alleged) to commit the fraud." *Id*. The Complaint, based on confidential sources, duration and scope of GAAP violations, lack of internal control, fraudulent financial reporting and dramatic bonus increase, extensive insider stock sales, clearly raises a strong influence of scienter against defendants.

> **1.    Defendants Had Actual Knowledge of Prepayments on the Company's Debt Securities and Need to Write-Off or Amortize the Appropriate Amount of Premium**

Defendants' knowledge of Investors Financial's true financial condition was gained, in part, through participation in the Company's twice monthly ALCO meetings which were expressly tasked with providing "sustainable net interest revenue under various economic conditions." ¶¶68-76. Sheehan, Rogers, Spinney, and Keenan served at various times on ALCO. ¶70. Using the Company's income simulation model and gap analysis, defendants were made aware of prepayments on the Company's debt securities mainly because interest income for that security would cease. *Id*. Defendants' actual knowledge of prepayments and the need to write off or amortize the appropriate amount of premium is further supported by defendants' own admission in their SEC filings that:

> Amortization and accretion of debt securities purchased at a premium or discount are amortized or accreted into income by a method which ***approximates the effective yield. Actual prepayment experience is reviewed periodically and the timing of the accretion and amortization is adjusted accordingly***.

Defs' App., Ex. 4 at F-11.

Thus, defendants do not, and cannot argue that they had no knowledge of prepayments. Indeed, defendants' statement of actual knowledge of prepayments is confirmed many times throughout the Class Period, with defendants making numerous statements such as Spinney's on the October 15, 2003 conference call where he stated that "[n]et interest income was flat on a year-over-year basis and decreased 8 percent linked quarter, primarily ***due to increased prepayments in our***

- 16 -

*mortgage-backed securities portfolio*." ¶172. With this knowledge, however, defendants nevertheless misrepresented the impact of Investors Financial's results.

Defendants' statement of "actual knowledge" is reaffirmed by defendants when they file their December 31, 2003 Amended Form 10-K on November 15, 2004 when the Company restated its financial results.[14] ¶206; Defs' App., Ex. 5 at F-11. Both Forms 10-K were signed by Sheehan, Rogers, and Spinney. ¶¶180, 206. "[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." *Howard v. Everex Sys.*, 228 F.3d 1057, 1061 (9th Cir. 2000). Thus, either defendants did what they said they would do and knew of the prepayments and need to write-off or amortize the appropriate amount of premium or violated the Company's own stated policies. Scienter is therefore established. *See Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (insiders' violation of company policies has long been held probative of scienter).

Defendants' scienter may also be inferred from their post-Class Period admissions of the correct accounting method under FAS 91 in the Company's June 30, 2005 Form 10-Q filed right after the Company drastically reduced its guidance estimate.

Under FAS 91, companies may either anticipate prepayments by considering "estimates of future principal prepayments in the calculation of the *constant effective yield* necessary to apply the interest method" or not anticipate prepayments in "the calculation of the *constant effective yield*

---

[14]     Suspiciously, in the Company's December 31, 2004 Form 10-K, the statement that "[a]ctual prepayment experience is reviewed periodically" was dropped (Defs' App., Ex. 11), but then reaffirmed post-Class Period in the Company's June 30, 2005 and September 30, 2005 filings where defendants admitted that prepayment experience "*is reviewed monthly* and the timing of the amortization and accretion is adjusted accordingly." ¶¶46, 229.

necessary to apply the interest method." ¶39; Defs' App., Ex. 27 ¶19. Comparing defendants' post-Class Period admission to its prior statements reveal that the Company knew all along. For example, the December 31, 2002 Form 10-K stated that amortization of premium is "recognized over the life of the securities utilizing a method that approximates the yield to maturity." ¶153; December 31, 2002 Form 10-K. Then, Investors Financial's December 31, 2003 Form 10-K and Amended Form 10-K stated that the Company uses a "method which approximates the effective yield." ¶¶180, 206; Defs' App., Exs. 4-5. However, ***even after*** the Company restated its financials in November 2004 to change in internal controls over financial reporting as it pertained to the application of FAS 91, that defendants did not calculate a "constant effective yield," as FAS 91 required. Rather, they continued to refer to the approximate yield –indicating that they still had not complied with FAS 91. Defendants only finally complied with FAS 91 and calculated the "constant effective yield" after the Company's July 14, 2005 announcement that guidance would be revised from 25% to 10% – indicative of the fact that defendants knew that they had not written off or amortized the appropriate amount of premium when $619 million of the SBA securities were prepaid as of December 2003.

"[A]llegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation. For example, the fact that a business files for bankruptcy on 'Day Two,' may, under the right surrounding circumstances, provide grounds for inferring that the business was performing poorly on 'Day One.'" *Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 698 (5th Cir. 2005); *Novak*, 216 F.3d at 313.

       **a.**       **Because the Company's Mortgage-Backed and SBA Securities Were Classified as Held-to-Maturity, Defendants Knew or Were Reckless in Not Knowing that the "Prospective Method" to Account for Its Debt Securities Violated GAAP Because They Were Not High Risk Securities**

Defendants' 2003 amended contractual years to maturity tables reflect that the restatement did not impact the Company's available-for-sale ("AFS") securities, only affecting the Company's held-to-maturity securities ("HTM"). *See and compare* Defs' App., Ex. 5 at 47-48 *with* Defs' App., Ex. 4 at 43-44. Because defendants classified these affected securities as HTM, they are not high risk securities which "may not be classified in the HTM category," as the Company's auditor notes. Complaint, Ex. A at 11. FASB defines "'high risk' securities as those securities where there is a potential for loss of substantially all of the original investment due to changes in (a) market interest rates, (b) prepayment rates or (c) temporary reinvestment earnings." *Id*. Indeed, defendants knew that SBA securities were not high-risk securities, as evidenced by the Company's December 31, 2003 Form 10-K that states: "management believes that the Company will recover all principal." ¶182. Thus, because the affected securities were HTM securities, the defendants could not have unknowingly used the "prospective method" on either its MBS or SBA securities.

       **2.**       **Plaintiffs Plead with Particularity that Defendants Knew or Were Reckless in Not Disclosing the Company's Prepayment Policy Until After the Class Period**

Defendants' failure to disclose the Company's prepayment policy and significant assumptions underlying their prepayment estimates is further evidence that they intentionally misled the market. FAS 91 requires that "[e]nterprises that anticipate prepayments shall disclose that policy and the significant assumptions underlying the prepayment estimates" in using the retrospective method. ¶45. Indeed, FAS 91 had been around since December 1986 and the Company's auditor publicly stated in 2000 that "[a]ll fixed rate MBSs and adjustable rate MBSs are required to follow

- 19 -

the retrospective method." ¶¶7, 202.  Similarly, for the SBA variable rate securities, the Company's

auditor notes that they "are accounted for using the retrospective method."  Complaint, Ex. A at 10.

For MBS, defendants essentially concede this non-disclosure because the required FAS 91 statement

only appears after the Class Period in the Company's June 30, 2005 and September 30, 2005 Forms

10-Q.  ¶¶46, 229.

However, in this motion, defendants challenge whether Investors Financial could reasonably

anticipate prepayments for SBA securities.  MTD at 27-30.  But the ***facts***, during the Class Period,

show this "challenge" to be simply wrong.  First, the defendants did not disclose the required FAS

91[15] prepayment policy, but were nevertheless anticipating prepayments of the Company's SBA

securities, as evidenced by statements such as Spinney's on the November 15, 2004 conference call

that the Company's guidance is subject to "***a forecast of SBAs running at industry prepayment***

***speeds***." ¶205.  (Such is a reference to the Constant Prepayment Rate ("CPR") discussed below and

shown in ¶51.)[16]

---

[15]    FAS 91 Interpretive Guidance also states that for "a pool of mortgage purchased at a premium, using the contractual terms in applying the effective interest method results in higher interest income being recognized until the prepayments are made than would be recognized if estimates of prepayments were anticipated. ***We believe estimates of prepayments should be considered in the calculation of the constant effective interest rate when the use of the contractual payment terms of the loan results in an effective interest rate significantly greater than the rate produced using estimates of prepayments such that interest income is materially overstated and the requirements of paragraph 19 are met***. (*See* Accounting Research Manager Interpretations and Examples\03. Financial Assets - Receivables, Loans, and Securities Loan Fees and Costs - Interpretations of FASB Statement No. 91 (FI 6060 192).

[16]    "CPR yield assessment has become the portfolio manager's standard for purchase analysis of mortgage-backed securities and SBA pools" (¶48 n.4) and "every SBA variable-rate pool with a stated-maturity date can be expected to prepay at close to the same-rate."  Asset-Backed Securities, by Anand K. Bhattacharya and Frank J. Fabozzi, Chapter 10 SBA Loan-Backed Securities at 176.

Thus, if defendants were not anticipating prepayment on the Company's debt securities they are reckless by investing the corporation's money without understanding the risk. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 199 (1st Cir. 1999) ("'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it'" sufficient to allege a strong inference of scienter).

Here, plaintiffs specifically plead that Investors Financial purchased SBA securities at a premium (¶48) and that Spinney was specifically informed in the first quarter of 2003 of the risk of SBA prepayments and that the Company would lose the unamortized amount of premium. ¶49. Coastal securities notes that because SBAs "normally trade at a premium," knowledge of their prepayment characteristics is important and it is "the [p]rimary issue in deciding to invest in SBA pools." ¶48 n.4. Thus, contrary to defendants' current assertions, prepayments *were* anticipated (and were being made), but just not disclosed.

### 3.    Defendants' Actions in Running the Company, as Well as the Nature of the Fraudulent Scheme, Further Supports Scienter

Plaintiffs specifically plead that corroborating witnesses reported that IBT was a "dictatorship of two partners" (CW1) and that Sheehan and Spinney "called the shots" concerning IBT's operations. (CW3). ¶257; *see Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232-34 (9th Cir. 2004) (scienter found where top management closely monitored real-time sales database and had a "detail-oriented" management style). Moreover, CW1 reported that although Sylvester recommended the categories of investments for IBT, Rogers decided on the specific asset and the dollar amount to be invested. ¶257. As stated in the scheme to defraud section of the brief, defendants in their June 30, 2003 to December 31, 2003 SEC filings stopped reporting the contractual held to maturity tables and increased their holdings of SBA securities to disguise the

- 21 -

fact that the "1 to 5" and "5 to 10" year maturities were being prepaid. ¶¶162, 169, 176, 181. Furthermore, CW2 reported that Sheehan was the "architect" of the SBA bond investment program and understood the marketplace because of his experience as a former executive with the Bank of England, which did a substantial amount of business in SBA bonds. ¶20.

Thus, it is clear that Sheehan and Rogers knew about the $619 million in SBA securities were prepaid as of December 31, 2003 both directly from CW 1 and as a result of their actions at the Company. ¶57; *In re PeopleSoft, Inc., Sec. Litig.*, No. C 99-00472 WHA, 2000 U.S. Dist. LEXIS 10953, at *11 (N.D. Cal. May 26, 2000) ("'facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers'"). The allegations showing defendants' knowledge confirm the reasonableness of the core business inference. Indeed, in *In re NorthPoint Commc'ns Group, Inc., Sec. Litig. & Consol. Cases*, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002), the court noted it would strain credulity to believe a company's top officers were not aware of improper accounting.

### 4.     Defendants' Suspicious, Unusual and Substantial Stock Sales of More than $68.1 Million Support a Strong Inference of Scienter

Defendants' stock sales were well timed to take advantage of the artificial inflation in the stock, caused by the reporting of false financials that concealed and misrepresented the Company's true financial condition, by unloading more than 1.7 million shares and pocketing $68.1 million in profits, an amount higher than the Company's 2001 or 2002 reported earnings of $44.6 million and $67.4 million, respectively. ¶¶77, 235-36. It has long been held that "[s]tock sales by insiders can supply evidence of scienter." *Cabletron*, 311 F.3d at 39-40. Insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount. *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995).

The timing of defendants' insider stock sales was both extraordinary and suspicious, as defendants sold large amounts of Investors Financial stock in 2001 and 2002 immediately after defendants issued false positive statements that overstated net interest income by $8.4 million in 2001 and $2.3 in 2002. ¶¶105, 107-108, 114-116, 124, 135, 150, 178, 204-205, 235-236. For example, after reporting the false net interest income for both the first and second quarters of 2001, the stock price increased substantially, and defendants sold a total of 457,680 shares and took in proceeds of more than $17.2 million.[17] ¶¶105-108, 112-116. Insider sales in close temporal proximity to false positive statements are indicative of scienter. *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 222 (D. Conn. 2001); *see Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999) (sale of officers' stock in proximity to allegedly false optimistic statements was significant to issue of whether sales were unusual and suspicious). Similarly, in 2002, defendants also sold large amounts of Investors Financial stock after issuing false positive financial statements, dumping a total of 647,344 shares taking in proceeds of $24.3 million. Indeed, defendants' stock sales in 2001 and 2002 represent over 64% of defendants' Class Period sales with defendants taking in proceeds of more than $41.5 million (61% of total proceeds). ¶236.

Equally suspicious are defendants' stock sales starting in March 2003 and ending in late January 2004 shortly after the Company released its fourth quarter results. *Id*. During this time period, CW1 stated that SBA securities were being prepaid and that he/she reported the risk to defendant Spinney. ¶49. At the same time, the Company stopped reporting its quarterly contractual

---

[17]    Notable, is the fact that prepayments rise when interest rates fall and that during 2001 and 2002 the Federal Reserve cut interest rates ***12 times*** dropping the Federal Funds Rate substantially from 6% on January 3, 2001 to 1.25% on November 6, 2002. Complaint, Ex. M. Plaintiffs specifically plead that during this time prepayments or the refinance share of mortgage originations jumped 57% in 2001 and 59% in 2002. ¶43.

years to maturity tables (¶¶163, 170, 177), and failed to fully write off or amortize the premium lost

when over $619 million of the Company's SBA securities were prepaid as of December 31, 2003.

¶¶56-67. The sales thus occurred while defendants were in possession of material non-public

information.

The magnitude of defendants' selling is also suspicious. Specifically, Maroney sold 63% of

his stock holdings for $8.7 million, Henry sold 55% of his stock holdings for $2.4 million, Mancuso

sold 52% of his stock holdings for $9.9 million, Sheehan sold 51% of his stock holdings for $38.9

million, Keenan sold 39% of her stock holdings for $4.4 million, Rogers sold 8% of his stock

holdings for $3.5 million, and Spinney[18] sold 1.8% of his stock holdings for $5,472. These sales

were made as defendants were misleading the market about Investors Financial's results and

prospects.

Finally, defendants' scienter is further demonstrated by Sheehan, Rogers, Mancuso, Spinney,

Henry, and Maroney "spring-load[ing]" their option grants in November 2004, to take full advantage

of their fraud. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 931 (9th Cir. 1993) (because

defendants "stood to receive more compensation because of the alleged non-disclosure" it raises an

---

[18] Defendants contend that because Spinney did not sell any shares, but rather bought 10,150 shares, scienter is negated. Defendants are incorrect. As the CFO, Spinney knew both from CW1 and his reporting of the Company's financial results that the reported information was false. Moreover, because Spinney was directly and personally responsible for the financial statements of the Company, his scienter is shown even without his stock sales. *See, e.g., Provenz v. Miller*, 102 F.3d 478 (9th Cir. 1996) (summary judgment denied for CFO even though stock sales were minimal). Further, the majority of the shares purchased by Spinney were made through option exercise *without* a corresponding sale in the stock. Thus, if defendants are to be believed, Spinney's "exercising to hold" behavior is irrational (outlaying a substantial amount of cash to hold stock while option achieves same return) and raises questions of fact regarding these trades, *e.g.*, whether Spinney pledged these shares for collateral against a loan or has somehow monetized these shares. *See* DerivativeStrategy.com article entitled "Cashing Out" *available at* http://www.derivativesstrategy.com/magazine/archive/2000/0900fea1.asp. Finally, Spinney did in fact sell 200 shares, as evidenced by his Form 4 filing on December 5, 2002.

inference of scienter); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003). Investors Financial's March 7, 2005 proxy reported on Schedule 14/A (page 14) contained in Defs' App., Ex. 34 reveals that after Investors Financial's stock declined over 16% after the October 21, 2004 announced restatement, defendants granted themselves over 340,000 immediately exercisable options at or near the lowest price their stock had reached in the prior three years. For defendants this grant represented an immediate $1.9 million gain on November 16, 2004. This, too, was evidence that defendants sought the benefits financially from their overall fraud. *Aldridge*, 284 F.3d at 75.[19]

Contrary to defendants' assertion, the strong inference of scienter evidenced by defendants' insider trading during the Class Period is not precluded by the length of the Class Period. MTD at 17 n.13. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002), relied on by defendants, merely held that the length of the Class Period weighed against a finding of scienter because in that particular case the plaintiffs failed to support an inference of fraud throughout the entire Class Period, and adopted a long Class Period for the sole purpose of "sweep[ing] as many stock sales into

---

[19]    The Complaint details the stock sales by date and transaction for each of the individual defendants. Complaint, ¶36 shows each of the defendants who sold stock (except the CFO Spinney), and made over $2 million each in proceeds. Investors Financial Chief Executive Officer Sheehan, its President Rogers, and Keenan (Investors Financial's CFO until 2002) each made $38.9 million, $3.5 million, and $4.42 million, selling respectively 51%, 8%, and 36% of their holdings. Mancuso, Maroney and Henry, also made $9.9 million, $8.7 million, and $2.4 million in proceeds from their stock sales, which was 52.64% , 63.06%, and 55.88% of their total stock holdings, respectively. While the percentage of stock sold by Mancuso, Maroney and Henry is accurate, the computation of their stock sales as a percentage of their shares **and** options was in error. Their stock sales as a percentage of their overall holdings were 28.1%, 32.2%, and 22.9%, respectively. While plaintiffs believe that it is far more appropriate to focus on stock sales, since defendants can control their option grants, even these percentages are more than sufficient to support a strong inference of scienter. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (17% significant percentage to establish scienter); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (sale of 20% of a corporate insider's shares sufficient to support a scienter allegation).

their totals as possible." *Id.* at 1092. Here, unlike in *Vantive*, plaintiffs do not extend the Class Period for the sole purpose of increasing the amount of defendants' stock sales. Rather, the length of the Class Period is co-extensive with the financial fraud.

Similarly, defendants' other arguments such that "four of the seven" defendants sold no stock between the issuance of the 2005 guidance and the subsequent July 2005 guidance revision and that "six of seven" defendants sold no stock in the second quarter are entirely misplaced, as the Court is required to look at all Class Period stock sales. MTD at 5. So is their argument that Sheehan's, Mancuso's, and Maroney's "sales are consistent with the amounts of their sales in earlier years," stating that defendants Sheehan's sale of 155,000 shares was not unusual because he had sold an average of 200,000 shares of Investors Financial stock from 2001 to 2004. *Id.* at 17. Defendants should compare prior period sales, not Class Period sales, the exact same shares plaintiffs allege were fraudulently sold.

Likewise, defendants' argument that the purported existence of Rule 10b5-1 plans renders some of the insiders sales as non-unusual as a matter of law is wholly misplaced on a motion to dismiss, as such plans merely offer defendants an affirmative defense under which defendants have the burden of proving that the plans meet all of the requirements under the regulation.[20] 17 C.F.R.

_____

[20]     In support of their erroneous theory that their insider trading plan could raise an inference that the sales were pre-scheduled and not suspicious, defendants cite *In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 U.S. Dist. LEXIS 18765, at *25 (N.D. Cal. June 28, 2005), and *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003). However, in *Netflix*, the court had already found that the "these percentages are not inherently suspicious" making their comments that sales were made pursuant to a Rule 10b-5(1) trading plan dicta. Similarly, in *Wietschner*, 294 F. Supp. 2d at 1117, the court misapplied the law by citing *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002) for the proposition that a court must consider all reasonable inferences (a case where Rule 10b5-1 plans were not even discussed) but neglected to consider that insider trading plans are an affirmative defenses to be set forth in the defendants' pleading under Fed. R. Civ. P. 8.

§240.10b5-1(c) ("Affirmative defenses").  Furthermore, defendants have put no evidence forward

(even if it were admissible on a motion to dismiss), but rather simply make the bald assertion that

their trades occurred pursuant to pre-existing trading plans.[21]

> **5.    Defendants' Dramatic Increase in Their Eligible Bonuses for 2004, Further Supports a Strong Inference of Scienter**

Defendants' scienter may also be inferred from defendants' November 2003 dramatic

increase to their bonus structure for fiscal year 2004 – that occurred shortly after the SEC's Final

Rule on Management's Reports on Internal Control Over Financial Reporting and Certification of

Disclosure in Exchange Act Periodic Reports ("SEC Final Rule") was issued on June 5, 2003 and

came into effect on August 14, 2003.[22]

In November 2003, defendants increased their eligible bonuses from 100%-125% up to 265%

of their annual base pay if the 2004 GAAP earnings per share equaled the minimum target, and

increased the eligible bonuses from 225% to 325% of their annual base pay if the GAAP 2004

earnings exceeded the minimum target.  Lawrence Decl., Exs. 2-3.  The facts above convincingly

demonstrate, not only that defendants knew they would restate their financial numbers due to lack of

---

[21]    For example, defendants neglected to tell this Court that after the Complaint was filed, the Company filed a Form 8-K on May 5, 2006 that declared virtually all of defendants' trades going clear back to 2001 were made pursuant to Rule 10b5-1 trading plans. Defs' App., Ex. 33. However, defendants have made no such amendments to their previous filings on Form 4.  Moreover, the fact that some of defendants' forms already stated that certain trades were made pursuant to plans, make defendants' new submission extremely suspect.  Such assertions, with or without proof, are entirely improper at this stage.

[22]    On June 5, 2003, the SEC Final Rule required Investors Financial to include in its annual reports "a report of management on the company's internal control over financial reporting "as of the end of its fiscal year ending on or after June 15, 2004," which meant that the Company would have to comply and include in its December 31, 2004 Form 10-K a report of management on the Company's internal control over financial reporting.  Thus, the stakes for financial fraud had increased.  Further, the change in accounting method resulted in additional profits from the scheme.

internal control over financial reporting, but that they knew that the previously shifted net interest income losses experienced in 2001-2002 that were pushed forward into 2003-2004 would be removed by restating 2001-2002 income creating record earnings and bonuses for 2004. Thus, the 50% earnings growth in 2004 came as no surprise and Sheehan, Rogers, Maroney, and Spinney took home record bonuses of 325% of their annual base pay receiving more than $8 million in bonuses.

¶234. "[T]he magnitude of [an executive's] compensation package, together with the timing coincidence of an overstatement of earnings at just the right time to benefit [the executive], provides an unusual, heightened showing of motive to commit fraud." *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 128 (D. Mass. 2003) (citing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001)); *see City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468, 501, 504 (6th Cir. 2004) (pocketing huge bonuses is one helpful factor to establish scienter).

Defendants argue that plaintiffs' insider trading and bonus allegations make no sense because Investors Financial actually revised upward its net interest income and net operating revenues for 2003 and the first three quarters of 2004 and that "[n]o officer or director intent on selling stock or obtaining a higher incentive-based bonus would intentionally understate financial results, artificially deflating the Company's stock, for the purpose of selling his or her shares at depressed prices or receiving a lower bonus payment." MTD at 26. Defendants are wrong. By changing the accounting from the prospective method to the (proper) retrospective method the defendants got to have their cake, and they got to eat it too: By initially shifting net interest income losses experienced in 2001 and 2002 forward into 2003-2004 defendants were able to take home and keep large bonus in 2001, 2002 and 2003 before deciding to restate their financials, removing previously pushed forward expenses, to achieve 50% earnings growth in 2004. In total, while the Company's financials were

misstated and its stock price artificially inflated, defendants made huge profits on insider stock sales, received more than $8.6 million in salary and more than $21.8 million in incentive bonuses that ranged from 150% to 325% of their annual salaries, receiving more than $30.4 million in total compensation for 2001-2004 by not disclosing the problems and risk associated with the Company's mortgage-backed and SBA securities.  ¶¶232-234.

> **C.      The Allegations of Financial Fraud Are Clearly Material and Cannot Be Dismissed as "Immaterial As a Matter of Law"**

At the pleading stage, "'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reason-able investor that reasonable minds could not differ on the question of their importance.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000); *see also In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46, 54 (D. Mass. 2003) ("[m]ateriality requires assessment of qualitative and quantitative factors, so that even quantitatively small amounts can still present a materially misleading picture of a company's health") (citing SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45152 (1999)) at 84 and n.8.  Here, materiality had been admitted by the Company's restatement and statement to investors that the Company's financial reports "should no longer be relied upon."  ¶¶78, 84-89, 199-200, 203.  Indeed, even in their motion, defendants also specifically acknowledge that the restatement is material in their brief by arguing that the Company's financials are "***materially*** lower in the year 2001."  MTD at 10; *see In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854, at **2-3 (N.D. Cal. Nov. 17, 2005) (company's own

public admission that its financial reports should not be relied upon and would be restated meant that the as-issued reports were materially inaccurate under GAAP).[23]

### D.     The Complaint Adequately Pleads Loss Causation

"[L]oss causation does not . . . require a corrective disclosure followed by a decline in price . . . the loss causation requirement will be satisfied if such conduct had the effect of concealing the circumstances that bore on the ultimate loss." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005). Here, defendants reported false financial results, concealed the SBA securities' prepayment risk, the fact that these securities experienced actual prepayments, the Company's prepayment policy, and that the Company was not correctly applying FAS 91 until after the end of the Class Period. The Complaint's loss causation allegations exceed the short and plain statement required by Rule 8 and provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." ¶¶237-249; *Dura*, 544 U.S. at 346-47; *In re Daou Sys.*, 411 F.3d 1006, 1025-27 (9th Cir. 2005), *cert. denied*, *Daou Sys. v. Sparling*, 126 S. Ct. 1335 (2006). Indeed, as the Complaint alleges as the truth about Investors Financial's picture emerged, the market reacted in direct response to the disclosures. ¶¶241-49. Nothing more is required.

---

[23]     Despite the fact that at the pleading stage a complaint may not be dismissed on the grounds that the alleged misstatements or omissions are not material, defendants nevertheless contend that the restatement is immaterial as a matter of law. MTD at 33. However, defendants' cases do not support their assertion, as *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 171 (D. Mass. 2000); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 715 (N.D. Ill. 2005); and *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003), all deal with *scienter* and whether the size of a restatement itself supports an inference of scienter. Similarly, defendants' reliance on *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir. 1996), is misplaced, as that case does not involve a restatement at all, but rather a duty to disclose and whether defendants were required to make a more specific disclosure, rather than a rough estimate, of the Company's backlog numbers where the estimate varied between 3%-9%.

**E.    Where the Combined Allegations Sufficiently Plead Defendants Had Actual Knowledge of SBA Prepayments, Investors Financial's Cautionary Warnings that Actual Results "Could" Differ from Projections Were Not Meaningful**

Defendants' forward-looking statements are not protected by the safe harbor because, as discussed previously, defendants made the material misrepresentations with actual knowledge that they were false and misleading. *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 311 (D. Mass. 2005) (safe harbor does not apply if plaintiff pleads "facts giving rise to a strong inference that the defendant made the statements with actual knowledge that they were false or misleading"); *see* 15 U.S.C. §78u-5(c); *see also In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003) ("If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading."); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) ("'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'").

Here, defendants do not, and cannot, argue that they have no knowledge of prepayments.[24] The Complaint adequately demonstrates defendants' actual knowledge by showing that CW1 stated

---

[24]    Defendants state: "***Actual prepayment experience is reviewed periodically and the timing of the accretion and amortization is adjusted accordingly***." Defs' App., Ex. 4 at F-11; ¶¶180, 229. "[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." *Howard*, 228 F.3d at 1061. Post-Class Period, defendants admit that prepayments are "reviewed monthly." ¶¶46, 229. Similarly, numerous statements were made during the Class Period demonstrating defendants' knowledge of prepayments, such as net interest income flat "***due to increased prepayments in our mortgage-backed securities portfolio***." ¶172; *see also* Complaint, Ex C.

that SBA prepayments occurred in 2002-2003 (¶¶53-55) and specifically informed Spinney of this risk (¶49), defendants stopped reporting the contractual years to maturity table (which concealed the prepayments from the market), increased the Company's SBA holdings, and that due to prepayments, the SBA securities' effective yield dropped below the risk free rate impairing the security which EITF 03-1 required defendants to make a statement that they had the "intent and ability to hold [the SBAs] to maturity." ¶¶162-163, 169-170, 176-177, 181-182. In addition, defendants did not follow FAS 91 in applying the interest method to calculate a "constant effective yield" for its debt securities until after the Class Period. ¶229. Thus, defendants knew that the SBA prepayments adversely affected the Company's future net income.

Defendants' knowledge that prepayments have an adverse affect on the Company's net interest income and financials is further demonstrated by defendants' own cautionary language given in the November 15, 2004 conference call identifying what they thought were "important factors," warning investors that: "*[i]ncluded in our guidance is and has always been a forecast of SBAs running at industry prepayment speeds*." ¶¶205, 263. This known risk was *not* incorporated into the Company's guidance issued on December 15, 2004, January 25, 2005, and April 13, 2005 that stated growth of 25% growth in diluted earnings per share in 2005.[25] This Court has acknowledged that a specific projection is actionable. *Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 245 (D. Mass. 2001) (acknowledging that that "optimistic projections 'accompanied by specific qualifications of projected results [*e.g.* prediction of 30% growth] implying certainty' can be the basis of liability"); *see also In re Sepracor, Inc., Sec. Litig.*, 308 F. Supp. 2d 20, 34 (D. Mass. 2004) ("Accepting Plaintiffs' allegations as true, Defendants would have been obliged under the

---

[25]    *See* Defs' App., Ex. 21; Lawrence Decl., Exs. 6-7.

circumstances to disclose known facts about the animal studies that undermined their predictions of Soltara's success."); *see, e.g.*, *In re Viropharma Sec. Litig.*, No. 02-1627, 2003 U.S. Dist. LEXIS 5623, at *29 (E.D. Pa. Apr. 7, 2003) (safe harbor provision not applicable when defendants are aware of facts that render their statements untrue when made); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004), *cert. denied*, 544 U.S. 920 (2005) (safe harbor not applicable when company omits important variables from cautionary language and makes projections more certain than internal estimates at the time warrant).

Defendants contend that the Company's risk warning was meaningful as it disclosed the risk of a change in the yield curve.[26]  MTD at 8.  Defendants fail to acknowledge the principle that the adequacy of the warnings cannot be decided as a matter of law at the pleading stage if a reasonable person could conclude that the cautionary statements, in context, were insufficient.  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1214 (1st Cir. 1996);[27] *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946-48 (9th Cir. 2005); *Asher*, 377 F.3d at 734; *see also EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 877 (3d Cir. 2000) (sufficiency of the warning, that had been incorporated into the annual report, could not be "decided as a matter of law" at the pleading stage when defendant "repeated his [false] assurance that contracts . . . were imminent," which reasonably

---

[26]     Even if a "flat yield curve" could be said to have caused defendants to change guidance, defendants' self-serving post-Class Period statements in the Company's June 30, 2005 Form 10-K modifying their risk disclosures to specifically include language on a "flat yield curve" raise a question of fact whether their initial disclosures were sufficient, that cannot be resolved on a motion to dismiss.  *See* Lawrence Decl., Ex. 8.

[27]     *Shaw*, 82 F.3d at 1214 states that "[t]he [bespeaks caution] doctrine has been codified in the Securities Litigation Reform Act, *supra*, Pub. L. No. 104-67, § 102, 109 Stat. at 750.

served to neutralized warnings given earlier that the contracts might not be concluded).[28]  Thus, defendants' guidance statements are not subject to the safe harbor provision.

### F.    Defendants Are Liable Under Section 20(a) of the Securities Exchange Act of 1934

Defendants do not contest that they are control persons.  They assert only that the §20(a) claim must be dismissed solely on the grounds that plaintiffs have failed to properly plead a §10(b) predicate for the §20(a) claim.  MTD at 35.  As demonstrated above, plaintiffs have properly pled a §10(b) predicate.  As such, the §20(a) claim should be sustained as well.

## V.    LEAVE TO AMEND

Plaintiffs believe that the initial Complaint satisfies PSLRA pleading standards.  Should the Court nevertheless conclude that the Complaint is deficient in any respect, plaintiffs respectfully request the opportunity to amend.  "Leave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).  The Supreme Court had indicated that this "liberal Amendment policy of Rule 15(a) is a mandate to be heeded."  *Pyramid Co. v. Homeplace Stores Two*, 175 F.R.D. 415, 417 (D. Mass. 1997) (citing *Foman v. Davis*, 371 U.S. 178, 181 (1962)).  Here, given that the Complaint is lead plaintiffs' first complaint in this action, plaintiffs should be permitted to cure any defects identified by the Court.  *See Guerra v. Teradyne Inc*., Civil Action No. 01-11779-NG, 2004 U.S. Dist. LEXIS 28548 (D. Mass. Jan. 16, 2006).

---

[28]    This case is unlike this Court's decision in *Ibis Tech.*, 422 F. Supp. 2d at 311, as investors **were not warned** of "risks of a significance similar to that actually realized" sufficient to put investors on notice of danger of investment to make intelligent decision whether to invest.  Here, not only was the risk known, it also came to pass when defendants released the Company's June 30, 2005 Form 10-Q and stated that: [p]repayment experience for . . . SBA guaranteed loan pools . . . increased over this period . . . [and] [w]e expect the combination of heightened prepayment experience and, more significantly, reduced reinvestment opportunities to continue to pressure our net interest income for the remainder of 2005.  ¶228.

## VI.    CONCLUSION

For all the foregoing reasons, defendants' motion to dismiss should be denied in its entirety.

DATED:  September 19, 2006                    Respectfully submitted,

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JEFFREY W. LAWRENCE
JAMES W. OLIVER


                    /s/ Jeffrey W. Lawrence
          JEFFREY W. LAWRENCE (BBO #289140)

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

KRAKOW & SOURIS, LLC
AARON D. KRAKOW (BBO No. 544424)
CHRISTOPHER N. SOURIS (BBO No. 556343)
225 Friend Street
Boston, MA  02114
Telephone:  617/723-8440
617/723-8443 (fax)

Liaison Counsel

CAVANAGH & O'HARA
WILLIAM K. CAVANAGH, JR.
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
2801 Ponce De Leon Blvd., Suite 750
Coral Gables, FL  33314
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiffs

- 35 -

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1(d), plaintiff requests oral argument on its opposition to defendants' motion to dismiss consolidated complaint.

T:\CasesSF\InvestorsFinancialServices\correctedBRF00034536.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2006, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

/s/ Jeffrey W. Lawrence
JEFFREY W. LAWRENCE (BBO #289140)

Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:JeffreyL@lerachlaw.com