UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE | ) | |
| SUPPORTING FUND, On Behalf of | ) | |
| Plaintiff and All Others Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| v. | ) | NO. 05-11627-RCL |
| | ) | (Consolidated) |
| INVESTORS FINANCIAL SERVICES | ) | |
| CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

# REPORT AND RECOMMENDATION
## ON DEFENDANTS' MOTION TO DISMISS

July 31, 2007

DEIN, U.S.M.J.

## I. INTRODUCTION

This is a consolidated securities class action in which the court-appointed lead

plaintiffs, the Ironworkers St. Louis District Council Pension Fund and the City of

Deerfield Beach Non-Uniform Employees Retirement Plan ("Plaintiffs"), have asserted

claims on behalf of themselves and the class of persons who purchased or otherwise

acquired the publicly traded securities of Investors Financial Services Corporation

("Investors Financial" or "Company") between April 10, 2001 and July 14, 2005 (the

"Class Period"). The defendants consist of Investors Financial, a bank holding company,

and seven individuals who were officers of the Company during the Class Period,

including Kevin Sheehan, Michael F. Rogers, John N. Spinney, Karen C. Keenan, Robert

D. Mancuso, Edmund J. Maroney and John E. Henry (collectively, "Defendants").

Investors Financial provides services to financial asset managers, and also

manages a portfolio of financial assets that it holds for its own account.  Its financial

result is sensitive to and dependent upon the movements of short-term and long-term

interest rates.  The essence of the Plaintiffs' claims, as derived from an analysis of their

138-page Complaint, is that during the Class Period, the Defendants engaged in a

fraudulent scheme designed to artificially inflate Investors Financial's diluted earnings

per share.  The Plaintiffs contend that the Defendants were motivated to engage in fraud

by a desire to obtain higher bonuses and increase proceeds on their stock sales.

In furtherance of this scheme, the Plaintiffs contend that the Defendants issued

over sixty-five press releases, financial reports and other public statements over the

course of the Class Period that contained materially false and misleading statements

regarding the Company's financial condition and future earnings prospects.  In addition,

Plaintiffs contend, the Defendants knowingly violated generally accepted accounting

principles ("GAAP") by, among other things, using a prospective instead of a

retrospective method for accounting for interest income.  This resulted in a restatement of

interest income for fiscal years 2001 through the first two quarters of 2004.  Despite this

restatement, the Plaintiffs contend that the Defendants continued to issue materially false

and misleading statements and fraudulently failed to report the true status of its financial

condition, including the status of its SBA loan portfolio, which had not been restated.

According to the Plaintiffs, these misleading reports continued until July 14, 2005 (and thereafter), when the Company announced that it could not achieve the 25% growth in net income it had predicted.

The Lead Plaintiffs' Consolidated Complaint for Violation of the Federal Securities Laws (Docket No. 27) ("Complaint") alleges in Count One that the Defendants made material misstatements and omissions in violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  In Count Two, the Plaintiffs assert that the individual Defendants are liable, pursuant to section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as control persons of Investors Financial.

The matter is presently before the court on the "Defendants' Motion to Dismiss the Consolidated Complaint in its Entirety" (Docket No. 32) pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).  For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Motion to Dismiss be ALLOWED, and that the Complaint be dismissed without prejudice.[1]  In particular, but without limitation, this court finds that earnings projections either were not false in that, even as restated, the

---

[1]  The analysis of the Plaintiffs' claims has been made more difficult by the diffuse nature of the allegations, the lack of specificity, or of a comprehensive theory, in the Complaint and the large number of events raised in the Complaint but not discussed in the Plaintiffs' memorandum. In addition, the Defendants seem to have focused many of their arguments on earlier versions of the Complaint which are not before the court.  Since this court cannot conclude that the Plaintiffs cannot assert some viable claim of wrongdoing, this court recommends dismissal without prejudice.

Company met projections, or constitute forward-looking statements which are protected by the safe harbor provisions of the PLSRA.  In addition, the Plaintiffs have failed to plead sufficient facts to support their claim that the Defendants' acted with the requisite state of mind when they made statements regarding Investors Financial's historical financial results.  This court also finds that the claims relating to the Company's SBA loan portfolio must fail since the Plaintiffs have failed to plead loss causation.  Finally, because control person liability is dependent upon a finding of primary liability under the Exchange Act, and no such primary liability has been sufficiently alleged, this court finds that the Plaintiffs have failed to state a claim against the individual Defendants on the basis of their status as control persons.

## II.  STANDARD OF REVIEW OF RECORD

### A.     Motion to Dismiss Standard of Review

"In considering a motion to dismiss, a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  In doing so, the court may consider documents attached to or expressly incorporated in the Complaint, as well as "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to the plaintiffs' claim," and "documents sufficiently referred to in the complaint" without converting the motion into one for summary judgment.  Id. at 3-4 and

cases cited.[2]  The court may grant dismissal only if the Plaintiffs have failed to "allege 'a

plausible entitlement to relief.'" Rodriguez-Ortiz v. Margo Caribe, Inc., — F.3d —, 2007

WL 1732883, at *2 (1st Cir. June 18, 2007) (quoting Bell Atl. Corp. v. Twombly, — U.S.

—, 127 S. Ct. 1955, 1967, — L. Ed. 2d — (2007)).  Accordingly, dismissal is appropriate

if the Complaint fails to allege "more than labels and conclusions, and a formulaic

recitation of the elements" of the Plaintiffs' claims.  Bell Atl. 127 S. Ct. at 1965.

### B.    PSLRA Heightened Pleading Requirements

In 1995, Congress enacted the Private Securities Litigation Reform Act

("PSLRA"), 15 U.S.C. § 78u-4, which marked an effort to curb abuse in private securities

lawsuits.  See Greebel v. FTP Software, Inc., 194 F.3d 185, 191 (1st Cir. 1999).  The

PSLRA established strict pleading standards for such lawsuits, which are consistent with

the First Circuit's preexisting standards for pleading securities fraud under Fed. R. Civ. P.

9(b).  See id. at 193.  The statute requires that a complaint claiming securities fraud based

on misstatements or omissions set forth "each statement alleged to have been misleading,

the reason or reasons why the statement is misleading, and, if an allegation regarding the

---

[2]  The parties have submitted various exhibits which may properly be considered in
connection with the motion to dismiss.  The Plaintiffs' exhibits are attached to the "Declaration of
Jeffrey W. Lawrence in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss
Consolidated Complaint and Request for Judicial Notice" (Docket No. 50) and will be cited as
"Pls.' Ex."  The Defendants' exhibits are contained in the "Appendix of Documents Submitted in
Support of Defendants' Motion to Dismiss the Consolidated Complaint" (Docket No. 42) and
will be cited as "Defs.' Ex."  In accordance with this court's separately issued Memorandum of
Decision and Order on Plaintiffs' Request for Judicial Notice and Motion to Strike, this court has
considered the parties' exhibits in connection with this motion to dismiss, with the exception of
Defs.' Exs. 23-25 and 30, which have been stricken.

statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, where a plaintiff's cause of action requires proof that a defendant acted with a particular state of mind, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The 'required state of mind' for liability under section 10(b) [of the Exchange Act] and Rule 10b-5 is referred to as scienter, which the Supreme Court has defined as 'a mental state embracing intent to deceive, manipulate, or defraud.'" Greebel, 194 F.3d at 194 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 1381 n.12, 47 L. Ed. 2d 668 (1976)). Therefore, under the PSLRA, the complaint must "state with particularity facts that give rise to a 'strong inference' of scienter rather than merely a reasonable inference." In re Cabletron Sys., Inc., 311 F.3d 11, 28 (1st Cir. 2002).

Although the pleading requirements in private securities fraud cases are strict, "they do not change the standard of review for a motion to dismiss." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002). Accordingly, the following facts are viewed in the light most favorable to the Plaintiffs.

### III.  **STATEMENT OF FACTS**

### **The Defendants**

Defendant Investors Financial is a bank holding company that is headquartered in Boston, Massachusetts and has offices throughout North America.  (Compl. ¶¶ 2, 19). Through its subsidiaries, primarily Investors Bank & Trust ("IBT"), Investors Financial provides a broad range of services to financial asset managers such as mutual fund complexes, investment advisors, banks and insurance companies.  (Id.).  In addition, Investors Financial manages a portfolio of financial assets that it holds for its own account.  (Id. ¶ 2).  These assets generally consist of mortgage-backed securities ("MBS") and federal agency debt securities comprised principally of Small Business Administration ("SBA") variable rate guaranteed loan pools.  (See id. ¶¶ 4, 111).  It is undisputed that a key measure of the Company's health is its "net interest income," which is the difference between the income generated from these assets and expenses.  At issue in this litigation is whether the Company appropriately disclosed and accounted for what Plaintiffs contend was a significant trend of prepayment of MBS and SBA loans.  It is the Plaintiffs' contention, which the Defendants deny, that the Company made numerous misrepresentations and otherwise wrongfully failed to disclose the significant prepayments of loans which the Company was experiencing.

At all relevant times, Defendant Kevin Sheehan ("Sheehan") was the Chief Executive Officer ("CEO") and Defendant Michael F. Rogers ("Rogers") was the President of Investors Financial.  (Compl. ¶¶ 20-21).  The Plaintiffs assert that Sheehan

and Rogers controlled Investors Financial and that they "called the shots" regarding IBT's operations. (<u>Id.</u> ¶ 257). Additionally, according to a confidential source, Sheehan was the "architect" of IBT's SBA bond investment program, and he understood the SBA bond marketplace due to his prior experience as an executive with the Bank of England, which did a substantial amount of business involving SBA bonds. (<u>Id.</u> ¶ 20).

Defendant Karen C. Keenan ("Keenan") was the Company's Chief Financial Officer ("CFO") until January 1, 2002, and Defendant John N. Spinney ("Spinney") served as the Company's CFO thereafter. (<u>Id.</u> ¶¶ 22-23). These Defendants, along with Sheehan and Rogers, were members of Investors Financial's Asset and Liability Committee ("ALCO"), which met twice a month. (<u>Id.</u> ¶ 70). At these meetings, the Defendants received reports containing information on interest rates, the yield curve,[3] the Company's net interest income and key assumptions regarding the Company's income simulation model, including the timing of cash flows, maturities and repricing of its financial instruments. (<u>Id.</u>). The Plaintiffs contend that as a result of their participation in the ALCO meetings and their receipt of the reports, Sheehan, Rogers, Spinney and Keenan also had knowledge of prepayments on Investors Financial's securities. (<u>Id.</u> ¶ 28).

_____

[3] The "yield curve" describes the relationship between interest rates and the maturity of fixed-income securities, typically Treasury securities. (<u>See</u> Defs.' Ex. 26 at 706). It shows whether interest rates on shorter-term securities are higher or lower than interest rates on longer-term securities. (<u>Id.</u>).

At all relevant times, Defendant Robert D. Mancuso ("Mancuso") was Investors Financial's Senior Vice President in charge of marketing and client management and Defendant Edmund J. Maroney ("Maroney") was the Senior Vice President of Technology. (Id. ¶¶ 24-25). Defendant John E. Henry ("Henry") served as the Company's Senior Vice President, General Counsel and Secretary throughout the Class Period. (Id. ¶ 26). It is alleged that each of the individual Defendants, due to his or her position with the Company, had access to internal corporate documents, had communications with other corporate officers and employees and attended management, board of directors and committee meetings at which reports and other information concerning the Company were disseminated. (Id. ¶ 28). Consequently, each of the individual Defendants obtained access to non-public information about the Company's business, finances, products, markets, and present and future business prospects. (Id.). Moreover, the individual Defendants had control or the authority to control the contents of the Company's reports, press releases and presentations to securities analysts. (Id. ¶ 30).

## Overview of the Alleged Fraud Scheme

The Plaintiffs claim that from 2001 through the first half of 2005, the Defendants conditioned the market to believe that Investors Financial would continue to achieve consistently positive growth year after year. (Id. ¶ 3). Thus, throughout the Class Period, the Defendants reported increasing earnings and repeatedly informed the market that the Company would continue to increase its diluted earnings per share ("EPS") by 25%. (Id.). According to the Plaintiffs,

> The essence of this case involves defendants' scheme to achieve these results by deceiving investors and the market about Investors Financial's true financial condition by issuing false and misleading statements and omissions regarding the Company's net interest income as a result of prepayments of the Company's debt instruments. Through out (sic) the class period, as defendants were telling the market that their business, and in particular their net interest income was increasing, they knew that in fact there were substantial prepayments on their debt instruments that would (and did) result in lowering the net interest income. In order to artificially inflate the price of Investors Financial securities, to meet analyst expectations and to pocket millions in ill-gotten gains, defendants caused the Company to falsely report its financial results in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules for: (i) fiscal years 2001, 2002 and 2003 filed with its Forms 10-K; (ii) the 2001, 2002 and 2003 quarters filed on Forms 10-Q; (iii) the first two quarters of 2004 filed on Forms 10-Q; and (iv) financial results included in press releases, conference calls and other SEC filings throughout the Class Period.

(Id. ¶ 36).

Net interest income, an important measure of the Company's financial condition, represents "the difference between income generated from interest-earning assets and expense on its interest-bearing liabilities – generally mortgage-backed securities ("MBS") and federal agency debt securities," principally the SBA backed loans. (Id. ¶ 4). The Plaintiffs allege that during the Class Period, Investors Financial's net interest income was negatively impacted by the significant decline in interest rates that began in January 2001. (Id.). Prepayments on loans generally increase in a declining interest rate environment because borrowers can obtain new loans with lower prevailing interest rates. (Id.). Due to the decline in interest rates that occurred during the Class Period, Investors Financial experienced substantial prepayments on its debt instruments. (See id. ¶ 36).

-10-

The Plaintiffs claim that the Defendants concealed the negative impact of these prepayments on the Company's net interest income by engaging in accounting manipulations and violations of GAAP, and by disseminating numerous materially false and misleading statements regarding the Company's true financial condition. (See id. ¶¶ 36-37). As detailed below, the Plaintiffs have based their claims on three general categories of allegedly fraudulent statements. They include (1) statements regarding historical financial results that were restated in 2004; (2) statements regarding the Company's federal agency (SBA) securities which were never restated; and (3) statements concerning the anticipated rate of growth in the Company's EPS.

The Plaintiffs contend that, due to the Defendants' allegedly fraudulent activity, the price of Investors Financial's securities remained artificially inflated throughout the Class Period, thereby enabling the Defendants to obtain substantial bonuses and significant proceeds on their stock sales. (See id. ¶¶ 36, 232-36). According to the Plaintiffs, in July 2005, when the Defendants made at least a partial disclosure of the true financial condition of the Company, its stock price dropped dramatically.

## A.     Alleged Misstatements and Omissions:  April 2001 - September 2004

### 1.     Historical Financial Results

The Plaintiffs challenge virtually every statement concerning its financial results issued by the Company from April 10, 2001 through September 28, 2004 as being false and misleading. (See id. ¶¶ 105-198). These include financial results set forth in press releases, financial reports filed with the SEC and other public statements. (Id.).

According to the Plaintiffs, these statements were all materially false and misleading and were not in accordance with GAAP and related regulations because the "defendants intentionally and/or recklessly did not disclose (1) that the Company was improperly using the prospective method of accounting to push the amortization of premium to future periods by failing to account for the Company's actual prepayments on its debt securities;[4] (2) the Company's prepayment policy and significant assumptions underlying its prepayment estimates;[5] and (3) the Company's prepayment risk that its debt securities could be redeemed prior to maturity and that the Company would lose its interest income and unamortized premium amount for securities it had purchased over par value." (Id. ¶ 110; see also id. ¶¶ 111, 118, 123, 129-30, 136-37, 144, 151, 157-58, 163, 190, 198). Each of these types of alleged misrepresentations will be discussed separately below.[6]

---

[4] As detailed below, in October 2004, the Defendants announced that they should have been using the retrospective method of accounting under FAS 91 and restated its financial earnings for 2001 though the first two quarters of 2004.

[5] As detailed below, the Plaintiffs contend that the Defendants' failure to disclose Investors Financial's prepayment policy in the Company's filings with the SEC violated FAS 91, which requires enterprises that anticipate prepayments to disclose their prepayment policy and the significant assumptions underlying their prepayment estimates. (Compl. ¶¶ 45-46).

[6] Except for a limited period, the Plaintiffs' challenges to the Company's statements are identical for the period April 10, 2001 through September 28, 2004. On August 11, 2003, Investors Financial filed a Form 10-Q with the SEC in which it reported its financial results for the second quarter ended June 30, 2003. (Compl. ¶ 168). Therein, the Defendants disclosed for the first time that the Company's SBA securities had prepayment risks. (Id. ¶ 169). This disclosure was not repeated in the May 7, 2004 Form 10-Q for the first quarter ending March 31, 2004. (Id. ¶ 187). The Plaintiffs contend that the reports were false and misleading during the period August 11, 2003 through May 7, 2004 because the Defendants intentionally and/or recklessly failed to disclose (1) that Investors Financial was still using the prospective method of accounting, which enabled the Company to avoid the true impact of prepayments on net interest income, and (2) the Company's prepayment policy and significant assumptions underlying its prepayment estimates.

According to the Plaintiffs, as a result of these misrepresentations and omissions, the Company's net interest income was overstated in 2001, 2002 and the second quarter of 2004, and understated in 2003 and the first quarter of 2004.  (See id. ¶¶ 77, 177, 184, 207, 208).

### (a)    Prospective vs. Retrospective Method of Accounting

The Company used the prospective method of accounting until November 2004, when it restated its financial results using the retrospective method, which it had determined was more appropriate.  Federal Accounting Standard ("FAS") 91 "establishes the accounting for nonrefundable fees and costs associated with lending, committing to lend, or purchasing a loan or group of loans."  (Id. ¶ 39).  It provides for a "retrospective" method of accounting, which, among other steps, establishes an effective yield by looking back at the actual prepayments experienced up to the reporting date, and a "prospective" method which calculates an effective yield by, among other steps, allowing a company to estimate prepayments without factoring in actual prepayments.  (Id. ¶¶ 39-41).  It is the Plaintiffs' contention that the Defendants used the prospective method to be able to report estimates of prepayments and avoid reporting actual prepayments and the consequent decline in net interest income.  As detailed more fully below, however, a change in accounting methods did not result in the dramatic financial recalculation which the Plaintiffs imply.

---

However, the Plaintiffs do not contend that there was a failure to disclose prepayment risks.  (See id. ¶¶ 170, 177, 183).

The Plaintiffs allege that the Defendants intentionally used the prospective method of accounting, knowing it to be incorrect.  In support of this claim, the Plaintiffs assert that in 2000 "the Company's auditor Deloitte & Touche LLP had publicly noted that: All fixed rate MBSs (mortgage backed securities) and adjustable rate MBSs are required to follow the retrospective method."  (Id. ¶ 7 (emphasis omitted).  This statement is based on an article by Deloitte personnel published by Deloitte in February 2000 entitled, "Accounting for Investments in MBS and ABS," by Sunil Gangwani, Allen S. Thomas and James Mountain.  (Compl. Ex. A).  According to the article, the prospective method should only be used for high risk securities.  (See id. pp. 9, 11).  The securities at issue in this case are not categorized as high risk.  There are no allegations in the Complaint that this Deloitte publication is considered persuasive in the industry, or that the Defendants knew of the article.  (See Compl. ¶ 7).  Similarly, there are no allegations that the Defendants were actually advised not to use the prospective method by their accountants or otherwise.

The Defendants point to the language and commentary regarding FAS 91 which, the Defendants argue, leave room for discretion as to which method of accounting is appropriate.  This court finds that the Plaintiffs have not alleged sufficient facts to support their conclusion that the Defendants knowingly used an inappropriate accounting method.

Paragraph 19 of FAS 91[7] does not refer to high risk securities. Rather, it provides in relevant part:

> Except as stated in the following sentence, the calculation of the constant effective yield necessary to apply the interest method shall use the payment terms required by the loan contracts, and prepayments of principal shall not be anticipated to shorten the loan term. <u>If the enterprise holds a large number of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated, the enterprise may consider estimates of future principal prepayments</u> in the calculation of the constant effective yield necessary to apply the interest method. If the enterprise anticipates prepayments in applying the interest method and a difference arises between the prepayments anticipated and actual prepayments received, <u>the enterprise shall recalculate the effective yield to reflect actual payments to date and anticipated future payments [i.e. the retrospective method]</u>.... <u>Enterprises that anticipate prepayments shall disclose that policy and the significant assumptions underlying the prepayment estimates</u>....

(FAS 91 at ¶ 19) (emphasis added). The Plaintiffs have made no allegations concerning the Company's portfolio, such as whether there were a large number of similar loans or the like.[8] Thus, it cannot be determined whether it was apparent to anyone that the retrospective method was required. The Complaint simply does not allege facts to establish that the use of the prospective method was blatantly inappropriate prior to the company's determination to change accounting methods.

---

[7] FAS 91 is found at Defs' Ex. 27.

[8] <u>See</u> <u>generally</u> FAS 91, ¶ 58 ("Absent a reasonably large number of loans with similar characteristics, the Board believes the reliability of reasonably projecting cash flows is diminished to an unacceptable level." Loans grouped together should have, among other things, "sufficiently similar levels of net fees or costs.").

<u>Restatement of the Company's Financial Results</u>

Following the close of the market on October 21, 2004, Investors Financial issued

a press release in which it announced that it was evaluating a change in the application of

FAS 91.  (<u>Compl.</u> ¶ 199).  The press release provided in relevant part:

> Commenting on the change in the application of FAS 91, the
> Company noted that it has historically applied a prospective method
> under FAS 91 to determine the amortization of premiums and
> accretion of discounts on applicable investment securities.  **The
> Company has determined that it is appropriate to change to
> applying a retrospective method on applicable investment
> securities.**  The Company does not believe that the impact of this
> change will be significant in the years 2004, 2003 and 2002.  The
> impact on 2001 reported earnings per share could be higher due to
> changes in interest rates that occurred in that year.  The Company is
> working closely with its audit committee in evaluating the effects of
> this change in application of FAS 91, and expects to complete this
> evaluation by November 15, 2004.

(<u>Id.</u> (emphasis in Complaint)).  That same day, Sheehan and Spinney participated in a

conference call with analysts in which they discussed the Company's change in

accounting.  (<u>Id.</u> ¶ 200).  During the call, Sheehan acknowledged that the prospective and

retrospective methods are "fundamentally different methodologies" and that "the retro-

spective method is the more correct method and more consistent with the requirements of

GAAP."  (<u>Id.</u>).  He also confirmed that Investors Financial remained comfortable with its

long-term growth rate of 25% in EPS and that he did not expect the accounting change to

materially alter his expectations for 2005.  (<u>Id.</u>).  Spinney, who had previously been a

partner in a Big 5 accounting firm, stated that the Company, as part of its internal control

structure, had looked at its mortgage-backed accounting policies and had realized that

"the retrospective method probably was more appropriate for securities that we hold in

our portfolio." (Id.). On October 22, 2004, following the news of the accounting change,

Investors Financial's stock price fell 16.5%. (Id. ¶ 201).

Subsequently, on November 15, 2004, Investors Financial filed with the SEC an

Amended Form 10-K for the fiscal year ended December 31, 2003 in which it restated the

Company's financial results for fiscal years 2001, 2002 and 2003. (Id. ¶ 206). The

adjustment for 2001 was the most significant and resulted in a decrease in net interest

income of approximately $8.5 million and a decrease in diluted EPS of $0.08. (Id.). The

adjustments for 2002 resulted in a decrease in net interest income of approximately $2.3

million and a decrease in diluted EPS of $0.02. (Id.). In contrast, the adjustments for

2003 resulted in an increase in net interest income of approximately $1 million and an

increase in diluted EPS of $0.01. (Id.).

Also on November 15, 2004, Investors Financial filed with the SEC Amended

Form 10-Qs in which it restated the Company's financial results for the first two fiscal

quarters of 2004. (Id. ¶¶ 207, 208). It is alleged that the adjustments resulted in an

increase in net interest income of approximately $2.5 million and an increase in diluted

EPS of $0.02 for the first fiscal quarter ended March 31, 2004, and a decrease in net

interest income of approximately $2.2 million and a decrease in diluted EPS of $0.02 for

the second quarter ended June 30, 2004.  (Id. ¶¶ 207, 208).[9]  Thus, while Investors

Financial's use of the prospective method had caused the Company to overstate its net

interest income and diluted EPS in 2001, 2002 and one quarter of 2004, it had also

caused the Company to understate its net interest income and diluted earnings per share

in 2003 and in one quarter of 2004.  The Defendants point out that during this period, the

Company had reported total net operating revenue of approximately $1.6 billion.

Therefore, the cumulative adjustment was less than .4% of the Company's total net

operating revenue during the time period.  (Defs.' Ex. 11 at 21; Defs.' Br. (Docket

No. 39) at 5).

 The Company did not restate its financials regarding its SBA loan portfolio.

While the Plaintiffs argue that the failure to restate was improper, they have made no

factual allegations to establish that the retrospective method was appropriate for the SBA

portfolio.  In fact, the article on which the Plaintiffs rely, discussed supra, is quoted only

with respect to using the retrospective method for mortgage-backed securities.  (Compl.

¶ 7).

 After issuing its restated financials, on November 16, 2004, Investors Financial's

stock price rose $3.93 per share (or 9%) to $44.96 per share on a trading volume of over

4.1 million shares.  (Id. ¶ 243).  According to the Plaintiffs, investors immediately

---

[9] Contrary to the allegations in the complaint, the Plaintiffs assert in their brief that, as restated, net interest income was overstated by $1.578 million in the first quarter of 2004, and understated by $1.502 million in the second quarter of 2004.  (Pls.' Opp. (Docket No. 51) at 6).

purchased the Company's stock upon learning that its financial condition was better than expected.  (Id.).

### (b)    Failure to Disclose Prepayment Policy

The Plaintiffs also contend that the Defendants' failure to disclose the Company's prepayment policy and significant assumptions underlying their prepayment estimates is evidence that they intentionally mislead the market.  As quoted above, FAS 91 ¶ 19 requires that "[e]nterprises that anticipate prepayments shall disclose that policy and the significant assumptions underlying the prepayment estimates."  (Compl. ¶ 45). According to the Plaintiffs, although required earlier, such disclosures were not made until the June 30, 2005 Form 10-Q, at the end of the Class Period.  (Id. ¶ 46; see also ¶¶ 228-29).  At that time, it was reported in relevant part:

> The Company applies ... [FAS 91] for the amortization of premiums and accretion of discounts.  Prepayments are anticipated using three-month actual prepayment experience for securities that represent holdings of large numbers of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated.  Premiums and discounts on securities not meeting these criteria are amortized or accreted over their contractual term using the constant effective yield.  Actual prepayment experience for all investment securities is reviewed monthly and the timing of the amortization and accretion is adjusted accordingly.

(Id. ¶ 229).  Plaintiffs do not allege any loss resulting from this alleged failure to disclose, but assert that its absence in earlier reports  is further evidence of an intent to mislead the public.

### (c)    Failure to Disclose Prepayment Risk

-19-

Plaintiffs further contend that the statements about the financial condition of the Company were false and misleading for failure to disclose the risks of prepayment. In particular, but without limitation, Plaintiffs contend that the Defendants knew about prepayments of both mortgage-backed securities and SBA loans, failed to disclose the risks of prepayments, and, while restating its financial condition in 2004, failed to apply the retrospective method to the SBA loans and disclose prepayments, thereby perpetuating the fraud.[10]

The record is clear that the Defendants did report the amount of prepayments on the Company's cash flow statements during every financial reporting period, and the Defendants do not deny that they knew about the prepayments. (See Defs.' Ex. 4 at F-9, Ex. 10 at 10, Ex. 11 at F-6). The record is also clear that the risks of prepayments were detailed in the SEC filings. For example, the Company stated in its 2003 Form 10-K/A:

> The decline in the yield is primarily due to the decline in the overall interest rate environment. As interest rates declined throughout the year, we experienced a higher level of prepayments, resulting in increased principal cash payments .... In addition, the accelerated prepayments caused us to recognize at a faster rate the premium amortization associated with the affected securities .... A significant portion of our investment portfolio is variable rate in nature. If interest rates were to rise during 2004, we would expect slower prepayments and our overall yield to increase as our variable rate securities reprice. Conversely, if interest rates were to decline in

---

[10] The Plaintiffs' challenges to the SBA loan portfolio are particularly confusing, and their arguments are based on snippets from various portions of the Complaint. A principal reason this court is recommending dismissal without prejudice is that it appears to this court that there may be a claim relating to the accounting for SBA loans lurking in the Complaint, it just has not been clearly articulated.

-20-

<u>2004, we would expect that prepayments would accelerate and be
comparative to the activity in 2003</u> ....

(Defs.' Ex. 5 at 47 (emphasis added)).  The 10-Q for the quarter ending September 30,

2004 and the Form 10-K for 2004 included virtually identical language.  (<u>See</u> Defs.'

Ex. 10 at 46, Ex. 11 at 37-38).  Also, in a conference call with analysts on October 15,

2003, Spinney stated that "[n]et interest income was flat on a year-over-year basis and

decreased 8 percent linked quarter, primarily due to increased prepayments in our

mortgage-backed securities portfolio through most of the summer."  (Compl. ¶ 172).

     The Plaintiffs contend that these warnings were insufficient in that they did not

specifically identify SBA securities.  As the Plaintiffs allege, however, in 2003 it was

"disclosed that the Company's SBA securities had prepayment risk."  (<u>Id.</u> ¶ 169; <u>see</u> note

6 <u>supra</u>).  That statement was dropped in the May 7, 2004 Form 10-Q for the first quarter

ending March 31, 2004.  (<u>Id.</u> ¶ 187).  However, the Company thereafter reported on the

risks of prepayment of variable rate securities.  (<u>See</u> Defs.' Ex. 10 at 46, Ex. 11 at 37-38).

The SBA loans were variable rate securities.  Investors Financial also reported that

federal agency bonds are subject to "call risk" which "is similar to prepayment risk and

results from the possibility that fluctuating interest rates and other factors may result in

the exercise of the call option by the Federal agency prior to the maturity date of the

bond."  (Defs.' Ex. 10 at 46; Compl. ¶ 187).  Thus, the record does not support the

Plaintiffs' claim that the Company failed to disclose the risks of prepayment.

According to the Plaintiffs, it was not until after the Class Period that the Defendants appropriately disclosed the status of its SBA portfolio. (Compl. ¶¶ 55, 228). Thus, on August 9, 2005, after the close of the Class Period, Investors Financial filed its Form 10-Q for the quarter ended June 30, 2005. (Id. ¶ 228). Therein, the Company stated:

> Prepayment speeds for mortgage-backed securities increased during the second quarter of 2005 due to increased refinancing activity driven by declining mortgage rates. We expect recent prepayment experience to continue subject to future interest rate movements. **Prepayment experience for Federal agency securities (primarily SBA guaranteed loan pools) also increased over this period as the weighted average life of the securities shortened. We expect the combination of heightened prepayment experience and, more significantly, reduced reinvestment opportunities to continue to pressure our net interest income for the remainder of 2005.**

(Id. (emphasis in Complaint)). As detailed below, since no disclosures were made during the Class Period relating to SBA loans which could have caused the Plaintiffs harm, the claims relating to the SBA loans must fail for failure to plead loss causation.

### 2.   **EPS Growth Rate**

In addition to challenging statements made about the Company's financial results, the Plaintiffs claim that during the time period between April 10, 2001 and September 29, 2004, the Defendants made false and misleading statements regarding the anticipated rate of growth in the Company's EPS for 2002 through 2004. Specifically, the Plaintiffs challenge repeated statements made by individual Defendants in press releases, during conference calls with market analysts and in documents filed with the SEC anticipating a "long term growth rate of 25 percent in EPS . . . ." (Id. ¶ 139: "we are raising our 2002

EPS guidance to 101 to 103, from a dollar to 102.  We remain comfortable with our long

term growth rate of 25 percent in EPS . . . ."; see also ¶¶ 140, 147, 151, 152, 154, 157,

172, 178, 185, 192, 198).  The Plaintiffs contend that the Defendants' statements

regarding Investors Financial's earnings prospects, as well as their statements concerning

the Company's financial results, triggered increases in the Company's stock price.  (See,

e.g., id. ¶¶ 113, 115, 126, 133, 142, 149, 155, 194).  Consequently, according to the

Plaintiffs, the Defendants caused Investors Financial's stock price to become artificially

inflated.  (Id. ¶ 238).

In response to these allegations, however, the Defendants contend, and the

Plaintiffs do not deny, that the Company did, in fact, achieve the predicted results in

2001-2004.  Even as restated, the Company's EPS grew by approximately 25.9% in 2001,

50% in 2002, 36% in 2003 and 50% in 2004.  (See Defs. Ex. 11 at 21; Compl. ¶ 206).

### B.    Alleged Misstatements and Omissions:  October 2004 - July 2005

#### 1.    Disclosures re the SBA Portfolio

The Plaintiffs contend that due to Investors Financial's announcement in October

2004 that it was evaluating a change in accounting, and the subsequent restatement of its

financial results in November 2004, the partial truth about the Company's financial

condition began to leak out to the market and some of the artificial inflation came out of

the Company's stock price.  (Compl. ¶¶ 240- 242).  However, they further contend that

throughout the time period from October 21, 2004 through the end of the Class Period,

the Defendants continued to hide the full truth about the Company's financial condition

-23-

from the market by issuing false and misleading statements that caused the stock to

continue to trade at artificially inflated prices.  (See id. ¶¶ 238, 243).

On November 15, 2004, the Company held an earnings conference call with

market analysts.  (Id. ¶ 205).  At that conference, the Company reported the results of the

restatement and represented that "this restatement did not impact the accounting for our

SBA portfolio."  (Id.)  As the Company went on to state:

> We did, however, correct a clerical error in the contractual maturity
> table in the MD&A [section] of our 2003 10-K.  We previously
> reported federal agency securities having a yield of 3.16% in the
> over-10-year category (sic) and 2.76% in the 5-to-10-year category.
> These yields should have been 2.71% and 2.28% respectively,
> consistent with the income we recognize in our financial statements.

(Id. (emphasis omitted)).  The Plaintiffs contend that these statements were false and

misleading "because the Company denied that the restatement did not impact the

accounting for its SBA portfolio, when in fact the Company made material adjustments to

the Company's effective yield calling it just a 'clerical error.'"  (Id. ¶ 210).  They also

assert that the accounting change "would reduce the SBA securities effective yield, due to

'actual prepayments' factored into the securities' new effective yield."  (Id.).  However,

the Plaintiffs have not alleged or established that the amended percentages were not, in

fact, consistent with the income reported in the financial statements.[11]

---

[11]  As detailed above, to the extent that the Plaintiffs are claiming that the retrospective
method should have been applied to the SBA portfolio, they have not alleged any facts to
establish that fact.

The Plaintiffs also challenge the restated filings in November 2004 because Defendants failed to disclose "that the Company's federal agency securities, primarily SBA bonds, had become impaired requiring a write-down to net income of at least $12.8 million by the end of fiscal year 2004." (Id. ¶ 210).[12] The Plaintiffs make the same objections to the Company's press release of December 16, 2004 in which the Company reported that it was still "comfortable with our long term guidance of 25% growth in fully diluted earnings per share." (Id. ¶¶ 211, 213).

In contrast with the Plaintiffs' conclusion that there needed to be a write-down, the Defendants reported that such a write-down was not necessary. Thus, with respect to the year ending December 2004, the Company reported the following with respect to its SBA securities:

> The unrealized losses related to the Company's investment in mortgage-backed and federal agency securities are attributable to changes in market interest rates. The contractual cash flows for certain of these securities are guaranteed by agencies of the U.S. government, including government sponsored agencies. As a result, the Company's exposure to the credit risk of these securities is minimal. At December 31, 2004, there were 590 investment securities that were in unrealized loss positions. The market value decline as a percentage of amortized cost for the Company's mortgage-backed and Federal agency investment securities portfolio was less than 1% at December 31, 2004. The Company has the intent and ability to hold these securities until forecasted recovery,

---

[12] The Plaintiffs also continue to challenge these statements for their alleged failure to disclose the Company's prepayment policy and the risk of prepayment as well. However, the Plaintiffs have not established that the Company's prepayment policy had to be disclosed with respect to the SBA portfolio under FAS 91. (See discussion supra). Also, they have failed to establish that the risks of prepayment were not, in fact, disclosed.

which may in some cases be maturity.  The Company does not
consider these investments to be other than temporarily impaired at
December 31, 2004.

(Id. ¶ 218) (emphasis added).  As detailed below, the Plaintiffs have failed to allege any

facts to establish either that a write-down was required, or, if it was, that any of the

Defendants acted intentionally.

The Plaintiffs contend that the Defendants' failure to take an impairment charge by

the end of 2004 constituted a violation of GAAP.  (Id. ¶ 58).  Under FAS 115, companies

that hold individual securities classified as either available-for-sale or held-to-maturity

are required to determine whether a decline in fair value below the amortized cost basis is

other than temporary.  (Id. ¶ 60).  If so, the cost basis of the security must be written

down to fair value as a new cost basis and the amount of the write-down shall be included

in earnings (that is, accounted for as a realized loss).  (Id.).  A determination as to

whether losses are other than temporary requires a judgment regarding whether subjective

and objective factors exist that indicate that an impairment loss has been incurred at the

end of a reporting period.  (Id. ¶ 63).  Nevertheless, the Plaintiffs claim that by the end of

2004, the effective yield on the Company's Federal agency securities had remained below

the risk free interest rate for a sufficient amount of time to be considered "other than

temporarily impaired."  (See id. ¶¶ 57-58, 62, 66).  However, they have pleaded no facts

to support this conclusion.

The Defendants point out that the "risk free interest rate" used by the Plaintiffs for

comparison was the rate for fixed-rate, long-term treasury notes.  (See id. ¶¶ 57-58).

Since, as the Plaintiffs admit, the Company's SBA securities were variable rate securities, and the rates are adjusted monthly or quarterly, the Defendants contend this comparison is not accurate.  (See id. ¶ 51 & n.5; Defs. Br. at 32).  Comparing the effective yield for the Company's SBA securities to the risk free rate for comparable short-term (3 month) treasury notes establishes that the SBA securities were not impaired.  (See Defs. Ex. 32). The Plaintiffs have not alleged any facts supporting their choice of securities for comparison.  Most importantly, the Plaintiffs have failed to plead sufficient facts to establish that the Defendants must have known that the securities were not merely temporarily impaired when the allegedly false and misleading representations were made.

### 2.     Change in Earnings Guidance

At the beginning of 2005 the Company reported that it remained confident in its ability "to produce growth of 25% in diluted earnings per share in 2005."  (Compl. ¶ 214).  This was true despite the trend of a flattening yield curve.  As the Company stated in an earnings conference call with market analysts on January 25, 2005:

> Turning to our earnings guidance for 2005, as we have done historically, we are reverting back to our targeted long-term diluted earnings-per-share growth rate of 25 percent at the outset of the year and will adjust our guidance as we progress through the year...  We are also modeling a further flattening of the yield curve in 2005.  We remain comfortable with our long-term growth rate of 25 percent EPS.
>
> ****
>
> And then with respect to the yield curve, we do have a flattening of the yield curve baked into our guidance for next year and expect [fed] ... funds to achieve 4 percent by the end of December.  That's baked into our guidance.

-27-

(Id. ¶ 215 (emphasis omitted)).  At the end of the first quarter of 2005 the Company

issued a press release reporting an increase in earnings of 11% which was characterized

as a "solid" result.  (Id. ¶ 220).  The Company reported further that it had "achieved these

positive results for the first quarter as well as the final two quarters of 2004 in an

environment where the Fed funds rate rose by 175 basis points and the yield curve

flattened considerably."  (Id. ¶ 221 (emphasis omitted)).  Acknowledging that it was "a

little flatter curve than . . . anticipated," the Company's outlook remained the same since

the flatter curve was expected to be offset by higher than expected fee income to

accomplish a 25% growth rate.  (Id.).  In its May 9, 2005 Form 10-Q for the first quarter

ending March 31, 2005, the Company again acknowledged a flattening yield curve

without altering its projection of 25% EPS.  (See id. ¶ 222).

On July 14, 2005, the last day of the Class Period, Investors Financial issued a

press release in which it announced that it was revising its fiscal year 2005 and 2006

diluted earnings per share guidance.  (Id. ¶ 223).  The Company stated in relevant part:

> Despite a more robust sales environment, including higher volume of
> sales opportunities than in the previous two fiscal years and
> continued closing of strategically important new business wins in the
> first and second quarters of 2005, the Company is revising its fiscal
> year 2005 and 2006 diluted earnings per share guidance.  The
> Company expects to achieve growth of approximately 10% in
> diluted earnings per share in 2005 compared to diluted earnings per
> share of $2.09 in 2004 under [GAAP].  From a core diluted earnings
> per share perspective, the Company expects 2005 diluted earnings
> per share to be approximately flat with 2004 GAAP diluted earnings
> per share of $2.09....  For 2006, the Company expects GAAP diluted
> earnings per share to be approximately flat compared to expected
> 2005 GAAP diluted earnings per share.  From a core earnings

> perspective, the Company expects to achieve approximately 8% to 10% growth in diluted earnings per share in 2006 over 2005 core diluted earnings per share.

(Id. (emphasis omitted)).  The Company attributed the change in its guidance to a number of factors including "a flatter than expected yield curve; narrower than expected reinvestment spreads; weaker than expected market-sensitive revenues, including fees linked to both the equity and foreign currency markets; and continued investments in headcount and technology to support new and existing clients."  (Id. (emphasis omitted)).

On July 15, 2005, following the announcement, Investors Financial's stock price fell 18%.  (Id. ¶ 225).  Specifically, the stock price declined $7.47 per share to $34.05 from $41.52 at the close of the previous day.  (Id.).  The drop in stock price caused the Plaintiffs to suffer economic losses.  (Id. ¶ 247).

Notwithstanding the impact of the news on the Company's stock, the Plaintiffs claim that the information contained in the July 14 press release still only partially disclosed the true state of the Company's financial condition because the Defendants' explanation that the reduced earnings guidance was due to a flatter than expected yield curve was untrue.  (Id. ¶ 226).  As the Plaintiffs contend, the Company had been aware of a flattening yield curve for months.  The Defendants, for their part, admit that they knew of the flattening yield curve, but contend that the situation turned out to be more severe than they had anticipated.

## C.    Disclosures Following the Class Period

The Plaintiffs allege that the full truth about the Company's earnings shortfall and reduced guidance was not revealed until August 9, 2005, after the close of the Class Period. (Id. ¶ 227). At that time, Investors Financial filed with the SEC its Form 10-Q for the quarter ended June 30, 2005. (Id.). Therein, as quoted above, the Company reported that it had been experiencing prepayments on its SBA loan portfolio. (Id. ¶ 228). Subsequently, on November 4, 2005, Investors Financial filed with the SEC its Form 10-Q for the quarter ended September 30, 2005. (Id. ¶ 230). Again, the Company disclosed that it had experienced prepayments on its federal agency securities during the reporting period. (Id.). As it had stated in its August 9, 2005 filing, the Company confirmed that it was still expecting "the combination of heightened prepayment experience and, more significantly, reduced reinvestment opportunities to continue to pressure our net interest income for the remainder of 2005." (Id.).

Additional factual details relevant to the court's analysis are described below.

## IV. ANALYSIS

### A. Overview of Plaintiffs' Claims

In Count One of the Complaint, the Plaintiffs allege that the Defendants violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder[13] by

---

[13] Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 states: "[i]t shall be unlawful for any

disseminating or approving materially false and misleading statements regarding the

Company's financial condition and earnings prospects, and by failing to disclose material

information necessary to make the statements not misleading.  In Count Two, the

Plaintiffs assert that Defendants Sheehan, Rogers, Keenan, Spinney, Mancuso, Maroney

and Henry are liable as "control persons" under section 20(a) of the Exchange Act, 15

U.S.C. § 78t(a).[14]  In order to state a claim under Section 10(b) and Rule 10b-5 based on

misrepresentations and omissions, the Plaintiffs must plead and prove "(1) that defen-

dants made a materially false or misleading statement or omitted to state a material fact

necessary to make a statement not misleading; (2) that defendants acted with scienter;

(3) that either plaintiffs or the market relied on the misrepresentation or omission; and

(4) resultant injury."  Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001).  In order

to establish control person liability, the Plaintiffs must allege and prove (i) an underlying

violation by a controlled person or entity, and (ii) control over the primary violator by the

person, directly or indirectly, by the use of any means or instrumentality of interstate commerce,
or of the mails or of any facility of any national securities exchange, (a) To employ any device,
scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or omit to state
a material fact necessary in order to make the statements made, in light of the circumstances under
which they were made, not misleading, or (c) To engage in any act, practice, or course of business
which operates as a fraud or deceit upon any person, in connection with the purchase or sale of
any security."  17 C.F.R. § 240.10b-5.

   [14]  Section 20(a) of the Exchange Act provides, "[e]very person who, directly or
indirectly, controls any person liable under any provision of this chapter or of any rule or
regulation thereunder shall also be liable jointly and severally with and to the same extent as such
controlled person to any person to whom such controlled person is liable, unless the controlling
person acted in good faith and did not directly or indirectly induce the act or acts constituting the
violation or cause of action."  15 U.S.C. § 78t(a).

Defendant.[15]  See In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 194 (1st Cir.

2005).

    **B.**    **Statements Regarding Investors Financial's Earnings Prospects**

        **1.**    **Statements Regarding EPS Growth Through 2004**

The Plaintiffs contend that the Defendants' statements regarding its EPS growth

prior to the 2004 restatement of financial results are actionable because at the time the

Company was not disclosing its use of an improper accounting method, did not detail its

prepayment policy and did not disclose the risks of prepayment.  (See Compl. ¶¶ 151,

157, 163, 198).  Therefore, according to the Plaintiffs, these statements were part of the

fraudulent scheme designed to mislead the public about the financial health of the

Company.  The Plaintiffs' claims must be dismissed because the actual rate of growth in

the Company's EPS for fiscal years 2001, 2002, 2003 and 2004 met or exceeded the

Defendants' predictions.  The Defendants' intent in making the predictions is, therefore,

irrelevant.

As detailed above, the Company informed investors and the market that it

expected to grow its EPS by at least 25% each year through the end of 2004.  (See, e.g.,

id. ¶¶ 139, 147, 152, 154, 191, 196).  In accordance with these predictions, the allegations

of the Complaint establish that, even as restated, Investors Financial's diluted EPS

---

    [15]  To date, the First Circuit has taken no position on whether a plaintiff must prove
"culpable participation" on the part of the controlling person to establish liability under section
20(a) of the Exchange Act.  See In re Stone & Webster, Inc. Sec. Litig., 414 F.3d 187, 194 n. 4
(1st Cir. 2005).

increased by 50% to $1.02 per share in 2002, and by 36% to $1.39 per share in 2003.[16]

(See id. ¶ 206).  Furthermore, although Investors Financial restated its financial results for

the first two quarters of 2004, it was still able to grow its diluted EPS by 50% to $2.09

per share by the end of 2004.  (See Defs.' Ex. 11 at 23).

In the First Circuit, "securities fraud cases are decided by a statement-by-statement

analysis in which the inquiry made is restricted to the immediate context of each

statement — namely, the balance of what was said on the particular occasion, and the

immediate circumstances in which the particular statement was made." W.R. Carney v.

Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 243 (D. Mass. 2001) (internal

quotation omitted).  Where, as here, a company's earnings projections are shown to be

accurate, those statements cannot serve as the basis for a securities fraud claim.  Id. at

245 (defendant's prediction of 30% growth not actionable where defendant's "prediction

in fact was not off the mark.").  See also Cutsforth v. Renschler, 235 F. Supp. 2d 1216,

1228 (M.D. Fla. 2002) (statements concerning defendants' revenue expectations not

actionable because plaintiffs failed to allege any facts showing that the expectations did

not come true: "[i]n other words, the statements were not false").  Because the alleged

facts set forth in the Complaint show that the Defendants' statements regarding the

---

[16]  The Complaint contains no allegations detailing the Company's diluted EPS for 2000,
and it is therefore not possible to determine from the Complaint the growth in diluted EPS in
2001.  However, the Defendants argue, and the Plaintiffs do not dispute, that Investors Financial
achieved 25.9% growth in diluted EPS in 2001, even after its financial results were restated.
(Defs.' Br. at 5).

Company's earnings guidance for 2002-2004 were neither false nor misleading, those statements do not support the Plaintiffs' Section 10(b) and Rule 10b-5 claims.

## 2.    Statements Regarding EPS Growth for 2005

As detailed above, on December 16, 2004, Investors Financial issued a press release in which Sheehan was quoted as stating, "[b]ased upon our favorable operating environment and outlook for future sales, we remain comfortable with our long term guidance of 25% growth in fully diluted earnings per share." (Compl. ¶ 211). The Plaintiffs claim that the 25% earnings guidance reported in this press release was false and misleading.  (Id. ¶ 213).  This statement is not actionable, however, because it is protected by the PSLRA's safe harbor provision.

The PSLRA created a statutory safe harbor for certain "forward-looking state-ments."  See 15 U.S.C. § 78u-5(c)(1).  As the First Circuit has explained:

> The statute generally provides, with specified limitations, that issuers and underwriters of securities shall not be liable in any private action based on an untrue or misleading statement of a material fact "with respect to any forward-looking statement" if the forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"....

Stone & Webster, 414 F.3d at 211-12 (quoting 15 U.S.C. § 78u-5(c)(1)).  Therefore, the statute establishes "a surprising rule that the maker of knowingly false and wilfully fraudulent forward-looking statements, designed to deceive investors, escapes liability for fraud" if the statement is identified as forward-looking and is accompanied by meaningful

cautionary language.  Id. at 212.  In other words, "if a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant."  Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999).

The statement at issue is forward looking, and the press release contains appropriate cautionary language.  See Stone & Webster, 414 F.3d at 212 (PSLRA defines "forward-looking" statements to include statements containing a projection of earnings per share and statements of future economic performance).  As the press release states:

> This news release contains forward-looking statements (statements that are not historical facts).  These statements, such as the Company's statements regarding its current and long term earnings guidance are based upon assumptions and estimates that might not be realized and are subject to risks and uncertainties that could cause actual results to differ materially from those in the forward looking statements.  Such risks and uncertainties include the performance of global financial markets, changes in interest rates, changes in the relationship between long-term and short-term interest rates, regulatory actions affecting the Company's clients, the Company's ability to manage the conversion of new business, and the Company's ability to continue to manage its costs.  Additional factors that could also affect actual results are set forth under the heading "Certain Factors That May Affect Future Results" in the Company's Form 10-Q for the quarter ended September 30, 2004 and in the Company's Annual Report on Form 10-K, as amended, for the year ended December 31, 2003.

(Defs.' Ex. 21).  The referenced Form 10-K for the period ending December 31, 2003[17] states, among the various factors that may affect future results, that the Company's

---

[17]  See Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 844 (N.D. Ill. 2003) (direct incorporation by reference of cautionary statements in SEC filings is permissible and supports the application of the safe harbor provisions).

"operating results are subject to fluctuations in interest rates and securities-markets."

(Defs.' Ex. 5 at 32).  In particular, but without limitation, the risks identified include the

following:

> A significant portion of our fees is based on the market value of the
> assets we process.  <u>Accordingly, our operating results are subject to
> fluctuations in interest rates and securities markets as these
> fluctuations affect the market value of assets processed.</u>  Current
> market conditions, including the recent volatility in the equity
> markets, can have a material effect on our asset-based fees.  While
> reductions in asset servicing fees may be offset by increases in other
> sources of revenue, a sustained downward movement of the broad
> equity markets will likely have an adverse impart on our earnings.
> Fluctuations in interest rates or the securities markets can also lead
> to investors seeking alternatives to the investment offerings of our
> clients, which could result in a lesser amount of assets processed and
> correspondingly lower fees.  Also, our net interest income is earned
> by investing depositors' funds in our investment portfolio and
> secondarily making loans.  Rapid changes in interest rates and/or the
> relationship between short-term and long-term interest rates could
> adversely affect the market value of, or the earnings produced by,
> our investment and loan portfolios, and thus could adversely affect
> our operating results.
>
>                                  ****
>
> The average balance of our combined investment portfolios for the
> year ended December 31, 2003 was $7.4 billion, with an average
> yield of 3.29%, compared to an average balance of $5.6 billion with
> an average yield of 4.29% during 2002.  The decline in the yield is
> primarily due to the decline in the overall interest rate environment.
> <u>As interest rates declined throughout the year, we experienced a
> higher level of prepayments, resulting in increased principal cash
> payments that were reinvested in lower-yielding securities.  In
> addition, the accelerated prepayments caused us to recognize at a
> faster rate the premium amortization associated with the affected
> securities.</u>  During 2003, we recognized net amortization of
> $39.2 million for the year ended December 31, 2003 compared to
> $12.8 million of net amortization in the same period of 2002.  The
> effect of this accelerated amortization lowered our effective yield on

-36-

the investment portfolio.  During the second half of 2003, interest
rates began to stabilize, resulting in lower prepayments.  <u>A signi-
ficant portion of our investment portfolio is variable rate in nature.
If interest rates were to rise during 2004, we would expect slower
prepayments and our overall yield to increase as our variable rate
securities reprice.  Conversely, if interest rates were to decline in
2004, we would expect that prepayments would accelerate and be
comparative to the activity in 2003, with the cash flows from these
prepayments being reinvested in lower-yielding assets of equal
quality and risk.</u>

(Defs.' Ex. 5 at 32, 47).  Similarly, the cited Form 10-Q for the quarter ending September

30, 2004 expressly discloses that "operating results are subject to fluctuations in interest

rates and securities market," and includes similar cautionary language.  (Defs.' Ex. 10 at

34).

        The Plaintiffs argue that the cautionary statements accompanying the challenged

statements were not meaningful because they did not specifically warn of the risk of

prepayments on Investors Financial's SBA loans.  (<u>See</u> Pls.' Opp. at 32, 34 n.28).

However, to invoke the safe harbor's protection, it is not necessary for a defendant to

describe "the particular factor that ultimately causes the forward-looking statement not to

come true," as long as the warnings accompanying the statement "mention important

factors that could cause actual results to differ materially from those in the forward-

looking statement."  <u>Harris</u>, 182 F.3d at 807 (quotations and citations omitted).  Here, the

Company warned investors about the risks of fluctuating interest rates and the risks of

prepayment.  (<u>See</u> Defs.' Ex. 5 at 47 ("if interest rates were to decline in 2004, we would

expect that prepayments would accelerate"); Defs.' Ex. 10 at 46 (same)).  Where, as here,

-37-

investors have "been warned of risks of a significance similar to that actually realized, [they are] sufficiently on notice of the danger of the investment to make an intelligent decision about it according to [their] own preferences for risk and reward." Harris, 182 F.3d at 807.

Since the Company's predictions as to the growth of EPS in 2005 are protected by the safe-harbor provision, claims relating to these predictions should be dismissed.[18] See Baron v. Smith, 380 F.3d 49, 53-54 (1st Cir. 2004) (affirming dismissal of claims based on forward-looking statements identified as such and accompanied by cautionary language).

### C.    Statements Regarding Historical Financial Results

The Defendants assert that the claims based on their numerous disclosures of financial results that ultimately were restated in 2004 should be dismissed because the Plaintiffs have failed to plead specific facts supporting a strong inference that any of the

---

[18]   In light of this result, there is no need for the court to address the Defendants' alternative grounds for dismissal, including their arguments that the failure to predict future events cannot give rise to liability for fraud and that the Plaintiffs have failed to plead sufficient facts to support a strong inference that the Defendants made the forward-looking statements with scienter.

-38-

disclosures were knowingly false when made.  (Defs.' Br. at 21-26).[19]  This court agrees

and recommends that the motion to dismiss these claims be allowed.

"To win a section 10(b) case, the plaintiff must show either that the defendants

consciously intended to defraud, or that they acted with a high degree of recklessness."

Aldridge, 284 F.3d at 82.  "[T]he plaintiff may combine various facts and circumstances

indicating fraudulent intent to show a strong inference of scienter."  Id.  Accordingly,

"[s]cienter may be demonstrated by indirect evidence, and may extend to a form of

extreme recklessness that 'is closer to a lesser form of intent.'"  Cabletron Sys., Inc., 311

F.3d at 38 (citations omitted).  However, "[a] showing of negligence or 'mere reckless-

ness' does not suffice."  In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 166

(D. Mass. 2000) (quoting In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 976 (9th

Cir. 1999)).  The Plaintiffs must set forth "specific facts that make it reasonable to believe

that defendant[s] knew that a statement was materially false or misleading."  Id. (quoting

Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994)).

The First Circuit "has rejected any rigid formula for pleading scienter, preferring

to rely on a 'fact-specific approach' that proceeds case by case.  Cabletron, 311 F.3d at

38.  Nevertheless, "[s]cienter allegations do not pass the 'strong inference' test when,

---

[19]  For purposes of this motion, the court will assume, without deciding, that the state-
ments regarding the financial condition of the Company were false and misleading.  However, as
detailed above, the Plaintiffs' claims that the Defendants knowingly used an inappropriate
accounting method, or improperly failed to disclose the Company's prepayment policies and the
risks of prepayment either are not supported by the record, or it is not alleged that the failure to
disclose caused any harm.

viewed in light of the complaint as a whole, there are legitimate explanations for the

behavior that are equally convincing.  Pleading fraud by hindsight, essentially making

general allegations that defendants knew earlier what later turned out badly, is not

sufficient."  Ezra Charitable Trust v. Tyco Int'l, Ltd., 466 F.3d 1, 6 (1st Cir. 2006).  "To

qualify as 'strong'. . . an inference of scienter must be more than merely plausible or

reasonable — it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., — S. Ct. —, 2007

WL 1773208, at *4 (June 21, 2007).

　　　　When the Complaint in the instant case is viewed as a whole, the Plaintiffs' claims

of scienter are not supported by adequate factual allegations.  In particular, any

conclusion that the Defendants were acting with a fraudulent state of mind at any time

during the Class Period is undermined by the Plaintiffs' own allegations regarding the

impact of the restatement on the Company's financial results.  The Plaintiffs' theory that

the Defendants intentionally used improper accounting methods and concealed

information from the market in order to artificially inflate the Company's stock price is

entirely inconsistent with the fact that Investors Financial understated its net interest

income and diluted EPS for 2003 and the first quarter of 2004.  It is also inconsistent with

the fact that, as detailed above, Investors Financial was able to achieve its targets for

growth in diluted EPS for each fiscal year from 2002 through 2004, no matter which

accounting method it used.  Additionally, as set forth in more detail below, the Plaintiffs'

assertion that the Defendants were motivated to engage in fraud by a desire to make more

money through stock sales and incentive-based bonuses is belied by allegations that the Defendants sold stock and received bonuses during periods when the Company's diluted EPS was understated.

Further compounding these fundamental weaknesses in the Plaintiffs' theory of liability is the Plaintiffs' failure to state with any degree of specificity the underlying facts, as opposed to generalized assertions or conclusory allegations, necessary to support a strong inference that the Defendants acted with an intent to deceive or defraud the market when they disseminated the statements at issue concerning the Company's financial results.  In particular, the Plaintiffs have not set forth specific details describing what the Defendants knew and when they knew it.  Instead, the Plaintiffs allege that the Defendants must be deemed to have acted with scienter by virtue of their backgrounds, their status as members of upper management in the Company, their participation in ALCO meetings, their receipt of financial information, and their control over the Company's financial statements.  (See Compl. ¶¶ 20, 28, 30, 70, 73-76, 89, 202, 231, 253).  The Plaintiffs further allege that the Company's GAAP violations and restatement of its financial results, the Defendants' stock sales during the Class Period, and the impact of the bonus program on the Defendants' salaries also support a strong inference of scienter.  (See id. ¶¶ 5-8, 232-36).  For the reasons set forth below, these allegations, even when viewed in combination, are insufficient to support such an inference.[20]

---

[20]  As described infra, this court concludes that the Plaintiffs' claims based on false and misleading statements concerning the Company's SBA loan portfolio which were not restated in

## The Fact of the Restatement As Establishing Scienter

The Plaintiffs argue that by restating Investors Financial's financial statements for 2001 through the second quarter of 2004, the Defendants have conceded that the financial statements were false at the time they were made. (Pls.' Opp. at 13). However, for purposes of determining whether the Plaintiffs have adequately pled scienter, the relevant question is not whether the financial statements were incorrect, but whether the Defendants knew, or were extremely reckless in not knowing, that they were incorrect at the time they issued those statements. See Ezra Charitable Trust, 466 F.3d at 9 (in order to plead scienter, plaintiffs must allege "facts that strongly suggest that the defendants knew any of the challenged statements were false when made."). The allegations concerning the restatement in this case do not sufficiently demonstrate conscious misbehavior or severe recklessness.

"[A] restatement of earnings, without more, does not support a 'strong inference' of fraud, or for that matter, a weak one." Segue Software, Inc., 106 F. Supp. 2d at 169. See also Ezra Charitable Trust, 466 F.3d at 9 (the simple fact of a correction is not particularly probative of scienter). "[P]laintiffs cannot use disclosures after the date of the statement to show that the company knew that problems existed at the earlier date and

_____

2004 should be dismissed for failure to plead loss causation. Therefore, this court's analysis of whether the Plaintiffs have adequately pled scienter does not specifically address the Plaintiffs' claims that the Defendants made misrepresentations concerning the status of its SBA portfolio by wrongfully labelling a correction a "clerical error" or failing to write-down allegedly impaired loans. As detailed above, however, these conclusory allegations of wrongdoing do not have factual support in the Complaint.

should have disclosed them." In re Galileo Corp. Shareholders Litig., 127 F. Supp. 2d

251, 270 (D. Mass. 2001) (quoting In re Peritus Software Servs., Inc. Sec. Litig, 52 F.

Supp. 2d 211, 223 (D. Mass. 1999)) (additional quotations and citation omitted). "To

reflexively punish a company for correcting its earnings statements when subsequent

events disclose errors in the originals would create a perverse incentive for management

to conceal mistakes, thereby defeating a core purpose of the securities laws." Segue

Software, Inc., 106 F. Supp. 2d at 170.  Accordingly, the fact that management

determined, in 2004, that the Company should have been using a different accounting

method does not alone support the Plaintiffs' claims of securities fraud.

　　The Plaintiffs do allege that the restatement involved certain "indicators of

scienter."  (Compl. ¶ 81).  According to the Plaintiffs, those indicators included the fact

that: (1) the restatement "was due to misuse of facts, not a simple mathematical error or

honest misapplication of an accounting standard or oversight;" (2) the financial fraud was

material "from both a quantitative and qualitative perspective;" (3) the restatement

affected financial statements from 2001 through the first two quarters of 2004, thereby

indicating that the improper accounting was not due to an honest mistake or oversight; (4)

the improper accounting "did not occur as a result of good faith differences in accounting

judgments, or interpretations of complicated or vague accounting rules," but rather

involved the violation of "the basic, fundamental rule of applying the level yield method

in accounting for accretion of discounts and amortization of premium for its debt

securities and applying the appropriate charge or credit to interest income as prescribed

by GAAP (FAS 91);" and (5) Spinney, Investors Financial's CFO, was a "seasoned financial professional with significant auditing and SEC reporting experience." (Compl. ¶¶ 81-89). However, "[s]uch conclusory allegations as to the existence of knowledge are insufficient to provide the factual basis, supporting a strong inference of scienter, required by the PSLRA." Stone & Webster, 414 F.3d at 205.

Missing in the instant case are any allegations of specific facts indicating that the Defendants knew at any time prior to the announcement of the restatement that use of the prospective method of accounting was improper. As detailed above, FAS 91, on its face, does not preclude the use of the prospective method and the Plaintiffs have failed to allege any facts which establish that the retrospective method was appropriate for the Company's loan portfolio. Similarly, while the Plaintiffs refer to a statement in the midst of an article by Deloitte that the prospective method should only be used for high risk securities, they have not alleged that the article was either recognized in the field or known to the Defendants. There are no allegations that the Defendants were advised by their accountants to always use the retrospective method. In short, the Plaintiffs have not pleaded sufficient facts to establish scienter based on use of the prospective method of accounting.[21]

---

[21] Similarly, the allegations concerning the alleged failure to disclose the Company's prepayment policy and assumptions do not support a finding of scienter. As an initial matter, such disclosure is required under FAS 91 only if the Company is anticipating prepayments. More importantly, Plaintiffs have not alleged any facts which would link this omission to any wrongful scheme. For example, but without limitation, they have not alleged how disclosure would affect any interpretation of the Company's report.

The Plaintiffs' allegations concerning the restatement not only are inadequate to support a strong inference of scienter, but also are inconsistent with such an inference. Most significantly, the Plaintiffs allege that the restatement revealed that the Company had <u>understated</u> its net interest income by over $1 million in 2003 and by about $2.5 million in the first quarter of 2004. (Compl. ¶¶ 206, 207). Moreover, the Company met its EPS prediction despite the restatement. This is entirely incompatible with the contention that the Defendants consciously chose to use an improper accounting method in order to inflate the Company's revenues and EPS. Additionally, the amount of the restatement was insignificant when viewed in the context of the Company's business. These facts undermine the assertion that the Defendants' acted with a fraudulent intent. <u>See</u> <u>Stone & Webster</u>, 414 F.3d at 201 ("[i]rregular financial statements which overstate estimated results to only a small degree do not support a strong inference that the [Defendant officers] of the company acted with intent to defraud, or with reckless disregard for the truth of the statements"); <u>Segue Software</u>, 106 F. Supp. 2d at 170 (only significant overstatements that would affect investors' decisions to purchase stock support inference of scienter).

### **<u>Defendants' Status and Access to Information As Establishing Scienter</u>**

The Plaintiffs assert that their allegations regarding the Defendants' status in the Company support their claim that the Defendants acted with scienter. (Pls.' Opp. at 21-22). In particular, the Plaintiffs contend that Defendants' control over the Company, their access to and receipt of inside information concerning Investors Financial's business and

financial condition, and their control over the release of information concerning the

Company's financial condition give rise to an inference that they were aware that the

Company was using improper accounting. (Id.; see also Compl. ¶¶ 20, 28, 30, 70, 89,

257).

"This kind of pleading, attributing knowledge to a defendant merely because of the

defendant's status in a corporation, generally fails as a method of meeting the rigorous

requirements for pleading scienter." W.R. Carney, 135 F. Supp. 2d at 255. Similarly,

allegations that the Defendants received internal reports and information concerning the

Company are insufficient to satisfy the pleading requirements of the PSLRA. See id.

("Attempts to plead scienter by general allusions to unspecified internal corporate

information are insufficient to withstand a motion to dismiss.") (quotations and citations

omitted). In their Complaint, the Plaintiffs have not specifically identified any specific

communications that the Defendants had or internal documents that they received which

would have alerted the Defendants, at any time prior to the announcement of the

restatement, that Investors Financial was using an improper method of accounting. Thus,

"[t]here is simply no basis for concluding that the individual defendants were involved in

or had personal knowledge of this detailed accounting issue." Ezra Charitable Trust, 466

F.3d at 9. See also W.R. Carney, 135 F. Supp. 2d at 255 (no strong inference of scienter

based on defendants' access to internal information where plaintiffs failed to allege

specific facts identifying particular reports or meetings, detailing the topics addressed in

any such reports or meetings or describing the circumstances under which specific

-46-

adverse information was relayed).  Similarly, there are no factual allegations, as opposed to conclusory assertions, to support the Plaintiffs' contention that the Defendants intentionally engaged in any other of the alleged accounting errors on which the plaintiffs base their claim.

The Plaintiffs have alleged sufficient facts to establish that the Defendants knew about the prepayments of the Company's MBS and SBA securities.  However, as detailed above, the fact and risk of prepayments were disclosed.  What is missing is any link between knowledge of prepayments, wrongdoing and loss.[22]

### Allegations of Motive

The Plaintiffs argue that a strong inference of scienter can be inferred from the Defendants' sales of more than 1.7 million shares of Investors Financial stock during the Class Period and from the Defendants' receipt of more than $21.8 million in incentive-based bonuses.  (Pls.' Opp. at 22-29).  This court finds that neither the allegations of insider trading nor the allegations concerning the Defendants' bonuses supports such an inference.

---

[22] For example, the fact that the Defendants knew about prepayments does not lead to the conclusion that they knew about the use of an improper accounting method which resulted in an overstatement of income in some periods (and an understatement in others).  See Capstead Mortgage Corp., 258 F. Supp. 2d 533, 565 (N.D. Tex. 2003) (defendants' awareness of escalation in prepayments not sufficient to support strong inference of scienter where plaintiffs failed to allege facts showing that defendants knew, at the time they made representations about company's projected earnings and dividends, that prepayment levels were adversely affecting company's asset value or income).

"[T]o show scienter on the basis of stock trading, the plaintiffs must show that the defendants' trading was 'unusual, well beyond the normal patterns of trading by those defendants.'" W.R. Carney, 135 F. Supp. 2d at 256 (quoting Greebel, 194 F.3d at 198). While the Complaint depicts a chart showing each of the individual Defendants' stock trades over the course of the Class Period, "[n]othing, however, is said about whether these sales were inconsistent with any pattern established by these defendants in either amount or to timing. Without more, these allegations do not raise a strong inference of scienter." Id. On this basis alone, the allegations of stock trading are insufficient to support the Plaintiffs' fraud claims.

In addition, the Plaintiffs' description of the Defendants' stock sales during the Class Period undermines any inference of wrongdoing. Significantly, the allegations illustrate that four of the seven individual Defendants sold stock at times when the Company's diluted EPS was understated. (See Compl. ¶ 236). Sheehan, Mancuso, Maroney and Henry each sold thousands of shares of stock, which together generated millions of dollars in proceeds, during 2003 and the first quarter of 2004. (See id.). As described above, the restatement resulted in an upward adjustment in diluted EPS for those periods. No conclusion can be drawn that the Defendants were motivated to commit fraud in order to profit from inflated stock prices when the Defendants sold a portion of their shares at artificially depressed prices.[23]

---

[23] The Plaintiffs argue that Defendants Sheehan, Rogers, Mancuso, Spinney, Henry and Maroney "spring-loaded" their stock options in November 2004 by granting themselves over

Any potential inference of scienter based on the Defendants' stock sales is further weakened by allegations that two of the Company's key officers, Rogers and Spinney, sold only small percentages of their holdings over the course of the Class Period. Rogers' sales amounted to only 4.86% of his total stock and options and Spinney, the Company's CFO, sold only 0.19% of his total stock and options.[24] (Id.). "Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, [the fact that defendants continued to retain most of their holdings] suggest[s] they had every incentive to keep [the company] profitable." In re: Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999). Furthermore, "[i]t is not unusual for individuals leaving a company . . . to sell shares." Greebel, 194 F.3d at 206. Consequently, Keenan's stock sales in 2001, prior to her departure from Investors Financial on January

---

340,000 immediately exerciseable options when the stock price reached its lowest or near lowest price in three years. (Pls.' Opp. at 24-25). Consequently, the Plaintiffs contend, the Defendants were able to take advantage of the artificially depressed stock prices and to benefit from their fraud. (Id.). This argument concerning "spring-loading" is unavailing. It is not supported by any allegations in the Complaint and is contradicted by allegations that the Defendants engaged in fraud so that they could benefit from artificially inflated stock prices.

[24] The Defendants, relying on documents filed by Spinney with the SEC, argue that Spinney did not sell any of his Investors Financial stock as the Plaintiffs allege, but, rather, that he purchased shares during the Class Period. (Defs.' Br. at 17; Defs.' Ex. 35). Even accepting as true the allegations set forth in the Complaint, Spinney's sale of 200 shares on one occasion during the more than four years that makes up the Class Period negates any inference of scienter based on motive. (See Compl. ¶ 236).

-49-

1, 2002, as well as her remaining sales in January and March 2002 shortly after she left the Company, do not support a strong inference of scienter.[25]

The allegations regarding the Defendants' receipt of bonuses during the Class Period suffer from similar deficiencies.  In their Complaint, the Plaintiffs assert that each of the Defendants "earned huge incentive-based bonuses which were based upon the achievement of revenue and EPS goals in the Company's fiscal year operating plan." (Compl. ¶ 232).  They further provide a chart illustrating that for the years covered by the Class Period, incentive-based compensation constituted a significant portion of at least some of the individual Defendants' compensation.  (Id. ¶ 234).  Nevertheless, the fact that the Defendants' compensation depended upon the Company's earnings "alone is not and cannot be enough to establish scienter."  Aldridge, 284 F.3d at 83.  A plaintiff must allege "more than the usual concern by executives to improve financial results."  Ezra Charitable Trust, 466 F.3d at 10 (quoting Cabletron, 311 F.3d at 39).  Therefore, the bonus allegations set forth in the Complaint fail to satisfy the requirements for pleading intent.

Moreover, as in the case of the stock sale allegations, the bonus allegations are inconsistent with an intent to defraud.  In particular, they show that the Defendants'

---

[25]  Having determined that the allegations regarding the Defendants' stock sales do not support a strong inference of scienter, but rather undermine any such inference, this court declines at this time to address the Defendants' argument that certain of their stock trades were executed pursuant to established trading plans and cannot, therefore, support an inference of scienter. (Defs.' Br. at 16 n.12, 18).

bonus compensation was directly tied to the Company's financial performance during each of the years included in the Class Period, including at times when the Company's financial results were understated.  (Compl. ¶ 232).  They also show that Sheehan, Rogers, Maroney and Spinney received larger bonuses in 2003, the year when net interest income and diluted EPS were understated, than they did in 2001 and 2002.  (Id. ¶ 234). There are also no allegations which establish what the bonuses would have been in light of the restated income for that year.  Thus, it is impossible to tell whether the amount of "excessive" bonuses in 2001 and 2002, or the amount of the "insufficient" bonuses in 2003 were significant.  Given these facts, this court cannot logically conclude that the Defendants were motivated to commit fraud in order to obtain higher bonuses.

The Plaintiffs nevertheless argue that scienter may be inferred "from defendants' November 2003 dramatic increase to their bonus structure for fiscal year 2004" and they suggest that the Defendants intentionally restated the Company's financial results in order to benefit from the new bonus structure in 2004.  (Pls.' Opp. at 27-28).  This argument is not supported by any allegations set forth in the Complaint and the Plaintiffs have provided no references to any specific facts that would support such a claim in any event. Therefore, the Plaintiffs' assertions regarding the restructuring of the bonus program offer no support for their claim that the Defendants had a motive to engage in fraud.

The Plaintiffs' failure to plead any facts supporting a strong inference of scienter is fatal to their claims based on statements concerning the Company's historical financial results.  Consequently, this court recommends that these claims be dismissed.

-51-

Case 1:05-cv-11627-RCL    Document 62    Filed 07/31/2007    Page 52 of 57

**D.**     <u>Allegations Concerning SBA Loans</u>

The Defendants argue that the Plaintiffs' claims relating to Investors Financial's

SBA loan portfolio, which was not adjusted in 2004, should be dismissed because the

Plaintiffs have failed to plead loss causation with respect to these claims.  This court

agrees and recommends that the motion to dismiss those claims be allowed on this basis.[26]


"A private plaintiff who claims securities fraud must prove that the defendant's

fraud caused economic loss." <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 338, 125 S. Ct.

1627, 1629, 161 L. Ed. 2d 577 (2005).  Thus, in a securities fraud case based on false and

misleading statements, the PSLRA "expressly imposes on plaintiffs 'the burden of

proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff

seeks to recover.'" <u>Id.</u> at 345-46, 125 S. Ct. at 1633 (quoting 15 U.S.C. § 78u-4(b)(4)).

The Supreme Court has held that the plaintiff must "*allege* these requirements" of

proximate causation and economic loss at the pleading stage.  <u>Id.</u> at 346, 125 S. Ct. at

1634.  Moreover, in order to satisfy this pleading requirement, the plaintiff must, at a

minimum, "provide a defendant with some indication of the loss and the causal

connection that the plaintiff has in mind." <u>Id.</u> at 347, 125 S. Ct. at 1634.  <u>See also id.</u> at

---

[26]   In light of this conclusion, this court declines to address the Defendants' alternative
arguments that the Plaintiffs have failed to allege scienter with respect to any disclosures
regarding the Company's SBA loans, and the Plaintiffs have alleged no specific facts showing that
the Defendants' disclosures regarding the SBA loans were false or misleading.

346, 125 S. Ct. at 1634 (assuming without deciding that no heightened pleading standard applies to pleading of proximate causation or economic loss in securities context).

In the instant case, the Plaintiffs have failed to link their loss to any alleged misstatements or omissions regarding the Company's SBA securities.  The Plaintiffs claim to have suffered economic loss "when Investors Financial's stock price plummeted upon defendants' October 21, 2004 and July 14, 2005 announcements."  (Compl. ¶ 247). There is no indication that the first announcement, which alerted the market to the Company's change in accounting and the need to restate its financial results, was related to information that the Defendants concealed regarding the accounting for SBA loans. Rather, according to the Plaintiffs, only "partial true facts about Investors Financial's operations and financial conditions reached the market" at this time, and only "part of the prior artificial inflation came out of Investors Financial's stock price" because the Defendants continued to hide the fact that the Company's SBA portfolio was also accounted for improperly.  (Id. ¶¶ 241-242).  Therefore, failure to disclose this information cannot form the basis of Plaintiffs' Complaint.

In fact, according to the allegations set forth in the Complaint, it was never revealed that Investors Financial was using an improper method of accounting for its SBA loans or that those loans had become impaired and should have been written down. Indeed, the Plaintiffs allege, "had the defendants disclosed the truth [about] the Company's SBA portfolio and that these securities experienced prepayments, it would have signaled to investors that the Company's current and future interest income derived

from its SBA securities would be lower than initially projected and the resulting stock movement would have been negative." (Id. ¶ 243). In other words, the Plaintiffs contend that if the Defendants had not continued to conceal the truth about the Company's SBA portfolio, their loss resulting from the announcement of the restatement would have been greater. Therefore, the Plaintiffs have not pled that the Defendants' misstatements and omissions regarding the SBA loans proximately caused them to incur losses in 2004.

Similarly, the Plaintiffs have not alleged that the July 14, 2005 announcement which caused them to suffer economic harm revealed any information that would have alerted investors that the Defendants had hid the truth about the SBA securities. Again, according to the Plaintiffs, only "the partial truth about Investors Financial's operations and financial condition began to leak out into the market" on that date because "[t]he Company blamed the substantial decrease in [earnings] guidance on 'a flatter than expected yield curve; narrower than expected reinvestment spreads; weaker than expected market-sensitive revenues, including fees linked to both the equity and foreign currency markets; and continued investments in headcount and technology to support new and existing clients'" rather than on the fact that it had been experiencing prepayments on its SBA loan portfolio. (Compl. ¶ 244). The Plaintiffs allege that "[t]he truth regarding the Company's earnings shortfall and severely reduced guidance" was not fully disclosed until August 9, 2005, when the Company revealed in its Form 10-Q for the period ended June 30, 2005 that it had experienced prepayments on its SBA portfolio. (Id. ¶ 227-28).

However, that announcement occurred after the close of the Class Period and the Plaintiffs have not alleged any economic loss resulting from that belated disclosure.

A misrepresentation does not lead to economic loss if an investor sells shares "before the relevant truth begins to leak out."  Dura Pharm., 544 U.S. at 342, 125 S. Ct. at 1631.  Because the Plaintiffs have not alleged that any true facts relating to Investors Financial's SBA portfolio began to leak to the market at any time prior to August 9, 2005, or that the facts that were ultimately revealed concerning the SBA loans caused them to suffer an economic loss, they have failed to allege loss causation.  Accordingly, this court recommends that the Defendants' motion to dismiss the claims relating to the SBA loans be granted.

**E.    Control Person Liability**

The Defendants have moved for dismissal of Count Two, by which the Plaintiffs are seeking to hold the individual Defendants liable as control persons pursuant to Section 20(a) of the Exchange Act.  "Section 20(a) creates derivative liability for those that directly or indirectly control a person or firm found liable under a provision of the Securities Exchange Act.  Credit Suisse First Boston Corp., 431 F.3d at 53.  Consequently, a "rejection of the underlying section 10(b) violations dooms the plaintiffs' claims against [the Defendants] under section 20(a)."  Id.  Because the Complaint fails to allege an underlying violation, this court recommends that Count Two of the Complaint be dismissed as well.

**F.    Leave to Amend**

-55-

The Plaintiffs have requested leave to amend in the event that the court finds the Complaint deficient in any respect. Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Complaint at issue is the first consolidated class action complaint that has been filed in this matter. "Because Plaintiffs have not previously been given an opportunity to amend and because it does not clearly appear to this court that any attempt to amend would necessarily be futile," this court recommends that the Complaint be dismissed without prejudice. Guerra v. Teradyne, Inc., No. Civ. A. 01-11789-NG, 2004 WL 1467065, at *28 (Jan. 16, 2004) (quoting In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308, 1339 (M.D. Fla. 2002)).

## V.  **CONCLUSION**

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Defendants' motion to dismiss (Docket No. 32) be ALLOWED, and that the Complaint be dismissed without prejudice.[27]


        / s / Judith Gail Dein
        Judith Gail Dein
        United States Magistrate Judge

---

[27]    The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).