UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, On Behalf of Plaintiff and All Others Similarly Situated, | ) ) ) | No. 1:05-cv-11627-RCL **(Consolidated)** |
| | ) | |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| | ) | |
| vs. | ) | |
| | ) | |
| INVESTORS FINANCIAL SERVICES CORP., et al., | ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

LEAD PLAINTIFFS' FIRST AMENDED CONSOLIDATED COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ........................................................................7

III.    THE PARTIES ...................................................................................................7

IV.     WITNESSES/SOURCES OF PLAINTIFFS' ALLEGATIONS .....................11

        A.      Overview of SBA Securities .................................................................12

        B.      Investors Financial Defendants Purchased SBA Securities at a Premium ............14

        C.      Investors Financial's SBA Securities Prepaid in 2002 and 2003 .........15

        D.      Investors Financial Defendants Experienced $619 Million Drop in
                Carrying Value of the Company's SBA Securities Reflecting Substantial
                Prepayment of These Securities, Loss of Premiums and Reduced Net
                Interest Income .....................................................................................17

V.      DEFENDANTS WERE RESPONSIBLE FOR THE COMPANY'S  FINANCIAL
        STATEMENTS AND ACCOUNTING AND KNEW OR WERE RECKLESS IN
        NOT KNOWING OF THE FALSE ACCOUNTING TREATMENT FOR
        INVESTORS' SECURITIES .............................................................................19

VI.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE
        CLASS PERIOD ...............................................................................................24

        A.      Defendants' False and Misleading Statements Concerning 1Q01 Financial
                Results ...................................................................................................24

        B.      Defendants' False and Misleading Statements Concerning 2Q01 Financial
                Results ...................................................................................................25

        C.      Defendants' False and Misleading Statements Concerning 3Q01 Financial
                Results ...................................................................................................27

        D.      Defendants' False and Misleading Statements Concerning 4Q01 Financial
                Results and Fiscal Year 2001 Financial Results ...................................28

        E.      Defendants' False and Misleading Statements Concerning 1Q02 Financial
                Results ...................................................................................................31

        F.      Defendants' False and Misleading Statements Concerning 2Q02 Financial
                Results ...................................................................................................33

Page

G.    Defendants' False and Misleading Statements Concerning 3Q02 Financial Results ...............................................................................35

H.    Defendants' False and Misleading Statements Concerning 4Q03 Financial Results and Fiscal Year 2001 Financial Results ....................................37

I.    Defendants' False and Misleading Statements Concerning the 1Q03 Financial Results ..........................................................................40

J.    Defendants' False and Misleading Statements Concerning 2Q03 Financial Results ...............................................................................42

K.    Defendants' False and Misleading Statements Concerning 3Q03 Financial Results ...............................................................................45

L.    Defendants' False and Misleading Statements Concerning 4Q04 Financial Results and Fiscal Year 2003 Financial Results ....................................50

M.    Defendants' False and Misleading Statements Concerning 1Q04 Financial Results ...............................................................................54

N.    Defendants' False and Misleading Statements Concerning 2Q04 Financial Results ...............................................................................55

O.    Defendants' False and Misleading Statements Concerning 3Q04 Financial Results ...............................................................................58

P.    Defendants' False and Misleading Statements Concerning 4Q04 and Fiscal Year 2004 Financial Results .......................................................77

Q.    Defendants' False and Misleading Statements Concerning 1Q05 Financial Results ...............................................................................84

R.    Defendants' False and Misleading Statements Concerning 2Q05 Financial Results ...............................................................................89

VII.    INVESTORS FINANCIAL RESTATES THREE-AND-A-HALF YEARS OF FINANCIAL STATEMENTS ....................................................................100

VIII.    INVESTORS FINANCIAL DEFENDANTS' KNOWING OR RECKLESS DISREGARD OF GAAP .....................................................................104

A.    General GAAP Violations ............................................................104

B.    Specific GAAP Violations ...........................................................109

**Page**

       1.      Defendants Improperly Recorded Mortgage Backed Securities and SBA Bonds as Held to Maturity and Mislead the Market As to the Risk of the Investments..........................................................................109

       2.      Defendants Improperly used the "Prospective" Method in Accounting for Mortgage Backed Securities Portfolio in Violation of FAS 91 ...............................................................................................111

       3.      Inadequate Disclosures-Defendants Material Omissions Concerning The Anticipated Prepayments and Significant Assumption Underlying the Prepayent Estimates...................................118

   C.     Additional Scienter Allegations as to the Investors Financial Defendants..........122

       1.      Investors Financial Defendants' Choice of Accounting Method Shows Actual Knowledge ......................................................................122

       2.      Investors Financial Knew Its Internal Accounting Controls Were Inadequate ................................................................................................125

       3.      Investors Financial Failed to Make Required Disclosures ......................127

       4.      Investors Financial Certified False and Misleading Financial Results..................................................................................................128

IX.    POST CLASS PERIOD EVENTS ................................................................................132

X.     ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER ....................................135

   A.     Investors Financial's Compensation Scheme Motivated Defendants to Commit Fraud ....................................................................................................135

   B.     Individual Defendants' Highly Suspicious Insider Selling of $68.1 Million, Confirms Their Knowing Participation in the Fraudulent Scheme .......139

XI.    LOSS CAUSATION.....................................................................................................144

XII.   CAUSES OF ACTION .................................................................................................151

COUNT ONE.......................................................................................................................151

   For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ...................................................................................................151

COUNT TWO........................................................................................................................152

- iii -

**Page**

For Violation of Section 20(a) of the Exchange Act Against All Defendants.................152

XIII.  CLASS ACTION ALLEGATIONS ..............................................................153

XIV.  NO SAFE HARBOR ......................................................................................154

XV.  PRAYER FOR RELIEF ...................................................................................154

XVI.  JURY DEMAND .............................................................................................155

## I.    INTRODUCTION

1.    This securities class action is brought on behalf of persons who purchased or otherwise acquired Investors Financial Services Corporation ("Investors Financial," the "Company" or "IFIN") securities between April 10, 2001 and July 14, 2005 (the "Class Period"), against Investors Financial and several of its officers and directors for violations of the federal securities laws.  Defendants engaged in a scheme to defraud shareholders in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5.

2.    Throughout the Class Period, defendant Investors Financial and defendants Kevin Sheehan, Chief Executive Officer ("CEO"); Michael F. Rogers, President; John N. Spinney, Chief Financial Officer ("CFO"); Karen C. Keenan, former CFO; Robert D. Mancuso, Senior Vice President Marketing And Client Management; Edmund J. Maroney, Senior Vice President of Technology; and John E. Henry, Senior Vice President, General Counsel and Secretary (collectively, the "Individual Defendants") (Investors Financial and the Individual Defendants are collectively referred to herein as the "Investors Financial Defendants"), issued public materially false and misleading financial reports and other statements that artificially inflated the price of Investors Financial's securities, in violation of §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

3.    Investors Financial is a bank holding company that, through its subsidiaries, primarily Investors Bank & Trust ("IBT"), provides a broad range of services to financial asset managers, such as mutual fund complexes, investment advisors, banks and insurance companies.  The Company breaks down its services into two categories: core services and value-added services.  The core services include global custody, multicurrency accounting and mutual fund administration, and the

value-added services include securities lending, foreign exchange, cash management, performance measurement, institutional transfer agency, investment advisory services and lines of credit. The Company also derives net interest income by investing cash balances from its client's deposits.

4.      The Company's net interest income is the difference between income generated from interest-earning assets and expense on its interest-bearing liabilities – generally, mortgage-backed securities ("MBS") and Federal agency debt securities (principally Small Business Administration ("SBA") backed loans). Net interest income comprises 25%-30% of the Company's total revenues with the other 70%-75% coming from financial servicing fees, which analysts note are "highly recurring" and "relatively predictable." Thus, due to the variability in Investors Financial's net interest income, it is one of the primary metrics followed by Wall Street analysts to assess the Company's financial condition.

5.      This case involves defendants' scheme to mislead investors about their ability to continue to grow net interest income and ultimately net earnings and earnings per share ("EPS") through false and misleading disclosures regarding the true nature of the securities they invested in (falsely representing that their MBS and SBA securities were held-to-maturity ("HTM") and the methods they used to account for these securities. In doing so, defendants materially misstated their financial results both from a disclosure standpoint as well as a quantitative standpoint.

6.      During the Class Period (prior to the restatement), the Company improperly used the "prospective" method of accounting under FASB Statement No. 91 for its MBS and SBA securities despite the fact that under generally accepted accounting principles ("GAAP") this method was clearly not appropriate. The Company failed to comply with GAAP by not using the "retrospective" method under FAS 91 which includes taking "catch-up" adjustments that signal to investors what the difference is between the Company's original estimates of prepayments versus the actual

- 2 -

prepayment experience. Accordingly, this allows for increased transparency disclosures regarding prepayments and provides for a "level-yield" over the life of the investment portfolio which properly states interest income. Instead, the Company used the materially false and misleading "prospective" method which allowed them to hid adjustments for prepayments through inadequate disclosures and mask decreasing yields due to prepayments over the life of the investment portfolio.

7.      Given their extensive and constant review and analysis of the Company's portfolio, Investors Financial Defendants knew or were reckless in not knowing, that the "retrospective" method was correct, not the "prospective" method that they decided to use. By using the prospective method, the Company avoided disclosing the reality of their prepayment experience and simply deferred the negative affects of these prepayments into the future through constantly decreasing yields on the affected securities.

8.      While the Investors Financial Defendants knew of the risk of prepayments and the resulting loss of unamortized premiums and future case flows, *see, e.g.*, IFIN SEC filings that "Federal agency bonds generally have a higher yield than U.S. Treasury securities due to credit and call risk" (December 31, 2003 Form 10-K), by falsely classifying these securities as Held-to-Maturity securities they were able to mislead investors into believing that the Company could recover substantially all of its recorded investment when, in fact, they knew that was not true.

9.      As long as the risk (in this case, prepayments) did not occur, the Investors Financial Defendants could report steady and increased earnings growth due in large part due to the higher yield they were receiving on their investment securities for taking on extra risk.

10.     In 2002 and 2003, however, the undisclosed risk came to pass. CW1 reported that the SBA securities began experiencing prepayments in 2002 and 2003. Indeed, plaintiffs' investigation, tracking the changes of the Federal agency securities (SBA securities) that mature in five to ten years

reveals a massive $607 million drop in the Company's SBA securities' carrying value from December 2002 to December 2003. Similarly, the Federal agency securities (SBA securities) that mature in one to five years also experienced a $12.6 million drop in the SBA securities carrying value, for a total drop of $619 million. As a result of the prepayments, Investors not only lost the premium paid for the security, but, going forward, the Company's net interest income was necessarily extensively reduced.

11.    Further, as it relates to the Company's MBS portfolio, had the Company used the correct method, the "retrospective" method, they would have had to take a large "catch-up" adjustment in 2001 – an approximately $10.9 million charge to interest income to re-adjust the yield on their MBS portfolio to be in-line with actual prepayment experience. This would have signaled to investors the risks inherent in the investment portfolio at that time, and would have been factored into analyst's growth models and earnings expectations which would never have allowed for the quarter after quarter of record growth the Company reported. Instead, by using the "prospective" method – the Company never made catch-up adjustments and instead was faced with decreasing yields going forward rather than the correct method which calls for catch-up adjustments each period and a "level-yield" over the life of the security.

12.    When the decreases in yield continued to eat away at the Company's net interest income, defendants, after extensively analyzing the impact of using the proper method, finally admitted that the Company's financial statements were false and could no longer be relied upon. On October 21, 2004, defendants announced that the Company would restate its financial results for 2001, 2002, 2003 and the first two quarters of 2004. Although the defendants attempted to portray the restatement as the result of a change in accounting method, where either method was allowed,

the restatement belies that assertion.  The fact that the Company restated its financial statements is an admission that the accounting treatment was improper based upon information known at the time.

13.     In an October 21, 2004 press release, the Company announced the restatement and stated, "[c]ommenting on the change in the application of FAS 91, the Company noted that it has historically applied a prospective method under Financial Accounting Standard Board ("FASB") Statement No. 91 to determine the amortization of premiums and accretion of discounts on applicable investment securities.  The Company has determined that it is appropriate to change to applying a retrospective method on applicable investment securities."

14.     Notably, during the Class Period, the Individual Defendants unloaded more than 1.7 million shares and pocketed $68.1 million in profits, with the overwhelming vast majority of these trades occurring prior to the October 21, 2004 announcement of their intention to restate.

15.     On news of the October 21, 2004 disclosure of the Company's financial condition, the Company's share price dropped more than 16%, closing at $36.50 per share on October 22, 2004 on astronomical trading of more than 11.6 million shares – *14 times* the trading volume of the day before. Six days later, in the October 27, 2004 Form 8-K, the Company informed investors that its financials reported on Form 10-K and Form 10-Q for fiscal year 2003 and the first two quarters of 2004 "should no longer be relied upon" and misrepresented to investors that the particular security or securities involved in the restatement regarding the FASB Statement No. 91 issue were "*securities backed by mortgages and other loans*," rather than stating that it involved SBA securities.  Because SBA "normally trade at a premium,"[1] informing investors that the restatement dealt with these

---

[1]     Coastal Securities Inc., Power Point presentation found at:
http://www.coastalsecurities.com/ Presentations/SBAPoolPrimer12-05.pps

- 5 -

securities would have tipped analysts and investors off to the major problems that had occurred in the Company's Federal agency portfolio (SBA securities).

16.     The restatement – which had the largest historical effects for the period three years earlier – was made when market forces, predominantly prepayments due to a declining interest rate environment, continued to put pressure on the earnings growth that the Company had promised investors. Defendants main motivation being increased net interest income in the future by taking previously reported net interest income and spreading it out over future periods in accordance with the retrospective method which they should have followed from the start.

17.     Defendants could only keep the facade up for two quarters. On July 14, 2005, the Company issued a press release reporting the financials for the quarter ended June 30, 2005. In the press release, *the Company reported that its <u>net interest income for the second quarter of 2005 would be flat</u> compared to the same period in 2004 and the Company drastically reduced its earnings guidance from 25% EPS growth to 10% growth for all of 2005 and all of 2006*. Thus, the Investors Financial Defendants' fraudulent conduct caused substantial economic harm to the class. On this disclosure of the true state of the Company's financial condition, the Company's share price dropped 18% to $34.05 per share on July 15, 2005 on trading of more than 22 million shares – which was 12.5 times the prior day's trade.

18.     In fact, the Company later revealed in more detail the reasons for the flat net interest income and drastic drop in earnings guidance for all of 2005 and 2006 – reasons defendants had known all along. On August 9, 2005 and November 4, 2005, buried in the Company's SEC Form 10-Q filings, for the quarters ending June 30, 2005 and September 30, 2005, the Investors Financial Defendants belatedly reported taking the unamortized premium expense lost and reported in nearly identical fashion that:

*Prepayment experience for Federal agency securities (primarily SBA guaranteed loan pools) also increased over this period as the <u>weighted average life of the securities shortened</u>. We expect the combination of heightened prepayment experience and, more significantly, reduced reinvestment opportunities to continue to pressure our net interest income for the remainder of 2005*.

19.    However, as stated above, the SBA prepayments occurred in 2003 and, the restatement which the 2004 restatement was able to increase their net interest income in the latter parts of 2004 and 2005; it could not replace the income lost through the prepayments.

## II.    JURISDICTION AND VENUE

20.    Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5.

21.    Venue is proper in this district pursuant to §27 of the Exchange Act.  Many of the false and misleading statements were made in or issued from this District.

22.    Investors Financial's executive offices are located in Boston, Massachusetts, where the day-to-day operations of the Company are directed and managed.

## III.    THE PARTIES

23.    Lead plaintiffs are the Ironworkers St. Louis District Council Pension Fund and the City of Deerfield Beach Non-Uniform Employees Retirement Plan; each purchased Investors Financial publicly traded securities during the Class Period at prices inflated by defendants' fraudulent activity and suffered substantial economic loss when the facts about Investors Financial's business were revealed at the end of the Class Period.

24.    Defendant Investors Financial is a bank holding company that through its subsidiaries, primarily IBT, provides a broad range of services to financial asset managers, such as mutual fund complexes, investment advisors, banks and insurance companies.  The Company provides global custody, multicurrency accounting and mutual fund administration, securities lending, foreign exchange, cash management, performance measurement, institutional transfer

agency, investment advisory services and lines of credit. The Company's headquarters are in Boston, Massachusetts, with offices throughout North America.

25.    Defendant Kevin J. Sheehan is, and was at all relevant times, Investors Financial's CEO. During the Class Period, defendant Sheehan sold 955,000 shares of Investors Financial common stock for proceeds of $38,970,144. Sheehan was present and/or directly made the false and misleading statements to analysts. According to Confidential Witness ("CW__") 2, defendant Sheehan was the "architect" of IBT's SBA bond investment program and that he understood the SBA bond marketplace because of his experience as a former executive with the Bank of England, which did a substantial amount of business in SBA bonds.

26.    Defendant Michael F. Rogers is, and was at all relevant times, Investors Financial's President. During the Class Period, Rogers sold 100,000 shares of Investors Financial common stock for proceeds of $3,533,311.

27.    Defendant John N. Spinney has been Investors Financial's CFO since January 1, 2002. During the Class Period, Spinney sold 200 shares of Investors Financial common stock for proceeds of $5,472,000. Spinney was present and/or directly made the statements to analysts. CW1 reported that defendant Spinney put together the material for the analysts.

28.    Defendant Karen C. Keenan was Investors Financial's CFO until January 1, 2002. During the Class Period, Keenan sold 120,000 shares of Investors Financial common stock for proceeds of $4,422,900. Keenan was present and/or directly made the false and misleading statements to analysts.

29.    Defendant Robert D. Mancuso is, and was at all relevant times, Investors Financial's Senior Vice President – marketing and client management. During the Class Period, Mancuso sold 253,709 shares of Investors Financial common stock for proceeds of $9,975,145.

30.     Defendant Edmund J. Maroney is, and was at all relevant times, Investors Financial's Senior Vice President of Technology.  During the Class Period, Maroney sold 230,680 shares of Investors Financial common stock for proceeds of $8,790,691.

31.     Defendant John E. Henry is, and was at all relevant times, Investors Financial's Senior Vice President, General Counsel and Secretary.  During the Class Period, Henry sold 65,848 shares of Investors Financial common stock for proceeds of $2,455,121.

32.     The defendants listed in ¶¶25-31 above are hereinafter referred to as the Individual Defendants.

33.     Because of their positions with Investors Financial, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  In particular, Sheehan, Rogers, Spinney and Keenan with their participation in the twice-monthly meetings of the Company's Asset & Liability Committee provided them with specific knowledge of the prepayments of Investors Financial securities.  Because of their possession of such information, Individual Defendants knew or recklessly disregarded the adverse facts specified herein that had not been disclosed to, and were being concealed from, the investing public.

34.     The Individual Defendants are liable as direct participants in, and co-schemed with respect to, the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions with the Company,

the Individual Defendants were able to – and did, directly or indirectly – control the conduct of Investors Financial's business.

## CONTROL PERSONS

35.    The Individual Defendants, because of their positions with Investors Financial, controlled and/or possessed the authority to control the contents of the Company's reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's filings, reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

36.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and still is, registered with the SEC pursuant to the Exchange Act was traded on the National Association of Securities Dealers Automatic Quotation System ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Investors Financial's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

37.    Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Investors Financial common

stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Investors Financial's business, operations, management and the intrinsic value of Investors Financial common stock; (b) enabled the Company to meet analyst earnings projections; (c) enabled Investors Financial insiders to sell their personally held Investors Financial common stock generating millions in proceeds; and (d) caused plaintiffs and other members of the class to be damaged by their purchase of Investors Financial securities at artificially inflated prices.

## IV.    WITNESSES/SOURCES OF PLAINTIFFS' ALLEGATIONS

38.    CW1 is a former managing director of risk management at IBT, the Company's primary operating subsidiary, between early 2001 and late 2003. While at IBT, CW1 reported to, and communicated with, IBT's CEO and members of the Management, Asset/Liability and Credit Committees concerning independent risk management; building an enterprise credit risk measurement and daily management reporting system providing management with a complete counterparty risk picture; accumulating input from trading desks; generating management reports, with an early warning system tracking key–risk indicators of common stock, debt, and credit default swap prices that included mortgage backed securities, collateralized debt obligations, municipal, and agency bond portfolios.

39.    CW2 is a former senior director of institutional transfer at IBT between early 2002 and late 2004. CW2 handled the accounting and record-keeping activities for transactions of shareholders in mutual funds and other investment products administered at IBT.

40.    CW3 is a former senior account manager at IBT prior to the Class Period up until late 2002. CW3 worked in the accounting and control service that IBT provided for its mutual fund client.

41.     CW4 is a former Wall Street analyst whose firm covered Investors Financial during the Class Period.

A.     **Overview of SBA Securities**

42.     SBA bonds represent indebtedness on loans to small businesses made by the SBA. The U.S. Small Business Administration Secondary Improvements Act of 1984 authorized the means by which SBA pool assemblers could create and market guaranteed loan pools similar to commonly used MBS.

43.     "SBA guaranteed-loan pools" are "backed by the full faith and credit of the U.S. government" and "offer the advantage of excellent credit quality, while allowing investors to earn high yields indexed off of the prime rate."  Anand K. Bhattacharya & Frank J. Fabozzi, Asset-Backed Securities, Chapter 10: SBA Loan-Backed Securities ("SBA Loan-Backed Securities"), attached hereto as Exhibit P, at 170.  "Variable-rate SBA pools are responsive to changing interest-rate environments as their coupons adjust every 30 or 90 days based on the current prime rate."  *Id.* "SBA Loan-Backed Securities" also states the following regarding SBA securities:

> The majority of the loans sold in the secondary market are variable-rate loans that are tied to the prime rate.  The prime rate, a leveling rate set by commercial banks, is the highest index used on any variable-rate security in today's marketplace and has always produced a wide margin above banks' cost-of funds rates.
>
> Variable-rate loans reset monthly on the first of the month or quarterly on the first of January, April, July and October.  Coupons on these securities are usually quoted in terms of their spread to the prime-rate index rather than by current coupon.  The maximum coupon allowable in the secondary market under present SBA regulations (as of 1988) equals prime plus 1.625%.  Most SBA pools do not have caps or floors on their rates, so investors should recognize the benefit of a fully adjustable coupon in the event of increases or decreases in interest rates over the life of the investment.  SBA-pool owners are assured of a positive spread in relation to other short-term yields, regardless of the actual rates that exist in a given market climate.

Exhibit P at 170-71.

44. "SBA Loan-Backed Securities" identifies the following risks to investors in "INVESTING IN SBA-POOL SECURITIES" section of the chapter:

- Liquidity – "SBA pools are now traded in an efficient and competitive marketplace" and "investors can now enjoy the benefits of improved pricing efficiency and liquidity equal to that associated with larger markets." Exhibit P at 174.

- Credit-Risk Quality – "SBA pools provide excellent credit quality because they are backed by the full faith and credit of the U.S. government and, as a result, are implicitly triple A-rated securities. The investor in an SBA loan or pool has an unconditional guarantee as to the repayment of 100% of the principal and accrued interest outstanding on a timely basis." *Id.*

- Interest-Rate Risk – "Variable-rate SBA pools are relatively free from interest-rate risk" "[s]ince these investments are indexed to the prime rate . . . [and] are adjusted monthly or quarterly and are mainly non-capped" and "the investor's coupon and yield adjust to changing interest-rate environments." *Id.* at 174-75.

- Prepayment – "Qualifying guaranteed loans for SBA pools may be prepaid without penalties by the small-business borrower at any time during their term, at the borrower's option." *Id.* at 175.

Like comparable mortgage-backed securities, SBA pools generate monthly cash flows, which may include proceeds of accelerated principal.

Prepayment rates on SBA pools include all events of early principal redemption, whether an actual borrower prepayment or default has occurred. Because SBA-pool yields are calculated on the basis of their cash flows, it is critical to assume a reasonable prepayment rate for accurately generating a proper cash-flow yield and average-life forecast. Prepayment rates on SBA loans are expressed as an annual constant prepayment rate (CPR) based on historical performance.

In conjunction with the Congressional passing of the Secondary Market Improvements Act of 1984, allowing for the creation of the pooling process, the Public Securities Association (PSA) undertook a prepayment study of more than 10,000 SBA-guaranteed loans with originations ranging from 1972 through 1984. *The results of the prepayment study established standard benchmark prepayment rates (CPRs) for fixed- and variable-rate SBA loans and pools, i.e., one prepayment rate was assigned to all fixed-rate SBA loans and pools, and one prepayment rate was assigned to all variable-rate SBA loans and pools.*

[A]lmost all variable-rate SBA loans are originated at interest rates between prime plus 2.25% to the maximum rate of prime plus 2.75%. For these reasons, *the*

- 13 -

>*maturity dates on variable-rate SBA pools are the significant factor in prepayment analysis,* rather than the coupon rates on the pools.
>
>   *The highest prepayment rates on SBA loans and pools exist on shorter-maturity product. Ten-year and shorter-term SBA pools, with underlying loans made for working capital, prepay at the highest rate.* Conversely, long-term, real-estate-backed SBA pools prepay much more slowly. The lowest prepayment rates tend to be on variable-rate SBA pools with interest-rate caps, all of which are long term and comprised of loans made with the most competitive terms to the best-quality credit borrowers.
>
>   Whether investors purchase SBA pools at a premium, at par or at a discount, prepayment rates are paramount to anticipated yields. As with most debt instruments, the "risk/reward" factor is an element of pricing. Risk on any product guaranteed by the Federal government begins with securities priced above par. SBA pools offered to investors at premium prices will carry higher yields than pools offered at par or at a discount. Keep in mind, regardless of the coupon or the price paid, every SBA variable-rate pool with a stated-maturity date can be expected to prepay at close to the same rate.

*Id.* at 175-76.

45.     Thus, as Coastal Securities notes, "[b]ecause SBA securities are subject to prepayments and normally trade at a premium, knowledge of their prepayment characteristics is important" and "premium risk" "is the [p]rimary issue in deciding to invest in SBA pools."

## B.     Investors Financial Defendants Purchased SBA Securities at a Premium

46.     The Investors Financial Defendants admit in the Company's SEC filings, that its Federal agency securities are "primarily SBA guaranteed loan pools" which "are variable rate securities indexed to the Prime rate." June 30, 2003 Form 10-Q and June 30, 2005 Form 10-Q.

47.     CW1 reported that the Company's major operating subsidiary, IBT, purchased SBA bonds whose loans were underwritten by "originating banks" and then resold to so-called financial intermediaries or "secondary purchasers," such as IBT. CW1 stated that IBT purchased those bonds

at a premium above par value (the bonds' coupon interest rate exceeded the market rate of interest).[2] In describing this situation, CW1 used as an example that IBT purchased around $900 million of SBA bonds and that the premium amount was about $90 million. CW1's example equates to the Company paying $110.00 (par value $100.00) or 110% of par.

48.    CW1 said that the U.S. Federal government insured the value of the SBA bonds, but the insured amount usually ranged between 80% and 100% of the par value. Because the premium paid by IBT was not insured, CW1 stated that the Company remained at risk of losing the premium paid on these securities (or the unamortized amount).

49.    CW1 stated that investing in SBA bonds is a very specialized area and that "you gotta know what you're doing… you can't be a buy-and-hold investor because if you are you'll shoot yourself in the foot." CW1 reported that he/she informed defendant Spinney (CFO) late in the first quarter of 2003 that the unamortized amount of the premium SBA bonds was at risk because it would be lost to the extent that the bonds were prepaid. CW1 explained that IBT could recapture the premium it had paid, but only if it received interest payments in excess of the market interest rate. Thus, if the bonds were prepaid, IBT would no longer receive interest payments and the opportunity to recover the unamortized portion of the premium would cease. Since the SBA loans could be prepaid without penalty, the unamortized premium remained at risk during the term of the bond.

### C.    Investors Financial's SBA Securities Prepaid in 2002 and 2003

50.    CW1 stated that during the 2002 to 2003 timeframe the banks that originated the SBA loans were prepaying the SBA loans held by secondary lenders, such as IBT. In doing so, the originating bank captured the right to collect the premium, *i.e.*, the higher than market rate of interest

---

[2]    SBA securities "normally trade at a premium." http://www.coastalsecurities.com/Presentations/SBAPoolPrimer12-05.pps.

to be paid to the originating bank by the borrower during the remaining term of the loan. As a result, IBT found that the Company's prepayment risk had materialized into a loss and the Company lost the unamortized premium amount of the SBA bond.

51. Coastal Securities has another presentation[3] that provides a good description how the Secondary Marketworks and is consistent with CW1's account. In part, it states: "A borrower seeking capital for expansion or start of a small business applies for a Small Business Administration Loan." Lending Bank (loan provider) "sells the loan to an [approved Pool assembler] to generate fee and premium income [and] lender retains at least 1% of servicing." The customer will not know that the loan has been sold into the secondary market and the Lending Bank retains customer relationship as they continue to service their SBA loans. The pool assembler has Lending Bank complete Secondary Participation Agreement (Form 1086) SBA /Federal Government to transfer the loan into the secondary market. The Pool assembler sells the loan as a pool of securitized SBA loans. The borrower makes payments to Lending Bank and Lending Bank submits the loan payment to the Fiscal and Transfer Agent (currently Colson Services). Colson Services then sends principal and interest payments to the investor.

52. CW1 also stated that generally SBA bonds finance the borrowers' purchases of machinery, plant and equipment and have about a seven-year term. CW1 stated that IBT had a well-defined borrowers' payment profile showing the likelihood of prepayment peaking at about five years. CW1 stated that beyond five years, the loans not refinanced were, for the most part, those that could not be economically refinanced. CW1 stated that IBT could apply this profile with its associated average expected life to each bond to determine the amortization schedule. CW1 stated

---

[3]    The Products, Features and Benefits of Government Guaranteed Loans and Pools is found at: http://www.coastalsecurities.com/Presentations/All%20Government%20Gtd%20Products.pps.

he/she recalled hearing that IBT's management thought there was economic evidence suggesting that the peak of the payment profile would "level out and move to the right," *i.e.*, the average term would lengthen and the maximum percentage of prepaid loans would decline.

53.     CW1 emphasized that even to the extent that IBT's prepayment profile of the borrowers was accurate, it failed to include the probability that market conditions might provide an incentive and opportunity for the originating bank to prepay the bond, which as CW1 stated occurred during 2002 and 2003.

**D.     Investors Financial Defendants Experienced $619 Million Drop in Carrying Value of the Company's SBA Securities Reflecting Substantial Prepayment of These Securities, Loss of Premiums and Reduced Net Interest Income**

54.     Investors Financial's Federal agency securities (SBA securities) were classified as HTM.  The Investors Financial Defendants typically reported the Company's HTM in the following format:

| | Years | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $  317,963 | 3.74% $ | 1,311,577 | 3.64% $ | 151,068 | 4.53% $ | 253,822 | 3.69% |
| Federal agency securities | — | — | 12,665 | 3.75 | 648,756 | 3.74 | 625,817 | 3.75 |
| State and political subdivisions | — | — | 2,385 | 5.13 | 6,542 | 5.13 | 108,094 | 5.10 |
| Total securities held to maturity | $  317,963 | 3.74% $ | 1,326,627 | 3.65% $ | 806,366 | 3.90% $ | 987,733 | 3.88% |

December 31, 2002 Form 10-K.

55.     Plaintiffs' investigation into the Company's Federal agency securities (SBA securities) that were HTM over many quarters, revealed in the year from December 2002 through December 2003, Investors Financial suffered a $607 million drop to the Company's Federal agency securities (SBA securities) that mature in five to ten years and $12.3 million and for securities that mature in one to five years dropped $12.3 million as of December 31, 2003.  The following chart tracks the Company's Federal agency securities (SBA securities) by maturity date over time:

- 17 -

| Federal Agency Securities (Primarily SBA Pools) | | | | | | | | | | | | | |
| | (under 1 yr) | | | (1 to 5 yrs) | | | (5 to 10 yrs) | | | (over 10 yrs) | | | |
| Period | | Diff. | | | Diff. | | | Diff. | | | Diff. | | SBA |
| Ending | Amount | B/n Periods | Yield | Amount | B/n Periods | Yield | Amount | B/n Periods | Yield | Amount | B/n Periods | Yield | Inc./Dec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/31/2001 | $0 | | | $111,011 | | 7.16% | $221,148 | | 7.26% | $0 | | | $0 |
| 6/30/2001 | $0 | $0 | | $111,937 | $926 | 5.88% | $258,118 | $36,970 | 6.10% | $0 | $0 | | $37,896 |
| 9/30/2001 | $5,000 | $5,000 | 6.44% | $104,792 | ($7,145) | 5.04% | $291,586 | $33,468 | 5.26% | $0 | $0 | | $31,323 |
| 12/31/2001 | $5,000 | $0 | 6.43% | $141,739 | $36,947 | 4.05% | $309,369 | $17,783 | 4.26% | $0 | $0 | | $54,730 |
| 3/31/2002 | $5,000 | $0 | 6.40% | $15,182 | ($126,557) | 3.80% | $271,953 | ($37,416) | 4.06% | $319,899 | $319,899 | 3.80% | $155,926 |
| 6/30/2002 | $5,000 | $0 | 6.30% | $14,981 | ($201) | 3.83% | $418,081 | $146,128 | 3.83% | $396,701 | $76,802 | 3.83% | $222,729 |
| 9/30/2002 | $0 | ($5,000) | | $13,692 | ($1,289) | 3.88% | $504,525 | $86,444 | 3.88% | $484,828 | $88,127 | 3.88% | $168,282 |
| 12/31/2002 | $0 | $0 | | $12,665 | ($1,027) | 3.75% | $648,756 | $144,231 | 3.74% | $625,817 | $140,989 | 3.75% | $284,193 |
| 3/31/2003 | NR | | | NR | | | NR | | | NR | | | $0 |
| 6/30/2003 | NR | | | NR | | | NR | | | NR | | | $0 |
| 9/30/2003 | NR | | | NR | | | NR | | | NR | | | $0 |
| 12/31/2003 | $0 | $0 | | $0 | ($12,665) | | $41,708 | ($607,048) | 2.76% | $1,864,804 | $1,238,987 | 3.16% | $619,274 |
| 12/31/03A | $0 | $0 | | $0 | ($12,665) | | $41,705 | ($607,051) | 2.28% | $1,864,849 | $1,239,032 | 2.71% | $619,316 |
| 3/31/2004 | NR | | | NR | | | NR | | | NR | | | $0 |
| 3/31/04A | NR | | | NR | | | NR | | | NR | | | $0 |
| 6/30/2004 | NR | | | NR | | | NR | | | NR | | | $0 |
| 6/30/04A | NR | | | NR | | | NR | | | NR | | | $0 |
| 9/30/2004 | NR | | | NR | | | NR | | | NR | | | $0 |
| 12/31/2004 | $0 | | | $2,407 | $2,407 | 2.32% | $106,572 | $64,867 | 3.04% | $2,165,686 | $300,837 | 3.17% | $368,111 |
| 3/31/2005 | NR | | | NR | | | NR | | | NR | | | $0 |
| 6/30/2005 | NR | | | NR | | | NR | | | NR | | | $0 |
| 9/31/05 | NR | | | NR | | | NR | | | NR | | | $0 |
| 12/31/2005 | | | | $3,814 | $1,407 | 4.90% | $237,101 | $130,529 | 4.78% | $2,064,416 | ($101,270) | 4.48% | $30,666 |

56.     In fact, the chart shows that the Investors Financial Defendants went further in trying to hide the prepayments and their destructive impact. Beginning in 2003, the Company stopped reporting the contractual years to maturity table for the Company's HTM securities in its March 31, 2003 Form 10-Q. Indeed, it was during the same time that CW1 reported that the SBA securities were prepaying and that he/she specifically informed defendant Spinney of this risk. Also, to offset the SBA prepayments that had occurred in the one to five and five to ten year categories and to report the total amount of Federal agency securities the same or higher, the Investors Financial Defendants increased their purchases of SBA securities that mature in over ten years, which are less likely to prepay. March 31, 2003 Form 10-Q, June 30, 2003 September 30, 2003 Form 10-Q and December 31, 2003.

57.     In fact, however, the Company's disclosures reveal that it had falsely classified these securities as HTM – thereby misleading the market as to the risks of the investments. Unlike HTM securities, these securities had substantial prepayment risk which would (and did) negatively impact the Company's net interest income.

- 18 -

58.     Plaintiffs' investigation into the Company's MBS that were HTM over many quarters, revealed in the year December 2002 through December 2003, Investors Financial suffered a $1.2 billion drop in the Company's MBS that mature in one to five years, which the Investors Financial Defendants noted "caused earnings to go down on the net interest income line."  *See* October 15, 2003 Conference Call, statement by Defendant Spinney, attached hereto as Exhibit F.

59.     GAAP, as set forth in Statement of Financial Accounting Standards Issue No. 115 requires that "[i]nvestments in debt securities shall be classified as held-to-maturity and measured at amortized cost in the statement of financial position *only if the reporting enterprise has the positive intent and ability to hold those securities to maturity.*"  FASB Statement No. 115, paragraph 7.

## V.    DEFENDANTS WERE RESPONSIBLE FOR THE COMPANY'S FINANCIAL STATEMENTS AND ACCOUNTING AND KNEW OR WERE RECKLESS IN NOT KNOWING OF THE FALSE ACCOUNTING TREATMENT FOR INVESTORS' SECURITIES

60.     Under SEC Regulation S-X, Investors Financial was required to report its financial results in accordance with GAAP and consistently represented, in its SEC filings, that it did so.  For example, in the Company's SEC Form 10-K for 2003, the Company acknowledged that: "The management of Investors Bank & Trust Company is responsible for the preparation, integrity, and fair presentation of its published financial statements and all other information presented in the Consolidated Financial Statements of Investors Financial Services Corp. (the "Company")" and that "the financial statements of the [Investors] Bank [& Trust Company] have been prepared in accordance with accounting principles generally accepted in the United States of America . . . ." Both Defendants Spinney and Sheehan signed the letter to shareholders in the 10-K reflecting these responsibilities.  In each of the Company's Form 10-Qs and 10-Ks during the Class Period, the Company made similar representations.  Defendants, as senior officers of the Company, were

responsible for Investors Financials' financial results, including the accounting and proper classification of its securities.

61.    From the first year that Investors Financial was a publicly traded company, defendants knew of the significant accounting and reporting difference from the classification of Investors securities.  In the SEC Form 10-K for the year ended 1996, signed by, among others, defendant Sheehan and then CFO Keenan the Company stated that acknowledged the effect of FASB Statement No. 115 on the classification of securities in IFIN's portfolio:

> **SECURITIES** – Effective November 1, 1994, the Company adopted Statement of Financial Accounting Standards ("SFAS") No. 115, "Accounting for Certain Investments in Debt and Equity Securities."  SFAS No. 115 requires investments in equity securities that have readily determinable fair values and all investments in debt securities to be classified into three categories as follows:
>
> - Debt securities that the Company has the positive intent and ability to hold to maturity are classified as held to maturity and reported at amortized cost.
>
> - Debt and equity securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities and reported at fair value, with unrealized gains and losses included in earnings.
>
> - All other debt and equity securities are classified as available for sale and reported at fair value, with unrealized gains and losses excluded from earnings and reported in a separate component of stockholders' equity.

62.    The classification of the IFIN securities was an important component in understanding the Company's financial results.  In an article discussing the operation and effects of the classifications, Deloitte & Touche ("Deloitte") noted that for securities classified as HTM, "fluctuations in market value due to changing economic conditions have no impact on the carrying values of such debt securities.  Any unrealized gain is not reported.  Any unrealized losses are not recognized unless the asset is permanently impaired."  *See* Exhibit A, attached hereto, at 2.  By contrast, securities that are not or cannot be HTM are reported at fair value and any unrealized gain or loss is reported in earnings or other comprehensive income as a component of shareholder equity.

- 20 -

Thus, HTM securities, particularly where the principal is guaranteed, provide a much more stable, *i.e.*, less volatile, source of interest income.  Defendants were not only cognizant of these classifications and their ramifications, they were required to and did actively manage and review IFIN's portfolio throughout the Class Period.

63.    In each of the Company's Forms 10-Q and Forms 10-K throughout the Class Period, the Company stated that "[t]he active management of market risk is integral to [its] . . . operations" and that ***"[t]he objective of interest rate sensitivity management is to provide sustainable net interest revenue under various economic conditions."***  The Company's board of directors set asset and liability management policies and controlled the Company's investment activities.  The Company's Forms 10-Q and Forms 10-K, under the "Market Risk" and "Liquidity" sections, state, in part:

> Our board of directors has set asset and liability management policies that define the overall framework for managing interest rate sensitivity, including accountabilities and controls over investment activities.  ***These policies delineate <u>investment limits</u> and strategies that are appropriate, given our <u>liquidity</u> and regulatory requirements.***  For example, we have established a policy limit stating that projected net interest income over the next twelve months will not be reduced by more than 10% given a change in interest rates of up to 200 basis points (+ or -) over twelve months.  Each quarter, our Board of Directors reviews our asset and liability positions, including simulations of the effect of various interest rate scenarios on our capital.
>
> *                *                *
>
> Liquidity represents the ability of an institution to meet present and future financial obligations through either the sale or ***maturity*** of existing assets or the acquisition of additional funds through liability management. . . .
>
> ***Our primary sources of liquidity include*** cash and cash equivalents, Federal Funds sold, Federal Reserve Discount Window, new deposits, short-term borrowings, ***interest and principal payments on securities held to maturity*** and available for sale, and fees collected  from asset administration clients.

64.    In the same Forms 10-Q and Forms 10-K, Investors Financial states that the "Board of Directors has delegated day-to-day responsibility for oversight of the Asset and Liability

Management function to our Asset and Liability Committee ('ALCO').   ALCO is a senior

management committee consisting of the Chief Executive Officer, the President, the Chief Financial

Officer, the Chief Risk Officer and members of the Treasury function. ALCO meets twice monthly."

65.    Sheehan, Rogers, Spinney and Keenan were members of ALCO and attended the

twice monthly meetings receiving reports on net interest income, interest rates and the yield curve

and key assumptions in their income simulation model, including timing of cash flows, maturities

and repricing of its financial instruments.   Thus, members of ALCO know if a security becomes

prepaid because the interest income for that security ceases.

66.    The Company stated in its Forms 10-Q and Forms 10-K that it manages interest rate

sensitivity by using an income simulation model.   The income simulation model is described as:

> Our primary tool in managing interest rate sensitivity is an income simulation model.
> Key assumptions in the simulation model include the ***timing of cash flows,
> maturities and repricing of financial instruments***, changes in market conditions,
> capital planning and deposit sensitivity.   The model assumes that the composition of
> our interest-sensitive assets and liabilities existing at the beginning of a period will
> change periodically over the period being measured.   The model also assumes that a
> particular change in interest rates is reflected uniformly across the yield curve
> regardless of the duration to maturity or repricing of specific assets and liabilities.[4]

67.    The Company also stated in its Forms 10-Q and Forms 10-K filings that it manages

interest rate sensitivity by using gap analysis.   Gap analysis is described as:

> We also use gap analysis as a secondary tool to manage our interest rate
> sensitivity. Gap analysis involves measurement of the difference in asset and liability
> repricing on a cumulative basis within a specified time frame.    A positive gap
> indicates that more interest-earning assets than interest-bearing liabilities mature in a
> time frame, and a negative gap indicates the opposite.   By seeking to minimize the

---

[4]    Notably, in the Company's June 30, 2005 Form 10-Q and September 30, 2005 Form 10-Q,
the above boilerplate statement changed to include prepayment risk.   The statement now reads: "Key
assumptions in the simulation model include the timing of cash flows, ***which include forecasted
prepayment speeds that are based on market and industry data***, maturities and repricing of
financial instruments, changes in market conditions, capital planning and deposit sensitivity."

net amount of assets and liabilities that could reprice in the same time frame, we attempt to reduce the risk of significant adverse effects on net interest income caused by interest rate changes.

68.    CW1 reported that IBT managed its investment risks and that IBT's ALCO was the core group handling the responsibility.  CW1 served on ALCO, along with Sheehan, Rogers, Spinney, and IBT's Treasurer H.C. ("Spike") Sylvester.  CW1 reported that this group monitored the details of IBT's asset and liability positions meeting twice monthly on a formal basis and that IBT's Treasurer was in charge of preparing the formal reporting package, *i.e.*, the report to management that served as the basis for discussion during each meeting and became a part of the ALCO's formal record.  CW1 stated that it took several days of work by several persons in the Treasurer's office to prepare the package.

69.    CW1 stated that in addition to a full set of updated financial statements (including balance sheet, income statement and cash flow statement), the ALCO package contained a full set of so-called "standard schedules," including those reporting gap analysis (which presents the cumulative matches of interest-earning assets and interest-bearing liabilities subject to repricing during the current monthly and quarterly time periods), and detailed schedules of data and analysis of risk associated with particular assets and liabilities.

70.    CW1 emphasized that ALCO "spent a lot of time" determining new opportunities for asset investments and development of its borrowing base.  IBT's forecast, which was done on a monthly, quarterly and annual basis, played a prominent role.  The current fiscal year forecast was updated each month for the remainder of the fiscal year.  Beginning in the third quarter of each fiscal year, the forecast for the next fiscal year was prepared, but on a quarterly (not monthly) basis. CW1 reported that the forecast included "***every variable needed" for investment decisions, the entire yield curve***, and used the forward rates from the U.S. Treasury data or London Inter-Bank Offer Rate ("LIBOR") data, depending on the objective of the forecast.

- 23 -

71.     Thus, Sheehan, Rogers, Spinney and Keenan obtained actual knowledge of the Company's prepayments on its debt securities and how changes in the yield curve would affect the Company's net interest income.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.   Defendants' False and Misleading Statements Concerning 1Q01 Financial Results

72.     On April 10, 2001, the Company issued a press release entitled, "Investors Financial Services Reports Record Earnings." The press release listed defendant Keenan as a contact and stated, in part:

> BOSTON – April 10, 2001 – Investors Financial Services Corp. (Nasdaq: IFIN) reported first quarter diluted earnings per share of $0.32, an increase of 33% from $0.24 in the first quarter of 2000. Net income for the first quarter was $10.3 million, up 42% from $7.3 million in the first quarter of 2000.
>
> "We are extremely pleased with our first quarter performance as we once again achieved our earnings target, despite the sharp decline in the equity market experienced during the quarter," stated Kevin J. Sheehan, Chairman, Chief Executive Officer and President. . . .  "I believe we are well positioned to achieve our earnings targets for the year."
>
> Net interest income, which arises from deposits generated by clients, increased 65% to $21.5 million from $13.0 million for the first quarter of 2000. . . .

73.     On April 11, 2001, in response to the Company's press release, the price of the Company's stock increased 23% jumping $7.08 per share to trade at $37.59 (pre-split $75.17) from the previous day's close of $30.51 (pre-split $61.01).

74.     On May 9, 2001, Investors Financial filed its Form 10-Q with the SEC for its first quarter ending March 31, 2001. The Form 10-Q was signed by Sheehan and Keenan and reported 1Q01 net interest income of $21.4 million, net income of $10.3 million, basic EPS of $0.33 and diluted EPS of $0.32.

75.    With respect to the Company's HTM securities at March 31, 2001, the Form 10-Q stated:

> The book value and weighted average yield of our securities held to maturity at March 31, 2001, by effective maturity, are reflected in the following table (Dollars in thousands):

| | | | Years | | | | |
|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $ 113,257 | 6.48% | $ 1,326,493 | 6.90% | $ 456,099 | 6.41% | $ 407,867 | 6.78% |
| Federal agency securities | — | — | 111,011 | 7.16 | 221,148 | 7.26 | | |

76.    By May 15, 2001, the Federal Reserve had cut the Federal Funds Rate five times by 50 basis points in 2001 starting from a rate of 6% on January 3, 2001 and going to a rate of 4% by May 15, 2001.  *See* Federal Funds Rate, attached hereto as Exhibit M.

**B.    Defendants' False and Misleading Statements Concerning 2Q01 Financial Results**

77.    On July 10, 2001, after the close of the market, the Company issued a press release entitled, "Investors Financial Services Reports 38% Growth in Second Quarter Earnings."  The press release listed defendant Keenan as a contact and stated, in part:

> BOSTON – July 10, 2001 – Investors Financial Services Corp. (Nasdaq: IFIN) reported second quarter diluted earnings per share of $0.36, an increase of 38% from $0.26 in the second quarter of 2000.  Net income for the second quarter was $11.9 million, up 47% from $8.1 million in the second quarter of 2000.

> "We are extremely pleased with our second quarter financial results.  We exceeded our quarterly earnings target and are well positioned to exceed our original expectation for the remainder of the year," stated Kevin J. Sheehan, Chairman, Chief Executive Officer and President. . . .

> Net interest income, which arises from deposits generated by clients, increased 107% to $26.9 million from $13.0 million for the second quarter of 2000. . . .

78.    On July 11, 2001, in response to the Company's July 10, 2001 press release, the price of the Company's stock increased 8.9% jumping $3.04 to trade at $37.17 (pre-split $74.33) from the previous day's close of $34.13 (pre-split $68.26).

79.     On July 12, 2001, pursuant to Regulation Fair Disclosure ("Regulation FD"), the Company filed its Form 8-K with the SEC.  The Form 8-K was signed by defendant Sheehan and reported 2Q01 net interest income of $26.9 million, net income of $11.8 million and diluted EPS of $0.36.

80.     On July 12, 2001 and July 13, 2001, in response to the Company's Form 8-K with the SEC reporting the Company's financial highlights for the quarter ended June 30, 2001, the stock climbed another $2.80 ($5.61 pre-split) gaining another 7.5%.

81.     On August 14, 2001, Investors Financial filed its Form 10-Q with the SEC for its second quarter ending June 30, 2001.  The Form 10-Q was signed by defendants Sheehan and Keenan and reported 2Q01 net interest income of $26.9 million, net income of $11.8 million, basic EPS of $0.38 and diluted EPS of $0.36.

82.     With respect to the Company's HTM securities at June 30, 2001, the Form 10-Q stated:

> The book value and weighted average yield of our securities held to maturity at June 30, 2001, by effective maturity, are reflected in the following table (Dollars in thousands):

|  | Years | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
|  | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $ 140,008 | 4.22% | $ 1,847,829 | 6.62% | $ 405,006 | 6.07% | $ 223,732 | 5.28% |
| Federal agency securities | — | — | 111,937 | 5.88 | 258,118 | 6.10 | | |

83.     On August 23, 2001, the Company issued a press release entitled, "Investors Financial Reports Management Changes."  The press release stated, in part:

> BOSTON – Aug. 23, 2001 –
>
> *        *        *
>
> Today the Company also **announced that Karen C. Keenan, Senior Vice President and Chief Financial Officer, will retire in January 2002 to spend more time with her family**, which is expecting an addition in early 2002.  The Company

has **named John Spinney, currently a partner at KPMG LLP, as Ms. Kennan's successor**.  Mr. Spinney will join the Company as Senior Vice President and Assistant Chief Financial Officer in September 2001, transitioning to Senior Vice President and Chief Financial Officer effective January 1, 2002.  The Company expects that Ms. Keenan will remain active in a consulting role for the Company after her retirement.

### C.    Defendants' False and Misleading Statements Concerning 3Q01 Financial Results

84.    On October 11, 2001, prior to the market opening, the Company issued a press release entitled, "Investors Financial Services Corp. Announces Third Quarter EPS Up 46%."  The press release stated, in part:

> BOSTON – Oct. 11, 2001 – Investors Financial Services Corp. (Nasdaq: IFIN) reported third quarter diluted earnings per share of $0.41, an increase of 46% from $0.28 in the third quarter of 2000. Net income for the third quarter was $13.5 million, up 53% from $8.8 million in the third quarter of 2000.
>
> "We are very pleased with the solid earnings growth in the third quarter, despite the challenges presented by the slowing economy," stated Kevin J. Sheehan, Chairman and Chief Executive Officer.  "We exceeded our earnings target for the quarter due to continued growth in both new and existing client relationships, the favorable interest rate environment, and careful monitoring of increased spending. We remain extremely confident of our long-term prospects."
>
> Net interest income, which arises from deposits generated by clients, increased 88% to $29.0 million from $15.4 million for the third quarter of 2000. . . .

85.    On October 11, 2001, pursuant to Regulation FD, the Company filed its Form 8-K with the SEC.  The Form 8-K was signed by defendant Sheehan and reported 3Q01 net interest income of $29.0 million, net income of $13.4 million and diluted EPS of $0.41.

86.    On November 13, 2001, Investors Financial filed its Form 10-Q with the SEC for its third quarter ending September 30, 2001.  The Form 10-Q was signed by defendants Sheehan and Keenan and reported 3Q01 net interest income of $29.0 million, net income of $13.4 million, basic EPS of $0.42 and diluted EPS of $0.41.

- 27 -

87.    With respect to the Company's HTM securities at September 30, 2001, the Form 10-Q stated:

> The book value and weighted average yield of our securities held to maturity at September 30, 2001, by effective maturity, are reflected in the following table (Dollars in thousands):

| | Years | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $ 241,142 | 5.80% | $ 2,097,959 | 6.06% | $ 350,223 | 5.72% | $ 27,335 | 5.00% |
| Federal agency securities | 5,000 | 6.44 | 104,792 | 5.04 | 291,586 | 5.26 | | |

**D.    Defendants' False and Misleading Statements Concerning 4Q01 Financial Results and Fiscal Year 2001 Financial Results**

88.    On January 22, 2002, prior to the market opening, the Company issued a press release entitled, "Investors Financial Services Corp. Announces Fourth Quarter Earnings Up 47% and Full Year Earnings Up 42%."  The press release stated, in part:

> BOSTON – Jan. 22, 2002 – Investors Financial Services Corp. (Nasdaq: IFIN) reported fourth quarter diluted earnings per share of $0.44, an increase of 47% from $0.30 in the fourth quarter of 2000.  Net income for the fourth quarter was $14.5 million, up 54% from $9.4 million in the fourth quarter of 2000.  For the year ended December 31, 2001, the Company reported diluted earnings per share of $1.53, an increase of 42% from $1.08 in 2000.  Net income for the year was $50.2 million, up 49% from $33.6 million in 2000.

> Kevin J. Sheehan, Chairman and Chief Executive Officer commented, "We had another outstanding year, with financial results exceeding our established targets. Despite a continued decline in worldwide equity markets, we achieved impressive growth rates for both revenue and earnings, fueled by continued strong demand for our services and a favorable interest rate environment. . . .

> Net interest income, which arises from deposits generated by clients, grew 83% to $31.8 million from $17.4 million for the same period in 2000. . . .

> *       *       *

> Net interest income increased 86% to $109.3 million in 2001 from $58.8 million in 2000. . . .

89.    On January 22, 2002, pursuant to Regulation FD, the Company filed its Form 8-K with the SEC. The Form 8-K was signed by defendant Sheehan and reported 4Q01 net interest income of $31.8 million, net income of $14.8 million and diluted EPS of $0.44.

90.    On January 22, 2002, in response to the Company's press release and Form 8-K, the price of the Company's stock increased 2.8% closing at $37.09 ($74.18 pre-split), from a previous close of $36.10 ($72.20 pre-split).

91.    On January 22, 2002, the Company, represented by defendant Sheehan, talked with *Bloomberg* about the Company's fourth quarter earnings.

> Boston, Jan. 22, 2002 (*Bloomberg*) – Kevin Sheehan, chairman and chief executive officer of Investors Financial Services Corp., talks with *Bloomberg*'s Su Keenan via satellite about the company's fourth-quarter earnings released today and the outlook for sales growth. Investors Financial posted fourth-quarter earnings of 44 cents a share.
>
> *                *                *
>
> KEENAN: Let's talk about what's going on with Investors Financial Services. They have been higher in today's session. We're going to show you how much higher. Certainly, that has a lot to do with their earnings surprise, which was announced today.
>
> ***You see the stock up better than 2 percent***. ***The company's diluted earnings per share came in at 44 cents, and that is 2 cents more than forecast, a 47 percent improvement over the period a year ago***.
>
> Now, Investors Financial Services net income rose 54 percent, to $14.5 million. Revenue grew 70 percent to nearly $100 million. The company also said it's boosting its dividend by 0.05 cent to 2.5 cents per share.
>
> So what's ahead for the company? Let's ask CEO Kevin Sheehan. He joins us from Boston. These numbers, these percentage gains, sounds like we're talking about another year besides 2002. What's going on? Where's the strength coming from in your company?
>
> SHEEHAN: ***Our strength is coming from an expansion of existing relationships, as well as new business that we've been able to pick up and a recovery in the equity markets***.

92.    On February 19, 2002, Investors Financial filed its Form 10-K with the SEC for the fiscal year ending December 31, 2001. The Form 10-K was signed by defendants Sheehan, Rogers and Spinney and reported 2001 fiscal net interest income of $109.2 million, net income of $50.2 million, basic EPS of $1.59 and diluted EPS of $1.53.

93.    With respect to the Company's Significant Accounting Policies, the 2001 Form 10-K stated:

Securities –

The specific identification method is used to determine gains and losses on sales of securities.

94.    With respect to the Company's HTM securities at December 31, 2001, the Form 10-K stated:

The book value and weighted average yield of our securities held to maturity at December 31, 2001, by effective maturity, are reflected in the following table (Dollars in thousands):

| | Years | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $ 205,374 | 5.10% | $ 1,849,049 | 5.64% | $ 429,655 | 4.87% | $ 101,209 | 4.16% |
| Federal agency securities | 5,000 | 6.43 | 141,739 | 4.05 | 309,369 | 4.26 | | |

95.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    As now admitted by the Investors Financial Defendants, the financial statements were not prepared in accordance with GAAP and could not be replied upon. The following chart summarizes the restatement (in millions, except EPS data):

| Statement of Income | As Reported | As Restated | Restatement Adjustments |
|---|---|---|---|
| Net interest income | $109,281 | $98,355 | ($10,926) |
| Net income | $50,200 | $44,686 | ($5,514) |
| Basic EPS | $0.79<br>(pre-split $1.58) | $0.71<br>(pre-split $1.42) | ($0.08) |
| Diluted EPS | $0.76<br>(pre-split $1.53) | $0.68<br>(pre-split $1.36) | ($0.08) |

(b)      The Investors Financial Defendants failed to disclose the Company's accounting method, how it amortizes and accretes its debt securities purchased at a premium or discount into income and whether it had anticipated prepayments.  Furthermore, the Investors Financial Defendants failed to disclose that it was using the "prospective method" (securities could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment) for "securities backed by mortgages and other loans."

(c)      The Investors Financial Defendants failed to disclose the Company was in violation of FASB Statement No. 91 by not disclosing its prepayment policy and its significant assumptions underlying its prepayment estimates.

(d)      The Investors Financial Defendants failed to disclose it was in violation of FASB Statement No. 115 by classifying the Company's Federal agency securities (SBA securities) and certain of its MBS as HTM when they could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment.

E.    **Defendants' False and Misleading Statements Concerning 1Q02 Financial Results**

96.    On April 15, 2002, after the close of the market, the Company issued a press release entitled, "Investors Financial Services Corp. Announces First Quarter Earnings Up 50%."  The press release stated, in part:

BOSTON – April 15, 2002 – Investors Financial Services Corp. (Nasdaq:IFIN) reported first quarter diluted earnings per share of $0.48, an increase of 50% from $0.32 in the first quarter of 2001 and an increase of 45% over first quarter 2001 diluted cash earnings per share of $0.33.  Net income for the first quarter was $16.1 million, up 56% from $10.3 million in the first quarter of 2001 and

- 31 -

an increase of 49% over first quarter 2001 cash net income of $10.8 million. Both diluted cash earnings per share and cash net income exclude the amortization of goodwill according to FASB 142.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "I am extremely pleased with our continued growth, driven by new assets from existing clients and a continued favorable interest rate environment. . . .

Net interest income, which arises primarily from cash balances generated by clients, grew 66% to $35.7 million from $21.5 million for the same period in 2001. . . .

97.     On April 15, 2002, pursuant to Regulation FD, the Company filed its Form 8-K with the SEC. The Form 8-K was signed by defendant Sheehan and reported 1Q02 net interest income of $35.7 million, net income of $16.0 million and diluted EPS of $0.48.

98.     On April 16, 2002, in response to the Company's press release and Form 8-K disclosure, the price of the Company's stock increased 2.3% closing at $37.46 ($74.92 pre-split), from a previous close of $36.60 ($73.20 pre-split), on trading volume of 584,000 shares, up from trading volume of 153,800 shares. The next day, on April 17, 2002, the stock climbed another $0.60 ($1.20 pre-split), gaining another 1.6%.

99.     On April 24, 2002, the Company issued a press release entitled, "Investors Financial Services Corp. Announces Two-for-One Stock Split." The press release stated, in part:

BOSTON – April 24, 2002 – Investors Financial Services Corp. (Nasdaq: IFIN) today announced that its Board of Directors approved a two-for-one stock split of the Company's common stock. Payable in the form of a 100% stock dividend, all shareholders of record at the close of business on May 24, 2002 will receive one additional share for each share owned. The additional shares will be distributed to shareholders on or about June 14, 2002. Upon completion of the stock split, the Company will have approximately 64.3 million shares of common stock outstanding.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "**_The consistently strong performance of Investors Financial Services Corp. has enabled us to split our common stock three times in the last four years, improving trading liquidity and broadening ownership of the Company's common stock_**."

100.    On May 13, 2002, Investors Financial filed its Form 10-Q with the SEC for its first quarter ending March 31, 2002 (the financials for the quarter ended March 31, 2001). The Form 10-

Q was signed by defendants Sheehan and Spinney and reported 1Q02 net interest income of $35.7 million, net income of $16.0 million, basic EPS of $0.50 and diluted EPS of $0.48.

101.    With respect to the Company's HTM securities at March 31, 2002, the Form 10-Q stated:

The book value and weighted average yield of our securities held to maturity at March 31, 2002, by effective maturity, are reflected in the following table (Dollars in thousands):

| | | | Years | | | | |
|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $ 121,464 | 4.88% | $ 1,905,313 | 4.85% | $ 497,798 | 4.19% | $ 70,457 | 3.89% |
| Federal agency securities | 5,000 | 6.40 | 15,182 | 3.80 | 271,953 | 4.06 | 319,899 | 3.80 |

### F.    Defendants' False and Misleading Statements Concerning 2Q02 Financial Results

102.    On July 11, 2002, prior to the market opening, the Company issued a press release entitled, "Investors Financial Services Corp. Announces Second Quarter Earnings Up 44%." The press release stated, in part:

BOSTON – July 11, 2002 – Investors Financial Services Corp. (Nasdaq: IFIN) reported 2002 second quarter diluted earnings per share of $0.26, an increase of 44% from $0.18 in the second quarter of 2001. Net income for the second quarter was $17.3 million, up 45% from $11.9 million in the second quarter of 2001.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "We delivered outstanding performance in the second quarter despite continued volatility and uncertainty in the capital markets. Our ability to maintain revenue and earnings growth in a difficult market environment shows the strength of our business model and the demand for our services. . . .

Net interest income, which arises primarily from cash balances generated by clients, grew 28% to $34.4 million from $26.9 million for the second quarter of 2001. . . .

103.    On July 11, 2002, on the Company held an earnings conference call with market analysts, attended by defendants Sheehan, Rogers and Spinney. At the start of the conference call defendant Sheehan confirmed the Company's second quarter earnings:

- 33 -

Good morning. I'll begin by reviewing some key points from the second quarter and then John Spinney will discuss our financial results in more detail and update our guidance on our models. The diluted EPS for the second quarter came in at 26 cents up two cents or eight fence link quarter and up eight cents 44 quarter two of last year.

Exhibit B.

104.    On July 11, 2002, pursuant to Regulation FD, the Company filed its Form 8-K with the SEC. The Form 8-K was signed by defendant Sheehan and reported 2Q02 net interest income of $34.3 million, net income of $17.3 million and diluted EPS of $0.26.

105.    On July 11, 2002, in response to the Company's press release, conference call and Form 8-K, the price of the Company's stock increased 4.5% increasing $1.31 to trade at $30.60 from the previous day's close of $29.29. The next day, on July 12, 2002, the stock continued to climb increasing 8.3% to close at $33.13.

106.    On August 14, 2002, Investors Financial filed its Form 10-Q with the SEC for its second quarter ending June 30, 2002 (and repeated the financials for the quarter ended June 30, 2001). The Form 10-Q was signed by defendants Sheehan and Spinney and reported 2Q02 net interest income of $34.3 million, net income of $17.3 million, basic EPS of $0.27 and diluted EPS of $0.26.

107.    With respect to the Company's HTM securities at June 30, 2002, the Form 10-Q stated:

The book value and weighted average yield of our securities held to maturity at June 30, 2002, by effective maturity, are reflected in the following table (Dollars in thousands):

| | Years | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $ 309,544 | 5.06% | $ 1,618,734 | 4.48% | $ 419,283 | 4.08% | $ 96,952 | 3.92% |
| Federal agency securities | 5,000 | 6.30 | 14,981 | 3.83 | 418,081 | 3.83 | 396,701 | 3.83 |

G.     **Defendants' False and Misleading Statements Concerning 3Q02
Financial Results**

108.     On October 10, 2002, prior to the market opening, the Company issued a press release
entitled, "Investors Financial Services Corp. Announces Third Quarter Earnings up 30%, Year-to-
Date Earnings up 41%." The press release stated, in part:

> BOSTON – Oct. 10, 2002 – Investors Financial Services Corp. (Nasdaq:
> IFIN) reported 2002 third quarter diluted earnings per share of $0.26, an increase of
> 30% from $0.20 in the third quarter of 2001. Net income for the third quarter was
> $17.3 million, up 28% from $13.5 million in the third quarter of 2001.
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented,
> "Despite challenging conditions in the capital markets during the third quarter, we
> again delivered solid financial results. . . . Although assets under administration
> declined during the quarter, our diversified revenue mix allowed us to achieve our
> financial goals. Looking forward, we remain comfortable with our 2002 earnings
> estimates of $1.01 to $1.03 per share."
>
> *          *          *
>
> Net interest income, which arises primarily from cash balances generated by clients,
> grew 24% to $35.9 million from $29.0 million for the third quarter of 2001. . . .

109.     On October 10, 2002, pursuant to Regulation FD, the Company filed its Form 8-K
with the SEC. The Form 8-K was signed by defendant Sheehan and reported net interest income of
$35.8 million, net income of $17.2 million and diluted EPS of $0.26.

110.     On October 10, 2002, the Company held an earnings conference call with market
analysts, attended by defendants Sheehan, Rogers and Spinney. At the start of the conference call
defendant Sheehan confirmed the Company's third quarter earnings by stating that "Diluted EPS for
the third quarter came in at 26 cents. Essentially flat on a late quart basis and up 6 cents or 30
percent from quarter 3 of last year." Defendant Spinney also confirmed the Company's third quarter
earnings:

> Good morning. As Kevin mentioned, third quarter diluted EPS came in at 26 cents a
> share, basically flat on a late quarter basis. Our diluted EPS at 26 cents represents a
> 30 percent increase over the third quarter of 2001's EPS of 20 cents and our year to

date EPS of 76 cents represents a 41 percent increase over 2001's year to date EPS of 54 cents. As we have stated on prior calls, diluted earnings per share and net income for 2002 both exclude the amortization of good will in accordance with the provisions of FASB 142. Net operating revenue, which is made up of net interest income, fee income and transaction income, increased 1 percent late quarter in 14 percent over the same quarter of last year.

Exhibit C.

111.    Also, on the Company's October 10, 2002 conference call, the Company and

defendant Rogers admitted that its models take into account the movement and flattening of the yield

curve and the Company is able to provide guidance based on its changes in interest income and

income.[5]  In part, defendant Rogers stated:

> Charles Trafton (ph): ***What's your outlook, you know, given the flat and the [flattening] yield curve and the very high prepayment fees on the mortgage portfolio?***
>
> Mike Rogers – Investors Financial Services Corporation – President
>
> ***We have it coming down throughout the next 12 months which is why we believe, even though we're going to increase deposits on the balance sheet, that management's income is going to stay flat***.
>
> Charles Trafton (ph): So, increasing the investment portfolio will enable you to maintain your net interest income, but the margin will decline?
>
> Mike Rogers – Investors Financial Services Corporation – President
>
> That's right. You know, I think it's important to note here that less than a billion dollars of those assets that are on the balance sheet, liabilities are on the balance sheet are not core to the business. So these deposits, again, are generated by our clients and we feel comfortable here in an increasing market and in a decreasing market.

Exhibit C.

---

[5]     The Company also admitted that a flat yield curve is built into its models and guidance on July 16, 2003 and November 15, 2004.

112.    On October 10, 2002, in response to the Company's press release, conference call and Form 8-K, the price of the Company's stock increased 14% increasing $3.12 per share to trade at $25.51 per share from the previous day's close of $22.39 per share.  On October 11, 2002, October 14, 2002 and October 15, 2002, the price of the Company's stock continued to rise jumping 1.8%, 2.0% and 10.0% to close at $25.97, $26.50 and $29.14, respectively.

113.    On November 15, 2002, Investors Financial filed its Form 10-Q with the SEC for its third quarter ending September, 30, 2002 (and repeated the financials for the quarter ended September 30, 2001).  The Form 10-Q was signed by defendants Sheehan and Spinney and reported 3Q02 net interest income of $35.8 million, net income of $17.2 million, basic EPS of $0.27 and diluted EPS of $0.26.

114.    With respect to the Company's HTM securities at September 30, 2002, the Form 10-Q stated:

The book value and weighted average yield of our securities held to maturity at September 30, 2002, by effective maturity, are reflected in the following table (Dollars in thousands):

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Years | | | | |
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield | |
| Mortgage-backed securities | $ 459,372 | 4.60% | $ 1,481,432 | 4.09% | $ 276,933 | 4.14% | $ 77,741 | 3.83% | |
| Federal agency securities | — | — | 13,692 | 3.88 | 504,525 | 3.88 | 484,828 | 3.88 | |

## H.    Defendants' False and Misleading Statements Concerning 4Q03 Financial Results and Fiscal Year 2001 Financial Results

115.    On January 23, 2003, prior to the market opening, the Company issued a press release entitled, "Investors Financial Services Corp. Announces Fourth Quarter Earnings Up 27% and Full Year Earnings Up 37%."  The press release listed defendant Spinney as a contact and was filed with the SEC on a Form 8-K signed by defendant Sheehan.  The press release stated, in part:

BOSTON – Jan. 23, 2003 – Investors Financial Services Corp. (Nasdaq: IFIN) reported fourth quarter diluted earnings per share of $0.28, an increase of 27% from $0.22 in the fourth quarter of 2001.  Net income for the fourth quarter was

$18.3 million, up 26% from $14.5 million in the fourth quarter of 2001. For the year ended December 31, 2002, the Company reported diluted earnings per share of $1.04, an increase of 37% from $0.76 per share in 2001. Net income for the year was $68.9 million, up 37% from $50.2 million in 2001.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "We delivered another year of outstanding results during 2002 despite a third straight year of declining equity markets. These results are indicative of our resilient business model. The Company's performance continues to be driven by strong customer demand for our services and a favorable interest rate environment.

Net interest income, which arises from deposits generated by clients, grew 18% to $37.5 million for the fourth quarter of 2002 from $31.8 million for the same period in 2001. . . .

Net interest income increased 31% to $143.5 million in 2002 from $109.3 million in 2001. . . .

116.     The January 23, 2003 Form 8-K, signed by defendant Sheehan, also reported 4Q02 net interest income of $37.4 million, net income of $18.3 million and diluted EPS of $0.28. In addition, the Form 8-K reported fiscal year 2002 net interest income of $143.4 million, net income of $68.9 million and diluted EPS of $1.04.

117.     On January 23, 2003, the Company held an earnings conference call with market analysts, attended by defendants Sheehan and Spinney. At the start of the conference call defendant Sheehan confirmed the Company's fourth quarter earnings:

Diluted EPS for the fourth quarter came in at 28 cents, up 8 cents on a link quarter basis, and up 6 cents or 27% from quarter 4 of last year. For the year-ended 2002, our dollar four and EPS represents a 37% increase over our 2001 EPS of 76 cents. As of December 31st, we processed approximately 785 billion of assets for our clients. Up approximately 43 billion from 742 as of the end of September 30, 2002. And down 29 billion from 814 at year-end 2001.

Exhibit D.

118.     On January 23, 2003, in response to the Company's press release, conference call and Form 8-K, the price of the Company's stock increased 6.4% increasing $1.61 to trade at $27.81 from the previous day's close of $26.14.

- 38 -

119.    On February 27, 2003, Investors Financial filed its Form 10-K with the SEC for the fiscal year ending 2002.  The Form 10-K was signed by defendants Sheehan, Rogers and Spinney and reported fiscal year 2002 net interest income of $143.4 million, net income of $68.9 million, basic EPS of $1.07 and diluted EPS of $1.04.

120.    With respect to the Company's Significant Accounting Policies, the 2002 Form 10-K stated:

> The specific identification method is used to determine gains and losses on sales of securities.  Amortization and accretion of debt securities purchased at a premium or discount are recognized over the life of the securities and are reported as a component of interest income.

121.    With respect to the Company's HTM securities at December 31, 2002, the Form 10-K stated:

> The book value and weighted average yield of our securities held to maturity at December 31, 2002, by effective maturity, are reflected in the following table (Dollars in thousands):

| | Years | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $ 317,963 | 3.74% | $ 1,311,577 | 3.64% | $ 151,068 | 4.53% | $ 253,822 | 3.69% |
| Federal agency securities | — | — | 12,665 | 3.75 | 648,756 | 3.74 | 625,817 | 3.75 |

122.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    As now admitted by the Investors Financial Defendants, the financial statements were not prepared in accordance with GAAP and could not be replied upon.  The following chart summarizes the restatement (in millions, except EPS data):

- 39 -

| Statement of Income | As Reported | As Restated | Restatement Adjustments |
|---|---|---|---|
| Net interest income | $143,478 | $138,725 | ($4,753) |
| Net income | $68,946 | $67,437 | ($1,509) |
| Basic EPS | $1.07 | $1.05 | ($0.02) |
| Diluted EPS | $1.04 | $1.02 | ($0.02) |

(b)    The Investors Financial Defendants failed to disclose the Company's accounting method, how it amortizes and accretes its debt securities purchased at a premium or discount into income and whether it had anticipated prepayments.  Furthermore, the Investors Financial Defendants failed to disclose that it was using the "prospective method" (securities could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment) for "securities backed by mortgages and other loans."

(c)    The Investors Financial Defendants failed to disclose the Company was in violation of FASB Statement No. 91 by not disclosing its prepayment policy and its significant assumptions underlying its prepayment estimates.

(d)    The Investors Financial Defendants failed to disclose it was in violation of FASB Statement No. 115 by classifying the Company's Federal agency securities (SBA securities) and certain of its MBS as HTM when they could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment.

I.    **Defendants' False and Misleading Statements Concerning the 1Q03 Financial Results**

123.    On April 10, 2003, prior to the market opening, the Company issued a press release entitled, "Investors Financial Services Corp. Announces First Quarter Earnings."  The press release listed defendant Spinney as a contact and was filed with the SEC on a Form 8-K signed by defendant Sheehan.  The press release stated, in part:

BOSTON – April 10, 2003 – Investors Financial Services Corp. (Nasdaq: IFIN) reported first quarter diluted operating earnings per share of $0.29, an increase of 21% from $0.24 in the first quarter of 2002.  Net operating income for the first quarter was $19.3 million, up 20% from $16.1 million in the first quarter of 2002.

Prior year diluted earnings per share reflects the two-for-one stock split which occurred on June 14, 2002.

\*          \*          \*

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Investors Financial Services again delivered impressive operating results in a challenging economic environment. Our diverse revenue stream and prudent cost controls continued to drive our strong performance. We are confident that we will be able to meet our diluted operating earnings per share target of $1.30 and our GAAP diluted earnings per share target of $1.09 for 2003."

Net interest income grew 10% to $39.4 million for the first quarter of 2003 from $35.7 million for the same period in 2002. . . .

124.    The April 10, 2003 Form 8-K, also reported the Company's financial highlights for the quarter ended March 31, 2003 and reported 1Q03 net interest income of $39.3 million, net income of $5.4 million and diluted EPS of $0.08.

125.    On May 14, 2003, Investors Financial filed its Form 10-Q for its first quarter ending March 31, 2003 with the SEC. The Form 10-Q was signed by Sheehan and Spinney and reported 1Q03 net interest income of $39.3 million, net income of $5.4 million, basic EPS of $0.08 and diluted EPS of $0.08.

126.    With respect to the Company's SBA securities, the March 31, 2003 Form 10-Q stated:

> **We also increased our investments in Federal agency securities, such as those issued by the SBA, during the three months ended March 31, 2003**. Generally, Federal agency securities have a higher yield than U.S. Treasury securities due to credit and call risk. Credit risk related to Federal agency bonds is substantially reduced by payment guarantees and credit enhancements.

127.    With respect to the Company's HTM securities at March 31, 2003, the Investors Financial Defendants for the ***first time*** abruptly stopped reporting its quarterly HTM table.

- 41 -

**J.     Defendants' False and Misleading Statements Concerning 2Q03
Financial Results**

128.    On July 16, 2003, prior to the market opening, the Company issued a press release

entitled, "Investors Financial Services Corp. Announces Second Quarter Earnings."  The press

release listed defendant Spinney as a contact and was filed with the SEC on a Form 8-K signed by

defendant Sheehan.  The press release stated, in part:

> BOSTON – July 16, 2003 – Investors Financial Services Corp. (Nasdaq:
> IFIN) reported second quarter diluted operating earnings per share of $0.32, an
> increase of 23% from $0.26 in the second quarter of 2002.  Net operating income for
> the second quarter was $21.3 million, up 23% from $17.3 million in the second
> quarter of 2002.

> *          *          *

> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "The
> second quarter of 2003 represented another period of outstanding performance by
> Investors Financial Services marked with significant accomplishments. . . . We
> remain confident in our ability to meet our diluted operating earnings per share target
> of $1.30 and our GAAP diluted earnings per share target of $1.19 for 2003."

> Net interest income grew 11% to $38.2 million for the second quarter of 2003 from
> $34.4 million for the same period in 2002. . . .

129.    On July 16, 2003, the Company held an earnings conference call with market

analysts, attended by defendants Sheehan, Rogers and Spinney.  At the start of the conference call

the Company and defendant Spinney admitted that the yield curve was flattening and stated that it

was built into their models and guidance:

> **J**ohn Spinney - *Investors Financial Services Corp - SVP and CFO*

> We continued to maintain strong and interest margin in spread, ***despite flattening
> [inaudible] curve*** primarily as a result of strong client funding. . . .

> Brad Moore - *Putnam Lovell NBF - Analyst*

> Secondly can you gives [sic] a little bit of color on where you think the contraction in
> our net interest margin on a go-forward basis.

> John Spinney - *Investors Financial Services Corp - SVP and CFO*

Right now our sensitivity to a 200 basis point increase in rates parallel shift in the curve is about 6.7% reduction in net interest income so net interest income is about 30%, that would equate to roughly 2%, and 2% of our top line is about $8 million, so worst case scenario would be 8 cents over a 12-month period.  We don't feel like that – we've got much risk at all in terms of interest rates moving up right now.

Brad Moore - *Putnam Lovell NBF - Analyst*

Did you say that assumed a parallel shift?

John Spinney - *Investors Financial Services Corp - SVP and CFO*

Yeah, it's a parallel shift over 12 months.

Brad Moore **-** *Putnam Lovell NBF* - Analyst

**and if it was a flattening curve**, . . . how would that impact the assumption?

John Spinney - *Investors Financial Services Corp - SVP and CFO*

**[A] flattening curve would contract our net interest income slight but I don't have that number at my finger tips**.

Exhibit E.

130.     On July 16, 2003, the Company filed its Form 8-K with the SEC.  The Form 8-K was signed by defendant Sheehan and reported 2Q03 net interest income of $38.1 million, net income of $28.0 million and diluted EPS of $0.42.

131.     On July 16, 2003, in response to the Company's press release, conference call and Form 8-K, the price of the Company's stock increased 1.3% increasing $0.39 to trade at $31.28 from the previous day's close of $30.89.

132.     On August 11, 2003, Investors Financial filed its Form 10-Q with the SEC for its second quarter ending June 30, 2003.  The Form 10-Q was signed by defendants Sheehan and Spinney and reported 2Q03 net interest income of $38.1 million, net income of $28.0 million, basic EPS of $0.43 and diluted EPS of $0.42.

133.     With respect to the Company's SBA securities, the June 30, 2003 Form 10-Q stated:

- 43 -

The increase in the held to maturity portfolio stems primarily from purchases of Federal agency securities, particularly those issued by the SBA. ***SBA securities provide an attractive yield with limited credit risk and prepayment risk in a rapidly changing interest rate environment***. The weighted average life of the SBA securities match with our overall asset liability strategy. SBA securities are variable rate securities indexed to the Prime rate and are purchased with an intent and ability to hold to maturity.

134.    With respect to the Company's HTM securities at June 30, 2003, as mentioned above, the Investors Financial Defendants had abruptly stopped reporting its HTM table in the Company's March 31, 2003 Form 10-Q.

135.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    As now admitted by the Investors Financial Defendants, the financial statements were not prepared in accordance with GAAP and could not be replied upon.

(b)    The Investors Financial Defendants failed to disclose the Company's accounting method, how it amortizes and accretes its debt securities purchased at a premium or discount into income and whether it had anticipated prepayments.  Furthermore, the Investors Financial Defendants failed to disclose it was using the "prospective method" (securities could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment) for "securities backed by mortgages and other loans."

(c)    The Investors Financial Defendants failed to disclose the Company was in violation of FASB Statement No. 91 by not disclosing its prepayment policy and its significant assumptions underlying its prepayment estimates.

(d)    The Investors Financial Defendants failed to disclose it was in violation of FASB Statement No. 115 by classifying the Company's Federal agency securities (SBA securities)

and certain of its MBS as held to maturity when they could contractually be prepaid or otherwise settle in such a way that the Company would not recover substantially all of its recorded investment.

(e)    The Investors Financial Defendants' statement that "SBA securities provide an attractive yield with limited credit risk and prepayment risk" was false and misleading because a substantial amount of SBA securities had already prepaid in 2003.

**K.    Defendants' False and Misleading Statements Concerning 3Q03 Financial Results**

136.    On October 15, 2003, prior to the market opening, the Company issued a press release entitled, "Investors Financial Services Corp. Announces Third Quarter Earnings Up 54%."  The press release listed defendant Spinney as a contact and was filed with the SEC as an attachment to its Form 8-K signed by defendant Sheehan.  The press release stated, in part:

> BOSTON – Investors Financial Services Corp. . . . reported third quarter diluted earnings per share of $0.40, an increase of 54% from $0.26 in the third quarter of 2002. Net income for the third quarter was $26.4 million, up 53% from $17.3 million in the third quarter of 2002.
>
> *    *    *
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Investors Financial Services delivered extremely impressive results for the third quarter of 2003. Driven by new business wins, higher equity values, and prudent expense management, the Company continues to display strong earnings growth. . . .
>
> *    *    *
>
> Net interest income was flat at $35.2 million for the third quarter of 2003 compared to the $35.2 million recorded for the same period in 2002. . . .

137.    On October 15, 2003, the Company held an earnings conference call with market analysts, attended by defendants Sheehan and Spinney.  Defendants stated, in part:

> Kevin Sheehan - *Investors Financial Services Corp. - Chairman and CEO*

Thanks. I will begin by reviewing some of the key points from our third quarter, and then John Spinney will discuss our financial results in more detail. Investors Financial Services recorded extremely impressive results for the third quarter of 2003. Diluted operating EPS for the quarter came in at 40 cents, up 25 percent on a linked-quarter basis; up 14 cents or 54 percent from quarter three of last year.

\*      \*      \*

To summarize, again, we delivered excellent results for our investors during the third quarter of 2003. These results were driven by our ability to sell new and existing clients, our continued focus on prudent expense management, and solid equity market performance. I will now turn the call over to John Spinney, who will review the quarter's financial results in more detail.

John Spinney - *Investors Financial Services Corp. - CFO and SVP*

Good morning. As Kevin mentioned, third-quarter diluted operating EPS came in at 40 cents a share, up 8 cents or 25 percent on a linked-quarter basis. Our diluted EPS of 40 cents represents a 54 percent increase over our third-quarter 2002 diluted EPS of 26 cents.

\*      \*      \*

Each of our revenue sources represents a component of our compensation for providing asset processing services to our clients. Net interest income is one of these components and results from investing the residual cash of our asset processing clients, who use our balance sheet as a convenient way to invest their excess cash.

We generate asset servicing fees based on assets under administration, the number of transactions generated by our clients, and managed risk (ph) income. These three revenue components create a natural hedge for our business model, which has been one of the factors enabling us to succeed in a variety of market environments.

The breakdown of our revenue stream for the third quarter of 2003 was 55 percent asset based, 15 percent transaction based, and 30 percent net interest income based, continuing the shift that we have witnessed recently to more of a contribution from asset-based fees as opposed to net interest income.

\*      \*      \*

Securities lending decreased 12 percent year-over-year, due to a smaller lending book, and declined linked quarter primarily due to the end of the international dividend season. ***Net interest income was flat on a year-over-year basis and decreased 8 percent linked quarter, primarily due to increased prepayments in our mortgage-backed securities portfolio through most of the summer***. ***We expect lower prepayment activity in the fourth quarter***.

- 46 -

Also we recorded an additional interest expense in the third quarter of approximately 1 million related to the ineffectiveness of our swap portfolio in accordance with FAS 133. The 1 million will flow back into net interest income over the remaining life of the swaps. Absent a further cut in the Fed funds rate, we expect little to no impact going forward.

We continue to maintain strong net interest margin spread as a result of continued healthy levels of client funding. The linked-quarter net interest margin decreased by 27 basis points to 1.81 percent, while the linked-quarter interest rate spread contracted by 26 basis points to 1.71 percent. Compared to the same quarter of last year, net interest income was flat, primarily as a result of a larger balance sheet offsetting a lower interest rate environment.

* * *

We continue to be cautiously optimistic about the capital markets and interest rate environment. As such we are increasing our GAAP EPS guidance to a range of $1.30 to $1.32 a share for the year ended December 31, 2003; and we're revising our diluted operating earnings-per-share target to a range of $1.41 to $1.43. We remain comfortable with our long term growth rate of 25 percent in EPS. I would now like to open up the call to your questions.

* * *

Jon Arfstrom - *RBC Capital Markets – Analyst*

Okay. And you're still comfortable with the 25 percent growth rate on that $1.40 to $1.43?

John Spinney - *Investors Financial Services Corp. - CFO and SVP*

Currently we are. Yes, Jon.

* * *

Casey Ambrich - *Millennium Partners – Analyst*

One last quick question. Can you give some color on how the margin changed by month? I will start with that.

John Spinney - *Investors Financial Services Corp. - CFO and SVP*

The net interest margin? By month I don't think it's really that important to go through in detail. But if you look at the decline sequentially, ***the biggest contributor to that was obviously the prepayments on the mortgage-backed portfolio, that caused earnings to go down on the net interest income line***.

- 47 -

> I actually added back the effect of that prepayment; and it probably gets us back to somewhere like 195, 196 from a margin perspective. ***So I clearly isolated the prepayments on the mortgage-backed portfolio. But we have those slow down now, and we are anticipating to have a fourth quarter of very slow prepayments relative to the third quarter***.

Exhibit F.

138.    The October 15, 2003 Form 8-K, signed by defendant Sheehan, also reported 3Q03 net interest income of $58.3 million, net income of $26.4 million, basic EPS of $0.41 and diluted EPS of $0.40.

139.    On October 15, 2003, in response to the Company's press release, conference call and Form 8-K, the price of the Company's stock increased 3.2% increasing $1.14 to trade at $37.14 from the previous day's close of $36.00.

140.    On November 12, 2003, Investors Financial filed its Form 10-Q for its third quarter ending September 30, 2003 with the SEC. The Form 10-Q was signed by defendants Sheehan and Spinney and reported 3Q03 net interest income of $35.2 million, net income of $26.4 million, basic EPS of $0.41 and diluted EPS of $0.40.

141.    With respect to the Company's SBA securities, the September 30, 2003 Form 10-Q stated:

> The increase in the held to maturity portfolio stems primarily from purchases of Federal agency securities, particularly those issued by the Small Business Administration ("SBA"). ***SBA securities provide an attractive yield with limited credit risk and prepayment risk in a rapidly changing interest rate environment***. The weighted average life of the SBA securities correspond with our overall asset liability strategy. SBA securities are variable rate securities indexed to the Prime rate and are purchased with an intent and ability to hold to maturity.

142.    With respect to the Company's HTM securities at September 30, 2003, as mentioned above, the Investors Financial Defendants had abruptly stopped reporting its HTM table in the Company's March 31, 2003 Form 10-Q.

143.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    As now admitted by the Investors Financial Defendants, the financial statements were not prepared in accordance with GAAP and could not be replied upon.

(b)    The Investors Financial Defendants failed to disclose the Company's accounting method, how it amortizes and accretes its debt securities purchased at a premium or discount into income and whether it had anticipated prepayments.  Furthermore, the Investors Financial Defendants failed to disclose it was using the "prospective method" (securities could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment) for "securities backed by mortgages and other loans."

(c)    The Investors Financial Defendants failed to disclose the Company was in violation of FASB Statement No. 91 by not disclosing its prepayment policy and its significant assumptions underlying its prepayment estimates.

(d)    The Investors Financial Defendants failed to disclose it was in violation of FASB Statement No. 115 by classifying the Company's Federal agency securities (SBA securities) and certain of its MBS as HTM when they could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment.

(e)    The Investors Financial Defendants' statement that "SBA securities provide an attractive yield with limited credit risk and prepayment risk" was false and misleading because a substantial amount of SBA securities had already prepaid in 2003.

- 49 -

L.    **Defendants' False and Misleading Statements Concerning 4Q04
      Financial Results and Fiscal Year 2003 Financial Results**

144.    On January 22, 2004, prior to the market opening, the Company issued a press release

entitled, "Investors Financial Services Corp. Announces Fourth Quarter Earnings Up 71% and Over

$1 Trillion in Assets Processed."  The press release listed defendant Spinney as a contact and was

filed with the SEC as an attachment to its Form 8-K signed by defendant Sheehan.  The press release

stated, in part:

> BOSTON – Investors Financial Services Corp. (Nasdaq: IFIN) reported
> fourth quarter diluted earnings per share of $0.48, an increase of 71% from $0.28 in
> the fourth quarter of 2002.  Net income for the fourth quarter was $31.9 million, up
> 74% from $18.3 million in the fourth quarter of 2002.  For the year ended December
> 31, 2003, the Company reported diluted operating earnings per share of $1.49, an
> increase of 43% from $1.04 per share in 2002.  Net operating income for the year
> was $99.0 million, up 44% from $68.9 million in 2002.
>
> *       *       *
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "2003
> represented another outstanding year for Investors Financial Services.  We delivered
> impressive growth in both revenue and net income, driven by new business wins,
> stronger capital markets and prudent expense management.  In addition, our assets
> under administration exceeded $1 trillion for the first time.  The current improving
> market conditions and the leverage inherent in our business model make us confident
> in our ability to deliver growth in earnings per share of 25% in 2004."
>
> Net interest income, which arises from investing deposits generated by clients, grew
> 12% to $41.3 million for the fourth quarter of 2003 from $36.9 million for the same
> period in 2002. . . .
>
> Net interest income increased 8% to $152.9 million in 2003 from $141.0 million in
> 2002.

145.    The January 22, 2004 Form 8-K, signed by defendant Sheehan, also reported 4Q03

net interest income of $41.2 million, net income of $31.9 million, basic EPS of $0.49 and diluted

EPS of $0.48.  In addition, the Form 8-K reported fiscal year 2003 net interest income of $152.8

million, net income of $91.7 million, basic EPS of $1.41 and diluted EPS of $1.38.

146.    On February 20, 2004, Investors Financial filed its Form 10-K for the fiscal year ending December 31, 2003 with the SEC. The Form 10-K was signed by defendants Sheehan, Rogers and Spinney and reported fiscal year 2003 net interest income of $152.8 million, net income of $91.7 million, basic EPS of $1.41 and diluted EPS of $1.38.

147.    With respect to the Company's Significant Accounting Policies, the 2003 Form 10-K stated:

> The specific identification method is used to determine gains and losses on sales of securities. ***Amortization and accretion of debt securities purchased at a premium or discount are amortized or accreted into income by a method which <u>approximates</u> the effective yield.*** Actual prepayment experience is reviewed periodically and the timing of the accretion and amortization is adjusted accordingly.

148.    With respect to the Company's SBA securities, the 2003 Form 10-K stated:

> The increase in the held to maturity portfolio stems primarily from purchases of federal agency securities, particularly those issued by the Small Business Administration ("SBA"). ***SBA securities provide an attractive yield with limited credit risk and prepayment risk in a rapidly changing interest rate environment.*** The weighted-average life of the SBA securities correspond with our overall asset liability strategy. SBA securities that we hold are variable rate securities indexed to the Prime rate and are purchased with an intent and ability to hold to maturity. The held to maturity investment portfolio is not viewed as our primary source of funds to satisfy liquidity needs.[6]

149.    With respect to the Company's Federal agency securities (SBA securities) reported as temporarily impaired investments at December 31, 2003, the 2003 Form 10-K stated:

---

[6]    FASB Statement No. 115 requires that a debt security should not be "classified as held-to-maturity if the enterprise anticipates that the security would be available to be sold in response to":
    a.  changes in market interest rates and related changes in the security's prepayment risk; and
    b.  needs for liquidity.

|  | Less than 12 months | | 12 months or longer | | Total | |
|---|---|---|---|---|---|---|
|  | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| Federal agency securities | $1,005,518 | $8,378 | $600,457 | $4,422 | $1,605,975 | $12,800 |

Federal agency securities in a loss position greater than 12 months are represented by securities issued by the Small Business Association and are guaranteed to recover the contractual principal of these investments. **_These securities are classified as held to maturity and <u>management believes that the Company will recover all principal</u>; therefore, no impairment losses have been recognized_**.

150.    With respect to the Company's HTM securities at December 31, 2003, the Form 10-K stated:

The book value and weighted average yield of our securities held to maturity at December 31, 2003, by effective maturity, are reflected in the following table (Dollars in thousands):

| | Years | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $   13 | 5.71% | $   34,827 | 3.89% | $   20,433 | 2.91% | $   2,218,193 | 2.73% |
| Federal agency securities | — | — | — | — | 41,708 | 2.76 | 1,864,804 | 3.16 |

151.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    As now admitted by the Investors Financial Defendants, the financial statements were not prepared in accordance with GAAP and could not be replied upon. The following chart summarizes the restatement (in millions, except EPS data):

| | As Reported | As Restated | Restatement Adjustments |
|---|---|---|---|
| **Statement of Income** | | | |
| Net interest income | $152,883 | $153,914 | $1,031 |
| Net income | $91,760 | $92,421 | $661 |
| Basic EPS | $1.41 | $1.42 | $0.01 |
| Diluted EPS | $1.38 | $1.39 | $0.01 |

(b)    The Investors Financial Defendants failed to disclose the Company's accounting method, how it amortizes and accretes its debt securities purchased at a premium or

- 52 -

discount into income and whether it had anticipated prepayments. Furthermore, the Investors Financial Defendants failed to disclose it was using the "prospective method" (securities could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment) for "securities backed by mortgages and other loans."

(c)    The Investors Financial Defendants failed to disclose the Company was in violation of FASB Statement No. 91 by not disclosing its prepayment policy and its significant assumptions underlying its prepayment estimates.

(d)    The Investors Financial Defendants failed to disclose it was in violation of FASB Statement No. 115 by classifying the Company's Federal agency securities (SBA securities) and certain of its MBS as HTM when they could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment.

(e)    The Investors Financial Defendants' statement that "SBA securities provide an attractive yield with limited credit risk and prepayment risk" was false and misleading because a substantial amount of SBA securities had already prepaid in 2003.

(f)    The Investors Financial Defendants reporting of the Federal agency securities as temporarily impaired was false and misleading because the SBA securities had already prepaid in 2003 which shortened the weighted average life of the securities. The Investors Financial Defendants violated GAAP by not immediately recognizing in income the unamortized amount of premium loss when the SBA securities prepaid. The Investors Financial Defendants' statement that "management believes that the Company will recover all principal; therefore, no impairment losses have been recognized" was also false and misleading because Investors Financial did not have the ability to hold the SBA securities for a reasonable time sufficient for a forecasted recovery of fair value up to the cost of the investment. As of December 31, 2004, Investors Financial's net income

was overstated by at least $12.8 million due to the Investor Financial Defendants failure to properly

records the unamortized premium expense related to the Company's SDA securities.

### M.    Defendants' False and Misleading Statements Concerning 1Q04 Financial Results

152.    On April 12, 2004, after the close of the market, the Company issued a press release

entitled, "Investors Financial Services Corp. Announces First Quarter Earnings Up 79 Percent." The

press release listed defendant Spinney as a contact and was filed with the SEC as an attachment to its

Form 8-K signed by defendant Sheehan. The press release stated, in part:

> BOSTON – April 12, 2004 – Investors Financial Services Corp. (Nasdaq: IFIN) reported first quarter diluted earnings per share of $0.52, an increase of 79% from diluted operating earnings per share of $0.29 in the first quarter of 2003. Net income for the first quarter of 2004 was $35.0 million, up 81% from $19.3 million in net operating income in the first quarter of 2003.
>
> *      *      *
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Investors Financial Services again recorded impressive results in the first quarter of 2004. Led by strong increases in our core asset processing revenue, foreign exchange fees, and net interest income, we were able to grow our revenue by over 30% on a year-over-year basis."
>
> Net interest income, which arises from investing deposits generated by clients, grew 19% to $46.0 million for the first quarter of 2004 from $38.8 million for the same period in 2003. . . .

153.    The April 12, 2004 Form 8-K, signed by defendant Sheehan, also reported 1Q04 net

interest income of $45.9 million, net income of $34.9 million, basic EPS of $0.53 and diluted EPS of

$0.52.

154.    On May 7, 2004, Investors Financial filed its Form 10-Q for its first quarter ending

March 31, 2004 (and repeated the financials for the quarter ended March 31, 2003) with the SEC.

The Form 10-Q was signed by defendants Sheehan and Spinney and reported 1Q04 net interest

income of $45.9 million, net income of $34.9 million, basic EPS of $0.53 and diluted EPS of $0.52.

155.    On June 7, 2004, the Company filed a Regulation FD report with the SEC on a Form 8-K signed by defendant John Henry.  The Regulation FD report stated in part:

> In meetings with investors this week, the Company will reaffirm its estimates for operating earnings of $1.90 to $1.95 per share for the year ended December 31, 2004.  The Company will also reaffirm that these earnings estimates for the year ended December 31, 2004 include the effect of increased interest rates, which the Company expects may rise as much as 300 basis points over the next eighteen months, beginning in the second half of 2004.  ***The Company's earnings estimates for the year ended December 31, 2004 also include an expected flattening of the yield curve, the difference between long-term and short-term interest rates, as short-term interest rates increase***.

156.    On June 7, 2004, in response to the Company's Form 8-K that reaffirmed earnings estimates, the price of the Company's stock increased 2.8% increasing $1.16 to trade at $42.68 from the previous day's close of $41.52.

## N.    Defendants' False and Misleading Statements Concerning 2Q04 Financial Results

157.    On July 14, 2004, after the close of the market, the Company issued a press release entitled, "Investors Financial Services Corp. Announces Second Quarter Earnings Up 63%."  The press release listed defendant Spinney as a contact and was filed with the SEC as an attachment to its Form 8-K signed by defendant Sheehan.  The press release stated, in part:

> BOSTON – July 14, 2004 – Investors Financial Services Corp. (Nasdaq: IFIN) reported second quarter diluted earnings per share of $0.52, an increase of 63% from $0.32 in diluted operating earnings per share in the second quarter of 2003.  Net income for the second quarter was $35.4 million, up 66% from $21.3 million in net operating income in the second quarter of 2003.
>
> *                *                *
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "The second quarter of 2004 represented another period of solid performance by Investors Financial Services.  Our core and ancillary service fees continued to display impressive organic growth rates.  New clients, further penetration of existing clients, and strong fund flows into our clients' products all contributed to these robust top-line increases."

Net interest income, which arises from investing deposits generated by clients, grew 18% to $44.3 million for the second quarter of 2004 from $37.6 million for the same period in 2003. . . .

158.     On July 14, 2004, the Company held an earnings conference call with market

analysts, attended by defendants Sheehan and Spinney.  Defendants stated in part:

Kevin Sheehan – *Investors Financial Services Corp. – Chairman & CEO*

Thanks, Joe.  I will begin by reviewing some of the key points from the second quarter and then John Spinney will discuss our financial results in more detail.

Investors Financial Services recorded extremely impressive results for the second quarter of 2004.  Diluted EPS for the quarter came in at 52 cents, up 63 percent from the second quarter of 2003 diluted operating EPS.  Our total asset servicing revenue grew by a strong 30 percent year-over-year, driven by a 27 percent increase in core service revenue and a 39 percent increase in ancillary services fees.

*          *          *

The current status of our new business pipeline remains medium.  We continue to maintain a positive outlook on our sales pipeline as we are seeing strong levels of RFP activity and increased interest by our clients in our service offerings.

To summarize, we again delivered outstanding results for our investors during the second quarter of 2004.  These results were driven by our ability to sell to new and existing clients, strong client fund flows and a favorable interest rate environment.

*          *          *

Carla Cooper - *Robert W. Baird - Analyst*

I had a question, I guess also about your guidance.  Just if I think about your new guidance, even the top end of the range implies that the quarters coming up in the back half of the year are going to be a little weaker than certainly what we saw this quarter.  And I'm just wondering sort of philosophically, what sort of lens -- is there anything sort of conservatism baked in there, or what kind of – I don't think you've ever had a year where the quarters have sort of been flat.

John Spinney

I think on the guidance front, Carla, we brought it up to a point where we felt comfortable achieving those numbers.  And giving ourselves some flexibility, as we've historically always done, we start with a 25 percent growth rate at the beginning of the year and try to outperform it quarter after quarter and try to guide you up, and try not to get ahead of ourselves.

- 56 -

*     *     *

Jamie Lester - *SAB Capital Management - Analyst*

I'm with you; I'm just trying to see – you guys, obviously, had net income of what, 35 million? But equity was down 10 million in the quarter. So, I guess, what happened there?

John Spinney

We had net income and then we had the marked to market on the portfolio, and the offset for the marked to market in the swaps runs through other OCI.

Jamie Lester - *SAB Capital Management - Analyst*

So there's another 20 million of swap?

John Spinney

Roughly about 20 million; yes.

*     *     *

Jamie Lester - *SAB Capital Management - Analyst*

So you did see some compression in the quarter?

John Spinney

Slightly.

Exhibit G.

159.    The July 14, 2004 Form 8-K, signed by defendant Sheehan, also reported 2Q04 net interest income of $44.2 million, net income of $35.4 million, basic EPS of $0.54 and diluted EPS of $0.52.

160.    On July 15, 2004, in response to the Company's press release, conference call and the Form 8-K, the price of the Company's stock increased 5.1% increasing $2.03 to trade at $42.15 from the previous day's close of $40.12.

161.    On August 6, 2004, Investors Financial filed its Form 10-Q for its second quarter ending June 30, 2004 with the SEC. The Form 10-Q was signed by defendants Sheehan and

- 57 -

Spinney and reported 2Q04 net interest income of $44.2 million, net income of $35.4 million, basic

EPS of $0.54 and diluted EPS of $0.52.

162.    On September 28, 2004, the Company filed a Regulation FD report with the SEC on a

Form 8-K signed by defendant Sheehan.  The Regulation FD report stated, in part:

> At an investor conference on September 29, 2004, management will reaffirm
> estimates for the Company's diluted earnings per share for the year ended December
> 31, 2004 of $2.00 to $2.05 per share.

163.    On September 28, 2004, in response to the Company's disclosure, the price of the

Company's stock increased 1.5% increasing $0.66 to trade at $44.94 from the previous day's close

of $44.28.

**O.    Defendants' False and Misleading Statements Concerning 3Q04
Financial Results**

164.    On October 21, 2004, after the close of the market, the Company issued a press

release entitled, "Investors Financial Services Corp. Expects to Report Fully Diluted EPS of $0.51 to

$0.53 for Q3 2004; Evaluating FAS 91 Change but Expects No Significant Impact for 2004, 2003 or

2002 Reported Results; The Company Reaffirms Expected Fully Diluted EPS of $2.00 to $2.05 for

2004."  The press release listed defendant Spinney as a contact and was filed with the SEC in its

Form 8-K signed by defendant Sheehan.  The press release stated, in part:

> Investors Financial Services Corp. (Nasdaq: IFIN) announced today that it
> expects to report fully diluted earnings per share of $0.51 to $0.53 for the quarter
> ended September 30, 2004.  The Company also expects to report fully diluted
> earnings per share of $1.55 to $1.57 for the nine months ended September 30, 2004.
> The Company is releasing a preliminary earnings estimate today as it finalizes the
> impact of an expected change in application of Financial Accounting Standard No.
> 91 ("FAS 91").  This change is not expected to have a material impact on earnings
> for 2004.

> *    *    *

> Kevin J. Sheehan, Chairman and Chief Executive Officer, stated, "Our
> business trends remain strong, as both core services and ancillary services continued
> to show impressive growth in the third quarter.  We are pleased with the continued

validation of our unwavering commitment to superior client service. We continue to expect to achieve fully diluted earnings per share of $2.00 to $2.05 for 2004."

Commenting on the change in the application of FAS 91, the Company noted that it has historically applied a prospective method under FAS 91 to determine the amortization of premiums and accretion of discounts on applicable investment securities. ***The Company has determined that it is appropriate to change to applying a retrospective method on applicable investment securities***. The Company does not believe that the impact of this change will be significant in the years 2004, 2003 and 2002. The impact on 2001 reported earnings per share could be higher due to changes in interest rates that occurred in that year. The Company is working closely with its audit committee in evaluating the effects of this change in application of FAS 91, and expects to complete this evaluation by November 15, 2004.

165.    On October 21, 2004, the Company held an earnings conference call with market analysts, attended by defendants Sheehan and Spinney. In the conference call defendants stated in part:

Kevin Sheehan – *Investors Financial Services Corp. – Chairman, CEO*

I want to begin by reviewing some key points from the Press Release we issued this afternoon. For the quarter ended September 30th, 2004 we expect to report fully diluted earnings per share of 51 cents to 53 cents with a 9-month ended September 30th, 2004 we expect to report $1.55 to $1.57 in earnings per share. We expect the final results to be available by November 15th. Before considering a FAS 91 adjustment, earnings per share would have been 51 cents for the third quarter of 2004. Core business trends remain positive. . . .

*        *        *

Turning back to today's Press Release we have consistently applied the perspective method under FAS 91 since the initial public offering in 1995 and are examining whether the retrospective method should be used for certain types of investment securities. We are currently completing a comprehensive review of applying FAS 91 with respect to immunization of premiums and an accretion of discounts on our investment securities. I would like to stress that this change and an application of FAS 91 has no impact on our continuing operations or our client service levels. From a financial perspective, the impact of this change will not be significant for years 2002 through 2004. But could result in a larger reduction in 2001 reporting earns per share due to the changing interest rate environment during that year. ***All years whether immaterial or not will be restated to correct the numbers upon completion of our comprehensive review. In other words, if it is wrong, we will fix it***. Given the status of our pipeline, as well as the capital markets and interest rate environments, ***we remain comfortable with our 2004 earnings per share guidance of 2 to 205. We remain comfortable with our long-term growth rate of 25% in EPS***

- 59 -

and would now like to open up the call to your questions. Operator, can you open it to questions?

Jon Arfstrom – *RBC Capital Markets – Analyst*

Interesting release. ***Question on the accounting change, of course. Is it something that the auditors decided needed to be changed?*** When did it arise and can you just talk about what needs to be done before you can officially put out the number with the full release?

Kevin Sheehan – *Investors Financial Services Corp. – Chairman, CEO*

***Sure. I think clearly everybody is looking at income recognition in this particular area. And we really have re-evaluated our approach. It is an extremely complex and technical area and we wanted to really essentially take a real hard look at what we were doing and make sure that we were using the right methodology.*** We have gone through an analysis of our portfolio and looked at it under both methodologies. It is a very time consuming and detailed exercise. We have involved both the audit committee and the external auditors in reviewing the results. And I think it will take us probably until the November 15th time frame to complete that exercise and process all the changes to the financials if they are necessary.

Jon Arfstrom – *RBC Capital Markets – Analyst*

***Is it as simple as -- is it conservatism?*** And if one results in a lower number that's what you will choose or how do you differentiate between which method is the best to use?

Kevin Sheehan – *Investors Financial Services Corp. – Chairman, CEO*

***I think they are just really 2 fundamentally different methodologies and I think we have come to the conclusion in conjunction with our advisors that the retrospective method is the more correct method and more consistent with the requirements of GAAP. And we just have to change to it.***

Jon Arfstrom – *RBC Capital Markets – Analyst*

Okay. Another question, and I'm assuming that it is a net interest income in tact which is why the number isn't disclosed in the release?

Kevin Sheehan – *Investors Financial Services Corp. – Chairman, CEO*

Yes.

*        *        *

Jon Arfstrom – *RBC Capital Markets – Analyst*

Okay. And then the other thing, the change you talked about the accounting change not having any impact in the prior years, anything for 05? I know Kevin you stated that the 25% growth rate is still something you're comfortable with. You don't expect this to have any material change on your expectations for 05?

Kevin Sheehan – *Investors Financial Services Corp. – Chairman, CEO*

No, I don't.

Carla Cooper – *Robert W. Baird & Company – Analyst*

Could you – I guess a couple things. One is, you say that the earnings in the quarter would have been 51 to 53 cents if this method is applied. So I guess 2 questions. One, what do you expect it to be once this method is applied? And the second thing is, do you suspect that this would also change – you reiterated the 2 to 205, but might this change in accounting also, change that number?

Kevin Sheehan – *Investors Financial Services Corp. – Chairman, CEO*

Yes. What I think what we said in the – I don't know where we said it. I think what our expectation is that without any change in accounting the earnings would be 51 cents for the third quarter with a change in accounting. We think there could be some increased recognition and that's why we put the 53 cents in.

Carla Cooper – *Robert W. Baird & Company – Analyst*

Okay. Got it. And what about that same thought process applied to the 2 to 205 number that you have given for '04?

Kevin Sheehan – *Investors Financial Services Corp. – Chairman, CEO*

You know, I think until we get through this complete process, I think we're comfortable staying with the 2 to 205 and once we are through the complete process we will be able to give you a much more definitive number there.

Carla Cooper – *Robert W. Baird & Company – Analyst*

***Okay. And John do you think with your accounting background you could indulge us a little bit with some FAS 91 and just talk a little bit more about perspective versus retrospective and maybe why it has become particularly important at this time?***

John Spinney Jr. – *Investors Financial Services Corp. – CFO*

I guess – sure. ***That's easy to do****, Carla, I guess. **The FAS 91 is a FAS related to the amortization of discounts and premiums and direct costs on loans that originated by financial institutions as well. Under this particular FAS, you have to calculate an effective yield for the securities in order to amortize premiums and discounts on***

- 61 -

*the securities and the investment portfolio. We have always used a prospective method which basically takes your current accounting yield and projects it forward and for purposes of determining a current amortization of premium or accretion of discount. Under the* ~~prospective~~ *[retrospective] method of accounting you would calculate your current yield today by taking all the prior cash flows and projecting your future cash flows to come up with a new yield for determining, really your net investment today and comparing that to the prior period of that investment and adjusting any balance up or down as a result of that analysis. So in the case of a security that had premium in -- when that evaluation was done there could be an additional premium that would need to be recognized after that analysis was performed. That was retrospective.*

*          *          *

Kyle Simonairro – *T Rowe Price – Analyst*

*Could you tell us what happened this quarter that made this accounting issue come up? Was there a change in interest rate, or was it just something that you caught? John, you're a CPA. You were previously a partner in a Big 5 firm. What happened this quarter that you suddenly woke up and said we need to take a look at this?*

John Spinney Jr. – *Investors Financial Services Corp. – CFO*

*Yes. I think part of any internal control structure in an accounting environment, you look at your accounting policies -- we looked our mortgage back accounting policies during this period. We went into our systems took a look at how they were calculating the interest method. We went back to the accounting standards and realized that we were using the prospective method and although the prospective method was allowed, the retrospective method probably was more appropriate for securities that we hold in our portfolio. As a result to that we consulted our advisors. Realized we should have been using the retrospective method. Did the right thing and went back and recalculated what those numbers would have been.* We are in the process of doing that. And as Kevin said, I think the results are pretty insignificant over the last few years with the largest impact in '01. *And as a result of doing that review we'll do what we have to do to make it right.*

Kyle Simonairro – *T Rowe Price – Analyst*

Do you have an estimate of a range of your net interest margin during the quarter?

John Spinney Jr. – I*nvestors Financial Services Corp. – CFO*

No.

Exhibit H.

- 62 -

166.    On October 22, 2004, upon this news, investors immediately sold off Investors Financial stock causing the stock price to fall 16.5% decreasing $7.20 to trade at $36.50 from the previous day's close of $43.70, on trading volume of 11.6 million shares, over 17 times the average Class Period trading volume.

167.    On October 27, 2004, the Company filed an Item 2.02 (Results of Operations and Financial Condition) and Item 4.02 (Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review with the SEC) in its Form 8-K signed by defendant Sheehan.  The Form 8-K disclosure stated, in part:

On October 21, 2004, the Audit Committee, in consultation with the Company's management, determined to amend its Annual Report on Form 10-K for the fiscal year ended December 31, 2003 and the subsequent Quarterly Reports on Form 10-Q for the quarters ended March 31, 2004 and June 30, 2004 to restate the financial statements (the "relevant financial statements") and related information contained therein, and, as such, that the financial statements of the Company and the related auditors' report for the periods reported therein should no longer be relied upon.  The Company's restatement arises from the application of Statement of Financial Accounting Standards No. 91 ("FAS 91") (Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases).

During this past financial quarter, the Company engaged in a review of its accounting policies and practices with regard to its investment portfolio.  In the course of this review, management and the Company's Audit Committee, in consultation with Deloitte & Touche LLP ("Deloitte"), the Company's independent registered public accounting firm, have reviewed the Company's accounting policies under FAS 91.  FAS 91 establishes the accounting for nonrefundable fees and costs associated with lending, committing to lend or purchasing a loan or a group of loans.

***The principal application of FAS 91 to the Company's financial statements is in determining the accounting treatment of premiums paid and discounts realized on the purchase by the Company of securities backed by mortgages and other loans.***  Historically, the Company had applied the prospective method to determine the amortization of such premiums and the accretion of such discounts for the securities in its investment portfolio.  ***The Company's management and Audit Committee have determined that the appropriate treatment for application of FAS 91 to certain of the Company's securities is the retrospective method.***

The Company has commenced recalculating the amortization of premiums and accretion of discounts in its investment portfolio resulting from the application of

- 63 -

the retrospective method under FAS 91. The Company does not believe that the impact of this application will be significant in the years 2004, 2003 and 2002. The impact on 2001 reported earnings per share could be greater due to changes in interest rates that occurred in that year. The Company is working closely with the Audit Committee in evaluating the effects of the application of the retrospective method under FAS 91, and expects to complete this evaluation by November 15, 2004.

The Audit Committee has discussed with Deloitte the matters disclosed in this filing. The Company is working expeditiously to prepare its amended filings. *The Company's restated annual financial statements will be subject to an audit by Deloitte and the Company's restated quarterly financial statements will be subject to a review by Deloitte. The Company intends to effect the restatements for all affected periods through amendments to its annual report on Form 10-K for the year ended December 31, 2003 on or about November 15, 2004 and its quarterly reports on Form 10-Q for the quarters ended March 31, 2004 and June 30, 2004 shortly thereafter.*

168.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    The Investors Financial Defendants' statement that "whether immaterial or not will be restated to correct the numbers" and that "if it is wrong, we will fix it" was false and misleading because the Investors Financial Defendants had violated GAAP by not immediately recognizing in income the unamortized amount of premium loss when the SBA securities prepaid. As of December 31, 2003, the Investors Financial Defendants' net income was overstated by at least $12.8 million due to their failure to properly record the unamortized premium expense related to the Company's SBA securities.

(b)    The Investors Financial Defendants' statements that they "remain comfortable with our 2004 earnings per share guidance of 2 to 205" and that they "remain comfortable with our long-term growth rate of 25% in EPS" were similarly false and misleading for the same reason.

(c)     The Investors Financial Defendants' statements that "[i]t is an extremely complex and technical area and we wanted to really essentially take a real hard look at what we were doing and make sure that we were using the right methodology," "I think we have come to the conclusion in conjunction with our advisors that the retrospective method is the more correct method and more consistent with the requirements of GAAP" and "we looked our mortgage back accounting policies during this period" and "went into our systems took a look at how they were calculating the interest method" and "went back to the accounting standards and realized that we were using the prospective method and although the prospective method was allowed, the retrospective method probably was more appropriate for securities that we hold in our portfolio" were false and misleading because had the Company continued to use the prospective method a write-down of the Company's SBA portfolios was required.[7]  As stated in "Accounting for Asset-Backed Securities" "[u]nder 99-20 [and the prospective method], any decrease in the estimated future cash flows (timing and amount) triggers the write down when the fair value of the security is less than the investor's carrying amount."  Exhibit D at 4.  Here, as of December 31, 2003, the Investors Financial Defendants reported the Federal agency securities (SBA securities) as having an unrealized loss of $12.8 million.  Such is an admission that the securities' fair value is below the Company's cost of the investment by at least $12.8 million.  Thus, under the prospective method and due to the decrease in cash flow caused by the SBA prepayments, the Investors Financial Defendants were required to record a $12.8 million loss to income.

---

[7]     The Company's SBA securities and certain of its MBS were required to use the "prospective method" because the securities could contractually be prepaid or settled in such a way that the Company would not recover substantially all its recorded investment.

(d)    The Investors Financial Defendants' statement that "[t]he principal application of FAS 91 to the Company's financial statements is in determining the accounting treatment of premiums paid and discounts realized on the purchase by the Company of securities backed by mortgages and other loans" was false and misleading because the Investors Financial Defendants did not reveal that the Company's SBA securities were involved in the restatement and that under all accounting methods the unamortized premium amount loss was immediately required to be recognized in income.

169.    On November 15, 2004, after the close of the market, the Company issued a press release entitled, "Investors Financial Services Corp. Announces Third Quarter Earnings Up 29%; Wins $160 Billion Middle Office Outsourcing Mandate with New European Client; Completes Previously Disclosed Review of FAS 91 and Related Restatement; Files Amended Forms 10K and 10Q." The press release listed defendant Spinney as a contact and was filed with the SEC Form 8-K signed by defendant Sheehan. The press release stated, in part:

> BOSTON – November 15, 2004 – Investors Financial Services Corp. (Nasdaq: IFIN) reported third quarter diluted earnings per share of $0.53, an increase of 29% from $0.41 in diluted earnings per share in the third quarter of 2003. Net income for the third quarter was $36.1 million, up 31% from $27.5 million in net income in the third quarter of 2003. For the nine months ended September 30, 2004, the Company reported diluted earnings per share of $1.57, an increase of 71% from $0.92 in diluted earnings per share for the same period in 2003. Net income for the nine months ended September 30, 2004 was $106.7 million, an increase of 74% from $61.2 million in net income for the same period of 2003.

> The Company also reported today that it filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. Today the Company also filed an amended Annual Report on Form 10-K/A for the year ended December 31, 2003, and amended Quarterly Reports on Form 10-Q/A for the quarters ended March 31 and June 30, 2004. These filings complete the Company's restatement of its financial statements for the years ended December 31, 2001, 2002, 2003 and for the six months ended June 30, 2004. As previously disclosed, the Company's restatement arose from its application of Statement of Financial Accounting Standards No. 91 to the Company's securities portfolio.

The Company's cumulative restatement since inception resulting from the accounting review was a reduction of $6.2 million in net interest income. The opening adjustment to retained earnings on January 1, 2001 was an increase of $0.9 million. For the year ended December 31, 2001, the total net interest income adjustment was a reduction of $8.5 million, resulting in a decrease in diluted earnings per share of $0.08. The respective net interest income adjustments for the years ended December 31, 2002, 2003 and 2004 were a reduction of $2.3 million, an increase of $1.0 million and an increase of $2.7 million. The adjustments to diluted earnings per share in 2002, 2003 and 2004 were a reduction of $0.02 per share, an increase of $0.01 per share and an increase of $0.02 per share, respectively.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "We have successfully completed a comprehensive review of the accounting for premiums and discounts on each investment in our securities portfolio. *Consistent with our preliminary disclosure, our accounting review resulted in no significant change to our 2004, 2003 or 2002 results. Our operating results continue to display the leverage and resilience of our business model. We remain confident in our ability to grow our diluted earnings per share in excess of 30% in 2004*."

\*     \*     \*

Net interest income grew 31% to $48.3 million for the third quarter of 2004 from $36.9 million for the same period in 2003. Operating expenses were $94.5 million for the third quarter of 2004, up 15% from $81.9 million for the same period in 2003. . . .

Net interest income grew 22% to $138.8 million for the first nine months of 2004 from $113.8 million for the same period in 2003. Operating expenses were $295.3 million for the first nine months of 2004, up 14% from $258.6 million for the same period in 2003. . . .

170.     On November 15, 2004, the Company held an earnings conference call with market analysts, attended by defendants Sheehan and Spinney. On the conference call, defendants stated, in part:

Kevin Sheehan - *Investors Financial Services Corp. - Chairman, CEO*

Senior management, the audit community of the board, our internal auditors and our independent registered public accountants have completed a comprehensive review of the amortization of premiums and accretion of discounts on all of our investment securities. We have examined the accounting for and evaluation of each and every investment security in our portfolio from December 31, 2000 to September 30, 2004. We are now amortizing premiums and accreting discounts in the affected securities in accordance with generally accepted accounting principals, including FAS 91. Again, we're making this statement in relation to all the securities and security types in our portfolio.

- 67 -

Today, we filed an amended annual report on form 10-KA for the year ended December 31, 2003. Amended quarterly reports on form 10-K -- 10-QA for the first two quarters of 2004 and our quarterly report on form 10-Q for the quarter ended September 30, 2004. We initially reported on October 21 that the impact of this change was not significant for the years 2002 through 2004, but it resulted in a larger reduction in 2001 reported earnings per share due to the rapidly changing interest rate environment during that period. The company's cumulative restatement since inception, resulting from the accounting review was a reduction of 6.2 million in net interest income. The opening adjustment to retained earnings as of January 1, 2001, was an increase of .9 million.

2001's total net interest income adjustment was a reduction of 8.5 million, resulting in a decrease in diluted earning per share of 8 cents. The net interest income adjustment for 2002 was a reduction of 2.3 million or 2 cents per share. For 2003, the adjustment was an increase of $1 million or 1 cent per share. For 2004, the adjustment was an increase of 2.7 million or 2 cents per share. There was no significant change to our capital or leverage ratios for any restated quarter. A detailed presentation of the changes arising from the restatement can be found in the reports we filed today with the SEC. *In addition, this restatement did not impact the accounting for our SBA portfolio.*

*We did, however, correct a clerical error in the contractual maturity table in the MD&A session of our 2003 10-K. We previously reported federal agency securities having a yield of 3.16% in the over-10-year category [sic] and 2.76% in the 5- to 10-year category. These yields should have been 2.71% and 2.28% respectively, consistent with the income we recognize in our financial statements.*

To summarize, we undertook a comprehensive effort to audit, recalculate and correct our financial statements and our SEC filings. We accomplished these tasks in a short period of time thanks to the tireless effort of our dedicated employees.

We will now turn to a review of our financial results. For the quarter ended September 30, 2004, we reported fully diluted earnings per share of 53 cents, up 29% from the third quarter of 2003's diluted EPS of 41 cents. For the 9 months ended September 30, 2004, net operating revenue rose 27% to 456 million while diluted operating earnings per share rose 52% and net operating income rose 56%. Our five-year compound annual growth rate and diluted earnings per share through September 30 remains an impressive 43%.

\*     \*     \*

To summarize, our third-quarter results demonstrate a continued robust condition of our business. These results were driven by our ability to sell new and existing clients, strong client fund flows and prudent expense management.

\*     \*     \*

John Spinney - *Investors Financial Services Corp. - Senior Vice President, CFO*

- 68 -

As Kevin mentioned, third-quarter diluted EPS came in at 53 cents, a 29% increase over our third-quarter, 2003, diluted EPS of 41 cents. On a year-over-year basis, our third-quarter net operating revenue increased 22% while our operating expenses grew 15%, again, exhibiting positive earnings growth in the continued leverage of our business model. For the nine months ended September 30, 2004, net operating revenue rose 27% to 456 million while our expenses grew 14%. Diluted operating earnings per share rose 52% and net operating income rose 56% for the nine months ended September 30, 2004.

We generate revenues based on assets under administration, the number of transactions generated by our clients and net interest income. These three revenue streams create a natural hedge for our business model. The breakdown of our revenue stream for the third quarter of 2004 was 52% asset-based, 16% transaction-based, and 32% net interest income based. I will now discuss the significant income and expense components for the third quarter in more detail.

*    *    *

Net interest income was up 31% on a year-over-year basis primarily due to balance sheet growth driven by strong client funding and a relatively steep yield curve.

We continue to maintain strong net interest margin of spread as a result of the strong client funding. The linked quarter net interest margin increased by 18 basis points to 1.94% while the linked quarter interest rate spread also increased 18 bases points to 1.85%.

*    *    *

Given the status of our pipeline as well as the capital markets and interest rate environments, we remain comfortable with our 2004 earnings per share guidance of $2 to $2.05, representing a greater than 35% annual increase in diluted earnings per share. As we previously stated, our guidance includes a 200 additional 200 basis point increase in the Fed funds rate from today to 4% over the next 15 months. *Included in our guidance is and has always been a forecast of SBAs running at industry prepayment speeds. We remain comfortable with our long-term growth rate of 25% on EPS.* As we have done historically, we revert back to our historical growth rate of 25% at the outset of a new year and adjust our guidance as we lock in new business. Amy, I'd now like to open up the call to your questions.

*    *    *

Jon Arfstrom - *RBC Capital Markets - Analyst*

Hey, John. Little different tone on this call than the last one, right?

John Spinney - I*nvestors Financial Services Corp. - Senior Vice President, CFO*

Yes.

- 69 -

Jon Arfstrom - *RBC Capital Markets - Analyst*

**Question on the restatement. Is it finished, is there any more risk here, is this issue complete and it's over with and we don't have to think about it.**

John Spinney - *Investors Financial Services Corp. - Senior Vice President, CFO*

**Yes, it's done, Jon. We made a full assessment and filed everything today.**

Jon Arfstrom - *RBC Capital Markets - Analyst*

Any changes you see in your business as a result of this, higher expense rate, does it impede your ability to grow, does it inject volatility, what changes?

John Spinney - *Investors Financial Services Corp. - Senior Vice President, CFO*

It doesn't have any affect on our business whatsoever, especially in terms of continuing to grow the business. We're still focusing on buying the same types of investments and generating that complementary income from net interest income and we see very little volatility as a result.

\*     \*     \*

Jon Arfstrom - *RBC Capital Markets - Analyst*

**Okay. And then I guess the last question is just on your interest rate positioning. Has anything that the Fed has done so far and the changes in the slope of the curve surprised you or has it all been consistent with your expectations for a flattening curve?**

John Spinney - *Investors Financial Services Corp. - Senior Vice President, CFO*

**It's pretty consistent with what we expected in terms of what the Fed moves have been. And it was built into that 300-basis point guidance we gave way back in June and continues to be in our guidance with the 200 basis points up from here today.**

\*     \*     \*

Kevin Sheehan  - *Investors Financial Services Corp. - Chairman, CEO*

Thank you, Amy. In closing, thanks for your patience as we work through this restatement. Given the new business closing during the month and the increasing demand for our services, **we look forward to a strong fiscal 2005**.  Thanks again.

Exhibit I.

171.    The statements above were each materially false and/or misleading when made and

were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1))

because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    The Investors Financial Defendants' statements "this restatement did not impact the accounting for our SBA portfolio," the Company "correct[ed] a clerical error in the contractual maturity table" were false and misleading because the Investors Financial Defendants failed to disclose that the Company's SBA securities had prepaid and that they had violated GAAP by not immediately recognizing in income the unamortized premium amount. Thus, while the yields may have been consistent with income recognized the Company's financials, the Investors Financial Defendants failed to disclose that as of December 31, 2003, the Company's net income was overstated by at least $12.8 million due to their failure to properly record the unamortized premium expense related to its SBA securities. Furthermore, the Investors Financial Defendants' statements that "[i]ncluded in [the Company's] guidance is and has always been a forecast of SBAs running at industry prepayment speeds" and that they "remain comfortable with our long-term growth rate of 25% on EPS" were similarly false and misleading because the event the Investors Financial Defendants had warned about had already occurred when the SBA securities prepaid in 2003 which shortened the average life of the securities, decreased the Company's cash flow and adversely impacted the Company's financials.

(b)    The Investors Financial Defendants' statement "Yes, it's done, Jon. We made a full assessment and filed everything today" made in direct response to a question regarding the restatement and "[i]s it finished, is there any more risk here, is this issue complete" was false and misleading because the Investors Financial Defendants knew that the SBA securities had prepaid and that they had violated GAAP by not immediately recognizing in income the unamortized amount of premium loss when the SBA securities prepaid. Thus, the Investors Financial Defendants knew that,

contrary to their statements, more loss unamortized premium expense would adversely affect the Company's financials in the future because they had delayed taking the expense in the period in which it occurred.

172.    On November 15, 2004, Investors Financial filed its Amended Form 10-K for the fiscal year ending December 31, 2003, with the SEC that restated its financials results for fiscal years 2001, 2002 and 2003. The Amended Form 10-K was signed by defendants Sheehan, Rogers and Spinney and reported the following restated financial results for 2001, 2002 and 2003 (in thousands, except EPS data):

2001 Restated Financial Results

| Statement of Income | As Reported | As Restated | Restatement Adjustments |
|---|---|---|---|
| Net interest income | $109,281 | $98,355 | ($10,926) |
| Net income | $50,200 | $44,686 | ($5,514) |
| Basic EPS | $0.79 (pre-split $1.58) | $0.71 (pre-split $1.42) | ($0.08) |
| Diluted EPS | $0.76 (pre-split $1.53) | $0.68 (pre-split $1.36) | ($0.08) |

2002 Restated Financial Results

| Statement of Income | As Reported | As Restated | Restatement Adjustments |
|---|---|---|---|
| Net interest income | $143,478 | $138,725 | ($2,321) |
| Net income | $68,946 | $67,437 | ($1,509) |
| Basic EPS | $1.07 | $1.05 | ($0.02) |
| Diluted EPS | $1.04 | $1.02 | ($0.02) |

2003 Restated Financial Results

| Statement of Income | As Reported | As Restated | Restatement Adjustments |
|---|---|---|---|
| Net interest income | $152,883 | $153,914 | $1,031 |
| Net income | $91,760 | $92,421 | $661 |
| Basic EPS | $1.41 | $1.42 | $0.01 |
| Diluted EPS | $1.38 | $1.39 | $0.01 |

173.    With respect to the Company's Significant Accounting Policies, the 2003 Form 10-K/A stated:

Securities –

    The specific identification method is used to determine gains and losses on sales of securities. ***Amortization and accretion of debt securities purchased at a***

- 72 -

***premium or discount are amortized or accreted into income by a method which approximates the effective yield.***  Actual prepayment experience is reviewed periodically and the timing of the accretion and amortization is adjusted accordingly.

174.    With respect to the Company's SBA securities, the December 31, 2003 Form 10-K/A stated:

> The increase in the held to maturity portfolio stems primarily from purchases of federal agency securities, particularly those issued by the Small Business Administration ("SBA"). ***SBA securities provide an attractive yield with limited credit risk and prepayment risk in a rapidly changing interest rate environment***. The weighted-average life of the SBA securities correspond with our overall asset liability strategy.  SBA securities that we hold are variable rate securities indexed to the Prime rate and are purchased with an intent and ability to hold to maturity.  The held to maturity investment portfolio is not viewed as our primary source of funds to satisfy liquidity needs.

175.    With respect to the Company's Federal agency securities reported as impaired investments  at December 31, 2003, the Form 10-K/A stated:

|  | Less than 12 months | | 12 months or longer | | Total | |
|---|---|---|---|---|---|---|
|  | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| Federal agency securities | $1,005,518 | $8,378 | $600,457 | $4,422 | $1,605,975 | $12,800 |

> Federal agency securities in a loss position greater than 12 months are represented by securities issued by the Small Business Association and are guaranteed to recover the contractual principal of these investments.  ***These securities are classified as held to maturity and <u>management believes that the Company will recover all principal</u>; therefore, no impairment losses have been recognized***.

176.    With respect to the Company's HTM securities at December 31, 2003, the Form 10-K/A stated:

> The book value and weighted average yield of our securities held to maturity at December 31, 2003, by effective maturity, are reflected in the following table (Dollars in thousands):

| | Years | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $       5 | 5.71% | $  31,732 | 3.89% | $  68,668 | 2.91% | $  2,171,625 | 2.73% |
| Federal agency securities | — | — | — | — | 41,705 | 2.28 | 1,864,849 | 2.71 |

- 73 -

177.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    As now admitted by the Investors Financial Defendants, the financial statements were not prepared in accordance with GAAP and could not be replied upon.

(b)    The Investors Financial Defendants failed to disclose the Company was in violation of FASB Statement No. 91 by not disclosing its prepayment policy and its significant assumptions underlying its prepayment estimates.

(c)    The Investors Financial Defendants failed to disclose it was in violation of FASB Statement No. 115 by classifying the Company's Federal agency securities (SBA securities) and certain of its MBS as HTM when they could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment.

(d)    The Investors Financial Defendants' statement that "SBA securities provide an attractive yield with limited credit risk and prepayment risk" was false and misleading because a substantial amount of SBA securities had already prepaid in 2003.

(e)    The Investors Financial Defendants reporting of the Federal agency securities reported as temporarily impaired was false and misleading because the SBA securities had already prepaid in 2003 which shortened the weighted average life of the securities.  The Investors Financial Defendants violated GAAP by not immediately recognizing in income the unamortized amount of premium loss when the SBA securities prepaid.  The Investors Financial Defendants' statement that "management believes that the Company will recover all principal; therefore, no impairment losses have been recognized" was also false and misleading because Investors Financial did not have the

ability to hold the SBA securities for a reasonable time sufficient for a forecasted recovery of fair value up to the cost of the investment. As of December 31, 2003, the Investors Financial Defendants net income was overstated by at least $12.8 million due to their failure to properly record the unamortized premium expense related to the Company's SBA securities.

178.    On November 15, 2004, Investors Financial filed its Amended Form 10-Q for its first quarter ending March 31, 2004 with the SEC. The Amended Form 10-Q was signed by defendants Sheehan and Spinney and reported the following restated financial results (in thousands, except EPS data):

March 31, 2004 Restated Financial Results
for the Three Months Ended March 31, 2004

| Statement of Income | As Previously Reported | As Restated | Restatement Adjustments |
|---|---|---|---|
| Net interest income | $45,961 | $48,421 | $2,460 |
| Net income | $34,975 | $36,553 | $1,5478 |
| Basic EPS | $0.53 | $0.53 | $0.00 |
| Diluted EPS | $0.52 | $0.54 | $0.02 |

179.    On November 15, 2004, Investors Financial filed its Amended Form 10-Q for its second quarter ending June 30, 2004 with the SEC. The Form 10-Q/A was signed by defendants Sheehan and Spinney and reported the following restated financial results (in thousands, except per share data):

March 31, 2004 Restated Financial Results
For the Three Months Ended June 30, 2004

| Statement of Income | As Previously Reported | As Restated | Restatement Adjustments |
|---|---|---|---|
| Net interest income | $44,292 | $42,075 | ($2,217) |
| Net income | $35,418 | $33,916 | ($1502) |
| Basic EPS | $0.54 | $0.51 | ($0.03) |
| Diluted EPS | $0.52 | $0.50 | $0.02) |

180.    On November 15, 2004, Investors Financial filed its Form 10-Q for its third quarter ending September 30, 2004 with the SEC. The Form 10-Q was signed by defendants Sheehan and

Spinney and reported 3Q04 net interest income of $48.2 million, net income of $36.1 million, basic EPS of $0.54 and diluted EPS of 40.53.

181.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    As now admitted by the Investors Financial Defendants, the financial statements were not prepared in accordance with GAAP and could not be replied upon.

182.    On December 16, 2004, after the close of the market, the Company issued a press release entitled, "***Investors Financial Services Corp. Raises Earnings Guidance for 2004 Fully Diluted EPS; Expects Earnings of $2.07 to $2.09 Per Share***."  The press release listed defendant Spinney as a contact and was filed with the SEC Form 8-K signed by defendant Sheehan.  The press release stated, in part:

> BOSTON – December 16, 2004 – Investors Financial Services Corp. (Nasdaq: IFIN) announced today that it has raised its earnings guidance for fully diluted earnings per share and currently expects $2.07 to $2.09 per share for the year ended December 31, 2004.  The Company plans to report its final results for the quarter and year ended December 31, 2004 on or about January 25, 2004.
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "We have witnessed stronger business trends during the fourth quarter of 2004 due to higher asset values and transaction volumes that are driving solid results in our core and ancillary services.  In addition, we recently completed the first conversion of our previously announced European outsourcing mandate.  Based upon our favorable operating environment and outlook for future sales, ***we remain comfortable with our long term guidance of 25% growth in fully diluted earnings per share***."

183.    On December 17, 2004, in response to the Company's Form 8-K that raised earnings estimates, the price of the Company's stock increased 4.8% increasing $2.09 to trade at $45.70 from the previous day's close of $43.61.  The next trading day, on December 20, 2002, the stock continued to climb increasing 3.6% to close at $47.34.

184.   The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)   The Investors Financial Defendants' statement that they "remain comfortable with our long term guidance of 25% growth in fully diluted earnings per share" was false and misleading because the Investors Financial Defendants failed to disclose that the Company's SBA securities had prepaid and that they had violated GAAP by not immediately recognizing in income the unamortized amount of premium.  As of December 31, 2003, the Investors Financial Defendants net income was overstated by at least $12.8 million due to their failure to properly record the unamortized premium expense related to the Company's SBA securities.

**P.   Defendants' False and Misleading Statements Concerning 4Q04 and Fiscal Year 2004 Financial Results**

185.   On January 25, 2005, after the close of the market, the Company issued a press release entitled, "Investors Financial Services Corp. Announces 2004 Diluted Earnings Per Share [U]p 50%; 2004 Net Operating Revenue Increases 25%."  The press release listed defendant Spinney as a contact and was filed with the SEC Form 8-K signed by defendant Sheehan.  The press release stated, in part:

> BOSTON – January 25, 2005 – Investors Financial Services Corp. (Nasdaq: IFIN) reported diluted earnings per share of $2.09 for the year ended December 31, 2004, an increase of 50% from $1.39 in 2003.  Net income for the year ended December 31, 2004 was $142.0 million, up 54% from $92.4 million in 2003. For the fourth quarter of 2004, diluted earnings per share grew 11% to $0.52 from $0.47 for same period in 2003.  Net income for the fourth quarter was $35.3 million, up 13% from $31.2 million in the fourth quarter of 2003.
>
> For the year ended December 31, 2004, diluted operating earnings per share increased 39% to $2.09 per share from $1.50 per share in 2003 and net operating income increased 43% to $142.0 million from $99.6 million in 2003.  Diluted operating earnings per share and net operating income for 2003 are presented on a

non-GAAP basis, which excludes the impact of a retroactive change in Massachusetts tax law enacted during 2003 as described below in this press release.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Investors Financial Services delivered another year of outstanding results during 2004. Sizeable wins from new and existing clients and the leverage inherent in our business model continue to drive our impressive performance. ***We remain confident in our ability to produce growth of 25% in diluted earnings per share in 2005***."

186.    On January 25, 2005, the Company held an earnings conference call with market

analysts, attended by defendants Sheehan and Spinney. On the conference call defendants stated, in

part:

Kevin Sheehan - *Investors Financial Services Corp. – Chairman, CEO*

\*       \*       \*

For the year ended December 31st, 2004, we again reported extremely impressive results. The 39 percent increase to 209 (ph$) in 2004 diluted earnings per share from $1.50 in 2003 was at the high end of our recently increased guidance. These results were driven by a 25 percent increase in our net operating revenue to 613 million and a 43 percent increase in our net operating income to 142 million.

Even more impressive of -- are our five-year compound annual growth rates in revenue, diluted earnings per share and net income. These growth rates include our performances in both strong and weak market environments and illustrate the health of our business and the leverage in our model. For the past five years, we have grown our diluted earnings per share to 42 percent keger (ph), our net income at a 46 percent keger, and our net operating revenue at a 29 percent keger.

\*       \*       \*

John Spinney - *Investors Financial Services Corp. - CFO, SVP*

Thank you, and good afternoon. As Kevin mentioned, for the year ended December 31st, 2004, net operating revenue rose 25 percent to 613 million, while our expenses grew only 16 percent. As a result of this leverage in our model, we are able to grow net operating income by 43 percent to 142 million in diluted earnings per share by 39 percent to $2.09. For the fourth quarter, net operating revenue increased 19 percent year over- year, while our diluted operating earnings per share grew to $0.52, an 11 percent increase over our fourth-quarter 2003 diluted EPS of $.47.

\*       \*       \*

Net-interest income was up 22 percent on a year-over-year basis, primarily due to balance sheet growth -- again, driven by healthy client funding. We continue to

- 78 -

maintain strong interest margin and spread during the fourth quarter. The linked-quarter net-interest margin decreased by 6 basis points to 1.88 percent, while the linked quarter interest rate spread decreased by 10 basis points to 1.75 percent.

\*          \*          \*

***Turning to our earnings guidance for 2005, as we have done historically, we are reverting back to our targeted long-term diluted earnings-per-share growth rate of 25 percent at the outset of the year and will adjust our guidance as we progress through the year. Our guidance includes an additional 175 basis point increase in the fed (ph) funds rate from today to 4 percent by the end of 2005. We are also modeling a further flattening of the yield curve in 2005. We remain comfortable with our long-term growth rate of 25 percent EPS.***

\*          \*          \*

Joel Gomberg - *William Blair - Analyst*

(Indiscernible) It's not a list of — and then, you had a pick-up in your deposits at year end. Is that something that is seasonal, and we expect to go back down? ***And then, we have clearly seen some flattening of the yield curve here this last quarter.*** So maybe you could talk a little bit about your expectations on the margin – some contraction here in the first quarter, as we move along if the deposits run down.

Kevin Sheehan - *Investors Financial Services Corp. - Chairman, CEO*

I think I would probably look at it more on an average basis and year over- year on the deposits front. Regardless of what we've got right at 12/31 is grown tremendously. And that afforded us the ability to grow the balance sheet by $2 billion this year. And as our assets continued to grow that we administer, more deposit flow will come off of that as a result. So I feel pretty comfortable that deposit flows will continue to move in line with asset growth. And whatever we've got at year-end, it could have been a year-end principal and interest payments that we got over year-end. So I'd more focus on the average balance increasing.

***And then with respect to the yield curve, we do have a flattening of the yield curve baked into our guidance for next year and expect dead (ph) funds to achieve 4 percent by the end of December. That's baked into our guidance. Does that answer your question?***

Joel Gomberg - *William Blair – Analyst*

Yes, thank you.

\*          \*          \*

Carla Cooper  - *Robert Baird - Analyst*

Okay. *And then, the second thing I wanted to just clarify is -- when you talk about your 25 percent EPS growth expectations, what kind of assumption does that bake in for*, I guess, both the market and then also fund flows from your client?

John Spinney - *Investors Financial Services Corp. - CFO, SVP*

Typically, as we've always done, Carla, we revert back to that 25 percent. There is no market appreciation built into achieving the 25 percent. If we get it, that's great. And from the fund flows perspective, we only bake in 6 percent. As we talked about at the end of the third quarter, most of the growth in assets we had this year was from good, strong client fund flows. We saw in the fourth quarter, the S&P was up on a link basis about 90 percent. Our asset growth was somewhere in the neighborhood of 15 percent. We are still getting strong fund flows to the tune of 6 percent just in the fourth quarter. So I feel from a budgeting and forecasting perspective right now, we are going down the right path.

                    *        *        *

Brandi Shaw – *Beekman Capital Management – Analyst*

Hi, guys, great quarter.  I was kind of wondering if you could just touch base real quick and just refresh whether or not the *accounting changes are going to have any significant effect in '05 or any at all?* And just -- if we have any expectations for stock option expensing or anything along those lines?

John Spinney - *Investors Financial Services Corp. - CFO, SVP*

Yes, Brandi, on the stock-option expensing first -- we have come out publicly and talked about that being somewhere in the neighborhood of $0.05 to $0.06 once it is opted on July 1st of '05. And that is baked into the 25-percent earnings guidance.

And then, secondly, on the change in accounting on fast (ph) 91 that we talked about on the November 15th call, *I expect that to have very little impact going forward*.

Exhibit J.

187.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

        (a)     The Investors Financial Defendants' statement that they "remain confident in our ability to produce growth of 25% in diluted earnings per share in 2005" was false and misleading

- 80 -

because the Investors Financial Defendants failed to disclose that the Company's SBA securities had prepaid and that they had violated GAAP by not immediately recognizing in income the unamortized amount of premium. As of December 31, 2003, the Investors Financial Defendants net income was overstated by at least $12.8 million due to their failure to properly record the unamortized premium expense related to the Company's SBA securities.

188.     On February 28, 2005, Investors Financial filed its Form 10-K for the fiscal year ending December 31, 2004 with the SEC. The Form 10-K was signed by defendants Sheehan, Rogers and Spinney, and reported fiscal 2004 net interest income of $87.6 million, net income of $141.9 million, basic EPS of $2.15 and diluted EPS of 42.09.

189.     With respect to the Company's SBA securities, the December 31, 2004 Form 10-K stated:

> The investment security purchases primarily included floating-rate mortgage-backed and ***Small Business Administration ("SBA") securities, which offer an attractive yield and reprice as interest rates increase***. Our held to maturity portfolio securities are purchased with an intent and ability to hold to maturity. The held to maturity investment portfolio is not viewed as our primary source of funds to satisfy liquidity needs.

190.     With respect to the Company's HTM securities at December 31, 2004, the Form 10-K stated:

> The book value and weighted average yield of our securities held to maturity at December 31, 2004, by effective maturity, are reflected in the following table (Dollars in thousands):

| | | | | | Years | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Under 1 | | 1 to 5 | | 5 to 10 | | Over 10 | |
| | Amount | Yield | Amount | Yield | Amount | Yield | Amount | Yield |
| Mortgage-backed securities | $ | % | $ 27,463 | 4.49% | $ 12,591 | 4.78% | $ 3,503,907 | 3.27% |
| Federal agency securities | — | — | 2,407 | 2.32 | 106,572 | 3.04 | 2,165,686 | 3.17 |

191.     With respect to the Company's Federal agency securities reported as temporarily impaired investments at December 31, 2004, the Form 10-K stated:

- 81 -

*The unrealized losses related to the Company's investment in mortgage-backed and federal agency securities <u>are attributable to changes in market interest rates</u>*. The contractual cash flows for certain of these securities are guaranteed by agencies of the U.S. government, including government sponsored agencies. As a result, the Company's exposure to the credit risk of these securities is minimal. At December 31, 2004, there were 590 investment securities that were in unrealized loss positions. The market value decline as a percentage of amortized cost for the Company's mortgage-backed and Federal agency investment securities portfolio was less than 1% at December 31, 2004. *The Company has the intent and ability to hold these securities until forecasted recovery, which may in some cases be maturity*. *The Company does not consider these investments to be other than temporarily impaired at December 31, 2004*.

| | Less than 12 months | | 12 months or longer | | Total | |
|---|---|---|---|---|---|---|
| | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses | Fair Value | Unrealized Losses |
| Federal agency securities | $1,446,223 | $12,332 | $518,045 | $6,111 | $1,964,268 | $18,443 |

192.    With respect to the Company's Significant Accounting Policies, the 2004 Form 10-K stated:

Securities–

The specific identification method is used to determine gains and losses on sales of securities. *Amortization and accretion of debt securities purchased at a premium or discount are amortized or accreted into income by a method which <u>approximates</u> the effective yield. The Company applies Financial Accounting Standard No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases ("FAS 91") for the amortization of premiums and accretion of discounts*.

193.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    The Investors Financial Defendants failed to disclose the Company was in violation of FASB Statement No. 91 by not disclosing its prepayment policy and its significant assumptions underlying its prepayment estimates.

(b)    The Investors Financial Defendants failed to disclose it was in violation of FASB Statement No. 115 by classifying the Company's Federal agency securities (SBA securities) and certain of its MBS as HTM when they could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment.

(c)    The Investors Financial Defendants reporting of the Federal agency securities reported as temporarily impaired was false and misleading because the SBA securities had already prepaid in 2003 which shortened the weighted average life of the securities.  The Investors Financial Defendants violated GAAP by not immediately recognizing in income the unamortized amount of premium loss when the SBA securities prepaid.  The Investors Financial Defendants' statement that "[t]he unrealized losses related to the Company's investment in mortgage-backed and federal agency securities *are attributable to changes in market interest rates*" was false and misleading because changes in market interest rates could not have caused the substantial impairment of $18.4 million as the Investors Financial Defendants note in the same filing that the Company's "Small Business Administration ("SBA") securities . . . reprice as interest rates increase."  Indeed, "[v]ariable-rate SBA pools are relatively free from interest-rate risk."  *See* §IV.A.

(d)    The Investors Financial Defendants' statements that "[t]he Company has the intent and ability to hold these securities until forecasted recovery, which may in some cases be maturity" and that "[t]he Company does not consider these investments to be other than temporarily impaired at December 31, 2004" were similarly false and misleading because Investors Financial did not have the ability to hold the SBA securities for a reasonable time sufficient for a forecasted recovery of fair value up to the cost of the investment.  As of December 31, 2004, Investors Financial's net income was overstated by at least $18.4 million due to the Investor Financial

Defendants failure to properly record the unamortized premium expense related to the Company's SBA securities.

**Q.    Defendants' False and Misleading Statements Concerning 1Q05 Financial Results**

194.    On April 13, 2005, after the close of the market, the Company issued a press release entitled, "Investors Financial Services Corp. Announces First Quarter 11% Investors Financial Services Corp. Announces First Quarter Earnings Up 11%." The press release listed defendant Spinney as a contact and was filed with the SEC as an attachment to its Form 8-K signed by defendant Sheehan. The press release stated, in part:

> BOSTON, MA, April 13, 2005 - Investors Financial Services Corp. (Nasdaq: IFIN) reported first quarter diluted earnings per share of $0.60, an increase of 11% from diluted earnings per share of $0.54 in the first quarter of 2004. Net income for the first quarter of 2005 was $40.9 million, up 12% from $36.6 million in net income in the first quarter of 2004.
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Investors Financial Services again delivered solid results in the first quarter of 2005. Our core services revenue grew impressively on both a year-over-year and linked quarter basis, driven by new business wins and client fund flows. ***We continue to have a number of exciting opportunities in our pipeline to drive earnings growth in fiscal year 2005***."
>
> *                *                *
>
> Net interest income decreased 2% to $47.6 million for the first quarter of 2005 from $48.4 million for the same period in 2004. . . .

195.    On April 13, 2005, the Company held an earnings conference call with market analysts, attended by defendants Sheehan and Spinney. Defendants stated, in part:

Kevin Sheehan - *Investors Financial Services Corp. - Chairman, CEO*

Investors Financial Services recorded solid results for the first quarter of 2005. On a link quarter basis, our net operating revenue grew by 7%, while our operating expenses increased by 2%, again exhibiting positive earnings leverage. Diluted EPS for the quarter came at $0.60, up 15% on a linked quarter basis, and up 11% on a year-over-year basis. We achieved these positive results for the first quarter as well

as the final two quarters of 2004 in an environment where the Fed funds rate rose by 175 basis points *and the yield curve flatten[ed] significantly*.

\* \* \*

*The current status of our new business pipeline remains medium*. We're seeing significant pent-up demand for asset servicing in the investment management industry that was previously subdued due to the regulatory pressures and concerns. As a result, we continue to maintain a positive outlook on our sales pipeline, and believe that sufficient opportunities exist for us to close enough business to meet our financial goals for 2005. Timing of conversion and the close of these sales is key.

To summarize, *we again delivered solid results for our investors during the first quarter of 2005. These results were driven by positive impact to the business we sold in 2004, strong fund flows, and our continued cost controls*.

\* \* \*

Joel Gomberg - *William Blair - Analyst*

John, can you talk about your outlook for the rest of the year in terms of the net interest market margin, as the Fed looks like will continue to raise rates, and outlook for net interest income?

John Spinney - *Investors Financial Services Corp. - CFO*

*Yes, our outlook is still the same as it was before, you know, a 4% Fed funds rate by the end of the year. And I think what happened to us, and you saw it in this quarter's results, was probably a little flatter curve than we anticipated. I still think we will probably achieve net interest income about what we achieved last year. We were talking a little bit higher than that before*.

*And depending on how the yield curve behaves the rest of the year, it could be higher than that. So we are just keeping on the steady and trying to manage through it right now.*

Joel Gomberg - *William Blair - Analyst*

But net interest income, basically flat year-over-year?

John Spinney - *Investors Financial Services Corp. – CFO*

It could be flat, year-over-year, Joel. It could be higher than where it is today.

\* \* \*

Dean Arnold  - *Millennium Partners - Analyst*

- 85 -

Okay, and then lastly on your comments a few minutes ago about NII being potentially flat and maybe up year-over-year, depending on the yield curve and where rates are -- what does that imply for additional growth or shrinkage in short-term and other borrowings on the balance sheet?

John Spinney - *Investors Financial Services Corp. – CFO*

You know, I think right now the balance sheet will continue to grow towards the end of the year. And we typically have it forecasted to grow somewhere around 20% as we had year-over-year on the balance sheet right now. And that will come with client liabilities. And to the extent there is a shortfall there, we may use some leverage, we may not, depending on what the investment alternatives are.

\*          \*          \*

Stuart Quint - *Gartmore Global Investments - Analyst*

*Just a question on your previous comment about net interest – about the yield curve being flatter than what you had initially anticipated. If you are saying net interest income is flat, and in your guidance – I am just trying to get a sense for are you implying that there is something else that you are adjusting to offset the expectation that net interest income might be weaker than what you were initially thinking? Or am I reading too much into what you are saying?*

John Spinney - *Investors Financial Services Corp. – CFO*

I think, back to Kevin's comments on his part of the presentation, ***we see the pipeline as being a lot more robust***. And a lot of things are pent-up from the regulatory matters starting to flow through. *And clearly closing sales and closing them sooner rather than later is going to make up for that.* And with those new sales comes ancillary services, outback securities lending, cash management, that, again, drives some of the higher margin revenue lines [sic] items.

\*          \*          \*

Stuart Quint  - *Gartmore Global Investments - Analyst*

Okay. I guess just to clarify for me -- so are you saying then -- you are saying that the pipeline is meeting what you said last quarter. Is it that the timing is ticking up since like three months ago, or it's still strong with that basically -- (indiscernible) income is an issue, but it is still not that much of an issue in terms of your guidance?

John Spinney  - *Investors Financial Services Corp. - CFO*

The dollars are in the pipeline, and I think that there are some things that are close to closing in there that we will be able to announce in the next quarter.

\*          \*          \*

Jon Arfstrom - *RBC Capital Markets - Analyst*

*I think Stuart got my question. But basically, what you're saying is – flat to modestly higher NII will be offset by higher-than-expected fee income to get you to 25% growth rate. So the curve is steeper, NII is stronger; curve is flatter, NII is weaker, and the Cs (ph) more than likely will offset any margin pressure that we see. That is what you are saying, right?*

John Spinney - *Investors Financial Services Corp. - CFO*

*Yes*.

Exhibit K.  In fact, that was false – the prepayments meant they had already lost it.

196.    On May 9, 2005, Investors Financial filed its Form 10-Q for its first quarter ending March 31, 2005 with the SEC.  The Form 10-Q was signed by defendants Sheehan and Spinney and reported 1Q05 net interest income of $47.6 million, net income of $40.9 million, basic EPS of $0.61 and diluted EPS of $0.60.

197.    With respect to the flattening of the yield curve, the March 31, 2005 Form 10-Q stated:

> Net interest income is affected by the volume and mix of assets and liabilities and the movement and level of interest rates.  The slight decline in our net interest income was primarily driven by lower interest rate spreads, offset by balance sheet growth. *Short-term interest rates have been steadily increasing since the second half of 2004 without a concurrent increase in longer-term rates, resulting in a flattening yield curve.  Consequently, our interest-bearing liabilities, of which the majority is priced based on floating rates, have repriced faster than our interest-earning assets, resulting in lower spreads*.  The average interest rate spreads for the periods ended March 31, 2005 and 2004 were 1.58% and 2.03%, respectively.  In addition, reinvestment and purchase spreads on fixed and floating-rate assets were lower than expected due to higher market demand, especially for shorter-term and floating-rate fixed income investments during this rising interest rate environment.

198.    With respect to the Company's SBA securities, the March 31, 2005 Form 10-Q stated:

> Our investment security purchases primarily included floating interest rate mortgage-backed securities and Small Business Administration ("SBA") securities, which offer an attractive yield and reprice as interest rates increase. Our held to maturity portfolio

securities are purchased with the intent and ability to hold to maturity and are not viewed as our primary source of funds to satisfy liquidity needs.

199.    The statements above were each materially false and/or misleading when made and were not reported in accordance with GAAP and Regulation S-X (17 C.F.R. §210.4-01(a)(1)) because, as discussed in ¶¶219-248, the Investors Financial Defendants failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    The Investors Financial Defendants failed to disclose the Company was in violation of FASB Statement No. 91 by not disclosing its prepayment policy and its significant assumptions underlying its prepayment estimates.

(b)    The Investors Financial Defendants failed to disclose it was in violation of FASB Statement No. 115 by classifying the Company's Federal agency agencies (SBA securities) and certain of its MBS as HTM when they could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment.

(c)    The Investors Financial Defendants' statements that "[w]e continue to have a number of exciting opportunities in our pipeline to drive earnings growth in fiscal year 2005" and their reaffirmance of the Company's 25% growth rate in EPS were false and misleading because the SBA securities had already prepaid in 2003 which shortened the weighted average life of the securities. The Investors Financial Defendants violated GAAP by not immediately recognizing in income the unamortized amount of premium loss when the SBA securities prepaid. As of December 31, 2004, the Investors Financial Defendants' net income was overstated by at least $18.4 million due to their failure to properly record the unamortized premium expense related to the Company's SBA securities.

R.     **Defendants' False and Misleading Statements Concerning 2Q05 Financial Results**

200.     On July 14, 2005, after the close of the market, the Company issued a press release entitled, "Investors Financial Services Corp. Announces Second Quarter Earnings Revises Fiscal Year 2005 and 2006 Guidance Announces Stock Repurchase Plan of [U]p to $150 Million."  The press release listed defendant Spinney as a contact and was filed with the SEC as an attachment to its Form 8-K signed by defendant Sheehan.  The press release stated, in part:

> BOSTON – July 14, 2005 - Investors Financial Services Corp. (Nasdaq: IFIN) reported second quarter diluted earnings per share of $0.64, an increase of 28% from diluted earnings per share of $0.50 in the second quarter of 2004.  Net income for the second quarter of 2005 was $44.1 million, up 30% from $34.0 million in net income in the second quarter of 2004.

> \*          \*          \*

> *Despite a more robust sales environment, including higher volumes of sales opportunities than in the previous two fiscal years and continued closing of strategically important new business wins in the first and second quarters of 2005, the Company is revising its fiscal year 2005 and 2006 diluted earnings per share guidance.  The Company expects to achieve growth of approximately 10% in diluted earnings per share in 2005 compared to diluted earnings per share of $2.09 in 2004 under Accounting Principles Generally Accepted in the United States of America ("GAAP").  From a core diluted earnings per share perspective, the Company expects 2005 diluted earnings per share to be approximately flat with 2004 GAAP diluted earnings per share of $2.09. ...For 2006, the Company expects GAAP diluted earnings per share to be approximately flat compared to expected 2005 GAAP diluted earnings per share.  From a core earnings perspective, the Company expects to achieve approximately 8% to 10% growth in diluted earnings per share in 2006 over 2005 core diluted earnings per share*.

> *A number of factors have contributed to the Company's revision of its historical target for annual growth in diluted earnings per share.  Key factors that are driving the change in expected diluted earnings per share include: a flatter than expected yield curve*; narrower than expected reinvestment spreads; weaker than expected market-sensitive revenues, including fees linked to both the equity and foreign currency markets; and continued investments in headcount and technology to support new and existing clients.  These factors are expected to be partially offset by continued strong growth in the Company's core service fees, which are driven by sales to new and existing clients and consistent growth in the Company's assets under administration.  The Company's pipeline for new business remains medium

and the Company continues to bid on and win mandates from new and existing customers.

Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Since our initial public offering in November 1995, the Company achieved a compound annual growth rate in diluted earnings per share of 39%. Over the last five years, a period characterized by generally weaker financial markets and more regulation of financial products, the Company grew diluted earnings per share at an impressive 42% compound annual growth rate. ***However, during 2005 we have experienced sustained interest rate pressure and market sensitive revenue challenges. As a result, with less than six months remaining in 2005, we do not believe that we will meet our historical annual growth target in diluted earnings per share in 2005 and 2006***. We remain confident in and committed to our business model and our ability to deliver industry leading customer service levels and financial performance, including long-term growth in diluted earnings per share in excess of industry averages. We are announcing another important new business win today, a $30 billion full-service contract with a major U.S. life insurance company."

*       *       *

***Net interest income of $42.0 million for the second quarter of 2005 was approximately flat compared to $42.1 million for the same period in 2004***. Operating expenses were $113.2 million for the second quarter of 2005, up 12% from $100.7 million for the same period in 2004.

Net interest income was approximately flat at $89.7 million for the first six months of 2005 compared to $90.5 million for the same period in 2004. Operating expenses were $218.0 million for the first six months of 2005, up 9% from $200.8 million for the same period in 2004. . . .

*       *       *

From a GAAP earnings perspective, the Company expects 2006 diluted earnings per share to be approximately flat compared to expected 2005 GAAP diluted earnings per share. The Company expects annual growth in core diluted earnings per share of approximately 8% to 10% in 2006 compared to expected 2005 core diluted earnings per share. Core 2005 diluted earnings per share excludes the impact of securities gains (approximately $0.10 per diluted share for the first six months of 2005) and the recognition of the indefinite reversal provision of APB 23 with respect to its Irish subsidiaries (approximately $0.10 per diluted share). The Company expects net operating revenue growth of 8% to 10% in 2006. As discussed above, 2005 net operating revenue includes securities gains, which we do not expect to recur in 2006. The Company is basing its 2006 net operating revenue guidance on continued strength in its core service business, continued sales of core and ancillary services to new and existing clients, continued client fund flows, and a sustained flat yield curve. The Company expects approximately 8% to 10% growth in expenses in 2006 and moderate diluted earnings per share impact from its share repurchase program.

201.    On July 14, 2005, after the close of the market, the Company held an earnings

conference call with market analysts, attended by defendants Sheehan and Spinney.    On the

conference call defendants stated, in part:

Kevin Sheehan

On today's call, we will cover our revised 2005 and 2006 earnings growth targets
and our results for the second quarter of 2005. . . .

*        *        *

*Unfortunately, we have had a strong year for new sales. We have not been able to
sell enough new business to overcome the significant environmental challenges
that we are experiencing in 2005*. As both CEO and a stockholder, I am
disappointed by the current environment and our revisions to earnings guidance. We
continue to have a strong core business with great opportunities for growth. As we
will discuss in more detail on this call, while the next 18 months will likely present a
number of challenges, we believe in the long term we will continue to grow at a level
that exceeds industry averages. In the short term, if we believe market conditions are
favorable, we will be a buyer under the repurchase program approved by our board.

*During 2005, we've experienced a more challenging environment than we have
faced over the previous nine years. These challenges include a sustained, flatter-
than-expected yield curve,* narrower-than-expected reinvestment spreads on our
reinvestment portfolio, and weaker-than-expected market-sensitive revenues,
including those linked to equity and foreign exchange markets and investment
advisory fees. *The yield curve and narrower reinvestment spreads have hampered
our ability to deploy capital in an effective fashion*.

*        *        *

*From a core perspective, we expect 2005 diluted earnings per share to be
approximately flat with our 2004 GAAP results of 209 per share*. ...We are
maintaining a cautiously optimistic outlook for 2006 as we expect to continue to see
headwinds driven by a challenging environment for net interest income, flat equity
markets, and contract renewals. We also expect to continue to invest in our
infrastructure, which may impact our operating leverage.

*For 2006, we expect GAAP diluted earnings per share to be approximately flat with
2005 GAAP diluted earnings per share. We expect 2006 growth in core diluted
earnings per share to be approximately 8% to 10% over expected 2005 core results,
reflecting a degree of caution for the reasons I just discussed.*

*Our new guidance for 2005 and 2006 places an expected financial performance –
our expected financial performance in line with publicly available guidance of our*

*primary competitors*. Long-term, we continue to expect our financial performance to exceed industry averages.

Turning to our second-quarter results, net operating revenue grew 12% year-over-year, driven by increases in core service revenue, cash management, sweep fees, and securities lending fees. Diluted EPS for the quarter came in at $.64, up 28% from second-quarter 2004 diluted EPS. As of June 30, we processed approximately 1.5 trillion of assets for our clients, up $27 billion or 2% from March 31, 2005 and up almost 300 billion or 25% from June 30, 2004. . . .

<div align="center">*     *     *</div>

John Spinney, Jr.: As Kevin mentioned, second-quarter diluted EPS came in at $.64, a 28% increase over second-quarter 2004 diluted EPS of $.50. The $.64 in second-quarter diluted EPS includes securities gains of approximately 5.6 million or approximately $.06 per share related to the Company's strategy of replacing lower after-tax yielding municipal securities with higher after-tax yielding municipal securities, capitalizing on strong market conditions.

<div align="center">*     *     *</div>

Sweep fees increased 37% year-over-year to 24% linked quarter, due to increased cash balances held by our clients. Securities lending fees increased over 120%, both year-over-year at linked quarter due to improved market conditions. Net interest income was approximately flat on a year-over-year basis as *our balance sheet growth was offset by a flatter yield curve*. Net interest income declined 12% linked quarter due to a flatter yield curve and tighter reinvestment spreads. The linked quarter net interest margin decreased by 28 basis points to 1.47% while the linked quarter interest rate spread decreased by 31 basis points to 1.27% due to the factors I just mentioned.

<div align="center">*     *     *</div>

I would now like to discuss our revised 2005 and 2006 diluted earnings per share guidance. *For fiscal 2005, the Company expects to achieve approximately 10% growth in GAAP diluted earnings per share*. From a core perspective, we expect 2005 diluted earnings per share to be approximately flat with our 2004 GAAP results of $2.09 per share. As Kevin discussed, core diluted earnings per share for 2005 exclude the impact of securities gains totaling $0.10 per share to date 2005 and approximately $.10 per share related to APB 23.

<div align="center">*     *     *</div>

*Net interest income is projected to be down approximately 10% from 188 million in 2004 driven by a flatter-than-expected yield curve environment and tighter-than-expected reinvestment spreads. We do not expect to grow our balance sheet materially for the remainder of 2005 from its size at the end of the second quarter*

<div align="center">- 92 -</div>

*due to the current interest rate environment. We will focus on reinvesting portfolio cash flows until the interest rate environment improves.*

*We assume in our net interest income forecast for 2005 and 2006 that short-term interest rates will rise until the end of 2005, and that the yield curve will remain flat.* We also assume that we will resume growing the balance sheet moderately in 2006 to generate incremental net interest income.

\*     \*     \*

*We are maintaining a cautiously optimistic outlook for 2006 as we expect to continue to see headwinds driven by a challenging environment for net interest income*, flat equity markets, and contract renewals. We also expect to continue to invest in our infrastructure, which may impact our operating leverage. For 2006, we expect GAAP diluted earnings per share to be approximately flat compared to 2005 cap diluted earnings per share. From a core earnings per share perspective, we are projecting annual growth in 2006 diluted EPS of approximately 8 to 10% over expected 2005 core results.

We are basing our 2006 earnings guidance on expected net operating revenue growth of approximately 8 to 10% compared to 2005 net operating revenue. 2005 net operating revenue includes approximately 10 million or $0.10 per share in securities gains taken year to date, which we do not expect to recur in 2006.

We expect our 2006 net operating revenue growth to be driven by the sustained strength of our core service business, continued sales of core and ancillary services to new and existing clients, to continued 6% client fund flow, a sustained flat yield curve, and tight reinvestment spreads

For 2007 and beyond, we are projecting long-term annual growth and net operating revenue of 12 to 14% and annual operating leverage of approximately 50 to 100 basis points, resulting in an annual diluted earnings per share growth of approximately 13 to 15%. We remain confident in and committed to our business model and our ability to deliver industry-leading customer service levels and financial performance, including long-term earnings growth in excess of industry averages.

\*     \*     \*

Jon Arfstrom - *RBC Capital Markets - Analyst*

Can you just, maybe, John, talk a little bit more about what you are doing or what you're planning on doing with the balance sheet for the second half of the year. It sounds like, reading between the lines, you are letting cash build, and you will opportunistically trigger the buyback at a certain point in time. Or do you think that all the cash flow will go to the buyback, or will you let capital build? Can you just discuss that a little bit?

John Spinney, Jr.: Yes, we're going to pretty much keep the balance sheet at its current levels, reinvest cash flows, and continue to build capital through net income, use some of that capital through net income in our overcapitalization right now, relative to our targeted leverage ratio to buy back stock opportunistically.

\*        \*        \*

Jon Arfstrom - *RBC Capital Markets - Analyst*

Okay. And did your guidance include any type of balance sheet restructuring or are you simply letting the cash flows roll in and then deciding what to do with them once they roll in?

John Spinney, Jr.: Yes, there's no restructuring, as I said in the call. We are investing in the similar type of assets we've always invested in. Short duration, variable rate products, and we don't see a change in our investment philosophy.

\*        \*        \*

Hi, Andrea.

Andrea Jao - *Lehman Brothers - Analyst*

***I wanted to drill down a bit on margin compression***. I was hoping you could break that down into -- how much was due to lower reinvestment yields. **How much was due to premium amortization accelerating**, if there's any. And how much of that was, you know, swap ineffectiveness, which added actually the margin, $2.3 million last quarter.

John Spinney, Jr.: I think the biggest driver there is just reinvestment spreads compressing. The other stuff I would characterize as probably immaterial or similar to what it's been in the past.

Andrea Jao  - *Lehman Brothers - Analyst*

So that means there was no swapping effectiveness this quarter?

John Spinney, Jr.: There was, but it was small in the first quarter.

Andrea Jao  - *Lehman Brothers - Analyst*

Got it. And just one follow-up question. ***Are you carrying a lot of premium bonds at the moment?***

John Spinney, Jr.: ***We have some premium bonds, yes***.

Andrea Jao  - *Lehman Brothers - Analyst*

- 94 -

*Is it possible to share how much of the mix is premium bonds? Or is it just a small portion?*

John Spinney, Jr.: *We typically don't give that amount of detail about our investment portfolio, Andrea.*

\*          \*          \*

Carla Cooper - *Robert W. Baird - Analyst*

And Kevin, I guess back to your comments. <u>**You talked about a pretty dramatic change, vis-a-vis the historical numbers that Investors Financial has achieved. I guess, how fundamental, as you look from your perch, having been in this business a long time, how fundamental do you view the changes here -- you know, the numbers certainly look like they are changing a lot,**</u> but maybe you can give us some perspective of how fundamental these changes feel to you as you look at the next 18 months and beyond.

Kevin Sheehan

*I think the big change for us is the compression in the – in the spreads and our inability to exact any growth in earnings from the net interest income side of the business, at least in this environment where we are facing rising rates.* On the other side, the core side, where we are increasing fee-based services in the ancillaries, I think we are performing pretty strongly and I think we will continue to do that and we will probably drive a lot hotter on that side to compensate for the limitations on the net interest income side and when that becomes more favorable and we can expand that again, you can expect to see us do it.

Carla Cooper  - *Robert W. Baird - Analyst*

So just to clarify, *your comments really relate to portfolio yields and net interest income as opposed to a change in the core competitive environment that you think is limiting your growth or your profitability*.

Kevin Sheehan

*Right. You can see that's where we got hammered, is on the net interest income side.*

\*          \*          \*

David Chamberlain  - *PIMCO - Analyst*

Hi, Guys. Just quickly, when you are look at your assumptions for '06, what are you assuming in terms of interest margin, any additional compression from a current level. What are you thinking on those lines?

- 95 -

John Spinney, Jr.: Our interest rate outlook is a continued rise in short-term rates to the end of the year and probably some continued flattening in the yield curve, depending on what happened to the tenure [ph] but we are assuming it gets flatter from here.

<center>*     *     *</center>

Matt D'Attilio - *Reinhard & Mahoney - Analyst*

Yes, could you guys just comment overall, ***similar to the previous question on how much compression you think can be left in your business model. I think part of the surprise on the press release is the 31-basis point contraction, and spread was probably a little bit greater than people's models. Maybe you can just discuss where it can go from there***.

John Spinney, Jr.: It could go down a little bit lower, ***but we're not going to give an estimate of where we think it's going to end up. I think, given where the guidance is we have out there and what that means for EPS in the next two quarters, I think it's pretty much baked into the numbers right now***.

<center>*     *     *</center>

Greg Lapin - *Saranac Capital - Analyst*

Hi. Greg Lapin at Saranac. My first question -- just looking at the income statement really quick. There a typo, or – you show that the second quarter of '04 having flat net interest income, but when you go back in my model and in the press release it was lower, yet the six-month number is the same. So I didn't know if there was any reclass or if you could just check on that. It can't be that way. So in the past it was $44.3 million, and – so –

John Spinney, Jr.: Yes, we will go back and look at it, but we did restate some numbers last year, so maybe – maybe you are looking at your model that maybe wasn't updated.

Greg Lapin  - *Saranac Capital - Analyst*

But the six-month number is the same in each -- okay. Then, just going into -- I will follow up. OCI is reclassed to give transference and net interest income. Is it safe to assume that this quarter might be the $6.5 million divided by 3?

John Spinney, Jr.: No, it's not safe to do that. It is a dynamic that changes every quarter and it's less than it was in the first quarter.

Greg Lapin  - *Saranac Capital - Analyst*

I am not talking about the hedge ineffectiveness – is that connected with the hedge ineffectiveness? So that the 6.5 is for the next three quarters?

<center>- 96 -</center>

John Spinney, Jr.: Yes.

Greg Lapin - *Saranac Capital - Analyst*

Oh, they are the same thing. Okay. Then another thing is just – if you look at other borrowings, they've – at the end of period basis, $2 billion, the average was 1.35. Or the average is 2 billion, the end-of-period is 1.35.

***Does this kind of show that you reversed course in the middle of the quarter and decided to change – and just – if that is the case, how comprehensive was your business strategy review when you underwent this to reassess your '05, your '06 projections and your long-term growth rates in EPS. What kind of process was that?***

John Spinney, Jr.: First of all, on the borrowings front, the average was higher during the quarter. At the end of the quarter we had a lot of deposits come in and that's why there's a difference between the average and the quarter-end number. And we've always historically had some amount of borrowings on our balance sheet to – to utilize our capital effectively. ***Coming out of the first quarter, we had a pretty – pretty relatively steep yield curve. We continue to – to manage net interest income and the growth of the balance sheet around at least getting some benefit out of that steepness.***

***As the yield curve flattened throughout the second quarter***, we reanalyzed our position with respect to growing the balance sheet, and in towards the end of the third quarter, we decided to stop growing the balance sheet into the third and fourth quarter, and that's kind of how it played out, I guess.

Greg Lapin - *Saranac Capital - Analyst*

And just for the long term, when you looked in '07 and beyond, we could assume the balance sheet grows, customer flows come in. Why the lower level to that magnitude? What else went in – were you looking at. Did you have a comprehensive – do you use consultants, did you look at financial asset growth, you just assess the business? You are still pretty small. Just wanted – anything more you could say on that?

Kevin Sheehan

***We just couldn't get the incremental yield so it didn't make sense. Wasn't effective to continue to grow the balance sheet with borrowed funds.***

Greg Lapin  - *Saranac Capital - Analyst*

The interest rate environment will normalize in '07 so you have a different long-term growth rate, moving down from 25% to 13 to 15.

Kevin Sheehan

Yes, I think you will see us more aggressive, but we wanted to be extremely conservative in putting these numbers together and not reach -- if the rates turn around, great. We will start to grow the balance sheet again.

Exhibit L.

202.    On July 15, 2005, upon this news, investors immediately sold off Investors Financial stock causing the stock price to fall 18.0% decreasing $7.47 to trade at $34.05 from the previous day's close of $41.52, on trading volume of 22 million shares, over five times the average trading volume.

203.    Thus, plaintiffs suffered loss when the true state of the Company's financial condition was revealed in the July 14, 2005 press release and conference call when the Investors Financial Defendants disclosed that the Company's net interest income would be flat for 2005 and 2006.

204.    The Company's explanation that the reduced guidance was due to a flat or flattening yield curve was untrue.  CW1 stated that Sylvester "would never have uttered such nonsense," adding that such a statement of surprise is "naïve garbage."  CW1 stated that "anyone with half a brain knew that for months all the extra cash from the Far East was going into 10-year US Treasury bonds," thus keeping longer term interest rates down, while shorter term rates rose, compressing rates and flattening the yield curve.  Moreover, Investors Financial Defendants' statements that the reduced guidance was due to a surprise flattening in the yield is further tarnished by their earlier class period statements where the defendants stated that the Company "*model[s] a further flattening of the yield curve*" and that "*a flattening of the yield curve[is] baked into our guidance*."  During the Class Period, the Investors Financial Defendants stated:

**October 10, 2002:**

Charles Trafton (ph): What's your outlook, you know, given the flat and the [flattening] yield curve and the very high prepayment fees on the mortgage portfolio?

Mike Rogers  -  *Investors Financial Services Corporation  -  President*

- 98 -

*We have it coming down throughout the next 12 months which is why we believe, even though we're going to increase deposits on the balance sheet, that management's income is going to stay flat.*

**July 16, 2003:**

John Spinney  - *Investors Financial Services Corp - SVP and CFO*

*We continued to maintain strong and interest margin in spread, despite flattening [inaudible] curve primarily as a result of strong client funding.*

Brad Moore  - *Putnam Lovell NBF - Analyst*

*And if it was a flattening curve*, would how would that impact the assumption?

John Spinney  - *Investors Financial Services Corp - SVP and CFO*

*[a] flattening curve would contract our net interest income slight but I don't have that number at my finger tips.*

**November 15, 2004:**

Jon Arfstrom  - *RBC Capital Markets - Analyst*

*Okay. And then I guess the last question is just on your interest rate positioning. Has anything that the Fed has done so far and the changes in the slope of the curve surprised you or has it all been consistent with your expectations for a flattening curve?*

John Spinney  - *Investors Financial Services Corp. - Senior Vice President, CFO*

*It's pretty consistent with what we expected in terms of what the Fed moves have been. And it was built into that 300-basis point guidance we gave way back in June and continues to be in our guidance with the 200 basis points up from here today.*

**January 25, 2005:**

John Spinney - *Investors Financial Services Corp. - CFO, SVP*

*We are also modeling a further flattening of the yield curve in 2005. We remain comfortable with our long-term growth rate of 25 percent EPS.*

Joel Gomberg - *William Blair – Analyst*

*And then, we have clearly seen some flattening of the yield curve here this last quarter.*

Kevin Sheehan - *Investors Financial Services Corp. - Chairman, CEO*

*And then with respect to the yield curve, we do have a flattening of the yield curve baked into our guidance for next year and expect dead (ph) funds to achieve 4 percent by the end of December. That's baked into our guidance. Does that answer your question?*

205.     Additional reasons behind the Company's flat net interest income and its drastic reduction in earnings guidance from 25% to 10% for 2005 and 2006 was further disclosed in the Company's June 30, 2005 Form 10-Q filed with the SEC on August 9, 2005.  *See* Post Class Period Events.

## VII.     INVESTORS FINANCIAL RESTATES THREE-AND-A-HALF YEARS OF FINANCIAL STATEMENTS

206.     There is no dispute about the falsity of the Company's financial statements.  As a result of employing the improper accounting practices as alleged herein throughout the Class Period, Investors Financial was ultimately forced to restate its previously released financial statements for all of 2001, 2002, 2003 and the first two quarters of 2004 to comply with GAAP and SEC guidelines. This restatement for net income and net interest income is as follows:

Net Income (in $000s)

|  | Reported | Restated | Misstatement | |
|---|---|---|---|---|
| FY 2001 | $50,200 | $44,686 | $5,514 | 12.3% |
| FY 2002 | $68,946 | $67,437 | $1,509 | 2.2% |
| FY 2003 | $91,760 | $92,421 | $661 | 0.79% |

Net Interest Income (in $000s)

|  | Orig. Reported | Prev. Reported | Restated | Misstatement | |
|---|---|---|---|---|---|
| FY 2001 | $109,281 | $106,838 | $98,355 | $10,926 | 11.11% |
| FY 2002 | $143,478 | $141,046 | $138,725 | $4,753 | 3.43% |
| FY 2003 | $152,883 | $152,883 | $153,914 | ($1031) | (.067%) |

207.     For the reasons stated below, the fact that Investors Financial restated its previous financial statements is an admission that: (a) the financial results originally issued during the Class

- 100 -

Period and the public statements regarding those results *were materially false and misleading*; and (b) the financial statements reported during the Class Period *were incorrect based on information available to defendants at the time the results were originally reported*.

208.    As recently noted by the SEC, "GAAP only allows a restatement of prior financial statements based upon information 'that existed at the time the financial statements were prepared,'" and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared."[8]  The Accounting Principles Board ("APB"), the governing body that promulgated the accounting rules regarding restatements of prior financial statements, has defined the only kind of "errors" that may be corrected through a restatement: "'Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or *misuse of facts that existed at the time that the financial statements were prepared*.'"  Indeed, as alleged herein, the restatement at issue here was not due to a simple mathematical error, honest misapplication of a standard or oversight, rather, as alleged below, it was due to intentional misuse of the facts that were known at the time the previous financial statements were disseminated to the public.

209.    The SEC has recently reiterated its position that, in its investigations of restated financial statements, it often finds that the persons responsible for the improper accounting acted with scienter.

> [T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement

---

[8]    *In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, SEC *Amicus Curiae Brief* Regarding Defendants' Motions in Limine to Exclude Evidence of the Restatement and the Restatement Report, filed January 31, 2002.

actions in order . . . to prove the falsity and materiality of the original financial statements, [and] to demonstrate that persons responsible for the original misstatements acted with scienter . . . .

*Sunbeam*, No. 98-8258-Civ.-Middlebanks, SEC *Amicus Curiae* Brief.

210.    The restatements at issue in this case contain at least the following indicators of scienter:

211.    **The type of restatement (misuse of the facts)** – The restatement was due to misuse of facts, not a simple mathematical error or honest misapplication of an accounting standard or oversight.  As alleged herein, Investors Financial knew that the Company had experienced actual prepayment of its SBA securities and that the Company's actual net interest income was materially lower than that recorded in the Company's books.  Despite this knowledge, Investors Financial refused to make the required adjustments to correct the financial statements because it would negatively affect the Company's reported net income and net interest income.

212.    Investors Financial's financial fraud alleged herein is material.  As an initial matter and as noted in the charts at ¶206, Investors Financial's misstatements were clearly material solely from a numerical (quantitative) standpoint.

213.    However, definitions of materiality are not limited to numbers and amounts – there are qualitative factors as well.  SEC Staff Accounting Bulletin ("SAB") Topic 1M,[9] Materiality, summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For

---

[9]        SAB Topic 1M, Materiality, represents the codification of certain Staff Accounting Bulletins, including SAB No. 99, Materiality, as of May 9, 2003.  SAB No. 99 was effective August 12, 1999.

example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.  SAB Topic 1M further states:

> Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> \*        \*        \*
>
> • whether the misstatement masks a change in earnings or other trends
>
> • whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
>
> \*        \*        \*
>
> • whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability . . . .

214.     SAB Topic 1M also states that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

215.     Investors Financial's misstatements, by their own admissions, satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

216.     **The duration over which the improper accounting was perpetrated** – As more fully detailed herein, this is not a case of an honest mistake or oversight during a single quarter or even a single year that was realized and corrected on a good faith basis.  ***Investors Financial restated three and a half years of financial statements*** to correct fraudulent accounting in 2001 through the second quarter of 2004.

217.     **The types of accounting gimmicks employed** – As detailed herein, the improper accounting corrected by this restatement did not occur as a result of good faith differences in accounting judgments, or interpretations of complicated or vague accounting rules.  The accounting gimmicks used by Investors Financial are as old and basic as they come – namely, the improper delaying of expenses to later periods in order to inflate the current period's financial position.  In this

case, Investors Financial violated the basic fundamental rule of applying the level yield method in accounting for accretion of discounts and amortization of premium for its debt securities and applying the appropriate charge or credit to interest income as prescribed by GAAP (FASB Statement No. 91).

218.    The improper accounting was not a result of inexperienced accounting managers who did not understand accounting rules, nor can it be blamed solely on implementation of a new accounting system and poor accounting controls.  To the contrary, Investors Financial's CFO is an experienced Certified Public Accountant and seasoned financial professional with significant auditing and SEC reporting experience.  Spinney has 14 years of experience at KPMG LLP working with financial service clients and as an audit partner in KPMG's Boston, Massachusetts office.  As a result of his "Big Four" accounting and auditing background, he was well versed in evaluating, establishing and auditing securities and internal accounting controls.

## VIII.    INVESTORS FINANCIAL DEFENDANTS' KNOWING OR RECKLESS DISREGARD OF GAAP

219.    The Investors Financial Defendants were only able to satisfy Wall Street expectations and make it appear as if the Company's earnings were characterized by steady growth and low volatility by engaging in the earnings manipulations and numerous accounting improprieties that violated fundamental GAAP precepts complained of herein.

### A.    General GAAP Violations

220.    As set forth in SEC Rule 4-01(a) of Regulation S-X, "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R. §210.4-01(a)(1).  Management is responsible for preparing financial statements that conform to GAAP, as set forth in AU §110.03 of the American Institute of Certified Public Accountants ("AICPA") Professional Standards:

The financial statements are management's responsibility. . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with [GAAP] is an implicit and integral part of management's responsibility. . . .

221.   The Individual Defendants, as senior management, were also responsible for implementing and maintaining sound accounting policies and appropriate internal controls and assuring that staffing levels and experience in financial accounting were sufficient to ensure that significant errors were prevented or detected at an early stage. AICPA Professional Standards, AU §110.02 provides as follows:

Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management  The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. The independent auditor may make suggestions about the form or content of the financial statements or draft them, in whole or in part, based on information from management during the performance of the audit. However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them.

222.   The Investors Financial Defendants were well aware of these responsibilities. In fact, Investors Financial's Form 10-K for fiscal year ended December 31, 2004, contained the following acknowledgement and assurance in a "Report of Management to the Board of Directors and Stockholders" signed by defendants Sheehan and Spinney:

The management of Investors Financial Services Corp. and its subsidiaries, ("the Company") is responsible for the preparation, integrity, and fair presentation of its published financial statements and all other information presented in the Consolidated Financial Statements of the Company contained in this Report. The

financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America and, as such, include amounts based on informed judgments and estimates made by management.

*          *          *

Management is responsible for establishing and maintaining effective internal control over financial reporting, including safeguarding of assets, for financial presentations in conformity with accounting principles generally accepted in the United States of America. The internal control contains monitoring mechanisms, and actions are taken to correct deficiencies identified. There are inherent limitations in the effectiveness of any internal control, including the possibility of human error and the circumvention or overriding of controls. Accordingly, even effective internal control can provide only reasonable assurance with respect to financial statement preparation. Further, because of changes in conditions, the effectiveness of internal control may vary over time.

Management has made a comprehensive review, evaluation and assessment of the Company's internal control over financial reporting, including safeguarding of assets, for financial presentations in conformity with accounting principles generally accepted in the United States of America as of December 31, 2004. This assessment was based on criteria for effective internal control over financial reporting, including safeguarding of assets, described in "Internal Control–Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has concluded that the Company maintained effective internal control over financial reporting, including safeguarding of assets, presented in conformity with accounting principles generally accepted in the United States of America as of December 31, 2004.

The Audit Committee of the Board of Directors is comprised entirely of outside directors who are independent of the Company's management; it includes members with banking or related management experience, has access to its own outside counsel, and does not include representatives of any large customers of the institution. The Audit Committee is responsible for recommending to the Board of Directors the selection of independent auditors. It meets periodically with management, the independent auditors, and the internal auditors to ensure that they are carrying out their responsibilities. The Committee is also responsible for performing an oversight role by reviewing and monitoring the financial, accounting and auditing procedures of the Company in addition to reviewing the Company's financial reports. The independent auditors and the internal auditors have full and free access to the Audit Committee, with or without the presence of management, to discuss the adequacy of internal control over financial reporting and any other matters which they believe should be brought to the attention of the Audit Committee.

223.     Additionally, in preparing financial statements, senior management was required to take into consideration the fundamental objectives and concepts upon which GAAP are based, which include:

(a)     The principle that "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment . . . decisions [and that] information should be comprehensible to those who have a reasonable understanding of business and economic activities."  (FASB Statement of Financial Accounting Concepts No. 1, ¶34);

(b)     The principle of materiality, which provides that the "omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." (FASB Statement of Financial Accounting Concepts No. 2, ¶132);

(c)     The principle that "[f]inancial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. . . .  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general."  (FASB Statement of Financial Accounting Concepts No. 1, ¶50);

(d)     The principle that "[f]inancial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations . . . about future enterprise performance, those

- 107 -

expectations are commonly based at least partly on evaluations of past enterprise performance."
(FASB Statement of Financial Accounting Concepts No. 1, ¶42);

       (e)    The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting.  (FASB Statement of Financial Accounting Concepts No. 2, ¶¶58-59);

       (f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions.  (FASB Statement of Financial Accounting Concepts No. 2, ¶80); and

       (g)    The principle that conservatism be used as a "prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered."  "The best way to avoid injury to investors . . . is to try to ensure that what is reported represents what it purports to represent."  (FASB Statement of Financial Accounting Concepts No. 2, ¶¶95, 97).

       224.    In restating IFIN's financial results for 2001 through 2203 and the first and second quarter of 2004, the Company has admitted that material errors existed at the time the financial statements were prepared and thus it failed to provide a fair presentation of its financial results during the Class Period.  *See* FASB Statement No. 16 and APB Opinion No. 20 (restatements of prior periods are required for material accounting errors that existed at the time financial statements were originally issued).  Investors Financial itself admitted that Investors Financial Defendants violated GAAP.  In its Form 8-K filed on October 21, 2004, Investors Financial reported that:

> [T]he Audit Committee, in consultation with the Company's management, determined to amend its Annual Report on Form 10-K for the fiscal year ended December 31, 2003 and the subsequent Quarterly Reports on Form 10-Q for the quarters ended March 31, 2004 and June 30, 2004 to restate the financial statements (the "relevant financial statements") and related information contained therein, ***and, as such, that the financial statements of the Company and the related auditors'***

*report for the periods reported therein should no longer be relied upon*. The Company's restatement arises from the application of Statement of Financial Accounting Standards No. 91 ("FAS 91") (Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases).

225. However, as noted above, plaintiffs allege that despite Investors Financial's restatement, severe internal flaws in the Company's internal controls and serious violations of GAAP, nevertheless, persisted.

**B.    Specific GAAP Violations**

**1.    Defendants Improperly Recorded Mortgage Backed Securities and SBA Bonds as Held to Maturity and Mislead the Market As to the Risk of the Investments**

226. GAAP, specifically FAS 115, FAS 140, and EITF 99-20, provide clear guidance as to how Investors Financial should have classified their various investments on their balance sheet during the class period. The classifications of "Trading," "Available-for-Sale," and "Held-to-Maturity" when applied to various investments, including asset backed securities and federal agency bonds, are important disclosures in a Company's financial statements and provide investors valuable information about the risk level inherent in a Company's investment portfolio. By classifying their mortgage backed securities and SBA bonds as "Held-to-Maturity", Investors Financial Defendants' materially falsified their financial statements in violation of GAAP and misled investors throughout the Class Period.

227. GAAP, as set forth in FASB Statement No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," paragraph 14, requires that financial assets subject to prepayment that "*can contractually be prepaid or otherwise settled in such a way that the holder would not recover substantially all of its recorded investment, except for instruments that are within the scope of Statement 133, shall be subsequently measured like investments in debt securities classified as available-for-sale or trading under Statement 115, as*

*amended.*"    Paragraph 362 of FASB Statement No. 140 amends FASB Statement No. 115,

"Accounting for Certain Investments in Debt and Equity Securities," paragraph 7, to include the

sentence contained in brackets, which now reads:

Held-to-Maturity Securities

Investments in debt securities shall be classified as held-to-maturity and measured at amortized cost in the statement of financial position only if the reporting enterprise has the positive intent and ability to hold those securities to maturity. [A security may not be classified as held-to-maturity if that security can contractually be prepaid or otherwise settled in such a way that the holder of the security would not recover substantially all of its recorded investment.]

228.    Thus, if a security can "contractually be prepaid" it cannot be classified as held-to-

maturity and must be classified as available-for-sale or Trading. See, e.g., Ex. A at 3.  Here, as stated

above, Investors Financial's Federal agency securities (SBA bonds) and much of its mortgage

backed securities portfolio could contractually be prepaid Thus, the Investors Financial Defendants

classification of the Company's Federal agency securities (SBA securities) and certain of its MBS as

held-to-maturity was materially false and misleading in all financial statements issued throughout the

class period.

229.    The Company's false classification of its Federal agency securities (SBA securities)

and the majority of its mortgage backed securities as held-to-maturity allowed the Investors

Financial Defendants to hold securities with greater risk than what was represented to the market.

This, in turn, allowed the Investors Financial Defendants to achieve higher earnings than what would

normally be expected for the relatively safe and conservative investment portfolio they reported to

the public.  (In general, securities classified as held-to-maturity indicate the lowest risks among

investments and primarily consist of conservative investments such as US Treasuries) For the

Investors Financial Defendants, as long as the risk (prepayments) did not occur, IFIN was able to

consistently report net interest earnings growth and avoid informing the market about the true nature of their investment portfolio.

230.     Further GAAP, specifically EITF Issue No. 99-20, "Recognition of Interest Income and Impairment on Purchased Beneficial Interests and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets," establishes that if certain securities, including asset-backed securities such as the Company's mortgage backed securities and SBA securities, "*can contractually be prepaid or otherwise settled in such a way that the holder would not recover substantially all of its recorded investment, [they] shall be subsequently measured* like investments in debt securities classified as available-for-sale or trading under Statement 115, as amended (paragraph 362)."

231.     In fact, the Investors Financial Defendants' deliberate use of the "prospective method", under FAS 91 as described below, to account for the amortization and accretion of its "securities backed by mortgages and other loans" is inconsistent with their classification of these same securities as held to maturity (rather than available for sale or trading). Indeed, the requirement for defendants' use of the prospective method of accounting (whether the securities can contractually be prepaid) is the same requirement that prevents defendants from classifying these securities as held to maturity and is an admission that defendants knew that the Company's "securities backed by mortgages and other loans" were falsely classified.

> **2.     Defendants Improperly used the "Prospective" Method in Accounting for Mortgage Backed Securities Portfolio in Violation of FAS 91**

232.     Throughout the class period, the Company incorrectly used the "prospective" method of accounting for the amortization premiums and the recognition of interest income on its securities backed by mortgages and other loans in violation of FASB Statement No. 91. Investors Financial Defendants clearly should have known the "retrospective" method was correct as GAAP clearly

states the "prospective" method should only be used for the riskiest class of securities and in cases where the holder may lose substantially all of their investment. Notably, the Company's auditor Deloitte notes that: "*[a]ll fixed rate MBSs and adjustable rate MBSs are required to follow the retrospective method*. *See* Ex. A.

233. By violating GAAP, specifically FAS 91, the Investors Financial Defendants materially falsified their financial statements throughout the class period and has ultimately admitted, through the restatement of financial results for 2001 through 2003 and the first and second quarter of 2004, that material errors existed at the time the financial statements were prepared See FASB Statement No. 16 and APB Opinion No. 20 (restatements of prior periods are required for material accounting errors that existed at the time financial statements were originally issued). Through this restatement, Investors Financial itself admitted that Investors Financial Defendants violated GAAP. In its Form 8-K filed on October 21, 2004, Investors Financial reported that:

> [T]he Audit Committee, in consultation with the Company's management, determined to amend its Annual Report on Form 10-K for the fiscal year ended December 31, 2003 and the subsequent Quarterly Reports on Form 10-Q for the quarters ended March 31, 2004 and June 30, 2004 to restate the financial statements (the "relevant financial statements") and related information contained therein, *and, as such, that the financial statements of the Company and the related auditors' report for the periods reported therein should no longer be relied upon*. The Company's restatement arises from the application of Statement of Financial Accounting Standards No. 91 ("FAS 91") (Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases).

234. In December 1986, FASB Statement No. 91, "Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases" was issued to establish consistent accounting for lending activities. The scope of FASB Standard No. 91 includes premiums and discounts, and requires that interest income be recognized based on a constant "level-yield" over the life of the investment. This requires that a company estimates a constant effective yield and makes necessary adjustments each time a company reports its financial

results.  In determining an estimate of the appropriate adjustment of yield, a company would need to consider the anticipated rate of prepayment for the associated loans and securities to the extent they are subject to prepayment (The Company's MBS and SBA securities were subject to prepayment).

235.    In addition, if a difference arises between the prepayments anticipated and the actual prepayments experienced, the effective yield must also reflect the actual payments to date, and a new estimate of anticipated future payments needs to be made. The difference between the revised estimate of amortization and the actual recorded amortization is required to be booked as a "catch-up" adjustment to interest income immediately.  The look-back to actual prepayment history, comparing that prepayment history as well as expected future prepayments to the original prepayment estimates, and the adjustment of a yield through "catch-up adjustments to create a level yield over the life of the investment security are the basic principles of what is referred to as the "retrospective" method. The retrospective method was required for all mortgage backed securities held by the Company. ***FASB Statement No. 91 also requires the disclosure of anticipated prepayments and significant assumptions underlying the prepayment estimates***.

236.    The key phrase in the guidance for FASB Statement No. 91 is the term "constant effective yield" or level-yield".  This means, for instance, assuming there are no changes in the estimated life of an instrument, that the effective yield on an investment would be the same for each reporting period in the life of the instrument.  The guidance on this process is also provided by FASB Statement No. 91, paragraph 19, as follows:

> Except as stated in the following sentence, the calculation of the constant effective yield necessary to apply the interest method shall use the payment terms required by the loan contract, and prepayments of principal shall not be anticipated to shorten the loan term. If the enterprise holds a large number of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated, the enterprise may consider estimates of future principal prepayments in the calculation of the constant effective yield necessary to apply the interest method. If the enterprise anticipates prepayments in applying the interest

method and a difference arises between the prepayments anticipated and actual prepayments received, the enterprise shall recalculate the effective yield to reflect actual payments to date and anticipated future payments. ***The net investment in the loans shall be adjusted to the amount that would have existed had the new effective yield been applied since the acquisition of the loans. The investment in the loans shall be adjusted to the new balance with a corresponding charge or credit to interest income***. Enterprises that anticipate prepayments shall disclose that policy and the significant assumptions underlying the prepayment estimates.

237.     Thus, as time passes, new estimates of the estimated life of an instrument can be developed, and the amount of amortization needs to be changed both retrospectively (that is what is meant by the guidance above which states in part, "adjusted to the amount that would have existed had the new effective yield been applied since the acquisition of the loans") and prospectively (by changing the rate of amortization going forward).  Meanwhile, the "prospective" method which was incorrectly used by the Investors Financial Defendants only incorporates prepayments as they occur with a corresponding adjustment to the effective yield going forward. This results in a decreasing yield curve as the portfolio matures and is the opposite of the primary principles of FAS 91 which calls for a "level yield" or "constant effective yield."   In addition, because of the inadequate disclosures given by the Investors Financial Defendants, investors were never made aware that this method was being used and more importantly that actual and expected prepayment rates were varying significantly from original prepayment estimates. The "retrospective" method includes taking "catch-up" adjustments that signal to investors what the difference is between the Company's original estimates of prepayments compared to what the actual prepayment experience is. This allows for increased transparency regarding prepayments and a "level-yield" over the life of the portfolio.  Using the prospective method allowed the Company to avoid disclosing the reality of their prepayment experience and simply defer the negative affects of these prepayments into the future through the realization of ever-decreasing yields on their securities.

238.    Further, if the Company had used the correct method, the "retrospective" method, they would have had to take a large "catch-up" adjustment in 2001- an approximately $10.9M charge to interest income- to re-adjust the yield on their MBS portfolio to be in line with actual prepayment experience.  This would have signaled to investors the risks inherent in the investment portfolio and would have been factored into analyst's growth models and earnings expectations which would never have allowed for the quarter after quarter of record growth the Company reported.  Instead, by using the "prospective" method- the Company never made catch-up adjustments and instead was faced with decreasing yields going forward rather than the correct method which calls for catch-up adjustments each period and a "level-yield" over the life of the security.  When the decreases in yield continued to eat away at the Company's net interest income, the Investors Financial Defendants finally made the decision to restate their financial results- with their main motivation being increased net interest income in the future by taking previously reported net interest income and spreading it out over future periods in accordance with the retrospective method.  This is evidenced by the Company's revised guidance upon announcing the restatement in which the Investors Financial Defendants stated that quarterly guidance was being increased during the then current quarter due to increased income "recognition" under the new method.   Thus, the Investors Financial Defendants had intentionally used the incorrect method of accounting throughout the class period to avoid significant "catch-up" adjustments and the related disclosures regarding revised estimates of prepayments; then, when they needed a pickup to interest income, they announced the restatement and shifted approximately $6 million (net decrease to previously reported net interest income announced at the time of the restatement) from prior periods to future periods to be recognized as part of the level-yield associated with the retrospective method under FAS 91.

239.    FASB Statement No. 91, paragraph 18(c) requires that "[i]f the loan's stated interest rate varies based on future changes in an independent factor," such as the prime rate for the Company's SBA securities, "the calculation of the constant effective yield necessary to recognize fees and costs shall be based either on the factor (the index or rate) that is in effect at the inception of the loan or on the factor as it changes over the life of the loan."  Exhibit A notes that "[b]oth are accounted for using the retrospective method."

240.    In large securities portfolios, such as Investors Financial's, the accounting for amortization could lead to significant volatility for two reasons:

- FASB Statement No. 91 requires that adjustments should be recorded into income when the estimated amortization period changes. This is significant because the amount of such adjustment is a cumulative life-to-date amount.

- The estimated life of a mortgage loan, MBS, or SBA security fluctuates constantly due to changes in interest rates, changes in forecasts of prepayments and other factors.

241.    In a hypothetical example of the application of FASB Statement No. 91, a $100,000.00 loan is purchased at a 2% discount.  The discount of $2,000.00 would be recorded as additional interest income over the estimated life of the loan with an offsetting increase to the recorded amount of the loan.

242.    Table 1, of the example below, shows how the constant effective yield method of amortization would translate into amortization of the discount over the originally estimated life of the loan.

243.    Table 2, of the example, is based on an assumption that at the end of the fifth year, the estimated life of the instrument is shortened from ten years to seven years.  This table shows what the amortization would have been if the estimated life of the instrument had originally been estimated to be seven years.  The difference between the two "Inception to-date" amounts of amortization at the end of the fifth year is the amount of income to be recognized ($1,587.00-

$1,400.00 = $187.00). In addition, the future amortization periods in Table 2 show that there are only two more years of amortization to be recorded, and that the amounts to be recorded (in years 6 and 7) have been adjusted accordingly.

**Table 1**

| Orig. Est. Life | Discount Amortization on | | Effective Yield |
|---|---|---|---|
| 1 | $333 | | 6.4618% |
| 2 | $308 | | 6.4618% |
| 3 | $282 | Inception | 6.4618% |
| 4 | $254 | to-date | 6.4618% |
| 5 | $224 | $1,400 | 6.4618% |
| 6 | $192 | | 6.4618% |
| 7 | $158 | | 6.4618% |
| 8 | $122 | | 6.4618% |
| 9 | $84 | | 6.4618% |
| 10 | $43 | | 6.4618% |

**Table 2**

| Orig. Est. Life | Discount Amortization on | | Effective Yield | |
|---|---|---|---|---|
| 1 | $373 | | 6.5030% | |
| 2 | $347 | | 6.5030% | Inception to-date |
| 3 | $319 | Inception | 6.5030% | adjustment |
| 4 | $290 | to-date | 6.5030% | $187 |
| 5 | $258 | $1,587 | 6.5030% | |
| 6 | $225 | | 6.5030% | |
| 7 | $189 | | 6.5030% | |

244. The $187.00 in this example is calculated as the difference between the cumulative life-to-date amount of interest amortization of $1,400.00 (what was already recorded based upon a previous estimated life of ten years) and what the amortization should be: $1,587.00 (based upon the new estimated life of seven years).

245. As mentioned previously, FASB Statement No. 91 requires that the amount of amortization income or expense for prior periods caused by a change in the set of assumptions be recorded into income immediately (in this example $187.00 needs to be recorded at the end of year 5).

- 117 -

246.    The information in the tables above is used to chart the effect that this would have on the discount amortization.

247.    As the graph above shows, the recording of the $187.00 of retrospective amortization in the year that the estimated life is shortened from ten years to seven (in this case year 5) significantly increases the volatility of the amount of amortization.  Moreover, regardless of whether the security is purchased at a discount or at a premium, the same logic applies in that FASB Statement No. 91 requires that the amount of amortization income or expense for prior periods caused by a change in the set of assumptions be recorded into income immediately.

### 3.    Inadequate Disclosures-Defendants Material Omissions Concerning The Anticipated Prepayments and Significant Assumption Underlying the Prepayment Estimates

248.    Even under the (improper) prospective method, the Defendants violated GAAP by failing to comply with FASB Statement No. 91 in failing to disclose of anticipated prepayments and significant assumptions underlying the prepayment estimates.  The undisclosed adverse information, as it relates to prepayments and more generally the deterioration of the MBS and SBA portfolios, concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected

- 118 -

by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed. Further, the inadequate disclosures violated GAAP, as follows:

(i) Specifically, AICPA Statement of Position 94-G: Disclosure of Certain Significant Risks and Uncertainties states, in relevant part:

.02 The disclosures focus primarily on risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term or the near-term functioning of the reporting entity.

\*       \*       \*

.08 The Accounting Standards Executive Committee (AcSEC) of the AICPA has concluded that reporting entities should make disclosures in their financial statements beyond those now required or generally made in financial statements about the risks and uncertainties existing as of the date of those statements in the following areas:

a.  Nature of operations

b.  Use of estimates in the preparation of financial statements

\*       \*       \*

.11 Financial statements should include an explanation that the preparation of financial statements in conformity with GAAP requires the use of management's estimates.

\*       \*       \*

.13 Disclosure regarding an estimate should be made when known information available prior to issuance of the financial statements indicates that both of the following criteria are met:

a.  It is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future confirming events.

b.  The effect of the change would be material to the financial statements.

\*       \*       \*

Current Vulnerability Due to Certain Concentrations

.20 Vulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk though diversification. Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance.

.21 Financial statements should disclose the concentrations described in paragraph .22 if, based on information known to management prior to issuance of the financial statements, all of the following criteria are met:

a.  The concentration exists at the date of the financial statements.

b.  The concentration makes the enterprise vulnerable to the risk of a near-term severe impact.

c.  It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

.22 Concentrations, including known group concentrations, described below required disclosure if they meet the criteria of paragraph .21. (Group concentrations exist if a number of counterparties or items that have similar of risk.)  Some concentrations may fall into more than one category.

*        *        *

d.  ***Concentrations in the market*** or geographic area in which an entity conducts its operation.  ***The potential for the severe impact can result, for example, from negative effects of the economic and political forces within the market*** or geographic area.

(ii) the fundamental principle of financial reporting under GAAP is that ***useful*** information be provided to present and potential investors and creditors and other users. FASCON No. 1, *Objectives of Financial Reporting by Business Enterprises*, ("FASCON 1").  The information should be comprehensible to those who have a reasonable understanding of business and economic activities and are willing to study the information with reasonable diligence.  FASCON 1 also provides that financial statements should include information about the Company's economic resources, its obligations and the events that would change any of those resources or any claims to those resources. FASCON 1, 40.

(iii) the fundamental principle that: Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. FASCON 1, 42.

Further, reliability is also a primary quality that makes accounting information useful for decision making.  To be reliable, information must have representational faithfulness and it must be verifiable and neutral. FASCON 2, 58-59.  As further defined by FASCON 2, reliability is:

"The quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent."

(iv) In addition, FASCON 2, 79 states that the fundamental principle of completeness requires that nothing material is left out of the information that may be necessary to ensure that the financial statements validly represent underlying events and conditions.

(v) Omission of material information which FASB Statement of Concepts defines as: The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

(vi) FASCON 5 which specifically states, in relevant part: Information disclosed in notes . . . amplifies or explains information recognized in the financial statements. That sort of information is essential to understanding the information recognized in the financial statements and has long been viewed as an integral part of financial statements prepared in accordance with generally accepted accounting principles. 7(a).

(vii) SEC Regulation S-K states that the management's discussion and analysis section of a company's filing with the SEC shall:

(a) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of income from continuing operations and, in each case, indicate the extent to which income was affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(b) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed. 17 C.F.R. §229.303(a)(3).

(viii) EC Regulation S-K also states that "management's discussion and analysis section shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

(ix) APB No. 22 ("APB 22"), Disclosure of Accounting Policies, 8, states:

The Board concludes that information about the accounting policies adopted by a reporting entity is essential for financial statement users. When financial statements are issued purporting to present fairly financial position, changes in financial position, and results of operations in accordance with generally accepted accounting principles, a description of all significant accounting policies of the reporting entity should be included as an integral part of the financial statements.

## C.    Additional Scienter Allegations as to the Investors Financial Defendants

### 1.    Investors Financial Defendants' Choice of Accounting Method Shows Actual Knowledge

249.    Investors Financial's accounting method and how its debt securities purchased at a premium or discount are amortized or accreted into income is a "Significant Accounting Policy" as admitted in the Company's SEC filings. For example, in the Company's December 31, 2002 Form 10-K, the Investors Financial Defendants state:

**Summary of Significant Accounting Policies**

Revenue Recognition

- Interest Income – The Company recognizes and accrues income on its interest-earning assets as earned. Amortization and accretion of debt securities purchased at a premium or discount are recognized over the life of the securities utilizing a method that approximates the yield to maturity. Income on loans is recognized utilizing the interest method.

*        *        *

Securities

*        *        *

The specific identification method is used to determine gains and losses on sales of securities. Amortization and accretion of debt securities purchased at a premium or discount are recognized over the life of the securities and are reported as a component of interest income.

250.    Thus, the accounting method chosen (the prospective method under EITF 99-20, the retrospective method or the contractual method under FASB Statement No. 91) by the Investors

- 122 -

Financial Defendants dictates how much or how little interest income is recognized and reported in the Company's quarterly and annual financial statements and demonstrates the Investors Financial Defendants' actual knowledge. Here, in the Company's SEC filings, signed by defendants Sheehan and Spinney, the Investors Financial Defendants reported the following interest income amounts:

|    | 2001 | 2002 | 2003 | 2004 | 2005 |
|----|------|------|------|------|------|
| 1Q | 57,021 | 57,560 | 59,485 | 69,890 | 96,132 |
| 2Q | 63,553 | 61,456 | 60,109 | 70,177 | 105,462 |
| 3Q | 64,200 | 62,378 | 57,401 | 79,464 |  |
| 4Q | 60,106 | 61,939 | 65,165 | 88,364 |  |

251.    As stated above, the Investors Financial Defendants' deliberate use of the prospective method which requires that securities can contractually be prepaid or otherwise settled in such a way that the holder would not recover substantially all its recorded investment, is inconsistent with their classification of these same securities as HTM, as the same standard is used and prevents these securities from being classified as held to maturity. Thus, the Investors Financial Defendants knew the Company's "securities backed by mortgages and other loans" were high-risk securities and falsely classified as HTM, rather than AFS or Trading. Such false classification allowed the Investors Financial Defendants to take on extra risk without having to report the risk in their financial statements by not reporting unrealized gains and losses in other comprehensive income or earnings for AFS and Trading, respectively.

252.    Here, the Investors Financial Defendants also deliberately omitted the exact accounting method from their Summary of Significant Accounting Policies. Indeed, prior to the Company's December 31, 2004 Form 10-K where the Investors Financial Defendants stated that "[t]he Company applies Financial Accounting Standard No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases* ("FAS 91") for the amortization of premiums and accretion of discounts" under "Summary of Significant Accounting Policies," the precise method of accounting for amortization of premiums and accretion

of discounts was never disclosed.  The Investors Financial Defendants stated only that "[t]he Company recognizes and accrues income on its interest-earning assets as earned. . . . utilizing a method that approximates the yield to maturity."  December 31, 2002 Form 10-K.

253.     Despite the Investors Financial Defendants restating the Company's financial results and switching from the prospective method to FASB Statement No. 91 and the retrospective method, the Investors Financial Defendants *still* did not follow a constant effective yield as required by FASB Statement No. 91.  Indeed, it was not until post-Class Period did the Investors Financial Defendants admit that a "constant effective yield" and its prepayment policy should have been followed and disclosed in its SEC filings.[10]  In the Company's June 30, 2005 Form 10-Q and September 30, 2005 Form 10-Q, the Company now provided limited disclosure of the Company's prepayment policy:

> Securities – The specific identification method is used to determine gains and losses on sales of securities.  *Amortization and accretion of debt securities purchased at a premium or discount are amortized or accreted into income using a method which approximates the constant effective yield.*[11]  The Company applies Financial Accounting Standard No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases ("FAS 91") for the amortization of premiums and accretion of discounts.  *Prepayments are anticipated using three-month actual prepayment experience for securities that represent holdings of large numbers of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated.  Premiums and discounts on securities not meeting these criteria are amortized or accreted over their contractual term using the constant effective yield.  Actual prepayment experience for all investment securities is*

---

[10]     FASB Statement No. 91, paragraph 19, requires that "[e]nterprises that anticipate prepayments shall disclose that policy and the significant assumptions underlying the prepayment estimates."  Throughout the Class Period, Investors Financial failed to disclose its prepayment estimates, policy and assumptions underlying its prepayment estimates in its SEC filings until the June 30, 2005 Form 10-Q.

[11]     Despite the restatement to the retrospective method which requires a "constant effective yield" under FASB Statement No. 91, the Investors Financial's December 31, 2003 Amended Form 10-K/A stated: "Amortization and accretion of debt securities purchased at a premium or discount are amortized or accreted into income by a method which *approximates the effective yield*."

*reviewed monthly and the timing of the amortization and accretion is adjusted accordingly.*

### 2.    Investors Financial Knew Its Internal Accounting Controls Were Inadequate

254.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must:

> (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer and (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit the preparation of financial statements in conformity with [GAAP].

15 U.S.C. §78m.

255.    These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.  *SEC v. World-Wide Coin Investments, Ltd.*, 567 F. Supp. 724, 750 (N.D. Ga. 1983).

256.    In addition to the allegations above and the indicators of scienter herein, defendants knew or were, at the very least, reckless in not knowing that their system of internal accounting controls governing the classification of securities and accretion of discounts and amortization of premium on their investment securities were inadequate.[12]

257.    Investors Financial violated §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning accretion of discounts and amortization of premium on its investment

---

[12]    AICPA Professional Standards, AU §319.06, *The Effect of Information Technology on the Auditor's Consideration of Internal Control in a Financial Statement Audit*, defines internal controls as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."

securities, and its net interest income as reported during the Class Period. By the Company's own admission in Item 9A of the December 31, 2003 Form 10-K/A, filed on November 15, 2004, the Company was required to change internal controls over financial reporting as it pertained to the application of FASB Statement No. 91. Specifically, by improperly using the prospective method, the Company avoided recording the amortization of premiums (expenses) in current periods, thereby pushing this expense to future periods. Investors Financial's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods, from 2001 through the second quarter of 2004. Accordingly, Investors Financial violated §13(b)(2)(A) of the Exchange Act.

258.     In addition, Investors Financial violated §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Investors Financial failed to ensure that proper review and checks were in place to ensure that it was recording and reporting the amortization of premiums and accretion of discounts on its investment securities. It failed to ensure that transactions were reported during the Class Period in accordance with its own policies and with GAAP.

259.     Investors Financial's failure to strengthen its known inadequate internal controls rendered its Class Period financial reporting inherently unreliable and contributed to the Company's inability to prepare financial statements that complied with GAAP. Nonetheless, as detailed above, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the known existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP when, as alleged herein, it knew the financial statements during the Class Period were not in compliance with GAAP.

### 3.    Investors Financial Failed to Make Required Disclosures

260.    The SEC requires that, as to annual and interim financial statements filed with the SEC, registrants include a management's discussion and analysis section which provides information with respect to the results of operations and "also shall provide[s] such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations." *See* Regulation S-K, 17 C.F.R. §229.303(a).  Regulation S-K states that, as to annual results, the management's discussion and analysis section shall:

(a)    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(b)    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials, price increases or inventory adjustments) the change in the relationship shall be disclosed.

261.    The SEC also requires that interim period financial statements filed with the SEC include a management's discussion and analysis of the financial condition and results of operations so as to enable the reader to assess material changes in financial condition and results of operations.  Regulation S-K, 17 C.F.R. §229.303(b) states that: "The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item [as set

forth in above, except that the impact of inflation and changing prices on operations for interim periods need not be addressed."

262.    During the Class Period, Investors Financial failed to truthfully disclose its accounting policies and practices related its accounting for premiums and discounts as required by FASB Statement No. 91.

263.    Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements.  *See* FASB Statement of Financial Accounting Concepts No. 1, ¶7.  For this reason, in addition to Investors Financial's failure to make the required disclosures in its financial statements and in its SEC filings, Investors Financial also shirked its duty to make such disclosures in its conference calls, its press releases, its quarterly financial reports and its annual reports.

### 4.    Investors Financial Certified False and Misleading Financial Results

264.    Defendants Sheehan and Spinney knowingly certified false and misleading financial statements.  Sheehan and Spinney certified the following financial statements during the Class Period:

| SCHEDULE OF CERTIFIED FINANCIAL STATEMENTS | | | | |
|---|---|---|---|---|
| Financial Statement Filed on Form | Filing Period | Filing Date | Signed/Certified by CEO | Signed/Certified by CFO |
| Form 10-Q | 09/30/2002 | 11/14/2002 | Sheehan | Spinney |
| Form 10-K | 12/31/2002 | 02/27/2003 | Sheehan | Spinney |
| Form 10-Q | 03/31/2003 | 05/14/2003 | Sheehan | Spinney |
| Form 10-Q | 06/30/2003 | 08/11/2003 | Sheehan | Spinney |
| Form 10-Q | 09/30/2003 | 11/12/2003 | Sheehan | Spinney |
| Form 10-K | 12/31/2003 | 02/20/2004 | Sheehan | Spinney |
| Form 10-Q | 03/31/2004 | 05/07/2004 | Sheehan | Spinney |
| Form 10-Q | 06/30/2004 | 08/06/2004 | Sheehan | Spinney |
| Form 10-K/A | 12/31/2003 | 11/15/2004 | Sheehan | Spinney |
| Form 10-Q | 09/30/2004 | 11/15/2004 | Sheehan | Spinney |
| Form 10-Q/A | 03/31/2004 | 11/15/2004 | Sheehan | Spinney |
| Form 10-Q/A | 06/30/2004 | 11/15/2004 | Sheehan | Spinney |
| *Form 10-K[13] | 12/31/2004 | 02/28/2005 | Sheehan | Spinney |
| Form 10-Q | 03/31/2005 | 05/09/2005 | Sheehan | Spinney |

265.    These financial statements were not in accordance with GAAP and SEC rules. Section 302 of the Sarbanes-Oxley Act of 2002 and SEC Rules 13A-14(a) and 15D-14(a) of the Exchange Act require Sheehan as CEO and Spinney as CFO to certify to the SEC and investors both the fairness of the financial information in each quarterly and annual report.  Sheehan and Spinney were required to certify that the financial statements and other financial information included in these reports were fairly presented in all material respects.  Sheehan and Spinney also stated that the reports did not contain any untrue statement of material fact or omit to state a material fact.  In addition, Sheehan and Spinney stated that Investors Financial had established and maintained disclosure controls and procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized and reported within the specified time periods.

---

[13]    The SEC Final Rule: Management's Reports on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports [RELEASE NOS. 33-8238; 34-47986; IC-26068; File Nos. S7-40-02; S7-06-03] ("Final Rule"), required Investors Financial to include in its annual report for December 31, 2004 a report by management of the Company's internal control over financial reporting.

266.    Sheehan and Spinney knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules.  In accordance with §906 of the Sarbanes Oxley Act of 2002 and 18 U.S.C. §1350, Sheehan and Spinney were required to certify each periodic report that included financial statements.  Their signed certification falsely stated that: (i) the report fully complied with the requirements of §§13(a) or 15(d) of the Exchange Act; and (ii) the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of Investors Financial.

267.    On June 5, 2003, the SEC issued its Final Rule.  Shortly thereafter, on August 11, 2003, Investors Financial filed its June 30, 2003 Form 10-Q and Sarbanes-Oxley 302 certifications regarding managements' responsibility for establishing and maintaining internal control over financial reporting.  There, defendants Sheehan and Spinney stated: "***Paragraph omitted in accordance with SEC transition instruction contained in SEC Release 34-47986***."  Thus, at the very least, defendants Sheehan and Spinney were on notice as of August 11, 2003 of possible flaws in the Company's internal control over financial reporting.[14]

268.    Specifically, the SEC Final Rule required Investors Financial to include in its annual report for December 31, 2004, a report by management of the Company's internal control over financial reporting.  The SEC Final Rule laid out the requirements and stated that the internal report must include:

> [A] statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company; management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year; a statement identifying the framework used by management to evaluate the effectiveness of the

---

[14]    The Investors Financial Defendants' drastic increase to their bonuses during this time is addressed in §XA.

company's internal control over financial reporting; and a statement that the registered public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's assessment of the company's internal control over financial reporting.

269.    The SEC Final Rule also required:

Under the new rules, a company is required to file the registered public accounting firm's attestation report as part of the annual report. Furthermore, we are adding a requirement that management evaluate any change in the company's internal control over financial reporting that occurred during a fiscal quarter that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting. Finally, we are adopting amendments to our rules and forms under the Securities Exchange Act of 1934 and the Investment Company Act of 1940 to revise the Section 302 certification requirements and to require issuers to provide the certifications required by Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 as exhibits to certain periodic reports.

270.    In addition, the SEC Final Rule required that Investors Financial's assessment of the effectiveness of the Company's internal control over financial reporting include "any 'material weaknesses' in the company's internal control over financial reporting identified by management" and Investors Financial "is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting." The SEC Final Rule stated that:

The terms "material weakness" and "significant deficiency" both represent deficiencies in the design or operation of internal control that could adversely affect a company's ability to record, process, summarize and report financial data consistent with the assertions of management in the company's financial statements, with a "material weakness" constituting a greater deficiency than a "significant deficiency." *Because of this relationship, it is our judgment that an aggregation of significant deficiencies could constitute a material weakness in a company's internal control over financial reporting*.

271.    On the dates noted in the Schedule of Certified Financial Statements at ¶264 above, Sheehan and Spinney signed and filed with the SEC certifications under Rule 13a-14(a) and Rule 15(d)-14(a) of the Exchange Act and §906 of the Sarbanes Oxley Act of 2002 attesting to the accuracy and truthfulness of the corresponding Form 10-Q and Form 10-K for Investors Financial.

At the time Sheehan and Spinney signed these certifications, they knew or recklessly disregarded that the certifications were false for the reasons set forth in ¶¶219-248.

## IX.    POST CLASS PERIOD EVENTS

272.    On August 9, 2005, Investors Financial filed its Form 10-Q for its second quarter ending June 30, 2005 with the SEC.  The Form 10-Q was signed by defendants Sheehan and Spinney and for the first time disclosed under the heading entitled "Market Risk" that the Company had experienced payments on its SBA securities portfolio.  The Form 10-Q stated, in part:

> Prepayment speeds for mortgage-backed securities increased during the second quarter of 2005 due to increased refinancing activity driven by declining mortgage rates.  We expect recent prepayment experience to continue subject to future interest rate movements.  ***Prepayment experience for Federal agency securities (primarily SBA guaranteed loan pools) also increased over this period as the weighted average life of the securities shortened.  We expect the combination of heightened prepayment experience and, more significantly, reduced reinvestment opportunities to continue to pressure our net interest income for the remainder of 2005.***

273.    The Form 10-Q also for the first time disclosed the Company's prepayment policy, as required by FASB Statement No. 91.  The Form 10-Q stated, in part:

> Securities – The specific identification method is used to determine gains and losses on sales of securities.  ***Amortization and accretion of debt securities purchased at a premium or discount are amortized or accreted into income using a method which approximates the <u>constant</u> effective yield***.  The Company applies Financial Accounting Standard No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases ("FAS 91") for the amortization of premiums and accretion of discounts.  ***Prepayments are anticipated using three-month actual prepayment experience for securities that represent holdings of large numbers of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated.  Premiums and discounts on securities not meeting these criteria are amortized or accreted over their contractual term using the constant effective yield.  Actual prepayment experience for all investment securities is reviewed monthly and the timing of the amortization and accretion is adjusted accordingly***.

274.    On November 4, 2005, Investors Financial filed its Form 10-Q for its third quarter ending September 30, 2005 with the SEC.  The Form 10-Q was signed by defendants Sheehan and

inney and disclosed under the heading entitled "Market Risk" that the Company experienced payments on its SBA portfolio.

> Prepayment speeds for mortgage-backed securities increased during the third quarter of 2005 due to increased refinancing activity driven by declining mortgage rates. We expect recent prepayment experience to continue subject to future interest rate movements. ***Prepayment experience for Federal agency securities (primarily SBA guaranteed loan pools) also increased over this period, which resulted in a shorter weighted average life of the securities. We expect the combination of heightened prepayment experience and, more significantly, reduced reinvestment opportunities to continue to pressure our net interest income for the remainder of 2005.***

275.    The Investors Financial Defendants' statements that the prepayment experience for Federal agency securities (primarily SBA securities guaranteed loan pools) increased during 2005 as the weighted average life of the securities shortened is nonsensical. First, the Federal agency securities (SBA securities) experienced no such drop as experienced in 2003 (*see* SBA securities chart ¶55), which caused the weighted average life of the securities to shorten. Second, borrowers are less likely to prepay during rising interest rate environments. Interest rates increased during 2004 and 2005 going from 1.25% on June 30, 2004 to 3.25% on June 30, 2005. Third, the Investors Financial Defendants disclosure in the Company's June 30, 2005 Form 10-Q filed on August 9, 2005 that "[a]mortization and accretion of debt securities purchased at a premium or discount are amortized or accreted into income using a method which approximates the ***constant*** effective yield" is an admission that despite the restatement, the Investors Financial Defendants had still violated GAAP and FASB Statement No. 91 by not applying a "constant effective yield."

276.    On March 2, 2006, Investors Financial filed its Form 10-K for its fiscal year ending December 31, 2005 with the SEC. The Form 10-K was signed by defendants Sheehan and Spinney and disclosed a more extensive prepayment policy:

> Amortization and accretion of debt securities purchased at a premium or discount are amortized or accreted into income using a method which approximates the constant effective yield method. We apply Statement of Financial Accounting

Standard No. 91, Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases ("SFAS 91") for the amortization of premiums and accretion of discounts. In calculating the effective yield for securities that represent holdings of large numbers of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated, prepayments are anticipated using our actual three-month prepayment experience.

The amount of amortization or accretion to recognize in income is driven by the calculation of the constant effective yield. When calculating this yield, we assume that prepayments will continue from the analysis date to the date of the security's expected maturity at our most recent three-month prepayment rate. The prepayment rate is updated monthly based on our previous three-month actual prepayment experience.

We utilize three-month prepayment rates to anticipate prepayments because such rates are based on our own actual prepayment experience and because we believe three-month rates are a better estimate of future experience than either one-month or six-month or longer rates. In the opinion of management, a one-month rate does not capture enough experience to predict future prepayment behavior and may create undue volatility in interest income due to one-time fluctuations in prepayment activity. Conversely, in the opinion of management, a six-month or longer rate would not capture enough volatility to predict future prepayment behavior.

If a difference arises between our estimated prepayments and our actual prepayments received, the constant effective yield is recalculated based on our actual payments to date and anticipated future payments. This monthly recalculation results in the carrying value of the security being adjusted to the amount that would have existed had the new effective yield been applied since the purchase date, and a corresponding charge or credit is recognized to interest income.

For securities that do not represent holdings of large numbers of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated, the associated premiums and discounts are amortized or accreted over their contractual term using the constant effective yield. Actual prepayment experience for such securities is reviewed monthly and a proportionate amount of premium or discount is recognized in income at that time such that the effective yield on the remaining portion of the securities continues unchanged.

As of and for the years ended December 31, 2005, 2004, and 2003, we anticipated prepayments on our mortgage-backed securities. ***All other securities, including Federal agency securities***, state and political subdivisions, corporate debt, U.S. Treasury securities, and foreign government securities ***do not meet the SFAS 91 criteria for anticipating prepayments***. Accordingly, no prepayments were anticipated for these securities.

- 134 -

277.    Despite the Investors Financial Defendants' statement to the contrary that "[i]ncluded in [their] guidance *is* and ***has always been*** a ***forecast of SBAs running at industry prepayment speeds***," which necessarily means they were anticipating prepayments, the above statement that they do ***not*** anticipate prepayments for Federal agency securities appears to be litigation driven. Nevertheless, had the Investors Financial Defendants followed the "contractual method" when the SBA securities prepaid in 2003, all of the unamortized amounts of premium would become immediately recognized in the income statement.  As the "Report of Findings" notes, "[b]ecause mortgages and mortgage-backed securities generally can be prepaid at any time, using the contract period could lead to significant fluctuations in amortization (for instance if rates fall precipitously and prepayments speed up due to refinancing) which makes this an unpopular option."  Exhibit N at 3.

## X.    ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER

### A.    Investors Financial's Compensation Scheme Motivated Defendants to Commit Fraud

278.    The Individual Defendants were also motivated to report false revenues and earnings and thus capitalize on the accounting fraud and the artificial inflation of Investors Financial stock.  In fact, each of the defendants and executive officers, Sheehan, Rogers, Spinney, Keenan, Mancuso, Maroney and Henry earned huge incentive-based bonuses which were based upon the achievement of revenue and EPS goals in the Company's fiscal year operating plan.  Defendants' Proxy Statements, filed with the SEC on March 19, 2001, March 13, 2002, March 11, 2003, March 2, 2004, March 7, 2005 and March 8, 2006, show that the executive defendants' bonus compensation was heavily tied to the Company's financial performance.  Each year's compensation plan established: (a) base salaries; (b) option grant levels; and (c) target levels for operating EPS and bonus amounts

payable to executive officers under the Senior Executive Bonus Plan, based on achieving such

targets.  The target levels set by the proxies provided that:

> If [year] operating earnings per share equal the minimum target, certain executive
> officers will receive bonuses ranging from 100% to 125% of their annual base pay,
> depending on their positions, with the Chief Executive Officer and the President each
> receiving 125% of their respective annual base pay.  If [year] operating earnings per
> share exceed the minimum target level, additional bonus amounts are available to the
> executive officers under the bonus plan, up to a maximum amount equal to 225% of
> their respective annual base pay.  The actual level of bonus earned is based upon
> achievement of specific predetermined performance targets established by the
> Compensation Committee.  No bonuses will be payable to executive officers if [year]
> operating earnings per share are less than or equal to [previous year] operating
> earnings per share.

279.  Incentive-based compensation played a significant role in the Individual Defendants'

total compensation and provided a direct incentive to growth.  A breakdown of the Individual

Defendants' bonus and salary structure for years 2001-2005 is provided below:

| Name | Year | Salary | Bonus | Total | Options | All Other Compensation | % EPS and Stock Performance |
|---|---|---|---|---|---|---|---|
| Sheehan | 2001 | $650,000 | $1,462,500 | $2,112,500 | 70,557 | $6,090 | 69.23% |
| | 2002 | $750,000 | $1,687,500 | $2,437,500 | 33,428 | $6,840 | 69.23% |
| | 2003 | $787,500 | $1,771,875 | $2,559,375 | 30,000 | $27,300 | 69.23% |
| | 2004 | $867,000 | $2,817,750 | $3,684,750 | 98,204 | $26,825 | 76.47% |
| | 2005 | $953,700 | $2,002,770 | $2,956,470 | 90,000 | $27,540 | 67.74% |
| | | | | | | | |
| Rogers | 2001 | $550,000 | $1,237,500 | $1,787,500 | 103,962 | $6,090 | 69.23% |
| | 2002 | $650,000 | $1,462,500 | $2,112,500 | 77,767 | $6,840 | 69.23% |
| | 2003 | $682,500 | $1,535,625 | $2,218,125 | 70,052 | $14,570 | 69.23% |
| | 2004 | $751,000 | $2,440,750 | $3,191,750 | 119,277 | $14,720 | 76.47% |
| | 2005 | $826,100 | $1,535,625 | $2,361,725 | 180,975 | $15,303 | 65.02% |
| | | | | | | | |
| Maroney | 2001 | $365,000 | $821,250 | $1,186,250 | 46,199 | $5,863 | 69.23% |
| | 2002 | $425,000 | $956,250 | $1,381,250 | 20,000 | $6,714 | 69.23% |
| | 2003 | $446,250 | $1,004,063 | $1,450,313 | 22,438 | $10,453 | 69.23% |
| | 2004 | $515,000 | $1,673,750 | $2,188,750 | 37,465 | $10,667 | 76.47% |
| | 2005 | $566,500 | 1,189,650 | $1,756,150 | 60,000 | $11,027 | 67.74% |
| | | | | | | | |
| Spinney | 2001 | $72,115 | $150,000 | $222,115 | 20,000 | $123 | 67.53% |
| | 2002 | $250,000 | $375,000 | $625,000 | 70,000 | $6,420 | 60.00% |
| | 2003 | $300,000 | $675,000 | $975,000 | 22,954 | $7,960 | 69.23% |
| | 2004 | $350,000 | $1,137,500 | $1,487,500 | 71,915 | $8,170 | 76.47% |
| | 2005 | $400,000 | $840,000 | $1,240,000 | 69,333 | $9,184 | 67.74% |
| | | | | | | | |

| Name | Year | Salary | Bonus | Total | Options | All Other Compensation | % EPS and Stock Performance |
|------|------|--------|-------|-------|---------|------------------------|------------------------------|
| Keenan | 2001 | $285,000 | $641,250 | $926,250 | 31,930 | $5,729 | 69.23% |
|  |  |  |  |  |  |  |  |
| Henry | 2002 | $275,000 | $343,750 | $618,750 | 26,516 | $6,275 | 55.56% |
|  | 2003 | $300,000 | $450,000 | $750,000 | 32,213 | $6,360 | 60.00% |
|  | 2004 | $345,000 | $776,250 | $1,121,250 | 20,000 | $7,834 | 69.23% |
|  | 2005 | $379,500 | $796,950 | $1,176,450 | 60,000 | $8,663 | 67.74% |

280.    The Individual Defendants thus reaped direct tangible economic benefit by overstating net interest income and reporting false financials.

281.    Also, comparing the Company's March 11, 2003 Proxy to the March 5, 2004 Proxy reveals that shortly after the SEC Final Rule (*See* §VII C 4), defendants drastically increased their eligible bonuses from 100%-125% up to 265% of their annual base pay if the 2004 GAAP EPS *equaled* the minimum target, and increased the eligible bonuses from 225% to 325% of their annual base pay if the 2004 GAAP EPS *exceeded* the minimum target.

282.    On March 11, 2003, Investors Financial filed its Proxy that disclosed the following in its Report of Compensation Committee on Executive Compensation that set the terms for the 2003 Executive Compensation Plan:

> In November 2002, the Compensation Committee set the terms for the 2003 Executive Compensation Plan, and recommended those terms to the full Board for approval. The full Board approved the 2003 Executive Compensation Plan at their November 2002 regular meeting. This plan established (i) base salaries for 2003; (ii) proposed option grant levels for 2003; (iii) target levels for operating earnings per share for 2003 and bonus amounts payable to executive officers under the Senior Executive Bonus Plan, based on achieving such targets and (iv) sales commission parameters for Mr. Mancuso. ***If 2003 operating earnings per share equal the minimum target, certain executive officers will receive bonuses ranging from 100% to 125% of their annual base pay, depending on their positions, with the Chief Executive Officer and the President each receiving 125% of their respective annual base pay.*** If 2003 operating earnings per share exceed the minimum target level, additional bonus amounts are available to the executive officers under the bonus plan, up to a maximum amount equal to 225% of their respective annual base pay. The actual level of bonus earned is based upon achievement of specific predetermined performance targets established by the Compensation Committee. No bonuses will be payable to executive officers if 2003 operating earnings per share are less than or equal to 2002 operating earnings per share.

283.    On March 5, 2004, Investors Financial filed its Proxy that disclosed the following in its Report of Compensation Committee on Executive Compensation that set the terms for the 2004 Executive Compensation Plan:

> In November 2003, the Compensation Committee set the terms for the 2004 Executive Compensation Plan, and recommended those terms to the full Board for approval. The full Board approved the 2004 Executive Compensation Plan at their November 2003 regular meeting. This plan established (i) base salaries for 2004; (ii) proposed option grant levels for 2004; (iii) target levels for operating earnings per share for 2004 and bonus amounts payable to executive officers under the Senior Executive Bonus Plan, based on achieving such targets and (iv) sales commission parameters for Mr. Mancuso. *If 2004 GAAP (Generally Accepted Accounting Principles) earnings per share equal the minimum target, certain executive officers will receive bonuses ranging up to 265% of their annual base pay, depending on their positions, with the Chief Executive Officer and the President each receiving 265% of their respective annual base pay.* If 2004 GAAP earnings per share exceed the minimum target level, additional bonus amounts are available to the executive officers under the bonus plan, up to a maximum amount equal to 325% of their respective annual base pay. The actual level of bonus earned is based upon achievement of specific predetermined performance targets established by the Compensation Committee. No bonuses will be payable to executive officers if 2004 GAAP earnings per share are less than or equal to 2003 GAAP earnings per share.

284.    By maintaining the (false) HTM classification for Investors' SBA securities and failing to acknowledge that the prepayments caused enormous premium amortization expense and loss of net interest income, the Investors Financial Defendants were able to reap the benefits of their fraud taking home bonuses in 2003 and record bonuses in 2004.

285.    Despite the Company's restatement and their knowledge that the SBA securities had prepaid in 2002-2003, the Investors Financial Defendants failed to properly record the unamortized premium expense of at least $12.8 million to income in 2003, later reported to be $18.4 million in 2004. Thus, the Investors Financial Defendants were able to reap the benefits of their fraud by taking home bonuses in 2003 and record bonuses in 2004 on overstated financials.

**B.** **Individual Defendants' Highly Suspicious Insider Selling of $68.1 Million, Confirms Their Knowing Participation in the Fraudulent Scheme**

286.    As alleged herein, the Individual Defendants knew their public statements about the Company's net interest income, net income and earnings were materially false and misleading.  The Individual Defendants' insider sales, therefore, are not necessary to establish scienter in this case.  But the Individual Defendants' stock sales are suspicious in both timing and amounts as compared to their prior trading history and confirm that the Individual Defendants knew their public statements were materially false and misleading.

287.    During the Class Period, the Individual Defendants sold 1.7 million shares of Investors Financial stock for more than $68.1 million.  Unbelievably, the Individual Defendants sold an amount that is higher than the Company's 2001 and 2002 reported earnings of $44.6 million and $67.4 million, respectively.  A summary of the Individual Defendants' stock sales is as follows:[15]

| CLASS PERIOD STOCK SALES | | | | |
|---|---|---|---|---|
| **Last Name** | **First Name** | **Date** | **Shares** | **Proceeds** |
| SHEEHAN | KEVIN | 5/29/2001 | 100,000 | 3,592,000 |
| | | 7/13/2001 | 68,000 | 2,721,360 |
| | | 7/16/2001 | 10,000 | 400,000 |
| | | 7/19/2001 | 62,000 | 2,481,240 |
| | | 7/20/2001 | 18,000 | 720,000 |
| | | 7/23/2001 | 14,000 | 560,000 |
| | | 5/13/2002 | 388,000 | 15,128,120 |
| | | 5/14/2002 | 37,000 | 1,445,220 |
| | | 12/30/2003 | 9,000 | 351,149 |
| | | 1/5/2004 | 79,000 | 3,082,455 |
| | | 1/6/2004 | 15,000 | 585,000 |
| | | 3/14/2005 | 155,000 | 7,903,600 |
| | | 5/29/2001 | 100,000 | 3,592,000 |
| | | | **955,000** | **38,970,144** |
| | | | | |
| ROGERS | MICHAEL | 11/22/2002 | 100,000 | 3,533,311 |
| | | | **100,000** | **3,533,311** |

---

[15]    All data is adjusted for the Company's June 17, 2002, two for one stock split.

| CLASS PERIOD STOCK SALES | | | | |
|---|---|---|---|---|
| **Last Name** | **First Name** | **Date** | **Shares** | **Proceeds** |
| | | | | |
| SPINNEY | JOHN | 8/12/2002 | 200 | 5,472 |
| | | | **200** | **5,472** |
| | | | | |
| KEENAN | KAREN | 5/9/2001 | 30,000 | 1,052,700 |
| | | 7/18/2001 | 30,000 | 1,150,200 |
| | | 1/24/2002 | 30,000 | 1,095,000 |
| | | 3/8/2002 | 30,000 | 1,125,000 |
| | | | **120,000** | **4,422,900** |
| | | | | |
| MANCUSO | ROBERT | 12/11/2002 | 19,144 | 533,601 |
| | | 3/12/2003 | 25,300 | 548,558 |
| | | 8/22/2003 | 11,750 | 343,977 |
| | | 10/17/2003 | 30,000 | 1,064,937 |
| | | 1/26/2004 | 15,000 | 648,038 |
| | | 1/27/2004 | 17,515 | 748,300 |
| | | 4/15/2004 | 15,000 | 600,448 |
| | | 7/19/2004 | 30,000 | 1,329,332 |
| | | 11/18/2004 | 30,000 | 1,331,299 |
| | | 1/28/2005 | 30,000 | 1,511,170 |
| | | 4/18/2005 | 30,000 | 1,315,485 |
| | | | **253,709** | **9,975,145** |
| | | | | |
| MARONEY | EDMUND | 5/21/2001 | 65,680 | 2,370,391 |
| | | 7/18/2001 | 30,000 | 1,150,800 |
| | | 1/24/2002 | 30,000 | 1,052,100 |
| | | 10/17/2003 | 60,000 | 2,117,400 |
| | | 3/5/2004 | 15,000 | 675,000 |
| | | 7/20/2004 | 15,000 | 675,000 |
| | | 12/27/2004 | 15,000 | 750,000 |
| | | | **230,680** | **8,790,691** |
| | | | | |
| HENRY | JOHN | 5/3/2001 | 30,000 | 1,066,500 |
| | | 11/21/2002 | 13,000 | 451,665 |
| | | 10/30/2003 | 5,000 | 177,337 |
| | | 1/26/2004 | 17,848 | 759,619 |
| | | | **65,848** | **2,455,121** |
| | | | | |
| | | **Total:** | **1,725,237** | **$68,152,784** |

288.    As shown in the following chart, the Individual Defendants sold a substantial amount

of their stock and those sales comprised a substantial percentage of their holdings:

| Investors Financial Services Corp. % of Holdings Sold Summary:  4/10/2001 - 7/14/2005 | | | | | |
|---|---|---|---|---|---|
| **Last Name** | **Shares Retained** | **Shares Sold** | **% Sold** | **Shares & Options** | **% Sold** |

|  | **Through CP** |  |  | **Retained** |  |
|---|---|---|---|---|---|
| SHEEHAN | 916,812 | 955,000 | 51.02% | 1,983,650 | 32.50% |
| ROGERS | 1,120,679 | 100,000 | 8.19% | 1,956,743 | 4.86% |
| SPINNEY | 10,572 | 200 | 1.86% | 104,115 | 0.19% |
| KEENAN | 186,770 | 120,000 | 39.12% | 220,937 | 35.20% |
| MANCUSO | 228,258 | 253,709 | 52.64% | 235,758 | 35.38% |
| MARONEY | 135,134 | 230,680 | 63.06% | 175,136 | 28.42% |
| HENRY | 51,985 | 65,848 | 55.88% | 83,653 | 23.42% |

289.    The Individual Defendants' sales were also dramatically out of line with their sales before the Class Period, as the Individual Defendants sold no shares prior to the Class Period.

290.    The Individual Defendants timing of their stock sales was also particularly suspicious, as shown in the following charts:

| Investors Financial Services Corp. Defendants' Yearly Stock Sale Totals | | |
|---|---|---|
| **Year** | **Shares Sold** | **Dollar Amount** |
| 2001 | 457,680 | $17,265,191 |
| 2002 | 647,344 | $24,369,491 |
| 2003 | 141,050 | $4,603,358 |
| 2004 | 264,363 | $11,184,491 |
| 2005 | 215,000 | $10,730,255 |

| Investors Financial Services Corp. Defendants' Individual Yearly Stock Sale Totals | | | | | |
|---|---|---|---|---|---|
|  | **2001** | **2002** | **2003** | **2004** | **2005** |
| SHEEHAN | $10,474,600 | $16,573,340 | $351,149 | $3,662,455 | $7,903,600 |
| ROGERS |  | $3,533,313 |  |  |  |
| SPINNEY |  | $5,472 |  |  |  |
| KEENAN | $2,202,900 | $2,220,000 |  |  |  |
| MANCUSO |  | $533,601 | $1,957,472 | $4,657,417 | $1,826,655 |
| MARONEY | $3,521,191 | $1,052,100 | $2,117,400 | $2,100,000 |  |
| HENRY | $1,066,500 | $451,665 | $177,377 | $759,619 |  |
|  |  |  |  |  |  |
| **TOTAL** | **$17,265,191** | **$24,369,491** | **$4,603,358** | **$11,184,491** | **$10,730,255** |

291.    Defendants Henry, Keenan, Maroney and Sheehan sold 225,080 shares of Investors Financial stock, taking in more than $8.0 million on May 3, 2001, May 9, 2001, May 21, 2001 and May 29, 2001, shortly after the Investors Financial Defendants issued false positive statements of "record earnings" and net interest income, net income and earnings announced in the Company's April 10, 2001 press release and in its March 31, 2001 Form 10-Q filed on May 9, 2001.  Similarly,

- 141 -

defendants Sheehan, Keenan and Maroney sold 232,000 shares of Investors Financial stock taking in more than $9.1 million on July 13, 2001, July 16, 2001, July 18, 2001, July 19, 2001, July 20, 2001 and July 23, 2001, shortly after the Investors Financial Defendants issued false positive statements of 38% growth in the second quarter and net interest income, net income and earnings announced in the Company's July 10, 2001 press release and in its July 12, 2001 Form 8-K. Similarly, defendants Keenan and Maroney sold 60,000 shares of Investors Financial stock taking in more than $2.1 million on January 24, 2002, days after the Investors Financial Defendants issued false positive statements of "[f]ull years earnings up 42%," net interest income, net income and earnings in the Company's January 22, 2002 press release. Lastly, defendant Keenan sold another 30,000 shares of Investors Financial stock taking in more than $2.1 million on March 8, 2002 shortly after the Investors Financial Defendants issued false positive statements reporting net interest income, net income and earnings in its December 31, 2001 Form 10-K filed on February 19, 2002.

292.  Notably, the Investors Financial Defendants have admitted that the Company's net interest income reported in 2001 was false and misleading and overstated by $10.9 million.[16]  Pre-split, Wall Street analysts had projected $1.50 in EPS for 2001 and the Company reported a $1.52 in diluted EPS in 2001.[17]  The Investors Financial Defendants restated 2001 earnings results to a $1.36 in diluted EPS for 2001, which would have been a miss of $0.16 or by 10%.  Thus, 547,680 shares of Investors Financial stock were sold for $20.5 million based on the Company's false 2001 financials where net interest income was overstated by 9% and net income by 11%.

---

[16]  The Investors Financial Defendants 2001 net interest income was overstated by $10.9 million, as they originally reported net interest income of $109.2 million that was later restated to $98.3 million.

[17]  The last analyst report in 2001 was from Robert W. Baird & Company, Inc. which projected $1.50 in EPS for 2001.

293.    Defendant Sheehan sold 425,000 shares of Investors Financial stock taking in more than $16.5 million on May 13, 2002 and May 14, 2002, shortly after the Investors Financial Defendants issued false positive statements regarding the Company's net interest income, net income and earnings in the Company's March 31, 2002 Form 10-Q filed on May 13, 2002.  Similarly, defendants Henry, Rogers and Mancuso sold 132,144 shares of Investors Financial stock taking in more than $4.5 million on November 21, 2002, November 22, 2002 and December 11, 2002 shortly after the Investors Financial Defendants issued false positive statements regarding the Company's net interest income, net income and earnings in the Company's September 30, 2002 Form 10-Q filed on November 15, 2002.  Lastly, defendant Mancusco sold 25,300 shares of Investors Financial stock taking in more than $548,558 on March 12, 2003 shortly after the Investors Financial Defendants issued false positive statements regarding the Company's net interest income, net income and earnings in the Company's December 31, 2002 Form 10-K filed on February 27, 2003.

294.    Notably, the Investors Financial Defendants have admitted that the Company's net interest income reported in 2002 was false and misleading and overstated by $4.7 million.[18]  Thus, 582,644 shares of Investors Financial shares were sold for $21.6 million based on the Company's 2002 financials where net interest income was overstated by 3% and net income by 2%.

295.    Defendants Mancuso, Henry, Sheehan and Maroney sold 595,113 shares of Investors Financial stock, taking in more than $25.9 million in 2003-2005 during the same time period that the Investors Financial Defendants issued false positive statements that "SBA securities provide an attractive yield with limited credit risk and prepayment risk," that the Company's SBA securities

_____

[18]     The Investors Financial Defendants' 2002 net interest income was overstated by $4.7 million, as they originally reported net interest income of $143.4 million that was later restated to $138.7 million.

were temporarily impaired (2003 and 2004 Form 10-Ks), that the Company remains comfortable with a long-term growth rate of 25%, the restatement did not impact the SBA securities, that included in the Company's guidance is and has always been a forecast of SBA securities running at industry prepayment speeds, and that the Company remains confident in its ability to produce 25% in diluted earnings per share in 2005 in the various Company press releases, conference calls and SEC filings. As stated previously, the Investors Financial Defendants experienced SBA prepayments in 2003 and were required by GAAP to immediately record the unamortized premium expense in the Company's income. As of December 31, 2003,`  the Company's income was overstated by at least $12.8 million.

## XI.    LOSS CAUSATION

296.    During the Class Period, as detailed herein, the Investors Financial Defendants devised a scheme to deceive investors and the market about Investors Financial's true financial condition by issuing false financial statements and knowingly misrepresenting its net interest income. The Investors Financial Defendants knew, or recklessly disregarded, however, that Investors Financial improperly used the prospective method of accounting for its high-risk securities while simultaneously falsely classifying these same securities as HTM. When Investors Financial experienced prepayments on its debt securities, the Investors Financial Defendants knew, or recklessly disregarded and failed to record, the unamortized premium amount in the Company's income when the debt securities weighted average life was cut short due to prepayments. By failing to correctly record the unamortized premium amount in the Company's income, the Investors Financial Defendants presented a misleading picture of the Company's financial results, net interest income, net income and earnings.

297.    The Investors Financial Defendants' false and misleading statements had the intended effect of and caused Investors Financial's stock to trade at artificially inflated prices throughout the

Class Period and to reach a Class Period high of $53.44 per share on February 7, 2005. Later, when more information regarding the true state of the Company's operations concealed by the Investors Financial Defendants' fraudulent scheme reached the market, Investors Financial's stock price plunged on October 21, 2004 as part of the prior artificial inflation came out of Investors Financial's stock price and on July 14, 2005, the remaining amount of artificial inflation came out of Investors Financial's stock. As a result, lead plaintiff and other members of the class suffered economic losses, *i.e.*, damages under the federal securities laws.

298.    For example, throughout the Class Period, it was part of the Investors Financial Defendants' scheme to present a misleading picture of Investors Financial's net interest income by failing to truthfully disclose: 1) the Company's accounting method, how it amortizes and accretes its debt securities purchased at a premium or discount into income and whether it had anticipated prepayments; 2) the Company was using the "prospective method" (securities could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment) for "securities backed by mortgages and other loans" while simultaneously falsely classifying these same securities as HTM; 3) the Company was in violation of FASB Statement No. 115 by classifying the Company's Federal agency securities (SBA securities) and certain of its MBS as HTM when they could contractually be prepaid or otherwise settled in such a way that the Company would not recover substantially all of its recorded investment; 4) the Company was in violation of EITF 99-20 and failed to write down the SBA securities to fair value when the SBA securities' fair value was below the Company's cost; 5) the Company was in violation of FASB Statement No. 91 by not disclosing its prepayment policy and its significant assumptions underlying its prepayment estimates; and 5) that the Company's SBA securities had

already prepaid, making the Investors Financial Defendants' statements that "SBA securities provide an attractive yield with limited credit risk and prepayment risk" false and misleading.

299.    On October 21, 2004, the partial truth about Investors Financial's operations and financial condition began to leak out into the market when Investors Financial announced that it was evaluating FASB Statement No. 91 change because it had incorrectly recorded the amortization of premiums and accretion of discounts on its investment securities by using the "prospective" method and that it was changing to the "retrospective" method.  The Company announced that it did not believe the impact of the change will be significant in fiscal years 2004, 2003 and 2002, but that the impact on 2001 reported earnings could be higher.  The Company expected the evaluation to be completed by November 15, 2004.  Although the Investors Financial Defendants admitted that their financial results could no longer be relied upon and needed to restated, the announcement of the restatement and the restatement itself were false and misleading because the Investors Financial Defendants had failed to disclose that the SBA securities had prepaid and the Company was required to immediately recognize in income the unamortized premium amounts.  Instead, the Investors Financial Defendants used the restatement to switch to using the retrospective method of accounting and delayed recording the unamortized premium expense in the Company's income.

300.    On October 22, 2004, the stock price plummeted $7.20 per share (or 16%) to $36.50 per share on trading volume of over 11.6 million shares, *almost 14 times* the previous day's trading volume of only 839,898, as investors immediately sold off Investors Financial stock as the information indicated that the Company's financial condition was unknown.  Because partial true facts about Investors Financial's operations and financial conditions reached the market, part of the prior artificial inflation came out of Investors Financial's stock price.

301.    On November 15, 2004, the partial truth about Investors Financial's operations and financial condition began to leak out into the market when Investors Financial restated its financial results filed with the SEC for the fiscal years 2001, 2002, 2003 and for the first two quarters of 2004. During the Company's conference call, the Investors Financial Defendants, specifically defendant Sheehan, falsely represented that "this restatement did not impact the accounting for our SBA portfolio." Later in the conference call, the Investors Financial Defendants, specifically defendant Spinney, deceitfully stated that "[i]ncluded in our guidance is and has always been a forecast of SBAs running at industry prepayment speeds" and that the Company "remain[s] comfortable with [their] long-term growth rate of 25% on EPS." As stated previously, the SBA securities had already prepaid in 2003 and the Investors Financial Defendants were required under GAAP, but failed, to write down the Federal agency securities (SBA securities) by at least $12.8 million as of December 31, 2003, which the Investors Financial Defendants later increased bringing the required write down to at least $18.4 million as of December 31, 2004. Thus, as CW1 reported, despite the Company's statement to the contrary, SBA bonds were or should have been impacted by the restatement.

302.    On November 16, 2004, the stock price rose to $3.93 per share (or 9%) to $44.96 per share on trading volume of over 4.1 million shares, **4.3 times** the previous day's trading volume of only 968,200, as investors immediately bought Investors Financial stock as the information indicated that the Company's financial condition was not as bad as previously thought. Moreover, had the Investors Financial Defendants disclosed the truth that the Company's SBA portfolio and securities experienced prepayments, it would have signaled to investors that the Company's current and future interest income derived from its SBA securities would be lower than initially projected and the resulting stock movement would have been negative. This is exactly what occurred at the end of the Class Period when the Company announced severely reduced guidance and flat interest income

caused, in part, by the SBA securities that had prepaid. On this news, the stock declined dramatically.

303.    On July 14, 2005, the truth about Investors Financial's operations and financial condition reached the market when Investors Financial announced that its *net interest income for the second quarter of 2005 would be flat compared to the same period in 2004* and the Company was revising its fiscal years 2005 and 2006 diluted EPS guidance. The Company's net interest income is an important measure of the Company's financial condition. For 2005 diluted EPS, guidance was cut from 25% to 10%. For 2006 diluted EPS, the Company stated that it expected to achieve approximately 8% to 10% growth in diluted EPS in 2006 over the 2005 diluted EPS. The Company blamed the substantial decrease in guidance on "a flatter than expected yield curve; narrower than expected reinvestment spreads; weaker than expected market-sensitive revenues, including fees linked to both the equity and foreign currency markets; and continued investments in headcount and technology to support new and existing clients." Thus, the relevant truth that the Company's net interest income was flat and guidance was cut for both 2005 and 2006 was revealed on July 14, 2005. Subsequent to that date, more detail on the relevant truth was disclosed.

304.    On August 9, 2005, Investors Financial filed its June 30, 2005 Form 10-Q and admitted that the Company's drastically reduced guidance and its flat net interest income was in part due to prepayments on its SBA securities stating: *"[p]repayment experience for Federal agency securities (primarily SBA guaranteed loan pools) also increased over this period as the weighted average life of the securities shortened"* and that "the combination of heightened prepayment experience and, more significantly, reduced reinvestment opportunities to *continue to pressure our net interest income for the remainder of 2005*." However, the above statements do not comport with facts or logic. First, borrowers are less likely to prepay when interest rates are rising and

interest rates increased dramatically from 1% on June 25, 2003 to 3.25% on June 30, 2005. Second, the Company's Federal agency securities (SBA securities) in 2005 show nothing close to the substantial $619 million drop in carrying value in the Company's Federal agency securities (SBA securities) that mature in one to five and five to ten years that was experienced as of December 31, 2003. *See* Chart at ¶55. Thus, more detail on the relevant truth (revealed on July 14, 2005) of flat net interest income which adversely affected the Company's EPS for 2005 and 2006 was later disclosed on August 9, 2005 in the Company's June 30, 2005 Form 10-Q that the net interest income drop was caused, in part, by SBA prepayments which reduced their reinvestment opportunities and put pressure on the Company's net interest income. Even though the prepayment had occurred earlier in 2003, the Investors Financial Defendants' statement is an admission that they belatedly recognized the unamortized premium expense or other-than-temporary impairment expense in income.

305.    On July 15, 2005, the stock price dropped to $7.47 per share (or 18%) to $33.68 per share on trading volume of over 22 million shares, six times the previous day's trading volume of only 3,714,815, as investors sold off Investors Financial stock as the information indicated that the Company's financial condition was worse than previously represented, the Company's net interest income was flat and the Company's earnings growth was cut from 25% to 10% for 2005 and 2006. Because the true facts about Investors Financial's operations and financial conditions reached the market, the remaining part of the prior artificial inflation came out of Investors Financial's stock price.

306.    The decline in Investors Financial's stock price as the market learned the bad news about the true state of the Company's financial results and operations was directly related to the

Investors Financial Defendants' prior misrepresentations and fraudulent conduct pursuant to their scheme to misrepresent and conceal Investors Financial's true financial problems.

307.    Like other members of the class who purchased Investors Financial's stock at artificially inflated prices during the Class Period, lead plaintiffs suffered an economic loss, *i.e.*, damages, when Investors Financial's stock price plummeted upon the Investors Financial Defendants' October 21, 2004 and July 14, 2005 announcements.

308.    As a result of the lead plaintiffs' purchases at artificially inflated prices during the Class Period and the subsequent revelation of the Company's true financial condition causing the stock price to drop, lead plaintiffs and other members of the class suffered economic losses, *i.e.*, damages, under the federal securities laws.

309.    The timing and magnitude of Investors Financial's stock price decline negate any inference that the loss suffered by lead plaintiffs and other class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Investors Financial Defendants' fraudulent conduct.    On October 22, 2004, the day Investors Financial's revelations caused the stock to drop by 16%, the NASDAQ 100 Stock Index ("NDX") lost only 1% and the Standard & Poor's ("S&P") 500 securities index lost less than 1%.    On July 15, 2005, the day Investors Financial's revelations caused the stock to drop by 18%, the NDX index gained less than 1% and the S&P's 500 securities index gained less than 1%.    The economic loss, *i.e.*, damages, suffered by lead plaintiffs and other members of the class, was a direct result of the Investors Financial Defendants' fraudulent scheme to artificially inflate Investors Financial's stock price and the subsequent significant decline in the value of Investors Financial's stock when the true state of the Company's operations was revealed to the market.

**XII.    CAUSES OF ACTION**

**COUNT ONE**

**For Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Against All Defendants**

310.    Plaintiffs incorporate ¶¶1-309 by reference.

311.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew, or recklessly disregarded, were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

312.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Investors Financial's publicly traded securities during the Class Period.

313.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Investors Financial's public filings, press releases and other publications as alleged herein are the collective actions of the Individual Defendants. Each of the Individual Defendants, by virtue of his/her high-level position with Investors Financial, directly participated in the management of Investors Financial, and was directly involved in the day-to-day operations of Investors Financial at the

highest level.  Each of the Individual Defendants was involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, including SEC filings, press releases and other publications.  Each of the Individual Defendants had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports, releases and statements detailed herein and is therefore primarily liable for the representations contained therein.

314.    Plaintiffs and the class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Investors Financial's publicly traded securities. Plaintiffs and the class would not have purchased Investors Financial's publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

315.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the class suffered damages in connection with their purchases of Investors Financial publicly traded securities during the Class Period.

<div align="center">

**COUNT TWO**

**For Violation of Section 20(a) of the Exchange Act
Against All Defendants**

</div>

316.    Plaintiffs incorporate ¶¶1-315 by reference.  The executive officers of Investors Financial prepared, or were responsible for preparing, the Company's press releases, SEC filings and conference calls.  The Individual Defendants controlled other employees of Investors Financial. Investors Financial controlled the Individual Defendants and each of its officers, executives and all of its employees.

<div align="center">

- 152 -

</div>

317.    Defendants Sheehan and Rogers controlled Investors Financial.  CW1 reported that IBT was a "dictatorship of two partners," defendants Sheehan and Rogers.  CW1 stated that although Sylvester recommended the categories of investments for IBT, defendant Rogers decided on the specific asset and the dollar amount to be invested.  Similarly, CW3 reported that defendants Sheehan and Rogers "called the shots" concerning IBT's operations.

318.    Furthermore, defendant Sheehan admitted his control person status in his Reported Form 144 filings with the SEC on July 16, 2001, July 19, 2001, July 23, 2001, August 2, 2001, May 13, 2002, May 14, 2002, December 30, 2003, January 5, 2004, January 6, 2004 and March 14, 2005.

319.    By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## XIII.  CLASS ACTION ALLEGATIONS

320.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Investors Financial publicly traded securities (the "Class") on the open market during the Class Period.  Excluded from the Class are defendants, directors and officers of Investors Financial and their families and affiliates.

321.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Investors Financial had more than 66.5 million shares of stock outstanding, owned by thousands of persons.

322.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Securities Act of 1933 was violated by defendants;

(b)    Whether the Exchange Act was violated by defendants;

- 153 -

(c)     Whether defendants omitted and/or misrepresented material facts;

(d)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

(e)     Whether defendants knew or recklessly disregarded that their statements were false and misleading for purposes of the Exchange Act claims.

## XIV.  NO SAFE HARBOR

323.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements in this complaint, because the specific statements pleaded herein were neither identified as "forward-looking statements" when made, nor accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.  To the extent that the statutory safe harbor applies to any of the statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of Investors Financial who knew that the statement was false or misleading.

## XV.  PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action;

B.     Awarding damages, including interest; and

C.     Such equitable/injunctive or other relief as the Court may deem proper.

## XVI.   JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  October 29, 2007

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JEFFREY W. LAWRENCE
JAMES W. OLIVER


                         /s/ Jeffrey W. Lawrence
JEFFREY W. LAWRENCE

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

KRAKOW & SOURIS, LLC
AARON D. KRAKOW (BBO No. 544424)
CHRISTOPHER N. SOURIS (BBO No. 556343)
225 Friend Street
Boston, MA  02114
Telephone:  617/723-8440
617/723-8443 (fax)

Liaison Counsel

CAVANAGH & O'HARA
WILLIAM K. CAVANAGH, JR.
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
2801 Ponce De Leon Blvd., Suite 750
Coral Gables, FL  33314
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiffs

T:\casesSF\investorsFinancialServices\CPT00046425_1st Amended Consol.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 29, 2007.

/s/ Jeffrey W. Lawrence
JEFFREY W. LAWRENCE

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

E-mail:JeffreyL@csgrr.com

# Mailing Information for a Case 1:05-cv-11627-RCL

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joel Z. Eigerman**
  joel@eigerman.com

- **Jason D. Frank**
  jason.frank@bingham.com

- **William R. Harb**
  william.Harb@bingham.com

- **Jordan D. Hershman**
  jordan.hershman@bingham.com

- **Alan L. Kovacs**
  alankovacs@yahoo.com

- **Jeffrey W. Lawrence**
  jeffreyl@lcsr.com

- **James Paul Lucking**
  james.lucking@Bingham.com

- **James W. Oliver**
  jimo@lerachlaw.com,e_file_sf@lerachlaw.com,e_file_sd@lerachlaw.com

- **David Pastor**
  dpastor@gilmanpastor.com,rdambrosio@gilmanpastor.com

- **Thomas G. Shapiro**
  tshapiro@shulaw.com,sgeresy@shulaw.com

- **Christopher N. Souris**
  csouris@krakowsouris.com

- **Marc A. Topaz**
  ecf_filings@sbtklaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Pavel Bespalko
Law Office of Joel Eigerman
50 Congress Street
Suite 200
Boston, MA 02109
```

Exhibit A

# Deloitte & Touche

*February 2000*
*Vol. 5 Issue 1*

# *Speaking of Securitization*

*Accounting, Tax, Regulatory and Other Developments*
*Affecting Transfers and Servicing of Financial Assets*

**In This Issue**

**Accounting For Investments In MBS and ABS**
page 1 - Abstract/Background

page 2 - Classification

page 8 - Accounting for Income

page 13 - Investments by Securitizers in Retained Interests-Residuals

page 15 - Servicing by Securitizers

page 19 - Acknowledgements

S.O.S. contains general information only; it is not a substitute for consultation with a professional. To receive copies or other information dealing with matters herein, contact the **Securitization Strategies Team hotline** at (213) 688-6555 or **e-mail** us at sst-los_angeles@dttus.com.

Securitization Strategies Team - helping you **from Concept ... to Wall Street ... and Beyond ...**

## ACCOUNTING FOR INVESTMENTS IN MBS AND ABS
### Sunil Gangwani, Allen S. Thomas and James Mountain

*Abstract*

The Financial Accounting Standards Board (the "FASB") is an independent organization which seeks to establish and improve standards of financial accounting and reporting for the guidance and education of the public, including issuers, auditors, and users of financial information. The Securities and Exchange Commission has empowered the Financial Accounting Standards Board to set these accounting standards for publicly held companies. The goal of these financial accounting standards is to foster uniform representation of financial statements of business organizations in the United States.

*Background*

This article provides a brief overview of certain U.S. generally accepted accounting principles ("GAAP") applicable to investments in mortgage loans, mortgage servicing assets and securitized debt instruments which are also known as mortgage-backed securities ("MBS") and asset-backed securities ("ABS"). It does not address income tax issues. It is not meant to provide professional advice but instead it is intended to merely state certain facts and, in some cases, the concepts behind the pronouncements of the FASB. The primary focus here will be on statements issued by the FASB. Specifically, this article addresses certain information set forth in the Statement of Financial Accounting Standards ("SFAS") No. 65, *"Accounting for Certain Mortgage Banking Activities"*, SFAS No. 91, *"Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases"*, SFAS No. 115, *"Accounting for Certain Investments in Debt and Equity Securities,"* SFAS No. 125, *"Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities"* and SFAS No. 134 *"Accounting for Mortgage-Backed*

**Deloitte Touche Tohmatsu**

*Securities Retained after the Securitization of Mortgage Loans Held for Sale by a Mortgage Banking Enterprise."* Certain unique issues related to investments such as "residuals" and "interest-only" securities are addressed by Emerging Issues Task Force ("EITF") Issue No. 89-4, *"Accounting for Purchased Investment in a Collateralized Mortgage Obligation Instrument or in a Mortgage-Backed Interest Only Certificate"* and EITF Issue No. 93-18, *"Recognition of Impairment for an Investment in a Collateralized Mortgage Obligation Instrument or in a Mortgage-Backed Interest Only Certificate."*

MBS and ABS are generally considered "debt instruments" for accounting purposes irrespective of the form of such securities. For example, an MBS from one transaction may be issued as an undivided interest (often characterized as "Certificates") in a pool of mortgage loans while an MBS from another transaction may be issued as debt (often characterized as "Notes" or "Bonds") of a special purpose entity. For accounting purposes, both such investments are usually treated as "debt securities." Therefore, interest-only securities, floaters, inverse floaters, principal-only securities, senior classes, subordinate classes, certificated residual classes, etc. are considered debt securities despite the fact that some of these types of securities may be issued in "equity" form. (Please note however, that certain residual interests may in fact be treated as equity).

*Classifications*

SFAS No. 115 requires investors to classify each security they hold into one of three categories: (a) held-to-maturity, (b) trading or (c) available-for-sale. Each classification is based on the intent and ability of the investor at the date of acquisition.

> **Held-to-maturity ("HTM"):** Debt securities that are acquired with the "positive intent and ability" to hold until maturity are classified as held-to-maturity. Equity securities are not eligible for the HTM category. HTM securities are reported at amortized historical-cost basis. Fluctuations in market value due to changing economic conditions have no impact on the carrying value of such debt securities. Any unrealized gain is not reported. Any unrealized losses are not recognized unless the asset is permanently impaired. The sale of HTM securities prior to maturity, might call into question the classification of current and future securities purchased on a HTM basis.

> **Trading:** Debt securities that are acquired for the sole purpose of profiting from short term fluctuations in price are classified as trading securities. Most brokers/dealers, pension plans and investment companies have their assets classified into this category. It is expected that this account will be the most active account for purchases and sales of securities. While the holding period of securities would typically be short, investors may also elect at the acquisition date to classify a security as trading, even if the holding period is expected to be long-term. Such assets are always reported at fair value. Any unrealized gain or loss is reported in earnings. Transfers to and out of the trading classifications should be rare.

> **Available-for-sale ("AFS"):** Debt securities that are not classified in either of the above two categories are placed in the available-for-sale category. Many regulated organizations may have assets in this category as a result of regulatory changes that may require disposing of certain securities within a certain time frame. Also, certain debt securities must be classified into

either the trading or AFS category if they can be contractually prepaid or otherwise settled in such a way that the holder would not recover substantially all of its investment. The assets are reported at fair value. Any unrealized gain or loss is reported in a separate component of shareholders' equity. If the investment is permanently impaired, the excess of amortized cost over fair value is recognized currently as a loss in the income statement.

| | | | |
|---|---|---|---|
| **Exhibit 1** | | | |
| **Classification of Debt Securities** | | | |
| **Impact** | **HTM** | **Trading** | **AFS** |
| Balance Sheet | Historical cost - adjusted for amortization of discount or premium in accordance with effective interest method. | Fair value. | Fair value. |
| Income Statement | Interest income reported in earnings based on the effective interest method; | Interest income reported in earnings based on the effective interest method; | Interest income reported in earnings based on the effective interest method; |
| | Losses arising from permanent impairment of assets reported in earnings. | Unrealized gain or loss arising from changes in market value reported directly in earnings. | Unrealized gain or loss arising from changes in market value reported as other comprehensive income and a separate component of shareholder's equity. |
| | | | Permanent impairment losses reported in earnings. |

Since these classifications are made on an individual security basis and largely reflect ability and intent, the same type of debt security may be reported on a different basis in the same organization. This classification is determined at acquisition and should be reassessed on each reporting date. However, debt securities are generally not allowed to be freely moved from one category to another. The FASB has provided certain guidelines under which reclassification of a security is permitted.

The debt securities reported under the held-to-maturity category cause the least amount of fluctuation in earnings of an organization. Earnings are reported on an historical cost basis which is based on pricing factors at the time of acquisition. Factors such as current market value and current interest rates generally have no impact on earnings. However, prepayments and credit losses do impact earnings as described below. If an organization does not have the ability to hold the debt securities until maturity due to interest rate risk, prepayment risk, currency risk, liquidity risk or gap management, they should not be classified as HTM. For example, if a bank is expecting to sell certain securities to meet

liquidity demands in the future, these debt securities should be classified as AFS or trading from the acquisition date. Similarly, if an organization does not have the positive intent to hold the debt securities until maturity, they should not be classified as HTM. Another example would be an organization's desire to sell securities in order to offset taxable losses or gains. For instance, if there are taxable losses, an organization cannot sell any appreciated debt securities from HTM to offset the taxable losses. If the intent is to offset taxable gains or losses by selling certain debt securities, those debt securities should be classified in the AFS or trading category from the acquisition date. Also, it was concluded by the FASB that hedging price and interest rate risk will be considered to be inconsistent with the intent to hold a debt security to maturity. When an organization adopts SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," it will no longer be able to completely hedge price or interest rate risk of HTM securities. However, at the time of adopting SFAS No. 133, an organization has a one-time opportunity to reclassify any securities out of HTM into AFS or Trading.

Any movements via reclassification or direct sales from the HTM category are expected to be rare. If a debt security is reclassified, the FASB expects the existence of very compelling and unusual reasons for doing so. Reclassifications are permitted if: (a) there is permanent credit impairment of such securities, (b) regulatory requirements change the risk weighting significantly or otherwise cause business organizations to sell such securities, (c) tax law changes the tax exempt status of such securities, (d) a major business combination or disposition (such as a merger or an acquisition) causes the organization to dispose of certain securities to maintain existing interest rate or credit risk profiles and (e) other events that are isolated, non-recurring and unusual that could not have been reasonably anticipated. Transfer or sale of an HTM security for other than the specified reasons would call into question the original classification and "taint" all other HTM securities. Those other tainted HTM securities would need to be reclassified and no new securities could be classified as HTM for a certain period. Fortunately for securitization transactions, the sale of the "tail" portion of the debt securities is allowed without raising doubts about the initial classification of the entire portfolio. The "tail" portion is identified as the earlier to occur of (a) when 85% of the outstanding principal balance at the date of acquisition is paid down and (b) 90 days or less to the final maturity date of the debt security.

**Exhibit 2**

**Historical Cost Method**

| Period | Scheduled Balance | Principal | Expected Interest | Payment | Carrying Value | 12.893% Income | Unamortized Discount |
|---|---|---|---|---|---|---|---|
| 0 | $100,000 | | | (98,000) | 98,000 | | 2,000 |
| 1 | 98,776 | 1,224 | 1,000 | 2,224 | 96,828 | 1,053 | 1,947 |
| 2 | 97,539 | 1,237 | 988 | 2,224 | 95,644 | 1,040 | 1,894 |
| 3 | 96,290 | 1,249 | 975 | 2,224 | 94,448 | 1,028 | 1,842 |
| 4 | 95,028 | 1,262 | 963 | 2,224 | 93,238 | 1,015 | 1,790 |
| 5 | 93,754 | 1,274 | 950 | 2,224 | 92,015 | 1,002 | 1,739 |
| 6 | 92,467 | 1,287 | 938 | 2,224 | 90,779 | 989 | 1,688 |
| - | - | - | - | - | - | - | - |
| 48 | 25,036 | 1,955 | 270 | 2,224 | 24,919 | 289 | 117 |
| 49 | 23,062 | 1,974 | 250 | 2,224 | 22,962 | 268 | 100 |
| 50 | 21,068 | 1,994 | 231 | 2,224 | 20,985 | 247 | 84 |
| 51 | 19,055 | 2,014 | 211 | 2,224 | 18,986 | 225 | 69 |
| 52 | 17,021 | 2,034 | 191 | 2,224 | 16,965 | 204 | 56 |
| 53 | 14,966 | 2,054 | 170 | 2,224 | 14,923 | 182 | 44 |
| 54 | 12,892 | 2,075 | 150 | 2,224 | 12,859 | 160 | 33 |
| 55 | 10,796 | 2,096 | 129 | 2,224 | 10,773 | 138 | 24 |
| 56 | 8,680 | 2,116 | 108 | 2,224 | 8,664 | 116 | 16 |
| 57 | 6,542 | 2,138 | 87 | 2,224 | 6,532 | 93 | 10 |
| 58 | 4,383 | 2,159 | 65 | 2,224 | 4,378 | 70 | 5 |
| 59 | 2,202 | 2,181 | 44 | 2,224 | 2,201 | 47 | 2 |
| 60 | 0 | 2,202 | 22 | 2,224 | (0) | 24 | 0 |

Regardless of the specific classification, interest income including amortization of purchased discount or premium is reported in earnings. Exhibit 2 shows the "effective interest" or "level yield" method of amortization for a hypothetical amortizing mortgage-like debt security with an outstanding principal balance of $100,000, a coupon of 12.0% per annum, a term of 5 years and a gross purchase price of 98.0% ($98,000). Based on these characteristics, the investor receives a contractual payment of $2,224 per month for 60 months. The internal rate of return or yield to maturity of the debt security is 12.893% per annum. The reportable income is calculated as the product of the beginning carrying value of the debt security in a period and 12.893% per annum. The ending carrying value in that period is determined by adding the interest income to the previous carrying value and reducing the resulting amount by the total cash payment received. If this debt security were classified as held-to-maturity, the carrying value of the security will be reported as shown in Exhibit 2 in every reporting period. Exhibit 3 shows the impact of a decline in the fair value to 95.0% (representing an unrealized loss of $2,972 and a fair value of $91,475) at the end of the first quarter for the same security carried under the three different categories. Note that the change in the fair value does not change the carrying value of the assets held in the HTM category.

---

### Exhibit 3

#### Impact on Reported Earnings - Journal Entries

**Original Entry**

| | | |
|---|---|---|
| Investments in MBS | $98,000 | |
| Cash | | $98,000 |

**Held-to-Maturity#**

| | | |
|---|---|---|
| Cash | $6,673 | |
| Interest income* | | $3,121 |
| Investments in MBS** | | $3,552 |

\# Requires disclosure of the fair value of this portfolio.
\* Earnings (includes $158 amortization of discount).
\*\* Principal amount received less amortization of discount.

**Trading**

| | | |
|---|---|---|
| Cash | $6,673 | |
| Interest income* | | $3,121 |
| Investments in MBS | | $3,552 |
| Loss from MBS* | $2,972 | |
| Investments in MBS | | $2,972 |

\* Earnings will increase by a net of only $149.

**Available-for-Sale**

| | | |
|---|---|---|
| Cash | $6,673 | |
| Interest income | | $3,121 |
| Investments in MBS | | $3,552 |
| Other comprehensive income* | $2,972 | |
| Investments in MBS | | $2,972 |

\* Separate component of equity (amount should be net of tax).

**Exhibit 4**

**Reclassification of Debt Securities**

| From\To | HTM | Trading | AFS |
|---------|-----|---------|-----|
| HTM | - | Recorded at fair value.<br><br>Unrealized gain or loss recognized in earnings at the time of reclassification. | Recorded at fair value. Unrealized gain or loss reported in a separate component of shareholder's equity. |
| Trading | Recorded at fair value.<br><br>Unrealized gain or loss already reported in earnings; no reversals. | - | Recorded at fair value.<br><br>Unrealized gain or loss already reported in earnings; no reversals. |
| AFS | Recorded at fair value.<br><br>Unrealized gain or loss recognized to be continued in a separate component of shareholder's equity. This amount is amortized in accordance with the effective interest method. | Recorded at fair value.<br><br>Unrealized gain or loss recognized in earnings at the time of reclassification. | - |

Exhibit 4 shows the recording of transfers in the event of a reclassification.

Somewhat similar to the rules for debt securities SFAS No. 65, accounting for certain mortgage banking activities, requires mortgage bankers to classify whole mortgage loans into one of two categories: held for sale or held for long-term investment. Mortgage loans classified as held for sale are carried at the lower of cost or market value ("LOCOM"). If market value is less than cost, a valuation allowance is recorded for the difference, resulting in a charge to income. Changes in the required valuation allowance due to changes in market value are reflected in income as they occur. This means that recovery of a previous LOCOM mark down can be recognized as a gain. However, the loans should not be carried at an amount above cost.

Mortgage loans held for long-term investment are those where there is an ability and intent to hold the loans for the foreseeable future, or until maturity. Loans held for long-term investment are carried at amortized cost and evaluated for other than temporary impairment. If ultimate recovery of the carrying amount of the loan is doubtful, the loans should be written down to the expected collectible amount, which becomes the new cost basis. The write down is recorded as a loss and any subsequent recovery is not recognized until the loans are sold or mature. Unlike SFAS No. 115, there is no specific list of circumstances under which loans may be transferred between classifications, although such transfers should be infrequent. Selling or transferring a loan out of the held for long-term investment category would not "taint" the similar classification of any other loan.

*Accounting for Income*

The generally accepted method of accounting for amortization of discount and premium for mortgage loans and debt securities, as described earlier, is called the "effective interest" or "level yield" method. The initial carrying value of the mortgage loans used to calculate the effective yield ("level yield" or "purchase yield") is the purchase price adjusted for (increased by) any direct costs and (decreased by) any nonrefundable origination fees associated with the mortgage loans. The initial carrying value of the debt securities is the purchase price plus accrued interest, if any, paid for such securities. The effective interest method determines the periodic income as either (a) the sum of coupon income and accretion of purchase discount, if any, or (b) the difference between coupon income and amortization of purchase premium, if any, in each case using the internal rate of return to determine the accretion of discount or amortization of purchase premium. In Exhibit 2 it was assumed that the investor will receive only contractual payments and that the debt security is neither callable nor puttable. However, in the case of mortgage loans and MBS, investors have implicitly written a call option to the mortgagors which makes them likely to prepay their loans at no additional cost (generally) to them in a declining interest rate environment. Prepayments are generally expected to rise in a declining interest rate environment because mortgagors can obtain other mortgage loans with lower prevailing interest rates. Prepaying the existing mortgage loans can therefore reduce their cost of borrowing. Since the borrowers in the underlying assets are long a call option, they have the right but not the obligation, to exercise the call. This arrangement makes it extremely difficult to predict the future cash flows to investors in mortgage loans and MBS and thus makes the yield to maturity only an estimate at any point in time. The FASB recognized the importance of the callable nature of mortgage-backed and asset-backed securities.

> **Effect of Prepayments:** If a securitized instrument is purchased at par, changing prepayments does not impact the interest income based on the effective interest method. The interest income received over time is the same as the cash received based on the coupon and the then-outstanding face amount. However, if such an instrument is purchased at a discount from par, an increase in interest rates can adversely affect income because mortgagors are less likely to prepay their mortgages and the accretion of discount will occur over a longer period of time. Of course, the reverse is true as well (i.e. purchases at a premium can be adversely affected by a decrease in interest rates).

SFAS No. 91 allows two basic methods of accounting for interest income for mortgage loans and debt securities that are prepayable. The first method is based on the contractual cash flows determined at the time of purchase without regard to any prepayments that may arise in the future. As prepayments are experienced, the discount or premium related to such prepayments is adjusted in the interest income for that period.

The second method is based on the cash flows with estimated prepayments embedded in those cash flows. The FASB does not require estimation of prepayments under SFAS No. 91. The method may be used if a pool of underlying mortgage loans consists of a large number of mortgage loans or similar assets with substantially similar characteristics such that prepayments can be reasonably estimated. In every reporting period, investors are required to make adjustments to the effective yield to maturity and hence the future interest income based on the actual prepayment experience to date and the expected future prepayment experience of the underlying mortgage loans. Using the actual prepayments from the date

of acquisition to the reporting date and the expected future prepayments from the reporting date onward, a new effective yield is calculated from the date of acquisition. The carrying value is adjusted to the amount that would have existed had the new effective yield been applied since acquisition. The difference between the new carrying value and the actual carrying value is charged or credited to interest income. This results in a "catch up" of effective yield in every reporting period. If a debt security were purchased at a discount and if the prepayments were to accelerate, the new effective yield would be higher than the one calculated at acquisition. Consequently, the interest income in the future reporting periods would be higher than initially projected. If prepayments were to decelerate, the new effective yield would be lower than the one calculated at acquisition resulting in lower interest income for the subsequent reporting periods. This method is also known as the "retrospective method." All fixed rate MBSs and adjustable rate MBSs are required to follow the retrospective method (other than high-risk IO and certain other classes for which the return of substantially all of the initial investment is not guaranteed). Exhibit 5 depicts the impact of "catch up" for a hypothetical mortgage-like debt security. In the first and second quarter, the income on the security is $3,119 (interest income of $3,146 (@13.266%) and a write-down of $27) and $2,955 (interest income of $2,841 (@13.154%) and a write-up of $94), respectively. This method will have the most impact on period-to-period earnings in the middle of the life of the investment. Because the effective yield to maturity is adjusted, a portion of the total change in cash flows is amortized over the remaining life at a higher or lower yield. Shortly after acquisition, very little income has been recognized so the yield adjustment recognized most of the cash flow change over future periods. Near the end of the investment's life, a change in prepayments will have less impact on cash flows.

**Exhibit 5**
**Retrospective Method**

| Period | Prepayments | Effective Yield | Carrying Value | Cash | Income | Discount Amortization | Unamortized Discount |
|---|---|---|---|---|---|---|---|
| 0 | | | 98,000 | | | | 2,000 |
| 1 | 22% | 13.266% | 94,835 | 4,249 | 1,083 | 83 | 1,917 |
| 2 | 22% | 13.266% | 91,746 | 4,137 | 1,048 | 81 | 1,836 |
| 3 | 22% | 13.266% | 88,733 | 4,027 | 1,014 | 78 | 1,757 |
| | | | | | | | |
| 0 | | | 98,000 | | | | 2,000 |
| 1 | 22% | 13.154% | 94,826 | 4,249 | 1,074 | 74 | 1,926 |
| 2 | 22% | 13.154% | 91,728 | 4,137 | 1,039 | 72 | 1,854 |
| 3 | 22% | 13.154% | 88,707 | 4,027 | 1,006 | 70 | 1,784 |
| 4 | 15% | 13.154% | 86,387 | 3,292 | 972 | 67 | 1,717 |
| 5 | 15% | 13.154% | 84,103 | 3,232 | 947 | 66 | 1,651 |
| 6 | 15% | 13.154% | 81,852 | 3,172 | 922 | 64 | 1,586 |
| | | | | | | | |
| 0 | | | 98,000 | | | | 2,000 |
| 1 | 22% | 13.356% | 94,842 | 4,249 | 1,091 | 91 | 1,909 |
| 2 | 22% | 13.356% | 91,761 | 4,137 | 1,056 | 88 | 1,821 |
| 3 | 22% | 13.356% | 88,755 | 4,027 | 1,021 | 85 | 1,736 |
| 4 | 15% | 13.356% | 86,451 | 3,292 | 988 | 83 | 1,653 |
| 5 | 15% | 13.356% | 84,182 | 3,232 | 962 | 81 | 1,572 |
| 6 | 15% | 13.356% | 81,946 | 3,172 | 937 | 79 | 1,492 |
| 7 | 30% | 13.356% | 78,442 | 4,416 | 912 | 78 | 1,415 |
| 8 | 30% | 13.356% | 75,061 | 4,253 | 873 | 74 | 1,340 |
| 9 | 30% | 13.356% | 71,801 | 4,096 | 835 | 71 | 1,269 |

Adjustable rate MBS ("ARM") are complicated not just by prepayments but also by the fact that their coupons are tied to specific indices. If the index moves the coupon income of the ARM becomes subject to increase or decrease. Also, most ARMs are created with "teaser" rates which rates may be significantly below the current interest rates at the time of issuance (resulting from a desire to attract new borrowers in the underlying mortgage loans who cannot afford a higher initial payment that would have resulted from a fixed rate mortgage). The teaser rates are fixed for a short period of time (the teaser period) after origination of mortgages. However, after the lapse of the teaser period, the coupon rate is pegged to an index implying that the coupon equals the applicable index plus the specified margin (subject to certain caps and floors). How does one compute the effective yield for an ARM with changing interest rates? For the purposes of amortizing the discount or premium, the FASB allows both (a) using an index rate at acquisition for the life of the ARM to project cash flows and (b) adjusting the coupon to the correctly indexed rate at the end of the teaser period and projecting the cash flows accordingly. The second strategy results in most of the original discount from discounted ARMs to be recognized in the teaser period. Floaters and Inverse Floaters coupons are tied to an index. In the case of Floaters, the coupon moves in the same direction as the related index, whereas in the case of Inverse Floaters, the coupon moves in the opposite direction. Note that both can be leveraged in relation to the underlying index making a significant impact on the coupon income. Both are accounted for using the retrospective method.

The FASB has defined "high risk" securities as those securities where there is a potential for loss of substantially all of the original investment due to changes in (a) market interest rates, (b) prepayment rates or (c) temporary reinvestment earnings. For a debt security to not be considered a high risk security, the generally accepted threshold is recovery of 90% or more of the initial investment. Under this definition, both interest-only ("IO") and most residual securities are considered high risk securities and the accounting for such securities is therefore based on the "prospective method" as described under EITF Issue No. 89-4, *"Accounting for Purchased Investment in a Collateralized Mortgage Obligation Instrument or in a Mortgage-Backed Interest Only Certificate."* In the initial accrual period, interest income is accrued based on the initial carrying value and effective yield. Any cash received is first used to apply towards accrued interest and then to reduce the carrying value to zero. At each reporting date, the effective yield is adjusted prospectively from the reporting period based on the new estimate of prepayments. If the new effective yield is less than the then-current risk-free interest rate, the investment is considered impaired and written down to fair value, which becomes the new cost basis. The new effective yield is calculated based on the carrying value at the end of the previous reporting period, the new prepayment estimates and the contractual terms of the debt security. This procedure continues until all cash has been received. Note that this does not result in a write-up or a write-down of the carrying value in the reporting period. Only the future interest income is affected. Exhibit 6 depicts the impact of the prospective method for a hypothetical mortgage-like debt security. In the second first and second quarters, the income from the debt security is $3,146 and $2,838, respectively. Also, as amended by SFAS No. 125, these types of debt securities may not be classified in the HTM category. Because of the high-risk and volatile nature of these debt securities, they are marked to market and classified in either the trading or AFS category.

**Exhibit 6**

**Prospective Method**

| Period | Prepayments | Effective Yield | Carrying Value | Cash | Income | Discount Amortization | Unamortized Discount |
|--------|-------------|-----------------|----------------|------|--------|----------------------|----------------------|
| 0 | | | 98,000 | | | | 2,000 |
| 1 | 22% | 13.266% | 94,835 | 4,249 | 1,083 | 83 | 1,917 |
| 2 | 22% | 13.266% | 91,746 | 4,137 | 1,048 | 81 | 1,836 |
| 3 | 22% | 13.266% | 88,733 | 4,027 | 1,014 | 78 | 1,757 |
| 4 | 15% | 13.137% | 86,413 | 3,292 | 971 | 66 | 1,691 |
| 5 | 15% | 13.137% | 84,127 | 3,232 | 946 | 65 | 1,626 |
| 6 | 15% | 13.137% | 81,876 | 3,172 | 921 | 63 | 1,562 |
| 7 | 30% | 13.421% | 78,375 | 4,416 | 916 | 81 | 1,481 |
| 8 | 30% | 13.421% | 74,998 | 4,253 | 877 | 78 | 1,403 |
| 9 | 30% | 13.421% | 71,741 | 4,096 | 839 | 75 | 1,328 |

Despite the fact that principal-only ("PO") securities are very sensitive to changes in market interest rates and prepayments, they are not considered high-risk securities under the definition described above. Aside from the permanent credit impairment that may potentially result in a loss of some portion of the original investment, investors in these securities generally receive back their entire investment. The adverse changes in market interest rates or the prepayment rates may only affect the effective yield or the total return of such debt securities. Of course, the market value of the security will be affected by changing interest rates and prepayments. Any changes in the fair value may be carried over to earnings or to a separate component of the equity based on the classification of the security as trading, AFS or HTM.

In certain situations, increasing prepayments that result in reduced cash flows to the security holder can cause the effective yield to equal or fall below 0%. Prior to the release of EITF Issue No. 93-18 such debt securities were written down to the undiscounted cash flows (equivalent to 0% effective yield) of the debt securities, however, now such debt securities are tested against the comparable duration risk-free yield and consequently written down to fair value in such a way as to yield the market rate in the future.

### Exhibit 7

### Recognition of Interest Income

| Debt security | Accounting Income |
| --- | --- |
| Planned Amortization Classes, Targeted Amortization Classes, Support Classes and other Fixed Rate Certificates | Retrospective method |
| Principal-Only Certificates | Retrospective method |
| Interest-Only Certificates | Prospective method |
| Residual Certificates | Prospective method |
| Adjustable Rate, Floater and Inverse Floater Certificates | Retrospective method |
| Originated Fixed Rate Loans | Retrospective method |

**Nuances**: 1) Most MBS investors accrue income during a specified accrual period, however, the accrued income is paid out to the investors only after certain number of days (often called delay days in the MBS community). SFAS No. 91 does not provide guidance on the computational techniques to account for such delay days. Economically, it reduces the effective yield on the debt security; 2) SFAS No. 91 also does not provide guidance on computational techniques to take into account purchased accrued interest. A typical fixed rate MBS accrues interest for the entire calendar month prior to the month of actual payment. If such MBS settles on the 28th of the month, an investor will purchase twenty-seven days of accrued interest from the seller; and 3) Due to variations in prepayment speeds and index rates, it is possible for discount and premium ARMs to accrete their cost basis to more than the outstanding principal balance or the initial basis at acquisition, respectively. In such cases, the cost basis is capped at the outstanding principal balance (for discount ARMs) or the market value (%) at acquisition (for premium ARMs). For simplicity, all examples shown in this article are based on (a) no delay days and (b) no accrued interest.

*Investments by Securitizers in Retained Interests - Residuals*

Many organizations securitize their assets periodically. There are many reasons to access the capital markets via securitization. The most important reason being the availability of funds at lower costs.

However, there has been a lot of press talk about certain accounting procedures followed by lending institutions which primarily depend on securitization to access the capital markets. Many lenders have had to change their accounting resulting in a write down of their assets, in particular, the residual interests in securitizations held by them. When high yielding mortgage loans such as B&C/subprime quality loans are securitized, a residual security is created by virtue of the fact that the underlying assets generate higher coupon income than that needed for any on-going expenses and the interest on newly formed debt securities. The difference between the income on the assets and the expense on the liabilities represents "excess interest" needed for credit enhancement and is given the form of "residual security" or "residual interest." These residual interests are akin to interest-only strips and generally have no principal balance. If prepayment rates were to increase, the residual interests would be left with declining cash flow possibly causing a significant loss of the original investment. Per SFAS No. 125, these securities must be classified into trading or AFS category and marked to market in every reporting period.

Ideally, the "market" or fair value of the residual security used for accounting purposes should be the price at which it can be traded. Quoted market prices in active markets are the best indicators of fair value. However, residual securities trading is scarce and very specialized making the market for such debt securities very inactive and illiquid. If quoted market prices are unavailable, the FASB allows estimation of fair value based on reasonable assumptions about future cash flows. The process of projecting the future cash flows for residual securities is driven mainly by the following assumptions: the (a) prepayment rate and (b) expected credit loss rate in a pool of mortgage loans. Future cash flows using the above assumptions are then discounted back to the date of securitization at the prevailing discount rates. These discounted cash flows provide an estimate of the fair value of the residual security.

If a securitization is to be treated as a sale for accounting purposes, the recognition of "gain" or "loss" is not an election of the seller. A seller must recognize gain or loss immediately based on the allocation of the carrying value of the mortgage loans to the debt securities sold. A hypothetical securitization shown in the box below depicts how pre-tax gain (loss) is calculated for a securitization assuming that the net carrying value of the mortgage loans is at par. The key factor here is to estimate the fair value of the residual class which often tends to drive a transaction. If the fair value is not available and if it cannot be estimated for a retained security, it should be recorded at zero.

### Exhibit 8

### Pre-tax Gain for Securitization

| Class | Balance | Coupon | Price | FMV | Allocation | Basis | Sold |
|---|---|---|---|---|---|---|---|
| Loans | $100,000 | 9.0% | - | - | | $100,000 | Y |
| Class AAA | 96,000 | 7.5 | 100% | $96,000 | 94.27% | 94,266 | Y |
| Class BB | 4,000 | 7.5 | 96 | 3,840 | 3.77 | 3,771 | Y |
| Residual | | - | | 1,500 | 1.47 | 1,473 | N |
| Servicing | | 0.5 | | 500 | 0.49 | 490 | N |
| | $100,000 | | | $101,840 | 100.00% | $100,000 | |

| | |
|---|---|
| Proceeds | $99,840 |
| Allocated Carrying Value | (98,037) |
| Pre-tax Gain | $1,803 |

### Journal Entries after a Securitization

| Journal Entries | Debit | Credit |
|---|---|---|
| Cash | $99,840 | |
| Class R certificates | 1,473 | |
| Servicing asset | 490 | |
| Mortgage loans | | $100,000 |
| Gain-on-sale | | 1,803 |
| | | |
| Class R certificates* | 27 | |
| Other comprehensive income | | 27 |

*Adjusting entries to mark the retained interest to fair value. Servicing asset (is not a security and) remains at carrying value.

The expected rate of return on the residual depends primarily on the expected credit loss experience and the expected prepayment experience of the underlying mortgage loans. Significant fluctuations in the earnings stream can result if the valuations are done incorrectly at the beginning of the process.

Upon acquisition, an effective yield is calculated for the residual security based on the reasonable assumptions about prepayment and credit loss rates. This effective yield is equal to the discount rate used at acquisition. In the above example, the prepayment rate was 25% per annum, the loss rate was 0.75% per annum taken as a haircut from interest income, and the discount rate for the residual security was 19.5% per annum. The effect of changing one of the assumptions (while keeping the others constant) from the base case is shown in Exhibit 9.

### Exhibit 9

#### Impact of Varying Assumptions on the Hypothetical Retained Interest

| Loss Rate | 0.00% | 0.25% | 0.50% | 1.00% |
|---|---|---|---|---|
| Fair Value | $3,078 | $2,548 | $2,021 | $981 |
| % Change from Base Case | 105% | 70% | 35% | -35% |
| | | | | |
| Prepayment Rate | 20.00% | 22.50% | 27.50% | 30.00% |
| Fair Value | $1,717 | $1,602 | $1,405 | $1,320 |
| % Change from Base Case | 14% | 7% | -6% | -12% |
| | | | | |
| Discount Rate | 10.00% | 12.50% | 15.00% | 17.50% |
| Fair Value | $1,853 | $1,745 | $1,648 | $1,562 |
| % Change from Base Case | 24% | 16% | 10% | 4% |

These securities are carried at fair value in either the trading or AFS category. Any unrealized gains or losses because of changes in the fair value of a trading security is recognized in earnings. For AFS securities, these changes are recognized in a separate component of equity called "comprehensive income." These debt securities are tested for other-than-temporary impairment by comparing the discounted present value of the expected cash flows at a comparable risk-free rate to the current carrying value of such debt security. The debt security is considered impaired if such difference is negative in which case the debt security should be written down to fair value. The write-down is a charge against earnings. The debt securities which are classified into the trading category need not be assessed for such impairment because any difference in fair value is already included in earnings.

At the time of this writing, the EITF has added to its agenda, EITF Issue No. 99-20, *(Recognition of Interest Income and Impairment on Certain Investments.)* Initially, the scope of the project will be limited to retained interests classified as either held-to-maturity or available-for-sale. Existing GAAP does not provide robust guidance for the ongoing measurement of interest income and other adjustments for securitized debt instruments whose cash flows may change as a result of prepayments, credit losses, changes in an interest rate index and other reasons. Multiple interest income accounting models have been developed and applied for particular types of securities to deal with changes in their estimated future cash flows.

*Servicing by Securitizers*

Servicing is inherent in all financial assets. The servicing function includes, but is not limited to, collections of principal, interest and taxes from borrowers, disbursement of such funds to investors and related taxing authorities, monitoring delinquencies and performing foreclosures on behalf of investors. Servicing becomes a distinct asset only when it is contractually separated from the underlying financial assets or if it is purchased separately.

Per SFAS No. 125, if the seller retains the servicing function of the securitized mortgage loans and the contractual servicing fee is more than "adequate," a servicing asset must be recorded on the balance sheet. Conversely, if the servicing compensation is not adequate, a servicing liability must be recorded. How does one determine the "adequate compensation" for any

portfolio? In general, it includes the cost of servicing plus some profit demanded by the marketplace. Note that the adequate compensation is not determined by the individual servicing operations. It is set by the marketplace. As a rule of thumb, larger balance mortgage loans demand smaller servicing fee and vice versa. For example, the servicing fee for non-conforming jumbo mortgage loans is generally 20 basis points whereas for conforming mortgage loans serviced by agency-approved servicers is expected to be higher than 20 basis points. In our example the contractual servicing fee is assumed to be 50 basis points. In most securitizations the servicers are entitled to late fees and any reinvestment earnings of the funds held. On the other hand, these servicers are also contractually obligated to advance certain payments for delinquent borrowers and, in some cases, for interest shortfalls caused by unexpected prepayments of principal. For simplicity, it is assumed in our example that the extra income from late fees and reinvestment earnings will offset these expenses (and that the time value of the difference is zero). Let us further assume that there is an average bid (solicited or unsolicited) of 40 basis points to service the portfolio. If the seller retains the servicing function of the portfolio, the 10 basis points over and above the average bid indicates that a servicing asset must be booked after securitization. If the contractual servicing fee were only 25 basis points, the 15 basis points below the representative bid would indicate a servicing liability.

A servicing asset or liability is not amortized using any of the contractual, retrospective or prospective methods discussed earlier. In fact, both servicing assets and liabilities are amortized in proportion to and over the period of net estimated servicing income (excess of servicing revenues over the servicing costs) or net servicing loss (excess of servicing costs over the servicing revenues). In addition, the servicing asset or liability should be reassessed each period for impairment by comparing the carrying value against the fair value of the asset or liability. If the fair value is lower than the carrying value, the servicing assets are adjusted downward to the lower-of-cost-or-market and the difference is carried via valuation allowance into earnings. Subsequent writeups through earnings are allowed only to the extent of previous writedowns.

The determination of impairment in servicing assets requires stratification of underlying assets being serviced. The underlying assets must be broken down into categories representing significant risk in the portfolio such as fixed rate vs. adjustable rate mortgage loans, coupon, remaining term, geographic location, etc. The fair value in each individual category is compared to the carrying value of the corresponding category. The writedown is taken through a valuation allowance in each individual category. A writedown in one category must not be offset by an increase in the fair value (over the carrying value) in another category. For servicing liabilities, an increase in fair value implies an increase in the liability via a basis adjustment (no valuation allowance) with the loss carried through earnings. Servicing assets and liabilities must be accounted for separately.

The income on IO securities is recognized either based on changes in fair value and the effective yield method (if classified as trading) or simply based on the effective yield method (if classified as available-for-sale). Because there are differences in the subsequent accounting for servicing and IO securities, sellers may structure contracts for the retained interests to provide smaller servicing assets and larger IO securities or vice versa. Exhibit 10 depicts the differences in accounting for income from servicing assets and IO securities for the same expected cash flows. The different methods of accounting for servicing and IO securities in this above example result in the same aggregate amount of accounting income to be recognized over the life of the investment, however the timing of such income varies.

The servicing assets are adjusted for the difference between fair value and the carrying value as described above under the LOCOM method, but only if the fair value were less than the carrying value of the assets. Thus, in subsequent periods, gains are recognized only to the extent of previously recorded losses. On the other hand, in each reporting period, the IO securities are adjusted to fair value, for both gains and losses, in earnings (if classified as trading) or equity (if classified as available-for-sale).

### Exhibit 10

**Accounting for Servicing Asset by Sellers (portfolio $100M, 9.0% coupon, 30 years, 25% CPR)**

| Period | Servicing Fee (.5%) | Servicing Fee less Servicing Costs | % of Total Income | Carrying Value at 12% | Amortization of Servicing Asset | Income (Fee less Amortization) |
|---|---|---|---|---|---|---|
| 0 | | | | $1,211,810 | | |
| 1 | $41,667 | $16,667 | 2.45% | 1,182,140 | $29,670 | $11,997 |
| 2 | 40,657 | 16,263 | 2.39% | 1,153,188 | 28,951 | 11,706 |
| 3 | 39,672 | 15,869 | 2.33% | 1,124,938 | 28,250 | 11,422 |
| 4 | 38,711 | 15,484 | 2.27% | 1,097,373 | 27,566 | 11,146 |
| 5 | 37,773 | 15,109 | 2.22% | 1,070,475 | 26,898 | 10,875 |
| 6 | 36,857 | 14,743 | 2.17% | 1,044,230 | 26,246 | 10,612 |
| 7 | 35,964 | 14,386 | 2.11% | 1,018,620 | 25,609 | 10,355 |
| 8 | 35,092 | 14,037 | 2.06% | 993,632 | 24,988 | 10,104 |
| 9 | 34,241 | 13,696 | 2.01% | 969,250 | 24,382 | 9,859 |
| 10 | 33,410 | 13,364 | 1.96% | 945,459 | 23,791 | 9,619 |
| 11 | 32,600 | 13,040 | 1.92% | 922,245 | 23,214 | 9,386 |
| 12 | 31,809 | 12,723 | 1.87% | 899,595 | 22,650 | 9,158 |

Accounting for IO security with same expected cash flows as above

| Period | Carrying Value | Interest-Only Amortization | Income |
|---|---|---|---|
| 0 | $1,211,810 | | |
| 1 | 1,182,261 | $29,549 | $12,118 |
| 2 | 1,153,427 | 28,835 | 11,823 |
| 3 | 1,125,288 | 28,138 | 11,534 |
| 4 | 1,097,830 | 27,458 | 11,253 |
| 5 | 1,071,035 | 26,795 | 10,978 |
| 6 | 1,044,888 | 26,147 | 10,710 |
| 7 | 1,019,373 | 25,515 | 10,449 |
| 8 | 994,475 | 24,898 | 10,194 |
| 9 | 970,179 | 24,296 | 9,945 |
| 10 | 946,471 | 23,708 | 9,702 |
| 11 | 923,336 | 23,135 | 9,465 |
| 12 | 900,761 | 22,575 | 9,233 |



*Acknowledgements*

The information set forth herein has been gathered from various publications from the Financial Accounting Standards Board. The rules and regulations are subject to change from time to time. The authors strongly encourage readers to refer to the original information published by the FASB or to contact their accountants for appropriate advice. The authors would also like to thank Marty Rosenblatt of Deloitte & Touche LLP.

**SUNIL GANGWANI** is a Director in the Securitization Transactions Team at Deloitte & Touche, New York. Sunil's primary focus is the modeling of domestic and international CDOs, asset-backed and mortgage-backed transactions. Sunil has extensive experience in managing structured transactions backed by high yield debt, bank loans, mortgages, automobile loans, equipment leases, tax liens and stranded assets. He is often consulted by clients and non-clients in providing securitization transaction related services such as due diligence and verification of information set forth in the offering documents for ABS. He has played a key role in developing the ABS practice of Deloitte & Touche. He has also authored "Securitization 101" and "MBS Structuring - Concepts and Techniques." Sunil can be reached at (212) 436-3719 or sgangwani@dttus.com.

**ALLEN S. THOMAS, JR.** is the Market Unit Leader of the Securitization Transactions Team at Deloitte & Touche LLP, New York, which is comprised of 55 client service professionals dedicated to assisting clients on securitization transactions. Allen has 17 years of public accounting experience, primarily within the financial services industry. Over the last 13 years, he has worked exclusively with mortgage-backed and asset-backed transactions. He has supervised our computer driven analyses of more than 2,000 CMO/REMIC public offerings, involving more than $1 trillion in assets. Allen is a well known consultant on structuring and the analysis of bond sensitivity to prepayments and losses.

**JAMES MOUNTAIN** is a Partner in the Capital Markets Group at Deloitte & Touche LLP in New York specializing in accounting structuring of securitizations and other structured finance transactions. Jim serves a wide variety of issuers, underwriters and investors. His work has spanned virtually every securitization asset class including residential and commercial mortgages, credit card and trade receivables, as well as real estate, aircraft, automobiles and other equipment operating and finance leases.

Exhibit B



# Thomson StreetEvents

# Conference Call Transcript

**IFIN - Q2 2002 Investors Financial Services Earnings Conference Call**

Event Date/Time: Jul. 11. 2002 / 6:00AM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

CORPORATE PARTICIPANTS

**Operator**

**Joe DeChristofero**
*Investors Financial Services*

**Kevin Sheehan**
*Investors Financial Services - Chairman and CEO*

**Mike Rogers**
*Investors Financial Services - President*

**John Spinney**
*Investors Financial Services - CFO*

CONFERENCE CALL PARTICIPANTS

**Analyst**

**Unknown Speaker**

PRESENTATION

**Operator**

Please stand by. Good day, everyone. Welcome to the Investors Financial Services Corporation second quarter earnings release conference call. Today's call is being recorded. At this time for opening remarks and introductions, I'd like to turn the call over to Mr. Joe DeChristofero (phonetic).

**Joe DeChristofero** - *Investors Financial Services*

Thank you, operator. Thanks for joining us on today's call. We'll be making a number of forward-looking statements which are based on management's assumptions as of today. The company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the MBNA section of the most recent 10-Q and 10-K. I recommend that anyone listening to this call review those reports carefully.

Because this call will be archived on our website, I want to emphasize again for anyone listening at a later date that the statements made today are based on our assumptions today, July 11th, 2002. These assumptions may change, but the recording of this call will not be updated. Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer, Mike Rogers, President, and John Spinney, Chief Financial Officer. I'll now turn the call over to Kevin Sheehan.

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

Good morning. I'll begin by reviewing some key points from the second quarter and then John Spinney will discuss our financial results in more detail and update our guidance on our models. The diluted EPS for the second quarter came in at 26 cents up two cents or eight fence link quarter and up eight cents 44 quarter two of last year.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

As of June 30th we processed approximately $835 billion of assets for our clients, up approximately $4 billion from March 31st, 2002, and $21 billion from the year ended 2001. During the quarter the S and P 500 index declined approximately 14 percent and NASDAQ declined approximately 21 percent. We converted approximately $19 billion in assets from new clients during the quarter and added an additional $11 billion in assets from existing clients.

Finally, market depreciation and client fund flows reported from a $26 billion decrease in our assets processed during the quarter. During the quarter we converted new business we announced on last quarter's call. This new business included Oak Mark Funds, CDC Invest Funds, Agone TransAmerica Funds, and BGI Global ETF Product, MFCI I-shares (phonetic).

In addition, we expanded our relationship with BGI by winning the processing mandate for I-shares. Some of which are expected to commence trading in July. The pipeline for new business remains at $40 million in annualized revenue. We define pipeline as the actualized revenue on outstanding bids where we believe we have a 50 percent greater likelihood or greater of winning the new business. The BGI conversion is on track for completion by October 31st, 2002, and the second quarter 2002 represents another solid top line and bottom line performance for our company in a difficult market environment. These results have been driven by our ability to sell new business in a declining market and a continued favorable interest rate environment. Now I'd like to turn the call over to John Spinney, who will review the quarter's results in more detail.

**John Spinney** - *Investors Financial Services - CFO*

Good morning. As Kevin mentioned, second quarter diluted EPS came in at 26 cents a share and 8 percent linked quarter increase. Our diluted EPS of 26 cents represents a 44 increase over the second quarter of 2001 EPS of 18 cents. Diluted EPS in net income for 2002 both exclude the amortization of good will in the accordance with provisions HASBY-142 (phonetic).

Revenue growth remains a key driver of the company's EPS growth. That off burning revenue which is made up of net interest income and fee income increased 4 percent link quarter and 22 percent over the same quarter of last year. The two components of our revenue, net income are reported separately financial statement for presentation purposes, but these two revenue sources are derived from the same core securities processing business as clients use the company's balance sheet as a convenient way to invest their excess cash, thus generating net income for us.

I'll now walk through the significant income and expense components in more detail. Debt income decreased 4 percent link quarter primarily due to three factors. Interest rate resets on our variable rate investments, 2Q having 91 days versus 89 in Q1 in an asset liability strategy to prepay high rate FHLB advance and replace it with one at a lower rate.

Despite these factors we maintained healthy net interest margin and spread percentages as the yield curve remained steep during the second quarter. The link quarter interest rates spread contracted by 33 basis points to 2.26 percent while net interest margin contracted by 35 basis points to 2.45 percent. Compared to the same quarter of last year, net interest income was up 28 percent both due to a steep EPO (phonetic) curb and the increase side of our balance sheet.

Fee income increased 8 percent link quarter due primarily to additional client fund flows in higher income from our securities lending and foreign exchange services. On a year over year basis fee income increased 20 percent due to higher asset levels in 2002 versus 2001 and higher ancillary revenues in 2002 versus 2001 all achieved during challenging equity marketing conditions.

Operating expenses increased 3 percent link quarter an increase in transaction processing fees accounted for the majority of the increase in operating expenses. Transaction processing fees were up link quarter as a result of higher transaction volumes in Q2 versus Q1. Comp and benefits, our largest operating expense, declined on a link quarter basis by approximately $1 million. The decrease in compensation and benefits link quarter as a result of lower bonus and payroll tax accruals in Q2 versus Q1. Both of which were partially offset by additional head count added in Q2 to service new business. We continue to maintain strict cost controls especially in the face of weaker equity markets.

I'd also like to address an issue that some of you may have seen in last month's American Banker, that we will disclose in our second quarter Q. Like many other financial institutions in Massachusetts, we recently received from the Mass DOR, Department of Revenue, a notice of intent to asset state excise taxes for tax years 1999 and 2000, 6.2 million including interest. The notice claims that the bank was not eligible to receive a 95 percent dividends received deduction on dividends it received from Investors Funding Corps, the bank's majority owned REET (phonetic. After consultation with our tax accountants and legal counsel, we believe strongly in a technical merits of our case and at this time feel comfortable

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

with our 1999 and 2000 tax provisions. As always, we are reviewing a number of business strategies that may also minimize our tax exposure. Prospectively we remain comfortable with our current effective tax rate.

In addition, I received several inquiries regarding our option dilution disclosure in our annual report. After reviewing financial accounting standards 123 and consulting with our independent accountants, it was fair to say we have been extremely conservative in our disclosure. The key drivers of the dilution calculation are the expected life of the option, the volatility of the underlying stock, and the effective tax rate used in the pro forma calculation. Our 2001 FAS-123 option dilution disclosure was based upon an expected option life of ten years, a volatility percentage of 57 percent, and a 30 percent effective tax rate.

Under these variables the resulting dilution as disclosed in the annual report was 37 percent. Utilizing the annual expected life of 40 years volatility over these years of 55.3 percent, an effective tax rate of 27.3, reflecting the tax benefit of the compensation deduction, the actual dilution would have been 18 percent.

I hope this clarifies our disclosure. We plan to update our FAS-123 disclosure for 2001 in our 2002 annual report. Given our continued strong top and bottom performance during the second quarter the continued favorable interest rates environment and client wins and conversions, we are raising our 2002 EPS guidance to 101 to 103, from a dollar to 102. We remain comfortable with our long term growth rate of 25 percent in EPS. I'd now like to open up the call to your questions.


## QUESTION AND ANSWER


**Operator**

Thank you. The question-and-answer session will be conducted electronically. Any participant wishing to ask a question, please press star one on your touch tone telephone. We'll take your calls in the order that you signal and as many as time permits. Again, that is star one to ask a question.

We'll first hear from Jon Afrstrom of RBC Capital Markets.


**Analyst**

Good morning guys. Pretty good quarter. Can you give us an update on how much of the new business from last quarter is already on the books and how much is left to go on Q3?


**John Spinney** - *Investors Financial Services - CFO*

Pretty much all the business we announced last quarter we talked about on this call has been converted in this call. The last piece converted on July 1, Jon, so that will be in place for the full Q3.


**Analyst**

And then can you talk a little bit about value added, what drove some of the results there.


**John Spinney** - *Investors Financial Services - CFO*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

I think on the value added side, security funding, we were in a traditional foreign dividend season, we got a little bit of benefit from that. We also on the effect side had good transaction volume and substantive favorable spread over the period.

**Analyst**

And then on the new guidance are you still saying the 25 percent long term growth rate should be listed in '03?

**John Spinney**  - *Investors Financial Services - CFO*

Yes.

**Analyst**

Thank you.

**Operator**

Moving on, we'll next hear from Joel Gomberg of William Blair.

**Analyst**

Perhaps expand a little bit more about the exchange rated fund business, how that has added to business this year compared to last. How you might make money in that business a little differently, some of your core business, and then talk about the opportunity there in the fixed income ETF business of BGI is rolling out, and what type of market you think is out there for those markets. Thanks.

**John Spinney**  - *Investors Financial Services - CFO*

Sure. The ETF business for us in terms of what it's meant has grown significantly since December of last year. I think we started the year at probably 19 billion, we ended this quarter in 27 billion of assets in that product. We pretty much own the market in terms of number of funds out there. I think we have 75 percent of the funds in the marketplace and we probably have close to 30 or 40 percent of the assets in ETF. So the marketplace, we're a marketplace leader, I would say, Joel.

In terms of how that translates into our results, as the assets have grown over the first two quarters, we picked up our traditional asset based and transaction fee revenue, the other incremental revenue derive from the ETF, what's called accretion and redemption fees, and every time an authorized placement agent wants to create or redeem one of these units which is denominated, I believe, 50,000 shares, they give deliver us a basket of securities plus some balancing cash. We deliver back the 50,000 units or they can collect 50,000 units in the marketplace deliver back to us and we deliver securities and cash back to us and that creates a little more revenue on those products. It's part of the fixed income ETFs. So those are - just were approved by the FCC.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

Our client enrollment was up in July. We believe there's an appetite for that market and they've been very successful in selling the car (phonetic) product that's growing extremely well and we think over time that's going to be accepted just as well as the equity ETFs.

---

**Analyst**

Do you receive the same type of profitability or fees from the fixed income versus the equity ETF?

---

**Mike Rogers**  *- Investors Financial Services - President*

Joel, this is Mike. Really it works the same way where two pieces of income are involved, an asset based fee with a minimum setting out so the asset is raised to a certain point and then a transaction fee component as John said those of those transactions are accrual, one, and redeeming in kind to the portfolio.

---

**Analyst**

Okay. Last question, John, the balance sheet grew by a billion dollars, period to period end. Could you explain that?

---

**John Spinney**  *- Investors Financial Services - CFO*

Sure, period to period end would happen at the end of this quarter. Well, first of all, our strategy in terms of our asset liability management was to (inaudible) the balance sheet at the at the end of this quarter we ended up with some late wires from clients where we had already gone and sold fed funds earlier in the day and now we were - we bought fed funds earlier in the day and then the $600 million of wires came in late in the day and we had to go out and sell fed funds. So you'll see we had a little inflation just for that one day for that $600 million that came in late day that we had to put out.

---

**Analyst**

Unwind?

---

**John Spinney**  *- Investors Financial Services - CFO*

Next day.

---

**Analyst**

Thanks a lot.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

**John Spinney** - *Investors Financial Services - CFO*

Yes.

**Operator**

We'll next hear from James Allen of JLS.

**Analyst**

Yes. Great quarter. Could you give me some comments in terms of what is the potential that you could sign another big deal that's kind of a transformation deal such as the one you signed in California and are you prepared to do that now and what's the potential we might see that by the end of the year.

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

We don't have anything to announce now. We certainly have the capability. When we nail one down, that's typically when we announce it.

**Analyst**

Okay. Can you give us a little bit of guidance on when to think about when we might be seeing something of that size?

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

No, I think it's really difficult to do that. We're certainly competing for outsourcing business, but I don't think we're at a stage where we could give you any more than that for guidance.

**Analyst**

Are there significant details that have a piece out right now?

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call |
| --- |

We're probably bidding on seven or eight deals that are outsourcing deals.

---

**Analyst**

That are all of that significant size to your company?

---

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

There's nothing that's $500 billion out.

---

**Analyst**

So just give us an idea, are these more like $100 billion or smaller, the deals you're bidding for.

---

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

They could range anywhere from $25 billion to $300 billion.

---

**Analyst**

But a $300 billion deal, that's pretty significant to your company at this point.

---

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

That's right.

---

**Analyst**

That's very much.

---

**Operator**

Next we'll hear from Timothy Willi of A.G. Edwards.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

**Analyst**

Sure. John, if I could ask another question about the balance sheet. On an average basis you had nice link quarter growth, obviously the margins came down but you still had good interest income. If you could just give us some thoughts on - I know it's hard from quarter to quarter, given what your clients may or may not do but should we expect to see, you know, continued margin compression but very strong sort of sequential growth and average earning assets and are you giving any kind of thought there and also be sort of curious about you all articulated 125 basis point rate hike assumption, I believe, when you were giving guidance in the beginning of the year and you still see that happening or is that sort of changed as you sort of ponder what could happen through the next two quarters?

**John Spinney  - Investors Financial Services - CFO**

I would say, Tim, good morning, by the way, the projections we've talked about in the past I think we've now revised what we think our outlook is on interest rates a little bit and we don't think there's going to be much movement until the end of this year and then we've got our assumption is probably 100 basis points over the next 12 months after that is in our assumption. So if you look at our net interest margin and spread now I think you're going to continue to see some compression as the reset happen in the portfolio as we get paydowns within the portfolio and reinvest those at lower rates we're naturally going to gravitate downward, so I would expect some contraction throughout the rest of the year.

**Analyst**

And then the other question was some of the value added services. I don't understand the seasonality in securities lending which you talked about, but could you talk about the actual sort of growth of customers or the portions of customer business that you've been able to gain, year over year sequentially just the seasonality or the market volatility. We now have 20 percent of customers giving us 20 percent more business. Any way you can quantify that?

**John Spinney  - Investors Financial Services - CFO**

Off the top of my head, all I can say to you is all the new business that we bid or win, as we win business, if it comes with all the ancillaries, we add them. If we don't get all the ancillaries, out of the box, we continuously working with clients the customers to get them converted on FX and securities lending. I would say that we have more opportunity now in our customer base given the fact that we've added more clients to grow those revenues in the future than we did year over year if you looked at it. So I think the opportunity is greater. I really can't tell you.

**Kevin Sheehan  - Investors Financial Services - Chairman and CEO**

I'd like to help you out. We added five new clients, Tim, year to year, in the second landing side and our assets under loan went up approximately a billion half although market conditions really have turned back some of the spread that we were traditionally making on some of those loans. So some of our efforts were diminished by the general market conditions.

**Analyst**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

Thank you very much.

---

**Operator**

Next we'll hear from Brad Moore of Putnam Lovell.

---

**Analyst**

Hi, good morning. A couple things it first off, just to circle back to the guidance again, you did speak to interest rates, but also be curious to know, originally your flat equity markets when you first put out your assumption, is that still your assumption or what is the assumption into your new guidance now.

---

**John Spinney  - Investors Financial Services - CFO**

The assumption is we're going to be down where we are. I think we can still make the guidance that we have out there.

---

**Analyst**

Okay. And is that - is that your expectation for 2003 as well with regard to the equity markets?

---

**John Spinney  - Investors Financial Services - CFO**

We will hope that will knock down, but right now we're expecting most of our growth is going to be organic and from new sales in '03.

---

**Analyst**

From the fund flows you mentioned this quarter can you give us some idea as to the clients that contributed materially to those fund flows? Was it largely BGI? And can you give us some color as to who was responsible for the fund flows?

---

**John Spinney  - Investors Financial Services - CFO**

I would say a portion of that was BGI and another piece that was Agone American Transaction (phonetic) business we discussed on this or a previous call.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call |
|---|

**Analyst**

Is it safe to say the majority was BGI?

**John Spinney** - *Investors Financial Services - CFO*

No, I wouldn't say the majority is BGI.

**Analyst**

Okay. And then with regard to new business, what's that pricing environment looking like? Do you see any change there?

**John Spinney** - *Investors Financial Services - CFO*

I think the pricing environment is still competitive as we see every time we're on the marketplace and at the end of the day it still comes down in our opinion to the service levels and, you know, and technology and that's what we seem to be differentiating ourselves in the sales and the marketplace.

**Analyst**

Okay. So any significant downward change in pricing or is it just variable like it has been in prior quarters?

**John Spinney** - *Investors Financial Services - CFO*

I think it's similar to prior quarters, still competitive.

**Analyst**

A couple of other things. Can you give us a sense, then, with specifically with regard to the value added revenue items, can you give us more color as to the actual growth rates for sec lining versus FX versus cash management.

**John Spinney** - *Investors Financial Services - CFO*

Quarter over quarter or link quarter?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

---

| Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call |
| --- |

---

**Analyst**

Year over year.

---

**John Spinney** - *Investors Financial Services - CFO*

Year over year, FX were up 51 percent for the quarter and security funding were up 36 percent quarter over quarter. Six month numbers were up 37 percent for FX and 29 percent securities lending.

---

**Analyst**

And then finally can you give us the amount of BGI revenue this quarter?

---

**John Spinney** - *Investors Financial Services - CFO*

We won't disclose BGI revenue.

---

**Analyst**

Okay. Great. All right. Thank you.

---

**John Spinney** - *Investors Financial Services - CFO*

You're welcome.

---

**Operator**

Again, star one to be placed in the queue for a question or comment. We'll next hear from Carla Cooper of Robert W. Baird.

---

**Analyst**

Good morning.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

---

**John Spinney** *- Investors Financial Services - CFO*

Hi Carla.

---

**Analyst**

I note the small item value added services but investment advisory actually shows some spectacular growth. Could you tell us a little comment on that?

---

**John Spinney** *- Investors Financial Services - CFO*

That's what Merimac (phonetic) mutual fund products, five money market funds that we distribute to our institutional customers as security lending customers and then to the outside world for cash management. The yields on those funds have really performed very well over the last 18 months, and I think it reflects some benefits we've gotten from that yield with outside distribution as well as reflects investment advisors pulling back out of equities and using that cash vehicle as a holding place where hopefully market conditions will improve.

---

**Analyst**

Great. And one other question I think one of the questions you made on the last conference call the amount of business buying early in the year actually gets you to the point where you're quite comfortable with guidance based on the business you just won. Am I remembering that correctly? Any update to that?

---

**John Spinney** *- Investors Financial Services - CFO*

What's that question again, Carla? I didn't understand that.

---

**Analyst**

I thought what we said on the last conference call was that the amount - the significant amount of business that was signed that's been signed so far in a year actually gives you - brings you almost all the way to the point where you could actually achieve the current guidance even without signing new customers? Am I remembering that correctly?

---

**John Spinney** *- Investors Financial Services - CFO*

Yeah, that's probably correct.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

**Analyst**

Okay. So all right. That was the question. Thanks.

**Operator**

Next we'll hear from Thomas Kanler (phonetic) of KBW investment bank.

**Analyst**

Great quarter. A couple of questions if I might, one for John, one for Kevin. Can you help us understand what was the size of the uptake in transaction volumes that you're processing on a late quarter basis?

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

Sure. The processing was up, I think, 36 percent in terms of dollars and the volumes were pretty much up relatively the same. That's link quarter annualized?

**Analyst**

Not annualized?

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

The way transactions work is we've had buy or sell a transaction. There's a fee associated with that so we annualize that item.

**Analyst**

Okay. Second question. Would you elaborate a little more what is the source of positive change that creates new guidance up a few pennies.

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

New guidance I think we converted more asset on some of the new business that we had expected, the markets haven't taken us down as much as we had thought, that interest margin remains strong. I think prior guidance was they thought it was going to go up in the second half of the year. Now it's not moving. And in all those positive things, last to bring guidance up.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

**Analyst**

I guess I'm trying to understand the positive on the net income. If I look correctly it's a little flat in the quarter and I thought you guys were looking for a little higher expectation than just income growth, so am I correct to infer that the noninterest income growth is actually better than you expected in offsetting the flat and interest growth?

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

No, I would say we would expect say we would expect that interest margin remain strong, as I mentioned earlier in the call, we prepaid some FHLD advances that costs a little money to basically lock in some long term spread for '03 and '04 and that's why the margin was off a little bit and I think we'll see a little bit of pickup from that next quarter.

**Analyst**

That helpful, John. Kevin, just some sort of a theoretical question, pick your broken, the lady who has done such a good job of running BGI stepped down for health reasons and there's a team of management below them, but there's been some discussion in the marketplace I guess as to whether or not there is as much pressure for management buyout or the unit would be sold. Do you have any thoughts as to whether or not her stepping down changes that outlook for what's likely to happen there?

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

You know, I don't, and I think if I did it would be really inappropriate for me to comment. We do have a five year contract with them with really no outs in that contract and as you'll recall, we picked up the 300 odd people that went with the transaction and have spent certainly significant resources in converting that into this institution, so I think we feel pretty secure with the relationship, whether they aggressively pursue their management buy out at this time or defer it, but I really don't have any guidance that I can confirm for you in terms of where they're going to go with that.

**Analyst**

That's fair. Just a point of clarification, if I may, when you say no outs, what does that mean exactly?

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

Basically it's a no cut contract. It's a five year deal with four years left to run.

**Analyst**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

Thanks a bunch.

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

Yes.

**Operator**

And actually we have a follow-up from Timothy Willi of A. G. Edwards.

**Analyst**

Kevin, I guess I want a theoretical question but you've had a lot more experience in this business than myself and probably others covering your name, but I think I would be curious working your years of this business in this type of environment that we've volatile and we've now taken another leg down, have you seen where this postpones decisions even further or another enterprise that's moved fairly far down the path, they continue to plug ahead, you know, despite fairly volatile or quick changes in market directions or, you know, has it been your experience this will cause people to sort of stop and reevaluate again?

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

No, I think we've found in the past although it sounds lot of intuitive, I think this is the time when a lot of people investing the next dollar coming through the door look strategically, look at costs, those costs they this outsource and typically tends to be an environment where we get the focus of the strategic thinkers and the decision makers in the organizations and typically they move more aggressively, I think, in terms of closing business or looking at the possibilities of changing the way they do business.

**Analyst**

Okay. So then it's actually sort of speeds up the process or makes it more pressing to kind of get the R and P and all that stuff wrapped up and moved forward.

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

That's our feeling.

**Analyst**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

One more question on that note. Could you refresh my memory on what kind of costs are beared by, you know, your customers, whether there is a conversion from one company to another, any significant outlays they have to make or painless from that perspective?

**Kevin Sheehan** - *Investors Financial Services - Chairman and CEO*

It's painless.

**Operator**

Next we have another question from James Allen from JLS.

**Analyst**

Great. Could you give us an idea just when you talked about the back half in terms of your guidance not going up what sort of market expectations are you building in there? Are you expecting improvements or a flat market?

**John Spinney** - *Investors Financial Services - CFO*

We've got a flat market built into that right now. As soon as the markets went down, we went back and reforecasted and we're comfortable with our guidance today based on our reformed values.

**Analyst**

And one other point I didn't see in the press release, maybe it's there, if we expensed options for EPS, what would EPS have been?

**John Spinney** - *Investors Financial Services - CFO*

For 2001, it would have been let me see, I don't have that number right in front of me, but would have been 18 percent off of $1.53. Let me do a quick calculation. $1.35, probably.

**Analyst**

And does that - I take it it's significantly smaller for this quarter; is that correct?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call |
| --- |

**John Spinney** - *Investors Financial Services - CFO*

Would have been $1.26, I'm sorry.

**Analyst**

I take it it's significantly less for this quarter?

**John Spinney** - *Investors Financial Services - CFO*

It would be if you were looking at - actually no. It wouldn't be any different unless the Black Shull's (phonetic) calculation changes would take the value down. I think it will take up from that if you had to expense because the valuation probably would come down a little bit.

**Analyst**

But it's something approximately 15 percent, something like that?

**John Spinney** - *Investors Financial Services - CFO*

Yes.

**Analyst**

Something reasonable for a tech company that's growing quickly?

**John Spinney** - *Investors Financial Services - CFO*

Yes.

**Analyst**

Thank you very much.

**Operator**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

---

**Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call**

---

We'll next hear another follow-up from Brad Moore.

---

**Analyst**

Yes, just to be clear, on the assets, you said that assets were up 19 billion from new clients and I understood that those - that those flows related to the four or five clients you mentioned that you won last quarter. Could you give us the names of clients that you've won this quarter and therefore will show up in new flows for next quarter?

---

**Kevin Sheehan** *- Investors Financial Services - Chairman and CEO*

We didn't win any additional new business this quarter. The numbers we gave you were for the conversions of the assets from last quarter we announced and fund flows from existing customers to this quarter.

---

**Analyst**

Okay. And so - I mean is that a little unusual, then, that you didn't win any new clients during the quarter, in terms of your historical velocity of new clients? Are you saying the market is relating to that or just a timing issue?

---

**John Spinney** *- Investors Financial Services - CFO*

Just a timing issue, Brad.

---

**Analyst**

But presumably, then, you were in the bidding process, I think, as you said, with seven or eight clients during the quarter and it's your expectation that some of those are clients to be signed earlier in the third quarter or should they just be clients that you expect to come in over the course of the entire quarter?

---

**John Spinney** *- Investors Financial Services - CFO*

It's traditionally been our policy to disclose them only when we win them.

---

**Analyst**

Okay. Thank you.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 11. 2002 / 6:00AM, IFIN - Q2 2002 Investors Financial Services Earnings Conference Call

**Operator**

That concludes our question-and-answer session. A replay of this call will be available starting at 11:00 central today and will run through July 18th at midnight. To access this replay please dial 719-457-0820 and enter in the pass code of 718642. Again that number is 719-457-0820 with a pass code of 718642. This concludes today's conference call. Thank you for your participation.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit C



# Thomson StreetEvents

# Conference Call Transcript

**IFIN - Q3 2002 Investors Financial Services Earnings Conference Call**

Event Date/Time: Oct. 10. 2002 / 6:00AM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

# CORPORATE PARTICIPANTS

**Kevin Sheehan**
*Investors Financial Services Corporation - Chairman and Chief Executive Officer*

**Mike Rogers**
*Investors Financial Services Corporation - President*

**John Spinney**
*Investors Financial Services Corporation - Chief Financial Officer*

**Joe DeChristofero**
*Investors Financial Services Corporation*

# CONFERENCE CALL PARTICIPANTS

**Tom Williams**
*C W*

**Brian**

**John Finney**

# PRESENTATION

---

**Operator**

 Please stand by. Good day, everyone, and welcome to the Investors Financial Services Corporation third quarter earnings release conference call. Today's call is being recorded. At this time for opening remarks and introductions, I would like to turn the call over to Mr. Joe DeChristofero. Please go ahead, sir.

Joe DeChristafarro(ph): Thanks, Operator. Thank you for joining us on today's call. We'll be making a number of forward looking statements which are based on management's assumptions and predictions as of today. The company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the MD and A (ph) section of our most recent 10(k) and 10(q).

I recommend that anyone listening to this call review those reports carefully. Because this call will be archived on our web site, I want to emphasize again for anyone listening at a later date that the statements made today are based on our assumptions as of today, October 10th, 2002. These assumptions may change, but the recording of this call will not be updated. Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer, Mike Rogers, President, and John Spinney, Chief Financial Officer. I will now turn the call over to Kevin Sheehan .

---

**Kevin Sheehan** - *Investors Financial Services Corporation - Chairman and Chief Executive Officer*

 I will begin by reviewing some key points from the third quarter and then John Spinney will discuss the financial results in more detail and update your guidance for your models. Diluted EPS for the third quarter came in at 26 cents. Essentially flat on a late quart basis and up 6 cents or 30 percent from quarter 3 of last year. As of September 30th, we processed approximately 742 billion of assets for our clients, down approximately 93 billion from 835 billion as of June 30th, 2002 and down 72 billion from the year-end 2001. The third quarter , to the surprise of no one on this call, was difficult, to say the least, for capital markets.

To recap for the quarter (ph) the S&P 500 index declined approximately 18 percent and the Nasdaq declined approximately 20 percent. We converted approximately 4.6 billion in assets from new clients during the quarter. These assets represented the I-dex (ph) mutual fund business that we announced on last quarter's call as well as the new assets from A I G. In addition, we added 7.4 billion in new assets from existing clients during the quarter. Sales to existing clients came from Eat on Vance(?), [inaudible] fixed income I shares and Goldman Sachs. Finally, market

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

depreciation in client fund flows resulted in 6 billion decrease in our assets processed during the quarter. The pipeline for new business remains at 40 million in annualized revenue.

To review, we define pipeline as the annualizes revenue on outstanding bids we believe we have a 50 percent or greater likelihood of winning the business. As of today, substantially all the assets assumed from the outsourcing of B GI's North American operation have been converted to our platform. The BGI conversion will be completed in the fourth quarter. To summarize, we again delivered solid results for our investors during the third quarter in an extremely difficult market. These results have been driven by our business' diversified revenue mix and continued favorable interest rate environment. Now I'd like to turn the call over to John Spinney, who will review the quarter's financial results in more detail.

**John Spinney - *Investors Financial Services Corporation - Chief Financial Officer***

Good morning. As Kevin mentioned, third quarter diluted EPS came in at 26 cents a share, basically flat on a late quarter basis. Our diluted EPS at 26 cents represents a 30 percent increase over the third quarter of 2001's EPS of 20 cents and our year to date EPS of 76 cents represents a 41 percent increase over 2001's year to date EPS of 54 cents. As we have stated on prior calls, diluted earnings per share and net income for 2002 both exclude the amortization of good will in accordance with the provisions of FASB 142. Net operating revenue, which is made up of net interest income, fee income and transaction income, increased 1 percent late quarter in 14 percent over the same quarter of last year.

For financial statement presentation purposes, we report two components of our revenue, net interest income and fee income which includes our transaction based fees. But each of our revenue sources is derived from the same core securities processing business. We did not gather deposits for their own sake like a retail bank. Instead, we generate net interest income by investing the residual cash of our asset processing clients who use our balance sheet as a convenient way to invest their excess cash. As I mentioned before, we generate fees based on assets under administration, net interest income and the number of transactions generated by our clients. It has been our experience that during market down turns, our net interest income and transaction volumes typically increase providing a hedge to our asset sensitive revenues.

The break down of our revenue stream for the third quarter was 51 percent asset based 33 percent net interest income and 16 percent transaction based. I'll now walk through the significant income and expense components in more detail. Net interest income increased 4 percent late quarter primarily due to the growth of our balance sheet which is driven by an increase in client funding and borrowings. Offsetting this was a prepayment penalty as a result of an asset liability strategy. To prepay a high rate F H L B advance with one of their (?) lower rate. We maintained healthy net interest margins spread percentages despite the flattening of the yield curve during the third quarter. The late quarter interest rate spread contracted 7 basis points to 2.1 9 percent, where the length quarter net interest margin contracted by 6 basis points to 2.39 percent. Compared to the same quarter of last year, net interest income was up 24 percent due both to a steep EL (ph) curve and the increased size of our balance sheet.

Our fixed rate mortgage backed portfolio, like many others, has experienced higher than normal prepayments as a result of drop in the 10 year treasury. While we are experiencing these higher than normal prepayments, we have been able to reinvest these cash flows in mortgage back securities with attractive spreads. Over the past year, we have shifted our focus on new purchases to short duration pass through MBS's especially 3-1 and 5-1 hybrid arms. These securities help keep our yield up while minimizing extension risk.

Our liability sensitivity has shrunk since the beginning of the year due to shorter duration but we still remain liability sensitive. As long as interest rates remain low or go lower, we intend to maintain the same posture, replacing fixed rate run-off with short duration fixed rate paper. 90 percent of our investment portfolios invested in securities backed by the U.S. government or triple A rated Muni (ph) securities. As a result we've been able to avoid credit losses and maintain strong net interest income and margin. Asset based fee income decreased 1 percent late quarter despite 11 percent decrease in our assets under administration. Our ability to win business and the ability of our clients to sell additional product, thus generating fund flows, allowed us to minimize the impact of the pronounced market downturn of the third quarter. Also contributing to this positive lack of correlation is our tiered pricing structure for asset based fees since we have detrimental pricing schedules for asset based fees as asset values deteriorate, revenue isonly impacted by the asset decline at the then marginal rate.

Transaction driven income, in which we include our ancillary services such as securities lending foreign exchange fees and cash management fees, increased 6 percent late quarter and 37 percent year over year, driven by strong foreign exchange and securities lending revenues over the past year. Linked quarter foreign exchange fees increased due to higher transaction volumes and volatility in the currencies traded by our clients, while securities lending was down 34 percent in late quarter as a result of market value declines, spread compression and the continued lack of capital markets activity. Also Q2 is seasonally higher due to the payment of dividends on foreign stocks. Total operating expenses increased 1 percent in late quarter.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

We were able to reduce our compensation and benefits expense by 2 percent on a late quarter basis. an increase in occupancy expense accounted for the majority in the increase in our operating expenses. Occupancy expense was up 21 percent in late quarter as a result of or need to take down additional space and in anticipation of future revenue growth driven by new client wins and expansion of existing relationships. We continue to maintain strict cost controls especially in the face of weaker equity markets.

As mentioned on our last call, the Massachusetts Department of Revenue has issued the bank a notice of intent to assess data excess taxes of 6.2 million related to dividends it received from its majority owned REIT (ph). The bank along with over 40 others has joined a coalition to obtain a declaratory judgment from the state's supreme judicial court. We are currently in that process and expect to prevail. As such we have not provided for any additional state excise tack. Despite the market value decline experienced during the third quarter and the prepayments on our mortgage backed portfolio, we are made comfortable with our 2002 EPS guidance at 101 to 103. Absent another severe sustained downturn in the equity markets, we remain comfortable with our long term EPS growth rate of 25 percent. I'd now like to open up this call for your questions.

## QUESTION AND ANSWER

**Operator**

Thank you. the questions and answer session will be conducted electronically. If you would like to ask a question, press star 1 on your touch tone keypad. We will take as many questions as time permits and take the questions in the order we receive them. Again if you would like to ask a question, please press star 1. Our first question will come from Tom McCanliss (ph) with Keith Brett wood.

Tom McCanliss (ph): Yes, good morning, gentlemen and congratulations. Several questions. You talk about how your comp. and bennies (ph) went down, when your head count, I guess, is going up. Is there any kind of reversal going on there? That's the first first question.

**John Spinney  -  Investors Financial Services Corporation  -  Chief Financial Officer**

Yes, comp and benefits is down as a result of some head count reduction and lower bonus accruals in the third quarter because we had bonus accruals in the first and second quarter, but it's a combination of two things: head count down quarter to quarter and excessive cost accruals now.

Tom McCanliss (ph): Second question is: It looks like you had a terrific success in your cash management business this quarter. Could you talk about what was driving the success there?

**Unidentified**

I think a couple of things are driving that: Further penetrations of our clients due to continuing sales, as well as market conditions that result in a natural hedge. You know, this is one business that we look at and our customers, you know, pay us servicing fees and sometimes they want that servicing fees paid by compensating us with balances.

Tom McCanliss (ph): Okay. and the next question I have is for Kevin and anybody else I suppose, but could you talk a bit about the environment today, what it's like, your ability to generate, you know, keep a pipeline that's around 40 million of new business when the way you all define it, I would anticipate it's tougher to make the sales, tougher to make close the sale. Is there any light at the end of the tunnel, or are my perceptions more generic and you all are able to do things that are unique to RFN (ph)?

**Unidentified**

I think we've seen a pretty active market. This is typically a time when portfolio managers and investment management companies are looking at ways to reduce their operating costs. They look more strategically at their business. I think from sales standpoint here we have tremendous level of activity. Exactly when those pieces of business will close is essentially unknown to us, but I will say that there's been extremely high levels of activity in the sales process.

Tom McCanliss (ph): Do you get a sense you all are looking at bigger business, bigger pieces of business than you were 6 to 9 months ago?

| Thomson StreetEvents | www.streetevents.com | | Contact Us | 4 |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10, 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

**Unidentified**

Certainly on the outsourcing side of the equation there are more and more people looking at more comprehensive undertakings in terms of externalizing their component of the business and their business needs are broader based right through their middle office operations.

Tom McCanliss (ph): One other question in terms of your assets under administration. How do they break down between equities, bonds and cash?

**Unidentified**

At the end of the quarter, Tom, 69 percent were in equities and 31 percent was in fixed income. We don't break up fixed income by bonds and money markets.

Tom McCanliss (ph): And then finally, what appears to be a little bit of reduced leverage on your balance sheet, net interest income growing, has the duration changed? Are your purchases, your new money purchases a little bit longer duration than what your existing duration is in the investment street book?

**Unidentified**

Our duration is down from 1.6 years to 2 at the beginning of the year. I think what we've done very effectively here is to buy securities that don't have extension risk if rates go up and have used these market conditions to lower risk in our portfolio.

Tom McCanliss (ph): Terrific. Thank you all very much.

**Unidentified**

Sure.

**Operator**

Thank you. Our next question will come from John Ofstrum (ph) with RBC Capital Markets.

John Ofstrum (ph): Good morning, guys.

**Unidentified**

Good morning, John.

John Ofstrum (ph): Can you talk about the historical success you've had in converting the pipeline, you talk about greater than 50 percent probability, but what has that been historically, is it higher than 50?

**Unidentified**

Basically, John, we prevail on about 25 percent of the business that we chase, so I would say that our historical conversions at least been one out of every four. RFP's and proposals we go out on we're winning.

John Ofstrum (ph): But the pipeline, the pipeline number that you give, you talk about having it greater than 50 percent success potential?

**Unidentified**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

---

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

---

Yes.

John Ofstrum (ph): So it's likely to be higher than 50 percent , is what you're saying

---

**Unidentified**

Yeah, it could be.

John Ofstrum (ph): And then in terms of your net interest income assumptions, particularly when you talk about your larger than 25 percent growth rate, what assumptions are you making for '03?

---

**Unidentified**

Right now we're making assumptions that fed funds rate will stay where it is until about July and then over the next 30 months after that at 225 basis point rise in that; that's what's baked in our model. And we're assuming, with that, we're talking about a flat net interest income line item for '03 right now.

John Ofstrum (ph): So flattening of the curve? The other thing, then, would be just in terms of client fund flows: You talked a little bit about market declines versus client fund flows. How are your clients performing? Are they seeing increased fund flows in general, can you make a generalization there?

---

**Unidentified**

I think -- we don't track the actual fund flows because we're not the T A for the clients. But intuitively what I like to tell investors and folks like yourself is that we've got a client base that's not necessarily retail focused, but more institutional focused, that sells a lot of retirement product. and as a result, we've got that recurring asset flow every single year from the $11,000 that people put into 401(K)'s and 403 B's and those type of retirement plans. So although we don't break it out intuitively based on our ability to our assets to go down less than the marketplace, we're probably gathering more assets than probably most other institutions.

John Ofstrum (ph): The last question for Kevin. How confident are you in your ability to sell through this, in other words, to be able to sell enough business to get to that 125?

---

**Kevin Sheehan - *Investors Financial Services Corporation - Chairman and Chief Executive Officer***

I think every year we're confronted with this. I don't think this is anything unusual for us. We come into the end of the year with a certain amount of business on our books and typically the progression we've made in the ensuing years is business that we have to close out of the pipeline. And I think our history suggests we've been pretty effective in doing that. We've certainly pulled back to 25 percent growth rate in the face of declining markets, but I think we're very bullish on our business and we think we can drive that 25 percent next year.

John Ofstrum (ph): Okay. Thanks a lot, guys.

---

**Unidentified**

You're welcome.

---

**Operator**

Thank you. Our next question will come from (inaudible) Cinto (?) with Cinto (?) Capital.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

Cinto (?): Good morning. I was wondering if you guys can talk about your tier 1 leverage. Just doing sort of back of the envelope calculation, I have you guys at something like six and a half percent including trust preferreds. and then I guess what I'm really sort of getting at is: what does that really mean in terms of growth of average-earning assets going forward?

**Unidentified**

I think our leverage capital ratio is closer to 5 and-a-half to 5.6. And I think, with the leverage ratio, we've said to the regulators we're going to maintain that above 5 percent. So I think we do have room for growth in the balance sheet and earning assets. However, that said, the driver of the earning asset side is typically the ability to track more deposits from our clients and that's typically how we grow the balance sheet. However we do ALCO (?) policies that allow us to borrow he and require us to maintain no greater than a 40 percent borrowed funds position at any point in time. We've actually been running much lower than that as client funding has been very strong and our balance sheet is about 80 percent client funded right now.

Cinto (?): What does that mean in terms of where you can get average earning assets can go from here?

**Unidentified**

I think they could go up as far as 8 billion by the end of next year.

Cinto (?): Wouldn't that take you below 5 percent in terms of tier 1?

**Unidentified**

We're going to generate capital every single quarter that will keep us within that 5 and-a-half to 5 percent band.

Cinto (?): Your outlook for margin over that time frame is?

**Unidentified**

Pretty much flat with this year which is probably expected around 140 million.

Cinto (?): Okay. Thank you very much.

**Unidentified**

Yep.

**Operator**

Thank you. Again, if you would like to ask a question today, please press star 1. We'll now go to Charles Trafton (ph) with Adams Harkness.

Charles Trafton (ph): Hi thanks. Good morning. The 93 million in asset decrease from June to September, could you shed a little light on how much was lost clients versus fund flows and market gains?

**Unidentified**

There were no losses.

Charles Trafton (ph): Okay. What about sales to new clients in September?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

**Unidentified**

Let's see. I think I covered that. We converted about 4.6 billion from new clients and 7.4 billion in new assets from existing clients during the quarter and the market depreciation was about 106 billion.

Charles Trafton (ph): Great. You had a similar kind of market depreciation a year ago in the 80 billion range and you seem to come through the last four quarters pretty well. A lot of that was because you got very large clients. Is your average deal that you guys are pitching now much larger than in the past because of the BGI (ph) business has allowed you to pitch for larger business?

**Unidentified**

I wouldn't say -- I would say there are certainly larger pieces of business in the mix, but I think it's right across the board. I don't think we're focused on any one specific tier of business.

Charles Trafton (ph): Is the sales cycle for that business in the last year the same, longer, shorter? more of an urgency to out source right now or are people [inaudible]?

**Unidentified**

I would say in the last couple months there's been some reluctance to pull the decision making. I think a lot of firms have been caught up with the budgeting process trying to figure out what the impact is going to be for them in the coming year, but I expect that to turn around fairly shortly.

Charles Trafton (ph): Do you think that will loosen up at year-end, is that when a lot of those decisions are made?

**Unidentified**

I think so.

Charles Trafton (ph): Great. And the occupancy has gone up 40 something percent this quarter. What do you think that will do in the next four quarters?

**Unidentified**

I think we've got adequate space to carry us into most of next year. So I don't think we'll see much of an uptick except for -- I'm sorry, we're going to add some space in Dublin next year so we'll get a little bit of increase in '03 related to Dublin. But, that space that came on this quarter with some space in Boston...

Charles Trafton (ph): Right.

**Unidentified**

We won't be adding space in Boston for the next 12 months or so at this point.

Charles Trafton (ph): What about head count between now and the end of the year? In order to make your growth goals, do net add 5 percent heads, zero?

**Unidentified**

I'd say as it's 5 percent.

Charles Trafton (ph): Okay. Thanks .

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10, 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

---

**Operator**

Thank you. Our next question will come from Tom Williams with C W.

---

**Tom Williams - *C W***

Good morning. Quick question on your investment portfolio: The disclosure previously said about 75 percent of your portfolio was in mortgage backs. Can you talk to me about how you calculate your duration? And if you're buying 5-1 arms and funding those with the overnight sweep and deposit, how do you feel your durations matched?

---

**Unidentified**

First on the match, while they have a -- those deposits are core, they're part of the business, they're here all the time. We've had some outside firms review that and they've concluded that they're also core. And we look at our portfolio and it's 48 percent fixed and the remainder is floating rate or adjustable rate of securities. So we feel comfortable that the liabilities do match to the assets. Every two weeks we run an assimilation of interest rate shop, up 200 basis points, up 300 basis points, down 100 basis points, and we aggressively manage the result of that so that we can grow the company long term.

Charles Trafton (ph): When you say its reviewed, can you tell us who reviews these?

---

**Mike Rogers - *Investors Financial Services Corporation - President***

We have a treasury operations and treasury department produces the documents and they're reviewed at ALCO (?) that this is Mike I sit on, Kevin sits on, John Finney sits on as well as the Head of Treasury Spike Sylvester.

Charles Trafton (ph): And when you talk about your mortgage portfolio being -- or that the deposits being core, if your assets under custody go down, certainly that's going to impact the deposits that are there, that's the mutual fund companies, correct?

---

**Mike Rogers - *Investors Financial Services Corporation - President***

It typically has not because the float that's coming from fail activity, redemption activity, other residual cash, really hasn't -- doesn't change based on market conditions. Or if anything, as the market goes down, those redemptions pick up, people become more conservative and leave more cash with us.

Charles Trafton (ph): All right. So I just want to make it clear, the review that you spoke of is really an internal review?

---

**Mike Rogers - *Investors Financial Services Corporation - President***

Yes, but we also have an outside consultant come in and validate that our assumption and our process is sound.

Charles Trafton (ph): And your net interest margin sounds like declined 6 or 7 basis points depending on how you look at it?

---

**Mike Rogers - *Investors Financial Services Corporation - President***

That's right.

---

**Unidentified**

This quarter.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

Charles Trafton (ph): What's your outlook, you know, given the flat and the yield curve and the very high prepayment fees on the mortgage portfolio?

**Mike Rogers** - *Investors Financial Services Corporation - President*

We have it coming down throughout the next 12 months which is why we believe, even though we're going to increase deposits on the balance sheet, that management's income is going to stay flat.

Charles Trafton (ph): So, increase the investment portfolio will enable you to maintain your net interest income, but the margin will decline?

**Mike Rogers** - *Investors Financial Services Corporation - President*

That's right. You know, I think it's important to note here that less than a billion dollars of those assets that are on the balance sheet, liabilities are on the balance sheet are not core to the business. So these deposits, again, are generated by our clients and we feel comfortable here in an increasing market and in a decreasing market.

Charles Trafton (ph): I guess your deposits are 2.7 billion?

**Mike Rogers** - *Investors Financial Services Corporation - President*

But also on the line that is borrowed funds or repo's, many of those are repo's come from our clients that are required to have them collateralized.

Charles Trafton (ph): All right.

**Mike Rogers** - *Investors Financial Services Corporation - President*

So the line that reads short term and other borrowings, a significant portion of that is generated by our clients and is just the deposit that's collateralized.

Charles Trafton (ph): And finally, what percentage of your estimate of[inaudible]

**Unidentified**

They're about 60 percent.

**Unidentified**

I can give you that. Hold on a second. Yeah, just under 60 percent.

Charles Trafton (ph): Thank you very much.

**Unidentified**

Yep.

**Operator**

Thank you. Our next question will come from Brian (inaudible) with Standard Morris.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

**Brian**

Hi, guys. Just wondering what capitalized software expense was in the quarter. It looks like June 30th of '02 was 16.3 million. Can you comment, about a third of pretax income, it looks like it represented the entire year over year, increase in net income in the first half? Also, why was it up so much year over year in the first half versus one H O '01 (ph)?

**Unidentified**

Capitalized software for the quarter was 8.9 million Q2 was 8.6, Q1 was 7.7. And primarily the reason it's up was that we've got some major initiatives going on straight through processing and the remainder of the builds that are being done for the Barclay's (ph) conversion also some software we've written to totally replace our future fund add min (ph) system, and also a couple of web products to enable our clients to get data and manage some of their assets -- asset information independently. The other thing is: the only reason we capitalize this stuff is because the FAS (ph) standard 98.1 requires us to do it and that's why we're capitalizing what we're capitalizing.

**Brian**

What's the amortization policy?

**Unidentified**

The amortization policy is three to five years depending on the useful life of the asset.

**Brian**

Thanks a lot.

**Unidentified**

Sure.

**Operator**

Thank you. Our next question will come from Kathy Kerry (ph) with Robert W. Baird.

Kathy Kerry (ph): Good morning.

**Unidentified**

Good morning, Kathy. Kathy Kerry (ph): Just a quick question, John, about your assumptions for market values on you're talking about the net interest income portion being flat. Are you looking at the market and staying at the levels that it's at? And I guess from your comments coming off the 25 percent growth rate, if we were to see a significant decline, is that like another 20 percent down?

**John Finney**

Yeah, I would say it's fair to say another 20 percent down. My assumptions for '03 are flat equity markets. We haven't baked in any ramping up of the equity markets to achieve the $1.27. So I think if we had a major melt down from here we'd have to relook at our guidance for next year. Kathy Kerry (ph): Okay. I saw an article recently I think it was in the Wall Street Journal about BGI closing down a couple of their I share funds. Just in general, is that something that's hurting asset values, too, as companies start to shut down or consolidate funds that don't have a lot of assets in them or aren't performing well?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

**Unidentified**

You know, I think at least on the B GI example they closed three down and opened four up and they were extremely successful with their new fixed income products that they rolled out this quarter. So I think we see that across the board with all of our clients, if there are some products that are not working, they are closing down, but they're finding other products that will be successful and opening those up. Kathy Kerry (ph): Great. Thanks.

**Operator**

Thank you. We'll next hear from Brad Moore (ph) with Putnam Lovell. Brad Moore (ph): Hi, good morning. a couple things: First off on the revenue pipeline, can you just take me through that again? Is that the 40 million in annualized revenue, is that from both new and existing clients and does that include net interest income as well?

**Unidentified**

No, that pipeline is primarily from new clients and it does not include net interest income. Brad Moore (ph): Okay. with regard to the -- is it safe to say, then, -- well, let me just shift tax. with regard to BGI, has there been any success at all in terms of moving that client relationship to a new level, or is it basically currently just the custody and the accounting work?

**Unidentified**

I think there's been some huge success in terms of moving into the next level that we are essentially done with the conversion, and that we achieved moving the largest outsourcing deal in the industry's history to a scalable platform that can be reused and I think they're very pleased with the effort that we've done in hitting our time goals there. We have been able to upgrade a couple of the accounts to include FX trading and we'll continue to pursue that and other opportunities. Brad Moore (ph): Okay. with regard to the competitive landscape, are you still seeing the same competitors currently in the environment?

**Unidentified**

Yes. Brad Moore (ph): OK. With regard to pricing trends, are you sensing that your clients are now getting more competitive or no change in pricing?

**Unidentified**

[inaudible] pricing continues to be relatively stable but as we always told you it's very competitive out there, so. Brad Moore (ph): OK. And then can you give us shares outstanding at the end of the quarter?

**Unidentified**

Sure. It's 64,547,952 and fully diluted, 66,276,997. Brad Moore (ph): Okay. and last question, I think you gave us the revenue changes securities lending down 34 percent late quarter. Was that correct?

**Unidentified**

34 percent, right. Brad Moore (ph): OK. And then FX, can you repeat that?

**Unidentified**

That was up 24 percent in late quarter. Brad Moore (ph): OK. Great. Thank you.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

**Unidentified**

Yep.

**Operator**

Thank you. Our next question will come from Jim Jones (ph) with Caribbean Partners. Jim Jones (ph): Good morning. I have a couple of questions: the first, just going back to the question about capitalized software expenses -- if I do my math right, if you go to your pretax and you do the numbers without the software, capitalized software expenses, I assume that they are expensed, your year to year comparison would be that there was little or no growth.

**Unidentified**

Yeah, I see what you're saying. Yep. Jim Jones (ph): Is that correct?

**Unidentified**

That would be pretty correct assumption, but I think the value of capitalized software is creating an asset to drive the revenue and the growth of the company in the future and that's why it's capitalized as an asset. Jim Jones (ph): Okay, I understand. Another question. I believe that all of the members of the financial services round table which includes some of your competitors like State Street and Bank of New York, plus most of the other large money center banks have agreed to extend stock options.

**Unidentified**

Yes. Jim Jones (ph): I think in the past this has had a pretty big impact on your net income delusion factor some 30 odd percent, 37 percent, I think, in 1991. What are your plans on future expensing of stock options and what is the likely impact on 2002 EPS and also your current estimate of impact on projected 2003 earnings?

**Unidentified**

Well, I think, first of all, that 2002, I don't think will be impacted by expensing options as we haven't made a decision to do that yet. We're waiting for the FAS-B (ph) (inaudible) exposure draft this past week on transition rules to 123. and also still kind of looking at the calculation of the value under the (inaudible) other method which is similar to what that group of institutions you mentioned earlier came out with. They all said they were adopted and they're waiting for what's the right valuation methodology. I think we're going to evaluate the transition rules and make our decision as we move into '03, the first year that would impact us. And our planning assumptions, we're planning to have some expense in '03 and just haven't bona fide the exact amount based on what the grants we're going to provide. Jim Jones (ph): But in terms of us being able to do our analysis, should we assume something around sort of 30, 37 percent level?

**Unidentified**

No. Actually, last quarter on our call, I came out with some revised guidance on that footnote you're referring to. and in our assumptions in that 2001 annual report, a 10- year life was assumed and, in reality, the average life of the options was 2.8 years. However, because the FAS-B (ph) requires you to use the longer of the vesting period or the average life, we had to go to a default of four years. Using a four- year life on those options created a 20 percent delusion versus 37 percent delusion. Jim Jones (ph): Okay. So roughly a 20 percent delusion going forward from stock options expense if you decide to go forward with it?

**Unidentified**

From an EPS perspective, yes. Jim Jones (ph): Just one more question on capitalized software costs. How much have you capitalized in total in round numbers?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

**Unidentified**

I'm going to say about 35, 40 million since we started capitalizing Jim Jones (ph): Okay. Thank you.

**Unidentified**

Yep.

**Operator**

Thank you. We'll next here hear from Jerry Swank (ph) D Swank Group Brokerage (ph). Jerry Swank (ph): Hi, guys. Some of my questions in the custody business have already been answered, but a couple things. When you look at your numbers it's obvious in the business model that, you know, the custody business without the deposits loses some money. Is there any reason to change that model? And secondly, you comment on the competition, but I'm surprised given that some of your competitors are having pretty big problems as it relates to businesses you're not in, like commercial loans, etc., that the pricing environment in the custody business isn't alleviated somewhat. Could you comment on that? And then I have a couple portfolio questions to ask.

**Unidentified**

I think the biggest misconception about the business is that we're in multiple different businesses as they relate to the net interest, income and asset based fees. The reality is: when we go out to price a piece of business we go through an expense buildup process and then we give the client the opportunity to pay us an asset base fees, transactions fees, or any kind of a sweep or overnight product that goes on our balance sheet. and that is taken through a comprehensive analysis to put us in a position where we're generating a positive performance on that piece of business. We don't have an independent deposit gathering function that we drive in the organization. It all relates specifically to the asset processing business. That's how we get those deposits. Jerry Swank (ph): Let me asking something here. Do your competitors use that same model and does the absolute level of rates in the curve matter when you do that or is your model kind of been the same on pricing today as it was a few years ago?

**Unidentified**

I think it's relatively the same, and I think our competitors use very similar models. and we give the client the host of capabilities to employ with his cash: they can be third-party vehicles, it can be on our balance sheet, they have various in terms of currencies that they put in those deposits, time frames that they utilize during the day to place and invest those deposits with us overnight. So I think there's a tremendous level of flexibility all of us extend to the client bases. Jerry Swank (ph): Do you feel you ever lose business because one of your competitors is more aggressive on a curve trade or on quality of the taking lower quality or more riskier assets on the balance sheet than you do?

**Unidentified**

I think fundamentally the drivers in the business have always been service levels and technology. Those to me are the two most finite deliverables. I don't think there is enough differentiation in the pricing of deposit products or some of the other aspects of the business to make that much of a difference. I think we're extremely competitive and we use the technology to get us to competitive pricing across the board with the day to day servicing components. Jerry Swank (ph): And so the other thing, given some of the loan problems your competitors has it still hasn't impacted their attitude or pricing in the marketplace?

**Unidentified**

I don't think so. I think they see that as a different component of the business. Those are typical corporate relationships that have nothing to do really with the asset servicing side of their model Jerry Swank (ph): A couple other things on the portfolio and your ALCO (ph) committee meetings and your portfolio monitoring and you're up and down which is very interesting stuff. Could you share with us, are you using your own software? We saw yesterday we had a couple guys in your neighborhood smart head fund guys blow up because obviously their prepayment model wasn't very good. Could you share with us whose model you use, Merrill's model or Gold man's model? And as it relates to your portfolio?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

Surely you must be more nervous than you were three months ago about prepayment, just about prepayment models for all mortgage securities being valid.

**Unidentified**

We use several different models and look at the results that come out of all of them. You know, we have tried to since 1998 buy securities that don't have a premium or only have a slight premium, so we don't get hit with a huge penalty. We do have some reinvestment risk and I think that's why reinvesting the security at a lower rate which is why we are forecasting net interest income to stay flat. the example that I think you referred to of yesterday's announcement was the situation where people were selling securities short and we don't take those types of bets. We are trying to hit singles over and over again and not take on huge risk here that, if our model doesn't work, we will have a problem. Jerry Swank (ph): Thanks.

**Operator**

Thank you. Our next question will come from John Henry (ph) with Vicar Young Capital Management (ph). John Henry (ph): Yes. Thank for taking the call. A quick question for you. You answered most of my questions in regards to the custody sign ins. Historically it looks like most of your custody growth has come from acquisition. Is that a strategy going forward as well?

**Unidentified**

I would say historically, absent the Bar clay's(ph) piece of business which is the largest outsourcing to date in the industry, our assets primarily have come from sales to new clients and existing clients and this hasn't been a grow by acquisition type strategy. So I don't think that's a fair statement. John Henry (ph): I just look at the Chase acquisition and a few of the others as well. Just going forward, though, is that a major part of your growth strategy or it's not I guess from what you're saying?

**Unidentified**

I think the growth rates we've put out there and the guidance we've provided is purely organic. John Henry (ph): OK.

**Unidentified**

Anything that we do would be above and beyond that. John Henry (ph): OK. Your revenues for the most recent quarter and your pure custody revenues, actually, went up quite a bit despite the decline in the overall custody growth. Is that because you're actually get being better pricing power on a per asset under administration basis?

**Unidentified**

Well, the core fees late quarter are actually down about a million and a half. As I said earlier, I think one of the benefits that we have is I did a little analysis of our revenue streams and as the assets come down there's a lot of funds that are at a higher key on their sliding scale the decremental fee schedule. So as assets came down 20 percent, a lot of the thresholds are still at the upper levels which minimize the impact on the revenues for the quarter. John Henry (ph): Okay. All right. Thank you very much.

**Operator**

Thank you. We'll next hear from David Foster (ph)with Body Brown Asset Management (ph). David Foster (ph):Hi, thanks. Most of my questions have been answered, but following up on an earlier question, could you provide a breakdown of your short term borrowings, how much was repo and how much was federal home loan bank and others?

**Unidentified**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

Of the 3.4 that is in the results, about 2 billion of that was internal repo with our clients, approximately half a billion of that was long term federal home loan advancers that we use to hedge some risk, and about a billion was short term financing through either reverse repo's or fed fund borrow. David Foster (ph): The billion, the last part, the billion financing, that's not client driven ; is that correct?

**Unidentified**

Right. David Foster (ph): Okay. and do you also -- can you give us some idea or break down of what percent of your deposits come from some of your major clients, how much from Eton Vance (ph), Bar clay's, any other clients that are significant sources for these deposits?

**Unidentified**

We don't give out that information. David Foster (ph): Okay. That's all I have. Thank you.

**Unidentified**

Yep.

**Operator**

Thank you. and we'll now hear from Glen Shapiro (ph) with Sigma Capital. Glen Shapiro (ph): Hi. I think my question is a follow-up to an earlier question which was just looking at the core custody business and what it is as a percentage of assets under administration. I'm wondering if you can walk me through the pricing a bit because quarter over quarter it went from -- and I'm looking at end of period but from 27 basis points up to 31 basis points. So I'm wondering if that's a sustainable new level of fees as a percentage of assets under administration that you guys are going to be able to maintain or is it a bulk of the assets priced off earlier in the quarter so I should expect the percentage to come down once assets under administration stabilize and as a result that fee line to be lower than the 57 million probably more than the 54, 55ish range?

**Unidentified**

How did you come up with 27 basis points on that? Glen Shapiro (ph): I took in the second quarter I took 57 million and annualized it and divided by the end of period, 835 billion.

**Unidentified**

That's not right. We're not even near 27 basis points on custody assets. Glen Shapiro (ph): OK. Can you walk me through -- I'm just looking at it. Maybe I'm not using the right number I'm getting a miscalculation. But just looking at it, the custody dollar amount actually stayed relatively constant quarter over quarter but the assets under administration went down, as you said, 93 billion?

**Unidentified**

Yes. Glen Shapiro (ph): Can you walk me through how the pricing is working for the fact that the dollar amount of fees generated off of significantly lower asset base, how that works in terms of if it's sustainable or not or pricing went up or priced off the beginning of the quarter?

**Unidentified**

First of all, a majority of our revenues are derived from average daily net asset values. They're not period end assets. and then I think, as I said earlier from a revenue perspective, you know, we're in decremental fee schedule similar to investment advisors. So if you're at quarter of a basis point or half a basis point or basis point at the upper level tier of that fee schedule on any particular client, in the next tier down is one basis point or one and a half. As the assets come down right now in this down draft we've suffered, we're losing revenue at let's say half to a quarter or one basis point. and then as you move down the decrements, the basis points go up. So as you stop moving down, you would have more revenue impact. But we haven't seen that yet because the assets are over those thresholds. Glen Shapiro (ph): Okay. I apologize. What I've done is I just

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call |
| --- |

grossed it up into basis points so it would be easier for me to look at. I agree it's not 27 basis points. It's some hundredths of it. So I guess my question is, is there pricing jump ups because assets are falling per customer? So the pricing scale is actually going up so that you guys can maintain the same dollar amount, or should I expect that line item to go down over time?

**Unidentified**

If the markets go down you should probably see that number go down. Glen Shapiro (ph): Okay. So I'm looking at assets under administration down 100 billion, quarter over quarter. I'm just wondering, is it 57 million I should be expecting kind of in the lower to mid 50s for the fourth quarter?

**Unidentified**

For asset fees? Glen Shapiro (ph): Yes, for custody fees.

**Unidentified**

I don't know off the top of my head, but it's probably somewhere north of that. Glen Shapiro (ph): Okay. Do you see where I'm going with it? I know you guys have reaffirmed guidance for the fourth quarter. I guess my question was: I see kind of the core business coming down a little bit, so where is it getting made up in the fourth quarter [inaudible] you have a new level down on the amount of assets that you guys administer?

**Unidentified**

I would stay relatively flat from where we are today, maybe down a little bit. We've got other business that will potentially convert in the fourth quarter that will add assets, that will add fees. So I wouldn't move too far off where we are today. Glen Shapiro (ph): Okay. So I mean I was just thinking I should expect a sharp uptick in the assets, holding markets flat I should expect a sharp uptick into the assets under administration in the fourth quarter, back up by 100 billion. and it would have to come on pretty early in the quarter so that you can hold those daily averages pretty constant over the course of the quarter?

**Unidentified**

I think what we showed you in the last quarter was assets came down 11 percent and it had what...

**Unidentified**

1 percent decrease in ...

**Unidentified**

So I think if you saw a similar impact, that's what you'd see in term of decremental, if you saw asset recoveries, you'd see it work literally in the inverse of that equation. But offsetting that will be new business that comes in the across a broad base of tiers, depending what size piece of business comes in. You don't have to see $100 billion jump up to get us back to where we were. Glen Shapiro (ph): Okay. I don't want to take a lot of you guys time. I'll call you off line. I'm just having trouble understanding that with assets under administration being 100 (?) billion in the quarter that you guys would be able to maintain the same dollar amount in custody...

**Unidentified**

Call us. Glen Shapiro (ph): Okay. I appreciate it.

**Operator**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

Our next question will come from Tom McCanlis (ph) with Keith Brettwood. Tom McCanlis (ph): Yes, just related to your initiatives, I know STP is a prerequisite for you and your major competitors. And I think I understand that you're going to be somewhat STP ready mid year next year. Is that a factor that goes into your planning process for new business next year? And specifically, what is the thoughts towards planning for deposit growth next year? What kind of deposit growth are you guys looking for? Is it contingent upon clients more new business once you get to that next level of technology readiness, is it contingent upon new business that you're pretty sure you're going to win in the first quarter? I'm just trying to get a better handle on deposit growth how and/or if there is any linkage to STP along with [inaudible] curiosity in interest as to how you will be positioned on the STP front.

**Unidentified**

I think deposit growth is linked to just core business growth. I don't think that's directly related to STP. We believe we have some huge advantages with STP. Over 90 percent of our trades today come straight through to us from our clients and get turned around all electronically without human hands touching them. and we believe our technology platform gives us a long-term competitive advantage, because when most of our competitors talk about STP, they talk about STP only through the settlement of the securities. When we talk about STP, it includes settlement of the security, but it also includes the portfolio economy, the general ledger accounting and the pricing and NAV calculation of the impact of those transactions all hit straight through processing. Tom McCanlis (ph): Along with order process, trade order processing and messaging?

**Unidentified**

That's right. Tom McCanlis (ph): So and the other 10 percent of your trades I suppose, is that what I understand will be more electronically driven...

**Unidentified**

I think 5 percent of those get implemented in the next week or so with BGI switching to our technology, and the other 5 percent right now with advisors that can't get us those trades electronically, and we're working with them to get them so it will all be straight through processing. Tom McCanlis (ph): Then going -- that's great. Then going back to the deposit question, what kind of deposit growth are you all anticipating and how much of that will be driven by new business versus taken more from existing clients?

**Unidentified**

From that standpoint, we don't care whether it comes from new business but we prefer to penetrate existing clients.

**Unidentified**

I think as I said earlier, we're looking at balance sheet of 8 billion at the end of the year, Tom. In order to get there it's going to be through mostly client deposits. Tom McCanlis (ph): OK.

**Unidentified**

In '03. End of '03, 8 billion. Tom McCanlis (ph): And then finally, could I just go back and revisit the competitive question, it would seem that investors financial would be in a good position to lease from a marketing perspective as you're going out to get new business because so many of your competitors have credit or have had credit related issues and/or are focused elsewhere, particularly just looking at what's going on with JP Morgan Chase. Are you finding attitudinal change among your client base in the bidding process?

**Unidentified**

I don't think related specifically to credit exposure, no. Tom McCanlis (ph): Great. Well, thank you very much.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

---

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

---

**Unidentified**

Yep.

---

**Operator**

Thank you. We'll now have a follow-up question from Brian (inaudible) with Standard Morris.

---

**Brian**

My follow-up has been asked. Thank you.

---

**Operator**

Thank you. and we'll now have a follow-up question from Tom Williams (ph) with C W. Tom Williams (ph): Yes. If you could just please clarify, it appears as though despite an 11 percent drop in your assets in your custody, your asset servicing and other fee revenues actually increased sequentially. How did you accomplish that? It's pretty extraordinary.

---

**John Spinney - _Investors Financial Services Corporation - Chief Financial Officer_**

Well, I think we talked a little bit about pricing in that I think the other piece that drives that is the FX was a good quarter for us and sweep fees were good.

---

**Unidentified**

John, I think the other thing, sorry to interrupt you, that is impacting here is the new business that was sold both and converted in both the second and third quarter helped offset some of the market value declines.

---

**Unidentified**

That's correct. Tom Williams (ph): Could you briefly give us a run down of those non-interest revenue line items?

---

**Unidentified**

Yes. The FX -- actually it's on an 8(k), but the FX was 7.7 million. That was up 24 percent. Securities lending was 2.4 million, down 34 percent. Sweep fees were 4.4 million, up 18 percent. and investment advisory was flat at 1.8 million. Tom Williams (ph): And then the expense breakdown again?

---

**Unidentified**

Between... Tom Williams (ph): Operating expense breakdown, please.

---

**Unidentified**

Yeah, hold on a second. The ones we talked about comp and benefits was down 2 percent. Occupancy was up 21 percent. Those were the two biggest ones of note. Tom Williams (ph): All right. Thank you.

---

**Unidentified**

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

Yep.

**Operator**

Thank you. and we'll have a follow-up question from Jim Jones (ph) with Caribbean Partners. Jim Jones (ph): Yeah. I'm trying to revisit my projections for 2003. If we take the quarter just announced and annualize your net interest income to get to roughly 140 million of net interest income for next year which is what you've said you're expecting, and then we take the asset servicing fees which have declined about 1 percent, I'm also looking at your total operating expenses which have gone up about 4.2 percent on eye quarter on quarter basis I'm struggling to get to the point where I take that bottom line of 26 cents a share and I get to a growth of 25 percent from that number, which if you annualize is a dollar 4 to the $1.20 to $1.25 range we're expecting for next year because your expenses are growing and even if you get did you remember you're going to have to get a lot more servicing business in order to make up for that growth in expenses.

**Unidentified**

I think in our projections for '03, we've annualized our current book of business and we've also factored in the 140 million of net interest margin. And I think coming out of the blocks we were probably only 17 cents off of hitting a buck 27 at that point in time. and we clearly have said to everybody we talk to that we realize that net interest income is going to be flat and we are going to make a dollar 27 by sales to new clients and existing clients which we have done historically in the past and we're comfortable with doing. And I think from an expense perspective, some of the expense growth you're seeing is step variable in terms of like the occupancy that came on this quarter. We're going to have very little increase in occupancy expense relative to next year's revenue growth. So we're getting a little bit of a pinch for that right now, but and the other thing you're going to see is just a reduction, I think, in expenses on the run rate going into '03 as we've just been through the 2003 budget process and have revise revisited all expense items and re-forecasted those to get to our dollar 27 Jim Jones (ph): So your run rate now on your current analysis if I understand you gets you -- means that you have to get 17 cents worth of new business in order to make the number for next year?

**Unidentified**

Yeah, in a simplistic model, yes. Jim Jones (ph): Okay. I understand. and that's excluding the impact of any changes in options expensing and things that were discussed earlier?

**Unidentified**

At the buck 27, there's no option expense number in that. Jim Jones (ph): Thank you.

**Unidentified**

Yeah.

**Operator**

Thank you. And we do have another follow-up question from Brian (inaudible) with Standard Morris.

**Brian**

Yes. You haven't announced in the large custody business signings. Do you have any expectations for Q4 and '03 for new custody signings in your assumptions for the buck 20 and change?

**Unidentified**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

Like I said, we've got pipeline of 40 million of annualized revenue. It's good business in that pipeline. And I think what I'm kind of hearing is you're looking for big chunks of custody assets, but I think I want to clarify that whether it's 100 billion or 10 billion, I could end up with the same revenues. It really depends on what services the clients takes. I think from an analyst's perspective I'd focus on the services that are sold to the assets versus the absolute size of the assets that are brought in.

**Brian**

But are you looking at any acquisitions in this area of the business? And I guess if so, what kind of [inaudible] rates are you using, what are your acquisition metrics?

**Unidentified**

First of all, we're not specifically looking at any acquisition in this space right now. and our acquisition matrix or criteria is basically it's got to be fit into the current, you know, operating strategy and it's got to be accretive within the first 12 months of its life with us. and those are the base criteria. We don't want to denigrate our growth margin. Excuse me.

**Brian**

What do you attribute this strong growth in FX revenues to?

**Unidentified**

This quarter it was-- we came out in July the first few weeks in July strong transaction volume, it continued into the August time frame, a little slower towards September, beginning of July we had some good volatility in the marketplace.

**Unidentified**

It's really two way flows and additional penetration of our clients.

**Brian**

Why would this be sustainable, given only 3 percent of international assets?

**Unidentified**

Because we've made further penetration with different advisors and we think they are going to continue to trade both in and out of the U.S. dollar.

**Brian**

Thank you.

**Operator**

Thank you. This concludes our question and answer session. A replay of this call will be available starting at 12:00 noon Eastern today and will run through October 17th at midnight central. To access this replay, please dial 719-457-0820 and enter the pass code of 771369. Again, that's 719-457-0820 with the pass code of 771369. This concludes today's conference call. Thank you for your participation and have a great day.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 10. 2002 / 6:00AM, IFIN - Q3 2002 Investors Financial Services Earnings Conference Call

## DISCLAIMER

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies mayindicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit D

# Thomson StreetEvents

## Conference Call Transcript

### IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

Event Date/Time: Jan. 23. 2003 / 6:00AM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Joe DeCristofaro (ph)**

**Kevin Sheehan**
*Investors Financial Services Corp - Chairman & Chief Executive Officer*

**John Spinney, Jr**
*Investors Financial Services Corp. - Chief Financial Officer*

## CONFERENCE CALL PARTICIPANTS

**John Afrstrom**
*RBC Capital Markets*

**Kathy Carrie (ph)**
*Robert W Baird & Co*

**Thomas McCandless**
*Keefe Bruyette & Woods*

**Cassandra Toroian**
*Cohen Brothers & Co*

**Kyle Sumenaro (ph)**
*T Rowe Price*

**Tim Willi**
*AG Edwards*

**Bradley Moore**
*Putnam Lovell NBF*

## PRESENTATION

---

### Operator

Good day everyone and welcome to the Investors Financial Services Corp. fourth quarter earnings release conference call. Today's conference is being recorded. Now at this time, I'd like to turn the conference over to Mr. Joe DeCristofaro. Please go ahead, sir.

---

### Joe DeCristofaro

Thanks, operator. Thanks for joining us on today's call. We'll be making a number of forward-looking statements which are based on management's assumptions and predictions as of today. The company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may effect our actual results is set forth in the MDN&A section of our most recent 10-K and 10-Q. I recommend that anyone listening to this call review those reports carefully. Because this call will be archived on our website, I want to emphasize again for anyone listening at a later date, that the statements made today are based on our assumptions as of today, January 23, 2003. The assumptions may change but the recording of this call will not be updated. Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer; Mike Rogers, President, and John Spinney, Chief Financial Officer. I'll turn the call over to Kevin Sheehan.

---

### Kevin Sheehan - *Investors Financial Services Corp - Chairman & Chief Executive Officer*

Good morning, I'll begin by reviewing some of the key points from the fourth quarter and then John Spinney will discuss our financial results in more detail and update our guidance for your models. Diluted EPS for the fourth quarter came in at 28 cents, up 8 cents on a link quarter basis, and up 6 cents or 27% from quarter 4 of last year. For the year-ended 2002, our dollar four and EPS represents a 37% increase over our 2001 EPS

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23, 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

of 76 cents. As of December 31st, we processed approximately 785 billion of assets for our clients. Up approximately 43 billion from 742 as of the end of September 30, 2002. And down 29 billion from 814 at year-end 2001.

During 2002, the S&P 500, NASDAQ and the Dow declined by 23%, 32% and 17% respectively. Given the pronounced decline in the major indices during 2002, we view our year-over-year decline in assets processed of 29 billion or almost 4% as quite positive. This very slight decline reflects our ability to sell new business in the strong distribution capabilities of our customers. The fourth quarter of 2002 was somewhat better from a capital markets perspective than both the third quarter and 2002 as a whole. As indices bottomed in early October and finished up for the quarter. To recap, for the fourth quarter, the S&P 500 index rose approximately 8%, and NASDAQ rose approximately 14%.

However, we build the majority of our business based on average daily net assets, which do not necessarily reflect the point-to-point increase in these market indices. This dynamic explains at least partly why our custody and fund accounting and administration revenues were down 1% link quarter. We converted approximately 3 billion in assets from existing clients during the third quarter -- the fourth quarter. Market appreciation and client flows resulted in a $40 billion increase in our assets processed during the quarter. Our pipeline is currently 40 million in annualized revenue and outstanding bids. However, we decided to stop using pipeline as a metric for the analyst community as we feel the number, because it is treated essentially as a backlog, which it definitely is not, brings more confusion than clarity to our story.

Instead, we will offer a general commentary on the current condition of our pipeline using a simple strong, medium or soft characterization system. The current status of the pipeline is medium, as we have plenty of potential opportunities for new business. That being said, we would say that the fourth quarter saw a bit of sluggishness in the corporate decision-making process. To summarize, we delivered solid results for our investors during the fourth quarter and full year 2002 in an extremely difficult capital market environment. These results were driven by our diversified revenue mix and a continued favorable interest environment. Now I'd like to turn the call over to John Spinney, who will view the quarter's financial results in more detail.

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Good morning, as Kevin mentioned, fourth quarter diluted EPS came in at 28 cents, up two cents or 8% [UNINTELLIGIBLE] basis.. Our diluted EPS at 28 cents represents a 27% increase over the fourth quarter of 2001's EPS of 22 cents, and our full year 2002 diluted EPS of $1.04 represents a 37% increase over 2001's EPS of 76 cents.

As we've stated on prior calls, diluted earnings per share and net income for 2002, both exclude the amortization of goodwill in accordance with the provisions of FASB 142. Then operating revenue which is made up of net interest income feeing from a transaction income increased 1% link quarter, and 10 percent over the same quarter of last year, for financial statement presentation purposes, we report two components of our revenue, net interest income and fee income, which includes our transaction-based fees. But, we'd like to stress that each of our revenue sources is derived from the same core processing, securites processing business. We do not gather deposits for their own sake like a retail bank. Instead, we generate net interest income by investing the residual cash of our asset processing clients who use our balance sheet as a convenient way to invest their excess cash.

As I mentioned before, we generate fees based on assets under administration, net interest income and the number of transactions generated by our clients. It has been our experience that during market downturns, our net interest income and transaction volumes typically increase providing a hedge to our asset-sensitive revenues. The breakdown of our revenue stream for the fourth quarter was 53% asset-based, 34% net interest income and 13 transaction-based. For the full year 2002, the breakdown was 47% asset based, 34% net interest income, and 19% transaction based. The diversified revenue stream contributes to the resiliency of our business model in a difficult capital market environment. I'll now walk through the significant income and expense components in more detail. Net interest income increased 5% link quarter, mostly due to the growth of our balance sheet which was driven primarily by the increase in client funding. Offsetting this growth was a prepayment penalty of approximately 2.5 million as a result of an asset liability strategy to prepay a high rate FHLB advance with one at a lower rate. We continued to maintain healthy net interest margin and spread percentages as the yield curve deepened slightly.

The link quarter interest rate spread increased by one basis point to 220 bases points, while the link quarter net interest margin contracted by 4 basis points to 235 basis points. Compared to the same quarter of last year, net interest income was up 18% due both to a steep yield curve and the increased size of our balance sheet. Approximately 98% of our investment portfolio is invested in securities backed by the U.S. Government and/or AAA-rated securities. As a result, we've been able to avoid credit losses and maintain strong net interest income. Core asset based fee income increased 2% link quarter, despite the almost 6% increase in our assets under administration. I'd like to remind listeners that the majority of our business is built on average daily net assets. Thus to a significant extent, asset values have to remain at an elevated level for a sustained period of time for us to benefit from a market upturn. Turning from revenue recognition to the fundamental health of our business, our ability to

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

win business and the ability of our clients to sell additional product thus generating fund flows, has allowed us to minimize the impact of the three-year market downturn. Our tiered pricing structure for asset based fees helps us to stem the broader market downturn.

As stated in our last call, we have decremental pricing schedules for asset based fees as asset values deteriorate, revenue is only impacted by the asset decline at the then marginal rate. Transaction driven income in which we include our axilery services such as securities lending, foreign exchange fees and cash management fees, declined 9% link quarter driven by a drop in our foreign exchange revenues when compared to the third quarter. FX was down link quarter due to low volumes in terms of dollars and transactions, and low volatility in the currencies traded by our clients. For all of 2002 transaction driven income rose 21% driven by sharp increases in FX and securities lending. Total operating expenses were essentially flat link quarter, comp and benefits expense declined by 4% on a link quarter basis due to lower bonus accruals and lower head count.

Technology and telecom expenses were up 21% link quarter largely due to lease buyouts on PCs aimed at reducing future expense levels, and due to higher contract programming costs on projects moved from the capitalization phase to the post-implementation phase. On a year-over-year basis, our operating expenses increased 18% compared to 21% increase in our revenue. We grew our compensation and technology expenses as growth in our business warranted. Other expense increases occurred in occupancy as we increased our office space to support the growth in our business and a depreciation in amortization as previously capitalized software projects are being placed into service. We continue to maintain strict cost controls across the organization, especially in the face of continued weaker capital markets. We increase our cost structure only to support the addition of new business. As mentioned on our last call, the Mass. department of revenue issued the bank a notice of intent to assess state excise taxes related to dividends that it received from its majority owned REIT's for the years ended 1999 and 2002. During the fourth quarter of '02, the state sent us another notice of intent to assess state excise taxes of 5.4 million for tax year-end 2001. Bringing the total from 6.2 million to 11.6 million for that three-year period.

We would like to remind you that our bank along with over 40 other Massachusetts financial institutions has joined a coalition to obtain a declaratory judgment from the state Supreme Judicial Court. We are currently in that process and expect to prevail. As such, we have not provided for any additional state excise tax. Despite three consecutive years of market value declines that we have experienced, for which we cannot predict an end, in the realization that we're experiencing historically favorable interest rate conditions for a liability sensitive institution such as our bank, we are formally issuing 2003 EPS guidance of 25% bottom line growth from our 2002 base earnings of $1.04. This guidance assumes no market appreciation. In other words, absent another severe sustained down turn in the equity markets, we're made comfortable with our long term EPS growth rate of 25%. And now I'd like to open up the call to your questions.

## QUESTION AND ANSWER

**Operator**

Thank you very much, sir. The question-and-answer session will be conducted electronically today. If you would like to ask a question, we ask that you please press star 1 on your telephone key pad at this time. And once again, that's star 1 to ask a question and we'll pause for just a moment to assemble our roster. And our first question comes from John Afrstrom from RBC Capital Markets

**John Afrstrom** - *RBC Capital Markets*

Spinney, just a question from your Federal Home Loan Bank borrowings. What did you do, what is the current term and rate, and can you just give us a little more detail on that?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Yes, basically, John, we took a higher rate, fixed rate FHLB advance and refinanced it out to a lower rate FHLB advance. The cost of doing that was a prepayment penalty of two and a half million dollars which will be more than recouped over the next 12 to 18 months. That was the strategy there. We also, in doing that particular transaction, matched up certain assets that we purchased to mirror that particular liability maturity, so we ended up having a matched asset against a liability for the most part.

**John Afrstrom** - *RBC Capital Markets*

Okay. And is this the same borrowing that you used the strategy with earlier in the year, or is this separate some.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

That's correct. It's similar strategy.

**John Afrstrom** - *RBC Capital Markets*

Similar strategy, okay. You mentioned down bonus accruals. Anything particular there? Is it a change in head count? What's behind that?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Oh, I think historically you know, we've had strong first quarters and we've taken higher accruals when the income was stronger, in certain quarters so as we came to the end of the year, we had less to accrue to our maximum bonus tiers. As a result, we had less bonus accrual in the fourth quarter. Then we did have some head count reductions that helped us save some bonuses, but a majority of it was the timing of the accrual.

**John Afrstrom** - *RBC Capital Markets*

Okay. And then I guess the other question I had was contract renewals. Do you have any big contract renewals coming up and any -- anything new under the State Street Deutsch business that causes you to be more or less optimistic on the new business outlook?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Right now, we do not have any major contracts renewing until probably 2005. So I'd say we've got still 75% of our contracts, our assets on long-term contract until the end of 2004. At this point, we haven't seen a lot of movement from the Deutsch State Street transaction, but has happened in the past, when other entities merge or combine, sometimes there's dislocation of clients and that benefits us.

**John Afrstrom** - *RBC Capital Markets*

Okay. And I guess one last question on your forward guidance, you're still saying flattish, 140 million net interest income for next year?

**Kevin Sheehan** - *Investors Financial Services Corp - Chairman & Chief Executive Officer*

I think we'd advise you to be a little more aggressive on that.

**John Afrstrom** - *RBC Capital Markets*

Okay.

**Kevin Sheehan** - *Investors Financial Services Corp - Chairman & Chief Executive Officer*

It's remained extremely strong and that's why we feel pretty comfortable with our estimates going forward.

**John Afrstrom** - *RBC Capital Markets*

Okay. Thanks a lot, guys.

**Kevin Sheehan** - *Investors Financial Services Corp - Chairman & Chief Executive Officer*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

Yes.

**Operator**

OPERATOR: and moving on, we'll now go to Kathy Carrie with Robert W. Baird & Co.

**Kathy Carrie** *- Robert W Baird & Co*

Good morning. I have one clarification question. When you talked about converting 3 billion in new business this quarter, was that business that was won in the third quarter?

**John Spinney, Jr** *- Investors Financial Services Corp. - Chief Financial Officer*

We didn't have conversions of new business, we had sales to existing business, Kathy, sales to existing clients.

**Kathy Carrie** *- Robert W Baird & Co*

That was new sales in the fourth quarter?

**John Spinney, Jr** *- Investors Financial Services Corp. - Chief Financial Officer*

That's correct.

**Kathy Carrie** *- Robert W Baird & Co*

Great. And then Kevin, when you talked about business being -- or signings, I guess, being a little bit sluggish in December, is that a change from what you had seen earlier in the year or pretty much how you had felt in most of 2002?

**Kevin Sheehan** *- Investors Financial Services Corp - Chairman & Chief Executive Officer*

I think the fourth quarter was particularly slow, particularly after the September downturn, but I think we still have a lot of activity and we have a lot of bids outstanding. I think the issue is when we'll close on those transactions.

**Kathy Carrie** *- Robert W Baird & Co*

Okay. Thank you.

**Kevin Sheehan** *- Investors Financial Services Corp - Chairman & Chief Executive Officer*

You're welcome.

**Operator**

OPERATOR: and we'll now go to Tom McCandless with Keefe Bruyette & Woods.

**Thomas McCandless** *- Keefe Bruyette & Woods*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

Good morning and congratulations on a good quarter and a good year given the difficult market. A couple of questions. Could you give us what your head count number was at the end of the year?

**John Spinney, Jr** *- Investors Financial Services Corp. - Chief Financial Officer*

Yeah, I will. Hold on one second. It was 2591, Tom.

**Thomas McCandless** *- Keefe Bruyette & Woods*

Thanks. The next question, could you update us on the portion of your asset under custody that are equity-oriented? Last quarter it was 69%, this quarter would be?

**John Spinney, Jr** *- Investors Financial Services Corp. - Chief Financial Officer*

70%.

**Thomas McCandless** *- Keefe Bruyette & Woods*

Okay. The next question is, John, with respect to the balance sheet comings and goings, could you share with us what it is you are able to do to lower your short-term borrowing costs by two and a half million? Were you able to swap some paper out? How did that work?

**John Spinney, Jr** *- Investors Financial Services Corp. - Chief Financial Officer*

I think we got some really strong client balances in the fourth quarter, Tom, as a result, our funding costs were down. We didn't have to get higher rate funding.

**Thomas McCandless** *- Keefe Bruyette & Woods*

That explains the 24% decline in interest expense for short-term borrowings?

**John Spinney, Jr** *- Investors Financial Services Corp. - Chief Financial Officer*

Pretty much, yeah.

**Thomas McCandless** *- Keefe Bruyette & Woods*

That's terrific, because -- that allows you to offset your prepay penalty. Could you share with us an update as you have in prior quarters what sort of the rate sensitivity is of the balance sheet these days? The rate sensitivity on a 200 basis point up, I want to say is like 6 1/2% reduction in net interest income. 200 basis points up.

**John Spinney, Jr** *- Investors Financial Services Corp. - Chief Financial Officer*

Would be a 6 1/2% decrease in net interest income which this year was 140 million.

**Thomas McCandless** *- Keefe Bruyette & Woods*

Over twelve months with no action?

| Thomson StreetEvents | www.streetevents.com | | Contact Us | 7 |
|---|---|---|---|---|

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

---

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Yep.

---

**Thomas McCandless** - *Keefe Bruyette & Woods*

Okay. And also, in terms of the volume of transactions processed, could you update us there on this quarter?

---

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

We had higher transaction volumes vis-a-vis third quarter quarter.

---

**Thomas McCandless** - *Keefe Bruyette & Woods*

Okay. And then I guess finally, many of us are unable -- were unable to listen to your comments in December, but did all receive your AK filing where you discussed hopefully an ability to lower the cost of expensing options if you all decide to do that. Could you please update us on your current thinking there?

---

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Sure. I think our currently thinking on expensing stock options is that we don't plan on expensing stock options unless, you know, the FASB or some accounting hierarchy determines we need to expense options. And if we did, we've already done that calculation and would expect it to be somewhere around 3 cents.

---

**Thomas McCandless** - *Keefe Bruyette & Woods*

for a full year?

---

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

For a full year. And then obviously if we follow the transition rules, under 128 now I guess it is, it would be 3 cents, then obviously it would add on top of that every single year, 3 cents or so until you're maxed out at probably somewhere 12 to 15 cents.

---

**Thomas McCandless** - *Keefe Bruyette & Woods*

Okay. That's helpful. And finely, I noticed in the 8 K that you're able to drop your other operating expenses by a healthy $600 million quarter-to-quarter. There is there any particular lumpiness in there? Is that sustainable? Could you add a little color to the $600 million drop?

---

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

I think it's 600,000 I don't think t's $600 million..

---

**Thomas McCandless** - *Keefe Bruyette & Woods*

Sorry, you're right.

---

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

And I think it's continuing to manage expense out and, you know, we did some reductions in staff in December to eliminate positions that were not needed. We also, you know, managed our poor performers during that period. So we got a little bit of lift in the fourth quarter from that. And I think, you know, we'll expect to be able to manage expenses going into '03. To make our efficiency better than it was this year.

**Thomas McCandless** - *Keefe Bruyette & Woods*

And I apologize, one final question: I'm just curious, yesterday, I think Northern Trust indicated they really began to step up their marketing in the fourth quarter because the marketing people have been eager for that to happen and felt their brand would sell well. I would somehow come to the conclusion the same could be said for your company. Have you all made a decision to step up marketing or are you thinking about it?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

I think we've got a world class marketing department. We've -- about a year ago, we added a lot of staff and we really geared up at the beginning of the year. I think we've been charging hard the whole year, so, for us, I don't think it was a realization of the third or fourth quarter to change anything different from what we'd done in the past.

**Thomas McCandless** - *Keefe Bruyette & Woods*

Okay, terrific. Thanks so much.

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

You're welcome.

**Operator**

OPERATOR: and we'll now go to Cassandra Toroian with Cohen Brothers & Co..

**Cassandra Toroian** - *Cohen Brothers & Co*

I just have a question about your pipeline, you're categorizing or you're saying it's medium. Would you describe the pipeline when you're saying you have, I guess it's $40 million in revenue in that pipeline, is that new business? Are you including potential new business from existing clients? And is this just processing? Are there -- is it some outsourcing? How would you -- would you give some more color on it?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Sure, I think the pipeline is primarily all new business, Cassandra. Some of its outsourcing opportunities, some of it's fund accounting custody. It includes ancillary services, such as FX, securities lending and cash, so I think all of those things, except for it doesn't really include sales to existing clients that we know about. We just keep those out of the pipeline and book them as we go.

**Cassandra Toroian** - *Cohen Brothers & Co*

That's great.

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Thank you.

**Operator**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

OPERATOR: and just a quick reminder, that is star 1, if you'd like to ask a question. And we'll now go to Kyle Sumenaro with T. Rowe Price.

**Kyle Sumenaro - *T Rowe Price***

Hey, guys. Hey, I wanted to follow up on your guidance for 2003. You had given us $1.27 number on the last few quarterly conference calls, being that you exceeded expectations in '02, I was wondering if you're feeling more comfortable with a number closer to $1.29 to $1.30.

**John Spinney, Jr - *Investors Financial Services Corp. - Chief Financial Officer***

I would say $1.30 is fine.

**Kyle Sumenaro - *T Rowe Price***

Could you give us a sense, you mentioned a flat market is incorporated in that guidance. Could you give us a sense for what type of variance there may be in terms of how comfortable you'd be, being that current estimates are $1.25 and you're saying you're more comfortable with the $1.30. How bad would the market have to be for you to come in at $1.25 next year?

**John Spinney, Jr - *Investors Financial Services Corp. - Chief Financial Officer***

Uhm, I would say, down 20%. Somewhere between 10 and 20%.

**Kyle Sumenaro - *T Rowe Price***

Also, could you give us a sense, I know the foreign exchange business has been weak across the trust banks, just wanted to get a sense for what your stating in the first few weeks of this quarter, if the market's picked up at all?

**Kevin Sheehan - *Investors Financial Services Corp - Chairman & Chief Executive Officer***

Yeah, we're seeing some trades, but I wouldn't say it's markedly picked up.

**Kyle Sumenaro - *T Rowe Price***

Thank you, guys.

**John Spinney, Jr - *Investors Financial Services Corp. - Chief Financial Officer***

You're welcome.

**Operator**

OPERATOR: and we'll now move to Tim Willi with A.G. Edwards.

**Tim Willi - *AG Edwards***

Good morning. Two questions. One was, in terms of the pipeline, I guess, would you be able to characterize Europe versus North America, any differently or would your comments apply to both regions in general terms?

| Thomson StreetEvents | www.streetevents.com | Contact Us | 10 |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

It applies to both regions, I think, we've tried to emphasize with you, while we've had extremely strong business growth in Dublin, it's certainly is not the driver in terms of the company's business. It's predominantly domestic and that remains true.

**Tim Willi** - *AG Edwards*

Okay. The other question I had was just a balance sheet question, and I probably should know this. In terms of looking at period and balance sheets, there was the big drop in securities repurchased on the liability side, with a big bump up in savings accounts. Is that due to the refinancing you just talked about, John, or is that something else that drove sort of the change in those numbers?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

No, I think, as I mentioned earlier to Tom McCandless, that we had really good client funding during the fourth quarter and we were able to take down our borrowings, Tim.

**Tim Willi** - *AG Edwards*

Okay. Great, thanks.

**Operator**

OPERATOR: and moving on, we'll now go to Brad Moore with Putnam Lovell NBF.

**Bradley Moore** - *Putnam Lovell NBF*

Good morning. A couple of things. Can you go back to the value added revenue and again go through for me the link quarter change? I think you talked about transactions being down and FX being down, but I don't think you commented on securities lending. Could can you take me through the link quarter change in that category?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Sure, Brad. Securities lending was up about 350,000 link quarter, I think a big driver from that growth was the interest rate cut in November that provided us a little lift on our reinvestment income. And really that's about the size of it. Well, the markets were up a little bit, that drove the balances of the collateral that drove a little bit more income as well.

**Bradley Moore** - *Putnam Lovell NBF*

Okay. So securities lending was up, and you said FX was down, cash management --

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

, ah, yes. Sweep was up 4% link quarter, about $200,000, a little healthier. Sweep income coming out of our global sweep products. And investment advisory was off a little bit link quarter, down about $50,000. And that just fluctuates with what the balances are in our money market funds in [UNINTELLIGIBLE].

**Bradley Moore** - *Putnam Lovell NBF*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

apart from market conditions, how are your efforts going in terms of penetrating your existing client base with some of these value-added services?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Well, I think they're very strong. Our clients take nine out of our 14 services right now. Each quarter we're harvesting more ancillary services from existing clients. And there's still more to go as penetration levels haven't hit 100% across all the ancillary services.

**Bradley Moore** - *Putnam Lovell NBF*

Are there some areas where you think you're sort of underpenetrated or on track, or are there areas where you think that you're ahead of expectations in terms of you penetration?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Well, I think we can further improve our penetration across all the areas, because we're not fully penetrated. The closest we are to 100% is on cash management. So and that's in the low 90s. But everything else is in, you know, 60, 70% range, 80%.

**Bradley Moore** - *Putnam Lovell NBF*

Okay. On another tack, can you talk -- tell me about, what was the thinking behind the increase in the dividend?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

I think we try to raise the dividend every year given the earnings of the company keep on going up. And we don't want to increase it to the point where we give away capital that we could use to continue the growth of the business or if we saw an attractive transaction where we needed the capital to support that transaction. So we try to continue to increase the dividend and I think it positions ourselves for, you know, portfolio managers that look for dividend-paying stocks, we want to make sure we're in those greens as well.

**Bradley Moore** - *Putnam Lovell NBF*

Okay. and then in terms of new business signed recently, what do you expect to convert in this -- in the first quarter of of '03? What do you have that you're working with that you expect to convert either in terms of assets or revenue?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Typically, we don't give out that guidance, but like we said, we've got 40 million of annualized revenue in the pipeline. And there's stuff that's close to being made, decisions are being made on it. But, you know, it could change daily. They push it out a week, they push it out two weeks, so I'd just kind of say that we have a $40 million pipeline, and I think we've got the ability to convert some stuff that's in there now. What it is, I don't know. We'll know better when we go on the first quarter call.

**Bradley Moore** - *Putnam Lovell NBF*

Okay. And then final question: Curious to know, I was a little surprised, you mentioned a head count reduction and I was thinking that you guys had been ramping up, given some of your new business wins over the last few quarters. Can you tell me about what sort of head count reductions and -- you incurred and what do you expect in '03?

**Kevin Sheehan** - *Investors Financial Services Corp - Chairman & Chief Executive Officer*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jan. 23, 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

These were just a 50 head count reduction, nothing significant, just trimming to clean up the place and take advantage of some efficiencies we've created in the organization and performance issues. Standard run-of-the-mill practice.

**Bradley Moore** - *Putnam Lovell NBF*

Okay. Great, thanks.

**Kevin Sheehan** - *Investors Financial Services Corp - Chairman & Chief Executive Officer*

You're welcome.

**Operator**

OPERATOR:And we'll now go back to Tom McCandless with a follow-up question.

**Thomas McCandless** - *Keefe Bruyette & Woods*

Actually, I have two questions: One, John, could you give us some sense of what the expectation is for deposit inflows from your customers this year?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

I don't give that type of guidance, Tom. But clearly we're always mining our client base for more deposits.

**Thomas McCandless** - *Keefe Bruyette & Woods*

Any color on how much balance sheet growth we should anticipate?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

I think, you know, we could grow the balance sheet to potentially 8 billion by the end of next year, provided, you know, we get the deposits that go with it.

**Thomas McCandless** - *Keefe Bruyette & Woods*

By the end of '04?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

'03.

**Thomas McCandless** - *Keefe Bruyette & Woods*

This year.

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Yeah, '03.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

**Thomas McCandless** - *Keefe Bruyette & Woods*

And then secondly, is there not contemplated or planned an upgraded rollout of some of your products and services this year, could you share with us kind of what some of the bigger initiatives are with respect to upgrades and initiatives [UNINTELLIGIBLE]?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

I think if you're talking about technology initiatives, we continue to work on a straight through processing platform, which is the largest initiative, and then secondly, our mutual fund admin platform which will be rolled out this year.

**Thomas McCandless** - *Keefe Bruyette & Woods*

What are the new attributes of the new fund admin platform that make it new and better than it was?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

It's --

**Kevin Sheehan** - *Investors Financial Services Corp - Chairman & Chief Executive Officer*

It will improve our operating efficiency as well as give clients access through to the web so we'd have realtime reporting right back to our clients.

**Thomas McCandless** - *Keefe Bruyette & Woods*

Terrific. Thank you.

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Yes.

**Operator**

OPERATOR: and we'll now go back to Kyle Sumenaro with a follow-up question.

**Kyle Sumenaro** - *T Rowe Price*

Hey, guys. Just a follow-up question on the net interest income line for next year. Do you anticipate, and obviously with guidance of the flat market, do you anticipate that line item being up next year, flat next year or down next year?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

We clearly think it will be up from the previous guidance.

**Kyle Sumenaro** - *T Rowe Price*

Okay. And is there a -- can you give us any guidance in terms of what you see as a sustainable net interest margin for the next few years?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 23. 2003 / 6:00AM, IFIN - Q4 2002 Investors Financial Services Corp. Earnings Conference Call

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

I think we could probably stay somewhere between where we are today and 185 basis points on average.

**Kyle Sumenaro** - *T Rowe Price*

Okay. So speculation on your margin going to 130 basis points, I guess, or termed 130 points on the spread would be out of your range of possibilities?

**John Spinney, Jr** - *Investors Financial Services Corp. - Chief Financial Officer*

Based on our current modeling, we would think it would be hard to get there. All set, Kyle?

**Operator**

Thank you very much, gentlemen, this concludes our question-and-answer session. session. A replay of this call will be available starting at 12 noon eastern time today and will run through January 29 at midnight, central time. To access this replay, please dial (719)457-0820, and enter the pass code of 439171. Once again, that number is (719)457-0820, with pass code 439171. This concludes our conference call, thank you all for participating and have a great day.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit E

# Thomson StreetEvents

## Conference Call Transcript

### IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call

Event Date/Time: Jul. 16. 2003 / 6:00AM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 16. 2003 / 6:00AM, IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Joe DeCristofaro**
*Investors Financial Services Corp - Manager of IR*

**Kevin Sheehan**
*Investors Financial Services Corp - Chairman and CEO*

**John Spinney**
*Investors Financial Services Corp - SVP and CFO*

**Mike Rogers**
*Investors Financial Services Corp - President*

## CONFERENCE CALL PARTICIPANTS

**Jon Arfstrom**
*RBC Capital Markets - Analyst*

**Joel Gomberg**
*William Blair and Company - Analyst*

**Brad Moore**
*Putnam Lovell NBF - Analyst*

**Carla Cooper**
*Robert W.Baird - Analyst*

**Tim Willi**
*AG Edwards and Sons - Analyst*

**Tom McCandles**
*Keefe, Bruyette & Woods - Analyst*

## PRESENTATION

---

**Operator**

This is premier conferencing. Please stand by. We are about to begin. Good day everyone and welcome to the Investors Financial Services Corporation second quarter release conference call. Today's call is being record at this time for opening remarks and introductions I would like to turn the call over to Mr. Joe DeCristofaro. Please go ahead, sir.

---

**Joe DeCristofaro** - *Investors Financial Services Corp - Manager of IR*

Thanks, operator. Thank you for joining us on today's call. We'll be making a number forward-looking statements which are based on management's assumptions and predictions as of today. The company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the MD&A section of our most recent 10-Q and 10-K filings with the SEC. I recommend that anyone listen to this call review these reports care three. because this call will be archived on our web site Q WW.IBTCO.com I want to emphasize for anyone listing at a later date that the statements made today are based on our assumptions as. today, July 16, 2003. This assumptions may change but the recording of this call will not be updated. Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer, Mike Rogers President, and John Spinney, Chief Financial Officer.

I'll now turn the call over to Kevin Sheehan.

---

**Kevin Sheehan** - *Investors Financial Services Corp - Chairman and CEO*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 16. 2003 / 6:00AM, IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call |

Good morning. I'll begin by reviewing some of the key points from the second quarter and then John Spinney will discuss our financial results in more detail the second quarter witnessed several important developments for Investors Financial Services. As we announced three weeks ago we reported diluted operating EPS for the second quarter of 32 cents per share. A penny ahead of consensuses estimates. We also disclosed we were selected by Barclays investor Canada a to process approximately $22 billion in assets. That we settled a REIT tax matter with the Massachusetts Department of Revenue and that the dispute was dismissed without our company making any payments. Looking at the bottom line results in a little more detail, diluted operating EPS for the second quarter came in at 32 cents. Up 10% on a [inaudible] basis, and up 6 cents or 23% from quarter 2 of last year. Including the $6.7 million tax charge reversal we disclosed in June related to the settlement of or REIT tax matter with the Massachusetts Department of Revenue our GAAP EPS for the quarter came in at 42 cents. In accordance with reg G we included both the GAAP and pro forma operating results in this morning's press release which you can access on the web site.

As of June 30th we processed approximately $897 billion of assets for our clients, up $113 billion from March 31st, 2003. On a pro forma basis, including the new business associated with the BGI Canada outsourcing our assets processed as of June 30, 2003, would have been approximately $919 billion. The BGI Canada business is scheduled to start converting during the third quarter of 2003 subject to regulatory approvals.

We converted approximately $5 billion in assets from existing clients during the quarter and lost $2 billion in assets as a result of the expiration of our contract with city street, a joint venture of city group and State Street bank, and experienced market appreciation and client fund flows of $110 billion during the quarter. The current status of our new business pipeline remains medium. We believe that the positive capital market improvement environment during the second quarter has created some momentum on several new business opportunities. We feel that this shift in market sentiment may lead to shorter decision cycles and create opportunities to close new business by the end of 2003.

To summarize, we again delivered excellent results for our investors during the second quarter of 2003. These results were driven by our ability to sell existing clients, our continued focus on prudent expense management and strong equity and fixed income market environments. I'll now turn the call over to John spin Spinney who will review the quarter's financial results in more detail.

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

Thank you and good morning. As Kevin mentioned, second quarter diluted operating EPS came in at 32 cents up 3 cents or 10% on a link quarter basis. Our diluted operating EPS of 32 cents represents a 23% increase over our second quarter 2002 diluted EPS of 26 cents. From a GAAP perspective we earned 42 cents for the quarter as a result of the 6.7 million or 10-cent a share reversal of a charge resulting from our settlement of the REIT tax matter with the Commonwealth of Massachusetts. Net operating revenue which is made up of fee income, transaction income and net interest income increased 7% link quarter and 11% over the same quarter of last year. Each of our revenue sources represents a component of our compensation for providing asset processing services to our clients. Net interest income is one of these components and results are investing the residual cash of our asset processing client who use our balance sheet as a convenient way to invest their excess cash. As I mentioned before we generate fees based on assets under administration, the number of transactions convenient rated by our clients, and net interest income. These three revenue components create a natural hedge for our business mad model which has been one of the factors enabling us to succeed in a variety of market environments. The breakdown have our revenue stream for the second quarter 2003 was 52% asset based, 31% net interest based and 17% transaction based.

I'll now discuss the significant income and expense components in more detail. Asset servicing fees increased 13% link quarter in line with the major indices and also due to higher transaction volumes from clients. Net interest income decreased 3% link quarter primarily due to an asset liability strategy which we also employed in 2002 if of prepaying a high yielding FHLD advance with a new borrowing and a lower rate and matching that lower rate borrowing against fixed rate assets of the same maturity We continued to maintain strong and interest margin in spread, despite flattening [inaudible] curve primarily as a result of strong client funding. The link quarter net margin decreased by 26 basis points to 208 while the linked quarter interest rates spread contracted by 25 basis points to 1.97%. Compared to the same quarter of last year, net interest income was up 11%, mostly due to the increased size of our balance sheet partially offset by a decrease in rates. Approximately 98% of our investment portfolio is invested in securities backed by the U.S. government and/or AAA rated securities. We continue to run a closely matched balance sheet with an asset duration of approximately 1.2 years and liability duration of approximately 1 year. Transaction driven income which we include our and auxiliary services such as security lending, foreign exchange fees and cash management fees increased 27% link quarter driven primarily by a strong rise in our FX business when compared to the first quarter of 2003.

Regarding FX, new clients further penetration of existing clients, high transaction volumes, and volatility in the currencies traded by our clients contributed to the strong performance. Securities lending was up link quarter due to higher equity market values in the international dividend payment season. On a year-over year basis transaction driven income rows 32% driven by strong increases in FX and cash management fees.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 16. 2003 / 6:00AM, IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call

Total operating expenses were up 6% linked quarter compared to our 7% increase in revenue. Comp and benefits expense rows by 2% on a link quarter basis, mainly due to higher bonus accruals as a result of the company's strong performance in the second quarter offset by lower head count and lower payroll tax accruals. Technology and telecommunications expense was up 3% link quarter due to increased spending on projects to meet client needs, increase our internal efficiency and reduce risk. Transaction processing was up 40% link quarter due to higher transaction volume in the second quarter of '03 versus the first quarter of 03. Depreciation and amortization increased 9% link quarter as projects that were previously capitalized were placed in the service during the second quarter of 03. Professional fees were up 23% a link quarter basis as a result of cost related to the REIT settlement, dismissal of the [MOPEX] (ph.) case and the California overtime lawsuit.

On a year-over-year basis our operating expenses increased 6% compared to our 11% increase in revenue. Despite the upturn in equity and fixed income values we'll continue to maintain strict cost controls until we see recurring positive economic indicators including new business wins and sustained levels in the capital markets. As always we'll only increase our cost structure to support the addition of new business. As most of you know we accrued a tax liability on our balance sheet and a tax expense on our income statement for the quarter ended March 31st, 2003, related to potential tax liabilities of the bank. The effect of this accrual reduced our net income for the first quarter of 2003 by $13.9 million or 21 cents a share. Last month the bank and the Massachusetts Department of Revenue entered into a settlement agreement that obligated the bank to pay 50% of its outstanding tax liability including interest. As a result of this settlement agreement, we recognize an income tax benefit during the second quarter of 2003 of $6.7 million or ten cents a share. We are cautiously optimistic about the capital markets in interest rate environment as such we continue to expect to achieve GAAP earnings per share of $1.19 for the year ended December 31st 2003 there when represents our original guidance of $1.30 per share reduced by net tax charge of 11 cents as previously described. We remain comfortable with our long-term growth rate of 25% in EPS.

I'd now like to open up the call to your questions. Operator?

## QUESTION AND ANSWER

#### Operator

Thank you the question and answer session will be conducted electron electronically. If you would look to ask a question, you would may do so by press than the star key followed by the digit 1 on your touch tone telephone. Make sure you're mute is ever function is turned off to allow your signal to reach our equipment. Again, that's star 1 if you would like to ask a question. We'll take our first question from Jon Arfstrom is from RBC Capital Markets.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Morning guys.

**John Spinney** *- Investors Financial Services Corp - SVP and CFO*

Morning Jon.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

a question for you on value added, you talked about the international dividend tax payment season. I guess there are other things in there. Can you talk about who it performed towards the end of the quarter and for the first two weeks has that strength in the business continued?

**John Spinney** *- Investors Financial Services Corp - SVP and CFO*

Are you talking SEC lending specifically, Jon?

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

---

Jul. 16. 2003 / 6:00AM, IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call

---

FX and SEC lending.

---

**John Spinney** *- Investors Financial Services Corp - SVP and CFO*

the first two weeks of this quarter?

---

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Yep. And then how it perform towards the tail end of the second quarter it.

---

**John Spinney** *- Investors Financial Services Corp - SVP and CFO*

Performed really well toward the sail end of the second quarter. We got a lot of activity the last two weeks of June on FX, and in securities lending after the rate cut we'll benefit slightly going into this third quarter but obviously, as the margin compresses there and collateral, we buy new additional collateral at lower rates, that will compress that. I think going forward FX will probably be a little bit lower than it was this quarter. We had the best month of our life last month of about 4-1/2 million in revenue, the best day of our life last month as well, so I would expect that it would be -- it would come off that a little bit, but I still think that we have strong outlook for the rest of the year.

---

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Okay. On your restructuring of the liabilities, I guess in the past you shared a few more details. Are you willing to do that in term of the penalty paid and the rate and the maturity of what you--

---

**John Spinney** *- Investors Financial Services Corp - SVP and CFO*

Yeah, basically we prepaid I think $100 million advance. We incurred a $1.1 million penalty which runs through interest expense. Refinanced that were with a lower borrowing, put on some fixed rate assets, and basically locked in 200 basis point spread over the life of that borrowing. It's relatively small , $100 million on a half million dollar balance sheet.

---

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Fair enough. On '04 I know you haven't commented on that, but do you still feel that bids on what you neonow you can stick with a 25% growth rate?

---

**John Spinney** *- Investors Financial Services Corp - SVP and CFO*

That's correct.

---

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Okay. Thank you.

---

**John Spinney** *- Investors Financial Services Corp - SVP and CFO*

Yep.

---

**Operator**

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 16. 2003 / 6:00AM, IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call

and we'll go to our next question that comes from Joel Gomberg of William Blair and Company.

**Joel Gomberg** - *William Blair and Company - Analyst*

Good morning. Maybe you can flesh out a little bit what you did for State, for City Street and then where the new business came from existing customers.

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

Yeah. On City Street we did custody fund accounting. It was I want to say probably less than a million dollars of revenue on an annualized basis. And obviously, you know, they're a competitor of ours and when the contract was up there was no surprise on our front that that was going to move back to State Street. That's reflected in our guidance for this year and our expectations for next year. And what was the second part of that question, Joel? I'm sorry.

**Joel Gomberg** - *William Blair and Company - Analyst*

On new business from existing customers.

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

On the new business from existing customers we did $5 billion of assets. The biggest chunk of that was from Eaton advance, a couple billion dollars, some new funds.

**Operator**

Anything else, Mr. Gomberg?

**Joel Gomberg** - *William Blair and Company - Analyst*

No, that's it. Thanks.

**Operator**

As a reminder you may press star 1 if you do have a question, that is star 1 to ask a question. We'll go back to Brad Moore of Putnam Lovell NBF.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

Good morning. A couple things. First, I wanted to know if you can give us a little bit more color on the operating environment. You did mention that you were sensing some improvement in the behavior of the target market, and I was just curious to understand if you can give us a little bit more about who it is. Is it mostly existing customers? You have seen a fair amount of new customers in that. And anything as to the timing of what that activity might look like.

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

You know, I think the pipeline still remains medium. We've definitely seen a pickup in interest in our services as the markets have recovered and investment managers have, you know, refocus owed strategic things look outsourcing and looking at their service providers, and our salespeople have had many more meetings with prospects, so I think what we're seeing is a general upturn in calls, in meetings with our salespeople, moving

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 16. 2003 / 6:00AM, IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call

things that were in the pipeline forward, and we've got a handful of outsourcing deals that I think one or two of those have the possibility of closing by the end of this year or early '04.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

and would you characterize those as small, medium or large?

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

I think they're sizable.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

Okay. And it would be the full range of services or what do you see in terms of client interest in term of the menu of services?

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

I think, you know, everybody looks at the full complement of services, Brad, very little people focus solely just on custody or fund accounting.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

Secondly can you gives a little bit of color on where you think the contraction in our net interest margin on a go-forward basis.

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

Right now our sensitivity to a 200 basis point increase in rates parallel shift in the curve is about 6.7% reduction in net interest income so net interest income is about 30%, that would equate to roughly 2%, and 2% of our top line is about $8 million, so worst case scenario would be 8 cents over a 12-month period. We don't feel like that -- we've got much risk at all in terms of interest rates moving up right now.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

Did you say that assumed a parallel shift?

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

Yeah, it's a parallel shift over 12 months.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

and if it was a flattening curve, would how would that impact the assumption?

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

a flattening curve would contract our net interest income slight but I don't have that number at my finger tips.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

All right. Thanks.

| Thomson StreetEvents | www.streetevents.com | | Contact Us | 7 |
|---|---|---|---|---|

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 16. 2003 / 6:00AM, IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call

**Operator**

and now we'll go to Carla Cooper of Robert W. Baird.

**Carla Cooper**  *- Robert W. Baird - Analyst*

Good morning. I wondered if you could talk a little bit just maybe update us on your thinking vis-à-vis the $1.30. Clearly at the beginning of the year I would have thought anyway that the components of that would have been a little different. Is it fair to say now that the $1.30 is likely to come a bit more from asset administration and value added services and a little less from net interest income?

**John Spinney**  *- Investors Financial Services Corp - SVP and CFO*

I think, Carla, from a geography perspective net interest income is going to be a little slightly lower than the $1.60 we talk about earlier. You know, given the markets, if they're sustainable levels versus choppy levels, we'll basically have more coming from the mutual fund administration line, and I think we've done a very good job managing expenses than we did this quarter as a result of the out performance. We booked up bonus accruals that we needed to book to offset the earnings that we put up for the quarter. But I would say from a geography perspective net interest income a little bit less than $1.60. Revenues and Mutual fund fees with a market stab will stay at the levels they are today and value added can like I said FX is usually a little bit slower over the summertime so that will probe come back in the third quarter to a more reasonable level of, you know, 2-1/2 to $3 million or something like that a month.

**Carla Cooper**  *- Robert W. Baird - Analyst*

Got I and then any other -- to my recollection you talk about the balance sheet sort of $8 billion being a number that we should -- I had in my head anyway for '03. Is that still looking a bit bigger than that or are you still looking around something for $8 billion for the year?

**John Spinney**  *- Investors Financial Services Corp - SVP and CFO*

I think it's a little bit higher than that like 8.3, 8.5, something like that in the neighborhood average balance sheet.

**Carla Cooper**  *- Robert W. Baird - Analyst*

for this quarter but I think previously you talk about of where you thought you could end the year.

**John Spinney**  *- Investors Financial Services Corp - SVP and CFO*

Yeah, it will probable be I a little bithigher than that.

**Carla Cooper**  *- Robert W. Baird - Analyst*

and then finally as regards competition, are you seeing, you know, anything different a long those lines? And I guess specifically also, you know, new discussion of pricing as these investment managers begin to sort of re look at outsourcing services?

**John Spinney**  *- Investors Financial Services Corp - SVP and CFO*

I think from a pricing perspective there hasn't been a lot of pricing pressure. I think we've said that historically on the past calls. I think given where our pricing is in the marketplace, being less than a basis point in some of the core custody services, is not a lot of room to take that fee down, and I think, you know, people typically look at service levels and at the end of the day, with our number one rankings. A.In global custodian two years in a row, I think people focus on quality for the price, and that's why we get very little price pressure.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 16. 2003 / 6:00AM, IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call |
|---|

**Carla Cooper** - *Robert W.Baird - Analyst*

Thanks.

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

Yep.

**Operator**

and now we'll go to Tim Willi of AG Edwards and Sons.

**Tim Willi** - *AG Edwards and Sons - Analyst*

Good morning. I was wondering if on the pipeline discussion if you could give any color when you talk about the or look at it, the pipeline for perspective new customers versus existing customers, and just if you are seeing any change in focus in activity from people you're currently doing work with and, you know, their willingness to make additional decisions and give you more assets or does that remain relatively stable and you're really just focusing on brand new entities when you talk about the pipelines?

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

I think, Tim, you know, we don't talk about all the new business that our clients give us every single month. But we do a tremendous amount of growth year in and year out from lines client that start new funds and new products similar to the piece of business that Eaton Vance started this quarter. So year over year we've continued to see our clients put on new product and put on product that fits into the current marketplace or whatever's being bought in the marketplace, so that's continued to drive one part of the sales side. And on the other side is really the new client business, and as I said earlier I think with the markets being up, folks are spending more time analyzing their vendors and the service levels and talking to our folks, and I think we'll see some more movement there, you know, in the next two quarters.

**Tim Willi** - *AG Edwards and Sons - Analyst*

Okay. So it's possible that the kind of wind win you just could the got from Barclays where they gave you a nice chunk of business and current customer feasible that you may get some other customers where you get lump sums like that versus just somebody opening up a new fund, but clearly you're also hitting the payment very hard on people you don't deal with yet.

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

Yeah, I mean on both fronts, we're attacking it on both fronts, and we're seeing positive movement on both fronts.

**Tim Willi** - *AG Edwards and Sons - Analyst*

Okay. Thank you.

**Operator**

Ands a reminder you may press star 1 to ask your question. That is star 1 if you would like to ask a question. We'll go next to Tom McCandles of Keefe, Bruyette & Woods brokerage.

**Tom McCandles** - *Keefe, Bruyette & Woods - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jul. 16. 2003 / 6:00AM, IFIN - Q2 2003 Investors Financial Services Corp. Earnings Conference Call |

Good morning. Quick question. Can you remind us of what the underlying assumptions were for the EPS guidance for this year and next year, assumptions regarding asset values?

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

Asset values we typically run with no market appreciation assumptions, and right now, as I said, we're cautiously optimistic. The markets may be up 15% for the quarter. I don't know how they're going to perform for the next six months. So, you know, we're cautious in guiding anywhere off the $1.30 right now. With respect to interest rates, we have interest rates flat to the end of '04, and then going up 300 over 18 months, 300 basis point over 18 months.

**Tom McCandles** - *Keefe, Bruyette & Woods - Analyst*

Great. And are you seeing any pickup in activity given the head count reduction effort over at State Street either in hue hires or in customer detexts?

**John Spinney** - *Investors Financial Services Corp - SVP and CFO*

None.

**Tom McCandles** - *Keefe, Bruyette & Woods - Analyst*

Fair enough. Thanks.

**Operator**

and this concludes our question and answer session. A replay of this call will be available starting at 12:00 noon eastern today and will run through July 22 at midnight central time. To access this replay please dial 719-457-0820. And enter in the pass code of 426571. This concludes today's conference p thank you all for your participation.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit F



# Thomson StreetEvents

## Conference Call Transcript

### IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

Event Date/Time: Oct. 15. 2003 / 6:00AM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 15. 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Joe DeCristofaro**
*Investors Financial Services Corp. - Company Representative*

**Kevin Sheehan**
*Investors Financial Services Corp. - Chairman and CEO*

**John Spinney**
*Investors Financial Services Corp. - CFO and SVP*

## CONFERENCE CALL PARTICIPANTS

**Jon Arfstrom**
*RBC Capital Markets - Analyst*

**Brad Moore**
*Putnam Lovell NBF - Analyst*

**Tom McCrohan**
*KBW Asset Management - Analyst*

**Casey Ambrich**
*Millennium Partners - Analyst*

**Kyle Cerminara**
*T. Rowe Price - Analyst*

**Meryl Witmer**
*Eagle Capital Partners - Analyst*

**Joel Gomberg**
*William Blair & Co. - Analyst*

## PRESENTATION

---

**Operator**

Good day, everyone, and welcome to the Investors Financial Services third-quarter earnings release conference call. Today's call is being recorded. At this time for opening remarks and introductions, I would like to turn the call over to Mr. Joe DeCristofaro (ph). Please go ahead, sir.

---

**Joe DeCristofaro** *- Investors Financial Services Corp. - Company Representative*

Thank you for joining us on today's call. We will be making a number of forward-looking statements, which are based on management's assumptions and predictions as of today. The company's actual results may differ materially from our current predictions due to anyone of a number of factors. Information regarding the factors that may affect our actual results is set forth in the MD&A section in our most recent 10-Q and 10-K filings with the SEC. I recommend that anyone listening to this call review these reports carefully.

Because this call will be archived on our website, www.IBTCO.com, I want to emphasize again for anyone listening at a later date that the statements made today are based on our assumptions as of today, October 15, 2003. These assumptions may change, but the recording of this call will not be updated.

Joining us on today's call are Kevin Sheehan, Chairman Chief Executive Officer; Mike Rogers, President; and John Spinney, Chief Financial Officer. I will now turn the call over to Kevin Sheehan.

---

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman and CEO*

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 15. 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

Thanks. I will begin by reviewing some of the key points from our third quarter, and then John Spinney will discuss our financial results in more detail. Investors Financial Services recorded extremely impressive results for the third quarter of 2003. Diluted operating EPS for the quarter came in at 40 cents, up 25 percent on a linked-quarter basis; up 14 cents or 54 percent from quarter three of last year.

As of September 30, we processed approximately 956 billion of assets for our clients, up 59 billion from June 30, 2003. For a little more detail on the assets processed, we converted approximately 25 billion of assets from numerous existing clients during the quarter, including Aegon, BGI Canada, BGI USA, Eaton Vance, Goldman Sachs, PIMCO, and Vega. We also converted about $1 billion from new clients such as EMC, Lehman Brothers, and some institutional custody clients.

We (technical difficulty) appreciation and client fund flows of 33 billion during the quarter. The strong rise in assets processed that we have witnessed this year has resulted from both our ability to sell new business, 35 billion during the first 9 months of 2003, and the rise in equity values over the past 6 months.

The current status of our new business pipeline remains medium. We believe that the positive capital market environment during the second and third quarters has created some momentum on several new business opportunities. We feel that this shift in market sentiment may lead to shorter decision cycles and create opportunities to close new business during the final quarter of 2003 and into 2004.

To summarize, again, we delivered excellent results for our investors during the third quarter of 2003. These results were driven by our ability to sell new and existing clients, our continued focus on prudent expense management, and solid equity market performance. I will now turn the call over to John Spinney, who will review the quarter's financial results in more detail.

John Spinney  - *Investors Financial Services Corp. - CFO and SVP*

Good morning. As Kevin mentioned, third-quarter diluted operating EPS came in at 40 cents a share, up 8 cents or 25 percent on a linked-quarter basis. Our diluted EPS of 40 cents represents a 54 percent increase over our third-quarter 2002 diluted EPS of 26 cents.

On year-over-year basis our net operating revenue increased 9 percent, compared to a 5 percent decrease in operating expenses, exhibiting the earnings growth potential and inherent leverage in our model. On a linked-quarter basis, revenue decreased 2 percent, versus a 10 percent decrease in our cost structure.

Each of our revenue sources represents a component of our compensation for providing asset processing services to our clients. Net interest income is one of these components and results from investing the residual cash of our asset processing clients, who use our balance sheet as a convenient way to invest their excess cash.

We generate asset servicing fees based on assets under administration, the number of transactions generated by our clients, and managed risk (ph) income. These three revenue components create a natural hedge for our business model, which has been one of the factors enabling us to succeed in a variety of market environments.

The breakdown of our revenue stream for the third quarter of 2003 was 55 percent asset based, 15 percent transaction based, and 30 percent net interest income based, continuing the shift that we have witnessed recently to more of a contribution from asset-based fees as opposed to net interest income.

I will now discuss the significant income and expense components in more detail. Cora asset servicing fees increased 13 percent year-over-year and 5 percent linked quarter, due to favorable market conditions, the addition of new clients such as BGI Canada, and the ability of our clients to continue to develop and sell new products.

Transaction-driven income, in which we include our ancillary services such as securities lending, foreign exchange fees, and cash management fees, increased 12 percent year-over-year, driven by strong increases in FX and cash management fees. On a linked-quarter basis, transaction income decreased 10 percent, primarily as a result of linked-quarter decrease in our FX and securities lending businesses.

Regarding FX, despite beating our expectations for the quarter and being up 19 percent on a year-over-year basis, lower volatility and volumes in the currencies traded by our clients during the third quarter compared to the second quarter caused a linked-quarter decline in FX revenue.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 15. 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

Securities lending decreased 12 percent year-over-year, due to a smaller lending book, and declined linked quarter primarily due to the end of the international dividend season. Net interest income was flat on a year-over-year basis and decreased 8 percent linked quarter, primarily due to increased prepayments in our mortgage-backed securities portfolio through most of the summer. We expect lower prepayment activity in the fourth quarter.

Also we recorded an additional interest expense in the third quarter of approximately 1 million related to the ineffectiveness of our swap portfolio in accordance with FAS 133. The 1 million will flow back into net interest income over the remaining life of the swaps. Absent a further cut in the Fed funds rate, we expect little to no impact going forward.

We continue to maintain strong net interest margin spread as a result of continued healthy levels of client funding. The linked-quarter net interest margin decreased by 27 basis points to 1.81 percent, while the linked-quarter interest rate spread contracted by 26 basis points to 1.71 percent. Compared to the same quarter of last year, net interest income was flat, primarily as a result of a larger balance sheet offsetting a lower interest rate environment.

Approximately 98 percent of our investment portfolio is invested in securities backed by the U.S. government and/or Triple-A rated securities. We continue to run a closely matched balance sheet, with an asset duration of approximately 1.5 years and a liability duration of approximately a year. The high amount of variable-rate securities in our portfolio has allowed us to maintain a low asset duration.

Total operating expenses were down 10 percent linked quarter compared to our 2 percent decrease in revenue. Comp and benefits expense declined by 16 percent on a linked-quarter basis, mainly due to lower bonus accruals and lower headcount. Contributing to this decline in compensation expense has been our ability to harvest operational efficiencies through our implementation of technology solutions.

Technology and telecommunications expense was up 6 percent linked quarter, due to increased spending on projects to meet client needs, increase our internal efficiency, and reduce risk. Transaction processing was down 23 percent linked quarter, due to lower subcustodian fees resulting from lower transaction volumes.

Depreciation and amortization increased 14 percent linked quarter, as projects that were previously capitalized were placed into service during the third quarter of 2003. Professional fees were down 28 percent on a linked-quarter basis, as a result of the end of costs related to the resettlement, the dismissal of the Mopex case, and the resolution in July of the California overtime lawsuit. We will continue to maintain strict cost controls, while we increase our cost structure to support the addition of new business.

During the third quarter we announced that we reached an agreement in principle with representatives of the plaintiffs to settle a class-action lawsuit alleging violations of California wage and hour laws in our Sacramento and Walnut Creek facilities. In anticipation of this settlement and related costs, the company accrued a liability of approximately 1 million in the second quarter of 2003.

We continue to be cautiously optimistic about the capital markets and interest rate environment. As such we are increasing our GAAP EPS guidance to a range of $1.30 to $1.32 a share for the year ended December 31, 2003; and we're revising our diluted operating earnings-per-share target to a range of $1.41 to $1.43. We remain comfortable with our long-term growth rate of 25 percent in EPS. I would now like to open up the call to your questions.

## QUESTION AND ANSWER

**Operator**

The question-and-answer session will be conducted electronically. (OPERATOR INSTRUCTIONS) Jon Arfstrom, RBC Capital Markets.

**Jon Arfstrom - RBC Capital Markets - Analyst**

A question for you on the 25 billion that you talked about, Kevin. What is that? Is that clients giving you more money? Or is it new products? Or what is behind that?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 15, 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

**Kevin Sheehan**  - *Investors Financial Services Corp. - Chairman and CEO*

It is new product offerings and growth in existing products.

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

So that is just further penetration of the client base?

**Kevin Sheehan**  - *Investors Financial Services Corp. - Chairman and CEO*

Yes.

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

And how much of the Barclays Canada business is in the 25 billion or in the 59 billion that you added for the quarter? Is that any at all?

**John Spinney**  - *Investors Financial Services Corp. - CFO and SVP*

Yes, 22 billion, Jon.

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

Expense control, I am sure that you maybe had questions about this already. But is that level of expenses that you have sustainable? Or do we expect that to go up in the fourth quarter?

**Kevin Sheehan**  - *Investors Financial Services Corp. - Chairman and CEO*

I think it is sustainable for the fourth quarter.

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

Any change in the structure of the balance sheet? It looks like you added 400 million in deposits and a little less in terms of investment securities. Would you expect it to grow little bit if prepayment is slow in the next quarter?

**John Spinney**  - *Investors Financial Services Corp. - CFO and SVP*

No, I think it may grow a little bit, but I think we're targeting somewhere around 8.5 to 8.8 billion for the end of the year; total balance sheet average about 8, 8.1, something like that.

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

And then in terms of your guidance, any change in the typical assumptions that you give for a flattish market?

**John Spinney**  - *Investors Financial Services Corp. - CFO and SVP*

In terms of rate environment?

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 15. 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

Rate environment and equity market levels.

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

We have no equity market upside built into our estimates. We never do that. In terms of interest rate environment, in terms of the rest of the year, obviously we don't think debt funds is going anywhere from where it is today. And the ten-year will probably trade somewhere, we hope, within the 4 percent range.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Okay. And you're still comfortable with the 25 percent growth rate on that $1.40 to $1.43?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

Currently we are. Yes, Jon.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Thank you.

**Operator**

Brad Moore of Putnam Lovell NBF.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

A couple of things. I wanted to understand the interplay between the -- you characterize the pipeline as medium; and yet it sounded like you were relatively bullish with regard to the momentum you are seeing on the new business front. I just wondered if you could square that up for me.

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

I think there is a couple of opportunities in there that we have talked about in the past, Brad, that are getting closer to fruition. And I think just in general there's more opportunities coming across our desk. We're responding to more RFPs. I think the general sentiment has been an uptick, and that is why we feel a little bit more positive and bullish on the sales front.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

So the difference then would be it is a difference between having an increase in the number of conversations and the number of bids, versus actually having something in front of you that you can sign?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

I think it is a little bit of both. We continue to sign, as Kevin mentioned in his remarks. There is a handful of clients that launched new products in the third quarter. And we're seeing a lot of that going on right now. So we are actually signing things from existing clients.

We have got some good opportunities in the pipeline in front of us that have a potential to close late this year, early next year. We continue to get RFP activity, and our clients continue to create ideas and products that we're bidding on as well.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 15, 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

**Brad Moore** - *Putnam Lovell NBF - Analyst*

And then with regard to the 25 billion that you signed up from existing customers. Was there any pricing changes or concessions given in terms of -- that includes renewals, I assume. So were there any concessions or changes in pricing from your typical rates?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

First I will answer the second question. We never include renewals as a new sale, so there are no renewals in the numbers. And then secondly, the pricing front, all this pricing is at what we currently expect to achieve from a margin perspective. And there were no givebacks or reductions in pricing.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

Okay and then finally just curious, any significant client con coming up for renewal in the next couple of quarters that you are aware of?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

Nothing major. Anything that was coming up of significant we have pretty much signed up. We've got about 65 percent of our assets on long-term contract till the end of '05 right now.

**Brad Moore** - *Putnam Lovell NBF - Analyst*

Great, thank you.

**Operator**

(technical difficulty) Tom McCrohan with KBW Asset Management.

**Tom McCrohan** - *KBW Asset Management - Analyst*

A quick question on the expense reductions. I was not expecting to see the expenses drop like that. I thought it was a pleasant surprise to see that. But can you give me some flavor for the staff reductions, and if they were like targeted reductions in certain areas? Or did you consolidate some type of group into one group? How did you go about doing that?

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman and CEO*

I think, Tom, what we're talking about is putting into place technologies that have (technical difficulty) to reduce our headcount throughout the year. And a good part of that in the third quarter. And that is really what we were talking about. There were no layoffs or any planned staffing reductions or anything of that nature. We continue to add new business, so we can't be laying people off.

**Tom McCrohan** - *KBW Asset Management - Analyst*

So the reduction in expenses was not related to people leaving, but being replaced by technology?

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman and CEO*

For the most part, yes.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Oct. 15, 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

**Tom McCrohan** - *KBW Asset Management - Analyst*

Do you feel comfortable that that is a run rate for the fourth quarter?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

Yes, I do.

**Tom McCrohan** - *KBW Asset Management - Analyst*

One last question. You had broken up the revenue into 55 percent asset-based, 15 percent transaction based, 30 percent net interest income. What do you consider the asset base of your income items?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

It would be our core fees, which is custody fund accounting, which are AUM-based fees. In fund administration, excuse me.

**Tom McCrohan** - *KBW Asset Management - Analyst*

And FX, cash management, sec lending? That would be all (multiple speakers) transaction?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

Yes.

**Tom McCrohan** - *KBW Asset Management - Analyst*

Okay, thanks very much.

**Operator**

(OPERATOR INSTRUCTIONS) Casey Ambrich (ph) with Millennium Partners.

**Casey Ambrich** - *Millennium Partners - Analyst*

One concern that some investors have had is regarding the potential NBS mark that the company might incur with the ten-year moving up here; the yields anyway. I was wondering if you could talk a little bit about your swaps on the liability side of the balance sheet? And how that works to hedge that?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

Certainly from the ten-year perspective on the asset side of the balance sheet, the mark on that is positive still. It has never run into a negative mark to market. And we're very comfortable with that, and it doesn't have an impact on our regulatory capital if it did.

Secondly on the swap portfolio, we use swaps basically against some of our deposit liability products to extend the maturities and fix those against fixed-rate assets. That really helps us to keep the duration up on the liabilities and matched with the asset duration.

**Casey Ambrich** - *Millennium Partners - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

> Oct. 15. 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

Great, thank you.

**Operator**

Kyle Cerminara with T. Rowe Price.

**Kyle Cerminara** - *T. Rowe Price - Analyst*

Great quarter. Quick question. What percent of your current customer assets have you penetrated?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

We've got about 7.2 percent of our client assets (technical difficulty) what we serve.

**Kyle Cerminara** - *T. Rowe Price - Analyst*

Now going forward, would you see more opportunity within the current customer base or within new business? Because it seems like if you only have penetrated 7.2 percent of your current customer base, there is a lot of opportunity within.

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

I think the opportunity is immense. It is 20-something trillion of assets or 17 trillion, I can never remember the number off the top of my head. But clearly when you have a client, it is always easier selling into an existing client. We do sell a ton of business to existing clients every year. We don't necessarily report it on every single call. And we expect that continue in the future and drive that number up.

Clearly as we have said in the past on calls and when we meet with investors, we go at it from both fronts all the time. From the sales front, we've got dedicated sales force out there. Got based on territories, going after opportunities that we don't currently have and generating our fee activity and new clients.

Then there are the client managers, who are charged with client service delivery, are charged with making sure service is what is expected; but more importantly from a financial perspective, cross-selling services and helping our clients develop product that obviously drives revenue to our firm.

**Kyle Cerminara** - *T. Rowe Price - Analyst*

Great. And of the current potential customers, new customers that are in your pipeline, could you expand upon it? Are they large asset managers? Are they medium-sized asset managers? Or whatever color you can give us would be helpful.

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

They are from some of the largest in the world to some of the smallest. It goes -- again, it is quite a few.

**Kyle Cerminara** - *T. Rowe Price - Analyst*

Great quarter and thanks for taking my call.

**Operator**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Oct. 15. 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

(OPERATOR INSTRUCTIONS) Zachary Cohen (ph) with Eagle Capital Partners.

**Meryl Witmer** - *Eagle Capital Partners - Analyst*

This is actually Meryl Witmer. Excuse me for being a little dense, but I am just looking at the comp and benefit line, which I believe went from almost 51 million in the second quarter to 42.5 million this quarter. Is that like a lower bonus accrual? If you didn't let anybody go, is that a lower bonus accrual? Did people leave? Did you have some consultants you are now paying? What caused that?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

Some of that is bonus accrual; and some of that is taking the efficiencies in terms of headcount reductions in the business.

**Meryl Witmer** - *Eagle Capital Partners - Analyst*

So there were headcount reductions?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

As a result of not replacing positions for people that left the firm, where we had efficiencies in the technology that allowed us not to replace positions.

**Meryl Witmer** - *Eagle Capital Partners - Analyst*

I see; so you let some people run off and the technology took its place.

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

Exactly. It just goes hand-in-hand with depreciation expense being up because we put the technology in place.

**Meryl Witmer** - *Eagle Capital Partners - Analyst*

I see. That ties in nicely. Now the lower bonus accruals, is that a foreshadowing of things not great to come?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

I think part of that, and we talked about it on the second-quarter call, was just a tremendous second quarter for us. Having the ability to accrue bonuses against hiring earnings in the second quarter; that allowed us to take lower bonus accruals going forward. And I think giving the REIT charge we took, we're not going to reach the potential of maximizing bonuses. So our accruals are going to be lower just as a result of that.

**Meryl Witmer** - *Eagle Capital Partners - Analyst*

So did you front-end load the bonuses into the second quarter?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

We accrue bonuses when we have the room (ph) in the EPS that marries up to it. So if the performance is there, we will accrue bonuses up against the performance.

---

| Thomson StreetEvents | www.streetevents.com | | Contact Us | 10 |
| --- | --- | --- | --- | --- |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 15, 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

**Meryl Witmer** - *Eagle Capital Partners - Analyst*

Although this quarter is very good also.

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

It is. But as we went into the third quarter, we looked at last year and said, last year's third quarter was not the best quarter in terms of transactional revenue; and the markets really took a sharp downturn; so we were not about to get behind the eight-ball on bonus accruals, and have to make up for it in the summertime.

**Meryl Witmer** - *Eagle Capital Partners - Analyst*

Okay, thank you.

**Operator**

Joel Gomberg with William Blair.

**Joel Gomberg** - *William Blair & Co. - Analyst*

John, I missed your comments on guidance. Your previous operating diluted EPS guidance was $1.30 for this year. What is it now?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

GAAP is $1.30 to $1.32; operating is $1.41 to $1.43.

**Joel Gomberg** - *William Blair & Co. - Analyst*

And the other question I had; how should we look at asset values and how you bill for them? Is it daily? Is it average for the month, and then you bill monthly? How exactly do you bill the asset fees?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

Most of it is average daily net asset value. With some that bills at end of period on the months; there's some that bill at end of quarter. But if you're looking for something to track well, I'd probably use an average net asset value over the period.

**Joel Gomberg** - *William Blair & Co. - Analyst*

And the mix of your custody is a mix between equities, fixed income, and cash. Can you give me a rough ballpark?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

70/30. 70 equity; 30 fixed income.

**Joel Gomberg** - *William Blair & Co. - Analyst*

Thank you.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

---

Oct. 15. 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

---

**Operator**

A follow-up from Casey Ambrich.

---

**Casey Ambrich** *- Millennium Partners - Analyst*

One last quick question. Can you give some color on how the margin changed by month? I will start with that.

---

**John Spinney** *- Investors Financial Services Corp. - CFO and SVP*

The net interest margin? By month I don't think it's really that important to go through in detail. But if you look at the decline sequentially, the biggest contributor to that was obviously the prepayments on the mortgage-backed portfolio, that caused earnings to go down on the net interest income line.

I actually added back the effect of that prepayment; and it probably gets us back to somewhere like 195, 196 from a margin perspective. So I clearly isolated the prepayments on the mortgage-backed portfolio. But we have those slow down now, and we are anticipating to have a fourth quarter of very slow prepayments relative to the third quarter.

---

**Casey Ambrich** *- Millennium Partners - Analyst*

So we should expect around a 190 for fourth quarter?

---

**John Spinney** *- Investors Financial Services Corp. - CFO and SVP*

I wouldn't go that high. But I just added back what happened in the third quarter.

---

**Casey Ambrich** *- Millennium Partners - Analyst*

Okay, thanks very much.

---

**Operator**

A follow-up from Jon Arfstrom.

---

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Anything seasonal that is going to impact value-added, that you can see in the fourth quarter? I know you talked about the end on (ph) tax season, but anything in the fourth quarter?

---

**John Spinney** *- Investors Financial Services Corp. - CFO and SVP*

No, not really.

---

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Thanks.

---

**Operator**

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 15. 2003 / 6:00AM, IFIN - Q3 2003 Investors Financial Services Corp. Earnings Conference Call

A follow-up from Tom McCrohan.

**Tom McCrohan** - *KBW Asset Management - Analyst*

Quick follow-up on the duration of your assets. Did I hear you say it was 1.5 years?

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

Yes.

**Tom McCrohan** - *KBW Asset Management - Analyst*

What drove that? I thought in the past it was closer to 2.5 or 2.2 or something like that.

**John Spinney** - *Investors Financial Services Corp. - CFO and SVP*

It has always been 1.2. It was 1.2 when I met with you down in New York; and it is about 1.5 now. It has never been 2.2.

**Tom McCrohan** - *KBW Asset Management - Analyst*

Never, okay. Thanks.

**Operator**

And this concludes the question-and-answer session. A replay of this call will be available starting at 12:00 noon Eastern time today and will run through October 21 at midnight Central time. To access this replay please dial 719-457-0820 and enter in the pass code of 531873. (OPERATOR INSTRUCTIONS) This concludes today's conference call. Thank you for your participation.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit G



# Thomson StreetEvents

## Conference Call Transcript

### IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call

Event Date/Time: Jul. 14. 2004 / 2:00PM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 14, 2004 / 2:00PM, IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Joe DeCristofaro**
*Investors Financial Services Corp. - Manager, IR*

**Kevin Sheehan**
*Investors Financial Services Corp. - Chairman & CEO*

**John Spinney Jr.**
*Investors Financial Services Corp. - SVP & CFO*

## CONFERENCE CALL PARTICIPANTS

**Jon Arfstrom**
*RBC Capital Markets - Analyst*

**David Chamberlain**
*Analyst*

**Carla Cooper**
*Robert W. Baird - Analyst*

**Jamie Lester**
*SAB Capital Management - Analyst*

**Tom McCrohan**
*Fulcrum Global Partners - Analyst*

**Joel Gomberg**
*William Blair - Analyst*

**John Spinney**

## PRESENTATION

**Operator**

Welcome to the Investors Financial Services Corp. second-quarter earnings release conference call. Today's call is being recorded. At this time for opening remarks and introductions, I would like to turn the call over to Joe de Christefaro (ph).

**Joe DeCristofaro** *- Investors Financial Services Corp. - Manager, IR*

Thanks, operator. Thank you for joining us on today's call. We'll be making a number of forward-looking statements which are based on management's assumptions and predictions as of today. The Company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the MD&A section of our most recent 10-Q and 10-K filings with the SEC. I recommended that anyone listening to this call review these reports carefully. Because this call will be archived on our website, www.ibtco.com, I want to emphasize again for anyone listening at a later date that the statements made today are based on our assumptions as of today, July 14, 2004. These assumptions may change but the recording of this call will not be updated.

Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer, Mike Rogers, President, and John Spinney, Chief Financial Officer. I'll now turn the call over to Kevin Sheehan.

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman & CEO*

Thanks, Joe. I will begin by reviewing some of the key points from the second quarter and then John Spinney will discuss our financial results in more detail.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 14. 2004 / 2:00PM, IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call

Investors Financial Services recorded extremely impressive results for the second quarter of 2004. Diluted EPS for the quarter came in at 52 cents, up 63 percent from the second quarter of 2003 diluted operating EPS. Our total asset servicing revenue grew by a strong 30 percent year-over-year, driven by a 27 percent increase in core service revenue and a 39 percent increase in ancillary services fees.

As of June 30, we processed approximately 1.2 trillion of assets for our clients, up 72 billion, or 6 percent, from March 31, 2004, and up 306 billion, or 34 percent, from June 30, 2003. We converted over 2.4 billion from new clients such as Matlin Patterson in the U.S. and Marathon Asset Management in our Dublin office.

In addition, we grew our institutional custody business by signing several new advisory clients and family offices in the second quarter, including a new $2 billion outsourcing relationship with Manning & Napier, which we expect to convert during the third quarter. We also won approximately 8.5 billion in assets from numerous existing clients during the quarter, including BGI, Eaton Vance, Goldman Sachs, MassMutual and Vega.

Client fund flows, and to a lesser extent, market appreciation, accounted for approximately 61 billion of the 72 billion increase during the quarter. Directly related to the growth of our processing business is the growth of our balance sheet, which on an average basis grew 2 billion, or 25 percent, from last year's second quarter to this year's second quarter, as a result of strong client funding.

The current status of our new business pipeline remains medium. We continue to maintain a positive outlook on our sales pipeline as we are seeing strong levels of RFP activity and increased interest by our clients in our service offerings.

To summarize, we again delivered outstanding results for our investors during the second quarter of 2004. These results were driven by our ability to sell to new and existing clients, strong client fund flows and a favorable interest rate environment.

I'll now turn it over to John Spinney who will review the quarter's financial results in more detail.

**John Spinney**

Good afternoon. As Kevin mentioned, second quarter diluted EPS came in at 52 cents, a 63 percent increase over our second-quarter 2003 diluted operating EPS of 32 cents, which excludes the 10 cent per share benefit we recognized pursuant to our settlement of a disputed tax matter with the Massachusetts Department of Revenue.

On a year-over-year basis, our second-quarter net operating revenue increased 26 percent, while operating expenses grew 11 percent, again exhibiting positive earnings growth and the continued leverage of our business model. We generate revenues based on assets under administration, the number of transactions generated by our clients and net interest income. These three revenue components create a natural hedge for our business model. The breakdown of our revenue stream for the second quarter of 2004 was 52 percent asset-based, 19 percent transaction-based and 29 percent net interest income-based.

I'll now discuss the significant income expense components for the second quarter in more detail. Core asset servicing fees for the second quarter increased 27 percent year-over-year due to wins from new and existing clients, such as BGI -- including the Canadian outsourcing contract -- Eaton Vance, Goldman Sachs, MassMutual, and Vega; also, the ability of our clients to develop and sell additional product, which generates fund flows that have a direct positive impact on our business, and higher asset levels compared to the year-ago period.

Ancillary service revenue -- including foreign exchange, cash management, securities lending and investment advisory -- increased 39 percent year-over-year. Each ancillary service exhibited solid year-over-year growth, primarily due to winning new clients and further penetration of existing clients. FX benefited from new clients, higher volumes and increased volatility in the currency markets.

Cash management suite revenues grew primarily as a result of higher domestic and foreign cash balances held by our clients. The improvement in securities lending can also be attributed to higher volumes and the international dividend season. The increase in investment advisory fees resulted from higher balances in our proprietary Merrimac money market funds.

Cash management, securities lending and investment advisory fees were also very strong on a linked-quarter basis, rising 20 percent, 67 percent and 31 percent, respectively. The reasons for this performance are the same as the ones I just discussed -- new clients and higher balances, and in the case of securities lending, the international dividend season.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 14. 2004 / 2:00PM, IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call

Net interest income was up 18 percent on a year-over-year basis, primarily due to balance sheet growth driven by strong client funding and a continued steep yield curve. During the second quarter, we again employed an asset liability strategy to prepay two higher-rate borrowings and replace them with lower cost to term funding.

We continue to maintain strong net interest margin and spread as a result of strong client funding. The linked-quarter net interest margin declined by 16 basis points to 1.85 percent, while the linked-quarter interest rate spread declined by 16 basis points to 1.76 percent. Absent the prepayment penalties of approximately 4.2 million related to the asset liability strategy, our net interest margin would have been 2.3 percent, while our interest rate spread would have been 1.96 percent.

Our investment portfolio is comprised of securities backed by the U.S. government, or AAA-rated securities. We continue to run a closely mapped balance sheet with an asset duration of approximately 1.5 years and a liability duration of approximately a year. The continued high amount of variable-rate securities in our portfolio has allowed us to maintain low asset duration.

Total operating expenses were up 11 percent year-over-year compared to our 26 percent increase in net operating revenue. Compensation and benefits expense was up 6 percent year-over-year, largely due to higher headcount, payroll taxes and incentive accruals. Depreciation and amortization was up 33 percent year-over-year due to the impact of technology projects being placed in the service in 2004.

In May of 2003, we came off a favorable five year fixed-rate insurance policy. As a result, insurance expense increased over 100 percent to 1.2 million for the quarter, due to higher premiums. Operating expenses increased -- other operating expense increased 86 percent to 4.4 million for the quarter, due to increased regulatory assessments due to higher deposit liabilities, higher recruiting expense, increased advertising expense and miscellaneous office expenses.

Given the status of our pipeline, as well as the capital markets and interest rate environments, we are increasing our 2004 earnings per share guidance from $1.90 to $1.95 to $2 to $2.05, representing approximately 35 percent growth over 2003 operating earnings per share of $1.49. As we have previously stated, our guidance includes a 275 basis point increase in the Fed funds rate from today over the next 18 months. We remain comfortable with our long-term growth rate of 25 percent in EPS.

Now I would like to open the call up for your questions.

## QUESTION AND ANSWER

**Operator**

(OPERATOR INSTRUCTIONS). Jon Arfstrom, RBC Capital.

**Jon Arfstrom**  *- RBC Capital Markets - Analyst*

A question for you on expenses. Obviously, expense pressure was something that hit the industry when you crosstown rival reported. Just curious if you see any expense pressures on the horizon, or is this a good run rate?

**John Spinney**

No, I don't see any expense pressure on the horizon, John. This is probably a good run rate for you.

**Jon Arfstrom**  *- RBC Capital Markets - Analyst*

The other question was on FX and just the sustainability versus, call it seasonality, in the business. And when you go back over the last three years you see higher and higher levels each quarter. And I'm just curious how this 14 to $15 million quarterly run rate feels, or is there something that we would be missing if we thought that this was a run rate?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 14. 2004 / 2:00PM, IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call

**John Spinney**

It could come off slightly just because the summer is a little slower, but it shouldn't come off that much.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

What is going on there? You talk about new business sales; what -- it's been growing pretty quickly and, obviously, the $18 million number was pretty high. But what is happening there?

**John Spinney**

It's continued volumes and volatilities in the currency that (indiscernible) our clients, and clearly the flows have come into the international product that have to be deployed, and the foreign assets need to be exchanged into the local currencies. And that's where those particular revenues are garnered from in those transactions.

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman & CEO*

We're constantly calling on our existing clients and new clients to build more and more of a base there. We, in this quarter, were recognize by Global Investor as the number two FX performance; so that goes a long way to giving credibility to our performance here to our clients.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

John, a question on some of the prepayment fees that you pay on the funding side. It seems to be like this is something that happens every quarter, and I'm just curious if there's a point in time where we'll be done with this and some of the higher margin numbers will be reported. Or is this something you expect to be ongoing?

**John Spinney**

I think this will be the last quarter for the near-term future (indiscernible) future here.

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman & CEO*

We don't have any left.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

I was going to ask.

**Operator**

David Chamberlain, (indiscernible) Asset Management.

**David Chamberlain** *Analyst*

Just a quick questions. Can you go over again -- I didn't catch the new business wins versus kind of the inflows from the clients, the numbers of this, the I think it's 67 million -- billion; I'm sorry.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 14. 2004 / 2:00PM, IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call

**John Spinney**

Out of the 72 billion, there was 2.4 billion from new clients. There was -- I'm sorry -- 4.4 from new clients and 8.5 from existing clients and 61 billion from market flows and market appreciation of client fund flows.

**David Chamberlain** *Analyst*

Okay. 4.4 from new clients, 8.5 from existing, and then 61 is market appreciation?

**John Spinney**

To a lesser extent, market appreciation mostly fund flows.

**David Chamberlain** *Analyst*

Okay. And just on expense -- just to add on to (indiscernible) question -- on your comp, how much more leverage -- if I look at it just as (indiscernible) of revenues, how much more leverage do you feel you have there on the existing (indiscernible) going forward?

**John Spinney**

I think we've got some leverage there yet.

**David Chamberlain** *Analyst*

Any kind of -- any kind of run rate margins you look at?

**John Spinney**

We don't comment specifically on line item guidance, but I would say we're guiding up to $2.02 to 2.05 right now from 1.90 to 1.95, and I think you get to kind of bake your assumptions in on the comp.

**Operator**

Carla Cooper, Robert W. Baird.

**Carla Cooper** *- Robert W. Baird - Analyst*

I had a question, I guess also about your guidance. Just if I think about your new guidance, even the top end of the range implies that the quarters coming up in the back half of the year are going to be a little weaker than certainly what we saw this quarter. And I'm just wondering sort of philosophically, what sort of lens -- is there anything sort of conservatism baked in there, or what kind of -- I don't think you've ever had a year where the quarters have sort of been flat.

**John Spinney**

I think on the guidance front, Carla, we brought it up to a point where we felt comfortable achieving those numbers. And giving ourselves some flexibility, as we've historically always done, we start with a 25 percent growth rate at the beginning of the year and try to outperform it quarter after quarter and try to guide you up, and try not to get ahead of ourselves.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 14. 2004 / 2:00PM, IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call |
|---|

**Carla Cooper** - *Robert W. Baird - Analyst*

Fair enough. And then, in Q2 can you talk about anything that would be -- or even remind us of the strategy that the Company employs for accruing for bonuses, and how that might have impacted the comp number?

**John Spinney**

The second quarter accrual was a little bit lower than the first quarter accrual, and we'll continue to accrue bonus into the third and fourth quarter to round out the year, but probably at lesser amounts.

**Carla Cooper** - *Robert W. Baird - Analyst*

Is that because you run into that cap that exists on bonuses?

**John Spinney**

That's correct.

**Operator**

Jamie Lester (ph) SAB Capital Management.

**Jamie Lester** - *SAB Capital Management - Analyst*

Great quarter. First question was on the occupancy expense. What caused the drop quarter-over-quarter in that?

**John Spinney**

Pretty simple; we had favorable valuations on the buildings in Boston and got real estate tax relief, and a final true-up of our operating escalations from the landlords (multiple speakers)

**Jamie Lester** - *SAB Capital Management - Analyst*

That's the go-forward run rate on that?

**John Spinney**

It's probably a little higher than that, because there was some pickup related to the whole year. So it's a little bit higher than what it is today.

**Jamie Lester** - *SAB Capital Management - Analyst*

Fair enough. And then on the leverage side, the equity was down quarter-over-quarter, I assume because we're marked to market on some of the assets.

**John Spinney**

The marked to market is 25 million negative at the end of the quarter, which is really minor in our opinion and doesn't affect our regulatory capital.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 14. 2004 / 2:00PM, IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call

---

**Jamie Lester** *- SAB Capital Management - Analyst*

I'm with you; I'm just trying to see -- you guys, obviously, had net income of what, 35 million? But equity was down 10 million in the quarter. So, I guess, what happened there?

---

**John Spinney**

We had net income and then we had the marked to market on the portfolio, and the offset for the marked to market in the swaps runs through other OCI.

---

**Jamie Lester** *- SAB Capital Management - Analyst*

So there's another 20 million of swap?

---

**John Spinney**

Roughly about 20 million; yes.

---

**Jamie Lester** *- SAB Capital Management - Analyst*

And then, where do you see, or how do you stand on the leverage side now? It looks like ending assets (indiscernible) interest-bearing assets of (indiscernible) I guess you look at total assets. I guess just walk us through where you are on the leverage side; it seems like you're kind of getting -- creeping towards the top-end.

---

**John Spinney**

We're at like the 5 58 (ph), I think, at the end of the quarter. And I think we will trend a little bit higher towards the end of the year; so that's still under 6 percent.

---

**Jamie Lester** *- SAB Capital Management - Analyst*

It looks like, if you look at a spread, non-interest income to non-interest expense, it seems to be kind of trending up. Should we look at that growth rate -- whatever it is, 5 million a quarter, plus or minus -- as continuing through the year? How do you think about that, or is that even a useful metric to look at?

---

**John Spinney**

I don't necessarily use that metric per se, but I think you could probably intuitively say that would go up.

---

**Jamie Lester** *- SAB Capital Management - Analyst*

What was the -- you mentioned the adjusted spread. If you take out the prepay penalties on the liability side for the quarter, what were the --?

---

**John Spinney**

The margin would have been 203 and the spread would have been 196.

---

Thomson StreetEvents     www.streetevents.com          Contact Us          6

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 14. 2004 / 2:00PM, IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call

**Jamie Lester** *- SAB Capital Management - Analyst*

What would the spread have been for the first quarter on that same basis?

**John Spinney**

I don't have that handy; it's probably about 10 basis points higher (multiple speakers) 13 and 206, probably.

**Jamie Lester** *- SAB Capital Management - Analyst*

So you did see some compression in the quarter?

**John Spinney**

Slightly.

**Operator**

Fulcrum Global Partners, Tom McCrohan.

**Tom McCrohan** *- Fulcrum Global Partners - Analyst*

You answered most of my questions, and maybe you answered this one as well, but just to clarify. Did the staff-related comp and benefits go down sequentially?

**John Spinney**

No, they did not go down sequentially. The thing that came down was the taxes that we talked about in the first quarter, because they pretty much had all accrued up earlier in the year. So that's the biggest component of that number, of the sequentially down number. And the other piece that drove that down was capitalized software was about a half-million higher in the second quarter.

**Operator**

Joel Gomberg, William Blair.

**Joel Gomberg** *- William Blair - Analyst*

The 61 billion -- that wasn't market appreciation, obviously. Could you just flush that out in terms of the assets (indiscernible) and what product sets are driving that?

**John Spinney**

I would say first of all the markets were up probably less than 1 percent on an average daily linked basis. So starting with our 1.1 trillion from the last quarter, you're talking about 11 billion. So 50 billion of it was coming from new clients. We saw strong flows on the ETF products, and we saw strong flows across the big clients that Kevin mentioned on the new revenue front as well, Joel. We continue to see good growth out of Dublin as well.

**Joel Gomberg** *- William Blair - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 14. 2004 / 2:00PM, IFIN - Q2 2004 Investors Financial Services Corp. Earnings Conference Call |
|---|

Could you expand a little bit, as you look out the next couple of years, your attitude on acquisitions, new areas or new locations?

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman & CEO*

You know, I think we're always looking for an acquisition that is close or related to the businesses we are in. But we have strict guidelines that ensure that it is accretive within the first year. And we don't find a lot of opportunities there, but we have found several over time. I think we are also strategically looking to see, using our Dublin operation as a hub, are there other locations in Europe that we can have administrative an office and leverage our opportunities in Europe as well?

**Operator**

Ladies and gentlemen, that will conclude today's question and answer session. A reminder that a replay of this call will be available starting at 8 PM Eastern time today and will run through midnight on July 20. To access this replay please dial area code 719-457-0820 and enter the passcode of 457951. (OPERATOR INSTRUCTIONS). Again, thank you all very much for your participation. That conclude today's conference call.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION  PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit H

# Thomson StreetEvents

## Conference Call Transcript

### IFIN - Investors Financial Services Corp. Guidance Announcement

Event Date/Time: Oct. 21. 2004 / 2:00PM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 21. 2004 / 2:00PM, IFIN - Investors Financial Services Corp. Guidance Announcement

CORPORATE PARTICIPANTS

**Joe DeCristofaro**
*Investors Financial Services Corp. - IR*

**Kevin Sheehan**
*Investors Financial Services Corp. - Chairman, CEO*

**John Spinney Jr.**
*Investors Financial Services Corp. - CFO*

CONFERENCE CALL PARTICIPANTS

**Jon Arfstrom**
*RBC Capital Markets - Analyst*

**Carla Cooper**
*Robert W. Baird & Company - Analyst*

**Kyle Simonairro**
*T Rowe Price - Analyst*

PRESENTATION

---

**Operator**

Good day, everyone. Welcome to the Investors Financial Services Corporation third quarter earnings update conference call. Today's call is being recorded. At this time for opening remarks and introductions I would like to turn the call over to Mr. Joe DeCristofaro. Please go ahead, sir.

---

**Joe DeCristofaro** *- Investors Financial Services Corp. - IR*

Thank you for joining us on today's call. We will be making a number of forward-looking statements which are based on Management's assumptions and predictions as of today. The Company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in our Press Release today in the MD&A Section of our most recent 10-Q and 10-K filings with the SEC. I recommend that anyone listening to this call view these reports carefully. Because this call will be archived on our website www.ibtco.com I want to emphasize again for anyone listening at a later date that the statements made today are based on our assumptions and predictions as of today October 21st, 2004. These assumptions may change, but the recording of this call will not be updated. Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer, Mike Rogers, President, and John Spinney, Chief Financial Officer. I will now turn the call over to Kevin Sheehan.

---

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

I want to begin by reviewing some key points from the Press Release we issued this afternoon. For the quarter ended September 30th, 2004 we expect to report fully diluted earnings per share of 51 cents to 53 cents with a 9-month ended September 30th, 2004 we expect to report $1.55 to $1.57 in earnings per share. We expect the final results to be available by November 15th. Before considering a FAS 91 adjustment, earnings per share would have been 51 cents for the third quarter of 2004. Core business trends remain positive. Our total asset servicing fees for the third quarter grew impressively year-over-year, increasing by 18% due to 3 factors, wins from new clients, such as Lumas Sales and Marshall Funds, the ability of our clients to develop and sell product which generates fund flows that has a direct positive impact on our business, and higher asset values compared to the year-ago period. Contributing to the 18% year-over-year growth in Asset Servicing fees, core services revenue grew 17% year-over-year and ancillary services revenue grew 21%. The increase in ancillary services revenue was driven primarily by strong increases in Cash Management and Investor Advisory fees. Cash Management suite revenues grew primarily as a result of higher domestic and foreign cash balances held by our clients. The increase in Invest Advisory fees resulted from higher balances in our proprietary Merrimac Money Market funds.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Oct. 21. 2004 / 2:00PM, IFIN - Investors Financial Services Corp. Guidance Announcement

Our assets processed continued to grew impressively. As of September 30th we processed approximately 1.2 trillion of assets for our clients. Up 40 billion or 3% from June 30th, 2004 and up 287 billion or 30% from September 30th, 2003. Of the 40 billion change in assets processed during the quarter 500 million converted in from new clients, such as the Marshall Funds and Lumas Sales. We also won approximately 6.4 billion in assets from several existing clients during the quarter. New business and client fund flows offset market depreciation resulting in a net increase of 34 billion, of the 40 billion increase during the quarter. In addition, we are pleased to announce that we won a comprehensive funded administration outsourcing mandate from [Ageon.] This win represents a significant expansion of services we currently provide to this important client. We will be performing funded administration services for approximately 100 funds and 30 billion in assets. As continued evidence of our commitment to and the viability of our client service model, we recently won the Award for "Best in Excellence" in the industry for global custody of North American Fund Managers. The current status of our new business pipeline remains medium. We continue to maintain a positive outlook on our sales pipeline as we are seeing strong levels of [RP] activity and increased interests by our clients in our service offerings.

Turning back to today's Press Release we have consistently applied the perspective method under FAS 91 since the initial public offering in 1995 and are examining whether the retrospective method should be used for certain types of investment securities. We are currently completing a comprehensive review of applying FAS 91 with respect to immunization of premiums and an accretion of discounts on our investment securities. I would like to stress that this change and an application of FAS 91 has no impact on our continuing operations or our client service levels. From a financial perspective, the impact of this change will not be significant for years 2002 through 2004. But could result in a larger reduction in 2001 reporting earns per share due to the changing interest rate environment during that year. All years whether immaterial or not will be restated to correct the numbers upon completion of our comprehensive review. In other words, if it is wrong, we will fix it. Given the status of our pipeline, as well as the capital markets and interest rate environments, we remain comfortable with our 2004 earnings per share guidance of 2 to 205. We remain comfortable with our long-term growth rate of 25% in EPS and would now like to open up the call to your questions. Operator, can you open it to questions?

## QUESTION AND ANSWER

**Operator**

Thank you. Jon Arfstrom, RBC Capital Markets.

**Jon Arfstrom  - RBC Capital Markets - Analyst**

Interesting release. Question on the accounting change, of course. Is it something that the auditors decided needed to be changed? When did it arise and can you just talk about what needs to be done before you can officially put out the number with the full release?

**Kevin Sheehan  - Investors Financial Services Corp. - Chairman, CEO**

Sure. I think clearly everybody is looking at income recognition in this particular area. And we really have re-evaluated our approach. It is an extremely complex and technical area and we wanted to essentially take a real hard look at what we were doing and make sure that we were using the right methodology. We have gone through an analysis of our portfolio and looked at it under both methodologies. It is a very time consuming and detailed exercise. We have involved both the audit committee and the external auditors in reviewing the results. And I think it will take us probably until the November 15th time frame to complete that exercise and process all the changes to the financials if they are necessary.

**Jon Arfstrom  - RBC Capital Markets - Analyst**

Is it as simple as -- is it conservatism? And if one results in a lower number that's what you will choose or how do you differentiate between which method is the best to use?

**Kevin Sheehan  - Investors Financial Services Corp. - Chairman, CEO**

I think they are just really 2 fundamentally different methodologies and I think we have come to the conclusion in conjunction with our advisors that the retrospective method is the more correct method and more consistent with the requirements of GAAP. And we just have to change to it.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 21. 2004 / 2:00PM, IFIN - Investors Financial Services Corp. Guidance Announcement

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

Okay. Another question, and I'm assuming that it is a net interest income in tact which is why the number isn't disclosed in the release?

**Kevin Sheehan**  - *Investors Financial Services Corp. - Chairman, CEO*

Yes.

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

Okay. The fee number, the core services fee was lighter than I expected, yet assets were up. Can you comment a little bit on what happened to the fees?

**Kevin Sheehan**  - *Investors Financial Services Corp. - Chairman, CEO*

The core fees themselves, Jon?

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

Core fees, yes.

**Kevin Sheehan**  - *Investors Financial Services Corp. - Chairman, CEO*

Primarily just lower transactions during the quarter.

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

Okay. Do you have an FX number also?

**Kevin Sheehan**  - *Investors Financial Services Corp. - Chairman, CEO*

Yes, I do.

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

I haven't seen it indicated.

**Kevin Sheehan**  - *Investors Financial Services Corp. - Chairman, CEO*

Yes. We're going to an 8K out with our normal release, Jon.

**Jon Arfstrom**  - *RBC Capital Markets - Analyst*

Okay. So you're saying that will be November, that will be out today?

**Kevin Sheehan**  - *Investors Financial Services Corp. - Chairman, CEO*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 21. 2004 / 2:00PM, IFIN - Investors Financial Services Corp. Guidance Announcement

Yes, that will be out in November most likely.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Okay. When does the Ageon business come on?

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

It starts in another month.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Okay. And then the other thing, the change you talked about the accounting change not having any impact in the prior years, anything for 05? I know Kevin you stated that the 25% growth rate is still something you're comfortable with. You don't expect this to have any material change on your expectations for 05?

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

No, I don't.

**Operator**

Carla Cooper, Robert W. Baird.

**Carla Cooper** *- Robert W. Baird & Company - Analyst*

Could you -- I guess a couple things. One is, you say that the earnings in the quarter would have been 51 to 53 cents if this method is applied. So I guess 2 questions. One, what do you expect it to be once this method is applied? And the second thing is, do you suspect that this would also change -- you reiterated the 2 to 205, but might this change in accounting also, change that number?

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

Yes. What I think what we said in the -- I don't know where we said it. I think what our expectation is that without any change in accounting the earnings would be 51 cents for the third quarter with a change in accounting. We think there could be some increased recognition and that's why we put the 53 cents in.

**Carla Cooper** *- Robert W. Baird & Company - Analyst*

Okay. Got it. And what about that same thought process applied to the 2 to 205 number that you have given for '04?

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

You know, I think until we get through this complete process, I think we're comfortable staying with the 2 to 205 and once we are through the complete process we will be able to give you a much more definitive number there.

**Carla Cooper** *- Robert W. Baird & Company - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Oct. 21. 2004 / 2:00PM, IFIN - Investors Financial Services Corp. Guidance Announcement

Okay. And John do you think with your accounting background you could indulge us a little bit with some FAS 91 and just talk a little bit more about perspective versus retrospective and maybe why it has become particularly important at this time?

**John Spinney Jr.** - *Investors Financial Services Corp. - CFO*

I guess -- sure. That's easy to do, Carla, I guess. The FAS 91 is a FAS related to the amortization of discounts and premiums and direct costs on loans that originated by financial institutions as well. Under this particular FAS, you have to calculate an effective yield for the securities in order to amortize premiums and discounts on the securities and the investment portfolio. We have always used a prospective method which basically takes your current accounting yield and projects it forward and for purposes of determining a current amortization of premium or accretion of discount. Under the prospective method of accounting you would calculate your current yield today by taking all the prior cash flows and projecting your future cash flows to come up with a new yield for determining, really your net investment today and comparing that to the prior period of that investment and adjusting any balance up or down as a result of that analysis. So in the case of a security that had premium in -- when that evaluation was done there could be an additional premium that would need to be recognized after that analysis was performed. That was retrospective.

**Carla Cooper** - *Robert W. Baird & Company - Analyst*

Got it. And then I guess one last question back to this, you know, just thinking about the revenue growth being slower than the asset growth. Was there something that impacted transactions in your -- in this quarter that you can point out? Were there any drivers behind that phenomenon?

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

I think the whole industry in general was relatively quiet. It's been pretty quiet in this business over the summer and it was probably quieter this year than last year as well.

**Operator**

Kyle Simonairro, T Rowe Price.

**Kyle Simonairro** - *T Rowe Price - Analyst*

Could you tell us what happened this quarter that made this accounting issue come up? Was there a change in interest rate, or was it just something that you caught? John, you're a CPA. You were previously a partner in a Big 5 firm. What happened this quarter that you suddenly woke up and said we need to take a look at this?

**John Spinney Jr.** - *Investors Financial Services Corp. - CFO*

Yes. I think part of any internal control structure in an accounting environment, you look at your accounting policies -- we looked our mortgage back accounting policies during this period. We went into our systems took a look at how they were calculating the interest method. We went back to the accounting standards and realized that we were using the prospective method and although the prospective method was allowed, the retrospective method probably was more appropriate for securities that we hold in our portfolio. As a result to that we consulted our advisors. Realized we should have been using the retrospective method. Did the right thing and went back and recalculated what those numbers would have been. We are in the process of doing that. And as Kevin said, I think the results are pretty insignificant over the last few years with the largest impact in '01. And as a result of doing that review we'll do what we have to do to make it right.

**Kyle Simonairro** - *T Rowe Price - Analyst*

Do you have an estimate of a range of your net interest margin during the quarter?

**John Spinney Jr.** - *Investors Financial Services Corp. - CFO*

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Oct. 21. 2004 / 2:00PM, IFIN - Investors Financial Services Corp. Guidance Announcement

No.

**Operator**

Ladies and gentlemen, this concludes our question-and-answer session. A replay of this call will be available starting 8 p.m. ET today and we'll run through October 27th at midnight CT. To access the replay please dial 719-457-0820 and enter in the pass code 937731. Again, that number is 719-457-0820 with a pass code of 937731. This concludes our conference call. We thank you for your participation.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit I



# Thomson StreetEvents

## Conference Call Transcript

### IFIN - Q3 2004 Investors Financial Services Corp. Earnings Conference Call

Event Date/Time: Nov. 15. 2004 / 2:00PM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 15. 2004 / 2:00PM, IFIN - Q3 2004 Investors Financial Services Corp. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Joe DeCristofaro**
*Investors Financial Services Corp. - Manager, Investor Relations*

**Kevin Sheehan**
*Investors Financial Services Corp. - Chairman, CEO*

**John Spinney**
*Investors Financial Services Corp. - Senior Vice President, CFO*

## CONFERENCE CALL PARTICIPANTS

**Jon Arfstrom**
*RBC Capital Markets - Analyst*

**Carla Cooper**
*Robert W. Baird - Analyst*

**Casey Ambrich**
*Millenium Partners - Analyst*

## PRESENTATION

**Operator**

Good day, everyone. Welcome to the Investors Financial Services Corp. Third Quarter Earnings Release Conference Call. Today's call is being recorded. At this time for opening remarks and introductions, I would like to turn the call over to Mr. Joe DeCristofaro. Please go ahead.

**Joe DeCristofaro** - *Investors Financial Services Corp. - Manager, Investor Relations*

Thank you for joining us on today's call. We'll be making a number of forward-looking statements which are based on management's assumptions and predictions as of today. The company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the MD&A section of our most recent 10-Q and 10-K filings as amended with the SEC. I recommend that anyone listening to this call review these reports carefully. Because this call will be archived on our website, www.ibtco.com, I want to emphasize again for anyone listening at a later date the statements made today are based on our assumptions as of today, November 15, 2004. These assumptions may change but the recording of this call will not be updated. Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer, Mike Rogers, President, and John Spinney, Chief Financial Officer. I will now turn the call over to Kevin Sheehan.

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

I will begin by reviewing some of the key points from our restatement process which we successfully completed and then turn to our third-quarter results. John Spinney will finish with the detailed discussion of our financial results.

Senior management, the audit community of the board, our internal auditors and our independent registered public accountants have completed a comprehensive review of the amortization of premiums and accretion of discounts on all of our investment securities. We have examined the accounting for and evaluation of each and every investment security in our portfolio from December 31, 2000 to September 30, 2004. We are now amortizing premiums and accreting discounts in the affected securities in accordance with generally accepted accounting principals, including FAS 91. Again, we're making this statement in relation to all the securities and security types in our portfolio.

Today, we filed an amended annual report on form 10-KA for the year ended December 31, 2003. Amended quarterly reports on form 10-K -- 10-QA for the first two quarters of 2004 and our quarterly report on form 10-Q for the quarter ended September 30, 2004. We initially reported on October 21 that the impact of this change was not significant for the years 2002 through 2004, but it resulted in a larger reduction in 2001

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Nov. 15. 2004 / 2:00PM, IFIN - Q3 2004 Investors Financial Services Corp. Earnings Conference Call

reported earnings per share due to the rapidly changing interest rate environment during that period. The company's cumulative restatement since inception, resulting from the accounting review was a reduction of 6.2 million in net interest income. The opening adjustment to retained earnings as of January 1, 2001, was an increase of .9 million.

2001's total net interest income adjustment was a reduction of 8.5 million, resulting in a decrease in diluted earning per share of 8 cents. The net interest income adjustment for 2002 was a reduction of 2.3 million or 2 cents per share. For 2003, the adjustment was an increase of $1 million or 1 cent per share. For 2004, the adjustment was an increase of 2.7 million or 2 cents per share. There was no significant change to our capital or leverage ratios for any restated quarter. A detailed presentation of the changes arising from the restatement can be found in the reports we filed today with the SEC. In addition, this restatement did not impact the accounting for our SBA portfolio.

We did, however, correct a clerical error in the contractual maturity table in the MD&A session of our 2003 10-K. We previously reported federal agency securities having a yield of 3.16% in the over-10-year catagory and 2.76% in the 5- to 10-year category. These yields should have been 2.71% and 2.28% respectively, consistent with the income we recognize in our financial statements.

To summarize, we undertook a comprehensive effort to audit, recalculate and correct our financial statements and our SEC filings. We accomplished these tasks in a short period of time thanks to the tireless effort of our dedicated employees.

We will now turn to a review of our financial results. For the quarter ended September 30, 2004, we reported fully diluted earnings per share of 53 cents, up 29% from the third quarter of 2003's diluted EPS of 41 cents. For the 9 months ended September 30, 2004, net operating revenue rose 27% to 456 million while diluted operating earnings per share rose 52% and net operating income rose 56%. Our five-year compound annual growth rate and diluted earnings per share through September 30 remains an impressive 43%.

As we disclosed in our previous call in October, core business trends remain positive. Our total asset servicing fees for the third quarter grew impressively year-over-year due to three factors: Wins from new clients and existing clients, the ability of our clients to develop and sell product which generates fund flows that have a direct positive impact on our business, and higher asset values compared to a year-ago period. Also, as previously disclosed, our assets process continued to grow impressively. As of September 30, we processed approximately 1.2 trillion of assets for our clients, up 40 billion or 3% from June 30, 2004 and up 287 billion or 30% from September 30, 2003.

In addition to the AGON (ph) mandate to perform mutual fund administration for over 100 funds and 30 billion in assets announced on our last call, we're also very pleased to announce we have signed an agreement to provide comprehensive middle office outsourcing services to a new European client. Under this agreement, we will service approximately 60 billion in assets. We have also signed a letter of intent with the same new client to provide middle office outsourcing services to another approximately $100 billion in assets for a total of 160 billion in new assets. The current status of our new business pipeline remains medium. We continue to maintain a positive outlook on our sales pipeline as we are seeing strong levels of RFP activity, and increased interest by our clients in our service offerings.

To summarize, our third-quarter results demonstrate a continued robust condition of our business. These results were driven by our ability to sell new and existing clients, strong client fund flows and prudent expense management. I will now turn the call over to John Spinney who will review the quarter's financial results in more detail.

**John Spinney** *- Investors Financial Services Corp. - Senior Vice President, CFO*

As Kevin mentioned, third-quarter diluted EPS came in at 53 cents, a 29% increase over our third-quarter, 2003, diluted EPS of 41 cents. On a year-over-year basis, our third-quarter net operating revenue increased 22% while our operating expenses grew 15%, again, exhibiting positive earnings growth in the continued leverage of our business model. For the nine months ended September 30, 2004, net operating revenue rose 27% to 456 million while our expenses grew 14%. Diluted operating earnings per share rose 52% and net operating income rose 56% for the nine months ended September 30, 2004.

We generate revenues based on assets under administration, the number of transactions generated by our clients and net interest income. These three revenue streams create a natural hedge for our business model. The breakdown of our revenue stream for the third quarter of 2004 was 52% asset-based, 16% transaction-based, and 32% net interest income based. I will now discuss the significant income and expense components for the third quarter in more detail.

Core asset servicing fees for the third quarter increased 18% year-over-year due to three factors: Wins from new and existing clients, the ability of our clients to develop and sell product which generates fund flows that have a direct positive impact on our business and higher asset values

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 15. 2004 / 2:00PM, IFIN - Q3 2004 Investors Financial Services Corp. Earnings Conference Call

compared to the year ago period. The increase in ancillary services revenue is driven primarily by strong increases in cash management and investment advisory fees. Cash management, sweep revenues grew as a result of higher domestic and foreign cash balances held by our clients. The increase in investment advisory fees resulted from higher balances and our proprietary Merrimack money funds.

Directly related to the growth of our processing business is the growth of our balance sheet which on an average basis grew 2 billion or 25% from last year's third quarter to this year's third quarter as a result of strong client funding which, grew 35% year-over-year. Net interest income was up 31% on a year-over-year basis primarily due to balance sheet growth driven by strong client funding and a relatively steep yield curve.

We continue to maintain strong net interest margin of spread as a result of the strong client funding. The linked quarter net interest margin increased by 18 basis points to 1.94% while the linked quarter interest rate spread also increased 18 bases points to 1.85%.

Our investment portfolio is comprised of securities backed by the U.S. government and/or triple-A rated securities. As of September 30, we continue to run a closely-matched balance sheet with an asset duration of approximately 1.4 years and liability duration of approximately one year. The continued high amount of variable rate securities in our portfolio has allowed us to maintain low asset duration.

Total operating expenses were up 15% year-over-year compared to our 22% increase in net operating revenue. Compensation and benefits expense was up 6% year-over-year largely due to higher headcount and incentive accruals, partially offset by employee costs that shifted to IBM Global Services as part of our recent outsourcing arrangement. Technology and telecommunications increased 40% due to increased infrastructure investments and our new outsourcing arrangement with IBM Global Services. Transaction processing services costs increased 32% due to higher global balances and transactions with our sub-custodians. Other operating expenses increased 82% to 3.6 million for the quarter, due to increased regulatory assessments due to higher deposit liabilities, higher recruiting expense, increased advertising expense, and miscellaneous office expenses.

Given the status of our pipeline as well as the capital markets and interest rate environments, we remain comfortable with our 2004 earnings per share guidance of $2 to $2.05, representing a greater than 35% annual increase in diluted earnings per share. As we previously stated, our guidance includes a 200 additional 200 basis point increase in the Fed funds rate from today to 4% over the next 15 months. Included in our guidance is and has always been a forecast of SBAs running at industry prepayment speeds. We remain comfortable with our long-term growth rate of 25% on EPS. As we have done historically, we revert back to our historical growth rate of 25% at the outset of a new year and adjust our guidance as we lock in new business. Amy, I'd now like to open up the call to your questions.

## QUESTION AND ANSWER

**Operator**

Thank you, the question-and-answer session will be conducted electronically. If you would like to ask a question, please press the star key followed by the digit 1 on your telephone. If you're using a speaker phone, please make sure your mute function is turned off to allow your signal to reach our equipment. We will proceed in the order that you signal us and we'll take as many questions as time permits. Once again, that's star 1 for your question. We will pause for just a moment. The first question is from Jon Arfstrom with RBC Capital Markets.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Good afternoon, guys.

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

Good afternoon.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Hey, John. Little different tone on this call than the last one, right?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 15, 2004 / 2:00PM, IFIN - Q3 2004 Investors Financial Services Corp. Earnings Conference Call

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

Yes.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Question on the restatement. Is it finished, is there any more risk here, is this issue complete and it's over with and we don't have to think about it.

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

Yes, it's done, Jon. We made a full assessment and filed everything today.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Any changes you see in your business as a result of this, higher expense rate, does it impede your ability to grow, does it inject volatility, what changes?

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

It doesn't have any affect on our business whatsoever, especially in terms of continuing to grow the business. We're still focusing on buying the same types of investments and generating that complementary income from net interest income and we see very little volatility as a result

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Okay. One of the line-items I think surprised people in late October when you released your numbers was the core fee services line and it was lower than, I think, a lot of people expected. Can you talk a bit about what caused that and maybe give us an outlook for part way through the fourth quarter since we have seen volumes return in the market, come up a bit.

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

Sure. During in the summer time months which, is part of the third quarter, I guess, we're lower volumes across the board on, on all the ancillary services and then within the core business where the buys and sells occur that are part of that "mutual fund fee". Those were lower than we had expected and lower than the previous year. So, as a result, the core revenues were down. In addition, we have, we've locked up five very significant clients for additional 3- to 5-year contracts and, as a result, had a little bit of fee give-back on some of those clients that flowed through the third quarter, but we expect, with the fourth quarter, with assets up that those asset revenues that came down will be recouped. I think the other thing that is going to happen in the fourth quarter is it happened a little bit in the third quarter was comp and benefits had some expense related to the business we won, that we talked about on this call and the previous call. We hire ahead so we're going to have a little bit of expense in the third and the fourth quarter here. The assets will convert in the end of this year for AGON and then into '05 for the new business that we won in Europe. So the revenues will catch up with the expenses going into '05 with respect to that.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Okay. Can you talk a bit about the extent of services that you're providing. I know you said middle office, but can you describe what you're doing for them.

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Nov. 15. 2004 / 2:00PM, IFIN - Q3 2004 Investors Financial Services Corp. Earnings Conference Call |
|---|

It's fund accounting, recon, and trade order management.

---

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Custody as well?

---

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

Not custody to start with, no.

---

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Okay. And then I guess the last question is just on your interest rate positioning. Has anything that the Fed has done so far and the changes in the slope of the curve surprised you or has it all been consistent with your expectations for a flattening curve?

---

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

It's pretty consistent with what we expected in terms of what the Fed moves have been. And it was built into that 300-basis point guidance we gave way back in June and continues to be in our guidance with the 200 basis points up from here today.

---

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

All right. Thanks.

---

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

Yes.

---

**Operator**

We'll now hear from Carla Cooper.

---

**Carla Cooper** - *Robert W. Baird - Analyst*

Good afternoon. Can you just talk a little bit more about what compensation did on a sequential basis. It looked to me like it was off Q2 to Q3 quite a bit.

---

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

Sure, Carla. Compensation was down on the linked quarter basis, primarily due to lower incentive accruals from the second quarter to the third quarter and just, you know, recalling Q1 and Q2 were significant quarters on the ancillary revenue line-items, as well in the second quarter with the core revenue line items and, as a result, higher incentives are accrued when the revenues and the earnings are there commensurate with those, um, with those expenses.

---

**Carla Cooper** - *Robert W. Baird - Analyst*

Thanks and then you said AGON Q4, beginning or end of Q4, and then looking out to next year, um, any, any closer sort of guidance as to when we should look to the revenue from the new clients?

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Nov. 15. 2004 / 2:00PM, IFIN - Q3 2004 Investors Financial Services Corp. Earnings Conference Call

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

AGON started in the fourth quarter and, um, it will be throughout 2005 that that revenue comes on for the other business.

**Carla Cooper** - *Robert W. Baird - Analyst*

Great. Thanks.

**Operator**

Once again, if do you have a question, it's star 1 on your telephone. If you find that your question has been answered, you may remove yourself by pressing the pound key. We'll now hear from Casey Ambrich with Millennium Partners.

**Casey Ambrich** - *Millenium Partners - Analyst*

Good evening, gentlemen, thanks very much for taking the question.

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

Sure, Casey.

**Casey Ambrich** - *Millenium Partners - Analyst*

Great quarter, really. Just a question on the expenses. Could you just go into this IBM outsourcing agreement and how we should think about that? Maybe you announced that before, but I don't remember hearing about that.

**John Spinney** - *Investors Financial Services Corp. - Senior Vice President, CFO*

It was announced before and it's, for the most part, it's expense neutral. The early part of the contract. A little bit of overlap that we picked up this year. For the most part, it has very little impact on expenses going forward. In fact, I think over time, we'll be able to generate some leverage within that contract to help us.

**Casey Ambrich** - *Millenium Partners - Analyst*

Okay, great. Thank you very much.

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

Yes.

**Operator**

Mr. Sheehan, at this time, I will turn the call back to you.

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

Thank you, Amy. In closing, thanks for your patience as we work through this restatement. Given the new business closing during the month and the increasing demand for our services, we look forward to a strong fiscal 2005. Thanks again.

| Thomson StreetEvents | www.streetevents.com | | Contact Us | 7 |

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Nov. 15. 2004 / 2:00PM, IFIN - Q3 2004 Investors Financial Services Corp. Earnings Conference Call

**Operator**

That does conclude today's conference. We thank you for your participation. You may now disconnect.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable. any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit J

# Thomson StreetEvents

## Conference Call Transcript

### IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call

Event Date/Time: Jan. 25, 2005 / 2:00PM PT
Event Duration: N/A

| Thomson StreetEvents | www.streetevents.com | | Contact Us | 1 |
|---|---|---|---|---|

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

> Jan. 25. 2005 / 2:00PM, IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Joe DeCristofaro**
*Investors Financial Services Corp. - IR*

**Kevin Sheehan**
*Investors Financial Services Corp. - Chairman, CEO*

**John Spinney**
*Investors Financial Services Corp. - CFO, SVP*

## CONFERENCE CALL PARTICIPANTS

**Jon Arfstrom**
*RBC Capital Markets - Analyst*

**Joel Gomberg**
*William Blair - Analyst*

**Carla Cooper**
*Robert Baird - Analyst*

**Trisha Meave**
*Variant Research - Analyst*

**Brandi Shaw**
*Beekman Capital Management - Analyst*

**Stuart Quint**
*Gartmore Global - Analyst*

## PRESENTATION

---

**Operator ·**

 Good day, everyone. And welcome to the Investors Financial Services Corp. fourth-quarter and year-and earnings release conference call. Today's conference is being recorded. At this time, for opening remarks and introductions, I would like to turn the conference over to Joe DeCristofaro. Please go ahead, sir.

---

**Joe DeCristofaro** *- Investors Financial Services Corp. - IR*

 Thank you for joining us on today's call. We will be making a number of forward-looking statements, which are based on management's assumptions and predictions as of today. The Company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the MD&A section of our most recent 10-Q and 10-K filings, as amended with the SEC. I recommend that anyone listening to this call review these reports carefully.

 Because this call will be archived on our website, www.ibtco.com, I want to emphasize again for anyone listening at a later date that the statements made today are based on our assumptions as of today, January 25th, 2005. These assumptions may change, but the recording of this call will not be updated.

 Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer; Mike Rogers, President; and John Spinney, Chief Financial Officer. I'll now turn the call over to Kevin Sheehan.

---

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 25. 2005 / 2:00PM, IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call

Thanks, good afternoon. I'll begin by reviewing some of the key points from our full-year results. John Spinney will then provide you with a more detailed discussion of our financial results.

For the year ended December 31st, 2004, we again reported extremely impressive results. The 39 percent increase to 209 (ph$) in 2004 diluted earnings per share from $1.50 in 2003 was at the high end of our recently increased guidance. These results were driven by a 25 percent increase in our net operating revenue to 613 million and a 43 percent increase in our net operating income to 142 million.

Even more impressive of -- are our five-year compound annual growth rates in revenue, diluted earnings per share and net income. These growth rates include our performances in both strong and weak market environments and illustrate the health of our business and the leverage in our model. For the past five years, we have grown our diluted earnings per share to 42 percent keger (ph), our net income at a 46 percent keger, and our net operating revenue at a 29 percent keger.

As of December 31st, we processed approximately 1.43 trillion of assets for our clients, up 187 billion or 15 percent from September 30th, 2004 and up 373 billion or 35 percent from December 31st, 2003. During the fourth quarter of 2004, we converted approximately 50 billion in new assets from new clients, including the first substantial conversion of the 47 billion in assets from our previously announced 160 billion new European client.

We expect to convert the rest of these assets during 2005. The remaining 3 billion in new assets comes from other new clients, including The Boulder Funds and Cypresstree International (ph). In addition to the 50 billion in assets we won from new clients, we also converted approximately 15 billion in new assets from existing clients, including Aegon, Eaton Vance, and Mass Mutual.

We also experienced market appreciation and client fund flows of 123 billion during the fourth quarter. The current status of our new business pipeline remains medium. We continue to maintain a positive outlook on our sales pipeline, as we are seeing strong levels of RFP activity and increased interest by our clients in our service offerings.

To summarize our results demonstrates the continued robust condition of our business. This performance was driven by our ability to sell to new and existing clients and strong client fund flows.

I will turn the call over to John Spinney, and we'll review the quarter's financial results in more detail.

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

Thank you, and good afternoon. As Kevin mentioned, for the year ended December 31st, 2004, net operating revenue rose 25 percent to 613 million, while our expenses grew only 16 percent. As a result of this leverage in our model, we are able to grow net operating income by 43 percent to 142 million in diluted earnings per share by 39 percent to $2.09. For the fourth quarter, net operating revenue increased 19 percent year-over-year, while our diluted operating earnings per share grew to $0.52, an 11 percent increase over our fourth-quarter 2003 diluted EPS of $.47.

I will discuss our full year and fourth-quarter 2004 results in more detail in a moment. We generate revenues based on assets under administration, the number of transactions generated by our clients and net interest income. These three revenue components create a natural hedge for our business model.

The breakdown of our revenue stream for 2004 was 52 percent asset-based, 17 percent transaction-based, and 31 percent net interest income-based. The breakdown of our revenue stream for the fourth quarter of 2004 was similar at 53 percent asset-based, 16 percent transaction-based and 31 percent net interest income-based.

I will now discuss the significant income and expense components for our full-year 2004 results. As we disclosed in our last call in November, key business trends remain positive. Our total 2004 core asset servicing fees grew an impressive year-over-year rate of 24 percent due to three factors -- wins from new clients and existing clients; the ability of our clients to develop and sell product, which generates fund flows that have a direct positive impact on our business; and higher asset values compared to the year-ago period.

2004 ancillary service fees grew by 37 percent, driven primarily by strong increases in foreign exchange and cash management sweet peas (ph). Foreign exchange revenues grew by 49 percent year-over-year due to new clients, increased activity in international markets for our existing clients, and volatility in the currency markets. Cash management suite revenues grew 26 percent year-over-year, primarily as a result of higher

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 25. 2005 / 2:00PM, IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call

domestic in foreign cash balances held by our clients. Total operating expenses were up 16 percent year-over-year, compared to our 25 percent increase in net-operating revenue.

Turning to individual 2004 costs, compensation benefits expense was up 10 percent year-over-year, largely due to higher headcount in incentive accruals, as well as higher payroll taxes and benefit expenses consistent with our growth in headcount. The increase in headcount of 365 employees to 2,778 at the end of 2004 was driven by the higher amount of new business we won during the year and the filling of open positions.

Technology and telecommunications increased 28 percent due to our continuing investments in technology and our new outsourcing arrangement with IBM Global Services, which is scaled to support our growth. Transaction processing service costs increased 27 percent due to higher global asset values and transactions with our subcustodians.

I'll now discuss the significant income expense components for the fourth quarter in more detail. Core asset servicing fees for the fourth quarter increased 18 percent year-over-year due to the same three factors I mentioned previously -- wins from new and existing clients, the ability of our clients to develop and sell their products, and higher asset values compared to the year-ago period.

The 21 percent increase in fourth-quarter ancillary services revenue was driven by strong increases in foreign exchange, cash management, and securities lending fees. Cash management suite revenues grew 33 percent, primarily as a result of higher domestic and foreign cash balances held by our clients. The 35 percent increase in securities lending fees resulted from generally improved spreads and higher volumes. Foreign exchange revenues grew 15 percent due to new clients, increased activity in international markets, and volatility in currency markets.

For the fourth quarter, total operating expenses were 19 percent quarter-over-quarter, compared to a 19 percent increase in net operating revenue. The growth in our cost structure during the fourth quarter was largely driven by new business we won during the second half of 2004, which required us to lead with headcount in technology.

Turning to individual fourth-quarter costs, compensation and benefits expense was up 18 percent quarter-over-quarter, largely due to higher headcount in incentive accruals, as well as higher payroll taxes and benefit expenses consistent with our headcount growth.

Technology and telecommunications increased 51 percent, primarily due to the transition to our new outsourcing arrangement with IBM Global Services. The transaction processing services cost increased 18 percent due to higher global asset values and transactions with subcustodians. Directly related to the growth of our processing business is the growth of our balance sheet, which on average basis grew by 2.1 billion or 24 percent from last year's fourth quarter to this year's fourth quarter, as a result of strong client funding.

Net-interest income was up 22 percent on a year-over-year basis, primarily due to balance sheet growth -- again, driven by healthy client funding. We continue to maintain strong interest margin and spread during the fourth quarter. The linked-quarter net-interest margin decreased by 6 basis points to 1.88 percent, while the linked quarter interest rate spread decreased by 10 basis points to 1.75 percent.

Our investment portfolios comprised of securities backed by the U.S. government and/or AAA-rated securities. As of December 31st, we continue to run a closely match balance sheet with an asset duration of approximately 1.3 years and a liability duration of approximately 1 year. The continued high amount of variable-rate securities in our portfolio has allowed us to maintain low-asset duration.

Turning to our earnings guidance for 2005, as we have done historically, we are reverting back to our targeted long-term diluted earnings-per-share growth rate of 25 percent at the outset of the year and will adjust our guidance as we progress through the year. Our guidance includes an additional 175 basis point increase in the fed (ph) funds rate from today to 4 percent by the end of 2005. We are also modeling a further flattening of the yield curve in 2005. We remain comfortable with our long-term growth rate of 25 percent EPS.

I would now like to turn the -- open up the call to your questions. Operator?

## QUESTION AND ANSWER

**Operator**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jan. 25, 2005 / 2:00PM, IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call |
|---|

Thank you, the question-and-answer session will be conducted electronically. (OPERATOR INSTRUCTIONS). Jon Arfstrom, RBC Capital Markets.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

A question for you on the value edit numbers. They look good in the fourth quarter, and I'm wondering if -- so far that environment is continued into the first quarter. And then, I have a follow-up on that.

**John Spinney** *- Investors Financial Services Corp. - CFO, SVP*

Yes, that's continued into the first-quarter, Jon.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

And then, also, on Q1 and Q2, you had some fairly high comps. You had the strong Q1 and Q2, a year ago, in some of your F-ex line, and I'm just curious how you feel about your ability to exceed that year-over-year?

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

I think what we see is -- we've seen assets in the international markets that we have custody for increase, substantially, the last part of this year and going into next year that will hopefully provide us with the volume. We're still getting some volatility in the currencies.

So I feel pretty good about being able to meet what we did last year in the first two quarters here, provided the flows keep coming into these international products, as we saw last year. And we're seeing it to the end of this year.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Okay. And then, on the expenses how -- are all of your new business expenses from the fourth quarter in the run rate, or will you see some incremental expenses in the first quarter from the new business that you added late in the year?

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

They are already in the fourth-quarter run rate, as we look into next year. I think the only expenses going up -- going into the first quarter would be typical comp expenses, payroll taxes reload as annual comp increases go into effect. Those will be the major -- and incentive accruals begin again. So other than that, I would expect most expenses to be at their current run rate or less, with the exception of depreciation expense that will go up slightly.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

And then, in terms of the 100 billion (ph) that comes out later in the year -- do you need to add significant amount of incremental expenses to handle that, or is this embedded in what you have added already?

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

There will be some incremental headcount, as the rest of the staff (ph) has come on. But as far as the technology cost and other transition costs, those are already embedded in the run rate.

**Operator**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jan. 25. 2005 / 2:00PM, IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call**

Joel Gomberg, William Blair.

---

**Joel Gomberg** - *William Blair - Analyst*

Thanks. The technology expense line item, you mentioned IBM. Are you going to be able to get some efficiencies out of that going forward? Or is this the run rate as well?

---

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

Joel, that run rate will come down. As I mentioned, on the previous call, in entering into this agreement with IBM, there were certain transition costs, which were born in the second -- I mean, third and fourth quarter of '04. So our run rate will go down in the first quarter.

And then, the whole premise behind entering into an outsourcing arrangement like this is to get the leverage out of the model that IBM brings to the table. So we will be able to grow based off that current run rate. And that was the key -- is that the growth was built into the existing run rate. So as we grow, we are not going to need to add incremental expense there.

---

**Joel Gomberg** - *William Blair - Analyst*

And then, John, it looks like you had a big jump in the headcount during the fourth quarter. Are you taking on some people from this new European client? Is that part of it?

---

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

Yeah, as we said in the last call as well, we were adding headcount going into the beginning of the fourth quarter here -- to handle both that and the Aegon business. So, both of those were being staffed up. We also filled open positions towards the end of the third quarter into the fourth quarter. And that is what caused the sequential increase in headcount.

---

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

But we are not taking over any incremental people from the client, Joel.

---

**Joel Gomberg** - *William Blair - Analyst*

(Indiscernible) It's not a list of -- and then, you had a pick-up in your deposits at year end. Is that something that is seasonal, and we expect to go back down? And then, we have clearly seen some flattening of the yield curve here this last quarter. So maybe you could talk a little bit about your expectations on the margin -- some contraction here in the first quarter, as we move along if the deposits run down.

---

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

I think I would probably look at it more on an average basis and year-over-year on the deposits front. Regardless of what we've got right at 12/31 is grown tremendously. And that afforded us the ability to grow the balance sheet by $2 billion this year. And as our assets continued to grow that we administer, more deposit flow will come off of that as a result. So I feel pretty comfortable that deposit flows will continue to move in line with asset growth. And whatever we've got at year-end, it could have been a year-end principal and interest payments that we got over year-end. So I'd more focus on the average balance increasing.

And then with respect to the yield curve, we do have a flattening of the yield curve baked into our guidance for next year and expect dead (ph) funds to achieve 4 percent by the end of December. That's baked into our guidance. Does that answer your question?

---

**Joel Gomberg** - *William Blair - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 25. 2005 / 2:00PM, IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call

Yes, thank you.

**Operator**

Carla Cooper, Robert Baird.

**Carla Cooper** - *Robert Baird - Analyst*

I wondered first if the amount that you expect to convert from -- the amounts that you have not yet converted from the European client -- does that total roughly 100 billion yet to convert from that client?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

It's not in the total number of assets process we gave you.

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

You have to convert --

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

You have to convert.

**Carla Cooper** - *Robert Baird - Analyst*

Right, okay. You have to convert. Because I think you said that client -- you expected; ultimately, to get about 160 billion in two different conches (ph)? And so, I'm just trying to make sure I'm doing all of the math. You got 47 this quarter, and that is in the number that you reported. And then, there should be roughly another 100, 110?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

Yes.

**Carla Cooper** - *Robert Baird - Analyst*

Okay. And then, the second thing I wanted to just clarify is -- when you talk about your 25 percent EPS growth expectations, what kind of assumption does that bake in for, I guess, both the market and then also fund flows from your client?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

Typically, as we've always done, Carla, we revert back to that 25 percent. There is no market appreciation built into achieving the 25 percent. If we get it, that's great. And from the fund flows perspective, we only bake in 6 percent. As we talked about at the end of the third quarter, most of the growth in assets we had this year was from good, strong client fund flows. We saw in the fourth quarter, the S&P was up on a link basis about 90 percent. Our asset growth was somewhere in the neighborhood of 15 percent. We are still getting strong fund flows to the tune of 6 percent just in the fourth quarter. So I feel from a budgeting and forecasting perspective right now, we are going down the right path.

**Carla Cooper** - *Robert Baird - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jan. 25. 2005 / 2:00PM, IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call

And then, I had a question about investment advisory in the fourth quarter. It looked to me like that was down a bit, both sequentially and year-over-year. And I wondered if you could just comment on that?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

Yes, the Mayor Max funds, which are a family of -- a family of mutual funds, excuse me, that we advise and we utilize subadvisers to work with us on those funds. During the fourth quarter, with the rate increases and the weighted-average life of that portfolio, it did lag a little bit in performance. And as a result, we waived fees during the fourth quarter. We expect that to continue a little bit into the first quarter, most likely, until the yield in the portfolio catches up with more of a market yield, which is not uncommon in this marketplace.

**Carla Cooper** - *Robert Baird - Analyst*

Okay. And then, last thing, is just that your fund flows from your client have continued to outpace the market pretty substantially. And I wonder if you could amplify maybe why you think that is? Just you're aligned with the right clients, who are doing a great job driving their product? Or is there something else that's feeding into that success?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

I think it's just exactly what you said -- we are aligned with clients that know how to develop products, distribute products. That's one of the basic underpinnings of the firm since day one -- was to align ourselves with those types of clients. You saw that with -- we've got a very -- couple of good international fund managers that have really done well for themselves and garnered a lot of assets that have been driven to our platform. You the ETS grow extremely -- strongly this year, that benefited us.

Eaton Vance (ph) has done a great job of developing some new products over the last 12 months that have really driven assets to their platform. And you know, performance drives asset flows, I think, the clients that we have have done a very good job of managing money. And as a result, -- have gotten the returns and the asset flows great.

I think the last point I'll make is on the European front. Dublin -- the assets in Dublin are up probably about 70 percent this year. We have had tremendous flows in that office off of some pretty sizable clients. We continue to see that business grow in terms of income perspective, about a hundred percent over last year. So we're getting some good movement out of Europe as well.

**Operator**

(OPERATOR INSTRUCTIONS). Trisha Meave, Variant Research.

**Trisha Meave** - *Variant Research - Analyst*

Just a small question -- looking at the pipeline -- just trying to get a sense of whether we're seeing large clients, small clients? What's the mix here in the pipeline? What is the sales cycle that you're seeing?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

I think the pipeline still has all different sizes of clients -- large outsourcing, medium-sized outsourcing client, and small clients, whether they are CDOs, CLOs, partnerships, thing of that nature. So the pipeline, I think, is robust across itself.

And I think what we have seen in '04 is a lot more sales close in '04. We've talked about the sphitzer (ph) phenomenon getting some headwind in '03 and into '04. We're starting to see a lot more movement from our prospects on looking at outsourcing and by a lot of the things we dealt with in '03 and '04. And we feel pretty bullish about the pipeline right now in terms of what we see in there and what is coming down the pipe for us.

**Trisha Meave** - *Variant Research - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jan. 25. 2005 / 2:00PM, IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call |

Great. You talked about your client penetration in 2005. How much of that is already baked in into your 25 percent growth rate?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

I'm sorry, say that again, Trish?

**Trisha Meave** - *Variant Research - Analyst*

In looking at your client, it says two clients -- how much of the 25 percent is incorporating in further client penetration or additional business wins with them?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

There is nothing baked in there in terms of additional growth. That's growth that will get you new sales or cross cells. But is -- in the achieving the '05 number is anything we've sold in '04 that had a fraction of a year will now be in the '05 run rate for the full year and help us achieve the 25-percent growth.

**Operator**

Brandi Shaw, Beekman Capital Management.

**Brandi Shaw** - *Beekman Capital Management - Analyst*

Hi, guys, great quarter. I was kind of wondering if you could just touch base real quick and just refresh whether or not the accounting changes are going to have any significant effect in '05 or any at all? And just -- if we have any expectations for stock option expensing or anything along those lines?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

Yes, Brandi, on the stock-option expensing first -- we have come out publicly and talked about that being somewhere in the neighborhood of $0.05 to $0.06 once it is opted on July 1st of '05. And that is baked into the 25-percent earnings guidance.

And then, secondly, on the change in accounting on fast (ph) 91 that we talked about on the November 15th call, I expect that to have very little impact going forward.

**Brandi Shaw** - *Beekman Capital Management - Analyst*

Okay, that is what I thought. On the $0.05 to $0.06, are you guys going to take that all in the third quarter?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

It will be spread through both the third and fourth quarter, as the previous grants get amortized off and any other grants that are made in those two quarters come on.

**Operator**

(OPERATOR INSTRUCTIONS). Stuart Quint, Gartmore Global.

**Stuart Quint** - *Gartmore Global - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jan. 25. 2005 / 2:00PM, IFIN - Q4 2004 Investors Financial Services Corp. Earnings Conference Call

Congratulations on the quarter. Just one quick question -- one of your big competitors was talking about additional expense from regulatory and compliance issues. And I'm curious about your thoughts on that, if any?

**John Spinney** - *Investors Financial Services Corp. - CFO, SVP*

I think that one of the biggest expenses we've had was Sarbanes-Oxley. That was born in our expense run rate for '04 and is in our estimates for '05. All other -- I think, regulatory expenses are built into our forecast for next year. I don't see there being a tremendous amount of expense increase from that area.

**Operator**

That does conclude our Q&A session. I'll turn the conference back over to Kevin Sheehan for additional or closing remarks.

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

Thank you. In closing, thank you for your interest in Investors Financial. Given our new business, closings during the fourth quarter and increasing demand for our services, we look forward to a strong fiscal 2005. That ends our call.

**Operator**

That does conclude today's conference. We thank you for your participation. You may now disconnect.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Exhibit K

# Thomson StreetEvents

## Conference Call Transcript

**IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call**

Event Date/Time: Apr. 13. 2005 / 2:00PM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Joe DeCristofaro**
*Investors Financial Services Corp. - IR*

**Kevin Sheehan**
*Investors Financial Services Corp. - Chairman, CEO*

**John Spinney**
*Investors Financial Services Corp. - CFO*

## CONFERENCE CALL PARTICIPANTS

**Jon Arfstrom**
*RBC Capital Markets - Analyst*

**Greg Larson**
*Sirinach - Analyst*

**Joel Gomberg**
*William Blair - Analyst*

**Troy Ward**
*A.G. Edwards - Analyst*

**Ryan Rachin**
*American Express - Analyst*

**Carla Cooper**
*Robert W. Baird - Analyst*

**Dean Arnold**
*Millennium Partners - Analyst*

**Tom Haine**
*BAM - Analyst*

**Stuart Quint**
*Gartmore Global Investments - Analyst*

## PRESENTATION

**Operator**

Good day everyone, and welcome to the Investors Financial Services Corp. first-quarter 2005 earnings conference call. Today's call is being recorded. At this time for opening remarks and introductions, I would like to turn the call over to Mr. Joe DeCristofaro (ph). Please go ahead, sir.

**Joe DeCristofaro** *- Investors Financial Services Corp. - IR*

Thank you for joining us on today's call. We will be making a number of forward-looking statements, which will are based on management's assumptions and predictions as of today. The Company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the MD&A section of our most recent 10-K filing with the SEC. I recommend that anyone listening to this call review this report carefully.

Because this call will be archived on our website, www.ibtco.com, I want to emphasize again for anyone listening at a later date that the statements made today are based on our assumptions as of today, April 13, 2005. These assumptions may change, but the recording of this call will not be updated.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call |
|---|

Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer; Mike Rogers, President; and John Spinney, Chief Financial Officer. I will turn the call over to Kevin Sheehan.

**Kevin Sheehan** *- Investors Financial Services Corp. - Chairman, CEO*

Thanks, Joe. I will begin by reviewing some of the key points from the first quarter. And then John Spinney will discuss our financial result in more detail.

Investors Financial Services recorded solid results for the first quarter of 2005. On a link quarter basis, our net operating revenue grew by 7%, while our operating expenses increased by 2%, again exhibiting positive earnings leverage. Diluted EPS for the quarter came at $0.60, up 15% on a linked quarter basis, and up 11% on a year-over-year basis. We achieved these positive results for the first quarter as well as the final two quarters of 2004 in an environment where the Fed funds rate rose by 175 basis points and the yield curve flatten significantly.

As of March 31, we processed approximately 1.47 trillion of assets for our clients, up 39 billion from December 31, 2004, up 338 billion, or 30%, from March 31, 2004. We won approximately $0.5 billion in alternative investment assets from a new client. This is an important win for us because it represents further expansion into the growing alternative asset space, and we are confident this client will create and distribute product which generates fund flows and future revenues for us.

We also won custody, fund accounting, and trustee services for the Fidelity Brokerage Company's unitized stock pools, and fund of funds, as well as fund accounting custody and fund administration for Mercer Global Investments' new series of mutual funds. Both are expected to commence in the second quarter of 2005.

In addition, we won approximately 7 billion in assets from numerous existing clients during the quarter, including Eaton Vance, Smith Graden (ph), and Vega.

As a result of the corporate mergers -- of corporate merger, the ING, ETNA, and the JPMorgan funds we service, representing 9 billion in assets, converted out during the quarter. Market appreciation client fund flows accounted for approximately 40 billion during the quarter. Directly related to the growth of the processing business is the growth of our balance sheet, which on an average basis grew 20% from last year's first quarter to this year (technical difficulty) this balance sheet growth.

The current status of our new business pipeline remains medium. We're seeing significant pent-up demand for asset servicing in the investment management industry that was previously subdued due to the regulatory pressures and concerns. As a result, we continue to maintain a positive outlook on our sales pipeline, and believe that sufficient opportunities exist for us to close enough business to meet our financial goals for 2005. Timing of conversion and the close of these sales is key.

To summarize, we again delivered solid results for our investors during the first quarter of 2005. These results were driven by positive impact to the business we sold in 2004, strong fund flows, and our continued cost controls.

I will now turn the call over to John Spinney who will review the quarter's financial result in more detail.

**John Spinney** *- Investors Financial Services Corp. - CFO*

Good afternoon. As Kevin mentioned, first-quarter diluted EPS came in at $0.60, an 11% increase over our first-quarter 2004 diluted EPS of $0.54. On a link order basis, diluted EPS rose by $0.08, or 15%. We were able to exhibit positive earnings leverage on both a year-over-year and linked quarter basis.

On a linked quarter basis, our net operating revenue grew by 7%, while our operating expenses increased by 2%. We generate revenues based on assets under administration, the number of transactions generated by our clients, and net interest income. These three revenue components create a natural hedge for our business model.

The breakdown of our revenue stream for the first quarter of 2005 was 54% asset based, 16% transaction based, 28% net interest income based, and 2% from securities sales. Our results for the first quarter of 2005, as well as for the second half of 2004, demonstrate this natural hedge. For example, short-term interest rates have increased substantially over the past nine months with a corresponding flattening of the yield curve. We have continued to grow our core asset servicing fees at an impressive rate in this environment.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call

I will now discuss the significant income expense components for the first quarter in more detail. Core asset servicing fees for the first quarter increased 16% year-over-year, and 7% linked quarter, due to previously announced wins from new and existing clients, as well as the ability of our clients to develop and sell product which generates fund flows that have a direct, positive impact on our business.

Ancillary services revenue, including cash management, foreign exchange, and securities lending declined 11% year-over-year, primarily driven by a decrease in FX and investment advisory fees. On a link quarter basis, ancillary services revenue increased 6%, primarily as a result of a linked quarter increase in FX and securities lending fees.

Regarding FX, we've recorded solid results in the first quarter of 2005 as we generated over 13 million in fees. As we discussed during our last call, we do not believe that this total would match last year's extraordinary first quarter for FX fees, primarily due to lower volatility in the first quarter of '05 compared to the first quarter of '04. However on a link order basis, FX increased 9% due to higher volatility.

Sweep fees increased 32% year-over-year, and 9% linked quarter, primarily due to increased domestic and foreign cash balances held by our clients. Securities lending fees increased 76% year-over-year and 37% linked quarter, due to higher balances and improved market conditions. Investment advisory fee revenue declined 51% year-over-year and 36% linked quarter due to lower balances and fee waivers as a result of the rising interest rate environment.

Net interest income was down 2% on the year-over-year basis, and 3% linked quarter, primarily due to a flatter yield curve offset by balance sheet growth. The link quarter net interest margin decreased by 13 basis points to 1.75%, while the linked quarter interest rate spread increased by 17 basis points to 1.58%.

Our investment portfolio is comprised of securities backed by the U.S. government or AAA rated securities. We continue to run a closely matched balance sheet with an asset duration of approximately 1.3 years, and a liability duration of 1. The high amount of variable-rate securities in our portfolio has allowed us to continue to maintain low asset duration.

We also sold municipal securities during the quarter generating approximately 40 million in gains. We replaced these securities with municipal securities that offer a more attractive after-tax yield.

Turning to expenses, again, we were able to grow our revenues faster than the increase in our operating expenses, which were up 5% year-over-year and 2% linked quarter. Compensation and benefits expense increased 3% year-over-year due to increased headcount and annual salary increases. Comp and benefits expense was up 10% linked quarter due to increased salaries related to annual merit increases and additional hiring to support new business. Directly related to compensation were increases in payroll taxes and unemployment insurance.

Technology and telecommunications expense grew 24% year-over-year due to our outsourcing agreement with IBM, which we entered into in July of '04. As we discussed in our last call, we planned on our technology and telecommunications expense decreasing on a linked quarter basis, which it did by 14%, due to the elimination of transition costs associated with our outsourcing agreement with IBM. Occupancy expense declined 11% on both a year-over-year and link quarter basis due to favorable new lease agreements negotiated for our Boston office space.

Our operating philosophy remains the same. We add incremental expense when new business is booked. Given the status of our pipeline and the level of the capital markets, we are reiterating our 2005 earnings per share guidance of 25% growth.

Now, I would like to open up the call to your questions. +++ q-and-a.

---

**Operator**

(OPERATOR INSTRUCTIONS) Jon Arfstrom with RBC Capital Markets.

---

**Jon Arfstrom  - RBC Capital Markets - Analyst**

A couple of questions for you. Is there any way you can size the new business, the Fidelity and the Mercer business? It sounds like Mercer is pretty small, but can you give us some ballpark idea?

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Apr. 13, 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call

**John Spinney** *- Investors Financial Services Corp. - CFO*

Yes. On the Mercer piece, I think on conversion will probably be about 0.5 billion. But I think as a client, as we said earlier in the call, that I think the product is right. They've got a distribution channel. And one of the things that we have really been successful with is aligning ourselves with those types of clients. So I think that we will be able to show positive fund flows on the Fidelity Brokerage Company's business. I think that will start up roughly about 0.5 billion in assets. The total asset pool they have over there in round numbers is about 50 billion. So I think there is -- already defined well that we will get in there, start converting things over, and keep picking away at that asset base like we have on other clients.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Is that an exclusive -- that Fidelity business or where is in at right now?

**John Spinney** *- Investors Financial Services Corp. - CFO*

Right now, as I said, it is for the unitized stock pools and the fund to fund. But I do think that 50 billion is an opportunity we can go after. I don't think we have an exclusive solely on the whole 50 billion.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Okay. The deposit number for the quarter -- can you talk a little bit about what happened on a sequential basis? I am just curious if there were any deposits attached to the business that went out the door during the quarter.

**John Spinney** *- Investors Financial Services Corp. - CFO*

I think that what you see in there is some shift to repo (ph). So repos were up. Deposits were down slightly. And a lot of folks were putting money back into the market, so it was -- typically, that is where the money was running to; it wasn't running outside the door.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Okay, so the money that came out of deposits most likely ended up in assets under custody?

**John Spinney** *- Investors Financial Services Corp. - CFO*

Yes.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

Can you give us an update on the option expense? It sounds like we may have that delayed a bit. Can you give us a little bit of an update on where you are at there?

**John Spinney** *- Investors Financial Services Corp. - CFO*

As we said before, we had option expense baked into our earnings guidance this year. And we are analyzing what was in the Wall Street Journal today. If it does get delayed, we will come back and address that, but right now it was in our earnings guidance, Jon.

**Jon Arfstrom** *- RBC Capital Markets - Analyst*

And it had been $0.05 or $0.06 cents, is that right?

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call

**John Spinney** - *Investors Financial Services Corp. - CFO*

Yes.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Okay. A couple of more things, the gain, the municipal gain -- anything more we should expect there? It is somewhat unusual for you guys to take a gain. And I understand without it, you were in line with consensus. But can you talk a little bit about the outlook on that?

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

I think, going forward, if we get an opportunity, if we have an opportunity to sell securities, it makes sense for the business and the shareholders we will do that. We don't have any plans today to sell anything. But if an opportunity comes up again, especially in the muni area, we could potentially do that again.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Okay. And then the last question -- you have another 100 billion coming on at some point in the middle of the year. And I thought I heard you say towards the end of the year that you had built -- some of the expenses that -- for boarding (ph) the first piece of business that has already been set, can you talk about how we should think about that business coming on? When we might see it, and how much expense pressure there would be with boarding that business?

**John Spinney** - *Investors Financial Services Corp. - CFO*

I think that will come in the second quarter in terms of the revenue generation, probably towards the end of the second quarter. And there will be some additional expense, but I don't think anything that will change our outlook.

**Operator**

Greg Larson (ph) with Sirinach (ph).

**Greg Larson** - *Sirinach - Analyst*

You touched on my question on the -- so there were some conversions and deposits to the repos. How much of the sequential increase represents leverage in that repo balance?

**John Spinney** - *Investors Financial Services Corp. - CFO*

The repo balance, pretty much 0.

**Greg Larson** - *Sirinach - Analyst*

Okay. And then just taking the total interest-bearing liabilities, how much is customer driven, and what percentage is leveraged?

**John Spinney** - *Investors Financial Services Corp. - CFO*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call

100% of the customer deposits on the deposit line -- almost all the repos are client liabilities. And the 8-K where the net interest margin table is laid out, you can see what the short-term borrowings are and other borrowings. That is really where the leverage component is, if that is what you are asking.

---

**Operator**

Joel Gomberg with William Blair.

---

**Joel Gomberg** - *William Blair - Analyst*

John, can you talk about your outlook for the rest of the year in terms of the net interest market margin, as the Fed looks like will continue to raise rates, and outlook for net interest income?

---

**John Spinney** - *Investors Financial Services Corp. - CFO*

Yes, our outlook is still the same as it was before, you know, a 4% Fed funds rate by the end of the year. And I think what happened to us, and you saw it in this quarter's results, was probably a little flatter curve than we anticipated. I still think we will probably achieve net interest income about what we achieved last year. We were talking a little bit higher than that before.

And depending on how the yield curve behaves the rest of the year, it couldbe higher than that. So we are just keeping on the steady and trying to manage through it right now.

---

**Joel Gomberg** - *William Blair - Analyst*

But net interest income, basically flat year-over-year?

---

**John Spinney** - *Investors Financial Services Corp. - CFO*

It could be flat, year-over-year, Joel. It could be higher than where it is today.

---

**Operator**

Troy Ward, A.G. Edwards.

---

**Troy Ward** - *A.G. Edwards - Analyst*

My questions were already answered. Thank you.

---

**Operator**

Ryan Rachin (ph), American Express.

---

**Ryan Rachin** - *American Express - Analyst*

Just a question on the security gains. Can you talk a little bit about the impact on the comp line from the security gains? I guess my assumption is that there is probably additional accruals for bonuses, because that is just part of the overall operating profit.

---

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call |
|---|

I would say that there is no incremental bonus accruals associated with that.

---

**Operator**

(OPERATOR INSTRUCTIONS) Carla Cooper, Robert W. Baird.

---

**Carla Cooper** *- Robert W. Baird - Analyst*

Could you talk I guess in terms of what your headcount was at the end of the quarter versus last quarter? Did I lose you?

---

**John Spinney** *- Investors Financial Services Corp. - CFO*

Take you off speaker phone.

---

**Carla Cooper** *- Robert W. Baird - Analyst*

What was your headcount?

---

**John Spinney** *- Investors Financial Services Corp. - CFO*

2,778 at the end of Q4. 2,812 at the end of Q1.

---

**Carla Cooper** *- Robert W. Baird - Analyst*

And would you say there are any particular expenses that you are watching and trying to hold back the reins on at this time?

---

**John Spinney** *- Investors Financial Services Corp. - CFO*

I think looking at the numbers, I think we have done a pretty good job of keeping the expenses in check. As we say in the call, and we talk about with you folks all the time is we will add expense when we get more business. We typically added ahead of that, and that is what you saw in the fourth quarter. We announced those two big deals, and that is why the headcount went up in the fourth quarter. And it went up in the first quarter as we closed additional business as well.

---

**Carla Cooper** *- Robert W. Baird - Analyst*

And what line items do you think we will see go up ahead of the new business that you expect to come on in Q2?

---

**John Spinney** *- Investors Financial Services Corp. - CFO*

It is typically compensation, and sometimes technology.

---

**Carla Cooper** *- Robert W. Baird - Analyst*

And then I guess the other thing that is out there is the idea that your Barclays contract is up in, I believe it's May of 2006, and the thought that you may enter into discussions with them this year. What do you think the chances are that we see a new contract this year?

And in terms of the pricing on that contract, the idea that it might be lower, given how much Barclays has grown, is that factored into your '05 guidance?

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call |
|---|

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

No, there is no BJ reassessment in our 2005 guidance at all. And you know, I think we have got a great relationship with Barclays. They value that relationship. And we are confident about of a renewal with Barclays in 2006. If anything happens before that, we will be the first to let everybody know.

**John Spinney** - *Investors Financial Services Corp. - CFO*

I think it is no different than any other long-term contract, Carla, where we are out ahead of it, and we are talking to them as we would talk to any client. So we are not treating it any differently.

**Carla Cooper** - *Robert W. Baird - Analyst*

And then finally, I guess could you talk a little bit about what you are seeing competitively? And I guess intensity of competition, are there any new basis of competition?

**John Spinney** - *Investors Financial Services Corp. - CFO*

Not really. I think it is the same as it always has been, the same players we see in the finals. And just hasn't any pricing pressure, if that is what you are asking, or any new competitors in this space that weren't there before.

**Carla Cooper** - *Robert W. Baird - Analyst*

All right, one last one. The economics on the alternative assets that you brought on board this quarter, are they different, I guess, in terms -- you know, in absolute, or in the feed that you could expect per -- for the services that you provide? Or do you expect a mix of your fees to be different than your "traditional" business?

**John Spinney** - *Investors Financial Services Corp. - CFO*

I would say it is typically a little bit richer margin, because it is more highly technical and requires a different level of skills set. But I would not say it was tremendously higher.

**Carla Cooper** - *Robert W. Baird - Analyst*

And same rough breakdown between transactions, basis point, and net interest income? You know, as you would typically see, or is the overall typically Company average are going to be weighted to different buckets differently?

**John Spinney** - *Investors Financial Services Corp. - CFO*

It will probably be similar to what it is for the Company today.

**Operator**

Dean Arnold (ph), Millennium Partners.

**Dean Arnold** - *Millennium Partners - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call

I wanted to -- John, I was wondering if you could shed a little more light on the margin? I know that you had said you have got maybe a higher mix of ARMs today, adjustable-rate securities rather, which might have led to a little bit more of the compression? I think analysts were pretty much modeling -- at least the sell side models I looked at were sort of like the 182 to 183 range for NIM (ph) for quarter.

**John Spinney** - *Investors Financial Services Corp. - CFO*

Yes, I think the biggest contributor there was just I think lower reinvestment yields than we expected in our models. And that is really what it amounted to. I don't think that there was anything other than that.

**Dean Arnold** - *Millennium Partners - Analyst*

Okay. On the movement of customer deposits into some of the repos in those other liabilities, is that seasonal at all, or was it just a matter of clients putting more money to work?

**John Spinney** - *Investors Financial Services Corp. - CFO*

You know, I think it was not per se seasonal to the first quarter, but I think it will move with different economic times and different markets, and just how cap stock flows into the funds, and how they manage the portfolio.

So it really depends on from quarter to quarter how that moves. And historically, we have seen it ebb and flow quarter to quarter, and it could be different quarters throughout the year.

**Dean Arnold** - *Millennium Partners - Analyst*

Okay, and then lastly on your comments a few minutes ago about NII being potentially flat and maybe up year-over-year, depending on the yield curve and where rates are -- what does that imply for additional growth or shrinkage in short-term and other borrowings on the balance sheet?

**John Spinney** - *Investors Financial Services Corp. - CFO*

You know, I think right now the balance sheet will continue to grow towards the end of the year. And we typically have it forecasted to grow somewhere around 20% as we had year-over-year on the balance sheet right now. And that will come with client liabilities. And to the extent there is a shortfall there, we may use some leverage, we may not, depending on what the investment alternatives are.

**Dean Arnold** - *Millennium Partners - Analyst*

Okay. Is there a benchmark? When you look at your liabilities, short-term and other borrowings they are about 10%, maybe a little bit more, 12%. Is there a benchmark that you try to keep those to?

**John Spinney** - *Investors Financial Services Corp. - CFO*

No, I think as we have talked before, in many instances short-term borrowings are one of those things that can move from day-to-day depending on what type of client liabilities come in. And we have got clients that could come in on any particular day with 0.5 billion or 1 billion of liabilities. And if it happens on a quarter end, and we put up balance sheet out in the quarter end, the client funding will be a lot higher than it is in this quarter end versus any other quarter end. And that is the beauty of running some short-term borrowings is because there is flexibility to buy assets when it is opportunistic for us, and it allows us to manage the liabilities.

**Operator**

(OPERATOR INSTRUCTIONS) Emil Stevens (ph) with BAM (ph).

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call

**Tom Haine** - *BAM - Analyst*

It is Tom Haine (ph) actually. I apologize. I have kind of lost track here. Is there any business that you have announced in the last couple of quarters that still hasn't been reflected yet, or is it pretty much all in the number that we are seeing here today?

**John Spinney** - *Investors Financial Services Corp. - CFO*

The last big piece of business that we announced, that European outsourcing, is still at a little over 100 billion to convert in the second quarter.

**Tom Haine** - *BAM - Analyst*

Okay. And then just back to the comp for a second. So it was like -- you said headcount relatively flat from last quarter. The comp expense was up. I mean, could we kind of view that as just conservative accruals as you begin the year, and then you adjust as you go through the year? Or was it really incentive comp that was genuinely earned in the first quarter?

**John Spinney** - *Investors Financial Services Corp. - CFO*

Well, it's a few things. It's incentive comp that is genuinely earned against the earnings for the quarter. It is annual focal salary increases, and then the restart on all the unemployment taxes, FICA and 401(k) match. And there was a slight offset from the IBM contract that comp would have been higher in terms of a sequential -- a year-over-year increase. However, with the outsourcing, with the folks that went away with that, that was not in the comp number in the first quarter. It was in the first quarter of 2004. And that's why if you look at the tech and telecom line item, that is up year-over-year. And that is up because it went from comp to services now.

**Tom Haine** - *BAM - Analyst*

Okay. And those things you just mentioned -- the kind of beginning of the year type items, are those pretty material that go away in the second quarter, or should we not try and split hairs on those?

**John Spinney** - *Investors Financial Services Corp. - CFO*

They are $1 million or two anyway.

**Operator**

Stuart Quint (ph) with Gartmore Global Investments (ph).

**Stuart Quint** - *Gartmore Global Investments - Analyst*

Just a question on your previous comment about net interest -- about the yield curve being flatter than what you had initially anticipated. If you are saying net interest income is flat, and in your guidance -- I am just trying to get a sense for are you implying that there is something else that you are adjusting to offset the expectation that net interest income might be weaker than what you were initially thinking? Or am I reading too much into what you are saying?

**John Spinney** - *Investors Financial Services Corp. - CFO*

I think, back to Kevin's comments on his part of the presentation, we see the pipeline as being a lot more robust. And a lot of things are pent-up from the regulatory matters starting to flow through. And clearly closing sales and closing them sooner rather than later is going to make up for that. And with those new sales comes ancillary services, outback securities lending, cash management, that, again, drives some of the higher margin revenue lines items.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call

**Stuart Quint** - *Gartmore Global Investments - Analyst*

Okay. I guess just to clarify for me -- so are you saying then -- you are saying that the pipeline is meeting what you said last quarter. Is it that the timing is ticking up since like three months ago, or it's still strong with that basically -- (indiscernible) income is an issue, but it is still not that much of an issue in terms of your guidance?

**John Spinney** - *Investors Financial Services Corp. - CFO*

The dollars are in the pipeline, and I think that there are some things that are close to closing in there that we will be able to announce in the next quarter.

**Operator**

Jon Arfstrom with RBC Capital Markets.

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

I think Stuart got my question. But basically, what you're saying is -- flat to modestly higher NII will be offset by higher-than-expected fee income to get you to 25% growth rate. So the curve is steeper, NII is stronger; curve is flatter, NII is weaker, and the Cs (ph) more than likely will offset any margin pressure that we see. That is what you are saying, right?

**John Spinney** - *Investors Financial Services Corp. - CFO*

Yes.

**Operator**

And at this time, I would like to turn the call back over to the speakers for any closing or additional remarks.

**Kevin Sheehan** - *Investors Financial Services Corp. - Chairman, CEO*

In closing, thank you for your interest in Investors Financial Services. We look forward to updating you on our progress in 2005 this July on our second-quarter earnings conference call.

**Operator**

And that does conclude today's teleconference. Once again, we thank you for your participation, and have a wonderful day.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 13. 2005 / 2:00PM, IFIN - Q1 2005 Investors Financial Services Corp. Earnings Conference Call

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

Exhibit L

# Thomson StreetEvents

## Conference Call Transcript

### IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

Event Date/Time: Jul. 14. 2005 / 2:00PM PT
Event Duration: N/A

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

> Jul. 14. 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

## CORPORATE PARTICIPANTS

**Joe DeCristofaro**
*Investors Financial Services Corp. - Manager, Investor Relations*

## CONFERENCE CALL PARTICIPANTS

**Jon Arfstrom**
*RBC Capital Markets - Analyst*

**Andrea Jao**
*Lehman Brothers - Analyst*

**Lori Applebaum**
*Goldman Sachs - Analyst*

**Carla Cooper**
*Robert W. Baird - Analyst*

**David Chamberlain**
*PIMCO - Analyst*

**Matt D'Attilio**
*Reinhard & Mahoney - Analyst*

**Greg Lapin**
*Saranac Capital - Analyst*

**Kevin Sheehan**

## PRESENTATION

---

**Operator**

Good day, everyone. Welcome to the Investors Financial Services Corp. second-quarter 2005 earnings . conference call. Today's call is being recorded.

At this time for opening remarks and introductions I will turn call over to Mr. Joe DeCristofaro. Please go ahead.

---

**Joe DeCristofaro** *- Investors Financial Services Corp. - Manager, Investor Relations*

Thank you for joining us on today's call .

We will be making a number of forward-looking statements which are based on management's assumptions and predictions as of today. These statements, including but not limited to statements regarding the Company's expected diluted earnings per share, effective tax rate, financial performance relative to competitors, projected net operating revenue, core service fees, ancillary service fees, foreign exchange services fees, net interest income, securities gains, customers conversions and renewals, growth and balance sheet, reinvestment focus, expenses, including compensation, investments in head count and technology, operating margin pipeline, and the impact of an activity under its share repurchase program, are subject to risks and uncertainties .

The Company's actual results may differ materially from our current predictions due to any one of a number of factors. Information regarding the factors that may affect our actual results is set forth in the MD&A sections of our most recent 10-K and 10-Q filings with the SEC and in a press release filed today on form 8-K. I recommend that anyone listening to this call review these reports carefully. Because this call will be archived on our website, www.ibtco.com, I want to emphasize again for anyone listening at a later date that the statements made today are based on our assumptions as of today, July 14, 2005. These assumptions may change but the recording of this call will not be updated.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 14. 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

In addition, on this call we will discuss non-GAAP measures as defined by the SEC. We believe that these measures provide a more useful depiction of the Company's results of operations. A reconciliation of GAAP information to non-GAAP measures will be discussed in this call and can be found in our form 8-K filed today and located on our web site at www.ibtco.com.

Joining us on today's call are Kevin Sheehan, Chairman and Chief Executive Officer; Mike Rogers, President; and John Spinney, Chief Financial Officer. I will now turn the call over to Kevin Sheehan.

**Kevin Sheehan**

On today's call, we will cover our revised 2005 and 2006 earnings growth targets and our results for the second quarter of 2005. During the positive and negative market environments since our IPO in 1995, we've achieved a compound annual growth rate and earnings per share of 39%. Over the last five years, a period featuring generally weaker financial markets and more regulation of financial products, we have grown earnings per share at a 42% compound annual growth rate. Clearly impressive accomplishments.

We have also consistently served our customers at the highest levels. This May we received overall first-place honors in the Global Investor Magazine's 2005 global custody survey and placed first in 17 categories. In addition to our first place in 2005, we were also ranked best global custodian in 2002 and 2003 and we were ranked second in 2004. We believe surveys like this validate our commitment to customer service, which represents an important advantage when pursuing new sales.

Turning to new sales environment, we continue to experience higher volumes of IRFP [ph] activity and new product launches by our clients. As evidence of this positive sales environment for us, we are pleased to announce the signing of a new $30 billion full-service relationship with a major U.S. life insurance company. We expect to finish this conversion during the third quarter of 2005. Services for this client include custody, fund accounting, fund administration, and securities lending.

Unfortunately, we have had a strong year for new sales. We have not been able to sell enough new business to overcome the significant environmental challenges that we are experiencing in 2005. As both CEO and a stockholder, I am disappointed by the current environment and our revisions to earnings guidance. We continue to have a strong core business with great opportunities for growth. As we will discuss in more detail on this call, while the next 18 months will likely present a number of challenges, we believe in the long term we will continue to grow at a level that exceeds industry averages. In the short term, if we believe market conditions are favorable, we will be a buyer under the repurchase program approved by our board.

During 2005, we've experienced a more challenging environment than we have faced over the previous nine years. These challenges include a sustained, flatter-than-expected yield curve, narrower-than-expected reinvestment spreads on our reinvestment portfolio, and weaker-than-expected market-sensitive revenues, including those linked to equity and foreign exchange markets and investment advisory fees. The yield curve and narrower reinvestment spreads have hampered our ability to deploy capital in an effective fashion.

We announced today that the Board of Directors authorized us to buy back up to $150 million of outstanding common stock over the next 12 months. These conditions are forcing us to revise our expectations for GAAP diluted earnings per share growth for 2005 to approximately 10%, compared to 2004 GAAP diluted EPS of 209.

From a core perspective, we expect 2005 diluted earnings per share to be approximately flat with our 2004 GAAP results of 209 per share. Core diluted earnings per share for 2005 excludes the impact of securities gains totaling $.10 per share to date in 2005 and approximately $.10 per share related to the recognition of the indefinite reversal provision of APB 23 with respect to the Company's Irish subsidiaries. Management considers core diluted earnings per share a more useful depiction of the Company's results of Operations as they exclude these noncore items. We are maintaining a cautiously optimistic outlook for 2006 as we expect to continue to see headwinds driven by a challenging environment for net interest income, flat equity markets, and contract renewals. We also expect to continue to invest in our infrastructure, which may impact our operating leverage.

For 2006, we expect GAAP diluted earnings per share to be approximately flat with 2005 GAAP diluted earnings per share. We expect 2006 growth in core diluted earnings per share to be approximately 8% to 10% over expected 2005 core results, reflecting a degree of caution for the reasons I just discussed.

Our new guidance for 2005 and 2006 places an expected financial performance -- our expected financial performance in line with publicly available guidance of our primary competitors. Long-term, we continue to expect our financial performance to exceed industry averages.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 14, 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

Beyond 2006, we expect long-term growth and diluted EPS of 13% to 15% per year. As evidence of the continued heath of our business, second-quarter 2005 core service revenues continue to grow at an impressive 14% year-over-year rate. Ancillary services, such as securities lending, cash management, and sweep fees have also been strong, rising over 120% and 37% respectively compared to the second quarter of 2004. Our pipeline is still characterized as medium, representing adequate opportunities to meet our revised earnings guidance.

Turning to our second-quarter results, net operating revenue grew 12% year-over-year, driven by increases in core service revenue, cash management, sweep fees, and securities lending fees. Diluted EPS for the quarter came in at $.64, up 28% from second-quarter 2004 diluted EPS. As of June 30, we processed approximately 1.5 trillion of assets for our clients, up $27 billion or 2% from March 31, 2005 and up almost 300 billion or 25% from June 30, 2004. We converted 1 billion from new clients. We won approximately 14 billion in assets from numerous existing clients during the quarter and we lost 2 billion from a customer related to an acquisition.

Client fund flows and, to a lesser extent, market movements, accounted for approximately 14 billion of the 27 billion increase during the quarter. Our 1.5 trillion of assets processed does not include approximately 110 billion in assets from our European outsourcing client or the 30 billion in assets from the contract with a major U.S. life insurance company that we announced today. We expect both of these conversions to be completed during the third quarter.

I'll now turn the call over to John Spinney, who will review the quarter's financial results, as well as our revised 2005-2006 guidance in more detail.

John Spinney, Jr.: As Kevin mentioned, second-quarter diluted EPS came in at $.64, a 28% increase over second-quarter 2004 diluted EPS of $.50. The $.64 in second-quarter diluted EPS includes securities gains of approximately 5.6 million or approximately $.06 per share related to the Company's strategy of replacing lower after-tax yielding municipal securities with higher after-tax yielding municipal securities, capitalizing on strong market conditions. We may take a moderate amount of additional securities gains prior to year-end 2005 if we believe we need to realign any aspects of our portfolio. We do not currently expect to take any securities gains in 2006.

Our second-quarter results also include a one-time benefit of approximately $.10 per share, related to the recognition of the indefinite reversal provision of APB 23, with respect to our Irish subsidiaries. As a result, the Company's effective tax rate was approximately 23% for the second quarter.

I'll now discuss the significant income and expense components for the second quarter in more detail. Core service fees for the second quarter increased 14% year-over-year, due to continued wins from new and existing clients as well as slightly higher market values compared to a year ago. Core service fees were flat linked quarter, primarily due to weaker market conditions in the second-quarter of '05 as compared to the first quarter. Ancillary services revenue increased 7% year-over-year and 21% linked quarter as a result of increases in cash management sweep fees and securities lending fees.

Regarding FX, we again recorded approximately 12 million in fees in the second quarter of 2005. These results represent a 15% decline year-over-year and a 7% linked quarter decline. Similar to the first quarter of 2005, we did not believe that this quarter's total would match last year's second quarter for FX fees, primarily due to lower volumes and volatility in the second quarter of '05 compared to the second quarter of '04.

Sweep fees increased 37% year-over-year to 24% linked quarter, due to increased cash balances held by our clients. Securities lending fees increased over 120%, both year-over-year at linked quarter due to improved market conditions. Net interest income was approximately flat on a year-over-year basis as our balance sheet growth was offset by a flatter yield curve. Net interest income declined 12% linked quarter due to a flatter yield curve and tighter reinvestment spreads. The linked quarter net interest margin decreased by 28 basis points to 1.47% while the linked quarter interest rate spread decreased by 31 basis points to 1.27% due to the factors I just mentioned.

We continue to invest in the same asset classes we have in the past. We are focusing our investments on variable rate, short duration securities. We are not attempting to generate incremental yield by taking on increased risk such as duration and credit risk. We also continue to run a closely matched balance sheet with an asset duration of approximately 1.1 years and a liability duration of approximately a year. The high amount of our variable rate securities in our portfolio has allowed us to continue to maintain low asset duration.

Total expenses were up 12% year-over-year and 8% linked quarter. Comp and benefits expense increased 18% year-over-year due to increased headcount and annual salary increases offset by lower bonus accruals compared to the second-quarter of 2004. Compensation and benefits expense was up 11% linked quarter due to an increase in headcount as well as bonus accruals reflecting higher net income in the second quarter. We expect comps and benefits to trend lower in the third and fourth quarters of 2005.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 14. 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

Technology and telecommunications expense grew 25% year-over-year due to our outsourcing agreement with IBM which we entered into in July of 2004. Technology and telecommunications expense was approximately flat linked quarter. Transaction processing fees increased 15% year-over-year and 5% linked quarter due to increases in transaction volumes and slightly higher market values. Occupancy expense declined 10% year-over-year and 6% linked quarter due to favorable lease renegotiations of the majority of our office space.

I would now like to discuss our revised 2005 and 2006 diluted earnings per share guidance. For fiscal 2005, the Company expects to achieve approximately 10% growth in GAAP diluted earnings per share. From a core perspective, we expect 2005 diluted earnings per share to be approximately flat with our 2004 GAAP results of $2.09 per share. As Kevin discussed, core diluted earnings per share for 2005 exclude the impact of securities gains totaling $0.10 per share to date 2005 and approximately $.10 per share related to APB 23.

We expect net operating revenue to grow approximately 10% in 2005. Core service fees are expected to grow by approximately 15% due to wins through new and existing clients and continued client fund flows, offset by the lackluster performance of the capital markets in the first half of the year. Total ancillary service fees are expected to increase approximately 5% from 2004 levels with solid growth in both securities and lending, sweep fees, driven by the factors I previously mentioned.

Foreign exchange fees are expected to be approximately flat due to lower volumes and volatility in 2005 compared to 2004. Net interest income is projected to be down approximately 10% from 188 million in 2004 driven by a flatter-than-expected yield curve environment and tighter-than-expected reinvestment spreads. We do not expect to grow our balance sheet materially for the remainder of 2005 from its size at the end of the second quarter due to the current interest rate environment. We will focus on reinvesting portfolio cash flows until the interest rate environment improves.

We assume in our net interest income forecast for 2005 and 2006 that short-term interest rates will rise until the end of 2005, and that the yield curve will remain flat. We also assume that we will resume growing the balance sheet moderately in 2006 to generate incremental net interest income.

During 2005, total expenses are expected to grow approximately 10%, driven by continued investments in headcount and technology to support new and existing clients. We expect total second-half 2005 compensation costs to approximate 2005's first-half compensation costs. We expect to achieve a pretax operating margin for 2005 of between 32 and 34% and an effective tax rate for 2005 of approximately 32% as a result of APB 23.

We recognize the indefinite reversal provision of APB 23 due to the projected capital needs of our subsidiaries necessary to support the continued impressive growth in net income at our Dublin, Ireland operation. Our Dublin operation has generated revenue growth of at least 40% over each of the past three years, driving markedly higher net income at the subsidiary.

We are maintaining a cautiously optimistic outlook for 2006 as we expect to continue to see headwinds driven by a challenging environment for net interest income, flat equity markets, and contract renewals. We also expect to continue to invest in our infrastructure, which may impact our operating leverage. For 2006, we expect GAAP diluted earnings per share to be approximately flat compared to 2005 cap diluted earnings per share. From a core earnings per share perspective, we are projecting annual growth in 2006 diluted EPS of approximately 8 to 10% over expected 2005 core results. Again, core 2005 diluted earnings per share excludes the impact of securities gains totaling $.10 per share to date in '05 and $.10 per share related to the recognition of the indefinite reversal provision of APB 23 with respect to our Irish subsidiaries.

We are basing our 2006 earnings guidance on expected net operating revenue growth of approximately 8 to 10% compared to 2005 net operating revenue. 2005 net operating revenue includes approximately 10 million or $0.10 per share in securities gains taken year to date, which we do not expect to recur in 2006.

We expect our 2006 net operating revenue growth to be driven by the sustained strength of our core service business, continued sales of core and ancillary services to new and existing clients, to continued 6% client fund flow, a sustained flat yield curve, and tight reinvestment spreads. We expect approximately 8 to 10% growth in expenses in 2006 and moderate diluted earnings per share impact from our share repurchase program. The recognition of the indefinite reversal provision of APB 23 with respect to our Irish subsidiaries should result in an effective tax rate of approximately 34.5% in 2006.

For 2007 and beyond, we are projecting long-term annual growth and net operating revenue of 12 to 14% and annual operating leverage of approximately 50 to 100 basis points, resulting in an annual diluted earnings per share growth of approximately 13 to 15%. We remain confident

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 14, 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

in and committed to our business model and our ability to deliver industry-leading customer service levels and financial performance, including long-term earnings growth in excess of industry averages.

Justin, I'd now like to open the call up for questions.

## QUESTION AND ANSWER

**Operator**

Thank you. [Operator Instructions] Our first question comes from Jon Arfstrom with RBC Capital Markets.

**Jon Arfstrom  - *RBC Capital Markets - Analyst***

Hi, guys.

John Spinney, Jr.: Hey, John.

**Kevin Sheehan**

Hi, John.

**Jon Arfstrom  - *RBC Capital Markets - Analyst***

Can you just, maybe, John, talk a little bit more about what you are doing or what you're planning on doing with the balance sheet for the second half of the year. It sounds like, reading between the lines, you are letting cash build, and you will opportunistically trigger the buyback at a certain point in time. Or do you think that all the cash flow will go to the buyback, or will you let capital build? Can you just discuss that a little bit?

John Spinney, Jr.: Yes, we're going to pretty much keep the balance sheet at its current levels, reinvest cash flows, and continue to build capital through net income, use some of that capital through net income in our overcapitalization right now, relative to our targeted leverage ratio to buy back stock opportunistically.

**Jon Arfstrom  - *RBC Capital Markets - Analyst***

Can you remind us the target of leverage ratio? Does that stay the same?

John Spinney, Jr.: Typically 5 to 5.5, but I think we will be right around 5.5 when we execute the full buyback.

**Jon Arfstrom  - *RBC Capital Markets - Analyst***

Okay. And did your guidance include any type of balance sheet restructuring or are you simply letting the cash flows roll in and then deciding what to do with them once they roll in?

John Spinney, Jr.: Yes, there's no restructuring, as I said in the call. We are investing in the similar type of assets we've always invested in. Short duration, variable rate products, and we don't see a change in our investment philosophy.

**Jon Arfstrom  - *RBC Capital Markets - Analyst***

Okay. Two questions on the '06 guidance. Does that include options expense? I don't think that was mentioned in your commentary.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

> Jul. 14, 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

John Spinney, Jr.: Yes, it does.

---

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

It does. Okay. And then without naming names, I think you said that fee compression from client renegotiations is something you have also imbedded in you're '06 guidance.

---

**Kevin Sheehan**

Yes.

John Spinney, Jr.: That's correct.

---

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Okay. The other question was just on client deposit flows. It looks like the client deposits are down again sequentially this quarter and I know that that was an issue for a lot of your holders in the last quarter. Can you talk a little bit about what's happening there?

John Spinney, Jr.: Yes, I think when you look at deposit line, in and of itself it is down. If you look at the repo line, we're at this other client deposits stats up, and then the sweep balances, the off-balance sheet sweeps, we've had 27% growth in those and 37% growth in those. So we've got balances growing off balance sheet. We've got repo balances growing and then some of the deposit flow runoff you see there is just going into clients getting invested again.

---

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Okay. And then can you — one last thing, can you just provide a little bit of color on what happened on the second traunch of that European contract? I think originally your expectation was that it would close late in the second quarter and I am just curious if there was anything unique that happened there?

John Spinney, Jr.: No, we are in complete parallel. Both sides have signed off on it. And the next window to implement is mid this quarter. We both decided that it would be wise to continue in parallel several extra weeks.

---

**Jon Arfstrom** - *RBC Capital Markets - Analyst*

Okay. All right. I will let others ask questions.

---

**Kevin Sheehan**

You're welcome.

---

**Operator**

Moving on to Andrea Jao with Lehman Brothers.

---

**Andrea Jao** - *Lehman Brothers - Analyst*

Good evening, gentlemen.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 14. 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

**Kevin Sheehan**

Hi, Andrea.

**Andrea Jao** *- Lehman Brothers - Analyst*

I wanted to drill down a bit on margin compression. I was hoping you could break that down into -- how much was due to lower reinvestment yields. How much was due to premium amortization accelerating, if there's any. And how much of that was, you know, swap ineffectiveness, which added actually the margin, $2.3 million last quarter.

John Spinney, Jr.: I think the biggest driver there is just reinvestment spreads compressing. The other stuff I would characterize as probably immaterial or similar to what it's been in the past.

**Andrea Jao** *- Lehman Brothers - Analyst*

So that means there was no swapping effectiveness this quarter?

John Spinney, Jr.: There was, but it was small in the first quarter.

**Andrea Jao** *- Lehman Brothers - Analyst*

Got it. And just one follow-up question. Are you carrying a lot of premium bonds at the moment?

John Spinney, Jr.: We have some premium bonds, yes.

**Andrea Jao** *- Lehman Brothers - Analyst*

Is it possible to share how much of the mix is premium bonds? Or is it just a small portion?

John Spinney, Jr.: We typically don't give that amount of detail about our investment portfolio, Andrea.

**Andrea Jao** *- Lehman Brothers - Analyst*

Okay. Got it. This is helpful. Thank you.

John Spinney, Jr.: You can see the amortization on the cash flow statement.

**Andrea Jao** *- Lehman Brothers - Analyst*

Okay. Good. Thanks.

John Spinney, Jr.: Yes.

**Operator**

This question comes from Lori Applebaum with Goldman Sachs.

**Lori Applebaum** *- Goldman Sachs - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 14. 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

John, within your revised 2006 expectations, what are your thoughts or assumptions behind the BGI contract repricing and what is factored into the outlook prospecs?

John Spinney, Jr.: We are not going to comment about specific client renegotiations, Lori. And all I can say is we've got a 8 to 10% revenue growth for next year imbedded in our guidance.

**Lori Applebaum  - *Goldman Sachs - Analyst***

And is -- whatever the specific assumptions that you are consider for BGI, is something factored into '06 for summary negotiation of the contract and the price?

John Spinney, Jr.: As we said in the call, we did consider all contracts coming up.

**Lori Applebaum  - *Goldman Sachs - Analyst***

Okay. Thanks.

John Spinney, Jr.: Yes.

**Operator**

We will take a question from Carla Cooper with Robert W. Baird.

**Carla Cooper  - *Robert W. Baird - Analyst***

Good afternoon. Just to clarify, does your EPS guidance reflect the repurchase activity that you expect to take place or not?

John Spinney, Jr.: In the script, Karla, it's a moderate impact from the buyback.

**Carla Cooper  - *Robert W. Baird - Analyst***

Okay. Thanks. Wanted to clarify.

And then, can you talk a little bit about -- you know, your expected operating leverage. You talked about investments in people and infrastructure that you plan to make to support clients. Is anything changed in the way you are thinking about that -- those expenses, and is there anything specific that you can point to?

John Spinney, Jr.: No, I don't think there is anything specific. I think it's continued -- addition of headcount related to client conversions and what we have historically done is whenever we take on new business like we announce a new piece of business this quarter, we add headcount ahead of that so we tend to lag a little bit on the expense side. So that is kind of the investment, and then coupled with that is some technology builds we are doing to enhance some core applications as well.

**Carla Cooper  - *Robert W. Baird - Analyst***

And Kevin, I guess back to your comments. You talked about a pretty dramatic change, vis-a-vis the historical numbers that Investors Financial has achieved. I guess, how fundamental, as you look from your perch, having been in this business a long time, how fundamental do you view the changes here -- you know, the numbers certainly look like they are changing a lot, but maybe you can give us some perspective of how fundamental these changes feel to you as you look at the next 18 months and beyond.

**Kevin Sheehan**

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Jul. 14, 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call**

I think the big change for us is the compression in the -- in the spreads and our inability to exact any growth in earnings from the net interest income side of the business, at least in this environment where we are facing rising rates. On the other side, the core side, where we are increasing fee-based services in the ancillaries, I think we are performing pretty strongly and I think we will continue to do that and we will probably drive a lot hotter on that side to compensate for the limitations on the net interest income side and when that becomes more favorable and we can expand that again, you can expect to see us do it.

**Carla Cooper** - *Robert W. Baird - Analyst*

So just to clarify, your comments really relate to portfolio yields and net interest income as opposed to a change in the core competitive environment that you think is limiting your growth or your profitability.

**Kevin Sheehan**

Right. You can see that's where we got hammered, is on the net interest income side.

**Carla Cooper** - *Robert W. Baird - Analyst*

Thank you.

**Operator**

Moving on to David Chamberlain with PIMCO.

**David Chamberlain** - *PIMCO - Analyst*

Hi, Guys. Just quickly, when you are look at your assumptions for '06, what are you assuming in terms of interest margin, any additional compression from a current level. What are you thinking on those lines?

John Spinney, Jr.: Our interest rate outlook is a continued rise in short-term rates to the end of the year and probably some continued flattening in the yield curve, depending on what happened to the tenure [ph] but we are assuming it gets flatter from here.

**David Chamberlain** - *PIMCO - Analyst*

How much? Do you think another 20, 25 -- I am just trying to think about how -- what you are assuming.

John Spinney, Jr.: Dave, we don't give point estimates. We just -- directionally, that is the way it is going to go we think.

**David Chamberlain** - *PIMCO - Analyst*

Okay, thanks.

**Operator**

This question comes from Matt D'Attilio with Reinhart & Mahoney.

**Matt D'Attilio** - *Reinhard & Mahoney - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jul. 14. 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call |

Yes, could you guys just comment overall, similar to the previous question on how much compression you think can be left in your business model. I think part of the surprise on the press release is the 31-basis point contraction, and spread was probably a little bit greater than people's models. Maybe you can just discuss where it can go from there.

John Spinney, Jr.: It could go down a little bit lower, but we're not going to give an estimate of where we think it's going to end up. I think, given where the guidance is we have out there and what that means for EPS in the next two quarters, I think it's pretty much baked into the numbers right now.

**Matt D'Attilio** - *Reinhard & Mahoney - Analyst*

Okay.

**Operator**

Mr. D'Attilio, do you have anything further?

**Matt D'Attilio** - *Reinhard & Mahoney - Analyst*

No, that's it.

**Operator**

We'll take a question from Greg Lapin with Saranac Capital.

**Greg Lapin**  - *Saranac Capital - Analyst*

Hi. Greg Lapin at Saranac. My first question -- just looking at the income statement really quick. There a typo, or -- you show that the second quarter of '04 having flat net interest income, but when you go back in my model and in the press release it was lower, yet the six-month number is the same. So I didn't know if there was any reclass or if you could just check on that. It can't be that way. So in the past it was $44.3 million, and -- so --

John Spinney, Jr.: Yes, we will go back and look at it, but we did restate some numbers last year, so maybe -- maybe you are looking at your model that maybe wasn't updated.

**Greg Lapin**  - *Saranac Capital - Analyst*

But the six-month number is the same in each -- okay. Then, just going into -- I will follow up. OCI is reclassed to give transference and net interest income. Is it safe to assume that this quarter might be the $6.5 million divided by 3?

John Spinney, Jr.: No, it's not safe to do that. It is a dynamic that changes every quarter and it's less than it was in the first quarter.

**Greg Lapin**  - *Saranac Capital - Analyst*

I am not talking about the hedge ineffectiveness -- is that connected with the hedge ineffectiveness? So that the 6.5 is for the next three quarters?

John Spinney, Jr.: Yes.

**Greg Lapin**  - *Saranac Capital - Analyst*

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 14, 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call

Oh, they are the same thing. Okay. Then another thing is just -- if you look at other borrowings, they've -- at the end of period basis, $2 billion, the average was 1.35. Or the average is 2 billion, the end-of-period is 1.35.

Does this kind of show that you reversed course in the middle of the quarter and decided to change -- and just -- if that is the case, how comprehensive was your business strategy review when you underwent this to reassess your '05, your '06 projections and your long-term growth rates in EPS. What kind of process was that?

John Spinney, Jr.: First of all, on the borrowings front, the average was higher during the quarter. At the end of the quarter we had a lot of deposits come in and that's why there's a difference between the average and the quarter-end number. And we've always historically had some amount of borrowings on our balance sheet to -- to utilize our capital effectively. Coming out of the first quarter, we had a pretty -- pretty relatively steep yield curve. We continue to -- to manage net interest income and the growth of the balance sheet around at least getting some benefit out of that steepness.

As the yield curve flattened throughout the second quarter, we reanalyzed our position with respect to growing the balance sheet, and in towards the end of the third quarter, we decided to stop growing the balance sheet into the third and fourth quarter, and that's kind of how it played out, I guess.

---

**Greg Lapin** *- Saranac Capital - Analyst*

And just for the long term, when you looked in '07 and beyond, we could assume the balance sheet grows, customer flows come in. Why the lower level to that magnitude? What else went in -- were you looking at. Did you have a comprehensive -- do you use consultants, did you look at financial asset growth, you just assess the business? You are still pretty small. Just wanted -- anything more you could say on that?

---

**Kevin Sheehan**

We just couldn't get the incremental yield so it didn't make sense. Wasn't effective to continue to grow the balance sheet with borrowed funds.

---

**Greg Lapin** *- Saranac Capital - Analyst*

The interest rate environment will normalize in '07 so you have a different long-term growth rate, moving down from 25% to 13 to 15.

---

**Kevin Sheehan**

Yes, I think you will see us more aggressive, but we wanted to be extremely conservative in putting these numbers together and not reach -- if the rates turn around, great. We will start to grow the balance sheet again.

---

**Greg Lapin** *- Saranac Capital - Analyst*

Okay. Thanks.

---

**Operator**

This concludes our question-and-answer session. A replay of the call will be available starting at 8 p.m. Eastern time today and will run through July 20 at midnight central time. To access this replay, please dial 719-457-0820 and enter in the passcode of 5418104. Again, that is 719-457-0820 with a passcode of 5418104.

At this time, I will turn the call back over to Mr. Kevin Sheehan for closing remarks.

---

**Kevin Sheehan**

In closing, thank you for joining us today. We look forward to updating you on our progress as we get to the third quarter in October.

---

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 14, 2005 / 2:00PM, IFIN - Q2 2005 Investors Financial Services Corp. Earnings Conference Call |
|---|

**Operator**

Thank you. That does conclude today's conference call. Thank you for your participation.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION  PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

© 2005, Thomson StreetEvents All Rights Reserved.

© 2005 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# Exhibit M

# FEDERAL FUNDS RATES

The following chart shows the Federal Reserve Board's changes in the intended federal funds rate:

| Change (basis points) | | | |
|---|---|---|---|
| Date | Increase | Decrease | Level (percent) |
| **2005** | | | |
| December 13 | 25 | ... | 4.25 |
| November 1 | 25 | ... | 4.00 |
| September 20 | 25 | ... | 3.75 |
| August 9 | 25 | ... | 3.50 |
| June 30 | 25 | ... | 3.25 |
| May 3 | 25 | ... | 3.00 |
| March 22 | 25 | ... | 2.75 |
| February 2 | 25 | ... | 2.50 |
| **2004** | | | |
| December 14 | 25 | ... | 2.25 |
| November 10 | 25 | ... | 2.00 |
| September 21 | 25 | ... | 1.75 |
| August 10 | 25 | ... | 1.50 |
| June 30 | 25 | ... | 1.25 |
| **2003** | | | |
| June 25 | ... | 25 | 1.00 |
| **2002** | | | |
| November 6 | ... | 50 | 1.25 |
| **2001** | | | |
| December 11 | ... | 25 | 1.75 |
| November 6 | ... | 50 | 2.00 |
| October 2 | ... | 50 | 2.50 |
| September 17 | ... | 50 | 3.00 |
| August 21 | ... | 25 | 3.50 |
| June 27 | ... | 25 | 3.75 |
| May 15 | ... | 50 | 4.00 |
| April 18 | ... | 50 | 4.50 |
| March 20 | ... | 50 | 5.00 |
| January 31 | ... | 50 | 5.50 |
| January 3 | ... | 50 | 6.00 |
| **2000** | | | |
| May 16 | 50 | ... | 6.50 |
| March 21 | 25 | ... | 6.00 |
| February 2 | 25 | ... | 5.75 |

Source: http://www.federalreserve.gov/fomc/fundsrate.htm.

# Exhibit N

Report of Findings to Date
Special Examination of Fannie Mae



*Office of Compliance*
*Office of Federal Housing Enterprise Oversight*

September 17, 2004

**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT**
*1700 G STREET, NW,   WASHINGTON, DC  20552   (202) 414-3800*
*Office of Compliance*

## MEMORANDUM

**TO:**          Armando Falcon, Jr., Director

**FROM:**     Christopher H. Dickerson, Chief Compliance Examiner

**SUBJECT:**  **Fannie Mae Special Examination**

**DATE:**        September 17, 2004

     Attached are the findings to-date of the special examination of Fannie Mae.  The matters detailed in this report are significant and warrant your immediate attention.

     This report is the result of a collective effort by the Office of Compliance, the Office of the Chief Accountant, and other OFHEO staff, as well as technical support provided by accountants from Deloitte & Touche, LLP.  During our examination, we have reviewed more than 200,000 documents and e-mails, and have interviewed and taken sworn testimony from numerous current and former Fannie Mae employees.

     Our examination is continuing and we will keep you apprised of our findings.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

# Report of Findings to Date
# Special Examination of Fannie Mae



*Office of Compliance*
*Office of Federal Housing Enterprise Oversight*

September 17, 2004

## Table of Contents

**INTRODUCTION AND EXECUTIVE SUMMARY** ................................................................ i

**ACCOUNTING FOR PURCHASE DISCOUNT AND PREMIUM AND OTHER DEFERRED PRICE ADJUSTMENTS UNDER SFAS 91** ................................................................ 1

REQUIREMENTS OF SFAS 91 ................................................................ 2
POLICY AND INFRASTRUCTURE DEVELOPMENT ................................................................ 7
  *Events of 1998 and 1999* ................................................................ 7
    Fourth Quarter of 1998 ................................................................ 7
    Bonuses Awarded in 1998 ................................................................ 10
    Recognition of 1998 "Catch-up" in 1999 ................................................................ 12
  *Formulation and Adoption of Accounting Policy* ................................................................ 13
    Formulation of Accounting Policy ................................................................ 13
    Policy Adopted to Recognize Expense or Income Over Multiple Reporting Periods ................................................................ 15
    Policy to Defer Income and Expense Up To Certain Thresholds ................................................................ 17
    Policy To Permit Discretionary Adjustments Within The Target Catch-Up Range ................................................................ 27
  *Managing the Catch-Up* ................................................................ 29
    Managing Within The Current Quarter's Catch-Up Range ................................................................ 29
    Modeling And Managing The Forecasted Catch-Up ................................................................ 32
  *Development of Systems and Modeling Capability* ................................................................ 40
HISTORICAL ANALYSIS OF ACCOUNTING FOR DEFERRED PRICE AMORTIZATION ................................................................ 42
  *Management of Catch-Up Results* ................................................................ 45
  *Management Discretion Applied in the Selection of Market Rate Assumptions* ................................................................ 49
  *Capitalization and Amortization of Reconciliation Differences* ................................................................ 53
  *Inconsistent and Incorrectly Applied Accounting Practices to Determine the Catch-Up* ................................................................ 58
INTERNAL CONTROLS OVER THE AMORTIZATION PROCESS ................................................................ 65
  *Segregation of Duties and Key Person Dependencies* ................................................................ 66
  *Modeling Undertaken to Produce Desired Results* ................................................................ 67
  *Underlying Data Issues* ................................................................ 68
  *Factor Anomalies* ................................................................ 69
    How Factor Anomalies Could Represent Departures from GAAP ................................................................ 71
  *The Office of Auditing Amortization Investigation* ................................................................ 73

**HEDGE ACCOUNTING UNDER SFAS 133** ................................................................ 82

INTRODUCTION ................................................................ 82
BACKGROUND ................................................................ 82
  *Implementation of SFAS 133 at Fannie Mae* ................................................................ 83
  *Determination to maintain the pre-SFAS 133 accounting* ................................................................ 84
  *Minimizing Earnings Volatility a Primary Objective* ................................................................ 84
  *Derivatives Accounting Policies & Procedures* ................................................................ 85
  *The Assumption of Perfect Effectiveness* ................................................................ 86
  *Environment for Formulation of Derivatives Accounting Policy at Fannie Mae* ................................................................ 87
SUMMARY OF KEY ISSUES IDENTIFIED ................................................................ 90
ISSUE 1: DERIVATIVE RE-DESIGNATIONS ................................................................ 94
ISSUE 2: ACCOUNTING FOR OFFSETTING DERIVATIVES ................................................................ 104
ISSUE 3: APPLICATION OF SHORTCUT AND MATCHED TERMS METHODS ................................................................ 112
ISSUE 4: INTEREST RATE CAPS ................................................................ 129
ISSUE 5: HEDGE ACCOUNTING DOCUMENTATION ISSUES ................................................................ 136

**ACCOUNTING OVERSIGHT** ................................................................ 146

ACCOUNTING POLICY DEVELOPMENT ................................................................ 147

Accounting Policy Review ......................................................................... 152
Segregation of Duties .............................................................................. 155
   Chief Financial Officer (CFO) ............................................................. 156
   Senior Vice President – Financial Reporting and Planning.................... 158
   Director of Financial Reporting .......................................................... 159
   SVP of Operations Risk (Head of Internal Audit)................................. 160
Key Person Dependency ............................................................................ 162
   The Financial Standards Group ........................................................... 162
   Controller .......................................................................................... 164
   Vice President for Financial Accounting .............................................. 166
Conclusion ............................................................................................... 168

**APPENDIX I** ....................................................................................... **170**

Estimation Methods Used for Modeling the Catch-Up .............................. 170
   A. Background.................................................................................... 170
   B. Development of Amortization Estimation Methods........................... 172
   C. Use of Multiple Rate Paths............................................................. 175
   D. The Application of Estimation Methods in 1999 and 2000................ 178
   E. Conclusion..................................................................................... 184

**APPENDIX II** ...................................................................................... **185**

Summary of SFAS 133, Accounting for Derivatives and Hedging Activities ..................... 185

**APPENDIX III** ..................................................................................... **187**

Example of a Term-out Transaction ......................................................... 187

**APPENDIX IV** ..................................................................................... **192**

Example of an Offsetting Swap ................................................................ 192

**APPENDIX V** ...................................................................................... **195**

Example of a Cancelable Swap ................................................................. 195

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**INTRODUCTION AND EXECUTIVE SUMMARY**

We are currently conducting a Special Examination of Fannie Mae's accounting policies, internal controls, and financial reporting processes. Although the examination is still in process, our findings to-date are serious and warrant a report at this juncture. This report details the Special Examination's concerns on the framework and conditions of Fannie Mae's accounting policies and internal controls, with a particular focus on two critical accounting areas:  deferred price adjustments, and derivatives and hedging activities.

We have determined that Fannie Mae, in developing policies and practices in these critical areas, has misapplied Generally Accepted Accounting Procedures ("GAAP"), specifically *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases* ("SFAS 91") and *Accounting for Derivative Instruments and Hedging Activities* ("SFAS 133"). The misapplications of GAAP are not limited occurrences, but are pervasive and are reinforced by management. **The matters detailed in this report are serious and raise concerns regarding the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness of the Enterprise.**

The problems relating to these accounting areas differ in their specifics, but they have emerged from a culture and environment that made these problems possible. Characteristics of this culture include:

- management's desire to portray Fannie Mae as a consistent generator of stable and growing earnings;
- a dysfunctional and ineffective process for developing accounting policies;
- an operating environment that tolerated weak or non-existent internal controls;
- key person dependencies and poor segregation of duties;
- incomplete and ineffective reviews by the Office of Auditing;
- an inordinate concentration of responsibility vested with the Chief Financial Officer; and
- an executive compensation structure that rewarded management for meeting goals tied to earnings-per-share, a metric subject to manipulation by management.

The tenor of earnings management is deeply ingrained at Fannie Mae and has given rise to accounting policies and practices that emphasize effects on earnings volatility, rather than faithfulness to GAAP. A key message by Fannie Mae to the investor community is management's ability to generate stable and growing earnings. This is evidenced by Fannie Mae's annual financial reports, with their recurring graphs of steadily increasing earnings against a backdrop of volatile interest rates. Less well known, but detailed in this report, is the fact that the desire by management to minimize earnings volatility was a central organizing principle in the development of key accounting policies.

Management also emphasized the stable earnings imperative in its communications to the Fannie Mae Board of Directors. In July 2003, even as the accounting problems of Freddie Mac were publicly emerging, Fannie Mae's Chief Financial Officer, Tim Howard, made a presentation to the Board that emphasized a "stable pattern of earnings" as a requirement for Fannie Mae if it were to be perceived as a low-risk Enterprise. Mr. Howard included in this presentation a

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

graph showing that the earnings of Fannie Mae were smoother than those of Freddie Mac and almost all other companies in the S&P 500.

Sound risk management practices can reduce the economic effects of volatile cash flows. However, management should not reduce earnings volatility through accounting policies and practices that do not comport with GAAP.

The key findings of our examination relating to SFAS 91, SFAS 133, accounting policy development, and internal controls are summarized below.

**Accounting for Purchase Discount and Premium and Other Deferred Price Adjustments (SFAS 91)**

**OFHEO has concluded that the accounting used by Fannie Mae for amortizing purchase premiums and discounts on securities and loans as well as amortizing other deferred charges is not in accordance with GAAP.** This is particularly significant, in that management, in the MD&A section of their Form 10-K, details their underlying application of amortization as it relates to SFAS 91, and also explains that the accounting estimates associated with deferred price adjustments are "critical accounting estimates."

However, despite the importance of premium and discount amortization to the financial statements of Fannie Mae, and despite the requirement of SFAS 91 to formulate best estimates in good faith, management intentionally developed accounting policies and selected and applied accounting methods to inappropriately reduce earnings volatility and to provide themselves with inordinate flexibility in determining the amount of income and expense recognized in any accounting period. In this regard, the amortization policies that management developed and the methods they applied created a "cookie jar" reserve. In addition, OFHEO found that management:

- deliberately developed and adopted accounting policies to spread estimated income or expense that exceeded predetermined thresholds over multiple reporting periods;
- established a materiality threshold for estimated income and expense, within which management could avoid making adjustments that would otherwise be required under SFAS 91;
- made discretionary adjustments to the financial statements, for the sole purpose of minimizing volatility and achieving desired financial results;
- forecasted and managed the future unrecognized income associated with misapplied GAAP;
- capitalized reconciliation differences as 'phantom' assets or liabilities and amortized them at the same speeds as 30-year fixed-rate mortgages;
- developed estimation methods that were inconsistently applied to retrospective and prospective amortization required by SFAS 91 for current and future periods;
- developed and implemented processes to generate multiple estimates of amortization with varying assumptions in order to select estimates that provided optimal accounting results;
- failed to properly investigate an employee's concerns regarding illogical or anomalous amortization results, along with that employee's further allegation of an intent to misstate reported income;

ii

- tolerated significant weaknesses in internal controls surrounding the amortization process; and
- inappropriately deferred $200 million of estimated amortization expense in 1998, which had significant effects on executive compensation.

This report provides details on the thresholds established by management for recognizing – or not recognizing – amortization income or expense. Although management often refers to the amounts within these thresholds as "the functional equivalent of zero", our report details why, in fact, the ranges of these thresholds are quite large relative to the amounts of amortization normally recognized, how the ranges greatly facilitate the smoothing of income, and why these thresholds fail the test of GAAP compliance.

This report chronicles the events that led to the development of Fannie Mae's current amortization policies and practices. It describes how management, after experiencing unexpected increases in amortization expense in 1998, developed policies and practices to cushion the income statement against future surprises. In various memoranda, management openly expressed as an objective of its amortization policies and practices a desire to minimize earnings volatility. For example, a March 1999 memorandum from an employee in the Controller's Department described the benefits of a particular brand of software for modeling amortization, noting that the software allowed a user to "manipulate factors to produce an array of recognition streams", which "strengthens the earnings management that is necessary when dealing with a volatile book of business."

This statement is a clear acknowledgement that a balance sheet comprised of fixed-rate mortgages produces volatility. However, in testimony that is highlighted in this report, management sought to portray their amortization policies and practices as attempts to dampen "artificial volatility" that arises from the estimation process. Chief Financial Officer Tim Howard, who was the chief architect of Fannie Mae's amortization policy, attempted to justify the use of a discretionary threshold for recording amortization by asserting that a single point-estimate resulted in "spurious precision." In fact, said Controller Leanne Spencer, management's freedom to book a number within this range was useful to investors, because doing so helped eliminate "jerky moves."

Management asserts that the "artificial volatility" they seek to dampen arises from assumption risk. Because key assumptions, such as mortgage prepayment speeds, can change dramatically from period to period, estimates of amortization can likewise change dramatically. However, changes in prepayment assumptions are driven by actual changes in the economic environment, particularly changes in interest rates, which gives rise to volatility. **GAAP requires this volatility to be recognized and reported.**

In arguing against the use of a single point-estimate for amortization, management has also asserted that estimates of prepayments may vary widely at any particular point in time. For example, one can survey Wall Street dealers and observe a wide range of prepayment estimates, any of which could be justified for estimating amortization. In fact, management sometimes obtains many prepayment estimates from market sources and, for particular asset categories, selects a speed within the range of estimates to develop amortization factors. Management asserts that any prepayment estimate within the range can be justified, but in fact the flexibility to select any prepayment speed within a range simply enhances the ability of

management to hit an earnings number.  Because these estimates of amortization are also used in management's analysis of net interest income sensitivity, this practice has unfavorable safety and soundness implications that go beyond financial reporting.

The Special Examination also found that the process for estimating amortization was characterized by significant control weaknesses.  Many of these control weaknesses are centered on the amortization system and the process for modeling amortization factors.  **These control weaknesses undermine the process of amortization to such an extent that the accuracy of premium and discount amortization is questionable.**  These control weaknesses include:

- inadequate segregation of duties and key person dependencies;
- modeling multiple runs to produce desired results;
- underlying data issues, including illogical or anomalous amortization factors; and
- a lack of written procedures, supporting documentation, and poor or non-existent audit trails.

This report also details an investigation performed by the Office of Auditing into allegations of amortization accounting irregularities raised by Roger Barnes, a former employee in the Controller's Department who left Fannie Mae in November 2003, and whose cooperation was important to our examination.  The Special Examination found that Mr. Barnes's allegations were substantive, and that the Office of Auditing failed to adequately investigate the problems surrounding the amortization process that he raised.

**The consequences of the misapplications of GAAP and control breakdowns surrounding accounting for amortization are potentially large.**  The management of Fannie Mae, by recording incorrect and incomplete amounts of premium and discount amortization, has misstated interest income over many reporting periods, as well as balance sheet accounts for unamortized premiums and discounts.  Also, because amortization estimates ultimately flow to individual securities, gains or losses recorded on the sale or transfer of securities in previous periods are also questionable.  Fannie Mae will need to devote considerable resources to determine the full magnitude of these errors.

### Accounting for Derivative Instruments and Hedging Activities (SFAS 133)

Fannie Mae adopted SFAS 133, *Accounting for Derivative Instruments and Hedging Activities,* on January 1, 2001.  The standard requires that all freestanding and certain embedded derivatives be carried on the balance sheet at fair value.  Changes in the fair value of a derivative are included in earnings, which gives rise to earnings volatility.  However, the hedge accounting provisions of SFAS 133 provide methods for offsetting the earnings effect of a derivative with a designated hedge transaction, if the combination meets specific criteria.  **Hedge accounting is optional**.  To qualify, entities must maintain extensive documentation and, in many instances, perform rigorous calculations.  These stringent criteria presented significant challenges to Fannie Mae, which has a large and dynamic hedging program.

Fannie Mae had a strong desire to retain the *status quo* of accrual/synthetic instrument accounting in effect before SFAS 133, because synthetic instrument accounting provided smoother accounting earnings and greater predictability of reported financial results.  To this

iv

end, **Fannie Mae implemented SFAS 133 in a manner that placed minimizing earnings volatility and maintaining simplicity of operations above compliance with GAAP.** These goals, to an inordinate degree, influenced the development of Fannie Mae's approach to hedge accounting.

Indeed, in a March 2003 memorandum that took a retrospective look at Fannie Mae's SFAS 133 implementation, Jonathan Boyles, Senior Vice President for Financial Standards, wrote that the implementation of this standard was driven by management's desire to minimize earnings volatility, leverage off existing systems, and make the non-GAAP measure of "operating earnings" simple and easy to understand. Mr. Boyles wrote that these goals "were intertwined in many of the decisions we made during the implementation process." He went on to write that these decisions "were often the joint decisions of management including the CFO." He further noted that "in hindsight these decisions may not have been the best decisions given what we know now."

These drivers did, in fact, result in major problems for Fannie Mae's accounting for derivatives. In fact, **OFHEO has found that in many cases Fannie Mae does not assess and record hedge ineffectiveness as required by SFAS 133, and applies hedge accounting to hedging relationships that do not qualify.**

Fannie Mae's hedge accounting regime assumes that the vast majority of its hedging relationships are "perfectly effective"; this greatly simplifies operations, because SFAS 133 requires no effectiveness assessment or measurement of ineffectiveness for such relationships. However, SFAS 133 prescribes specific rules for assuming perfect effectiveness; hedges that do not meet these criteria require an assessment of effectiveness to qualify for hedge accounting and a measurement of ineffectiveness for qualifying hedge relationships. **OFHEO's analysis indicates that Fannie Mae has many hedging relationships that do not qualify as perfectly effective, yet have been treated as such.** Because Fannie Mae has not performed a proper assessment of hedge effectiveness for such hedges, these hedge relationships do not qualify for hedge accounting treatment. Thus, **the fair value changes for derivatives in these relationships should be recorded in earnings.**

Even if a hedge relationship qualifies for hedge accounting, "ineffectiveness" may exist. Ineffectiveness represents the extent to which changes in the fair value of a derivative are not perfectly matched with the changes in fair value or cash flows of the hedged item. The ineffective portion of changes in the derivative's fair value must be recorded in earnings. OFHEO has identified numerous instances in which **Fannie Mae has improperly ignored this ineffectiveness in hedge relationships or has failed to perform assessment tests.** For example, Fannie Mae often re-designates derivatives to different hedged items during the life of the derivative. OFHEO found that Fannie Mae incorrectly assumes that such derivatives are perfectly effective upon re-designation, even though the derivatives do not have a fair value of zero at the time of re-designation. This is required in order to assume perfect effectiveness or to receive matched terms accounting.

Further, **Fannie Mae has applied the "short-cut" method, or the "matched terms" method, for a broad range of hedge relationships where these methods are inappropriate.** The Enterprise has also applied its own definitions of "matched terms" in certain instances. Examples detailed in this report include:

v

- receive-fixed swaptions hedging the fair value of non-callable debt;
- callable swaps hedging discount notes, which are incorrectly treated as perfectly effective without regard to the option value existing in the derivative but not the hedged item;
- swaps arising from the exercise of a swaption, which are treated as perfectly effective despite their non-zero fair value at inception;
- the modification of the requirement for matching of reset dates (in order to assume perfect effectiveness) between the hedged item and the swap in cash flow hedges to permit up to a seven day reset date mismatch;
- the modification of the requirement for matching of maturity dates (in order to assume perfect effectiveness) between the hedged item and the swap in fair value hedges to permit up to a 90 day mismatch;  and
- the use of a "duration method" to assume perfect effectiveness in hedges of anticipated debt issuances.  (In March 2004, Fannie Mae discontinued the use of duration matching as a method to assess the effectiveness of hedging anticipated debt issuances.  The Enterprise admits that this methodology was a known departure from GAAP.)

When seeking to effectively terminate interest rate swaps, management often entered into offsetting swaps instead of buying back the existing swaps.  However, the accounting for offsetting derivatives was inappropriate through the end of 2003, because **Fannie Mae incorrectly treated the original swap and the offsetting swap as perfect cash flow hedges and recorded changes in their fair value in accumulated other comprehensive income (AOCI), instead of earnings.**  In the first quarter of 2004, Fannie Mae modified its accounting for these offsetting swaps prospectively.  However, OFHEO believes that these offsetting swaps were not valid hedging relationships under SFAS 133 in past periods and should not have received hedge accounting after the execution of the second swap.

**OFHEO identified a number of problems with Fannie Mae's hedge documentation.**  In several examples OFHEO reviewed, the documentation was ambiguous as to the nature of the hedging relationship or did not clearly identify the hedged risk, hedged item, or its probability of occurrence.  In addition, OFHEO found instances where there was no contemporaneous hedge documentation, as well as instances where staff created hedge designations retroactively.  Under SFAS 133, the lack of contemporaneous hedge designation documentation precludes a company from qualifying for hedge accounting.  **This lack of documentation and the ability to create such documentation retroactively is not only a SFAS 133 violation, but is evidence of a poor control framework and is a significant safety and soundness problem.**

This report also provides details on an error made by Fannie Mae in accounting for changes in the time value and the intrinsic value components of purchased interest rate caps.  The Enterprise discovered the error, corrected its methodology, and applied the new methodology only prospectively to new interest rate caps.  The analysis and discussion in this report show that **Fannie Mae has incorrectly accounted for and reported this error in its financial statements.**  Further analysis is necessary to make a precise determination of the complete financial statement impact on all periods affected.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

For derivatives not qualifying for hedge accounting, fair value changes should be reflected in earnings in the period in which the value change occurred. As of December 31, 2003, the balance in "Accumulated Other Comprehensive Income" (AOCI) included approximately $12.2 billion in deferred losses relating to cash flow hedges. Furthermore, carrying value adjustments of liabilities relating to fair value hedges amounted to $7.2 billion as of that date. Fannie Mae's improper application of hedge accounting leads us to question the validity of the amount reflected in AOCI, as well as amounts reflected as carrying value adjustments, at any point in time after the adoption of SFAS 133. **The possible reclassification of such amounts into retained earnings could have a significant effect on Fannie Mae's regulatory capital.**

## Accounting Oversight

As part of the Special Examination, we assessed various controls and processes surrounding Fannie Mae's accounting and financial reporting. These include processes for developing, approving, maintaining, and implementing accounting policies, as well as the segregation of duties and key person dependencies. In particular, we concentrated examination efforts on evaluating the roles and responsibilities of the Chief Financial Officer, executives in the Controller's Department, and controls that support the integrity of the financial reporting process.

**The failure by management to properly implement critical accounting policies is due in part to the lack of a sound framework for developing these policies.** Fannie Mae often relies on a few individuals to make key decisions on critical accounting policies and practices. This report documents how management failed to establish an internal control system to ensure that accounting policies are appropriately developed and reviewed.

A prime example of this failure is the process for developing the key document relating to SFAS 91 accounting. OFHEO found that Fannie Mae's *Purchase Premium and Discount Amortization Policy* was developed without input from the Financial Standards, which is the group in the Controller's Department normally responsible for setting accounting policy. Indeed, the head of that group, Jonathan Boyles, testified that key provisions of that document do not comply with GAAP.

Our report documents that Fannie Mae's external auditor, KPMG, is often viewed within the Enterprise as the final arbiter of compliance with GAAP. However, it is ultimately the responsibility of management to determine sound accounting policies for the Enterprise – the burden of management can not be shifted to the external auditor. OFHEO views this reliance on the external auditor to determine the propriety of accounting policy as an indication of inadequate technical expertise within the Controller's Department. OFHEO found that the accounting policy review process does not provide reasonable assurance that the accounting policies adopted by the Enterprise are in compliance with GAAP.

**The control weaknesses that we identified in Fannie Mae's accounting policy development process have contributed to accounting policies that do not comply with GAAP.** Additionally, the Special Examination found that a lack of formal procedures for accounting policy development has resulted in incomplete disclosure of critical accounting policies by the Chief Financial Officer to the Audit Committee of the Board of Directors.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

A cornerstone of sound corporate oversight is the control structure itself. It is management's responsibility to ensure that Fannie Mae operates in a safe and sound manner and has proper segregation of duties, an adequate level of controls to support its key business processes, and clear and appropriate accounting policies. In addition, it is the responsibility of management to ensure that personnel in key control functions are competent and qualified to execute their responsibilities. In this regard, OFHEO found that a combination of heavy workloads, weak technical skills, and a weak review environment contributed to the development of key person dependencies and inadequate segregation of duties.

**The Special Examination found that the Chief Financial Officer, Tim Howard, failed to provide adequate oversight to key control and reporting functions within Fannie Mae.** Mr. Howard oversees the Controller's Department, which does not possess the skills required to ensure that Fannie Mae has appropriate accounting policies, the resources to appropriately implement such policies, nor an effective system of internal controls. In addition, the Chief Financial Officer significantly influences the evaluation of the head of the Office of Auditing, and makes compensation recommendations for him. This decreases the independence and effectiveness of the internal audit function and is inappropriate.

With respect to key person dependencies, we found that the Chief Financial Officer also serves as the Chief Risk Officer of Fannie Mae, and is directly responsible for overseeing the Enterprise's Treasury and Portfolio Management functions, in addition to the Controller's Department. **The combination of these responsibilities does not provide the independence necessary for an effective Chief Risk Officer function.** We further found that Mr. Howard was instrumental in setting financial targets as Vice Chairman, and had the authority to meet these targets as Chief Financial Officer.

Additionally, we found inherent conflicts in the roles assigned to key managers and executives. For example, Janet Pennewell, Senior Vice President for Financial Reporting and Planning, has the ability to affect the amounts of reported net income in order to achieve results that her group forecasted. In the critical area of purchase premium and discount amortization, the Special Examination found that one director, Jeff Juliane, has responsibility for modeling, reporting, and accounting.

Fannie Mae's dysfunctional accounting policy development, key person dependencies, and poor segregation of duties were major contributors to the accounting failures and the safety and soundness problems detailed in this report.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**ACCOUNTING FOR PURCHASE DISCOUNT AND PREMIUM AND OTHER DEFERRED PRICE ADJUSTMENTS UNDER SFAS 91**

OFHEO has concluded that Fannie Mae's accounting for the amortization of purchase premiums and discounts on securities and loans as well as the amortization of other deferred charges was not in accordance with Generally Accepted Accounting Principles ("GAAP").

Specifically, the Enterprise's method of recording adjustments for the difference between the cumulative life-to-date amortization (which was based upon the previous estimated lives) and what that amortization should be (based upon current estimated lives of the underlying mortgage assets) does not comply with the requirements of Statement of Financial Accounting Standards Number 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases* (SFAS 91). The Enterprise's determination of prospective amortization also does not comply with GAAP.

SFAS 91 is highlighted as a critical accounting policy in the Enterprise's 2003 Form 10K filed with the Securities and Exchange Commission. The MD&A section of the Form 10K details Fannie Mae's underlying application of amortization as it relates to SFAS 91, and also explains that the accounting estimates associated with amortization of deferred price adjustments are "critical accounting estimates."

Despite its importance to the Enterprise's financial statements and despite the requirement to formulate best estimates in good faith, Fannie Mae intentionally developed accounting policies, and selected and applied accounting methods, to inappropriately reduce earnings volatility and provide management with the flexibility to determine the amount of income and expense recognized in any accounting period. In this regard, Fannie Mae developed policies and methods to create a "cookie jar" reserve. More specifically, management of the Enterprise:

- Failed to apply the accounting treatment required by SFAS 91 to REMIC[1] securities held in its portfolio until 1998, even though SFAS 91 became effective in 1988.

- Inappropriately deferred $200 million of estimated expense in 1998, and established and executed a plan to record this expense in subsequent fiscal years. Furthermore, the deferral of such amount enabled management of the Enterprise to receive 100% of their annual bonus compensation. Without such deferral, no bonus would have been paid out.

- Undertook a concerted effort to develop and adopt accounting policies that would enable the Enterprise to spread income or expense over multiple reporting periods.

- Applied a materiality threshold to estimated income and expense, within which the Enterprise could avoid making adjustments that would otherwise be required under SFAS 91.

---

[1] Real Estate Mortgage Investment Conduit, as defined by Barron's Dictionary of Finance and Investment Terms 2003, is a pass through vehicle created under the Tax Reform Act of 1986 to issue multi-class mortgage backed securities.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- Made discretionary adjustments to the financial statements, for the sole purpose of minimizing volatility and achieving desired financial results.

- Forecasted and managed unrecognized income and expense to measure and maintain a "cookie jar" reserve.

- Recorded reconciliation differences and other errors as 'phantom assets and liabilities'. These phantom assets and liabilities were then amortized in accordance with a 30-year conventional mortgage proxy life.

- Developed estimation methods that were inconsistently applied to retrospective and prospective amortization.

- Applied discretion to the selection of market rate assumptions in order to achieve desired accounting results.

- Developed and effected capabilities to iteratively generate and evaluate estimates under varying assumptions, in order to obtain desired outcomes.

- Incorrectly and inconsistently applied adjustments to the estimate of amortization.

- Failed to properly investigate an employee's concerns regarding illogical or anomalous amortization results, and allegations of an intent to misstate reported income.

- Tolerated significant weaknesses in internal controls that undermined control objectives, maintained inadequate segregation of duties, and impeded the review and oversight of accounting processes and results.

### *Requirements of SFAS 91*

SFAS 91[2] was issued to establish consistent accounting for nonrefundable fees and costs associated with lending activities.  The scope of SFAS 91 includes premiums, discounts, and other deferred purchase and guarantee fee price adjustments (collectively "deferred price adjustments"), and requires that they be recognized as an adjustment to income using the effective yield method.  This method requires that a company estimate a constant effective yield for (e.g., loans and mortgage-backed securities (MBS)) each time a company reports its financial results.

The accounting standard requires that purchases of loans and MBS be recorded at the net purchase price, taking into account premiums, discounts and other deferred purchase and

---

[2] Statement of Financial Accounting Standards No. 91 Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases, effective December 1988.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

guarantee fee price adjustments.[3]  These price adjustments are recognized as an adjustment of yield over the life of the loan or security.  In determining an estimate of the appropriate adjustment of yield, a company would need to consider the anticipated rate of prepayment for the associated loans and securities to the extent they are subject to prepayment.[4]

In addition, if a difference arises between the prepayments anticipated and the actual prepayments experienced, the effective yield must also reflect the actual payments to date, and a new estimate of anticipated future payments needs to be made. The difference between the revised estimate of amortization and the actual recorded amortization is required to be booked as an adjustment to interest income immediately. SFAS 91 also requires disclosure of anticipated prepayments and significant assumptions underlying the prepayment estimates.

The key phrase in the guidance for SFAS 91 is the term "constant effective yield." This means, for instance, assuming no changes in the estimated life of an instrument, that the effective yield on an investment would be the same for each reporting period in the life of the instrument. The guidance on this process is also provided by SFAS 91 as follows:

> Except as stated in the following sentence, the calculation of the constant effective yield necessary to apply the interest method shall use the payment terms required by the loan contract, and prepayments of principal shall not be anticipated to shorten the loan term.  If the enterprise[5] holds a large number of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated, the enterprise may[6] consider estimates of future principal prepayments in the calculation of the constant effective yield necessary to apply the interest method.  If the enterprise anticipates prepayments in applying the interest method[7] and a difference arises between the prepayments anticipated and actual prepayments received, the enterprise shall recalculate the effective yield to reflect actual payments to date and anticipated future payments.  **The net investment in the loans shall be adjusted to the amount that would have existed had the new effective yield been applied since the acquisition of the loans.  The investment in the loans shall be adjusted to the new balance with a corresponding charge or credit to interest income.** [Emphasis added]  Enterprises that

---

[3] Guarantee fee price adjustments include "buy-ups" – negotiated up-front cash disbursements from the Enterprise to lenders in return for a higher Enterprise guarantee fee, and "buy-downs" – up-front cash receipts from lenders in return for a lower Enterprise guarantee fee.

[4] A mortgage is typically subject to prepayment.  Most of the loans and securities held by Fannie Mae are mortgage related and therefore are subject to prepayment.

[5] In this context enterprise is used generically and does not refer specifically to Fannie Mae.

[6] Alternatively, if an enterprise chooses *not* to use estimates of prepayments, the amortization period could be the contract period (e.g., loan term).  However, if the contract period is used, large spikes in amortization could occur if the amortization period is shortened due to prepayment. For instance, if a loan prepaid early, all of the unamortized amounts would have to be immediately recognized in the income statement.
Because mortgages and mortgage-backed securities generally can be prepaid at any time, using the contract period could lead to significant fluctuations in amortization (for instance if rates fall precipitously and prepayments speed up due to refinancing) which makes this an unpopular option.

[7] "Interest Method" is terminology that also refers to the method for determining a constant effective yield.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

anticipate prepayments shall disclose that policy and the significant assumptions underlying the prepayment estimates.[8]

Thus, as time passes, new estimates of the estimated life of an instrument can be developed, and the amount of amortization needs to be changed both *retrospectively* (that is what is meant by the guidance above which states in part, "adjusted to the amount that <u>would</u> have existed had the new effective yield been applied since the acquisition of the loans") and *prospectively* (by changing the rate of amortization going forward).

The accounting guidance on how to estimate prepayments for purposes of calculating interest amortization is provided in question 52 in the Q&A on SFAS 91[9]:

> Q--If a lender meets the requirements of paragraph 19 for considering principal prepayments in calculating constant effective yield, what factors should be considered in estimating those principal prepayments?
>
> A--The lender should consider historical prepayment data in making its estimate of future prepayments.  Also, the lender should consider external information, including existing and forecasted interest rates and economic conditions and published mortality and prepayment tables for similar loans.  If periodic changes in estimates occur or actual prepayments are different from estimated prepayments, an adjustment will be necessary.

In a large mortgage portfolio, the accounting for amortization could lead to significant volatility for two reasons:

- SFAS 91 requires that adjustments should be recorded into income when the estimated amortization period changes.  This is significant because the amount of such adjustment is a *<u>cumulative life-to-date</u>* amount.

- The estimated life of a mortgage loan or mortgage-backed security fluctuates constantly due to changes in interest rates, changes in forecasts of prepayments and other factors.

**In subsequent sections of this report we will demonstrate how Fannie Mae established an amortization policy that would allow the Enterprise to avoid current period volatility, and would further provide management with the latitude to shift income and minimize the potential for prospective volatility.**

A hypothetical example of the application of SFAS 91 was provided to the Audit Committee of the Board of Fannie Mae on November 17, 2003 by Ms. Leanne Spencer, SVP Controller.[10]  The

---

[8] SFAS 91, Application of the Interest Method and Other Amortization Matters, paragraph 19.
[9] "A Guide to Implementation of Statement 91 on Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases:  Questions and Answers", published by the FASB
[10] Fannie Mae Audit Committee Update, Critical Accounting Policy, Deferred Price Adjustments, by Leanne Spencer, November 17, 2003, FMSE 015610-015623
It should be noted that, pursuant to SFAS 91, prepayment can only be forecasted for a pool of loans. A single security has been used for this illustration as an example only.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

example is based upon a $100,000 loan that is purchased at a 2% discount. The discount of $2,000 would be recorded as additional interest income over the estimated life of the loan with an offsetting increase to the recorded amount of the loan.

Table 1 of the example below shows how the constant effective yield method of amortization would translate into amortization of the discount over the originally estimated life of the loan.

Table 2 of the example is based on an assumption that at the end of the fifth year the estimated life of the instrument is shortened from 10 years to 7 years. This table shows what the amortization would have been if the estimated life of the instrument had *originally* been estimated to be 7 years. The difference between the two "Inception to-date" amounts of amortization at the end of the fifth year is the amount of income to be recognized ($1,587-$1,400 = $187). In addition, the future amortization periods in table 2 show that there are only two more years of amortization to be recorded, and that the amounts to be recorded (in years 6 and 7) have been adjusted accordingly.

## Table 1                                    ## Table 2

| Original Est. Life | Discount Amortization | Inception to-date | Effective Yield | | Adjusted Est. Life | Adjusted Discount | Inception to-date | Effective Yield | | Inception to-date adjustment |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $333 | | 6.4618% | | 1 | $373 | | 6.5030% | | |
| 2 | $308 | | 6.4618% | | 2 | $347 | | 6.5030% | | |
| 3 | $282 | Inception to-date | 6.4618% | | 3 | $319 | Inception to-date | 6.5030% | | Inception to-date adjustment |
| 4 | $254 | | 6.4618% | | 4 | $290 | | 6.5030% | | |
| 5 | $224 | $ 1,400 | 6.4618% | | 5 | $258 | $1,587 | 6.5030% | | $187 |
| 6 | $192 | | 6.4618% | | 6 | $225 | | 6.5030% | | |
| 7 | $158 | | 6.4618% | | 7 | $189 | | 6.5030% | | |
| 8 | $122 | | 6.4618% | | | | | | | |
| 9 | $84 | | 6.4618% | | | | | | | |
| 10 | $43 | | 6.4618% | | | | | | | |

*Presentation to Fannie Mae Audit Committee: Critical Accounting Policy, Deferred Price Adjustments, by Leanne Spencer dated November 17, 2003, FMSE 015610-015623*

The $187 in this example is calculated as the difference between the cumulative life-to-date amount of interest amortization of $1,400 (what was already recorded based upon a previous estimated life of 10 years) and what the amortization should be: $1,587 (based upon the new estimated life of 7 years).

As mentioned previously, SFAS 91 requires that the amount of amortization income or expense for prior periods caused by a change in the set of assumptions be recorded into income *immediately* (in this example $187 needs to be recorded at the end of year 5).

We have used the information in the tables above to chart the effect that this would have on the discount amortization:

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited



**Accounting Example - Level Yield with Catch-Up**

As the graph above shows, the recording of the $187 of retrospective amortization in the year that the estimated life is shortened from 10 years to 7 (in this case year 5) significantly increases the volatility of the amount of amortization.  OFHEO has concluded that this is exactly the type of volatility that Fannie Mae was trying to avoid in designing their amortization policy.[11]

---

[11] OFHEO Interview, Ms. Janet Pennewell, VP Financial Reporting & Planning, June 15, 2004, pp. 16-18
Q: What is arbitrary volatility in earnings?
A: Arbitrary volatility, in our view, was introduced when--I can give you an example of what would cause, in our view, arbitrary volatility. If your constant effective yield was dramatically different between one quarter and the next quarter because of an arbitrary decision you had or view--changing your view of long-term interest rates that caused a dramatic change in the constant effective yield that you were reporting, you could therefore be in a position where you might be booking 300 million of income in one quarter and 200 million of expense in the next quarter, introduced merely by what your assumption about future interest rates was. And to us that was arbitrary volatility because it really just literally because of your view, your expectation of interest rates and the way that you were modeling your premium and discount constant effective yield, you would introduce something into your financial statements that, again, wasn't very reflective of how you really expect that mortgage to perform over its entire expected life, and was not very representative of the fundamental financial performance of the company.
OFHEO Interview, Mr. Tim Howard, EVP Chief Financial Officer, August 5, 2004, pp. 120-121
Q: Do you have a specific understanding of the individual that approved this policy for the company?
A: Well, again, it would have been Jonathan Boyles who would have been our subject matter expert. Leanne technically approved it as the Controller, and I concurred. KPMG also reviewed this and opined that it was GAAP.
Q: So, specifically, this policy was recommended by Jonathan Boyles?
A: I'm not sure who recommended it. I was involved in the development of the policy. There was a lengthy process where we looked at many different ways to deal with the fact that estimating the life of a

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

*Policy and Infrastructure Development*

**Events of 1998 and 1999**

*Fourth Quarter of 1998*
The genesis for many of Fannie Mae's philosophies, policies and methods began at a time of financial stress for the American economy.  In the third quarter of 1998, the Russian Financial Crisis (among other things) caused dramatically lower interest rates.  The resulting interest rate environment increased the propensity of consumers to prepay their existing home mortgages and refinance them at more favorable rates.

The following chart illustrates the dramatic shift in rates during 1998:



*Federal Reserve US H15 T Note Treasury Constant Maturity 10 Year    Source: Bloomberg*

The manifestation of faster prepayments adversely impacted the Enterprise. The impact of changing rates of prepayments on deferred price adjustments is a function of cumulative life to date amortization itself, and whether prepayment rates are increasing or decreasing, and whether aggregate premiums are greater or lesser than aggregate discounts with respect to the associated loans and securities.[12]  Since prepayments were increasings, Fannie Mae's amortization models showed that an estimated expense of approximately $400 million had been incurred.  This estimated expense was the adjustment necessary to recognize the impact of

---

mortgage has inherent uncertainties, and we wanted to come up with a policy that was consistent with GAAP, that minimized the potential for introducing unnecessary volatility based on what, to me, would have been arbitrary assumptions that would change substantially over time and therefore not be reflective of the economic substance of the transactions being accounted for.
[12] Faster prepayments generally result in losses for a portfolio where aggregate premiums exceed aggregate discounts, and gains where aggregate discounts exceed aggregate premiums.  Slower prepayments have the opposite affect.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

changing prepayments on deferred price adjustments, consistent with the constant effective yield calculation required under GAAP. **Rather than recognizing the full amount of this estimated adjustment to income, Enterprise management decided to defer recognizing approximately one half (or $200 million) of the estimated expense.**[13] The $200 million was known within the Enterprise as the "*catch-up*". In both previous and subsequent reporting periods, differences between amounts estimated versus the amount previously recorded, were consistently referred to within the Enterprise as the catch-up. OFHEO has further concluded that Fannie Mae's methods for determining the catch-up were also inconsistent with the requirements of SFAS 91.

As described throughout this report, OFHEO has concluded that there a variety of reasons why the "catch-up" calculation **_would not_** produce results similar to those required by the retrospective adjustment required by SFAS 91. However, the term "catch-up" is used throughout this report in order to provided context and factual information related to the preliminary results of our examination.

In their testimony, management explained that the deferral of this expense was necessitated by limitations in models and insufficient infrastructure that caused the estimate of expense to be overstated. However, the Enterprise has not provided OFHEO with any credible analysis[14] which supports the recording of only half of the calculated catch-up amount. In fact, information received during the examination directly contradicts the explanations which management provided. Both Ms. Leanne Spencer, Controller, and Mr. Tim Howard, Chief Financial Officer indicated that one of the reasons for not recording the additional $200 million of amortization expense related to the fact that not all REMIC securities could be modeled individually.[15] In contrast, records provided to OFHEO indicate that, upon increasing the

---

[13] OFHEO Interview, Ms. Leanne Spencer, June 22, 2004, pp. 34-36
Q: What was the potential impact of the 200 million difference on earnings?
A: I would like to give you some background on 1998 –
Q: Sure.
A: [...] By the end of the year--by the end of the year, as we moved to the end of the year, we took an adjustment of over $200 million into our financial--into our financial statements. We had a remaining balance of approximately 200 million which our auditors were very comfortable with. We were very comfortable with. [...]
[14] Memorandum from Mr. Jeff Juliane to Ms. Leanne Spencer, Subject: Income Risks from Amortization Issues, dated July 14, 1999, FMSE-SP 003103.
[15] OFHEO Interview, Mr. Tim Howard, August 5, 2004, pp. 211-212
Q: You mentioned the inadequacy in the system or your ability to deal with the REMIC at the time. What's the relevance of that to the determination of the catch-up adjustment in '98?
A: We believed that the REMIC book – that the expense that needed to be booked to reflect expected amortization in the REMIC book was overstated based on the inadequacies of the system. We were in the process of undertaking a project to do loan level detail, or at least security class level detail of the REMIC book. And as we completed that, our basic instinct on the nature of that book turned out to be correct. And once we reflected that in actuals later on – don't know if it was '99; I think it was – that also proved out to be true. So that part was factually verified. The rest was situational.
OFHEO Interview, Ms. Leanne Spencer, June 22, 2004, pp. 34-37
Q: What was the potential impact of the 200 million difference on earnings?
A: I would like to give you some background on 1998 –
Q: Sure.
A: In 1998, particularly as relates to the second half of the year, interest rates were extremely volatile. You had global economic meltdown occurring, Russian financial crisis, so you had a very precipitous drop

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

percentage of REMIC securities which could be modeled, the amount of the catch-up expense amount actually *increased*.[16]

Lastly, in performing their audit of the Enterprise's 1998 financial statements, Fannie Mae's independent auditor, KPMG, identified the $200 million deferred expense (the unrecorded amount) as an audit difference.[17]

**Despite their insistence that the estimate of loss was overstated, Fannie Mae management nevertheless developed a strategy to record planned monthly on-top adjustments[18] to the financial statements to recognize the estimated $200 million deferred expense in the subsequent fiscal years 1999 and 2000.[19]**

---

in interest rates that occurred with a significant – significant effect on business was that you had a significant amount of prepayment occurring. So, this is what you had going on in the world. We found ourselves in a company at that point in time where our balances on our balance sheet as it relates to the portfolio, rates have been fairly stable. You moved into a big period of rate move, and we had a model at that point in time that had been developed, predated my involvement in the Controller's Department, but it was an early generation model that had been built to implement FAS 91, and it had limitations now for this period of time in terms of how the business had grown, how – how the business had grown, volatility in rates, the limitations that would even allow you to put good robust assumptions into it. So, it's the kind of second piece that we were dealing. And then there is a third piece relevant to this that we were dealing with as a company, in that we had some asset classes that had been had been allowed to be purchased for the portfolio, gone through all the pertinent reviews in terms of allowing the portfolio to begin to purchase REMIC to hold as an investment – as an investment class. We had good controls on the front end in terms of who could evaluate them and price them appropriately. We didn't have sufficient – we didn't have a sufficient infrastructure on the back end and in the model to be able to do a pristine FAS 91-type level yield calculation on this asset class, although it was something that we were working toward. So, there was a set of factors that were occurring in 1998. […]

[16] Fannie Mae PDA Catch-Up, FMSE-SP 000471. Note 2 to the analysis indicates that the amount of the catch-up expense on REMICS increased in June of 1999 by approximately $60 million from the prior month. Note 2 reads "Increased percent of REMIC book modeled." Such increase in the percent of the REMIC book modeled was corroborated by the testimony of Jeff Juliane on August, 31, 2004.
OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, pp. 245-246
Q: Now there's a Footnote 2 that relates to June of 1999 for the REMIC portfolio that indicates increased percent of REMIC book modeled. What does that refer to?
A: With [sic. What] that means is that prior to that, there were issues with getting cash flows passed back from Intex to the model, so that we were only modeling about 74 percent of all REMIC securities. And then when we – I think we increased it to approximately 90 percent at that point in time.
Q: And this increased the amount of negative catch-up?
A: Correct.
[17] OFHEO Interview, Ms. Leanne Spencer, SVP Controller, June 22, 2004, pp. 33-34
Q: Do you recall the nature of the premium discount amortization audit difference identified by KPMG?
A: Yes.
Q: Do you recall the amount?
A: Yes.
Q: And what was the amount?
A: Approximately 200 million.
[18] "On-top adjustments" represent adjustments made directly to the general ledger during the financial statements close process.
[19] OFHEO Interview, Ms. Janet Pennewell, VP Financial Reporting & Planning, June 15, 2004, pp 149-150

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Beyond the $200 million deferred estimated expense itself, the explanations provided by management, as well as documents provided to OFHEO, raise other issues.  First, if one accepted the Enterprise's rationale of estimation inaccuracy that existed at the end of the fourth quarter of 1998, then what about previous quarters?  Information obtained by OFHEO shows that catch-up amounts were calculated as far back as 1995.[20]  Furthermore, the catch-up exceeded $100 million as early as December 1996, and further exceeded $150 million for each of the three quarters prior to the fourth quarter in 1998.[21]  Consistent with managements explanation, the incremental effect to the catch-up does indeed appear to arise in the fourth quarter 1998; however, it seems to arise because that time period is the first time period in which *any* calculation of catch-up  for REMIC's was performed.[22]  **This information as well as other documentation[23] seems to indicate that the calculation of constant effective yield for REMIC securities had not previously been performed at all, even though SFAS 91 became effective in 1988.**

The second issue raised is one concerning the nature of the catch-up itself.  This issue will be further examined in subsequent sections of this report.

*Bonuses Awarded in 1998*

Fannie Mae compensation for executive officers involves several key components: 1) basic compensation, which includes base salary and other annual compensation; 2) Annual Incentive Plan (AIP) awards ("bonuses"), which link the size of the bonus pool to meeting annual earnings per share (EPS) goals; and 3) long-term incentive awards, which typically award substantial amounts of "performance shares" to executives if EPS and certain non-financial goals are met over a three-year period.

The Fannie Mae proxy statement for 1998 disclosed salary and annual bonuses to certain senior executives as follows:

---

Q: […] you had testified that in December of 1998 that you had experienced losses due to the changes in the interest amortization, but at that point there was an approximately 200 million catch-up that was a negative catch-up, correct?
A: That's my recollection, yes.
Q: A negative catch-up would be a deferred expense, correct?
A: Correct.
Q: Now, you indicated that there had been discussions with KPMG and there was an objective to try to cut that in half. And was the objective to try to cut that in half in one year or over a two-year horizon, or do you recall any time—
A: My recollection is over one year.
Q: Okay. Now, was that achieved through systematic, planned on-tops, or was it offset against other changes in the catch-up?
A: It was primarily--it was primarily achieved through a systematic, planned on-tops, but then in addition to those planned on-tops, we re-evaluated our catch-up position each quarter to see if either the composition of the book premium discount or changes in interest rates would have altered our position.
[20] Analysis document titled "Fannie Mae PDA Catch-up", dated October 6, 2000, FMSE-SP 002434.
[21] *Id.*
[22] *Id.*
[23] Memorandum from Mr. Jeff Juliane to Ms. Leanne Spencer, Subject: Income Risks from Amortization Issues, dated July 14, 1999, FMSE-SP 003103.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

1998 Salary and Bonus of Senior Fannie Mae Executives

| Officer | Title | Salary | AIP Award/Bonus |
|---------|-------|--------|-----------------|
| **James A. Johnson** | Chairman and CEO | $966,000 | $1,932,000 |
| **Franklin D. Raines** | Chairman and CEO Designate | $526,154 | $1,109,589 |
| **Lawrence M. Small** | President and COO | $783,839 | $1,108,259 |
| **Jamie Gorelick** | Vice-Chairman | $567,000 | $779,625 |
| **J. Timothy Howard** | EVP and CFO | $395,000 | $493,750 |
| **Robert J. Levin** | EVP, Housing and Comm. Develop. | $395,000 | $493,750 |

Source: Fannie Mae Notice of Annual Meeting of Stockholders, May 20, 1999

*1998 Earnings Per Share Targets*

Fannie Mae adopted EPS thresholds for annual bonuses in 1995 partly to bring that short-term, performance-based compensation measure into conformity with their long-term compensation plan, which was already EPS-based.[24]

For the year-ended 1998, the size of the annual bonus payout pool was linked to specific EPS targets, as follows: [25]

**Earnings Per Share (EPS) Range for 1998 AIP Corporate Goals**

$3.13   Minimum Payout
$3.18   Target Payout
$3.23   Maximum Payout

For Fannie Mae to pay out the *maximum* amount in AIP awards in 1998 (approximately $27.1 million), the Earnings Per Share would have to be $3.23.  If EPS was below the $3.13 minimum payout threshold, no AIP payout would occur.  Remarkably, the 1998 EPS number turned out to be $3.2309, a result that meant that Fannie Mae met the EPS maximum payout goal right down to the penny.

*Impact of 1998 Catch-up on Compensation* [27]

The annual EPS number is determined by dividing the net annual earnings by the average number of shares of common stock outstanding for the year.  Accordingly, the 1998 $3.23 EPS was derived by dividing the net income available to common shareholders ($3.352 billion) by the weighted average number of common shares outstanding (1,037 million).[26]

Notably, had net income available to common shareholders been reduced by $125 million, the EPS for 1998 would have fallen to $3.11[27]--below the minimum payout threshold.  As a result,

---

[24] FMSE 017772.
[25] *Id.*
[26] These figures include dilutive potential common shares. Fannie Mae 1998 Annual Report, Financial and Statistical Summary, p. 51.
[27] $3.227 billion of earnings ÷ 1,037 million shares

11

no bonuses would have been awarded. Alternatively, had net income been reduced even a relatively modest $50 million, the EPS would have been approximately $3.18.[28] In that instance, the overall bonus pool would have been reduced by approximately $9 million to $18 million. This would have resulted in a corresponding reduction in bonuses awarded to individual executive officers.

As it turns out, the unrecognized estimated $200 million negative catch-up was a pre-tax effect on net income.  Adjusted for taxes at the 35% statutory federal corporate income tax rate,[29] the after tax impact on net income – upon which calculations of EPS are made - was approximately $130 million.  **The tax affected amount of deferred expense therefore, only slightly exceeded the $125 million difference between no bonus being awarded and the maximum amount being awarded.**

*Recognition of 1998 "Catch-up" in 1999*
In 1999, the Enterprise began to record the scheduled on-top adjustments to recognize the $200 million negative catch-up.[30]  The objective of the plan was to recognize amounts sufficient to ensure that the catch-up did not exceed negative $100 million at the end of fiscal year 1999.[31]  Accordingly, the Enterprise determined to record monthly on-top adjustments to recognize estimated losses of $5 million and $2.9 million to Net Interest Income ("NII") and deferred price adjustments (in internal documents Fannie Mae refers to these adjustments collectively as "GFee", and this report adopts that convention) respectively.[32]  In addition to these planned on-tops however, the Enterprise also decided, during the course of the year, to write-off an additional $95 million "against NII as a reserve against future interest rate changes."[33]  This additional $95 million write-off was also scheduled monthly, such that the planned aggregate monthly adjustment to NII and GFee ultimately grew to $16.5 million.[34]

Such amounts are described in a July 1999 analysis.  The analysis shows the actual adjustments recorded to amortization as of June 1999 and the amount of forecasted adjustments through the remainder of the year.  The analysis clearly shows that the Enterprise had developed a plan to systematically record the $16.5 million of adjustments per month.  It should be noted that $16.5 million per month for twelve months totals to planned adjustments of $198 million.  This amount of planned adjustments is almost identical to the amount of catch-up not recorded as of the end of 1998.

---

[28] $3.302 billion of earnings ÷ 1,037 million shares
[29] Fannie Mae 1998 Annual Report, pp. 50-51, Notes to the Financial Statements, Note 6: Income Taxes. Further pursuant to this footnote, Fannie Mae is exempt from state and local income taxes.
[30] OFHEO Interview, Ms. Leanne Spencer, SVP Controller, June 22, 2004, pp. 55-56
Q: Now, in 1999, did you make scheduled adjustments as a result of the 200 million that was determined at the end of 1998?
A: Yes.
[31] Fannie Mae Controller, Leanne Spencer, acknowledged the reason for this objective.  OFHEO Interview, Ms. Leanne Spencer, June 22, 2004, p. 56.
Q: Now, it is our understanding that, in fact, KPMG was desirous of reducing that 200 million to a hundred million at least by the end of '99; is that consistent with your recollection?
A: It's consistent with my recollection.
[32] Monthly Summary of Amortization Adjustments, July 14, 1999, FMSE-SP 003102
[33] *Id.*
[34] *Id.*

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

In addition, in the notes to the aforementioned analysis, the following explanation is provided for the planned on-tops:

> Note- Per plan, a write-off of $95 million was to be taken to reduce our catchup [sic] in a systematic approach of $5 million a month for NII and $2.9 million a month for Gfee.  Subsequent to plan, an additional $95 million was to be written-off [sic] against NII as a reserve against future interest rate changes.[35]

As the note above shows, not only was the $200 million amount of catch-up that was deferred being recorded into the income statement in a systematic manner, but a portion of it was specifically referred to as a "reserve against future interest rate changes."  This note is the earliest indication that the Enterprise specifically intended to manage the catch-up position as a buffer to sudden changes in interest rates and the resultant volatility of amortization amounts. **The lesson the Enterprise learned in 1998 was clear: avoid having to record large amounts of unexpected catch-up expenses by actively managing the process of calculating amortization.**

But subsequent increases in interest rates overtook Fannie Mae's plans.  At the same time that the Enterprise was recording the monthly on-top adjustments, a rise in interest rates was having a favorable economic impact on Fannie Mae's catch-up position.  OFHEO was not able to determine the exact amount of planned NII and GFee on-top adjustments that were actually recorded during the year 1999.[36]  However, through the combination of on-top adjustments that were recorded and the changing economic environment, the amount of unrecognized catch-up had actually become a positive (deferred credit) amount of $84 million[37] by the end of 1999.


## Formulation and Adoption of Accounting Policy

### *Formulation of Accounting Policy*

During 1999 Fannie Mae management also began a prolonged and concerted effort to formulate a policy to manage the amortization of deferred price adjustments.  **Many of the policies considered, as well as those subsequently adopted, were inconsistent with GAAP, and were designed to provide earnings flexibility and minimize earnings volatility.**

---

[35] *Id.*

[36] An analysis of the catch-up position prepared by the Enterprise would seem to indicate that the amount of recorded adjustments was $158.0 million ($136.3 million through on-top adjustments, and $21.7 million applied as amortization factor change adjustments). Fannie Mae PDA Catch-up, April 10, 2000, FMSE-SP 000505.

[37] OFHEO Interview, Ms. Leanne Spencer, SVP Controller, June 22, 2004, p. 53
Q: And then you indicated at the end of 1999 they identified another audit difference that I believe was really the reversal of the $200 million effect, or was it something different?
A: No, I would describe that as different. I will kind of go back to time doesn't stand still, and as you do 365 or how many business days you have during your start, you're starting with a balance, you're rolling forward, rates are changing, prepayments are changing, new business coming on--is coming on in a different mix. So, there is a variety of factors that affects your recalibration and your reestimation process. But by the end of the year, it was $84 million positive.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

The effort was directed and overseen by Chief Financial Officer Mr. Tim Howard.  Policy analysis was performed for the most part by personnel within the controllers group, including active involvement by the Controller, Ms. Leanne Spencer.  Mr. Tom Lawler, Senior Vice President Portfolio Management,[38] was also part of the policy analysis team.  Beginning in the first quarter of 1999 and continuing throughout 2000 numerous memoranda regarding SFAS 91 policy recommendations were developed.  Many of these memoranda expressed – as an objective of policy formulation - the need to minimize the volatility of reported earnings.  Certain of these memoranda acknowledged the flexibility provided by the policies and methods proposed.[39]

**The specific recommended policy provisions within these memoranda varied as to their precise nature, and the empirical thresholds that would be applied. However, certain themes were consistently reflected within them, including policy recommendations that permitted the Enterprise:**

> **a. to not recognize estimated income or expense up to certain thresholds, and**

> **b. to defer the recognition of income or expense that exceeded recommended thresholds over a several year planning horizon**

**Such accounting methods are neither supported by SFAS 91 nor Generally Accepted Accounting Principles more broadly.  However, provisions of this nature were ultimately adopted as policy by the Enterprise in December of 2000.[40]**

One memorandum, dated September 23, 1999, proposed that estimated income be treated differently than estimated expense. [41]  In the case of estimated income, no adjustment to

---

[38] Mr. Tom Lawler was Senior Vice President of Portfolio Management at the time the policy analysis team was functioning.  In 2002, Mr. Tom Lawler was designated Senior Vice President of Corporate Financial Strategy.  OFHEO Interview Mr. Tom Lawler, June 24, 2004, pp. 7-9.

[39] Memorandum from Ms. Janet Pennewell, Vice President Financial Reporting, and Mr. Jeff Juliane, to Mr. Tim Howard, December 16, 1999, Subject: Catch-up Policy.  FMSE 217559 -217561.
One of several reasons provided for recommending a method of modeling the catch-up reads: "3) Due to system enhancements and increased analytics, we will be better positioned to forecast future catch-up behavior. This should provide the flexibility to adhere to a much more stringent standard while minimizing material catch-up swings recently experienced.  This policy acknowledges such changes and additionally maintains a cushion for income statement flexibility."
Attachment to email from Mr. Tim Howard, CFO, to Ms. Janet Pennewell, SVP Financial Reporting and Planning, November 25, 2000, Subject; Amortization.  Pennewell 08182004
A paragraph describing the proposed amortization strategy reads: "Today's configuration would give us a fair amount of leeway under the policy I envision.  We start out under our plus or minus $75 million range, so technically we wouldn't have to do anything for at least the first year.  However, if we wanted to 'get a leg up' on getting under the $75 million threshold three years out we could certainly justify getting started today.  Our policy would allow us to do $40 or $50 million this year-or even more.  (I wouldn't recommend it, but we <u>would</u> have the flexibility to do so)."

[40] Purchase Premium and Discount Amortization Policy, December 2000, FMSE 074523-074524

[41] Memorandum from Ms. Janet Pennewell, VP Financial Reporting & Planning, to Mr. Tim Howard, CFO, September 23, 1999, Subject: Policy on Purchase Premium/Discount Management, FMSE-SP 000106-000107.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

income would be taken if current interest rates were more than one standard deviation above the 5 year historical average.  Other memoranda dated May 4, 2000[42] and May 8, 2000[43] proposed that adjustments be determined by comparing the estimated catch-up to the calculated annual on-top adjustment. Both memoranda recommended that the estimate of quarterly catch-up be given different treatment depending on whether the calculated estimate was positive or negative.[44]  There is also no basis in SFAS 91, or in any promulgated accounting standard, that would support any of these accounting treatments recommended by management.

*Policy Adopted to Recognize Expense or Income Over Multiple Reporting Periods*
The first memorandum[45] that proposed a recommended accounting policy on the catch-up position was dated March 2, 1999, and was from the Controller to the Chief Financial Officer. This memorandum recommended that adjustments only be required in the current year, if the catch-up position exceeded +/-3.5% of projected annual revenue.  Otherwise, management would implement a plan to bring the balance down to 2% of annual revenue by the end of the *following* year.  Coincidentally, this threshold approximated the $200 million amount of estimated expense not recognized just two months prior.[46]  The previously referred to memorandum[47], dated September 23, 1999, alternatively recommended applying a similar $200 million threshold, but characterized it instead as 1% of *three* year cumulative revenue.[48]

---

[42] Memorandum from Mr. Jeff Juliane, Director Financial Accounting, to Distribution, May 4, 2000, Subject: Amortization/Catch-up Management Process, FMSE 217540.

[43] Draft Memorandum from Mr. Jeff Juliane to Distribution, May 8, 2000, Subject: Amortization/Catch-up Management Process, FMSE 217527.  This draft memorandum was subsequently distributed as an attachment to a memorandum dated September 15, 2000 from Ms. Janet Pennewell to Mr. Tim Howard, Subject: Amortization Policy.  In this distribution, the label "Draft" had been removed from the memorandum.

[44] Memorandum from Mr. Jeff Juliane to Distribution, May 4, 2000, Subject: Amortization/Catch-up Management Process, FMSE 217540-217544, states that "In any interim year, if the mean catch-up is less than the calculated annual on-top, the amount of on-top applied in that year will equal the mean catch-up. If the mean catch-up is the opposite sign as compared to the calculated on-top, no adjustment will be made.
Draft Memorandum from Mr. Jeff Juliane to Distribution, May 8, 2000 (with a handwritten note saying "draft for meeting with Tim on May"), FMSE 217527-217528, describes under "Catch-up Recognition" how the Enterprise plans to reach their "targeted catch-up": "A. If the spot estimate exceeded 2.5% of pre-tax income, we would accelerate the on-tops to ensure that we were less than the 2.5% target within 1 year. B. If the spot estimate exceeded 5% of pre-tax income, an immediate on-top adjustment would be taken to bring us within the 5% limit. C. If the spot estimate for any interim year is less than the calculated annual on-top, the amount of on-top applied in that year will equal the spot estimate. D. If the spot estimate is the opposite sign as compared to the calculated on-top, no adjustment will be made." OFHEO received this document in a final version labeled FMSE-SP 000019-000020.

[45] Memorandum from Ms. Leanne Spencer and Ms. Janet Pennewell to Mr. Tim Howard, Subject: Policy on Purchase Premium/Discount Management, March 2, 1999, FMSE-SP 000110-000111.

[46] *Id.,* The actual recommendation stated; "If the Catch-up exceeds 3.5% of projected annual revenue (currently about $200 million) we will take a write-off during the current calendar year to bring it below that level, and will implement a plan to bring the balance down to 2% of projected revenue by the end of the following year."

[47] Memorandum from Ms. Janet Pennewell to Mr. Tim Howard, September 23, 1999, Subject: Policy on Purchase Premium/Discount Management, FMSE-SP 000106-000109

[48] *Id.*

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Subsequent memoranda proposed even higher thresholds before an immediate adjustment to earnings would be required. The previously referred to memoranda[49] dated May 4, 2000, May 8, 2000, and September 15, 2000, recommended that immediate adjustments not be required until 5% of annual pre-tax income had been exceeded. 5% of annual pre-tax income was, at the time, approximately $300 million. This is an extremely large threshold considering that during the three years for which OFHEO has data, the quarterly *combined* deferred price amortization never exceeded $142 million (FMSE 184911, 184994, 185079, 184923, 185006, and 185092).[50]

Furthermore, in theory, if such a 5% threshold had been applied, quarterly changes in catch-up of up to $600 million income statement impact (+/- $300 million) could go unrecorded in any given quarter. This too is also extremely large considering that the quarterly change in purchased premium/discount and guarantee fee amortization reported by the Enterprise in its financial statements never exceeded $135.8 million[51] and $127.4 million[52] respectively, in any of the quarterly periods for which OFHEO has such information.[53]

The subsequent memorandum that sought to recommend these higher thresholds also recommended that adjustments be made over a one year horizon of time to reduce the catch-up to below a +/- 2.5% (approximately +/- $150 million) threshold.

Ultimately, in December 2000, the Enterprise established a policy[54] that had two provisions addressing the recognition of larger variances in catch-up over multiple reporting periods. These provisions are:

---

[49] Memorandum from Mr. Jeff Juliane to Distribution, May 4, 2000, Subject: Amortization/Catch-up Management Process, FMSE 217540, and Draft Memorandum from Mr. Jeff Juliane to Distribution, May 8, 2000, Subject: Amortization/Catch-up Management Process, FMSE 217527. This draft memorandum was subsequently distributed as an attachment to a memorandum dated September 15, 2000 from Ms. Janet Pennewell to Mr. Tim Howard, Subject: Amortization Policy. In this distribution the label "Draft" had been removed from the memorandum.

[50] Memoranda recommending accounting policy for deferred price amortization in 1999 and 2000 did not distinguish between purchased premium and discount amortization (which is recorded as a component of *Net interest income*) and guarantee fee amortization (which is recorded separately in the income statement as *Guarantee fees)*. Various Fannie Mae analyses prepared in conjunction with these memoranda, as well as early policy drafts (FMSE 217499), indicate that these combined amortization amounts would be applied when measuring against the applicable recommended threshold. The policy subsequently adopted in December 2000 (FMSE 074523) also specified that these components would be combined. However, the policy also stated *"Since the components of the total catch-up position are related to two different income statement line items, net interest income and Gfee, it is important to look at each component separately to determine whether an audit difference has occurred.* For the quarterly periods for which OFHEO has the relevant information (Q1 2001 through Q1 2004), the highest separate amounts of quarterly purchased premium/discount amortization and guarantee fee amortization were approximately $(151) million (FMSE 186045,186115, and 186186) and $244 million (FMSE 186053, 186123, and 186195) respectively.

[51] Change from Q4 2002 (FMSE 184911, 184994, and 185079) to Q1 2003 (FMSE 185164, 185244, and 185319).

[52] Change from Q4 2003 (FMSE 185835, 185907, and 185980) to Q1 2004 (FMSE 186053, 186123, and 186195).

[53] Q1 2001 through Q1 2004

[54] Purchase Premium and Discount Amortization Policy, December, 2000, FMSE 074523

16

    i.   If our catch-up moves beyond one, but within two percent of combined portfolio net interest and guarantee fee income, we will book monthly "on-top" adjustments that bring us back to within the plus or minus one percent range within our three year planning period.[55]

    ii.  Should our catch-up ever exceed two percent of the combined portfolio and interest guarantee fee income, however, we will bring it back to within the one to two percent range within a six month period.  After that time, we will continue our monthly "on-tops" to return the catch-up to the plus or minus one year range within the three year horizon.[56]

That policy adopted in December 2000, remains the Enterprise's official policy today.  In his testimony, Mr. Jonathan Boyles, Senior Vice President Financial Standards, acknowledged that these provisions were not consistent with GAAP.[57]  Even though the estimated $200 million expense in 1998 was deferred and recognized in subsequent periods, Mr. Boyles and other senior officers explained that neither of the above two provisions were ever used since this policy was adopted in December 2000.  However, it should be noted that the accounting treatment of the estimated $200 million expense in 1998 is similar (if not identical) to the same policies which Mr. Boyles stated would not be in accordance with GAAP.

Information gathered thus far in this Special Examination has not identified any instances since December 2000 where either of these two provisions had been used.  However, we have identified other practices employed by the Enterprise whereby adjustments that should have been recognized immediately, were instead deferred and recognized over multiple reporting periods. [See section *Capitalization of Amortization of Reconciliation Differences* for a discussion of the Enterprise's treatment of "realignment" differences.]

<u>Policy to Defer Income and Expense Up To Certain Thresholds</u>
Management's drive to formulate policy in 1999 and 2000 was fueled by management's surprise at the magnitude of the $400 million estimated expense at the end of 1998, by a determination to avoid audit differences,[58] and by the insistence of KPMG[59] that a policy be developed.  In

---

[55] *Id.*
[56] *Id.*
[57] OFHEO Interview, Mr. Jonathan Boyles, August 24, 2004, pp. 12-13 (with respect to Exhibit 9A: Purchase Premium and Discount Amortization Policy, FMSE 074523-074524)
Q: The first sentence of this paragraph states: If our catch-up moves beyond one within two percent of combined portfolio net interest in guaranty fee income, we will book monthly "on-top" adjustments that bring us back to within the plus or minus one percent range within our three-year planning period. Is that a provision that you recollect discussing with the outside auditors, KPMG?
A: I don't recall discussing that provision.
Q: Is that a provision that you had approved at all?
A: I don't recall approving it.
Q: Okay. In your opinion is that provision permitted under General Accepted Accounting Principles?
A: No, I don't believe that would be allowed.
Q: Okay. In your opinion is that provision permitted under General Accepted Accounting Principles?
A: No, I don't believe that would be allowed.
[58] OFHEO Interview, Ms. Leanne Spencer, August 12, 2004, pp. 87-90
Q: Now my question is what basis does the company – did the company have when they established this policy for believing that adding a de minimis [sic. minimus] amount onto the target range was appropriate

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

addition to the policy provisions that would permit the Enterprise to recognize greater estimated income or expense over time, the Enterprise also recommended and ultimately adopted thresholds within which estimated income or expense would not be recognized at all.  Indeed, such practice had already been an established part of the Enterprise's financial reporting, even prior to the 4th quarter of 1998.  During 1998, Mr. Jonathan Boyles was the individual within the Enterprise responsible for determining the amount of the catch up position.  In his testimony Mr. Boyles could not recall the catch-up ever being booked to zero during this timeframe.[60]  In a memorandum dated November 25, 2000 from Mr. Tim Howard to Ms. Janet Pennewell, that discusses the elements of proposed policy, Mr. Howard notes that KPMG was comfortable with

---

for GAAP? Was there some accounting standard or some understood practice within industry that would have provided that basis?

A: Are you asking – I'm just trying to be clear here so I can give you exactly what you need. Are you asking me why we considered a de minimis [sic. minimus] amount on top of the plus or minus 1 percent? This discussion occurred between Fannie Mae and KPMG at the same time that we were in discussions around what did or didn't constitute an audit difference. And what we were really trying to accomplish here with this document is to put things in writing and put things on paper so that we had an understanding and KPMG had an understanding of how we would operate in this framework. And so this was only put on here just for clarity and transparency. You probably know specifically – I can't recall, about the same time was there not a new – I don't know if it was an auditing standard or if it was an SEC standard, whereby all audit differences became a required part of conversations with the audit, you know, committee, or you know, this – you know where I'm going with this?

Q: Uh-huh.

A: And so what we were really trying to do, you know, I don't really like audit differences. I prefer not to have them. If there is something that needs to be corrected, I just want to post it.

Q: You wouldn't be the first company to have that feeling.

A: Pardon me?

Q: You wouldn't be the first company that had that feeling.

A: But that's how I feel. And so in a lot of putting this framework together, for our communication between Fannie Mae and KPMG to be very clear, and that we were going to operate within this policy, and I wasn't interested in having an audit difference. But since at the same time this new requirement in -- I can't remember what new requirement it was, but the new requirement around the discussion of audit differences, we were just trying to be clear about what constituted an audit difference. I never intended to have one. But we wanted to not wait for that. We wanted to be clear up front, and so just in terms of how you would operate within this policy and then tie that back to the other separate discussions we were having with them around – that I described to you, which this actually confirms what I was telling you earlier, pretax amount by 1 percent on adjustment [sic] that causes the net interest margin to move by a basis point, where it causes the fee rate to change by a tenth of a basis point. That's the earlier discussion that I was trying to describe to you.

[59] OFHEO Interview, Mr. Jonathan Boyles, August 24, 2004, p. 78-79

Q: During 1998, what was the company's policy for recording catch-up?

A: I don't recall there was a stated policy, and that was the issue that was raised with KPMG, They wanted a policy, and they wanted us to consistently apply a policy. And that was the genesis of the policy that we developed.

[60] OFHEO Interview, Mr. Jonathan Boyles, August 24, 2004, p. 79

Q: Do you recall whether or not the catch-up was booked to zero on a routine basis during that time?

A: I don't recall that it was ever booked to zero.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

a $100 million threshold going back to the mid-90's.[61] During 1999 and 2000, the informal policy of the Enterprise was to stay within a $100 million threshold.[62]

The memorandum dated March 2, 1999 recommended that the range, within which the Enterprise did not need to recognize income or expense, be +/- 1% of projected revenue.[63] The policy adopted in December 2000, was consistent with this recommendation; however, the policy further established separate thresholds for purchase premium and discount amortization, and guarantee fee amortization. The threshold for purchase premium and discount amortization was stated as +/- 1% of Portfolio Net interest income, while the threshold for guarantee fee amortization was stated as +/- 2% of related Gfee revenue. These thresholds were referred to as the target catch-up for both of these respective revenue items.[64] As embodied in the December 2000 policy Enterprise management considered any point within the respective target catch-up ranges as the "functional equivalent of zero."[65]

Superficially, these ranges within which estimated income or expense will not be recognized may seem immaterial. However, OFHEO has concluded that such target thresholds are inappropriate for many reasons:

- SEC Staff Accounting Bulletin (SAB) No. 99 takes a dim view of defining any threshold of immateriality (no matter how small), and then purposely accounting for those transactions in a manner that does not conform to GAAP.

- According to management, the threshold was established due to the uncertainty of forecasting interest rates and prepayments. However, the range that the Enterprise has employed is not expressed as a range around the amount of calculated catch-up, but rather a more or less fixed threshold that is determined by reference to revenue amounts (e.g. NII) that include significant activity unrelated to amortization.

---

[61] The attachment to an email from Mr. Tim Howard to Ms. Janet Pennewell, November 25, 2000, Subject: Amortization, states that "the second precedent is somewhat weaker but is KPMG's own – they were comfortable with a $ 100 million PDA threshold in the mid-90s, when our book was half the size it is today." Pennewell 08182004

[62] OFHEO Interview, Leanne Spencer, SVP Controller, June 22, 2004, p. 61.
Q: You said before there was roughly a hundred million dollar threshold.
A: I said that previously in when we were talking about inherent limitations of the model, what the model could do and couldn't do, that our auditors understood those limitations, and that it was an unwritten policy that was not documented, but it was an established practice we had in operating on our auditors that a plus or minus 100 million represented the acknowledgement of the imprecision that exists in this estimation process in connection with our model.

[63] Memorandum from Ms. Leanne Spencer and Ms. Janet Pennewell to Mr. Tim Howard, Subject: Policy on Purchase Premium/Discount Management, March 2, 1999, FMSE-SP 000110-000111.

[64] Purchase Premium and Discount Amortization Policy, December 2000, FMSE 074523-074524.

[65] OFHEO Interview, Ms. Janet Pennewell, June 15, 2004, pp.48-49
Q: So getting back to the plus or minus 1 percent threshold, which I understand you also called a target range, but if you are within that target range, policy doesn't require you make an adjustment, and in fact you may leave the amounts as you have recorded them during and through the quarter, correct?
A: That's correct.
Q: And you've also said that it's the – that the nature of the range is that it's the functional equivalent of zero?
A: Right. That's a phrase that we used for it, because again, that's our view as the level of precision in our estimate.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- The Enterprise's justification for such thresholds contradicts the basis for their election to change the amortization periods used from periods based upon contractual terms to estimated periods, which incorporated forecasts of prepayments.

- The thresholds are based upon _annual_ income statement amounts, but are then applied in determining whether adjustments should be made to the _quarterly_ financial statements.

- The thresholds are so large relative to the amounts of deferred price adjustment amortization that the retrospective adjustments required by SFAS 91 are unlikely to occur.  As such, the Enterprise has effectively ignored this requirement of the standard by spreading income and expense due to normal market fluctuations over future periods.

- The Enterprise has provided no analysis which could separate what they have described as "artificial volatility"[66] from the actual market volatility of a mortgage portfolio.

- The range of the threshold is significantly larger than the amount of actual quarterly amortization and, in most cases, is almost as large as the amount of annual amortization.

- The Enterprise applied a different threshold to net interest income (NII) and guarantee fees (Gfee) despite the fact that both NII and Gfee are exposed to interest rates and prepayments in a similar manner.

In their testimony, members of Fannie Mae management have contended that the target range thresholds were necessitated by the uncertainty and imprecision associated with estimating the amortization of deferred price adjustments pursuant to the calculation of constant effective yield that was required by SFAS 91.

This line of reasoning on the part of management can be rejected on several grounds:

   a. There is no basis of support either from a statistical standpoint or within Generally Accepted Accounting Principles for applying a range of uncertainty in this manner. The catch-up position for each respective source of revenue represents the

---

[66] OFHEO Interview, Mr. Tim Howard, August 5, 2004, pp. 187-188 (referring to Exhibit 8, Note for Janet Pennewell from Tim Howard, October 27, 1999, FMSE 217558).
Q: […] Then the next paragraph reads, "I then attempted to use our projected PDA sensitivities to ask 'where would we like our PDA to be' in order to minimize the amount and frequency of PDA adjustments we would have to make as interest rates moved (as we know they will)." The question that I have for you is – well, actually, I have several questions. The first question is: Would you understand that FAS 91 would actually attempt to capture the volatility that would arise in both retrospective and prospective changes to purchase premium/discount interest amortization that would result from changes in interest rate fluctuations and result in changes in prepayments?
A: Yes. And this is a shorthand that I think not really accurately worded formulation. The attempt was never to minimize economic sensitivity. This is always in the context of not having our assumptions drive artificial volatility, so that's what we were talking about.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

difference between 1) an amortization amount that was recorded during the quarter based upon assumptions made at the *beginning* of that quarter, and 2) an amortization amount estimated at the *end* of the quarter that uses the latest available information on current interest rates and actual prepayments experienced.[67] Imprecision and uncertainty indeed exist when making estimates. **However, the Enterprise is using this uncertainty and imprecision to rationalize why it need not recognize changes to income that simply result from fluctuations in market rates that occur naturally over time.**

b.   The Enterprise's treatment of estimation uncertainty was not consistently applied, even *within* the accounting framework for deferred price amortization itself. Determining a constant effective yield in accordance with SFAS 91 requires both a retrospective (historical) and prospective adjustment based on the revised estimated amortization period due to changing rates of prepayments. Fannie Mae's objection to uncertainty seemed confined only to the immediate financial statement impact of the estimate. In fact, estimation uncertainty did not prevent Fannie Mae from adjusting the prospective amortization period of both discounts/premiums and guarantee fees in accordance with its revised estimate of prepayment speeds.

---

[67] OFHEO Interview, Ms. Janet Pennewell, June 15, 2004, pp. 46-48.

Q:  And only if the difference is 1 percent plus or minus do you make an adjustment. Otherwise you use what you've booked previously?
A:  That would be true, yes.
Q:  Now, why is what you booked previously a better estimate than the sensitivity analysis that you would perform at quarter end?
A:  Well, what we're really saying is that because we don't exactly know what prepayments are going to do in the future, that you cannot know what your--how much you should have booked in the past with precision, and that that range of plus or minus 1 percent is meant to recognize the fact that you don't know with precision what your prepayments are going to do, and so therefore, you don't know with precision exactly how much you should have booked inception to date. So to say that--within a range, to say that--because it's kind of all the same, that's as close as you can get. It's just to recognize the degree of imprecision in coming up with that estimate position, because it is an estimate until you know exactly what prepayments are going to be in the future.
Q: I agree that it's subject to uncertainty, but when you're within the 1 percent threshold or when the difference is in the 1 percent threshold, why would what you booked previously be a better estimate than your latest modeling?
A:  It's not necessarily a better--as good of an estimate than to us it is within what we call—we actually the term functional equivalent of zero to say, yeah, that's what our estimate is. Our estimate is a number within this range. That's as close as we can estimate it. It's kind of like—I always kind of think of it as polling error, so if you see a poll that says, you know, John Kerry's behind by 9 points, however our polling error is plus or minus 4 percent, so it's really not as close as it sounds. You've got polling error here. There are just certain aspects that you don't know with precision, and therefore there is not a precise number. And you'd fool yourself if you treated it as if there was a precise point in time number. There isn't.
Q: So because there is uncertainty, you in effect default to what you had previously booked as long as you're within the threshold?
A:  Because what we previously booked, in the example that you give, where what we previously booked is within our range of what we think is exactly what we should have booked, that's as close as we can calculate the number. And we're saying what we did book was the correct amount to have recorded.

21

Fannie Mae personnel fully understood the prospective nature of their policy in their own characterization of their method for managing the catch-up position.  An undated and unsigned document[68] provided by the Enterprise discusses a suggested defense to possible challenge by KPMG of the Enterprise's proposed amortization policy. The document states:

> We have traditionally used a prospective approach because it reduces our income statement volatility; we don't want to be placed in a position where we are booking a positive number one quarter and negative the next.

A memorandum from Mr. Tom Lawler dated April 2000 further states:

> We currently employ what I would call a 'modified prospective method' in determining the premium or discount amortization to be booked to current income.  By that I mean that we do not manage our 'catch-up' position to zero each quarter.....It is a 'modified prospective method', however, in that if our catch up moves beyond a certain threshold, we then periodically may take a one-time adjustment into income to lower the catch up amount to a 'manageable' number.[69]

A prospective approach to adjusting income recognition on the amortization of deferred price adjustments is an explicit contravention of the requirements of SFAS No. 91.  This accounting standard requires that the determination of constant effective yield be adjusted for the historical 'inception to date what-if' (retrospective) impact of changes in prepayment speeds each reporting period.

c.  The Enterprise's rationale for the catch-up threshold because of uncertainty[70] in estimation calls into question their ability to elect to estimate prepayments (pursuant to the requirements of SFAS 91.)  As mentioned previously in this report, FAS 91 requires that the amortization of deferred price adjustments be made over the contract life[71] (e.g., 30 years for a 30 year MBS.)  However, such accounting could cause significant volatility in certain market environments.  For instance, a large drop in interest rates could lead to a wave of prepayments.

---

[68] Undated and unsigned document, Titled Proposed Amortization Policy, FMSE 217504 –217505.
[69] Undated and unsigned document, Titled Suggested Amortization Strategy, FMSE 217556-217557. This document has a handwritten note that indicates "from Tom April 00".  In his testimony Mr. Tim Howard provided information regarding the sender of the document;
Q: Okay, I'd like to introduce into the record Exhibit 11.
A: I can tell you just from the style that this would have been written to somebody from Tom Lawler.  I don't know if you knew that.  It does say "from Tom".
[70] The Enterprise's rationale of uncertainty includes not only the designation of the target catch-up range, but also the estimation methods to determine the catch-up.  See Appendix I.
[71] Except as stated in the following sentence, the calculation of the constant effective yield necessary to apply the interest method shall use the **payment terms required by the loan contract** [Emphasis added], and prepayments of principal shall not be anticipated to shorten the loan term. SFAS 91, p. 19.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Under such conditions, previously unamortized amounts would be immediately recorded into income.

For large pools of similar loans, SFAS 91 provides an elective to companies that are seeking to avoid such volatility by including a forecast of prepayments in the determination of an estimated amortization period.  The particular wording of this elective is as follows:

> **If the enterprise holds a large number of similar loans for which prepayments are probable and the timing and amount of prepayments can be reasonably estimated** [Emphasis added], the enterprise may consider estimates of future principal prepayments in the calculation of the constant effective yield necessary to apply the interest method.[72]

As such, the Enterprise's justification of large target thresholds based on the uncertainty of estimating prepayments does not reconcile to the elective in SFAS 91 which requires that "prepayments can be reasonably estimated.[73]"  **As such, OFHEO has concluded that the Enterprise's adoption of a policy which establishes a threshold for recording adjustments to deferred price amortization is a violation of GAAP.**

d.  Fannie Mae's treatment of estimation uncertainty is not consistent with the Enterprise's own treatment of other critical accounting estimates.[74]  In addition to the amortization of deferred price adjustments, the Enterprise's Form 10K, filed with the SEC, identifies three other critical accounting estimates:[75]

  i.  Determining the adequacy of the allowance for loan losses and guarantee liability for MBS;
  ii.  Estimating the time value of purchased options; and
  iii.  Assessing other-than-temporary impairment.

The Form 10K states that *all* of the critical accounting estimates "require significant management judgment and assumptions about highly complex and uncertain matters."[76] Yet, none of these other accounting estimates are determined in accordance with methods analogous to the 'target catch-up range' that is applied to the amortization of deferred price adjustments.  In their testimony to OFHEO,

---

[72] *Id.*
[73] *Id.*
[74] Fannie Mae Controller Ms. Leanne Spencer commenting on other critical accounting estimates. OFHEO Interview, Ms. Leanne Spencer, August 12, 2004, pp. 95-96.
Q: I just wanted to continue discussion around the purchase premium discount amortization policy.  I think you have testified previously that you do not apply a target range to other accounting estimates of the company; is that correct?
A: I can't recall an area where we do.
[75] Fannie Mae 2003 Annual Report, pp. 39-40.
[76] *Id.*, p. 40.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

officers of the Enterprise alternatively explained that the uncertainty associated with estimating deferred price amortization would give rise to "artificial" [77] or "spurious" volatility[78] of reported financial results.  Many readers of this summarized report will understand that estimation uncertainty in statistical parlance refers to how *accurate* an estimate may be.  But accuracy, in this context, is referring to an amount calculated at a point in time.  Volatility, however, refers to the degree of change between an estimate made in one quarter, and the estimate made either the previous or following quarter.  Therefore, uncertainty in accuracy and uncertainty in volatility are two different things.  For example, a watch may be inaccurate because it is set 10 minutes ahead.  However, that watch, all other things being equal, will still correctly mark the passage of three hours.  While the Enterprise did prepare analysis that purported to demonstrate the extent of uncertainty associated with determining an estimate of deferred price amortization,[79] **OFHEO is not aware of any analysis ever prepared that demonstrates the existence, nature, or magnitude of any 'artificial' or 'spurious volatility' associated with estimating deferred price amortization. [80]**

Further undermining the argument of linkage between policy development and the manifestation of spurious volatility was the inability of Fannie Mae officers to explain why the target catch-up range for purchase premium/discount amortization (+/- 1%) was different from the target catch-up range for guarantee fee amortization (+/-2%).[81]  Furthermore, the

---

[77] OFHEO Interview, Ms. Janet Pennewell, June 15, 2004, p. 18.
Q: So isn't there actually some volatility in the business that you're in?
A: That's true. There certainly is volatility in the business that we're in, and certainly one would expect some volatility therefore in the premium and discount amortization that you're reporting. And what I was focused on was, what I really want to be very clear on is, artificial volatility. In other words, dramatic changes on what you're recording to income through FAS 91 because of what could be arbitrary changes in your assumption about interest rates. […]
[78] OFHEO Interview, Mr. Tom Lawler, June 24, 2004, pp. 127-128.
A: […] what we have first on the core data and modeling, we have some core uncertainties about the accuracy of the results, and sometimes there is the arbitrary nature of the date of the sensitivities we do, and we felt that in looking at the results swings that, in our mind, were spurious in nature or related to-- unrelated to anything fundamental would be such that we would not want to, I believe the word they use here is book, although I don't do any booking.
[79] Memorandum from Mr. Jeff Juliane to Mr. Tim Howard, June 21, 2000, Subject: Amortization Policy Runs.  FMSE 217521- 217526.
[80] Fannie Mae officer Mr. Tom Lawler commenting on deferred price amortization.  OFHEO Interview, Mr. Tom Lawler, June 24, 2004 p. 149.
Q: How did the company conclude that the inaccuracy in the modeling translated into spurious volatility?
A: How did we know for a fact that it created spurious volatility?
Q: Yes.
A: I don't know that I could demonstrate for a fact that it created spurious volatility.  It was based on analysis sensitivities and time where we saw that, that the conclusion was that we felt it did, it could create spurious volatility.
Q: And did anyone at the time prepare an analysis or paper attempting to demonstrate that at the time?
FANNIE MAE COUNSEL: What time are we talking about?
Q: At the time you were formulating the policy at the 1 percent threshold.
A: I don't believe so.
[81] OFHEO Interview, Jonathan Boyles, August 24, 2004, pp. 34-35.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

respective target catch-up ranges are each expressed in a curiously different manner. The +/- 1% portfolio NII target catch-up range for purchased premium and discounts is expressed as and determined on a *tax equivalent basis*, while the +/- 2% guarantee fee target catch-up range is expressed on a basis not adjusted for taxes. Indeed, the income tax treatment of these respective revenue amounts is in fact different. However, since both revenue amounts are reported in the financial statements before tax, modifying the threshold to reflect NII on a tax-equivalent basis would only be relevant to managing after tax net income or EPS. This convention would seem to have no relevance whatsoever to the issues of either estimation uncertainty or volatility of pre-tax reported financial results.

Could the motivation for focusing on estimation uncertainty have been a means to justify the application of a materiality threshold? In their response to requests for information made by OFHEO, the Enterprise responded that the basis for justifying the magnitude of the target catch-up range was an analysis prepared on June 21, 2000.[82] However, a memorandum[83] dated March 2, 1999 proposed a plus or minus 1% target catch-up well before the analysis dated June 21, 2000 was prepared.

A memorandum[84] dated April 2000 that Mr. Tim Howard testified was from Mr. Tom Lawler, explicitly refers to measures of materiality as the basis for determining the magnitude of target catch-up thresholds. A memorandum[85] dated September 23, 1999, from Ms. Janet Pennewell, Vice President Financial Reporting,[86] to Mr. Tim Howard devotes a section consisting of two paragraphs that discuss materiality. The first paragraph argues that it "may be appropriate to adjust the catch-up over time if the amount is not material,"[87] and even suggests that "since catch-up relates to the entire period since the mortgages/fees were put on the books, one could

---

Q: Do you have an understanding as to why the target catch-up for purchase discount and premium amortization is plus or minus one percent and why alternatively for guaranty fee income, it's plus or minus two percent?
A: I don't recall why there is a difference.
Q: Do you recall seeing any analysis that would have demonstrated that the estimation of guaranty fee income is subject to greater uncertainty than purchase premium discount amortization?
A: I don't recall an analysis.
[82] Memorandum from Mr. Jeff Juliane to Mr. Tim Howard, June 21, 2000, Subject: Amortization Policy Runs. FMSE 217521-217526.
[83] Memorandum from Ms. Leanne Spencer and Ms. Janet Pennewell to Mr. Tim Howard, Subject: Policy on Purchase Premium/Discount Management, March 2, 1999, FMSE-SP 000110-000111
[84] Unsigned document, Titled: Suggested Amortization Strategy, FMSE 217556-217557. This document has a handwritten note that indicates "from Tom April 00."
[85] Memorandum from Ms. Janet Pennewell to Mr. Tim Howard, dated September 23, 1999, Subject: Policy on Purchase Premium/Discount Management, FMSE-SP 000106-000109.
[86] Ms. Janet Pennewell was Vice President of Financial reporting at the time this memorandum was written. In May of 2003, Ms. Pennewell was promoted to Senior Vice President Financial Reporting and Planning. OFHEO Interview with Ms. Janet Pennewell, June 15, 2004. p. 8
Q: So in 1999 you took on the responsibilities in Financial Reporting that you – describe what happened in 1999 again, if you would.
A: Sure. In 1999 I was promoted to Vice President, and before my promotion I was in charge of the business planning function, which resides within the Controller's Department, and when I was promoted to Vice President in 1999, also took on responsibility for financial reporting and for financial accounting.
[87] Memorandum from Ms. Janet Pennewell to Mr. Tim Howard, dated September 23, 1999, Subject: Policy on Purchase Premium/Discount Management, FMSE-SP 000106-000109.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

argue that materiality should be judged in the context of multiple years of revenue."[88] The second paragraph however warns of SAB No. 99, which was released by the Securities and Exchange Commission just one month prior on August 13, 1999.[89] Clearly, management was thinking in the context of materiality – as opposed to uncertainty – at the time that memorandum was written. Lastly, as late as last year Fannie Mae's Office of Auditing describes the catch-up threshold as "a materiality threshold that is used in determining when differences should be booked."[90]

The Functional Equivalent of 16%

At this point, one might be forgiven for concluding that the thresholds ultimately adopted by the Enterprise were small in relation to the magnitude of the financial statement revenue amounts being reported.  After all, management expressed the belief that the target catch-up was the functional equivalent of zero.[91]  However, the thresholds either proposed or adopted were in reference to *annual* revenue amounts.[92] The effect on quarterly income was therefore much larger.

First of all, each of the percentage thresholds needs to be appropriately scaled to understand the impact on quarterly reporting.  If we assume, for purposes of simplification, that quarterly revenue is approximately 1/4th of annual revenue, the percentage thresholds scale up to a quarterly effect of +/-4% and +/- 8% respectively.  These percentages are the relevant threshold to understand the potential balance sheet effect on purchased premium/discounts and guarantee fees.  To understand the potential impact on the volatility of reported earnings, the percentage thresholds need to be scaled further, in accordance with the full *range* of the threshold, to properly consider the impact on quarterly income.  Since volatility refers to the degree of change between financial measures, in theory, quarterly guarantee fee catch-up could swing from +8% one quarter to -8% the next without any adjustment to income for the

---

[88] *Id.*

[89] *Id.*, FMSE-SP 000108.  The full paragraph referred to reads:
"However, on August 13, of this year [1999] the Securities and Exchange Commission released Staff Accounting Bulletin (SAB) No. 99, which specifically addresses the application of "materiality" thresholds to the preparation and audit of financial statements.  This bulletin was released in response to the SEC's concern about the tendency of companies, with the acquiescence of their auditors, to manage earnings by designating certain transactions or events below a certain percentage threshold as "immaterial" and the accounting for transactions and events in a manner that does not conform to GAAP.  The bulletin states that the use of a percentage ceiling test alone to make materiality determinations is not acceptable.  Although a quantitative test can be used as an initial assessment, all "facts and circumstances" must be evaluated to determine materiality - including whether a reasonable investor would find the amount to be material to the company's ability to meet earnings expectations."
[90] Fannie Mae Office of Auditing Workpaper, July 7, 2003, Reviewed by Ms. Joyce Philip, Manager Office of Auditing, FMSE 118802-118803.
[91] OFHEO Interview, Mr. Tim Howard, August 5, 2004, p. 124.
Q: And as long as it did not exceed the plus or minus 1 percent, then, in fact, no adjustment be required, correct?
A: Yes, because we deemed any estimate within the plus or minus 1 percent to be what we called the functional equivalent of zero.
[92] OFHEO Interview, Mr. Jeff Juliane, June 8, 2004, p. 199.
Q: On a quarterly basis, the cumulative catch-up amount is always evaluated in relation to one percent of projected annual net interest income?
A: Correct.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

retrospective impact of that swing. **Therefore, the potential magnitude of avoided volatility becomes 8% and 16% of the respective quarterly revenue amounts.**

In 2003, the threshold for NII catch up was approximately +/-$110 million.[93] The associated range of this threshold therefore was over $220 million. It was this threshold and range that were applied to *quarterly* financial reporting. The highest amount of quarterly Net interest income related to purchase premium and discount amortization, for the period in which OFHEO has such information (Q1 2001 through Q1 2004), was approximately $151 million. The largest magnitude of change in purchase premium and discount amortization between consecutive quarterly reporting periods was approximately $135.8 million. The analogous threshold and range for Guarantee Fees was approximately +/- $45 million and $90 million, respectively.

In either case, when policy did not require that deferred price amortization adjustments be made the effect was to shift the catch-up amount to future periods, and the default amortization estimate in the current quarter would have been the estimate made at the beginning of the quarter. In quarters when the percent thresholds were exceeded and policy required that adjustments for estimated income or expense be made, the policy would have only required that amortization be adjusted to the amount of the target catch-up threshold. For example, if the target catch-up threshold was +/-$110 million, and the modeled catch-up estimate was $125 million, only a $15 million adjustment needed to be made under the policy.

The key attributes of the policy were that: 1) quarterly thresholds were pegged to annual amounts, 2) the additional scaling of a plus and minus range insofar as quarterly changes were concerned, and 3) the operation of policy whereby the Enterprise only recognized estimated adjustments that exceeded the range, allowed volatility to be avoided altogether - or at least significantly dampened – and future earnings surprises were rare.

The application of the quarterly thresholds results in the failure to record amortization and misstates financial results. Such misstatements mask changes in earnings and other trends that are important to investors. The SEC issued Staff Accounting Bulleting No. 99 to specifically prohibit such misstatements.[94]

*Policy To Permit Discretionary Adjustments Within The Target Catch-Up Range*
Yet another significant aspect of the Enterprise's policy was the ability of management to make discretionary adjustments[95] to quarterly income as long as they were within the target catch-up

---

[93] OFHEO Interview, Mr. Tim Howard, August 5, 2004, p. 147.
Q: And, in fact, I think, just to be more precise because I was using an approximation that the company has defined this 1-percent range as being as high as $ 110 million is my understanding.
A: As of the date of that document, that was probably true, but net interest income has been elevated for the last couple of years. So I think that's an outdated number.
Q: And possibly understated; is that –
A: Yes, it could be.
[94] SEC Staff Accounting Bulletin: No. 99 – Materiality, issued August 12, 1999.
[95] OFHEO Interview, Ms. Janet Pennewell, June 15, 2004, pp. 34-35
Q: Sometimes when you're under the 1 percent threshold, you may or may not make an adjustment?
A: That's correct.
Q: And that's based on management discretion?

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

range. While this was not explicitly stated in the policy, it arose as an extension of management's assertion that the 'functional equivalent of zero' was anywhere within the range. Accordingly, in 2003, when the NII target catch-up position approximated +/- $110 million, management had the ability to make discretionary adjustments to income of up to $220 million that, in theory, could move the catch-up from one end of the range to the other and still be permissible under their policy.

The following is a quote from testimony by Mr. Howard, CFO, regarding the latitude of recording adjustments to the catch-up position allowed in the amortization policy:

> Q: And then just to be clear, your terminology "deeper into the range" means that you could have booked an entry that would have made a positive catch-up a greater positive number, correct, in any given quarter?
> A: Right. If the calculated number was 120, and the minimum amount of the upper end of the range was 80, according to our policy, we needed to book the $40-million difference, but we were permitted to book--am I missing here?
> Q: No, keep going. I'm listening.
> A: We do the five scenarios, and each scenario we have an amount of catch-up that has to be recorded as income or expense to produce the level of yield [sic]. In averaging the five scenarios, we get a single number. And let me just assert that that number is $120 million, and the question is how much of that $120 million should be brought into income in the current quarter? Using our range-- and let's call it plus or minus 1 percent--I will assert that 1 percent of net interest income, at this hypothetical time we're doing this, is $80 million. So that would mean that the smallest amount we could book as income was the difference between a $120- catch-up and the $80 million, top of the range. We could, by following the policy, conceivably book as much as $200 million of income, which would take us from the $120- all the way down to the negative $80-.[96]

Additionally, when asked about the ability to adjust earnings Mr. Tim Howard, Chief Financial Officer, provided the following testimony:

> Q: Okay. Now, were adjustments within the plus or minus 1-percent range ever made to cause actual earnings to more closely align with forecasted earnings, as far as you know?
> A: Not to my recollection.
> Q: Do you believe that would be prohibited under your policy?
> A: Technically, no.[97]

---

A: That's based on management's judgment in looking at our asymmetrical exposure to interest rates, yes.
Q: Is it ever based on anything else?
A: There might be other factors that management might look at in making that judgment, such as the current composition of the book. Most of those things we might look at come down to evaluating, again, that asymmetry of the impact if rates don't move in line with how we forecasted them.
[96] OFHEO Interview, Mr. Tim Howard, August 5, 2004, pp. 139-141
[97] OFHEO Interview, Mr. Tim Howard, August 5, 2004, p. 207

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Subsequent sections of this report will provide examples in which the Enterprise exercised latitude in making adjustments within the range of uncertainty permitted by the policy. If accounting standards permitted this practice (which they do not), similar latitude could be applied to other estimates such as loan loss allowances, pension obligations and estimates of fair value. **If other companies used Fannie Mae's logic in applying accounting principles, they could dictate the financial results they desired, and there would be no comparability of financial results between reporting entities even within the same industry.**


## Managing the Catch-Up

*Managing Within The Current Quarter's Catch-Up Range*
Another proposed mechanism to reduce earnings volatility was the intention to manage to a specific target level of catch-up. Targeting a specific level of catch-up was a means to minimize the probability that adjustments would be necessitated by exceeding either end of the plus or minus catch-up range. The idea essentially was to target a level of catch-up, such that the probability – in future periods - of exceeding one end of the range be no greater than the probability of exceeding the other end of the range. In this manner, the Enterprise could navigate the catch-up within the threshold range such that future income volatility which might arise through recording adjustments which would exceed the target threshold would be avoided. This objective, as well as the means, was suggested by the Chief Financial Officer himself to Ms. Janet Pennewell.

> Here's what I did in coming up with my proposed purchase premium and discount rule.
>
> First, I looked at our projections three years from now, and calculated the 'expected' amount of unamortized PDA.[98] This is simply the average of the results from the 'rates unchanged' and 'up and down 1 and 2 standard deviations' cases. Using the October projections, this 'expected PDA amount' in December '02 was $160 million.
>
> **I then attempted to use our projected PDA sensitivities to ask "where would we like our PDA to be" in order to minimize the amount and frequency of PDA adjustments we would have to make as interest rates moved (as we know they will).** [Emphasis added] To answer that, I looked at the sensitivity of our PDA calculations to up and down 2 standard deviation moves in interest rates in each of the next four years. What I found when I did that is that, on average over this period, if interest rates went up by two standard deviations, our so-called 'catchup' credit would increase by a positive $80 million dollars (roughly). For a two standard deviation <u>fall</u> in interest rates, however, the catchup would drop by $250 million – actually turning into a negative. So to make our corporate sensitivity to these rate changes symmetric, I figured that as long as our PDA sensitivity looked like this we should aim for a PDA catchup position of a positive $85 million. (That way, if rates moved up by 2

---

[98] PDA is the acronym for 'premium/discount amortization'

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

standard deviations the catchup would rise by $80 million to a positive $165 million; if rates fell by 2 standard deviations our catchup would decline by $250 million, to a negative $165 million. That's symmetric.)

My final step was to integrate the first and second paragraphs. That is, to say "given our current projected PDA sensitivity we want to be at $85 million; our probability-weighted expectation is that we will be at $160 million over the next three years, so to get where we want to be we should amortize the difference ($75 million) evenly into income over the next three years (at $25 million per year).

I then added a couple of refinements to that. First, if the difference between where we were and where wanted to be was large (and particularly if it were large and negative), we would want to get back to our target more quickly than would be achieved by an even amortization over three years. So I would front-load the change – perhaps fifty percent in the first year, and 25 percent in the next two years.

It also seemed to me that if we followed this procedure rigorously – i.e., we updated our PDA position and sensitivities, and our 'where do we want to be calculation' quarterly – we would find that the changes we would be making to our projected 'on top PDA adjustments' would be relatively small, spread out over a three year period. That would help with our goal of minimizing unnecessary net income volatility, while ensuring that we maintain an adequate amount of PDA amortization at all times. [99]

In a later memorandum[100] to Ms. Pennewell, dated November 25, 2000, Mr. Howard - on the eve of the adoption of the policy - further wrote:

In looking out three years, we should look not only at the base scenario (rates unchanged) and the weighted average of the five scenarios, but also at the two extremes.  The reason is to see whether we get a sense of whether we may find ourselves needing to move our catch-up quickly and in large amounts if rates move in a particular direction.  This should affect where within the plus or minus $75 million range we aim for (i.e., if three years out the catch-up really plummets in the 'down 120' scenario, we should probably want to aim to be fairly high in the plus-or-minus $75 million range, as a cushion in case rates fall further).

This memorandum clearly shows that the intention of the policy the Enterprise adopted was to allow for positive (income) adjustments to the catch-up and to mitigate negative (loss) adjustments.  OFHEO has concluded that such a practice is the equivalent to establishing a

---

[99] Memorandum from Mr. Tim Howard to Ms. Janet Pennewell, October 27, 1999, FMSE 217558
[100] Memorandum titled "Notes on Purchase Premium and Discount Amortization," attached to email from Mr. Timothy Howard to Ms. Janet Pennewell, November 25, 2000, Subject: Amortization.  Howard 08152004.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

reserve for amortization expenses.  **However, since the catch-up was never fully recorded, the policy of the Enterprise effectively created a "cookie jar" reserve.**

In his testimony regarding the October 27, 1999 memorandum, Mr. Howard went on to state that the concept of a "where we want to be" target "never went anywhere."[101]  However, a memorandum dated April 12, 2001, describing the Q1 2001 Amortization results, indicates that the Enterprise determined to make additional on-top adjustments for NII and Gfee of $10 million and $8 million respectively, of which each had the effect of increasing the catch up, even though the modeled deferred price adjustment amortization was within the respective threshold.  In her testimony regarding the information contained within the April 12, 2001 memorandum, Ms. Leanne Spencer confirmed that it was management's practice to make adjustments because of the Enterprise's asymmetric exposure.[102]  Ms. Pennewell, when asked about the practice of making adjustments within the catch-up range, also confirmed that the asymmetric exposure of interest rates influenced where management wanted to be within that range, and further pointed out specifically where within the *current* policy this practice would be supported.[103]

---

[101] Mr. Tim Howard commenting on the memorandum to Ms. Pennewell dated October 27, 1999, FMSE 217558. OFHEO Interview, Mr. Timothy Howard, August 5, 2004, pp 197-198
Q: Would you regard the quarterly analysis that's done of catch-up as a "where we want to be calculation"?
A: No. The reason that's in quotes, this is – the "where you want to be" is looking out towards the famous moving target.  This is not a "fiddle the number" concept.  And that's why I put it in quotes.  But, again, because this was sufficiently complex and hard to pin down, it never – the concept never went anywhere.
[102] Ms. Leanne Spencer commenting on a memorandum from Mr. Jeff Juliane and Mr. Rene LeRouzes to Distribution, dated April 12, 2001, Subject: Q1 2001 amortization update.  FMSE-SP 000220-000223. OFHEO Interview, Ms. Leanne Spencer, June 22, 2004, p. 99.
Q: Would it have been your practice to sometimes book such an amount in because of this asymmetric exposure?
A: Yes.
Q: So, while you do not recollect specifically whether it was 10 million was booked or not, it could have been the case consistent with your practice.
A: Yes.
Ms. Leanne Spencer further commented.  OFHEO Interview, Ms. Leanne Spencer, June 22, 2004, p. 100
Q: […] and I assume you don't have any specific recollection specifically whether 8 million was booked or not.
A: I do not.
Q: But by analogy looking [sic] such an amount would have been consistent with practice that you might have employed?
A: Yes.
[103] OFHEO Interview, Ms. Janet Pennewell, June 15, 2004, pp. 33-34.
Q: Now, if this threshold were to be exceeded and you were required under your policy to make an adjustment to the quarter's interest amortization, you would only book the difference between the mean catch-up number and the threshold?
A: No. Our policy explicitly says that as long as we fall within that range, and the policy recognizes that we may use management judgment to recognize the fact that we typically have asymmetric exposure to interest rates.  And so it's recognized that management may- that that may influence management's judgment in terms of where within that plus or minus 1 percent range we think is appropriate to be. Mortgages have a good deal of negative convexity, as I know you know, and therefore, depending on exactly the composition of our book, we won't – our catch-up position won't move symmetrically to, say, a plus or minus 100 basis point move in rates, and so where exactly within that policy range we thought it was appropriate to be, would typically be influenced by that asymmetry.

31

This practice and the latitude within the policy that authorized it, meant that the Enterprise was no longer making adjustments to improve the accuracy of its reported financial results. **Rather, the Enterprise was making preemptive adjustments for the sole purpose of managing prospective earnings.**  OFHEO is not aware of any basis in promulgated accounting standards that would support this accounting treatment.

In his memorandum to Ms. Pennewell, Mr. Howard summed up the achievement of constructing the catch-up framework implemented by the Enterprise:

> There are variations on this theme, but you can see what I am trying to do.  We have a target range that we define as the 'functional equivalent of zero'. We look at a three year horizon and multiple rate scenarios to try to avoid volatility in the monthly amortization numbers.  And we give ourselves a (small) 'safe zone' before we force ourselves to make large changes in amortization to get quickly back to within our target range.[104]

_Modeling And Managing The Forecasted Catch-Up_
The discussion of catch-up thus far has focused on the impact associated with the reporting of _current_ period income.  However, a full understanding of the accounting for deferred price adjustment amortization, and its impact on the Enterprise's reported financial results, also has to consider the dimension of time and future reporting periods.  For any given quarter, the quarterly catch-up amount is, by its very nature, simply unrecognized income or expense.  The accounting policy adopted by the Enterprise specified the accounting to be applied to the catch-up in the current quarter.  However, the policy also states:

> "In managing the premium/discount catch-up position, it is important to project how that position can change over time.  We believe that a three year time horizon is appropriate for that assessment." [105]

Since catch-up is unrecognized income or expense, a _forecast_ of catch-up is, in effect, nothing more than a forecast of _future_ unrecognized income or expense.  It was in this regard that the Enterprise devoted considerable systems and human resources to supporting a well developed and robust capability to forecast the level of catch-up in future periods, in accordance with the several years planning horizon referred to in the policy.

Each quarter, and often much more frequently, the Enterprise would perform analysis to determine both the current quarter's catch-up as well as the forecast of catch-up for prospective periods.  The forecasting of prospective period catch-up would further be

---

OFHEO Interview, Ms. Janet Pennewell, June 15, 2004, p. 83.
Q: Could you tell me in here where it refers to this policy around the negative convexity and booking within the target range that you referred to before?
A: It's on the second page, and specific – and I will tell you that the language that we look to in this policy is, "…we also need to be sensitive to the impact of extreme interest rate moves on our catch-up.  This will affect where within our target range we should aim to be."

[104] Attachment to email from Mr. Tim Howard to Ms. Janet Pennewell, VP Financial Reporting & Planning, November 25, 2000, Subject: Amortization, Pennewell 08252004.
[105] Purchase Premium and Discount Amortization Policy, FMSE 074524.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

performed pursuant to a variety of different assumptions, in order to determine, for example, the impact of different interest rate assumptions on future period catch-up.

During the period from 1999 through to 2004, the Enterprise performed many sensitivity analyses for forecasting purposes. Over this timeframe, the relationship between forecasted catch-up for near term periods, and forecasted catch-up for outer periods varied. In 2000, the forecasts performed show progressively higher levels of catch-up, where the cumulative amount, at the end of the planning horizon, is significantly higher than the current period catch-up. For example, the table below presents a sensitivity analysis for the first quarter of 2000 that provides an estimate of the catch-up for prospective periods through to 2004 - the end of the planning horizon. This forecast was contained within a memorandum dated April 5, 2000. The forecasted catch-up for each period represents a weighted average of the catch-up calculated using prepayment estimates associated with each of five interest rate scenarios: Base Rate Path, +/- 60 basis points and +/- 120 basis points.[106]  See Appendix I of this document for a more detailed description of the modeling methodology.

| Forecast Period | 5-Apr-00 Analysis |
|---|---|
| Dec-00 | $183.0 |
| Dec-01 | $222.0 |
| Dec-02 | $258.0 |
| Dec-03 | $292.2 |
| *Base rate path used* | 8.65% |
| *Book used* | Jan-00 |
| *Reference* | *FMSE-SP 000237* |

Another way to understand the catch-up is to view it graphically. The following is an illustration that uses the estimate of catch-up contained within the April 5th 2000 analysis.

---

[106] Memorandum from Mr. Jeff Juliane to Ms. Leanne Spencer, dated April 5, 2000, Subject: Amortization Sensitivities.  FMSE-SP 000236–000238.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited





The catch-up represents the difference between the projection of deferred price adjustment amortization in accordance with a forecast using multiple up and down rate path scenarios versus the prospective amortization that would be taken in accordance with 'in-use' amortization factors applied prospectively. The level as well as shape of both the catch-up, and prospective amortization could however vary.  This is due to the fact that such amortization could include the amortization of both premiums and discounts.  All other things being equal, the amortization of premiums would result in projected expense and the amortization of discount would result in projected income.  The projected amount of net interest income from the amortization of both premiums and discounts would be a combination of the two.  This net amount, therefore, is going to be impacted by whether there are more premiums or discounts associated with the underlying mortgage assets held by the Enterprise.  Further complicating this is that at any given point in time, the mortgage assets held by the Enterprise have varying estimated lives.  For example, a 15 year mortgage has a different estimated life than a conventional 30 year mortgage.

For purposes of this discussion, the shape and level of expected amortization is not important. The illustration is meant to show the nature of the catch-up itself.  In this example, the sensitivity analysis prepared on April 5, 2000, serves as an example of the catch-up calculation that would be made in the current quarter. The estimate of current quarterly catch-up would then be subject to comparison to the catch-up target threshold in effect in order to determine if an adjustment to the *current* quarter's income is required.  Alternatively, the estimate of the subsequent year's catch-up is, in this illustration, an estimate of the cumulative amount of future unrecorded income (catch-up) that would exist at each point forward if no other action is taken.

Hypothetically, if the Enterprise were to record the entire amount of the current quarter's catch-up, the forecasted catch-up for subsequent periods would be similarly affected as well.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited



**OFHEO believes that the methods selected and infrastructure developed to support the estimation of prospective unrecognized income or expense, were in fact designed to facilitate a proactive management of earnings that extended well beyond the flexibility merely afforded by the Enterprise's accounting for the *current* quarter's catch-up.**  This contention is supported both by a conceptual understanding of the catch-up and estimation methods used, as well as by the actual practices and accounting employed by the Enterprise that are documented both within this section, as well as other sections in this report.

Relationship of Catch-up to Amortization
Outer periods that have a greater magnitude of either unrecognized income or unrecognized expense than the current or nearer term periods do, suggest a divergence between two estimates that conceptually should either be the same or at least be converging.

SFAS 91 requires that a retrospective - "inception to date what-if" - adjustment be made to accumulated amortization and the corresponding income statement (amortization) account. This adjustment would be based on the latest estimate of the effective life of the mortgage assets being amortized.  SFAS 91 also requires that the mortgage assets be amortized *prospectively* over the new estimate of effective life.  Presumptively, the estimated life of the deferred price adjustments would be the same for both the retrospective and prospective treatment.  Why then, would forecasted unrecognized income or expense be growing in magnitude?

In making the adjustment required by SFAS 91, there should be no unrecorded income or expense other than the momentary difference that should then be immediately recorded, from applying the revised forecast of the new estimated lives of the mortgage assets that forms the basis of the retrospective adjustment.

If hypothetically, a reporting entity were permitted to avoid making the retrospective adjustment under SFAS 91, the forecasted amount of unrecorded income or expense associated with that treatment would then be either positive or negative but should still nevertheless, be

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

diminishing and converging to zero. The following graphic illustrates this effect in a circumstance where a positive (income) retrospective adjustment is not made.

Illustration
$
Catch-up
Current Quarter
Time

In the circumstance above, one would expect that the difference, between the amortization that *should* have been recorded and the amortization that *was* recorded, should diminish. The rate at which the unrecorded amortization would diminish would be a function of the rate at which the portfolio of mortgage assets itself is diminishing due to mortgage loan prepayments. In a typical pool of mortgages, the rate at which mortgages prepay – and the portfolio diminishes – is faster earlier in the life of the pool, than at the end.

This expectation of diminishing differences however, was not always reflected in the forecasts of catch-up at the Enterprise. The graph below shows the forecast of guarantee fee[107] catch-up for the first quarter of 2004.[108]

[107] Fannie Mae started to separately track the catch-up associated with purchased premiums and discounts and guarantee fee separately, in accordance with the requirements of the December 2000 purchased premium and discount amortization policy. Purchase Premium and Discount Amortization Policy, FMSE 074523-074524.

[108] The first quarter 2004 estimate of current quarter catch-up was further adjusted by the correction of an error related to the treatment of Dollar Rolls. The impact of this correction resulted in an adjustment to NII that reduced that catch-up by approximately $36 million. Accordingly, all prospective periods of forecasted catch-up would have been similarly affected as well. OFHEO utilized the 'before adjustment amounts' since it did not have the 'post adjustment' analysis.
Memorandum from Jeff Juliane and Rene LeRouzes, Subject: Q1 2004 Amortization Results, to File, dated April 27, 2004, FMSE-SP 000260-000265 and
Memorandum from Mukul Gupta, Subject: Error in Amortization of Securities Used in Dollar Rolls, to Distribution, dated May 3, 2004, FMSE-SP 000266-000272. Distribution included among others Ms. Leanne Spencer, Mr. Jonathan Boyles, Ms. Janet Pennewell.

**GFEE**



This analysis shows the estimate of catch-up to be growing over subsequent prospective quarters.  The next graph shows the forecast of NII catch-up for the same period:

**NII**



In either case, the magnitude of forecasted unrecognized income and loss should be trending towards zero in subsequent periods.

The selection of the catch-up forecast for the first quarter of 2004 was specifically made because according to the testimony of Fannie Mae management decided not to make any 'in use' factor changes at the end of that quarter.  OFHEO does not find this decision to be appropriate. However, it serves a useful purpose since the Enterprise could not provide many

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

instances where full catch-up forecasts were performed on both a before and after 'in use' factor change basis.[109]

Appendix I provides an analysis of the estimation methods that Fannie Mae employed to determine the catch-up.  As noted in this appendix, the Enterprise uses a *different* method for forecasting catch-up and estimating prepayment speeds for determining the SFAS 91 retrospective adjustment than it uses for determining prospective amortization.   Pursuant to the analysis provided in the appendix, OFHEO has concluded that Fannie Mae's forecast of catch-up and estimate of the SFAS 91 retrospective adjustment, based on their method of using multiple rate paths and related assumptions, is incorrect. In addition, since the Enterprise's own forecasts of catch-up do not consistently show a diminishing level of catch-up, **OFHEO has further concluded that the estimate of effective lives used for prospectively amortizing deferred price adjustments is also incorrect.**

The Use of Catch-up to Promote Earnings Stability and
Shift Income or Expense between Periods

In two previous sections, this report described 1) the latitude of the Enterprise – within the framework of policy – to recognize discretionary income or expense within the target threshold range, and 2) the view that the catch-up was to be managed in accordance with maintaining a target level of catch-up, such that the potential of exceeding the target range thresholds and the resultant earnings volatility, was minimized.

The capability to forecast catch-up therefore was, among other things, the means to steer toward the desired target catch-up. Making discretionary adjustments within the target range served to propel the Enterprise toward this goal.  A challenge however, would be the wake of earnings volatility that such navigation created.  In this regard, course corrections using such discretionary adjustments would themselves potentially create an undesirable impact in the quarter in which they were made.

A memorandum[110] dated April 12, 2001 from Jeff Juliane and Rene LeRouzes indicates that planned on-tops of $75 million of income related to NII, and $57 million of expense relating to GFEE will be taken prospectively via 2001 amortization factors.  The memorandum further states that 1) an additional $10 million of on-tops will be booked for 2001 "to hedge our exposure if rates continue to decline,"[111] and 2) "However, since we are disproportionately exposed to the Gfee catch-up in the down sensitivities (50 and 100 bps respectively), it was

---

[109] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, p. 15.
Q: Getting back to the instances you described before where the rate change was not processed, can you recall specifically what period that was?
A: The only period I can recall was Q1 – it was the April 2004 rate change. We did not process the April 2004 rate change.
Q: And that's the April 2001 –
A: Four.
Q: April 2004, okay.
[110] Memorandum from Mr. Jeff Juliane and Mr. Rene LeRouzes to Distribution dated April 12, 2001, Subject: Q1 2001 Amortization Update.  Distribution included Mr. Tom Lawler, Mr. Peter Niculescu, Ms. Leanne Spencer and Ms. Janet Pennewell. FMSE-SP 002787–002790.
[111] *Id.*

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

decided to layer on an additional $8 million of expense on-tops in 2001. This results in a total on-top amount of $66 million of related expense for 2001."[112]

The practice of booking scheduled monthly on-tops was previous practice at Fannie Mae. OFHEO's examination procedures did not extend to an exhaustive review of accounting records to determine all instances in which this occurred.  However, in 1999 and 2000 OFHEO is aware of scheduled on-tops taken to reduce the $200 million deferred expense not taken in 1998.  In addition, for purposes unrelated to this $200 million, scheduled monthly on-tops were made in 2000 as well.[113]

The memorandum dated April 12th 2001 however, is OFHEO's first understanding that scheduled on-tops were now being made as factor change adjustments.  Within the amortization system itself, adjustments to current quarter and future period income could now be made.  There are further instances of on-top adjustments being made through factor changes.

More significantly, and as noted in subsequent sections of this report, there are numerous instances where the impact of other accounting events were capitalized as phantom assets or liabilities within the amortization system and subsequently amortized over a 30-year conventional mortgage proxy life.  Typically, these items were reconciliation differences between various accounting sub-ledgers that had an income statement effect; however, other accounting events of a different nature were treated in similar fashion as well.  Thus, earnings volatility could be managed and income shifted from one period to another.

In fact, just two quarters prior to the commencement of the scheduled factor amortization adjustments of 2001, an unsigned note to Ms. Janet Pennewell stated the following:

> Lost $20 million in catch-up due to rate change and picked up $30 million in catch-up due to change in book (recognizing to [sic] little discount into income). Lost $78 million in catch up due to methodology change (short term CPR's were changed from 3-months to 24-month) to slow down the recognition of discount into income in request to reducing the positive catch-up and transferring income into the outer years.[114]

The use of the amortization process to effect changes to the Enterprise's financial statements also supports OFHEO's contention that Fannie Mae management selected estimation methods that understated the true level of the catch-up.  Any items, on-tops or other accounting events that had an income statement impact would have had the earlier noted effect of reducing the estimate of prospective catch-up for all forecast horizons impacted.  In this regard, having a

---

[112] Id.

[113] Memorandum from Mr. Rene LeRouzes to Distribution, dated October 17, 2000, Subject: PDA/REMIC Results (August Book), the distribution list includes Ms. Janet Pennewell and Mr. Jeff Juliane. FMSE-SP 000113-000116. This memorandum states: "With the Q3 update, our on-top adjustments for the remainder of 2000 and the forecast horizon was revised.  Previously, we were booking approximately $8.0M monthly ($1.8 M Gfee, $6.0 M NII) for the balance of 2000.  Revised for the Q3 update, and incorporated within the forecast, on-tops are approximately $2.0M monthly ($.7M GFee, $1.0M NII) for the remainder of the year."

[114] Undated document titled: "Notes for Janet – Explanation of results."  FMSE-SP 002590.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

large catch-up would be preferred.   In theory, the catch-up could mechanically support the ratable recognition of stable earnings, or the shifting of income between periods, if it was in either a positive or negative position.  However, it would be much better to have a proportionally larger, rather than smaller, unrecognized income to cushion against earnings volatility – both market driven (i.e., changing prepayment estimates) and event driven (reconciliation errors).  A larger rather than smaller catch-up could also serve as a reserve that could be drawn from or replenished as necessity might dictate.

The use of the amortization system to effect adjustments to the financial statements also provided a means to contravene the internal controls that would otherwise be necessary when making adjustments to the general ledger.  Accounting systems, as well as traditional related internal controls, serve to highlight such entries both on a current basis as well in accordance with maintaining a history or an audit trail of such adjustments that would facilitate inquiry and critical review.  The amortization system on the other hand was not subject to these same internal controls.  **A diminished transaction trail, key person dependencies, as well as accounting effects obscured within sub-ledgers containing hundreds of thousands of records, were all manifestations of the process of amortization at Fannie Mae.**

Subsequent sections of this report will detail matters concerning the weak control environment associated with the amortization process.  We have concluded that Fannie Mae tolerated significant control weaknesses as a further means to obscure the management of the catch-up and any related income effects.


## Development of Systems and Modeling Capability

**OFHEO has concluded that iterative modeling of the catch-up was performed for both the current quarter as well as prospective reporting periods for the purpose of generating results under varying assumptions in order to achieve a specific desired outcome.**

The active modeling and management of both current and forecasted catch-up required systems applications more robust than the Enterprise previously had.  This section of the report links methods for modeling and managing the catch-up that were previously described, to systems functionality specifically designed to support them and the earnings management intended.  Subsequent sections of this report, as well as the included appendix titled "Estimation Methods Used for Modeling the Catch-up" will document examples of instances where either iterative modeling was performed or assumptions were selected specifically to achieve desired financial results.

In 1998, the Enterprise anticipated this need and installed an application called "BancWare Convergence" (hereafter referred to as "BancWare").  This software was "purchased and installed as a tool to facilitate the scenario analysis of our purchase discount/premium and deferred/ prepaid fee position."[115]  In a memorandum dated March 12, 1999, Mr. Jeff Juliane

---

[115] Memorandum from Mr. Jeff Juliane to Distribution, dated March 12, 1999, Subject: BancWare Convergence – Next Steps, distribution included; Mr. Tom Lawler, Ms. Leanne Spencer, Ms. Mary

described that the first phase of implementation began in the fall of 1998 and further advocated the elevated priority of functional development.  In commenting on the capability now provided by BancWare, Mr. Juliane noted: "Phase I of the conversion to BancWare was completed recently increasing our 'what-if' capabilities in analyzing purchase premium/discount and deferred/prepaid fees on the core book of business."[116] Commenting on upgrades in capability achieved in Phase I, Mr. Juliane further noted that "These upgrades created enhanced cash flows, which improved our catch-up forecasting ability."[117]

In commenting on the need for a specific additional enhancement that would allow BancWare to produce modeling reports in dollars, and therefore bypass PDAMS[118], Mr. Juliane states a need for producing multiple scenarios quickly: "This enhancement would eliminate the need to run scenarios through PDAMS to produce useable reports.  This greatly enhances our ability to produce multiple scenarios within short timeframes." [119]

Commenting on needs beyond speed, and providing a stated objective for certain desired capabilities, Mr. Juliane further wrote:

> BancWare amortizes premium and discount using an interest proxy method based on a proportionate amount of principal collected.  This generates an amortization amount that ensures that the purchase price is maintained throughout the life of the instrument.  Consequently, the normal amortization factors BancWare produces assume that you record catch-up in the period when incurred.  **However, even though the normal factors assume that you will recognize catch-up in the period incurred, BancWare gives you the flexibility to manipulate the factors to produce an array of recognition streams.**[120] [Emphasis added]

Mr. Juliane continues in the paragraph:

> With this manipulation you can 'bleed' the catch-up within a specified time period and affect both the subsidiary ledger as well as the general ledger equally.  This strengthens the earnings management that is necessary when dealing with a volatile book of business.[121]

Further in the memorandum, Mr. Juliane describes additional functionality that – if built - would provide further flexibility and control over the recognition of the catch-up:

---

Lewers, Mr. Jonathan Boyles, with copy to Ms. Janet Pennewell and Mr. Rene LeRouzes, FMSE-SP 000364–000367.

[116] *Id.*

[117] *Id.*

[118] Purchase Discount Amortization System.  This was the system used at the time by the Enterprise to model catch-up.

[119] Memorandum from Mr. Jeff Juliane to Distribution, dated March 12, 1999, Subject: BancWare Convergence – Next Steps, distribution included; Mr. Tom Lawler, Ms. Leanne Spencer, Ms. Mary Lewers, Mr. Jonathan Boyles, with cc to Ms. Janet Pennewell and Mr. Rene LeRouzes, FMSE-SP 000364–000367.

[120] *Id.*

[121] *Id.*

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

It is recommended that we adopt the amortization method currently used within BancWare.  It applies Fas [sic] 91 more consistently than our PDAMS process and has the ability to generate factors that give us multiple recognition patterns that create maximum earnings flexibility.  We will need to build a table within BancWare (or multiple tables) that will allow us to control the period over which catch-up is recognized.[122]

OFHEO believes that the catch-up convention itself is inconsistent with the requirements of GAAP.  **It is clear however, that in addition to not recognizing amounts that should be recorded in the current period as they are estimated, the Enterprise intended to also manage the prospective periods over which the deferred amounts were managed, and devoted resources in order to systematically apply this inappropriate treatment.**

Additional sections of this report will demonstrate the circumstances under which this capability was used.

### *Historical Analysis of Accounting for Deferred Price Amortization*

The previous discussion of OFHEO's preliminary findings on accounting for deferred price amortization focused on the Enterprise's accounting at the end of 1998 and years immediately subsequent, as well as the formulation of a policy that led to the adoption of the Enterprise's policy in December 2000 that remains in effect currently.  But what was the impact?

We have attempted to illustrate the effect that the Enterprise's policies and practices have had on the recorded amount of amortization.  All of the information that these charts are based on was provided by the Enterprise.  While we have made adjustments to reflect the impact of particular aspects of the Enterprise's policies and practices, in some cases this was difficult due to inconsistent information and inadequately described adjustments.  It should be noted that while we have included adjustments to amortization for the periodic swings in the catch-up level, we have concluded elsewhere in this report that the calculation of the catch-up level was not consistent with the requirements of SFAS 91.

An overview of the effect is illustrated in the following charts which show how the implementation of the Enterprise's amortization policy reduced income statement volatility:

[122] *Id.*

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Chart 1:**



***Chart 1*** shows the effect the on-top adjustments had on the recorded amount of amortization income or expense.

**Chart 2:**



***Chart 2*** shows the effect of recording the mean amount of catch-up to $0 at each quarter-end. The base amount is calculated using a base rate path, which is the interest rate path the Enterprise deems to be the most likely forecasted rate. Such base rate path is then used to generate a forecast of prepayments. The mean amount is a simple average using the base rate path and 4 shocks scenarios of up and down 50 bps and up and down 100 bps. As we have noted elsewhere in this report, we do not believe that the mean catch-up would be equivalent to the retrospective adjustment that is required by SFAS 91. However, this chart does show that the Enterprise's policy of applying the catch-up thresholds and not recording the mean

43

amount to $0 at each quarter end had the effect of significantly reducing the volatility of recorded amounts.

**Chart 3:**



**Chart 3** shows the effect of recording the base amount of catch-up to $0 at each quarter-end. This analysis clearly shows that, not only did the Enterprise's policy provide more stable earnings but also the use of the mean of the five scenarios in the calculation of catch-up further served to minimize the volatility of the catch-up position (as compared to the base amount of calculated catch-up) in certain periods.

**Chart 4:**



**Chart 4** shows both the effect of recording the base amount of catch-up to $0 at each quarter-end as well as what the impact would have been if the reconciliation differences had been recorded (rather than capitalized and amortized over proxy lives) in the periods that they were

44

calculated.  Although the true determination of what amounts should have been recorded in prior periods is a matter of ongoing examination, this chart adequately depicts the total impact of some of the Enterprise's policies and practices based upon the information we were provided.

The remainder of this section provides further specific examples regarding the Enterprise's *application* of its policies.  These *examples* are intended to illustrate our findings.  **OFHEO is still in the process of reviewing further information and analysis regarding the Enterprise's accounting for deferred price adjustment amortization.** Examples of the Enterprise's accounting for deferred price adjustments include:

a. On two occasions during 2003, a variety of means were employed to affect the amount of catch-up adjustment required during periods in which investment analysts' expectations would otherwise not have been met.

b. Numerous sensitivity runs of the catch-up were performed so that results under different assumptions could be evaluated. In the instances reviewed, assumptions were selected so that generated results would trigger adjustments to income in order to produce desired financial results.

c. Management exercised discretion in accordance with the adopted policy in the selection of interest rate assumptions to ensure desired financial results were achieved.

d. Inconsistent accounting practices were applied in the determination of the catch-up position.  These inconsistently applied practices allowed management to avoid exceeding the thresholds for the catch-up position.

e. Reconciliation differences between information maintained on sub-ledgers and information used by the catch-up modeling application were recorded as 'phantom' assets or liabilities and were amortized over subsequent years.[123]

## Management of Catch-Up Results

The Enterprise's policies for accounting for amortization were purposefully designed and implemented in a manner that provided management with the discretion to adjust the amount of recorded income or expense as long as such adjustments were made to reduce catch-up to the threshold amount as well as within the target catch-up ranges.  This gave management the means to mitigate the volatility of income that is normally associated with a large mortgage portfolio, and further gave them the flexibility to achieve desired financial results.

---

[123] Fannie Mae Audit Report, Office of Auditing, Amortization Audit, dated July 9, 2003, FMSE 023745-023752 under the caption 'Data Processes' states:
"Because of systems and process limitations, reconciliation differences exist between the amortization account sub-ledgers (STATS and LASER), the G/L, and the amortization database (PDI). For this reason, the various systems need to be periodically realigned, resulting in adjustments to original unamortized accounts and accumulated amortization account balances.
These adjustments ranged from $700 thousand to $45 million during the period 11/2002 to 5/2003.
Management's practice has been to expense smaller differences, to book and amortize larger differences as new acquisitions, or incorporate the differences into the overall Catch-up balance."

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**In addition, the Enterprise engineered the catch-up results to generate a catch-up amount that exceeded the threshold, in order to trigger a specific amount of an on-top adjustment pursuant to the policy.**



During Q2 and Q4 of 2003, on-top adjustments were recorded that - after adjusting for the effect of income taxes - allowed the Enterprise to meet (or very closely meet) analysts' estimates. Such adjustments made to the accounting for amortization - during the period since the Enterprise began filing public financial information - were contrary to SEC Staff Accounting Bulletin No. 99 (SAB 99).

In June of 2003, the consensus EPS estimate for Fannie Mae was $1.867 per share and the low estimate was $1.81 per share.[124]  The actual EPS of Fannie Mae prior to recording the on-top adjustment would have been only $1.82 per share.  After recording the on-top adjustment, the final EPS amount was $1.86 per share.

The amount of the on-tops recorded for the June 2003 closing were $21.2 million for NII and $24.9 million for Gfee.  The amount of the on-top required (per the Enterprise's policy) as of June, 2003 was significantly affected by two different events.  Both of the two events described below had the effect of increasing the amount of income to be recorded without borrowing too much income from future periods:

- First, the interest rate selected for the computation of the catch-up as of June 30 was specifically changed to incorporate interest rate drops that occurred (primarily during the

---

[124] Source: Bloomberg

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

month May).[125] OFHEO has concluded that the interest rate chosen by the Enterprise for the June 2003 catch-up sensitivity was chosen, in part, because of the effect that such a change would have on the amount of income for the quarter as well as the *forecasted* amount of catch-up. Essentially, the rate was chosen to increase income, but in a measured fashion. See Section "Management Discretion Applied in the Selection of Market Assumptions" for more information on this matter.

- Second, the Enterprise began to add certain capitalized reconciliation differences to the catch-up results (in addition to the impact of certain forecasted reconciliation differences which had been included in the catch-up analysis beginning in the prior quarter.) Again, the inclusion of a *forecasted* reconciliation difference in the catch-up results shows that management was thinking about current and future periods in determining the amounts to be recorded in the financial statements. OFHEO has concluded that the inclusion of such realignment differences in the catch-up sensitivity is not appropriate. See Section "Inconsistently Applied Accounting Practices to Determine the Catch-up" for more information on this matter.

In December of 2003, the consensus EPS estimate for Fannie Mae was $1.75 per share.[126] The actual EPS of Fannie Mae prior to recording the on-top adjustment would have been only $1.72 per share. After recording the on-top adjustment, the final EPS amount was $1.76 per share.

The December 2003 catch-up analysis was notable for the manner in which the catch-up amount was determined. In this circumstance, multiple catch-up sensitivities were run[127] before the final catch-up amount was determined. OFHEO has received draft sensitivity reports generated on January 5, January 6, and January 8, 2004. In addition, there was a final draft sensitivity report, which is undated, but which matches the amount of the final on-top adjustment which was recorded on January 10, 2004.

In addition, there were two journal entries used to record the on-top adjustments. The first journal entry, dated January 7, 2004 was for $50.1 million of income.[128] The entry is supported by a sensitivity analysis and bears a number of authorizing signatures including sign-offs by Mr. Juliane and Ms. Pennewell. The second entry, dated January 10, 2004 was for an additional $6.5 million.[129] Such activity, on its face, may not raise much attention. But in retrospect, it seems suspect. The final catch-up threshold for the fourth quarter of 2003 was $110.2 million. If a sensitivity analysis was run on January 7th and an on-top had already been recorded, then why would another sensitivity analysis need to be run? Also, why would the result, a mere $6.5 million then be recorded? The $6.5 million number seems especially small when you consider that, according to the definition provided by management, the "functional equivalent of zero"[130] was +/- $110.2 million?

---

[125] The Fannie Mae 30-year coupon dropped from 4.908% on April 30, 2003 to 4.177% on June 12, 2003. The rate then rose to 4.648% on June 30, 2003. Source: Bloomberg. FMSE 194295-194296.
[126] Source: Bloomberg
[127] For bates ranges see references in the table on the following page.
[128] Journal Entry Dated 1/7/2004, FMSE 216777
[129] Journal Entry Dated 1/10/2004, FMSE 216778
[130] OFHEO Interview, Mr. Tim Howard, August 5, 2004, p. 151
Q: And do you think that, given the historical amount of the variability, that even an annual variability, that the $ 200- or potentially greater than $ 200-million target range that you apply is reasonable?

The results of the four sensitivities that we received are compared in the following table:

| Date | NII Catch-Up Mean | Catch-Up Threshold | Difference | Comments |
|------|------------------|--------------------|-----------|----------|
| January 5, 2004 | $ 173.5 | $ 109.5 | $ 64.0 | Marked "Not Final" |
| January 6, 2004 | 159.6 | 109.5 | 50.1 | Agrees to on-top recorded on 1/7 |
| January 8, 2004 | 133.6 | 110.2 | 23.4 | Marked "Alternative" |
| January 10, 2004 | 166.8 | 110.2 | 56.6 | Agrees to combined on-tops recorded on 1/7, 1/10 |

Bates numbers (in order by date above): FMSE-SP 002872, 002875, 002869, and 002502

As the table above shows, the NII catch-up was recalculated twice after the on-top journal entry was recorded on January 7, 2004. In addition, it should be noted that the NII revenue target was also slightly adjusted from $109.5 million to $110.2 million. The adjustment of the NII target had the effect of changing the catch-up threshold itself.

As of the date of this report, we have received no specific evidence that such adjustments were made to intentionally match the analysts' estimates. However, the existence of multiple sensitivity runs, the timing of their production and the small amounts of on-top journal entries recorded suggests that results were generated to achieve desired financial results.

A reason for the multiple runs however, *is* suggested by Mr. Juliane's 2002 performance appraisal. That performance appraisal states:

Under a section entitled "Objective 1" of Mr. Juliane's 2002 year-end appraisal, the following statement appears (among others): "Assist management to reach results that fit within established guidelines." Under the "Results Achieved" section of Objective 1, the following appraisal if provided:

> This was an extremely intense year as record low interest rates could have caused our catch-up position to fall outside of our corporate policy. The low interest rates resulted in a significant increase in the number of sensitivity runs performed to provide management with the best analysis possible when making decisions. In support of this need, Jeff and his staff completed several unscheduled sensitivity runs and responded to numerous requests for information.[131]

Although this performance appraisal was for the prior year (2002) it supports OFHEO's contention that the Enterprise processed multiple sensitivity runs in order to "reach results." **This strongly suggests that amortization expense was being actively and inappropriately managed by the Enterprise.**

---

A: I wouldn't relate it to the variability, economic variability, because what we were attempting to do was calculate a zone of estimation error, if you will, within which any number we produced we would view as the functional equivalent of zero – could not differentiate between whether $70 million is the right number or minus $50 million is the right number. That was the theory and intent behind the policy.

[131] Employee Contribution Review Form for Mr. Jeffrey Juliane for the period January to December 2002. The appraisal was provided by Mr. Richard Stawarz and approved by Ms. Janet Pennewell and is dated March 18, 2003. FMSE 220368-22073.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

## Management Discretion Applied in the Selection of Market Rate Assumptions

Appendix I "Estimation Methods Used for Modeling the Catch-up" provides an analysis of estimation methods selected, and their impact on the catch-up. The appendix also provides an analysis of assumptions selected in 1999 and 2000 by management that were used in the determination of the catch-up. OFHEO believes that the estimation methods selected, as well as market rate assumptions applied during this period, were consistent with an intent to avoid volatility and achieve desired financial results. **OFHEO also believes there are other noteworthy instances in which management selected assumptions, in periods subsequent to 2000, in order to produce desired financial results as well.**

Noteworthy in particular is the calculation of the June 2003 amortization. First, in this period, rates had declined sharply during the quarter. This rate decline precipitated a significant amount of discussion on how it should be addressed insofar as the modeling of the deferred price amortization was concerned.[132]

During testimony, management indicated that due to the timing of the rate setting meeting, it was common that the rate might be updated prior to quarter-end.[133] Due to the steep decline in rates, an analysis was performed to determine the most appropriate rate path to use for the June 2003 quarter-end sensitivity analysis. As a result of the analysis, management decided that it would be best to use a "hybrid rate" in order to calculate the amortization for that quarter.[134] The hybrid rate would be a combination of the current rate curve and the forward curve run as of April 30, 2003.[135]

---

[132] Memorandum prepared by Mr. Jeff Juliane, Re: Amortization, June 11, 2003, FMSE-SP 000166-000167, in which he discusses 3 different interest rate scenarios and their expected impact on the Net Interest Income and Guarantee Fee catch-up position as of 6/30/03, 9/30/03, 12/31/03 and 12/31/04 compared to the respective thresholds.

[133] OFHEO Interview, Mr. Jeff Juliane, June 8, 2004, p.34
A: In Q2 there was a significant rate move after the rate setting meeting that came out. So we had a subsequent meeting with the rate setters and we came up with an adjusted rate path that they felt was the more prudent rate path to deal with because rates had been so substantial.

[134] OFHEO Interview, Mr. Jeff Juliane, June 8, 2004, p. 56
A: We felt it prudent that we needed to adjust our interest rate forecast because taken into the effect that rate reduction and then management had discussions around whether we should use like the May 15 floor or some other floor or what was an appropriate long-term rate associated with that historically low short-term perspective and they came up with this hybrid approach of getting back to the April 30 forward long-term perspective over a seven-month time horizon--6 month time horizon.

[135] Memorandum prepared by Mr. Jeff Juliane, Re: Amortization, dated June 11, 2003, FMSE- SP 000166-000167 states "Management elected to determine the impacts in considering the move down in rates as a "temporary shift" in the curve from the rates of April 30th. A third rate curve was modeled which we consider as a "hybrid" of the two runs. The "hybrid" rate path started at the May 28th current coupon rate, which was 50 basis points lower as compared to the April 30th forward rate, reverting back to the April 30th curve by the end of October. The curve was then consistent with the April 30th curve from that point forward."

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

The hybrid rate would consider the recent decline in rates, but at the same time assume a return to the April rate level over a short period of time.  The net amount of the total catch-up position at that point was a deferred income amount.  The change to the hybrid rate had the effect of increasing the amount of deferred income and thereby increasing the amount available for income recognition in the future.

The rate that was originally used for that quarter was previously determined at a meeting in April of that year.  Subsequent to that meeting, rates suddenly dropped by approximately 50 basis points.  The effect of the rate change on the catch-up level was analyzed in a memorandum dated June 11, 2003 from Mr. Jeff Juliane.  The following table is an excerpt from that analysis:

**4/30/2003 Forward Curve Run**

| Date | NII Catch-up | 1% of NII Revenue Target | Gfee Catch-up | 2% of Gfee Revenue Target |
|---|---|---|---|---|
| 6/30/2003 | $190.2 | $99.6 | $77.6 | $44.4 |
| 9/30/2003 | $142.0 | $99.6 | $81.3 | $44.4 |
| 12/31/2003 | $112.8 | $99.6 | $83.2 | $44.4 |
| 12/31/2004 | $68.2 | $108.5 | $90.0 | $47.7 |

**Down 50 Run**

| Date | NII Catch-up | 1% of NII Revenue Target | Gfee Catch-up | 2% of Gfee Revenue Target |
|---|---|---|---|---|
| 6/30/2003 | $216.0 | $99.6 | $174.3 | $44.4 |
| 9/30/2003 | $138.7 | $99.6 | $192.5 | $44.4 |
| 12/31/2003 | $99.4 | $99.6 | $204.6 | $44.4 |
| 12/31/2004 | $8.6 | $108.5 | $231.2 | $47.7 |

**Hybrid run**

| Date | NII Catch-up | 1% of NII Revenue Target | Gfee Catch-up | 2% of Gfee Revenue Target |
|---|---|---|---|---|
| 6/30/2003 | $217.3 | $99.6 | $92.1 | $44.4 |
| 9/30/2003 | $158.0 | $99.6 | $100.2 | $44.4 |
| 12/31/2003 | $129.4 | $99.6 | $102.4 | $44.4 |
| 12/31/2004 | $92.6 | $108.5 | $106.7 | $47.7 |

*Tables from memorandum dated June 11, 2003 from Jeff Juliane to Distribution. Subject: Amortization, FMSE –SP 000166-000167*

The first table labeled "4/30/2003 Forward Curve Run" shows the amount of catch-up position using the interest rates from the April forecast.

The second table labeled "Down 50 Run" shows the amount of the catch-up position using the revised interest rate from a date in early June of 2003.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

The third table labeled "Hybrid Run" shows the amount of the catch-up position using the revised interest rate from a date in early June combined with an assumption of a return to the April 30th rate level by the end of October 2003.

**It is important to note that in all these rate scenarios, management's analysis included a *projection* of how it would affect future periods. This is consistent with emphasizing the forecasting and management of the catch-up over prospective periods.**

The different dates on the tables reflect the forecasted trend in the catch-up position based upon the forecasted interest rate and prepayment assumptions assuming no future change in market conditions. In all three scenarios, the amount of the deferred income for NII was forecasted to decline and the amount of the deferred income for Guarantee Fee was forecasted to increase.

A Bloomberg printout obtained from Enterprise management shows that the decrease in rates from April was a temporary decline, and that rates actually rose towards the end of June. The low point of rates for the quarter actually occurred on June 12, 2003, one day after the date of Mr. Juliane's rate analysis.[136] Coincidentally, this curve was the most advantageous rate curve possible. Had the analysis been re-run using the June 30 rate estimates, it is likely that the catch-up amounts would not have exceeded the respective thresholds and no income on-top adjustments would have been required or the amounts of the on-top adjustments would have certainly been lower.

Why the Hybrid Rate was Advantageous
The hybrid rate was attractive for two reasons: (1) the incorporation of the rate decline provided more income that could be recorded as compared to the income that could be recorded using the April rate and (2) the hybrid rate provided less income than the "Down 50" scenario. This allowed management to record some income, but not so much that the catch-up position would become negative, if rates changed adversely in subsequent periods. To this extent, the hybrid rate presented a "Goldilocks" solution: it was not too high, not too low; it was just right.

In addition, the Enterprise was in the process of correcting certain errors that had been discovered in the data used to calculate amortization. For instance, securities that were purchased at a premium were erroneously included in modeling groups with securities purchased at par or at a discount. The reason that including them together was incorrect is due to the fact that securities purchased at a premium do not respond to changes in interest rates in a similar manner as those purchased at a discount.[137] The correction of these misclassifications was being done pursuant to a project known as "Security Master."

Beginning in the first quarter of 2003, the Enterprise began modeling the effects of the Security Master project. This was important because the potential adjustments resulting from the project could have a significant effect on the amount of accumulated amortization. Specifically, the changes were likely to result in large amounts of catch-up adjustments. As the modeling

---

[136] Bloomberg screen print, FMSE 194295-194296
[137] SFAS 91, Q&A 51

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

progressed, it became clear that the adjustments resulting from the Security Master project would result in a negative (expense) catch-up adjustment.  This recognition was acknowledged by the inclusion of the projected expense as one of the reconciling items in the amortization results memorandum prepared for the quarter ended June 30, 2003.[138]

Because the Security Master project was expected to result in a large expense adjustment, it was monitored closely so that the final effect could be absorbed into the catch-up position when the project was completed without having an adverse effect on reported earnings.

The projected expense resulting from Security Master is also a reason why the "Down 50" rate scenario was not advantageous as of June 30.  If too much income was taken in June, then there might not be enough unrecorded income in the catch-up position to absorb the expense resulting from the corrections identified by the Security Master project in the following quarter when the project was expected to be completed. This is another example of how the catch-up framework was used as a "cookie-jar" to mitigate forecasted expenses.

In her testimony Ms. Janet Pennewell described a point in the formulation of the policy in 1999 where the concept of a mean reversion technique was considered.[139]  Mean reversion is a concept whereby forecasts of long-term interest rates are assumed to always revert to a mean interest rate level.  Ms. Pennewell indicated that the Enterprise chose not to implement the mean reversion technique because they did not feel that such a technique was permissible.  Ms. Pennewell further elaborated that it was her personal belief that such a technique (if employed as a matter of policy) could lead to even greater volatility.  For instance, if rates fell, the mean reversion technique could slow down the rate of change in the amortization speeds.  However, if rates did not revert to the mean shortly thereafter or continued to fall a large amount of catch-up adjustment could result.[140]

Although the hybrid rate did not technically constitute a mean reversion technique, in fact, it had an analogous effect. The current rate path was only used for the next few months and expected to revert back to the April 30th rate curve within a 4 month period. The flexibility to apply discretionary judgment to selecting interest rate assumptions and modeling rate curves provided much more favorable results than mandating certain rate scenarios by using the

---

[138] Memorandum prepared by Mr. Jeff Juliane, Subject: Q2 Amortization Results, July 29, 2003, FMSE 023763-023765.
[139] Memorandum prepared by Mr. Jeff Juliane, Subject: Amortization Policy Runs, to Mr. Tim Howard, June 21, 2000, FMSE-SP 000024-000025, in which he discusses various scenarios showing "sensitivity results using mean reversion to generate the prospective cashflows."
[140] OFHEO Interview, Ms. Janet Pennewell, June 15, 2004, pp. 176-177.
Q: […] In this discussion of this alternative, the effect of assuming that rates will trend back down towards a historical average, that would have the effect of reducing earnings volatility, correct?
FANNIE MAE LEGAL COUNSEL: Would or did? Because this was done –
Q: Would.
FANNIE MAE LEGAL COUNSEL: Hypothetically.
Q: Hypothetically, it would.
A: I actually don't think it would. The proponent of that particular view thought that it would help reduce the arbitrary earnings volatility that we've talked about before. In fact, I was of the view that, in fact, it would increase the potential, in certain circumstances, for additional volatility and, more importantly, I was concerned that if rates continued to, over a sustained period of time, continued to [sic] move away from historical means that you could very quickly develop a large catch-up, and that was never our objective.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

concept of mean reversion.  As this circumstance shows, management had the latitude to determine whatever interest rate assumptions it desired.

## Capitalization and Amortization of Reconciliation Differences

Limitations in systems integration and application level controls undermined the integrity of information used to estimate amortization.  This necessitated periodic reconciliations between information on transaction sub-ledgers (i.e. STATS, LASER) and the information on the amortization sub-ledger (iPDI). Differences from these reconciliations are known to Fannie Mae personnel as "realignments."  On some occasions, these differences were recorded as adjustments in the period in which they became known. On other occasions, these differences were capitalized as phantom assets or liabilities and amortized over a period of time using the life of a proxy security.[141]  Amounts capitalized in this manner were placed in a separate account in the PDI sub-ledger which was commonly referred to as the "deferred pool bucket" or the "bucket".  Management of the Enterprise refers to such reconciliation differences as realignments.[142]

This practice was well known within the Enterprise.  In their July 9, 2003 audit report on Amortization, the Office of Auditing included the following statement (referring to reconciliation differences):

> Management's practice has been to expense smaller differences, to book and amortize larger differences as new acquisitions, or incorporate the differences into the overall catch-up balance.[143]

In addition, Ms. Joyce Philip provided the following background on the above observation:

> Q: Did audit inquire as to whether the alternative treatment of expensing smaller items and amortizing larger items was consistent under GAAP?
>
> A: We raised-we discussed this with Jonathan [Boyles] to determine whether any one of these treatments was appropriate.  And Jonathan indicated that he had no concern with either one of the methods. But he did agree that there should

---

[141] OFHEO Interview, Mr. Jeff Juliane, June 8, 2004, pp. 137-138.
Q: Is – what is the amortization characteristic of balances that are assigned to the bucket?
A: We assign a conventional proxy for the amortization flow of those bucket acquisitions.
Q: "Conventional" meaning 30-year fixed rate?
A: Yes.
Q: That would be true even though originally the amount assigned to this bucket may have come from a pooled mortgage that – pooled mortgages that was not 30-year fixed rate?
A: That's correct. I mean, the color of the elements of our asset is 30-year fixed range [sic: should be rate]. The specific answer to your question is you're right.
[142] OFHEO Interview, Mr. Jeff Juliane, June 8, 2004, pp. 82-83.
Q: [...] So what is the deferred pool bucket comprised of?
A: When we have--when we do--the deferred pool bucket is where we do realignments. We have a realignment policy that states that amounts above a certain threshold are put in the deferred pool bucket and given the proxy factors that amortize it over the life of that proxy collateral, and--but the amount is fully incorporated within the framework of the policy in times of catch-up.
[143] Fannie Mae Office of Auditing Report, Amortization Audit, July 9, 2003, FMSE 023745-023752.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

be consistent direction or procedures as to how, going forward, realignment differences should be treated.[144]

In his testimony, Mr. Boyles claimed no recollection of that discussion.[145]

There is no justification in GAAP for capitalizing and deferring differences resulting from reconciliation differences.  Also, the effort involved in performing these reconciliations, and the magnitude of the differences, suggests that meaningful weaknesses in internal controls and system deficiencies had existed in previous years.

The following is an illustration of how the practice of transferring differences into the bucket would work:  For example, a security is purchased with a premium of $10, a purchase price of $110 and $100 redemption value.  Six months later the systems are realigned and the premium, which was originally recorded at $10, is adjusted to $5. As such, the amortization that has occurred to date is roughly twice as high as it should have been.  Rather than recording an adjustment to income as they should have, Fannie Mae moved the difference to the bucket and amortized it using a proxy estimated life.

According to information OFHEO received during the examination, the practice of capitalizing reconciliation differences dates back to 1991.  The last significant LASER reconciliation difference added to the bucket was a deferred income of approximately $27.8 million in April of 1998.[146] Most of the older amounts in the bucket relate to LASER realignments and were for the most part fully amortized as of June 2002.   The total net composition of the bucket as of June 2002 was a deferred credit balance of approximately $43 million.[147]

The first STATS realignment, however, was performed in August of 2002[148] and the resulting difference was also recorded as a "new acquisition" into the bucket.  This accounting practice was described in the Office of Auditing Amortization Audit Report, dated July 9, 2003, as one of their audit observations regarding processes that "should be improved to provide better documentation of analyses supporting G/L activities"[149] as follows:

> Data Processes:
> Because of systems and process limitations, reconciliation differences exist between the amortization account sub-ledgers (STATS and LASER), the G/L, and the amortization subledger (PDI).  For this reason, the various systems need to be periodically realigned, resulting in adjustments to original unamortized accounts and accumulated amortization account balances.

---

[144] OFHEO Interview, Ms. Joyce Philip, July 21, 2004, p. 91.

[145] OFHEO Interview, Mr. Jonathan Boyles, August 24, 2004, pp. 97-98.
Q: Okay. Have you ever rendered an opinion that it would be appropriate to capitalize and amortize reconciliation differences at any point?
A: I don't remember ever giving an opinion as relates to that.

[146] Subsidiary G/L Account by Acquisition Date, Month Ended: March 2002, FMSE 193570.

[147] Id.

[148] Subsidiary G/L Account by Acquisition Date, Month Ended: September 2002, FMSE 193572, shows an addition to the STATS realignment product type in August of 2002 for approximately $46 million.

[149] Subsidiary G/L Account by Acquisition Date, month ended: June 2002, FMSE 331640

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

These adjustments ranged from $700 thousand to $45 million during the period 11/2002 to 5/2003. Management's practice has been to expense smaller differences, to book and amortize larger differences as new acquisitions, or incorporate the differences into the overall catch-up balance.[150]

The following table shows significant STATS realignment amounts that were transferred into the bucket since 2002 and the total net balance of the bucket as of March 2004:

**Composition of the Bucket as of March 2004**
**Deferred Debits (Credits)**

| | | |
|---|---|---|
| August 2002 | $ | (15,102,606) |
| May 2003 | $ | (40,183,296) |
| August 2003 | $ | 63,951,446 |
| February 2004 | $ | 105,915,406 |
| Other (Net) | $ | (25,697,089) |
| Total | $ | 88,883,861 |

Source: Subsidiary G/L Account by Acquisition Date: For Original Amount: Deferred Debits (Credits) Month Ended March 2004 (G/L Account 1201-01) FMSE 193584

The amount shown on the schedule above for February of 2004 relates to a different error in the amortization process. OFHEO understands that the $105 million amount was subsequently revised to an amount of only $36.5 million.[151] Management of the Enterprise informed OFHEO that the amount of this $36.5 million realignment was later reversed and recorded as an expense in the month of March.[152]

The error related to a system problem in handling dollar roll transactions. In a dollar roll transaction, securities are lent out of the portfolio in secured financing arrangements. The error occurred when, upon return of the collateral, the original acquisition date of the security was overwritten with the date the security was returned to the portfolio. Such a date change caused issues with the accounting for amortization since the original acquisition date was needed to estimate the period of amortization.

---

[150] Id.

[151] Fannie Mae Reasonableness Test of Purchase Discount Income, for month ended March 31, 2004, FMSE-SP 003313.

[152] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, p. 181

Q: If I understand this correctly, then at the end of that same corridor [sic quarter], Q104 [sic Q1 04], you were within the threshold for NII, but a debit was booked –

A: For $36,515 [sic].

Q: Right. What did that amount relate to?

A: That related to the dollar-roll realignment that Financial Standards determined that was an error. We did a SAB 99 on it, and we booked it. We just happened to use that account booking. It wasn't an on-top based on policy. That's the account that we chose to recognize the expense related to this dollar-roll error.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

The final amount of the adjustment was determined by correcting the data in the STATS system and then determining the impact of the corrected information.  Mr. Juliane specifically referred to the dollar-roll realignment as "non-standard."[153]

A formal SAB 99 analysis was prepared on the error including an evaluation of what effect the error had on prior periods, earnings per share, employee award calculations and other measures.  This analysis was performed by the Financial Standards group at the request of Ms. Spencer.[154]

It should be noted that the analysis completely ignores the Enterprise's prior practice of capitalizing differences and amortizing them over proxy periods. **While the memorandum recommends that the results of the analysis should be shared with management, any comparison to the Enterprise's realignment policy is noticeably absent.[155]**

The recording of this error as an expense is in direct contrast to the treatment of past differences.  In addition, it is not in conformity with the Enterprise's policy for recording realignments into the bucket.  Management of the Enterprise indicated that going forward all non-standard realignments will be evaluated by Financial Standards before they are recorded.[156]

---

[153] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, pp. 181-182.
Q: What differentiated that dollar-roll error from, let's say, a realignment?
A: That would be a question for Financial Standards because we engaged them on this realignment, and I provided analysis to their group, and they did a determination, whether it was a change in estimate or an error.
Q: When did that occur?
A: End of March. You'll see a Q1 memo for 2004, there's an attachment of Nicole's [sic. Mukul's] analysis of whether there was an error or not in the materiality relating to previous periods.
Q: I thought that was for dollar rolls and not for realignments.
A: No, it was a realignment due to the fact that we determined that we determine there was a dollar-roll error inside of STATS. So this was the processing of changing the original un-ams associated with the fact that there was a dollar-roll error, and that's what Nicole's [sic. Mukul's] analysis is all about.
Q: Does that mean that future realignments will no longer be capitalized into the bucket?
A: No. Once again, when you see our SOX documentation, we have a formalized realignment policy that says that standard realignment differences will be handled in the same fashion that they're currently being handled. Nonstandard realignments will be run through Financial Standards to determine the proper handling of the accounting associated with that.
[154] OFHEO Interview, Mr. Jonathan Boyles, August 24, 2004, pp. 83-84.
Q: Referring back to, I guess, audit difference related to dollar rolls, we saw an analysis that was done by someone who worked for you named Mukul Gupta?
A: Yes.
Q: And he evaluated the error in context of many periods and many different things, basically a SAB 99 analysis. Who directed him to perform that analysis?
A: I don't recall who it was in particular, but either Janet or Leanne. My best guess would be Leanne. In one of my meetings with her, one of my regular meetings with her, described this issue and asked me to perform the analysis. And so I obtained the information from Janet Pennewell's group and Mukul did the detailed analysis and reported up through me.
[155] Memorandum dated May 3, 2004, from Mukul Gupta to Distribution, Re: Error in Amortization of Securities Used in Dollar Rolls,  FMSE-SP 000268.
[156] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, p. 182.
A: […] Once again, when you see our SOX documentation, we have a formalized realignment policy that says that standard realignment differences will be handled in the same fashion that they're currently being

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Our examination has not seen any evidence to indicate that the errors on dollar rolls are any different than other types of errors that have an effect on the accounting for amortization.

OFHEO believes that the expense was taken for two reasons: (1) there was a large income on-top adjustment required for Guarantee fee amortization at the end of the first quarter of 2004 which more than offset the amount of the expense resulting from the recording of the dollar roll error, and (2) changes in interest rates projected that the net interest income catch-up position would grow negative by the end of the year.  If correct this conclusion would be consistent with the intent to maintain the catch-up amount in a deferred income position.

Accounting for the Correction of an Error

The relevant accounting guidance for the treatment of the reconciliation differences can be found in Accounting Principles Board Opinion 20, *Accounting Changes* (APB 20).  APB 20 provides the following guidance about why matters such as the reconciliation differences should be considered errors:

> Reporting a correction of an error in previously issued financial statements concerns factors similar to those relating to reporting an accounting change and is therefore discussed in the Opinion. Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared.  In contrast, a change in accounting estimate results from new information or subsequent developments and accordingly from better insight or improved judgment.  Thus, an error is distinguishable from a change in estimate.[157]

APB 20 also provides guidance on how corrections of errors should be recorded in the financial statements:

> The Board concludes that correction of an error in the financial statements of a prior period discovered subsequent to their issuance (paragraph 13) should be reported as a prior period adjustment.[158]

Although the guidance above would indicate that the adjustment should be shown as a prior period adjustment, the SEC issued Staff Accounting Bulletin Topic 5F which provides the following additional guidance with respect to the correction of immaterial errors:

> If prior periods are not restated, *the cumulative effect of the change should be included in the statement of income for the period in which the change is made* [Emphasis added] (not to be reported as a cumulative effect adjustment in the manner of APB Opinion 20). Even in cases where the total cumulative effect is

---

handled. Nonstandard realignments will be run through Financial Standards to determine the proper handling of the accounting associated with that.
[157] APB No. 20: Accounting Changes, Par 13.
[158] *Id.*, Par. 36

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

not significant, the staff believes that the amount should be reflected in the results of operations for the period in which the change is made.[159]

**Based upon the guidance above, OFHEO has concluded that the practice of capitalizing and deferring these reconciliation differences is not permitted under GAAP.** In addition, the Enterprise's practice of treating reconciliation differences in one of three ways (expense, capitalize or include in catch-up position) demonstrates yet another manner in which inconsistent decisions were made by management that affected the recorded amount of amortization.


### Inconsistent and Incorrectly Applied Accounting Practices to Determine the Catch-Up

**OFHEO's examination identified a number of instances whereby the catch-up results were changed by including adjustments that were incorrect or inconsistently applied.**

During 2003, certain of the reconciliation differences started being included in the catch-up analysis for NII. However, not all reconciliations were included. The inclusion of reconciliation differences in the catch-up framework is inappropriate for a number of reasons:

- According to management, the catch-up sensitivity analysis is necessary due to the range of uncertainty in estimating prepayments. However, the inclusion of such adjustments (which result from errors created by system limitations and other items) to the results of the catch-up sensitivity analysis is fundamentally inconsistent with this line of reasoning.

- Certain modeled future reconciliation amounts – modeled pursuant to only one interest rate scenario - were included as adjustments to different catch-up sensitivities. Even management of the Enterprise pointed out to us that this would not make sense since the catch-up sensitivity is based upon the mean of five interest rate scenarios while the estimated impact of the future reconciliation amounts is based upon only *one* interest rate scenario.[160]

- Management of the Enterprise used discretion to select which amounts to include as adjustments to the catch-up on a quarterly basis.

---

[159] SEC Staff Accounting Bulletin Topic 5F: Accounting Changes Not Retroactively Applied Due To Immateriality.

[160] OFHEO Interview, Rene LeRouzes, July 16, 2004 p. 144
Q: Three hundred and ninety-three million. So if you had run catch-up sensitivities as of that date, the 393 million would have been the net impact that using an updated factor after-affecting the MBS reclass would have on catch-up?
FANNIE MAE LEGAL COUNSEL: Q: Can you tell him what that number is?
A: That number – a sensitivity analysis of five rate environments, a base and two outliers up and down. This [the $393] is only reflective of one environment. So to confuse this with a sensitivity analysis would be apples and oranges, from my perspective.

58

The catch-up calculation for the first quarter of 2003 was the first one to include the effects of reconciliation differences. The adjustment was actually made for the effect of a future realignment related to the Security Master Project. Alternatively, no adjustment was made for past reconciliation differences. The following description of the Security Master project was included in the Q2 2003 Amortization Results Memorandum:

> Security Master is an attribute level identification process that ensures consistent handling of collateral by assigning the FAS 91 type and associated general ledger accounts based on the actual security characteristics. These attributes are compared against rule-based tables within STATs [sic] to assign the appropriate set of accounts and FAS 91 designation. The rules are defined by the business users and maintained within STATs [sic].[161]

The result of the project would be that securities that had previously been included in inappropriate modeling types would now be included in modeling groups based upon objective criteria. Prior to the implementation of Security Master, the process of identifying securities had been done manually by the trade input area.[162] The two significant issues that were supposed to be resolved by Security Master were as follows: 1) certain securities purchased at a premium had been included with securities purchased at par or at a discount. This was not appropriate because (as described in this report) prepayments on securities purchased at a premium were not affected by changes in interest rates in a similar manner as securities purchased at a discount; and 2) certain REMIC tranches[163] were inappropriately grouped together for modeling purposes as well (for example, premium and discount REMICs were commingled).

The reason that Security Master was going to have a large effect on the financial statements was due to the fact that, after the securities would be transferred, catch-up would be recorded (comparing the new life-to-date calculation to the previously recorded amounts) and any errors in the previous calculation would cause significant swings in the catch-up balance.

---

[161] Memorandum prepared by Jeff Juliane, Subject: Q2 Amortization Results, dated July 29, 2003, to File, FMSE 023763-023765.

[162] OFHEO Interview, Mr. Rene LeRouzes, July 16, 2004, pp. 147-148.
Q: So this analysis that we just looked at, that was – that showed the dollar effect of the MBS reclass. Was there an analysis prepared to show any dollar impact of the REMIC remapping?
A: Not that I worked on. No.
Q: Do you know, in fact, whether or not the REMIC remapping did have a dollar effect on the catch-up or on the amortization?
A: Yes, it had – it had an impact. But I don't know what that was and, sitting here today, when that analysis was integrated with this one. If it was, in fact, done, but I would think it would have been.
Q: Would it be possible for you to explain to us why that – what generated that impact?
A: What impact?
Q: The impact of the REMIC remapping?
A: The REMIC remapping was a rule-based engine that provided instead of manually determined concepts at the cohort level, the rule-based engine for securities, specifically the MBS reclass and the REMIC project, made the actual process as best as it could be. So there was no manual tagging done at the trade level to determine FAS 91 types. It was an automated approach to provide increased data integrity.

[163] Risk, maturity or other classes into which a multi-class security such as CMO or REMIC is split.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

An amount of $118 million was deducted from the amount of the NII catch-up position as of the first quarter of 2003. In addition, there were four sensitivity analyses run for the first quarter of 2003[164] which calculated a positive catch-up (income position) ranging from $175 million to $232 million.

The impact of the Security Master was actually modeled twice (presumably for purposes of estimating the effect it would have on the catch-up). The first analysis was done using the existing (in-use) factors. That analysis showed that the Security Master Project would result in an estimated $118 million expense amount.[165] The second analysis was done using the updated (March 2003) factors and showed that the project would result in an estimated $393 million amortization expense amount.[166]

Management decided to rely on the analysis using the older rates. This was important for two reasons: 1) Had the analysis using the newer rates been used, the inclusion of the $393 million amount in the analysis of catch-up would have required management to record an on-top expense adjustment of roughly $62 million (using even the most advantageous catch-up based upon the 4 scenarios run).[167] In addition, that would have left the catch-up position in a negative $99 million (deferred expense) position, the least advantageous position under the policy. 2) The catch-up position (based upon the final calculation) exceeded the threshold by approximately $78 million. By including the lower amount, no on-top adjustment was necessary because the catch-up was now within the range of +/- 1% of portfolio NII.

Even though the adjustment for the Security Master project related to prior periods, it should be noted that an assessment of the impact of the project on prior reporting periods was never performed. However, in the first quarter of 2004, a comprehensive assessment was done for the amortization errors related to dollar rolls. This is interesting, especially due to the magnitude of the potential Security Master Project adjustment.[168] In the instance of the dollar roll error, management concluded that the $36.5 million impact was immaterial.

The final catch up calculation prepared for the quarter ended June 2003 showed a total catch-up position of $220.5 million. However, the impact of Security Master had grown to be $155 million as of June 30, 2003. It is interesting to note, however that the amount of the impact had not been re-modeled (as would be necessary to appropriately reflect the updated rate

---

[164] The four sensitivity analyses referred to are labeled FMSE-SP 002926, FMSE-SP 002930, FMSE-SP 002942 and FMSE-SP 002943.
[165] MBS Reclass Summary Update, FMSE-SP 000155-000156.
[166] *Id.*
[167] $232-393=-161. With a catch-up threshold of approximately 99 million as of March 31, 2003, an on-top adjustment of approximately $62 million ($99-161) would have been required under the Enterprise's policy.
[168] OFHEO Interview, Mr. Jonathan Boyles, August 24, 2004, p. 86.
Q: I'm just curious. Why prepare a SAB 99 analysis for this particular item and not, for instance, for the security master items?
A: Again, I'm not on the day-to-day, you know, feed on what's happening down in the purchase discount area. When I'm asked to perform it, I perform it. I'm not aware of other issues or other concerns that Leanne would have thought would have required a SAB 99. So, you know, what she will do will she'll ask me or, you know, here's something that we think we might have missed. You know let's evaluate it. And so she asked me to do it, and I would not have even known about the dollar roll if somebody didn't bring that to my attention and ask me to perform it.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

environment).  Instead, an amount of $37 million was simply added to the original $118 amount.  The $37 million was the estimated impact that moving those securities (that had an estimated impact of $118) would have on the other securities that would still remain in their original modeling entities.  Management of the Enterprise indicated that this amount had been more difficult to isolate and to model, and that is why this number was not determinable on the same date as the $118 million amount.[169]  It is not clear why the $118 amount was not updated, especially since there had been such a wide range of possible outcomes ($118-$393) using the data from the first quarter.

The amortization catch-up results for the second quarter of 2003 were also adjusted to take into account certain reconciling items.   The inclusion of reconciling items was identified as an observation in the internal audit report.[170]  That report noted that there were no standards specifying which reconciling items should be included.[171]  The reconciling amounts were related to certain realignments arising from the STATS system.  However, reconciliation differences from the LASER system were ignored.  Management of the Enterprise has not offered any credible explanation for why only certain items were included.

The amounts included as reconciling items in the catch-up analysis performed for the second quarter of 2003 were deferred credits which totaled approximately $60 million increasing the mean catch-up position from $ 220.5 million to approximately $ 280.5 million.[172] The actual net amount of deferred reconciliation differences as of that date was, however, $92.3 million.

This raises the question of why only certain amounts of the realignments were included in the reconciliation. Although our examination has not found specific evidence that the inclusion of only certain realignments at June 30, 2003 was done intentionally to achieve a particular result, the inclusion of the reconciliation differences did have a direct impact on the amount of the on-

---

[169] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, pp. 104-105.
Q: Was that effect incorporated into the catch-up and the on-top, or was it included – was it treated similar to a realignment?
A: It was completely encapsulated in the framework of the policy. There's multiple stages of this thing. We did an analysis in Q1 to determine the 118 [million]. Then there's an analysis that we – we enhanced that analysis because when you're moving collateral out of a FAS 91 type and into a FAS 91 type, there's going to be ancillary effect to the assets that remain in the old FAS 91 type because you're altering the cash flows. So we went in and as we enhanced our estimate over time, we said that 118 was the initial estimate that we have from just moving collateral X – collateral out of conventional into conventional premium.
We then said, okay, we didn't have time at that point in time in Q1 to do an analysis, so, okay, what's that going to do to the factor of the assets that are left behind in the conventional FAS 91 type, because theoretically you had just taken the higher-yielding assets, i.e., premium priced assets, out of conventional and moved them somewhere else. So you're theoretically going to slow down or lengthen the duration of the remaining assets in conventional. So we did that analysis in Q2, and we came up with an estimate of, I believe, $37 million that was going to be the impact of the catch-up related to the conventional acquisitions. At that point in time, our total estimate was $155 million related to the entire Security Master impact relating to MBS re-class. […]
[170] Fannie Mae Audit Report, Office of Auditing, Amortization Audit, July 9, 2003, FMSE 023749
[171] *Id.*, the audit report states "[…] procedures do not specify what level of documentation is required to support actions taken, or what level of management involvement is required. Examples include: - Changes to modeling methodology […], - Adjustments to Catch-up Results […]."
[172] Memorandum prepared by Jeff Juliane, Subject: Q2 Amortization Results, July 29, 2003, to File, FMSE 023763-023765.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

top adjustment recorded in that period.  Essentially, by including the projected effect of the STATS realignment, management of the Enterprise had allowed the amount of catch-up to grow so that the impact of the errors to be corrected by the Security Master project could be absorbed in the period the project was completed while still maintaining a positive catch-up position.  This is further evidence that the catch-up framework was not a range of uncertainty in estimation but rather a reserve that management could rely upon and offset against other adjustments.

Later, in September 2003, the net amount of *all* realignments was included as a reconciling item in the catch-up analysis.

The following table, taken from a draft of the Q3 Amortization Results Memorandum, shows the adjustments made to the modeled catch-up position for both the second and third quarters of 2003:

|  | Q2 | Q3 | Difference (Q3-Q2) |
|---|---|---|---|
| Mean Catch-up position on preliminary sensitivity report | $220.5 | $298.1 | $77.6  (a) |
| All realignments | $60.9 | $82.8 | $21.9  (b) |
| Back out catch-up from PO sales | $0 | $(30.4) | $(30.4) |
| Modeling estimate of $1.3 billion MBS reclass | $(155.0) estimate | $(132.0) actual | $23.0 |
| **On-top recorded** | $(21.2) | $(107.5) | $(86.3) |
| Ending Position | $105.2 | $111.0 | $5.8 |

(a) Difference due to higher rate environment.  This caused the net premium book amortization speeds to slow relative to current in-use factors.  This causes an increase in the overall income (over amortization of premium) position.

(b) Included the impact of all net LASER realignments for the Q3 sensitivity runs.  This caused an additional 21.9 million of positive catch-up to included [sic] into the analysis.

*Q3 Amortization Results Memorandum draft dated October 22, 2003; FMSE-SP 000377.*[173]

There are a few things to note about the realignments included in the analysis above:

- The catch-up threshold is, according to management, meant to serve as a measure of the range of uncertainty in estimating prepayments.  Conversely, the realignment amounts relate primarily to known and quantified amounts that reflect the correction of processing errors.

---

[173] Although the memorandum dated October 22, 2003 is a draft, the amounts included in the table agree to a copy of the final memorandum dated as of the same date except that, in the final memorandum, the realignment amounts were included together with the mean catch-up amounts.  See FMSE-SP 000576.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- There are differences between the manner in which included amounts have been calculated.  The mean catch-up position is calculated using the simple mean of five different interest rate scenarios.  Alternatively, the estimated impact of the MBS reclass as of June 30 ($155 million expense) was estimated using only one interest rate path.  Lastly, the recorded realignment amounts ($62.9 and $82.8 for June and September, respectively), the amounts related to PO sales in September ($30.4 million) and the amount of the MBS reclass are actual *recorded* amounts.  **This commingling of different reconciling items (with mixed bases of valuation) clearly shows that the catch-up framework devised by the Enterprise is a means for managing amortization expense and not, as management claims, a range of uncertainty in estimation.**

In addition, the balance of all realignments recorded to the bucket was $92.3 million and $20.9 million (both deferred credits) as of June 30, 2003 and September 30, 2003, respectively.  Based on OFHEO's review neither of the amounts included in the table above agree to the balance of the bucket as of the respective dates.

The amount included in the table for realignments as of June 30, 2003 ($60.9 million) does not agree, because only certain realignment amounts were included, as previously discussed.

The amount included in the table for realignments as of September 30, 2003 ($82.8 million) also does not agree.  Information about how the $82.8 million amount was derived is not clear at this point in OFHEO's examination.  This amount appears to be included in error because the following month, only $19.4 million[174] of deferred income from realignments was included in the analysis of the amortization results despite the fact that there were no realignments between September and December of 2003.

However, management of the Enterprise did inform OFHEO that an amount of $67 million, which was recorded into the bucket in August of 2003, directly corresponded to the originally estimated amount of the Security Master impact of $118 million.[175]  This means that the impact of Security Master had been included in the catch-up framework for three quarters, which directly impacted the amount of amortization recorded.  However, when the project was completed and the impact was quantified, the amount was recorded as a new acquisition and amortized over a proxy (thirty year) life**.  This clearly shows that the inclusion of certain reconciling items had the effect of shifting large amounts of income from one period to the next.  Had the impact of Security Master not been included as an adjustment**

---

[174] Memorandum prepared by Mr. Rene LeRouzes, Subject: Q4 Plan Amortization Results, dated January 30, 2003, FMSE-SP 000370.

[175] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, pp. 114-115.
Q: […] Do you recall what the purpose of including these reconciling items was?
A: My recollection as we sit here today is that we were trying to encompass all the different arenas where STATS had been – where issues between STATS and iPDI were impacting the results. So at that point in time, we had two of them through realignments and one through Security Master. So we encompassed all those things to look at – to come up with what we thought at that point in time was our best estimate of our catch-up position.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**to the catch-up results beginning in Q1 2003, the amortization results for the year would have looked very different.**

The following chart illustrates the difference between the amount of amortization recorded by the Enterprise during 2003 and the amount that would have been recorded if realignments had been recorded in income and if the catch-up (using the base rate forecast) had been recorded to $0 at each quarter end.



Management's decisions on how to include realignments in the catch-up evolved as follows:

Q1 2003: Include only the effect of the projected impact of the anticipated Security Master
          Realignment
Q2 2003: Include Security Master and certain other STATS realignments
Q3 2003: Include all realignments
Q3 2004: Continue to include all realignments

As described previously, in the first quarter of 2004, the Enterprise performed another reconciliation and corrected a known error in the accounting for Dollar Rolls.  In that case, management first decided to capitalize the amount and later decided to expense it. So in the span of one year, the Enterprise has employed four different practices with respect to realignment differences.  See section X for more discussion about the expensing of the Dollar Roll realignment.

OFHEO also identified other adjustments to the modeled catch-up amount that were either not approved by management or the amortization policy did not provide guidance on how to handle these adjustments:

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- For the 4th quarter of 2002 and the 1st quarter of 2003 the modeled catch up amount was adjusted for the impact of new acquisitions. In the 4th quarter of 2002 this adjustment brought the amount of the catch-up position within threshold and therefore made the recording of an adjustment to amortization income unnecessary. The adjustments for the impact of new acquisitions on the book of business were not approved by management. The inclusion of new acquisitions in the modeling process is necessary because the book of business is generally on a two to three month lag;[176] however, this process is not documented and was not applied consistently.

- For the 3rd quarter of 2003 the catch up results for guarantee fees (as modeled by the system) were manually adjusted by $ 20 million. The adjustment was not disclosed on the catch-up sensitivity analysis report as a manual adjustment to the model results and therefore might not have been known and approved by management. Fannie Mae's Office of Auditing was able to obtain some support for the adjustment; however, the amount was based on judgment and therefore "not very intuitive".[177]

### Internal Controls over the Amortization Process

During our examination, we noted a number of significant control weaknesses in the process of accounting for amortization.  A majority of these internal control weaknesses are centered around the AIMS system[178] and the modeling process.  Such findings have been made in spite of the fact that the Fannie Mae Office of Auditing (OA) completed an audit (which noted some issues but only issued a "yellow"[179] rating) of the amortization process as recently as July 2003 and had, in addition, performed other procedures subsequent to that date.[180]  OFHEO believes

---

[176] OFHEO Interview, Mr. Jeff Juliane, June 8, 2004, pp. 99-100.
Q: At some point, our understanding is that you began to incorporate – let me ask a question prior to that. The balances upon which the catch-up analysis is performed lagged by one quarter, so when – is that correct?
A: That is correct. There is a – when a book is presented four [sic. for] our consumption; that is, between 28 to 29 days after the months that is just closed so we always strive to stay on the same book as portfolio, so there is a two- to three month lag between the book of business remodeling versus where we're actually at from a calendar period.
[177] Fannie Mae Office of Auditing SDI, Amortization Audit, 2003, FMSE 118808-118811.
[178] AIMS - Amortization Integration Modeling System.
[179] The Office of Auditing "yellow" rating translates into a conclusion that "Controls need strengthening. Requires attention during the normal course of business."
[180] OFHEO Interview, Ms. Joyce Philip, July 21, 2004, pp. 158-159
Q: As a follow-up, I noted that Security Master was referred to in management's corrective action. As a follow-up to this audit, would you do a post implementation review of the Security Master Project?
A: We did do a post implementation review of Security Master.
Q: And what was the date of that work, roughly?
A: It would have been some time in the third of fourth quarter of '03.
Q: Would there have been an official audit report similar to the July 9th report?
A: There would have been a memo issued.
Q: And would there be work papers that support that memo?
A: Yes.
OFHEO Interview, Ms. Joyce Philip, July 21, 2004, p. 111

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

that the presence of these significant control weaknesses themselves, undermined the process of amortization to such an extent that the material accuracy of deferred price adjustment amortization could not be reasonably assured.  The significant control weaknesses include:

- Insufficient segregation of duties and key person dependencies
- Modeling undertaken to produce desired results
- Underlying data issues, including illogical or anomalous amortization factors
- A lack of written procedures, supporting documentation and an insufficient audit trail.

## Segregation of Duties and Key Person Dependencies

In July 2003 Mr. Jeff Juliane was promoted and given responsibility over both the modeling and accounting for amortization.  Immediately subsequent to his promotion, a concern was raised regarding the segregation of these functions in a meeting on August 8, 2003.  The meeting related to an Office of Auditing investigation into an employee's – Mr. Roger Barnes - concern over amortization factor anomalies, and Mr. Barnes' further allegation that amortization factor change adjustments had been made to cause actual earnings to more closely align with planned earnings (See subsequent sections of this report for more information on the Amortization Investigation).

The following appears under the heading "3) Discussion of the internal controls over amortization activities" in the minutes to the August 8th meeting:

> Sam [Mr. Rajappa, SVP Operations Risk, Office of Auditing] stated that a recent reorganization, that organized iPDI subledger process (Roger Barnes' team) under the AIMS modeling function (Jeff Juliane), weakens the segregation of functions between the modeling and PDI data processing and general ledger functions.

Despite the Office of Auditing report, and Mr. Rajappa's concerns over the reorganization, that very same paragraph of the August 8th meeting minutes states:

> Janet Pennewell responded that the previous segregation of duties was largely due to how the two systems and functions had been developed and evolved over time.  She added that she did not see this segregation as a key control being that determining how much income or expense should be recognized (accomplished by AIMS system) and processing to the G/L (accomplished by PDI) would be uncommon [sic] across other accounting operations within the Company.[181]

---

Q: Okay. Our understanding is that on August 8, 2003, a meeting was held to discuss his allegations. Is that consistent with your understanding?
A: My understanding of the meeting of August 8th was to provide a status update to various parties within Fannie Mae of the results of the test work we had done up to that point in time.
[181] Summarized Minutes of the Meeting (8/8/03), Unamortized Balances and Factor Analysis, FMSE-SP 000080-000081.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

It is clear that members of the Controller's staff had the ability to effectively ignore concerns about control weaknesses raised by the OA.  OFHEO has not been provided with any information to indicate if the segregation issue raised by Mr. Rajappa has been addressed.

OFHEO has determined that Mr. Juliane was already responsible for: a) all amortization modeling, b) determining changes to amortization prepayment assumptions, c) specifying functional requirements for the system that supported amortization modeling, d) performing the quarterly catch-up analysis, and e) making adjustments to earnings that were made directly to the AIMS modeling system as factor adjustments. With the reorganization, Mr. Juliane was now responsible for the PDI data processing and general ledger function.  The segregation of those functions previously served as an important check and control point in the amortization process. In fact, the factor anomaly concerns that were examined by the OA were observed through the PDI data processing and general ledger recording activities, and significantly, the allegation that earnings were being adjusted to align with plan, were being directed at Mr. Juliane himself.  An underdeveloped audit trail additionally impeded the capability of the Enterprise to effect any meaningful review or oversight of the processes and activities that now collectively fall under his responsibility.


## Modeling Undertaken to Produce Desired Results

The AIMS System -as designed by the Enterprise- has two primary functions: the calculation of the catch-up and the calculation of the amortization factors that are used to determine prospective amortization.  The system has the functionality to model the amortization results using a variety of different scenarios.  This provides management of the Enterprise with a "menu" of available options for calculating the amount of catch-up.  For instance, the AIMS system has the functionality to model a variety of possible rate scenarios, prepayment speeds, prospective catch-up adjustments and other modeling parameters. This allows the system user to evaluate results generated under varying scenarios before determining which specific assumptions to use for quarterly reporting.

OFHEO has found that, on a number of occasions, multiple sensitivity runs were processed after the quarterly closing.  In particular, these occasions included periods after the yearly close. This is curious because the model-ready book is generally based on a book of business that is anywhere from one to three months old.[182]  As such, the catch-up sensitivity report could have been run well before the closing of the books at the end of these periods.  It is furthermore not clear why performing multiple runs using different assumptions or parameters would otherwise be necessary at all.  The Office of Auditing did not identify any systems performance issues that would have necessitated such multiple runs.  Neither, did the Controllers Group, identify any

---

[182] OFHEO Interview, Mr. Jeff Juliane, June 8, 2004, pp. 99-100.
Q: At some point, our understanding is that you began to incorporate – let me ask a question prior to that. The balances upon which the catch-up analysis is performed lagged by one quarter, so when – is that correct?
A: That is correct. There is a – when a book is presented four [sic. for] our consumption; that is, between 28 to 29 days after the month that is just closed so we always strive to stay on the same book as portfolio, so there is a two- to three-month lag between the book of business remodeling versus where we're actually at from a calendar period.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

performance issues in the controls self assessment questionnaire that all business units are required to complete.

## Underlying Data Issues

There were also significant differences between the source systems (e.g. STATS, LASER) and the amortization system (iPDI), regarding the original balances to be amortized.  These differences were primarily due to limitations in the timing and quality of the data which was fed from the transaction subledgers to the amortization system.  As previously noted in this report, the reconciliation of those systems occasionally led to large differences which the Enterprise capitalized as new acquisitions and amortized over a proxy life.  In addition however, such realignments also led to manual adjustments made to the catch-up sensitivity analysis. These manual adjustments were sometimes inconsistently treated and were not always adequately documented or supported.  Thus review or validation of them was difficult.

The Enterprise's method for recording on-top adjustments within AIMS was also manually effected as well.  AIMS system functionality supported the ability to selectively update factors for certain products without affecting others.  This was one means to effect on-top adjustments (recorded as factor changes).  Such adjustments were judgmentally allocated to particular modeling groups. This process of adjustment and allocation is inconsistent with maintaining the integrity of loan and security level information and, at a minimum, makes analysis and review of the amortization results more difficult (See following on Factor Anomalies).  In her testimony Ms. Ann Eilers, Director Office of Auditing, described misclassifications caused by system feeds as one of her biggest concerns surrounding the amortization process.[183]

A manifestation of the extent of underlying data issues is illustrated by an adjustment to the catch-up results that was made in the third quarter of 2003.   The analysis of amortization results noted an adjustment of approximately $30 million to the calculation of the catch-up amount to correct for improperly determined amortization for three principal-only ("PO") mortgage securities that had just been sold, and upon which, incorrect gains on sale had also been determined.  OFHEO is still evaluating this issue and its implications.  However, in his testimony, Mr. Juliane acknowledged the inaccurate amortization, and further stated that a review of the accuracy of the amortization of securities sold had never been previously performed.  Aside from raising questions as to why such a review was performed at this particular time (the adjustment allowed the Enterprise to stay within the catch-up threshold), it also raises further concern about the extent or magnitude of similar errors on other securities.[184]

---

[183] OFHEO Interview, Ann Eilers, Director Office of Auditing, July 23, 2004, pp. 45-46.
Q: What was your biggest concern personally about the control surrounding the amortization process?
A: We had some system feeds that were creating misclassifications. We had some policies and procedures that weren't documented, and we had some business area records that were not as well documented.
[184] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, p. 103.
Q: You did an analysis on gain/loss?

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

## Factor Anomalies

The AIMS system produces results that are illogical or that represent mathematical anomalies. These illogical or anomalous conditions include negative amortization factors and amortization factors greater than one. In theory, a negative amortization factor would cause a premium or discount to grow larger over time. A factor greater than one could potentially cause for example, a premium to amortize beyond the original balance to become a discount.

Management has asserted that such illogical and anomalous results derived from the aggregation of premiums and discounts as well as REMIC tranches with dissimilar characteristics, but that they did not translate into inaccurate financial statements. This explanation however implies, at a minimum, the presence of other potentially deeper issues regarding the aggregation of deferred price adjustments into incorrect modeling groups. In addition, it raises the question as to why edit checks and error reports on data processes did not prevent the illogical results and anomalies from occurring, or why the Enterprise was not able to sufficiently flag their existence or report their breadth.

The improper aggregation of premiums and discounts and the illogical results and anomalies themselves posed other internal control concerns because such issues made it virtually impossible to correlate the amortization results to the actual performance of the underlying loans/securities. OFHEO believes that management would have been unable to effect such a review. In addition, the full extent to which illogical results and anomalies did, in fact, cause inaccurate financial reporting is a focus of OFHEO's continuing examination.

Our examination has concluded that these factor anomalies were caused primarily by a lack of clear delineation of responsibility by management of the Enterprise. A breakdown clearly occurred between the business unit owners of the source systems and the personnel in the Controller's Department responsible for calculating amortization. Because neither party took responsibility for the quality of the data, amortization errors occurred. When questioned about responsibility for ensuring whether a loan or security was included in an appropriate modeling group, Mr. LeRouzes offered the following answer: "Well, it's not me."[185] This was further validated by Mr. Juliane.[186]

---

A: No, no. I did an analysis quantifying the CUSIPs that we're moving and passed it along. I mean, I – I don't know if we – from an institutional perspective if we looked at that or not. I don't know if STATS did an analysis or not.

[185] OFHEO Interview, Mr. Rene LeRouzes, July 16, 2004, p. 30.

Q: I guess – okay, that's fine. From a functional perspective, would you know which functional area would be the owner of that process?
A: Of signing off of ALEX?
Q: Making sure that securities are going into the right cohort?
A: I really can't speculate on what functional area there would be responsible for that.
Q: Okay. But it's clearly not – clearly not your area?
FANNIE MAE LEGAL COUNSEL: Not him. Right.
A: Well, it's not me.

[186] OFHEO Interview, Mr. Juliane, June 8, 2004 p. 68.

Q: So, the business unit owner of the system would be responsible for setting the rules?

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Factor anomalies can occur in a variety of ways and for a variety of reasons.  There are a few simple maxims that can be applied, however, to ensure that factor arrays are correct. Mathematically speaking, a graph of level-yield factor arrays should be curvilinear and downward sloping over time.  Updates to factor arrays could shift the curve up or down, but the prospective array thereafter should assume a similar relationship.  In addition, the sum of all factors in any given array should total to 1 (or 100% of the item to be amortized).   Another example of a factor anomaly would be a negative factor (which technically should never occur except in the case of a retrospective adjustment.)

Ms. Mary Lewers, Vice President of Financial Accounting, was the supervisor of Mr. Barnes and the iPDI area (among other things) and, as such, was ultimately responsible for the amounts recorded to the general ledger.  She provided the following example of how such anomalies could occur:

> Question: How can you get a correct answer with a negative amortization factor?

> Answer: My understanding is that in total, when you combine all of the related information that you get to the same answer. It's just the pieces have this appearance to them that makes it difficult to analyze, but that fundamentally the amortization and the creation of factors is occurring at the REMIC level, which is the right level in terms of calculating the level yield.

Her response reflects two recurring themes about factor anomalies that we have encountered in our examination: 1) Personnel in the Controller's Department accepted the fact that factor anomalies existed and 2) Ms. Pennewell and Mr. Juliane continuously offered the same explanations as to *why* factor anomalies could occur, while always managing to avoid the larger question of whether such anomalies represented errors.

The question of whether such anomalies represented errors did not get addressed until the concerns raised by Mr. Barnes precipitated the Office of Auditing Amortization Investigation. **OFHEO has concluded that factor anomalies, in certain cases, do in fact represent errors and may also constitute departures from GAAP.**

According to direct testimony received in our examination, there appears to be a critical control point between the AIMS and iPDI systems that would identify any factor anomalies.[187]

---

A: They are responsible for insuring the light [sic, "right"] collateral on assets are getting put in the same FAS 91 types.
[187] OFHEO Interview, Mr. Roger Barnes, September 1, 2004, pp. 115-116.
Q: Why would AIMS not calculate the right amount of the current month's amortization if it had the factor with it generated and if it had received the balances from PDI?
A: The way AIMS was structured, and I am not the expert on AIMS, being on the periphery, they had the ability to include and exclude certain things. You could be including or excluding components that were part of AIMS. They could select, as they called it, a book of business to use for calculating the amortization. If they did not use the write-back [sic. right book] of business, they would be using a different month than what the production system had and not even realize until they finished the run and then had differences. These were the kinds of things that happened with great regularity even though they had the balances there, but because one could go in and make changes to what was and was not

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

However, this control was not working effectively.  Such a breakdown in controls is clearly evidenced by the size of the adjustment related to the Securities Master Project, and the significant number of securities involved.  This issue was known by personnel in the Controller's Department for several years before the problem was resolved.[188]

Prior to the implementation of Security Master, the portfolio area was responsible for the process of coding securities into modeling groups – information that ultimately found its way into the STATS system.  This process was essentially a manual process and was not consistently applied by all relevant personnel.[189]

How Factor Anomalies Could Represent Departures from GAAP
As previously described, securities are pooled into similar groups for purposes of modeling. SFAS 91 provides specific guidance on how to determine what constitutes "similar" for the purposes of grouping securities.

Because the Enterprise is the largest holder of mortgage loans and mortgage-related securities, the process of grouping securities into similar groups is a data-intensive process.  For example,

---

included, certain components, there would be instances where the results would be different because I maintained a tightly controlled system where very few changes could be made, and their system was somewhat different where they in turn were inevitably massaging their write-back [sic. right book] of business, even though you are generating the factors, or some of the factors get passed in error in transition, or they could go through editing, and when the factors come to PDI, and they would show a list showing me their reports and I would reject them and pass them back to them saying there were problems. […]

[188] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, pp. 106-107.
Q: You said earlier that the problem associated with the misclassified securities was something that you yourself became aware of when you started doing this job?
A: Yes.
Q: Who did you report that to in management?
A: We really had – we had a regularly convening FAS 91 kind of group, and that would have been Tom, myself, Leanne, Janet, and over time other people have come and gone, Bill Quinn, et cetera. At the point in time that you're talking about with this conversation, I know there was a conversation with the group at that point in time that this dynamic was going on.
[189] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, pp. 98-99.
Q: When did you first become aware that there was going to be a need to reclassify securities that had been erroneously categorized as discounts and reclassify them under premium FAS 91 –
A: When did I first learn that we needed to do that?
Q: Right.
A: It would have been reasonably early on when I took over. When I looked at the inventory of the collateral, you realize that if in the conventional bucket we had premiums and discounts in there. It really became a question more of when could we do something about it because we didn't have the infrastructure at that point in time to do anything about it.
Q: Was it a matter of securities being miscoded as premiums?
A: The process to assign a FAS 91 type before Security Master, the way I understand it, was that the traders would enter a pool type code that would then be translated into a FAS 91 type. So these assignments of pool type code could theoretically be translated from one trader to another trader differently. So there wasn't a way to ensure consistency of application of this information. Once Security Master came in place, we were able to do that by looking at relative sets of attributes and then assigning FAS 91 types at that point in time.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

the Enterprise's MBS portfolio alone contains approximately 400,000 different security CUSIPs.[190]

The criteria for determining whether securities can be pooled into a group are prescribed by Question 51 to the Q&A on FAS 91 as follows:

> Q: What characteristics should be considered in determining whether the lender holds a large number of similar loans for purposes of estimating prepayments in accordance with paragraph 19?
>
> A: The objective is to evaluate all characteristics that would affect the ability of the lender to estimate the behavior of a group of loans. The following are examples of some characteristics that should be considered when aggregating loans:
>
> - Loan type
> - Loan size
> - Nature and location of collateral
> - Coupon interest rate
> - Maturity
> - Period of origination
> - Prepayment history of the loans (if seasoned)
> - Level of net fees or costs
> - Prepayment penalties
> - Interest rate type (fixed or variable)
> - Expected prepayment performance in varying interest rate scenarios.

The purpose of the guidance above is to distinguish between loans and/or securities that, based upon their characteristics, should be modeled together because they are likely to have similar estimated lives.  Conversely, loans and/or securities that would not be expected to have similar estimated lives should not be modeled together.

From an accounting control perspective, the pooling of securities with dissimilar characteristics would lead to anomalies in the factor array.  This could be easily assessed by a comparison of the performance of the underlying collateral to the amount of amortization recorded.  As mentioned above, a number of factor anomalies existed which clearly indicated that the guidance in Q&A item 51 was not being followed appropriately.

---

[190] OFHEO Interview, Mr. Sam Rajappa, June 17, 2004, pp. 96-97.
Q: What specific parts of the accounting transaction did he not – the accounting for those transactions did he not understand?
A: Okay. Again, I want to make sure – I'm not saying he didn't understand. I'm just saying either he didn't understand or he didn't go there. For whatever reason, he didn't go there.
The way we do the amortization, like we said, we have 400,000-plus securities. It's not possible on each security or a CUSIP to determine what the factors should have been and what it was. So we grouped them into what we considered to be logical buckets of like securities, those with like characteristics. […]

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**The Office of Auditing Amortization Investigation**

Prior to the commencement of our examination, the Enterprise informed us that Mr. Barnes, a former manager in the Controller's Department, had raised his concerns about several matters including the modeling of amortization factors, significant control deficiencies in the modeling systems, segregation of duties issues as well as other matters.[191]

In August 2003 Fannie Mae's OA performed an Amortization Investigation, which included a review of the controls over factor changes and a review of factor anomalies themselves. The timing of the investigation was made much more complicated due to the fact that the Enterprise's quarterly report on Form 10-Q was expected to be filed the following week.[192] In addition to completing the investigation, Mr. Rajappa also needed to inform the CFO and CEO of the investigation as part of the quarterly financial statement certification process, as well as update the Audit Committee of the Board.

Although some of Mr. Barnes' concerns were raised to the highest levels of the Enterprise, culminating in a presentation by Mr. Sam Rajappa on August 14, 2003 to the Audit Committee of the Board of the Directors, our examination has concluded that the Amortization Investigation was flawed in a number of ways.

Mr. Barnes raised concerns about the modeling process in an e-mail to Sam Rajappa.[193] These concerns were related to three specific anomalies, which he had observed in the data passed to the iPDI system from the AIMS system: 1) factors in excess of 100%, 2) negative factors and 3) factor arrays that amortized almost the entire amount to be amortized in the first few months.[194]

A meeting was held on August 8, 2003, one week after Mr. Barnes expressed his concerns. This meeting was attended by a number of representatives from different internal groups as well as the external auditors to discuss the concerns raised by Mr. Barnes. The OA performed a number of procedures to evaluate the issues raised by Mr. Barnes in preparation for this meeting. At this meeting. Mr. Rajappa stated that "...this process is in compliance with the company's accounting policies that are in compliance with GAAP" and then asked if anyone at the meeting objected to that statement.  There were no objections.[195]  Although we have interviewed a

---

[191] Undated document titled 'Unamortized Balances and Factor Analysis', handwritten notes identify Mr. Roger Barnes as the source for this document. FMSE 023356.

[192] The audit notification memorandum is dated August 6, 2003 (FMSE 023289) and the 10-Q was officially filed on August 14, 2003 (http://www.fanniemae.com/ir/sec/index.jhtml?s=SEC+Filings).

[193] An email from Mr. Roger Barnes to Mr. Sam Rajappa, Subject: Request for Meeting, dated July 29, 2003, states that "it is necessary that I schedule an important meeting with you regarding analysis and research I have been conducting for a number of weeks." The email further states "it might be a good idea to invite select members of your staff (Ann Eilers, Paul Jackson, and/or Joyce Philip) who will have familiarity with the subject I must cover." FMSE 024268

[194] "Unamortized Balances and Factor Analysis" Prepared by Mr. Roger Barnes and provided to the Office of Audit.  FMSE 023356

[195] OFHEO Interview, Mr. Roger Barnes, September 1, 2004, p. 147-148.
Q: Were you informed that they were concluded or that there was no problem?
A: I think they said it was not material and that it was in compliance with GAAP.
Q: But they never came back and provided you with any supporting documentation at all?

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

number of witnesses on this particular conclusion, it is still not exactly clear how such a conclusion was reached, since many of the anomalies that Mr. Barnes had identified were subsequently fixed through various projects including the Security Master Project, the enhancements to the Gfee modeling process and the REMIC re-mapping project.[196]

However, one particular test performed by the OA was significant by virtue of the fact that it was performed at all.  The OA performed specific procedures to test whether the transactions identified by Mr. Barnes were included in the catch-up analysis.  As stated previously, OFHEO strongly disagrees with the Enterprise's accounting (catch-up threshold) for estimation uncertainty.  However, if one were to accept the Enterprise's reasoning for establishing a catch-up, would that acceptance further permit including adjustments resulting from data errors and other issues in the catch-up as well?  Furthermore, the OA analysis in this regard was flawed for the simple reason that their procedures were insufficient to assess the breadth of the issues or their quantitative impact on the catch-up analysis. Mr. Rajappa's testimony on this matter follows:

> Q:  Now, was that correct or appropriate--was it appropriate under generally accepted accounting principles to assign REMICs to FAS 91 buckets regardless of their characteristics?
> A:  I do not know the--I cannot opine on the generally accepted accounting principles, but that's the way it was done.
> Q:  Were you aware that it resulted in large variance--were you aware that this practice of assigning REMICs to FAS 91 types, regardless of the characteristics of the tranche, that it resulted in large variances in modeling characteristics of the CUSIPs that reside in that type?
> FANNIE MAE LEGAL COUNSEL:  Are you reading from a particular part of the document?
> Q:  Yes.
> [Pause.]
> A:  Yes.
> Q:  Yet you had--yet the company concluded overall that its reported results were in accordance with generally accepted accounting principles, correct?
> A:  The company concluded--I concluded based on my audit that those specific 62 CUSIPs, give or take a few, and the 26 identified by Jeff, they were part of the beginning balance of the catch-up analysis.
> Q:  And that compensating control is what, in fact, made the financial statements correct?

---

A: No, no one went in depth to try to explain, and that is what led to my comments of how can the review be done when at this point I raised questions and the items in [sic. internal] audit referred to were only one or two of the, so how can you have your review done? We had amortization of – it was occurring so rapidly that we were amortizing the income expense, the entire discount that should have been 10 to 15 years, in as short as seven months. […]
196 OFHEO Interview, Mr. Jeff Juliane, June 8, 2003, pp. 125-126.
Q: […] My question is, is it your opinion that the amortization of the securities that he [Mr. Barnes] identified was corrected as a result of implementation of the project?
A: I'll answer that specifically. There was no correction needed in the securities he identified in his analysis. There was an enhancement done through Security Master to better group the assets so these kinds of anomalies from a myopic perspective would not show up any longer.
Q: Do you still have REMIC as 91 categories or REMICs that produce negative factors?
A: A, yes, we do, and – but the occurrence of these are much – have been greatly reduced through Security Master.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

FANNIE MAE LEGAL COUNSEL:  Would you describe that as- OFHEO has characterized it as a "compensating control."  You don't necessarily have to phrase it that way, but...
 Q:  Would you agree that including that effect in the catch-up is a compensating control?
 A:   I don't want to quibble on compensating or not, but it is a good control, having a catch-up analysis that is approved by our external auditors and making sure that the catch-up analysis starting point included this and all the other effects that we talked about that could change.  As a starting point, I think that is a good--that gave me comfort.[197]

The Office of Auditing's attention was also brought to another matter related to a manual factor change submitted by the modeling group. This matter was raised at the August 8, 2003 meeting to address the issues raised by Mr. Barnes.[198]

The iPDI system, which at that point was the responsibility of Mr. Barnes, had the capability to manually change an individual factor that had previously been passed from AIMS.  A manual change could be necessary if, for instance, it became too late in the closing process to effect another complete pass of information from AIMS to iPDI.  If a change was necessary, a message would be sent from the AIMS modeling team to the iPDI team to process the change. In addition, the AIMS team was responsible for validating the reason for the change.  This is a segregation of duties that no longer exists today as a result of the changes to Mr. Juliane's responsibilities.

The manual factor change was processed "without full understanding by the iPDI group of the reason for the change"[199] and despite the fact that "written documentation supporting the change request was not sufficient."[200]   The minutes of the August 8, 2003 meeting clearly state Mr. Barnes' concern: "Roger said that this transaction bothered him because it appeared that the factor change was made to make iPDI "agree" with forecasted amortization expense."[201] Mr. Barnes' concerns were significant because, in his mind an intentional misstatement may have occurred, and by raising his concerns, he also brought attention to the potential segregation of duties issue in the Controller's Department.

The CFO, Mr. Howard, clearly understood that Mr. Barnes had alleged an intentional misstatement in the matter of the $6.5 million factor change.  When OFHEO asked Mr. Howard whether Mr. Barnes had made such an allegation, Mr. Howard responded as follows: "Well, he alleged that was intentional misstatement."[202]  Ms. Spencer, who reported directly to Mr. Howard and was ultimately responsible for the amortization area because it was part of the

---

[197] OFHEO Interview, Mr. Sam Rajappa, June 17, 2004, pp. 99-101
[198] Summarized Minutes of the Meeting (8/8/03), Unamortized Balances and Factor Analysis, FMSE-SP 000081. The minutes state that "Roger [Barnes] said that this transaction bothered him because it appeared that the factor change was made to make iPDI "agree" with forecasted amortization expense."
[199] *Id.,* The meeting concluded the investigation by the Office of Auditing and was attended by members of the Controller's Department, Financial Standards, Office of Auditing, Corporate Compliance and KPMG.
[200] Fannie Mae Office of Auditing, Amortization Investigation, August 2003, FMSE 023283
[201] Summarized Minutes of the Meeting (8/8/03), Unamortized Balances and Factor Analysis, FMSE-SP 000081.
[202] OFHEO Interview, Tim Howard, August 5, 2004, p. 99.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Controller's Department, did not understand Mr. Barnes' allegation as intentional misstatement or fraud.[203]

In addition, neither Mr. Rajappa, nor his staff (the very people who were responsible for conducting an independent investigation) understood his allegations as intentional misstatement.[204] Such a lack of understanding is strange, especially since the summarized minutes of the August 8, 2003 meeting (which included the statement made by Mr. Barnes that the factor change appeared to have been made to make actual results *agree* with forecasted results) were prepared by Mr. Paul Jackson, Director in the OA, and were reviewed by Mr. Rajappa.[205]

What made the manual factor change even more difficult to understand is the way in which it was processed. It seems, according to documentation reviewed by OFHEO, that the issue that gave rise to the need for the factor change occurred in one particular FAS 91 type but the factor adjustment actually occurred in a different FAS 91 type.

The factor change actually occurred in the FAS 91 type RMC T802. RMC T802 is a special FAS 91 type, which was created for a particular pool of securities related to a single transaction. The RMC T802 bucket was chosen because it would be easier to deal with later operationally when

---

[203] OFHEO Interview, Leanne Spencer, August 12, 2004, pp. 52-53.
Q: Okay. At any time in the past, did you ever have the opinion that the company's accounting was not in accordance with generally accepted accounting principles?
A: No.
Q: Are you aware of any company officer or employee ever expressing their belief that any of Fannie Mae's accounting policies or practices were inconsistent with GAAP?
A: There was an employee in the controller's department in 2003 that raised some concerns to the level of the controller of some items that he felt warranted looking into and was unclear if they were appropriate and we investigated it.
Q: And that was Roger Barnes?
A: That's correct.
Q: When he raised these issues, did he ever allege fraud or intention to misstate financial results?
A: No. Not to me.
Q: Okay. Did you ever develop an awareness that that was what he was alleging?
A: No. I -- no.
[204] OFHEO Interview, Ms. Ann Eilers, July 23, 2004, p. 222
Q: Now you testified earlier that you were present in the initial meeting that Roger Barnes had with Sam Rajappa where Mr. Barnes provided his concerns regarding premium discount amortization; correct?
A: Yes.
Q: Now did Mr. Barnes make any allegations or statements regarding intentional misstatements?
A: At that meeting?
Q: Yes.
A: Not that I recall.
Q: Did he make any allegations or assertions regarding intentional misstatements at any other time that you are aware of?
A: Not that I'm aware of.
[205] OFHEO Interview, Mr. Sam Rajappa, June 17, 2004, p. 86-87.
Q: Did you prepare this document (FMSE-SP 000080-81)?
A: No, I reviewed it. I believe it was prepared by Mr. Paul Jackson.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

the factor change (which was made in iPDI) would need to be reflected in the data which feeds the AIMS system (from ALEX).[206]

OFHEO has prepared graphs to show the before and after effects of the factor change:



The chart above is as of July 31, 2003 and, as such, shows the actual factors used prior to July 2003 and the projected factors for periods thereafter.  The prospective factor array (after June 30th) is –as would be expected- a curvilinear, downward sloping line.



---

[206] "However, FAS 91 type RMC-T802 was selected for the factor change simply because it had only one underlying security (thus no changes would be required at the next discrete level – ALEX product type.)" KPMG 2003 workpapers "FAS 91 Amortization – Manual Adjustments", KPMG 000904.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

The chart above shows the effect that the factor change has on the prospective array (after June 30th).  Because the factor array should correlate roughly to the forecasted cash flows (in this case on a security) the prospective factor array created by the factor change is clearly not logical.

The factor change was applied to two specific factors in the array for one amortization type for the periods of July and October 2003.  This resulted in a transfer of amortization expense of approximately $ 6.5 million from future periods to the 3rd quarter of 2003.  According to testimony provided by Mr. Juliane during OFHEO's examination, the business purpose of the factor change adjustment was to roll forward the book of business used for modeling purposes.[207]  However, the rate change clearly seems to be counterintuitive based on the revised array of factors.  The end result of the change (as the charts show) was to shift income from the July 2003 period into future periods.

Fannie Mae's OA reviewed the documentation supporting the request for the factor change as part of the Amortization Investigation performed in August 2003 and concluded that the supporting documentation was in fact not sufficient to support the factor change made.[208]

Based on the information the OA team received from the modeling group during their investigation the OA team was not able to come to a conclusion about whether the factor change causing the $ 6.5 million adjustment to amortization income was in fact a *valid adjustment*. The procedures performed by the OA team consisted of reviewing the supporting documentation provided by the modeling group and, despite several requests, conclusive documentation was not provided by the modeling group.  It was at precisely that point that the OA concluded its investigation.  **The lack of diligence on behalf of the OA in the matter of the manual factor change is inconsistent with their responsibility to exercise due professional care.**

The summarized minutes of the meeting on August 8, 2003 include the following conclusion from Mr. Rajappa:

> Sam [Mr. Rajappa] stated that in his opinion, the July factor change process showed a weakening of this control because the factor change request did not include sufficient written documentation to support the transaction and because a change was made without full understanding by the iPDI group of the reason for the change. Sam added that this required remediation in the form of written

---

[207] OFHEO Interview, Mr. Jeff Juliane, June 8, 2004, pp. 117-118
Q: Do you recall the $ 6.5 million factor change and what it related to?
A: Yes.
Q: Can you describe it?
A: […] what we did is that we did a factor change. And in AIMS we had done an estimate on what that factor change was. There were new business books that we took into consideration. We basically rolled for our estimate and came up with an estimate that was. $6.5 million higher than what iPDI was booking. So, I vetted that conversation with my management team, and we decided that, based on my analysis, that we would increase the expense by $6.5 million through and a partial factor change.
[208] Summarized Minutes of the Meeting (8/8/03). Unamortized Balances and Factor Analysis, FMSE-SP 000081

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

procedures and better defined roles and responsibilities. Jonathan Boyles agreed with this statement.[209]

When asked during his testimony whether, in the instance of an assertion regarding intentional misstatements, it would be the Enterprise's policy to prove that entries made to the financial statements are in fact correct, Tim Howard, Chief Financial Officer, testified that it would be expected practice to verify the validity of these entries.[210] However, Fannie Mae's OA did not perform additional auditing procedures to determine if the request for a factor change was valid or not. In fact management of Fannie Mae's OA "had no basis to believe it was correct or wrong"[211] and could "not rule out the possibility that entry could be incorrect."[212]

Therefore the amortization investigation performed by Fannie Mae's OA did not arrive at a conclusion on whether or not these factor changes are made to manage earnings rather than to arrive at a best estimate for the amortization period of the underlying securities.

Lack of Written Procedures and Supporting Documentation, and an Insufficient Audit Trail
In July 2003 Fannie Mae's Office of Auditing issued its Audit Report[213] summarizing the results of their review of controls over Fannie Mae's amortization of mortgage related price adjustments. OFHEO believes that this report was flawed because it merely reflected a "yellow" rating of "controls need strengthening requires attention during normal course of business," rather than a "red" rating of "Controls need strengthening, request immediate attention." OFHEO further believes that the characterization of findings within the report was either not clear, did not provide appropriate emphasis and inappropriately represented certain significant control weaknesses as documentation issues. Lastly, OFHEO determined that a number of meaningful findings that were noted in the workpapers were inappropriately omitted from the report.

However, irrespective of OFHEO's evaluation of the July 2003 OA report itself, matters noted by OA auditors, in combination with OFHEO's own analysis and findings **suggest a pervasive lack of written procedures and documentation for most of the Enterprise's amortization activities.**

OFHEO has concluded from its own examination procedures that:

- Insufficient documentation existed for most procedures.

---

[209] Summarized Minutes of the Meeting (8/8/03), Unamortized Balances and Factor Analysis, FMSE-SP 000080-000081
[210] OFHEO Interview, Mr. Tim Howard, Chief Financial Officer, August 5, 2005, p. 58
Q: In the instance of an assertion regarding intentional misstatement, would it be company policy to prove that any entries made to the financial statements were in fact correct?
FANNIE MAE LEGAL COUNSEL: Are you talking specifically about the Barnes complaint or generally?
Q: Generally.
A: I don't know that I would say company policy. It would certainly be expected practice to do so.
[211] OFHEO Interview, Mr. Sam Rajappa, June 17, 2004, p. 108
[212] OFHEO Interview, Mr. Paul Jackson, August 17, 2004, pp. 152-153
[213] Fannie Mae Audit Report, Office of Auditing, Amortization Audit, July 9, 2003, FMSE 023745-023754.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- Explanations regarding the basis for changes to methodology were not adequate or appropriately documented.

- Catch-up results were poorly documented, particularly for the periods prior to 2003.

- Inconsistent accounting methods were applied without adequate supporting explanation.

- Factor change adjustments were not sufficiently explained or documented.

In addition, an observation contained within the July 9, 2003 report was that "policies over data processes and key modeling methodology and assumptions should be developed to provide better supportability."[214] Specifically, the audit report pointed out that "procedures do not specify what level of documentation is required to support actions taken, or what level of management involvement is required."[215] Additional areas, not stated previously, cited for lacking appropriate documentation included among others:

- Modeling performed outside the AIMS framework
- Use of proxies instead of actual data

Other items *not* included in the audit report, but separately conveyed to business unit management further identified the need to develop guidelines to address documentation requirements related to:

- The use of proxies for FAS 91 types used to group types of securities with similar characteristics;
- Manual factor adjustments to the amortization accounting sub-ledger and
- Archiving the support for interest rate assumptions and the level of required management approval of these interest rate assumptions.[216]

Lastly, the workpapers prepared by Fannie Mae's Office of Auditing include comments about formalizing and documenting procedures to properly address the modeling process including changes to the modeling methodology and to CPRs[217] used in the modeling process.[218]

In evaluating the catch-up process, Fannie Mae's Office of Auditing identified several further areas with documentation weaknesses as described below:

- Approval procedures documented in 2001, may not still apply and are not being followed currently. Specifically, Portfolio Management does not sign off on the Sensitivity Analysis prepared by the Controller's Department

---

[214] *Id.*, FMSE 023749
[215] *Id.*, FMSE 023749
[216] Email from Ms. Joyce Philip, Manager Office of Auditing, to Mr. Jeff Juliane and Mr. Paul Jackson, Director Office of Auditing, July 6, 2003, FMSE 118812
[217] CPR stands for Constant Prepayment Rate and is one of the critical components used in determining amortization factors.
[218] Fannie Mae Office of Auditing SDI, Amortization Audit 2003, FMSE 117502-117503, states that "there are not documented procedures that address the CPR change process and specifically the documentation and approval process."

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- Documented procedures do not address the incorporation of current month acquisitions activities into the quarterly catch up analysis and adjustment process. Adjusting the catch up analysis to include current period acquisitions was first incorporated in November 2002 for the September book of business.[219]

- The business analyst who runs the AIMS model was unable to provide support for the current acquisitions adjustments – this could only be provided by the manager – potential Key Person Dependency.

- There are no guidelines that identify what activities require management [approval or sign-off]."[220]

**OFHEO believes that the lack of documented procedures and underdeveloped audit trail for the various processes and systems used to calculate deferred price adjustment amortization allowed personnel within the Enterprise to affect the management of earnings and volatility in a manner not easily observable or readily subject to sufficient review.**

---

[219] Note that the process of determining the impact of current acquisitions on the catch-up analysis is performed manually.
OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, pp. 60-61
Q: And you said that's done manually, so what systems in particular is that information –
A: Well, we don't do it manually. It's done through system interfaces between us and ALEX. There's no manual processing involved at all in terms of rolling the book forward. We manually [sic. model] outside the system, if we're on a December book of business, look at the catch-up impact of January acquisitions and February acquisitions. That's the manual process in terms of generating the sensitivity that I'm talking about. [...]
[220] Fannie Mae Office of Auditing Workpaper, Amortization Audit 2003, FMSE 118804-118807 The workpapers prepared by Fannie Mae's Office of Auditing cut off the text in the last bullet point. However, the related SDI prepared by the Office of Auditing titled "Catch Up Processes and Controls are not fully articulated, formalized, or documented" states that "the following areas need to be better defined" listing among others "when management approval/sign-off is required." FMSE 118808

81

## HEDGE ACCOUNTING UNDER SFAS 133

### *Introduction*

OFHEO's on-going special examination has placed a specific focus on Fannie Mae's application of Statement of Financial Accounting Standards No. 133 *Accounting for Derivative Instruments and Hedging Activities* ("SFAS 133").  SFAS 133, which was issued in 1998 and became effective in 2001, presented Fannie Mae with the potential for significant volatility in earnings and several operational challenges.  For the Enterprise to avoid much of the potential earnings volatility caused by marking derivatives to fair value under SFAS 133, it elected to adopt hedge accounting under the new standard.  However, qualifying for hedge accounting under SFAS 133 required changes to significant administrative, documentation, and system requirements for most entities.  For an entity with a large and dynamic hedging program, like Fannie Mae, hedge accounting posed even greater challenges.  Fannie Mae devised a hedge accounting approach in which the vast majority of its derivatives were treated as "perfectly effective"[221] hedges with the objectives of minimizing earnings volatility and simplifying operations. OFHEO has determined that Fannie Mae has misapplied GAAP (specifically, the hedge accounting requirements of SFAS 133) in pursuit of these objectives. The misapplications of GAAP are not limited occurrences, but appear to be pervasive and reinforced by management whose objective is to reduce earnings volatility at significant cost to employee and management integrity. The matters discussed herein raise serious doubts as to the validity of previously reported financial results, as well as adequacy of regulatory capital, management supervision, and overall safety and soundness of the Enterprise.

### *Background*

SFAS 133,[222] as amended and interpreted, provides the primary guidance under GAAP for companies' accounting and reporting for derivatives.  The accounting framework in SFAS 133 brought significant changes to prior accounting practice and effectively superseded concepts such as synthetic accounting.[223]  SFAS 133 requires that all freestanding and certain embedded derivatives be carried on the balance sheet at fair value.  Changes in a derivative's fair value are included in earnings, unless the derivative is ***designated and qualifies*** for hedge accounting. Hedge accounting provides a means for a matching of the earnings effect of a derivative and the related designated hedged transaction, thereby mitigating the impact of marking-to-market the derivative under SFAS 133.

---

[221] See discussion of "perfectly effective" hedge relationships in; The Assumption of Perfect Effectiveness, herein.

[222] Appendix II provides a summary of the basic provisions of SFAS 133.

[223] Synthetic accounting was the accounting treatment followed by many entities, including Fannie Mae, prior to SFAS 133. Paragraph 349 of SFAS 133 defines synthetic instrument accounting as follows: "Synthetic instrument accounting, which evolved in practice, views two or more distinct financial instruments (generally a cash instrument and a derivative instrument) as having synthetically created another single cash instrument.  The objective of synthetic instrument accounting is to present those multiple instruments in the financial statements as if they were the single instrument that the entity sought to create."

Synthetic instrument accounting essentially allowed derivatives to be accounted for on an accrual basis together with the related hedged item, in order to "synthetically" replicate a fixed or floating rate instrument, as applicable.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Hedge accounting is elective.  However, to qualify, certain stringent criteria must be satisfied. These requirements were outlined in a recent Securities and Exchange Commission ("SEC") speech by John James, Professional Accounting Fellow from the Office of the Chief Accountant at the SEC.  Below is an extract from the speech which emphasizes the strict criteria necessary to receive hedge accounting:

> Many have complained that Statement 133 is not a principles-based standard and that its rules are too complex to follow. However, the principle in Statement 133 is fairly straightforward in that derivatives should be recorded on the balance sheet at fair value with changes in fair value reported in earnings. The complexity is mostly associated with achieving hedge accounting, which is optional under Statement 133. Thus, in order to achieve hedge accounting, the Board concluded that entities would be required to meet certain requirements at the inception of the hedging relationship and on an ongoing basis. These requirements include: contemporaneous designation and documentation of the hedging relationship, the entity's risk management objective and strategy for undertaking the hedge - including, identification of the hedging instrument, the hedged item, the nature of the risk being hedged and how effectiveness will be assessed and measured. Additionally, Statement 133 requires an entity to perform a hedge effectiveness assessment at both the inception of the hedge and on an ongoing basis as support for the assertion that the hedging relationship is expected to be (or was) highly effective in achieving offsetting changes in fair value or cash flows attributable to the hedged risk during the designated hedging period.

> Those are the requirements. They were pretty well understood in and around the adoption date of Statement 133; however, as commonly happens as a standard matures, the staff has recently observed situations of "sloppy" documentation and aggressive interpretations of Statement 133's hedge accounting guidance. [224]

### Implementation of SFAS 133 at Fannie Mae

Prior to SFAS 133, Fannie Mae followed synthetic instrument accounting for debt instruments whereby cash flows were synthetically altered through the use of derivatives.  As Fannie Mae was not a "mark-to-market" entity, the new accounting for derivatives under SFAS 133 would significantly affect the volatility of its financial results if hedge accounting were not applied. Some entities, such as broker-dealers and investment companies, account for most of or all of their assets and liabilities at fair value, with changes therein flowing through earnings (referred to as "mark-to-market" accounting). When such entities use derivatives to manage risk, they often achieve a natural offset in earnings due to the mark-to-market of both the derivatives and the assets/liabilities that give rise to the risk. Fannie Mae, as well as most banks and finance companies, apply a modified historical cost approach to accounting for most financial assets and

---

[224] Extract from John James, Professional Accounting Fellow from the Office of the Chief Accountant - US SEC, speech at the 2003 Thirty-First American Institute of Certified Public Accountants ("AICPA") National Conference on Current SEC Developments held in December 2003.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

liabilities. Thus, the introduction of fair value accounting for derivatives under SFAS 133 had the potential to create significant earnings volatility unless hedge accounting was used to allow an offset to the earnings effect of marking the derivatives to market.

Fannie Mae faced significant challenges in qualifying for hedge accounting. Due to its extensive documentation and effectiveness calculation requirements, hedge accounting under SFAS 133 was most easily adopted by entities with simple, passive hedging approaches in which hedges are established and allowed to run their course. However, Fannie Mae's hedging approach was neither simple nor passive. The complex nature of funding its massive mortgage portfolio and managing the associated interest rate risk necessitated an active, dynamic hedging approach to respond to changing market conditions and portfolio re-balancing requirements. Such an environment adds significant complexity to the administrative and systems requirements to support hedge accounting. Furthermore, Fannie Mae's use of option-based derivative products further complicated the application of hedge accounting, due to additional complexities associated with such instruments.

### Determination to maintain the pre-SFAS 133 accounting
Despite the challenges noted above, Fannie Mae had a strong desire to retain the status quo of accrual/synthetic instrument accounting. Fannie Mae's net interest margin reflects the spread between the income earned on its assets (interest income) and its cost of funding (interest expense). Synthetic instrument accounting provided relatively smoother accounting earnings and greater predictability of reported financial results, including Earnings Per Share ("EPS"). Fannie Mae's derivatives accounting policy makes several references to derivative transactions in which the intended result is for the accounting to continue to mimic synthetic instrument accounting even after the adoption of SFAS 133.

### Minimizing Earnings Volatility a Primary Objective
Fannie Mae documents relating to its SFAS 133 implementation discuss minimizing earnings volatility and maintaining the simplicity of the Enterprise's operations as the primary objectives when Fannie Mae undertook the implementation of the standard. [225] Earnings volatility would naturally arise from those derivatives that did not qualify for hedge accounting and from any hedge ineffectiveness resulting from hedging relationships that qualified for hedge accounting. OFHEO acknowledges that minimizing earnings volatility and simplifying operations in connection with the adoption of SFAS 133 are not prohibited and that many companies likely had similar objectives in their implementation of the standard. However, as discussed further below, these goals have influenced the development of misapplications of hedge accounting.

---

[225] Memorandum from Jonathan Boyles, Senior Vice President–Financial Standards and Corporate Tax Compliance, to Distribution, Subject: Background on SFAS 133 implementation, March 2, 2003, FMSE 078540 – 078542, in which Mr. Boyles stated that, "At the time of our implementation efforts there were several tenets that we [sic] drove our decisions regarding implementation and derivatives strategies. In the simplest terms, these tenets were: 1. Earnings volatility was to be minimized and if there were earnings volatility it should be as predictable as possible. 2. We were to leverage off existing systems as much as possible, 3. Operating earnings needed to be simple and easily understood."; and presentation document, "Examining Our Hedging Strategies-Post FAS 133," Tim Howard, Peter Niculescu, Linda Knight, Leanne Spencer, David Benson, Jonathan Boyles, Bill Quinn and Mary Lewers, May 9, 2003, FMSE 027242-027265, bullet three on page 2 of the presentation (FMSE 027243) states, "Goals when we adopted FAS 133: minimizing earnings volatility, leverage existing systems, keep operating earnings simple…"

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

These improper approaches included not assessing hedge effectiveness, not measuring hedge ineffectiveness when required, and applying hedge accounting to hedging relationships that do not qualify for such treatment.

### Derivatives Accounting Policies & Procedures

Fannie Mae's accounting policies for derivatives post SFAS 133 are contained in the Derivatives Accounting Guidelines ("DAG"). The DAG represents Fannie Mae's effort to detail the potential derivative transactions that the Enterprise may enter into, the accounting to be followed for such transactions, and the impact the accounting has on earnings. The DAG serves as the foundation for Fannie Mae's derivative accounting. Interviews with Fannie Mae personnel indicate that these guidelines also formed the basis for system development efforts to support SFAS 133.

The DAG has the appearance of a comprehensive set of accounting policies. However, a close review of the guidelines revealed numerous instances of departures from hedge accounting requirements under SFAS 133. Jonathan Boyles, Senior Vice President – Financial Standards & Corporate Tax, is the head of accounting policy formulation at Fannie Mae, and had primary responsibility for the DAG's development. Mr. Boyles has referred to some of these matters as "known departures from GAAP".[226]  Other members of Fannie Mae management refer to these matters as "practical applications" of GAAP.[227]  These departures, or practical applications, had the effect of allowing Fannie Mae to apply hedge accounting and the assumption of perfect effectiveness[228] to numerous transactions in situations where such treatment was not appropriate without the necessary documentation and analysis.

---

[226] OFHEO interview, Jonathan Boyles, Senior Vice President – Financial Accounting Standards and Corporate Tax, August 3, 2004, p. 64. In the interview, Mr. Boyles stated, "We have several known departures from GAAP in our adoption of FAS 133. We have cleared those with our auditors. We have reported to our auditors on an annual basis the effect of those. And they were comfortable when we adopted them, and they were comfortable over the last several years when we reported the results of that work."

[227] OFHEO Interview, Leanne Spencer, Controller, August 12, 2004, pp. 28-29. In the interview, Ms. Spencer made reference to a "practical application" of GAAP:
Q: Did KPMG ever request that you perform some ongoing measurement in order to determine whether a materiality threshold had been exceeded?
A: We have had had [sic], over the course of time, we have had had [sic] situations where we've looked at GAAP, we've said, how do you take this technical literature and how do you apply it to how Fannie Mae's business runs, and made a judgment, not Fannie Mae making a lone judgment, but in working with our external auditors and their concurrence that what I recall my words are practical application, how you take a technical piece of literature, and you try to overlay it into how a company does business and that we have periodically have several areas where you do back-testing.

[228] OFHEO Interview, Mary Lewers, Vice President—Financial Accounting, July 13, 2004, p. 132. In the interview, Ms. Lewers confirmed that perfectly effective hedges are those for which there is no explicit assessment or measurement of effectiveness.
Q: So, if you don't qualify for perfect effectiveness, you would use the long haul method.
A: Uh-huh.
Q: And does the long haul method include both assessment and measurement of effectiveness?
A: Yes, it does.
Q: So that would mean that for the perfectly effective hedges, there's no explicit assessment or measurement of effectiveness; is that correct?
A: That's a correct statement.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

### The Assumption of Perfect Effectiveness

Consistent with Fannie Mae's desire to minimize earnings volatility and maintain simplicity of operations, a great deal of emphasis was placed on treating hedges as perfectly effective, whereby it is assumed that no ineffectiveness exists in a hedging relationship, and no assessment or measurement of effectiveness is performed. [229] In fact, Fannie Mae treats almost all of its hedging relationships as perfectly effective. [230] SFAS 133 does allow the assumption of no ineffectiveness, but only in very limited circumstances. However, in many instances, as discussed further below, Fannie Mae has disregarded the requirements of SFAS in its treatment of hedges as being perfectly effective. Accordingly, the Enterprise has not properly assessed and measured effectiveness as required by the standard. At December 31, 2003, Fannie Mae had a notional of $1.04 trillion in derivatives, of which a notional of only $43 million was not in hedging relationships.[231]

The importance given by management to an assumption of perfect effectiveness in hedging relationships is further highlighted by the fact that Fannie Mae's accounting policy required special management approval for derivatives requiring "long haul" [232] treatment. However,

---

[229] OFHEO Interview, Janet Pennewell, Senior Vice President—Financial Reporting and Planning, June 15, 2004, p.197
Q: Do you believe or is it your understanding that an emphasis is placed by Fannie Mae on structuring their hedge strategies to attempt to achieve the "perfect hedge" or no ineffectiveness?
A: I believe that that was consistent with our objective early on. In fact, I believe that leading into the implementation of FAS 133 that we looked at the different derivatives that we were using with an objective of trying to use those derivatives and those hedging vehicles that we thought we could assume were perfectly effective. But I think it's not always the case.
[230] OFHEO interview, Jonathan Boyles, Senior Vice President of Accounting Standards and Corporate Tax, August 3, 2004, p. 45, in which Mr. Boyles stated that he would guess over 90% of Fannie Mae's hedges are perfectly effective at any point in time.
Q: That's what I'm talking about. In terms of what is actually on the books, not in terms of the transactions described in the policy, but what's on your books today or at any point in time. Generally how much of the portfolio would be treated as perfectly effective?
A: I would guess over 90 percent, but I don't see those reports.
OFHEO interview, Mona Patel, Senior Project Manager—Financial Accounting Group, September 8, 2004, pp. 118-119
Q: What percentage of your--of the derivatives portfolio would you say qualified for perfect effectiveness?
[…]
Q: Any estimates that you may have?
A: […]The majority of our linkages get perfectly effective hedge accounting except for a couple of long hauls or [sic] the population. So, anything that other [sic] long haul is all perfectly effective accounting.[…]
Q: And we are not trying to get a precise, but--precise number but just an approximation. Is it five? Is it a hundred? Is it two? I mean, just roughly, how many long-haul calculations tend to be performed on a given month?
A: Not a given month. There was none, like in one in April. If there are any, they're a handful.
[231] Fannie Mae December 31, 2003 10-K, Table 30 "Notional and Fair Value of Derivatives by Hedge Designation," p. 79. These balances exclude mortgage commitments accounted for as derivatives under SFAS 149. Note that the $43 million which were not in hedging relationships represent approximately 0.004% of the total $1.04 trillion notional amount of outstanding derivatives.
[232] OFHEO Interview, Mary Lewers, Vice President—Financial Accounting, July 13, 2004, p. 132. Fannie Mae designates hedge relationships in which it cannot assume perfect effectiveness. In these situations, SFAS 133 requires that Fannie Mae assess effectiveness and measure ineffectiveness to qualify for

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Fannie Mae requires no such special approval for hedges treated as perfectly effective -- thereby making perfect effectiveness the rule, and long haul treatment the exception. As noted above, there are specific requirements that must be met under SFAS 133 to treat hedges as perfectly effective. The complex nature of Fannie Mae's hedging approach makes meeting these requirements difficult. OFHEO believes that Fannie Mae did not place sufficient emphasis on policies, procedures and approval requirements to ensure that the proper accounting treatment was applied. Instead, their procedures focused on special review and approval of transactions that might cause earnings volatility or operational complexity.

Hedges that do not meet the criteria for being perfectly effective require an assessment of effectiveness that must be performed to qualify for hedge accounting. As noted above, OFHEO's analysis indicates that Fannie Mae has many hedging relationships that do not qualify as perfectly effective, yet have been treated as such. Since Fannie Mae has not performed a proper assessment of hedge effectiveness for such transactions, these transactions do not qualify for the hedge accounting treatment that they have been given. Instead, the proper accounting for such derivatives would be for their fair value changes to be recorded directly through earnings. OFHEO believes that the disqualification of hedge accounting for such a large number of transactions would have a significant impact on Fannie Mae's reported financial results, both prospectively and historically.

### Environment for Formulation of Derivatives Accounting Policy at Fannie Mae

There are a number of issues that are important to understand as it relates to the environment in which Fannie Mae's derivatives accounting policies and practices were developed:

> **Financial Standards Group: Significant Reliance on Limited Resources** – The Enterprise relies heavily on its Financial Standards Group for advice on the application of accounting policy. There does not appear to be an environment conducive to questioning or challenging accounting decisions made by the Financial Standards Group. Fannie Mae's Office of Auditing also relies on the Financial Standards Group to formulate accounting policy for the Enterprise in accordance with GAAP. Although the Office of Auditing reports conclude that Fannie Mae's accounting for derivatives is in compliance with SFAS 133, the Vice President of Office of Auditing (A. Eilers) indicated in her testimony that the Office of Auditing verifies compliance with Fannie Mae policy as it is

---

hedge accounting. This is commonly referred to as the long haul approach. Ms. Lewers confirmed this definition in her testimony.
Q: […]Are you familiar with the terminology that's used in the Derivative Accounting Guidelines known as the long haul method?
A: Yes, I am.
Q: And is the long haul method the method that is used for hedges that are not perfectly effective?
A: Yes. Long haul would be used in a situation in lieu of perfect effectiveness, if we didn't qualify for perfect effectiveness. […]
Q: And does the long haul method include both assessment and measurement of effectiveness?
A: Yes, it does.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

established by the Financial Standards Group, and does not check for the policy's compliance with GAAP. [233]

Despite the significant influence wielded by the Financial Standards Group, it is comprised of relatively few personnel.[234]  OFHEO believes the limited resources devoted to complex technical accounting matters has contributed to Fannie Mae's problems with SFAS 133 compliance.

**Lack of Adequate Understanding by Accounting Operations** –Accounting and treasury operations personnel that are responsible for the implementation of certain aspects of the standard lack an adequate understanding of SFAS 133.  This lack of understanding is attributed to the groups' significant reliance placed on the Financial Standards Group.  Testimony from various members of the Controller's organization and the Controller indicated that questions relating to the accounting for derivatives could only be answered by the Senior Vice President of the Financial Standards Group (J. Boyles). [235]  OFHEO noted that individuals having responsibility for key aspects of the SFAS 133 accounting process (such as ensuring hedge designation occurs, or checking to ensure matching of critical terms) were not knowledgeable about how such activities met the requirements as set forth under GAAP. [236]

---

[233] Audit Report, Subject: Derivatives Controls Audit, March 31, 2003, FMSE 102385-102391.  The audit report conclusion states, "Controls are in place to capture derivative transactions, monitor counterparty risk, monitor FAS 133 compliance, and report accurate financial results."
Audit Memorandum from Joyce Phillip, Director of Office of Auditing, to Leanne Spencer, Subject: New Accounting Standards Review, February 17, 2004.  This memorandum was provided by OFHEO staff and was not provided through the Fannie Mae Special Examination Production; therefore, no Bates number is available.  The memorandum's conclusion states, "Fannie Mae's implementation of FAS 149, FIN 45 and FIN 46 is consistent with FASB requirements."
The conclusions reached in the two documents referenced above state that the Office of Auditing has verified compliance with GAAP.  However, these conclusions are not consistent with Ann Eilers' testimony.
OFHEO interview, Ann Eilers, Vice President -- Office of Auditing, July 23, 2004, p. 29, where she stated, "As far as GAAP accounting, that's really the role of Financial Standards who runs -- you know, has a team of professionals who basically review GAAP accounting rules, and they would then work with KPMG. At the end of the day KPMG ultimately opines on GAAP. Internal audit would not do that. We basically opine on the controls around those processes."
[234] OFHEO interview, Jonathan Boyles, Senior Vice President – Financial Standards and Corporate Tax, August 3, 2004, p. 10
Q: When Greg Ramsey came in, did the size of the group grow in terms of the people reporting to him, or when did you get from the four to the eight?  I'm just trying to get a sense of timing.
A: Going from the four to the eight has been within the last 18 months.
[235] OFHEO interview, Mary Lewers, Vice President – Financial Accounting, July 13, 2004, p. 45, in which she stated, "Accounting Standards is what I would refer to as our expert advice regarding the translation of GAAP into appropriate policy….So I would define myself as someone who was learning this, but that the real sort of expert advance (sic)  in terms of how to translate this into compliance with GAAP, it really rested within the Financial Standards team."

[236] OFHEO interview,  Katarina Skladony, Senior Financial Analyst – Treasury Middle Office, August 26, 2004, pp. 144-146, in which she stated, among other things, that the Financial Standards Group did not make her aware of the requirements of SFAS 133.
Q: Ms. Skladony, are you aware that for getting hedge accounting, you have to have contemporaneous documentation?

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Disregard of FASB Decisions** – Like many entities, Fannie Mae engages in active efforts to influence the Financial Accounting Standards Board's ("FASB") rule making decisions, with a goal of advancing the accounting positions it views as most favorable to the Enterprise. SFAS 133 was no exception in this regard – according to documents obtained by OFHEO, Fannie Mae played an active role in lobbying the FASB both prior to the issuance of the standard and subsequently. In some instances, despite entreaties to the FASB by Fannie Mae for a desired derivative accounting treatment, the FASB rejected the requested treatment. At times, even though the FASB had rejected the requested treatment, Fannie Mae disregarded the FASB's guidance and accounted for their transactions the way they had originally proposed. This sheds some light on the culture and attitude within Fannie Mae – a determination to do things "their way."

One such instance relates to certain illustrative transactions included in SFAS 133's Implementation Guidance that were apparently initiated and drafted by the SVP of the Financial Standards Group (J. Boyles). These illustrative transactions addressed accounting for both "termouts"[237] and "offsetting swaps" discussed in this report. OFHEO understands the approach as originally proposed by Fannie Mae would have resulted in treatment of these transactions as perfectly effective hedges. The FASB ultimately rejected this treatment in the guidance ultimately published in SFAS 133. However, Fannie Mae disregarded this guidance and accounted for these types of transactions the way they had originally advocated.[238]

---

FANNIE MAE LEGAL COUNSEL: With respect to FAS 133?
Q: Right.
A: I'm not familiar with FAS 133 requirements.
Q: Are you aware that you have to produce documentation at the time the trade is contemplated?
FANNIE MAE LEGAL COUNSEL: You say again "you." I'm just—
Q: You meaning she.
FANNIE MAE LEGAL COUNSEL: Do you understand that's a requirement of FAS 133? That's your question?
Q: Yeah.
FANNIE MAE LEGAL COUNSEL: Okay.
A: No. […]
Q: So you were not made aware by Financial Standards that contemporaneous documentation is required; is that correct?
A: That's correct.
[237] OFHEO understands the word "term-out" to be used by Fannie Mae generally to describe the replacement of discount notes with fixed rate notes or different floating rate borrowings.
[238] OFHEO interview, Jonathan Boyles, Senior Vice President – Financial Standards and Corporate Tax, August 3, 2004, pp. 177-178. OFHEO notes that this particular example is Example 8 in paragraphs 153-161 of SFAS 133
Q: Was that the Example 8 in the appendix—
A: It was the Fed Funds' example. I don't remember the number. But when FAS 133, when we talked to the FASB, and when they wrote FAS 133, what they told us verbally was confirmed with what they had written--the two ways that they had talked—
Q: When you noticed that it was removed from FAS 133 subsequently, did you discuss it any further with the FASB?
A: We did not go back and discuss that with the FASB. We discussed that with our auditors.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Responsibility for "Aggressive" Positions –** Accounting policy decisions are determined almost unilaterally by Jonathan Boyles and members of his Financial Standards team.  As noted above, certain accounting positions taken by Fannie Mae are contrary to GAAP and at times described as "aggressive interpretations."[239] Taking SFAS 133 accounting positions characterized as aggressive or not in compliance with GAAP appears to be motivated by management objectives of minimizing earnings volatility and ensuring simplicity of operations. Based on information and testimony OFHEO has obtained, it appears that Jonathan Boyles has responsibility for accounting policy decisions made by Fannie Mae that resulted in the improper application of SFAS 133.

### Summary of Key Issues Identified
There are several issues that have been identified by OFHEO, most of which represent misapplications of the hedge accounting requirements of SFAS 133.  Given that the special examination is continuing, the items outlined below should not be considered an exhaustive list of issues identified in connection with Fannie Mae's application of SFAS 133.  These broader issues, which affect a large number of Fannie Mae's derivative transactions, are discussed in greater detail in the remaining sections of this report:

**Issue 1:**     Fannie Mae improperly assumes that derivatives continue to be perfectly effective hedges upon their re-designation into new hedging relationships.  When existing derivatives are re-designated, they generally do not have a fair value of zero when the new hedging relationship is established. As such, they violate one of the requirements under SFAS 133 for the assumption of no ineffectiveness. This issue is prevalent for most derivatives associated with term-outs, which represent a large portion of Fannie Mae's derivatives     portfolio.[240]

**Issue 2:**     The accounting for offsetting derivatives was inappropriate from the adoption of SFAS 133 through the end of 2003.  The Enterprise often entered into offsetting swaps rather than terminating an existing swap.  The original swap and the offsetting swap were incorrectly treated as perfect cash flow hedges and their changes in fair value were recorded in Accumulated Other Comprehensive

---

Q: So you did not change your accounting as a result of the amendment made by the FASB; is that correct? And this was before you applied FAS 133; is that correct? The amendment was made prior to you having applied FAS 133.
A: I believe it was. I forget the date.
[239] See Issue 3 herein: Application of Shortcut and Matched Terms Method, Additional Transaction Examples, Receive-Fixed Swaptions, for more details on the email from Jonathan Boyles referenced above, in which the term "aggressive interpretations" is used.
[240] Email from Pete Barbera to Jonathan Boyles, Subject: Inventory of FAS 133 transactions, June 2, 2004, produced via CD 8/11/04 in M Box.  Attached to Mr. Barbera's email was a draft schedule titled "Analysis of the March 2004 Book."   The draft analysis categorized approximately $960 Billion of Fannie Mae's notional outstanding derivatives by transaction type (per the DAG) and by hedge classification (CF, FV, DNQ and Other) as of the end of March 2004.  The thirteen most frequently used transactions presented in Mr. Barbera's analysis match those presented in a letter by Jodie Kelley, Vice President and Deputy General Counsel, to Chris Dickerson, July 28, 2004, FMSE 00083.  They are 1, 2, 3, 4, 8, 10, 11, 12, 13, 20, 52, 67 and 71.  Of these, OFHEO has identified that 5 are term-out transactions and comprise approximately $240 billion of the over $960 billion of outstanding derivative notional balances at March 31, 2004.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Income ("AOCI").  Instead, hedge accounting should have been discontinued and changes in fair value should have been recorded in earnings.  Effective the first quarter of 2004, Fannie Mae modified its accounting for these offsetting swaps, with the new accounting method being applied prospectively.[241]

**Issue 3:**    Fannie Mae has incorrectly applied the "short-cut" method (or "matched terms" method) in a number of situations. The following are those discussed in this report:

- Receive-fixed swaptions hedging the fair value of debt are incorrectly accounted for as perfect hedges, even though ineffectiveness would generally be expected to exist in such relationships.
- Callable swaps hedging discount notes are incorrectly treated as perfectly effective without regard to the option value existing in the derivative but not in the hedged item.
- Perfect effectiveness in hedges of anticipated debt issuances has been assumed based upon a duration comparison which is not supported by SFAS 133.
- Swaps arising from the exercise of a swaption are treated as perfectly effective despite having a non-zero fair value at inception.
- The requirement for matching of reset dates (in order to assume perfect effectiveness) between the hedged item and the swap in cash flow hedges has been modified in the Enterprise's policy to permit up to a seven day reset date mismatch.
- The requirement for matching of maturity dates (in order to assume perfect effectiveness) between the hedged item and the swap in fair value hedges has been modified to permit up to a 90 day mismatch.

**Issue 4:**    Beginning with its initial adoption of SFAS 133, Fannie Mae employed an erroneous methodology to account for changes in the time value and intrinsic value components of purchased interest rate caps. In November 2002, the Enterprise discovered the error, corrected its methodology, and applied the new methodology only to new interest rate caps prospectively. The accounting for previously existing caps was not corrected and previously reported accounting results were not evaluated for possible restatement. In its 2002 10-K, Fannie Mae described this as a refinement of its methodology rather than a correction of an error.

**Issue 5:**    OFHEO has identified a number of problems with Fannie Mae's hedge documentation with respect to its compliance with hedge accounting requirements. In several examples reviewed by OFHEO, the documentation was ambiguous as to the nature of the hedging relationship or did not clearly identify the hedged risk, hedged item or its probability of occurrence – all required under SFAS 133 to meet the hedge accounting criteria.  In addition, OFHEO noted instances of a lack of contemporaneous documentation, such as the occurrence

---

[241] Memorandum from Jonathan Boyles to Distribution, Subject: Revisions to the December 2003 DAG, March 13, 2004, FMSE 113686-113690.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

of retroactive hedge designations and the lack of adequate documentation when a re-linkage (re-designation) occurs.

**Implications of Issues Identified**

From our review of documents, emails, testimony and initial interviews with Fannie Mae personnel, OFHEO has concluded that there has been an intentional effort by management to misapply the accounting rules as specified in the standard in order to minimize earnings volatility and simplify operations.

By improperly assuming perfect effectiveness for many of its hedges, Fannie Mae has failed to perform the proper assessment of effectiveness and measurement of ineffectiveness in these instances. Furthermore, the Enterprise has many deficiencies in its hedge designation documentation. Effectiveness assessment, ineffectiveness measurement and proper hedge documentation are critical pre-requisites to receive hedge accounting treatment under SFAS 133. Because the Enterprise has not met these criteria, it should not receive hedge accounting treatment for many of its derivatives. Instead, the proper accounting for such derivatives would be for their fair value changes to be recorded directly through earnings.

Prior to 2004, Fannie Mae improperly accounted for certain offsetting derivatives, treating them as hedges when they did not qualify as such.  Additionally in 2001-2002, Fannie Mae improperly accounted for certain purchased interest rate caps which may have significantly misstated the Enterprise's earnings and AOCI during those years. These instances raise further questions about possible misstatements of prior years' financial results. These matters also raise concerns about Fannie Mae's financial reporting and disclosures:

- Fannie Mae was aware that their prior accounting treatment for offsetting derivatives was not consistent with GAAP. When this accounting treatment was changed in the first quarter of 2004, no mention was made of a possible misstatement of prior years' financial statements or the amounts of such prior misstatements. Fannie Mae disclosed in the first quarter 2004 10-Q that the impact of classifying certain derivatives as non-hedging was approximately $13 million on that quarter's pre-tax net income. [242] While the actual impact on prior periods is unclear, OFHEO believes it could have been larger, because the mark-to-market impact on earnings in the first quarter 2004 has been dampened by efforts to actively manage the undesignated derivatives portfolio. Irrespective of the amounts involved, this is an instance in which Fannie Mae knowingly applied improper accounting which furthered their objective of minimizing earnings volatility.

- In 2002, the Enterprise disclosed a change of methodology in its accounting for changes in time and intrinsic value of purchased interest rate caps. It did not disclose the improper accounting resulting from the earlier approach. OFHEO believes that Fannie Mae's disclosure in the 2002 10-K was not adequate to provide a reader with a complete understanding of the matter, or to enable them to discern that errors had occurred in prior periods. Fannie Mae did not address the correction of this error. Instead Fannie Mae changed its accounting for new transactions

---

[242] Fannie Mae March 31, 2004 10-Q, p. 26.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

prospectively, and did not evaluate the impact on prior periods or transactions that existed at the time the change was made.

As of December 31, 2003, the balance in AOCI reflects $12.2 billion in deferred losses relating to cash flow hedges. [243]  Furthermore, carrying value adjustments of liabilities relating to fair value hedges amounted to $7.2 billion as of that date.[244]  The matters noted herein with respect to improper application of hedge accounting leads OFHEO to question the validity of the amounts reflected in AOCI; as well as amounts reflected as carrying value adjustments, at any point in time since the adoption of SFAS 133.  For hedges which do not qualify for hedge accounting, fair value changes should be reflected in earnings in the period in which the value change occurred, with no offset to AOCI or hedged item carrying value. Additionally, the possible reclassification of these amounts into retained earnings could have a substantial impact on Fannie Mae's compliance with its regulatory capital requirements.  In order to determine the actual impact of the matters discussed herein, a substantial investment of resources and management's commitment will be required.

---

[243] Fannie Mae December 31, 2003 10-K, p. 80.
[244] Fannie Mae December 31, 2003 10-K, p. 146.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

## *Issue 1: Derivative Re-Designations*

Fannie Mae uses a variety of derivative instruments to hedge its interest rate risk. Due to the dynamic nature of Fannie Mae's portfolio, hedging instruments are regularly de-designated from old hedging relationships and re-designated into new hedging relationships as the portfolio changes. This section discusses Fannie Mae's assumption of perfect effectiveness in its hedging relationships when such re-designations occur.

## Background

SFAS 133 requires an entity applying hedge accounting to perform an assessment to demonstrate a highly effective hedge relationship both at inception and on an on-going basis, unless the relationship meets the requirements of the short-cut method[245] or where the critical terms of the hedging instrument and the hedged items match[246] such that there will be no ineffectiveness in the hedge relationship and the changes in the fair values or cash flows of the hedged item are expected to completely offset those of the derivative.[247] The concept of hedge effectiveness is important under SFAS 133 in two respects:

• The assessment test is required in order to qualify for hedge accounting. It must be performed at the inception of a hedge relationship and throughout its life on at least a quarterly basis to demonstrate that the hedge has been, and is expected to continue to be, "highly effective."[248]
• Even though a hedge relationship may be deemed highly effective and qualify for hedge accounting, ineffectiveness may exist in the hedging relationship. Ineffectiveness represents the extent to which changes in the fair value of the derivative are not perfectly matched with the changes in fair values or cash flows of the hedged item. The ineffective portion of changes in the derivative's fair value must be recorded in earnings.

A perfect cash flow hedge has the effect of deferring the recognition of a change in the derivative's fair value in the income statement, by recording all changes in value in AOCI and recording no ineffectiveness in the income statement. A perfect fair value hedge results in changes in fair value of the derivative being offset by equal changes in fair value of the hedged item, resulting with zero ineffectiveness in the income statement. Fannie Mae's predominant approach is to assert that their hedge relationships are perfectly effective due to the matching of critical terms. We will refer to this as the "matched terms" approach.

## Summary of Issue

Fannie Mae frequently de-designates and re-designates hedge relationships as it goes through the process of re-balancing its liability portfolio. In most instances, the re-designation is caused by a term-out, which is a phrase used by Fannie Mae generally to describe the replacement of discount notes with fixed rate notes or different floating rate borrowings. When a derivative is

---

[245] FASB, SFAS 133, paragraph 68, as amended. This paragraph discusses the requirements of the shortcut method.
[246] FASB, SFAS 133, paragraph 65, as amended. The concept of matching of critical terms is discussed in this paragraph.
[247] FASB, SFAS 133, paragraphs 20 (b) and 28 (b), as amended, for fair value and cash flow hedges, respectively.
[248] FASB, SFAS 133, paragraphs 20 and 28, as amended, which relate to fair value and cash flow hedges, respectively.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

re-designated due to a term-out, it is the beginning of a new hedging relationship. This requires an entity to evaluate the effectiveness of the new hedge relationship, including consideration of whether the matched terms approach may be applied. As discussed in greater detail below, one of the criteria that must be met in order to apply matched terms accounting is that the fair value of the hedging instrument at the inception of the hedging relationship be zero. When an existing derivative is re-designated, it would typically have a fair value that is not zero, due to market changes that have occurred since the instrument's inception. Thus, it is generally not possible to qualify for matched terms treatment upon the re-designation of a hedging instrument. Nonetheless, Fannie Mae continues to apply matched terms accounting when such situations occur. **It is OFHEO's conclusion that Fannie Mae has improperly applied matched terms accounting to derivatives that have been subject to re-designation in connection with term-out transactions. By incorrectly applying matched terms accounting, Fannie Mae has not only failed to measure the ineffectiveness associated with such relationships but they have failed to perform a proper hedge effectiveness assessment, which invalidates their ability to receive hedge accounting treatment.**

**Example 1.**
Below is an example of a term-out and its effect on the associated swap for purposes of illustrating a typical re-designation that Fannie Mae executes as part of their portfolio rebalancing.



## Example of a Term-out

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

*Description of Transaction:*

- *On 7/2/1997, Fannie Mae issues $500M in Discount Notes ("DN") and enters into Swap #1 (treated as a "perfect" cash flow hedge of the forecasted interest payments on the discount notes). Swap #1 is a pay-fixed, receive-floating swap with a term of 7 years, the period of expected reissuance of DNs. For purposes of this example it is assumed that the swap's interest rate reset dates match the expected timing of DN reissuance and all other critical terms are matched in order to allow Fannie Mae to assume perfect effectiveness under SFAS 133.*
- *On 7/2/1999, Fannie Mae issues $500M 6.175% 3-yr Medium Term Note ("MTN") rather than reissuing $500M in DNs. At that time Fannie Mae also enters into swap #2. Swap #2 is a receive-fixed, pay-floating swap that matures in three years. Swap #2 is structured such that its cash flows offset those of swap #1 for the three year term of swap #2 (period B in the illustration), with the exception of a differential between the fixed rates of the two swaps, which remains constant during that period.*
- *Upon the maturity of the MTN, Fannie Mae expects to resume issuing $500M in DNs through the remainder of the original 7 year period (period C in the illustration).*
- *On 7/2/1999, Fannie Mae de-designates swap # 1 from its original hedge relationship and re-designates it, in combination with swap#2, as a "perfect" cash flow hedge of the anticipated rollover of $500M of DNs during a future period (period C, which is the period of time in which the MTN matures and a $500M DN is issued again). As of 7/2/1999, the re-designated swap #1 together with swap #2 is hedging a "forward starting" two year period that begins 7/2/2002.*

In Fannie Mae's DAG, the accounting treatment described for the re-designated hedge relationship set forth above, and other similar re-designations, is matched terms accounting. In many of the transaction examples involving term-outs and re-designations as set forth in the DAG, their descriptions indicate an assumption of no ineffectiveness. Based on OFHEO's interviews with Mr. Boyles and other accounting personnel, as well as our reading of the Enterprise's DAG, we understand that in such instances, Fannie Mae has applied the guidance in DIG Issue No. G9 *Cash Flow Hedges:  Assuming No Ineffectiveness When Critical Terms of Hedging Instruments and Hedged Transaction Match in a Cash Flow Hedge* ("DIG Issue G9"), and paragraph 65 of SFAS 133, to assume perfect effectiveness.  Moreover, we understand that in these circumstances Fannie Mae performs no assessment test and no measurement of ineffectiveness, which results in the earnings effect of these transactions being the same as the synthetic accounting treatment that Fannie Mae followed prior to SFAS 133. [249]  OFHEO asserts that this accounting is not consistent with the requirements of SFAS 133.

---

[249] For example, "Termout Transaction #2" in Fannie Mae's DAG, states that "changes in fair value of the re-designated portion of Swap #1 and all of Swap #2 will be reported in [Accumulated] Other Comprehensive Income" and that "This accounting treatment will have the effect of keeping the original accrual rate in earnings equal to what would have been recognized under synthetic accounting treatment."

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Accounting Analysis**

Paragraph 65 of Statement 133 states:

> If the critical terms of the hedging instrument and of the entire hedged asset or liability (as opposed to selected cash flows) or hedged forecasted transaction are the same, the entity could conclude that changes in the fair value or cash flows attributable to the risk being hedged are expected to completely offset at inception and on an ongoing basis. For example, an entity may assume that a hedge of a forecasted purchase of a commodity with a forward contract will be highly effective and that there will be no ineffectiveness to be recognized in earnings if:
>
> a.     The forward contract is for purchase of the same quantity of the same commodity at the same time and location as the hedged forecasted purchase.
>
> b.     **The fair value of the forward contract at inception is zero.** [Emphasis added]
>
> c.     Either the change in the discount or premium on the forward contract is excluded from the assessment of effectiveness and included directly in earnings pursuant to paragraph 63 or the change in expected cash flows on the forecasted transaction is based on the forward price for the commodity.

DIG Issue G9 further expands on the method of matched terms. It states an entity is still required to perform and document an assessment of hedge effectiveness at the inception of the hedging relationship and on an on-going basis throughout the hedge period, however subsequent assessments can be performed by ***verifying and documenting*** whether the critical terms of the hedging instrument and the forecasted transaction have changed during the period in review. Furthermore, the following excerpt from DIG Issue G9 should be noted:

> However, **if the critical terms of the hedging instrument or the hedged forecasted transaction have changed** [Emphasis added] or if there have been adverse developments regarding the risk of counterparty default, the entity must measure the amount of ineffectiveness that must be recorded currently in earnings pursuant to the guidance in Statement 133 Implementation Issue No. G7, "Measuring the Ineffectiveness of a Cash Flow Hedge under Paragraph 30(b) When the Shortcut Method Is Not Applied." **In addition, the entity must assess whether the hedging relationship is expected to continue to be highly effective (using either a dollar-offset test or a statistical method such as regression analysis).** [Emphasis added]

When Fannie Mae re-designates a derivative in the manner described in the example above, there has been a change in both the hedging instruments used as well as the hedged transaction. Thus, upon re-designation this represents a new hedge relationship.[250] Accordingly, the requirements of paragraph 65, to assume critical terms matching, need to be evaluated in connection with the newly designated hedge relationship. In the term-out example (Example 1), on the date of re-designation, Swap #1 would presumably have a fair value other than zero,

---

[250] As noted in the example, Fannie Mae starts with one swap hedging the rollover of existing and future discount notes. After the re-designation, it is using two swaps in combination to hedge anticipated issuance of discount notes in a future period.

97

whereas Swap #2 would presumably have a fair value of zero.[251]  As a result of the combination of the Swap #1 and Swap #2 having a fair value not equal to zero, the hedge does not meet the requirements of paragraph 65(b) as stated above.  In addition to being specifically listed in paragraph 65(b), the concept of a zero fair value at inception as a requirement for demonstrating a matching of critical terms is noted in DIG Issue G9 and is also a requirement for the shortcut method, which is a concept similar to the matching of critical terms.[252]

Example 8 in SFAS 133, set forth in paragraphs 153-161, contains an example transaction – Scenario 2 - that specifically illustrates this point. This transaction illustrates a situation very similar to a term-out, involving the re-designation of an existing swap in combination with another swap. Relevant excerpts of that example are as follows:

> MNO Company enters into an interest rate swap (Swap 1) and designates it as a hedge of the variable interest payments on a series of $5 million notes with 90-day terms. MNO plans to continue issuing new 90-day notes over the next five years as each outstanding note matures.  The interest on each note will be determined based on LIBOR at the time each note is issued.  Swap 1 requires a settlement every 90 days, and the variable interest rate is reset immediately following each payment.  MNO pays a fixed rate of interest (6.5 percent) and receives interest at LIBOR.  MNO neither pays nor receives a premium at the inception of Swap 1.  The notional amount of the contract is $5 million, and it expires in 5 years.

> Because Swap 1 and the hedged forecasted interest payments are based on the same notional amount, have the same reset dates, and are based on the same benchmark interest rate designated under paragraph 29(h), MNO may conclude that there will be no ineffectiveness in the hedging relationship (absent a default by the swap counterparty).

> Scenario 2—Two Interest Rate Swaps Designated as a Hedge of Future Variable Interest Payments

> At the end of the second year of the 5-year hedging relationship, MNO discontinues its practice of issuing 90-day notes and issues a 3-year, $5 million note with a rate of interest that adjusts every 90 days to the prime rate quoted on that day.  Swap 1 is no longer effective as a cash flow hedge because the receive-variable rate on the swap is LIBOR, and the prime rate and LIBOR are expected to change differently.  Thus, the cash flows from the swap will not effectively offset changes in cash flows from the three-year note.

> Rather than liquidate Swap 1 and obtain a separate derivative to hedge the variability of the prime-rate-based interest payments, MNO enters into a pay-LIBOR, receive-prime basis swap.  The basis swap has a $5 million notional amount and a 3-year term and requires a settlement every 90 days. **MNO designates Swap 1 and the basis swap in combination as the hedging instrument in a cash flow hedge of the variable**

---

[251] These presumptions are based on the nature of typical interest rate swaps, which start with a fair value of zero, and thereafter have a positive or negative fair value, depending upon changes in interest rates.
[252] OFHEO has observed that Fannie Mae's policies cite criteria similar to the SFAS 133 shortcut criteria as a basis for matching of critical terms. These can be found in the DAG section IV.20 for cash flow hedges and section VI.13 for fair value hedges.  See DAG, FMSE 112567-113143.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**interest payments on the three-year note.** [Emphasis added]  On the three-year note, MNO pays interest at prime.  On the basis swap, MNO receives interest at prime and pays interest at LIBOR.  On Swap 1, MNO receives interest at LIBOR and pays interest at 6.5 percent.  Together, the cash flows from the two derivatives are effective at offsetting changes in the interest payments on the three-year note.  Changes in fair values of the two swaps are recognized in other comprehensive income and are reclassified to earnings when the hedged forecasted transactions (the variable interest payments) affect earnings (as required by paragraph 31).

SFAS 133, as originally drafted, also contained the following sentence at the end of the above example (paragraph 161):

> Because the two swaps in combination meet the conditions discussed in paragraph 68, MNO is permitted to assume no ineffectiveness and use the shortcut method illustrated in Example 5.

However, when SFAS 133 was amended by Statement of Financial Accounting Standards No. 138, *Accounting for Certain Derivative Instruments and Certain Hedging Activities, an amendment of FASB Statement No. 133,* ("SFAS 138"),[253] the above sentence was deleted. Paragraph 38 in SFAS 138's "Background Information and Basis for Conclusions" states:

> This Statement also deletes the last sentence of paragraph 161 **because the hedging instrument in Example 8 does not meet the criterion in paragraph 68(b) to qualify for the shortcut method.  The hedging instrument does not have fair value of zero at inception of the hedging relationship.** [Emphasis added.]

This example and the subsequent correction made by SFAS 138 clearly indicates that under SFAS 133, re-designated derivatives do not qualify for shortcut or matched terms treatment if their fair value is other than zero at the time of the re-designation. **Accordingly, it is OFHEO's conclusion that Fannie Mae incorrectly applies matched terms accounting in the term-out example discussed previously as well as in numerous other term-out transactions described in its DAG. By incorrectly applying matched terms accounting, Fannie Mae has not only failed to measure ineffectiveness associated with such relationships but they have failed to perform a proper hedge effectiveness assessment, which invalidates their ability to receive hedge accounting treatment.**

Further, it should be noted that Fannie Mae's DAG includes guidance on assuming perfect effectiveness. OFHEO noted that Fannie Mae's internal guidance is consistent with the accounting literature with regard to the requirement that the fair value of the hedging instrument must be zero at the inception of the hedge relationship, as well as references to DIG Issue G9.[254]  Thus, **Fannie Mae's assumption of perfect effectiveness upon a hedge re-designation is not only inconsistent with SFAS 133 guidance, it is inconsistent with Fannie Mae's own internal accounting guidance.  The DAG also requires a**

---

[253] SFAS 138 was issued in June 2000 and amended SFAS 133 for certain technical matters prior to the effective adoption date of SFAS 133 by Fannie Mae.
[254] Fannie Mae DAG pp. IV.20 – IV.24 for cash flow hedges and VI.13 - IV.15 for fair value hedges.  See DAG, FMSE 112652-112656.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**quantitative assessment of effectiveness to qualify for hedge accounting, as well as measurement of ineffectiveness, when matched terms criteria are not met.[255] Although, these requirements are documented in the DAG, Fannie Mae has not performed such assessments and measurements for hedges involving re-designated derivatives.**

## Implications

The improper accounting for re-designations as described above impacts a substantial portion of Fannie Mae's derivatives portfolio. Based on our review of Fannie Mae's DAG, many of the re-designated hedge relationships as described therein would not qualify as perfect hedges for reasons similar to those outlined for the transaction discussed in Example 1. Although further information needs to be gathered to gain a full understanding of the magnitude of these errors, OFHEO understands that as much as 50-75% of Fannie Mae's derivatives portfolio may have been subject to re-designations at some point in time.[256] Additionally, in testimony to OFHEO, the senior financial analyst in the Treasury Middle Office stated that hedge effectiveness assessment and ineffectiveness measurement is performed for only a very small number of hedge relationships relative to the total portfolio, and all others are assumed to be perfectly effective.[257] Because a proper effectiveness assessment is apparently not performed for the re-designated hedge relationships, they would not qualify for hedge accounting under SFAS 133. Such transactions would thus be properly accounted for on a "non-hedge" basis, meaning fair value changes are recorded directly to earnings.

During an interview with Mr. Boyles, he stated that Fannie Mae was aware that the sentence referenced above ["Because the two swaps in combination meet the conditions discussed in combination meet the conditions discussed in paragraph 68, MNO is permitted to assume no ineffectiveness and use the shortcut method illustrated in Example 5"] was deleted by SFAS 138. He further stated that Fannie Mae had performed an analysis prior to its adoption of SFAS 133 to evaluate the impact of the change, and based on the results of this analysis, decided to continue using the assumption of no ineffectiveness and therefore ignoring the change made in SFAS 138. Mr. Boyles stated that the difference between assuming perfect effectiveness and

---

[255] Fannie Mae DAG p. IV.25 for cash flow hedges and VI.16 for fair value hedges. See DAG, FMSE 112657,112768, respectively. OFHEO observes that Fannie Mae's DAG calls for the use of a cumulative dollar offset test (80-125% is regarded as highly effective) to assess effectiveness in situations where the "long haul" method is required. Long haul method refers to situations in which neither the shortcut nor matching of critical terms method is applicable and an assessment of hedge effectiveness and measurement of ineffectiveness is required.

[256] Internal notes prepared by OFHEO, Re: Interview with Laura Simmons—Treasury Office Operations, May 20, 2004. In the interview she indicated that 50%-75% of the portfolio of derivatives is potentially re-linked.

[257] OFHEO interview, Katarina Skladony, Senior Financial Analyst-Treasury Middle Office, August 26, 2004, p. 150
A: As I recall, as of the end of the last quarter, there were no transactions for which you would have to use hypothetical derivative method for ineffectiveness calculation.
Q: So were there no long haul calculations being performed for the last quarter?
A: There were no cash flow hedges that would require long haul calculation.
See Mona Patel testimony in; The Assumption of Perfect Effectiveness, herein, for more details relating to the number of long hauls performed.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

the amount of ineffectiveness measured using the long haul method was minor.[258]  In the same interview, he represented that he believed that any ineffectiveness that was ignored by Fannie Mae in term-out transactions was immaterial based on the analysis performed.  He also indicated that he no longer had the analysis as he had discarded it, along with several other items, when he moved offices. [259]  Mr. Boyles also acknowledged that there was no quarterly or annual review of the ineffectiveness resulting from term-out transactions.

In a subsequent interview, Mr. Boyles stated that a recent analysis had been performed using information as of June 30, 2004.  He informed OFHEO that this analysis was performed as a direct result of some of the issues that were raised by OFHEO as part of this special examination.   He also stated that the amount of cumulative ineffectiveness resulting from re-designated derivatives was approximately $50 million.  Fannie Mae's auditor, KPMG, had posted a "review difference" for this amount. [260]  OFHEO obtained a summary analysis (which had no supporting documentation attached) which was used to project the ineffectiveness calculation across the entire population.  OFHEO also participated in a conference call with Fannie Mae in which representatives of the Enterprise attempted to explain the methodology that was followed in completing the analysis. [261]  Mr. Boyles stated that the revised projected economic

---

[258] OFHEO interview,  Jonathan Boyles, Senior Vice President – Financial Standards and Corporate Tax, August 3, 2004, pp. 212-213
Q: […]So when this change was made as a result of FAS 138, is our understanding correct that a conscious decision was made to continue to apply the treatment irrespective of this change?
A: When 138 was released we also saw that sentence deleted. The background information refers to this as not qualifying for the shortcut method. It did not say that the--in the matching concept, that the--one of the critical terms was the beginning value starting with zero. This only refers to--and the criteria relates to the shortcut method.  […] We also did some analysis that I believe I mentioned earlier, that we showed our auditors, as it relates to this transaction, that showed that difference between going long haul and assuming no ineffectiveness to be minor.
[259] OFHEO interview,  Jonathan Boyles, Senior Vice President – Financial Standards and Corporate Tax, August 3, 2004, pp. 225-226
Q So was that what your example was, an example of not applying matched terms but actually doing long haul?
A: […]The analysis that we did was the analysis as it relates to if I'm going to take the income amount out of OCI, and if I'm going to record the ineffectiveness as expense, and book both of them to the income statement, that that analysis showed those amounts to be immaterial difference. And so the accrual that will normally occur will capture those differences. And that's what the policy reflects.
[…]A:[…]Several years ago when I took over the Tax Department, I switched offices, and almost everything related to the adoption of 133 I threw in the trash[…]and so I could not find it in my analysis. […]
[260] OFHEO interview,  Jonathan Boyles, Senior Vice President – Financial Standards and Corporate Tax, August 24, 2004, p. 106
Q: Was the difference, a $50 million difference, proposed as an adjustment by KPMG or was that not proposed?
A: It was a review difference for them. […]
A: The audit isn't done so it's not an audit adjustment. But the review was completed for the quarter so it would have been a review adjustment for them.
[261] Handwritten notes from conference call held between Fannie Mae and OFHEO, September 7, 2004. Fannie Mae explained the analysis that was performed and the approach the Enterprise took to project out the sample across the entire population. Fannie Mae was represented by Leanne Spencer, Controller; Jonathan Boyles, Senior Vice President – Financial Standards and Corporate Tax; Mark Wiener, Vice President of Risk Management; and Jodie Kelley, Associate General Counsel.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

impact of the analysis was a loss of $27 million[262] and that Fannie Mae's external auditor was comfortable with the number.  While the matter is still under study, our initial conclusion is that the analysis procedures performed were not adequate to support Fannie Mae's conclusion for the following reasons: [263]

- The analysis was based on a sample of 40 hedge transactions and attempts to extrapolate these results to the entire population of affected transactions, rather than performing a calculation for each affected transaction.  We do not believe an accurate estimate can be made using such an extrapolation.
- Fannie Mae only evaluated cumulative ineffectiveness as of a point in time, ignoring the fact that the amount of ineffectiveness recorded in earnings on a period-to-period basis will fluctuate.
- As noted earlier, an assessment of effectiveness is required to be performed retrospectively and prospectively on a quarterly basis to qualify for hedge accounting. The analysis referenced above only addressed measurement of ineffectiveness.  In the call with OFHEO, Mr. Boyles represented that the Enterprise had also performed a regression analysis as of June 30, 2004 on a select number of derivative transactions out of the 40 transactions that were included in the sample.  Such an after-the-fact test does not meet SFAS 133 requirements.

In order to gain an understanding of the potential ineffectiveness that can result from a term-out transaction, OFHEO performed an analysis using an illustrative $500 million notional swap that is assumed to be subject to a term-out similar to the Example 1 Term-out described above. This analysis used actual market data to illustrate the accounting effect of such a transaction if ineffectiveness is properly measured. See Appendix III. OFHEO's analysis indicates that, while cumulative ineffectiveness can be small (or even zero) at a given period end, it can result in millions of dollars of ineffectiveness affecting earnings on a period-to-period basis for a single hedge relationship. Furthermore, our illustration indicates that if an effectiveness assessment test had been properly performed in accordance with Fannie Mae's policy, the hedge relationship could fail the 80% to 125% correlation test.[264]  This would preclude the application of hedge accounting in periods in which the test failed.  The following graph is summarized from OFHEO's analysis and illustrates the periodic earnings volatility that can occur when ineffectiveness is properly measured (assuming the hedge relationship qualifies for hedge accounting).

---

[262] Handwritten notes from conference call held between Fannie Mae and OFHEO, September 7, 2004. Fannie Mae was represented by Leanne Spencer, Controller; Jonathan Boyles, Senior Vice President – Financial Standards; and Corporate Tax; Mark Wiener, Vice President of Risk Management; and Jodie Kelley, Associate General Counsel.  It is OFHEO's understanding from the call that the revised projected economic impact from the analysis was determined by Fannie Mae to be $27 million.

[263] OFHEO had requested all information that was used to prepare the analysis and develop the expectations.  Fannie Mae mentioned in the call referenced above that they have been working on pulling together the information and supporting schedules that supports the analysis.  This information was originally requested via a subpoena dated August 18, 2004.

[264] Fannie Mae's DAG, as well as SEC guidance, requires a dollar offset ratio between the hedging instrument and hedged item to fall between 80% and 125% in order to meet the "highly effective" requirement to qualify for hedge accounting.  See section II.15-17 Hedge Effectiveness Analysis of the DAG (FMSE 112604-112606).

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited



As noted above, further information and an in-depth analysis will be required to determine the proper treatment of each of Fannie Mae's hedging strategies and actual impact of these matters in relation to Fannie Mae's total derivatives portfolio for past financial statement periods. However, even without any further analysis, OFHEO contends that this matter has significant implications to Fannie Mae's financial statements given the frequent use of term-outs and the significant earnings impact. The impact that would result from recording changes in fair values of such derivatives through earnings could be in the billions of dollars.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

*Issue 2: Accounting for Offsetting Derivatives*

Fannie Mae enters into offsetting swaps in which an existing swap (typically a pay-fixed, receive-floating swap) is effectively cancelled by a second swap with offsetting terms (i.e., pay-float, receive-fixed).  This section discusses Fannie Mae's accounting treatment of these transactions and specifically the Enterprise's application of cash flow hedge accounting.

**Background**

SFAS 133 describes a cash flow hedge as follows: "An entity may designate a derivative instrument as hedging the exposure to variability in expected future cash flows that is attributable to a particular risk.  That exposure may be associated with an existing recognized asset or liability (such as all or certain future interest payments on variable-rate debt) or a forecasted transaction (such as a forecasted purchase or sale)."[265] Thus, the essence of a cash flow hedge is to offset the variability in cash flows of the hedged item.

Furthermore, SFAS 133 requires that an entity discontinue cash flow hedging **prospectively** if any one of the following occurs:[266]

• Any of the criteria to qualify for hedge accounting are no longer met.
• The derivative expires or is sold, terminated or exercised.
• The entity removes the designation of the cash flow hedge.

After a cash flow hedge has been discontinued, the effective portion of the derivative's net gain or loss shall remain in AOCI and be reclassified to earnings at the time the hedged transaction affects earnings, unless the hedged transaction is deemed probable of not occurring, in which case any gains or losses would be immediately be reclassified from AOCI to earnings.[267]

**Summary of Issue**

As discussed under Issue 1: Derivative Re-Designations, Fannie Mae frequently goes through the process of "re-balancing" its liability portfolio.  In this process, it often enters into new swaps and other derivatives, many of which are used to offset existing derivatives either fully or partially. In many cases, this relates to a "term-out" which, as described earlier, is generally the replacement of discount notes with fixed rate notes or other borrowings. Certain term-outs result in a situation in which a hedged exposure no longer exists, for instance when short-term floating rate debt is replaced with long-term fixed rate debt and the variability of future interest payments has been eliminated. When this occurs, the swap is no longer matched to an exposure, leaving Fannie Mae with the choice of terminating the swap, offsetting it with another swap, or re-designating it to another exposure. Assuming no other exposure exists to which the swap can be re-designated, Fannie Mae's typical approach has been to enter into an offsetting swap to effectively terminate the hedging relationship. When this has occurred, Fannie Mae's past practice has been to continue to account for both swaps as a cash flow hedge, which is not consistent with SFAS 133 requirements. **It is OFHEO's conclusion that Fannie Mae has inappropriately applied hedge accounting in these circumstances. When the floating rate debt has been termed-out cash flow hedge accounting must cease because the**

---

[265] FASB, SFAS 133, paragraph 28.
[266] FASB, SFAS 133, paragraph 32.
[267] FASB, SFAS 133, paragraphs 32 and 33.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**hedged exposure no longer exists. The two offsetting swaps should both be recorded at fair value with changes in their fair values recorded in earnings. Although the swaps offset one another, there should still be a net mark-to-market impact because the rate on the swaps' fixed legs (one pay, one receive) would differ.**

**Example 2.**

Below is an example of a situation in which an offsetting swap is used by Fannie Mae in connection with a term-out.

# Example of an Offsetting Swap



*Description of Transaction:*

- *On 7/2/97, Fannie Mae issues $500M in DNs and enters into Swap #1 (treated as a perfect cash flow hedge of the forecasted interest payments on the discount notes). Swap #1 is a pay-fixed, receive-floating swap with a term of 7 years, the period of expected reissuance of DNs. For purposes of this example, it is assumed that the swap's interest rate reset dates match the expected timing of DN reissuance and all other critical terms are matched in order to allow Fannie Mae to assume perfect effectiveness under SFAS 133.*
- *On 7/2/01, Fannie Mae issues a $500M 6.175% 3-yr MTN to replace a rollover of $500M in DNs and enters into swap #2. Swap #2 is a receive-fixed, pay-floating swap that matures in 3 years which coincides with the maturity of the MTN and the end of the original 7 year hedge period. Swap #2 serves to completely offset the effect of Swap #1 except that the two swaps have different fixed interest rates because they were entered into at different times. The net result of the two swaps is a fixed stream of cash flows over their remaining lives, representing the difference in their respective fixed rates.*

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- *Fannie Mae continues to treat both Swap#1 and Swap#2 as a perfect cash flow hedge over their remaining lives and as such all changes in the swaps' fair values are reflected in AOCI and reclassified into earnings as the interest settlements on the swaps accrue.*

In Fannie Mae's DAG, they describe the above accounting treatment as "...a practical interpretation of the Statement to treat this as a cash flow hedge rather than two speculative hedges..."  It states further that "This accounting will have the effect of keeping original accrual rate in earnings equal to what would have been recognized under synthetic accounting treatment."[268] OFHEO asserts that this treatment is not consistent with the requirements of SFAS 133.

## Accounting Analysis

OFHEO concludes that the accounting treatment described in the above example is not compliant with the requirements of SFAS 133. As noted above, cash flow hedge accounting is applied when there is an exposure to variable cash flows.  In Example 2, the exposure to variable cash flows was eliminated when the issuance of discount notes was replaced with a fixed rate MTN. Thus, at that time cash flow hedge accounting should have been discontinued for swap #1, consistent with the requirements of paragraph 32 of SFAS 133. Both swap #1 and swap #2 should have been marked-to-market through earnings from that point forward and treated as non-hedging derivatives. This conclusion is supported in SFAS 133 by "Example 8 – Scenario 1", set forth in paragraphs 153-158, excerpted as follows:

> MNO Company enters into an interest rate swap (Swap 1) and designates it as a hedge of the variable interest payments on a series of $5 million notes with 90-day terms. MNO plans to continue issuing new 90-day notes over the next five years as each outstanding note matures.  The interest on each note will be determined based on LIBOR at the time each note is issued.  Swap 1 requires a settlement every 90 days, and the variable interest rate is reset immediately following each payment.  MNO pays a fixed rate of interest (6.5 percent) and receives interest at LIBOR.  MNO neither pays nor receives a premium at the inception of Swap 1.  The notional amount of the contract is $5 million, and it expires in 5 years.

> Because Swap 1 and the hedged forecasted interest payments are based on the same notional amount, have the same reset dates, and are based on the same benchmark interest rate designated under paragraph 29(h), MNO may conclude that there will be no ineffectiveness in the hedging relationship (absent a default by the swap counterparty).

> Scenario 1—Two Undesignated Interest Rate Swaps

> At the end of the second year of the 5-year hedging relationship, MNO discontinues its practice of issuing 90-day notes.  Instead, MNO issues a 3-year, $5 million note with a fixed rate of interest (7.25 %).  Because the interest rate on the three-year note is fixed, the variability of the future interest payments has been eliminated.  **Thus, Swap 1 no longer qualifies for cash flow hedge accounting** [Emphasis added]. However, the net gain or loss on Swap 1 in accumulated other comprehensive income is not reclassified to earnings immediately.  Immediate reclassification is required (and

---

[268] This language can be found under example transaction #43 in the DAG, FMSE 113073.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

permitted) only if it becomes probable that the hedged transactions (future interest payments) will not occur.  The variability of the payments has been eliminated, but it still is probable that they will occur.  Thus, those gains or losses will continue to be reclassified from accumulated other comprehensive income to earnings as the interest payments affect earnings (as required by paragraph 31).

Rather than liquidate the pay-fixed, receive-variable Swap 1, MNO enters into a pay-variable, receive-fixed interest rate swap (Swap 2) with a 3-year term and a notional amount of $5 million.  MNO neither pays nor receives a premium.  Like Swap 1, Swap 2 requires a settlement every 90 days and reprices immediately following each settlement.  The relationship between 90-day interest rates and longer term rates has changed since MNO entered into Swap 1 (that is, the shape of the yield curve is different).  As a result, Swap 2 has different terms and its settlements do not exactly offset the settlements on Swap 1.  Under the terms of Swap 2, MNO will receive a fixed rate of 7.25 percent and pay interest at LIBOR.

**The two swaps are not designated as hedging instruments and are reported at fair value** [Emphasis added].  The changes in fair value are reported immediately in earnings and offset each other to a significant degree.

The excerpt above from SFAS 133 clearly indicates that there is no basis for applying hedge accounting after the DN's are replaced with MTNs because the variability in cash flows previously being hedged no longer exists. Furthermore, OFHEO observes that by applying hedge accounting to the two offsetting swaps, Fannie Mae was effectively hedging a derivative with another derivative, which is not permitted by SFAS 133. Paragraph 29(d) of SFAS 133 describes one of the criteria that must be met for a forecasted transaction to be designated as a hedged item in a cash flow hedge as follows:

The forecasted transaction is not the acquisition of an asset or incurrence of a liability that will subsequently be remeasured with changes in fair value attributable to the hedged risk reported currently in earnings.  If the forecasted transaction relates to a recognized asset or liability, the asset or liability is not remeasured with changes in fair value attributable to the hedged risk reported currently in earnings.

A derivative is an asset or liability that is remeasured with changes in fair value reported in earnings; therefore, it is not eligible as a hedged item in a cash flow hedge relationship.

In March 2004, shortly after the commencement of OFHEO's special examination, Fannie Mae made a decision to de-designate or terminate certain hedging relationships that were classified as perfect cash flow hedges.[269]  OFHEO understands that these hedging relationships included

---

[269] Memorandum from Jonathan Boyles to distribution, Subject: Revisions to the December 2003 DAG, March 13, 2004, FMSE 113686-113690. The memorandum states, "Effective January 1, 2004, any plain vanilla PF and RF swaps that are linked with matching terms will be treated as DNQ derivatives with both sides marked to market through earnings."

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

those strategies that combined a receive-fixed swap with a pay-fixed swap effectively canceling the pay-fixed swap (as illustrated in Example 2) and those that combined a pay-fixed swaption with a receive-fixed swaption. These relationships were previously treated as perfect cash flow hedges. Effective as of January 1, 2004, these swaps are being marked to market through earnings and are not receiving hedge accounting treatment. According to the 10-Q for the first quarter of 2004, the impact on earnings of marking to market these derivatives was a pre-tax loss of approximately $13 million.[270] OFHEO noted that this change in accounting treatment has been done prospectively. Fannie Mae has made no acknowledgement that its prior accounting was incorrect. Accordingly, OFHEO believes that they have not properly quantified the financial statement impact on prior periods.

**It is OFHEO's conclusion, based on the accounting analysis above, that these offsetting swaps were not valid hedging relationships under SFAS 133 and should not have received hedge accounting once the term-out occurred.** OFHEO discussed the accounting change with Jonathan Boyles to determine whether he believed Fannie Mae's prior accounting was correct. Mr. Boyles stated that he did not believe the prior accounting was in error, but he did believe it could be viewed as "aggressive."[271] Mr. Boyles indicated both in his memorandum and in our discussions that the reasons for the accounting change were primarily operational in nature. However, it should be noted that when asked to identify the exposure being hedged or the hedged item in these transactions, Mr. Boyles could not recall the exposure being hedged.[272] It is OFHEO's belief that Fannie Mae may have made the change in policy as a direct response to the special examination.

**Implications**

It appears that the derivative positions to which this issue relates have represented a reasonably significant portion of Fannie Mae's derivatives portfolio in prior periods. The magnitude is apparent from the Enterprise's March 31, 2004 10-Q, which shows that derivatives with notional and fair value balances of $51 billion and negative $1.6 billion, respectively, were treated as non-hedging instruments.[273] At December 31, 2003 the same derivatives balances were $43 million and $0.[274] OFHEO's understanding is that this change is primarily attributable to offsetting derivatives for which the accounting was changed in the first quarter of 2004. As noted earlier, Fannie Mae disclosed that the income statement effect of this change in the first quarter of 2004 was approximately $13 million. In initial discussions with Fannie Mae, OFHEO was led to believe that this amount might be an approximation of the potential earnings impact if the proper accounting method had been applied in prior periods. In discussions with OFHEO, Mr. Boyles expressed the view that Fannie Mae's practical interpretation of SFAS 133 would not

---

[270] Fannie Mae March 31, 2004 10-Q, p. 26.

[271] Internal notes prepared by OFHEO, Re: Interview with Jonathan Boyles, Senior Vice President— Financial Accounting Standards and Corporate Tax, May 20, 2004.

[272] OFHEO interview, Jonathan Boyles, Senior Vice President – Financial Standards and Corporate Tax, August 24, 2004, pp.177-178
Q: What was the exposure that was being hedged?
A: The exposure that was being hedged in this instance was the--I have to go back and think about it--I don't recall now. Going back, I don't recall what the exposure that was being hedged in this.

[273] Fannie Mae March 31, 2004 10-Q, Table 20: Notional and Fair Value of Derivatives by Hedge Designation, p. 27.

[274] Fannie Mae March 31, 2004 10-Q, Table 20: Notional and Fair Value of Derivatives by Hedge Designation, p. 27.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

have resulted in a material difference had a strict adherence to SFAS 133 been followed for such transactions, and that the $13 million result in the first quarter of 2004 demonstrated this.

However, based on a review of several e-mails as well as an interview with Katarina Skladony, Senior Financial Analyst in Fannie Mae's Treasury Middle Office, OFHEO discerned that the earnings impact of derivatives that have been marked as non-hedging is actively monitored and managed by the Treasurer's group.[275]  The following email from Cheryl DeFlorimonte illustrates Fannie Mae's response to the increased population of DNQ[276] derivatives resulting from the policy change:[277]

> In an effort to monitor and manage the earnings impact of the intentional DNQs, TMO was requested to generate a weekly report showing the change in the market value and the interest accrual relating to these DNQ swaps.  It is my understanding that currently, TMO is not in a position to obtain weekly accruals for these DNQs from their system.  As such, TMO has proposed that they provide the earnings impact report on a monthly basis until the required system enhancement is made...

This information led OFHEO to believe that the $13 million recognized in earnings in the first quarter is the result of the discontinuation of hedge accounting for those derivatives that were in offsetting positions as well as certain derivatives that had previously been in valid hedge relationships but were intentionally de-designated with the intention of minimizing the earnings impact of the offsetting derivatives.  The "DNQ" book is apparently being actively managed and monitored to ensure that the earnings impact is minimal.  The emails indicate that specific directions have been given to the technology group requesting the development of a weekly report to facilitate managing the earnings impact of non-hedge derivatives.

There are several points to note resulting from the above discussion.  First, the Enterprise had employed improper accounting in prior periods, presumably in order to avoid the earnings volatility that might result from proper accounting treatment.   There was no basis under SFAS 133 to defer the mark-to-market of the offsetting derivatives in AOCI.  Secondly, Fannie Mae's

---

[275] OFHEO interview,  Katarina Skladony, Senior Financial Analyst – Treasury Middle Office, dated August 26, 2004, pp. 31-37 31, where she stated, "The DNQ project was initiated by the change in the accounting policy earlier this year that as a result of this, there were a number of transactions for which the hedge accounting guidelines changed in terms of how they're going to be reported, how the change of their market value will be reported, and since it included a fairly extensive number of trades, it was determined that there has to be a better process, a more comprehensive process, to make sure that, you know, all those transactions are properly identified and reported…Again, I believe that the project is a joint project between the Controller and the Treasurer's."
Q: Are you given any instructions from the front office and Treasurer's to specifically DNQ particular trades?
A: Yes, they have given me instructions such as that.
[276] DNQ is the terminology used by Fannie Mae to designate those derivative transactions that "do not qualify" for hedge accounting.
[277] Email from Cheryl DeFlorimonte to David Benson and Janet Pennewell, copy to Paul Salfi and Laura Simmons, Subject: Report on Earnings Impact from DNQs, February 27, 2004.  This email is the 5th email in a chain of emails.  The latest email (top of page) is an email from David Benson to Laura Simmons, Janet Pennewell, Cheryl DeFlorimone, copies to Paul Salfi, Katarina Skladony among others, Subject: Report on Earnings Impact from DNQs, March 1, 2004, produced via CD on 8/11/2004 in box M.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

first quarter 2004 disclosure of the earnings impact of DNQ derivatives is not indicative of the potential earnings impact that would have been recognized had the proper accounting treatment been applied in prior periods.  In order to evaluate the true impact on past earnings, Fannie Mae would have to perform a detailed historical analysis for all such hedge relationships and quantify the impact of applying the proper accounting treatment.

In order to gain an understanding of the potential earnings impact of marking-to-market the offsetting swaps, with changes in fair value being recorded through earnings, OFHEO performed an analysis using an illustrative transaction and historical market data. This illustrative transaction involved a $500 million, seven year pay fixed swap that was subsequently offset with a receive-fixed swap.  See Appendix IV.  The analysis indicates that for an individual swap, the earnings effect of marking the two swaps to market through earnings, together with the amortization of prior AOCI amounts, may in fact largely offset one another, but still result in earnings volatility.  However, the impact for actual transactions may vary, depending upon the terms of the instruments involved, actual market conditions and the size of the offsetting swap portfolio.  In contrast, Fannie Mae did not mark the two swaps to market, but reflected them in earnings on an accrual basis, making the earnings impact much more predictable.  The following graph is summarized from OFHEO's analysis and illustrates the periodic earnings volatility that can result when the proper accounting is applied to offsetting swaps.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited



Illustration of Earnings Volatility - Offsetting Swaps

Fannie Mae's treatment of offsetting swaps is one of many instances in which the Enterprise has employed improper accounting, apparently in order to avoid the earnings volatility that might result from proper accounting treatment. Furthermore, explicit guidance for this type of transaction was provided by the FASB (in Example 8 in SFAS 133), in large part due to Fannie Mae's active discussions with the FASB. However, despite this guidance, Fannie Mae chose to do the accounting "their way" which provides some insight into the culture and attitudes within the Enterprise.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

## *Issue 3: Application of Shortcut and Matched Terms Methods*

Fannie Mae's use of hedge accounting relies heavily on the assumption that the vast majority of its hedging relationships are perfectly effective and that accordingly no effectiveness assessment or measurement of ineffectiveness needs to be performed for such relationships. This section discusses Fannie Mae's application of the matched terms method and the assumption of perfect effectiveness.

### Background

As discussed earlier, hedge accounting under SFAS 133 requires both an assessment of hedge effectiveness (initial and on-going) in order to qualify for hedge accounting treatment, as well as measurement of the ineffective portion of the hedge through earnings. An exception is granted for certain hedging relationships involving interest rate swaps, which qualify for what is known as the "shortcut" method.  If the shortcut criteria are met, an entity is permitted to assume that the hedging relationship is perfectly effective and thus perform no assessment of effectiveness and no measurement of ineffectiveness. The criteria to qualify for the shortcut method are summarized as follows:[278]

Conditions applicable to both fair value hedges and cash flow hedges:

a) The notional amount of the swap matches the principal amount of the interest-bearing asset or liability being hedged
b) The fair value of the swap at the inception of the hedging relationship is zero (or if applicable, reflects the fair value of an embedded call option in the swap which mirrors a call option in the hedged item).
c) The formula for computing net settlements under the interest rate swap is the same for each net settlement.
d) The interest-bearing asset or liability is not prepayable (unless it contains an embedded call or put option that is mirrored in the terms of the swap).
dd) The index on which the variable leg of the swap is based matches the benchmark interest rate designated as the interest rate risk being hedged for that hedging relationship.
e) Any other terms in the interest-bearing financial instruments or interest rate swaps are typical of those instruments and do not invalidate the assumption of no ineffectiveness.

Conditions applicable to fair value hedges only:

f) The expiration date of the swap matches the maturity date of the interest-bearing asset or liability.
g) There is no floor or ceiling on the variable interest rate of the swap.
h) The interval between repricings of the variable interest rate in the swap is frequent (generally three to six months or less).

Conditions applicable to cash flow hedges only:

---

[278] FASB, SFAS 133, paragraph 68.  Information is summarized from this paragraph.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

i)   All interest receipts or payments on the variable-rate asset or liability during the term of the swap are designated as hedged, and no interest payments beyond the term of the swap are designated as hedged.

j)   There is no floor or cap on the variable interest rate of the swap unless the variable-rate asset or liability has a floor or cap.  In that case, the swap must have a floor or cap on the variable interest rate that is comparable to the floor or cap on the variable-rate asset or liability.  (For this purpose, comparable does not necessarily mean equal.  For example, if a swap's variable rate is LIBOR and an asset's variable rate is LIBOR plus 2 percent, a 10 percent cap on the swap would be comparable to a 12 percent cap on the asset.)

k)   The repricing dates match those of the variable-rate asset or liability.

SFAS 133 also provides that if the critical terms of the hedging instrument and of the hedged asset, liability or forecasted transaction are the same, the entity could conclude that changes in fair value or cash flows attributable to the risk being hedged are expected to completely offset at inception and on an on-going basis.[279] As a result, the entity would apply matched terms accounting. In this case there would be no ineffectiveness to record and the effectiveness assessment would consist of confirming that the critical terms are matched at inception and continue to be matched over the life of the hedge.

While the shortcut and matched terms methods appear to be similar, there are subtle but important differences in these methods:

- Under the shortcut method, the entity is allowed to *assume* no ineffectiveness in the hedging relationship, even though some ineffectiveness may exist if it were actually measured.

- Under the matched terms method, a conclusion is reached that there *is no ineffectiveness.* Thus, if the entity were to perform the measurement, no ineffectiveness would result.

- The shortcut method applies only to hedges involving interest rate swaps and existing debt instruments, whereas the matched terms method is not restricted to specific instrument types.

**Summary of Issue**
**Fannie Mae incorrectly assumes perfect effectiveness for many of its hedge relationships. Its definitions of matched terms and shortcut criteria are not consistent with the requirements of SFAS 133. Accordingly, Fannie Mae does not perform an effectiveness assessment or measurement of ineffectiveness as required, and many of its hedging relationships therefore should not qualify for hedge accounting treatment.**

**Accounting Analysis**
Fannie Mae's DAG sets forth requirements for assuming perfect effectiveness, which do not comply with SFAS 133 in several respects as discussed below:

---

[279] FASB, SFAS 133, paragraph 65, as amended.

113

*The Seven-Day Rule:* Fannie Mae's DAG allows reset dates to be mismatched by plus or minus seven days in cash flow hedging relationships and still assume perfect hedge effectiveness.[280] SFAS 133 only permits an assumption of no ineffectiveness if shortcut criteria are met or if critical terms of the derivative instrument exactly match those of the hedged item. In all other cases, effectiveness assessments and ineffectiveness measurements must be performed. This is supported by DIG Issue No. E4 *Hedging—General: Application of the Shortcut Method* ("DIG Issue E4"), which states, in part:

> Question 1: Can the shortcut method be applied if most but not all of the applicable conditions in paragraph 68 are met?
>
> Question 1 Response: No. The shortcut method can be applied only if all of the applicable conditions in paragraph 68 are met.  That is, all the conditions applicable to fair value hedges must be met to apply the shortcut method to a fair value hedge, and all the conditions applicable to cash flow hedges must be met to apply the shortcut method to a cash flow hedge.  A hedging relationship cannot qualify for application of the shortcut method based on an assumption of no ineffectiveness justified by applying other criteria. [Emphasis added]…

The response to question 1 goes on to say:

> The verb match is used in the specified conditions in paragraph 68 to mean *be exactly the same or correspond exactly.*

Furthermore, paragraph 65 of SFAS 133 applies only if "the critical terms of the hedging instrument and of the … hedged forecasted transaction are the **same**…" [Emphasis added]. **Fannie Mae's use of the seven-day rule precludes it from applying shortcut or matched terms accounting to cash flow hedges for which reset dates are not exactly matched. Because Fannie Mae does not perform an effectiveness assessment or measurement of ineffectiveness for such hedge relationships, they do not qualify for hedge accounting unless the reset dates are matched exactly.**

Fannie Mae concedes that the plus or minus seven days policy is a departure from GAAP.[281] However, Fannie Mae asserts that they perform an annual analysis to determine what the

---

[280] Fannie Mae DAG p. IV.22, FMSE 112654.

[281] OFHEO interview,  Jonathan Boyles, Senior Vice President – Financial Accounting Standards and Corporate Tax, August 3, 2004, pp. 64-66.  In the interview, Mr. Boyles stated "We have several known departures from GAAP in our adoption of FAS 133.  We have cleared those with our auditors.  We have reported to our auditors on an annual basis the effect of those.  And they were comfortable when we adopted them, and they were comfortable over the last several years when we reported the results of that work.[…] As it relates to the plus or minus seven days, that came down to the realization in the business that we--from a business perspective we issue discount notes on an auction basis, on a weekly basis. And at times those interest rate swaps would reprice on a Monday, but we're going to issue debt on a Wednesday—[…].  And it sometimes might be on a Friday. And then, on average, it's going to be at zero, but any individual one might be off by a couple of days. And so we built this practical application as it relates to the resetting of those, partially because all of that ineffectiveness is going to roll through as you make your payments and partially because it's just the way the business is run. And so we tried to make that very narrow, that time frame in which they're allowed to do the relinkages in that."

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

income statement impact would be of measuring ineffectiveness that would result due to the mismatch in repricing dates had they not assumed these hedges to be perfectly effective.  This analysis is prepared primarily to represent to KPMG that the difference on earnings resulting from assuming perfect effectiveness versus performing a measurement of ineffectiveness is not material.  There is no hedge effectiveness assessment performed or specified in hedge documentation, as required by SFAS 133.  Jonathan Boyles stated that due to Fannie Mae's assumption of no ineffectiveness, an assessment of hedge effectiveness is not necessary.  OFHEO believes it is contradictory on the one hand, to acknowledge that there is ineffectiveness in the hedging relationship (which the Enterprise calculates for the external auditors) and on the other hand to assert that no assessment is required due to "assumed" perfect effectiveness.

Fannie Mae performs two analyses, the "average approach" and the "absolute value approach".  An internal memorandum explains the quantitative approaches that Fannie Mae utilizes as follows:

> The first set of quantitative analysis ("average approach") incorporates the idea that there is offset between movements in LIBOR associated with pay-fixed swap funding needs which occur <u>before</u> a Benchmark Bill issuance and movements in LIBOR associated with pay-fixed swap funding needs which occur <u>after</u> a Benchmark Bill issuance.  The second set of quantitative analysis ("absolute value approach") does not incorporate this idea of offset and assumes that changes in LIBOR always move against us, who we believe represents a "worst case" scenario and is highly unlikely.[282]

Both approaches, however, ignore any ineffectiveness resulting from differences in reset dates in the future.  The analyses performed calculate ineffectiveness resulting only from differences in historical reset dates.

SFAS 133, DIG Issue No. G7, *Cash Flow Hedges: Measuring the Ineffectiveness of a Cash Flow Hedge under Paragraph 30(b) When the Shortcut Method Is Not Applied* ("DIG Issue G7"), prescribes three methods for measuring ineffectiveness for cash flow hedges that are not eligible for the shortcut method:  (1) change in variable cash flows method, (2) hypothetical derivative method, and (3) change in fair value method.  The analysis performed by Fannie Mae in their quantitative evaluation of ineffectiveness does not conform to the prescribed methods in SFAS 133, and as such, may produce a different ineffectiveness result than if it had been performed using a proper method.  **Thus, OFHEO contends that not only is Fannie Mae's accounting for these transactions inconsistent with SFAS 133 requirements, but also their attempt to quantify the unrecorded ineffectiveness is not consistent with SFAS 133 guidelines for performing such measurements.**

*The 90-Day Rule:* Fannie Mae's DAG allows maturity dates of the hedging instrument and the hedged item to be mismatched by plus or minus 90 days in fair value hedging relationships and

---

[282] Memorandum from Ilan Sussan to the Files, Subject:  Assessing the Income Statement Impact of Applying the Plus or Minus Seven Day Policy to Fannie Mae's Average Pay-Fixed Swap Book, December 17, 2003, FMSE 032657-032658.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

still assume perfect hedge effectiveness.[283] As discussed in relation to the seven-day rule, SFAS 133 only permits an assumption of no ineffectiveness if shortcut criteria are met or if critical terms of the derivative instrument exactly match those of the hedged item.  As noted above, one of the criteria to assume perfect effectiveness for fair value hedges is that the maturities of the hedged item and the hedging instrument should be the same.  **Fannie Mae's inclusion of the 90-day rule in its policy permits the Enterprise to apply a shortcut or matched terms approach when it does not meet the requirements under SFAS 133.  Applying hedge accounting to such transactions without performing an effectiveness assessment or measurement of ineffectiveness is not permissible under SFAS 133.**

Jonathan Boyles noted that he could not recall how or why the 90-day rule was created or if it has been used by Fannie Mae in any of its transactions.[284] Further research is required to determine whether this aspect of the policy has been applied in practice and the magnitude of its impact.

*Duration Matching:*  Fannie Mae's DAG allowed the Hedge Desk to assume no ineffectiveness in hedge relationships as long as the duration of the hedging instrument and the hedged item were matched, within certain parameters.  OFHEO asserts that because the durations and other critical terms of the instruments were closely, but not perfectly matched, there should have been some resulting ineffectiveness in the relationship, requiring measurement and assessment procedures.  In March 2004, Fannie Mae discontinued the use of duration matching as a method to assess the effectiveness of hedging anticipated debt issuances.  Effective the beginning of the first quarter of 2004, the Enterprise began measuring and accounting for hedge ineffectiveness. [285]  Mr. Boyles acknowledged that this was a departure from GAAP. [286]  As such, an analysis had historically been performed on an annual basis to determine if the amounts that would have been recorded by using the long haul method would be material.  Management's justification for using such an approach is that they believed "from an economic

---

[283] Section VI.14 of the DAG outlines the criteria required to assume no ineffectiveness for fair value hedges.  Item 1 states "The expiration date of the swap matches the maturity date of the interest-bearing asset or liability that is being hedged within 3 months" (FMSE 112766).

[284] OFHEO interview, Jonathan Boyles, Senior Vice President of Accounting Standards and Corporate Tax, August 3, 2004, p. 103, in which he states "I don't recall why we have that plus or minus three months in the policy, what was the genesis of that. But presumably it was because we felt that that plus or minus three months was immaterial. I'm not aware that that's used because in a typical termout they will match the terms in a typical termout."

[285] Memorandum from Jonathan Boyles to the File, Subject:  Revisions to the December 2003 DAG, March 13, 2004, FMSE 113686-113690.

[286] OFHEO interview, Jonathan Boyles, Senior Vice President – Financial Accounting Standards and Corporate Tax, August 3, 2004, pp. 64-65.  In the interview, Mr. Boyles stated, that "We have several known departures from GAAP in our adoption of FAS 133.  We have cleared those with our auditors.  We have reported to our auditors on an annual basis the effect of those.  And they were comfortable when we adopted them, and they were comfortable over the last several years when we reported the results of that work."

Q: As it relates to 133. You said there were several departures from GAAP.

A: The purpose there was really twofold: one, we felt like in the case of the duration shortcut, we felt--if you think about duration, duration is a sensitivity of an instrument's--of the instrument to interest rates. And so, you know, FAS 133 built in the concept of a shortcut so you can match notionals and match maturities and repricing dates and assume no ineffectiveness when really a better economic hedge would be to match duration, not notionals…

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

standpoint, the correlation from matching durations between the anticipated debt and actual debt to be issued is better than just matching notional and payment/reset dates." [287]  In 2001 and 2002, such amounts were considered to be immaterial by Fannie Mae; however, in 2003 the amount was approximately $12 million, which prompted the discontinuation of duration matching effective January 1, 2004.  Duration matching is another instance where Fannie Mae has distorted the provisions of SFAS 133 to assume perfect effectiveness, though not warranted.

*Use of Shortcut Criteria as a Basis for Matched Terms Accounting:* The term "shortcut accounting" was noted in many instances within Fannie Mae's documentation, including the DAG, hedge designation documents and emails between Fannie Mae employees.  In addition, Fannie Mae's policy requirements for assuming perfect effectiveness are based on SFAS 133's shortcut criteria, which was confirmed through an interview with Jonathan Boyles.[288]  However, Fannie Mae employees have stated that they do not utilize the shortcut method as referenced in paragraph 68 of SFAS 133, and that the term "shortcut" is "loosely" used by Fannie Mae employees to describe the matched terms method, per SFAS 133 paragraph 65.[289]

Even though the special exception provided by the FASB for use of shortcut criteria is only permitted for interest rate swaps,[290] Fannie Mae's policy applies this criteria to other types of derivatives as well based on its position that such criteria results in perfect effectiveness and if those criteria are met, matched terms accounting can be applied.[291] However, OFHEO believes

---

[287] Memorandum from Jonathan Boyles to the File, Subject:  Revisions to the December 2003 DAG, March 13, 2004, FMSE 113686-113690.

[288] OFHEO interview, Jonathan Boyles, Senior Vice President of Accounting Standards and Corporate Tax, August 3, 2004, p. 77.
Q: Also with respect to these conditions that are used to assume no ineffectiveness, would it be fair to say that these are based upon the shortcut criteria that are outlined under FAS 133, paragraph 68, which I assume you're familiar with?
A: Mm-hmm, I believe they would be based on that.
p. 85
Q: […]so for fair value hedges, would you agree that these criteria are based on the shortcut criteria in FAS 133?
A: Yes, I believe they're based on the shortcut criteria.

[289] OFHEO interview, Jonathan Boyles, Senior Vice President of Accounting Standards and Corporate Tax, August 3, 2004, p. 88.
Q: […]So I guess after considering what E4 says, I'd again ask you how Fannie Mae's application of shortcut is consistent with GAAP.
FANNIE MAE LEGAL COUNSEL: When you're saying shortcut, are you talking about shortcut under 133 or what they sometimes loosely refer to as shortcut?
Q: I'm talking about how the company applies the criteria in its policy for assuming perfect effectiveness and how that's consistent with the criteria we've just looked at based on DIG Issue--
A: I would not have expressed Fannie Mae's policy to be applying the shortcut method but to be applying the terms matching.[…]

[290] SFAS 133 paragraph 68 and DIG Issue E4, question 2.

[291] Fannie Mae DAG, page IV.24, states the following with respect to cash flow hedges: "Fannie Mae also hedges the variability in cash flows by entering into certain option contracts, including caps (for liabilities), floors (for assets), and pay-fixed swaptions (for Discount Notes). Fannie Mae must meet the same criteria outlined above to assume that a hedge will be entirely effective at offsetting the hedged transaction's variability in cash flows." See FMSE 112656.  Furthermore, Fannie Mae DAG page VI.15 states the following with respect to fair value hedges: "Fannie Mae also hedges the variability in fair values by entering into certain option contracts, including receive-fixed swaptions. The instrument underlying the

117

that in some cases, particularly fair value hedges, ineffectiveness can exist in a hedging relationship even though criteria similar to shortcut are met.  For transactions not subject to the shortcut method, other items can cause ineffectiveness and must be considered in determining whether matched terms accounting can be applied.[292] Thus, in order to assume perfect effectiveness for a hedging relationship that does not meet the shortcut criteria, an entity would need to perform a calculation to demonstrate that no ineffectiveness exists. This point is described by DIG Issue E4 which states, in part:

> Although a hedging relationship may not qualify for the shortcut method, the application of regular fair value hedge accounting may nevertheless result in recognizing no ineffectiveness.  For example, the characteristics of the hedged item and the hedging derivative may, in some circumstances, cause an entity's **calculation** [Emphasis added] of the change in the hedged item's fair value attributable to the hedged risk to be an amount that is equal and offsetting to the change in the derivative's fair value.  In those circumstances, because there is no ineffectiveness that needs to be reported, the result of the fair value hedge accounting would be the same as under the shortcut method.

Based on the guidance discussed above, it is inappropriate for Fannie Mae to apply the short-cut criteria to derivatives other than interest rate swaps as a basis for matched terms accounting. Such treatment would only be supported if a calculation demonstrates that those criteria do, in fact, result in perfect offset between the hedging instrument and the hedged item. **Fannie Mae has not demonstrated that its application of matched terms accounting results in perfect effectiveness and has not performed an effectiveness assessment or measurement of ineffectiveness for such hedge relationships. Accordingly, they do not qualify for hedge accounting.**

**Additional Transaction Examples**
The following are additional examples of hedge accounting transactions for which perfect effectiveness has been incorrectly assumed yet permitted in the DAG.  These examples are not a complete list of all the sample transactions contained in the DAG for which OFHEO believes the accounting policy is incorrect.  The selected transactions discussed below highlight some of the frequently used transactions that have been identified as problematic during the course of the examination.

1. Receive-fixed swaption hedging a medium term note
2. Callable swap hedging discount notes
3. Discount notes hedged with funding swaps[293] and received fixed swaptions

---

option contract (i.e., receive-fixed swap) and the debt being hedged must meet the same criteria outlined above to assume that a hedge will be perfectly effective at offsetting the hedged transaction's change in fair value if and when the option is exercised." See FMSE 112767. OFHEO understands the references to "same criteria outlined above" to refer to the criteria outlined for interest rate swaps earlier in the DAG.
[292] Such items may include differences between the fixed rates of the hedging instrument and hedged item, intervals between interest reset dates on the hedging instrument, or changes in creditworthiness of the derivative counterparty, for example. These matters are not considered under the "shortcut" method.
[293] For purposes of this report, a funding swap is defined as a pay-fixed swap.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

*1. Received-Fixed Swaption Hedging a Medium Term Note*

# Example of a Receive-Fixed Swaption



**MTN**  PAY: $500 million 7.00% Bullet, 7-year

**Swaption**  21 basis points per year-2 years    PAY: Libor, Resets every 90-days ($500 million notional)

RECEIVE: 7.0018% 5 – Years ($500 million notional)

Period A    Period B

**7/2/97**    **7/2/99**

## *Description of Transaction:*

- *On 7/2/97, Fannie Mae issues $500M in bullet debt with a 7-year maturity and enters into a swaption that gives Fannie Mae the option to enter into a receive-fixed pay-variable swap on 7/2/1999. The underlying swap is out-of-the money at the inception of the hedge, meaning its fixed rate is lower than current market rates. The underlying swap (and thus the option) will gain value as rates fall, providing protection against increases in the fair value of its debt obligation as rates fall. The option is a European style option, meaning it is exercisable at its expiration date and Fannie Mae elects to pay for the option over the two year option period. The cost is 21 basis points per year.*
- *Fannie Mae recognizes changes in the time value component of the option through earnings over the life of the option (in this case, 2 years).* [294]

---

[294] This election is made pursuant to SFAS 133, paragraph 63. An option's value is comprised of two elements, time value and intrinsic value. Intrinsic value represents the extent to which the option is "in the money" based on a comparison of market interest rates to the option's strike rate. Time value represents the remaining value attributed to the option contract by the market. Conceptually, time value can be viewed as the value attributed to the probability that the option could move further into the money during its life. Paragraph 63 permits companies to exclude the time value component of options and only focus on the intrinsic value in assessing effectiveness. If the time value is excluded in a valid fair value hedging relationship, then it will be recorded through earnings. The effective portion of the intrinsic value will also

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- *Changes in the intrinsic value of the swaption (the value attributable to the underlying swap becoming "in the money") during Period A will be recognized in earnings along with an equal and offsetting adjustment for the change in fair value of the debt in period A. Fannie Mae treats the intrinsic value portion of the swap as being "perfectly effective."*
- *When the swap is exercised, Fannie Mae treats the new swap as a perfect fair value hedge of the change in fair values of the bullet debt during period B.  As such, changes in the fair value of the swap will be recognized in earnings along with an equal and offsetting adjustment for the change in fair value of the debt in Period B.*

**Hedge Accounting Issues:**

The above transaction is one of Fannie Mae's thirteen most frequently used transactions.[295]  In the above example Fannie Mae synthetically creates callable debt.   In accounting for this transaction, Fannie Mae is a) improperly assuming no ineffectiveness during the option period (period A), and b) improperly assuming no ineffectiveness when the swaption is exercised in period B.

**Issue A**

In this transaction, Fannie Mae is assuming perfect effectiveness based on the assumption that critical terms are matched using "short-cut like" criteria for matching of terms. However as noted earlier, the short-cut method does not apply to instruments other than swaps (such as swaptions).  Thus, in order to assume perfect effectiveness, there must be a demonstration that the fair values of the hedging instrument and the hedged item do, in fact, offset one another (see earlier discussion of DIG Issue E4). In a hedging relationship such as the one illustrated above, it is likely that there would be some ineffectiveness due to differences in the fixed rate of the underlying swap versus that of the MTN, and possibly other factors. OFHEO understands that Fannie Mae has not performed a calculation to support their claim of perfect effectiveness and has not specified any such calculation methodology in their DAG or related documentation. **As such Fannie Mae has not properly measured and assessed effectiveness for such transactions and is not in compliance with the hedge accounting requirements of SFAS 133.**

Furthermore, based on a review of the hedge designation documentation and the DAG, these documents fail to define the hedged risk in such a way to specify that the option is a one-directional hedge (i.e., to be effective as a hedge, the hedged risk would need to be defined in such a way to indicate that it provides protection against fair value changes due to decline of rates below a certain level).  Fannie Mae's DAG and related designation documentation for such transactions merely describe the swaption as hedging fair value changes in the debt.  With the hedged risk defined in this way, there is no basis for expecting the change in the swaption intrinsic value to perfectly offset the change in fair value of the bullet debt, because the swaption intrinsic value can fluctuate only in one direction (experiencing a gain only) whereas the value of the bullet debt can fluctuate in both directions (experiencing either gain or loss). SFAS 133 specifically requires documentation of the nature of the hedged risk and how the

---

be recorded in earnings with an offsetting amount reflected in earnings as a fair value adjustment of the hedged item.

[295] Letter from Jodie Kelley, Fannie Mae Vice President and Deputy General Counsel to Chris Dickerson, OFHEO, dated July 28, 2004, FMSE1 00083, in which Ms. Kelley lists Fannie Mae's thirteen most frequent transactions.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

derivative's effectiveness in offsetting that risk will be addressed. Such a description of the hedged risk is also critical to facilitating a calculation of the change in fair value of the debt attributable to the risk being hedged which would be necessary to support an effectiveness calculation as discussed above. **Fannie Mae has not properly documented the hedged risk associated with this hedging relationship and thus is not in compliance with SFAS 133's hedge accounting requirements.**

### Issue B

If the swaption is exercised by the Enterprise, it would typically do so because the swaption is "in-the-money," meaning the underlying swap has a positive value. When the swaption is exercised and the swap is entered into, the assumption of no ineffectiveness cannot be made due to the swap's positive fair value at the start of the new hedging relationship (which would become a two-directional hedge, mitigating both fair value gains and losses in the debt).[296] As discussed earlier in this report, paragraphs 65 and 68 of SFAS 133 require the fair value of the hedging relationship at inception to be zero in order to assume perfect effectiveness. Therefore, in order to qualify for hedge accounting, assessment and measurement of effectiveness using the long haul method would be required. **Fannie Mae does not perform an assessment and measurement of effectiveness for swaps entered into in connection with the exercise of swaptions. Therefore, such transactions do not qualify for hedge accounting under SFAS 133.**

In our discussions with Fannie Mae about their accounting for swaptions, they expressed the view that their accounting was appropriate under SFAS 133. Yet in an email dated April 17, 2001, from Jonathan Boyles to several members of management, Mr. Boyles discusses a proposal made by the FASB relating to the accounting treatment for the time value of options. In the email, Mr. Boyles describes Fannie Mae's accounting for transactions involving receive-fixed swaptions as "aggressive." It states:

> ...the accounting treatment we currently utilize for our receive-fixed swaptions is aggressive (we have KPMG's approval) and not one we would want to flash in front of the FASB for comment or the treatment could get worse... [297]

When Mr. Boyles was asked about his reference to Fannie Mae's swaption accounting as "aggressive," he was unable to recall why he had characterized it as such. [298]

---

[296] The exercise of the swaption constitutes the termination of the original hedging relationship per paragraph 25b of SFAS 133 which states that hedge accounting is discontinued when the "derivative expires or is sold, terminated, or exercised." As such, a newly designated hedge relationship must be established for the swap entered into upon exercise.

[297] Email from Jonathan Boyles to several members of management, April 17, 2001, Subject: Recent FASB Proposal on the time value of options, FMSE 096460-096462.

[298] OFHEO interview, Jonathan Boyles, Senior Vice President of Accounting Standards and Corporate Tax, August 3, 2004, p. 184.
Q: Jonathan, do you recall what you meant by your "accounting treatment for receive-fixed swaptions is aggressive"?
A: I don't recall what I would have meant by that. I don't know why I would have called it that because I'm not sure I would view it as aggressive.[...]

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Conclusion:**

It is OFHEO's conclusion that Fannie Mae incorrectly applies matched terms accounting and assumes no ineffectiveness in the receive-fixed swaption example, both before and after the swaption is exercised. In addition, as a result of incorrectly applying matched terms accounting, Fannie Mae failed to perform an assessment of hedge effectiveness, the absence of which precludes Fannie Mae from qualifying for hedge accounting for such transactions. The aggressive interpretation of matched terms is consistent with Fannie Mae's objectives of minimizing earnings volatility and simplifying operations.

## *2. Callable Swap Hedging Discount Notes*

# Example of a Callable Swap



**Description of Transaction:**

- *On 7/2/97, Fannie Mae issues $500M in DNs and simultaneously enters into Swap #1, which matures after 7 years.*
- *Swap #1 is callable after 5 years. This results in its gaining value as rates rise, but only losing value to a limited degree as rates fall and the call feature becomes "in-the-money."*
- *Fannie Mae treats Swap #1 as a perfect cash flow hedge during the period which it is outstanding.*
- *Changes in the fair value of Swap #1 will be recognized by Fannie Mae in AOCI in periods where Swap #1 is outstanding. Amounts in AOCI will be reclassified into earnings in the same periods during which the forecasted transaction occurs, through recognition of interest accruals and settlements on the swap.*

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Hedge Accounting Issues:**

There are several issues related to the above shown transaction [Example of a callable swap]. In accounting for the transaction, Fannie Mae:  a) assumes no ineffectiveness although the call option embedded in the swap is not mirrored in the discount notes; b) is inappropriately recording both the intrinsic *and* time value in AOCI; and c) is improperly documenting their hedge strategy by failing to outline that the strategy is one-directional.

**Issue A**

Fannie Mae is treating the callable swap as a perfect cash flow hedge of the forecasted interest payments associated with the anticipated reissuance of existing and future discount notes. However, the call option in the swap is not mirrored in the hedged item.  As discussed in previous sections of the report, paragraphs 65 and 68 of SFAS 133 require the critical terms of the swap to match those of the underlying hedged item in order to assume no ineffectiveness, including the call option feature.[299]  Conceptually, the hedge relationship cannot be assessed as perfectly effective because the change in fair value of the swap is expected to be different than changes in cash flows of the discount notes due to the additional value of the option, which is not present in the discount notes.  Generally, in order to qualify for hedge accounting, it would be necessary to separate the derivative's time and intrinsic value components, as discussed in Issue B. **Fannie Mae's assumption of perfect effectiveness for the entire change in fair value of the derivative is not consistent with the hedge accounting requirements of SFAS 133**.

**Issue B**

By including all changes in the derivative's fair value in AOCI, Fannie Mae is in essence assessing effectiveness using the entire value (both intrinsic and time value) of the instrument, and treating it as perfectly effective.  For all other option based derivatives, Fannie Mae separates the time and intrinsic value in assessing and measuring effectiveness.  When OFHEO questioned Mr. Boyles on the rationale for not separating the time value from the intrinsic value in assessing effectiveness for callable swaps, he stated that the Enterprise was following the guidance in DIG Issue G20 *Cash Flow Hedges:  Assessing and Measuring the Effectiveness of a Purchased Option Used in a Cash Flow Hedge* ("DIG Issue G20[300]").  However, the December 2003 DAG does not make any reference to the fact that Fannie Mae had adopted DIG Issue G20, which requires specific designation language to that effect. [301] Additionally, DIG Issue G20

---

[299] FASB, SFAS 133, paragraph 68 (e).

[300] DIG Issue G20 states that when designating a purchased option as hedging the variability in cash flows, the assessment of effectiveness can be based on total changes in the option's cash flows (that is, the assessment will include the hedging instrument's entire change in fair value—its entire gain or loss), rather than documenting that the assessment of effectiveness will be based on only the changes in the hedging instrument's intrinsic value as permitted by paragraph 63(a) of FAS 133.

[301] OFHEO interview, Jonathan Boyles, Senior Vice President of Accounting Standards and Corporate Tax, August 24, 2004, pp. 186-187

Q: I'd like to just get back to transaction number 32, the callable swap, and I guess the question is what were you doing--you mentioned you were applying G20. Where in the policy is it stated that you're applying G20 in your derivatives accounting guidelines?

A: It does not--I mean we'll be more explicit in our next version in the end of 2004, but the policy and the practices of G20.

123

states that it applies to "purchased options and combinations of only options." This language indicates that DIG Issue G20 does not apply to swaps containing embedded options. Furthermore, the initial version of the DAG, released prior to the issuance of DIG Issue G20, included the same accounting for this transaction that is being followed today.  Thus, an assertion that this accounting treatment is based on DIG Issue G20 is unsupported.[302]  Finally, in May 2004, we noted drafts of potential changes to Fannie Mae's DAG indicating that Fannie Mae was considering separating the time and intrinsic value for callable swaps. [303] **Fannie Mae's inclusion of both time and intrinsic value changes of the callable swap in AOCI is not consistent with the requirements of SFAS 133 or the Enterprise's own practices for other options based strategies.**

### Issue C
Based on OFHEO's review of the hedge designation documentation and the DAG, these documents fail to define the hedged risk in such a way to specify that the option is a one-directional hedge (i.e., to be effective as a hedge, the hedged risk would need to be defined in such a way to indicate that it provides protection against cash flow changes due to increases in rates but only against declines in rates below a certain level – that at which the call feature is "in-the-money").  Fannie Mae's DAG and related designation documentation for such transactions merely describe the callable swap as hedging cash flows attributable to interest payments on discount notes.  With the hedged risk defined in this way, there is no basis for expecting the change in the swap's fair value to perfectly offset all changes in cash flows of the discount notes, because the swap fair value would experience gains as rates rise, but would only experience losses to a limited degree as rates fall; whereas the cash outflows of the discount notes can both increase and decrease as rates rise or fall.  SFAS 133 specifically requires documentation of the nature of the hedged risk and how the derivative's effectiveness in offsetting that risk will be addressed. Such a description of the hedged risk is also critical to facilitating a calculation of the change in hedged cash flows attributable to the risk being hedged in order to support an effectiveness calculation. **Fannie Mae has not properly documented the hedged risk associated with this hedging relationship and thus is not in compliance with SFAS 133's hedge accounting requirements.**

Fannie Mae was apparently aware that this accounting treatment was aggressive in 2000, one year before the adoption of SFAS 133.  In an email, Kim Stone, a former employee of Fannie Mae and manager in the Financial Accounting Standards Group, wrote: "As it is, using the cancelable swap under the short-cut method is very aggressive." [304]

### Conclusion:

It is OFHEO's conclusion, based on the accounting analysis above, that Fannie Mae's accounting for the callable swaps as perfect hedges, as well as the recognition of the entire option value in

---

[302] OFHEO interview, Jonathan Boyles, Senior Vice President of Accounting Standards and Corporate Tax, August 24, 2004, p. 187
Q: What were you doing prior to G20 being effective?
A: We were doing the same accounting treatment.
[303] Email from Ilan Sussan, Financial Standards, to various individuals at KPMG including as an attachment *"DAG – PowerPoint Slides"*, 5/24/2004, produced via CD 8/11/04 in M box.
[304] Email from Kimberly Stone, former manager in Financial Accounting Standards, to Joseph Rosenberg, August 10, 2000, FMSE 078731-078732.

AOCI, is inappropriate. As is the case in other examples discussed herein, there was no assessment of hedge effectiveness performed, and thus, Fannie Mae should not have received hedge accounting.

For purposes of illustrating the earnings impact of not assuming perfect effectiveness, but instead measuring and recognizing ineffectiveness correctly, OFHEO prepared an illustrative transaction using actual market data to show its potential impact on earnings using a $500 million callable swap. The complete analysis can be found at Appendix V. Per OFHEO's analysis, the dollar-offset approach required by Fannie Mae's DAG for assessing effectiveness indicates that this hedging relationship could fail to qualify for hedge accounting. [305] The amount of ineffectiveness varies from quarter to quarter which would have led to additional volatility in earnings. If the hedge is not deemed highly effective (within the 80% to 125% range), hedge accounting should be terminated as of the last date the derivative was considered to be highly effective. Additionally, even if the hedge did qualify as being highly effective, the amount of ineffectiveness could fluctuate from quarter to quarter causing additional volatility in earnings. This is illustrated by the following graph, which is summarized from OFHEO's analysis.



Illustration of Earnings Volatility - Callable Swap

---

[305] Fannie Mae's DAG, as well as SEC guidance, requires a dollar offset ratio between the hedging instrument and hedged item to fall between 80% and 125% in order to meet the "highly effective" requirement for hedge accounting, FMSE 112604-112606.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**3. Discount Notes Hedged with Funding Swaps and Received-Fixed Swaptions**

## Example of Discount Notes Hedged by Funding Swap and Receive-Fixed Swaption



**Description of Transaction:**

- On 7/2/1997, Fannie Mae issues $500 million in DNs and simultaneously enters into a pay-fixed funding swap in which they receive LIBOR.
- In period B, they enter into a swaption which gives Fannie Mae the option to enter into a receive-fixed swap on 7/2/1999. The cost of the option is 5 basis points per year.
- Fannie Mae would exercise the option if the LIBOR swap rate falls below the fixed rate on the underlying receive-fixed swap (i.e., the swaption is "in-the-money"). This would partially offset the loss on the funding swap and lower Fannie Mae's effective debt cost. This combined transaction is similar economically to using a callable swap.
- The combination of the receive-fixed swaption (intrinsic value only) and the funding swap would be treated by Fannie Mae as a cash flow hedge of future DN issuances. Fannie would assume no ineffectiveness because the critical terms of the combined derivatives are deemed to match the hedged debt. Changes in the time value of the option would be recorded in earnings.
- If the swaption is exercised, the two offsetting swaps would be treated as a perfect cash flow hedge during period C.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Hedge Accounting Issues:**

Several issues exist in the above shown transaction, most of which are similar to the issues discussed in the previous transactions.  In reviewing Fannie Mae's accounting for this type of transaction, OFHEO noted the following issues with respect to the application of hedge accounting:

    a.  Fannie Mae separates the time and intrinsic value components of the option which is inconsistent with their treatment of the callable swap discussed above, even though the transactions are economically similar. While this treatment appears proper for this transaction, it highlights the improper treatment of time value associated with the callable swap.

    b.  The combined swap and swaption are treated as perfectly effective once the swaption is entered into, although the funding swap has a fair value other than zero at the inception of this new hedging relationship. As noted for other strategies described within this report, the non-zero intrinsic value of the combined instruments at inception of the hedging relationship precludes the ability to assume perfect effectiveness for this strategy.

    c.  The DAG and related documentation fail to document that the hedging strategy is one-directional due to nature of the option values. This issue was also noted with respect to the receive-fixed swaption and callable swap transactions discussed in this report, and violates the hedge accounting documentation requirements of SFAS 133.

    d.  Upon exercise of the swaption, Fannie Mae in the past continued to treat two offsetting swaps as cash flow hedges in combination, even though they do not serve to mitigate cash flow variability associated with the discount notes (because the cash flows of the two swaps offset one another). This is similar to the issue discussed relating to offsetting swaps in this report (Issue #2). This practice was discontinued by Fannie Mae in the first quarter of 2004.

**Conclusions:**

Based on the accounting analysis above, OFHEO has concluded that Fannie Mae's accounting for the pay-fixed swap and the receive-fixed swaption in combination as a perfect hedge is not justified under SFAS 133.  Additionally, since no hedge assessment is performed, the hedge relationship should not qualify for hedge accounting.   The offsetting swaps resulting from the exercise of the swaption should not have received hedge accounting in past periods and instead their changes in fair value should have been marked to market through earnings. Finally, the documentation of the risk hedged by the combined swap and swaption does not adequately reflect the nature of the hedging relationship and further calls into question Fannie Mae's hedge accounting for such transactions.

## Implications

Fannie Mae's inappropriate assumption of no ineffectiveness based on its application of the short-cut or matched terms approaches set forth in its DAG and as discussed herein calls into question the accounting treatment for a significant portion of the Enterprise's derivatives portfolio. The approaches employed by Fannie Mae have not only served to reduce the earnings

volatility and lessened the operational complexity associated with the application of SFAS 133, but have potentially misstated the Enterprise's financial results in a significant way. The transactions discussed in this section for which accounting problems have been identified are among the most common strategies employed by the Fannie Mae.

While OFHEO has not quantified the effects of the misstatement on current or past periods resulting from the improper application of the short-cut or matched terms approach, from a qualitative perspective, as stated earlier, almost all of Fannie Mae's hedges receive short-cut treatment, or assume no ineffectiveness.  Of the thirteen most frequent hedging transactions identified by Fannie Mae, issues relating to the concept of no ineffectiveness have been identified for seven of such transactions. As of December 31, 2003, amounts deferred in AOCI due to cash flow hedge accounting were negative $12.2 billion,[306] and carrying value adjustments of hedged items in fair value hedges amounted to approximately $7.2 billion. [307] As a result of the invalidation of hedge accounting, a significant portion of these amounts could be reversed and put into earnings. However, the determination of the exact amounts of any earnings adjustments and the periods in which they should be effected will require a substantial amount of analysis, time and resources on the part of the Enterprise.

---

[306] Fannie Mae December 31, 2003 10-K, p. 80.
[307] Fannie Mae December 31, 2003 10-K, p. 146.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

***Issue 4: Interest Rate Caps***

**Background**

Fannie Mae purchases interest rate caps to hedge exposures to increases in interest rates on its discount notes or floating rate borrowings. Under SFAS 133, Fannie Mae applies cash flow hedge accounting to the caps and is therefore required to fair value the caps at each reporting date. To the extent effective, fair value changes are recorded in AOCI, and the ineffective portion is recorded in earnings.

To illustrate the mechanics of a purchased cap, assume Fannie Mae issues floating rate debt and does not wish to pay interest exceeding 5%. Fannie Mae can purchase an interest rate cap with a strike rate of 5% to hedge the variability in cash flows from the floating rate debt attributed to rising interest rates. In the event interest rates rose to 7%, the counterparty to the derivative agreement would pay Fannie Mae the difference of 2% (7% - 5% representing the difference between strike and current interest rate), leaving Fannie Mae with an effective interest cost of 5%.

The cap is a series of individual options on interest rates for each quarterly or monthly period in the contract (referred to as "caplets"). An option's value is comprised of two elements, time value and intrinsic value. Intrinsic value represents the extent to which the cap is "in-the-money" based on a comparison of market interest rates to the cap's strike rate. Time value represents the remaining value attributed to the option contract by the market. Conceptually, time value can be viewed as the value attributed to the probability that the option could move further into the money during its life.

In Fannie Mae's application of hedge accounting, changes in intrinsic value are deemed to represent the "effective" portion of the hedge. This is because increases in the intrinsic value of the cap serve to offset related increases in forecasted interest payments on hedged borrowings. As such, Fannie Mae records changes in the intrinsic value component through AOCI, deferring their recognition in earnings until the future interest payments occur and affect earnings. Changes in the time value component are recorded directly to earnings as they occur.

SFAS 133 does not specify a single methodology to be used in allocating an instrument's value between time and intrinsic components. One methodology is to compare the cap strike rate to the current "spot" interest rate and derive a resulting intrinsic value for the entire cap agreement (in Fannie Mae terminology the "Trader Approach"). An alternate methodology would be to calculate the intrinsic value of each individual caplet by comparing the cap strike rate to the respective point on the forward curve (in Fannie Mae terminology the "Zero Volatility Approach"). In both approaches, the time value would represent the difference between the total fair value of the cap[308] and its calculated intrinsic value. While either method may be deemed acceptable, the two methods yield different results. Thus, one method must be

---

[308] The total fair value of the cap would be derived from an appropriate option pricing model.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

consistently applied. For example, a cap may have zero intrinsic value under the Trader Approach because the strike rate is higher than the current market interest rate. However, in a typical upward sloping yield curve, that same cap may have some intrinsic value under the Zero Volatility Approach because the forward rates relating to the later periods of the term are higher than the strike rate.

As described above, when interest rate caps are purchased, an upfront premium is paid. To make future determinations of changes in time and intrinsic values for accounting purposes, it is necessary to allocate the initial value of the option premium between time and intrinsic value components.

**Summary of Issue**
Until the fourth quarter of 2002, Fannie Mae treated the entire upfront premium payment as time value because the strike rate was above the current interest rate at the time of purchase. The Enterprise used the Trader Approach to determine intrinsic value at the inception of a cap contract. However, for subsequent calculations at each reporting date, Fannie Mae calculated intrinsic value using the Zero Volatility Approach. As a result, during the time from adoption of SFAS 133 (January 2001) through the third quarter of 2002, **Fannie Mae was applying an inconsistent methodology in its determination of time and intrinsic value.** Because many of the caps purchased by Fannie Mae had intrinsic value at the time of purchase under the Zero Volatility Approach, yet had no intrinsic value at inception under the Trader Approach, this inconsistent methodology resulted in misstatements of changes in time value and intrinsic value reported in earnings and AOCI, respectively.

The misstatement that occurs when this inconsistent methodology is applied can be illustrated by the following simple example. Assume an interest rate cap is purchased for $1,000,000 and its value is further broken down as follows under the two approaches:

|  | **Trader Approach** | **Zero Volatility Approach** |
|---|---|---|
| Time Value | $1,000,000 | $ 500,000 |
| Intrinsic Value | 0 | 500,000 |
| Total Value at inception | 1,000,000 | 1,000,000 |

In addition, assume that the above options were purchased near quarter-end and that as of the quarter-end reporting date, there had been no change in interest rates or in the total fair value of the cap contract. Under either approach, if applied consistently, there would be zero change in the option time value or intrinsic value, and no gain or loss recorded through earnings or AOCI*.*

However, when the inconsistent approach applied by Fannie Mae is used at the quarter-end reporting period, the following result would be reflected:

|  | **Time Value** | **Intrinsic Value** |
|---|---|---|
| Ending Value – Zero Volatility Approach | $ 500,000 | $ 500,000 |
| Beginning Value – Trader Approach | 1,000,000 | 0 |
| Change in Value | (500,000) | 500,000 |

130

As a result, Fannie Mae would have recorded a loss in earnings for change in time value of $500,000 and a gain in AOCI for change in intrinsic value of the same amount, when in fact there was no change in the instrument's value.  Furthermore, because no change in interest rates had occurred, there would have been no change in the forecasted interest payments that were being hedged by the caps.  As such there would be no basis under SFAS 133 to record a gain in AOCI as there had been no corresponding change in the underlying hedged item. OFHEO has determined that the above accounting for the cap represents an error in the application of SFAS 133.

As a result of using the Trader Approach at inception and the Zero Volatility Approach on subsequent reporting dates, Fannie Mae was overstating its option premium expense as well as gains recorded in AOCI due to changes in intrinsic value.  It appears that the largest impact of this treatment would have been in the quarter in which a cap contract is executed, due to the immediate premium expense and AOCI gain that would be recognized relating to the inception intrinsic value. There would also be an effect on earnings in periods later in the life of the cap contracts (to which the original intrinsic value relates), as the inception intrinsic value gains are reclassified into earnings as payments are made on the cap.

In the fourth quarter of 2002, Fannie Mae changed its accounting for the premium paid at inception for interest rate caps.[309]  Effective October 1, 2002, Fannie Mae began to allocate the initial premium paid to both time value and intrinsic value, using the Zero Volatility Method. This change was implemented prospectively, that is for new caps purchased after September 30, 2002.[310]  Fannie Mae concluded in an internal memorandum addressing this issue that they believed that this change qualified as a change in accounting analogous to that described in paragraphs 23 and 24 of APB 20.[311]

---

[309] Fannie Mae December 31, 2002 annual report on form 10-K, Notes to Financial Statements, Significant Accounting Policies, p. 113.
[310] Information has been obtained from the following sources:
    1.  Fannie Mae December 31, 2002 annual report on form 10-K, Notes to Financial Statements, Significant Accounting Policies, p. 113.
    2.  Memorandum from Jonathan Boyles to File with Distribution, Subject: Proposal to Change Fair Value Estimate of IV/TV Decompositions for Caps, January 29, 2003, FMSE 055014-055016.
    3.  OFHEO interview, Jonathan Boyles, Senior Vice President—Financial Accounting Standards and Corporate Tax, August 24, 2004, pp. 211, 214
    Q: [...]it was being treated prospectively. You didn't go back and correct some of the, your prior periods?
    A: We didn't feel there was a need to correct because we deemed it to be a change in estimate, so we refined our estimation process. Now our describe that in our disclosures[…]
    Q: […]when talking about the effect of th [sic] change in running an analysis, did anyone go and perform analysis what would be the impact on the quarterly basis had the consistent estimation methodology been used throughout the life of an option?
    A: I don't recall. I believe there was a lot of analysis done at the time[...]
[311] Memorandum from Jonathan Boyles to File with Distribution, Subject: Proposal to Change Fair Value Estimate of IV/TV Decompositions for Caps, January 29, 2003, FMSE 055014-055016, in which Mr. Boyles stated,    "In addition, even though we think this change should be analogized to paragraphs 23 and 24 of APB-20, if one were to conclude that this is a change in estimate the accounting treatment would be the same."

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

It is OFHEO's belief that the accounting change made by Fannie Mae is correcting an inconsistent application of a methodology and not a change in methodology to calculate fair values and therefore should be treated as a correction of an error. As illustrated in the example above, the inconsistent application results in a misstatement of amounts recorded in both AOCI and earnings. A correction of an error would require the prior period financial statements to be restated.

**Accounting Analysis**
APB 20's scope includes changes in accounting principles, accounting estimates, or reporting entity. It also covers reporting of a correction of an error in previously issued financial statements.

### *Is it a Change in Accounting Principle?*
Paragraph 7 of APB 20 states that a change in accounting principle "results from adoption of a generally accepted accounting principle different from the one used previously for reporting purposes." This statement includes not only accounting principles and practices but also the methods of applying them, or when choosing from among two or more generally accepted accounting principles, such as two amortization/depreciation methods, alternative methods of revenue recognition under long-term contracts, or alternative inventory pricing methods.

The above change did not entail a choice of a new generally accepted accounting principle different from the one previously applied. Rather, it represented a change to correct an inconsistency in prior application. It therefore **should not be considered a change in accounting principle.**

### *Is it a Change in Accounting Estimate?*
A change in accounting estimate is due to the occurrence of new events, as more experience is acquired, or as additional information is obtained. Paragraph 11 of APB 20 highlights a change in estimate affected by a change in accounting principle. "Changes of this type are often related to the continuing process of obtaining additional information and revising estimates and are therefore considered as changes in estimates for purposes of applying this Opinion."

The change in the way Fannie Mae used to account for the premium at inception did not result from the occurrence of new events or as more experience was acquired or as additional information was obtained. It was based upon an apparent realization that the prior methodology was causing incorrect financial statement results. It therefore **cannot be considered a change in estimate.**

### *Is it an Error in Financial Statements?*
Paragraph 13 of APB 20 states "Errors in financial statements result from mathematical mistakes, mistakes in the application of accounting principles, or oversight or misuse of facts that existed at the time the financial statements were prepared. In contrast, a change in accounting estimate results from new information or subsequent developments and accordingly from better insight or improved judgment."

132

In OFHEO's view, Fannie Mae's change in methodology resulted from a previous oversight or an inconsistent application of accounting principles.  Fannie Mae's old methodology resulted in amounts recorded in AOCI when no corresponding change had occurred in the forecasted hedged item, which is clearly inconsistent with the cash flow hedge accounting provisions of SFAS 133. The offset to the error in AOCI is a misstatement in option premium expense. Therefore, the above change should have been **treated as a correction of an error**, resulting in the correction and re-statement of prior periods' financial statements.

### Fannie Mae's interpretation of the relevance of APB 20

Fannie Mae treated the above change to be similar to that of a change in a method of amortization as discussed under paragraph 23 of APB 20.  They accounted for the change in accordance with the guidance in paragraph 24 of APB 20, which relates to a new method of amortization applied to newly acquired assets.  Paragraph 24 states that the Enterprise should use the new method "for all additional new assets of the same class but continue to use the previous method for existing balances of previously recorded assets of that class.  For that type of change in accounting principle, there is no adjustment of the type outlined in paragraphs 19-22[312], but a description of the nature of the change in method and its effect on income before extraordinary items and net income of the period of the change, together with the related per share amounts, should be disclosed."

The excerpt below from Fannie Mae's 2002 10-K sets forth Fannie Mae's disclosure of the change in methodology.

> During the fourth quarter of 2002, we refined our methodology for estimating the initial time value of interest rate caps at the date of purchase and prospectively adopted a preferred method that resulted in a $282 million pre-tax reduction in purchased options expense and increased our diluted EPS for 2002 by $.18. Under our previous valuation method, we treated the entire premium paid on purchased "at-the-money" caps as time value with no allocation to intrinsic value. Our new methodology allocates the initial purchase price to reflect the value of individual caplets, some of which are above the strike rate of the cap, which results in a higher intrinsic value and corresponding lower time value at the date of purchase. This approach is more consistent with our estimation of time value subsequent to the initial purchase date. This change does not affect the total expense that will be recorded in our income statement over the life of our caps and has no effect on our non-GAAP core business earnings measure.

---

[312] These paragraphs discuss the recording of a cumulative effect of a change in accounting principle, the disclosure of pro-forma effects of retroactive application, and a change in depreciation method for previously recorded assets.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Reporting a Correction of an Error**

Reporting a correction of an error in the financial statements of a prior period discovered subsequent to their issuance should be reported as a prior period adjustment (paragraph 36 of APB 20).   In addition, APB 9, *Reporting the Results of Operations*, states "when comparative statements are presented, corresponding adjustments should be made of the amounts of net income (and the components thereof) and retained earnings balances (as well as of other affected balances) for all of the periods reported therein, to reflect the retroactive application of the prior period adjustments."

**Implications**

The implications of treating the above change prospectively as a change in accounting rather than a correction of an error is that the earnings and OCI amounts have been misstated for the years 2001, 2002 and likely for 2003 and possibly later periods depending upon the original maturity of the cap contracts and the future periods to which the inception intrinsic value relates.

The table below has been extracted from a memorandum from Jonathan Boyles and provides some indication of the potential dollar impact. [313]   However, OFHEO contends it does not provide one with an accurate measure of the quarterly impact on earnings or AOCI.

| Purchase Period | Purchase Premium* | New Methodology | | Old Methodology | |
|---|---|---|---|---|---|
| | | Intrinsic Value* | Time Value* | Intrinsic Value* | Time Value* |
| *2001* | 248.0 | 128.7 | 119.3 | 0 | 248.0 |
| *2002* | 1055.0 | 544.0 | 511.0 | 0 | 1055.0 |
| *2002: Q4\*\** | 489.7 | 257.8 | 231.8 | 0 | 489.7 |

\*    *All figures in millions of dollars*
\*\* *The New methodology was first implemented in Q4, 2002.*

Using the 2002 information presented above for discussion purposes, it appears that options were purchased prior to the fourth quarter for an initial premium of $565.3 million ($1,055 million less $489.7 million). [314]   Based on the amounts listed under the column titled New Methodology, approximately $286.2 million ($544 million - $257.8 million) should have been recorded as intrinsic value and $279.2 million ($511 million - $231.8 million) should have been recorded as time value during the first three quarters of 2002. This means that when applying the Old Methodology, option premium expense was overstated by $286.2 million in the quarters when these options were purchased, and accumulated AOCI gains/losses were overstated/understated by the same amount. Interest expense would also be understated in the future periods to which the inception intrinsic value relates.  The specific periods affected would need to be determined based upon the terms of the individual cap contracts.

---

[313] Memorandum from Jonathan Boyles to File with Distribution, Subject: Proposal to Change Fair Value Estimate of IV/TV Decompositions for Caps, January 29, 2003, FMSE 055014-055016.  The table is on page 3 of the document (FMSE 055016).
[314] As stated in the table, the new methodology was implemented starting in the fourth quarter of 2002.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Additionally, Fannie Mae's 10-K describes the change as a prospective change to a "preferred method" [315] of accounting.  However, in a memorandum written by Jonathan Boyles in 2003,[316] he refers to the matter as an inconsistency in approaches.  Mr. Boyles reference to the inconsistencies in the memorandum has not been disclosed in the 10-K.  In fact, the disclosure discusses a refinement in methodology[317] and makes no reference to the inconsistent application of methods, which OFHEO believes represents an accounting error.

**The above analysis and discussion show that Fannie Mae has incorrectly accounted for and reported a correction of an error in its financial statements.** This is yet another example of how Fannie Mae has corrected errors in their accounting for derivatives only on a prospective basis.  The impact on specific periods is unclear. Further detailed information and detailed instrument-by-instrument analysis will be required to make a precise determination of the complete financial statement impact on all periods affected.

---

[315] Fannie Mae December 31, 2002 annual report on form 10-K, Notes to Financial Statements, Summary of Significant Accounting Policies, Derivative Instruments and Hedging Activities, p. 113.

[316] Memorandum from Jonathan Boyles to File with Distribution, Subject: Proposal to Change Fair Value Estimate of IV/TV Decompositions for Caps, January 29, 2003, FMSE 055014-055016, in which Mr. Boyles stated, "As the dollar amount of our cap purchases has grown over time, this inconsistency in approaches has led to growing differences in our decomposition of IV/TV."

[317] Fannie Mae December 31, 2002 annual report on form 10-K, Notes to Financial Statements, Summary of Significant Accounting Policies, p. 113, states, "During the fourth quarter of 2002, we refined our methodology for estimating the initial time value of interest rate caps at the date of purchase and prospectively adopted a preferred method that resulted in a $282 million pre-tax reduction in purchased options expense and increased our diluted earnings per share for 2002 by $.18."

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

***Issue 5: Hedge Accounting Documentation Issues***

The importance of designation, documentation and risk management is emphasized by the FASB in the basis for conclusions of SFAS 133. Paragraph 385 states:

> The Board decided that concurrent designation and documentation of a hedge is critical; without it, an entity could retroactively identify a hedged item, a hedged transaction, or a method of measuring effectiveness to achieve a desired accounting result.  The Board also decided that identifying the nature of the risk being hedged and using a hedging derivative consistent with an entity's established policy for risk management are essential components of risk management and are necessary to add verifiability to the hedge accounting model.

The designation and documentation requirements were acknowledged by Franklin Raines in "Answers from the CEO," [318] in which he stated:

> The hedge accounting treatment for each individual transaction is determined -- and documented in writing -- before we enter into the transaction. And it cannot subsequently be changed.
> <div align="right">—<em>Franklin Raines, Answers from the CEO</em></div>

**Background**
SFAS 133, paragraphs 20(a) and 28(a) for fair value and cash flow hedges respectively, require an entity to document at inception of the hedge the following:

> (1) management objective and strategy for entering into the hedge;
> (2) identification of the hedging instrument;
> (3) the risk being hedged; and
> (4) how hedge effectiveness will be assessed.

In addition to the above criteria, paragraph 28(a) (2) of SFAS 133, which applies to cash flow hedges, goes on to state that the level of detail that must be documented at the inception of the hedge regarding identification of the forecasted transaction must be "with sufficient specificity so that when a transaction occurs, it is clear whether that transaction is or is not the hedged transaction."

---

[318] Fannie Mae website, Answers from the CEO.  Fannie Mae describes this section of its website as follows, "This section of our Web site is designed to help visitors better understand the company's approach to the issues we face.  As part of our continuing effort to be best-in-class in corporate governance and transparency, Chairman and Chief Executive Officer Franklin D. Raines is committed to answering investors' most frequent questions about Fannie Mae's business. This section provides plain talk about how we operate to provide liquidity to the homeownership markets."  The answer shown is in response to the following question, "Why do you have confidence that you have done your derivatives accounting properly?"
http://www.fanniemae.com/ceoanswers/derivativesaccounting.jhtml

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Fannie Mae's documentation of a hedge relationship in support of hedge accounting for transactions entered into by the Long Term Funding Desk includes the following:[319]

- Termsheets describing the hedging instrument and the hedged item
- The linkage of the derivative with the hedged item (as reflected in the "DEBTS" system)
- The transaction descriptions for permitted hedging strategies in the DAG

Termsheets are produced at the time a derivative is entered into the system. The termsheets identify if the hedge relationship qualifies for hedge accounting. Additionally, when the derivative qualifies for hedge accounting, the termsheet identifies the hedged item, the hedging relationship, the type of hedge and how effectiveness will be measured. The DAG indicates that the termsheet forms the initial hedge designation documentation for derivatives entered into by the Long-term Funding Desk. The linkage in the DEBTS system associates the derivative with the hedged item. The transaction descriptions in the DAG attempts to include all potential hedging strategies that Fannie Mae may enter into and describes the accounting that should be followed for each such strategy.

Katrina Skladony, a Senior Financial Analyst in Fannie Mae's Treasury Middle Office, is responsible for ensuring that the derivatives and hedged item are properly linked to a hedged item within DEBTS. The termsheets, which are generated once the derivative is entered into and verified by the back office, serve as the initial documentation of the hedge relationship.[320] OFHEO understands there is no reconciliation performed between the termsheet and the ultimate hedge linkage in DEBTS. Ms. Skladony also indicated that the final determination of the nature of the hedging relationship (fair value or cash flow) and the hedged item is made by the Controller's Financial Accounting group and not by Treasury Middle Office.[321] The ability for

---

[319] OFHEO interview, Jonathan Boyles, Senior Vice President of Accounting Standards and Corporate Tax, August 24, 2004, p. 138, where he stated that: "We have viewed, for our documentation, we have viewed a combination of termsheets, our accounting policy manual, and the transcription in our systems linkages in combination as all of the documentation, so you can look at those, and you'll see what the linked items are, you'll see what the accounting is, you'll see if the risk is being hedged, you'll see the terms matching pieces in there."

[320] OFHEO interview, Katrina Skladony, Senior Financial Analyst – Treasury Middle Office, August 26, 2004, p.10, where she stated that, "[…]the back office verifies the securities and produces the initial term sheet that includes the hedge designation. The back office then distributes this documentation to the Controllers[…].

[321] OFHEO interview, Katrina Skladony, Senior Financial Analyst – Treasury Middle Office, August 26, 2004, pp. 78-79
Q: …Is that the normal process that Controllers make the decision whether it's a cash flow hedge or a fair value hedge?
A: Correct.
Q: In all instances?
A: Correct.
Q: And how often do they do that?
A: They do it on monthly basis when we pass them on, all the relinkage files. […]
Q: Up until when Controllers make that determination that it's a cash flow hedge or a
fair value hedge, is there no determination whether it's a cash flow hedge or a fair value hedge?
A: When the dynamic links are created, the determination is not made what type of
hedge it is. That is determined by Controllers FAS 133 system from when that information is passed to that system. […]
Q: Does Controllers also make the determination that the trade is DNQ?
A: Correct.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Accounting to change the ultimate treatment of a hedge's designation is not consistent with the standard's requirements for concurrent designation and documentation noted above.

The Financial Accounting Group is the business owner of the FAS 133 (accounting) system and is responsible for recording accounting entries relating to the system. Ms. Mona Patel, Senior Project Manager – Financial Accounting Group, indicated that the FAS 133 system receives information from DEBTS on a daily basis. A program is run in the FAS 133 system at the end of the month to determine the hedge classification (cash flow hedge or fair value hedge) based on the terms of the derivatives received from DEBTS. There is no reconciliation between the hedge classification as determined on the term sheet and that in the FAS 133 system.

If there is a change in linkage in DEBTS, the hedge classification may change. Based on the interview with Ms. Patel, if the hedge classification changes for a particular derivative from the prior month, the FAS 133 system assumes that the change in hedge classification is effective from the start of the month even though the linkage may have changed on the last day of the month.[322] As part of the month-end FAS 133 accounting process and prior to posting of journal entries, the Financial Accounting Group runs an exception report which identifies all derivatives that do not qualify for hedge accounting. This report is sent to Treasury who will review the report and evaluate whether any changes should be made to the linkages. Treasury advises the Financial Accounting Group of changes to linkages as a result of those derivatives that are on the exception list which may qualify for hedge accounting. These retroactive changes in linkages are inconsistent with the contemporaneous documentation requirements of SFAS 133.

**Summary of Issues**

There are several instances where OFHEO believes the hedge documentation is inadequate and does not meet requirements of SFAS 133 to qualify for hedge accounting. The inadequacies are categorized as follows:

- Ambiguity of hedging relationship
- Hedged risk not properly defined
- Hedged item not specifically identified in certain fair value hedges
- No termsheet produced for re-linkages
- Designation not contemporaneous
- Unclear definition and probability of hedged transaction in cash flow hedges
- Retroactive linkage of hedging instruments with hedged items

---

[322] OFHEO interview, Mona Patel, Senior Project Manager – Financial Accounting Group, September 8, 2004, pp. 52-53

Q: So, what would be the entry that you would pose [sic] for the entire month?

A: Okay. The system would pose [sic] prior month as a cash flow hedge, so it would book the market value over to either a gain or a loss on the balance sheet as derivatives in a gain or a loss, and the offset would be to OCI, other comprehensive income. Next month, that swap is a fair value hedge so the system would report again the derivatives in a gain or a loss, and it would also record--it would also adjust the debt basis. So, the derivatives would be recorded as a gain or a loss and offset to the P&L, and you would also adjust your debt basis offset to the P&L.

Q: So, would it be for the entire change in fair value from the first of the month of the month through June 30th in the swap value and in the debt or the hedged item value debt for the entire month, even though the link changed only mid-month.

A: Yes.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

*Ambiguity of hedging relationship*
In our review of termsheets generated by DEBTS we noted that certain termsheets contained ambiguous hedge designation language.  For instance, in some cases the term sheet designates the same derivative as both a cash flow and a fair value hedge.  An example of this is in a term-out transaction similar to the one described under Issue 2: Derivative Re-Designations.[323] In such situations, OFHEO noted term sheets that described a debt swap[324] as a fair value hedge of the MTN issued at the beginning of period B, and also a cash flow hedge (in combination with swap #1) of the forecasted issuance of DN's in period C. Such a dual designation is not permitted under SFAS 133, which requires specific identification of the hedged item at the inception of the hedging relationship.

OFHEO understands that the linkage between the hedged item and the hedging instrument in the DEBTS system is done through an automated process whereby the system "finds" a combination of derivatives and debt instruments that can be linked together in a hedging relationship. In the term-out example, the ambiguous documentation would allow DEBTS to assign the debt swap to either a fair value or a cash flow hedge relationship and still appear to be consistent with the hedge designation on the term sheet. It also appears that this ambiguous designation approach would allow linkages between derivatives and hedged items to be changed after the fact and still appear to be "consistent" with the original designation documentation.

*Hedged risk is not accurately defined*
In instances involving option products, OFHEO has noted the hedge documentation does not appropriately identify the hedged risk.  For example, as discussed earlier in relation to hedges using receive-fixed swaptions, the termsheets describe the strategy as one that synthetically converts fixed rate debt to floating, and the hedged risk as changes in fair value of the debt attributable to the benchmark interest rate. However in reality, Fannie Mae is only protected against changes in fair value due to a decline in interest rates below a certain level, and the fixed rate debt is only synthetically converted to floating rate if and when the swaption is exercised.  In these cases, the documentation fails to properly identify the hedged risk as required to receive hedge accounting under SFAS 133. Similar deficiencies in documentation of the hedged risk exist for strategies involving pay-fixed swaptions and callable swaps

*Hedged item not specifically identified in certain fair value hedges*
OFHEO also noted that when Fannie Mae uses receive-fixed swaptions in fair value hedges of fixed rate debt, its policy is not to identify the debt instrument being hedged until the option becomes "in-the-money." This approach is not consistent with the requirement in paragraph 21(a) of SFAS 133 that the hedged item be "specifically identified as either all or a specific portion of a recognized asset or liability or of an unrecognized firm commitment." It also appears inconsistent with Fannie Mae's assertion of perfect effectiveness for such transactions, since it is impossible to make such a determination without identifying the terms of the hedged item.

---

[323] Referred to as "Term-out transaction #2" in the DAG.  FMSE 112990-112991.
[324] For purposes of this report, a debt swap is defined as a receive-fixed swap.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Absence of termsheets for re-linkage**

Fannie Mae regularly "re-links" its derivatives and hedged items, which often represents the designation of a new hedge relationship prospectively under SFAS 133. When derivatives are re-linked in this manner there is no termsheet created to document the new hedge relationship that has been established. Since re-linking derivatives is a recurring practice at Fannie Mae, and the DAG indicates that termsheets serve as a primary hedge designation document, OFHEO believes that a significant number of hedge relationships may not have the appropriate documentation to qualify for hedge accounting under SFAS 133.

**Designation not contemporaneous**

As mentioned above, it appears that the final determination of the hedge relationship is made by the Controller's Department upon review of information populated in the SFAS 133 system from DEBTS. This information is updated approximately monthly. This seems to indicate that the hedge relationship is not final and is potentially subject to change until reviewed by the Controllers group. This would appear to be inconsistent with the contemporaneous designation requirements of SFAS 133. Additionally, no termsheets are produced at the time of relinkage and the only hedge documentation that is available is the linkage in the DEBTS system. The absence of a termsheet could allow Fannie Mae to make retroactive changes to the linkages in DEBTS without any audit trail of changes.

Additionally, Fannie Mae's DAG and operating practices allow them seven days to identify and document the hedged item. This practice is inconsistent with the requirements of contemporaneous hedge documentation. To illustrate the practices followed by Fannie Mae, the following is an excerpt from an email from Paul Salfi, Director of the Financial Standards Group, to Jonathan Boyles discussing the fact that Fannie Mae has seven days to document a hedge relationship. [325] It states the following:

> We have a situation where Treasurer's wants to override automated linkages of DNQ basis swaps to PF swaps to avoid long haul on the combination. Instead, they want to keep the basis swaps DNQ and the PF swaps with termouts such that the combination is perfectly effective. The questions are when is the effective date of the original linkages of basis swaps and PF swaps and do we give them a grace period of 7 days to correct the error.
>
> Below are my thoughts on what the guidance should be that I wanted to run by you:
>
> Since my understanding is that our policy has been to link derivatives within 7 days of settlement to attempt to get hedge accounting for the derivative, we have seven days from the reset dates of the PF swaps to correct the error made by DEBTS. My understanding is that DEBTS linked basis swaps that

---

[325] Email from Paul Salfi to Jonathan Boyles, copy to Ilan Sussan, Subject: Re: 315SWD441_linkage_analysis.xls – Please approve link changes, April 21, 2004, produced via CD 8/11/04 in Box M. This email is the 3rd in a chain of emails. The most recent email (on top) is an email from Paul Salfi to Jonathan Boyles, April 22, 2004, subject: same as above.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

were DNQ to PF swaps effective on the PF reset dates below, but that we did not want this linkage.

If we correct the linkages within 7 days of the PF reset dates below, we would honor the new designations not the ones on 4/12 to be effective beginning on the PF reset dates below.  The PF swaps had adequate funding through the PF reset dates below, so the PF reset dates below are considered to be the effective date of the original designations as this the beginning point from which the PF swaps needed to get hedge accounting.  The basis swaps would be DNQ under the new designations.

### *Unclear definition and probability of hedged transaction in cash flow hedges*

A number of Fannie Mae's hedging strategies represent cash flow hedges relating to interest rate risk associated with existing and forecasted issuance of DNs. In many situations, DNs are subsequently replaced ("termed-out") with other forms of borrowings, such as fixed or floating rate MTNs. Fannie Mae's DAG contemplates the occurrence of term-outs by virtue of the transaction descriptions contained therein, many of which are examples of various forms of term-outs.  When a term-out occurs, Fannie Mae's practice is to continue to retain any accumulated hedge gains or losses in AOCI because future interest payments are still expected to occur.[326] The nature of Fannie Mae's funding and hedging strategy and in particular the regular occurrence of term-outs have certain implications regarding hedge accounting under SFAS 133, namely:

- How the hedged transaction has been defined in the designation documentation -- specifically whether such designation is made "broadly" to encompass interest payments generally on a portfolio that consists of DNs as well as instruments that may subsequently replace them, or whether the designation is "specific" to DNs only;

- Whether the hedged transaction (as defined) is deemed probable of occurring which is a requirement to qualify for cash flow hedge accounting both at inception and on an ongoing basis; and

- Whether a term-out or similar transaction indicates that the hedged transaction (as defined) is deemed "probable of not occurring" which would mean that: a) any amounts accumulated in AOCI should be reclassified into earnings; and b) the ability to apply hedge accounting to similar hedge relationships would be called into question.

The implications of these issues are summarized in the following endnote excerpt from DIG Issue G13 *Cash Flow Hedges:  Hedging the Variable Interest Payments on a Group of Floating-Rate Interest-Bearing Loans ("DIG Issue G13"):*

How the hedged forecasted transaction is designated and documented in a cash flow hedge is critically important in determining whether it is probable that the hedged forecasted transaction will occur. In the cash flow hedge in Example 8, **had the hedged forecasted transaction been narrowly**

---

[326] Even though the DNs are no longer issued, they have been replaced with another interest-bearing debt instrument. This treatment is pursuant to Example 8, Scenario 2 in SFAS 133, and in particular, paragraph 160.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

> **limited to the interest payments on specific future debt issuances rather than on the five-year borrowing program** [Emphasis added], the failure to engage in those future debt issuances would cause the related derivative net gain or loss in OCI to be immediately reclassified into earnings pursuant to paragraph 33 because it would have been probable that the hedged forecasted transactions would not occur. Furthermore, that failure, if part of a pattern of having hedged forecasted transactions cease being probable of occurring, would call into question both an entity's ability to accurately predict forecasted transactions and the propriety of using hedge accounting in the future for similar forecasted transactions, pursuant to paragraph 494.

The accounting treatment applied by Fannie Mae, as well as the transaction examples documented as part of its DAG, appear to imply an approach of "broad" designation to future interest payments, rather than a specific or narrow designation to interest on DNs only. However, OFHEO has observed the following elements of Fannie Mae's hedge accounting documentation and approach that appear to be inconsistent with an approach of broad designation:

- Term sheets representing the inception hedge designation documentation refer specifically to DNs and **_not_** a broad designation to include interest payments on other borrowings, such as MTNs, resulting from a term-out.

- Within DEBTS, derivatives are "linked" to **_specific_** DNs for purposes of designating the relationship and matching of terms (and in most cases, for asserting perfect effectiveness).  This is **_inconsistent_** with a broad designation scheme.  OFHEO understands that when broad designation approaches are used for hedging of short-term borrowings, standard industry practice is that matched terms or "short-cut" like approaches are not used. Instead, effectiveness is assessed and measured based on the derivatives' relationship with the reset and other characteristics of the entire portfolio (or portion thereof being hedged) and not based on specific debt instruments.

This ambiguity in Fannie Mae's documentation has serious implications for its cash flow hedge accounting associated with DNs. If the assertion is made that a narrow designation scheme is being used, the occurrence of term-outs would require that amounts accumulated in AOCI be reclassified to earnings when the term-out occurs, and would call into question the ability to apply cash flow hedge accounting to such transactions in the future due to the frequency of term-outs. Conversely, if the assertion is made that a broad designation scheme is used, the treatment of hedges as perfectly effective based on matching to specific DN issuances would be invalid and would disqualify hedge accounting due to the lack of an appropriate assessment of effectiveness.

Furthermore, Fannie Mae's DAG and related documentation do not appear to explicitly address the matter of probability of forecasted transactions (irrespective of whether they have been defined in a broad or specific manner). Because forecasted transactions must be deemed probable to qualify for cash flow hedge accounting, an analysis should be performed and periodically updated to support this assertion, based on factors such as business plans, forecasted growth of the mortgage and debt portfolios, sources of future funding, etc. Based on

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

the information obtained and reviewed by OFHEO, it is unclear how Fannie Mae has addressed this requirement.

### Retroactive linkage of hedging instruments with hedged items

Through the special examination of Fannie Mae, OFHEO has noted instances in which Fannie Mae has retroactively re-linked a hedging instrument to a hedged item in order to qualify for special hedged accounting treatment.  Retroactive re-linkage to obtain special hedge accounting is not permitted by SFAS 133.  The retroactive linkages appear to have occurred for several reasons including:

- re-linking a derivative to a different hedged item due to a failed correlation analysis with the original hedged item,
- re-linking a derivative to an eligible hedged item due to an erroneous system linkage to an ineligible hedged item, and
- re-linking a derivative to a different hedged item at the request of the front office in order to achieve the trader's original intent.

In the March 31, 2003 Derivatives Controls Audit, the Fannie Mae Office of Audit conclusion recommended that the controls over the re-linkage of derivatives to debt and other derivatives needed to be clarified.[327]  In the report it stated:

> This may occur when the hedged debt is called or when a derivative is termed-out.  We noted that procedures for re-linking derivatives are not well documented, and review and approvals are not robust.

> Specifically, we noted that the Hedge Accounting guidelines do not address the process for linkages and type [sic] types of re-linkages allowed.  We noted one instance in which a derivative was re-linked to a debt instrument retroactively to reduce the amount of hedge ineffectiveness at month end. Although the financial statement impact was minimal, retroactive re-linkages do not conform to FAS 133 requirements.

As a response, a memorandum was drafted in October of 2003 by the Financial Accounting Standards group outlining Fannie Mae's procedures with respect to the manual re-linking of term-outs.[328] However, the memorandum did not address retroactive linkages or re-linkages.  In an interview with Katarina Skladony in which retroactive re-linkages were addressed, the witnesses testified that situations in which retroactive re-linkages were made were rare[329].  The

---

[327] Derivatives Controls Audit Report, Office of Auditing, March 31, 2003, Paul Jackson, Audit Director, FMSE 102385-102391.

[328] Memorandum written by Paul Salfi to File with Distribution, Subject: Manual ReLinking of Termouts: Procedures, Documentation, and Examples, October 15, 2003, FMSE 027422-027426.

[329] OFHEO interview,  Katarina Skladony, Senior Financial Analysis-Treasury Middle Office, August 26, 2004, p. 23
A: In this case, a trader asked me to find out whether such an option even exists. It's not a standard rule that in all the circumstances we always go and make change for the system. We determine, you know, whether such a change is appropriate in the first place, and if it's not appropriate, then we don't make a change.
Q: How often does something this happen?
A: It does not happen often. I think that this would be a fairly rare situation.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

following emails were identified by OFHEO during its examination, of instances in which retroactive re-linkages have occurred at Fannie Mae.

In an email dated 1/6/2004 from Katarina Skladony to Mona Patel and copying several individuals in Treasury Middle Office, Front Office and Financial Reporting, Ms. Skladony makes a retroactive re-linkage per the request of a trader from the front office.[330]  The email states:

> Enclosed spreadsheet shows the proposed linkage changes in order to bring the termout linkages in line the [sic] trader's intent at the time of buyback.  I highlighted in yellow the linkages that need to be reversed and restored.  In addition, I typed in blue all additional linkages that need to be broken.

In the same chain of emails, a message on the same day from Linda Knight to several individuals including Laura Simmons, Donald Sinclair and Katarina Skladony, Ms. Knight stated:[331]

> I just spoke to Janet Pennewell who confirmed the guidance from yesterday. Controllers just finished meeting with Peat who concurs with this guidance. We can go ahead and change linkages to the traders intent at the time of the buyback.  That means we can establish the links that were intended from Don Sinclair's spreadsheet on 12/16...Finally, Peat confirmed that we cannot change the spreadsheet so we cannot adjust anything related to spreadsheet mistakes...

The excerpt above illustrates that Fannie Mae had treated the front office documentation created by Donald Sinclair (the spreadsheet referred above) as hedge designation documentation in an effort to correct an accounting linkage error.  As mentioned earlier, per Jonathan Boyles, Fannie Mae's hedge designation documentation consists of "a combination of termsheets, our accounting policy manual, and the transcription in our systems linkages...". [332]

Also as noted earlier, termsheets are not prepared for documentation of re-linkages and there is no other formally established means for hedge designation upon a re-linkage. This makes a retroactive re-linkage such as the one described above questionable since there is no formal document that can be referred to as the proper source of hedge designation. Instead, Fannie Mae made the designation based on a spreadsheet that was represented as the "trader's intent." Had there been a termsheet in place to establish the re-linkage, such document would presumably have represented the trader's intent and there would be no question about the proper course of action. Absent a formal document used for designation of the hedge relationship upon a re-linkage, the ability exists to retroactively change designations in order to

---

[330] Email from Katarina Skladony to Laura Simmons, Donald Sinclair with a copy to Mona Patel, January 6, 2004, Subject: Corrected Termout Linkages due to 12/18/03 Buyback – PLS APPROVE, produced via CD 8/11/04 in M box.

[331] Email from Linda Knight to Laura Simmons, David Benson, Donald Sinclair, Ursula Schaefer, Nadine Bates, Katarina Skladony; Copes to Janet Pennewell and Peter Niculescu, January 1, 2004, Subject: Buybacks, produced via CD 8/11/04 in M box.

[332] OFHEO interview,  Jonathan Boyles, Senior Vice President – Financial Standards and Corporate Tax, August 24, 2004, p.138.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

achieve a desired accounting result. This is not permitted under SFAS 133. Paragraph 385 of SFAS 133 states:

> The Board decided that concurrent designation and documentation of a hedge is critical; without it, **an entity could retroactively identify a hedged item, a hedged transaction, or a method of measuring effectiveness to achieve a desired accounting result**… [Emphasis added.]

In a 2001 email from Katarina Skladony to Mona Patel, Ms. Skladony stated:

> Please note that I am going to make the below manual change in linkage for 313SWI540.  The 50M link 313SWI540 – 313SWD758 was qualified for long haul method.  However, in the process of effectiveness calculation Don had a problem to reach 80-120% correlation range and asked me to seek alternative linkage to 313SWI540.  I found 313SWD979 reset determination dates of which and 313SWI540 meet the 7 day window requirement and thus qualify for the short cut method."[333]

This above excerpt illustrates that retroactive re-linking was being applied to hedges in order to achieve hedge accounting treatment in situations in which the hedge effectiveness criteria (through a correlation analysis) was not met.  This is clearly an example of retroactive designation in order to achieve a desired accounting result and is not permitted under SFAS 133 per the reference above.

**Implications**

The numerous documentation issues described above appear to have serious implications for Fannie Mae's hedge accounting. Many of these matters relate to routine, commonly occurring transactions at Fannie Mae. Under SFAS 133, the lack of adequate, contemporaneous hedge designation documentation precludes a company from qualifying for hedge accounting. This has been reiterated by the SEC staff.[334]  Failure to receive hedge accounting means the fair value changes for such derivatives should be recorded through the income statement without receiving any offset, or matching with, the earnings affect of the hedged item. Given the billions of dollars of mark-to-market value of Fannie Mae's derivatives and the fact that the vast majority of them are currently receiving hedge accounting, the potential impact of these documentation issues on Fannie Mae's reported financial results and regulatory capital appears to be substantial.

---

[333] Email from Katarina Skladony to Mona Patel and Prasad Chintamaneni with a copy to Donald Sinclair, March 5, 2001, Subject: 313SWI540 switch from long haul to short cut, FMSE 100488-100490.
[334] See reference to December 2003 speech of John James in background section of this report.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

## ACCOUNTING OVERSIGHT

As part of the special examination of Fannie Mae, OFHEO reviewed the following four aspects of the Enterprise's financial reporting practices: (1) accounting policy development, (2) accounting policy review, (3) segregation of duties and (4) key person dependency. OFHEO concentrated examination efforts on evaluating the roles and responsibilities of the executives in the Controller's Department and the related controls that support the integrity of the financial reporting process. OFHEO believes that a lack of proper segregation of duties exists within Fannie Mae's Controller's Department which has created an environment that is not conducive for developing safe and sound financial reporting practices. AICPA Statement on Auditing Standards 1 (SAS 1) offers the following guidance on the responsibility of management for adopting sound accounting policies:

> Management has the responsibility for adopting sound accounting policies, for maintaining an adequate and effective system of accounts, for the safeguarding of assets, and for devising a system of internal control that will, among other things, help assure the production of proper financial statements. The transactions which should be reflected in the accounts and in the financial statements are matters within the direct knowledge and control of management. The auditor's knowledge of such transactions is limited to that acquired through his examination. Accordingly, the fairness of the representations made through financial statements is an implicit and integral part of management's responsibility. The independent auditor may make suggestions as to the form or content of financial statements or he may draft them in whole or in part, based on management's accounts and records. However, his responsibility for the statements he has examined confined to the expression of his opinion on them. The financial statements remain the representations of management.[335]

Fannie Mae, accounting policy recommendations are the responsibility of Jonathan Boyles. During testimony, Tim Howard explained that the accounting policy development process is such that the SVP for Financial Standards has the authority to recommend a specific policy, the Controller has the responsibility and authority for approving accounting policy, and the CFO has the general responsibility for the adopted accounting policies.[336] Based on evidence reviewed during the Special Examination, OFHEO believes that the accounting policy development process within the Controller's Department lends itself to the formation of accounting policies that are aggressive in nature and which do not comport with a strict interpretation of GAAP as promulgated by the Financial Accounting Standards Board (FASB).

In addition, OFHEO identified critical resource shortages and a lack of technical accounting expertise within the Controller's Department which resulted in key person dependencies.

---

[335] American Institute of Certified Public Accountants (AICPA) 2002 *Codification of Auditing Standards and Procedures*, Statement of Auditing Standards No. 1, Section 110.02. New York, NY: AICPA.
[336] OFHEO Interview, Mr. Tim Howard, August 5, 2004, p. 21
Q: Who has the authority for formulating accounting policy at Fannie Mae?
A: Jonathan [Boyles] has the authority for recommending a specific accounting policy. Leanne [Spencer] has line responsibility for what policy is actually adopted. And I have general responsibility for ensuring that the process works well and produces a quality result.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

OFHEO believes that these weaknesses resulted in an environment that impeded independent thinking and encouraged an inadequate level of policy and procedure development and documentation. A basic component of good corporate risk oversight is a sound internal control environment supported by a prudent system of "checks and balances" between the risk taking and control functions of an organization. Necessary components of this are both an independent risk management and audit function. Also, those responsible for the transacting or risk-taking business should not responsible for the settlements, financial reporting or recording of the transactions into the Enterprise's books and records. [337]

### Accounting Policy Development

The financial reporting responsibilities at Fannie Mae reside in the Controller's Department and ultimate responsibility for certification of the financial statements lies with Franklin Raines, Chairman of the Board and Chief Executive Officer (CEO), Tim Howard, Vice Chairman and Chief Financial Officer (CFO) and Leanne Spencer, Senior Vice President and Controller. The Controller's Department, relative to the areas under review, is organized as follows:



Fannie Mae's accounting policy development process begins in the Financial Standards group under the purview of Jonathan Boyles. Financial Standards has the corporate responsibility to recommend accounting policy for Fannie Mae. Jonathan Boyles explained that new accounting policies originate primarily from two sources. First, the Financial Standards group follows new accounting rules as they develop at the FASB, EITF and SEC. If it is determined that the new standards will have an impact on Fannie Mae's business, then Financial Standards will draft accounting policy for recommendation to the Controller. Secondly, the Financial Standards group receives requests from the business units to review new and/or proposed business products developed at Fannie Mae, and Financial Standards will develop accounting policy for

---

[337] Group of Thirty, Enhancing Public Confidence in Financial Reporting, Washington DC, 2003, p. 14. "Financial control and risk management must be fully independent of the risk taking side."

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

recommendation to the Controller.  The Controller is then responsible for reviewing the proposed policies for compliance with GAAP and ensuring that the financial accounting practices implemented are done so in a safe and sound manner.

During the Special Examination, OFHEO found no evidence of formal written procedures which govern the development of accounting policy at Fannie Mae.  In fact, when questioned about documentation of the accounting policy development procedures, Jonathan Boyles indicated that he was not aware if any existed:

> Q: Jonathan, is there a formal procedure for that to take place?
> A: I'm not sure what you mean by a formal procedure.
> Q: A formal procedure for the business unit to contact you.
> A: There's a policy that they're supposed to contact me.
> Q: Is that in writing anywhere?
> A: I don't know that it's in a policy manual out to people.  I don't know that it's in writing or not.[338]

OFHEO believes that maintaining formal accounting policy development procedures is necessary to meet management's responsibility for adopting sound accounting policies and devising a system of internal control that will help assure the production of proper financial statements, as outlined in SAS 1.  The lack of written policy development procedures results in a disorganized process and the improper development of Enterprise's policy.

In fact, OFHEO noted that the development of the _Purchase Premium and Discount Amortization Policy_, a critical accounting policy for the Enterprise, was directed by Mr. Tim Howard, with significant involvement by Ms. Leanne Spencer and other members of the Controller's Department.  However, the policy was developed without input from the Financial Standards group.  During testimony, Jonathan Boyles commented on Financial Standards' involvement in the policy as follows:

> Q: Are you familiar with this document [Purchase Premium and Discount Amortization Policy]?
> A: Yes.
> Q: Is this document a policy of the Enterprise for amortizing purchase premium and discount?
> A: I believe this policy, this document is a procedures document for amortization.
> Q: And would you describe this procedures document as being distinct from a policy document?
> A: Yes, I would.  I would consider this two different things.
> Q: Now this is maintained outside of your accounting policy manual; correct?
> A: Correct.
> Q: Now did you approve this document?
> A: I don't recall approving this document.
> Q: Do you recall reviewing this document at the time that it was adopted?
> A:  I don't recall reviewing this document at the time it was adopted.[339]

---

[338] OFHEO Interview, Jonathan Boyles, August 3, 2004, pp. 11-12.
[339] OFHEO Interview, Jonathan Boyles, August 24, 2004, pp. 7-8.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

It should be noted that although during testimony Jonathan Boyles specifies that the document represents procedure rather than the Enterprise's policy, Fannie Mae provided the *Purchase Premium and Discount Amortization Policy* referenced above in response to an OFHEO subpoena requesting the Enterprise's accounting policies related to SFAS 91.

This occurrence highlights the disorganization that results when clearly defined policy development procedures are not in place. Moreover, upon review of the *Purchase Premium and Discount Amortization Policy*, Jonathan Boyles indicated that aspects of that policy do not comport with GAAP:

> Q: I'd like to refer you then to the last page or second page of this document [Purchase Premium and Discount Amortization Policy], FMSE 074524, and I wanted to specifically ask about two policy provisions.
> A: Uh-huh
> Q: And these policy provisions are both indicated in the last paragraph. Do you want to read that last paragraph again?...
> A: Okay.
> Q: The first sentence of this paragraph states: If our catch-up moves beyond one within two percent of combined portfolio net interest in guaranty fee income, we will book monthly "on-top" adjustments that bring us back to within the plus or minus one percent range within our three-year planning period. Is that a provision that you recollect discussing with the outside auditors, KPMG?
> A: I don't recall discussing that provision.
> Q: Is that a provision that you had approved at all?
> A: I don't recall approving it.
> Q: Okay. In your opinion is that provision permitted under Generally Accepted Accounting Principles?
> A: No, I don't believe that would be allowed.
> Q: Then there is, I'd like to direct your attention to the last sentence.
> A: Uh-huh
> Q: States that —I'm sorry—the last two sentences state: Should our catch-up ever exceed two percent of the combined portfolio interest and guaranty fee income, however, we will bring it back to within the one to two percent range within a six month period. After that time, we will continue our monthly "on-tops" to return the catch-up to the plus or minus one-year range within a three-year horizon. Is that policy provision— let me rephrase that. Do you recall having discussed that policy with the outside auditors?
> A: I don't recall discussing this second page with the outside auditors.
> Q: Okay.
> A: As I mentioned earlier, I was surprised when I saw it in April or May.
> Q: Would the policy—I'm sorry—would that provision in that paragraph, in your opinion, be in accordance with Generally Accepted Accounting Principles?
> A: No, I don't believe it would be. I don't believe anything on this—that I'm aware of— on the second page has ever been implemented in practice.[340]

---

[340] OFHEO Interview, Jonathan Boyles, August 24, 2004, pp. 11-13.

149

OFHEO contends that the lack of formal policy development procedures within the Controller's Department resulted in the formation of accounting policies that are not consistent with GAAP.

During our examination, OFHEO identified other instances, related to the accounting policies for hedge accounting under SFAS 133, in which aspects of the policy did not comport with a strict compliance with GAAP.  During testimony, Jonathan Boyles characterized these instances as "known departures from GAAP," and claimed that they represented a practical application of the accounting standards:

> Q: With respect to the overall approach and the concept of assuming no ineffectiveness, do you believe that there are situations in which Fannie Mae is applying that when it's not consistent with the guidance in FAS 133?
> A: We have several known departures from GAAP in our adoption of FAS 133.  We have cleared those with our auditors.  We have reported to our auditors on an annual basis the effect of those.  And they were comfortable when we adopted them, and they were comfortable over the last several years when we reported the results of that work.
> Q: What were the reasons for you not applying GAAP in its strict conformity?
> A: As is relates to what?
> Q: As it relates to 133.  You said there were several departures from GAAP.
> A: The purpose there was really twofold: one, we felt like in the case of the duration shortcut, we felt—if you think about duration, duration is a sensitivity of an instrument's –of the instrument to interest rates.  And so, you know, FAS 133 built in the concept of a shortcut so you can match notionals and match maturities and repricing dates and assume no ineffectiveness when really a better economic hedge would be to match duration, not notionals.  If somebody on the business side wanted to eliminate interest rate risk, they wouldn't necessarily match up notional or maturity.  They would match up durations.  Those durations would get you that.  When we developed the duration shortcut, we felt like it was in the spirit of 133 while not exactly to the letter, and so we built that into our adoption of 133 because we felt like that was within the tenets of 133 of a match, and then on an annual basis, we would report back to our auditors and the management what the effect of – had we gone long haul on those transactions and not taken the duration shortcut, what that effect would have been on earnings.[...][341]

However, testimony of the CFO indicates that he was not apprised of these "known departures from GAAP" that existed within the Enterprise's accounting policies:

> Q: Do you believe that all elements of the Enterprise's accounting policies are consistent with Generally Accepted Accounting Principles?
> A: Yes, I do.
> Q: And would you have held that belief as well for the last several years?
> A: Yes.[342]
> Q: We understand from Jonathan Boyles' testimony that the company identified certain instances in which the company's accounting practices or policies depart from GAAP.  Is that consistent with your understanding?
> A: No, It's not.

---

[341] OFHEO Interview, Jonathan Boyles, August 3, 2004, pp.64-65.
[342] OFHEO Interview, Timothy Howard, August 5, 2004, p.53.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Q: And he's never informed you of instances where – that he would characterize as known departures from GAAP?
A: I have not heard that term.[343]

In this instance, the lack of formal accounting policy development procedures has led to a breakdown in communication regarding the Enterprise's accounting policies compliance with regulatory standards.  OFHEO noted that this instance is particularly egregious given the CFO's responsibility for certifying the financial statements with the SEC.  The lack of communication between Financial Standards and the CFO is a result of the internal control weaknesses that result in the absence of written accounting policy development procedures.

Additionally, a review of evidence gathered during the Special Examination highlighted instances in which personnel within Financial Standards characterized aspects of the Enterprise's hedge accounting policies as being aggressive.  In an email dated August 10, 2000 with the subject line, *Receiver Swaption + Bullet Swap = Cancelable Swap?*, a former Senior Project Manager within the Financial Standards group writes:

> "We could not analogize the combination of the bullet swap and the swaption to be treated like the cancelable swap and qualify for the shortcut method.  As it is, using the cancelable swap under the shortcut method is very aggressive."[344]

In a subsequent email dated April 17, 2001 to several members of management, including Tim Howard and Leanne Spencer, with the subject line, *Recent FASB proposal on the time value of option*, Mr. Boyles writes:

> "Secondly, the accounting treatment we currently utilize for our received fixed swaptions is aggressive (we have KPMG's approval) and not one we would want to flash in front of the FASB for comment or the treatment could get worse."[345]

During testimony, the CFO expressed a level of awareness and tolerance for the aggressive nature of the Enterprise's accounting policies:

> Q: Has any company officer or employee ever informed you that the company's accounting policies or interpretation of accounting policies was aggressive?
> A: Certain policies, not in the plural but in the singular, have been described as such at various times.  And again, I don't view that as alarming or inappropriate.[346]

However, based on evidence reviewed during the Special Examination, OFHEO believes that the Audit Committee of the Board of Directors was not apprised, at the time they were

---

[343] OFHEO Interview, Timothy Howard, August 5, 2004, pp. 59-60.

[344] Email from Kimberly Stone, to Joseph Rosenberg, and cc to Jonathan Boyles, Donald Sinclair, Warren Fitzgibbon and Mary Lewers, dated August 10, 2000, Subject: Receiver Swaption + Bullet Swap = Cancelable Swap ?, FMSE 078731-078732.

[345] Email from Timothy Howard to Jonathan Boyles and cc to Leanne Spencer, Tom Lawler, Peter Niculescu, Linda Knight, Jayne Shontell, Janet Pennewell, Hal Gann, Mary Lewers, Richard Swick, Kimberly Stone, Richard Stawarz, dated April 17, 2001, Subject: Recent FASB proposal on the time value of options, FMSE 096460-096461.

[346] OFHEO Interview, Timothy Howard, August 5, 2004, pp. 49-50.

151

implemented into the Enterprise's accounting policies, of these "known departures from GAAP" and instances where the Enterprise adopted aggressive accounting policies. During testimony, when questioned regarding whether the accounting policies characterized as being aggressive were reported to the Audit Committee, Tim Howard responded as follows:

> Q: Has Jonathan Boyles ever informed you that the company's accounting policies or interpretation of accounting policy were aggressive?
> A: I'm almost certain he has, but I can't recall a specific instance.
> Q: Would you ever then inform the Audit Committee of the board of such an opinion held by your Financial Standards head?
> A: No, because again, I don't view the label aggressive accounting as being a bad thing. It is descriptive of relative positioning compared to the GAAP line. That's why I want to find out more about the specific incidents. And if it's uncomfortably close to the line, we will change it. It's not take it to the board. It's don't do it.
> Q: Have you ever informed the board or Audit Committee of the board of such an opinion held by your Financial Standards Department head?
> A: Not to my recollection.[347]

OFHEO believes that the control weaknesses identified in the accounting policy development process at Fannie Mae have allowed the formation of accounting policies that are aggressive in nature and which do not comport with GAAP. Additionally, OFHEO contends that the lack of formal policy development procedures has resulted in a breakdown in communication regarding the Enterprise's policies compliance with regulatory standards and less than full disclosure to the Audit Committee of the Board of Directors.

In addition to the weaknesses that exist within the control environment surrounding the accounting policy development process, evidence suggests that for the period under review, the Enterprise did not maintain a complete and updated database of accounting policies which could be easily accessed by Fannie Mae personnel. During testimony, the Controller asserted that the general structure for maintaining accounting policies at Fannie Mae is in the Financial Accounting Policy Guide, which is periodically updated and posted to the Enterprise's intranet. However, during the examination, OFHEO identified instances in which critical accounting policies were maintained outside of the designated online database for accounting policy and outside of the offline Financial Accounting Policy Guide. In order for the accounting policies to be effective, it is imperative that the business units who rely on the guidance to evaluate proper performance of business operations, have access to a complete accounting guide listing all of the Enterprise's accounting polices and procedures.

### Accounting Policy Review

The internal review of proposed accounting policies is performed by the Controller. During testimony, the CFO confirmed that it is ultimately the Controller's responsibility to decide which policies to approve and implement. The CFO further explained that he views the Controller's position as an "internal check" on the Financial Standards group.[348] During our examination,

---

[347] OFHEO Interview, Timothy Howard, August 5, 2004, pp. 50-51.
[348] OFHEO Interview, Mr. Tim Howard, August 5, 2004, pp. 19-20

152

OFHEO noted that while the Controller has the responsibility for reviewing proposed accounting policies for compliance with GAAP, she is not a Certified Public Accountant (CPA).  The accounting policy development process as currently practiced is circular as the Controller relies on the Financial Standards group to provide guidance on whether or not accounting policies conform to regulatory standards.  The effective result of the process as described is that the Financial Standards group develops and also approves accounting policy.

Furthermore, during testimony, the CFO indicated that in situations where the Controller has a difference of opinion from the accounting policy recommendation developed by Financial Standards, the matter is brought to him for a final decision:

> Q: Since Jonathan provides recommendations to Leanne, I assume implicit in her authority is the ability to evaluate those recommendations, but ultimately establish policy she judges to be appropriate, which may in fact deviate from Jonathan's recommendations.
> A: In theory that could happen.  What's occurred in practice, for as long as I can remember, is when that is the case, Leanne does not make those decisions without consultation with me, which is—that's something that I have put in to practice as a, I think, good process check.  Again, if you have a recommendation for the subject matter expert, that his or her supervisor—there's a difference of a point of view, there's an issue there.  And one of the things that I am good at doing in the company is ferreting out the merits and drawbacks of resolving issues in different ways.  So I am invariably asked to participate in the process.  And then whatever the final judgment is, I will likely be involved in it.
> Q: And I assume that that's actually happened, that it's not just hypothetical?
> A: Yes, it has.  Again, if you ask me for specific recollections, I would probably rack my memory to come up with one.  But it doesn't just work that way in the controller's area.  It works that way in all areas that I oversee.  That's the one way I think I add some benefit, by holding the various responsibilities I've got.[349]

It should be noted that the CFO is also not a CPA nor does his technical background include accounting related experience.  OFHEO does not believe that the accounting policy development review process is sufficient to function as a "check" on the propriety of accounting policies as it relates conformity with GAAP.

OFHEO questioned the Controller about the process that she undertakes to ensure that the Enterprise's accounting policies are in compliance with GAAP.  The Controller responded that

---

Q: How would you describe the distinction of responsibilities between Financial Standards headed up by Jonathan [Boyles], and then alternatively, Leanne Spencer and the Controller's Group that she oversees? A: Well, Jonathan is the subject matter expert on accounting policies, so he is the person that we look to for not only advice but decisions around how to implement the various financial standards requirements. Leanne is supervisor, overseer. She is a internal check on Jonathan, and in my role as sitting on top of the overall department, I look first to Jonathan for his subject matter expertise, do rely on Leanne's thoroughness in engaging on issues and her sense for when an issue needs to come to my attention, and frequently issues are brought up to me, both to inform me, and in some cases to seek my counsel on decisions. So that's how I think about it. Jonathan's the subject matter expert, and Leanne is an engaged participant in the process.
[349] OFHEO Interview, Timothy Howard, August 5, 2004, pp. 24-26.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

she relies on the advice of the external auditor in determining whether the accounting policies comply with regulatory standards:

> Q: How do you assure yourself that the company's policies are in accordance with GAAP?
> A: I hire technical experts to staff the Financial Standards Unit, and then I liberally use our external auditors and our external auditors' national office to review policy and to have check-offs on the policy, and we really are in a mode to where we check with them frequently, and we want to make sure we don't have habits where we move forward and then inform them of what we did.  Our habits are have them along with us, and be with us along the way as we are looking at items of a policy nature.[350]

As noted above, SAS 1 states that it is the responsibility of management to develop sound accounting policies as the primary responsibility for the financial statements rests with management.  Part of that responsibility includes devising a system of internal control that will, among other things, help assure the production of proper financial statements.  The standard also describes the scope of an auditor's activity: "As part of their audit, they will assess the accounting principles used.  However the auditor's responsibility for the statements he/she has examined is confined to the expression of his/her opinion of them.  The financial statements remain the representation of management."[351]  It is the responsibility of management to ensure that the Enterprise maintains the internal expertise to properly develop, approve, and implement accounting policy.

The testimony of the CFO, Controller, Vice President of Financial Accounting, Director of Financial Accounting, and the head of the Office of Auditing, all referred to KPMG as the final arbiter of the Enterprise's compliance with GAAP.[352]  This provides insight into management's "liberal use"[353] of its external auditors as the first check on the appropriateness of the Enterprise's accounting policies.  However, it is ultimately the responsibility of management to determine sound accounting policies for the Enterprise[354] – the burden of management can not be shifted to the external auditor.  OFHEO views the Enterprise's reliance on the external auditor to determine the propriety of accounting policy as an indication of a lack of adequate

---

[350] OFHEO Interview, Leanne Spencer, August 12, 2004, pp. 24-25.
[351] American Institute of Certified Public Accountants (AICPA) 2002 *Codification of Auditing Standards and Procedures,* Statement of Auditing Standards No. 1, Section 110.02. New York, NY: AICPA.
[352] OFHEO Interview, Mr. Tim Howard, August 5, 2004, pp. 19-20
Q: How would you describe the distinction of responsibilities between Financial Standards headed up by Jonathan [Boyles], and then alternatively, Leanne Spencer and the Controller's Group that she oversees?
A: Well, Jonathan is the subject matter expert on accounting policies, so he is the person that we look to for not only advice but decisions around how to implement the various financial standards requirements. Leanne is supervisor, overseer. She is a internal check on Jonathan, and in my role as sitting on top of the overall department, I look first to Jonathan for his subject matter expertise, do rely on Leanne's thoroughness in engaging on issues and her sense for when an issue needs to come to my attention, and frequently issues are brought up to me, both to inform me, and in some cases to seek my counsel on decisions. So that's how I think about it. Jonathan's the subject matter expert, and Leanne is an engaged participant in the process.
[353] OFHEO Interview, Leanne Spencer, June 22, 2004, p. 24-25.
[354] American Institute of Certified Public Accountants (AICPA) 2002 Codification of Auditing Standards and Procedures, Statement of Auditing Standards No. 1, Section 110.02.  New York, NY: AICPA.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

technical expertise within the Controller's Department.  OFHEO believes that although the Controller has the ultimate responsibility for approving accounting policies at Fannie Mae, the processes as practiced rely heavily on the SVP of Financial Standards and the external auditor to determine compliance with GAAP.  OFHEO asserts that the accounting policy review process does not provide a sufficient internal independent verification of recommended policy and does not provide reasonable assurance that the accounting policies adopted by the Enterprise are in compliance with GAAP.

Additionally, OFHEO noted that although internal audit procedures indicated that test work was performed to assess compliance with regulatory standards, the Office of Audit (OA) does not conduct an independent review of accounting policies to determine compliance with GAAP.  According to the CFO, Internal Audit has no role in determining whether or not Fannie Mae's accounting policies are consistent with GAAP.  The CFO asserts that the role of the OA is to evaluate the internal controls of accounting processes relative to the internal policy:

> Q: What is Internal Audit's responsibility for evaluating the company's accounting policies?
> A: Their primary responsibility is to do audits to ensure that the policies are followed by those they govern in a fashion consistent with our [internal] standards.[355]

As it relates to the review of accounting policies, the CFO does not look to the OA to review the Enterprise's accounting policies for propriety under GAAP; he instead looks to the outside auditor.  Sam Rajappa, Senior Vice President of Operations Risk (Director of the Office of Audit) confirmed that his team does not provide any review of the Enterprise's accounting policies relative to GAAP:

> Q: Are audit procedures directed at determining whether or not the company has been in compliance with GAAP?
> A: Audit procedures are directed at auditing to the standards established by Financial Standards and approved by KPMG.[356]

Fannie Mae's organizational structure and accounting policy development review process has created material deficiencies in the Enterprise's ability to effectively review financial accounting policies.  OFHEO determined that as a result of the lack of technical skill of the executives who serve as a control check of the policy development process, management over relies on the SVP of Financial Standards and the external auditor to perform this key function. OFHEO believes that the policy development review process, as currently practiced, does not adequately fulfill management's responsibilities, which has resulted in the development of accounting policy that is aggressive in nature and an environment that acquiesces to the development of policies that do not comport with a strict interpretation of GAAP.

### Segregation of Duties

OFHEO examined the roles and responsibilities of the executives in the Controller's Department and the related controls that support the integrity of the financial reporting process.  During the

---

[355] OFHEO Interview, Timothy Howard, August 5, 2004, p.36.
[356] OFHEO Interview, Sam Rajappa, June 17, 2004, p.10.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

examination, OFHEO noted several instances in which the executives in the Controller's Department lacked a proper segregation of duties.  One example of this is the lack of segregation of duties regarding the amortization of deferred price adjustments.  OFHEO believes that these instances represent critical conflicts of interest and are not conducive for developing safe and sound financial reporting practices.  Statements on Auditing Standards 55 (SAS 55) issued by the Auditing Standards Board (ASB) "provides guidance on the independent auditor's consideration of an entity's internal control structure in an audit of financial statements in accordance with generally accepted auditing standards," as follows:

**Control Procedures**
11. Control procedures are those policies and procedures in addition to the control environment and accounting system that management has established to provide reasonable assurance that specific entity objectives will be achieved[...]

- Segregation of duties that reduce the opportunities to allow any person to be in a position to both perpetrate and conceal errors or irregularities in the normal course of his duties – assigning different people the responsibilities of authorizing transactions, recording transactions, and maintaining custody of assets[...][357]

The standard emphasizes the importance of segregating responsibilities of individuals who are in a position to authorize and record transactions in establishing a strong control environment around financial reporting.

*Chief Financial Officer (CFO)*

OFHEO noted that the CFO has a myriad of responsibilities, which include risk management, the retained portfolio, the accounting function, investor relations, treasury, and financial reporting and he also has responsibility for evaluating and making compensation recommendations for the Head of the Office of Auditing, Mr. Sam Rajappa.  When asked to describe his current position at Fannie Mae, the CFO responded as follows:

Q: I want to start off with just some questions related to your background and experience.  Can you describe your current position at Fannie Mae?

A: Boy, how much time do we have? [Laughter.]

A: My title is vice chairman and chief financial officer.  As vice chairman I have a fairly wide range of corporate strategy oversight management responsibilities, part of a four-person Office of the Chairman includes Frank Raines, the chairman and the chief operating officer and Tom Donilon, who's executive vice president for law and policy.

Beyond that, I also serve informally as the Enterprise's chief risk officer.  Back, I guess, in November of 2000 Frank asked me to take on those responsibilities, and we effectuated that by moving the credit policy function out of the reporting, the chief operating officer reporting to me, and that gave me direct reports of all people who

---

[357] American Institute of Certified Public Accountants (AICPA) 2002 *Codification of Auditing Standards and Procedures,* Statement of Auditing Standards No. 55. New York, NY: AICPA.

156

either set risk policy or did risk analytics.  So that's a second level of responsibilities I have.

I direct the person who manages our on-balance sheet mortgage portfolio.  That's Peter Niculescu.  Prior to November of 2002 I had direct oversight responsibility for the three functions that composed that business, the portfolio strategy function, the mortgage acquisition function, and the Treasurer's Office.  In November that passed to Peter, but I retain active involvement as a overseer of the business.

As chief financial officer I have the accounting control function, with Leanne Spencer heading that up, reporting to me.  In addition to financial reporting, we also do business planning, tax, and accounting policy.  Investor Relations reports to me directly.

A small group called Corporate Financial Strategies, headed by Tom Lawler, who I believe you talked to, serves as a standard setter and the group that ensures that we're looking at risk consistently across the company.  Tom reports to me.

And finally I have, indirect or dotted line reporting from the auditor.  Sam Rajappa reports directly to the chairman of the audit committee, but for the last I think year and a half, maybe two years, he has reported on a dotted line basis to me.  Previously he also reported to our chief operating officer.

So that covers the range of responsibilities I currently have.  Like in the past I've had others, but not significantly different from what I have now.[358]

The CFO indicated a wide range of functions that fall within his purview of responsibility, several of which potentially impair the CFO's independence.  According to the best practices outlined in, *Enhancing Public Confidence in Financial Reporting*, written by the Group of Thirty, "financial control and risk management must be fully independent of the risk taking business."[359]  The Group of Thirty is comprised of members from both the public and private sectors and academia.  The Group issues guidance on economic, financial, and policy development.  In fact, during his testimony, Mr. Howard stated that he is currently serving as a member of The Group of Thirty:

Q: Have you yourself been involved in meetings with standard setters, accounting standard setters such as the SEC or FASB to discuss the company's accounting policies?
A: Both.  I've been a number of meetings with FASB board members, including the chairman, and also been to the SEC.  And one other thing I'll mention that falls into that category is there is an outfit called the Group of 30, that you may or may not have heard of.  It's a group of basically international financial policy makers that are the board of a nonprofit headquartered here in Washington.  Last year they decided to do something they've never done before which is attack accounting policy, and they put together a steering committee.

---

[358] OFHEO Interview, Tim Howard, August 5, 2004, pp. 6-8.
[359] *Enhancing Public Confidence in Financial Reporting*, The Group of Thirty, Washington, D.C., p.14.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

The chairman of the board of trustees is Paul Volcker, who I've known for some time. Paul asked me to serve on the task force to look at the issue of fair value versus historical cost for international financial institutions. But Bob Herrs [ph] was on that as a observer, Susan Bies from the Fed, Jim Leisenring from the IASB. So that's an accounting policy group. I also head that interaction. We met three times in the course of putting together our report, twice in New York and once in London.[360]

As part of his responsibility for the retained portfolio, the CFO has the authority to approve transactions related to mortgage acquisitions and derivatives. He also has the authority to set risk management strategies which are used to develop the financial forecast. Additionally, he has the authority to determine how the financial transactions are reported in the financial statements. This lack of segregation of duties is inappropriate and contradicts the following public statement made by Franklin Raines, Fannie Mae's CEO:

> "Those entering into business transactions and accountable for business results do not determine the accounting of those transactions."[361]
> – Franklin D. Raines

OFHEO asserts that commensurate in the CFO's responsibility is the ability to set a financial target through his duties as Vice Chairman and the ability to meet the financial target via his duties as CFO.

Best practices necessitate controls that ensure the independence of management. In addition, while executive compensation for management is ultimately the responsibility of the Compensation Committee of the Board of Directors, the CFO significantly influences the evaluation and makes compensation recommendations for the head of the OA. OFHEO contends that this reporting line is inappropriate.

### Senior Vice President – Financial Reporting and Planning

During discussions with Janet Pennewell, Senior Vice President – Financial Reporting and Planning, OFHEO noted a similar conflict of interest corresponding to her roles and responsibilities. When asked to describe her current responsibilities, Janet Pennewell indicated that she is responsible for forecasting the financial statements as well as financial reporting:

Q: So in 1999 you took on the responsibilities in Financial Reporting that you—describe what happened in 1999 again, if you would.
A: Sure. In 1999 I was promoted to Vice President, and before my promotion I was in charge of the business planning function, which resides within the Controller's Department, and when I was promoted to Vice President in 1999, also took on responsibility for financial reporting and for financial accounting.
Q: In 1998 were your responsibilities in the business planning function quite a bit different from what you started doing in 1999?

---

[360] OFHEO Interview, Tim Howard, August 5, 2004, pp. 39-40.
[361] See, Answers from the CEO: Why do you have confidence that you have done your derivative accounting properly?," http://fanniemae.com/ceoanswers/derivativesaccounting.jhtml.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

A: I retained the responsibility for the business planning function, but then took on additional, significant additional responsibility.

Q: Right.  So in 1998 would you have had any responsibility for forecasting income?

A: Yes.  That's what—that's what the Business Planning Group does.  It forecasted essentially profit and loss statement, balance sheets for the company as a whole, out of our three or four-year planning horizon, and also for our business areas.[362]

OFHEO asserts that this dual role presents a significant conflict of interest.  Janet Pennewell, in her role as SVP of Financial Reporting and Planning, has the ability to affect the amounts of reported net income in order to achieve planned results.

During testimony, Janet Pennewell further described that her responsibilities included modeling the purchase premium and discount amortization as well as recording the amortization to the financial statements:

Q: So some of the—in forecasting income back in 1998 you also—would you have also had some oversight over the tracking of premium and discount amortization?

A: In—not officially.  We began, my team and myself, began to get involved peripherally in the tracking of premium—the modeling of premium and discount amortization in maybe mid 1998, and then the responsibility for the modeling necessary to come up with the level yield factors was transferred to my area officially in 1999.[363]

Having the dual responsibility of modeling the amortization and reporting amortization results to the financial statements under the authority of a single individual is a major control weakness that undermines the integrity of the financial reporting process.

*Director of Financial Reporting*

In addition, OFHEO noted that a single individual is responsible for the modeling, reporting and accounting for SFAS 91.  During his testimony, Jeffrey Juliane, Director of Financial Reporting, explained his responsibilities related to the purchase premium and discount amortization process as follows:

Q: Can you walk us through your employment at Fannie Mae?

A: I came on at Fannie Mae.  I was working in the corporate planning area in charge of the mortgage portfolio forecast, worked extensively with the mortgage portfolio area in terms of generating their quarterly forecast numbers and stayed.  That was my primary focus for the first year of employment there.

At that point in time, we had Jonathan Boyles' area was responsible for doing FAS 91 calculations.  We identified a need to increase the expertise in that area.  Then it came underneath me in Q1 of 1999, so at that point in time I had a combined role of doing a corporate plan from the portfolio perspective as well as doing FAS 91 forecasting or FAS 91 accounting.

---

[362] OFHEO Interview, Janet Pennewell, June 15, 2004, pp. 8-9.
[363] OFHEO Interview, Janet Pennewell, June 15, 2004, p. 9.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

That stayed that way until mid-2000 and then I moved over to be a part of the financial reporting team where I was in charge of new product development from the accounting perspective as well as FAS 91. That stayed that way until toward the end of 2001 when I got asked to help do accrual accounting implementation on a STATs system as well as doing FAS 91....

Q: And who do you report to?
A: I formally report to Mary Lewers.
Q: And you say formally?
A: (Witness nods)
Q: Can you explain that?
A: For—I've always had a dotted-line relationship with Janet, especially when it comes to FAS 91 related activities.
Q: That would be Janet Pennewell?
A: Yes.[364]

Jeffrey Juliane is currently responsible for both modeling the purchase premium and discount amortization amount as well as recording that amortization amount to the financial statements. This is a control weakness that subverts the soundness of the financial reporting process as there is no independent check on the amortization modeling, forecasting and reporting processes. Again, OFHEO asserts that Jeffrey Juliane's dual responsibility of calculating the modeled amortization results and recording amortization for purposes of financial reporting represents a conflict of interest and undermines the integrity of the modeling process.

### SVP of Operations Risk (Head of Internal Audit)

During testimony, OFHEO noted that Sam Rajappa, Senior Vice President – Operations Risk, serves as the head of the Office of Audit (OA) and reports to the CFO. OFHEO concludes that the OA should independently report to the Audit Committee of the Board of Directors and not to management such as the CFO. Based on evidence gathered during the Special Examination, OFHEO believes that Sam Rajappa does not have independence from the CFO. During testimony, the CFO indicated that he has "indirect or dotted line reporting from the auditor." Tim Howard qualified the statement by noting that, "Sam Rajappa reports directly to the chairman of the Audit Committee, but for the last I think year and a half, maybe two years, he has reported on a dotted line basis to me. Previously he also reported to our chief operating officer."[365] Although the CFO characterized his reporting responsibility as that of a "dotted line," OFHEO noted that the CFO participates in the annual performance evaluation and makes compensation recommendations for Sam Rajappa:

Q: Who does Mr. Rajappa's performance review?
A: I write it, but I do it with very significant input from Tom Gerrity, the chairman of the Audit Committee.
Q: Similarly, for your direct reports, do you also perform their evaluation?
A: Yes, I do.

---

[364] OFHEO Interview, Jeffrey Juliane, June 8, 2004, pp. 8-10.
[365] OFHEO Interview, Tim Howard, August 5, 2004, p. 8.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Q: Are you also involved in making compensation recommendations for these individuals?
A: Yes.  Although for people at the senior vice president level and above, we do it collaboratively.  We have a group of executives we call our senior leadership team, which is the Office of the Chairman and six other executive vice presidents, who meet as a group, and talk about the performance of all of our senior officers, and we make the compensation decisions collectively.  I will make a recommendation to the group about the compensation of each of my officers, but the compensation is ultimately determined by the results of the discussions that take place at the senior leadership team meeting.
Q: Would you also make the compensation recommendation for Sam Rajappa as well?
A: I do, but that is also determined by the group as a whole.[366]

OFHEO believes that Sam Rajappa should report directly to the Audit Committee of the Board of Directors.  The position should be independent from the CFO.  The current organizational structure which gives the CFO the authority to evaluate and affect compensation decisions for the head of the OA critically impairs the independence of the OA.

OFHEO also believes that the current roles and responsibilities of the executives within the Controller's Department do not meet management's responsibility to "sufficiently segregate duties in order reduce the opportunities to allow any person to be in a position to both perpetrate and conceal errors or irregularities in the normal course of his duties,"[367] as outlined in SAS 55.  As a result, the current control environment is not structured to promote safe and sound financial reporting practices.  It should be noted that this conflict of interest and underdeveloped segregation of duties was formally noted on several occasions by the Office of Audit, including in their July 9, 2003 Amortization Audit Report.[368]

Moreover, OFHEO contends that OA failed to follow standards established by the Institute of Internal Auditors (IIA) for evaluating risk exposures relating to impairments of auditor independence and objectivity.  IIA standards on individual objectivity provide the following guidance regarding impairments to internal auditor independence:

> Internal Auditors should refrain from assessing specific operations for which they were previously responsible.  Objectivity is presumed to be impaired if an internal auditor provides assurance services for an activity for which the internal auditor had responsibility within the previous year.[369]

During testimony, Sam Rajappa indicated that prior to serving in his current role as the head of Internal Audit, he held the position of Controller for the Enterprise:

---

[366] OFHEO Interview, Tim Howard, August 5, 2004, p. 13.
[367] American Institute of Certified Public Accountants (AICPA) 2002 *Codification of Auditing Standards and Procedures,* Statement of Auditing Standards No. 55. New York, NY: AICPA.
[368] The Fannie Mae Audit Report issued by the Office of Auditing on the Amortization Audit dated July 9, 2003 states the following: "We noted key-person dependencies in both the data and modeling processes. A limited number of individuals have a strong understanding of the amortization processes. Improved policies over these areas would provide better support for procedures performed and would reduce key person dependencies." FMSE 023745-023752.
[369] The Institute of the Internal Auditors' Standards for the Professional Practice of Internal Auditing, Attribute Standards – 1130.A1

161

Q: Mr. Rajappa, could you describe your current responsibilities at Fannie Mae?
A: Yes, I am Senior Vice President for Operations Risk now, and I head up the internal audit function, and I have a staff of 57 auditors, including me.
Q: And how long have you had those responsibilities?
A: I've been in this job since January of 1999.
Q: And what is your prior employment history and responsibilities with Fannie Mae?
A: I was the Controller from 1994 through end of 1998.
Q: And how long have you had those responsibilities?
A: I've been in this job since January of 1999.[370]

Based on Sam Rajappa's testimony, it appears that for the fiscal year 1999, the OA function did not meet IIA standards relative to auditor independence.  As Sam Rajappa served as the Controller for the period of 1994 thru 1998 and subsequently acted as the head of the Internal Audit function, he was given the authority to audit his own work, which represents a major conflict of interest.


## Key Person Dependency

Information obtained during the examination demonstrates that critical shortages of qualified accounting specialists existed within the Controller's Department during the period under review.  The shortage of staff and technical accounting expertise created key person dependencies for crucial accounting policy development areas.  The problem was exacerbated as Fannie Mae was challenged with fulfilling the necessary requirements to complete registration with the Securities and Exchange Commission (SEC), while also complying with an increasing number of accounting standards that impacted their business.


### The Financial Standards Group

The Financial Standards group, which is headed by Jonathan Boyles, is presently staffed with 8 employees.  During testimony, Jonathan Boyles indicated that his Financial Standards staff doubled to reach its current number during the past 18 months.[371]  Jonathan Boyles explained that he started as a manager in 1994, at which point in time the Financial Standards group consisted of himself and one direct report:

> Q: Could you describe what the progression of your positions and job responsibilities have been during that time?

---

[370] OFHEO Interview, Sam Rajappa, June 17, 2004, p. 7.

[371] OFHEO Interview, Mr. Jonathan Boyles, August 3, 2004, pp. 9-10

Q: So what was the size of the group when you started?
A: When I started there were two managers and a director. When my boss moved on there were – I was acting head of the department as a manger, and I had one person reporting to me. After I got promoted I replaced my head count essentially, and for a while there were two people reporting. I don't remember the years, but, you know, got approval for a third. And then gradually got a fourth. And then this past year we hired Greg Ramsey as the lead Vice President.
Q: When Greg Ramsey came in, did the size of the group grow in terms of the people reporting to him, or when did you get from the four to the eight? I am just trying to get a sense of timing.
A: Going from the four to the eight has been within the last 18 months.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

A: Sure. I started in 1994 as a manager in the Financial Standards Department. I was promoted to Director of the Financial Standards Department around 1997. I was promoted to Vice President, Financial Standards Department 2001, I believe. And I was promoted to Senior Vice President of Financial Accounting Standards and Corporate Tax in 2004....[372]

Q: So what was the size of the group when you started?
A: When I started there were two managers and a director. When my boss moved on there were--I was acting head of the department as a manager, and I had one person reporting to me. After I got promoted I replaced my head count essentially, and for a while there were two people reporting. I don't remember the years, but, you know, got approval for a third. And then gradually got a fourth. And then this past year we hired Greg Ramsey as the lead Vice President.[373]

It should be noted that SFAS 133 became effective for fiscal years beginning after June 15, 1999; Fannie Mae voluntarily registered its common stock with the SEC effective March 31, 2003, filing reports for the FY2002 financial statements; and SFAS 149 became effective for contracts entered into or modified after June 30, 2003.

In addition to developing accounting policy for the Enterprise, the SVP of Financial Standards and Tax also devotes some of his energies to corporate tax issues. Jonathan Boyles is also called upon to prepare analyses such as due diligence support for counterparties and reviews of investee companies. Financial Standards is also responsible for drafting the language that appears in the publicly filed 10K and 10Q statements and the Administrative Finance Report. Additionally, the group is often required to do special projects such as reviewing accounting issues related to Freddie Mac. Financial Standards regularly provides management with analyses comparing Freddie Mac's financial disclosures to their own in order to highlight issues of concern or explain differing financial statement presentations.[374]

---

[372] OFHEO Interview, Jonathan Boyles, August 3, 2004, p. 7.

[373] OFHEO Interview, Jonathan Boyles, August 3, 2004, pp.9-10.

[374] OFHEO Interview, Mr. Jonathan Boyles, August 3, 2004, pp. 12-14
Q: So, in addition to being involved in providing accounting guidance, and you know, could you describe what the full extent of your responsibilities are?
A: The full extent of my responsibilities, as it relates just to accounting policy?
Q: You can start with that, and then – it sounds like you have other responsibilities too. I'd like to hear that too.
A: Right. As it relates to accounting policy, my responsibilities are to provide the accounting policy to the departments within the company and to the Financial Reporting Department. We also provide training to the company if there's a need for accounting training, whether it's on old existing rules or on something new. That will go not just for what affects Fannie Mae, but oftentimes we'll do training on what affects our customers but may not have a direct impact on the company. My role is to provide that guidance to those who are responsible for implementing the guidance, and I act as a consultant and get brought in where necessary. I mean, "I" in that regard, I mean me and my team.
Q: And other responsibilities besides accounting –
A: Other responsibilities that we do, I often get asked to do special projects within the company. We have occasionally bought into, during the dot.com craze, several investments in companies that were in the mortgage market, and that we had an interest in the technology. Me or my team would do due diligence, financial due diligence on those companies as part of the decision-making process, would report up through those who would make that decision. We do due diligence on counter-party risk. We'll go out to

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Given the technical accounting support necessary for Fannie Mae to comply with regulatory requirements for implementing the new standards from the FASB and registering its common stock with the SEC along with its regular operational activities, OFHEO believes that Fannie Mae management failed to adequately staff the Financial Standards function to sufficiently meet these requirements.  In fact, the Controller commented on the need to increase staffing for the Financial Standards group as part of Jonathan Boyles' 2002 Performance Review:

> I believe FAS 149 knocked us off our horse which had begun to canter.  We are only slowly building momentum.  In hindsight, and I know you agree, Paul [Salfi] was not nearly strong enough to lead this huge effort.  We recognized this and we are taking action to staff your organization appropriately and to add a strong head of accounting policy.[375]

OFHEO believes that management across business operations was aware of the lack of accounting expertise within the Controller's Department.[376]  However, management appears to have been slow taking action to remedy the situation.

In addition, based on evidence reviewed during our examination, OFHEO determined that there is limited technical accounting expertise at Fannie Mae, as the SVP of Financial Standards is heavily relied upon for all matters accounting related at the Enterprise.  OFHEO noted that executives within the Controller's Department exhibit only a "high level" understanding of the relevant GAAP standards that support the Enterprise's accounting policies.

_Controller_

When questioned regarding the Enterprise's accounting treatment of interest only (IO) and principal only (PO) securities, Leanne Spencer deferred her comments to Jonathan Boyles citing

---

my companies as part of a broader team. We'll do the financial due diligence where others will look at other risks of our counter-parties, and we do other special projects like that, most things as it relates to Freddie Mac and Freddie Mac's accounting gets done out of my department. My department's also responsible for drafting the 10K, the 10Q, and it's responsible for drafting the administrative finance report, both of those.

[375] Performance Review, Jonathan Boyles, by Leanne Spencer, 2002 (FMSE 220363).

[376] The 2003 Performance Evaluation from Tim Howard to Leanne Spencer, dated December 30, 2003, states the following: "The one consistent development theme in the survey was the resource issue. It was mentioned somewhere in the survey by each of the four peers who reviewed you: "she needs to fill out her team and invest more in her functions." "I think the area for development is in realizing how much the world has changed and needing to get ahead of those changes in terms of her organization, resource levels and other investments needed for today's controllership function." "She needs more depth in certain functions." "The fact that her staff is overworked and under such extreme resource pressure is apparent." And one of your direct reports said: "I believe she has a pride issue that prevents her from asking for more help and as a result, she doesn't have more time to actually perform her management duties. Because she runs such a lean shop her employees also don't have much time to develop her skills or attend training." I know you're on top of his now, but as the survey indicates, both you and I let this get a little further along than we should have without raising it up on our priority lists – which our peers clearly noted." FMSE 220315-220318

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

that she did not have an understanding of the GAAP standards which validate the Enterprise's accounting treatment:

> Q: We're going to talk a little bit about Fannie Mae's accounting for IO and PO securities. Now we understand from some of the previous discussions we've had that the company's policy is to account for IO and PO securities on a combined basis; is that correct?
> A: I have a limited recollection of this area, so I would not represent myself as having expertise in this matter. But I am aware of IO/POs combined. I believe we have talked to you about this before.
> Q: Do you – are you familiar with the criteria that the company uses for making that decision in terms of combining IOs/POs from an accounting standpoint?
> A: I have a high level understanding, but I wouldn't have a detailed – I wouldn't have a detailed understanding.
> Q: Who would have a detailed understanding?
> A: The SVP of Financial Standards, and traders in the portfolio business who he would be interacting with.
> Q: So would you have an understanding of what basis in GAAP was used to get to that conclusion?
> A: I would not.[377]

As the corporate Controller is considered a critical member of the management team at Fannie Mae, OFHEO finds her inability to comment on the regulatory accounting standards which govern the Enterprise's accounting policy unacceptable. Particularly in light of the CFO testimony that he viewed it as ultimately the Controller's responsibility to decide which accounting policies to approve and implement.

Evidence reviewed as part of the Special Examination indicated that the Controller's function was also overworked and had persistent resource issues during the period under review. In the Controller's 2001 performance review, the CFO made the following comment regarding workload management and staff development within the Controller's Department.

> Once we get overloaded, things slip. They don't get done as thoroughly, with the degree of coordination, or in the right priority as would be the case otherwise.[378]

The Controller's 2002 performance report echoed the 2001 report. The CFO urged the Controller to focus on staff development and coaching.[379] Also, the CFO noted the following feedback from fellow officers regarding the lack of resources in the Controller's function. A survey revealed that the lack of resources in the Controller's Department

---

[377] OFHEO Interview, Ms. Leanne Spencer, August 12, 2004, pp. 68-70.

[378] 2001 Performance Review: Leanne Spencer, by Timothy Howard (FMSE 220309).

[379] The 2002 Performance Evaluation from Tim Howard to Leanne Spencer, dated December 30, 2002, states the following: "Truth to be told, Leanne, it was your subordinates' comments about your attention to their development needs that caused me to hesitate to recommend you for "SE" consideration this year, notwithstanding the phenomenal year you had on the results side. If you get your people development skills up, you should be able to waltz across the SE goal line." FMSE 220311-220314.

165

was identified across business functions and these comments were noted in Leanne Spencer's 2003 annual performance review:

> "She needs to fill out her team and invest more in her functions."

> "I think the area for development is in realizing how much the world has changed and needing to get ahead of those changes in terms of her organization, resource levels and other investments in today's controllership function."

> "She needs more depth in certain functions."

> "The fact that her staff is overworked and under such extreme resource pressure is apparent."

> "Because she runs such a lean shop her employees also don't have much time to develop their skills or attend training."[380]

Interviews with other executives within the Controller's Department revealed a similar limited knowledge of accounting standards and indicated a significant reliance on Financial Standards regarding technical accounting matters.

### *Vice President for Financial Accounting*

During testimony, Mary Lewers, Vice President of Financial Accounting, indicated that she has been employed at Fannie Mae for 21 years working in various financial accounting positions. Mary Lewers noted that the responsibility to produce accurate financial statements rests with others.  She insisted that her responsibility is limited to accounting operations and ensuring that "...the transactions are processed and that the accounting is appropriate as per the guidance that would have been provided to my team."[381]

> Q: So, with respect to these various areas then, is it your group's responsibility to ensure that the transactions are accounted for properly in accordance with generally accepted accounting principles?
> A: The responsibility of my group would be to work alongside the Financial Standards group.  The Financial Standards group would establish the Fannie Mae's policy for Accounting.  And so then the individuals on my team would be; their responsibility is to manage the processes and to ensure that our accounting is in compliance with that policy.[382]

OFHEO noted that she characterized her current level of knowledge as limited regarding amortization of purchase premium, insisting that she is still working on developing an

---

[380] 2003 Performance Review: Leanne Spencer, by Timothy Howard (FMSE 220317).
[381] OFHEO Interview, Mary Lewers, July 13, 2003, pp. 15-16.
[382] OFHEO Interview, Mary Lewers, July 13, 2003, p.20.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

understanding of the broader concepts behind FAS 91.[383]  Mary Lewers testified that she is becoming familiar with this area for which she currently has the responsibility to manage.  She was assigned these duties in 2003.

When questioned regarding aspects of the Enterprise's hedge accounting policies and its compliance with GAAP, Mary Lewers asserted that she relies on Financial Standards to determine compliance with regulatory standards:

> Q: Do you believe it is in compliance with FAS 133, the specific discussion that we've just had in terms of having just a second swap at the inception of the second hedge relationship be equal to zero?
> A: I have been--I'll go back to kind of what I said earlier.  FAS 133 is a very technical area of accounting, and it's one that I rely upon the expert advice of the Financial Standards Group to establish our policy, and that my understanding of our policy is that we assess the fair market value of zero at the beginning of each of these hedge instruments that we enter into and that that's the point where we apply that test.
> Q: So does that mean--is your answer implying that you think it's consistent with FAS 133? ...
> A: And I'll go back to that I have found that FAS 133 is a very complicated area of accounting, and it's one that I look to get expert advice on how to interpret--the interpretation into our policy, and so I rely upon the information supplied to me by Accounting Standards, and that that appears to be appropriate accounting to me based on that advice.
> Q: You're a CPA yourself, right?
> A: Yes, I am.
> Q: Have you given these issues a great deal of thought yourself?

---

[383] OFHEO Interview, Ms. Mary Lewers, July 13, 2004, pp. 241-243
Q: Ms. Lewers, I think we spoke to you earlier about your involvement in the amortization process on another date. I just wanted to clarify some of that quickly today. Could you tell us what your involvement and responsibility is with respect to the process of calculating amortization?
A: Are you referring to FAS 91?
Q: Yes.
A: Historically, my involvement with FAS 91 has been a very limited component of this accounting. In that accounting I had responsibility for what used to be PDS, became PDI, and the iPDI, which was a system that tracked balances and that received factors from another system, and then the PDS/PDI/iPDI, that system would take balances, apply factors, and then generate an amortization amount that would then be booked to the general ledger. And so that piece of the FAS 91 process was my area of responsibility.
Q: And has that changed at all over time?
A: In the past, I think about last summer maybe, the organization – we did some reorganization of individuals, and so the individuals who have responsibility for this area now reports in to me. And so I'm in what I would call a transition phase in that I have been learning and working developing an understanding of the broader concepts behind FAS 91. But that effectively Janet Pennewell has really been more the supervisor in charge of this area.
Q: I guess in the past year you've been becoming more involved in the process. Is that a fair statement?
A: Well, I haven't really devoted much time to it until the last few months, and my – so I'm not – I have not mastered this subject area.
Q: As of today, if there was an important management decision to be made regarding the process of amortization, would you be involved in that decision?
A: I would probably be involved in hearing the discussion that went on, but I would not be the one making the decision.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

A: I spend a fair amount of time on this, but I have to also remind everyone that this is not my only area of responsibility, and that my responsibility covers a broad range of accounting topics. This is an area that--so it's one of several areas that I work with, and it's one that has--it's a very technical area and it's one that--there are people in the company, in Fannie Mae, who work on this on a more day-to-day basis than myself.
Q: FAS 133 is one of the company's critical accounting policies, is that correct?
A: Yes, it is[384]

OFHEO believes that the Vice President for Financial Accounting does not have sufficient knowledge of the technical accounting requirements related to SFAS 91 and SFAS 133 to adequately perform her duties. Based on Mary Lewers' testimony, it appears that she takes no responsibility for ensuring that the accounting policies that are being implemented are in compliance with GAAP and over relies on the Financial Standards group for interpretation of the accounting standards.

OFHEO noted that staffing shortages also exist in the Controller's department related to FAS 133 accounting. In a memorandum dated February 2, 2004, from Cheryl DeFlorimonte, Director, Accounting and Audit, the situation was described as a crisis:

> This memo serves to bring to your attention, my concern about the limited resources that are currently in place to meet ongoing FAS 133 production challenges, as well as to spearhead the re-engineering initiative.
>
> With one and a half business analysts currently assigned to FAS 133, monthly production operations is in crisis. This situation has been exasperated by the recent DNQ policy change. As a result of this change, there are additional data requirements for monthly processing, new reconciliations and validations, manual overrides and additional manual journal entries. Further, we continue to flush out additional issues associated with this recent policy change.
>
> Coupled with these production challenges, is the increasing demand on our limited resources to spearhead the FAS 133 re-engineering project. Currently, with total resources of one and a half business analysts and a part time contractor to undertake both production and the re-engineering project, we are at high risk for slippage on both fronts. In fact, both activities cannot be successfully performed with the present resources....[385]

### Conclusion

OFHEO believes that Fannie Mae failed to adequately exercise their duty to develop sound accounting policies at Fannie Mae. The Enterprise failed to develop an internal control system to ensure that accounting policy was sufficiently developed and reviewed. A combination of heavy workload, weak technical skills and a weak review environment contributed to the development of key person dependencies. Fannie Mae relies on just a few individuals to make key decisions, particularly those related to accounting policy development. A cornerstone of

---

[384] OFHEO Interview, Mary Lewers, July 13, 2003, pp.152-153.
[385] Memorandum attached to email from Cheryl DeFlorimonte to Leanne Spencer, Subject: FAS 133 Resources, dated February 2, 2004, DeFlorimonte 08112203

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

sound corporate oversight is the control structure itself.  The board of directors and management are responsible for promoting high ethical and integrity standards, and for establishing a culture within the organization that emphasizes and demonstrates to all level of personnel the importance of internal controls.

It is management's responsibility to ensure that Fannie Mae operates in a safe and sound manner and has proper segregation of duties, an adequate level of controls to support its key business processes, and clear and appropriate accounting policies.  In addition, it is management's responsibility to ensure that key control function personnel are competent and qualified to execute their daily responsibilities.[386]  OFHEO contends that the CFO, as the primary manager for key financial reporting and accounting areas, failed in providing adequate oversight to key control and reporting functions within the Enterprise.  In addition, he developed and rewarded[387] a staff that collectively does not possess the skills necessary to ensure that Fannie Mae has proper accounting policies, adequate resources to support proper implementation of such policies, and an effective system of internal controls.

---

[386] Both the Group of Thirty and the Basel Committee on Banking Supervision both emphasize it is management's responsibility to ensure that key control function personnel are competent and qualified to execute their daily responsibilities.
Group of Thirty Report, *Enhancing Public Confidence in Financial Reporting*, Washington DC 2003, p. 14.
Bank for International Settlements, Basel Committee on Banking Supervision, *Framework for the Evaluation of Internal Control Systems*, January 1998, p. 11.
[387] *Id.*, p. 12.  The Committee on Banking Supervision also states that, "In reinforcing ethical values, banking organizations should avoid policies and practices that may inadvertently provide incentives or temptations for inappropriate activities.  Examples of such policies and practices include undue emphasis on performance targets or other operational results, particularly short term ones; high performance-dependent compensation rewards; ineffective segregation of duties or other controls may offer temptations to misuse or conceal poor performance; and insignificant or overly onerous penalties for improper behaviors.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**APPENDIX I**

**Estimation Methods Used for Modeling the Catch-Up**

*A. Background*
In assessing the methods and discipline applied by Fannie Mae for determining prepayments used to calculate the catch-up, **OFHEO has concluded that Fannie Mae 1) designed and applied estimation methods, and 2) selected assumptions used in the calculation of the catch-up, for the improper purpose of managing its current and prospective financial results.  In addition, OFHEO has determined that Fannie Mae applied methodologies for determining prepayment assumptions that were alternatively different for the retrospective adjustment and prospective amortization required under SFAS 91.**

In order to calculate the quarterly adjustment necessary to recognize a constant effective yield required by SFAS 91, the Enterprise needed to calculate the estimated life of the mortgage loans and securities associated with the deferred price adjustments to be amortized.  The estimated life of such mortgage assets is a function of expectations regarding the likelihood of consumers to prepay their mortgages, which itself is a function of future interest rates.  If future interest rates decline, then consumers would likely be disposed to refinance mortgages they have previously financed at higher rates.  Alternatively, if future rates increase, there would be a reduced incentive to refinance since doing so would only result in the consumer obtaining a higher rate mortgage.

The propensity of consumers to refinance is intuitively understood by many.  However, the methods for forecasting future interest rates, and determining the impact of these forecasts on the rate at which consumers will prepay their mortgages, is better understood by finance professionals or economists with experience in such modeling.  While these professionals themselves may disagree on the specific assumptions and models that may be used to forecast prepayments, there are nevertheless methods, and an accepted discipline in applying those methods, that most such professionals would agree on.  **The methods used by Fannie Mae were less sophisticated than the Enterprise had the capability to support, and furthermore produced flawed results.**

The December 2000 policy codified the methodology by which each quarter's catch-up amount would be estimated;

> The catch-up position is calculated using the average of five interest rate scenarios – the base rate together with the four sensitivity runs that encompass a 95% confidence interval around that base rate (currently +/- 60 and 120 basis points[388]).[389]  The base rate will normally be consistent with the rate that is used

---

[388] Basis point (bps) is defined as one hundredth of a percentage point (0.01%).
[389] While the policy to this day specifies that the scenarios around the base rate will be +/- 60 and +/- 120, the interest rate scenarios applied around the base were changed to +/- 50 and +/- 100 immediately after the policy was adopted for the calculation of the Q1 2001 amortization estimate.  This range of scenarios was consistently applied for the period 2001 through to the current period in 2004.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

in our most current business plan.  However, if circumstances exist that cause us to use a different a different rate path we will document the rationale for the rate path used.  At all times the base rate and the standard sensitivities will encompass a 95% confidence interval around the rate that was used.

In providing commentary regarding the functionality of amortization modeling software the Enterprise was using, Ms Janet Pennewell also commented on management's views concerning the use of the multiple interest rate scenarios[390] (also referred to as "rate paths") described in the amortization policy:

> Q: [...] Ms. Pennewell, do you recall any discussion around the ability of BancWare to manipulate factors to produce an array of recognition streams?
> A: Yes.
> Q: And can you elaborate on that?
> A: Sure.  At this point your previous question, we talked about a group of us working on how to enhance our models and begin thinking about formalizing a policy for our premium and discount.  And again, our thinking really was that you have a current interest rate pattern today, and our recognition was that FAS 91 requires you to try to project what you think the average life of your mortgages is going to be.  Obviously, that first requires that you can project what interest rates are going to be, and then within that interest rate path know what prepayments are going to be so that you can get a correct effective life to calculate your constant effective yield.
>     And we recognized that we weren't very good at projecting where interest rates were going to be, and even if we could accurately project where interest rates were going to be, that we--that there was then a range of very reasonable prepayment assumptions that would fit with that interest rate projection.
>     And so we were in the process of saying, well, we don't want to run one scenario with one interest rate assumption and fool ourselves into thinking that that with precision is, is exactly what our catch-up position is.  And so we were beginning the process of figuring out how to put together a policy that would address a couple very key pieces of assumption risk, namely, our ability to forecast interest rates, and our ability to, within an interest rate path, to, with precision to project what prepayments were going to be, and to want to have a modeling tool that gave us the flexibility to potentially, say, use BancWare run 5, 10 different scenarios, maybe in different interest rate paths that might capture the kind of variation that you really would expect to happen in interest rates, and then average them together.
>     So BancWare, initially, is my recollection, was set up to say you kind of put in one path of interest rates, and then whatever catch-up number that produces, that you would—the assumption in BancWare was that you would record that to income.  Instead we thought what we needed was not just one path of interest rates, but again a range of paths of interest rates where we may want to average them together, recognizing the lack of precision that's inherent in projecting interest rates and prepayments.
>     And so then we needed a model that would then give us the flexibility to not just book our entries or produce our factors--because the BancWare and then later AIMS is a system that we used to calculate what--calculate factors that allow us to record the

---

[390] OFHEO Interview, Ms. Janet Pennewell, June 15, 2004, pp. 21-24

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

constant effective yield.  Those factors the actually get fed into another system which actually calculates the amount that would get booked through the general ledger.

Anyway, so, in order to produce a good set of factors we needed a model that didn't just, say, give me one interest rate path and produce one set of factors.  We needed the ability to, as I said, capture a range of assumptions and adjust the factors to reflect that range of assumptions.

## B. Development of Amortization Estimation Methods

The first written recommendation by the amortization policy analysis group concerning the modeling of interest rates and prepayments was contained within the September 23, 1999 memorandum[391] to Tim Howard from Janet Pennewell.  This memorandum noted that while amortization was estimated and recorded using a single flat rate path, the Enterprise used multiple rate paths (up 75 bps, up 150 bps, down 50 bps and down 100 bps) for the purposes of forecasting earnings.  The memorandum went on to state the recommendation that the multiple rate paths used for forecasting, also be used for the purposes of estimating and recording deferred price adjustment amortization.[392] This memorandum further recommended that the forecast be determined using "a probability weighted average of the base plus four standard scenarios."[393]

Another memorandum[394] to Tim Howard, dated December 16, 1999, recommended that the up and down scenarios be established by determining the respective +/- one standard deviation[395] (1 std.) and +/- two standard deviation (2 std.) rate paths.  The memorandum further recommended the specific statistical weighting to be assigned to each of the rate paths; weighting values of 30% for the base rate path, 20% for both the up and down 1 std. rate paths, and 15% for the up and down 2 std. rate paths.  Other analysis[396] also included within the memorandum suggested that the ranges used for the up and down 1 and 2 standard deviation rate paths be the up 75bp, down 50bp and up 150bp, down 100bp rate paths referenced in the September 23rd memorandum.

While finance professionals and economists may disagree on the specific probabilities associated with upward or downward movements in interest rates, they would most certainly agree that significant (2 standard deviation) upward or downward movements in interest rates are less likely to occur than more modest (1 standard deviation) upward or downward movements.  In addition, many finance professionals would also agree that a 1 or 2 standard deviation *upward* movement would be inherently larger than a 1 or 2 standard deviation

---

[391] Memorandum from Ms. Janet Pennewell to Mr. Tim Howard, dated September 23, 1999, Subject: Policy on Purchase Premium/Discount Management.  FMSE-SP 000106-000109

[392] As far as OFHEO can determine, the Enterprise did not use multiple rate paths to determine the estimate of deferred price adjustments amortization – or catch-up – until after it formally adopted its accounting policy for 'purchase premium and discount amortization' in December 2000

[393] Memorandum from Ms. Janet Pennewell to Mr. Tim Howard, dated September 23, 1999, Subject: Policy on Purchase Premium/Discount Management, FMSE-SP 000106-000109.

[394] Memorandum from Ms. Janet Pennewell and Mr. Jeff Juliane to Mr. Tim Howard dated December 16, 1999, Subject: Catch-up Policy.  FMSE 217559-217569.

[395] Standard deviation is a statistical measure of the historical volatility and generally a measure of the extent to which numbers are spread around their average.

[231] Memorandum from Ms. Janet Pennewell and Mr. Jeff Juliane to Mr. Tim Howard dated December 16, 1999, Subject: Catch-up Policy.  FMSE 217567.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

*downward* movement.  While this last point is debatable, it is clear that thus far in their thinking, Fannie Mae also agreed with this conclusion.

A memorandum[397] dated April 5, 2000 from Mr. Jeff Juliane to Ms. Leanne Spencer provided a first quarter updated 2000-plan analysis of the catch-up.  This analysis utilized probability weighted rate paths to project catch-up amounts for the years 2000 to 2003, using the five interest rate scenarios, but instead modified the up and down 1 and 2 standard deviation movements to be a consistent basis point magnitude of +/- 60bps and +/- 120 bps respectively representing a change from the Enterprise's earlier forecasting assumptions.

On May 8th 2000, another memorandum[398] from Mr. Jeff Juliane now recommended that a simple average -rather than a probability weighted mean- of the five rate paths be used. Analysis included with this memorandum provided equal weights to each of the rate scenarios. The effect of this change was to reduce slightly the estimate of positive (income) catch-up for each of the current and subsequent years.

Another memorandum dated June 21, 2000, from Mr. Jeff Juliane to Mr. Tim Howard describes the impact of an alternative estimation method known as mean reversion.  Mean reversion is a statistical term to describe, in this instance, a tendency that interest rates in the +/- 120bp 'shock' scenarios would trend back or revert to a "rolling five year average."  This assumption had an additional modest impact to reduce the estimate of positive (income) catch-up over the forecast horizon to December 2003.  In the memorandum, Mr. Juliane noted the following:

> It is worth noting that the mean catch-up difference between the Freddie[399] mean reversion technique and our standard sensitivity methodology is not that large, $61.1 million at December 2003.  This is due to the natural hedge that is occurring between our core book of business and the REMIC and GFEE books of business. [400]

Still another memorandum,[401] dated September 15, 2000, from Ms. Janet Pennewell to Mr. Tim Howard provided another analysis of estimated catch-up over a forecast horizon through to December 2003.  This analysis showed an even larger decrease in the estimate of positive (income) catch-up through to 2003, of approximately $261.4 million over the June 21, 2000 analysis.  This analysis differed from previous ones in that the use of short-term constant

---

[397] Memorandum from Mr. Jeff Juliane to Ms. Leanne Spencer, dated April 5, 2000,  Subject: Amortization Sensitivities,  FMSE-SP 000236 – 000238.

[398] Memorandum from Mr. Jeff Juliane to distribution, dated May 8, 2000, Subject: Amortization/Catch-up Management Process, FMSE 217527 to FMSE 217531. The distribution list includes Mr. Tom Lawler, Ms. Leanne Spencer, and Mr. Rene LeRouzes.

[399] This was referred to as the "Freddie Method" because the Enterprise had understood it to be the methodology employed by Freddie Mac.  OFHEO's procedures did not extend to determining if this method was ever employed by Freddie Mac

[400] Memorandum from Mr. Jeff Juliane to Mr. Tim Howard, dated June 21, 2000, Subject; Amortization Policy Runs, FMSE 217521 – FMSE 217526.

[401] Memorandum from Ms. Janet Pennewell to Mr. Tim Howard, dated September 15, 2000, Subject: Amortization Policy, FMSE-SP 000016 to FMSE-SP 000028. The distribution list includes Ms. Leanne Spencer, Mr. Jeff Juliane, and Mr. Tom Lawler.

173

prepayment rates (CPRs) was extended from 3 months to 24 months. This had the effect of reducing the estimate of positive catch-up (income).[402]

The table below shows the progressive change in forecasted catch-up under the different methods described in the previously noted memorandum:

| Date | 5-Apr-00 Analysis | 8-May-00 Analysis | 21-Jun-00 Analysis | 15-Sep-00 Analysis | Difference 4/5 to 9/15 |
|---|---|---|---|---|---|
| December-00 | $183.0 | $179.3 | $122.9 | $88.8 | ($94.2) |
| December-01 | $222.0 | $219.0 | $184.3 | $125.5 | ($96.5) |
| December-02 | $258.0 | $255.0 | $242.6 | $165.1 | ($92.9) |
| December-03 | $292.2 | $290.7 | $297.3 | $206.3 | ($85.9) |
| **Base rate path used** | 8.65% | 8.65% | 8.06% | 8.40% | |
| **Book used** | Jan-00 | Jan-00 | Apr-00 | May-00 | |
| Reference | FMSE-SP 000237 | FMSE 217529 | FMSE 217523 | FMSE-SP 000018 | |

OFHEO has concluded that the Enterprise sought to maintain a positive level of catch-up when the amortization policy was formulated in 2000. OFHEO also believes that the effort of continual iterative analysis, and subsequent choices in methodology made by Fannie Mae management, reflected a consciously determined objective to understate the amount of estimated catch-up itself to better facilitate 1) shifting income between reporting periods (from 2000 to 2001) or 2) converting earnings that would otherwise be subject to volatility to earnings that would be recognized in a more stable pattern. The contention that income was shifted from 2000 to 2001 will be demonstrated by other actions taken by management as described in Section D of the Report.

The methodological choice to migrate from a probabilistically determined mean catch-up to one determined by calculating a simple mean is not grounded in any sound statistical or finance theory. Moreover, calculating a simple mean did not reduce the effort or complexity of estimating the catch-up in any meaningful way. Furthermore, while modifying the up and down rate paths - so that they were equal in their basis point magnitude - is a defensible simplifying accounting convention; it is clear that the Enterprise had a previously established view on, as well as capability to support, what management previously regarded as better practice. Third, while mean reversion was not incorporated as a standard convention of the Enterprise's estimation methodology, management nevertheless adopted – as part of the December 2000 policy – the ability to use a different rate path. This flexibility extended to choosing not only the level of interest rates used in the base rate path, but also other assumptions regarding interest rate behavior. The manifestation of this flexibility included assumptions made by management – in the estimate of Q2 2003 deferred price amortization - regarding their expectation that interest rates would rise from historic lows back to higher levels. In this

---

[402] Untitled, undated document from Mr. Tim Howard to Ms. Janet Pennewell labeled "Notes for Janet" states "Lost $78 million in catch up due to methodology change (short term CPR's were changed from 3 months to 24 months) to slow down the recognition of discount into income in request to reducing the positive catch-up and transferring income into outer years." FMSE-SP 002590

174

instance, the employment of this discretionary assumption allowed management to increase income in a measured way.  The ability to exercise such judgment in determining rate paths was even better than mean reversion because it could be employed at the discretion of management.

## C. Use of Multiple Rate Paths

Beyond the specific assumptions used to develop the multiple rate paths, the use of multiple rate paths *itself* had two further significant effects on the estimate of deferred price amortization:

1. Fannie Mae was generally asymmetrically exposed to changes in interest rates insofar as the income statement impact of deferred price adjustment amortization was concerned.  Asymmetrical exposure means that the financial impact to the Enterprise of interest rate movements in one direction is greater than the impact of rate movements of similar magnitude in the other direction.  In 2000, and for most other subsequent periods, downward movements in interest rates affected the Enterprise's net income greater than upward movements of similar magnitude. This effect is illustrated by the following analysis of data taken from the sensitivity modeling results for the forecast of December 2000 catch-up included in the September 15, 2000 memorandum:

| Rate Path Scenario | Estimated Catch-up | Deviation From Base |
|---|---|---|
| Up 120 bps - 9.6% | $139.9 | $18.5 |
| Base - 8.40% | $121.4 | - |
| Down 120 bps - 7.2% | ($2.5) | ($123.9) |

Source:  Memorandum from Ms. Janet Pennewell to
Mr. Tim Howard, dtd 9/15/200,  FMSE-SP 000018.

As can be seen from the above analysis, the income statement impact of $123.9 million in expense of the down 120bps scenario is much more dramatic than the $18.5 million income statement impact to income of the up 120bps scenario.  This asymmetrical effect of interest rate moves on deferred price adjustment amortization was consistent with the Enterprise's typical portfolio profile. This effect and profile was well understood by management.[403]

---

[403] An undated memorandum titled "Suggested Amortization Strategy" states the following: "On the second issue, I would recommend that the desired level of the catchup at any given time be equal to the average of the "up 120bp" catchup estimate, the "down 120 bp" catchup estimate, and the "base" catchup estimate, assuming the base catchup estimate were zero. Given the asymmetric nature of our catchup – the catchup usually becomes more negative when rates go down that [sic than] it becomes positive when rates go up, following the asymmetric response of prepayments to changes in interest rates – this recommendation would imply that our target catchup level will usually be somewhat positive." The memorandum also contains handwritten notes indicating "from Tom April 00," which was confirmed by testimony provided by Mr. Tim Howard to be referring to Mr. Tom Lawler.  FMSE 217556-217557

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

The consequence of using multiple rate paths to determine an estimate of average catch-up was that the estimated amount of catch-up would be lower (during this time period) than if just the base rate path was used. The analysis below, using Fannie Mae sensitivity modeling for the forecast of December 2000 catch-up included in the various memoranda referenced previously, illustrates this effect further.

| Rate Path Scenario | 5-Apr-00 Analysis | 8-May-00 Analysis | 21-Sep-00 Analysis |
|---|---|---|---|
| Base Path - Est. Catch-up | $160.1 | $160.1 | $96.2 |
| Mean - Est. Catch-up | $146.1 | $142.3 | $70.1 |
| Difference | ($14.0) | ($17.8) | ($26.1) |
| Method Applied | Weighted Avg. | Simple Avg. | Simple Avg. |
| Reference: | FMSE-SP 000237 | FMSE-217529 | FMSE-SP 000018 |

In her testimony cited previously, Ms. Pennewell explained the rationale for using multiple rate paths:

> Anyway, so, in order to produce a good set of factors we needed a model that didn't just, say, give me one interest rate path and produce one set of factors. We needed the ability to, as I said, capture a range of assumptions and adjust the factors to reflect that range of assumptions.[404]

In fact, however, Fannie Mae *did not* use the multiple rate paths to establish the prospective estimated life over which deferred price adjustments would be amortized. Mr. Jeff Juliane confirmed this in his testimony:

> Q:  Would the – I think – you testified earlier the base scenario would be the one that would be used for the factor change that would occur the month after the quarter end?  Is that correct?
> A:  That's correct. [405]

In later testimony during that same interview:

---

[404] OFHEO Interview, Ms. Janet Pennewell, June 15, 2004, p. 24
[405] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, pp. 141-142
Q: I think you justified [sic. testified] earlier that the base-rate scenario would be the one that would be used for the factor change that would occur the month after the quarter end; is that correct?
A: That is correct.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Q: So the question I have is what impact would the multiple scenarios have on the factors used to amortize premium and discount balances going forward?
A: Can I ask you back what I think you're asking?
Q: Uh-huh.
A: Are you asking, to the extent what are the nonbase runs, how do those nonbase runs impact the factors?
Q: Going forward, yes.
A: Currently, they don't.
Q: So, if the multiple scenarios are based upon the uncertainty of future interest rates, but they really don't affect the amortization in the future, then what is the multiple scenarios used for?
A: Let me step back. They impact the prospective recognition of amortization to the extent that the five runs lead us to be outside of compliance with policy and take an on-top. We also have identified this as a requirement in our current rebuild of the AIMS system, so we are now – I don't know if you guys have heard this yet, we are getting re-engineered right now, and we're going to have a system called MARS, Modeling And Reporting System. And when we do rate changes, it's going to be based upon all five scenarios.
It was an operational implementation thing that we couldn't do it when we went with AIMS. It was something that we discussed, but we couldn't operationally implement it when AIMS went live.[406]

The multiple rate scenarios of future interest rates, therefore, only impacted the retrospective (historical) element of the amounts required to be recognized by SFAS 91. Effectively, Fannie Mae was applying different estimated lives in the calculation of deferred price adjustment amortization.  One set of estimated lives – based upon a methodology that resulted in lower estimates of catch-up than the base rate path would have suggested – for the determination of the current quarter's retrospective adjustment, and another set of estimated lives – based solely upon the base rate path – for the determination of the rate of prospective amortization.

2.  The use of the multiple rate paths also had the effect of _reducing_ the volatility of the retrospective adjustment required under SFAS No. 91.  This effect is demonstrated in the graphs provided in the section titled "Historical Analysis of Accounting for Deferred Price Amortization." The reason for this is that the change in quarterly catch-up, from period to period, is going to be greater if that change is based upon fluctuations in one rate path, versus the fluctuation in multiple rate paths that are averaged together. When five rate paths are averaged, the resultant impact from change to one rate path is likely to be partially offset from the resultant impact of change to a different rate path. In that regard, deferred price adjustment amortization - using a multiple rate path estimation method – is going to be less affected by fluctuations in rates, than it will be by sustained upward or downward trends in rates.

The behavior of results produced by the Enterprise's method for estimating deferred price adjustment amortization was also understood by management.  Mr. Tim Howard commented on this:[407]

---

[406] OFHEO Interview, Mr. Jeff Juliane, August 31, 2004, pp. 144-145.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Q:  Do you have a sense for how frequently the modeled estimate would exceed a plus or minus 1-percent threshold?
A:  The modeled estimate? The calculated catch-up amount?
Q:  Yes.
A:  No, I don't. It will do that when interest rates are trending more often than when they're simply volatile at random-

**OFHEO has concluded that the use of multiple rate paths facilitated the shifting of income from 2000 to 2001 and also served to reduce the volatility of the current quarter's retrospective adjustment of deferred price adjustment amortization for all reporting periods.**

*D. The Application of Estimation Methods in 1999 and 2000*
**OFHEO's conclusion that Fannie Mae management purposefully selected methods to understate the estimate of catch-up for prospective periods is corroborated by the Enterprise's actions in applying estimation methods during the time frame coincident with the development of those methods.**

Except where specifically noted otherwise, the following information[408] was provided to OFHEO by Fannie Mae.  In addition, certain information has been specifically highlighted (circled) and referenced.

---

[407] OFHEO Interview, Mr. Tim Howard, August 5, 2004, pp. 158-159.
[408] Document titled "Fannie Mae PDA Catch-Up." Typed notation indicates "Forwarded to Peat on 10/06/00."  Handwritten notation indicates "to KPMG 10/6/00."  FMSE-SP 002434

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

| Period | PDAMS | REMICS | Unapplied On-Tops | Corporate Total | Fannie Mae Current Coupon[1] | 30 Yr Fixed Rate Mortgage | FRM CPR Based on | Basis Point Difference[2] |
|---|---|---|---|---|---|---|---|---|
| Dec-98 | (178.2) | (298.0) | 276.5 | (199.7) | | | | |
| Jan-99 | (76.7) | (74.5) | 17.9 | (133.3) | 6.28 | 6.79 | 6.75 | 0.04 |
| Feb-99 | (95.1) | (73.0) | 34.8 | (133.3) | 6.69 | 6.81 | 6.75 | 0.06 |
| Mar-99 | (66.7) | (78.7) | 32.5 | (112.9) | 6.64 | 7.04 | 7.00 | 0.04 |
| Apr-99 | (69.0) | (81.3) | 46.6 | (103.7) | 6.66 | 6.92 | 7.00 | (0.08) |
| May-99 | (73.9) | (81.3) | 60.5 | (94.7) | 6.99 | 7.15 | 7.00 | 0.15 |
| Jun-99 | (53.7) | (144.6) a | 66.7 | (131.6) | 7.21 | 7.55 | 7.25 | 0.30 |
| Jul-99 | (55.7) | (142.5) | 75.9 | (122.3) | 7.52 | 7.63 | 7.25 | 0.38 |
| Aug-99 | (56.3) | (121.6) | 82.9 | (95.0) | 7.69 | 7.88 | 7.25 b | 0.63 |
| Sep-99 | 2.5 | (68.5) | 88.9 | 22.9 | 7.45 | 7.90 | 7.90 | 0.00 |
| Oct-99 | 2.6 | (66.2) | 99.8 | 36.2 | 7.46 | 7.85 | 7.90 | (0.05) |
| Nov-99 | 4.4 | (66.2) | 121.9 | 60.1 | 7.60 | 7.74 | 7.90 | (0.16) |
| Dec-99 | 6.7 | (59.0) | 136.3 | 84.0 | 7.80 | 7.91 | 7.90 | 0.01 |
| | | | | | | | | 0.00 |
| Jan-00 | (14.6) | (48.0) | 127.6 | 65.0 | 8.10 | 8.21 | 8.05 | 0.16 |
| Feb-00 | (20.4) | (48.0) | 127.6 | 59.2 | 8.01 | 8.33 | 8.05 | 0.28 |
| Mar-00 | (20.0) | 23.6 c | 127.6 | 131.2 | 7.96 | 8.24 | 8.05 | 0.19 |
| Apr-00 | (44.9) | 60.7 | 119.7 | 135.5 | 8.08 | 8.15 | 9.00 d | (0.85) |
| May-00 | (46.0) | 64.8 | 111.9 | 130.7 | 8.24 | 8.45 | 9.00 e | (0.55) |
| Jun-00 | (59.2) | 48.0 | 104.1 | 92.9 | 7.92 | 8.52 | 8.40 f | 0.12 |
| Jul-00[3] | (56.5) | 57.0 | 96.3 | 96.8 | 7.94 | 8.29 | 8.40 | (0.11) |

1 *source: www.ubs.com*
2 *Computed by determining the difference between the rate provided in the column labeled '30 Yr Fixed Rate Mortgage'*
   *and the rate provided in the column labeled 'FRM CPR Based on'*
3 *Fannie Mae did not provide OFHEO with a similar analysis for periods subsequent to July 2000.*

The above information provides the actual catch-up calculated historically by Fannie Mae and the related underlying interest rate assumptions. As can be seen, the relationship between 1) the interest rate upon which prepayment rates ("CPR"[409]) were based, and 2) the rate identified by the Enterprise as the 30 year fixed rate mortgage ("FRM"), is tenuous.  The basis point difference between these two rates varies and, furthermore, the basis point difference is also sometimes negative and sometimes positive.  In addition, it is clear that the CPR rate used for forecasting is held steadier by management than the FRM rate would otherwise suggest. Lastly, the Fannie Mae Current Coupon Rate[410] is also provided for comparison purposes as well. Changes in the Fannie Mae Current Coupon Rate correlate more closely to the FRM rate, than the FRM rate correlate to the CPR rate.  At a minimum, Fannie Mae's selection of interest rate assumptions does not seem to have been determined in a systematical and objective method.

The following is an analysis of certain specific actions that Fannie Mae management took with regard to setting the CPR rate.  It should be understood, however, that OFHEO is conducting further review of the catch-up estimation rate setting process for periods both before and after 1999 and 2000.

---

[409] CPR stands for Constant Prepayment Rate.
[410] The pass-through coupon in the mortgage-backed securities (MBS) market trading at or nearest to - but not exceeding - par.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

***June '99 (Note a):*** In June of 1999, the Enterprise had increased the percent of the REMIC book which could be modeled to support the calculation of the constant effective yield required under SFAS No. 91.  However, the modeling of a greater portion of the REMIC book had had an adverse impact on the catch-up.  According to a memorandum[411] dated July 15, 1999, the incremental impact on the catch-up of the additional REMIC's was approximately $72.5 million additional expense.  When all other factors are considered, including a rate change from 7.00% to 7.25%, the negative catch-up associated with the REMIC book increased by $63.3 million.  This brought the estimate of the total negative catch-up back over $100 million to negative $131.6 million.

***September '99 (Note b):*** Three months later, the Enterprise's catch-up had swung from the negative $131.6 million to a positive catch-up of $22.9 million – a large swing of $154.5 million of unrecognized positive income.  $21 million[412] of this swing can be accounted for by the modeling of additional REMICS.  The remainder of the increase is due to the 'in-use'[413] rate change from 7.25% to 7.90%.

As previously noted, it is difficult to draw precise conclusions from the relationship between 30 year fixed mortgage rate and the 'in use' rate used to estimate prepayments.  On the one hand, the change between the August versus the September 30 year mortgage rate was only 2 basis points.  On the other hand, the 30 year fixed mortgage rate had in fact risen 86 basis points since March 1999, when the 'in use rate' was at 7.00%. However, a memorandum[414] from Mr. Jeff Juliane, dated one month before the September 2000 catch-up estimate was prepared, provides his perspective on the rate change:

> In the upcoming month, we will be initiating a rate change from our current 7.25% level to our Q3 Forecasted Rate Path of 7.90%.  We would expect the quarterly change and subsequent slowdown in prepayment speeds to allow for further earnings flexibility and a subsequent improvement in the near term.

***March '00 (Note c):*** The estimated catch-up for March '00 was determined in April '00.  A memorandum[415] from Mr. Jeff Juliane to Ms. Leanne Spencer, dated April 5, 2000, states that:

> "The Q1 sensitivities include the impact of process enhancements for REMICs, which now support the modeling of approximately 93% of the underlying book.  This added approximately $63.5 million additional catch-up income, and an average catch-up improvement of $30.1 million throughout the forecast horizon."

---

[411] Memorandum from Mr. Jeff Juliane/ Rene LeRouzes to distribution, dated July 15, 1999, Subject: PDAMS/REMIC Results (May Book). Distribution included Ms. Janet Pennewell. FMSE-SP 003089 – FMSE-SP 003092

[412] Memorandum from Jeff Juliane/Rene LeRouzes to distribution, dated October 15, 1999, Subject: PDAMS/REMIC Results (August Book), distribution included Ms. Janet Pennewell.  FMSE-SP 000328

[413] 'In-use rate' is a Fannie Mae term that refers to the rate being used to estimate prepayments.

[414] Document titled 'Fannie Mae PDA Catch-up'. Typed notation indicates forwarded to Peat on 10/06/00. Handwritten notation indicates "to KPMG 10/6/00."  FMSE-SP 002434

[415] Memorandum from Jeff Juliane/Rene LeRouzes to distribution, dated October 15, 1999, Subject: PDAMS/REMIC Results (August Book), distribution included Ms. Janet Pennewell, FMSE-SP 000327-000330

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

The modeling of the additional REMICS also had the effect of increasing the March 2000 catch-up to a positive (income) $131.2 million – above the informal pre-policy catch-up threshold.[416] The impact on estimated catch-up for prospective years is demonstrated on two schedules of sensitivity analysis that were attached to the April 5, 2000 memorandum.[417]  The first schedule shows the Year 2000 sensitivity analysis using the January book with 93% REMICS modeled, while the second schedule shows the Year 2000 sensitivity analysis using the previous October book with 76% REMICS modeled.  A comparison between these two schedules shows the average catch-up improvement $30.1 million throughout the forecast horizon associated with the increased REMIC modeling, as well as an additional increase in catch-up due to the increasing rate environment:

| Date | 5-Apr-00 76% Remics | 5-Apr-00 93% Remics | Difference |
|------|------|------|------|
| Dec-00 | $115.5 | $183.0 | $67.5 |
| Dec-01 | $168.2 | $222.0 | $53.8 |
| Dec-02 | $215.8 | $258.0 | $42.2 |
| Dec-03 | $261.2 | $292.2 | $31.0 |
| **Base rate path used** | 8.05% | 8.65% | |
| **Book used** | Oct-00 | Jan-00 | |
| Reference | FMSE-SP 000237 | FMSE-SP 000238 | |

Recall that at the end of 1998 Fannie Mae was confronted with the challenge of a larger than anticipated estimated current loss, of which approximately $200 million was deferred to subsequent periods.  The situation now presenting itself to the Enterprise was the circumstance of a large unrecognized current period income, along with the expectation of greater forecasted unrecognized income (positive catch-up) over its planning horizon.

Coincidentally, the analysis in the April 5th memorandum[418] was also the analysis whereby Fannie Mae changed its proposed catch-up estimation method to utilize up and down rate paths of similar magnitude.  Had this change in estimation method not been made, the forecast of future positive catch-up would have been even greater.

---

[416] OFHEO Interview, Ms. Leanne Spencer, June 22, 2004, p. 61
Q: You said before there was roughly a hundred million dollar threshold.
A: I said that previously in when we were talking about inherent limitations of the model, what the model could do and couldn't do, that our auditors understood those limitations, and that it was an unwritten policy that was not documented, but it was an established practice we had in operating on our auditors that a plus or minus 100 million represented the acknowledgement of the imprecision that exists in this estimation process in connection with our model.
[417] *Id.,* memorandum from Mr. Jeff Juliane to Ms. Leanne Spencer, dated April 5, 2000, Subject: Amortization Sensitivities.  FMSE-SP 000236–000238.
[418] *Id.,* FMSE-SP 000237.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

***April '00 (Note d):*** The estimated catch-up for April '00 was determined in May '00.   A memorandum[419] from Jeff Juliane, dated May 23, 2000, notes that "Management has determined to implement a rate change with the April Book."  If the challenge however was large unrecognized income and large estimates of forecasted catch-up raising the 'in use' rate would seem to make these challenges larger.  One factor, that offset the effect of increase in the base rate, was a change in the book.  This offsetting impact as well as the change to the book was highlighted in an undated document titled 'Notes for Janet – Explanation of results' in a section of the document referencing a rate change from 8.05% to 9.0%, it states:

> Picked up $75 million in catch-up due to rate change and lost $30 million in catch-up due to change in book (recognizing too much discount into income).  The amount of discount added from October of 1999 through April of 2000 was $1.4 billion dollars.[420]

Further mitigating the impact – on both current period as well as forecasted prospective catch-up - of the decision to increase the 'in use' rate, was another decision, also reflected in the May 23rd memorandum, to recognize $54.3 million of income.  This had the effect of reducing both the current period catch-up as well as the forecasted catch-up.

Lastly, also coincident with the decision to raise rates, was the further decision – reflected in the May 8th memorandum[421] - to use an un-weighted simple average rather than a probabilistically weighted mean of the multiple rate paths.

***May '00 (Note e):*** The estimated catch-up for May '00 was determined in June '00. A memorandum[422] dated June 16th from Rene LeRouzes highlights managements decision to recognize still more income.  The memorandum states: "the Q2 sensitivities include $15.7 million of applied on-tops (GFEE: $3.7 million, NII: $12.0 million) booked as of May." Accordingly, another memorandum,[423] dated June 26th provides a catch-up summary analysis showing the reduction of $70 million ($54.3 million from ***note d***, plus $15.7 million as indicated in this note) from both the current period as well as the forecasted catch-up. However, the catch-up May '00 remains at $130.7 million, well in excess of the $100 million mark.

***June '00 (Note f):*** The estimated catch-up for June '00 was determined in July '00.  The challenge of too high a level of forecasted catch-up in subsequent years continued to be

---

[419] Memorandum from Mr. Jeff Juliane/ Mr. Rene LeRouzes to distribution, dated May 23, 2000, Subject: PDAMS/REMIC Results (March Book), FMSE-SP 000299 to FMSE-SP 000302.  Distribution includes Ms. Janet Pennewell.
[420] Undated document titled: Notes for Janet – Explanation of results.  This document was provided to OFHEO by Ms. Janet Pennewell, pursuant to OFHEO's subpoena for information issued to her.  The full reference indicated reads: 'Picked up $75 million in catch-up due to rate change and lost $30 million in catch-up due to change in book (recognizing too much discount into income).  The amount of discount added from October of 1999 through April of 2000 was $1.4 billion dollars.' FMSE-SP 002590
[421] Memorandum from Mr. Jeff Julianne to distribution, dated May 8, 2000, Subject: Amortization/Catch-up Management Process, FMSE 217527 to FMSE 217531.  Distribution includes Mr. Tom Lawler, Ms. Leanne Spencer, and Mr. Rene LeRouzes.
[422] Memorandum from Rene LeRouzes to distribution, dated June 16, 2000, Subject; Q2-2000 Catch-up Sensitivities. Distribution included Mr. Tim Howard, Mr. Tom Lawler, Ms. Leanne Spencer and Ms. Janet Pennewell.  FMSE-SP 002608-002609.
[423] Memorandum from Mr. Jeff Juliane/Mr. Rene LeRouzes to distribution, dated June 26, 2000, Subject; PDA/REMIC Results (April Book).  Distribution includes Ms. Janet Pennewell. FMSE-SP 002611-002612.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

addressed in earnest.  Analysis prepared on July 10th contrasts one scenario with a 9.00% 'in use' base rate path, and a flat rate curve,[424] with another scenario that used a 8.40% 'in use' base rate path, and a curve that used lower short-term interest rates for the first 24 months of the rate curve.  The difference between these two methodologies was significant:

| Date | Q2 2000 Version 1 | Q2 2000 Version 2 | Difference |
|------|-------------------|-------------------|------------|
| Dec-00 | $155.2 | $88.8 | ($66.40) |
| Dec-01 | $198.8 | $125.8 | ($73.00) |
| Dec-02 | $238.1 | $165.1 | ($73.00) |
| Dec-03 | $275.1 | $206.3 | ($68.80) |
| **Method** | Mtg rate flat | 24 mos. Sht term rates | |
| **Base rate path used** | 9.00% | 8.40% | |
| **Book used** | April '00 Book | May '00 Book | |
| *Reference* | FMSE-SP 002822 | FMSE-SP 002591 | |

The estimation method using short-term rates for the first 24 months of the rate curve had the effect of reducing the estimate of unrecognized income for all prospective periods. This estimation method was also the method formally recommended by the working group to Tim Howard in the memorandum[425] dated September 15, 2000.  Furthermore, Fannie Mae in fact also changed the 'in use' base rate path for the estimation of the June '00 catch-up from 9.00% to 8.40%.  In addition to lowering the forecast of catch-up for prospective years, the change also addressed the other challenge of high (above 100 million) current period catch-up. Accordingly, the quarterly catch-up decreased approximately $38 million to $92.9 million.

Although it is somewhat difficult to evaluate, the decision to lower the base rate path by 60 basis points to 8.40%, seems to be too large a decrease to be explained by the interest rate environment alone.  Fannie Mae's own analysis of catch-up and 'in use' rates used to determine prepayments, shows that  30 year fixed mortgage rates in fact *rose* to 8.52% from 8.45%. Alternatively, OFHEO's analysis of interest rates shows that rates did indeed decline, but not by enough to justify the full amount of the decrease.  OFHEO's analysis shows that the 10 year treasury and Fannie Mae Current Coupon declined by only 32bps and 34bps respectively.

Perhaps the rationale for both the change in estimation method as well as the decline in the 'in use' base rate path is also provided by the undated document[426] titled 'Notes for Janet – Explanation of results.'  In a different section of the document referencing a rate change from 9.0% to 8.4% it states:

---

[424] Fannie Mae's catch-up estimation method heretofore utilized a flat rate curve.
[425] Memorandum from Ms. Janet Pennewell to Mr. Tim Howard, dated September 15, 2000, Subject: Amortization Policy, FMSE-SP 000016-000028.  Distribution includes Ms. Leanne Spencer, Mr. Jeff Juliane, and Mr. Tom Lawler.
[426] Undated document titled: Notes for Janet – Explanation of results.  FMSE-SP 002590

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Lost $20 million in catch-up due to rate change and picked up $30 million in catch-up due to change in book (recognizing to little discount into income).  Lost $78 million in catch up due to methodology change (short term CPR's were changed from 3-months to 24-month) to slow down the recognition of discount into income in request to reducing the positive catch-up and transferring income into the outer years.

## E. Conclusion

**Fannie Mae's formulation, selection and application of estimation methods seems to have been made for the purposes of achieving desired results rather than for achieving good faith estimates of the highest quality.  Furthermore, the estimation methods were not consistently applied to both the retrospective adjustment, and prospective amortization required by SFAS 91.  Lastly, the selection of market rate assumptions was not made in an objective and consistent manner.  Instead, priority was given to the financial statement impact of these assumptions.**

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

## APPENDIX II

### Summary of SFAS 133, Accounting for Derivatives and Hedging Activities

The hedge accounting framework in SFAS 133 results in a matching of the earnings effect of the change in fair value (or cash flows) of the derivative and that of the hedged item, by offsetting them against one another in the same accounting period.  As hedge accounting is elective, companies are able to designate a derivative as a hedging instrument at any time and apply hedge accounting prospectively as long as the related criteria are satisfied. Qualifying for hedge accounting is important to many entities because of this matching effect that it provides in the income statement.

Under SFAS 133, hedges can be classified as fair value hedges or cash flow hedges.  The objective of a fair value hedge is to use a derivative to mitigate the variability in the fair value of the hedged item.  In a fair value hedge, both the changes in the fair value of the hedging derivative and the changes in the fair value of the hedged item (usually an asset or a liability) attributable to changes in the risk being hedged are recorded in earnings.[427]  Effectiveness for a fair value hedge is determined as the extent to which the changes in the fair value of the hedging instrument offset the changes in the fair value of the hedged item attributable to the risk being hedged.  The net difference represents the hedge ineffectiveness.  The objective of a cash flow hedge is to mitigate the variability of cash flows relating to a hedged item (usually a forecasted transaction) using a derivative.  In a cash flow hedge, changes in the fair value of the hedging instrument are recorded in AOCI for the effective portion of the hedge, while the ineffective portion is recorded immediately in earnings.  Amounts accumulated in AOCI are reclassified from AOCI to earnings in the period in which the hedged item affects earnings.[428]

Hedge accounting is permitted only if the derivative is highly effective in hedging the identified hedged risk associated with the hedged transaction at inception and throughout the term of the hedging relationship.[429]  That is, in order to qualify for hedge accounting, the changes in the fair value or cash flows of a hedged item attributable to the risk being hedged must be expected to be largely offset by the related changes in the fair value of the hedging instrument. This expectation must be updated at least quarterly.[430]  Additionally, a hedger is required to support its expectation by either qualitative or analytical means referred to as an effectiveness "assessment."  SFAS 133 provides the hedger flexibility in identifying the methodologies used in assessing the effectiveness of these hedges; however, the methodologies selected must be reasonable and applied consistently to all similar hedges.  Such methodologies must also be specified in documentation prepared at the inception of the hedge and may not be changed retroactively.

SFAS 133 recognizes that a certain level of hedge inefficiency exists in almost every hedging relationship, even those that are deemed to be highly effective.  That inefficiency, referred to as hedge ineffectiveness, may result because of differences in tenors, indices, repricing dates,

---

[427] FASB, SFAS 133, paragraph 22.
[428] FASB, SFAS 133, paragraph 31.
[429] FASB, SFAS 133, paragraphs 20 (b) and 28 (b) for fair value and cash flow hedges.
[430] FASB, SFAS 133, paragraphs 20 (b) and 28 (b) for fair value and cash flow hedges.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

credit worthiness, liquidity, etc. between the hedging derivative and the hedged item. *To the extent hedge ineffectiveness exists, it must be measured and recorded in earnings immediately*. Thus, at least on a quarterly basis, an entity is required to measure the ineffectiveness in the hedge and report it immediately in the financial statements. SFAS 133 prescribes the methodologies that should be used to measure the ineffectiveness in hedging relationships, and such methodologies may differ from those used to assess the effectiveness of that relationship. Accounting prior to the effective date of SFAS 133 ignored hedge ineffectiveness.

In addition to the assessment test, documentation of the hedging relationship is critical to qualify for hedge accounting. As part of the hedge designation, the hedger must identify, at a minimum, the following information:[431]

- The nature of the risk being hedged and a description of the hedging instrument and the hedged item
- A description of how the hedging instrument's effectiveness in offsetting the change in fair value or cash flows will be assessed and measured
- A description of how the designated hedging relationship is consistent with the established risk management practices.

SFAS 133 requires that this information be documented concurrently with the designation of the hedge to avoid accounting abuses. Once the designation and documentation is complete for an individual hedging relationship, hedge accounting will be afforded prospectively for that specific relationship. There can be no retroactive designation of any hedging relationships.

---

[431] FASB, SFAS 133, paragraphs 20 (a) and 28 (a) for fair value and cash flow hedges, respectively.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**APPENDIX III**

*Example of a Term-out Transaction*

**Description of Transaction:**

• On 7/2/1997, Fannie Mae issues $500M in DNs and enters into Swap #1.  Swap #1 is a pay-fixed, receive-floating swap with a term of 7 years, the period of expected reissuance of DNs. For purposes of this example it is assumed that the swap's interest rate reset dates match the expected timing of DN reissuance and all other critical terms are matched in order to allow Fannie Mae to assume perfect effectiveness under SFAS 133.
• On 7/2/1999, Fannie Mae issues $500M 6.175% 3-yr MTN rather than reissuing $500M in DNs. At that time Fannie Mae also enters into swap #2.  Swap #2 is a receive-fixed, pay-floating swap that matures in 3 years. Swap #2 is structured such that its cash flows offset those of swap #1 for the three year term of swap #2, with the exception of a differential between the fixed rates of the two swaps, which remains constant during that period.
• Upon the maturity of the MTN, Fannie Mae expects to resume issuing $500M in DNs through the remainder of the original 7 year period.
• As of 7/2/1999, the re-designated swap #1 together with swap #2 is hedging DNs to be issued over a "forward starting" two year period that begins 7/2/2002.

**Hypothetical Derivative**

• Since the hedged transactions represent discount notes to be issued in a "forward starting" period, as noted above, OFHEO believes a hypothetical forward starting pay-fixed swap should be used for purposes of measuring hedge ineffectiveness based on the guidance provided in DIG Issue G7 and for assessing effectiveness using the dollar offset method.
• The forward starting swap ("hypothetical derivative") is assumed to be on market terms (such that the fair value is zero) as of 7/2/99 (the inception of the new hedging relationship), with a forward starting date of 7/2/02, and maturity date of 7/2/04, consistent with the period in which future interest payments are hedged.
• In order to measure and assess effectiveness, changes in the fair values of the hedging instruments (swap#1 and #2 combined) are compared to changes in the fair value of the hypothetical derivative.
• The terms of the two swaps and the hypothetical derivative are summarized as follows:

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

| Swap #1 | | Swap #2 | | Hypothetical Swap #3 | |
|---|---|---|---|---|---|
| Notional | 500,000,000 | Notional | 500,000,000 | Notional | 500,000,000 |
| Pay | 6.7850% | Receive | 6.1750% | Pay | 6.6999% |
| Receive | LIBOR | Pay | LIBOR | Receive | LIBOR |
| Trade Date | 6/30/1997 | Trade Date | 6/30/1999 | Trade Date | 6/30/1999 |
| Effective | 07/02/1997 | Effective | 07/02/1999 | Effective | 07/02/2002 |
| Maturity | 07/02/2004 | Maturity | 07/02/2002 | Maturity | 07/02/2004 |
| FixPayFreq | Semi-annual | FixPayFreq | Semi-annual | FixPayFreq | Semi-annual |
| FltPayFreq | Quarterly | FltPayFreq | Quarterly | FltPayFreq | Quarterly |

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Analysis:** See Next Page for Explanatory Notes.

| # | Date | A Swap#1 CLEAN | B Swap#2 CLEAN | C A + B | D Hypothetical Swap#3 CLEAN | E Period Change in C | F Period Change in D | G E - F | H E/F (period dollar offset) | I Cumulative Change in Hedge (1&2) | J Cumulative Change in Hypothetical Swap#3 | K I/J (cum. dollar offset) | L Cumulative OCI | M Cumulative Ineffect-ivenss (P&L) | N Period OCI Entry | O Period P&L Ineffect-iveness Entry | P Prior Hedge OCI Amortization | Q Net P&L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| - | 06/30/1997 | 0 | | | | | | | | | | | | | | | | |
| 1 | 09/30/1997 | (9,521,840) | | | | | | | | | | | | | | | | |
| 2 | 12/31/1997 | (16,632,572) | | | | | | | | | | | | | | | | |
| 3 | 03/31/1998 | (18,385,686) | | | | | | | | | | | | | | | | |
| 4 | 06/30/1998 | (21,234,550) | | | | | | | | | | | | | | | | |
| 5 | 09/30/1998 | (43,037,438) | | | | | | | | | | | | | | | | |
| 6 | 12/31/1998 | (34,911,044) | | | | | | | | | | | | | | | | |
| 7 | 03/31/1999 | (23,050,566) | | | | | | | | | | | | | | | | |
| 8 | 06/30/1999 | (8,953,548) | | (8,953,548) | | | | | | | | | | | | | | |
| 9 | 09/30/1999 | (5,110,527) | (1,748,228) | (6,858,755) | 1,411,246 | 2,094,793 | 1,411,246 | 683,547 | 148.4% | 2,094,793 | 1,411,246 | 148.4% | 1,411,246 | 683,547 | 1,411,246 | 683,547 | (447,677) | 235,870 |
| 10 | 12/31/1999 | 3,327,731 | (7,518,361) | (4,190,629) | 3,388,930 | 2,668,126 | 1,977,684 | 690,442 | 134.9% | 4,762,918 | 3,388,930 | 140.5% | 3,388,930 | 1,373,989 | 1,977,684 | 690,442 | (447,677) | 242,764 |
| 11 | 03/31/2000 | 8,685,601 | (10,273,290) | (1,587,689) | 5,320,495 | 2,602,940 | 1,931,565 | 671,375 | 134.8% | 7,365,859 | 5,320,495 | 138.4% | 5,320,495 | 2,045,364 | 1,931,565 | 671,375 | (447,677) | 223,698 |
| 12 | 06/30/2000 | 7,178,852 | (9,422,879) | (2,244,028) | 4,036,143 | (656,339) | (1,284,351) | 628,012 | 51.1% | 6,709,520 | 4,036,143 | 166.2% | 4,036,143 | 2,673,377 | (1,284,351) | 628,012 | (447,677) | 180,335 |
| 13 | 09/29/2000 | (1,055,865) | (4,554,754) | (5,610,619) | 58,410 | (3,366,591) | (3,977,733) | 611,143 | 84.6% | 3,342,929 | 58,410 | 5723.2% | 58,410 | 3,284,519 | (3,977,733) | 611,143 | (447,677) | 163,465 |
| 14 | 12/29/2000 | (13,446,023) | 1,971,108 | (11,474,914) | (6,413,309) | (5,864,296) | (6,471,779) | 607,423 | 90.6% | (2,521,367) | (6,413,309) | 39.3% | (2,521,367) | - | (2,579,777) | (3,284,519) | (447,677) | (3,732,196) |
| 15 | 03/30/2001 | (24,658,180) | 8,770,759 | (15,887,421) | (11,464,170) | (4,412,507) | (5,050,861) | 638,354 | 87.4% | (6,933,873) | (11,464,170) | 60.5% | (6,933,873) | - | (4,412,507) | - | (447,677) | (447,677) |
| 16 | 06/29/2001 | (20,589,573) | 9,656,575 | (10,932,998) | (7,189,426) | 4,954,423 | 4,274,744 | 679,679 | 115.9% | (1,979,450) | (7,189,426) | 27.5% | (1,979,450) | - | 4,954,423 | - | (447,677) | (447,677) |
| 17 | 09/28/2001 | (39,108,456) | 13,280,986 | (25,827,470) | (22,751,233) | (14,894,472) | (15,561,807) | 667,336 | 95.7% | (16,873,922) | (22,751,233) | 74.2% | (16,873,922) | - | (14,894,472) | - | (447,677) | (447,677) |
| 18 | 12/31/2001 | (33,476,184) | 10,365,191 | (23,110,993) | (20,790,673) | 2,716,477 | 1,960,560 | 755,916 | 138.6% | (14,157,445) | (20,790,673) | 68.1% | (14,157,445) | - | 2,716,477 | - | (447,677) | (447,677) |
| 19 | 03/29/2002 | (26,870,835) | 5,237,763 | (21,633,072) | (20,048,413) | 1,477,921 | 742,260 | 735,661 | 199.1% | (12,679,524) | (20,048,413) | 63.2% | (12,679,524) | - | 1,477,921 | - | (447,677) | (447,677) |
| 20 | 06/28/2002 | (34,700,899) | 227,618 | (34,473,281) | (33,617,300) | (12,840,209) | (13,568,888) | 728,679 | 94.6% | (25,519,733) | (33,617,300) | 75.9% | (25,519,733) | - | (12,840,209) | - | (447,677) | (447,677) |
| 21 | 09/30/2002 | (41,285,067) | - | (41,285,067) | (40,553,564) | (6,811,786) | (6,936,263) | 124,477 | 98.2% | (32,331,519) | (40,553,564) | 79.7% | (32,331,519) | - | (6,811,786) | - | (447,677) | (447,677) |
| 22 | 12/31/2002 | (38,000,308) | - | (38,000,308) | (37,370,431) | 3,284,759 | 3,183,133 | 101,626 | 103.2% | (29,046,760) | (37,370,431) | 77.7% | (29,046,760) | - | 3,284,759 | - | (447,677) | (447,677) |
| 23 | 03/31/2003 | (33,405,434) | - | (33,405,434) | (32,878,576) | 4,594,873 | 4,491,855 | 103,019 | 102.3% | (24,451,887) | (32,878,576) | 74.4% | (24,451,887) | - | 4,594,873 | - | (447,677) | (447,677) |
| 24 | 06/30/2003 | (27,799,169) | - | (27,799,169) | (27,374,944) | 5,606,266 | 5,503,632 | 102,634 | 101.9% | (18,845,621) | (27,374,944) | 68.8% | (18,845,621) | - | 5,606,266 | - | (447,677) | (447,677) |
| 25 | 09/30/2003 | (20,720,113) | - | (20,720,113) | (20,401,152) | 7,079,056 | 6,973,792 | 105,264 | 101.5% | (11,766,565) | (20,401,152) | 57.7% | (11,766,565) | - | 7,079,056 | - | (447,677) | (447,677) |
| 26 | 12/31/2003 | (13,853,676) | - | (13,853,676) | (13,640,999) | 6,866,437 | 6,760,154 | 106,283 | 101.6% | (4,900,128) | (13,640,999) | 35.9% | (4,900,128) | - | 6,866,437 | - | (447,677) | (447,677) |
| 27 | 03/31/2004 | (7,096,170) | - | (7,096,170) | (6,989,183) | 6,757,506 | 6,651,816 | 105,690 | 101.6% | 1,857,378 | (6,989,183) | -26.6% | - | 1,857,378 | 4,900,128 | 1,857,378 | (447,677) | 1,409,700 |
| 28 | 06/30/2004 | (156,247) | - | (156,247) | (153,902) | 6,939,923 | 6,835,281 | 104,642 | 101.5% | 8,797,301 | (153,902) | -5716.2% | - | 8,953,548 | 8,797,301 | 6,939,923 | (447,677) | 6,492,246 |
| 29 | 07/02/2004 | - | - | - | - | 156,247 | 153,902 | 2,346 | 101.5% | 8,953,548 | - | - | - | 8,953,548 | - | 156,247 | 0 | 156,247 |
| | | | | | | | | | | | | TOTAL P&L=======> | | | 8,953,548 | (8,953,548) | - | |

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Explanatory Notes:**

- The columns labeled as A and B represent the fair values of the pay-fixed (swap #1) and receive-fixed swap (swap #2), respectively for each quarter-end.
- Column C represents the combined fair value of swaps #1 and #2.
- Column D reflects the fair value of the hypothetical swap for each quarter-end.
- The fair values in the analysis represent "clean" fair values. These clean fair values exclude the interest accrued on the swaps. Fair values have been calculated based on actual market rates for the dates presented.
- The columns labeled E and F represent the quarterly change in fair value for the swaps and the hypothetical swap, respectively.
- Column H represents the period-to-period[432] dollar offset ratio, provided for informational purposes. This ratio represents the change in value of the hedging instruments as a percentage of the change in value of the hedged item (represented by the hypothetical instrument) for each quarterly period. The period-to-period dollar offset ratio is one way of assessing the effectiveness[433] of the hedging relationship (another is to use cumulative dollar offset ratio, as discussed below). For purposes of assessing whether a hedge is highly effective, the ratio should be between 80%-125%. If the ratio falls outside the range, the hedge does not qualify for hedge accounting, if the period-to-period method is used.
- Columns I and J represent the cumulative change in fair value of the swaps and the hypothetical swap, respectively, since the inception of the re-designated hedge relationship (7/2/99).
- Column K represents the cumulative dollar offset ratio. This represents the change in value of the hedging instruments as a percentage of the change in value of the hedged item since the inception of the hedging relationship. As noted above, cumulative dollar offset is another way in which to assess hedge effectiveness. The DAG identifies the cumulative dollar offset method as Fannie Mae's approved method to assess hedge effectiveness. Had Fannie Mae utilized the cumulative dollar offset approach for assessing effectiveness, the swaps would have failed to qualify for hedge accounting at the end of the first quarter of the hedging relationship (9/30/99).[434] If Fannie Mae were to later attempt to qualify for hedge accounting it would need to "re-start" its cumulative calculation beginning with a new inception date. Such calculations are not presented in the example.
- Column L indicates the cumulative balance in AOCI and is adjusted to reflect the lower of the absolute cumulative changes in fair value since inception between the hypothetical swap and the actual swap.
- Column N represents the change in AOCI from quarter to quarter.

---

[432] A "period" in these examples refers to a quarter.

[433] The method chosen to assess effectiveness must be elected and documented at inception of the hedging relationship per paragraph 62 of SFAS 133 and DIG Issue E8 *Hedging—General: Assessing Hedge Effectiveness Of Fair Value And Cash Flow Hedges Period-By-Period Or Cumulatively under a Dollar-Offset Approach.*

[434] Note that Fannie Mae would also have been required to perform an assessment of effectiveness at the inception of the hedge relationship. As noted, Fannie Mae's DAG specifies the use of dollar offset for its assessment test, however, it is unclear how that test is to be applied at the inception of the hedge.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- Column O represents the amount of overhedge, i.e. amount by which the periodic change in fair value of the actual swaps (column E) is greater than the periodic change in AOCI (Column N).  This amount is the ineffectiveness that is recorded in P&L for the quarter.
- Column P represents the prior period AOCI amortization into earnings (the balance in AOCI relating to the funding swap prior to re-designation is amortized into earnings over the original life of the swap).  For the purposes of this example, the amortization has been calculated ratably.
- Column Q is the net P&L effect that would result from these entries.
- This analysis assumes that all interest payments and accruals on the swaps would also be recorded in interest expense, consistent with Fannie Mae's method.  Thus, column Q represents the net difference between OFHEO and Fannie Mae methodologies.

**Implications of this Analysis:**

Fannie Mae does not perform the above calculations when a term-out occurs.  Instead, they account for both swaps as being perfectly effective hedges and incorrectly record the changes in fair value of the swaps in AOCI.  The result of accounting for these swaps as perfectly effective hedges is that the earnings effect is reflected on an accrual basis over the lives of the swaps, avoiding any volatility arising from the changes in fair values of the swaps.  The analysis OFHEO has prepared presents the entries that would also be required in addition to the accrual entries recorded under Fannie Mae's approach, if the accounting were properly applied.

The following observations can be made as a result of this analysis:

- Column Q reflects the net difference in earnings that would be recorded if ineffectiveness had been properly measured, assuming the hedge passed the effectiveness test (see point below).  Note that even if the hedge were deemed highly effective, there would be periodic earnings volatility, sometime in the millions of dollars, if the proper accounting treatment were applied.
- Fannie Mae's DAG provides for an assessment of effectiveness using the dollar offset approach.  The above analysis indicates that this particular swap would fail such a hedge effectiveness test and therefore not qualify for hedge accounting for at least some of the periods during the term of the hedge.  This would require all changes in fair value of the derivatives to be recorded in earnings during such periods.

**Conclusion:**

If Fannie Mae accounted for the term-out transactions in accordance with GAAP, there would have been significant volatility in earnings caused by ineffectiveness and/or the failure of hedge relationships to qualify for hedge accounting, based on the dollar offset assessment test they define in their policy.

**APPENDIX IV**

*Example of an Offsetting Swap*

**Description of Transaction:**

- On 7/2/97, Fannie Mae issues $500M in DNs and enters into Swap #1. Swap #1 is a pay-fixed, receive-floating swap with a term of 7 years, the period of expected reissuance of DNs. For purposes of this example it is assumed that the swap's interest rate reset dates match the expected timing of DN reissuance and all other critical terms are matched in order to allow Fannie Mae to assume perfect effectiveness under SFAS 133.
- On 7/2/01, Fannie Mae issues a $500M 6.175% 3-yr MTN to replace rollover of $500M DN and enters into swap #2. Swap #2 is a receive-fixed, 5.202%, pay-floating swap that matures in 3 years which coincides with the maturity of the MTN and the end of the original 7 year hedge period. Swap #2 serves to completely offset the effect of swap #1 except that the two swaps have different fixed interest rates because they were entered into at different times. The net result of the two swaps is a fixed stream of cash flows over their remaining lives, representing the difference in their respective fixed rates.
- The terms of the two swaps are summarized as follows:

| Swap #1 | | | Swap #2 | |
|---|---|---|---|---|
| Notional | 500,000,000 | | Notional | 500,000,000 |
| Pay | 6.7850% | | Receive | 5.2020% |
| Receive | LIBOR | | Pay | LIBOR |
| Effective | 07/02/1997 | | Effective | 07/02/2001 |
| Maturity | 07/02/2004 | | Maturity | 07/02/2004 |
| FixPayFreq | Semi-annual | | FixPayFreq | Semi-annual |
| FltPayFreq | Quarterly | | FltPayFreq | Quarterly |

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Analysis:** See Next Page for Explanatory Notes.

| # | Date | A<br>Swap#1<br>CLEAN | B<br>Swap#2<br>CLEAN | C<br>Period Change<br>in Swap #1 | D<br>Period Change<br>in Swap #2 | E<br>C + D<br>Net P&L | F<br>Prior Hedge OCI<br>Amortization | G<br>Period P&L<br>Impact |
|---|---|---|---|---|---|---|---|---|
| - | 06/30/1997 | 0 | | | | | | |
| 1 | 09/30/1997 | (9,521,840) | | | | | | |
| 2 | 12/31/1997 | (16,632,572) | | | | | | |
| 3 | 03/31/1998 | (18,385,686) | | | | | | |
| 4 | 06/30/1998 | (21,234,550) | | | | | | |
| 5 | 09/30/1998 | (43,037,438) | | | | | | |
| 6 | 12/31/1998 | (34,911,044) | | | | | | |
| 7 | 03/31/1999 | (23,050,566) | | | | | | |
| 8 | 06/30/1999 | (8,953,548) | | | | | | |
| 9 | 09/30/1999 | (5,110,527) | | | | | | |
| 10 | 12/31/1999 | 3,327,731 | | | | | | |
| 11 | 03/31/2000 | 8,685,601 | | | | | | |
| 12 | 06/30/2000 | 7,178,852 | | | | | | |
| 13 | 09/29/2000 | (1,055,865) | | | | | | |
| 14 | 12/29/2000 | (13,446,023) | | | | | | |
| 15 | 03/30/2001 | (24,658,180) | | | | | | |
| 16 | 06/28/2001 | (21,967,722) | - | | | | | |
| 17 | 09/28/2001 | (39,111,008) | 18,407,588 | (17,143,286) | 18,407,588 | 1,264,302 | (1,830,644) | (566,342) |
| 18 | 12/31/2001 | (33,476,184) | 14,619,596 | 5,634,824 | (3,787,992) | 1,846,832 | (1,830,644) | 16,188 |
| 19 | 03/29/2002 | (26,870,835) | 9,880,730 | 6,605,350 | (4,738,865) | 1,866,484 | (1,830,644) | 35,841 |
| 20 | 06/28/2002 | (34,700,899) | 19,321,190 | (7,830,065) | 9,440,460 | 1,610,395 | (1,830,644) | (220,248) |
| 21 | 09/30/2002 | (41,285,067) | 27,682,822 | (6,584,168) | 8,361,632 | 1,777,464 | (1,830,644) | (53,180) |
| 22 | 12/31/2002 | (38,000,308) | 26,287,794 | 3,284,759 | (1,395,028) | 1,889,731 | (1,830,644) | 59,088 |
| 23 | 03/31/2003 | (33,405,434) | 23,608,545 | 4,594,873 | (2,679,250) | 1,915,624 | (1,830,644) | 84,980 |
| 24 | 06/30/2003 | (27,799,169) | 19,910,748 | 5,606,266 | (3,697,796) | 1,908,470 | (1,830,644) | 77,826 |
| 25 | 09/30/2003 | (20,720,113) | 14,789,064 | 7,079,056 | (5,121,685) | 1,957,371 | (1,830,644) | 126,727 |
| 26 | 12/31/2003 | (13,853,676) | 9,898,954 | 6,866,437 | (4,890,109) | 1,976,328 | (1,830,644) | 145,684 |
| 27 | 03/31/2004 | (7,096,170) | 5,106,751 | 6,757,506 | (4,792,204) | 1,965,302 | (1,830,644) | 134,659 |
| 28 | 06/30/2004 | (156,247) | 112,629 | 6,939,923 | (4,994,122) | 1,945,801 | (1,830,644) | 115,158 |
| 29 | 07/02/2004 | - | - | 156,247 | (112,629) | 43,618 | (21,967,722) | (43,618) |
| | | | TOTAL P&L=======> | | | 21,967,722 | | |

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Explanatory Notes:**

- The columns labeled as A and B represent the quarter-end clean fair values of the initial pay-fixed swap (swap #1) and the offsetting, receive-fixed swap (swap #2), respectively.
- The columns labeled C and D represent the quarterly change in fair value for swap #1 and swap #2, respectively.
- Column E represents the Net P&L from the mark-to-market of the two swaps.
- Column F represents the amortization from AOCI to earnings relating to the previously existing hedge relationship.
- Column G represents net P&L for the period after taking into account the amortization of the balance from AOCI into earnings.

**Implications of this Analysis:**

It is OFHEO's understanding that from a hedge accounting perspective, Fannie Mae enters into swap #2 to offset swap #1.  Although there is no remaining exposure to be hedged, Fannie Mae accounts for these swaps as perfectly effective hedges.  The changes in fair value for both swaps, the original pay-fixed swap and the offsetting receive-fixed swap, are recorded in AOCI. The result of accounting for these swaps as perfectly effective hedges is that the earnings effect is reflected on an accrual basis over the lives of the swaps, avoiding any volatility arising from the changes in their fair values.  The analysis OFHEO has prepared presents the entries that would also be required in addition to the accrual entries recorded under Fannie Mae's approach, if the accounting were properly applied.

The following observation is made as a result of this analysis:
- Column G reflects the net difference in earnings that would be recorded if the proper accounting were applied.

**Conclusion:**

If, after the execution of the offsetting swap, Fannie Mae had accounted for the pay-fixed swap and the offsetting receive swap in accordance with GAAP and recorded the changes in fair value of the swaps in earnings, it would have resulted in volatility in earnings.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

## APPENDIX V

*Example of a Cancelable Swap*

### Description of Transaction:

• On 7/2/1997, Fannie Mae issues $500M in DNs and enters into Swap #1. Swap #1 is a pay-fixed, receive-floating swap with a term of 7 years, the period of expected reissuance of DNs. For purposes of this example it is assumed that the swap's interest rate reset dates match the expected timing of DN reissuance and all other critical terms are matched in order to allow Fannie Mae to assume perfect effectiveness under SFAS 133.

### Hypothetical Derivative

• Since the hedged transactions represent discount notes to be issued over a seven year period, OFHEO believes a seven year hypothetical non-cancelable swap should be used for purposes of measuring hedge ineffectiveness based on the guidance provided in DIG Issue G7, and for assessing effectiveness using the dollar offset method. [435]
• The hypothetical non-cancelable swap is assumed to be on market terms (such that the fair value is zero) as of 7/2/97 (the inception of the new hedging relationship), with a start date of 7/2/97, and maturity date of 7/2/04, consistent with the period over which the discount note issuances are hedged.
• In order to measure and assess effectiveness, changes in the fair values of the hedging instrument (swap#1) is compared to changes in the fair value of the hypothetical derivative.

| Swap #1 | | | Swap #2 (Non-Callable Hypothetical) | |
|---|---|---|---|---|
| Notional | 500,000,000 | | Notional | 500,000,000 |
| Pay | 7.1031% | | Pay | 6.7850% |
| Receive | LIBOR | | Receive | LIBOR |
| Effective | 07/02/1997 | | Effective | 07/02/1997 |
| Maturity | 07/02/2004 | | Maturity | 07/02/2004 |
| FixPayFreq | Semi-annual | | FixPayFreq | Semi-annual |
| FltPayFreq | Quarterly | | FltPayFreq | Quarterly |
| Callable On | 07/02/2001 | | Callable On | n/a |

---

[435] Fannie Mae has elected not to separate the time and intrinsic value components of the callable swap and has not identified optionality in the transaction being hedged. As such, the hypothetical is a swap with no option feature.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Analysis:** See Next Page for Explanatory Notes.

| # | Date | A Swap#1 CLEAN | B Swap#2 CLEAN | C Period Change in Swap #1 | D Period Change in Swap#2 | E C/D (period dollar offset) | F G/H (cumulative dollar offset) | G Cumulative OCI | H Period OCI Entry | I Period P&L Ineffect-iveness Entry |
|---|---|---|---|---|---|---|---|---|---|---|
| - | 06/30/1997 | (0) | 0 | | | | | | | |
| 1 | 09/30/1997 | (6,856,921) | (9,521,840) | (6,856,921) | (9,521,840) | 72.0% | 72.0% | (6,856,921) | (6,856,921) | 0 |
| 2 | 12/31/1997 | (11,312,269) | (16,632,572) | (4,455,348) | (7,110,733) | 62.7% | 68.0% | (11,312,269) | (4,455,348) | - |
| 3 | 03/31/1998 | (12,815,287) | (18,385,686) | (1,503,018) | (1,753,114) | 85.7% | 69.7% | (12,815,287) | (1,503,018) | - |
| 4 | 06/30/1998 | (14,271,875) | (21,234,550) | (1,456,588) | (2,848,864) | 51.1% | 67.2% | (14,271,875) | (1,456,588) | - |
| 5 | 09/30/1998 | (28,200,079) | (43,037,438) | (13,928,204) | (21,802,888) | 63.9% | 65.5% | (28,200,079) | (13,928,204) | - |
| 6 | 12/31/1998 | (20,280,281) | (34,911,044) | 7,919,798 | 8,126,394 | 97.5% | 58.1% | (20,280,281) | 7,919,798 | - |
| 7 | 03/31/1999 | (14,169,710) | (23,050,566) | 6,110,571 | 11,860,477 | 51.5% | 61.5% | (14,169,710) | 6,110,571 | - |
| 8 | 06/30/1999 | (5,146,137) | (8,953,548) | 9,023,573 | 14,097,018 | 64.0% | 57.5% | (5,146,137) | 9,023,573 | - |
| 9 | 09/30/1999 | (2,308,078) | (5,110,527) | 2,838,060 | 3,843,021 | 73.8% | 45.2% | (2,308,078) | 2,838,060 | - |
| 10 | 12/31/1999 | 3,698,686 | 3,327,731 | 6,006,764 | 8,438,258 | 71.2% | 111.1% | 3,327,731 | 5,635,809 | 370,955 |
| 11 | 03/31/2000 | 6,931,412 | 8,685,601 | 3,232,725 | 5,357,870 | 60.3% | 79.8% | 6,931,412 | 3,603,680 | (370,955) |
| 12 | 06/30/2000 | 5,854,847 | 7,178,852 | (1,076,564) | (1,506,749) | 71.4% | 81.6% | 5,854,847 | (1,076,564) | - |
| 13 | 09/29/2000 | 1,217,927 | (1,055,865) | (4,636,920) | (8,234,716) | 56.3% | -115.3% | - | (5,854,847) | 1,217,927 |
| 14 | 12/29/2000 | (1,732,822) | (13,446,023) | (2,950,749) | (12,390,158) | 23.8% | 12.9% | (1,732,822) | (1,732,822) | (1,217,927) |
| 15 | 03/30/2001 | (2,498,793) | (24,658,180) | (765,971) | (11,212,158) | 6.8% | 10.1% | (2,498,793) | (765,971) | - |
| 16 | 06/29/2001 | (175,990) | (20,469,902) | 2,322,803 | 4,188,279 | 55.5% | 0.9% | (175,990) | 2,322,803 | - |

Assume swap is canceled as the option was in the money

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

**Explanatory Notes:**

- The columns labeled as A and B represent the quarterly clean fair values of the actual and hypothetical swap, respectively.
- The hypothetical swap is created to mirror the terms of the discount notes being hedged. The clean value excludes the interest accrued on the swaps.
- The columns labeled C and D represent the quarterly change in fair value for swap #1 and swap #2, respectively.
- Column E represents the period-to-period dollar offset ratio; provided for informational purposes.
- Column F represents the cumulative dollar offset ratio. The dollar offset ratio is a measure of the degree to which a hedging instrument (callable swap) has been effective in offsetting the change in fair value of the hedged item (discount notes, represented by the hypothetical swap). For purposes of assessing whether a hedge is highly effective, the ratio should be between 80%-125%. If the ratio falls outside the range, the hedge does not qualify for hedge accounting. The DAG identifies the cumulative dollar offset method as Fannie Mae's approved method to assess hedge effectiveness. Had Fannie Mae utilized the cumulative dollar offset approach for assessing effectiveness, the swaps would have failed to qualify for hedge accounting at the end of the first quarter of the hedging relationship (9/30/97).[436] If Fannie Mae were to later attempt to qualify for hedge accounting it would need to "re-start" its cumulative calculation beginning with a new inception date. Such calculations are not presented in the example.
- Column G indicates the cumulative balance in AOCI and is adjusted to reflect the lower of the absolute cumulative changes in fair value since inception between the hypothetical and the actual swap.
- Column H represents the change in AOCI from quarter to quarter.
- Column I represents the amount of overhedge, i.e. amount by which the periodic change in fair value of the actual swap (column C) is greater than the periodic change in AOCI (column H).
- Fannie Mae does not perform the above calculation and assumes that the entire change in fair value should be posted to AOCI.

**Implications of this Analysis:**

Fannie Mae does not perform the above calculations when executing a callable swap to hedge discount notes from a hedge accounting perspective. Instead, they account for the callable swap as being "perfectly effective" and incorrectly record the changes in fair value of the swap in AOCI. The result of accounting for the swap as perfectly effective is that the earnings effect is reflected on an accrual basis over the life of the swap, avoiding any volatility arising from the changes in fair values of the swaps. The analysis OFHEO has prepared presents the entries that would also be required in addition to the accrual entries recorded under Fannie Mae's approach, if the accounting were properly applied.

The following observations can be made as a result of this analysis:

---

[436] Note that Fannie Mae would also have been required to perform an assessment of effectiveness at the inception of the hedge relationship. As noted, Fannie Mae's DAG specifies the use of dollar offset for its assessment test, however, it is unclear how that test is to be applied at the inception of the hedge.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

- Column I reflects the net difference in earnings that would be recorded if ineffectiveness had been properly measured, assuming the hedge passed the effectiveness test (see point below).  Note that even if the hedge were deemed highly effective, there would be periodic earnings volatility, sometimes in the millions of dollars, if the proper accounting treatment were applied.
- Fannie Mae's DAG provides for an assessment of effectiveness using the cumulative dollar offset approach.  The above analysis indicates that this particular swap would fail such a hedge effectiveness test and therefore not qualify for hedge accounting for at least some of the periods during the term of the hedge.  This would require all changes in fair value of the derivatives to be recorded in earnings during such periods.

**Conclusion:**

If Fannie Mae accounted for the callable swap as described above, which is consistent with how the hedge was designated, there would have been significant volatility in earnings caused by ineffectiveness and/or the failure of hedge relationships to qualify for hedge accounting.  Had Fannie Mae designated the relationships differently, and separated the time and intrinsic value, it is possible that hedge accounting could have been achieved, though volatility would have still resulted from having recorded time value changes in earnings.

Special Examination of Fannie Mae
Privileged & Confidential
Disclosure and/or Duplication Prohibited

Exhibit O

**Deloitte & Touche**

# *Heads Up*™

*Accounting, Tax and Regulatory Developments
Affecting Capital Markets Instruments and Strategies*

July 28, 2000; Volume 7; Issue 8

### The ABCs of ABS: Accounting for Asset-Backed Securities

How does an investor account for an asset-backed security (ABS)? It's a trick question. Until now there's been no comprehensive accounting guidance covering the basics: **recording interest income and recording losses for other-than-temporary impairments**. At July's meeting, the EITF stepped up to the plate (Issue 99-20) and reached a consensus covering many – not all – instruments.

What makes these basic issues so tough for an ABS is that many asset-backed securities feature terms that make the **timing and amount of future cash flows** uncertain.[1] Until these factors are pinned down (usually at or close to maturity), the best an investor can do is estimate the yield he or she is currently earning on the investment. Also, changes in estimated cash flows and changes in prevailing market conditions affect the value of the ABS.

The Task Force decided that investors in asset-backed securities (at least those covered by Issue 99-20) should record changes in their estimated yield using the **prospective method**. That's good news for investors. Compared to one alternative (the retrospective method), the effect of changes in estimated cash flows doesn't get concentrated in a single accounting period. Instead, the investor recognizes the effect over the remaining life of the ABS.

---

[1] Two sets of factors make the timing and amount of cash flows uncertain. First, the assets underlying the deal often bear credit risk and/or can be prepaid before their scheduled maturity. Second, a securitization vehicle typically allocates the cash flows (according to a predetermined formula) differently to various tranches of securities it issues. For example, tranching allows an investor in a subordinated certificate to bear the brunt of the credit risk of the securitized assets in exchange for a higher rate of interest.

As developments warrant, *Heads Up* is edited by Jim Johnson and published by Deloitte & Touche's Capital Markets Group (New York). *Heads Up* contains general information only; it is not a substitute for consultation with a professional. To receive copies, contact Robert Canaan at rcanaan@dttus.com or visit our website at www.dttus.com (Publications).



**Deloitte
Touche
Tohmatsu**



**Serving
Financial Services
Industries Globally**



With every silver lining there is, of course, a cloud.  If the carrying amount of the ABS exceeds its current fair value, the investor must determine if the excess represents an other-than-temporary decline in value.  Generally, **any decrease in current estimated cash flows (timing and amount)** compared to the investor's previous estimate, points to an other-than-temporary impairment.  The investor records the excess carrying amount as a loss in the income statement.  We expect that the Issue 99-20 approach will lead to earlier and/or more frequent loss recognition.

The EITF wants the consensus applied no later than fiscal quarters beginning after December 15, 2000, without restatement of earlier financial statements.  See Attachment I for additional details, including a discussion of which asset-backed securities are included in the scope of the issue.

_____

### Staying Alive!
### EITF Nears a Consensus on Equity Derivative Accounting

Like the last remaining contestant on *Survivor*, carefully crafted derivative contracts linked to a company's own stock should prevail against ongoing accounting challenges – that is, if the EITF's **tentative July consensus on Issue 00-19** holds.  Among other requirements, the tentative consensus requires a **cap** on the number of shares (if any) that can be issued and the contract cannot require the delivery of **registered** shares.

To appreciate the issue, a little background is in order.  Fundamentally, the question is whether the derivative is marked to fair value via income (because it is accounted for as an asset or liability) or not (because it is accounted for as equity or temporary equity).  The EITF established the framework for answering the question when it deliberated Issue 96-13 (*Heads Up*, November 16, 1996).  The framework rests on the method by which the derivative can be settled.  Net share settlement and physical settlement jibe with equity (or temporary equity) treatment.[2]  Thus, contracts that require either of these settlement mechanisms or give the company the option to choose one of these methods are not marked to fair value.

In Issue 00-7 (*Heads Up*, March 16, 2000), the EITF focused on settlement provisions triggered by a specific event such as the company's bankruptcy.  According to the consensus, a derivative that includes **any** provision (triggered by an event beyond the company's control) that requires **net cash settlement** will result in asset or liability accounting

_____

[2] You'll need a glossary (at the very least) to decipher this issue:

- *Physical Settlement* – The buyer of the shares delivers the stated amount of cash to the seller of the shares who delivers the stated number of shares.
- *Net Share Settlement* – The party with a loss delivers shares with a current fair value equal to the other party's gain.
- *Net Cash Settlement* – The party with a loss delivers cash equal to the other party's gain.

for the contract. Tautologically speaking, "any" means any. In other words, the company cannot avoid asset/liability accounting because it decides the triggering event is unlikely to occur.

As companies and their advisors reviewed existing contracts for compliance with Issue 00-7, they identified a number of specific contract terms or legal and regulatory impediments that could preclude a settlement method consistent with equity (or temporary equity) accounting. The Task Force reached a **tentative consensus** that equity-linked derivatives must feature six conditions to be accounted for as an equity (or temporary equity) instrument under Issue 96-13's framework. See Attachment 2 for a list of the conditions and a brief explanation of their significance.

Apply the requirements of Issue 00-19 (and 00-7) to contracts entered into after the date on which the Task Force reaches a final consensus (we're guessing this will be the date of the September meeting). For contracts that predate a final consensus,[3] the accounting requirements of Issue 00-19 should be applied as of June 30, 2001 – giving companies time to fix non-compliant positions.

**The EITF also reached conclusions on derivatives indexed to a subsidiary's stock.** **Issue 00-6** deals with the parent company's accounting for a derivative it enters that is indexed to the stock of one of its consolidated subsidiaries. Generally, these contracts will be accounted for as derivatives under FAS 133 and marked to fair value via earnings. (Any ultimate share settlement, if it occurs, affects the accounting for the investment.) If the contract is excluded from the scope of FAS 133, it is accounted for as follows:

- A firmly committed contract to buy or sell shares of a subsidiary should be accounted for as a purchase or a sale on the date the forward contract settles.

- The forward purchase or sale price should be considered in determining (or adjusting) an impairment loss on the investment in the subsidiary.

When are these derivatives excluded from the scope of FAS 133? Here's an example: (1) the derivative requires physical settlement, (2) the subsidiary's shares are not *readily convertible to cash*, **and** (3) no other market mechanism facilitates net settlement of the contract. But don't rely on the FAS 133 exclusion applicable to some equity derivatives (see paragraph 11(a)). The EITF decided that the paragraph 11(a) exclusion applies only to parent company contracts linked to the parent's shares (for consolidated financial statements).

---

[3] Considering a new contract that predates a final consensus? Prudence is the better part of valor – check with your accountants if its terms deviate from the conditions outlined in Attachment 2.

Issue 00-6 remains on the agenda pending a discussion of **written options** indexed to a subsidiary's shares.

**Issue 00-4** deals with a narrower fact pattern: – the derivative is between a parent company and a minority shareholder in one of the parent's subsidiaries. The derivative's underlying is the minority holder's shares. The derivative is a fixed price forward purchase contract, a combination of calls and puts with similar terms or a total return swap.

The Task Force concluded that the parent company retains the risks and rewards of owning the minority interest. The derivative should be combined with the minority interest and accounted for as a financing. The EITF plans no further discussions.

_____

## Working Together: The FDIC Issues a Final Rule on Asset Securitizations

Just issued is the FDIC's final rule (effective September 11) covering securitizations. What's the big deal? When FASB's proposed amendment to FAS 125 takes effect, FDIC insured institutions will first be subject to a key FAS 125 requirement. The FDIC's final rule is designed to give banks, their lawyers and their auditors the basis for concluding that **properly structured securitizations isolate** the transferred assets in the event that the selling bank fails (*Heads Up*, September 9, 1999). FASB is targeting an end-of-August publication date for the amendment. We found the rule at the FDIC's website; try this address:

www.fdic.gov/regulations/laws/federal/00TreatFA.html

_____

## Answers Even Regis Doesn't Know! The Firm's Latest Edition of FAS 133 Q&As

Stumped over the complex provisions of FAS 133? Help is on the way. Contact Robert Canaan (rcanaan@dttus.com) and he'll put the Firm's latest guidance on FAS 133 in your hands. The publication asks and answers 98 implementation questions ranging from the basic to the arcane and – for those with the appropriate appetite – includes sample journal entries illustrating the fine points.

_____

## Trash Those Binders! Back Issues of "Heads Up" Available Online

Well, don't trash everything. On D&T's website, we've archived back issues of *Heads Up,* dating from April 1998. Go to www.us.deloitte.com, click on "Publications" and look for the *Heads Up* button in the left margin.

**Attachment 1**
**Questions and Answers**
**EITF 99-20, Recognition of Interest Income**
**and Impairment on Certain Investments**

Need a little more guidance?  In this attachment, we address the following questions:

1.  Are all asset-backed securities included within the scope of EITF Issue 99-20?

2.  How about an example of the Prospective Interest Method?

3.  What accounting guidance does Issue 99-20 affect?

4.  Do the impairment requirements of 99-20 mean that I carry asset-backed securities at the "lower of cost or market"?

5.  I'm a seller, not a buyer. Does 99-20 apply to me if I securitize loans that I originate?

6.  RegionsBanc owns a "vanilla" LIBOR-indexed ABS for which it paid a significant premium.  The underlying assets cannot be prepaid.  Does RegionsBanc face any special considerations regarding impairments?

7.  Does Issue 99-20 offer any guidance on estimating future cash flows?

8.  I account for all of my ABS investments in a trading account at fair value.   Does  99-20 affect me?

9.  In transition, how do I account for an existing ABS?

**<u>Here are the answers</u>:**

**<u>1.  Are all asset-backed securities included within the scope of EITF Issue 99-20?</u>**

No.  While the guidance applies to many asset-backed securities, billions-worth are excluded (most agency and AAA-rated non-agency paper, for example).  By the way, when you read the formal EITF minutes, you'll find that the FASB staff uses the more technically accurate term *beneficial interest in a securitization* versus our vernacular use of the term *asset-backed security.*  However, unless an asset-backed security appears in the table below, Issue 99-20 covers it.

|   | **Excluded ABS** | **Comments** |
|---|---|---|
| 1 | High credit quality asset-backed securities not subject to paragraph 14 of FAS 125 (see exclusion 2) | Factors that could qualify an ABS as one of high credit quality:<br>• Guarantees of the U.S. government and its agencies<br>• Guarantees of high-quality monoline insurers<br>• The presence of collateral that makes losses remote<br>• Credit enhancement in the form of subordinated interests |

|   | Excluded ABS | Comments |
|---|---|---|
| 2 | Asset-backed securities **not** accounted for as a debt security under FAS 115 or FAS 125, paragraph 14 | FAS 115 explicitly covers all instruments that are debt securities or marketable equity securities.  While most ABS take the form of a debt security (and thus do not meet exclusion 2), some interests take the form of equity (e.g. a non-certificated residual interest).  The Task Force observed that many non-debt interests are nonetheless accounted for as debt instruments under FAS 115 and therefore are not eligible for scope exclusion 2.<br><br>Paragraph 14 of FAS 125 requires certain instruments to be accounted for like an FAS 115 available for sale or trading security.[4]  Thus, even a high quality ABS is included in the scope of Issue 99-20 if it is covered by paragraph 14. |
| 3 | An ABS that results in consolidation by the investor of the entity issuing the ABS | The investor accounts for the underlying assets in the consolidated financial statements using applicable, generally accepted accounting principles. |
| 4 | An ABS within the scope of AICPA Practice Bulletin 6, *Amortization of Discounts on Certain Acquired Loans* | PB 6 applies to loans and debt securities purchased at a discount when it is probable that estimated undiscounted future cash flows will not cover stated principal and contractual interest. |
| 5 | Securities backed by assets that do not feature contractual cash flows due to the holder | Assets that do not feature contractual cash flows include common stock equity securities and certain option-based derivatives. |

*Example 1.  Insurance Co.  purchases two securities backed by mortgages guaranteed by the US government.  It pays par for the first security.  It pays 115% of par for the second security (we exaggerated the premium on purpose) because the instrument has appreciated in value since it was issued.  Only the first of the two securities is excluded from the scope of Issue 99-20.  Why?  The second security exposes Insurance Co. to loss from prepayments, a circumstance covered by paragraph 14 of FAS 125.*

**2.  How about an example of the Prospective Interest Method?**

*Example 2.  TechForever pays $231,450 for a security backed by high quality, short-term prepayable loans.  The security entitles TechForever to all of the interest and none of the principal payments on the underlying pool of loans.   TechForever must apply the provisions of Issue 99-20 because the ABS is subject to paragraph 14 of FAS 125.*

---

[4] Paragraph 14 states the following:

Interest-only strips, loans, other receivables, or retained interests in securitizations that can contractually be prepaid or otherwise settled in such a way that the holder would not recover substantially all of its recorded investment shall be subsequently measured like investments in debt securities classified as available-for-sale or trading under Statement 115, as amended by this Statement.

*When TechForever made its initial investment, it forecasted the expected cash flows and discounted them at a market rate commensurate with the prepayment and credit risks of the investment.  The initial evaluation indicates that TechForever will earn an all-in yield of 15% based on the following cash flows*:

| Yr. | Total Cash Flows |
|---|---|
| 1 | $100,000 |
| 2 | 83,625 |
| 3 | 65,613 |
| 4 | 45,799 |
| 5 | 24,004 |
| | **$319,041** |

*At the end of year 1,[5] the investment has generated $100,000 – exactly equal to the original forecast.  How much is interest income?  $34,718 – equal to the forecasted yield times the carrying amount of the asset (15% X's $231,450).  The balance of the cash received represents TechForever's recovery of its investment or $65,282 ($100,000 - $34,718).*

*At the beginning of year 2, TechForever estimates future remaining cash flows and concludes that the timing and amount remain unchanged from its initial estimate.  In year 2, TechForever recognizes $24,925 of interest income.  That's equal to the unchanged yield of 15% times the adjusted carrying amount[6] of $166,168.  The remainder of year 2's cash flow ($58,700) reduces TechForever's carrying amount.*

*At the end of year two, here's where TechForever stands:*

| Period | Amortized Cost | | | Interest | Total Cash | Proof |
|---|---|---|---|---|---|---|
| | Beginning | Net Change | End | | | |
| 1 | 231,450 | 65,282 | 166,168 | 34,718 | 100,000 | 15% |
| 2 | 166,168 | 58,700 | 107,468 | 24,925 | 83,625 | 15% |

*During Period 3, TechForever determines that some of the loans underlying the securitized asset pool have prepaid.  It revises its earlier cash flows as follows:*

| Yr. | Total Cash Flows | |
|---|---|---|
| | Original | Revised |
| 1 | $100,000 | $100,000 |
| 2 | 83,625 | 83,625 |
| 3 | 65,613 | 64,300 |
| 4 | 45,799 | 44,883 |
| 5 | 24,004 | 23,524 |
| | **$319,041** | **$316,332** |

---

[5] In reality, investors will make this evaluation at least quarterly.

[6] The initial carrying amount of the investment is its fair value (if purchased) or the allocated basis (if retained in a securitization – see question 4).  Subsequently, the carrying amount is the sum of (a) the initial investment less (b) cash received to date less (c) other-than-temporary impairments recognized to date…plus (d) the yield accreted to date.

*The internal rate of return of an investment that costs $107,468, generating the forecasted cash flows from years three to five, is approximately 13.57%. Beginning in year 3 (assuming the absence of an other-than-temporary impairment – see below), TechForever uses the revised yield to recognize interest income. The Table below displays the results.*

| Period | Amortized Cost | | | Interest | Total Cash | Proof |
|--------|-----------|------------|------|----------|------------|-------|
| | Beginning | Net Change | End | | | |
| 3 | 107,468 | 49,712 | 57,755 | 14,588 | 64,300 | 13.57% |
| 4 | 57,755 | 37,043 | 20,712 | 7,840 | 44,883 | 13.57% |
| 5 | 20,712 | 20,712 | 0 | 2,812 | 23,524 | 13.57% |

*Does TechForever recognize an other-than-temporary impairment at the end of period 2? The answer depends on the fair value of the interest only strip. If market participants require less than a 13.57% return, the fair value of the investment will be more than TechForever's carrying amount. TechForever would not record an other-than-temporary impairment even though its estimate of future cash flows (timing and amount) has decreased. But if the market yield on the investment was more than 13.57% (meaning that the fair value of the investment was less than the carrying amount), TechForever would record an other-than-temporary impairment by permanently writing down the asset. The future yield would be based on the rate necessary to make the present value of the forecasted cash flows equal the current fair value (the written down amount) of the interest-only strip.*

### 3.   What accounting guidance does Issue 99-20 affect?

Issue 99-20 trumps the following EITF Issues:

- 89-4, *Accounting for a Purchased Investment in a Collateralized Mortgage Obligation Instrument or in a Mortgage-Backed Interest-Only Certificate*

- 93-18, *Recognition of Impairment for an Investment in a Collateralized Mortgage Obligation Instrument or in a Mortgage-Backed Interest-Only Certificate.*

First, Issue 99-20 **dramatically affects impairment accounting when compared to the method required by Issue 93-18**. Under both methods, an other-than-temporary impairment causes the investor to write down the ABS to fair value. But the circumstances that trigger the adjustment differ. Under EITF 93-18, the investor discounts estimated future cash flows at a risk-free rate. An impairment adjustment is triggered when the present value of the cash flows is less than the investor's carrying amount. Under 99-20, **any** decrease in the estimated future cash flows (timing and amount)[7] triggers the write down when the fair value of the security is less than the investor's carrying amount.

*Example 3.  Finance-It-All owns an ABS. At 6/30/0X, the following amounts pertain to the investment:*

| | | At 6/30/0X |
|---|---|---|
| 1 | Carrying Amount | $1,100,000 |
| 2 | Fair Value | 1,000,000 |
| 3 | Present Value of Future Cash Flows Using a Risk-Free Rate | $1,150,000 |

---

[7] Exclude decreases due solely to interest-rate resets on plain vanilla floating rate ABS. See Question 6.

*Assuming a decrease in estimated cash flows, Issue 99-20 requires Finance-It-All to write down the ABS to $1,000,000. Under Issue 96-13, Finance-It-All avoids a write down because the present value of the future cash flows, discounted at a risk-free rate, exceed the ABS's carrying amount.*

Second, Issue 99-20 casts a wider net than the EITF issues cited above – it applies to securities (within its scope) backed by all forms of asset classes, not just mortgages.

### *4. Do the impairment requirements of 99-20 mean that I carry asset-backed securities at the "lower of cost or market"?*

No. First of all, not all asset-backed securities are within the scope of EITF 99-20 (see question 1). For example, high credit, quality asset-backed securities (unless recorded at a significant premium) are outside the issue's scope. Second, the impairment test involves two triggers: a decline in fair value below the investor's carrying amount and a decrease in estimated future cash flows. Having said that, the impairment test is more rigorous than those included in current GAAP and will lead to more impairment adjustments.

### *5. I'm a seller, not a buyer. Does 99-20 apply to me if I securitize loans that I originate?*

Usually. Issue 99-20 generally applies to securitizers who retain most or a portion of the cash flows on the securitized assets that are accounted for as debt securities. To make the initial evaluation of yield, use the carrying amount of the asset-backed security (it usually differs from fair value). A securitizer determines the initial carrying amount by allocating the original carrying amount of the securitized assets to the portion sold and the portion retained based on the relative fair value of each. For an example, download *Securitization Accounting under FAS 125* at D&T's website (www.us.deloitte.com) and click on *Publications*.

### *6. RegionsBanc owns a "vanilla" LIBOR-indexed ABS for which it paid a significant premium. Does RegionsBanc face any special considerations regarding impairments?*

Yes. First, note that this is an unusual fact pattern. Often, a vanilla variable-rate ABS will trade at or near its par amount. But assume that RegionsBanc paid a premium because it acquired the ABS in the secondary market and the credit quality of the underlying assets has significantly improved since the issuance date of the security.

Further assume that since RegionsBanc's purchase, the fair value of the ABS has declined below the bank's carrying amount. Further investigation indicates that RegionsBanc's forecasted cash flows have declined only because the forward LIBOR curve indicates that it will receive less **interest** than previously forecast. RegionsBanc does not face an other-than-temporary impairment. According to Issue 99-20:

> Absent any other factors that indicate an other-than-temporary impairment has occurred, changes in the interest rate of a "plain-vanilla," variable-rate beneficial interest generally should not result in the recognition of an other-than-temporary impairment (a plain-vanilla, variable-rate beneficial interest does not include those variable-rate beneficial interests with interest rate reset formulas that involve either leverage or an inverse floater).

### 7.  Does Issue 99-20 offer any guidance on estimating future cash flows?

Yes.  At the acquisition or securitization date, future cash flows are the holder's estimate of the following, respectively:

1.  The amount and timing of estimated future principal and interest cash flows used in determining the purchase price, or

2.  The holder's fair value determination for purposes of determining a gain or loss under Statement 125.

In subsequent periods, estimated cash flows are the holder's estimate of the amount and timing of estimated principal and interest cash flows **based on the holder's best estimate of current information and events that a market participant would use** in determining the current fair value of the beneficial interest.  Note that the accounting assumptions driving 1 and 2 above should be based on market realities, thus making the initial and subsequent measurement methods consistent.

### 8.  I account for all of my ABS investments in a "trading" account at fair value.   Does  99-20 affect me?

Probably, although you don't have to be concerned about an other-than-temporary impairment – the fair value adjustment of trading assets embraces changes in value for any reason.  Instead, the prospective interest income guidance usually applies – assuming the ABS is within the scope of the issue.

### 9.  In transition, how do I account for an existing ABS?

Regardless of a company's year-end, ABS investors apply EITF 99-20 on the first day of the fiscal quarter beginning after December 15, 2000.  While earlier application is permitted, previously issued financial statements are not restated.

The initial application of Issue 99-20 will require some investors to immediately record an other-than-temporary impairment on January 1 (or sooner, if the consensus is applied earlier).  The investor accounts for the write down as a cumulative change in accounting principle – i.e. as a separate income statement line, net of tax effects.[8]  If the ABS is other-than-temporarily impaired under existing GAAP, the cumulative effect adjustment excludes the existing impairment – that's recorded in the quarter it occurs.

---

[8] See APB Opinion 20.  Pro forma disclosures are not required and the consensus deviates from APB 20's requirement that a change in accounting principal be applied during the first quarter of an entity's fiscal year.

**Attachment 2**
**EITF 00-19[9]**
**Tentative Consensus**
**Conditions Required for Equity (or Temporary Equity) Treatment**

|    | *Required Condition (All Must Be Present)* | *Explanation* |
|----|---------------------------------------------|---------------|
| 1* | The contract permits the company to settle in either registered or unregistered shares (that is, the ability to deliver registered shares is outside the control of a company). | The ability to effect a registration statement is outside of the company's control. Thus, the contract must permit delivery of unregistered shares. |
| 2* | The company has sufficient authorized but unissued shares available to settle the contract after considering all other commitments that may require the issuance of stock during the period the derivative could remain outstanding. | The Task Force tentatively concluded that the need to obtain shareholder approval of additional share authorizations is outside the control of the company. |
| 3* | The contract contains an explicit limit on the number of shares to be delivered in a share settlement. This limit must apply even if the contract terminates when the stock price reaches a stated price trigger. | The Task Force tentatively concluded that a limitation is required to determine whether a company has sufficient authorized and unissued shares to settle the contract. |
| 4  | There is no requirement in the contract to post collateral at any point or for any reason. | Collateral requirements are inconsistent with equity treatment. |
| 5* | There are no required cash payments to the counterparty if the shares initially delivered are subsequently sold by the counterparty and the sales proceeds are insufficient to provide the counterparty with full return of the amount due (that is, there is no cash settled "top-off" or "make-whole" provision). | Required cash payments are inconsistent with equity treatment. |
| 6  | There are no provisions in the contract that indicate the counterparty has rights that rank higher than those of a shareholder of the stock underlying the contract. | Creditor rights are inconsistent with equity treatment. |

\* Physical settlement sometimes requires the Company to write a check (e.g. upon exercise of a put option it wrote or upon settlement of a forward purchase of shares). If the contract permits physical settlement but doesn't provide for the possibility of net share settlement, it would classify the contract as **temporary equity**. Thus, if these contracts require physical settlement (or give the Company the option of physical or net cash settlement) the asterisked conditions do not apply.

The EITF explored a boatload of related issues at the July meeting. Contact Robert Canaan (rcanaan@dttus.com) for a copy of the final minutes.

---

[9] *Determination of Whether Share Settlement is Within the Control of the Issuer for Purposes of Applying Issue No. 96-13, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock"*

Exhibit P

# *Asset-Backed Securities*

Edited by

**Anand K. Bhattacharya**
**Senior Vice President**
**Director of Fixed Income Research**
**Prudential Securities Inc.**

and

**Frank J. Fabozzi**
**Adjunct Professor of Finance**
**School of Management**
**Yale University**

*Published by Frank J. Fabozzi Associates*

# *Chapter 10*

# SBA Loan-Backed Securities

**Donna Faulk**
**Vice President**
**ABS Trading**
**Prudential Securities Inc.**

170  SBA Loan-Backed Securities

## INTRODUCTION

The Small Business Administration (SBA), an agency of the federal government, was created in 1953 to assist, advise and safeguard the interests of small businesses. To facilitate the flow of funds to the small-business sector, the SBA is empowered to guarantee loans made by approved SBA lenders to qualified borrowers.

SBA guaranteed-loan pools, backed by the full faith and credit of the U.S. government, offer the advantage of excellent credit quality, while allowing investors to earn high yields indexed off of the prime rate. Variable-rate SBA pools are responsive to changing interest-rate environments as their coupons adjust every 30 or 90 days based on the current prime rate.

## SBA SECONDARY MARKET

The SBA has been guaranteeing loans made by lenders to small businesses since 1958. A secondary market in SBA-guaranteed loans emerged in 1975 when a group of bankers, traders, and SBA officials worked together to allow for the sale of the guaranteed portions of SBA loans. Under the aegis of this program, the lender of an SBA loan retained the unguaranteed portion and servicing of the loan and sold the guaranteed portion to a secondary party. In most cases, the secondary party (a dealer) subsequently sold the SBA-guaranteed loan to an investor and, as a result, transferred full rights of the government guarantee. The liquidity provided by the secondary market served to free the lender's capital for creation of subsequent small-business loans, thereby giving such businesses access to more capital.

In 1984, Congress passed the Small Business Secondary Market Improvement Act. It provided for the central registration and servicing of loans sold in the secondary market by a single fiscal and transfer agent (FTA). More importantly, the legislation allowed for the pooling of SBA loans. The intent of the act was to provide increased efficiency and better liquidity, as well as to establish an improved SBA product in the secondary market. Allowing single-guaranteed SBA loans to be pooled was an important step toward attracting institutional investors to this product.

## SBA POOL INVESTMENT CHARACTERISTICS

### Coupon

The majority of the loans sold in the secondary market are variable-rate loans that are tied to the prime rate. The prime rate, a leveling rate set by commercial banks, is the highest index used on any variable-rate security in today's marketplace and has always produced a wide margin above banks' cost-of-funds rates (see Exhibit 1).

Case 1:05-cv-11627-RCL    Document 68-18    Filed 10/30/2007    Page 5 of 11

**Exhibit 1: Prime Rate versus One-Month LIBOR**



Source: Prudential Securities' IMPACT data base

Variable-rate loans reset monthly on the first of the month or quarterly on the first of January, April, July and October. Coupons on these securities are usually quoted in terms of their spread to the prime-rate index rather than by current coupon. The maximum coupon allowable in the secondary market under present SBA regulations (as of 1988) equals prime plus 1.625%. Most SBA pools do not have caps or floors on their rates, so investors should recognize the benefit of a fully adjustable coupon in the event of increases or decreases in interest rates over the life of the investment. SBA-pool owners are assured of a positive spread in relation to other short-term yields, regardless of the actual rates that exist in a given market climate.

## Maturities

The terms on new issues range from 7 to 25 years. Remaining maturities of less than seven years are available through investment in seasoned SBA pools. SBA loans must have similar terms and features in order to be pooled with one another. Thus certain maturities have become more or less standard for SBA pools. These maturities are 7-year maturities, 10-year maturities, 15-year maturities, 20-year maturities, and 25-year maturities.

## Payment Schedules

Almost all SBA loans and pools make monthly payments of principal and interest based on a level-debt service, or "mortgage-type" amortization schedule. Like similar mortgage-backed securities, yields on SBA pools are quoted on a "bond-equivalent" basis, which allows investors to compare this monthly paying security with other debt instruments that pay semi-annually. SBA loans are not simply pass-through securities. While borrower payments are applied to the pool payments, some important differences exist between

172   SBA Loan-Backed Securities

SBA pool payments and the underlying cash flows on the loans. These differ-
ences include:

- Timely remittances of principal and interest are guaranteed on SBA
  pools and are issued on the 25th of each month by the FTA.
- Payment schedules are re-amortized to accommodate coupon
  changes every time rates are adjusted.
- There is a pass-through delay of 85 days on variable-rate pools.
- Amortization schedules are based on the final maturities of SBA
  pools and on the net-pool rate.

    The features of the payment method for SBA pools give investors the
benefit of receiving precisely the correct amount of principal and interest to
account for variable rates. Significantly, the payment schedule for SBA pools
precludes any possibility of negative amortization. All SBA pools are fully
amortized by their maturity dates.

## SBA Standard Pooling Requirements

The following are the required parameters for assembling a pool of SBA loans:

- Minimum pool size of $1 million.
- Minimum of four loans in a pool.
- No single loan can comprise more than 25% of a pool.
- All loans in a pool must be either fixed or variable rate.
- All loans in a pool must have the same repayment term.
- Variable-rate pools must be comprised of loans having the same
  adjustment dates.
- For variable-rate pools that contain loans with interest-rate caps,
  the pool will reflect the lowest cap on any of the loans in the pool.
- The maximum difference in borrower-note rates in a given pool
  must be 2%.
- The maturity dates of the loans underlying a pool all must be
  within 30% of one another. In other words, the maturity on the
  shortest loan in the pool must be no less than 70% of the maturity
  on the longest loan in the pool.
- The loan having the longest maturity date will determine the matu-
  rity date of the entire pool.
- The minimum pool-certificate amount is $25,000, with $5,000 incre-
  ments thereafter.

## SBA Pool Assemblers

To obtain approval from the SBA to assemble SBA loans into a pool for sale
in the secondary market, SBA-pool assemblers must conform to the follow-
ing criteria:

- Assemblers must meet SBA regulations (or those of a regulatory agency) or be a member of the NASD.
- Assemblers must meet a minimum capital requirement and obtain good standing with the SBA (as determined by the SBA administrator).

In the competitive marketplace for SBA loans and pools, market makers, usually dealers or dealer banks, generally assume the role of SBA-pool assemblers.

SBA-approved pool assemblers purchase the guaranteed portions of SBA loans from lenders across the country, usually in competition with other SBA dealers. Loans having similar terms and features are grouped together to form pools that conform to the SBA's standard pooling requirements. The SBA loans to be placed in a pool are sent to the FTA, which issues a pool certificate in lieu of the single-loan certificates. Registered participation certificates can then be issued to investors.

Whether they create the pools themselves or if other dealers create the pools, most SBA dealers make an active secondary market in existing SBA pools. Detailed information is available to every SBA dealer concerning all SBA pools issued, thereby allowing market makers to determine a pool's market value based on its characteristics and performance.

## The Role of the FTA

An integral factor of the enhanced SBA secondary market is the role of the government-appointed central FTA, presently Colson Services Corp., based in New York.

The FTA handles all clearing, transfers, and ongoing servicing for every SBA-guaranteed loan and pool sold in the secondary market. The FTA collects payments from the lenders and remits those payments to the registered holders of single loans. When loans have been placed in pools, remittances are incorporated into the monthly payments made to the holders of pool participations. In addition to regular collection and servicing duties, the FTA administers all default claims and any prepayments.

Colson Services Corp. issues certificates for single loans and for pools, and is responsible for the registration and transfer of these certificates when SBA loans and pools are traded in the secondary market. Accurate records are kept by the FTA for each transaction and on every payment. Finally, the FTA issues monthly factor tables for SBA pools used by SBA dealers and pool assemblers. For its services, the FTA retains an ongoing servicing fee of one eighth of a point on every SBA loan and pool.

## Investors

Among institutional investors, particularly financial institutions, the popularity of asset-backed securities has increased along with the demand for

174    SBA Loan-Backed Securities

SBA pools. Banks and thrifts purchase SBA pools to enhance their asset/lia-
bility management because the frequently adjusted rate on SBA pools tends
to produce a positive spread to fluctuating cost-of-funds rates. Historically,
the spread relationship between the prime rate and other short-term interest
rates has proven to be wide. While adjustments in the prime rate lag money-
market-rate fluctuations, the prime rate tends to adjust upward more
quickly than it adjusts downward.

Banks and thrifts are not the only institutions that have found SBA
pools to be attractive investments. While SBA pools can have final maturi-
ties as long as 25 years, the 90-day or 30-day rate adjustments make SBA
pools a high-yielding alternative to money-market securities for mutual
funds, pension funds, and credit unions.

Changes in regulatory guidelines imposed by the Federal govern-
ment have made SBA pools even more attractive to banks and thrifts; SBA
pools can be held with zero risk-weighted capital and effective GAP man-
agement can be achieved with investments in SBA pools. While regulatory
treatment may vary, generally speaking, pool certificates are treated as
investments and may be pledged as collateral for public funds, Federal
Reserve and Federal Home Loan Bank advances, and Treasury tax and loan
accounts.

## INVESTING IN SBA-POOL SECURITIES

### Liquidity

Although SBA pools have been available since August 1984, they are still rela-
tively new to the marketplace. Due to the increased participation from the tra-
ditional fixed-income investor base and improved research on the behavior of
SBA loan-backed securities, SBA pools are now traded in an efficient and com-
petitive marketplace. The upshot is that investors can now enjoy the benefits of
improved pricing efficiency and liquidity equal to that associated with larger
markets. The increased participation and demand insures an increasingly com-
petitive marketplace, as well as liquidity for investors going forward.

### Credit-Risk Quality

SBA pools provide excellent credit quality because they are backed by the full
faith and credit of the U.S. government and, as a result, are implicitly triple A-
rated securities. The investor in an SBA loan or pool has an unconditional
guarantee as to the repayment of 100% of the principal and accrued interest
outstanding on a timely basis.

### Interest-Rate Risk

Variable-rate SBA pools are relatively free from interest-rate risk. Since these
investments are indexed to the prime rate, they are adjusted monthly or quar-

Case 1:05-cv-11627-RCL    Document 68-18    Filed 10/30/2007    Page 9 of 11

terly and are mainly non-capped; in turn, the investor's coupon and yield adjust to changing interest-rate environments.

## Prepayment

Qualifying guaranteed loans for SBA pools may be prepaid without penalties by the small-business borrower at any time during their term, at the borrower's option. Moreover, SBA loans may occasionally default. In the event of either prepayment or default, the Federal government will advance 100% of the outstanding principal and interest to the FTA, who, in turn, passes it through to the holders of pool participations on a pro-rata basis. Investors receive principal at the 100% outstanding par balances of accelerated-SBA loans. Like comparable mortgage-backed securities, SBA pools generate monthly cash flows, which may include proceeds of accelerated principal.

Prepayment rates on SBA pools include all events of early principal redemption, whether an actual borrower prepayment or default has occurred. Because SBA-pool yields are calculated on the basis of their cash flows, it is critical to assume a reasonable prepayment rate for accurately generating a proper cash-flow yield and average-life forecast. Prepayment rates on SBA loans are expressed as an annual constant prepayment rate (CPR) based on historical performance.

In conjunction with the Congressional passing of the Secondary Market Improvements Act of 1984, allowing for the creation of the pooling process, the Public Securities Association (PSA) undertook a prepayment study of more than 10,000 SBA-guaranteed loans with originations ranging from 1972 through 1984. The results of the prepayment study established standard benchmark prepayment rates (CPRs) for fixed- and variable-rate SBA loans and pools, i.e., one prepayment rate was assigned to all fixed-rate SBA loans and pools, and one prepayment rate was assigned to all variable-rate SBA loans and pools. These CPR recommendations were adopted by the SBA and quoted until April 1990. Today, based on ongoing prepayment studies, prepayment rates vary according to each individual loan and pool. As such, the onus is on the seller of an SBA pool to provide investors with yield quotations based on the individual prepayment assumptions for the loans or pools in question. More accurate prepayment assumptions, combined with data supplied by the FTA on all SBA pools, provide market participants with a better understanding of the performance of qualifying SBA-guaranteed loans.

## What Have We Learned About Prepayments?

We now know that variable-rate SBA loans and pools, depending on their maturity dates, are subject to prepayment at different speeds. The underlying SBA-guaranteed-loan maturity is determined by the purpose of the financing. Loans made for working capital, for example, will not perform the same way as loans made to finance real-estate purchases or construction. Regardless of

the coupons on SBA pools, almost all variable-rate SBA loans are originated at interest rates between prime plus 2.25% to the maximum rate of prime plus 2.75%. For these reasons, the maturity dates on variable-rate SBA pools are the significant factor in prepayment analysis, rather than the coupon rates on the pools.

The highest prepayment rates on SBA loans and pools exist on shorter-maturity product. Ten-year and shorter-term SBA pools, with underlying loans made for working capital, prepay at the highest rate. Conversely, long-term, real-estate-backed SBA pools prepay much more slowly. The lowest prepayment rates tend to be on variable-rate SBA pools with interest-rate caps, all of which are long term and comprised of loans made with the most competitive terms to the best-quality credit borrowers.

Whether investors purchase SBA pools at a premium, at par or at a discount, prepayment rates are paramount to anticipated yields. As with most debt instruments, the "risk/reward" factor is an element of pricing. Risk on any product guaranteed by the Federal government begins with securities priced above par. SBA pools offered to investors at premium prices will carry higher yields than pools offered at par or at a discount. Keep in mind, regardless of the coupon or the price paid, every SBA variable-rate pool with a stated-maturity date can be expected to prepay at close to the same rate. Once investors determine the amount of acceptable risk, offerings on SBA pools can be found to match investor objectives.

## SUMMARY OF INVESTMENT ADVANTAGES AND DISADVANTAGES OF SBA POOLS

Variable-rate SBA loan pools represent diversification through ownership in assembled pools of small-business loans guaranteed by the SBA. SBA pools are a safe investment that offer high yields versus comparable money-market instruments and enhance the overall performance of well-managed portfolios.

There are two disadvantages of investing in SBA pools. First, they are often issued at a premium, unlike other securities that are issued at par. Second, they require physical delivery of certificate as opposed to book entry.

The advantages of SBA pools as an investment outlet are summarized below:

- Full faith and credit guarantee by the U.S. government.
- Timely remittance of monthly principal and interest payments.
- A wide variety of maturities and coupons.
- Investment in intermediate to long-term maturities with yields in excess of short-term fixed-rate alternatives.

- Adjustable rates indexed to the prime rate provide price stability and sensitivity from interest-rate risk.
- Collateral eligibility.
- Zero-percent risk weight for banks and thrifts.