entire second quarter of 2005, immediately preceding the Company's guidance revision.  Id.
Courts across the country have held that where, as here, only some of the individual defendants
in a complaint actually traded company stock during the period at issue, there is no inference of
scienter.  See, e.g., Nathenson v. Zonagen Inc., 267 F.3d 400, 420-21 (5th Cir. 2001) (no strong
inference of scienter where only one out of three insider defendants sold corporate stock); In re
Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d Cir. 1999) (no strong inference of scienter
where "three of the individual defendants sold no stock at all during the class period, raising
doubt whether the sales were motivated by an intent to profit from inflated stock prices").

Mr. Sheehan, Mr. Mancuso, and Mr. Maroney were the only Individual Defendants who
sold any Company stock after the 2005 earnings guidance at issue, and Plaintiffs have not even
attempted to plead that there was anything suspicious or unusual about any of their sales.  FAC
¶ 295.  Indeed, Mr. Sheehan's post-guidance stock sales, the last of which occurred on March 14,
2005, represented only **5%** of his total holdings during the purported class period.  FAC ¶ 287.
Mr. Mancuso and Mr. Maroney's post-guidance stock sales represented, according to Plaintiffs,
only 12% and 3.7% of their class period holdings.  FAC ¶¶ 287-88.  The sale of such a low
percentage of a defendant's holdings generally is not considered suspicious.  See, e.g., In re
Vantive Corp. Sec. Litig., 283 F.3d 1079, 1094 (9th Cir. 2002) (finding a defendant's sale of
13% of stock and options was not suspicious and "belies any intent to rid himself of a substantial
portion of his holdings"); In re E.spire Commc'ns, Inc. Sec. Litig., 127 F. Supp. 2d 734, 743 (D.
Md. 2001) ("[T]hat an individual defendant sold so little stock [6.2% of holdings] can be
construed as negating the inference that there was fraud.").[12]

---

[12] Indeed, many of these sales cannot give rise to an inference of scienter because all such post-
guidance stock sales by Mr. Mancuso and Mr. Maroney were made pursuant to written trading plans.  See
App. 23.  Pursuant to SEC Rule 10b5-1, a person's trading is not "on the basis of" material non-public
information if the person adopted, and sold their securities pursuant to, a written trading plan consistent
with the terms of Rule 10b5-1.  See 17 C.F.R. 240.10b5-1.  Courts have interpreted this rule to provide
that, on a motion to dismiss, a plaintiff may not rely on such transactions to support an inference of
scienter.  See In re Netflix, Inc., Sec. Litig., No. C04-2978-FMS, 2005 WL 1562858, at *8 (N.D. Cal.

(Footnote Continued on Next Page.)

The fact that the Individual Defendants retained most of their stock and options after the Company issued its earnings guidance simply cannot be harmonized with their unsupported accusation of fraud. See Maldonado v. Dominguez, 137 F.3d 1, 12 n.9 (1st Cir. 1998) (inference of scienter was undermined by the defendants' loss of $1.5 million of their own money); see also In re Vantive Corp. Sec. Litig., 110 F. Supp. 2d 1209, 1219 (N.D. Cal. 2000) (sale of 38% of holdings is a "minimal sale of stock [that] tends to negate an inference of scienter"), aff'd, 283 F.3d 1079 (9th Cir. 2002); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999) ("Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, [retained holdings] suggest they had every incentive to keep Advanta profitable."); Report at 48-49.

Further, as the Amended Complaint demonstrates, Mr. Sheehan, Mr. Mancuso, and Mr. Maroney's sales were consistent with the amounts of their sales in earlier years. There was nothing unusual about Mr. Sheehan's sale of 155,000 shares of IFIN stock after the Company's 2005 earnings guidance, as he had sold an average of 200,000 shares of IFIN stock per year from 2001 to 2004. FAC ¶ 287. Likewise, in 2003 and 2004, Mr. Mancuso sold an average of over 87,000 shares of Company stock each year, so his sale of 60,000 shares in 2005 was not unusual in amount. Mr. Maroney had sold over 215,000 shares of IFIN stock since 2001, so his sale of 15,000 shares of IFIN stock on December 27, 2004 also was not unusual in amount.

Second, none of the Individual Defendants' stock sales during the entire class period, listed in Paragraph 287 of the Amended Complaint, support any inference of scienter with respect to any allegedly false statement, let alone IFIN's 2005 guidance. Just as with the post-guidance stock sales discussed above, Plaintiffs have not established that there was anything

_____

(Footnote Continued from Previous Page.)

June 28, 2005) (finding no strong inference of scienter where defendants' sales were pursuant to a Rule 10b5-1 plan); Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (same).

unusual about the amount of the Individual Defendants' stock sales in the aggregate.[13]  In fact, over the entire class period, two of the seven Individual Defendants sold less than 5% of their stock and option holdings.  Mr. Spinney, the Company's CFO, did not sell **any** of his Company stock during the entire class period,[14] but rather **bought** 10,150 shares.  See App. 24; Rombach v. Chang, 355 F.3d 164, 176-77 (2d Cir. 2004) (no scienter where, inter alia, individual defendants purchased shares); In re Century Bus. Serv. Sec. Litig., No. 1:99CV02200, 2002 WL 32254513, at *8 (N.D. Ohio June 27, 2002) (finding it improbable that defendant would seek to increase his wealth by purchasing stock at inflated prices).   Mr. Rogers, who allegedly "controlled Investors Financial" in a "dictatorship of two partners" (FAC ¶ 317), sold only **4.86%** of his stock and options during the class period.  FAC ¶ 288.  As Magistrate Judge Dein found (Report at 49), the fact that two key officers sold **0%** and **4.86%** of their holdings during a purported class period of over four years -- and the Company's CFO actually **bought** shares -- undermines any inference of scienter.

Having failed to establish anything unusual about the amount of the Individual Defendants' trading during the extended class period, Plaintiffs also have failed to establish that there was anything suspicious about the timing or pattern of the Individual Defendants' sales during this period.  In fact, three of the Individual Defendants did not sell any Company stock

---

[13] It should be noted that, in a transparent attempt to increase the amount of relevant insider sales, Plaintiffs have extended their purported class period back to 2001, creating a class period of almost four and a half years.  Courts have found that an unusually long class period is a mitigating factor when determining, with respect to scienter, the weight to be attributed to insider sales.  See, e.g., In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir. 2002) ("[P]laintiffs have selected an unusually long class period of sixty-three weeks . . . allow[ing] the plaintiffs to sweep as many sales into their total as possible, thereby making the stock sales appear more suspicious."); In re Syncor Int'l Corp. Sec. Litig., 327 F. Supp. 2d 1149, 1163 (C.D. Cal. 2004) (viewing allegations of insider trading "with heightened scrutiny" where class period was four years and eight months).

[14] Although Plaintiffs allege that Mr. Spinney sold 200 shares of IFIN stock in 2002 (AC ¶ 287), in fact, as indicated in contemporaneously filed SEC filings, Mr. Spinney sold no shares of IFIN stock at that time.  App. 24.

after 2002, **two years** before the allegedly misleading earnings guidance.[15]    FAC ¶ 290. Moreover, numerous of the other Individual Defendants' stock sales in earlier years were made pursuant to Rule 10b5-1 plans, and, therefore, cannot support an inference of scienter. See supra 19 n.12.    Indeed, with respect to four of the seven Individual Defendants, all or most of their sales during the class period were pursuant to Rule 10b5-1 trading plans.  App. 23.  These many transactions yielded proceeds of over $52 million, or **76%** of the total trading relied on by Plaintiffs over the proposed four-plus year class period.  Id.; FAC ¶ 287.  These trades cannot support any inference that any Defendant acted with scienter.  See supra 19 n.12.  For this reason as well, Plaintiffs' allegations concerning stock sales from 2001 through 2004 do not support any inference of scienter with respect to any challenged statement, let alone IFIN's 2005 guidance.

### (2)    Plaintiffs' Allegations Concerning Defendants' Bonus Plans Do Not Give Rise To A Strong Inference Of Scienter.

Plaintiffs' allegations regarding incentive-based bonuses also fail to give rise to any inference of scienter with respect to any challenged statement, let alone IFIN's 2005 guidance. In the Amended Complaint, Plaintiffs simply list the bonuses received by some of the Individual Defendants during the class period, and then allege that "executive defendants' bonus compensation was heavily tied to the Company's financial performance."  FAC ¶ 278.  As Magistrate Judge Dein recognized, the First Circuit has held that the mere assertion that a defendant's compensation is tied to financial performance is insufficient to raise a strong inference of scienter.  See Report at 50 (citing Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002) (fact that executives' compensation allegedly depended on company earnings "alone is not and cannot be enough to establish scienter")).  Moreover, Plaintiffs fail to explain how

---

[15] As Magistrate Judge Dein previously held, Individual Defendant Karen Keenan's sale of 60,000 shares of stock within three months of her retirement is not unusual or suspicious so as to support a strong inference of scienter.  See FAC ¶¶ 28; Report at 49; Greebel, 194 F. 3d at 206 ("It is not unusual for individuals leaving a company . . . to sell shares."); In re K-Tel Int'l, Inc., Sec. Litig., 300 F.3d 881, 896 (8th Cir. 2002) (sale of $11.7 million in shares did not "materially impact the scienter analysis" where defendant resigned three weeks after sale).

incentive based bonuses could possibly serve as a motive for artificially inflating the Company's earnings projections. While Plaintiffs have alleged that bonus compensation was tied to <u>financial performance</u>, nowhere do Plaintiffs allege that the Individual Defendants' compensation was in any way tied to its earnings <u>projections</u>. Indeed, Magistrate Judge Dein further found that "the bonus allegations are inconsistent with any intent to defraud." Report at 50.

Having failed to identify any specific fact or motive supporting a strong inference that any Defendant actually knew that the 2005 earnings guidance was false, Plaintiffs have failed adequately to plead scienter. Accordingly, their 2005 guidance claims must be dismissed.

**D.** **Plaintiffs' Claims Based On IFIN's 2004 Guidance Also Must Be Dismissed Under Rule 12(b)(6), The PSLRA, And Rule 9(b).**

Although this case was triggered by IFIN's revision to its 2005 earnings guidance, Plaintiffs also allege that the Company's earnings guidance for 2004 was false and misleading. Specifically, Plaintiffs allege that, when the Company projected that its earnings would grow at a rate of 25% in 2004, those projections were purposefully false and misleading because IFIN had failed to disclose alleged GAAP violations with respect to its SBA loans. FAC ¶¶ 168, 171. No claims based on IFIN's 2004 guidance can survive this motion.

IFIN's earnings guidance for 2004 was accurate. The Company exceeded its 25% earnings growth projection in 2004 **irrespective** of whether it was using the prospective or the retrospective method of accounting. Indeed, even after the Company's restatement, IFIN **exceeded** its **25%** earnings growth target, achieving year-over-year earnings growth of **50%** in 2004. Report at 32-34. As Magistrate Judge Dein found (Report at 32-33), as a matter of law, a company's earnings guidance that is later proven to be accurate is not actionable. <u>See</u> <u>Carney</u>, 135 F. Supp. 2d at 245 (whether a growth projection was sufficiently accompanied by meaningful cautionary language is "moot" if the defendant's projection "was not off the mark").

Even if the Company's guidance for 2004 had been inaccurate -- and it was not -- that projection nonetheless is not actionable for all the reasons Plaintiffs' 2005 guidance claims fail. First, Plaintiffs' guidance claims fail because each statement at issue was a forward-looking

statement accompanied by meaningful cautionary language, and it is therefore protected by the PSLRA's safe harbor for forward-looking statements. See supra 9-12.[16] Second, Plaintiffs' guidance claims fail because Plaintiffs have not pled that any Defendant had actual knowledge that the guidance was false when issued. See supra 13 (quoting 15 U.S.C. §78u-5(c)(1)(B)(ii)). Further, as explained below, Plaintiffs have failed to plead loss causation with respect to their SBA allegations. See infra 32-35. Plaintiffs have not and cannot point to any disclosure, by IFIN or anyone else, that somehow disclosed that IFIN's guidance for 2004 ultimately proved to be inaccurate.

For all of these reasons, Plaintiffs' claims based on the Company's earnings guidance for both 2004 and 2005 must be dismissed.

**III.     PLAINTIFFS FAIL TO STATE ANY FEDERAL SECURITIES FRAUD CLAIMS BASED ON THE HISTORICAL FINANCIAL RESULTS THAT THEY CHALLENGE.**

As discussed above, as with the Consolidated Complaint in this case, the Amended Complaint once again bases claims on the restatement of financial results that IFIN announced in October 2004 -- nine months before the July 14, 2005 announcement regarding 2005 guidance that triggered the filing of this case. Plaintiffs attack as a misrepresentation virtually every financial disclosure that IFIN made between 2001 and 2005, and certain related statements (the "Financial Disclosure Claims"). For the reasons discussed below, Plaintiffs' Financial Disclosure Claims must be dismissed pursuant to the law of the case doctrine, the PSLRA and Rule 9(b), and Rule 12(b)(6).

---

[16] See October 21, 2004 conference call transcript (FAC ¶ 165, Ex. H).

**A.    Plaintiffs' Financial Disclosure**
**Claims Relating To IFIN's Restatement**
**Of Its Historical Financial Results Must Be Dismissed.**

**1.    IFIN's Restatement-Related Claims Must**
**Be Dismissed Under The Law Of The Case Doctrine.**

As discussed supra at 9-10, the law of the case doctrine requires courts to respect prior orders in the same case absent exceptional circumstances, such as new evidence or a change in controlling authority. United States v. Moran, 393 F.3d 1, 7 (1st Cir. 2004). Here, Plaintiffs' Amended Complaint contains the same defective restatement-related allegations that Plaintiffs included in their Consolidated Complaint. This Court rejected those claims when it adopted Magistrate Judge Dein's Report. Lacking any new evidence and failing to cite a change in controlling authority, this Court should reject Plaintiffs' renewed attempt to re-litigate those claims under the law of the case doctrine.

In their Amended Complaint, as in their Consolidated Complaint, Plaintiffs allege that, from 2001 to October 2004, IFIN fraudulently used an improper accounting method -- the prospective method -- to account for its Mortgage Backed ("MBS") securities. See FAC ¶¶ 7, 11, 12 & 13; see also FAC, Ex. A, at 8-11 ("SFAS No. 91 allows two basic methods of accounting for interest income for mortgage loans and debt securities that are prepayable."). Plaintiffs base their scienter allegations respecting IFIN's restatement on the following three factors: (1) IFIN's restatement itself; (2) Defendants' status and alleged access to internal information through ALCO meetings; and (3) Defendants' stock sales during the class period. Compare FAC ¶¶ 7, 12, 14, 33, 34, 65, 207, 208 & 210-225, with CC ¶¶ 5-8, 20, 28, 30, 70, 73-76, 89, 202 & 231-236. Magistrate Judge Dein already considered and rejected these same scienter allegations in her Report. See Report at 38-51.

In her Report, Magistrate Judge Dein ruled that the exact allegations that Plaintiffs' regurgitate in their Amended Complaint cannot, as a matter of law, support a strong inference that the Defendants acted with scienter in applying the prospective method to account for IFIN's MBS securities. Report at 38-51. More specifically, Magistrate Judge Dein held, inter alia, the

following regarding each of the scienter allegations that Plaintiffs' proffer in support of their restatement-related allegations:

- "Missing in the instant case are any allegations of specific facts indicating that the defendants knew at any time prior to the announcement of the restatement that use of the prospective method of accounting was improper." Report at 44.

- "Plaintiffs have not specifically identified any specific communications that the Defendants had or internal document that they received which would have alerted the Defendants, at any time prior to the announcement of the restatement, that [IFIN] was using an improper method of accounting." Report at 46.

- "[T]he restatement resulted in an upward adjustment in diluted EPS for those periods. No conclusion can be drawn that the Defendants were motivated to commit fraud in order to profit from inflated stock prices when the Defendants sold a portion of their shares at artificially depressed prices." Report at 48.

Magistrate Judge Dein's Report applies with equal force to the essentially identical restatement-related claims in the Amended Complaint. Magistrate Judge Dein's ruling that Plaintiffs' allegations respecting their restatement-related claims do not support a strong inference of scienter is the law of this case, which must be followed absent exceptional circumstances. Plaintiffs have failed to identify any such exceptional circumstances. To the contrary, Plaintiffs rely upon the same legally defective, conclusory allegations, founded upon the exact same evidence, from their Consolidated Complaint. Indeed, Plaintiffs fail to include a single new piece of evidence: not a single communication, document, or confidential witness that supports a strong inference that the Defendants' acted with scienter in using the prospective method to account for IFIN's MBS securities. Thus, Plaintiffs' restatement-related allegations must be dismissed pursuant to the law of the case doctrine.

Even if the law of the case doctrine did not mandate dismissal of Plaintiffs' restatement-related claims -- and it does -- those claims should be dismissed for all of the reasons stated infra at Section III.A.2, as well as the reasons stated in Magistrate Judge Dein's Report.

### 2.    Plaintiffs' Restatement-Related Claims Must Be Dismissed Under The PSLRA And Rule 9(b).

Plaintiffs' restatement-related claims also  must be dismissed under the PSLRA and Rule 9(b) because Plaintiffs fail to plead any specific facts supporting a strong inference that any financial disclosure was knowingly false when made.  As discussed above, in order to support a strong inference that a challenged statement was knowingly false when made, a complaint typically identifies internal reports, memoranda or the like and alleges both the contents of those documents and defendant's possession of them at the relevant time.  See supra 14.  Here, Plaintiffs have once again failed to allege a single specific fact -- not a single specific document, or meeting, or conversation -- that supports any inference, let alone a strong inference, that any one of the myriad challenged statements was knowingly false when made.  That failure is fatal to all of their financial disclosure claims.[17]

Lacking any new specific facts to support any of their financial disclosure claims, Plaintiffs simply rehash the defective scienter allegations from their Consolidated Complaint, complete with the same underlying allegations concerning:  (1) the restatement itself; (2) the status and background of the Individual Defendants; and (3) Defendants' alleged motivation to engage in stock trading and obtain higher bonus compensation.  As discussed at length in Magistrate Judge Dein's Report, none of those allegations, either individually or in the aggregate, support any inference of scienter, as a matter of law.  See Report at 38-51.

---

[17]  In addition, Plaintiffs also conclusorily allege that Defendants knew that IFIN's internal accounting controls were inadequate in violation of Section 13(b)(2).  FAC ¶¶ 254-259.  Plaintiffs' allegations fail as a matter of law, because Plaintiffs fail to allege either:  (1) any specific facts to support the conclusory allegation that IFIN's internal controls were inadequate; or (2) any specific facts supporting a strong inference that any Defendant knew about any alleged weakness in IFIN's financial controls.  See Abrams v. Baker Hughes, Inc., 292 F.3d 424, 433 (5th Cir. 2002) (affirming dismissal of securities fraud claims where plaintiffs failed to plead specific facts showing that defendants knew internal controls were inadequate); In re Westinghouse Sec. Litig., 90 F.3d 696, 711-12 (3d Cir. 1996) (same).

a.    **IFIN's Restatement Does Not
Support Any Inference Of Scienter.**

Plaintiffs again allege that IFIN improperly used one accounting method recognized by FAS 91 -- the prospective method -- over another -- the retrospective method. See FAC, Ex. A, at 8-11 ("SFAS No. 91 allows two basic methods of accounting for interest income for mortgage loans and debt securities that are prepayable."). At bottom, Plaintiffs attempt to conjure fraud out of what amounted to a subjective bookkeeping judgment between two recognized and complex accounting methods. Well-established legal principles preclude Plaintiffs' efforts.

As Magistrate Judge Dein noted in her Report, the mere fact that a company has restated its financial results does not, without more, "support a 'strong inference' of fraud, or for that matter, a weak one." See Report at 42-43; In re Segue Software, Inc. Sec. Litig., 106 F. Supp. 2d 161, 169 (D. Mass. 2000); see also Ezra Charitable Trust v. Tyco Int'l, Ltd, 466 F.3d 1, 9 (1st Cir. 2006) (affirming dismissal of securities fraud claims where plaintiffs failed to plead specific facts indicating that CEO and CFO were "directly involved in detailed accounting matters or had knowledge of their falsity"); In re Galileo Corp. S'holders Litig., 127 F. Supp. 2d 251, 258 (D. Mass. 2001) (granting motion to dismiss where: (1) defendants violated the defendant company's own revenue recognition policy; (2) company restated its financial results for Q2 1998; and (3) defendant company's CEO and CFO were fired when the GAAP violations were discovered). Moreover, where, as here, the issuer's financial adjustments are small in size "[r]estatements are less probative of deliberate wrongdoing or recklessness." In re Hypercom Corp. Sec. Litig., No. CV-05-0455-PHX, 2006 WL 726791, at *4 (D. Ariz. Mar. 9, 2006) (dismissing fraud claim and holding that company's restatement was "not of the magnitude typically found to support a strong inference of scienter"). As Magistrate Judge Dein observed, the size of IFIN's restatement is "entirely incompatible with the contention that the Defendants consciously chose to use an improper accounting method in order to inflate the Company's revenues and EPS." See Report at 45.

Here, Plaintiffs continue to ask this Court to infer from the fact that IFIN restated its financial results that Defendants acted with the requisite mental state. See FAC ¶¶ 206-218. The

law on this point remains the same today as the day Plaintiffs filed their moribund Consolidated Complaint. As noted above, merely alleging that IFIN restated its financial results does not support even a "weak" inference of scienter. Moreover, the size of IFIN's adjustment to its financial results for fiscal years 2001, 2002, 2003, and 2004 militates against any inference, let alone a strong inference, of scienter. Indeed, the cumulative adjustment of $6.2 million was **less than 0.4%** of the **$1.6 billion** total net operating revenue that IFIN reported during those periods. See Report at 40 ("[A]ny conclusion that the Defendants were acting with a fraudulent state of mind at any time during the Class Period is undermined by the Plaintiffs' own allegations regarding the impact of the restatement on the Company's financial results."). In addition, IFIN actually **understated** its earnings for fiscal year 2003 and the first two quarters of 2004, causing IFIN to **revise upward** its net interest income for those time periods. See Report at 40. For most of the other restated quarters, the difference between the original and restated numbers is immaterial.[18] All told, IFIN's restatement of less than 0.4% of its net operating revenues constituted a far smaller restatement, on a percentage basis, than the restatements that other courts have held do not give rise to any inference of scienter. See, e.g., Greebel, 194 F.3d at 206 (no strong inference of scienter where revenue artificially inflated by 4%). In light of these many authorities, Plaintiffs' allegations regarding IFIN's restatement of its financial results, absent additional specific facts which Plaintiffs' Amended Complaint lacks, cannot give rise to the requisite strong inference of scienter.

> **b.    Plaintiffs' "Status" And "Access"**
> **Allegations Cannot Support Any Inference Of Scienter.**

Unable to allege any new particularized facts to satisfy the strictures of the PSLRA and Rule 9(b), Plaintiffs fall back on the same general status and access allegations that littered the Consolidated Complaint. In particular, Plaintiffs continue to focus on the status of one of the Individual Defendants and the alleged access that four of the Individual Defendants had to

---

[18] See supra 6-7.

unspecified documents at internal meetings. FAC ¶¶ 33, 218. These allegations are incapable of giving rise to a strong inference that any Defendant acted with the necessary level of scienter.

In the Amended Complaint, Plaintiffs repeat their allegation that, because Mr. Spinney is a CPA, he "must have known" that financial disclosures were inaccurate when made. FAC ¶ 218. However, rote allegations such as these, suggesting what Defendants must have known solely by virtue of their status, position or background are not sufficient to meet the strict pleading requirements of the PSLRA and Rule 9(b) and cannot support a strong inference of scienter, as a matter of law. See, e.g., In re Peritus Software Servs., Inc., Sec. Litig., 52 F. Supp. 2d 211, 228 (D. Mass. 1999); Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998); Report at 45-47.

Plaintiffs' "access" allegations are similarly flawed. Specifically, Plaintiffs also reallege that four of the Individual Defendants served on IFIN's Asset and Liability Committee ("ALCO") and received unspecified reports and information as a result. FAC ¶¶ 33, 64-71.[19] However, it is axiomatic that, "[g]eneral allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss." Lirette, 27 F. Supp. 2d at 283; see also Report at 46-47. Rather, plaintiffs must specifically identify particular internal corporate documents, the date of such documents, the exact information in the documents, and who received them. Capstead, 258 F. Supp. 2d at 564-65 (allegations that defendants knew from internal documents that prepayment levels were "adversely affecting" income insufficient to give rise to strong inference of scienter); see also Guerra v. Teradyne, Inc., No. 01-11789, 2004 WL 1467065, at *25 (D. Mass. Jan. 16, 2004) (recommending dismissal of complaint where, inter alia, plaintiffs

---

[19] Plaintiffs attribute a number of their very general ALCO meeting allegations to "CW1." FAC ¶¶ 68-71. As discussed above, courts in the First Circuit carefully scrutinize statements attributed to confidential witnesses, and alleged confidential witnesses must have been in a position to know the information alleged. See supra 15. Here, CW1 is not cited as the source of any allegation of specific fact bearing on what any Individual Defendant, at any particular time, knew concerning the accuracy of any IFIN financial disclosures, for any financial period.

did not plead with particularity the contents of any single report allegedly received by defendants) (Dein, M.J.).

As in <u>Capstead</u>, the Amended Complaint here does not specify the date that any one ALCO "reporting package" was prepared; the sender of any one specific "reporting package;" the recipient of any one specific "reporting package;" or the content of any one specific "reporting package." <u>See</u> <u>Capstead</u>, 258 F. Supp. 2d at 565; <u>see also</u> Report at 46 ("Plaintiffs have not specifically identified any specific communications that the Defendants had or internal documents that they received which would have alerted the Defendants, at any time prior to the announcement of the restatement, that [IFIN] was using an improper method of accounting."). Further, Plaintiffs have not specifically described a single particular "reporting package" that allegedly addressed FAS 91, the retrospective method, the prospective method, mortgage-backed securities ("MBS securities"), or SBA securities. Instead, the Amended Complaint contains only conclusory allegations regarding the general composition of ALCO and a "reporting package" allegedly distributed to the committee. Thus, none of Plaintiffs' ALCO allegations can support any inference that any Defendant possessed any specific information, at any point in time, indicating that any challenged statement was false when made. <u>See</u> Report at 47 ("[T]he fact and risk of prepayments were disclosed. What is missing is any link between knowledge of prepayments, wrongdoing, and loss."). For all of the reasons discussed above, the Amended Complaint fails to allege facts sufficient to give rise to a strong inference of scienter respecting Plaintiffs' Financial Disclosure Claims. Accordingly, their claims must be dismissed.

**c.   Plaintiffs' Motive Allegations Do<br>Not Support Any Inference Of Scienter.**

For all of the reasons discussed above, Plaintiffs' motive allegations relating to the Individual Defendants' stock trading and bonus compensation remain defective and do not support any inference of scienter. <u>See</u> <u>supra</u> 17-22. Furthermore, those motive allegations do not support any inference of scienter as applied to Plaintiffs' Financial Disclosure Claims for an additional reason: They make no sense. Irrational motive allegations cannot support a fraud

claim, as a matter of law.  See Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001) (affirming lower court's dismissal of the complaint where plaintiffs' view of the facts defies economic reason); In re CDNOW Sec. Litig., 138 F. Supp. 2d 624, 642 (E.D. Pa. 2001) (granting motion to dismiss where "motive alleged" was "illogical") (citation omitted).

Here, Plaintiffs' insider trading and bonus allegations make no sense as applied to Plaintiffs' Financial Disclosure Claims because IFIN **actually revised upward** its net interest income and net operating revenues for 2003 and the first three quarters of 2004.  See App. 13; see also supra 7.  No officer or director intent on selling stock or obtaining a **higher** incentive-based bonus would intentionally **understate** financial results, artificially **deflating** the Company's stock, for the purpose of selling his or her shares at **depressed** prices or receiving a **lower** bonus payment.  See Report at 48 ("No conclusion can be drawn that the Defendants were motivated to commit fraud in order to profit from inflated stock prices when the Defendants sold a portion of their shares at artificially depressed prices.").  Plaintiffs' motive allegations defy economic reason.  Therefore, they cannot support any inference of scienter when applied to Plaintiffs' Financial Disclosure Claims.

In sum, Plaintiffs' irrational motive allegations are defective, as a matter of law.

**B.      Plaintiffs' Financial Disclosure Claims
            Relating To IFIN's SBA Securities  Must Be Dismissed.**

**1.      Plaintiffs' SBA Security-Related Claims Must
            Be Dismissed Under The Law Of The Case Doctrine.**

In her Report, Magistrate Judge Dein recommended that this Court dismiss Plaintiffs' SBA security-related claims due to the Plaintiffs' failure adequately to allege loss causation with respect to those claims.  Plaintiffs' Amended Complaint contains the same defective loss causation allegations concerning its SBA security-related claims as the Consolidated Complaint. Indeed, the Amended Complaint does not contain a single new fact showing that IFIN ever issued any disclosure concerning the manner in which it accounted for its SBA securities that caused IFIN's stock price to drop, nor does the Amended Complaint reference any new law that modifies the loss causation pleading requirement the Supreme Court established in Dura

Pharms., Inc. v. Broudo, 544 U.S. 336 (2005). As such, Magistrate Judge Dein has already held that these loss causation allegations, which Plaintiffs recycle from their Consolidated Complaint, fail to satisfy Dura, as a matter of law. See Report at 52-55. Lacking any new facts and failing to cite a change in controlling authority, this Court should reject Plaintiffs' SBA security-related claims under the law of the case doctrine.

Even if the law of the case doctrine did not mandate dismissal of Plaintiffs' SBA security-related claims -- and it does -- those claims should be dismissed for all of the reasons stated infra at Section III.B.2, as well as the reasons stated in Magistrate Judge Dein's Report.

### 2. Plaintiffs' SBA Security-Related Claims Must Be Dismissed Under The PSLRA And Rule 9(b).

Plaintiffs' SBA security-related claims must be dismissed under the PSLRA and Rule 9(b) because: (1) Plaintiffs fail adequately to plead loss causation; (2) Plaintiffs fail to plead specific facts that render any disclosure concerning IFIN's SBA securities false or misleading; and (3) Plaintiffs fail adequately to plead scienter respecting their SBA security-related claims.

### a. Plaintiffs Fail To Plead Loss Causation Respecting Their SBA Security-Related Allegations.

As Magistrate Judge Dein previously held, none of Plaintiffs' SBA-related allegations can support a Section 10(b) claim because Plaintiffs have failed adequately to plead loss causation. In 2005, the United States Supreme Court, in Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005), resolved a circuit split regarding what plaintiffs in securities fraud actions must plead and prove to establish loss causation. As the Supreme Court held, Plaintiffs must plead that **the allegedly concealed facts** have become "generally known" and that, as a result of such disclosure, the defendant company's share price depreciated. Dura, 544 U.S. at 344. Since Dura, courts in more than 30 cases have dismissed securities claims for failure adequately to allege loss causation. See App. 29. As the court stated in In re Polaroid Corp. Sec. Litig., "there [is] no loss causation where the concealments were 'latent faults that never manifested themselves." 134 F. Supp. 2d 176, 188 (D. Mass. 2001). Further, as it is an element of their Section 10(b) securities fraud claim, Plaintiffs must allege loss causation with particularity under

Rule 9(b).  In re First Union Corp. Sec. Litig., No. 3:99CV237-H, 2006 WL 163616, at *5-6

(W.D.N.C. Jan. 20, 2006).

    In recommending this dismissal of Plaintiffs' SBA-related claims because Plaintiffs

failed to plead loss causation respecting those claims, Magistrate Judge Dein specifically rejected

Plaintiffs' attempt to link IFIN's August 9, 2005 post-Class Period disclosure that it had

experienced prepayments on its SBA portfolio to IFIN's July 14, 2005 disclosure revising its

earnings guidance.  As Magistrate Judge Dein stated:

> The Plaintiffs allege that "[t]he truth regarding the Company's earnings shortfall
> and severely reduced guidance" was not fully disclosed until August 9, 2005,
> when the Company revealed in its Form 10-Q . . . that it had experienced
> prepayments on its SBA portfolio.  However, that announcement occurred after
> the close of the Class Period and the Plaintiffs have not alleged any economic loss
> resulting from that belated disclosure.

Report at 54-55.  In their Amended Complaint, Plaintiffs rely upon the same August 9, 2005

disclosure regarding IFIN's SBA portfolio to allege loss causation.  FAC ¶ 304.  However,

Plaintiffs now allege that IFIN's August 9, 2005 disclosure was not, in fact, the "truth," as they

alleged in their Consolidated Complaint, but a further misrepresentation that did "not comport

with facts or logic."  Compare CC ¶¶ 227-28 with FAC ¶ 304.

    Regardless of how Plaintiffs choose to characterize IFIN's August 9, 2005 disclosure,

they cannot escape one simple truth:  there was never any disclosure regarding how IFIN

accounts for or classifies its SBA loans that triggered a corresponding drop in IFIN's stock price

during the class period, or even on August 9, 2005 (after the class period had ended).  The

Amended Complaint does not identify any stock drop that was allegedly triggered by the market

learning anything about either:  (1) IFIN's accounting for its SBA securities; (2) IFIN's

classification of its SBA securities; (3) IFIN's alleged need to write-down the value of its SBA

securities (which it never either did or needed to do); (4) the occurrence of prepayments on

IFIN's SBA securities; or (5) IFIN's prepayment policy.  Indeed, even if IFIN had inaccurately

accounted for its SBA securities -- which Plaintiffs have failed to allege with particularity (see

infra) -- any artificial inflation in IFIN's stock price that might have resulted from any such

misstatements would have remained in IFIN's stock price after the class period ended, because there never was any disclosure respecting those issues that triggered any decline in IFIN's stock price, ever. Dura, 544 U.S. at 342. In any event, Plaintiffs certainly have failed to allege that any concealed facts concerning how IFIN accounts for its SBA securities became "generally known" and resulted in a drop in IFIN's stock price during the putative class period.

Indeed, Plaintiffs' newly-minted argument that IFIN's August 9, 2005 statement concerning prepayments on its SBA securities was itself a misrepresentation, underscores Plaintiffs' failure both to comprehend and satisfy Dura's prescriptions. After all, under Dura, Plaintiffs must allege that the **truth** regarding how IFIN accounted for and classified its SBA securities became **generally known** causing a corresponding **drop** in the price of IFIN's stock. Instead, Plaintiffs allege that IFIN issued an additional **misrepresentation**, further **concealing** the truth, and causing IFIN's stock price to **rise**. See FAC ¶ 304; App. 22 (On August 9, 2005, IFIN's stock price opened at $34.15 a share and closed at $34.48 a share -- an increase of 33 cents per share). Thus, at most, the Amended Complaint conclusorily alleges "latent faults that never manifested themselves" and, therefore, fails to allege loss causation. In re Polaroid Corp. Sec. Litig., 134 F. Supp. 2d at 188. Consequently, Plaintiffs' continued failure to allege loss causation once again dictates the dismissal of their SBA-related claims.[20]

*    *    *

As Magistrate Judge Dein concluded in her Report, this Court need proceed no further. Report at 51 n.26. Plaintiffs' failure adequately to plead loss causation is fatal to all of their SBA security-related claims, as a matter of law. Even if Plaintiffs had cured their failure to allege loss causation -- which they have not -- as discussed below, Plaintiffs' SBA security-related claims nonetheless are subject to dismissal for the following two, separate, reasons: (1) Plaintiffs fail to plead specific facts regarding IFIN's SBA securities that render any financial disclosure false or

---

[20] While loss causation must be pled with particularity as required by Rule 9(b), Plaintiffs' loss causation claims also fail under a more lenient Rule 8 pleading standard.

misleading; and (2) Plaintiffs fail adequately to plead scienter respecting their SBA security-related claims.

> **b.    Plaintiffs Fail To Plead Specific Facts**
> **Regarding The Company's SBA Securities**
> **That Render Any Financial Disclosure False Or Misleading.**

Plaintiffs litter throughout their Amended Complaint the allegation that IFIN's financial disclosures respecting its SBA securities were fraudulently inaccurate. As discussed above, those claims fail because Plaintiffs fail adequately to plead scienter and loss causation. See supra 27-35. As discussed below, Plaintiffs' SBA securities claims also fail to state a claim because: (1) Plaintiffs fail to plead specific facts showing that the Company misclassified its SBA securities as Held-to-Maturity ("HTM"); and (2) Plaintiffs fail to plead specific facts showing that the Company was required to write down the value of its SBA portfolio.

> **(1)    Plaintiffs Fail To Plead**
> **Specific Facts Showing That The**
> **Company Misclassified Its SBA Securities**
> **Or "Certain" Of Its MBS Securities As HTM.**

Plaintiffs conclusorily allege that IFIN misled investors by misclassifying its SBA securities and "certain" of its MBS securities as HTM under FAS 115 and FAS 140. FAC ¶¶ 5, 8, 57, 62, 95, 122, 135, 143, 151, 177, 193, 199 & 226-230. Plaintiffs' allegations are unsupported by any specific facts, belied by their own allegations, and premised upon misrepresentations of FAS 115, FAS 140, and their respective requirements.

As an initial matter, conclusory allegations of GAAP violations do not suffice. Greebel, 194 F.3d at 203-04. Rather, a court must analyze whether the specific facts alleged demonstrate a violation of the GAAP provision on which a plaintiff relies. Id. Indeed, courts routinely dismiss securities fraud complaints that fail to plead specific facts showing that the GAAP provision in question has been violated. See, e.g., Greebel, 194 F.3d at 203-04 (affirming dismissal of claim that defendant improperly inflated earnings under GAAP where plaintiffs failed to plead specific facts indicating violation of FAS 48); In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 891-892 (8th Cir. 2002) (affirming dismissal of claim that defendants violated

FAS 121 and FAS 5 because plaintiffs failed to plead specific facts indicating that either provision was violated); Capstead, 258 F. Supp. 2d at 551-53 (dismissing claims where plaintiffs failed to plead specific facts showing that defendants misclassified its interest-only securities under FAS 115).

Here, Plaintiffs allege that IFIN mislead investors regarding the risks associated with MBS and SBA securities by improperly classifying its SBA securities and certain unspecified MBS securities as held-to-maturity.  FAC ¶¶ 226-231.  Plaintiffs' allegations, however, are based on a distortion of the applicable accounting rules.  Under Paragraph 7 of FAS 115, a company must classify its debt securities as HTM if the company has the intent and ability to hold those securities to maturity.  See FAS No. 115, ¶ 7 & Appendix A, ¶¶ 59 & 60 (App. 25).  Paragraph 7 of FAS 115 provides, in pertinent part:

> Investments in debt securities shall be classified as *held-to-maturity* and measured at amortized cost in the statement of financial position only if the reporting enterprise has the positive intent and ability to hold those securities to maturity.

FAS No. 115, ¶ 7 (emphasis in original).  A company's decision to classify a particular security as HTM is determined by whether the company's decision about continuing to hold, i.e., not sell, the security will be affected by "changes in market interest rates or the security's prepayment risk."  FAS No. 115 Appendix A, ¶ 62.  Paragraph 59 of Appendix A, provides that a company should consider "pertinent historical experience, such as sales and transfers of debt securities classified as [HTM]," when evaluating whether the company has the "intent and ability" to hold a security "to maturity."  FAS No. 115 Appendix A, ¶ 59.

As Plaintiffs allege in the Amended Complaint, FAS 140 amended Paragraph 7 of FAS 115 to also provide that "[a] security may not be classified as held-to-maturity if that security can contractually be prepaid or otherwise settled in such a way that the holder of the security would not recover substantially all of its recorded investment."  See FAC ¶ 227 (emphasis added).  However, as FAS 140 makes clear, the fact that a security may be contractually prepaid does not disqualify that security from being classified as HTM:

> The Board, by deciding that a receivable may not be classified as [HTM] if it can be prepaid or otherwise settled in such a way that the holder of the asset would not recover *substantially all* of its recorded investment, left room for judgment, so that investments in mortgage-backed securities or callable securities purchased at an insubstantial premium, for example, are not necessarily disallowed from being classified as [HTM].

FAS 140 Appendix A, ¶ 293 (emphasis in original) (App. 26).[21]

Here, Plaintiffs fail to plead any specific facts to support their conclusory allegation that IFIN misled investors by classifying its SBA securities and certain unspecified MBS securities as HTM. Plaintiffs' Amended Complaint is devoid of any specific facts indicating that IFIN did not have the "intent and ability" to hold its securities to maturity.[22] Plaintiffs have not pled a single specific fact that bears in any way on any of the factors identified in Paragraph 59 of FAS 115

------------------------------------------------------------

[21] The Board's recognition that this GAAP provision allows "room for judgment" is consistent with this Court observation that GAAP provisions "tolerate a range of 'reasonable' treatments leaving the choice among alternatives to management." Greebel, 194 F.3d at 205 (citation omitted). Furthermore, GAAP provisions, such as FAS 115, "require the substantial application of judgment." Capstead, 258 F. Supp. 2d at 552; see also Galileo, 127 F. Supp. 2d at 265 (accounting decisions often involve "fundamentally a subjective determination" and are "a matter of judgment and estimate"); see also FAS 140 Appendix A, ¶ 293 ("The Board, by deciding that a receivable may not be classified as held-to-maturity if it can be prepaid or otherwise settled in such a way that the holder of the asset would not recover *substantially all* of its recorded investment, **left room for judgment** . . . .") (second emphasis added).

[22] In its Forms 10-K throughout the Class Period, IFIN made the following disclosure concerning the classification of its securities:

> *Securities*—The Company classifies all equity securities that have readily determinable fair values and all investments in debt securities into one of three categories, as follows:
>
> • Debt securities that the Company has the positive intent and ability to hold to maturity are classified as held to maturity and reported at amortized cost.
>
> • Debt and equity securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities and reported at fair value, with unrealized gains and losses included in earnings.
>
> • All other debt and equity securities are classified as available for sale and reported at fair value, with unrealized gains and losses excluded from earnings and reported in other comprehensive income.

See, e.g., App. 3, at F-11.

Appendix A that a company must assess to determine whether it has the intent and ability to hold a security to maturity. Plaintiffs do not allege that IFIN ever sold or transferred improperly a single MBS or SBA security that it classified as HTM. See Capstead, 258 F. Supp. 2d at 552-54 (dismissing claim that defendant misclassified securities under FAS 115 where "[p]laintiffs allege[d] no facts demonstrating that [defendant] bought its . . . securities and held them principally for the purpose of selling them in a short period of time."). Rather, Plaintiffs allege that because MBS and SBA securities can be contractually prepaid, those securities are per se disqualified from being classified as HTM. FAC ¶ 228.

The plain language of FAS No. 140, quoted above, contradicts Plaintiffs' specious allegation that all securities that can be contractually prepaid cannot be classified as HTM. FAS No. 140 Appendix A, ¶ 293. As Paragraph 293 of FAS 140 Appendix A clearly states, the relevant inquiry in determining whether a security that can be contractually prepaid can be classified as HTM is whether the company can recover "substantially all" of its investment. ("[I]nvestments in mortgage-backed securities or callable securities purchased at an insubstantial premium, for example, are not necessarily disallowed from being classified as [HTM]."). Here, Plaintiffs fail to allege any specific facts -- as they must -- demonstrating that IFIN could not recover "substantially all" of its investment in securities that IFIN classified as HTM. Indeed, as Plaintiffs allege in their Amended Compliant, SBA pools are "backed by the full faith and credit of the U.S. government" and "[t]he investor in an SBA loan or pool has an unconditional **guarantee** as to the **repayment** of **100%** of the principal and accrued interest outstanding on a timely basis." FAC ¶ 43 (emphasis added).[23] Thus, Plaintiffs do not, because they cannot, allege specific facts demonstrating that IFIN could not recover "substantially all" of its investment in

---

[23] Moreover, Plaintiffs conclusorily allege that SBA loans can be "prepaid without penalty." FAC ¶ 49. However, Plaintiffs do not plead a single specific fact to support that conclusion. Indeed, in January 2001, the Small Business Administration imposed mandatory prepayment penalties on SBA loans that have a maturity of 15 years or more. See App. 27; see also www.sba.gov/services/financialassistance /basics/sbarole/serv_7a_penalties.html.

the SBA securities that IFIN held. See K-Tel Int'l, Inc., 300 F.3d at 891-92 (holding that plaintiffs' "allegations were not pled with particularity as required by the Reform Act in terms of alleging a basis for implicating FAS 121 and further specifying the assets, the carrying amount and the impairment of such assets.") (citing Greebel, 194 F.3d at 204).

For all of these reasons, Plaintiffs have failed sufficiently to allege that IFIN improperly classified any securities as HTM, as a matter of law.

> **(2)   Plaintiffs Fail To Plead Specific Facts Showing That The Company Was Required To Write Down The Value Of Its SBA Portfolio.**

Additionally, Plaintiffs fail to plead specific facts supporting its allegation that the Company's press releases and financial results were misleading because IFIN failed to take a "write-down" on its SBA portfolio, which Plaintiffs allege was required under EITF 99-20. FAC ¶ 168 (c). Specifically, Plaintiffs allege that, because the Company's SBA portfolio had an alleged unrealized loss of $12.8 million as of December 31, 2003, IFIN was required under EITF 99-20 to record a $12.8 million loss to income. FAC ¶ 168 (c). Similarly, Plaintiffs allege that the Company's SBA portfolio had an alleged unrealized loss of $18.4 million as of December 31, 2004. FAC ¶ 193(d). However, the plain language of EITF 99-20 makes clear that it does not apply to IFIN's SBA loan portfolio. Specifically, paragraph 5.e. of EITF 99-20 states that it does not apply to "financial assets that (1) are of **high credit quality** (for example, **guaranteed by the U.S. Government**, its agencies, or other creditworthy guarantors, and loans or securities sufficiently collaterized to ensure that the possibility of credit loss is remote). . . ." EITF 99-20 ¶ 5.e (emphasis added) (App. 28). In Plaintiffs' Amended Complaint, they admit that "**SBA guaranteed-loan pools** are **backed by the full faith and credit of the U.S. government** and offer the advantage of excellent credit quality, while allowing investors to earn high yields indexed off the prime rate." FAC ¶ 43 (citing Anand K. Bhattacharya & Frank J. Fabozzi, Asset-Backed Securities, Chapter 10: SBA Loan-Backed Securities) (emphasis added). Thus, Plaintiffs' own allegations make clear that, far from requiring IFIN to take a write-down on its SBA securities, EITF 99-20 does not even apply to SBA loans, which are guaranteed by the U.S.

government. Thus, Plaintiffs have failed sufficiently to allege that any IFIN press release or financial disclosure was misleading because IFIN failed to take a "write-down" on its SBA portfolio under EITF 99-20, as a matter of law. See, e.g., Greebel, 194 F.3d at 203-04 (affirming dismissal of claim that defendant improperly inflated earnings under GAAP where plaintiffs failed to plead specific facts indicating violation of FAS 48); Capstead, 258 F. Supp. 2d at 552-54 (dismissing, inter alia, claim that defendants failed properly to account for interest income under GAAP, where plaintiffs did not plead specific facts demonstrating that defendants had violated any GAAP provision).

### c.   Plaintiffs Fail Adequately To Plead Scienter Respecting Their SBA Security-Related Allegations.

Even if Plaintiffs had pled specific facts indicating that IFIN made a material misstatement concerning the Company's SBA portfolio -- which they have not -- their SBA security-related claims nonetheless would still fail because they have not pled any specific facts supporting a strong inference that any Individual Defendant knew that any disclosure concerning SBA loans was false when made. Contrary to the strict pleading requirements of the PSLRA and Rule 9(b), Plaintiffs fail to cite a single contemporaneous fact -- not a single specific document, or meeting, or conversation -- supporting a strong inference of scienter. See supra 17-31. For this independent reason, Plaintiffs' SBA security-related claims must be dismissed under Rule 9(b) and the PSLRA.

### C.   Plaintiffs' Claims Based On An Alleged Failure To Disclose Prepayment Risk Must Be Dismissed Under The Law Of The Case Doctrine And Rule 12(b)(6).

Plaintiffs' allegation that the Company's press releases and financial results were misleading because the Company failed to disclose risks associated with the possible prepayment of its debt securities, see FAC ¶ 8, 11, 57, must fail because, as Magistrate Judge Dein has already held, the Company, in fact, publicly disclosed these risks throughout the proposed class period. See Report at 20 ("The record is . . . clear that the risks of prepayments were detailed in

the [Company's] SEC filings."). Specifically, in its Forms 10-K the Company warned investors of the risks it faced due to the possibility of prepayments, stating:

> We invest in mortgage-backed securities, . . . Mortgage-backed securities generally have a higher yield than U.S. Treasury securities due to credit and **prepayment risk**. . . . Prepayment risk results from the possibility that **changes in interest rates may cause mortgage-backed securities to be paid off prior to their maturity dates.**

See, e.g., App. 4 at 43, 5 at 47 (emphasis added).[24]  Similarly, several of the Company's Forms 10-Q filed during the Class Period warned investors of prepayment risk and the effect of prepayment on net interest income. See, e.g., App. 1 at 34, 2 at 28. Plaintiffs' allegations that the Company failed to disclose its prepayment risk have no more basis in fact today than the day Magistrate Judge Dein drafted her opinion recommending their dismissal. As such, Plaintiffs' claims respecting IFIN's alleged failure to disclose prepayment risk should be dismissed under the law of the case doctrine and Rule 12(b)(6).

## IV.    PLAINTIFFS' SECTION 20(a) "CONTROL PERSON" CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE A PRIMARY VIOLATION OF THE SECURITIES LAWS.

As set forth above, Plaintiffs have failed adequately to allege a primary violation of Section 10(b) of the 1934 Act and SEC Rule 10b-5 thereunder. Accordingly, the Amended Complaint cannot state a claim for violation of Section 20(a) of the 1934 Act, as a matter of law. See Greebel, 194 F.3d at 207; Suna v. Bailey Corp., 107 F.3d 64, 71 (1st Cir. 1997) (same).[25]

---

[24] To avoid burdening the Court with literally hundreds of additional pages of exhibits, Defendants have not included in the Appendix submitted herewith all of IFIN's SEC filings from 2001 to 2005, virtually all of which Plaintiffs have challenged as false and misleading. To the extent the Court wishes to review any of these filings, Defendants will promptly submit them upon request and note that they are publicly available at http://www.sec.gov.

[25] Even if Plaintiffs had pled an underlying violation of Section 20(a) -- which they have not -- Plaintiffs have failed to plead that Defendants John N. Spinney, Karen C. Keenan, Robert D. Mancuso, Edmund J. Maroney and John E. Henry exercised any control over any controlled person. See FAC ¶ 317 (identifying only Kevin Sheehan and Michael Rogers as control persons).

## CONCLUSION

For all of the foregoing reasons, the Amended Complaint should be dismissed. Furthermore, because this Court already has dismissed Plaintiffs' Consolidated Complaint, without prejudice, and their Amended Complaint represents Plaintiffs' second effort to articulate cognizable claims, "[c]onsiderations of fairness, judicial economy, and congressional purpose in enacting the Securities Laws all point to a denial of discovery and to dismissal of this complaint with prejudice." Carney, 135 F. Supp. 2d at 257 (quoting Colby v. Hologic, Inc., 817 F. Supp. 204, 217 (D. Mass. 1993)).

Respectfully submitted,

**INVESTORS FINANCIAL SERVICES
CORP., KEVIN J. SHEEHAN,
MICHAEL F. ROGERS, JOHN N.
SPINNEY, JR., KAREN C. KEENAN,
ROBERT D. MANCUSO, EDMUND J.
MARONEY AND JOHN E. HENRY**

By their attorneys,

/s/ Jordan D. Hershman
Jordan D. Hershman, BBO #553709
Jason D. Frank, BBO #634985
James P. Lucking, BBO #650588
William R. Harb, BBO #657270
**BINGHAM McCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: January 11, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 11, 2008.

/s/ Jordan D. Hershman