UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE SUPPORTING FUND, On Behalf of Plaintiff and All Others Similarly Situated, | ) ) ) | No. 1:05-cv-11627-RCL **(Consolidated)** |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| INVESTORS FINANCIAL SERVICES CORP., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST
AMENDED CONSOLIDATED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...........................................................................................................1

II.     STATEMENT OF FACTS ............................................................................................2

III.    STANDARD OF REVIEW ..........................................................................................9

IV.     ARGUMENT ...............................................................................................................11

      A.    The Law of the Case Doctrine is Entirely Inapplicable Here and Should be
           Rejected Out of Hand; The FAC, the Only Operative Complaint Sets Forth
           an Actionable Complaint Under the PSLRA ........................................................11

           1.    Law of the Case .......................................................................................11

           2.    The FAC Is the Only Operative Complaint Before the Court and
                   Its Scheme to Defraud Relating to Defendants' Fraudulent
                   Reporting of IFIN's Investments and of Its Net Interest Income
                   States a Claim Under the PSLRA ............................................................12

      B.    The FAC Alleges IFIN's False and Misleading Statements Throughout the
           Class Period with Particularity..............................................................................15

      C.    Plaintiffs Have Pled a Strong Inference of Scienter Against All Defendants........21

           1.    Defendants Had Actual Knowledge of Prepayments on the
                   Company's Debt Securities and Falsely Reported Its Financial
                   Results Misleading the Market Throughout the Class Period ...................22

           2.    Defendants' Suspicious, Unusual and Substantial Stock Sales of
                   More than $68.1 Million Support a Strong Inference of Scienter .............24

           3.    Defendants' Dramatic Increase in Their Eligible Bonuses for 2004
                   Further Supports a Strong Inference of Scienter.......................................26

      D.    Defendants' False Statements Are Not Entitled to Safe Harbor Protection ..........28

           1.    Defendants Cannot Use Cautionary Language to Protect
                   Themselves When They Made Material Misrepresentations with
                   Actual Knowledge that They Were False and Misleading .......................28

           2.    Because They Had Actual Knowledge, Defendants' Disclaimers
                   Are Insufficient to Invoke Safe Harbor Protection ...................................30

**Page**

E.    Plaintiffs More than Adequately Plead Loss Causation Under the Controlling Authority of *Dura* ...............................................................................31

1.    Plaintiffs Plead More than the "Some Connection" Between the Fraud and a Decline in IFIN's Stock Price Required by *Dura* .................33

V.    PLAINTIFFS HAVE ADEQUATELY PLED A §20(a) CLAIM .....................................35

VI.    LEAVE TO AMEND .......................................................................................................36

VII.    CONCLUSION................................................................................................................36

# TABLE OF AUTHORITIES

**Page**

## CASES

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ....................................................................................10, 36

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) .....................................................................................24, 25

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) .......................................................................10, 21, 24, 35

*Asher v. Baxter Int'l.*,
    No. 02 C 5608, 2005 U.S. Dist. LEXIS 2131 (N.D. Ill. Feb. 3, 2005) ............................29

*Asher v. Baxter Int'l, Inc.*,
    377 F.3d 727 (7th Cir. 2004) .........................................................................................30

*Barrie v. Intervoice-Brite, Inc.*,
    409 F.3d 653 (5th Cir. 2005) .........................................................................................18

*Beyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ........................................................................28

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
    387 F.3d 468 (6th Cir. 2004) .........................................................................................27

*Danis v. USN Commc'ns, Inc.*,
    73 F. Supp. 2d 923 (1999) .............................................................................................30

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ......................................................................................................32

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ...................................................................................24, 27

*Freeland v. Iridium World Commc'ns, Ltd.*,
    233 F.R.D. 40 (D.C. 2006) .............................................................................................34

*Geffon v. Micrion Corp.*,
    249 F.3d 29 (1st Cir. 2001) ............................................................................................21

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ..........................................................................................21

**Page**

*Gross v. Medaphis Corp.*,
   977 F. Supp. 1463 (N.D. Ga. 1997) ............................................................17

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ....................................................................18

*In re Amylin Pharm., Inc. Sec. Litig.*,
   No. 01 cv 1455 BTM (NLS),
   2003 U.S. Dist. LEXIS 7667 (S.D. Cal. May 1, 2003).................................31

*In re Cabletron Sys.*,
   311 F.3d 11 (1st Cir. 2002)............................................................... *passim*

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ......................................................................29

*In re Cylink Sec. Litig.*,
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) ......................................................19

*In re Cytyc Corp. Sec. Litig.*,
   No. 02-12399-NMG, 2005 U.S. LEXIS 6166 (D. Mass. Mar. 1, 2005)...........17

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ....................................................................33

*In re Discovery Zone Sec. Litig.*,
   943 F. Supp. 924 (N.D. Ill. 1996) ...............................................................17

*In re Dura Pharm., Inc. Sec. Litig.*,
   452 F. Supp. 2d 1005 (S.D. Cal. 2006)................................................ *passim*

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   No. H-01-3624, 2003 U.S. Dist. LEXIS 7632 (S.D. Tex. Apr. 24, 2003).........18

*In re FirstEnergy Corp. Sec. Litig.*,
   316 F. Supp. 2d 581 (N.D. Ohio 2004).......................................................19

*In re Goodyear Tire & Rubber Co. Sec. Litig.*,
   436 F. Supp. 2d 873 (N.D. Ohio 2006).......................................................19

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001).........................................................18

**Page**

*In re Miller Indus., Inc. Sec. Litig.*,
    120 F. Supp. 2d 1371 (N.D. Ga. 2000) ...........................................................................17

*In re Omnivision Techs., Inc.*,
    No. C-04-2297 SC, 2005 WL 1867717 (N.D. Cal. July 29, 2005)....................................32

*In re Openwave Sys. Sec. Litig.*,
    No. 07 Civ. 1309 (DLC), 2007 WL 3224584 (S.D.N.Y. Oct. 31, 2007)...........................32

*In re Praecis Pharm., Inc. Sec. Litig.*,
    No. 04-12581-GAD, 2007 U.S. Dist. LEXIS 22222 (D. Mass. Mar. 28, 2007)...............15

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
    124 F. Supp. 2d 527 (S.D. Ohio 2000) ...........................................................................18

*In re St. Paul Travelers Sec. Litig. II*,
    No. 04-4697 (JRT/FNS), 2006 U.S. Dist. LEXIS 70261
    (D. Minn. Sept. 25, 2006) ..............................................................................................33

*In re StockerYale Sec. Litig.*,
    453 F. Supp. 2d 345 (D.N.H. 2006)...........................................................................35, 36

*In re Stone & Webster, Inc., Sec. Litig.*,
    253 F. Supp. 2d 102 (D. Mass. 2003) .............................................................................27

*In re Stone & Webster, Inc., Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)..............................................................................10, 35, 36

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) .......................................................................................25

*In re Xerox Corp. Sec. Litig.*,
    165 F. Supp. 2d 208 (D. Conn. 2001).............................................................................25

*Isquith v. Middle S. Utils., Inc.*,
    847 F.2d 186 (5th Cir.), *cert. denied*, 488 U.S. 926, 102 L. Ed. 2d 329, 109 S.
    Ct. 310 (1988) ................................................................................................................14

*Langevine v. District of Columbia*,
    106 F.3d 1018 (D.C. Cir. 1997) ....................................................................................11

*Lubin v. Chicago Title & Trust Co.*,
    260 F.2d 411 (7th Cir. 1958) .........................................................................................12

**Page**

*Lucia v. Prospect St. High Income Portfolio,*
  36 F. 3d 170 (1st Cir. 1994)..................................................................14

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
  513 F.3d 702 (7th Cir. 2008) ................................................17, 19, 20, 22

*Marksman Partners, L.P. v. Chantal Pharm. Corp.,*
  927 F. Supp. 1297 (C.D. Cal. 1996) ..................................................17

*McMahan v. Wherehouse Entertainment, Inc.,*
  900 F.2d 576 (2d Cir. 1990), *cert. denied*, 501 U.S. 1249, 115 L. Ed. 2d 1052,
  111 S. Ct. 2887 (1991)..................................................................14

*No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West
  Holding Corp.,*
  320 F.3d 920 (9th Cir. 2003) ............................................................28

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
  380 F.3d 1226 (9th Cir. 2004) ..........................................................23

*Parrino v. FHP, Inc.,*
  146 F.3d 699 (9th Cir. 1998) ............................................................12

*Perez-Ruiz v. Crespo-Guillen,*
  25 F.3d 40 (1st Cir. 1994)..................................................................11

*Pyramid Co. of Holyoke v. Homeplace Stores Two, Inc.,*
  175 F.R.D. 415 (D. Mass. 1997)........................................................36

*SEC v. Sys. Software Assocs., Inc.,*
  145 F. Supp. 2d 954 (N.D. Ill. 2001) ................................................17

*Shaw v. Digital Equip. Corp.,*
  82 F.3d 1194 (1st Cir. 1996)..............................................................35

*Sloman v. Presstek, Inc.,*
  No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475
  (D.N.H. Sept. 18, 2007) ......................................................10, 17, 19, 23

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.,*
  365 F.3d 353 (5th Cir. 2004) ............................................................19

*Stevelman v. Alias Research Inc.,*
  174 F.3d 79 (2d Cir. 1999)................................................................25

**Page**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 127 S. Ct. 2499 (2007) .............................................................................................10, 23

*United States v. Henke*,
 222 F.3d 633 (9th Cir. 2000) ......................................................................................18

*Wojtunik v. Kealy*,
 No. CV-03-2161-PHX-PGR, 2006 U.S. Dist. LEXIS 73448
 (D. Ariz. Sept. 30, 2006)..............................................................................................32

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
 §78j(b)..................................................................................................................10
 §78t(a)..................................................................................................................35
 §78u-4 .......................................................................................................... *passim*
 §78u-4(b)(1)........................................................................................................17
 §78u-5(c)(1).........................................................................................................30

17 C.F.R
 §§210.1-02(a)(2) ................................................................................................19
 §210.4-01(a)(1) .............................................................................................17, 19
 §240.10b-5 ..........................................................................................................10
 §240.10b5-1(c).............................................................................................26, 27
 §240.12b-2 ..........................................................................................................35
 §249.308a ...........................................................................................................19

## RULES

Federal Rules of Civil Procedure
 Rule 8.............................................................................................................32, 35
 Rule 9(b) .............................................................................................................17
 Rule 10(b)5-1................................................................................................12, 26
 Rule 8(a)(2)....................................................................................................32, 33
 Rule 12(b)(6)........................................................................................................9
 Rule 15(a)............................................................................................................36

Local Rule 7.1(d) ...........................................................................................................36

## SECONDARY AUTHORITIES

*Black's Law Dictionary* .................................................................................................14

## I.       INTRODUCTION

On July 31, 2007, Magistrate Judge Dein, recommended that lead plaintiffs' initial consolidated complaint be dismissed without prejudice and that lead plaintiff be given leave to file an amended complaint ("FAC").[1] That recommendation was subsequently accepted and adopted by this Court and plaintiff filed an amended complaint on October 29, 2007. The FAC addressed and cured the deficiencies identified by Magistrate Dein in her Report and Recommendation on Defendants' Motion to Dismiss ("Report and Recommendation").

The FAC makes clear that defendants, with extensive knowledge both of Investors Financial Services Corporation's ("Investors Financial," "IFIN" or the "Company") business and accounting requirements, knowingly or recklessly reported falsely inflated financial results throughout the Class Period (April 10, 2001 through July 14, 2005) and particularly misled the market concerning the Company's reported net interest income, a key metric used by investors to assess a company's financial condition.[2] It was not until July 14, 2005, after the November 2004 restatement of 3-1/2 years of financial results, that defendants finally admitted that a 25% growth in net income would not (and could not) be achieved. In fact, the prepayments had diminished IFIN's net interest income. Because substantial prepayment in IFIN bond portfolio had been made since 2002, this information this had long been known to defendants and they had falsified the Company's accounting to conceal it from the market.

---

[1]      "FAC" or the "Complaint" refers to Lead Plaintiffs' First Amended Consolidated Complaint for Violation of the Federal Securities Laws, filed October 29, 2007.

[2]      In the Report and Recommendation, the Court noted that the earnings projections were not actionable because, even as restated, the Company achieved the projected growth rates. Report and Recommendation at 3. But the gravamen of plaintiffs' FAC in defendants' scheme to defraud – concealing declining net interest income by misleading the market through improper accounting.

Defendants were well motivated to conceal the true financial picture of the Company throughout the Class Period. During the Class Period, defendants also sold a combined total of over 1,100,000 shares of stock at artificially inflated prices for proceeds of over $65.8 million, the vast majority of which were obtained while the Company had issued false financial statements. The executive officers also reaped bonuses of $8.7 million which were tied to the Company's financial performance. ¶287[3] (breakdown of the individual defendants' sales). Defendants were thus able to reap the benefit of their fraudulent conduct.

The FAC sets out how defendants affirmatively misled the public about Investors Financial's reported financial results, knowingly or recklessly, by reporting those results in violation of generally accepted accounting principles ("GAAP"), and their knowledge of the falsity of the Company's net interest income projections are pled with particularity and raise a strong inference of scienter that is more than sufficient to meet even the stringent standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Lead plaintiffs' current FAC meets its burden at the pleading stage, and defendants' motion to dismiss should be denied.

## II.    STATEMENT OF FACTS

Investors Financial is a bank holding company that through its subsidiaries, primarily Investors Bank & Trust ("IBT"), provides a broad range of services to financial asset managers, such as mutual fund complexes, investment advisors, banks and insurance companies. The Company manages a portfolio of financial assets that it holds for its own account. ¶2. IFIN's business breaks down to about 70%-75% from the financial servicing fees 25%-30% from the investments. ¶¶3-4. The servicing business is generally regarded as relatively predictable and recurring. IFIN's

---

[3]    All paragraph ("¶") references refer to the Complaint.

investments – generally, mortgage-backed securities ("MBS") and Federal agency debt securities (principally Small Business Administration ("SBA") backed loans) – were subject to a number of risks and because there were generally bond investments, a key measure of the Company's financial health is its net interest income[4] – which the market watched and the Company reported in every quarterly earnings release. *See, e.g.*, ¶72 (1Q 2001 net interest income of $21.5 million – an increase of 65% over 1Q 2000); *see also* ¶¶77, 84.

Investors look at the Company's net interest income because, among other things, it reflected the income stream and profitability generated by the Company's bond portfolio. ¶4. In addition, the classification of IFIN securities, as either held to maturity (HTM) or available for trade (AFS) were important to IFIN's financial results. ¶62. HTM securities could be reported at amortized cost without regard to market fluctuations; securities that were not or could not be so classified were reported at fair value with any unrealized gain or loss reported in earnings or other comprehensive income as a component of shareholder equity. *Id.* Thus, investments that were HTM, particularly where the principal was guaranteed, provided a far more stable source of interest income. ¶62.

Defendants were not only cognizant of the importance of these measures of the Company's health but the Securities and Exchange Commission ("SEC") and GAAP required that they accurately and completely report this information to the market since it was necessary for a fair presentation of the Company's financial performance. *E.g.*, ¶223(d) ("'[f]inancial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise'");

---

[4]    The Company's net interest income is the difference between income generated from interest-earning assets and expense on its interest-bearing liabilities – generally MBS and federal agency debt securities (principally SBA backed loans). ¶4.

¶223(f) (an enterprise's financial reporting should be complete, "which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions").

As the officers and directors of a publicly traded company, defendants, particularly Kevin Sheehan, Karen C. Keenan and later John N. Spinney, knew that they were obligated to comply with GAAP. IFIN's Board of Directors delegated the day-to-day responsibility for managing the Company's Asset and Liability Management function to the Asset and Liability Committee ("ALCO"), consisting of the Chief Executive Officer ("CEO"), the President, the Chief Financial Officer ("CFO"), and the Chief Risk Officer among others. ¶¶64-65. ALCO was a senior management committee whose functions, by its own admission, was to manage interest rate sensitivity with regard to the Company's investments. ¶¶65-66. In discharging its responsibilities, ALCO used simulation models that included the timing of cash flows, maturities, repricing of financial instruments, and changes in market conditions among other things. ¶66. Sheehan, Michael F. Rogers, Spinney and Keenan were members of ALCO and attended the twice monthly meetings receiving reports on net interest income, interest rates and the yield curve and key assumptions in their income simulation model, including timing of cash flows, maturities and repricing of its financial instruments. *Id*. Thus, members of ALCO knew, on almost a realtime basis, whether and when a security becomes prepaid because the interest income for that security ceases. Defendants were actively and constantly evaluating IFIN's investments and thus could tell if "prepayment risk" had become a reality.

In fact, as defendants knew, they were. By the end of 2003, the Company had experienced approximately $619 million in SBA loan prepayments. ¶¶55-56. In fact, to hide the prepayments, the Company stopped reporting the contractual "years to maturity" information which it had reported

- 4 -

in years past. ¶56. The results were dramatic: after 2003, the SBA prepayments in the five to ten year category had declined by 93%. *Id.* At the same time defendants increased (albeit unreported) their portfolio of over ten years investments but these were at a lower yield and less likely to prepay. *Id.*

Further, defendants' knowledge of the prepayments and their impact is shown not only by their change in reporting and restatement, but by confidential witness ("CW") 1 – a member of ALCO and percipient witness at the Company during 2003, when substantial prepayments occurred. CW1 confirmed that ALCO was fully aware of the status of IFIN's portfolio-receiving extensive financial information concerning the interest bearing assets of the Company, ¶69, as well as detailed schedules with data and analysis of risk associated with particular assets and liabilities. *Id.* In addition, CW1 expressly told defendant Spinney that the unamortized premiums of the SBA bonds were at risk if they were prepaid, ¶49, and that risk materialized in 2002-2003. ¶50.

Because the prepayments effectively eliminated future net interest income on those investments, defendants, however, could not maintain the fraud forever. On October 21, 2004, IFIN stunned the market by announcing that it would restate its last three years of financial results. ¶167. The announced restatement, coming in mid-October 2004, seemed to analysts to come out of the blue and for no apparent reason. ¶165. In the conference call, analysts pressed both defendants Spinney and Sheehan repeatedly seeking an explanation as to why the restatement had occurred then. *See, e.g.*, ¶165 (Kyle Simonairro) ("What happened this quarter that you suddenly woke up and said we need to take a look at this?"). When they responded, both Spinney and Sheehan essentially stated that the review was part of their internal review structure. *Id.* But that could not have been the answer – defendants had examined IFIN's internal controls every quarter since September 2002, and had certified that "Investors Financial had established and maintained disclosure controls and

procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized and reported."   ¶265.   The circumstances and the effect of the restatement reveal that it was timed to minimize the current impact eliminating the fraudulent accounting and increase net interest income to compensate for the declining yields.  ¶238.

At the outset, defendant Sheehan made clear that, "[f]rom a financial perspective, the impact of this change will not be significant for years 2002 through 2004."  ¶165.  Thus, defendants had already determined that the most significant negative impact would be remote, and had the largest impact when interest rates  began to declined in 2001-2002.  Had the Company properly accounted for at the time, IFIN would have taken a large "catch-up" adjustment – an approximately $10.9 million charge to interest income to properly readjust the yields which would have disclosed the risks in the investment portfolio and would have reduced the Company's quarter after quarter growth.  ¶238.  The prospective method allowed the Company to avoid the "catch-up" adjustment which would have maintained a level yield over the life of the loan as required.  As the Company was facing decreasing yield going forward, defendants decided to comply with GAAP with the main motive being to spread the net interest income over future periods.  *Id.*

Moreover, defendants did effectively admit, (albeit not intentionally), that the prospective method they had been using did not comply with GAAP:

Jon Arfstrom – *RBC Capital Markets – Analyst*

Is it as simple as – is it conservatism?  And if one results in a lower number that's what you will choose or how do you differentiate between which method is the best to use?

Kevin Sheehan – *Investors Financial Services Corp. – Chairman, CEO*

I think they are just really 2 fundamentally different methodologies and I think we have come to the conclusion in conjunction with our advisors that the retrospective

method is the more correct method and more consistent with the requirements of GAAP. And we just have to change to it.

¶165.

In the conference call, defendant Spinney not only knew the different methods but it was clear that he was familiar with how and why they applied:

Carla Cooper – *Robert W. Baird & Company – Analyst*

Okay. And John do you think with your accounting background you could indulge us a little bit with some FAS 91 and just talk a little bit more about perspective versus retrospective and maybe why it has become particularly important at this time?

John Spinney Jr. – *Investors Financial Services Corp. – CFO*

I guess – sure. That's easy to do, Carla, I guess. The FAS 91 is a FAS related to the amortization of discounts and premiums and direct costs on loans that originated by financial institutions as well. Under this particular FAS, you have to calculate an effective yield for the securities in order to amortize premiums and discounts on the securities and the investment portfolio. We have always used a prospective method which basically takes your current accounting yield and projects it forward and for purposes of determining a current amortization of premium or accretion of discount. Under the ~~prospective~~ [retrospective] method of accounting you would calculate your current yield today by taking all the prior cash flows and projecting your future cash flows to come up with a new yield for determining, really your net investment today and comparing that to the prior period of that investment and adjusting any balance up or down as a result of that analysis. So in the case of a security that had premium in – when that evaluation was done there could be an additional premium that would need to be recognized after that analysis was performed. That was retrospective.

¶165. The following day, Friday, October 22, 2004, Investors Financial's share price dropped 16.5% from $43.70 to $36.50 on trading volume of 11.6 million shares (over 17 times the average Class Period trading volume). ¶166.

On November 15, 2004, Investors Financial announced its restated financials for 2001, 2002, 2003 and the first two quarters of 2004, stating in part that:

The Company's cumulative restatement since inception resulting from the accounting review was a reduction of $6.2 million in net interest income. . . . The respective net interest income adjustments for the years ended December 31, 2002,

- 7 -

2003 and 2004 were a reduction of $2.3 million, an increase of $1.0 million and an increase of $2.7 million.

¶169. Even this revealed only part of the story. Defendants restated fiscal years 2001, 2002, 2003 and the first two quarters of 2004, and included 3Q 2004 net interest income to arrive at the $2.7 million increase to net interest income. *Id*. Thus, later in the conference call, Spinney couched their guidance by stating:

> Included in our guidance is and has always been a forecast of SBAs running at industry prepayment speeds. We remain comfortable with our long-term growth rate of 25% on EPS.

¶170. But defendants knew that significant SBA prepayments had already occurred and that those prepayments had negatively affected the Company's net interest income. *See, e.g.*, ¶56.

On January 25, 2005, in press release, Sheehan stated "[w]e remain confident in our ability to produce growth of 25% in diluted earnings per share in 2005." ¶185. However, even with the increase in current income from the "catch-up" provision in the retrospective method, the extensive prepayments in prior quarters had effectively eliminated the possibility that the growth could continue.

By mid-year, defendants could no longer maintain the facade. On July 14, 2005, Investors Financial slashed its fiscal year 2005 and 2006 diluted EPS guidance by 15% announcing that "[t]he Company expects to achieve growth of approximately 10% in diluted earnings per share in 2005." ¶200. Defendants sought to explain that change was due to "a flatter than expected yield curve," among other things. *Id*. However, this explanation not only contradicted statements that a flattening of the yield curve was taken in account in the 25% growth guidance, ¶186, but was inconsistent with the fact that the Company had considered the yield curve in virtually every estimate that the Company had given since 2002. ¶204.

While defendants' explanation for the reduction was less than forthcoming, the causal effect of the disclosure was not. The next day, on July 15, 2005, the market reaction was again severe. Investors Financial's share price immediately dropped 18% from $41.52 to $34.05. ¶202. It was not until August 9, 2005, three weeks later, defendants finally disclosed for the very first time what they had known since the beginning: that prepayments, and particularly SBA prepayments, had reduced the Company's net income and growth potential. SBA securities experienced prepayments by stating that:

> *Prepayment experience for Federal agency securities (primarily SBA guaranteed loan pools) also increased* over this period as the weighted average life of the securities shortened. We expect the combination of *heightened prepayment experience and, more significantly, reduced reinvestment opportunities to continue to pressure our net interest income for the remainder of 2005*.

¶272. The market had finally learned the reason for the decline, but the damage was already done.

In addition to the evidence of conscious accounting fraud, defendants also reaped the benefits of IFIN's inflated stock price. By maintaining Investors Financial's stock price at artificially inflated levels and avoiding the timely readjustment the compliance with GAAP required, they were able to, among other things, sell $68.1 million in Investors Financial stock – the vast majority of which was sold prior to the decision to restate the Company's financial results. In addition, they took home $8.6 million in salary and $21.8 million in incentive bonuses – which was tied to the Company's financial performance. ¶¶278-79.

The FAC lays out defendants' scheme to defraud the market with particularized detail that far exceeds the pleading requirements of the PSLRA. Accordingly, defendants' motion to dismiss should be denied.

## III.    STANDARD OF REVIEW

Recently, both the Supreme Court and the First Circuit reaffirmed that in evaluating a Fed. R. Civ. P. 12(b)(6) motion, in the securities fraud context, the court must take the factual allegations in

the complaint as true as with any motion to dismiss. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46 (1st Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002).

To state a claim under §10b of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, plaintiffs must allege: (1) "a material misrepresentation (or omission)"; (2) "scienter, *i.e.*, a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) "loss causation." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 193 (1st Cir. 2005)

With respect to scienter, the *ACA* court acknowledged that *Tellabs* modified some of the First Circuit's prior case law. The court first noted, however, that "*Tellabs* confirms this Court's existing rule from *Cabletron*, 311 F.3d at 40, that scienter should be evaluated with reference to the complaint as a whole rather than to piecemeal allegations. *Tellabs*, 127 S. Ct. at 2509 ('The inquiry . . . is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter . . . .')." *ACA*, 512 F.3d at 59. But the court acknowledged that *Tellabs* overruled prior First Circuit case law holding that equally strong inferences both for or against scienter resulted in a win for defendants. *Id*. Now, where there are equally strong inferences of scienter, the court must come down on the side of sustaining the complaint. "In other words, where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff." *Id*.; *Tellabs*, 127 S. Ct. at 2510 ("A complaint will survive . . . if . . . the inference of scienter [is] cogent and at least as compelling as any opposing inference one could draw from the facts alleged."); *accord, Sloman v. Presstek, Inc.*, No. 06-cv-377-JD, 2007 U.S. Dist. LEXIS 69475, at *25 (D.N.H. Sept. 18, 2007) ("In other words, a tie now goes to the plaintiff.").

## IV.    ARGUMENT

### A.    The Law of the Case Doctrine is Entirely Inapplicable Here and Should be Rejected Out of Hand; The FAC, the Only Operative Complaint Sets Forth an Actionable Complaint Under the PSLRA

#### 1.    Law of the Case

Defendants' argument that the FAC should be dismissed under the law of the case doctrine, should be summarily rejected: the doctrine simply has no application where, as here, defendants spend much of their brief arguing that the entire FAC should be dismissed under the law of case doctrine.

On September 28, 2007, the Court issued an Order granting defendants' motion to dismiss and adopting the Report and Recommendations of Magistrate Dein with leave to file an amended complaint. *See* Order entered September 28, 2007. The September 28, 2007 Order was an interlocutory order, not a final decision by the Court – indeed, it clearly contemplated a subsequent complaint.

First Circuit case law is clear: the law of the case doctrine does not apply to interlocutory orders such as Magistrate Dein's Report and Recommendation or the Court's Order adopting Magistrate Dein's Report and Recommendation. *In re Cabletron Sys.*, 311 F.3d 11, 22 n.2 (1st Cir. 2002) ("'Interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case.'"); *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994) (same); *see also Langevine v. District of Columbia,* 106 F.3d 1018, 1023 (D.C. Cir. 1997) ("Interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment."). Indeed, this is particularly true, where, as here, the operative pleading was to be amended. Therefore, neither the issues addressed in Magistrate Dein's Report and Recommendation nor its adoption by the Court's September 28, 2007 Order render it the law of the case.

- 11 -

Defendants' suggestion that the adoption of Magistrate Dein's Report and Recommendation somehow prevents plaintiffs from reasserting their claims in an amended complaint is simply wrong. In dismissing the FAC without prejudice, the Court contemplated that another complaint could and would be filed. Here, the FAC re-asserts both a Rule §10b-5 claim and a §20(a) claim, and addresses the concerns raised in the Report and Recommendation. The current complaint must be evaluated against the pleading standards of the PSLRA. Nothing was waived. *See Parrino v. FHP, Inc.*, 146 F.3d 699, 704 (9th Cir. 1998) ("A plaintiff waives all claims dismissed with leave to amend by failing to reallege those claims in his amended complaint.").

> **2.** **The FAC Is the Only Operative Complaint Before the Court and Its Scheme to Defraud Relating to Defendants' Fraudulent Reporting of IFIN's Investments and of Its Net Interest Income States a Claim Under the PSLRA**

Defendants, as they did in their last motion to dismiss, attempt to attribute allegations made by other plaintiffs in earlier complaints to the lead plaintiffs. *See, e.g.*, Defs' Mem.[5] at 5. This is wholly improper. Because the FAC is the only pleading currently before the Court and lead plaintiffs were not parties to the first filed complaints, the allegations of other plaintiffs cannot and should not be attributed to them. Indeed, even allegations in prior complaints filed by the same party are no longer binding. *Lubin v. Chicago Title & Trust Co.*, 260 F.2d 411, 413 (7th Cir. 1958) ("It is hornbook law that an amended complaint complete in itself and making no reference to nor adopting any portion of a prior complaint renders the latter functus officio."); *see also* 3 James Wm. Moore, *et al.*, Moore's Federal Practice ¶15.17[3] (3d ed. 1997) ("An amended pleading that is complete in itself and does not reference or adopt any portion of the prior pleading supersedes the prior

---

[5]    "Defs' Mem." refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Consolidated Complaint in its entirety, filed January 11, 2008.

pleading."). Thus, defendants' repeated attempts to contrast what other plaintiffs may have said in other pleadings filed at an earlier time are simply not part of this case or the present motion.

Similarly, defendants' attempts to show that IFIN's net interest income was not material by comparing it to total net operating revenue, or overall net income, *see* Defs' Mem. at 6-7, are likewise improper. Investors Financial's net interest income measured the continued income and viability of the Company investments – a major segment of IFIN's business. The FAC sets out precisely why IFIN's net interest income was material to investors in valuing the Company's financial results and financial prospects. *See, e.g.* ¶¶2-5. In fact, GAAP, which IFIN was required to follow and told the market it was following, recognizes that earnings – net income and its component parts, like net interest income here – are key components in evaluating the enterprise. FASB Statement of Financial Accounting Concepts No. 1 expressly captures the distinction:

> The primary focus of financial reporting is information about an enterprise's performance provided by measures of earnings ***and its components***. Investors, creditors, and others who are concerned with assessing the prospects for enterprise net cash inflows are especially interested in that information. Their interest in an enterprise's future cash flows and its ability to generate favorable cash flows leads primarily to an interest in information about its earnings rather than information directly about its cash flows. Financial statements that show only cash receipts and payments during a short period, such as a year, cannot adequately indicate whether or not an enterprise's performance is successful.

Given defendants' repeated statements to the market regarding the Company's net interest income, and the fact that they informed the market about the Company's ability to recover its overall investments on its securities, a substantial portion of IFIN's business, there can be no serious question that investors were particularly focused on it in making investment decisions. Indeed, the materiality of IFIN's net interest income is reflected by its restatement in 2004, which related to the Company's improper accounting for these investments.

Defendants also seek to minimize their fraud by pointing out that, ordinarily, class actions point to restatements as evidence of fraud because their restated financial results are lower but that,

here, the results are higher for some of the periods.  Defs' Mem. at 6.  The fact that defendants'

fraudulent conduct is not of the kind "ordinarily" seen does not make it any less culpable.  While the

securities laws define the elements of the cause of action, the means and methods by which

defendants commit the violation are limited only by their ingenuity.  *See, generally*, *Black's Law*

*Dictionary* (Fraud is: ". . . . .  All multifarious means which human ingenuity can devise, and which

are resorted to by one individual to get advantage over another by false suggestions or suppression of

the truth, and includes all surprise, trick, cunning, or dissembling, and any unfair way by which

another is cheated.").  Fraudulent conduct that otherwise establishes a securities law violation is not

so limited.

Thus, for example, in *Lucia v. Prospect St. High Income Portfolio*, 36 F. 3d 170 (1st Cir.

1994), defendants had compared their investment portfolio with the ten year rate of return on

treasury bonds and claimed that it was superior over that period.  In a complaint for securities fraud,

plaintiffs alleged that over the last six years, prior to the offering at issue, treasury bonds had done

better.  *Id* at 176-77.  The First Circuit, in reversing the dismissal of the complaint held that despite

the literal truth of the comparison, a cause of action was stated:

> [T]he fact that a statement is literally accurate does not preclude liability under
> federal securities laws.  "Some statements, although literally accurate, can become,
> through their context and manner of presentation, devices which mislead investors.
> For that reason, the disclosure required by the securities laws is measured not by
> literal truth, but by the ability of the material to accurately inform rather than mislead
> prospective buyers."  *McMahan v. Wherehouse Entertainment, Inc.*, 900 F.2d 576,
> 579 (2d Cir. 1990), *cert. denied*, 501 U.S. 1249, 115 L. Ed. 2d 1052, 111 S. Ct. 2887
> (1991).  Under the foregoing standards, "emphasis and gloss can, in the right
> circumstances, create liability."  *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 203
> (5th Cir.), *cert. denied*, 488 U.S. 926, 102 L. Ed. 2d 329, 109 S. Ct. 310 (1988).

*Id*. at 175.  In the present case, there is no doubt that the earlier financial results relating to the

Company's net interest income were false when made – indeed, that was why they were restated.

The relevant context is that of the classification of the Company's investments and the materiality to

- 14 -

investors of IFIN's net interest income to the overall value of the Company.  As the FAC alleges, these were critical measures used by investors to value the Company and, accordingly, properly allege a securities fraud class action.

**B.    The FAC Alleges IFIN's False and Misleading Statements Throughout the Class Period with Particularity**

The FAC pleads the falsity of IFIN's financial results reported in statements to the market via press releases and during analyst conference calls and filed with the SEC in quarterly and annual Forms 10-Q and 10-K.  The FAC need only identify the exact statements or the content plaintiffs allege were false and misleading, the identity of the speakers, the date the statements were made and the reasons the statements were false.  *In re Praecis Pharm., Inc. Sec. Litig.*, No. 04-12581-GAD, 2007 U.S. Dist. LEXIS 22222, at \*12 (D. Mass. Mar. 28, 2007).  The FAC easily met this standard and set forth which statements reporting financial results plaintiffs contend were false, the dates upon which those statements were made and who the speakers were.  ¶¶72, 74-75, 77, 79, 81-89, 91-97, 99-104, 106-11, 113-17, 119-30, 132-38, 130-55, 157-59, 161-62, 164-65, 167-201, 204.  The statements reporting financial results fall into three categories:  (1) IFIN's earnings announcements (¶¶72, 77, 84-85, 88-89, 96-97, 102, 104, 108-09, 115-16, 123-24, 128, 130, 136, 138, 144-45, 152-53, 155-57, 159, 162, 164, 169, 182, 185, 194, 200); (2) public statements made by defendants to securities analysts, news reporters and investors (¶¶83, 91, 99, 103, 110-11, 117, 129, 137, 158, 165, 167, 170, 186, 195, 201, 204); and (3) IFIN's statements in quarterly and year-end public filings with the SEC (¶¶74-75, 79, 81, 86-87, 92-94, 100-01, 106-07, 113-14, 119-21, 125-27, 132-34, 140-42, 146-50, 154, 161, 172-76, 178-80, 188-92, 196-98).  The FAC also sets forth in detail precisely why the statements were false when made and how they were material to investors.  ¶¶95, 122, 135, 143, 151, 168, 171, 177, 181, 184, 187, 193, 199, 204.

In addition to setting forth why each of these earnings announcements, public statements to investors and analysts and SEC filings were untrue or omitted material facts, the FAC details how defendants' claims of steady projected net interest income violated long-standing accounting principles. ¶¶219-48. Defendants' arguments aside, there can be no question that plaintiffs identify with particularity how IFIN improperly classified its SBA and MBS as HTM securities, utilized the improper prospective method for accounting for net interest income, and restated its historic financials in order to give investors and the market the false impression that the securities would bring a constant stream of interest income. ¶¶206-48. Plaintiffs do not simply state that these statements were misleading, but explain exactly how much of IFIN's net interest income revenue was overstated and the dramatic impact defendants' scheme had on covering up the Company's diminishing interest income revenue. *E.g.*, ¶294.

The FAC lays out defendants' false statements and why those statements were false when made. For example, in ¶¶72-95, the FAC sets forth the alleged false statements regarding IFIN's financial results in fiscal year 2001: ¶72 sets forth IFIN's April 10, 2001 press release reporting financial results for 1Q 2001; ¶74 sets forth IFIN's Form 10-Q filed with the SEC for 1Q 2001, which included the financial results for that quarter; ¶77 sets forth IFIN's July 10, 2001 press release reporting financial results for 2Q 2001; ¶81 sets forth IFIN's Form 10-Q filed with the SEC for 2Q 2001, which included the financial results for that quarter; ¶84 sets forth IFIN's October 11, 2001 press release reporting financial results for 3Q 2001; ¶86 sets forth IFIN's Form 10-Q filed with the SEC for 3Q 2001, which included the financial results for that quarter; ¶88 sets forth IFIN's January 22, 2002 press release reporting financial results for 4Q 2001; ¶91 sets forth that these financial results were discussed the same day by defendant Sheehan during a quarterly earnings conference call with securities analysts; ¶92 sets forth IFIN's Form 10-Q filed with the SEC for 4Q 2001,

which included the financial results for that quarter. Paragraph 95(a)-(d) then explains in detail why defendants' statements for fiscal year 2001, set forth in ¶¶72-95, were false and misleading when made.[6] This clearly complies with the pleading requirements of Rule 9(b) of the PSLRA. 15 U.S.C. §78u-4(b)(1).

SEC Regulation 17 C.F.R. § 210.4-01(a)(1) provides that "'filings that do not comply with GAAP will be presumed to be misleading and inaccurate.'" *In re Cytyc Corp. Sec. Litig.*, No. 02-12399-NMG, 2005 U.S. LEXIS 6166, at \*48 n. 37 (D. Mass. Mar. 1, 2005) (citing *Cabletron*, 311 F.3d at 34). "A financial statement that recognizes revenue and does not conform to the requirements of GAAP is presumptively a false or misleading statement of material fact under Rule 10b-5." *SEC v. Sys. Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001); *see also In re Miller Indus., Inc. Sec. Litig.*, 120 F. Supp. 2d 1371, 1379 (N.D. Ga. 2000) ("overstatement of revenues and income in violation of GAAP may constitute false or misleading statements of material fact in violation of Rule 10b-5"); *Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) (same); *In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924, 936-37 (N.D. Ill. 1996) (same); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1304 (C.D. Cal. 1996) (same).

There is no doubt that both Sheehan and the CFO defendants (Spinny and Keenan) were authorized to make the statements on behalf of the Company and thus, the Company is clearly liable for them. *Sloman*, 2007 U.S. Dist. LEXIS 69475, at \*27; *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008). This Court should thus reject defendants' assertions that the FAC

---

[6]     A similar pattern is followed throughout the Complaint as follows: 1Q 2002: ¶¶96-101, 122; 2Q 2002: ¶¶102-07, 122; 3Q 2002: ¶¶108-14, 122; 4Q 2002: ¶¶115-22; 1Q 2003: ¶¶123-27; 2Q 2003: ¶¶128-35; 3Q 2003: ¶¶136-143; 4Q 2003: ¶¶144-51; 1Q 2004: ¶¶152-56; 2Q 2004: ¶¶157-63; 3Q 2004: ¶¶164-84; 4Q 2004: ¶¶185-93; 1Q 2005: ¶¶194-99; 2Q 2005: ¶¶200-05.

does not adequately tie defendants to the alleged fraud. Defs' Mem. at 8. Further, it is axiomatic that "an individual who signs an SEC filing at a time when he knows, or exhibits reckless disregard toward warnings, that it is false or misleading, has 'made' a statement for purposes of a primary violation of §10(b)." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, No. H-01-3624, 2003 U.S. Dist. LEXIS 7632, at *10 (S.D. Tex. Apr. 24, 2003). For this reason, each of the Forms 10-Q and 10-K set forth in the FAC (¶¶74, 81, 86, 92, 100, 106, 113, 119, 125, 132, 146, 154, 161, 172, 178-79, 188, 196), which were signed by defendants Sheehan and Spinney, are attributable to these individual defendants. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 767 (S.D.N.Y. 2001).

Further, as to defendants' liability for statements made during conference calls (¶¶103, 110-11, 117, 129, 137, 158, 165, 170, 186, 195, 201), whether a particular sentence during the conference calls was uttered by one of the individual defendants or another, all are still liable. The speaker is liable for the false statement made with scienter. And the other defendants – who sat by silently – are liable for an omission in failing to correct the falsehood. *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000). Defendants Sheehan, Spinney and Rogers participated in IFIN's conference calls. ¶¶103, 110-11, 117, 129, 137, 158, 165, 170, 186, 195, 201. In any case, "a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements. If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context." *Intervoice*, 409 F.3d at 656. Indeed, evidence of silence may be admitted as "an adoptive admission." *United States v. Henke*, 222 F.3d 633, 642 (9th Cir. 2000).

- 18 -

As to IFIN's liability, where the statements were made by those authorized to make them, courts will treat "the particular complained of statements in the SEC filings, reports and releases" issued in IFIN's name as "having been made by" the Company. *Makor*, 513 F.3d at 708 (a corporation is liable for statements by those authorized to make them); *Sloman*, 2007 U.S. Dist. LEXIS 69475, at *27; *see also Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 365 (5th Cir. 2004). Thus, plaintiffs need not show which of the individual defendants made the particular statements for purposes of alleging IFIN's primary liability for violations of §10(b). By identifying the statements issued in IFIN's name and then describing in great detail that these statements are false and misleading for the same reasons as those statements attributed to certain defendants' herein, the FAC meets the requirements of the PSLRA and the First Circuit.

Defendants again do not contest that the FAC sufficiently pleads the falsity of IFIN's financial statements filed between 1Q 2001 and 2Q 2004. Indeed, defendants cannot challenge the falsity of IFIN's financial statements because the Company restated 1Q 2001 through 2Q 2004 financial results, admitting that they were false when originally filed. Restatements are admissions that facts existed and were available at the time of the filing of the original financial statements which contradicted those financial statements. *See In re Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873 (N.D. Ohio 2006) ("'By definition . . . a restatement says that the prior financial statement was false.'") (citing *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004)); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("the mere fact that the [financial] statements were restated at all supports . . . an inference" of falsity); SEC Regulation S-X, 17 C.F.R. §§210.1-02(a)(2), 249.308a, 210.4-01(a)(1) ("[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate").

The Report and Recommendation found that the Complaint failed to state a claim because the Company made its revenue EPS number even with the restated numbers. Report and Recommendation at 23, 33-34. In both cases cited by the Court, the claims involved allegations that the Company simply missed its growth targets and because the numbers were "not far off the mark" no claim was stated. Report and Recommendation at 33. Here, by contrast, the scheme involved not only the reported numbers, but defendants' use and misuse of fraudulent accounting. By improperly using the prospective method, defendants were able to mislead the market into believing and valuing IFIN based on its net interest income when the proper accounting method would have required IFIN to take a substantial charge to earnings that would have accurately disclosed the adjustments to the portfolio yields and would have informed and provided the market with material information about the Company's securities. As Judge Posner observed in *Markor*:

> Prompt disclosure of the truth would have caused Tellabs's stock price to plummet, as it did when the truth came out a couple of months later. Suppose the situation had corrected itself. Still, investors would have discovered that the stock was more volatile than they thought, and risk-averse investors (who predominate) do not like volatility and so, unless it can be diversified away, demand compensation in the form of a lower price; consequently the stock might not recover to its previous level. The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.

*Markor*, 513 F.3d at 710.

Indeed, by not disclosing the truth, defendants avoided the potential decline, or at a minimum, the volatility that a substantial write down was certain to cause. Then, when they could (and ultimately did), they corrected the error when it was to their advantage. ¶238. Moreover, when viewed as part of an overall scheme to defraud the market, defendants' insider sales, and "spring-loaded options," provide additional evidence of the scheme.

The FAC also makes clear that defendants' stock sales during the Class Period further support both the fraudulent scheme alleged and defendants' scienter. ¶287. Every defendant at the

Company through 2005, except Spinney (who, as CFO, was principally responsible for the Company's financial reports) made the vast majority of their sales before the Company's decision to restate its financial results in October 2004: Sheehan ($27,474,544; 63%); Rogers ($3,533,311; 100%); Robert D. Mancuso ($5,817,191; 58%); Edmund J. Maroney ($8,790,691; 92%); and John E. Henry ($2,455,121; 100%). Thus, while the fraud alleged is not the kind that is "ordinarily pled," Defs' Mem. at 5, the FAC nevertheless alleges actionable misconduct and the motion to dismiss should be denied.

### C.  Plaintiffs Have Pled a Strong Inference of Scienter Against All Defendants

In the First Circuit, scienter is determined by "'analyz[ing] the particular facts alleged in each individual case.'" *Aldridge*, 284 F.3d at 82. A "plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter. As part of the mix of facts, the plaintiff may allege that the defendants had the motive ('concrete benefits that could be realized by . . . the false statements and wrongful nondisclosures') and opportunity ('the means and likely prospect of achieving concrete benefits by the means alleged') to commit the fraud." *Id.* As before, the complaint is viewed "holistically" for evidence of conscious wrongdoing, which may provide the "something more" necessary to prove scienter. *Cabletron*, 311 F.3d at 39.

The First Circuit has recognized that significant GAAP violations also "could provide evidence of scienter." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999). "[A]ccounting shenanigans" are among the characteristic types of circumstances which may demonstrate scienter for securities fraud." *See Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001). Here, defendants' accounting violations throughout the Class Period were extensive and involved a core area from 2001-2004. Such particularized allegations of large-scale fraudulent practices over time and such circumstances make a strong inference of scienter difficult to escape.

- 21 -

The FAC, based on confidential sources, duration and scope of GAAP violations, lack of internal control, fraudulent financial reporting, dramatic bonus increase and extensive insider stock sales clearly raise a strong influence of scienter against defendants.

> **1.    Defendants Had Actual Knowledge of Prepayments on the Company's Debt Securities and Falsely Reported Its Financial Results Misleading the Market Throughout the Class Period**

Defendants' knowledge of Investors Financial's true financial condition was gained, in part, through participation in the Company's twice monthly ALCO meetings which were expressly tasked with providing "sustainable net interest revenue under various economic conditions." ¶¶68-76. Defendants Sheehan, Rogers, Spinney and Keenan served at various times on ALCO and not only had access to, but reviewed the Company's investments. ¶68.

In the Report and Recommendation, the Court concluded that plaintiffs had sought to raise a strong inference of scienter by virtue of defendants' positions and status within the Company. Report and Recommendation at 44. But as the FAC makes clear, however, it was their participation in connection with ALCO, and their actual review of that information, that raises the strong inference of scienter. Indeed, given the importance of managing and monitoring IFIN's investments, there is little doubt that defendants would be and were aware of the status of those investments and the impact of prepayments. As the *Markor* court noted, in evaluating defendants' scienter regarding false projections relating to major product lines at Tellabs, "that no member of the company's senior management who was involved in authorizing or making public statements about the demand for [its major products] and knew that they were false is very hard to credit." *Markor*, 513 F.3d at 709. Here, the FAC alleges that defendants were actually involved with IFIN's major product – its investment income.

As the FAC alleges, as interest rates dropped, IFIN began to experience substantial prepayments on its MBS and SBA securities. Recognizing that properly reporting these results

would inform the market that recovery of the amortized premium on IFIN's investments was in question, defendants sought to conceal the prepayments and avoid the impact on the Company. Circumstantial evidence throughout the class period also supports defendants' scienter. *Sloman*, 2007 U.S. Dist. LEXIS 69475, at \*7 (circumstantial evidence will support scienter).

Beginning in 2002, the Company stopped reporting its interim contractual maturity holdings, thereby preventing the market from gauging the Company's prepayment rate. ¶¶55-57. Similarly, by improperly classifying the SBA securities as HTM, defendants further misled the market into believing that payments were not significant. In addition, the FAC specifically plead that corroborating witnesses reported that IBT was a "dictatorship of two partners" (CW1) and that Sheehan and Spinney "called the shots" concerning IBT's operations (CW3). ¶317; *see Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232-34 (9th Cir. 2004) (scienter found where top management closely monitored realtime sales database and had a "detail-oriented" management style). Moreover, CW1 reported that although IBT's Treasurer H.C. Sylvester recommended the categories of investments for IBT, defendant Rogers decided on the specific asset and the dollar amount to be invested. ¶317. Furthermore, CW2 reported that Sheehan was the "architect" of the SBA bond investment program and understood the marketplace because of his experience as a former executive with the Bank of England, which did a substantial amount of business in SBA bonds. ¶25.

Thus, it is clear that Sheehan and Rogers actually knew about the extensive prepayments, both directly from CW1 and as a result of their actions at the Company, and yet they continued to mislead the market about IFIN's financial results and its prospects. ¶57. At a minimum, defendants acted in reckless disregard of the facts known to them and thus scienter is adequately pled under *Tellabs* and *Cabletron*.

Moreover, defendants were at all times under a duty to speak truthfully. As such, "evidence of conscious wrongdoing . . . may provide the 'something more' necessary to prove scienter." *Cabletron*, 311 F.3d at 39. "[T]he fact that the defendants published statements when they knew facts suggest the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge*, 284 F.3d at 83 (citing *Fla. State Bd. of Admin.*, 270 F.3d at 665 (collecting cases)). Here, defendants' repeated statements concerning IFIN's net interest income, as well as its growth, clearly violated defendants' duty to speak truthfully, yet throughout the Class Period they repeatedly misrepresented IFIN's financial results.

### 2. Defendants' Suspicious, Unusual and Substantial Stock Sales of More than $68.1 Million Support a Strong Inference of Scienter

The FAC details that defendants' stock sales were well timed to take advantage of the artificial inflation in the stock, caused by the reporting of false financials that concealed and misrepresented the Company's true financial condition, by unloading more than 1.7 million shares and pocketing $68.1 million in profits, an amount higher than the Company's 2001 or 2002 reported earnings of $44.6 million and $67.4 million, respectively. ¶¶77, 278-79. Here, all defendants made the vast majority of their sales before the decision to restate. It has long been held that "stock sales by insiders can add to evidence of scienter." *Aldridge*, 284 F.3d at 72; *Cabletron*, 311 F.3d at 39-40. Insider sales of stock may be evidence of scienter where, as here, the trades are unusual or suspicious in timing or amount. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). Here, moreover, all defendants sold the vast majority of their stock while issuing false financial results. *See* ¶¶278-79 (defendants made between 58% and 100% of their Class Period sales before the restatement).

Indeed, the timing of defendants' specific stock sales was both extraordinary and suspicious, as defendants sold large amounts of Investors Financial stock in 2001 and 2002 immediately after defendants issued false positive statements that overstated net interest income by $8.4 million in

2001 and $2.3 million in 2002.  For example, after reporting the false net interest income for both 1Q

2001 and 2Q 2001, the stock price increased substantially, and defendants sold a total of 457,680

shares and took in proceeds of more than $17.2 million.  *Id*.  Insider sales in close temporal

proximity to false positive statements are indicative of scienter.  *In re Xerox Corp. Sec. Litig.*, 165 F.

Supp. 2d 208, 222 (D. Conn. 2001); *see Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85-86 (2d

Cir. 1999) (sale of officers' stock in proximity to allegedly false optimistic statements was

significant to issue of whether sales were unusual and suspicious).  Similarly, in 2002, defendants

also sold large amounts of Investors Financial stock after issuing false positive financial statements,

dumping a total of 647,344 shares taking in proceeds of $24.3 million.  Indeed, defendants' stock

sales in 2001 and 2002 represent over 64% of defendants' Class Period sales with defendants taking

in proceeds of more than $41.5 million (61% of total proceeds).  ¶236.

The magnitude of defendants' selling is also suspicious.  Specifically, Maroney sold 63% of

his stock holdings for $8.7 million; Henry sold 55% of his stock holdings for $2.4 million; Mancuso

sold 52% of his stock holdings for $9.9 million; Sheehan sold 51% of his stock holdings for $38.9

million; Keenan sold 39% of her stock holdings for $4.4 million; Rogers sold 8% of his stock

holdings for $3.5 million; and Spinney sold 1.8% of his stock holdings for $5,472.  These sales were

made as defendants were misleading the market about Investors Financial's results and prospects.

The strong inference of scienter evidenced by defendants' insider trading during the Class

Period is not precluded by the length of the Class Period.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d

1079 (9th Cir. 2002), relied on by defendants, merely held that the length of the class period weighed

against a finding of scienter because in that particular case plaintiffs failed to support an inference of

fraud throughout the entire class period, and adopted a long class period for the sole purpose of

"sweep[ing] as many stock sales into their totals as possible."  *Id*. at 1092.  Here, unlike in *Vantive*,

plaintiffs do not extend the Class Period for the sole purpose of increasing the amount of defendants'

stock sales. Rather, the length of the Class Period is co-extensive with the financial fraud.

Similarly, defendants' other arguments such  that "four of the seven" defendants sold no

stock between the issuance of the 2005 guidance and the subsequent July 2005 guidance revision and

that "six of seven" defendants sold no stock in the second quarter are entirely misplaced.  Defs'

Mem. at 17-19.  The critical dates are in the restatement – when defendants began to reveal the

fraud.  It was after the disclosure that IFIN's net interest income would decline and the stock price

would weaken.

Likewise, defendants' argument that the purported existence of Rule 10(b)5-1 plans renders

some of the insiders sales as non-unusual as a matter of law is wholly misplaced on a motion to

dismiss, as such plans merely offer defendants an affirmative defense under which defendants have

the burden of proving that the plans meet all of the requirements under the regulation.  17 C.F.R.

§240.10b5-1(c) ("Affirmative defenses").

### 3.    Defendants' Dramatic Increase in Their Eligible Bonuses for 2004 Further Supports a Strong Inference of Scienter

Defendants' scienter may also be inferred from defendants' November 2003 dramatic

increase to their bonus structure for fiscal year 2004 – that occurred shortly after the SEC's Final

Rule on Management's Reports on Internal Control Over Financial Reporting and Certification of

Disclosure in Exchange Act Periodic Reports ("SEC Final Rule") was issued on June 5, 2003 and

came into effect on August 14, 2003.

In November 2003, defendants increased their eligible bonuses from 100%-125%, up to

265% of their annual base pay if the 2004 GAAP earnings per share equaled the minimum target,

and increased the eligible bonuses from 225% to 325% of their annual base pay if the GAAP 2004

earnings exceeded the minimum target.  ¶¶279-80.  The facts above convincingly demonstrate, not

only that defendants knew they would restate their financial numbers due to the lack of internal control over financial reporting, but that they knew that the previously shifted net interest income losses experienced in 2001-2002 that were pushed forward into 2003-2004 would be removed by restating 2001-2002 income creating record earnings and bonuses for 2004. Thus, the 50% earnings growth in 2004 came as no surprise and Sheehan, Rogers, Maroney and Spinney took home record bonuses of 325% of their annual base pay, receiving more than $8 million in bonuses. *Id.* "'[T]he magnitude of [an executive's] compensation package, together with the timing coincidence of an overstatement of earnings at just the right time to benefit [the executive], provides an unusual, heightened showing of motive to commit fraud.'" *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 128 (D. Mass. 2003) (citing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001)); *see City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468, 501, 504 (6th Cir. 2004) (pocketing huge bonuses is one helpful factor to establish scienter).

Defendants argue that plaintiffs' insider trading and bonus allegations make no sense because Investors Financial actually revised upward its net interest income and net operating revenues for 2003 and the first three quarters of 2004 and that "[n]o officer or director intent on selling stock or obtaining a higher incentive-based bonus would intentionally understate financial results, artificially deflating the Company's stock, for the purpose of selling his or her shares at depressed prices or receiving a lower bonus payment." Defs' Mem. at 32. Defendants are wrong, as the FAC makes clear: Throughout the Class Period, defendants knew that the yields on their portfolio were declining as a result of prepayments. Indeed, the largest adjustment was in 2001, when the Class Period began and defendants sold large quantities of stock. By failing to properly report the Company's financial results, defendants were able to maintain the illusion that IFIN's net interest income would continue

to grow – but the erosion of the future income stream, as they know, was inevitable. Thus, by choosing to restate when they did, through changing the accounting from the prospective method to the (proper) retrospective method, defendants got to have their cake, and they got to eat it too. By initially shifting net interest income losses experienced in 2001-2002 forward into 2003-2004, defendants were able to take home and keep large bonuses in 2001, 2002 and 2003 before deciding to restate their financials, removing previously pushed forward expenses, to achieve 50% earnings growth in 2004. In total, while the Company's financials were misstated and its stock price artificially inflated, defendants made huge profits on insider stock sales, received more than $8.6 million in salary and more than $21.8 million in incentive bonuses that ranged from 150%-325% of their annual salaries, receiving more than $30.4 million in total compensation for 2001-2004 by not disclosing the problems and risks associated with the Company's MBS and SBA securities.

### D.  Defendants' False Statements Are Not Entitled to Safe Harbor Protection

#### 1.  Defendants Cannot Use Cautionary Language to Protect Themselves When They Made Material Misrepresentations with Actual Knowledge that They Were False and Misleading

Defendants' forward looking statements are not protected by the safe harbor because, as discussed previously, defendants made the material misrepresentations with actual knowledge that they were false and misleading. *No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 937 n.15 (9th Cir. 2003) ("it is arguable that a strong inference of actual knowledge has been raised, thus, excepting these statements from the safe harbor rule altogether"); *see In re See Beyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165 (C.D. Cal. 2003) ("If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons

why it is false or misleading."); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

This case is substantially similar, if not more compelling, than *Asher v. Baxter Int'l.*, No. 02 C 5608, 2005 U.S. Dist. LEXIS 2131, at *17 (N.D. Ill. Feb. 3, 2005). There, the district court comprehensively reviewed the factors that determine whether a complaint alleges actual knowledge that a projection is made without reasonable basis. In *Baxter*, defendants had assured the market that the company would meet its 2002 projections of "sales growth in the mid-teens" despite the fact that it would discontinue its dialysis machinery, one of its major product lines. On the last day of the class period, the company announced a growth rate of 8% which was substantially less than predicted. The complaint alleged that the numbers were the result of a 1% decline in the sales in Baxter's Renal Division, which accounted for 25% of the company's total sales. *Id.* at *6-8. When the results were announced, the stock dropped by 25%. *Id.* Defendants moved to dismiss on the grounds that the complaint failed to adequately allege that defendants had "actual knowledge" that the projections were misleading. *Id.* at *24. The court denied the motion stating:

> This decision is based on Plaintiffs' allegations that: (1) the Individual Defendants had information which called into doubt the Commitments in the Public Statements; (2) nine of the eleven Defendants financially benefited from the false information by selling off substantial portions of their Baxter stock during the Class period at much higher prices than if the non-disclosed information had been released; and (3) Baxter was able to acquire Fusion at a much lower cost at the artificially high stock price.

The court found that as top managers, defendants had access to information that contradicted the company's rosy prediction. *Id.* In particular, because the Renal Division was so important to Baxter's sales, its top managers would necessarily be aware of them. *Id.* Knowledge of problems with the sale of dialysis products would have been particularly telling because the Renal Division's

sales accounted for 25% of Baxter's total sales the previous year. Thus, any problems with sales this year would no doubt have been recognized as having a negative effect on Baxter's overall sales numbers. *See Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 939 (1999) ("Problems readily recognized by an outsider can be presumed to be known to a company's management.").

Here, the evidence is even more dramatic. The FAC establishes that defendants not only had access to, but actually reviewed and analyzed the information that made their public statements false and misleading. IFIN's investment portfolio, responsible for as much as 30% of its net income, was a critical component of the market's evaluation of the Company and defendants had the incentive and obligation to learn and did learn that IFIN's net interest income was declining as a result of extensive prepayments. In fact, here, when the full effect of the prepayments was made known to the market in July 2005, IFIN's stock price declined precipitously. In short, the FAC establishes that defendants not only had access to the information but they actually knew it and misrepresented it to the market.

### 2.     Because They Had Actual Knowledge, Defendants' Disclaimers Are Insufficient to Invoke Safe Harbor Protection

Defendants insist that their risk disclosures provide safe harbor protection under the PSLRA. In order to invoke the PSLRA's safe harbor, the statement at issue must be: (i) forward looking; (ii) identified as such; and (iii) accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements. 15 U.S.C. §78u-5(c)(1). *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727 (7th Cir. 2004), noted that it is improper to resolve the factual issue of what constitutes "meaningful cautionary statements" on a motion to dismiss before plaintiffs have access to discovery so that a court can determine whether "the items mentioned in [defendant's] cautionary language were those that at the time were the (or any of the) 'important' sources of variance." *Id.* at 730, 734.

As noted, because defendants knew that they were reporting false financial results throughout the Class Period, the warnings were not and could not be meaningful. Accordingly, such statements are neither "detailed" nor "specific," and do not address the known facts that were actually known to defendants. Where, as here, defendants have been shown to actually know their statement are false, such "[v]ague or boilerplate disclaimers are insufficient to invoke safe harbor protection." *In re Amylin Pharm., Inc. Sec. Litig.*, No. 01 cv 1455 BTM (NLS), 2003 U.S. Dist. LEXIS 7667, at *20 (S.D. Cal. May 1, 2003).

### E.   Plaintiffs More than Adequately Plead Loss Causation Under the Controlling Authority of *Dura*

The gravamen of the FAC is that defendants knowingly or recklessly falsely reported IFIN's financial results – particularly its net interest income – thereby presenting a misleading picture of the Company's financial results, net interest income, net income and earnings. ¶296. The FAC alleges that it was this accounting misrepresentation that caused IFIN's stock to trade at inflated prices, and that when the truth began to leak into the market – that is that IFIN's accounting had violated GAAP – and the market learned that it had been subject to extensive prepayments, the artificial inflation caused by the misrepresentation came out of the stock and caused plaintiffs and the Class to suffer economic losses. *See*, *e.g.*, ¶299-301.

The FAC details how and when the market reacted to this news – when the Company admitted that it had to restate because its financial statements had been reported under the wrong accounting method, the stock price declined 16% in one day on nearly 14 times the previous day's trading volume. ¶300. When on July 14, 2005, IFIN announced that its net interest income would be flat compared to 2Q 2004 and that the Company was revising its overall EPS guidance by 15%, the Company's stock price declined by 18%, this time on trading volume six times that of the prior trading day. ¶305. The price reactions to these disclosure was thus Company-specific and directly

related to the negative disclosure relating to IFIN's the financial results – particularly its net interest income. Although the artificial inflation came out of the stock as the market learned of the truth of IFIN's business and prospects, on August 9, 2005, defendants finally explained what the market had already figured out – that the decline in net interest income was the result of prepayments – including those of the SBA portfolio.

As before, defendants' seize on the statement that there was no specific disclosure of the SBA prepayment and, therefore, there can be no losses caused from that disclosure. This argument, however, should be rejected for at least two reasons. First, the fraud alleged in the FAC, and the disclosures, which caused plaintiffs' losses, concerned defendants' misstatements and omissions regarding accounting for, and reporting of the Company's net interest income on it bond investments. That the specific manner in which defendants committed this fraud was revealed is not pled in the Complaint, was not required by *Dura* or the cases that have considered its application since.

*Dura* holds that, at the pleading stage, all a plaintiff needs to do is "provide a defendant with ***some indication*** of the loss and the causal connection that the plaintiff has in mind."[7] *Dura Pharm.,*

---

[7]    It is clear that Fed. R. Civ. P. 8(a)(2) governs the scope of loss causation allegations under the Exchange Act, and requires only a short and plain statement of such allegations. *In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1021 (S.D. Cal. 2006) ("The Supreme Court's decision did not create a heightened pleading standard for loss causation: the Court noted its holding did not affect Rule 8(a)(2)'s applicability."). District courts, including those in this district, have applied Fed. R. Civ. P. 8 to loss causation allegations similar to those here. *See, e.g.*, *Wojtunik v. Kealy*, No. CV-03-2161-PHX-PGR, 2006 U.S. Dist. LEXIS 73448, at *11 (D. Ariz. Sept. 30, 2006) (Judge Rosenblatt held that "[w]hile loss causation is a basic element of a § 10(b) claim, it need only be alleged so as to meet the 'fair notice' requirement of Fed. R. Civ. P. 8(a)(2)."); *accord*, *In re Openwave Sys. Sec. Litig.*, No. 07 Civ. 1309 (DLC), 2007 WL 3224584, at *13 (S.D.N.Y. Oct. 31, 2007) (complaint alleged "series of Openwave announcements publicizing investigations into the backdating scheme and, eventually, the resultant restatement of the company's finances, and avers that these disclosures led to temporally proximate drops in the price of Openwave stock"); *In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2005 WL 1867717, at *5 (N.D. Cal. July 29, 2005)

*Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The loss causation requirement is "not meant to impose a great burden upon a plaintiff" and simply requires a plaintiff to provide a short and plain statement in accordance with Fed. R. Civ. P. 8(a)(2) setting forth what the relevant loss "***might be***" and "what the causal connection ***might be*** between" plaintiff's loss and defendants' misconduct. *Id*.[8]

For example, in *In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005), the Ninth Circuit, interpreting *Dura*, held that loss causation is adequately pled where plaintiff gave "***some indication***" that the drop in the company's stock price was "causally related" to the company's practice of prematurely recognizing revenue before it was earned. *Daou*, 411 F.3d at 1026. Not only was that deemed sufficient to allege loss causation, but the court also noted that "plaintiff is not required to show 'that a misrepresentation was the ***sole*** reason for the investment's decline in value' in order to establish loss causation." *Id*. at 1025 (emphasis in original).

### 1.   Plaintiffs Plead More than the "Some Connection" Between the Fraud and a Decline in IFIN's Stock Price Required by *Dura*

Defendants nevertheless argue that the FAC fails to connect a decline in stock price to a disclosure, *i.e.*, "between the alleged accounting fraud of which it complains and any drop in IFIN's stock price." Defs' Mem. at 17. But that is simply not true. The FAC alleges how and why the partial disclosures of defendants' fraudulent accounting caused plaintiffs' losses.

---

(finding loss causation where plaintiffs allege, simply: "Plaintiffs purchased Omnivision securities at artificially inflated prices and suffered damages when revelation of the true facts caused a decline in the value of their investments").

[8]     In *Dura*, plaintiff attempted to allege economic harm ***merely by virtue of price inflation*** caused by fraud. *Id*. Addressing the narrow question of whether an "allegation of purchase price inflation ***alone***" (*id*.) sufficiently pleads loss causation, the "Supreme Court held that an allegation of an inflated purchase price alone is insufficient to plead loss causation." *In re St. Paul Travelers Sec. Litig. II*, No. 04-4697 (JRT/FNS), 2006 U.S. Dist. LEXIS 70261, at *14 (D. Minn. Sept. 25, 2006).

During the Class Period (prior to the restatement), the Company improperly used the "prospective" method of accounting for its SBA and MBS securities despite the fact that under GAAP this method was clearly not appropriate. Under this method, defendants were able to estimate IFIN's prepayments. The "retrospective" method includes taking "catch-up" adjustments that signal to investors what the difference is between the Company's original estimates of prepayments versus the actual prepayment experience. Accordingly, this allows for increased disclosures re: prepayments and provides for a "level-yield" over the life of the security which properly reports the return rather than the ever-decreasing yields due to prepayments and improper disclosures. By manipulating the accounting for IFIN's net interest income, defendants were able to convince the market and its investors that its reported net interest income was in excess of its projections and that there was little or no risk of loss of that income from prepayments; accordingly, the market (over)valued IFIN stock accordingly. When, in October 2004, defendants revealed that IFIN's financial reports were the product of improper accounting, which had had the effect of hiding extensive prepayments, the stock price declined. When, in July of 2005, defendants revealed that IFIN's net interest income was flat and defendants reduced guidance by 15%, the stock again declined. It was this announcement that caused the loss.

With these and other similar revelations leaking the truth about defendants' fraud, the market clearly understood that there were serious problems with IFIN's accounting for its net interest income from its bond portfolio – the heart of plaintiffs' allegations. That defendants chose not to admit that they had been committing fraud by manipulating its accounting is simply not required. *See Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.C. 2006) ("Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize

themselves with a protracted series of partial disclosures."). Thus, the losses are directly related to the misconduct alleged and more than adequately plead loss causation in accord with *Dura*.

By July 14, 2005, IFIN's second quarter had been closed for two weeks and defendants necessarily already knew that prepayments had increased which caused a reduction in guidance. *See*, *e.g.*, *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1211 (1st Cir. 1996) (it was proper to infer that defendants knew of a substantial write-down 11 days **before** the quarter end). That defendants chose to attribute the reductions to a "flattening yield curve" in the press release, and then to come clean and explain the reason for the decline in net interest income was "the combination of heightened prepayment experience and, more significantly, reduced reinvestment opportunities to continue to pressure our net interest income for the remainder of 2005," ¶272, in an SEC filing does not diminish the impact on the damage caused by the revelation in July 2005. If anything, it adds to it. *See In re Dura Pharm.*, 452 F. Supp. 2d at 1025. Additionally, such disclosures provide additional evidence of defendants' scienter in connection with the overall scheme to mislead the market. Accordingly, defendants' motion to dismiss the Complaint on the grounds that it failed to satisfy Fed. R. Civ. P. 8 pleading requirements of *Dura* should be denied.

## V.     PLAINTIFFS HAVE ADEQUATELY PLED A §20(a) CLAIM

The elements necessary to establish §20(a) "control person" liability "are generally stated to be (i) an underlying violation of the same chapter of the securities laws by the control entity, . . . and (ii) control of the primary violator by the defendant." *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 360 (D.N.H. 2006) (citing *Stone & Webster*, 414 F.3d at 194 n.3 (citing 15 U.S.C. §78t(a) and citing *Aldridge*, 284 F.3d at 84-85)). The "term 'control' . . . means under the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *StockerYale*, 453 F. Supp. 2d at 360-61 (citing 17 C.F.R, §240.12b-2). Under §20(a), plaintiff is neither required to

- 35 -

plead nor prove scienter (or any other state of mind) on the part of the controlling persons named as a defendant. *StockerYale*, 453 F. Supp. 2d at 360 (citing *Stone & Webster*, 414 F.3d at 194).

Defendants do not contest that they are control persons. They assert only that the §20(a) claim must be dismissed solely on the grounds that plaintiffs have failed to properly plead a §10(b) predicate for the §20(a) claim. Defs' Mem. at 43. As demonstrated above, plaintiffs have properly pled a §10(b) predicate. As such, the §20(a) claim should be sustained as well.

## VI.    LEAVE TO AMEND

Plaintiffs believe that the FAC satisfies PSLRA pleading standards and cures the defects in the earlier complaint found by Magistrate Judge Dein. Should the Court nevertheless conclude that the FAC is deficient in any respect, plaintiffs respectfully request the opportunity to amend. "[L]eave [to amend] shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Supreme Court had indicated that this "liberal amendment policy of Rule 15(a) is a mandate to be heeded." *Pyramid Co. of Holyoke v. Homeplace Stores Two, Inc.*, 175 F.R.D. 415, 417 (D. Mass. 1997). In *ACA*, the First Circuit recently reaffirmed the liberal amendment policies of Fed. R. Civ. P. 15(a). *ACA*, 512 F.3d 46. Accordingly, plaintiffs request the opportunity to be permitted to cure any defects that might remain.

## VII.    CONCLUSION

For all the foregoing reasons, defendants' motion to dismiss should be denied in its entirety.

### REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), plaintiffs request oral argument on their opposition to defendants' motion to dismiss consolidated complaint.

DATED: March 25, 2008                    Respectfully submitted,

                                         COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
                                         JEFFREY W. LAWRENCE


                                         _____
                                                     /s/ Jeffrey W. Lawrence
                                                  JEFFREY W. LAWRENCE

                                         100 Pine Street, Suite 2600
                                         San Francisco, CA  94111
                                         Telephone:  415/288-4545
                                         415/288-4534 (fax)

                                         Lead Counsel for Plaintiffs

                                         KRAKOW & SOURIS, LLC
                                         AARON D. KRAKOW (BBO No. 544424)
                                         CHRISTOPHER N. SOURIS (BBO No. 556343)
                                         225 Friend Street
                                         Boston, MA  02114
                                         Telephone:  617/723-8440
                                         617/723-8443 (fax)

                                         Liaison Counsel

                                         CAVANAGH & O'HARA
                                         WILLIAM K. CAVANAGH, JR.
                                         407 East Adams Street
                                         Springfield, IL  62701
                                         Telephone:  217/544-1771
                                         217/544-9894 (fax)

                                         SUGARMAN & SUSSKIND
                                         ROBERT SUGARMAN
                                         2801 Ponce De Leon Blvd., Suite 750
                                         Coral Gables, FL  33314
                                         Telephone:  305/529-2801
                                         305/447-8115 (fax)

                                         Additional Counsel for Plaintiffs

T:\CasesSF\InvestorsFinancialServices\OMD00050086.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 28, 2008.

/s/ Jeffrey W. Lawrence
JEFFREY W. LAWRENCE

COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail:jlawrence@csgrr.com

# Mailing Information for a Case 1:05-cv-11627-RCL

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Joel Z. Eigerman**
  joel@eigerman.com

- **Jason D. Frank**
  jason.frank@bingham.com

- **William R. Harb**
  william.Harb@bingham.com

- **Jordan D. Hershman**
  jordan.hershman@bingham.com

- **Alan L. Kovacs**
  alankovacs@yahoo.com

- **Jeffrey W. Lawrence**
  jeffreyl@lcsr.com

- **James Paul Lucking**
  james.lucking@Bingham.com

- **James W. Oliver**
  e_file_sf@lerachlaw.com,e_file_sd@lerachlaw.com,GDarwish@csgrr.com

- **David Pastor**
  dpastor@gilmanpastor.com,rdambrosio@gilmanpastor.com

- **Thomas G. Shapiro**
  tshapiro@shulaw.com,sgeresy@shulaw.com

- **Christopher N. Souris**
  csouris@krakowsouris.com

- **Marc A. Topaz**
  ecf_filings@sbtklaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Pavel Bespalko**

```
Law Office of Joel Eigerman
50 Congress Street
Suite 200
Boston, MA 02109
```